1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12796-reg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


FLETCHER INTERNATIONAL, LTD.,


            Debtor.


- - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                October 2, 2013

                10:01 AM


B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

1

2  Doc# 277 Motion for Protective Order - Discovery Dispute

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20  Transcribed by:  Penina Wolicki

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

1

2  A P P E A R A N C E S :

3  LUSKIN, STERN & EISLER LLP

4          Attorneys for Chapter 11 Trustee

5          Eleven Times Square

6          New York, NY 10036

7

8  BY:   STEPHAN E. HORNUNG, ESQ.

9

10

11  UNITED STATES SECURITIES AND EXCHANGE COMMISSION

12          3 World Financial Center

13          New York, NY 10281

14

15  BY:   NEAL JACOBSON, ESQ.

16

17

18  SHER TREMONTE LLP

19          Fletcher Asset Management

20          80 Broad Street

21          Suite 1301

22          New York, NY 10004

23

24  BY:   MICHAEL TREMONTE, ESQ.

25          MARK CUCCARO, ESQ.

1

2    PORZIO BROMBERG & NEWMAN P.C.

3        100 Southgate Parkway

4        Morristown, NJ 07962

5

6    BY:   WARREN J. MARTIN, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S
2              THE COURT:  Let me get appearances, and then I have a
3    couple of preliminary comments.
4              MR. TREMONTE:  Good morning, Your Honor.  Michael
5    Tremonte and -- that's T-R-E-M-O-N-T-E and Mark Cuccaro
6    C-U-C-C-A-R-O, Sher Tremonte for Fletcher Asset Management.
7              THE COURT:  Okay.
8              MR. JACOBSON:  Your Honor, Neal Jacobson on behalf of
9    the Securities and Exchange Commission.
10             THE COURT:  And the SEC, unlike the U.S. Trustee
11   program, still has the ability to work today?
12             MR. JACOBSON:  We're told that we probably have a few
13   weeks.
14             THE COURT:  Okay.
15             MR. JACOBSON:  Thank you.
16             MR. HORNUNG:  Good morning, Your Honor.  Stephan
17   Hornung, from Luskin, Stern & Eisler, on behalf of the Chapter
18   11 Trustee,
19             THE COURT:  Right, thank you, Mr. Hornung.
20             All right.  Gentlemen, I've read the papers, and I
21   don't want you to repeat them.  I do want to hear from you, Mr.
22   Tremonte, as to whether it's disputed, as I gather from the
23   SEC's papers, that your client designated every single one of
24   the documents that it had produced to the Fletcher
25   International trustee, as confidential.  And -- I guess this is

1   a compound question; after you've answered the first, answer

2   the second -- whether it's your position that your doing that

3   immunizes all of those documents from production by the

4   Fletcher International trustee, in contrast to what I would

5   have read that stip that I so ordered to be, to be simply

6   giving you an initial level of protection after which you have

7   to show why any such designation would be binding on a court

8   like me.

9          I also need you to focus on your remarks on the extent

10  of what I'll call and what the case law calls justifiable

11  reliance for the belief that by handing those documents over to

12  the Chapter 11 trustee, you could have expected that they would

13  be protected from disclosure.  Mr. Tremonte, I'll hear from you

14  first.

15         MR. TREMONTE:  Yes, Your Honor.

16         THE COURT:  Main lectern, if you will, please.

17         MR. TREMONTE:  Thank you, Your Honor.  Let me address

18  each of the Court's inquiries in turn.

19         With respect to the confidentiality designation of the

20  documents at issue, the answer is simply yes.  There is an

21  agreement in place between FAM -- Fletcher Asset Management,

22  which I'll refer to as FAM -- and counsel for the trustee, that

23  for the purposes of the conduct of discovery to date, all of

24  the documents that were -- that made their way into the

25  possession of the trustee from what we refer to as the e-mail

1   server, satisfy, in fact, the definition of confidential

2   information which is memorialized in the protective order.

3          Now, that agreement was not taken willy-nilly without

4   some reflection and some thoughtfulness on the part of either

5   FAM or the trustee.  And I would direct the Court to --

6          THE COURT:  What's FAM -- I don't know if you were in

7   the courtroom on any of the many times I've said that I can't

8   live with acronyms.

9          MR. TREMONTE:  I'm sorry, Your Honor.  I was not.  I

10  was not aware of that.  Fletcher Asset Management, and I will

11  refer to it as such going forward.

12         The confidential information definition in Section 1

13  of the protective order is quite broad, and it includes,

14  without limitation, "information" -- and I'm reading from a

15  protective order -- "concerning the disclosing parties' assets,

16  liabilities, business operations, business practices, business

17  plans, financial projections, financial and business analysis,

18  corporate governance, et cetera."

19         We've spent a great deal of time examining each

20  document individually in the course of our review.  I know that

21  the lawyers for the trustee have also spent a tremendous amount

22  of time with these documents.  And so to the extent that we

23  have arrived in agreement that those documents from the e-mail

24  server should be designated confidential, it is a considered

25  decision.  They all, in fact, satisfy the definition.  These

1  are not e-mails about family or sports or about redecorating

2  the office.  These are all highly detailed conversations

3  between principals of Fletcher Asset Management, of the debtor,

4  Fletcher International Limited Bermuda, and other affiliates of

5  the debtor.

6          And so this is not a situation which you do find in

7  some of -- in some of the cases.  And I want to be very, very

8  careful here.  There are really two categories of Martindell

9  cases.  There are cases where a third party who's a private

10 entity or a private person is seeking disclosure, and there are

11 cases where the government is seeking disclosure.  And this is

12 not like any of the cases cited in the government's brief, the

13 majority of which involve private parties, where there was a

14 willy-nilly designation; or a stipulation that embodied a broad

15 agreement to provisionally keep everything confidential; or to

16 allow the parties to unilaterally designate.  None of those

17 things happened here, and the designation was a considered

18 decision and it's accurate, in our view.

19         THE COURT:  I lost you when you said it didn't involve

20 a situation where a party could unilaterally designate.  I was

21 under the impression that your client did designate and

22 unilaterally did so, all of the production to the trustee as

23 confidential.

24         MR. TREMONTE:  And, Your Honor, I don't want to split

25 hairs.  I don't think it makes sense.  It is the case, the fact

1  is, that the designation of all the e-mails as confidential, is

2  pursuant to an agreement initiated by Fletcher Asset

3  Management, my client, but agreed to by the trustee.  And

4  again, for good reason, because these documents do satisfy the

5  definition.

6        In terms of the Court's question about whether or not

7  that designation immunizes the documents, and I think it's

8  related, under the circumstances, to the Court's question about

9  justifiable reliance; and if the Court would allow me just a

10  few minutes to walk through the analysis as to why, the answer

11  to both of those questions is emphatically yes.

12        The chronology here is very important.  In fact, all

13  the facts are terribly important on this motion.  The

14  chronology is as follows.  We got a notification from the

15  trustee on July 11 of this year that they had received a

16  subpoena from the SEC, that in fact, they had received it about

17  a month earlier, on June 19.

18        After we learned about the subpoena, we spoke to the

19  SEC staff in Washington.  We immediately reached out to the

20  government.  We discussed the terms of the protective order,

21  and we advised the government clearly of our view -- both of

22  the history of the discussions and arrangements, agreements,

23  between Fletcher Asset Management on the one hand and trustee's

24  counsel on the other.  But most importantly, two things:  one,

25  we advised them of our view as to Martindell, but we also

1   invited the SEC, at that time, to subpoena Fletcher Asset

2   Management directly.

3           After about another month, no response from the SEC.

4   Another month went by.  On August 6th, the SEC notified the

5   trustee that they were willing to litigate to get at the

6   documents.  And now, nearly four months after the SEC's

7   original subpoena had been issued, we're here, as specifically

8   contemplated in the order, trying to understand why the SEC

9   won't simply serve a subpoena on FAM directly.

10          And I emphasize the timeline to make what I think is a

11  very, very important point under the case law.  Had the SEC

12  subpoenaed Fletcher Asset Management directly four months ago,

13  we would have spent the past 120 days reviewing and producing

14  documents, and the SEC would actually be much closer to

15  completing its inquiry.

16          And the Court should know also that the SEC has

17  extensive prior experience with Fletcher Asset Management, and

18  it has all been positive.  And based on that prior experience,

19  the SEC has every reason to be very confident of FAM's

20  cooperation and good faith in responding to document requests.

21          The inquiry that brings us here, the SEC inquiry

22  involving Fletcher Asset Management, began in 2009, Your Honor.

23  The SEC notified Fletcher Asset Management in July of that year

24  that it had begun an inquiry, and it subsequently issued five

25  subpoenas directly to my client, at least five.  I wasn't

1    involved.  During that time, Skadden Arps represented Fletcher

2    Asset Management.  But there were at least five separate

3    subpoenas and many, many informal documents requests from the

4    SEC to Fletcher Asset Management.

5           In response to those prior subpoenas and document

6    requests, between 2009 and 2011, Fletcher Asset Management

7    produced over two million pages of documents directly to the

8    SEC.  FAM was, in every respect, cooperative, and made

9    complete, organized, and prompt productions to the SEC.  And

10   after all those subpoenas and requests and following the

11   Commission's review of literally millions of documents, there

12   was a Wells Process.  And at the end of that Wells Process

13   there was a conclusion by the SEC, without any finding of

14   wrongdoing by FAM or any of its affiliates.

15          That's the same investigation that the SEC is

16   undertaking now.  I have a representation from the staff in

17   Washington that we're proceeding under the same formal order.

18   And as the subpoena shows, it's the exact same investigation

19   number.

20          So again, we scratch our head and wonder why, despite

21   our invitation for a subpoena directly to FAM, we're not

22   getting one.

23          THE COURT:  Pause.  I should have interrupted you

24   sooner.  A Wells submission informs a person or entity of the

25   potential for being the target of further enforcement action?

FLETCHER INTERNATIONAL, LTD.                         12

1          MR. TREMONTE:  Yes.  And as I said, after the Wells

2    Process had run its course, it concluded without a finding of

3    wrongdoing by Fletcher Asset Management or its affiliates.

4    That's a representation that was made by the SEC to counsel at

5    that time, Skadden Arps.  And that was the conclusion of that

6    process.

7          Now, it's not clear to me -- the SEC will not tell me

8    what's going on -- what's different, what has changed.  But

9    they have reopened the investigation in the past, as far as we

10   know, in the past -- at least in the past four months.  And

11   this time around, despite the fact that we've been extremely

12   good about producing documents every time they ask, whether by

13   subpoena or otherwise, this time they want them from the

14   trustee.

15         It doesn't make sense to ask for these documents from

16   the trustee.  It doesn't make sense when Fletcher Asset

17   Management is obviously in the best position to determine what

18   materials are responsive to the requests and to ensure that the

19   SEC has a complete set of those documents.  It doesn't make

20   sense when FAM should have the opportunity to object to the

21   subpoena, to the SEC's requests as appropriate, and if

22   necessary, to negotiate and litigate with the SEC concerning

23   the terms of its enforcement.

24         It really doesn't make sense to deprive Fletcher Asset

25   Management of the opportunity to ensure against the production

1  of privileged documents.  And here, I'm thoroughly mystified by

2  the averments in both the submissions here by trustee's counsel

3  and by counsel for the SEC, which indicate that a clawback

4  provision has been negotiated between, on the one hand, the

5  trustee, and on the other hand, the Securities and Exchange

6  Commission; and somehow this is supposed to give the Court and

7  the parties comfort that Fletcher Asset Management's privilege

8  will be protected.

9          Now, for the life of me, I don't understand how that

10  would work.  And I don't understand how it makes sense, logical

11  or legal, for the responsibility for policing Fletcher Asset

12  Management's privilege to rest with the trustee going forward.

13          And now, again, coming back specifically to the

14  Court's questions about immunity and justifiable reliance.  The

15  SEC's reading of the protective order really does render it a

16  nullity.  The protective order, according to the SEC, affords

17  no meaningful protection to Fletcher Asset Management from

18  disclosure to the outside parties, including the government.

19  And in fact, if you follow the SEC's position, the Court's

20  protective order only prohibits disclosure to outside parties

21  who have not subpoenaed the trustee.  That is the logical

22  consequence of the SEC's position.  If the SEC is right, then

23  anyone with a subpoena can get at FAM's documents.

24          Now, the SEC's main argument for avoiding the holding

25  of Martindell is to argue that it simply doesn't apply, that

1  there in fact, is no protective order in place.  Specifically,

2  the Commission interprets the design of the protective order as

3  proof that disclosures in response to a subpoena are not

4  prohibited in the first instance, and that a further order of

5  this Court is required to prevent disclosure to outside

6  parties.

7          Now, in our view, that really doesn't make sense.

8  Mechanisms like the one that's embodied in this protective

9  order are required, because without them, there would be no way

10  for the trustee to avoid being in contempt of court every time

11  it receives a subpoena from an outside party.  In other words,

12  the protective order would not work without a provision

13  directing the producing party -- here the trustee -- to go to

14  court to enforce it against an outside party, because the

15  trustee would be forced, necessarily, into an untenable

16  position.

17          On the one hand, he could produce materials to the

18  outside party, but that would be in violation of the protective

19  order which specifically prohibits that in many -- in multiple

20  places.  On the other hand, the trustee could refuse to comply

21  with the subpoena, but that would leave the trustee in contempt

22  of the issuing court, the court that issued the subpoena in the

23  first place.

24          So the provision that we have here, which enables the

25  court to adjudicate conflicts between the protective order and

1  subpoenas from outside parties, is the absolutely reasonably

2  and widely used method for addressing this dilemma.  And the

3  fact that the protective order has this provision is not

4  evidence, as the SEC suggests, that it's not really a

5  protective order, that we're not, in fact, entitled to the

6  protections that are expressly described in the text of the

7  document.

8            The SEC, in our view, has a very strong interest in

9  convincing the Court that the protective order is not really a

10  protective order, because it wants to avoid Martindell.  And

11  that's because from the SEC's perspective, on the facts of this

12  case, the Martindell standard is absolutely insurmountable.

13  There is no way, it is impossible for the Securities and

14  Exchange Commission in this case to show compelling need for

15  disclosure of these documents, because it is beyond dispute

16  that the Securities and Exchange Commission can subpoena FAM

17  directly, as they have done many times in the past in this very

18  investigation.

19            The SEC has a backup position --

20            THE COURT:  Pause, please, Mr. --

21            MR. TREMONTE:  Sure.

22            THE COURT:  -- Tremonte.

23            MR. TREMONTE:  Yes, Your Honor.

24            THE COURT:  Because the substance of this aspect of

25  your argument is that the SEC can get the documents anyway.

FLETCHER INTERNATIONAL, LTD.                    16

1  That walks, talks, and quacks like no-harm no-foul to your

2  client.  But it also invokes part of the analysis by Judge

3  Ellis -- Ron Ellis -- in the International Equity Investments

4  decision, where he says that "where the parties have not given

5  up any rights", such as a Fifth Amendment right -- I'm adding

6  that parenthetically, and I'm continuing my quote -- "and

7  indeed would have been compelled to produce the discovery

8  materials even in the absence of a protective order, the

9  presumption against modification is not as strong."  And he

10 quotes EPDM.  Isn't that exactly what I've got here?

11          MR. TREMONTE:  That is a question which if the Court

12 rules in favor of the SEC, will never be answered.  It is an

13 open question which is not before this Court whether or not the

14 subpoena that the SEC issued for these documents, if issued to

15 FAM -- I'm sorry -- to Fletcher Asset Management, would be

16 enforceable on its terms.  And that is precisely the reason why

17 there would be significant harm to Fletcher Asset Management if

18 the protective order were lifted and these documents were

19 produced.  We would never get to litigate the question,

20 precisely the question that Your Honor references, as to

21 whether or not Fletcher Asset Management would, in any event,

22 be required to produce these documents.

23          And the SEC can get up here and say all it wants that

24 that would be the case, but that's not a question before this

25 Court, that's a question for the enforcing court, if, in fact,

1   a subpoena was directed to Fletcher Asset Management.  And

2   another point there, Your Honor, I'm put in mind of the

3   Electrolux case that was decided by Judge Bianco in 2012 in the

4   Eastern District, also a case involving a third party that was

5   as private litigant, okay, that sought disclosure of discovery

6   documents covered by a protective order.  And there too, you

7   had a situation where in civil litigation involving a common

8   plaintiff, common parties, and identical issues with respect to

9   enforcement of the subpoena, and no dispute that the subpoena

10  would be enforceable if served directly on the resisting party,

11  then the court reached the conclusion that as a practical

12  matter, there was less reason to worry about the restrictions

13  of the protective order.  And there too, the court found that

14  here in fact been a showing of compelling need.

15       So again, to answer the question directly, I think

16  that is precisely -- that is one of the very important issues

17  in this case.  It is a problem that cannot be resolved here.

18  And we simply won't know the answer if the SEC can get these

19  documents from the trustee rather than asking for them from

20  FAM, in which case FAM could, if appropriate, go to the issuing

21  court and make a motion to quash.

22       THE COURT:  Did you have any discussion with anyone

23  from the SEC about whether the SEC would agree that if the SEC

24  got the documents from the Chapter 11 trustee, it would agree

25  that you'd have the standing to assert any privilege if you and

 1  the SEC couldn't agree on the SEC giving the documents back?

 2          MR. TREMONTE:  We did -- I suppose, indirectly, yes.

 3  I mean, the staff informed me that an arrangement had been in

 4  principle agreed to between the staff and the trustee that they

 5  would agree to a clawback provision which --

 6          THE COURT:  Forgive me.  The "they" being?

 7          MR. TREMONTE:  I apologize, Your Honor.  I was

 8  informed that the staff of the Securities and Exchange

 9  Commission and the lawyers for the trustee has agreed to a

10  clawback provision.  But as I said earlier, it makes no sense

11  to me, because it puts the trustee in the position of having to

12  enforce another party's privilege, namely Fletcher Asset

13  Management's privilege.  And the trustee doesn't represent

14  Fletcher Asset Management. So --

15          THE COURT:  So you're saying the critical deficiency

16  is that you need to have the standing to be heard either before

17  me or the subpoena-issuing court to enforce the clawback

18  personally?

19          MR. TREMONTE:  Your Honor, that is one of multiple

20  critical deficiencies.  The other important, sort of, piece of

21  the history of discovery here, has to do with the manner in

22  which discovery has been conducted in the Chapter 11

23  proceeding.  And there, Your Honor, a little bit of -- two

24  minutes of history is in order.

25          It's not disputed that the trustee came into

1    possession of FAM's e-mails under unusual circumstances in this

2    case.  The debtor, Fletcher International Limited Bermuda, is

3    an affiliate of Fletcher Asset Management, my client.  Prior to

4    the appointment of the trustee in this case, debtor's former

5    counsel, Young Conaway, made a copy of the e-mail server, which

6    is really the repository of all the documents that are at issue

7    on this motion.  And that e-mail server, which contained all of

8    my client's e-mails, among others, was provided by Young

9    Conaway directly to the trustee.

10            The parties recognize that under these unusual

11    circum -- well, under any circumstances, it would be improper

12    for the trustee to have unfettered access to Fletcher Asset

13    Management's e-mails, the trustee representing a different

14    party.  So accordingly, the parties began discussing practical

15    and efficient alternatives to a traditional full-dress

16    privilege review.

17            What apparently they didn't want was they didn't want

18    to have to give the server back to Fletcher Asset Management

19    and have them do a soup to nuts document-by-document review.

20    And so in various conversations and e-mail exchanges between,

21    on the one hand, the trustee's lawyers, and on the other hand,

22    predecessor counsel for Fletcher Asset Management, the parties

23    discussed arrangements which were never reduced to a single

24    definitive writing, which entailed the trustee running searches

25    through the e-mails for the names of certain attorneys and law

1   firms and then providing the results of those searches to

2   Fletcher Asset Management for further review.

3          So it's a two-step.  First the trustee runs lawyers'

4   names through the database, and then any document, any e-mail

5   that has a lawyer's name on it, goes over the wall to Fletcher

6   Asset Management.  Fletcher Asset Management reviews it for

7   privilege and produces a privilege log.  According to these

8   arrangements, FAM's attorneys reviewed tens of thousands of

9   documents that came back over the wall.

10         Now, although such arrangements may have been useful

11  under the circumstances as an ad hoc alternative to a full-

12  blown privilege review, inherent shortcomings in this method

13  are obvious.  Such arrangements are necessarily under-

14  inclusive, because they provide no mechanism to capture

15  privileged communications that recount attorney advice if the

16  attorney himself or herself is not a party to the

17  communication.  And it's settled law that you don't have to

18  have a party on a communication within a corporate entity for

19  the communication to be privileged.

20         So whatever FAM's willing -- whatever the willingness

21  of my client, Fletcher Asset Management, to proceed under this

22  provisional arrangement for the limited purpose of facilitating

23  the trustee's work, Fletcher Asset Management is not willing to

24  share its materials with outside parties absent a comprehensive

25  privilege review, and it should not be forced to do so.

1          And this is especially true -- back to the case law --

2     where the party seeking disclosure is the government and not a

3     private party.  Whatever the shortcomings of the conduct of

4     discovery, FAM has at all times acted in reliance on the clear

5     terms of the protective order.  FAM has relied on it to

6     prevent:  a) the disclosure of privileged communications to

7     third parties, as well as b) any claim that FAM inadvertently

8     waived it privilege.

9          And to claim otherwise, as the SEC does, in our view,

10    really is to ignore the reality of what happened on the ground

11    in this case, which as I said, was highly unusual.

12          THE COURT:  All right.  Thank you.

13          MR. TREMONTE:  Thank you, Your Honor.

14          THE COURT:  Mr. Jacobson.

15          MR. JACOBSON:  Your Honor, Neal Jacobson on behalf of

16    the Securities and Exchange Commission.  The first thing I'd

17    like to say is we obviously would agree with Fletcher Asset

18    Management that if any documents produced to us, in fact, turn

19    out to be privileged we would return them to Fletcher Asset

20    Management.

21          THE COURT:  Pause right there please, Mr. Jacobson.

22    So if I were to otherwise agree with you, and if I were to say

23    that you get the documents, but if I were to also say, in baby

24    talk, that Fletcher Asset Management has the right to invoke

25    the clawback in its own name, has all of the standing necessary

1  to do so, and has full rights vis-a-vis the protection of its

2  privilege, I could expect that my order and condition would be

3  complied with?

4         MR. JACOBSON:  Absolutely, Your Honor.

5         THE COURT:  Okay.

6         MR. JACOBSON:  We have no intention to argue that

7  privilege was waived when the documents were given to the

8  trustee.

9         THE COURT:  Well, I hear you.  But I was thinking

10  mainly of the standing issue.  Standing is often a big deal to

11  Article 3 courts, and I want to have the comfort, if I

12  otherwise agree with you, that I won't hear contentions that

13  Fletcher Asset Management or anybody associated with Fletcher

14  Asset Management's privilege lacks standing to assert any

15  rights.

16         MR. JACOBSON:  We would agree to any order that

17  provided for that protection.

18         THE COURT:  Continue, then, please.

19         MR. JACOBSON:  With respect to Fletcher Asset

20  Management's argument that the SEC had not subpoenaed the

21  documents from them directly, we have a lawful investigation

22  ongoing, and we typically subpoena documents from many sources.

23  As set forth in the declaration from the attorney involved in

24  Washington, we only found out about these documents relatively

25  recently, because we knew that the trustee already had them and

1    he had already gone through a privilege review of some type.  I

2    can't speak to exactly what happened.  The trustee's counsel

3    may be able to speak to the exact agreements and the privilege

4    review that was done.

5         So in our view, there is nothing preventing the SEC

6    from simply subpoenaing the trustee for the same documents.

7         THE COURT:  Um-hum.  Come a little closer to the

8    microphone, if you would, please.

9         MR. JACOBSON:  So in the SEC's view there is nothing

10   prohibiting us, and there was no reason not to subpoena the

11   documents at the source where they were located, which was with

12   the trustee, because that's where we found out that the

13   documents actually existed.  We were not aware of these

14   documents prior to that.

15        In terms of going directly to Fletcher Asset

16   Management for the documents, I'm really not sure how --

17   assuming that the privilege is protected, I'm really not sure

18   what argument Fletcher would have -- Fletcher Asset Management

19   would have to withhold production of documents from the

20   Securities and Exchange Commission.  In fact, we don't dispute

21   that in the past, Fletcher Asset Management, in fact, did

22   produce documents pursuant to a subpoena, so I'm really not

23   sure why this subpoena would be special and they'd be able to

24   argue that they don't have to -- they do not have to produce

25   corporate e-mails to the SEC, pursuant to a subpoena that was

 1   issued in a lawful investigation.

 2          In any event, so therefore, I'm not sure why it's

 3   relevant what the history -- the history, how that's relevant

 4   to the determination of whether the SEC can get these documents

 5   from the trustee now.  I just don't understand.  And we don't

 6   believe, as we set forth in the papers -- I don't want to

 7   repeat what we said in the papers -- but we don't believe that

 8   the confidentiality agreement, in fact, gives Fletcher Asset

 9   Management blanket ability to withhold documents just by noting

10   that they're confidential.  We do believe that the provision in

11   paragraph 10 gives them a lot of protection in that it allows

12   them to come to court and explain why the documents should not

13   be produced, why they are confidential and should not be

14   produced to the SEC.

15          THE COURT:  Fair enough.  Anything further?

16          MR. JACOBSON:  No, Your Honor.

17          THE COURT:  Thank you.

18          Mr. Hornung, do you want to weigh in on this?

19          MR. TREMONTE:  Your Honor --

20          THE COURT:  Verbally, I mean.

21          MR. TREMONTE:  -- may I be heard before Mr. Hornung

22   addresses the Court?

23          THE COURT:  On his standing to be heard?

24          MR. TREMONTE:  On a related issue to the standing to

25   be heard.

1           Mr. Hornung submitted an affidavit concerning the

2    factual history and events that took place in the past, and the

3    conduct of discovery in recent months.  If Mr. Hornung is going

4    to make representations to the Court concerning any historical

5    facts related to the production, I would respectfully request

6    an opportunity to examine.

7           THE COURT:  To examine what?

8           MR. TREMONTE:  To examine Mr. Hornung on his

9    statements to the Court under oath.

10          THE COURT:  No.  You had the ability, if you wanted

11   to, to submit a reply, a reply just as he did.  And under my

12   case management order, which couldn't be clearer, every matter

13   is a nonevidentiary hearing on its first day, unless and until

14   matters are put into dispute or the parties tell the Court in

15   advance that it will be an evidentiary hearing.

16          Now, I'll take your representations as a lawyer, just

17   like I'll take his, if you want to respond verbally, although

18   even that is an abuse, because you failed to comply with the

19   case management order.  And the bankruptcy system, even before

20   the days of sequestration, Mr. Tremonte, could not function if

21   people demanded the right to have evidentiary hearings whenever

22   they wanted to.  So please sit down.

23          Mr. Hornung, I'll hear from you.

24          MR. HORNUNG:  Good morning, Your Honor.  Just a few

25   things.  Mainly the trustee takes no position on whether or not

1     these documents should be produced or not.  We stand ready,

2     willing, and able to comply with however Your Honor decides

3     this should be disposed of.

4              I did want to clarify or at least respond to a few

5     things that Mr. Tremonte said in his opening remarks.  The

6     first is with his characterization of our agreement with

7     respect to whether or not the documents were designated as

8     confidential.  The trustee agreed that Mr. Tremonte and

9     Fletcher Asset Management could, in fact, mark the documents as

10    confidential.  However, we did not agree that they were, in

11    fact, confidential within the meaning of a protective order,

12    and expected and reserved our rights to use Paragraph 8,

13    consistent with the order, to raise an issue and bring it to

14    the Court after first conferring with Fletcher Asset Management

15    about whether or not those documents were confidential.

16             Second, I just wanted to clarify briefly about Mr.

17    Tremonte's description of the trustee's review process of the

18    e-mails.  The review process was a little bit more fulsome than

19    Mr. Tremonte described.  Each and every document was, in fact,

20    reviewed for privilege, regardless of whether or not it had an

21    attorney's name on it or whether it was sent to an attorney.

22    The trustee employed a team of contract attorneys to do that.

23    And I personally have not reviewed all 400,000 documents, but I

24    can tell you that procedures were put in place and we hope and

25    expect that those were followed, and that very few documents

1  slipped through the crack.

2        Finally, I just wanted to clarify with respect to the

3  description of the hard drive that contained the e-mails.  My

4  understanding is that there was nine or ten custodians that

5  were on the Fletcher Asset Management hard drive that was

6  turned over to the trustee.  It was not the entire e-mail

7  server of Fletcher Asset Management.  Those e-mails were

8  collected by the debtor's previous counsel at Young Conaway

9  just the week following the debtor's petition.

10        And with that, I stand ready to answer any questions

11  that Your Honor may have.  After we conclude oral argument, I

12  did want to raise just two brief matters with the Court, but we

13  can table those until later, if that's okay with Your Honor.

14        THE COURT:  It is not just okay, but necessary.  All

15  right.

16        Mr. Tremonte, I'll take reply, limited of course to

17  new matter that was set forth by either Mr. Jacobson or Mr.

18  Hornung verbally.

19        MR. TREMONTE:  Your Honor --

20        THE COURT:  Come to the main lectern, if you would,

21  please.

22        MR. TREMONTE:  Thank you, Your Honor.  And my

23  apologies to the Court.  It was not my intention to run afoul

24  of the Court's case management order.  I did not anticipate

25  that Mr. Hornung would be heard on this motion.

1          THE COURT:  Pause, please.  When he filed a submission

2    himself?

3          MR. TREMONTE:  Your Honor, again, with apologies, I

4    did not anticipate that Mr. Hornung, in his capacity on this

5    motion as a fact witness, would stand at the lectern and make

6    argument with respect to the pending motion.  It's my mistake,

7    Your Honor.  Perhaps I should have anticipated that.  But I did

8    not mean to run afoul of the Court's case management order

9    which we did consult.

10         I'd like to make the point that as far as we are

11   aware, there is not a case in the Second Circuit in which the

12   government has sought access to documents covered by precisely

13   this kind of protective order, where such access has been

14   granted.  And the rationale set forth in all the decisions

15   where it's the government -- and that includes both criminal

16   and civil agencies, it's both the DOJ and the SEC, it's the

17   CFTC in one of the cases -- the courts' rationale is clear.

18   The awesome investigative powers of the government make it

19   impossible for it, under all the circumstances that have been

20   presented to the Court, to show compelling need.

21         And this case is no different in that the SEC

22   indisputably, as counsel for the Commission has acknowledged,

23   can subpoena FAM directly.

24         And finally, Your Honor, I would simply note that to

25   the extent that the Court is inclined to grant the motion -- to

1  deny the motion and to grant access to the discovery materials

2  by the SEC, which of course we emphatically believe is not the

3  appropriate result, we would respectfully request that Your

4  Honor's order include an explicit prohibition that prohibits

5  the Commission from sharing documents with any other party,

6  including other government agencies.  Thank you, Your Honor.

7          THE COURT:  Mr. Jacobson?

8          MR. JACOBSON:  Thank you, Your Honor.

9          THE COURT:  Limited to anything new that we just heard

10 from Mr. Tremonte.

11         MR. JACOBSON:  Thank you, Your Honor.  Just with

12 respect to the Martindell line of cases, our reading of those

13 cases, the protective orders in place were specifically in

14 place in order to prevent the government from obtaining the

15 discovery, and the discovery was mostly documents created in

16 reliance upon the specific protective order, testimony given in

17 reliance on the protective order, and waiver of Fifth Amendment

18 rights to reliance on the protective order.  And the parties

19 specifically contemplated that the government should not

20 receive those documents.

21         Here, the protective order was entered at the request

22 of the trustee for his benefit so he wouldn't have to negotiate

23 separate orders with various parties.  There is nothing in this

24 order that indicates at all that the government would not be

25 entitled to any of these documents pursuant to the normal

1  subpoena process.

2          With respect to the sharing of documents, I will say

3  the SEC does have, under the Code of Federal Regulations,

4  there's certain entities which the SEC is permitted to share

5  documents with.  However, they -- the sharing is only pursuant

6  to the terms of whatever the agreement was, pursuant to which

7  the SEC received those documents.  So in the event that the

8  documents would be shared, pursuant to federal law, they would

9  be subject to the same restrictions that the SEC received.

10          THE COURT:  All right.  Gentlemen, I'm going to take

11  recess, after which I'll rule.  I want you back here by 10:55.

12  I can't guarantee you that I'll be ready by that time.  I'll

13  see you then.

14          Mr. Hornung, I'll deal with your administrative

15  matters or other matters after I've ruled.  We're in recess.

16          IN UNISON:  Thank you, Your Honor.

17      (Recess from 10:42 a.m. until 11:59 a.m.)

18          THE COURT:  I apologize for keeping you all waiting.

19          Ladies and gentlemen, in this contested matter in the

20  Chapter 11 case of debtor Fletcher International, Ltd., which

21  I'll refer to as "the debtor", Fletcher Asset Management, an

22  affiliate of the debtor, moves for an order enjoining the

23  Chapter 11 trustee, whom I'll refer to as "the trustee", from

24  producing documents to the Securities and Exchange Commission

25  in alleged violation of the uniform protective order, which

FLETCHER INTERNATIONAL, LTD.                                    31

1  I'll refer to as "the protective order", entered by this Court

2  in debtor's Chapter 11 case.

3         Fletcher's motion is opposed by the SEC principally on

4  the basis that Fletcher hasn't shown good cause for an

5  additional protective order protecting these documents or

6  modifying the earlier order, especially when the SEC could

7  obtain these documents directly from Fletcher Asset Management,

8  albeit only after additional delay and expense.

9         I agree with the SEC.  The protective order in

10  question, which was a blanket order entered without judicial

11  review of any of the documents sought to be protected, granted

12  Fletcher Asset Management interim protection to enable Fletcher

13  Asset Management to show, if it could, a basis for protecting

14  the confidentiality that was claimed.  But it was a procedural

15  order facilitating production and envisioning second-stage

16  inquiry to determine whether continuing protection was

17  appropriate.

18         It could not justify reasonable reliance.  And in

19  particular, it did not provide broad-based dispensation to

20  protect thousands of documents from disclosure based on ipse

21  dixit claims of confidentiality by Fletcher Asset Management,

22  especially when Fletcher Asset Management chose to designate as

23  confidential every single document it produced.

24         Fletcher's motion is denied, albeit on conditions that

25  are necessary to protect its legitimate rights.  The facts

1  underlying my decision, my conclusions of law, and the bases

2  for the exercise of my discretion follow.

3          Turning first to the underlying facts.  As the

4  differences between the parties are not due to those underlying

5  facts, but how I should interpret the protective order I

6  entered in light of those facts, an evidentiary hearing was

7  unnecessary.  Thus I won't make extensive findings of fact,

8  except to note particular facts that inform my decision.

9          Under my case management order, facts not disputed in

10  motions and motion-related papers are taken as truth.  See case

11  management order, paragraph 2.  The facts come from matters as

12  to which I can take judicial notice under Federal Rule of

13  Evidence 201, from undisputed assertions of fact in the motion

14  papers, and from undisputed evidence in declarations by

15  Jennifer Leete of the SEC, and Stephan Hornung, one of the

16  counsel for the trustee.

17          As facts, I find that the protective order was so

18  ordered by me and entered on this Court's docket without a

19  hearing, November 9, 2012.  The broad purpose of the protective

20  order was to govern the disclosure, discovery, production, and

21  use of documents and other information provided to the trustee

22  or any other party granted access to discovery material,

23  subject to the protective order.  See protective order,

24  paragraphs 1 and 2.

25          In July 2012, certain Fletcher e-mail accounts held by

1   employees and consultants were copied.  The trustee, Fletcher

2   Asset Management, and Alfonse Fletcher, an executive associated

3   with Fletcher Asset Management, agreed on a review protocol to

4   glean potentially relevant documents from the copied e-mail

5   accounts, and to screen those documents for privilege.  Tens of

6   thousands of e-mails produced to the trustee have undergone

7   this process.

8          Later, on or about June 19, 2013, in connection with

9   an investigation of Fletcher Asset Management, the SEC

10  subpoenaed the trustee.  The subpoena ultimately sought those

11  corporate e-mails that Fletcher Asset Management and its

12  affiliates produced to the trustee, and that already had been

13  reviewed for privilege.  The SEC has not requested nor has it

14  received the presently sought documents from Fletcher Asset

15  Management directly.

16         Turning now to my conclusions of law and the bases for

17  the exercise of my discretion.  I've considered Fletcher Asset

18  Management's argument that the Second Circuit's 1979 decision

19  in Martindell v. International Telephone and Telegraph

20  Corporation, 594 F.2d 291 (2d Cir. 1979), speaking through

21  Judge Mansfield, which requires the party seeking to modify a

22  protective order to show either:  1) improvidence in the

23  granting of the protective order, or 2) some extraordinary

24  circumstance or compelling need, applies to the present matter.

25         Martindell, which of course is binding on me, does not

1   prohibit production in a situation like the one we have here.

2   First, the protective order in Martindell was a substantive

3   order that specifically protected the transcripts of twelve

4   depositions of party and non-party witnesses from being

5   disclosed or used outside of the civil litigation in which the

6   protective order had been issued.  Here, as I noted earlier,

7   the protective order contemplated further proceedings which

8   would determine the extent to which the documents would remain

9   subject to confidentiality and does not necessarily warrant the

10  same protection as the substantive order in Martindell.

11          Importantly, Martindell was not the last word on this

12  issue, either from the Second Circuit itself or from lower

13  courts.  In 2001, the Second Circuit in SEC v. TheStreet.com,

14  273 F.3d 222, addressed the situation again.  While with full

15  consideration and analysis of Martindell, the circuit, then

16  speaking through Judge Cabranes, stated that "some protective

17  orders may not merit a strong presumption against modification.

18  For instance, protective orders that are on their face

19  temporary or limited may not justify reliance by the parties.

20  Indeed, in such circumstances reliance may be unreasonable."

21  273 F.3d at pages 230-231.

22          It continued, "Where a litigant or deponent could not

23  reasonably have relied on the continuation of a protective

24  orderm a court may properly permit modification of the order.

25  In such a case, whether to lift or modify a protective order is

1  a decision committed to the sound discretion of the trial

2  court."  That's 273 F.3d at page 231, quotation marks and

3  bracketing deleted.

4        Later case law down in the trenches in the trial

5  courts have fleshed out those considerations and articulated

6  standards for judges like me to apply.  One of the most

7  important of those is Judge Underhill's decision in the

8  Ethylene Propylene Diene Monomer Antitrust Litigation, more

9  commonly referred to as the EPDM Antitrust Litigation.

10        While Judge Underhill expressly recognized that

11  Martindell imposes a presumption on the continued protection of

12  information produced under confidentiality stips and orders,

13  when those orders, among other things, led to reasonable

14  reliance, he continued that "application of the Martindell

15  presumption against modification depends on the nature of the

16  protective order and whether it invited reasonable reliance by

17  a party or deponent."  I'm reading from 255 FRD at page 318.

18        He continued that, "an examination of Second Circuit

19  case law reveals the following factors as relevant when

20  determining whether a party has reasonably relied on the

21  protective order.  1) the scope of the protective order; 2) the

22  language of the order itself; 3) the level of inquiry the court

23  undertook before granting the order; and 4) the nature of

24  reliance on the order."

25        He added that, "additional considerations that could

1    influence a court's decision to grant modification of the order

2    would include the type of discovery materials the collateral

3    litigant seeks, and the party's purpose in seeking a

4    modification."

5            Judge Underhill added, understandably, that "given the

6    wide variety of protective orders in operation, the more

7    flexible approach to modification emphasized by TheStreet.com,

8    is sensible.

9            Judge Underhill continued that, "When considering a

10   motion to modify, it's relevant whether the order is a blanket

11   protective order," and I add parenthetically that that's

12   exactly what we have here, "covering all documents and

13   testimony produced in a lawsuit, or whether it's specifically

14   focused on protecting certain documents or certain deponents

15   for a particular reason.  A blanket protective order is more

16   likely to be subject to modification than a more specific

17   targeted order, because it's more difficult to show a party

18   reasonably relied on a blanket order in producing documents or

19   submitting to a deposition."

20           He observed that, "Although such blanket protective

21   orders may be useful in expediting the flow of pre-trial

22   discovery materials, they are by nature over-inclusive and are

23   therefore particularly subject to later modification."

24           Before I continue with the case law, I should observe

25   that that was exactly my understanding and intent when I so

1  ordered the stip.  It was plainly useful in expediting the flow

2  of discovery materials, but I well understood that when I gave

3  one side the right to designate as confidential whatever it

4  wanted without any judicial scrutiny at all, there was the

5  risk, if not probability, that it would be over-inclusive, and

6  the order expressly contemplated later modification.

7       Judge Underhill's decision in the EPDM litigation was

8  followed, not surprisingly, in later authority, and in

9  particular by Magistrate Judge Ellis in International Equity

10 Investments, Inc. v. Opportunity Equity Partners, Ltd., 2010 WL

11 779314 (S.D.N.Y. March 2, 2010).  He made a number of

12 observations, one of which in particular is applicable here.

13      He said, "Where the parties have not given up any

14 rights and, indeed, would have been compelled to produce the

15 discovery materials even in the absence of a protective order

16 the presumption against modification is not as strong."  I'm

17 reading from page 7 of his decision, which in turn cites EPDM

18 at page 323.

19      As Judge Underhill did and as Judge Ellis did I look

20 at the particular factors that were identified in EPDM and

21 later in International Equity Investments.

22      First, as to scope, the protective order here was a

23 blanket protective order under which the disclosing party had

24 "free reign" to designate as "confidential" or "highly

25 confidential" any and all proprietary and confidential

1    nonpublic information.  Protective order paragraphs 1 and 5.

2           The free reign to which I made reference was taken

3    from International Equity Investments at page 5.  Here, as

4    there, the producing party had free reign to designate as

5    confidential any and all documents supplied on good-faith

6    showing only.  I have no reason to doubt good faith in having

7    designated so many, and, indeed, all of the documents

8    confidential, but it evidences the fact that that was the

9    starting point and not the ending point of any determination as

10   to the extent to which continued confidentiality would be

11   warranted.

12          Unlike in Martindell the protective order here is

13   "Broad and not focused on any narrow set of materials, and it

14   allows unilateral designation by the [disclosing party] without

15   court intervention."  See International Equity Investments at

16   page 5.

17          Of course, broad protective orders such as this have

18   become common procedural tools "to keep discovery pursuits to a

19   minimum and the proceeding moving."  See EPDM at page 319.

20          I can reasonably infer that the protective order in

21   this matter as originally stipulated to by the parties was

22   entered with that goal in mind.  Certainly, that was my

23   understanding when I so ordered it.  And I note, once again,

24   that that was all I could do because I hadn't reviewed a single

25   document as to which confidentiality was claimed.

1            Turning to the second of the EPDM and International

2      Equity Investment factors, language of the order, itself,

3      "Anticipates the potential for modification [and] contains

4      specific procedures for disclosing confidential materials to

5      nonparties," again making it unreasonable for Fletcher Asset

6      Management to have relied on an assumption that it could never

7      be modified.

8            Importantly, critically, the order expressly

9      contemplated an opportunity for declassification, if you

10     will -- I use classification in the military sense -- in

11     further proceedings.

12           The third factor, the level of inquiry taken by the

13     court in entering the protective order, also cuts against any

14     conclusions that might otherwise be argued to be premised upon

15     the Martindell Doctrine.  "A protective order granted on the

16     basis of a stipulation by the parties carries less weight than

17     a protective order granted after a hearing to show good cause."

18     International Equity Investments at page 6.

19           Here, the protective order was entered on an unopposed

20     motion of the trustee and without a hearing.  Fletcher Asset

21     Management didn't have to show good cause for why all of the

22     documents it produced to the trustee should be protected as

23     "confidential."  And as I've noted, I did not review any of the

24     documents as to which confidentiality is claimed.  Frankly, the

25     notion that every one of the thousands of documents that were

1    designated as confidential would ultimately deserve to be kept

2    that way is absurd.

3            Finally, turning to the fourth factor, the nature of

4    Fletcher's reliance further cuts against granting a presumption

5    against modification of the type noted in Martindell.  In

6    evaluating reliance, courts in this circuit analyze whether a

7    party gave up rights to produce documents they would not

8    otherwise have been compelled to produce.  And where parties

9    testify, notwithstanding an arguable Fifth Amendment privilege,

10   that is of a reliance very different than of the character we

11   have here.

12           If a party has given up substantive rights, much less

13   Constitutional ones, it's more likely that the Martindell

14   presumption will apply.  And as you will recall, Martindell

15   involved transcripts of testimony that could have been taken

16   notwithstanding Fifth Amendment rights.  Reading from pages 296

17   and 297 of Martindell the -- I note that the circuit placed

18   emphasis on the fact that the deponents testified in reliance

19   upon the Rule 26(c) protective order, absent which they may

20   have refused to testify.  Considerations of that type certainly

21   got the attention of the Second Circuit, and they certainly

22   have gotten mine.

23           Here, because both sides recognize that the SEC could

24   directly compel Fletcher to disclose the documents, Fletcher

25   did not relinquish, in any meaningful way, any rights in this

FLETCHER INTERNATIONAL, LTD.                                    41

1  document production to the trustee.  I cannot and do not make a

2  finding here that it acted in justifiable reliance.

3          All four factors show that the protective order isn't

4  entitled to the strong presumption against modification that

5  was established in Martindell.  So where does that take us?

6  Fletcher Asset Management may still be entitled to protection,

7  but it no longer has the benefit of a presumption, and,

8  ultimately, the issue becomes one of the Court's discretion as

9  Judge Ellis expressly noted.

10         So having found then that Martindell doesn't compel a

11 particular conclusion, I now turn to whether Fletcher has met

12 the burden imposed on it by paragraph 10 of the protective

13 order.  That paragraph provides in relevant part, "If a

14 receiving party...is requested pursuant to, or becomes legally

15 compelled by, applicable law, rule, regulation, regulatory

16 authority, or legal process to make any disclosure that is

17 otherwise prohibited or constrained by this protective order

18 the receiving party...shall provide written notice of

19 such...compel disclosure...to the disclosing party...so that

20 the disclosing party may seek an appropriate protective order

21 or otherwise -- or other appropriate relief."  I'm omitting

22 further matter in that paragraph.

23         I note, however, before continuing, that the portion

24 that I read expressly contemplates further proceedings, and

25 that the fact that matter was designated as protected in the

1   protective order was not the last word on it.  It expressly

2   contemplated an application for an appropriate protective order

3   which, if the Court considering any such request was not

4   sitting as a potted plant, would be decided in accordance with

5   its discretion.

6            The parties agreed that paragraph 10 applies to the

7   present dispute, and that paragraph 10 required the trustee to

8   notify Fletcher of the SEC subpoena.  And, of course, the

9   trustee did so comply.  Then Fletcher Asset Management had the

10  right to seek an appropriate protective order or other

11  appropriate relief, as Fletcher has done here.  And now I'm

12  determining what is appropriate relief.

13           But the language that I just quoted, or for that

14  matter, the remainder of paragraph 10 doesn't mean that relief,

15  especially appropriate relief, must be granted.  It's a matter

16  of judicial discretion.  Here, Fletcher Asset Management failed

17  to show good cause for enjoining the trustee from producing

18  documents to the SEC.  It doesn't amount to good cause to

19  merely argue, 1) that the documents should be protected simply

20  because they were claimed to be confidential, or 2) that the

21  danger of inadvertent disclosure should altogether prevent

22  production to the SEC.

23           As the SEC fairly observes, "Fletcher cannot and does

24  not argue that the subpoena was issued for an improper purpose,

25  that it seeks irrelevant information, or that it's overly

1  burdensome," quoting from the SEC's opposition on page 4.

2         The second concern, inadvertent disclosure, is a more

3  legitimate one, but it was already addressed by the clawback

4  entered into by the trustee and the SEC on August 19th, 2013,

5  and it can also be addressed that by conditions, that I can and

6  will impose on the SEC to ensure that the clawback is as

7  meaningful for Fletcher Asset Management, as it otherwise was

8  originally drafted to be.

9         It's well established, of course, that judges like me

10 who have entered orders, have the power to construe them.

11 Putting it differently, judges have the power to construe their

12 own orders.  See, for example, In re Applied Theory Corp., 2008

13 WL 1869770 at page 3, citing Truskoski v. ESPN, Inc., 60 F.3d

14 74, 77 (2d Cir. 1995).  ("It is peculiarly within the province

15 of the district court to determine the meaning of its own

16 order...and the court's interpretation of its order will not be

17 disturbed absent a clear abuse of discretion...." See also

18 Global Crossing Estate Representative v. Alta Partners

19 Holdings, LDC, (In re Global Crossing, Ltd.), 2008 Bankr. LEXIS

20 988 at page 86, and note 113, 2008 WL 934012 at page 22 and

21 note 113, a decision that I personally issued back in 2008

22 noting and applying that principle.

23         So I enjoy the benefit of knowing my intent in

24 ordering as I did.  When I so ordered the stip without having

25 first reviewed the documents that would only later be produced

1   I wasn't determining that any documents warranted protection.

2   As Judge Underhill observed, I was only managing the litigation

3   and moving the ball going forward.

4           So I am declining to modify the stipulation -- or,

5   excuse me, I am modifying the stipulation to allow delivery of

6   the documents to the SEC subject to other limitations in the

7   stip, and, in particular, subject to some conditions that I add

8   as necessary protection in the balancing act between need and

9   protection, which is otherwise warranted under cases like EPDM

10  and International Equity Investments.

11          As conditions to the ability of the SEC to receive the

12  documents and the resulting modification of the order to make

13  that clear, my new order, which will be entered pursuant to

14  this ruling, is to provide in substance that the clawback

15  provisions will apply to the SEC and to anyone who gets the

16  documents from the SEC to the same extent as they did with

17  respect to the production to the trustee.

18          The order is also to expressly provide that Fletcher

19  Asset Management has standing to be heard as a jurisprudential

20  matter to enforce the confidentiality provisions and the

21  clawback, and has the substantive right to enforce the clawback

22  in the event there has been or turns out to be any inadvertent

23  production, notwithstanding an otherwise applicable privilege.

24          I have considered the oral request made at the end for

25  limiting production to the SEC.  That request is granted in

1  part and denied in part.  I will permit disclosure to be made

2  not just to the SEC but to any other agency or entity of the

3  United States.  I am not, however, at least at this time,

4  authorizing delivery of the documents to any private litigant.

5          My discretion in that regard is informed by a couple

6  of things.

7          First, as a general matter, at least on facts now

8  known to me, the need for providing documents to private

9  litigants is not as great as it is to allowing access to

10  governmental agencies in doing their job.

11          Also, of course, I have confidence that, as I've

12  ordered, that those other governmental agencies would be

13  subject to the same clawback provisions as the SEC would be, I

14  need have no concerns in that regard.  But there is also a

15  lesser need and a propriety, at least seemingly, on the part of

16  private litigants.

17          Many of the causes of action that private litigants

18  bring, as we bankruptcy judges have come to learn, involve

19  causes of action that they don't own; rather the causes of

20  action that so many litigants bring actually belong to the

21  estate, and are owned, if you will, by the Chapter 11 trustee,

22  itself.  It is possible that something that one of them might

23  sue upon would actually be its own property and not belong to

24  the Chapter 11 estate, but before that is assumed to be true it

25  warrants a judicial stop, look and listen to determine that.

1        So I'm going to order that at this point the SEC can

2   share anything it receives only with other governmental

3   agencies, and may not share it with private litigants, though

4   without prejudice to any future application to authorize a

5   different disclosure.  I'm not at all sure that I would

6   authorize a greater disclosure to private litigants, but I'll

7   keep an open mind on that going forward.

8        So the motion is determined in accordance with the

9   decision I just dictated.  The SEC is to settle an order in

10  accordance with the foregoing, being sure to include the

11  conditions along with the bottom line, at its earliest

12  reasonable convenience, which can, to the extent applicable,

13  include any limitations on the SEC's resources by reason of

14  either sequestration or the government shutdown.

15       I would encourage, but not require, the SEC to run its

16  draft form of order past counsel for Fletcher Asset Management,

17  to minimize the likelihood of any dispute.  But if after having

18  tried and failed to do that, or if the SEC really thinks it

19  needs to without engaging in that process, the SEC wants to

20  settle an order, it has my permission to do so.

21       All right, folks, not by way of reargument, are there

22  any open issues?

23       Hearing none, we're adjourned.

24       Mr. Tremonte, were you rising, I'm not meaning to cut

25  you off?

1        MR. TREMONTE:  I was not, Your Honor, I was conferring

2   with my colleague.  Thank you.

3        THE COURT:  Okay.

4        MR. HORNUNG:  Your Honor, just a few administrative

5   matters --

6        THE COURT:  Oh, yes, you had that.  Come on up,

7   please.

8        MR. HORNUNG:  Thank you, Your Honor.

9        Your Honor, the first matter that we wanted to address

10  was, as Your Honor is aware, we have an interim fee application

11  hearing scheduled for next Wednesday at 9:45.  In light of the

12  government shutdown and with the U.S. Trustee's Office being

13  closed, we think it might be appropriate to adjourn that

14  hearing one or two weeks into the future.

15       THE COURT:  I think that makes sense.  If you had

16  already gotten a nonobjection from the U.S. Trustee Program I

17  would waive the hearing, but if they haven't had a chance to

18  weigh in on it yet, I think we need to do that.

19       MR. HORNUNG:  Yeah, Your Honor, we spoke with the

20  trustee's office I guess --

21       THE COURT:  The U.S. Trustee's Office.

22       MR. HORNUNG:  Excuse me, the U.S. Trustee's Office on

23  Tuesday evening, indicated they did not expect to object but

24  had not finally reviewed all the pending applications.

25       THE COURT:  Then your game plan makes sense.

1        As part of your dialogue, though, because I'm
2  confident you're going to talk to them, given the same demands
3  on them that I mentioned in a different context a minute ago,
4  ask them if they want to appear personally, if they don't
5  object, and if they don't I'll waive the hearing.
6        MR. HORNUNG:  Okay, very good.  Thank you, Your Honor.
7        And the second matter I wanted to bring up, just
8  wanted to put on Your Honor's radar that we are in talks with
9  Fletcher Asset Management about some discovery disputes.  We do
10  hope to resolve them this week.  In the event that we do not,
11  we would be seeking Court intervention.  And I just wanted to
12  let you know that you might be seeing something from us in the
13  near future.
14        THE COURT:  Well, please do.  Of course, under the
15  case management order they're not done on papers they're done
16  by conference call, but you don't need me to tell you how
17  burdensome these discovery disputes are.
18        MR. HORNUNG:  No, I understand, Your Honor.  And we
19  hope to avoid bringing it to your attention.
20        THE COURT:  Okay.
21        MR. HORNUNG:  Thank you, that's all from us.
22        THE COURT:  Okay.  Then we're adjourned.
23        (Whereupon these proceedings were concluded at 12:02 PM)
24
25

1

2                              **I N D E X**

3

4                              RULINGS

5                                        Page      Line

6   Fletcher Asset Management's Motion for        31        25

7   protective order is denied, with conditions

8   as delineated on the record.

9   Court modifying the stipulation to allow      44        5

10  delivery of the documents to the SEC

11  subject to other limitations in the stip,

12  and subject to some conditions are added

13  as necessary

14  Oral request made limiting production to      44        25

15  the SEC granted in part and denied in part

16  SEC can share anything it receives only with  46        1

17  other governmental agencies, may not share

18  it with private litigants

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10   _____

11   PENINA WOLICKI

12   AAERT Certified Electronic Transcriber CET**D-569

13

14

15   eScribers

16   700 West 192nd Street, Suite #607

17   New York, NY 10040

18

19   Date:  October 3, 2013

20

21

22

23

24

25