Michael Luskin
Lucia T. Chapman
Stephan E. Hornung
LUSKIN, STERN & EISLER LLP
Eleven Times Square
New York, New York 10036
Telephone:  (212) 597-8200
Facsimile:  (212) 974-3205

*Attorneys for the Chapter 11 Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:                                      :          Chapter 11
                                            :
FLETCHER INTERNATIONAL, LTD.,               :          Case No. 12-12796 (REG)
                                            :
                          Debtor.           :
                                            :
-------------------------------------------------------------x


### TRUSTEE'S REPORT AND DISCLOSURE STATEMENT


Richard J. Davis
Chapter 11 Trustee
415 Madison Avenue, 11th Floor
New York, New York  10017
Telephone: (646) 553-1365


**This is not a solicitation of acceptance or rejection of the Plan. Acceptances or rejections may not be solicited until a disclosure statement has been approved by the Bankruptcy Court.  This Disclosure Statement is being submitted for approval but has not been approved by the Court.**

I. INTRODUCTION AND SUMMARY ................................................................................ 1

    A.    Preliminary Statement ................................................................................ 1

    B.    Overview of Findings of Investigation ..................................................... 4

    C.    Summary of the Plan ................................................................................. 10

II. BACKGROUND & ORGANIZATION ......................................................................... 12

    A.    The Fletcher Funds .................................................................................. 12

    B.    Ownership of FILB .................................................................................. 14

        1.    December 31, 2008 Reorganization ......................................... 14

        2.    April 22, 2012 Transactions ..................................................... 15

    C.    FILB Management & Directors ............................................................... 16

    D.    Overlapping Directors ............................................................................. 17

    E.    Fletcher Asset Management, Inc. ............................................................ 17

        1.    Investment Management Agreement ....................................... 17

        2.    Investment Strategy ................................................................. 18

        3.    FAM's Performance Track Record ........................................... 24

        4.    FAM's Assets Under Management ........................................... 26

        5.    Fees .......................................................................................... 27

            a)    Management Fees ......................................................... 28

            b)    Incentive Fees .............................................................. 28

        6.    Mismatch Between Terms of the Investment Vehicles, the Underlying Investments, and the Valuation Methodologies Employed ..................... 29

        7.    Leverage .................................................................................. 30

        8.    Cashless Notes ......................................................................... 32

        9.    The Valuation Process ............................................................. 35

            a)    Quantal – FAM's "Valuation Agent" ........................... 36

            b)    FAM's Valuation Process ............................................. 39

            c)    Administrators' and Servicers' Roles in Valuations ..................... 39

        10.    Operations ............................................................................... 40

        11.    Backdating ............................................................................... 46

    F.    Administrators ......................................................................................... 47

        1.    Citco Fund Services (Cayman Islands) Ltd. ............................ 49

        2.    SS&C Technologies ................................................................. 50

    G.    Auditors ................................................................................................... 53

        1.    Grant Thornton LLP ................................................................ 53

2.    EisnerAmper LLP ............................................................... 55

H.    Outside Counsel ........................................................................ 57

1.    Skadden ............................................................................ 57

2.    Walkers ............................................................................. 59

III. FILB'S INVESTORS OVER TIME ...................................................... 59

A.    The Investment Materials .......................................................... 59

B.    Principal Investors Over Time (dates, amounts, redemptions)............................ 60

1.    MBTA/Alpha .................................................................... 60

2.    Louisiana Pension Funds/Leveraged Series N.......................... 61

3.    Corsair (Leveraged Series 4, 5 and 6)..................................... 63

4.    Richcourt Funds ................................................................ 66

5.    Other Investors.................................................................. 66

6.    Redemptions Paid ............................................................. 67

IV. Use of Investor Money ........................................................................... 67

A.    FILB Investment Portfolio as of June 30, 2007.................................. 67

B.    Use of the MBTA's Money .......................................................... 68

C.    FILB Investment Portfolio as of March 31, 2008................................. 69

D.    Use of the Louisiana Pension Funds' Money ...................................... 70

E.    Richcourt Acquisition (June 2008) .................................................. 71

F.    Fletcher International Partners, Ltd.  (July 2008 through October 2009)............ 76

G.    Raser Technologies (November 2008, December 2008, January 2010) .............. 79

H.    Edelman Financial/Sanders Morris Harris Group and Madison Williams
(November 2009, February 2011, August 2011)................................ 81

I.    Syntroleum Corporation (November 2007 through April 2010) ......... 83

J.    ANTS Software (March 2010 through December 2010)................... 85

K.    UCBI (April 2010) ...................................................................... 88

1.    The Non-Performing Loans .............................................. 88

2.    The Securities Purchase Agreement .................................. 89

L.    Document Security Systems (December 2010) ................................... 92

M.    High Plains Gas (February 2011) ................................................... 93

N.    BRG Investments, LLC (December 2009 through March 2012) ................ 94

1.    Intellitravel Media Inc. a/k/a Budget Travel
(December 2009 through May 2012)..................................... 95

2.    Fletcher Dividend Income Fund LLC
(January 2010 through March 2012)..................................... 96

3.       MV Nepenthes, LLC (September 2010 through December 2012) .......... 97
4.       Lowercase Ventures Fund (May 2010 through October 2010) ................ 97
O.       Aesop Fund, Ltd. and Vanquish Fund Ltd. ........................................................ 98
1.       Aesop Fund, Ltd. ..................................................................................... 99
2.       Vanquish Fund Ltd. .............................................................................. 100

V. EVENTS LEADING UP TO THE COMMENCEMENT OF THE CHAPTER 11 CASE... 101
A.       SEC Investigation ............................................................................................ 101
B.       Louisiana Pension Funds' Redemption Requests ............................................. 102
C.       Liquidations in the Cayman Islands ................................................................. 104
D.       April 22 Transactions ....................................................................................... 105
E.       New York State Case – FILB v. Leveraged ..................................................... 107
F.       Litigation in Bermuda ...................................................................................... 108
G.       Credit Suisse .................................................................................................... 108

VI. THE CHAPTER 11 CASE ............................................................................................ 110
A.       Commencement of the Chapter 11 Case ........................................................... 110
B.       The Debtor's Employment of Professionals ..................................................... 110
C.       Summer 2012 Litigation between FILB
and Leveraged, Arbitrage and Alpha ............................................................... 111
D.       Appointment of Chapter 11 Trustee ................................................................. 113
E.       Schedules and Statements of Financial Affairs ............................................... 114
F.       The Trustee's Employment of Professionals .................................................... 115
G.       Significant Actions Taken by the Trustee ........................................................ 116
1.       Cash Collateral Order .......................................................................... 116
2.       363 Sale of the Helix Stock ................................................................. 117
3.       Consulting Agreements with Turner and MacGregor ........................... 117
4.       Rejection of the FAM Investment Management Agreement ................... 119
5.       Authorization to Serve Rule 2004 Subpoenas ...................................... 119
6.       Unwind of April 22 Transactions ......................................................... 120
7.       Settlement of Silva Litigation .............................................................. 121
8.       Settlement of the FILBCI Litigation .................................................... 122
9.       Unwind of FIP Transaction ................................................................... 126
10.      UCBI Warrant Exercise ....................................................................... 129
11.      MV Nepenthes Consent Agreement ..................................................... 130
12.      Budget Travel Bankruptcy ................................................................... 131
13.      Settlement of the BRG Lease Litigation ............................................... 132

14.    Fletcher Dividend Income Fund ........................................... 132

15.    Kasowitz Adversary Proceeding........................................... 133

H.    The Ion Litigation ...................................................................... 133

I.    The Louisiana Litigation............................................................. 136

J.    Claims and Bar Date ................................................................... 136

K.    Monthly Operating Reports and General Administration.................. 138

L.    Tax Returns and Other Tax Consequences .................................... 138

VII. THE TRUSTEE'S INVESTIGATIVE PROCESS ................................. 139

A.    Documents ................................................................................. 139

B.    Email Review ............................................................................. 141

C.    Depositions and Witness Interviews ............................................. 143

D.    The DOJ and SEC subpoenas ...................................................... 143

VIII. TRUSTEE'S CONCLUSIONS.......................................................... 144

A.    Misuse of the Pension Funds' Money............................................ 144

B.    Use of Richcourt Funds ............................................................... 149

C.    Investments Outside of the Investment Strategy ............................ 149

1.    Richcourt .......................................................................... 150

2.    Fletcher International Partners, Ltd. ..................................... 152

3.    BRG ................................................................................. 153

a)    Intellitravel (Budget Travel) ....................................... 153

b)    MV Nepenthes ........................................................... 154

c)    Lowercase ................................................................. 154

4.    UCBI ................................................................................ 155

5.    Madison Williams ............................................................. 156

6.    Vanquish and Aesop .......................................................... 157

7.    Lyxor................................................................................ 158

D.    Mandatory Redemption of Series N .............................................. 159

1.    Valuations ......................................................................... 160

2.    IAP/EIC Note.................................................................... 160

3.    Vanquish and Aesop .......................................................... 161

4.    Corsair Redemption ........................................................... 162

E.    Valuation Issues ......................................................................... 165

1.    Valuation Best Practices .................................................... 166

a)    Fair Value Standards.................................................. 166

|     |     | b)  | Best Practices for Valuations Policies and Procedures | 166 |
|     |     | c)  | Use of Pricing Letters and Broker Quotations | 170 |
|     | 2.  | The Trustee's Market Research | | 170 |
|     | 3.  | Fraudulent Valuations | | 173 |
|     |     | a)  | Valuations of Investments That Did Not Reflect Partial Monetizations | 174 |
|     |     | b)  | Valuing Non-Exercised Contract Rights | 178 |
|     |     | c)  | Initial Markups | 178 |
|     |     | d)  | Non-Standard Cashless Warrant Exercise Provisions | 182 |
|     |     | e)  | Lack of Fundamental Analysis | 187 |
|     |     | f)  | Insufficient Discounts and Flawed Model Inputs | 189 |
|     |     | g)  | Lack of Corroborative Evidence For Valuations From Market Participants | 192 |
|     |     | h)  | UCBI Investment | 193 |
|     |     | i)  | IAP/EIC Note Valuation | 197 |
|     |     | j)  | Madison Williams | 203 |
|     |     | k)  | Fletcher International Partners, Ltd. | 205 |
|     |     | l)  | BRG | 206 |
|     | 4.  | Impact of Misvaluations | | 207 |
| F.  | Solvency | | | 209 |
|     | 1.  | Balance Sheet Test | | 210 |
|     | 2.  | Cash Flow Test and Capital Adequacy Test | | 216 |
|     | 3.  | Conclusions | | 220 |
| G.  | Insiders | | | 220 |
| H.  | Quantal | | | 221 |
|     | 1.  | Richcourt Holding AUM Trends | | 225 |
|     | 2.  | Richcourt Holding's Year-End 2008 AUM | | 225 |
| I.  | Auditors | | | 227 |
|     | 1.  | Grant Thornton | | 229 |
|     |     | a)  | Cashless Notes | 229 |
|     |     | b)  | IAP/EIC Note | 231 |
|     |     | c)  | Related Party Transactions | 233 |
|     |     | d)  | FILB PIPEs and Warrant Investments | 234 |

e)    Going Concern ............................................................................ 237

2.    Eisner ............................................................................................ 238

a)    IAP/EIC Note.............................................................................. 238

b)    Corsair Redemption ................................................................... 239

c)    FIP................................................................................................ 239

d)    FILB's PIPE and Warrant Investments..................................... 239

e)    Lack of Independence ................................................................ 243

f)    Going Concern ............................................................................ 244

J.    Citco...................................................................................................... 245

K.    SS&C .................................................................................................... 247

IX. CERTAIN LITIGATION RISK FACTORS TO BE CONSIDERED ................. 248

X. THE PLAN .......................................................................................................... 250

A.    Summary of the Plan.......................................................................... 250

1.    Liquidation of FILB Assets ...................................................... 250

2.    Pooling of Claims ...................................................................... 251

B.    Classification of Claims and Interests and General Provisions ......... 252

1.    General Rules of Classification ................................................ 252

2.    Administrative Claims and Priority Tax Claims.................... 252

3.    Satisfaction of Claims and Interests......................................... 253

4.    Bar Date for Administrative Claims ....................................... 253

5.    Bar Date for Fee Claims ............................................................ 253

C.    Classification of Claims and Interests................................................ 254

D.    Treatment of Unclassified Claims and
Unimpaired Classes of Claims and Interests ....................................... 255

1.    Treatment of Allowed Administrative Claims........................ 255

2.    Treatment of Allowed Priority Tax Claims ............................ 255

3.    Treatment of Other Priority Claims (Class 1)........................ 255

4.    Treatment of Allowed Secured Claims (Class 2) .................. 256

E.    Treatment of Impaired Classes of Allowed Claims and Interests...... 256

1.    Class 3: General Unsecured Claims......................................... 256

2.    Class 4A: Arbitrage and the Arbitrage JOLs .......................... 256

3.    Class 4B: Leveraged and the Leveraged JOLs ...................... 257

4.    Class 4C: Alpha and the Alpha JOLs ...................................... 257

5.    Class 4D: Louisiana Pension Funds......................................... 257

6.      Class 5: Insider Claims ............................................................ 258

7.      Class 6: Intercompany Claims .................................................. 258

8.      Equity Interests ......................................................................... 258

F.      No Substantive Consolidation ............................................................ 259

G.      Executory Contracts and Unexpired Leases ....................................... 259

H.      Effective Date ..................................................................................... 260

1.      Conditions to Confirmation ...................................................... 260

2.      Conditions to the Effective Date .............................................. 260

3.      Waiver of Conditions ................................................................ 260

I.      Waiver, Releases, and Indemnification .............................................. 260

1.      Waiver of Claims ...................................................................... 260

2.      Injunction .................................................................................. 261

3.      Releases ..................................................................................... 262

4.      Indemnification ......................................................................... 263

5.      Exculpation ............................................................................... 263

6.      Existing or Future Claims ......................................................... 264

J.      Retention of Jurisdiction .................................................................... 264

1.      Claims and Interests .................................................................. 264

2.      Injunction, etc. .......................................................................... 264

3.      Fees ........................................................................................... 264

4.      Dispute Resolution .................................................................... 265

5.      Leases and Executory Contracts ............................................... 265

6.      Actions ...................................................................................... 265

7.      General Matters ......................................................................... 265

8.      Plan Modification ...................................................................... 265

9.      Aid Consummation .................................................................... 266

10.     Avoidance Actions .................................................................... 266

11.     Implementation of Confirmation Order .................................... 266

12.     Resolve Disputes ....................................................................... 266

13.     Determine Tax Liability ............................................................ 266

14.     Final Order ................................................................................ 266

K.      Miscellaneous Provisions ................................................................... 267

1.      Defects, Omissions, Amendments and Modifications .............. 267

a)      Pre-Confirmation Modification ................................ 267

b)      Post-Confirmation Immaterial Modification ............................. 267

c)      Post-Confirmation Material Modification .................................. 267

2.      Withdrawal or Revocation of the Plan.................................................... 267

3.      Successors and Assigns.......................................................................... 268

4.      Final Orders ........................................................................................... 268

5.      Governing Law ...................................................................................... 268

6.      Notices ................................................................................................... 268

7.      Severability ............................................................................................ 269

8.      No Admissions........................................................................................ 269

XI. CONFIRMATION OF THE PLAN ................................................................... 269

A.      Confirmation Hearing ...................................................................................... 269

B.      Objections ......................................................................................................... 270

C.      Requirements for Confirmation of the Plan....................................................... 270

1.      Requirements of Section 1129(a) of the Bankruptcy Code .................... 270

a)      General Requirements.................................................................. 270

b)      Best Interests Test ...................................................................... 272

c)      Feasibility................................................................................... 273

2.      Requirements of Section 1129(b) of the Bankruptcy Code .................... 273

a)      Fair and Equitable Test ............................................................... 273

b)      No Unfair Discrimination ........................................................... 274

c)      Application to the Plan................................................................ 275

3.      Alternative to Confirmation of the Plan.................................................. 275

4.      Nonconsensual Confirmation.................................................................. 275

XII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.................... 276

A.      Federal Income Tax Consequence to the Debtor................................................ 277

B.      Federal Income Tax Consequences to Holders of Claims and Interests............. 278

XIII. CONCLUSION .......................................................................................... 279

XIV. GLOSSARY

XV. APPENDIX

## TRUSTEE'S REPORT AND DISCLOSURE STATEMENT

Richard J. Davis, the Chapter 11 Trustee of the Debtor, Fletcher International, Limited, respectfully submits this Report and Disclosure Statement pursuant to Sections 704, 1106 and 1125 of the Bankruptcy Code.[1]

# I.
# INTRODUCTION AND SUMMARY

### A.    PRELIMINARY STATEMENT

The Debtor, Fletcher International, Ltd. (known as "FILB" – the "B" standing for "Bermuda"), was one of dozens of investment funds, investment vehicles, and investment managers created or owned by Alphonse Fletcher, Jr.  (Almost all these entities have "Fletcher" in their names.  Fletcher the individual is referred to as "AF.")  FILB was a "master fund" that was supposed to invest money from "feeder funds" in accordance with a well-thought-out and precisely-articulated strategy managed by an experienced, successful manager, AF, and his wholly-owned management company, Fletcher Asset Management ("FAM").  The reality was very different.

FILB was a fund which on the date of its bankruptcy held only one asset of undisputed value – Helix stock – worth less than $8 million.  What the Trustee's investigation shows is that, with FAM as its investment manager, FILB did not make a single profitable investment after August 31, 2007, and none of its investments made since then came close to realizing the valuations FAM placed on those investments – indeed, many are now virtually worthless.  What the investigation also shows is that FILB, its feeder funds, and their investors were victims of a fraud perpetrated by AF and others at FAM, which enabled them to divert

---

[1] All capitalized terms are defined in the accompanying Glossary.  Some of the less frequently used terms are also defined in the text.

investor funds for AF's own benefit, aided or facilitated by those we normally think of as creating a line of protection against such fraud – administrators, valuation experts, and auditors. Among the facts obscured by the fraud was that FILB and its feeder funds likely were insolvent as early as 2008.

The paucity of assets with any value has had two major impacts on the FILB bankruptcy since the Trustee was appointed. First, while the Trustee has done an extensive investigation to determine whether any claims exist, it has been necessary to factor in cost considerations in deciding whether to take particular investigative steps.[2] A prime example of this necessary balancing involves discovery relating to Citco and its affiliates, Citco Trading Inc. and Citco Fund Services (Cayman Islands) Ltd., the latter serving as the administrator of the feeder funds – Alpha, Leveraged, and Arbitrage – until March 31, 2010, while also having many other conflicting relationships with AF, FAM and the Funds. The U.S.-based Citco entities from which the Trustee sought discovery responded to subpoenas by denying that they had any responsive documents; all responsive documents purportedly reside with non-U.S. Citco entities. Once Citco refused to provide those documents (or any witnesses) voluntarily, the Trustee made the decision not to incur the substantial expense involved in engaging in foreign discovery. In the end, while the Funds have all the complexities of much larger funds, the estate simply did not have the resources to take all conceivable investigative steps.

The second principal impact flowing from the lack of real assets is that recoveries under the Plan will be nearly totally dependent on the potential claims uncovered in the Trustee's investigation, and described in this Report and Disclosure Statement. While the Trustee has been able to recover some assets that were improperly transferred pre-petition, and has been able to

---

[2] References to the "Trustee" throughout should be understood to include the Trustee, his counsel, and his special consultant.

recover FILB's interest in Fletcher International Partners, Ltd., which should have some value, it is the outcome of the litigations relating to the liability of UCBI under certain warrants and against FAM, AF, service providers, and potentially others that will determine how much creditors will receive. In this connection, it is likely that the pursuit of claims against third parties will require the use of counsel compensated on a contingency basis. And, it should be assumed that each of these claims will be vigorously contested.

The necessarily uncertain nature of recoveries under the Plan will be particularly painful for the ultimate victims of this fraud – four public employee pension funds[3] which collectively invested $125 million since mid-2007, and which as of May 31, 2011, were told their investments were worth approximately $170 million. The creditors listed on the original schedules filed by the Debtor did not include these funds, and instead identified several million dollars worth of direct creditors. Based on the analysis of claims undertaken by the Trustee, however, more than 90% of all recoveries should go to these pension funds, either directly or through allowed claims of the various feeder funds. Also, as part of the proposed Plan, there is a pooling of claims against third parties among FILB and the feeder funds (Alpha, Leveraged, and Arbitrage) and the investor in Alpha (the MBTA). Pooling is particularly desirable because of the existence of potentially overlapping claims. Prosecution of claims will also be coordinated with the Louisiana Pension Funds, investors in Leveraged, who until confirmation of the Plan can elect to pursue their claims as part of the pool.

---

[3] These funds are the Massachusetts Bay Transportation Authority Retirement Fund (the "MBTA"), and the New Orleans Firefighters Pension & Relief Fund, the Municipal Employees Retirement System, and the Firefighters Retirement System (the "Louisiana Pension Funds").

## B.    OVERVIEW OF FINDINGS OF INVESTIGATION

A key early decision by the Trustee was that because of the interconnection between the feeder funds and FILB (the master fund), his investigation had to look broadly at the operations of all these funds.  Also, given the fact that as of May 31, 2011, the Louisiana Pension Funds and the MBTA believed they had combined capital accounts in excess of $170 million, it was important to understand why there was later so little in the way of assets for these pension funds to look to in order to recoup their investments.

As part of the investigative process, the Trustee, beginning this past summer, met with those whose conduct he then believed he might be criticizing.  Counsel for these entities participated in the meetings.[4]  The purpose of these meetings was to outline areas of concern and to invite the participants to provide responses which they felt would address those concerns.  Some of the participants, at least to some degree, took advantage of this offer to provide feedback; others did not.

Based on the Trustee's investigation, the answer to the question of why FILB had no meaningful assets at the time of the bankruptcy filing is principally that the Funds were victims of a fraud defined by the extensive use of wildly inflated valuations, the existence of fictitious assets under management ("AUM") numbers, the improper payment of excessive fees, the misuse of investor money, and efforts wrongly to deny the Louisiana Pension Funds a key benefit of their investment agreement – mandatory redemption of their investment under certain circumstances.  The Funds were also victims of an environment where self-interest all too often trumped fiduciary obligations.

---

[4] In the case of Quantal, the meetings were telephonic.  Also, Grant Thornton elected to have only counsel attend.

A brief overview of circumstances surrounding the Louisiana Pension Funds' March 31, 2008, investments demonstrates much of what was wrong within the Fletcher System.

**Around the Time of the Investment in March 2008**

- The combined cash balance of Alpha, Leveraged, Arbitrage, FII and FILB on March 31, 2008, was a mere $1.6 million, plainly insufficient to pay existing obligations.

- Virtually the entire FILB portfolio was held in two securities (ION and Helix), which FAM valued at $352.8 million, when a fair valuation would have been approximately $212 million.

- Citco – the administrator for the Feeder Funds and also a lender to Leveraged and a marketer for FAM – was pressing FAM to have Leveraged repay the last $13.5 million of its $60 million credit line and finally to honor a year-old $3.1 million redemption request by a Richcourt fund that Citco then controlled.

- Citco, eager to divest its Richcourt fund of funds business, was actively negotiating to sell it to AF.

- In order to allow the Louisiana Pension Funds' investments, Citco, acting for certain Richcourt Fund investors in Leveraged, consented on their behalf not only to subordinate their investments to the new Louisiana Pension Funds' investments, but also to allow their capital accounts to be

reduced to the extent necessary to allow the Louisiana Pension Funds to earn a preferred 12% annual return.[5]

- Citco was paying the Louisiana Pension Funds' financial advisor a marketing fee to introduce investors to Arbitrage.

The Louisiana Pension Funds, knowing virtually none of this, then invested $100 million into Leveraged on March 31, 2008.

**What Happened in the Ensuing Months:**

- $27 million from the Louisiana Pension Funds was used to fund an unsecured loan on non-market terms to an AF holding company to fund AF's acquisition of the Richcourt fund of funds business, a transaction not allowed by the relevant documents.

- $13.5 million was used to pay back Citco's loan, and $3.1 million was used to satisfy the long-outstanding Richcourt Fund redemption request.

- With the acquiescence of Citco's most senior executive, Christopher Smeets, FILB paid a net amount of $4.1 million to a senior Citco executive – Ermanno Unternaehrer – through a transaction designed to provide him with needed personal liquidity, in another transaction not allowed under the relevant documents.

- The remainder of the Louisiana Pension Funds' money went for margin calls, other redemptions (including $5.1 million to FFLP), and fees to FAM and others.[6]

---

[5] Since the Funds' track record at the time showed materially lower returns, the possibility of the Richcourt Fund investors' capital accounts being reduced each year was very real.

[6] Much of the earlier MBTA investment was similarly used for redemptions, loan repayments to Citco, margin calls and fees, all at a time when there was very little other cash on hand and the value of the assets supporting the investment was inflated.

Unfortunately, this pattern of inadequate cash, inflated valuations, misuse of investor money, and flouting of fiduciary obligations was to be repeated in the future. For example, not only was $27 million of investor money diverted to AF's personal benefit so that he could buy the Richcourt fund of funds business, but nearly $8 million was later diverted to fund a movie being made by his brother. Highly inflated valuations also continued, which served as the justification for excessive management and incentive fees; gave comfort to investors that all was well; helped avoid the triggering of a mandatory redemption provision that would have stopped the cash flow to AF and FAM; and allowed FAM and related entities to redeem their interests at inflated values. Between 2007 and 2012, the Funds paid approximately $32 million in unwarranted fees to FAM, RF Services, and Duhallow.[7]

One example of inflated valuations, the investment in ANTS, a small company that produces high performance data management software for corporate customers, demonstrates how the systematic misvaluation of assets worked:

- On March 15, 2010, FILB invested $1.5 million in ANTS, receiving common stock (then trading at 90 cents) and warrants to purchase another ten million shares.

- On March 31, 2010, FAM marked up this investment, despite there having been no fundamental change at ANTS, to $17.3 million (a 1,053% gain in 16 days) even though at the same time the ANTS 2009 audited financials were released, raising "going concern" issues (a fact FAM neglected to mention in highly optimistic reports to the MBTA Pension Fund).

---

[7] Duhallow was owned and run by Denis Kiely. RF Services was created in late 2010 and took over for Duhallow to provide back offices services to the Funds.

- FILB, either directly or through BRG (a FILB subsidiary), invested an additional $5.9 million in ANTS during 2010, and at its high point, FAM marked the investment at $62.8 million.

- Ultimately, FILB recovered $4.9 million of the $7.4 million it invested; the remaining warrants are worthless.

- Nevertheless, on an investment where FILB lost $2.5 million (ANTS), FAM took management and incentive fees as if it were worth 1,164% more than the investment actually returned.

FAM did not engage in these misvaluations of assets, self-dealing and other wrongs in isolation.  Citco Cayman, the initial administrator for the Feeder Funds, with all its and its affiliates' entanglements with FAM and AF, seemed more interested in its own financial interests than in the Funds for which it had responsibilities.  Among other things, Citco Cayman appears to have ignored the role assigned to it by the various Offering Memoranda in the valuation process.  SS&C, the successor administrator for the Feeder Funds and FILB, not only appears to have ignored this responsibility, but secretly contracted away the valuation role assigned to it by the governing documents, and concealed what it had done in a series of misleading communications sent to investors and the Cayman Regulators that did not disclose this key fact.

Auditors, too, failed to exercise adequate professional skepticism when reviewing valuations; failed to insist on adequate disclosure of related party transactions involving AF and his family, Citco, and Unternaehrer; and failed to require disclosure of redemption obligations which would have caused a collapse of the Funds.

Finally, Quantal, the so-called independent valuation expert, appears not to have had the necessary market expertise to perform the tasks it undertook, produced wholly unrealistic valuations, and, over time, became far from independent, as its principal took on positions with Fletcher-Related Entities and sought to secure business opportunities from AF.

In many ways, the fraud here has many of the characteristics of a Ponzi scheme, where, absent new investor money coming in, the overall structure would collapse due to an inability to meet existing redemption and other obligations. The MBTA and Louisiana Pension Funds were such new investors; and from late 2008 to March 2010, the only new investors were Richcourt Funds that AF controlled. Then, when even that source ran out, the scheme was sustained for a time by continued use of inflated valuations. The result has been a serious loss for the investing pension funds and other creditors.

There were numerous red flags that ought to have been readily apparent to the administrators and auditors for the Funds. These red flags included:

- Manager-controlled pricing of customized investments, supported by a valuation agent lacking adequate experience and independence;

- Massive subscriptions into the Funds in November and December 2008 (following the collapse of Lehman Brothers) from the FAM-controlled Richcourt Funds, when both the administrator and auditor knew that the Richcourt Funds had suspended net asset values ("NAVs") and redemptions and imposed gating on investors;

- Repeated massive sudden gains in multiple investment positions;

- Multiple transactions in major positions at values that were inconsistent with the mark-to-model valuations;

- Valuation reports that did not meet minimum industry standards;

- Guaranteed minimum investor returns for certain investors;

- Absence of any down months over 127 months from June 1997 through December 2007;

- Fund complexity;

- Lack of timely issuance of annual audited financial statements;

- Lack of timely reporting and communications to investors, including delays in receiving monthly and weekly financial data from the investment manager in order to calculate NAVs;

- Backdating corporate and transaction documents;

- Ascribing value to non-exercised contract rights to buy securities without actually investing in them;

- Mismatch between the terms of the investment vehicle and the underlying investments; and

- Continued inflows and outflow over short time periods from affiliates and related entities.

These red flags should have caused the administrators and auditors to have investigated, disclosed and stopped.  None did.

The Trustee's investigation was conducted by the Trustee personally, his counsel (Luskin, Stern & Eisler), and his special consultant (Goldin Associates).

### C.   SUMMARY OF THE PLAN

Given the serious misconduct by the Debtor's former management and those acting in concert with them, and the lack of meaningful value of virtually all of its assets, it is not

possible to reorganize FILB as a going concern.  The Trustee is therefore proposing a liquidating

Plan.  The Trustee has already liquidated the limited amount of the Debtor's assets for which

there is a ready market, and proposes to liquidate the Debtor's as-yet unliquidated assets and

claims under the supervision of a Plan Administrator and Advisory Board.  These claims and

assets consist primarily of preference and fraudulent conveyance claims, claims relating to the

liquidation of certain securities owned by the Debtor, and a few assets, which with one or two

possible exceptions, are of limited, if any, value. These Liquidation Recoveries will be used first

to satisfy administrative and priority claims and will then be distributed pro rata to the unsecured

creditors and the investors in Classes 3 and 4.  In addition, a key part of the Plan is the creation

of a pool of certain litigation claims (the "Pooled Claims"), also to be administered by the Plan

Administrator and Advisory Board.

The Pooled Claims – principally fraud, breach of fiduciary duty, negligence and

similar tort claims against Insiders and affiliates and certain service providers and professionals –

will be pooled together with similar claims belonging to the Debtor's feeder funds and certain of

its ultimate investors.  Net recoveries on the Pooled Claims will share in the percentages set out

in the Investor Settlement.  FILB's share is 26.8%; its share will be distributed as a Liquidation

Recovery.  Finally the claims of Insiders and their affiliates will be subordinated or disallowed,

and no distributions will be made on their account.  The Plan is described in detail in Section X

below.

The Trustee believes that the Plan is fair and equitable to all Holders of Claims

and Interests and is in the best interests of all creditors and other stakeholders.  All creditors

entitled to vote are urged to vote in favor of the Plan by no later than the Voting Deadline.  The

Bankruptcy Court will confirm the Plan only if it finds, at the Confirmation Hearing, that all of

the applicable requirements of Section 1129 of the Bankruptcy Code are met.  Among the

requirements for confirmation of a plan of liquidation are that the plan: (i) is accepted by the

requisite holders of claims and interests in impaired classes of creditors and interest holders; (ii)

is in the "best interests" of each holder of a claim or interest in each impaired class; and (iii)

complies with the applicable provisions of the Bankruptcy Code.  See Section XI.C of this

Report and Disclosure Statement for a discussion of the Bankruptcy Code requirements for

Confirmation of the Plan.  There can be no assurance that these conditions will be satisfied.

## II.
## BACKGROUND & ORGANIZATION

### A.   THE FLETCHER FUNDS

The Fletcher family of funds was organized as a group of related feeder and

master funds, each with a management contract with a single management company, Fletcher

Asset Management Inc., known as FAM, but having separate boards of directors and being

separate legal entities.  This type of structure is often used when a manager's prospective

investors have different tax attributes (e.g., taxable U.S. investors, non-taxable U.S. investors,

and offshore investors).[8]  FILB, the Debtor, is a master fund.  It was intended to hold the

underlying investments.  As time went on, it was also the source of much of the funds needed by

the feeder funds to meet their obligations.

The largest of the feeder funds was Fletcher's flagship fund – Fletcher Income

Arbitrage, Ltd., known as Arbitrage.  This was the entity through which a number of Fletcher's

clients invested and which was meant to transfer the invested funds down to the master fund that

actually held the underlying investments – in this case, FILB.  Arbitrage was set up for non-

---

[8] AIMA, Guide to Sound Practices for Hedge Fund Administrators 24-25 (2d ed. Sept. 2009); Effie
Vasilopoulos and Katherine Abrat, Hedge Fund Monthly: The Benefits of Master-Feeder Fund Structures
for Asian-based Hedge Fund Managers, Eurekahedge, Apr. 2004.

taxable United States investors and offshore investors. FIA Leveraged Fund, Ltd., known as

Leveraged, was another feeder fund. Leveraged was set up for clients who wanted to make a

leveraged investment into Arbitrage with a target leverage ratio of 3:1.[9] This means that for

every $1.00 of client money, the fund would seek to borrow $3.00 and then invest the total $4.00

into Arbitrage. According to its Offering Memorandum, Leveraged was obligated to invest

100% of its funds into Arbitrage.[10] Fletcher Fixed Income Alpha Fund, known as Alpha, was a

customized investment vehicle set up for one investor – the MBTA – that was designed to invest

in Arbitrage.

  Fletcher International, Inc., known as FII, is a Delaware company whose precise

purpose remains unclear. Between 2006 and 2012, FII owned 100% of the shares of the Debtor

and seemed to operate as a feeder fund. In certain instances, however, it operated as a master

fund.[11] For example, FII held investments in a portfolio of bank-owned properties and non-

performing real estate loans purchased from UCBI through five wholly-owned asset holding

companies (although much of the cash and securities FII used to fund this transaction came from

FILB).[12]

  Arbitrage, while operationally a feeder fund, was described in the Leveraged and

Arbitrage Offering Memoranda as a master fund which could make direct investments in third-

party securities and also in other affiliated funds.[13]

---

[9] Leveraged Offering Memorandum, Oct. 19, 1998, as amended Feb. 21, 2007, at 1.

[10] Id. at 12.

[11] A simplified organizational chart of the Fletcher System appears in the Appendix as Exhibit B.

[12] 2009 FII Audited Financial Statements, Note A (describing FII as a "Master Fund").

[13] Series N Offering Memorandum at 1; Arbitrage Offering Memorandum at 18–20.

While between 2006 and 2012, the Funds' assets were largely concentrated in FILB, in total, AF maintained at least 56 separate but related entities (the "Fletcher-Related Entities"). A list of the Fletcher-Related Entities (including FILB) appears in the Appendix as Exhibit C. Given that from 2007 to the Petition Date, Fletcher-Related Entities invested in approximately 25 companies (approximately five per year) on behalf of fewer than 40 investors and never had more than $275 million under management, this structure seems inordinately complex. FAM's auditor, Grant Thornton, agreed.[14]

### B.    OWNERSHIP OF FILB

#### 1.    December 31, 2008 Reorganization

Prior to December 31, 2008, FII owned 66% of the common stock of FILB, and Arbitrage owned 34% of those shares.[15] FILB's preferred shares were owned by Arbitrage (which owned the vast majority of these shares), Arbitrage LP, Aggressive LP, and Aggressive Ltd. (all but Arbitrage were funds owned by AF).[16] FILB's common stock was structurally subordinated to its preferred stock. On December 31, 2008, the preferred shares in FILB were redeemed and restructured into common shares of FII, thus eliminating preferred shareholders' higher priority in the FILB capital structure and leaving FII as the 100% owner of FILB.[17] The

---

[14] Luttinger Dep. 126:20–22, June 4, 2013.

[15] Until earlier in December 2008, FII had owned 100% of the common stock.

[16] Arbitrage LP is a limited partnership formed in 1999 and organized under the laws of Delaware. Between January 2007 and December 2011, a significant percentage of ownership interest in Arbitrage LP was held by entities owned by AF (FAM, FFLP and IAP). During the same period, there were also 14 different third-party investors in Arbitrage LP.

[17] FILB 2008 Audited Financial Statements.

ownership structures of FILB immediately before and after the December 31, 2008 restructuring

are summarized in the following charts:[18]

### Ownership of FILB and FII before the Restructuring

| Ownership of **FILB** Immediately **before** the 12/31/2008 Restructuring | | |
|---|---|---|
| Series 3 Preferred: | Arbitrage | 100.0% |
| Series 4 Preferred: | Arbitrage LP | 85.9% |
| | MMI | 13.8% |
| | Aggressive Ltd. | 0.3% |
| | Total Series 4: | 100.0% |
| Common: | FII | 66.0% |
| | Arbitrage | 34.0% |
| | Total Common: | 100.0% |

| Ownership of **FII** Immediately **before** the 12/31/2008 Restructuring | | |
|---|---|---|
| Common: | Arbitrage | 79.9% |
| | MMI | 14.9% |
| | Arbitrage LP | 4.5% |
| | Aggressive Ltd. | 0.7% |
| | Total: | 100.0% |

### Ownership of FILB and FII after the Restructuring

| Ownership of **FILB** Immediately **after** the 12/31/2008 Restructuring | | |
|---|---|---|
| Common: | FII: | 100.0% |

| Ownership of **FII** Immediately **after** the 12/31/2008 Restructuring | | |
|---|---|---|
| Common: | Arbitrage | 87.8% |
| | MMI | 1.6% |
| | Arbitrage LP | 10.5% |
| | Aggressive Ltd. | 0.1% |

2.    **April 22, 2012 Transactions**

FILB entered into a series of transactions in April 2012 (the "April 22 Transactions"), including asset transfers that were at the Trustee's insistence later reversed. The Trustee believes that the April 22 Transactions were intended to remove FILB assets from the reach of Arbitrage and Arbitrage's investors, and in particular, Leveraged, Alpha, the JOLs administering Leveraged and Alpha, and Leveraged's and Alpha's public pension fund investors. The April 22 Transactions, and the Trustee's response, are described in detail in Sections V.D

---

[18] FILB 2008 Audited Financial Statements; FII 2008 Audited Financial Statements.

and VI.G.6. below.  Among the April 22 Transactions was a purported transfer of 85% of FII's
ownership interest in FILB to Arbitrage,[19] but because the required share transfer was never
accomplished, the ownership transfer never took place.  In the end, it appears that FII retained its
100% ownership interest in FILB.  As noted elsewhere, as part of the Plan Confirmation, the
Trustee will seek to subordinate FII's claims and equity interest, and FII will receive no
distributions under the Plan.[20]

### C.    FILB MANAGEMENT & DIRECTORS

FILB had no employees of its own.  It had a management agreement with FAM
pursuant to which, as described more fully in Section II.E.1 below, FAM was empowered and
obligated to make investment and certain other day-to-day decisions on behalf of FILB.  In
addition, FILB paid certain consultants for services which should have been provided by FAM.
FILB did have a board of directors:  its members since 2008 are listed in the following chart.
James Keyes, who served as an independent outside director, was a former partner at Appleby
(Bermuda) Limited, a Bermuda law firm that represented the Debtor in Bermuda and also served
as its corporate administrator, through its corporate services entity.

---

[19] FILB Shareholders' Capital Account Summary for the period between Dec. 31, 2003 and Oct. 31, 2012.

[20] In addition, the Trustee intends to commence a preference action against FII to avoid various transfers
to it improperly made by FILB.  According to the Debtor's Schedules [Docket No. 105], in the 12 months
preceding the Debtor's bankruptcy, FAM caused the Debtor to transfer nearly $41 million in cash and
investments valued by FAM at approximately $2.4 million to FII.  The Debtor also forgave debt of $6.6
million owed by FII.  The Debtor may have additional claims based on earlier fraudulent conveyances.

| FILB Directors Over Time | | | | | |
|---|---|---|---|---|---|
| | **2008** | **2009** | **2010** | **2011** | **2012** |
| Denis Kiely | ✔ | ✔ | ✔ | ✔ | |
| Stewart Turner | | | | | ✔ |
| Moez Kaba | | | ✔ | ✔ | |
| James Keyes | ✔ | ✔ | ✔ | ✔ | ✔ |
| Floyd Saunders | | | | | ✔ |
| Teddy Stewart | | | | | ✔ |
| **Count:** | **2** | **2** | **3** | **3** | **4** |
| Peter Zayfert (Alternate Director) | ✔ | ✔ | ✔ | ✔ | |

### D.    OVERLAPPING DIRECTORS

Some of the individuals who served on FILB's board also served on the boards of other Fletcher-Related Entities, Richcourt Holding, and some of the underlying Richcourt Funds.[21]  Alpha, Leveraged and Arbitrage each had an independent director – Lisa Alexander of Walkers Fund Services Limited.[22]

### E.    FLETCHER ASSET MANAGEMENT, INC.

#### 1.    Investment Management Agreement

FAM (100% owned by AF) had management contracts with each of the funds, including FILB.  As described more fully in Section VI.G.4 below, the Trustee rejected FILB's management contract with FAM in November 2012.

Under the terms of the IMA, the Debtor retained FAM to manage its investment portfolio, and FAM was authorized "to (i) continuously supervise the investment program of the [Debtor] and the composition of its investment portfolio; (ii) have complete discretion to cause the [Debtor] to purchase or sell any asset, enter into any other investment related transaction,

---

[21] In attempting to determine which individuals served as directors of which entities, the Trustee relied on a variety of sources, including registers of directors, letters from directors, board resolutions, offering memoranda, subscription documents, and promissory notes.

[22] AF did not serve as a director of any of these funds between 2007 and 2012.

including borrowing money, lending securities, exercising control over a company, exercising

voting or approval rights and selecting brokers and dealers for execution of portfolio

transactions."[23]  Among other things, FAM supervised and arranged all investment-related

transactions, including the purchase and sale of all investments and all related loans.  In

exchange for these services, FAM was paid a nominal fee.  However, under the terms of the

IMA, FILB was obligated to indemnify FAM for all liabilities, costs and expenses (including

reasonable attorneys' fees) incurred that related to any services provided by FAM under the

IMA, unless FAM (or any of its officers, directors, employees, or agents) engaged in willful

misconduct, was grossly negligent, or otherwise acted in bad faith.  Pursuant to separate

management agreements between FAM and Alpha, Leveraged, and Arbitrage, the Funds paid

significant fees to FAM, all generally funded by FILB.

## 2.   **Investment Strategy**

FAM's investment strategy for the Funds was to focus on private investments in

public entities (referred to commonly as "PIPEs").  A PIPE security is a privately negotiated

equity or equity-linked investment in a public company.  A PIPE could be structured in a variety

of ways, including as common stock, convertible preferred stock, or convertible debt.  PIPE

investors are often granted warrants as part of the deal.  Historically, investors in PIPEs have

included venture capital and private equity firms and selected large hedge funds.  Examples of

some recent large PIPE transactions include Warren Buffet's investments in Goldman Sachs and

General Electric in 2008 at the height of the financial crisis.

A PIPE typically represents a financing alternative for companies with uncertain

financing prospects in the public markets and can provide the issuer with quick access to capital

---

[23] IMA § 2(a).

when it is needed without the necessity for an upfront registration process. PIPE transactions typically involve a limited group of investors and are highly negotiated. Because they are customized and issued through a private placement process, PIPE investments tend to be illiquid and of interest to only a select group of sophisticated institutional investors.

As described by AF, FAM's investment strategy was to identify public companies closed out of traditional financing markets. FAM would offer to provide such a company with a capital infusion on certain terms. In so doing, the Funds, acting through FILB, would be making a privately placed investment in the stock of a public company. In Stock Market Wizards: Interviews with America's Top Stock Traders, a book by Jack Schwager originally published in 2001 and updated in 2008, AF described his investment strategy as follows:

> Our primary current activity . . . involves finding good companies with a promising future that need more capital but can't raise it by traditional means because of a transitory situation. Maybe it's because their earnings were down in the previous quarter and everyone is saying hands-off, or maybe it's because the whole sector is in trouble. For whatever reason, the company is temporarily disadvantaged. That is a great opportunity for us to step in. We like to approach a company like that and offer financial assistance for some concession.[24]

In the book, AF goes on to describe that his investment positions are hedged through the options market and says that this type of PIPEs strategy has become "our single most important market activity."[25]

The importance of PIPEs was also stressed in the Offering Memoranda. For example, the Arbitrage Offering Memorandum provides:

---

[24] Jack D. Schwager, Stock Market Wizards: Interviews with America's Top Stock Traders (3d ed. 2008) at 159–60.

[25] Id. at 162.

[Arbitrage] may buy newly issued shares (typically in private transactions), directly or through special purpose investment companies, jointly owned with other funds managed by the Investment Manager, from publicly traded companies. The Master Fund may or may not reduce the risks of these investments by subsequently establishing hedges in securities, options, and other derivatives. In some cases, the Master Fund purchases a convertible security and may, in addition, receive warrants to purchase additional equity. The Investment Manager attempts to execute this strategy by negotiating investments in companies that it believes can profitably utilize additional capital. Targeted companies often welcome these proposals because they have the opportunity to raise substantial capital at attractive prices. A portion of the Master Fund's profit from such transactions may result from such hedging techniques as well as from appreciation in the underlying security.[26]

According to the Series N Offering Memorandum, 100% of Leveraged's capital was supposed to be invested into Arbitrage.[27] While the Series N Offering Memorandum described Leveraged's investment objectives in similar terms to those used in the Arbitrage Offering Memorandum, it also stated that Leveraged would "adhere to the guidelines and strategies referred to in the [Arbitrage] Offering Memorandum."

The Arbitrage Offering Memorandum also provides:

[Arbitrage's] investment objective is to achieve returns in the range of 10-15% per annum primarily by exploiting price inefficiencies and anomalies in both equity and fixed income securities around the world. [FAM] believes certain investors can enjoy above average returns by entering into transactions in which instruments are traded which are immediately quantifiably worth more to the buyer than to the seller. Buyers and sellers may place different values on the same asset because of tax, liquidity, transaction cost, carrying cost, risk, accounting, regulatory, administrative or strategic considerations. [FAM] will attempt to achieve the [Arbitrage's] investment objective by utilizing a number of strategies in arbitraging different valuations placed on

---

[26] Arbitrage Offering Memorandum at 20; see also Alpha Offering Memorandum at 23 (describing the importance of PIPEs).

[27] Series N Offering Memorandum at 1.

the income streams of a variety of instruments and by investing on a preferred or creditor basis in other entities managed by [FAM] that in turn engage directly or indirectly in the types of arbitrage and other investments [Arbitrage] could make directly. The strategies that [Arbitrage] or the affiliated entities it invests in include, but are not limited by, the techniques described below. Such techniques may be engaged in by one or more of the Master Funds (as defined below) invested in by [Arbitrage] and will be engaged in by [Arbitrage] directly only to the extent [Arbitrage] makes such investments directly rather than by investing in Master Funds.

During recent years [Arbitrage] has pursued its investment program largely on an indirect basis through investments in corporations, joint ventures, partnerships and other structures (collectively, the "Master Funds") managed by the Investment Manager, which may or may not be subsidiaries of the Fund.

Some or all of the Fund's investment may take the form of equity or loans to a Master Fund.  [Arbitrage] will make loans to the Master Funds only upon approval of the terms of the loans by the Investment Manager.  The equity for such Master Funds may be provided by entities and accounts managed by the Investment Manager, and such equity interests will be subordinated to the loans made by [Arbitrage].  Because such equity interests will be subordinated, the Master Funds will be constructed so that the projected returns to the equity holders, if obtained, would exceed the returns to [Arbitrage].

The portfolio of [Arbitrage] will include both long and short positions.  [Arbitrage] will actively buy and sell U.S. and non-U.S. stocks, bonds and derivative instruments of private and publicly traded issuers (including exchange-traded options and over-the-counter instruments such as forward rate agreements, options, swaps, swaptions, caps, and other products).  [Arbitrage] will enter into transactions in derivative instruments for both hedging and speculative purposes.[28]

In March 2007, FAM made a presentation to the MBTA, entitled "Structured Market Neutral Investments in Mid-Sized Public Companies," that laid out FAM's investment strategy as making "hedged structured investments in quality mid-sized companies" through

---

[28] Arbitrage Offering Memorandum at 5–7.

direct investments, structured transactions and market hedges.[29]  The firm's process as outlined

in the marketing materials describes beginning with a universe of 10,000 or more public

companies and then narrowing that down to 3,000 or more small and mid-cap public companies

of which 250 would be of specific interest.  Of the eight historical investments included as

examples in the presentation, all were PIPEs.[30]  FAM further acknowledged its obligation to

follow this specific investment strategy in a side letter agreement it entered into with the MBTA

and Alpha ("the MBTA Side Letter") at the time the MBTA made its investment, requiring that

notice be given to the MBTA of any investment inconsistent with the strategy described in those

materials so that it could be provided an opportunity to redeem its investment.  The MBTA Side

Letter provides:

> 8.    <u>Fund Investment Strategy</u>.  The Fund and the
> Manager agree to notify the Investor promptly and with sufficient
> advance notice to permit Investor to place a redemption order in
> the event that there is a material change to the Fund's Investment
> Strategy.  As used herein, "<u>Investment Strategy</u>" shall mean the
> investment practices of the Fund as described within the
> presentation document entitled, "Structured Market Neutral
> Investments In Mid-Sized Public Companies," as presented by
> Fletcher Asset Management, Inc. to the Investor, dated March
> 2007. . . .[31]

A due diligence questionnaire prepared by FAM with respect to Arbitrage dated

July 7, 2009, also described Arbitrage's investment strategy as focusing on PIPEs.  It provides:

> These Funds primarily invest in quality small-capitalization and
> mid-capitalization public companies, and often make these
> investments by way of a direct investment. FAM proposes these
> direct investments to provide new capital to those select companies

---

[29] "Structured Market Neutral Investments in Mid-Sized Public Companies," Mar. 2007 ("MBTA
Presentation"), at 4.

[30] MBTA Presentation at 7, 16–19.

[31] MBTA Side Letter at 2–3.

> that the firm believes can productively employ that capital for
> acquisitions, debt reduction, new products, and other beneficial
> purposes. Once a company has passed the firm's rigorous screens,
> FAM crafts investment structures that provide substantial
> participation in a company's success, and protection against
> volatility in a particular stock, sector, or the overall equity
> markets. . . .[32]

In early 2008, FAM's Denis Kiely described Fletcher's investment strategy to the

Louisiana Pension Funds as follows:

> We find good, solid mid-size publicly traded companies that need
> capital and we structure direct investments with them.  We're not
> buying stock in the market and hoping for the best.  We're looking
> to buy preferred stock or convertible debt, or common stock rights
> will go up kind of options and protections, so that in every case
> we're looking to make sure that our capital is safe and we're
> negotiating a lot of options (inaudible) to make an above market
> return.  That's the heart of the business, that's what we do every
> day.

Kiely also stated that:

> We're not looking to buy stock we can't sell . . . .  Generally our
> initial position is no more than 5% of the company's market cap
> and that very important 5% is no more than a couple weeks of
> trading volume.  What that means is when we make an investment,
> unlike a debt holder, or a real estate holder, or a private equity
> investor, we can liquidate in a matter of weeks.  So we can get our
> capital back and that's how we operate.  Everything we're doing,
> even if we're buying preferred stock or debt, we want to be able to
> get our money back in short order. . . .  One key part of our
> business is we don't go on the board and we don't take material
> non-public information because we want them to sell
> immediately.[33]

On October 27, 2009, Kiely testified before the SEC that:

---

[32] Due Diligence Questionnaire for Arbitrage, July 7, 2009, at 5.  A due diligence questionnaire is a widely used written form used in the hedge fund industry, in which a hedge fund supplies information about the fund manager's operations.

[33] Non-Verbatim transcript of the March 12, 2008 FRS Investment Committee Meeting (the "Non-Verbatim Transcript") at 1–2.

> I'm referring to the main investment activity of the FAM Funds is
> making direct investments in publicly traded companies. The
> typical transaction might be — usually, mid-sized publicly traded
> companies, so companies with market capitalizations between a
> couple hundred million and a couple or several billion.[34]

FAM failed to adhere to this investment strategy. Significant amounts of the

investors' money was invested in ways that were patently at odds with the strategy, for instance,

as a non-market loan to enable an AF-controlled company to buy a fund of funds business; in

AF's brother Geoffrey's film company to produce the motion picture Violet & Daisy; in a print

and digital media travel company (Intellitravel, a/k/a Budget Travel); in a distressed real estate

portfolio (UCBI); and in a broker-dealer (Madison Williams). These investments were made in

private companies, and although the Offering Memoranda refer to "private and publicly traded

issuers," the investment had to be in instruments that could be "actively" traded – e.g., publicly

issued bonds of a private company.[35]  No private company investments, however, were permitted

at all under the MBTA Side Letter without prior notice or under express representations made to

the Louisiana Pension Funds. Each of the investments described above was inconsistent with the

overall approach described in the Offering Memoranda and elsewhere. Each of these

investments is discussed more fully in Section IV below.

### 3.      FAM's Performance Track Record

FAM provided performance numbers for a variety of investment vehicles,

including Arbitrage (the flagship fund), Alpha and Leveraged. The performance track records

took into account both realized and unrealized gains and losses on positions, as well as interest

---

[34] Kiely SEC Dep. 41:10–15, Oct. 27, 2009.

[35] See, e.g., Arbitrage Offering Memorandum at 20 ("[Arbitrage] will actively buy and sell U.S. and non-U.S. stocks, bonds and derivative instruments of private and publicly traded issuers."). In his testimony before the SEC, Kiely recognized that Arbitrage could not own Richcourt because it was a private entity. Kiely SEC Dep. 160:6–17, Oct. 27, 2009. The same restriction would apply to all the Funds.

and dividend income. While the inclusion of unrealized investment results is standard practice in the hedge fund community, the issue with the Funds' track record was the highly inflated nature of the purported unrealized gains.

In a presentation made to the Louisiana Pension Funds dated March 12, 2008, annualized net returns for Arbitrage were reported at +8.13% for the period commencing June 1997 through December 2007. Annual returns in any given year ranged from a low of +3.92% in 2002 to +12.05% in 1999. [36] The reported track record is striking for the lack of any down months over 127 months and the overall moderate performance.[37] Out of 127 months in this period, not a single down month was reported, even though the period covered a number of major market dislocations, including the Russian Debt Crisis and failure of Long Term Capital in 1998, the after effects of September 11th in 2001, and a major stock market downturn in 2002.

In March 2011, FAM provided a presentation to Société Generale that contained an updated track record through 2010. In this presentation, FAM reported positive performance for Arbitrage in each of the years 2008, 2009 and 2010, thus continuing a streak of no down years from 1997 through 2010, despite the financial crisis in 2008. The years 2008 through 2010 include 14 total down months, in contrast to the 1997 through 2007 track record which had no down months. According to the Société Generale presentation, 2010 was the best year in Arbitrage's history, with reported net performance of +15.03%.[38]

---

[36] FRS Presentation at 16.

[37] Articles about AF suggested that he had previously talked about an investment track record of + 350% per annum on an annualized basis for the period from 1991 to 1995. See Susanna Andrews, Sex, Lies, and Lawsuits, Vanity Fair, Mar. 1, 2013; Zoe Heller, The Buddy System, The New Yorker, Apr. 29, 1996.

[38] Presentation by FAM to Société Generale, Mar. 2011 at 16.

4.    **FAM's Assets Under Management**

AUM is an important metric for any investment management firm because AUM

is the basis for fees derived by the firm and also reflects the investment buying power of the

firm.  AUM is also a key metric for existing and potential clients, as it is viewed as being a

measure of the health and sustainability of a firm.  Some of the important factors that will be

considered with respect to an investment management firm's AUM include the absolute dollar

amount of AUM, how that amount is trending over time, and whether that trend is likely to

continue.

Statements made by AF to the Trustee that the Funds' peak AUM was in the

range of $500 to $700 million are inconsistent with the Trustee's calculations.  Based on the

Trustee's analysis, the total approximate AUM in the Fletcher System between

December 31, 2007, and December 31, 2009, based on FAM's inflated valuations, was no more

(and likely substantially less) than the following:[39]

| AUM | $ in millions |
|---|---|
| Year-end 2007 | $132 |
| March 31, 2008 | $171 |
| April 30, 2008 | $261 |
| Year-end 2008 | $229 |
| Year-end 2009[40] | $231 |

No audit was concluded for FILB in 2010, although FAM's documents indicate that AUM would

have been $341 million.[41]  Because no audit was produced and because no new investors came

---

[39] In this context, AUM is the sum of the capital accounts of all of FAM's clients.  The AUM data set
forth in the chart is based on the 2007 and 2008 restated audited financial statements of Arbitrage and
Leveraged and data provided to the Trustee by Turner on January 11, 2013, and the Arbitrage LP
Shareholder Register for the period between January 2007, and December 2011.  The Trustee has
corrected this data to eliminate double-counting.

[40] The 2009 audit for Leveraged was never finalized.  This figure includes the IAP/EIC Note at $10
million (the value proposed by Eisner).  See Sections II.G.2. IV.E, and VIII.D.2 below.

into the Funds other than through the FAM-controlled Richcourt Funds, the Trustee concluded that these numbers were unreliable.[42]  The Trustee believes that FAM's AUM from December 31, 2007, forward was likely substantially less than the numbers shown above when properly adjusted to reflect more realistic valuations for the underlying positions.  Even accepting FAM's valuations, the Funds collectively would be considered to be a small hedge fund.

### 5.    Fees

FAM's fee structure varied over time by client and feeder fund, but generally included charging a management fee (based upon the purported value of each investor's capital account), an incentive fee (based upon the purported performance of the Funds), and additional indirect fees derived from compensation directly paid to certain members of the FAM team as "consultants" or paid to companies affiliated with FAM.  For the period from January 2007 through June 2012, FAM, Duhallow and RF Services received $50.7 million[43] in payments in management fees, incentive fees, expense reimbursements, and fees for administrative and record keeping services paid by the Funds.[44]

---

[41] This number is based on data provided to the Trustee by Turner on January 11, 2013, and the Arbitrage LP Shareholder Register for the period between January 2007, and December 2011.

[42] Kiely testified before the SEC on October 27, 2009, that AUM was in the range of $200 million to $300 million.  Kiely SEC Dep. 141:9-12.

[43] This figure includes the $12.3 million deferred incentive fee related to the Corsair transaction.

[44] Cash Model created by Conway MacKenzie (the "Cash Model").  According to Conway MacKenzie, the Cash Model was compiled using bank statements provided to them by FAM and was supposed to reflect all movements of cash in and out of the Funds and certain other Fletcher-Related Entities between January 2006 and June 2012.  See also Spreadsheet provided by Turner calculating $12.3 million deferred fee; Leveraged capital shareholder register for April 30, 2010.

a)    **Management Fees**

FAM charged effective management fees that were well above market.  It was able to do so in part due to the structure of the Funds and the way FAM's clients' investments flowed through the various feeder funds into the master fund.  Investors ended up paying effective management fees of between 3.34% and 3.96% as opposed to standard market rates of between 1% and 2%.[45]  The differential arose because fees were charged at multiple levels in the structure and because FAM clients paid de facto management fees in the form of payments to Duhallow or RF Services for administrative functions and to Citco for marketing functions that FAM should have either performed itself or paid others to do out of its own management fees. FAM also had FILB pay separately for consulting services provided at various times by Turner and MacGregor that should have been performed by FAM or paid for out of FAM's fees.[46]

b)    **Incentive Fees**

Fletcher's main feeder fund investment vehicle – Arbitrage – was set up to charge a weekly incentive fee equal to 20% of both realized and unrealized profits.[47]  This was highly unusual:  typically, hedge funds charge incentive fees on an annual basis, and private equity firms charge fees only when the underlying investments are monetized.[48]  As discussed in Section VIII.E.3.(c) below, only one of FILB's ten PIPE investments initiated from 2007 onward ever came close to its highest mark, even though significant fees were paid based on those

---

[45] Gregory Zuckerman, Juliet Chung & Michael Corkery, Hedge Funds Cut Back on Fees, Wall St. J., Sept. 9, 2013.

[46] Id.

[47] Arbitrage Offering Memorandum at 22.

[48] Ulrich Grabenwarter and Tom Weidig, Exposed to the J-Curve: Understanding and Managing Private Equity Fund Investments 65 (2005).

marks.  In fact, many of the assets upon which these fees were paid ultimately proved to be

worthless.

### 6.   Mismatch Between Terms of the Investment Vehicles, the Underlying Investments, and the Valuation Methodologies Employed

FAM's flagship fund was Arbitrage, which by its terms permitted clients to

subscribe and redeem on a weekly basis.  In addition, incentive fees at Arbitrage were calculated

on a weekly basis.  Arbitrage thus was structurally set up to be a highly liquid investment

vehicle.  In order to function properly, Arbitrage would need to be able to pay out investors at

their stated account value on short notice.

At the same time, many of the underlying investments being made by Arbitrage

(through FII or FILB) had the characteristics of private equity investments – they were highly

customized investments that were illiquid.  For example, FILB made an equity investment in a

private broker-dealer (Madison Williams), a movie (Violet & Daisy) and a portfolio of illiquid

real estate (UCBI) and invested in private warrants for which there was no ready market.  The

two largest investments in the portfolio from 2007 to April 2010 were Helix and ION convertible

preferred positions.  These positions could have provided – and did provide – near-term liquidity

for Arbitrage as they were both convertible into publicly tradable common stock of the two

companies which could then be sold in the market.  However, as discussed below, they were

never valued on this basis.   Rather than linking their value to conversion value, FAM valued

these positions by using a theoretical model-based approach which at times produced valuations

that were almost double what could realistically have been achieved in a sale linked to their

conversion value.

The liquidity features of Arbitrage combined with the private equity nature of

many investments and the model-based approach to valuing positions created a mismatch,

increasing the risk that the Funds would not be able to meet redemptions at stated account values in the normal course of business.

### 7. <u>Leverage</u>

Leverage was an essential part of FAM's investment strategy. The Fletcher system was exposed to a high degree of both embedded leverage, as a result of the types of investments in the portfolio, and financial leverage. Financial leverage is money borrowed from a financial institution. Embedded leverage is leverage that exists due to the nature of the underlying investments.[49] The value of a warrant, for example, can rise more on a percentage basis than the value of the underlying stock. This leverage, and particularly its financial leverage, increased the risk within the Fletcher system overall, making it highly susceptible to changes in market conditions both with respect to the value of the underlying investments and the willingness of capital providers to provide financial leverage.

FAM's business operated with three levels of financial leverage. The first level consisted of margin loans provided by Credit Suisse, Lehman Brothers, and Bear Stearns (later JPM) that were typically collateralized by positions held with those brokers. In the period immediately preceding the bankruptcy filing of Lehman Brothers, FILB's margin debt approached approximately $200 million. By March 2009 (undoubtedly in part due to the 2008

---

[49] For example, warrants have embedded leverage because they allow the holder to receive the economics on an amount of security without having to purchase the security outright. FILB investments contained substantial embedded leverage because the underlying investments were in large part either warrants or convertible preferred stock where significant value was ascribed to the purported option value of the conversion feature. FILB's Helix convertible preferred position was one of the larger positions in FILB's portfolio, and much of the value ascribed to it related to the option to convert the preferred into Helix common stock over time.

debt crisis), the margin debt was brought down to approximately $25 million.  As of the end of

May, 2012, just prior to the FILB Chapter 11 filing, it was $29 million.[50]

The second level of financial leverage in the Fletcher system was at Leveraged.

Leveraged was a feeder fund that was designed to take in investor capital, leverage it, and then

invest all the proceeds into Arbitrage.  The target leverage ratio at Leverage was 3:1 (borrowing

$3 for every $1 of investor money).[51]  Historically, this financial leverage had been provided by

Citco and its affiliates, including SFT Bank N.V., which sometime in or prior to 2006 had

provided a total of $60 million in financing to Leveraged and its wholly-owned subsidiaries.[52]

Up until 2005, the Sandoz Family Foundation held a controlling interest in Citco,

which they had initially acquired in 1995.  In August 2005, an investor group led by the Smeets

Family Trust acquired the controlling interest from the Sandoz Family Foundation.  The parties

who provided the financing for this transaction required that Citco cut back on its hedge fund

lending business.[53]  As a result, around this time Citco notified FAM that it wanted the $60

million in borrowings it had extended to Leveraged repaid.  It took three years for these loans to

be repaid in full, and at least five loan extensions were provided over the period.  Of the amount

repaid, $7.1 million came from the MBTA's $25 million investment, and the final $13.5 million

came from the Louisiana Pension Funds' investment.  The final $13.5 million was due on

---

[50] FILB trial balances for period between May 2007, and June 2012.  In the weeks leading up to the filing of the Debtor's bankruptcy petition, Credit Suisse liquidated certain positions and satisfied the remaining margin debt.

[51] Leveraged Offering Memorandum, Oct. 9, 1998, as amended Feb. 21, 2007, at 1.

[52] Citco Bank Corporation N.V. provided a $20 million credit facility to Leveraged.  Agreement, May 2005, amended Aug. 2005.  Citco Bank Corporation N.V. provided a $20 million credit facility to FIAL II Fund Ltd.  Agreement, Dec. 2004.  SFT Bank N.V. provided $20 million credit facility to FIAL 1 Fund.  Agreement, Apr. 6, 2006.

[53] AF Dep. 17:7–13, July 1, 2013.

March 1, 2008, but Citco had provided Fletcher with an extension to April 1, 2008, the day after the Louisiana Pension Funds' money was due.  Citco immediately swept out enough money to satisfy the remaining loan.[54]

The third level of financial leverage in the Fletcher system resided with Corsair, which was an investment vehicle organized by Citco, FAM and JPM that invested in Leveraged. While the structure was complex, in simple terms Corsair had made its investment into Leveraged in part with money borrowed from RBS.  As a result, Corsair's ability to maintain its investment at Leveraged was dependent on compliance with the terms and conditions of the RBS loan.  In 2009, RBS called an event of default and required that the loan be repaid.  Because the loan had to be repaid, Corsair's investment in Leveraged had to be redeemed.  This Corsair redemption was an issue for the Fletcher system because, as discussed below, the very basis upon which the Louisiana Pension Funds, FAM's largest client, had invested was that Corsair would remain locked in and would provide the Louisiana Pension Funds with their downside protection in the form of the 20% "cushion."[55]

## 8.    Cashless Notes

As Citco sought to retire the lines of credit it had issued to the Funds and the Funds' sources of capital began to tighten and eventually to disappear entirely, FAM looked to alternative means of increasing AUM, including the issuance of promissory notes by the Funds. Having failed to identify a real new lender to provide leverage, FAM created a fictitious one through the use of Cashless Notes issued among affiliates (the "Cashless Notes").  On April 28, 2007, and again on April 26, 2008, FAM used two Cashless Notes of $80 million each, issued by

---

[54] Cash Model.

[55] Series N Offering Memorandum at 10.

Leveraged, as in kind subscriptions to Arbitrage.  Arbitrage recorded the Cashless Notes due

from Leveraged as assets, and allocated them to the capital accounts of the Corsair investors in

Series 1, 4, 5, and 6.  Leveraged recorded the investment in Arbitrage as an asset and recorded

the Notes payable as liabilities.  Thereafter, in June 2007, FAM substituted FILB for Leveraged

as the obligor on the Notes, and in June 2008, the principal value of the Notes was increased.  As

a result, Leveraged was obligated to FILB, and FILB was obligated to Arbitrage.[56]

At their peak, the Cashless Note transactions artificially boosted AUM by over

$160 million, enabling FAM, Citco Cayman and Duhallow to collect higher fees than they

otherwise would have and misleading investors as to the success (or lack thereof) of the Funds.

The Cashless Notes resulted in a 61% increase in Arbitrage's AUM between March 31 and

May 31, 2007, and a 71% increase in Arbitrage's AUM between March 31 and May 31, 2008.[57]

This resulted in total fee overcharges of over $5 million.[58]

This fictitious AUM also was relevant to the Funds' participation in the CSFB

Tremont Investable Hedge Fund Index, whose membership requirements were recalculated and

determined on April 30 every year.[59]  FAM included the two Cashless Notes in its purported

---

[56] The Cashless Notes were "repaid" on December 31, 2008, but no cash changed hands.  It appears that the Cashless Notes were simply extinguished.  See 2008 Arbitrage, Leveraged, and FILB Audited Financial Statements.

[57] These figures are derived from a FAM AUM spreadsheet dated Jan. 11, 2013, supplied by Turner.  The notes also bore interest at one month Libor +1.75%, resulting in non-cash interest income of $3.9 million in 2007 and $14.9 million in 2008 for Arbitrage, boosting returns as well as AUM, which in turn boosted fees to an even greater extent.

[58] See, e.g., Written Resolutions of the Directors of Arbitrage, Dec. 24, 2010.

[59] Credit Suisse maintained a hedge fund index called the CSFB/Tremont Hedge Fund Index, which included 448 funds across a variety of strategies and according to Credit Suisse was the "most widely quoted hedge fund index in the world."  Credit Suisse also created a product for clients who wished to invest in the index.  The product allowed clients to have exposure to approximately 60 hedge fund managers that Credit Suisse believed would largely replicate the performance of this index.  FAM was one of these managers.  Credit Suisse's allocations to these managers were dependent on a variety of

$338.9 million AUM as of April 30, 2008, and sent that number to Credit Suisse in an email dated June 19, 2008.[60]  According to AF, the purpose of providing Credit Suisse with AUM numbers was that Credit Suisse "like[s] to tally up for each fund that's represented the total assets that that manager is deploying in that strategy as part of their deciding how much weight to give to that fund in their index."[61]

The Cashless Notes also benefited the Corsair investors to the detriment of other investors in Arbitrage.  By issuing the new shares in connection with the Cashless Notes, FAM increased the percentage of Arbitrage that the Corsair investors owned, and correspondingly decreased the percentage of Arbitrage that the other investors (who had invested with cash) owned.  Ultimately, the Corsair investors more than tripled their stake in Arbitrage without making any additional investment, going from owning 20% of Arbitrage to close to 70%.  The change in percentage ownership also meant that the Corsair investors received additional profit allocations, and the other – "real" – investors lost their corresponding profit allocations.

The Cashless Notes never should have been classified as assets.  EITF 85-1 provides the accounting guidance[62] on how to classify notes received for capital stock.  EITF prescribes that no value should be ascribed to the value of a note received in lieu of cash except

---

factors, including the AUM of the manager.  See Press Release, Credit Suisse, Press Releases & Announcements (Aug. 14, 2003), available at:

http://www.hedgeindex.com/hedgeindex/en/PressRelease.aspx?cy=USD&DocID=235.

The 2008 Cashless Note was created in May 2008, but backdated to April 26, 2008, two days before the rebalancing deadline for the CSFB index.  This is clear on the face of the Note.

[60] AF SEC Dep. 161:17-20, Sept. 30, 2010.

[61] AF SEC Dep. 108:12-15, Sept. 29, 2010.

[62] Accounting guidance is generally accepted accounting principles ("GAAP"), and any departure would require "qualification" of the audit opinion.

under very limited circumstances, the most important of which is the existence of substantial

evidence of the ability and intent to pay the note off in a reasonably short period of time or

evidence of its being secured by a letter of credit or similar liquid collateral.  There was no such

evidence in this case.  The failure of Grant Thornton, the Funds' auditors, to address these notes

appropriately is discussed below.

### 9.    The Valuation Process

Investment valuation is a critical function for any investment management firm.

The Alternative Investment Management Association ("AIMA") –a global industry organization

for the hedge fund industry – has stated that "independence and competence . . . is at the heart of

the hedge fund valuation process."[63]  Valuation provides the foundation for measuring

investment performance.  For firms that invest in non-exchange traded financial instruments, the

valuation exercise takes on even more importance.  Valuation drives the fees the investment

manager charges to clients, typically derived as a percentage of AUM or performance, and also

affects the price at which clients purchase and redeem their shares.  Valuation also has an impact

on risk management, particularly for firms operating with leverage or other investor triggers.

As would be the case with any firm investing in esoteric securities, the proper

valuation of the underlying portfolio investments was a key responsibility and risk area for FAM.

AIMA's Guide for Sound Practices for Hedge Fund Valuation states that: "[t]he absence of

procedures and controls in the area of valuation can lead to misstatements of a portfolio's value,

which in turn may have a detrimental impact upon the decision-making processes of managers

and investors.  In certain scenarios persistent overstatement of the value of a portfolio's net

---

[63] AIMA, Guide to Sound Practices for Hedge Fund Valuation 6 (2d ed. Mar. 2007).  Citco has served as a co-chair of the AIMA Asset Pricing Committee since at least 2007.

assets may hide or facilitate misappropriation of those assets."[64]  There is no evidence that FAM had any written valuation procedures.

The bulk of FAM's portfolio was in privately placed investments, and FAM operated with a valuation model that did not include obtaining pricing validation from multiple brokers in the form of periodic pricing letters, which would have been a standard hedge fund practice.[65]  Most of FILB's portfolio was in what AIMA would refer to as "hard-to-value" assets, where a good process is particularly important.[66]

The Offering Memoranda for Arbitrage, Leveraged, and Alpha all describe a valuation process that was intended to include the active involvement of three parties – FAM, each fund's boards of directors, and the fund's administrator.  In practice, FAM performed valuations internally, supported by theoretical model-based valuations supplied by Quantal, a firm that had been retained to serve as the Funds' "valuation agent," and the administrators and boards of directors played little, if any, role (notwithstanding disclosures in the Offering Memoranda that they would).

### a)    Quantal – FAM's "Valuation Agent"

Quantal is a small California-based firm founded by two finance professors and an IT specialist to offer investors portfolio risk analytics solutions with a focus on equities and government bond portfolios.[67]  During the time that Quantal provided valuation services to

---

[64] Id. at 14.

[65] Id. at 11.

[66] Id. at 16.

[67] Quantal's website describes the company as follows:  "Quantal International Inc. offers a suite of advanced portfolio-analytics to meet the needs of clients from the investment management industry, together with highly effective on-going customer support and solutions services.  Core financial technology consists of global 'hybrid' multi-factor models for equities and Government bond returns."

FAM,[68] it valued a number of FILB PIPEs as well as three operating businesses – Richcourt (a fund of funds business), Madison Williams (a broker-dealer), and FAM (a hedge fund manager).[69]

       Quantal's main point of contact with FAM was Terry Marsh, who served as Quantal's President and CEO.[70]  Marsh has an MBA and PhD from the University of Chicago and was a Finance Professor at Berkeley until 2005.[71]  James Quinn and Samir Dutt also performed valuation work for FAM.  Dutt was a graduate student at Berkeley.[72]

       From 2006 to 2012, Quantal was paid approximately $290,000 to $780,000 a year for its work for FAM.[73]  FAM records indicate that, between January 2006 and June 2012, Quantal was paid a total of approximately $3.3 million.[74]  Funds used to pay Quantal came out of FILB, meaning that the clients were effectively paying to have their own positions valued.[75]

       Quantal, however, was – and is – a risk management firm.  In a 2010 marketing release, Quantal described itself as "a leading provider of risk analytics solutions for global institutional investors" that "develops cutting edge tools for portfolio management risk

---

[68] Although the sole services agreement produced by Quantal is with FAM, "on behalf of Fletcher and its affiliated entities," the more than $3 million paid to Quantal from June 2006 through June 2012 came from the Debtor.

[69] Quantal valued FAM as part of AF's application to purchase an additional apartment at the Dakota. See Marsh Aff.¶ 6, Mar, 2, 2011, Alphonse Fletcher Jr. et al. v. The Dakota, Inc. et al., Index No. 101289/11 (Sup. Ct. N.Y. Cnty).

[70] Marsh Dep. 47:19, May 7, 2013.

[71] About Quantal:  Company Profile, Quantal International, http://www.quantal.com/About_Company.html.

[72] Marsh Dep. 57:17–22, May 7, 2013.

[73] Cash Model.

[74] Id.

[75] Id.

assessment and control."[76]  As far as the Trustee has been able to discover, FAM is and was

either Quantal's only or only meaningful valuation client[77] and the first and only client investing

in PIPEs.[78]  And despite performing valuations of Richcourt, FAM, and Madison Williams,

Quantal had little experience valuing these types of entities.[79]  Nevertheless, FAM used the

Quantal valuations for marking approximately 80% of FILB's reported asset value at year-end

2008[80] and 98% at year-end 2009.[81]

Valuation agents and model-based valuations should only be used within

reasonable and prudent bounds.  AIMA states that "pricing models for formal valuation purposes

should be sufficiently tested and controlled."[82]  Quantal's were not.  Pricing models should also

be subject to back-testing to ensure that they are reliable.[83]  Again, Quantal's were not – they did

not even take into account numerous, contemporaneous market transactions that at the very least

should have called into question the validity of Quantal's models.

As discussed more fully in Section VIII.E below, the Trustee has concluded that

Quantal's valuations were extremely misleading.  The Trustee believes that Quantal's valuations

were so inflated because Quantal lacked adequate valuation expertise; applied inappropriate or

---

[76] News Release, Quantal, Quantal and QED Join Forces to Deliver Risk Analysis and Performance
Attribution (Feb. 1, 2010), available at http://www.quantal.com/Papers/Quantal-QED%202010-02-01.pdf

[77] Marsh Dep. 94:3–18, May 7, 2013.

[78] Id. 43:22–44:12.

[79] Marsh Dep. 206:2–4, May 7, 2013.

[80] FILB Holdings Report for the Month Ending Dec. 31, 2008.

[81] FILB Holdings Report for the Months Ending Dec. 31, 2008, and Dec. 31, 2009.

[82] AIMA, Guide to Sound Practices for Hedge Fund Valuation 7 (2d ed. 2007).

[83] Id. at 69.

flawed methodologies; utilized inappropriate inputs, did not take into account monetizations, and ignored relevant information; and, over time, became far from independent as a result of its efforts to develop additional business with FAM and various Fletcher-Related Entities, including Richcourt Holding and its subsidiaries. While the Trustee understands that qualified, outside valuation agents may play a role in a well-conceived valuation process, Quantal was neither qualified nor, ultimately, independent. FAM should not have relied on Quantal to perform valuations to the extent that it did.

### b) FAM's Valuation Process

In many cases, FAM's valuation process began before investments were actually made. At the term sheet stage, FAM would often involve Quantal to determine how they would be able to value investments once acquired. After a PIPE or warrant investment was made, Quantal would prepare a "mark-to-model" valuation, using input from FAM.[84] Quantal would submit the theoretical model-based valuations to FAM, and then FAM would perform certain analytics on Quantal's work to come up with a valuation to be used to calculate the portfolio's value.[85] Despite AF's public contention that the Fund's administrators had the final say on the valuation of the underlying positions,[86] it appears that in reality the final decisions with respect to valuation were made by FAM.

### c) Administrators' and Servicers' Roles in Valuations

As discussed in Section II.F below, the Offering Memoranda represented that the administrators were supposed to take an active role in valuing both the underlying securities held

---

[84] Turner was the primary FAM liaison with Quantal. Marsh Dep. 86:9–13, May 7, 2013.

[85] Interview with Stewart Turner (June 6, 2013) ("Turner Interview").

[86] Josh Barbanel and Jamie Heller, Wall St. J. Reporters, with AF (Apr. 15, 2011) (the "WSJ Transcript") at 119:04.

at the master fund level and in calculating the NAV for each of the funds.[87]  However, while the

administrators appear to have "calculated" the NAVs, they do not appear to have taken any

active role in valuing the underlying assets, instead relying on valuations provided by FAM and

Quantal.  While the Agreements with at least SS&C might have indicated that they were not

responsible for valuing underlying assets, this deviation from the Offering Memoranda was

never disclosed to the investors, who justifiably relied on those documents and understood that

the Administrator would be taking an active role in a valuing the Funds' investments.  Nor was

this limitation disclosed in the letter from SS&C to the Cayman Islands Monetary Authority

("CIMA"), the primary financial services regulator in the Cayman Islands, or in the actual

communication to investors announcing the replacement by SS&C of Citco as the administrator

of the Funds.

## 10.    **Operations**

Typically, a firm the size of FAM might have a portfolio manager, research

analysts, a trader, a handful of back-office employees, a chief operating officer (who might also

handle compliance), a marketing professional, and perhaps a lawyer.  The firm would be

expected to have approximately ten employees in total.[88]  FAM appears to have had many more:

in 2010, for instance, it had 19[89] employees on its direct payroll,[90] and several who were retained

---

[87] During Citco Cayman's tenure, FILB – where the individual investments were primarily held – did not
have an administrator.  However, the Offering Memoranda do not disclose this fact; instead, they confirm
that the administrator would take an active role in valuing the underlying positions held at FILB.  See,
e.g., Arbitrage Offering Memorandum at 40.

[88] Citi Prime Finance, 2012 Hedge Fund Business Expense Survey: Industry-Wide Benchmarks for
Managing a Hedge Fund Organization 25 (2012).

[89] Email from Jay Shows to AF (Dec. 21, 2010) (regarding 2010 annual compensation).

[90] At various points in time, several of AF's family members, including his mother Bettye (FAM Vice
President-public affairs), brother Geoffrey (FAM Vice President-Administration) and brother Todd
(Supervisory Board of RFA-Richcourt Paris), were on the FAM payroll.  Email from Jay Shows to AF,

and paid as consultants to FILB, or through Duhallow, as opposed to being on FAM's direct payroll. These included at times Stewart Turner and Stuart MacGregor – both of whom had been working with FAM for some time.[91]  As discussed above, it appears that this arrangement allowed FAM to charge FILB and the other feeder funds for services that ordinarily would have been part of FAM's own overhead costs to be covered by the management fee the feeder funds paid to FAM. This effectively enabled FAM to increase its fee income. Certain key personnel who remained with the Fletcher-Related Entities during the 2007-2012 time period are described below. Additional personnel and their roles are described later in this Report and Disclosure Statement in connection with the transactions in which they were involved.

Alphonse Fletcher, Jr.

Alphonse Fletcher, Jr. is the Chairman and CEO of FAM. He founded FAM in 1991, and is the sole owner of FAM and numerous other Fletcher-Related Entities. AF was the key decision maker on behalf of FAM on investments and the valuations ascribed to them.

Duhallow Financial Services.

Certain administrative functions typically handled in-house by a manager were "outsourced" to a firm called Duhallow. Duhallow was a fund servicing and record keeping company owned and run by Denis Kiely, a principal FAM employee and consultant. FAM was Duhallow's only client. According to the Alpha, Arbitrage and Leveraged Series N Offering Memoranda, Duhallow was retained by FAM to assist the funds and the administrators with the maintenance and preparation of certain financial records on behalf of the funds, to assist in the computation of net asset value of the funds, and to prepare financial statements and to provide

---

Dec. 14, 2010; email from Jay Shows to AF, Dec. 21, 2010.

[91] Turner and MacGregor provided services to FAM and related entities since at least 1998.

tax and audit services to the funds.  Essentially, Duhallow acted as the "back office" book keepers for the Funds.

Pursuant to the contract between Duhallow, FAM and the Funds, Duhallow was supposed to:  (i) review and obtain a comprehensive review and understanding of all contracts, financial reporting systems, correspondence and reports related to the funds; (ii) perform substantially all the accounting functions related to the fund, including preparing journal entries related to transactions, performing reconciliations, and maintaining ledgers and tax records; (iii) prepare, document and disseminate to all appropriate parties the required financial statements, cash flow reports, investor statements and fund performance reports; (iv) manage the Funds' audit and tax service providers to ensure timely completion of the annual audits; (v) maintain and prepare all required financial and other records on behalf of the Funds; and (vi) prepare all necessary wires and checks, process subscriptions and redemptions, and ensure the timely payment of any fund expenses or redemptions.

Duhallow was paid fees based on AUM at multiple levels in the master-feeder fund structure, receiving anywhere from 12 to 60 basis points per fund.[92]  The arrangement with Duhallow meant investors were charged for services that would ordinarily have been performed by FAM and covered by the management fee paid to FAM by the funds.  While Duhallow appears to have also had its own office, Duhallow functioned primarily out of FAM's offices at 48 Wall Street, New York City.[93]  The contract with Duhallow was terminated effective

---

[92] Amended and Restated Financial Services Agreement between Duhallow and the Funds, FII, and certain other Fletcher-Related Entities, June 1, 2006; Administrator Monthly Closing Packages; Arbitrage, Leveraged, and Alpha Offering Memoranda; 2007, 2008, and 2009 FILB Audited Financial Statements.

[93] Series N Offering Memorandum at 1; Lieberman Dep. 18–19, 23; 16-25, June 13, 2013.

December 31, 2010, on the assumption that RF Services would take over and begin providing the same back office fund services. [94]

<u>Denis Kiely</u>

In addition to running Duhallow, Kiely was involved in all of FAM's and FILB's key areas of business. While Kiely is an attorney, he functioned almost entirely in a key business capacity at FAM. Kiely described himself as AF's right hand man.[95] Kiely's tasks included:

- <u>Marketing</u>. Kiely played an active role in soliciting the Louisiana Pension Funds' investment in Leveraged in 2008. He was listed as the Fletcher contact on the back of the Funds' marketing materials. On March 12, 2008, he made a face-to-face presentation to the Firefighters Retirement System ("FRS") which was videotaped. Kiely also was active in marketing efforts to other clients and potential clients.

- <u>Accounting</u>. Kiely routinely interfaced with the Funds' outside accountants concerning the preparation of financial statements.

- <u>Banking and Brokerage</u>. Kiely routinely interfaced with the Funds' banks and brokers.

- <u>Legal</u>. Kiely was a lawyer, but seems rarely to have functioned as in-house counsel while he was employed at FAM. He did, however, routinely consult with the Funds' regular outside counsel (Skadden) and other law firms on a wide variety of matters related to FILB, the other

---

[94] Lieberman Dep. 65:20-66:4.

[95] Kiely SEC Dep. 409:6-7, Apr. 17, 2012.

funds, and FAM.  Between October 2010 and April 2012, Kiely's law firm
received $528,252 from FILB as payment for legal services.  This amount
includes $230,000 paid for legal services while Kiely was still working for
FAM.[96]

- Investments.  Kiely was head of the Richcourt Investment Committee.
  The role of the Investment Committee was to "evaluate [the]
  appropriateness of each manager."  Kiely was described as providing
  executive oversight at Richcourt Holding[97] and was a director of several of
  the Richcourt Funds.

- Boards.  Kiely sat on the boards of multiple Fletcher-Related Entities and
  of various Richcourt Funds, and routinely signed documents (resolutions,
  notes, etc.) on their behalf.

- Richcourt Acquisition.  Kiely was active in the negotiation and eventual
  acquisition of Richcourt Holding from Citco Trading in 2008.

Stewart Turner

Turner provided valuation services, was responsible for the creation and
maintenance of valuation models, and was responsible for reviewing the financials of the Debtor
and its affiliated funds.[98]  Turner sat on the boards of multiple Fletcher-Related Entities
(including FIP) and some Richcourt Funds, and like Kiely, he routinely signed documents
(resolutions, notes, etc.) on their behalf.  He played key roles in at least two of the improper

---

[96] Cash Model.

[97] Richcourt Group Presentation, Feb. 2011, at 11.

[98] As discussed more fully in Section IV.G.3 below, because of Turner's knowledge regarding the Debtor,
the Trustee initially retained Turner as a consultant for a limited period of time.

transactions that the Trustee has investigated, including the April 22 Transactions and the FIP
investment and redemption transactions.

Stuart MacGregor

MacGregor provided accounting services and maintained the books and records
for the Debtor and its affiliated funds. [99] MacGregor played a key role in transmitting financial
and accounting data to the Funds' servicers and administrators who were responsible for
maintaining the Funds' official books and records.

RF Services

As of December 31, 2010, Duhallow was replaced by Richcourt Financial
Services (later renamed RF Services). [100] A possible explanation for the creation of RF Services
was to boost the revenue stream to support the shrinking value of the Richcourt fund of funds
business which became critical to avoiding certain mandatory redemption rights.  It was
supposed to take over for Duhallow as record keeper and to provide the same back office and
record keeping services that Duhallow had previously provided. [101]

Many of the same employees who had originally worked for Duhallow now
simply worked for and were paid through RF Services. [102]  All (or virtually all) services

---

[99] As discussed more fully in Section IV.G.3 below, because of MacGregor's knowledge regarding the
Debtor, the Trustee initially retained MacGregor as a consultant for a limited period of time.

[100] Effective on the same date that the agreement was terminated with Duhallow, RF Services executed a
financial services agreement with 42 of the Fletcher-Related Entities (the "RF Services Agreement").
However, in order to help ease the transition from Duhallow to RF Services, Duhallow entered into a
transition agreement with Duhallow (the "Duhallow Transition Agreement").  Under the Duhallow
Transition Agreement, Duhallow received 50% of the fees that it had been receiving under the original
agreement.  Termination and Transitional Services Agreement dated December 31, 2010, between
Duhallow and the Funds, FII, and certain other Fletcher-Related Entities.

[101] See RF Services Agreement, Dec. 31, 2010; Duhallow Transition Agreement, Dec. 31, 2010;
Duhallow Agreement, June 1, 2006.

[102] Other Duhallow employees became direct consultants to FILB.  For example, once the contract with

continued to be provided out of FAM's 48 Wall Street offices, and all (or virtually all) of the

employees were the same; they now simply were considered employees of RF Services as

opposed to Duhallow.[103]  Terry Marsh, the president of Quantal, was a director of RF Services.

Moez Kaba

   Moez Kaba, also an attorney, joined FAM in 2009.  He worked from California

and served as internal counsel.  He also served as a director of FILB, BRG and other Fletcher-

Related Entities and played a key role in some of the key investments outside of the stated

investment strategy, including the investments in AF's brother's movie and Budget Travel.

   **11.**  **Backdating**

   FAM often backdated documentation in connection with significant transactions

when it was to its advantage.  Examples include:

- The Creation of the $80 Million Cashless Notes:  The 2007 $80 million
  Cashless Note was signed on May 22, 2007, as were the accompanying
  resolutions of Leveraged and Arbitrage; however, the effective date was
  April 28, 2007.  Similarly, the 2008 Cashless Note and the accompanying
  resolutions were dated May 9, 2008, with an effective date of
  April 26, 2008.  The apparent reason was to ensure that FAM would
  receive or maintain larger investments for a FAM managed fund from the
  CSFB/Tremont Investable Hedge Fund Index, whose capital allocations
  were recalculated and determined on April 30 every year.

---

Duhallow was terminated, Turner and MacGregor were retained as consultants to FILB and were
compensated directly by FILB.

[103] Lieberman Dep. 19:10–15; 23:16–18; 65:20–66:4, June 13, 2013.

- The FIP Redemption:  FAM attempted to backdate the transfer of FILB's

  interest in FIP to Richcourt Euro Strategies and Richcourt Allweather

  Fund in partial satisfaction of two redemption requests.  Turner, as sole

  director of FIP, signed resolutions dated June 20, 2013, to effect a transfer

  as of June 30, 2011, nearly two years after the event.

## F.    ADMINISTRATORS

Between 2007 and the Petition Date, first Citco Cayman and then SS&C served as administrator to the Funds.  Citco and SS&C prepared NAVs for each investor in each series of the feeder funds – Arbitrage, Leveraged, and Alpha.  As a general principle, in calculating the NAVs of the Funds, the NAV of each entity flowed into the entities owning that entity.  For example, the NAV of FILB flowed into FII, then to Arbitrage, and then to Leveraged and Alpha. Thus, the cornerstone of the investor's NAV was the valuation of FILB, which was largely derived from the value of FILB's investment portfolio.

While there were minor differences, according to the Funds' respective Offering Memoranda, the administrator was generally supposed to:  (i) maintain the register of shareholders; (ii) process subscriptions and redemptions; (iii) maintain the fund's books and records; (iv) distribute monthly reports to shareholders; (v) provide officers to act as Secretary and provide directors of the Funds; (vi) serve as the registered office of the Funds; and (vii) perform accounting and clerical services.[104]  Moreover, as discussed more fully below and of particular importance, the Offering Memoranda told investors that the administrator would take an active role in performing valuations of the Funds' underlying investment positions, which is critical to calculating and disseminating the NAV to investors.

---

[104] See, e.g., Series N Offering Memorandum at 21.

For instance, the Leveraged Series N Confidential Offering Memorandum states

that:

> The Net Asset Value calculation is made by the Board of Directors
> in consultation with the Administrator and Investment Manager . . .
>
> * * *
>
> All securities or investments and assets of the Fund including
> securities . . . for which no market exists . . . shall be assigned such
> fair value as the Investment Manager, <u>in consultation with the
> Board of Directors and the Administrator</u>, shall determine in good
> faith to reflect its fair value.[105]

The Offering Memoranda for both Alpha and Arbitrage contain nearly identical language.[106]  AF

confirmed the active role of the administrator in an interview with the Wall Street Journal,

stating (and really overstating) that the administrator has the "final say" on valuations.[107]  The

Offering Memoranda do not suggest that the administrator would serve merely as a "NAV

calculation agent" or that it would be providing limited "NAV Lite" services.  In the absence of

such a description, according to the AIMA, an investor would reasonably rely on the

administrator to be engaged in valuations.[108]

However, in practice, neither Citco Cayman nor SS&C appears to have fulfilled

the role described in the Offering Memoranda.  While both appear to have "calculated" the NAV

for the Funds, neither appears to have taken the active role valuing the underlying assets set forth

in the Offering Memoranda, instead, with immaterial exceptions, mechanically relying on

valuations provided by FAM or its valuation agent, Quantal.  Indeed, as discussed below, SS&C

---

[105] Series N Offering Memorandum at 24 (emphasis supplied).  <u>See also id.</u> at 9 (noting that "Valuations will be made by the Administrator and the Investment Manager, in consultation with the Board of Directors . . .").

[106] <u>See</u> Arbitrage Offering Memorandum at 39; Alpha Offering Memorandum at 44–45.

[107] WSJ Transcript at 119–20.

[108] AIMA, <u>Guide to Sound Practices for Hedge Fund Valuation</u> 58 (2d ed. 2007).

expressly disavowed the role assigned to it in the Offering Memoranda (though this was not disclosed to investors).

1.    **Citco Fund Services (Cayman Islands) Ltd.**

From June 1, 1997, until March 31, 2010, Citco Cayman was the administrator for Arbitrage, Leveraged, and Alpha pursuant to three separate agreements.[109]  Pursuant to these agreements, Citco Cayman generally received an annual fee of 12 basis points of the NAV of each fund, subject to certain minimums, as well as additional annual fees for providing a registered office or an outside director.  While the agreements between Citco Cayman and the Feeder Funds were not identical, the descriptions of the services Citco Cayman was providing in the Offering Memoranda were.

During the time that Citco Cayman served as administrator to Alpha, Arbitrage and Leveraged, it does not appear to have taken an active role in connection with valuations of the Funds' assets, which were primarily held at the FILB level.[110]  While Citco Cayman was not FILB's administrator, it had access to information about FILB's investment portfolio and had reviewed FILB's books and records, including its investments, at least once at FAM's offices in New York.[111]  And, on occasion, it received information on specific valuations.[112]  Nonetheless, Citco Cayman appears to have relied primarily on valuations provided by FAM.[113]

---

[109] These agreements are (i) the Administrative Services Agreement dated as of June 1, 1997, between Arbitrage and Citco Cayman; (ii) the Administrative Services Agreement dated as of August 1, 1998, between Leveraged and Citco Cayman; and (iii) the Administration Agreement dated as of June 8, 2007, between Alpha and Citco Cayman.  Citco Cayman did not provide administrative services to FILB.

[110] In its agreement with Alpha only, Citco Cayman disavowed its obligation to price the portfolio of investments.  See Alpha Administration Services Agreement, Schedule 1, Part 1(a).  However, this limitation was not disclosed in the Alpha Offering Memorandum, and it does not appear that this ever was disclosed to the investors.

[111] Turner Interview.

In December 2009, Citco Cayman provided notice that it was terminating the administration agreements effective as of March 31, 2010. Citco Cayman eventually entered into separate transition agreements with Alpha, Leveraged, and Arbitrage, pursuant to which Citco Cayman agreed to provide certain investor-related services (e.g., processing subscriptions and redemptions) until June 15, 2010. However, SS&C was supposed to take over administration services (e.g., keeping the Funds' books and records and calculating NAVs) immediately.[114]

### 2.    SS&C Technologies

Pursuant to the SS&C Agreement, dated as of March 24, 2010 (the "SS&C Agreement"), SS&C took over as administrator for FILB, Alpha, Leveraged, Arbitrage, and FII effective April 1, 2010.[115] While Citco Cayman continued to provide investor services until June 15, 2010, SS&C was to begin providing administration services immediately. Of particular importance, the SS&C Agreement obligated SS&C to "observe and endeavor to comply with the applicable provisions of each Fund's Memorandum and Articles of Association, private placement memorandum and resolutions of the Directors of which SS&C has notice," which would have included a role in the valuation of the assets and in calculating the NAV.[116] However, later in the SS&C Agreement, SS&C purported to disavow the specific obligation to

---

[112] See, e.g., email from Manmeet Thethi of Citco to Terry Marsh and Samir Dutt of Quantal and Albert van Nijen of Citco (Jun. 3, 2009, 22:09).

[113] Turner Interview; Interview with Stuart MacGregor (Sept. 13, 2013).

[114] Leveraged April 2010 Administrator Supplement at 1; Letter to Investors from FAM dated May 12, 2010.

[115] Subsequently, SS&C also agreed to provide administrative services to FIAL I Fund, Ltd., pursuant to an addendum to the SS&C Agreement, which was effective retroactive to April 1, 2010.

[116] SS&C Agreement at 1.

value the Funds' investments contained in those documents.[117]  Not only did SS&C not disclose

this to the Funds' investors,[118] but it also sent a misleading letter to the Cayman regulators which

hid this key fact, and allowed a similarly misleading communication to be sent to investors.

In connection with SS&C taking over as administrator, a Supplement to the

Confidential Offering Memorandum for each of the Funds (the "Administrator Supplements")

was drafted and distributed to the each of the Funds' investors with an accompanying cover letter

stating that SS&C would be taking over as administrator and describing the services that SS&C

would be providing.  Each of the Administrator Supplements provided that:

> SS&C will perform services including but not limited to weekly
> services (e.g. transaction processing; weekly prime broker,
> custodian and counterparty reconciliation; and weekly reporting);
> calculation of net asset value on a monthly basis; and investor
> services (e.g. operation of bank accounts, processing and
> accepting/disbursing subscriptions and redemptions, providing
> fund information and estimates, and preparing and distributing
> investor account statements, and providing assistance to the Fund's
> auditors).[119]

Before they were distributed, SS&C was given the opportunity to review and comment on the

Administrator Supplements.[120]  However, the Administrator Supplements did not disclose that

the administrator was disavowing its valuation role and would not be performing the valuation

roles described in the Offering Memoranda.

---

[117] SS&C Agreement at 5 (noting that SS&C "will not be responsible for determining the valuation of the Fund's investments.").

[118] According to SS&C, it was not customary for the SS&C Agreement to be distributed to investors, and to its knowledge, this particular agreement was never distributed to the Funds' investors.  Mooney Dep. 217:13–25, May 3, 2013.

[119] April 2010 Administrator Supplements for Alpha, Leveraged, and Arbitrage.

[120] Email from Rahul Kanwar to Gary Leyva, John Zinger and Alan Baron (Apr. 26, 2010, 13:44:41).

On April 28, 2010, SS&C sent a letter to CIMA, the primary financial services regulator in the Cayman Islands.  In its letter to CIMA, SS&C similarly disclosed that it would be responsible for (i) communicating with the fund's shareholders; (ii) accepting the subscriptions of new shareholders; (iii) maintaining the fund's principal corporate records and books of accounting; (iv) arranging for and coordinating the audit of the fund's financial statements by independent auditors; (v) disbursing distributions with respect to the shares, legal fees, accounting fees, and Officers' and Directors' fees on behalf of the fund; (vi) calculating the net asset value of the shares; and (vii) processing of redemptions.  The CIMA letter, like the Administrator Supplements, makes no mention of the fact that SS&C would not be fulfilling its role with respect to the valuation of assets set out in the Offering Memoranda.[121]

In practice, SS&C relied on its agreement to disavow any obligation to value the Funds' assets.[122]  While SS&C did "calculate" the NAV for each of the Funds,[123] SS&C does not appear to have done more than simply rely on whatever FAM and Quantal provided it with respect to valuations of the underlying investments.[124]

---

[121] Letter from SS&C to CIMA, Apr. 28, 2010.

[122] SS&C Agreement at 5; Maniglia Dep. 27:6:15, July 17, 2013.

[123] SS&C Agreement at 2; Maniglia Dep. 36–37, July 17, 2013.

[124] Maniglia Dep. 27:10–12, July 17, 2013.  Nonetheless, on at least one occasion (involving UCBI), SS&C questioned the valuation FAM ascribed to a FILB holding.  FAM had marked up the Debtor's UCBI position from $30.6 million as of May 31, 2011, to $122.1 million as of June 30, 2011, on the basis of a 1:5 reverse stock split UCBI announced in June 2011.  SS&C challenged this $122.1 million valuation because of the drastic markup between May and June 2011, and demanded that FAM produce support from Quantal, Skadden, and its accountants.  See, e.g., Maniglia Dep. 72–96.  While it appears that SS&C eventually accepted this valuation based upon the valuations provided by Quantal and a letter provided by Skadden (see Maniglia Dep. 95:25–96:16), the June 2011 NAV calculation was never produced because of other issues between SS&C and FAM.  Maniglia Dep. 96:17–98:4.

G.    **AUDITORS**

Two outside auditing firms – first Grant Thornton then Eisner – issued audit opinions for various Fletcher-Related Entities from 2001 through 2009.[125]  In 2010, Grant Thornton, which had issued audit opinions through year-end 2008, withdrew its audit opinions for Arbitrage and Leveraged for 2007 and 2008.  Grant Thornton eventually (in 2011) issued opinions for the restated Arbitrage and Leveraged financial statements.

1.    **Grant Thornton LLP**

Grant Thornton was the auditor for the 2001 through 2008 financial year-ends for several of the Funds.  With respect to the 2007 year-end, Grant Thornton was engaged to audit certain of the Fletcher-Related Entities.[126]  For the 2008 year-end, Grant Thornton continued to be auditor to the certain Fletcher-Related Entities,[127] but Grant Thornton's Grand Cayman Island office was also engaged to audit certain of the funds.[128]

---

[125] While the Confidential Offering Memoranda for Alpha, Arbitrage, and Leveraged vary to a degree, all identify Grant Thornton as the independent auditor for the funds, and provide that shareholders will receive an annual audited financial report "prepared by the Fund's independent chartered accountants, Grant Thornton LLP."  The offering memoranda for Alpha and Arbitrage state that "year end Net Asset Value calculations will be reviewed by the Fund's independent auditors."

[126] Grant Thornton was the auditor for the 2007 year-end for the following entities:  Fletcher International, Ltd. and Affiliates, The Fletcher Fund, L.P., The Fletcher Aggressive Fund, L.P., The Fletcher Income Arbitrage Fund, L.P., The Fletcher Market Fund, L.P., The Fletcher Aggressive Fund Limited, The Fletcher Polaris Fund, FIA Leverage Fund, FIAL I Fund, Ltd, and Fletcher Income Arbitrage Fund, Ltd.

[127] Grant Thornton New York was the auditor for the 2008 year-end for the following entities:  Fletcher International, Ltd., Fletcher International Inc., The Fletcher Fund, L.P., The Fletcher Aggressive Fund, L.P., The Fletcher Income Arbitrage Fund, L.P., The Fletcher Market Fund, L.P., The Fletcher Aggressive Fund Ltd., The Fletcher Polaris Fund, FIA Leveraged Fund, FIAL I Fund, Ltd., Fletcher Income Arbitrage Fund, Ltd., Fletcher Fixed Income Alpha Fund, Ltd. and Income Arbitrage Partners, L.P. and Affiliate.

[128] Grant Thornton Grand Cayman Island was the auditor for the 2008 year-end for the following entities: The Fletcher Aggressive Fund Ltd., The Fletcher Polaris Fund, FIA Leveraged Fund, Fletcher Income Arbitrage Fund, Ltd., and Fletcher Fixed Income Alpha Fund, Ltd.

The below chart summarizes Grant Thornton's opinion dates for the Funds and FII for the 2007 and 2008 year-ends.

| Grant Thornton Audit Opinion Dates | | | | |
|---|---|---|---|---|
| | **Opinion Date** | | | |
| | **2007** | **2007 restated** | **2008** | **2008 restated** |
| FILB | 4/22/2008 | | 5/13/2009 | |
| FII | | | 5/18/2009 | |
| Arbitrage | 4/22/2008 | 1/20/2011 | 5/29/2009 | 1/20/2011 |
| Alpha | | | 6/3/2009 | |
| Leveraged | 4/22/2008 | 1/20/2011 | 6/9/2009 | 1/20/2011 |

Until the SEC subpoenaed Grant Thornton in late 2009, each of the audit opinions issued by Grant Thornton for the Funds and FII for 2007 and 2008 was unqualified and stated that the respective financial statements "present fairly, in all material respects, the financial position" of the fund "and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America," and that "our audit provides a reasonable basis for our opinion."[129]  After receipt of the SEC subpoena, Grant Thornton reviewed its work, and in March 2010, notified FAM that it was withdrawing its audit opinions for Arbitrage and Leveraged and requested that FAM notify "persons who are known to be relying, or who are likely to [rely]" on the prior auditing opinions that they should no longer be relied on.[130]  Grant Thornton had concluded that the Cashless Notes could not be accounted for as assets on the 2007 and 2008 financial statements of Arbitrage.  After discussions with Grant Thornton, FAM issued restated financial statements for Leveraged and Arbitrage upon which Grant Thornton opined.

---

[129] See, e.g., 2008 Arbitrage Audited Financial Statements at 3.

[130] Letter from Grant Thornton to FAM (Mar. 31, 2010).

In his April 9, 2010, testimony to the SEC, Matt Luttinger of Grant Thornton informed the SEC that Grant Thornton had made it clear to FAM that Grant Thornton could not proceed with the 2009 year-end audits until Luttinger had testified before the SEC.[131]  Luttinger also noted that Grant Thornton wanted to hear everything before deciding whether he "would recommend to [his] firm and the partners to continue with Fletcher."[132]  During the same period (in March 2010), FAM approached Eisner as a possible replacement for Grant Thornton as auditors of the Funds and certain other Fletcher-Related Entities for the 2009 year-end.[133]

The financial statements for Leveraged and Arbitrage for the 2007 and 2008 year-end were restated and reissued in January 2011 to reflect the change in the accounting treatment of the Cashless Notes.  Grant Thornton reissued its audit opinions on January 20, 2011, for those statements, and ceased to act as an auditor to FAM and the Funds.

## 2.   **EisnerAmper LLP**

In late March 2010, FAM engaged Eisner as the auditors for the Funds and certain other Fletcher-Related Entities for the year-ended 2009.[134]  Investors were notified of this change in a Supplement dated April 2010 to the Confidential Offering Memorandum for each of Leveraged, Arbitrage and Alpha.[135]

---

[131] Luttinger SEC Dep. 43:14–20, Apr. 9, 2010.

[132] Luttinger SEC Dep. 44:2–5, Apr. 9, 2010.

[133] Testaverde Dep. 10:11–12, June 24, 2013.

[134] Eisner was the auditor for the 2009 year-end for the following entities:  Fletcher Dividend Income Fund, BRG International Partners, Ltd., Fletcher International Partners, Ltd., Fletcher International, Ltd., Fletcher International, Inc., The Fletcher Aggressive Fund, Limited, The Fletcher Polaris Fund, Fletcher Income Arbitrage Fund, Ltd., Fletcher Fixed Income Alpha Fund, Ltd., FIAL I Fund, Ltd., FIA Leveraged Fund, Richcourt Partners, L.P., The Fletcher Income Arbitrage Fund, LP, Fletcher Equity Alpha Fund, L.P., The Fletcher G Fund, L.L.C, Multi Manager Investors, L.L.C, Equity Income Corporation, Fletcher Fund, L.P., and The Fletcher Aggressive Fund, LP.

[135] April 2010 Supplements to Leveraged, Alpha, and Arbitrage Offering Memoranda.

Eisner commenced its fieldwork in 2010 and issued audit opinions for the 2009 year-end for FILB and FII in July and August, 2010, respectively.  Eisner could not issue opinions for Leveraged and Arbitrage until the restatements had been finalized and Grant Thornton had reissued its audit opinions.

The below chart summarizes the opinion dates for the Funds and FII for the 2009 year-end.

| Eisner Audit Opinion Dates | |
| --- | --- |
| | **2009** |
| FILB | 7/14/2010 |
| FII | 8/11/2010 |
| Arbitrage | 2/18/2011 |
| Alpha | 4/8/2011 |
| Leveraged | (a) |

(a) No audit opinion was issued.

As illustrated above, Eisner issued opinions for the financial statements for year-end 2009 for Arbitrage, FII and FILB, but Eisner did not issue an opinion on the Leveraged financial statements, due to a disagreement concerning the valuation of the IAP/EIC Note.[136] Although FAM had valued the IAP/EIC Note at $28.6 million, Eisner refused to certify this valuation in the face of Eisner's own conclusion that the IAP/EIC Note was worth only $10 million,[137] a value that would have triggered the mandatory redemption of Leveraged's Series N Shares and the likely collapse of the entire structure.  Discussions ensued between Eisner and FAM.  FAM prepared draft financial statements for Leveraged in November 2011.

---

[136] The significance of the IAP/EIC Note is discussed more fully in Sections VIII.D.2 and V.E.3.(i) below.

[137] 2009 Leveraged Draft Financial Statements, at 17, Note G.

According to Peter Testaverde of Eisner, FAM stopped responding to Eisner audit inquiries, and Eisner did not complete the audit of Leveraged for the 2009 year-end.[138]

Eisner entered into an engagement to audit the Funds and certain other Fletcher-Related Entities for the 2010 year-end.[139]  While draft 2010 financial statements were prepared, the audits were never completed and the financial statements were never issued.  According to Testaverde, Eisner never resigned and considers the 2010 audit to be ongoing.[140]

### H.    OUTSIDE COUNSEL

#### 1.    Skadden

FAM and the Funds used various outside United States and foreign counsel over the years, but their main outside counsel throughout the period relevant to the Trustee's investigation was Skadden.  The precise scope of Skadden's representation, however, became an issue which the Trustee reviewed as part of his investigation.

The Offering Memoranda of Alpha, Leveraged, and Arbitrage, which were prepared by Skadden, identified Skadden as counsel to each of those funds, FAM and their affiliates.  Skadden was also featured in marketing materials provided both to the MBTA and to at least one of the Louisiana Pension Funds.[141]  Skadden, however, has maintained it was counsel only to FAM, with a Skadden partner describing the language in the Offering Memoranda as

---

[138] Testaverde Dep. 185:2–6, June 24, 2013.

[139] Eisner was auditor for the 2010 year-end for the following entities: Fletcher International, Ltd., Fletcher International, Inc., Fletcher Income Arbitrage Fund, Ltd., Fletcher Fixed Alpha Fund, Ltd., FIA Leveraged Fund, and FIAL 1 Fund, Ltd.

[140] Testaverde Dep. 187:8–11, June 24, 2013.  According to Testaverde, "we started 2010 for Fletcher International Limited, which was their main operating company, and we hit some valuation questions.  So we started going – valuation people started going back and forth with Fletcher on those valuation questions, and that's pretty much where it stopped."  Id. 22:10–16.

[141] MBTA Presentation at 13, 32; FRS Presentation at 11, 16, 21 & 25.

"lingo in the investment management world for doing work for the advisors in relation to a fund that it manages."[142]  Skadden also, to varying degrees, provided counsel in a number of transactions undertaken by FILB and its wholly-owned subsidiary BRG, including many of the transactions discussed below.  Skadden also was counsel to FAM and related entities in their 2008 acquisition of the Richcourt fund of funds business.

The Trustee believes that, while it represented FAM, Skadden was also ongoing counsel to Alpha, Leveraged, Arbitrage, and FILB.  Among other things, the Trustee bases this conclusion on:

1.     The language of the Offering Memoranda discussed above which Skadden prepared;

2.     The fact that the Offering Memoranda contained no qualifying language suggesting that Skadden, for example, was counsel only for the offering;

3.     The fact that Skadden was listed in the marketing materials as counsel to Arbitrage, Alpha and Leveraged;[143]

4.     Evidence that Skadden reviewed the marketing materials listing it as Fund counsel;[144]

5.     Audit letter responses submitted by Skadden through 2011 which stated that they were "regular" counsel to each of these funds and to FILB, although their engagement was "limited to specific matters as to which [they] were consulted."[145]

---

[142] Prins Dep. 53:17–19; 54:8–11, Apr. 17, 2013.

[143] MBTA Presentation at 13, 32; FRS Presentation at 11, 16, 21 & 25.

[144] Interview with Denis Kiely (Oct. 21, 2013).

[145] See, e.g., Audit Response Letter from Skadden to Grant Thornton dated April 23, 2009.

6.      As to FILB, Skadden's provision of legal services in connection with numerous FILB transactions, and the payment by FILB to Skadden for those services; and

7.      The belief by various directors of these funds that Skadden represented them as well as FAM.

While concluding that Skadden represented these entities, the Trustee has not at this time concluded that claims exist against Skadden. He is, however, continuing his review of this issue, including by litigating for access to documents and information in Skadden and FAM's possession where FAM has claimed attorney-client privilege.[146]

## 2.      **Walkers**

Walkers represented Alpha, Arbitrage, and Leveraged and advised FAM and the funds on matters related to Cayman Islands law. Walkers often times provided advice concerning the offering memoranda and drafted resolutions and other corporate documents. Walkers has shared communications and other documents related to Leveraged, Arbitrage, and FILB with the JOLs, and the JOLs have shared those communications and documents with the Trustee.[147]

### III.
### FILB'S INVESTORS OVER TIME

### A.      THE INVESTMENT MATERIALS

In connection with its investment, each investor was generally provided with one or more marketing presentations (both oral and written), offering memoranda for the various Funds, and sometimes a side letter. Among other things, these materials collectively disclosed

---

[146] The parties are submitting papers to the Court on this issue in November and December.

[147] The Trustee continues to evaluate whether there are any possible claims against Walkers.

how the particular fund was organized and how it was managed; how decisions were made; the governing law; eligibility requirements for investors; the roles played by various service providers (including administrators, auditors, investment managers and outside counsel); how the NAV for the fund was determined; and any subscription or redemption limits or requirements. These documents set forth the parameters of the investor's investment and were supposed to describe how the investment would be managed.

### B.    PRINCIPAL INVESTORS OVER TIME (DATES, AMOUNTS, REDEMPTIONS)

### 1.    MBTA/Alpha

On June 7, 2007, MBTA invested $25 million into Alpha, in which it was the sole investor. The investment materials providing the specifics of the transactions include the Alpha Offering Memorandum, the MBTA Side Letter, a March 2007 Presentation by FAM to MBTA., and a subscription agreement.

Under the Alpha Offering Memorandum, MBTA was entitled to redeem after one year, and thereafter quarterly on 60 days' notice to the fund.[148] However, as discussed in Section II.E.2 above, pursuant to the MBTA Side Letter, FAM and Alpha were required to provide the MBTA with notice of any investment outside of the investment strategy detailed in FAM's March 2007 Presentation and to notify MBTA with sufficient advance warning so that it could redeem. While, as described below, FAM caused numerous investments to be made outside of the investment strategy, neither FAM nor Alpha ever gave the MBTA the notice required under the MBTA Side Letter to allow it to submit a redemption request.

---

[148] Alpha Offering Memorandum at 3, 13, 45.

On March 24, 2011, MBTA requested a $10 million partial redemption from Alpha.  The redemption request was never satisfied.[149]

On May 9, 2012, Alpha was placed into Voluntary Liquidation, and Tammy Fu and Gordon MacRea of Zolfo Cooper (Cayman) Limited were appointed as Joint Official Liquidators.

### 2.    Louisiana Pension Funds/Leveraged Series N

On March 31, 2008, the three Louisiana Pension Funds collectively invested $100 million ($95 million in cash plus a $5 million legacy investment in Arbitrage that was invested in kind) into Leveraged Series N.  The investment materials providing details regarding the investment into Leveraged include the Series N Offering Memorandum, a subscription booklet, a presentation by FAM to FRS dated March 12, 2008, and an oral presentation to the FRS investment committee by Denis Kiely on March 12, 2008, which was videotaped.

The Louisiana Pension Funds invested in a series of stock issued by Leveraged called Series N.  The Louisiana Pension Funds were the only Series N investors in Leveraged.  Series N shareholders agreed to lock up their money in the Series N investment for two years from the date of subscription.[150]  Thereafter, Series N shareholders were entitled to redeem their investments at the end of any calendar month on 60 days prior written notice.[151]

There were also two provisions requiring a mandatory redemption – even inside the initial two year lock-up period.  Those provisions were:

---

[149] On October 10, 2008, MBTA received an $11.3 million redemption from its legacy investment in Arbitrage from August 2004.  This investment was separate from MBTA's $25 million investment into Alpha discussed in this Section.

[150] Series N Offering Memorandum at 25.  The lock-up on the initial subscription on April 1, 2008, would have expired on April 1, 2010 – the date the Corsair Redemption discussed below was effective.

[151] Series N Offering Memorandum at 9, 25.

- If Series 4, 5 or 6 investors redeemed, a mandatory redemption of Series N was required one day before the redemption of the Series 4, 5, or 6 shareholder; and

- An automatic redemption of Series N would occur if the value of non-Series N capital accounts fell below 20% of the level of Series N shareholders' capital accounts.[152]

The Series N shareholders were granted a preferred return of 12% and also had the possibility of increasing the 12% return to 18% if the underlying investments resulted in fund performance of greater than 12%. Once Series N shareholders had achieved an 18% return, all incremental profit would flow to the non-Series N investors. The minimum 12% return for Series N would result either from performance on investments made or from a reallocation of capital accounts from the non-Series N investors to the Series N investors. This meant that the non-Series N investors in Leveraged were at risk not only of giving up return but also of losing their capital account value if investment returns to Series N fell below 12%.[153]

Because FAM had agreed to provide the Louisiana Pension Funds with this minimum 12% per annum return, the Louisiana Pension Funds' stated account balances automatically went up each month, regardless of any underlying investment performance. As a result, to stay clear of the automatic redemption trigger, the account balances of the other investors had to be maintained at 20% of an ever increasing number.

In order to enable the issuance of the Series N Shares, it was necessary to obtain consents from the non-Series N shareholders in Leveraged. The only non-Series N shareholder

---

[152] Id. at 10, 27.

[153] See id. at 27–28.

not related to FAM or its affiliates was the Corsair investment, a structured product involving Citco. Citco, which controlled the vote for the Corsair investors, provided the necessary consent.[154]

Given that the annualized net returns for Arbitrage for the period commencing June 1997 through December 2007 were +8.13%, these formulas referring to 12% returns were not particularly realistic; nor is it clear why the non-Series N investors themselves would have an incentive to consent to be subordinated to the 12% return for the Series N investors, particularly since their capital accounts would be reduced to ensure the return.

The history of the redemption requests made by the Louisiana Pension Funds, which began in March 2011, is set forth in Section V.B below.

### 3. Corsair (Leveraged Series 4, 5 and 6)

The Corsair (Jersey) Limited Programme-Zero Coupon Fund Linked Guaranteed Principal Protected Notes ("Corsair") was supposed to be a principal-protected investment: Corsair's objective was to guarantee investors their principal investment while providing the potential for upside through an investment in Leveraged. Corsair invested approximately 70% of the client's initial investment (including funds borrowed from RBS) in United States Treasury instruments that would have a value at the product's maturity equal to the client's initial investment. The remaining 30% was invested in Leveraged Series 4, 5 and 6 shares. As part of the Corsair product, JPM acted as guarantor of the investor's principal investment.

The Corsair investment was made through an entity called Global Hawk. Investors provided $15 million in cash, and RBS provided $91.3 million of leverage, for a total of $106.3 million, which was then invested into Corsair. Of that investment, approximately

---

[154] Email from Gabriele Magris (Citco) to Jeffrey Davidovitch and Michaell Gordon (JPM) (Mar. 21, 2008, 12:22) instructing Corsair to sign Consent Letters; Corsair Consent.

$34.7 million was invested into Leveraged Series 4, 5 and 6 shares[155] and the balance was used to purchase ten-year treasury STRIPS.

RBS's loan was credit enhanced through a credit default swap transaction with the investing Richcourt funds. The CDS meant that in the event of a default, RBS would have recourse to the Richcourt investors. The CDS was backed in turn by a reinsurance agreement with Swiss Re.

In 2009, RBS notified FAM that the financing arrangements needed to be terminated. According to Denis Kiely, RBS had been "indicating for a long time that they wanted to unwind the financing, and they issued a default notice in the summer of 2009."[156] RBS provided notice of an "Early Termination" in a letter dated June 24, 2009, designating June 26, 2009, as the "Early Termination Date." It appears that discussions proceeded over the next nine months as the parties looked for a way to unwind the Corsair investment.

Following communications among the parties in early 2010, the board of directors of Leveraged on March 31, 2010, gave notice to Corsair of the compulsory redemption of its Leveraged Series 4, 5 and 6 shares as of March 31, 2010 (the "Corsair Redemption"). Although the Corsair Redemption was to be valued as of March 31, 2010, FAM, RBS, Citco, Swiss Re, Corsair, the Richcourt entities and all the other parties to the structure continued to negotiate how best to unwind the structure. These negotiations culminated in three agreements: (i) an Amended and Restated Termination and Release Agreement dated May 6, 2010, (ii) a Settlement Agreement, dated August 23, 2010, and (iii) a Side Agreement dated August 23, 2010. Pursuant to these Agreements (a) Global Hawk repaid its loan from RBS (apparently from the proceeds of

---

[155] Spreadsheet provided by Turner calculating $12.3 million deferred fee.

[156] Kiely SEC Dep. 467:23–25, Apr. 17, 2012.

the Treasury STRIPS and from the redemption) and received from Leveraged $12.4 million in cash and a redemption in kind of Arbitrage shares at a purported value of $8.4 million; (b) the Arbitrage shares were then transferred to four Richcourt funds that were investors in Global Hawk and invested back into Leveraged as subscriptions in kind;[157] and (c) FAM was paid a $12.3 million deferred incentive fee in kind with Arbitrage shares which were then used to subscribe to Leveraged Series 5 and 6 shares.  The upshot was that <u>before</u> the Corsair Redemption, Corsair had a $33.1 million investment in Leveraged Series 4, 5, and 6 shares; and <u>after</u> the Corsair Redemption the four Richcourt funds that invested in Corsair (through Global Hawk) had an $8.4 million investment in Leveraged Series 4 shares, FAM had a $12.3 million investment in Leveraged Series 5 and 6 shares resulting from the deferred incentive fee, and $12.4 million in cash went to Global Hawk, which presumably used it to repay its loan from RBS.[158]

The incentive fee was controversial.  Pursuant to the Leveraged Offering Memorandum, FAM was entitled to the incentive fee due upon the earlier of (i) the ten-year stated maturity of the Corsair product, or (ii) an earlier voluntary investor redemption.  However, in the event of a compulsory redemption, FAM was not entitled to the entire deferred fee.  If the redemption was compulsory and the return on the Corsair Notes was less than the return at Arbitrage, FAM was required to reimburse the difference to the Corsair investors from its incentive fee. [159]  Citco (which controlled Global Hawk) challenged FAM's entitlement to and

---

[157] America Alternative Investments, Inc., Pitagora Fund Ltd., Richcourt Allweather B Fund, Inc., and Richcourt Euro Strategies, Inc.

[158] Shareholder Register for Leveraged for March and April 2010; Cash Model.

[159] Leveraged Offering Memorandum, Oct.  9, 1998, as supplemented Dec. 21, 2004, at 6.

calculation of the incentive fee, but eventually acquiesced.[160]  FAM elected to receive the

performance fee in shares of Arbitrage, which it then subscribed in kind into Leveraged.  Over

the course of the latter half of 2010 and 2011, FAM was able to monetize approximately

$8 million through redemptions of its Leveraged shares.[161]  As discussed in Section VIII.D.4

below, the Trustee believes that the Corsair Redemption and the payment of the incentive fee

raise multiple potential claims.

### 4.      **Richcourt Funds**

As of year-end 2007, the Richcourt Funds' direct and indirect (i.e. via Corsair)

investment in the Funds totaled $49 million, representing 37% of FAM's total client AUM of

$132 million (based on FAM valuations).   After November 1, 2008, these Richcourt Funds

directly invested an additional $61.7 million in cash into Arbitrage.[162]  Thereafter, the Richcourt

Funds received $56 million in redemptions.[163]

### 5.      **Other Investors**

Other investors who over time invested at least $5 million each include (i) two

foreign fund of funds, which in the aggregate invested $42 million in Arbitrage between 2004

and 2008 ($37.7 million by the first and $4.3 million by the other), and (ii) a private university,

---

[160] Letter from Citco Cayman to the Board of Directors of Leveraged and FAM (June 25, 2010).

[161] Cash Model.  As with the redemption of Corsair's Series 4, 5 and 6 shares, these redemptions also gave rise to the automatic redemption of the Series N shares.  The Series N shares were not, of course, redeemed.

[162] Cash Model.

[163] This includes the $12.4 million cash portion of the Corsair Redemption as of March 31, 2010, which was paid in August 2010, but does not include the redemption requests that Richcourt Euro Strategies and Richcourt Allweather Fund made in June 2011, which were to be partially satisfied with FILB's shares in FIP.  See Section IV.F.

which invested $5 million in Arbitrage in August 2008.[164]  After September 30, 2008, no non-AF-controlled money was invested in Alpha, Leveraged, Arbitrage, or FILB.

### 6.     Redemptions Paid

Between January 1, 2007, and the Petition Date, Arbitrage and Leveraged paid out cash redemptions to investors in the aggregate amount of approximately $128 million.[165]  Of this $128 million, Arbitrage paid approximately $100 million, and Leveraged paid approximately $28 million.  Alpha did not make any redemption payments.  Funds for those redemptions often derived from FILB.

FILB paid out approximately $177 million in cash redemptions between March 31, 2008, and the Petition Date, of which $143 million was paid to FII, $26 million to Arbitrage LP, $6 million to Arbitrage, $1 million to Aggressive LP, and approximately $1 million to other investors.[166]

## IV.
## USE OF INVESTOR MONEY

### A.     FILB INVESTMENT PORTFOLIO AS OF JUNE 30, 2007

As of June 30, 2007, FILB owned Helix convertible preferred stock with a face value of $55 million, ION convertible preferred stock with a face value of $30 million and rights to purchase an additional $40 million of ION convertible preferred stock.  Pursuant to FAM's

---

[164] One of the foreign fund of funds fully redeemed between April 2005 and September 2009; the other fully redeemed between March 2006 and September 2009; the private university fully redeemed between September 2010 and March 2011.  However, pursuant to the terms of the Arbitrage Offering Memorandum, Arbitrage held back 10% of the private university redemption because of the lack of audited financial statements for 2010.

[165] This excludes any in kind redemptions made to Louisiana Pension Funds in June 2011 and February 2012 or any other in kind redemptions to other investors.  This data also excludes any inter-fund redemptions.

[166] Cash Model.

valuations, these FILB positions in the convertible preferred stock and rights of Helix and ION were carried at a combined value of $343.7 million, with a purported unrealized gain of $258.7 million.[167]  While the aggregate carrying value of the positions as of June 30, 2007, was $343.7 million, the aggregate conversion value of the two positions on the same date was $205.8 million.  These figures include stock purchased with leverage.[168]  There was only one other PIPE investment in the FILB portfolio (Alloy), and it was carried at minimal value.[169]

### B.    USE OF THE MBTA'S MONEY

On June 8, 2007, MBTA invested $25 million into Alpha.  Immediately prior to this investment, the combined cash position of the Funds, FII, and Arbitrage LP (the "Fletcher System")[170] was approximately $2.6 million.[171]  The $25 million in funds from MBTA and an additional $11.9 million inflow from other sources were depleted by December 20, 2007, when the balance in the system was down to $1.7 million.  Of the $25 million invested by MBTA along with the additional $11.9 million that came in from other sources between June 8, 2007 and December 20, 2007, no more than $8 million was used for actual investments.[172]

---

[167] FILB Holdings Report for the Month Ending June 30, 2007.

[168] FILB Holdings Report for the Month Ending June 30, 2007.  Goldin Associates determined the conversion value for the convertible preferred stock as the value (based on the then-current stock price) of the shares of common stock receivable following a conversion.  The number of shares of common stock receivable upon conversion was determined as the ratio of the face amount and the contractual conversion price.

[169] FILB Holdings Report for the Month Ending June 30, 2007.

[170] Arbitrage LP is a limited partnership that was organized in 1999.  As of December 31, 2009, substantially all of Arbitrage LP's assets were invested in FII for a 1% interest.

[171] Cash Model.

[172] Id.

The uses of the MBTA capital, as well as other miscellaneous cash flows during the period, are summarized as follows:

| Uses of Cash from MBTA Investment Made in June 2007 | | | |
|---|---|---|---|
| ($ in millions) | Sources | Uses | Cash Balance |
| *Beginning balance on June 7, 2007* | | | *2.6* |
| MBTA Subscription | 25.0 | | |
| Other Miscellaneous Cash Flows[173] | 11.9 | | |
| **Total Sources:** | **36.9** | | |
| Margin Calls/Financing | | (11.4) | |
| Third Party Redemptions[174] | | (10.6) | |
| Transfers to Broker Accounts | | (8.0) | |
| Professional, Administrative and Consulting Fees | | (5.4) | |
| Other/Miscellaneous | | (1.4) | |
| Total Outflows to AF or AF Controlled Entities | | (1.0) | |
| **Total Uses:** | | **(37.8)** | |
| *Balance as of December 20, 2007* | | | *1.7* |

## C.    FILB INVESTMENT PORTFOLIO AS OF MARCH 31, 2008

As of March 31, 2008, FILB held $55 million in face value of Helix preferred stock and $70 million in face value of ION preferred stock.  As of March 31, 2008, the positions in the preferred stock of Helix and ION were marked at $352.8 million,[175] with a purported unrealized gain of $227.8 million.  While the aggregate carrying value of the positions as of March 31, 2008, was $352.8 million, the aggregate conversion value of the two positions on the

---

[173] This reflects other miscellaneous inflows between June 7, 2007, and December 20, 2007.  It includes other subscriptions, Helix and ION dividends, Lehman Repo pair-offs, transfers from FILB's broker accounts. FILB's broker accounts include accounts at Bear Stearns International Ltd./J.P. Morgan Securities Inc., Credit Suisse Securities (USA) LLC, Lehman Brothers International/Barclays Capital Inc., and other miscellaneous inflows.

[174] This includes $2 million to a bank in Paris; $1.3 million to another investor; $0.6 million to the two foreign fund of funds; and $6.7 million of other or unspecified third parties.

[175] FILB Holdings Report for the Month Ending Mar. 31, 2008.

same date was $212.2 million.[176]  These figures include stock purchased with leverage.  There were only three other PIPE investments in the FILB portfolio (Alloy, Antigenics and Syntroleum), which were carried at $13.8 million in the aggregate. [177]

### D.    USE OF THE LOUISIANA PENSION FUNDS' MONEY

On March 31, 2008, the combined cash position of the Fletcher System was approximately $1.6 million.  On that date, the three Louisiana Pension Funds collectively invested $95 million in new cash ($100 million less a $5 million in kind subscription) in Leveraged Series N, with the expectation that the money would be used for investments consistent with the investment strategy set out in the Offering Memorandum and other materials. In fact, none of the Series N investment funds was used in that fashion.

Approximately $48 million of the Louisiana Pension Funds' $95 million cash benefited Citco.  It was used (i) to pay down $13.5 million in debt owed to Citco, (ii) to lend to an AF entity to purchase Richcourt Holding and its affiliates for $27 million from Citco Trading, (iii) to pay Citco $3.1 million on a long-outstanding Richcourt Fund redemption request, and (iv) to provide $4.1 million to one of Citco's top executives to provide him with needed liquidity.[178] Other uses included paying fees to FAM, satisfying redemption requests, and meeting margin calls from Credit Suisse and Lehman Brothers.  None of the cash was applied to new investments.

---

[176] FILB Holdings Report for the Month Ending Mar. 31, 2008.  The Trustee determined the conversion value for the convertible preferred stock as the value (based on the then-current stock price) of the shares of common stock receivable following a conversion.  The number of shares of common stock receivable upon conversion was determined as the ratio of the face amount and the contractual conversion price.

[177] FILB Holdings Report for the Month Ending Mar. 31, 2008.

[178] Cash Model.

The specific uses of the Louisiana Pension Funds' investment, along with other funds received during 2008 are summarized in the following chart:

| **Uses of Cash from Louisiana Pension Funds' Investment Made in March 2008** | | | |
|---|---|---|---|
| ($ in millions) | **Sources** | **Uses** | **Cash Balance** |
| *Beginning Balance on March 31, 2008* | | | *1.6* |
| Louisiana Pension Funds' Subscription | 95.0 | | |
| Other Miscellaneous Cash Flows[179] | 20.5 | | |
| **Total Sources:** | **115.5** | | |
| Richcourt Loan | | (27.0) | |
| Third Party Redemptions[180] | | (26.6) | |
| Margin Calls | | (24.4) | |
| Paydown of Citco Credit Facility | | (13.5) | |
| Outflows to Entities Owned or Controlled by AF | | (12.1) | |
| Net FIP Ltd. Investment | | (4.1) | |
| Professional, Administrative and Consulting Fees | | (4.6) | |
| Other/Miscellaneous | | (1.2) | |
| **Total Uses** | | **(113.5)** | |
| *Balance as of November 12, 2008* | | | *3.6* |

**E.    RICHCOURT ACQUISITION (JUNE 2008)**

In June 2008, entities directly and indirectly owned by AF and FAM acquired an 85% interest in Richcourt Holding for approximately $28 million.[181]  (The implied valuation for 100% of Richcourt was approximately $33 million.)  The purchase followed a sales process

---

[179] This chart reflects other miscellaneous inflows between March 31, 2008 and November 12, 2008.  This includes subscriptions from a private university, Richcourt Partners L.P., the two foreign fund of funds, a European bank, an investment fund, inflows from FILB's broker accounts, ION and Helix dividends, and other miscellaneous sources.

[180] Third-party redemptions during this period included an $11.3 million redemption to MBTA from its prior investment in Arbitrage, $7 million to the two foreign fund of funds, a $3.1 million Richcourt redemption, and $5.2 million to other or unspecified third parties.

[181] Richcourt Holding is a holding company that owned several asset management companies that managed the Richcourt fund of funds.  Deed dated June 20, 2008 between Richcourt Acquisition, Citco Trading, and Richcourt Holding.

managed by UBS on behalf of the seller over a period of several months beginning in at least

January 2008.[182]  FAM retained the M&A group from its auditing firm, Grant Thornton, to

evaluate Richcourt.[183]  According to the due diligence report prepared by Grant Thornton,

Richcourt's 2007 year-end AUM was $1.56 billion, and unadjusted EBITDA was $726,000.[184]

Grant Thornton's analysis also demonstrated that the average AUM required to meet annual

overhead was $963 million, and indicated that Richcourt Holding had informed Grant Thornton

that if the Richcourt Funds imposed gates they would "lock themselves out of the market

forever."[185]  AUM quickly fell below this $963 million number and gates were imposed.

Skadden represented the Fletcher-Related Entities and worked on the legal

documents related to the Richcourt acquisition, including FAM's bid letters.[186]  FAM's bid letter

dated March 7, 2008, included as potential sources of financing Fletcher-Related Entities,

Millennium Management, LLC, Credit Suisse Prime Services Department, Gyre Capital

Management, LLC, and Kohlberg Capital Corporation.[187]  These parties had provided only

general non-binding expressions of interest,[188] and as far as the Trustee has been able to

ascertain, only Millennium (through three of its principals) actually invested, and the principals'

money was not actually used to purchase Richcourt Holding (although some was used to pay

---

[182] Letter from FAM to Citco Trading, Jan. 10, 2008.

[183] See Richcourt Holdings, Inc. [sic] Financial and HR Due Diligence Report Prepared for Fletcher Asset Management, Inc., May 7, 2008 (the "Grant Thornton Due Diligence Report").

[184] Grant Thornton Due Diligence Report at 7, 9.

[185] Id. at 39, 52.

[186] King Dep. 19:17–19, 30:15–34:12, May 3, 2013.

[187] Letter from FAM to UBS (Mar. 7, 2008).

[188] Proposal letters by Millennium Management, LLC (Mar. 5, 2008), Credit Suisse (Mar. 6, 2008), Gyre Capital Management LLC (Mar. 6, 2008), and Kohlberg Capital Corporation (Mar. 7, 2008).

Skadden's fees). These individuals invested a total of $4.7 million into Richcourt Partners,

L.P.[189]

Although there were other bids for Richcourt Holding, FAM's was plainly the

best bid and apparently the only one that offered to pay virtually the entire purchase price up

front. The buyer, Richcourt Acquisition, Inc., was a Fletcher affiliate controlled and 84% owned

by MMI.[190] The seller was Citco Trading Inc., an affiliate of Citco. As part of the transaction,

Citco Trading also received a put option to sell its remaining 15% interest in Richcourt for a

minimum of $5 million.[191] While it appears that Citco attempted to exercise the put, the

documents suggest it was never finalized.

$27 million was paid at the initial closing, and an additional $1 million was later

paid for the purchase of RFA-Richcourt Paris.[192] The closing for RFA-Richcourt Paris was

delayed until October 2010, when French regulatory approval was finally received. By the time

the acquisition of RFA-Richcourt Paris closed in October 2010, all RFA-Richcourt Paris AUM

had been redeemed, and there was no remaining business.[193]

---

[189] According to the Limited Partnership Agreement, Richcourt Partners, L.P.'s sole purpose was to acquire Richcourt Holding. However, all the funds invested by the Millennium principals were not used for the Richcourt acquisition – instead $3.4 million of their $4.7 million was invested into shares of Arbitrage, which were later transferred into shares of Leveraged. The remaining $1.3 million was used to pay Skadden invoices and other miscellaneous items. According to the Leveraged shareholder register maintained by FAM, Richcourt Partners, L.P. had a $3.2 million investment balance at Leveraged as of the Petition Date. The Millennium principals did not receive any cash back on account of their investment. Richcourt Partners L.P. Partners Capital Allocation between June 20, 2008 and April 30, 2011; Limited Partnership Agreement of Richcourt Partners L.P. dated June 20, 2008.

[190] Quantal Valuation Report of EIC Note owned by FIAL (Mar. 23, 2011); 2008 FFLP Audited Financial Statements.

[191] Share Purchase Agreement between Citco Trading and Richcourt Acquisition dated June 12, 2008.

[192] Cash Model; email from Eric Lieberman to Jim Quinn and Terry Marsh (Aug. 22, 2011, 21:50).

[193] ████████████████████████████████████████████████████████
A single investor accounted for approximately 90% of RFA-Richcourt Paris' AUM. Turner Interview,

The $27 million paid in the June 2008 closing came from the Louisiana Pension Funds' Leveraged Series N investment and was funneled through a series of Fletcher affiliates, including FII, before reaching AF's wholly-owned acquisition vehicle.  It appears that for a short period of time the shares of the acquisition vehicle were held in trust for FII, with AF as trustee, but it is also clear that, from the outset, AF or one of the entities he owned was to be the purchaser and owner of Richcourt Holding.

The Trustee believes that at the time he was submitting his bids for Richcourt, AF knew that the Louisiana Pension Funds' Series N investment was imminent and would be used to fund the Richcourt purchase if other financing was unavailable or less beneficial to him.

As the $27 million made its way to the seller (Citco), a series of promissory notes was created to reflect the intermediate transactions.[194]  The end result was that Leveraged received an unsecured promissory note from Income Arbitrage Partners, L.P. ("IAP")[195] (ultimately owned by AF) [196] that was later exchanged for a promissory note from Equity Income Corporation[197] ("EIC") (also controlled and ultimately owned by AF). [198]  That promissory note (originally the "IAP Note," and later the "IAP/EIC Note") was unsecured, had no covenants, and

June 6, 2013; Grant Thornton Due Diligence Report at 9.

[194] The intermediate notes issued included the following:  a) Leveraged issued a $27 million note (the "FIAL Note") to IAP and in exchange received a $27 million note issued by IAP; b) MMI issued a $27 million note and in exchange received the $27 million FIAL Note; c) MMI transferred the FIAL Note to Richcourt Acquisition in exchange for Richcourt Acquisition common shares at a purported value of $27 million; and d) MMI transferred the Richcourt Acquisition shares to Richcourt Partners, L.P. as a capital contribution.

[195] Promissory Note dated as of June 20, 2008 made by IAP in favor of Leveraged.

[196] 2008 FFLP Audited Financial Statements; EIC Shareholders' Capital Allocation between December 31, 2009, and December 31, 2010.

[197] Written Resolutions of EIC, Dec. 31, 2010.

[198] EIC Shareholders' Capital Allocation between December 31, 2009 and December 31, 2010.

for a period of time did not have a set interest coupon. Its value was tied to the value of the Richcourt investment. The initial interest rate was 0% to 18%, depending on returns attained by IAP, derived from purported investment returns at Arbitrage LP. [199] When the IAP Note was exchanged for the EIC Note, the interest rate was set at Libor plus 3%, for an "all-in" rate at the time of 3.24%.[200] Although interest was accrued and appeared as an asset on the financial statements of Leveraged, no interest was ever actually paid on the IAP/EIC Note.

The valuation of the IAP/EIC Note later became one of the main areas of dispute between FAM and its auditors and a principal reason why Eisner never issued its 2009 audit report on Leveraged. Applying what the auditors viewed as the fair market value of the IAP/EIC Note (Eisner believed the proper value was $10 million),[201] the mandatory redemption provisions of the Leveraged Series N shares held by the Louisiana Pension Funds would have been triggered because the value of non-Series N investors at Leveraged would have equaled 14% of Series N (i.e. well under the required 20%), and the entire fund structure would have collapsed.[202]

The deterioration of the Richcourt business was unsurprising. There was no protection in the agreement against material investor redemption requests. Richcourt's liquidity lines of credit (which were in place to provide liquidity for redemptions) were up for renewal in September 2008, and there was no guaranty they would be renewed; in fact they were not.

---

[199] IAP/EIC Note.

[200] Id.

[201] Draft 2009 Leveraged Financial Statements, at 17, Note G.

[202] While Leveraged loaned the money for the acquisition of Richcourt Holding via Louisiana Pension Funds' infusion of $95 million in cash in April 2008, there is no mention of Richcourt in the 2008 audited financial statements of Leveraged.

Because the credit lines were not renewed, the Richcourt Funds had to redeem from their underlying funds just to pay down the lines of credit, and ended up suspending or limiting ("gating") redemptions for a period of time in funds representing approximately 88% of assets (excluding RFA-Richcourt Paris) in November and December 2008.  It appears that by September 2010, AUM not subject to pending redemptions had declined to zero or close to zero.[203]

Citco was strongly motivated to complete the Richcourt Holding sale.  Clients of its primary business – fund administration – viewed its ownership of a competitor, the Richcourt Funds, as potentially creating a conflict of interest.  Thus, Citco was anxious to exit the fund of funds business.[204]  Citco's previous exit strategy – a joint venture with a private equity investment management firm Hamilton Lane – had failed, and Citco therefore needed a new approach.[205]

### F.    FLETCHER INTERNATIONAL PARTNERS, LTD.
### (JULY 2008 THROUGH OCTOBER 2009)

At the time FAM was negotiating the Richcourt acquisition, it was also working on a parallel transaction that would ultimately provide Ermanno Unternaehrer, a longtime acquaintance and business associate of AF, founder of Richcourt, one of the top Citco executives, and principal intermediary on all Fletcher-related business, with millions of dollars of much needed liquidity through an investment in a then dormant Cayman Islands entity called Fletcher International Partners, Ltd. ("FIP").

---

[203] 2008 Richcourt Holding Audited Financial Statements; ███████████████████████████████

[204] Kiely SEC Dep. 189:6, July 13, 2011.

[205] Investment Magazine, Hamilton Lane retracts call on hedge fund-private equity merge (July 1, 2008).

Under the terms of the transaction, Unternaehrer agreed to contribute 1,639.15 shares of FFC Fund to FIP. FFC indirectly owns shares of Citco III Limited., a Cayman Islands company formed to make an equity investment in the Citco Group Limited. This amounts to the equivalent of a 0.45% ownership interest in Citco III.[206] Unternaehrer's contribution into FIP was valued (by him and with the knowledge of Christopher Smeets, CEO of Citco) at $10.5 million[207] and was FIP's sole asset. According to the offering memorandum for FFC, the shares are illiquid. Among other things, the offering memorandum discloses that the FFC shares are "redeemable only at the option of FFC Management, as determined in its sole and absolute discretion," that investors "should not expect that they will ever receive cash redemption payments," and that "[t]he Issuers do not anticipate paying cash distributions or dividends to their respective investors."[208] Importantly, Unternaehrer – the very person obtaining the benefit of the FILB investment – was the Director of FFC Management and therefore was directly responsible for determining whether or not a redemption was allowed.[209]

On July 2, 2008, simultaneously with Unternaehrer's contribution of FFC shares to FIP, FILB contributed $6.6 million in cash in exchange for $3.65 million in preferred stock and 2,922 common shares (approximately 43% of the common stock). For his contribution of FFC shares, Unternaehrer received 10,479 common shares. On the following day, Unternaehrer redeemed 6,572 shares and received almost $6.6 million in cash from FIP. Approximately one week later, Unternaehrer's pension plan (Citco International Pension Plan) contributed

---

[206] 2008 FFC Audited Financial Statements at 15-16.

[207] Email from Ermanno Unternaehrer to Christopher Smeets (May 27, 2008, 17:21).

[208] FFC Confidential Offering Memorandum, July 11, 2005 at 5–6.

[209] FFC Confidential Offering Memorandum, July 11, 2005 at ix.

approximately $2.5 million in cash to FIP. The following day, FILB redeemed 2,522 common shares and received just over $2.5 million in cash. All told, Unternaehrer was able to extract $6.6 million in cash from FIP, $4.1 million of which came from FILB.[210] Through a series of additional transactions in October and November 2009, Unternaehrer received an additional $900,000, of which $250,000 came from FILB and $650,000 from FIP.

Although Unternaehrer and FAM settled on a $10.5 million valuation for Unternaehrer's FFC shares as the basis for the transaction, the shares were never independently valued, and email communications suggest that Unternaehrer and Smeets knew that others had valued the shares at far less.[211] SFT Bank, a Citco bank, carried the investment at $2.7 million. Moreover, notwithstanding that over the course of this investment there were a number of separate occasions when a valuation should have been performed, as far as the Trustee can tell, none ever was.[212] The investment in FIP, designed to provide liquidity to a Citco executive, is outside of the Funds' investment strategy and raises many additional questions.

FAM later attempted to transfer the FIP shares to Richcourt Euro Strategies and Richcourt Allweather Fund in partial satisfaction of two redemption requests. The Trustee has undone that transaction, and the FIP shares were returned to the Debtor's estate in October

---

[210] $2.5 million of FILB's $6.6 million was returned to FILB by the Citco International Pension Plan. Subscription Agreement of Citco International Pension Plan, July 7, 2008, whereby Citco International Pension Plan agreed to purchase 2,572 shares of FIP for $2,572,000.

[211] Email from Ermanno Unternaehrer to Christopher Smeets (May 27, 2008). The account statements issued by SFT Bank (a Citco affiliate) acting as custodian for FIP, show that as of December 31, 2008, the value of the FFC shares contributed to FIP by Unternaehrer was $2.7 million – not $10.5 million.

[212] Valuations should have been performed on July 2 and July 8, 2008 (when the original investment was made), on October 1, 2009 (when FILB purchased 274.39 shares of common stock from Unternaehrer), on November 1, 2009 (when AAI subscribed for $2 million in preferred shares, and dividends were distributed), on June 30, 2011 (the effective date when FIP was purportedly transferred to Richcourt Euro Strategies and Richcourt Allweather Fund as described above), and on December 31, 2008, 2009, and 2010 (in connection with FILB's year-end audited financial statements).

2013.[213]  While as noted above the shares are illiquid, the Trustee will attempt to liquidate the

FIP shares and to distribute the proceeds as provided in the Plan.

G.    RASER TECHNOLOGIES (NOVEMBER 2008, DECEMBER 2008, JANUARY 2010)

Raser Technologies ("Raser") is a geothermal power development and technology

company.  The company was founded in 2003, and prior to the Fletcher investment, had never

been cash flow positive.  Between November 2008 and January 2010, FILB invested $25 million

in Raser.[214]

On November 28, 2008, FILB invested $10 million[215] in exchange for newly-

issued common stock equal to 3.4% of the outstanding common stock and a 10-year warrant to

purchase an additional $20 million in common stock.[216]  On the same day, FAM valued the

Raser position on FILB's books at $34.4 million — indicating an immediate gain of 244%.[217]

Among other defects, in valuing the position, FAM assumed that the entire $20 million had been

invested, when in fact only $10 million had been invested.  On December 12, 2008, FILB

invested an additional $10 million and received 2,360,417 additional common shares.[218]

As part of Raser's 2008 audited financial statements released on March 18, 2009,

Raser's auditors expressed substantial doubts about Raser's ability to continue as a going

---

[213] See Section VI.G.9.

[214] Raser Form 10-K for Year Ended Dec. 31, 2010, at 85, 94.

[215] Realized Gains Report entitled "FILB Realized Analysis" for the period January 1, 2007, through June 30, 2012, prepared by MacGregor (the "FILB Realized Gains Report").

[216] In its September 30, 2008, Form 10-Q filed on November 13, 2008, Raser disclosed that it would require financing to continue as a going concern.  On the day the Form 10Q was filed, FILB agreed to invest a total of $20 million in Raser in two separate closings.

[217] FILB Holdings Report for the Month Ending November 30, 2008.

[218] FILB Realized Gains Report.

concern, despite the recent $20 million cash infusion from FILB.[219]  Just fifteen days later, on

March 31, 2009, Fletcher took its highest mark on the initial Raser position – $43.9 million

(versus the $20 million cost basis).[220]

On January 29, 2010, FILB invested an additional $5 million and received Raser

convertible preferred stock and warrants for additional preferred stock.[221]  On that same day,

FAM marked the new investment at $25.4 million,[222] suggesting an immediate gain of 408%.

The highest mark for this portion of the investment was $26.3 million.[223]  At the same time,

FAM marked the 2008 Raser investment down to $7.2 million.[224]

In March 2011, FILB agreed to cancel the warrants received in the 2008

transaction and all the securities issued to FILB in January 2010.  In exchange, FILB received

51.7 million shares of common stock and warrants to acquire 26.9 million shares of common

stock at an exercise price of $0.20 per share expiring in March 2020.[225]  FILB sold or transferred

the common stock for $14.4 million,[226] realizing a loss of $10.6 million on an investment that

had been marked as high as $75.1 million.

---

[219] Raser Form 10-K for Year Ended Dec. 31, 2010, at Note 1.

[220] FILB Holdings Report for the Month Ending Mar. 31, 2009.

[221] Raser Form 10-K for Year Ended Dec. 31. 2010, at 94; FILB Realized Gains Report.

[222] FILB Holdings Report for the Month Ending Jan. 31, 2010.

[223] FILB Holdings Report for the Month Ending Feb. 28, 2010.

[224] FILB Holdings Report for the Month Ending Jan. 31, 2010.

[225] Settlement Agreement between FILB and Raser, Mar. 16, 2011.

[226] FILB Realized Gains Report.

Raser's auditors again expressed doubt about Raser's ability to continue as a going concern in the 2009 audited financial statements released on March 18, 2010.[227]  In April 2011, Raser filed for Chapter 11 protection, and emerged from bankruptcy on August 30, 2011. As part of the reorganization, all equity was wiped out, and the warrants, although still nominally held by FILB on its books and records, are worthless.[228]

While the Trustee believes that the Raser investments were consistent with the Funds' stated investment strategy, the Raser investments were materially overvalued and the Trustee believes that the valuations of the Raser investments contributed to the calculation of excessive fees by FAM and its affiliates.

### H.    EDELMAN FINANCIAL/SANDERS MORRIS HARRIS GROUP AND MADISON WILLIAMS (NOVEMBER 2009, FEBRUARY 2011, AUGUST 2011)

The Edelman Financial Group, previously known as the Sanders Morris Harris Group or SMHG, was a financial services company that had both a broker-dealer (Madison Williams) and a wealth management business.  FILB and FII invested a total of $15.7 million in SMHG and Madison Williams together.  In November 2009, FILB made a two-part $12.5 million investment in SMHG.  One part of the transaction involved a $5 million FILB investment as part of a consortium of investors to acquire Madison Williams. [229]  Concurrently, FILB invested $7.5 million in SMHG and received common stock and warrants for shares of common stock in SMHG. [230]  FAM initially marked the Madison Williams position at $5 million[231] and

---

[227] Raser Form 10-K for Year Ended Dec. 31, 2009, at 46.

[228] See Third Amended Joint Plan of Reorganization, In re: Raser Technologies, Inc., No. 11-11315 (KJC) (D. Del. Aug. 11, 2011), at 20, confirmed Aug. 30, 2011 [Docket Nos. 338, 401].

[229] Cash Model; Subscription Agreement of Madison Williams (with FILB) dated Nov. 8, 2009; Madison Williams and Co. LLC Audited Financials 2010.

[230] Agreement between FILB and SMHG, Nov. 8, 2009.

the SMHG position at $16.7 million.[232]  In December 2009, the Madison Williams investment was transferred to FII to meet a purported $5 million redemption by FII of its investment in FILB. [233]

Subsequently, in 2011 FII infused an additional $3.2 million[234] into Madison Williams, which was failing. [235]  In December 2011, Madison Williams filed for bankruptcy, and no recovery on the FILB/FII investment is anticipated.  In February 2012, FILB sold the SMHG warrant back to SMHG (which is not in bankruptcy) for $8 million.[236]  In total, FILB and FII invested $15.7 million into this transaction, of which $15.3 million[237] was returned, representing an overall loss on the investment of $400,000 or 3% of cost.  The total investment (including Madison Williams) had been marked as high as $40.3 million.  The Trustee believes that the Madison Williams portion of this investment was outside FILB's stated investment strategy, and the Trustee believes that the valuations of Madison Williams contributed to the calculation of excessive fees by FAM and its affiliates.

---

[231] FILB Ledger Detail, Nov. 2009.

[232] FILB Holdings Report for the Month Ending December 31, 2009.

[233] FILB Shareholders' Capital Account Summary.

[234] Madison Williams, materials prepared for the Board of Managers, Sept. 14, 2011; Cash Model.

[235] Approximately $3 million of this money came from FILB.  See Cash Model.

[236] Edelman Financial Group, Form 8-K, April 16, 2012; and Cash Model.

[237] FILB Realized Gains Report.

I.    SYNTROLEUM CORPORATION (NOVEMBER 2007 THROUGH APRIL 2010)

Syntroleum produces synthetic fuels from a wide variety of feedstock using a proprietary conversion process.  Between November 2007 and April 2010, FILB invested a total of $14.1 million[238] in Syntroleum.

In November 2007, FILB agreed to purchase $12 million of newly issued Syntroleum common stock over a period of 24 months.[239]  Pursuant to the agreement, between March 24, 2008 and April 18, 2008, FILB was required to purchase $3 million of common stock at a $0.60 premium[240] to the stock price on the date of the stock purchase (the "Initial Syntroleum Investment").  FILB was required to invest the remaining $9 million over the last 18 months of the 24-month investment period at a $0.20 discount to the stock price on the date of the later purchase (the "Later Syntroleum Investment").  Upon making the Initial Syntroleum Investment, FILB was entitled to receive additional seven-year warrants under certain circumstances.[241]

On November 30, 2007, the Syntroleum investment was marked at $2.2 million,[242] despite the fact that FILB had not yet purchased any common stock.  FILB ultimately declined to make the Initial Syntroleum Investment before the April 18, 2008, deadline, asserting that all of the conditions precedent had not been satisfied.  Nevertheless, at

---

[238] FILB Realized Gains Report.

[239] Agreement between FILB and Syntroleum, Nov. 18, 2007.

[240] Id. at 2.

[241] For example, if FILB were to make a later investment and purchase two million shares, FILB would receive a warrant to purchase an additional one million shares of common stock.

[242] FILB Holdings Report for the Month Ending November 30, 2007.

month-end April 2008, FAM valued the position at $10.2 million on FILB's books and records.[243]

In May 2008, FILB attempted to invest $6 million of the $9 million contemplated as part of the Later Syntroleum Investment. Syntroleum refused to honor the request, alleging that making the Initial Syntroleum Investment was a precondition for the Later Syntroleum Investment.[244] On May 30, 2008, Syntroleum sued FILB for breach of contract, rescission, and a declaratory judgment, seeking a determination of the company's rights and obligations under the agreement. Notwithstanding the ongoing litigation, FAM continued to mark the Syntroleum investment as if the entire Later Syntroleum Investment had been made. Between May 2008, when the litigation was commenced, and June 2008, FAM increased the mark on the Syntroleum investment from $11.9 million to $13.2 million,[245] its highest mark, even though no investment had been made, and FILB's cost basis was zero.[246]

The litigation was settled in October 2009.[247] Pursuant to the terms of the settlement, FILB purchased $4 million of newly issued common stock and received the right until June 2010 to purchase up to $8 million of common stock in two subsequent closings and to receive additional six-year warrants at each closing. At the end of October 2009, FAM marked

---

[243] FILB Holdings Report for the Month Ending Apr. 30, 2008.

[244] Syntroleum Form 10-Q for the quarter ending June 30, 2008, at 8.

[245] FILB Holdings Reports for the months ending May 31, 2008 and June 30, 2008.

[246] During this entire period, FILB made no additional investment in Syntroleum, but continued to mark its position as if the entire Later Investment had been made, albeit with discounts for litigation risk that the auditors insisted on as part of the 2008 audit.

[247] Syntroleum Form 8-K, Oct. 14, 2009.

the new Syntroleum investment at $10.3 million.[248]  This suggests an immediate unrealized gain of 158% on the $4 million investment.

FILB made additional investments in Syntroleum common stock between December 2009 and April 2010, bringing the aggregate amount invested over time to $14 million.[249]  As a result, FILB also received three series of warrants.  FILB ultimately sold or transferred all of its Syntroleum common stock for $9.7 million,[250] realizing a loss of $4.3 million on an investment that had been marked as high as $35.6 million.

Although it resulted in a loss, the Trustee believes that this investment was consistent with the Funds' stated investment strategy.  Nonetheless, the position was materially overvalued, and the Trustee believes that the valuations of the Syntroleum investments contributed to the calculation of excessive fees.  As of the Petition Date, all three series of warrants remain in the Debtor's estate and were valued at $200,000.  Syntroleum continues to operate as a public company.  The Trustee intends to liquidate the warrants as part of the Plan.

**J.      ANTS SOFTWARE (MARCH 2010 THROUGH DECEMBER 2010)**

ANTS Software Inc. ("ANTS") is a public company that produces high performance data management software for corporate customers.  Between March 2010 and December 2010, FILB – directly and through BRG – invested approximately $7.4 million in ANTS.

---

[248] FILB Holdings Report for the Month Ending October 31, 2009.

[249] FILB Realized Gains Report.

[250] FILB Realized Gains Report.

In March 2010, FILB agreed to purchase $10 million[251] of ANTS newly issued common stock.  Pursuant to this agreement, FILB purchased $4.0 million of common stock (equal to 3.7% of common stock) in multiple closings.  At the first closing, on March 15, 2010, FILB invested $1.5 million and received common stock and a nine-year warrant to purchase an additional $10 million in common stock.[252]  The stock price was $0.90 per share as of the first closing.[253]  At month-end March 2010 – 12 trading days after the transaction was closed – FAM marked the initial position, with a cost basis of $1.5 million, at $17.3 million,[254] suggesting an intra-month gain of 1,053%.  On that same day, ANTS issued its 2009 year-end audited financials, in which its auditors raised substantial doubts about ANTS' viability as a going concern.[255]

In the first half of 2010, ANTS' financial position continued to be unstable, and FILB infused additional funds into the company, investing $0.5 million in May 2010 and an additional $2 million in July 2010.[256]  The highest mark ($38 million) was taken in August 2010, at a time when ANTS common stock was trading at $1.02 a share (equating to a market capitalization of $117.2 million).[257]

---

[251] FILB Agreement with ANTS Software, Mar. 12, 2010.

[252] ANTS Form 10-K for Year Ended Dec. 31, 2010, at 6.

[253] Bloomberg Historical Stock Prices Ticker for Mar. 15, 2001.

[254] FILB Holdings Report for the Month Ending Mar. 31, 2010.

[255] ANTS Form 10-K for Year Ended Dec. 31, 2009, at n. 1.

[256] Id. at Note. 20.

[257] Had FAM's $38 million mark been accurate, this would have implied a market capitalization of over $1 billion.

In December 2010, FILB invested an additional $3 million[258] into ANTS through BRG. Despite these additional cash infusions, in its year-end 2010 financial statements, ANTS' auditors again expressed doubt about the company's continuing viability.[259]

By year-end 2010, the stock price had declined to $0.64[260] for a total equity market capitalization of $77.6 million.[261] In total, FILB invested $7.4 million in ANTS and sold common stock for aggregate proceeds of $4.9 million,[262] representing a loss of $2.5 million, or 33% relative to cost on an investment that had been marked as high as $62.8 million. Moreover, references to the ANTS investment in reports submitted to the MBTA were very deceptive, as they discussed perceived positive developments relating to the company, without mentioning the going concern issues raised by its auditors.[263]

Although it resulted in a loss, the Trustee believes that this investment was consistent with the Funds' stated investment strategy. Nonetheless, the position was materially overvalued, and the Trustee believes that the valuations of the ANTS investment contributed to the calculation of excessive fees by FAM and its affiliates. As of the Petition Date, the remaining positions in the Debtor's estate consisting of 2.1 million common shares, and all the initial warrants are being carried at minimal value.[264] ANTS remains an operating company, but has been delisted. The Trustee intends to liquidate these positions as part of the Plan.

---

[258] ANTS Form 10-K for Year Ended Dec. 31, 2010 at n. 20.

[259] Id. at 14.

[260] Bloomberg Historical Stock Prices Ticker for Dec. 31, 2010.

[261] Id.

[262] FILB Realized Gains Report.

[263] See Alpha Performance Update – First Quarter 2010 Overview, distributed by FAM to the MBTA.

[264] Monthly Operating Report for the month ended September 2013.

### K.    UCBI (April 2010)

The April 2010 transaction with UCBI consisted of two components:  (i) the purchase of a portfolio of non-performing loans and bank owned properties, and (ii) the distribution of warrants and a contract to purchase UCBI preferred stock.

### 1.    The Non-Performing Loans

In the first part, five special purpose entities wholly-owned by FII purchased a portfolio of non-performing commercial and residential mortgage loans and foreclosed properties from UCBI for $103.1 million.[265]  Of the purchase price, FILB contributed $10.5 million in cash, Arbitrage contributed $10 million in cash, and UCBI provided financing for the remaining $82.5 million.[266]  As part of the transaction, FILB, through a loan to FII, also contributed in excess of $21.9 million in cash and securities to five "Carry Accounts," which were set up to cover three years of interest on the UCBI loan as well as certain carrying costs associated with the bank-owned properties (insurance, taxes, etc.). [267]

The loan portfolio consisted of illiquid non-performing loans with a carrying value of approximately $70 million[268] and foreclosed properties with a carrying value of approximately $33 million.[269]  The real estate portfolio included commercial buildings, apartment buildings, warehouse and storage units, and vacant lots.  Immediately after the

---

[265] UCBI Form 10-Q for the Quarter Ending June 30, 2010, at 19.

[266] UCBI Form 10-K for the Year Ended Dec. 31, 2010, at 35; Cash Model.

[267] Guaranty and Pledge Agreement, April 30, 2010 between FILB, FII and Asset Holding Company 5; FILB Shareholders' Capital Account Summary; FILB Realized Gains Report; Cash Model; UCBI Form 10-Q for the Quarter Ending June 30, 2010, at 20.

[268] UCBI Form 10-Q for the Quarter Ending June 30, 2010, at 20.

[269] Id.

purchase of the portfolio, FII marked the assets down by $20.6 million, to $82.5 million. [270]  As

discussed more fully in Section VIII.C.4 below, the Trustee does not believe that the real estate

portion of the UCBI investment was consistent with the Funds' stated investment strategy.

      As of the Petition Date, there was approximately $4 million in cash and securities

in the Carry Accounts.  The Trustee believes that the Carry Accounts constitute property of the

Debtor that is protected by the automatic stay under Section 362 of the Bankruptcy Code and

demanded that UCBI cease using the funds in the Carry Accounts absent consent of the Trustee

(which has not been given) or authorization from the Court (which UCBI has never sought).

UCBI ignored the Trustee's demands and continued to use the Carry Accounts, which have since

been depleted in their entirety.  UCBI denies it violated the automatic stay and it appears likely

that the Trustee will have to commence litigation against UCBI for what he believes to be

UCBI's violation of the automatic stay and recovery of the Carry Account funds.  To the extent

the Carry Accounts are depleted and no cash from other sources is available to make interest

payments, events of default may be triggered under the documents governing the $82.5 million

in financing provided by UCBI.

### 2.   The Securities Purchase Agreement

      In the second part of the transaction, FILB entered into a Securities Purchase

Agreement dated April 1, 2010, as amended June 11, 2010 (the "UCBI Securities Purchase

Agreement" or the "SPA") with UCBI whereby FILB received (i) a warrant to purchase up to

$30 million of Common Stock Junior Preferred at a strike price of $4.25 per share, and (ii) the

right to purchase up to $65 million in UCBI Series C Convertible Preferred Stock at $5.25 per

---

[270] FII Ledger Detail, Apr. 2010.

share.[271]   FILB was required to purchase the shares by certain dates (the "Investment Period") or

was subject to penalties:  (a) 5% of the uncommitted amount if the purchase was not

consummated by May 26, 2011; and (b) an additional 5% if the purchase was not consummated

by May 26, 2012.  If FILB did purchase the full amount of preferred stock, FILB was entitled to

an additional cashless exercise warrant for $35 million at an exercise price of $6.02 per share.

FILB's performance was excused, however, if there was a "Registration Failure."  A Registration

Failure occurs if at any point a Registration Statement[272] is not effective and available for more

than seven days.[273]   In the event of a Registration Failure, UCBI was required to make payments

to FILB pursuant to a predetermined formula (the "Registration Failure Payment").  The

Investment Period was also extended one day for each day of the Registration Failure or until

UCBI paid FILB the Registration Failure Payment.[274]   The Trustee claims that a Registration

Failure occurred in January 2012 based upon UCBI's restatement of certain financial statements,

and that, pursuant to the language of the agreement, because the Debtor has not received a

Registration Failure Payment for the full amount, the Registration Failure continues.  UCBI

disputes this claim.

---

[271] As discussed in Section V.B below, in February 2012, FILB attempted to meet a full redemption request from the Louisiana Pension Funds by delivering FILB's right to purchase preferred stock.  FAM, supported by wholly unrealistic valuation work provided by Quantal, took the position that the position was worth $135.5 million – the approximate account balance previously reported to the Louisiana Pension Funds.[271]  Therefore, FAM took the position that the full redemption request had been satisfied through this in kind distribution of the UCBI Preferred Stock contract.  Litigation with respect to the Preferred Stock contract between Louisiana and UCBI was settled in February 2013.  See Section VI.G.8.

[272] A Registration Statement is defined as "UCBI's Registration Statement on S-3/A (Registration No. 333-159958) and Registration Statement on S-3 filed as of the date of the [Securities Purchase Agreement]."  UCBI Securities Purchase Agreement § 4(a).

[273] UCBI Securities Purchase Agreement § 1(b)(1).

[274] UCBI Securities Purchase Agreement § 5(f).

In early April 2010, following the close of the transaction, FAM added the UCBI initial warrant position to FILB's portfolio at a zero cost basis.[275]  No value was attributed to the right to purchase the preferred shares or to the additional warrants that would be issued when the preferred stock was issued.  By April 30, 2010, FAM marked up the initial warrant position to $76.3 million, creating an unrealized gain of $76.3 million.[276]

As of June 30, 2010, the situation had changed, and FAM valued the entire FILB position (including the right to purchase the preferred stock) at $59.2 million.[277]  As part of the valuation, FAM reduced the value of the initial warrant to reflect that the original agreement included a non-standard cashless exercise warrant formula that was unusually beneficial to FILB.[278]  When UCBI noticed the original formula, it insisted that the formula be changed to the standard formula.  FILB acquiesced, and FAM reduced the value of the initial warrant by 80% to $14.9 million.  To partially offset this loss, FAM decided to value the previously-unvalued right to purchase preferred shares at $44.3 million.[279]

By June 17, 2011, UCBI's stock price had declined 61%, to $2.04 per share.[280]  On that same day, UCBI completed a 1:5 reverse stock split of its common stock.  FAM took the position that the strike price of the Initial Warrant remained unchanged despite the 1:5 reverse stock split.  This position has support in New York law, but is vigorously contested by UCBI.

---

[275] FILB Holdings Report for the Month Ending April 30, 2010.

[276] FILB Holdings Report for the Month Ending April 30, 2010.

[277] FILB Holdings Report for the Month Ending June 30, 2010.

[278] See Section VIII.E.3.(d) for a complete discussion of FAM's improper use of this non-standard formula.

[279] FILB Holdings Report for the Month Ending June 30, 2010.

[280] Bloomberg Historical Stock Prices Ticker for June 17, 2011.

Without taking any discount for litigation risk, FAM marked the UCBI position in the aggregate up from $30.6 million[281] as of May 31, 2011, to $122.1 million[282] as of June 30, 2011, an increase of 299% in one month.

As discussed in Section VI.G.10 below, on April 30, 2012, FAM submitted a notice on FILB's behalf to exercise Initial Warrants for an amount of $1 million at an exercise price of $4.25 per share. UCBI refused to honor the warrant exercise because, among other reasons, FILB's calculation did not take into consideration the June 2011 1:5 reverse stock split. On August 16, 2013, the Trustee submitted a notice to exercise the entire $30 million of Initial Warrants, but UCBI again refused to honor the notice because (among other reasons) of the reverse stock split. It appears likely that the Trustee will have to initiate litigation against UCBI in order to enforce its right to exercise the Warrants. That litigation, if necessary, is not a Pooled Claim under the Plan.

In total, the Funds invested $42.4 million in the UCBI transaction. The highest mark taken by Fletcher for this investment was $173.8 million.[283] To date the Funds have received no value for this investment.[284]

### L.    DOCUMENT SECURITY SYSTEMS (DECEMBER 2010)

DSS provides anti-counterfeit, authentication, and mass-serialization technologies to corporations, governments and financial institutions around the world. FILB invested a total

---

[281] FILB Holdings Report for the Month Ending May 31, 2011.

[282] FILB Holdings Report for the Month Ending June 30, 2011.

[283] FILB Holdings Report for the Month Ending Sept. 30, 2011.

[284] This is the case with the exception of the amount received in connection with the settlement of the FILBCI litigation. See Section VI.G.8 below.

of $4 million[285] in DSS on December 31, 2010, and received newly-issued DSS common stock

equal to 4.2% of common stock outstanding, nine-year warrants to purchase an additional

$4 million of common stock, and a right to make a later investment on or before May 2, 2011.

The later investment included an option to purchase another $4 million in common stock and to

receive an additional warrant to purchase common stock.

On the same day that FILB made its $4 million investment in DSS, the position

was marked at $23.6 million,[286] reflecting an instantaneous gain of $19.6 million, or 490%.  The

initial mark of $23.6 million was also the highest mark for the DSS investment.  FILB ultimately

sold its DSS common stock for $3.1 million,[287] resulting in a loss on the investment of $0.9

million (a 23% loss relative to the $4 million investment).

Although it resulted in a loss, the Trustee believes that this investment was

consistent with the Funds' stated investment strategy.  Nonetheless, the position was materially

overvalued and likely contributed to the calculation of excessive fees by FAM and its affiliates.

The warrants remain in the Debtor's estate.  DSS continues to operate as a public company.  The

Trustee intends to liquidate the warrants as part of the Plan.

## M.    HIGH PLAINS GAS (FEBRUARY 2011)

HPG is a natural gas exploration and production company located in the Powder

River Basin in Central Wyoming.  FILB invested a total of $1 million[288] in HPG on

February 24, 2011, in exchange for a seven-year warrant to purchase $5 million in common

---

[285] DSS Form 8-K, Feb. 18, 2011, at 2.

[286] FILB Holdings Report for the Month Ending December 31, 2010.

[287] FILB Realized Gains Report.

[288] FILB Agreement with HPG to purchase shares of Common Stock of HPG, Feb. 24, 2011.

stock at the lower of $1.25 and the market price, but no less than $0.50 per share.  Two business days later, FAM marked the HPG position at $25.7 million[289] on FILB's books and records, suggesting an immediate gain of $24.7 million, or 2,470%.  The highest mark on the HPG investment was recorded in May 2011 at $30.7 million.[290]  The Debtor still owns the HPG warrants, which were estimated to be worth $364,455 as of the Petition Date, suggesting a 64% loss relative to the purchase price.  The highest mark of $30.7 million was more than 10,000% greater than HPG's estimated value as of the Petition Date.  HPG continues to operate as a public company.

The Trustee believes that the HPG investment was consistent with FILB's investment strategy, although it resulted in a loss and in warrants worth far less than the immediately inflated $25.7 million mark or the highest $30.7 million mark for the position, and likely contributed to the calculation of excessive fees.  The warrants will be liquidated under the Plan.

### N.    BRG INVESTMENTS, LLC (DECEMBER 2009 THROUGH MARCH 2012)

BRG Investments, LLC is a limited liability company formed in Delaware on December 15, 2009.[291]  According to its former director, Moez Kaba, BRG was formed to allow the funds to make small cap investments in media companies.[292]  FILB provided the initial $5 million capital contribution to BRG in exchange for 5,000 common shares.[293]  As part of the April 22 Transactions, FILB's ownership interest in BRG was purportedly transferred to FII.  As

---

[289] FILB Holdings Report for the Month Ending February 28, 2011.

[290] FILB Holdings Report for the Month Ending Mar. 31, 2011.

[291] BRG LLC Agreement, Dec. 15, 2009.

[292] Interview with Moez Kaba (Oct. 2, 2013).

[293] 2010 BRG General Ledger Detail.

described in Section VI.G.6, this transfer was undone at the Trustee's insistence.  Over the years, FILB increased its investment in BRG through additional equity contributions totaling approximately $21.3 million.[294]  BRG has a number of partial and wholly-owned subsidiaries and investments, including Budget Travel, FDIF, Lowercase, and MV Nepenthes.  Each is described below.

### 1. Intellitravel Media Inc. a/k/a Budget Travel (December 2009 through May 2012)

Intellitravel is a media company that produces both print and electronic versions of a budget travel magazine.  It does business under the name Budget Travel.  In December 2009, BRG acquired a 100% ownership interest in Intellitravel from an affiliate of the Washington Post.  According to the Stock Purchase Agreement dated December 15, 2009, the transaction consideration was $1.00, and interest in FDIF preferred shares with a stated value of $1 million, and up to $700,000 of working capital financing.

Information gathered to date indicates that, beginning on March 4, 2010, BRG also has loaned Budget Travel a total of $3.7 million.  FDIF purchased $2.5 million of the $3.7 million Intellitravel Note during 2011 and 2012 from BRG.  The company is now in Chapter 11 proceedings in the United States Bankruptcy Court for the Southern District of New York (Case No. 12-14815 (ALG)) and is in the process of being sold.  BRG will take a significant loss on this investment.  The Trustee does not believe that this was a permissible investment under the governing documents.

---

[294] Cash Model.

2.     **Fletcher Dividend Income Fund LLC**
       **(January 2010 through March 2012)**

FDIF was initially a wholly-owned subsidiary of FILB.  FDIF is a limited liability company formed in Delaware on December 31, 2009.  FDIF's stated strategy as defined by the Limited Liability Company Agreement dated December 31, 2009, was "to seek substantial dividend income and consistent annual profits by investing in investment grade securities and various private investment funds managed by [FAM]."[295]  In addition to its investment activities and its acquisition of the Budget Travel debt, in February 2010, FDIF purchased from FILB a $1.7 million loan to Vanquish.  Vanquish repaid that loan in full in August 2011.[296]

At formation, FILB was FDIF's sole owner.  On December 31, 2009, BRG transferred $1 million worth of FDIF Preferred Class A shares to Newsweek, Inc., as partial consideration for the purchase of Intellitravel.[297]  To date, Newsweek has been paid $600,000, and is owed an additional $400,000.  FILB's interest in FDIF was later transferred to BRG, and BRG continues to hold 100% of the common shares of FDIF.[298]  As of February 2013, FDIF's assets consisted of $407,559 in United States Treasuries, $31,026 in cash, and the Budget Travel debt.[299]  As of the Petition Date, FDIF's primary liability is the remaining $400,000 owed to the Post.[300]  The Trustee intends to liquidate the Debtor's position in FDIF as part of the plan.

---

[295] Limited Liability Company Agreement of FDIF, Dec. 31, 2009.

[296] Cash Model.

[297] Intellitravel Stock Purchase Agreement dated December 15, 2009.

[298] FDIF Shareholders' Capital Account Summary, through Dec. 31, 2012.

[299] FDIF February 2013 Lampost account statement.

[300] FDIF Statement of Financial Condition, estimated as of June 30, 2012.

### 3.    MV Nepenthes, LLC (September 2010 through December 2012)

MV Nepenthes is a New York limited liability company formed on June 22, 2010.[301]  Originally, FAM was the sole member, but FAM distributed a $1.1 million interest to AF on September 2010 as a dividend in kind.[302]  Between September 2010, and December 2012, BRG contributed approximately $7.7 million[303] in cash to MV Nepenthes, ending up with approximately an 86% ownership interest in it.[304]  The remainder of MV Nepenthes is now owned by Magic Violet LLC ("Magic Violet"), a company owned by AF's brother Geoffrey Fletcher.  In September 2010, Magic Violet purchased its interest in MV Nepenthes from AF in exchange for a $1.1 million promissory note.[305]

MV Nepenthes' only asset is the rights to the feature motion picture Violet & Daisy, which was written and directed by Geoffrey Fletcher.  As discussed more fully in SectionVIII.C.3.(b) below, the Trustee believes that this investment was inconsistent with the Funds' investment strategy.  The picture had an unsuccessful United States theatrical release in June 2013, and the investment is virtually worthless.

### 4.    Lowercase Ventures Fund (May 2010 through October 2010)

Lowercase Ventures Fund I, L.P. ("Lowercase") is a venture capital fund that primarily invests in technology companies.  Currently, Lowercase's three largest investments are in Uber Technologies, Twitter, and Facebook.  On May 4, 2010, BRG invested $50,000, and on October 8, 2010, BRG invested an additional $20,000 for a total investment of $70,000.  BRG

---

[301] MV Nepenthes Limited Liability Company Agreement, July 22, 2010.

[302] MV Nepenthes Amended Limited Liability Company Agreement, Sept. 22, 2010.

[303] BRG Trial Balance as of Dec. 31, 2012.  BRG received all its funding directly or indirectly from FILB.

[304] 2012 MV Nepenthes Tax Return.

[305] MV Nepenthes Amended Limited Liability Company Agreement, Sept. 22, 2010.

remains committed to provide an additional $30,000 of capital. However, the Trustee has been

informed by the investment manager that it does not anticipate making a capital call. Through

May 2013, Lowercase has returned approximately $102,000 to BRG. According to the

Lowercase Statement of Partner's Capital as of June 30, 2013, BRG is an approximately 1.2%

limited partner, and its capital account is approximately $1.3 million.[306] While the Trustee

considers this investment to have been outside the stated investment strategy, it appears that the

investment could return value to the estate. The Trustee is currently in the process of exploring

options and determining how best to liquidate this investment.

### O.    AESOP FUND, LTD. AND VANQUISH FUND LTD.

Vanquish Fund Ltd. ("Vanquish") and Aesop Fund Ltd. ("Aesop") were two

funds formed in late 2009. These funds were both supposed to be investing in a portfolio of

small-cap securities.[307] However, at least in the case of Vanquish it is not apparent that any such

investments were made. The investors in these funds were FILB,[308] BRG,[309] FDIF[310] and

Richcourt Holding.[311] There were no third-party investors in the funds. FILB and BRG

---

[306] Lowercase Statement of Partner's Capital as of June 30, 2013.

[307] Vanquish Fund Ltd. Information Memorandum, Nov. 4, 2009; The Aesop Fund Ltd. Information Memorandum, Dec. 2009.

[308] FILB contributed a total of $15.8 million in cash. See Cash Model.

[309] BRG contributed a total of $1.7 million in cash. See Cash Model.

[310] On March 1, 2010, FDIF purchased one of the $1.7 million Vanquish Promissory Notes from FILB. See Cash Model.

[311] Richcourt Holding contributed Arbitrage shares with a stated value of $3.5 million in exchange for 100% of Vanquish common stock. See Richcourt Written Resolutions dated February 23, 2010.

combined invested $17.5 million into Vanquish and Aesop and over time received back $7.1 million in cash.[312]

## 1.    Aesop Fund, Ltd.

Aesop was incorporated in the Cayman Islands on December 4, 2009.  Its Offering Memorandum dated December 2009 states that Aesop's main investment strategy was to manage an investment portfolio that would "generally consist of long positions in listed and unlisted securities including equity securities of public companies that the Investment Manager believes to be attractively valued."  The investment manager for Aesop was New Wave Asset Management Ltd. (a Richcourt entity) and charged a 2.0% management fee per annum.[313]

On January 7, 2010, FILB invested cash in the amount of $10.0 million into Aesop in exchange for 100% of the common shares.  On February 23, 2010, FILB contributed the Aesop shares to Vanquish in exchange for preferred shares of Vanquish with a stated value of $10 million.  In June 2011, Aesop shares with a purported value of $5.9 million were transferred back to FILB,[314] which currently holds 100% of Aesop.[315]  On October 12, 2011, FILB partially redeemed and received $1.0 million in cash from Aesop.[316]  As of the Petition Date, Aesop's

---

[312] $1,700,000 Promissory Note, dated Feb. 24, 2010, made by Vanquish in favor of FILB; $4,050,000 Promissory Note, dated Feb. 23, 2010, made by Vanquish in favor of FILB; $1,700,000 Promissory Note, dated Feb. 23, 2010, made by Vanquish in favor of BRG; Cash Model.

[313] The Aesop Fund Ltd. Confidential Information Memorandum, Dec. 2009.

[314] Email from Stuart MacGregor to Goldin Associates (Apr. 24, 2013, 3:24 p.m.); Cash Model.

[315] On August 4, 2011, Vanquish redeemed its investment in Aesop and received $5.0 million cash.  Cash Model.

[316] Cash Model.

assets were valued by the Debtor at $4.2 million, which represents Aesop's investment in

Leveraged.[317]   Any value of this investment is dependent on securing recoveries under the Plan.

### 2.    Vanquish Fund Ltd.

Vanquish was incorporated in the Cayman Islands on November 5, 2009.  Its

stated strategy was to invest in "long positions in listed and unlisted securities including equity

securities of public companies that the Investment Manager believes to be attractively valued."[318]

The Investment Manager for Vanquish was New Wave Asset Management Ltd. (a Richcourt

entity) and charged a 1.5% management fee per annum.[319]

On February 23, 2010, FILB contributed its Aesop common shares to Vanquish

and received $10.0 million in Vanquish preferred stock.[320]  On the same day, Richcourt Holding

contributed Arbitrage shares to Vanquish and received 100% of Vanquish's common stock.[321]

On February 24, 2010, FILB loaned Vanquish $5.75 million, and BRG agreed to loan Vanquish

$1.7 million.[322]  Vanquish ultimately repaid $3.7 million of its debt to FILB[323] and $1.7 million

of its debt to BRG in cash.[324]  In exchange for the remaining $2.05 million owed to FILB, FILB

---

[317] Aesop Trial Balance, June 30, 2012.

[318] Vanquish Fund Ltd. Information Memorandum, Nov. 4, 2009.

[319] Id.

[320] Written Resolutions of FILB, Feb. 24, 2010.

[321] Written Resolutions of Richcourt Holding, Feb. 23, 2010.

[322] $1,700,000 Promissory Note, dated Feb. 24, 2010, made by Vanquish in favor of FILB; $4,050,000 Promissory Note, dated Feb. 23, 2010, made by Vanquish in favor of FILB; $1,700,000 Promissory Note, dated Feb. 23, 2010, made by Vanquish in favor of BRG.

[323] Only $2 million cash went directly to FILB.  In March 2010, FILB sold its $1.7 million Vanquish note to FDIF.  Vanquish ultimately repaid that note directly to FDIF.

[324] Cash Model.

received a reduction in its debt to Leveraged under the Euro Note.[325]  In June 2011, FILB

redeemed its preferred shares in exchange for a reduction in the Euro Note and an ownership

interest in Aesop with a stated value of $5.9 million.[326]  As a result of these transactions, neither

FILB nor BRG holds any investment in Vanquish, which is currently 100% owned by Richcourt

Holding.  Because 100% of Vanquish's common stock is owned by Richcourt Holding,[327] the

Trustee does not have access to its complete books and records.  Documents suggest that

Vanquish's assets consist of a $2.7 million investment in Richcourt Euro Strategies[328] and a $2.6

million redemption receivable from Leveraged.[329]

## V.
## EVENTS LEADING UP TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

### A.    SEC INVESTIGATION

The SEC has issued a formal order of investigation into Fletcher Asset

Management and FAM Insiders, investigating, among other things, whether Fletcher overvalued

its assets and how it used investor proceeds.[330]  Skadden has represented FAM in connection

with this investigation.  All or substantially all of Skadden's bills related to the SEC

Investigation (amounting to more than $3.4 million) were paid by FILB pursuant to the

---

[325] The Euro Note was originally between Arbitrage and Leveraged but was later assumed by FILB.  The Trustee does not believe that FILB received any consideration for assuming the Euro Note.

[326] Email from Stuart MacGregor to Goldin Associates (Apr. 24, 2013, 3:24 p.m.); Cash Model.

[327] Written Resolutions of Richcourt Holding, dated Feb. 23, 2010.  The Trustee has not seen records suggesting that any other shareholders of Vanquish exist.

[328] Vanquish Unaudited Trial Balance, Dec. 31, 2010.

[329] Leveraged Capital Register for the period between June 30, 2011, and June 30, 2012.

[330] Declaration of Jennifer Leete, Sept. 19, 2013 [Docket No. 285].

indemnity provisions of the IMA.[331]   The Trustee does not believe that FAM Insiders should

have been indemnified by FILB.  The SEC investigation into FAM and its affiliates is ongoing.

### B.   LOUISIANA PENSION FUNDS' REDEMPTION REQUESTS

In March 2011, two of the Louisiana Pension Funds, MERS and FRS, made

partial redemption requests to Leveraged.  By letter dated April 14, 2011, Leveraged notified

MERS and FRS that in accordance with its governing documents, Leveraged would satisfy the

redemptions "in cash or in kind" and had the right to satisfy a minimum of 90% of the redeemed

amounts within 15 days of the redemption date, with the remaining 10% being payable no later

than 30 days after the completion of Leveraged's audit for that year.[332]   On June 15, 2011,

Leveraged distributed to each of the redeeming Louisiana Pension Funds promissory notes

issued in favor of Leveraged by Arbitrage, which were due to mature on June 15, 2013.  The

Louisiana Pension Funds ultimately rejected the promissory notes as unsatisfactory.[333]

Following the issuance of the promissory notes, on June 22 and June 27, 2011,

MERS and FRS demanded to be redeemed for the remainder of their respective investments.  On

June 27, 2011, NOFF, the third Louisiana Pension Fund, also demanded to be fully redeemed.  In

late July 2011, Leveraged began discussions with all three Louisiana Pension Funds concerning

resolution of their respective redemption requests.  During the course of these talks, in late July

2011, the three Louisiana Pension Funds executed a waiver of the Series N Offering

Memorandum that the Pension Funds be redeemed if the ratio of the non-Series N shareholders

fell below 20% of the aggregate value of the fund.  Apparently, the Louisiana Pension Funds

---

[331] Spreadsheet entitled "FILB Legal Expense" prepared by MacGregor.

[332] Letter from Leveraged to MERS and FRS, Apr.14, 2011.

[333] Saunders Decl. ¶ 23, July 2, 2012.

were advised at a meeting attended by FAM and Eisner that if they did not execute the waiver, they might not be able to realize the 1% return per month that they had accrued in the past, and that without a waiver, Eisner was not going to issue its audit report on Leveraged.[334]  As discussed below in Section VIII.J.2.(e), the Trustee considers Eisner's participation in this meeting to have been inappropriate, and in breach of the requirement that an auditor be independent.

The Louisiana Pension Funds hired Ernst & Young to examine Leveraged's books and records.  E&Y spent approximately two weeks at FAM's offices over the summer of 2011 examining books and records.  In September 2011, E&Y issued a written report to the Louisiana Pension Funds.  The Louisiana Pension Funds issued a joint statement, stating that E&Y had determined that "FAM's valuation [of the investment portfolio] showed that the asset values exceed[ed] the [Louisiana Pension Funds'] investment and expected return."[335]  The review was a facial analysis of the books and records only, and did not include any independent analyses of the propriety or valuation of particular investments.

In January 2012, after months of failed negotiations, the Louisiana Pension Funds again demanded their full redemptions.  On February 13, 2012, the Debtor transferred to a newly-formed and wholly-owned subsidiary, FILB Co-Investments LLC ("FILBCI"), certain of its rights under the UCBI Securities Purchase Agreement pursuant to a Subscription Agreement, dated as of February 13, 2012, and Cross Receipt executed February 22, 2012 (together, the "Assignment Agreements").  According to FAM's valuations, the rights under the SPA that were transferred to FILBCI were purportedly worth $136,135,806 – a grossly inflated

---

[334] See, e.g., Interview with representatives of the Louisiana Pension Funds; email from Eli Shamoon to Joe Meals (July 26, 2011, 14:45).

[335] Press Release by FRS, MERS and NOFF Joint Statement (Sept. 9, 2011).

valuation.[336]  Through a series of transactions, the shares of FILBCI were distributed through the chain of funds and ultimately distributed to and registered in the names of the Louisiana Pension Funds in amounts corresponding to the amounts of their respective redemptions from Leveraged.

Under the SPA, FILBCI (as assignee from FILB) was entitled (i) to purchase up to 65,000 shares of UCBI Series C Convertible Preferred Stock (the "Series C Preferred Stock") from UCBI, (ii) to convert Series C shares into common shares, and (iii) to the extent, certain conditions were met, to receive warrants to purchase shares of Junior Preferred Stock in accordance with a predetermined formula.  On June 25, 2012, FILBCI tendered an Investment Notice and $76,000 in cash in exchange for 76 shares of Series C Preferred Stock.  Four days later, FILBCI attempted to redeem the 76 shares of Series C Preferred Stock and to convert those preferred shares into 14,476 common shares on the basis that UCBI's June 2011 1:5 reverse stock split had not changed the strike price of the Series C Preferred Shares.  In a letter dated the same day, UCBI refused to honor both the Investment Notice and the redemption request.  As discussed more fully in Section VI.G.8 below, litigation ensued between FILBCI and UCBI, which was ultimately settled in March 2013.

C.    LIQUIDATIONS IN THE CAYMAN ISLANDS

On January 31, 2012, the Louisiana Pension Systems filed a winding-up petition against Leveraged in the Cayman Islands.  Leveraged's management opposed the winding-up petition, but on April 18, 2012, the Grand Court for the Cayman Islands (the "Cayman Islands Court") ordered the winding up of Leveraged and appointed Robin Lee McMahon and Roy Bailey of E&Y as the joint official liquidators of Leveraged (the "JOLs").  The Cayman Islands Court found, among other things, that the shares of FILBCI (and the corresponding rights to the

---

[336] Subscription Agreement between FILB and FILBCI, Feb. 13, 2013.

SPA with UCBI) were "commercially worthless when compared to the debt it purports to redeem."[337]

The Leveraged directors appealed the Cayman Winding Up Order. That appeal was denied August 1, 2012. The Trustee understands that the Louisiana Pension Funds are still redeeming creditors in Leveraged.[338]

On May 9, 2012, the successor to the MBTA, Gregoreuo Ltd., in its capacity as the sole shareholder of Alpha, caused Alpha to enter into voluntary liquidation, and professionals from Zolfo Cooper were appointed as joint voluntary liquidators (the "Alpha Liquidators").

On June 13, 2012, Alpha and Leveraged (the two shareholders of Arbitrage) called a meeting of the shareholders of Arbitrage to consider: (i) placing Arbitrage into voluntary liquidation and appointing the Leveraged JOLs (or some other qualified insolvency practitioners) as joint voluntary liquidators for the entity; or (ii) in the alternative, replacing the board of Arbitrage with the Leveraged JOLs (or other persons resident in the Cayman Islands). The meeting ultimately was held on June 29, 2012, and the shareholders of Arbitrage elected to put Arbitrage into voluntary liquidation and appointed the same JOLs that were in charge of the liquidation of Leveraged.

### D.    APRIL 22 TRANSACTIONS

On the evening of April 22, 2012, just four days after the Cayman Winding Up Order, the boards of directors of FILB, FII, and Arbitrage purported to enter into a series of transactions which changed the ownership structure of the Debtor and transferred certain of its

---

[337] In the Matter of FIA Leveraged Fund, Grand Court, Cayman Islands (Cause No. 0013/12) (CJQ), Apr. 18, 2012 (the "Cayman Winding Up Order"), at 119.

[338] The Leveraged directors attempted to file a further appeal, but it appears they failed to meet the deadlines to post the necessary bond to perfect the appeal.

assets to FII, an affiliate entity.  It does not appear that any valuations were performed or that there was any justifiable business purpose for these transactions.  The directors who purportedly considered the April 22 Transactions appear to have received no written analysis of them. Although draft board minutes were executed by FII and prepared for FILB, FILB's board of directors does not appear to have ever executed them.  AF and Turner were the individuals particularly involved in orchestrating these transactions.  The Trustee believes that the express purpose of the April 22 Transactions was to put FILB assets out of the reach of the JOLs and ultimately the Louisiana Pension Funds, by transferring them to an entity – FII – in which, pursuant to the share transfer aspect of the transaction, Arbitrage would no longer have an interest.  As a purported payment-in kind for the redemption by FII of its shares of FILB, the following assets were transferred to FII:

- $2,200,000 was transferred from FILB's bank account to FII's bank account;

- FILB transferred to FII one-half of the UCBI Warrants (the warrants held to purchase shares of Common Stock Junior Preferred of UCBI with a strike price of $4.25);

- FILB transferred to FII the BRG Membership Interests (100% of the membership interest in BRG);

- FILB transferred to FII the DSS Warrants (warrants to purchase in shares of Common Stock of DSS with a strike price of $5.38); and

- FILB assigned to FII the Excess Registration Funds (the right to any payment in excess of $606,667.00 made by UCBI to FILB due to a "Registration Failure" under the UCBI Securities Purchase Agreement.

By virtue of the April 22 Transactions, Arbitrage was intended to become the owner of approximately 85% of the equity interests of the Debtor, and FII was intended to become the owner of approximately 15% of the equity of the Debtor. FII would no longer be owned by Arbitrage, but instead would be owned or controlled by AF-owned entities. However, the transfer of FII's shares of the Debtor to Arbitrage was never recorded in the Debtor's official Register of Members, and the transfer therefore was never completed. As discussed more fully in Section VI.G.6 below, the Trustee negotiated a settlement whereby the assets transferred as part of the April 22 Transactions from the Debtor to FII were returned to the Debtor's estate.

### E.    NEW YORK STATE CASE – FILB V. LEVERAGED

By letter dated May 1, 2012, the JOLs demanded repayment of a promissory note in the face amount of €20,448,765.14 that it held from FILB, generally referred to as the "Euro Note."[339] By letter dated May 9, 2012, the Debtor responded that only $5.1 million was currently due under the Euro Note. On May 14, 2012, the JOLs demanded immediate payment on the Euro Note.

On May 24, 2012, the Debtor filed a complaint in the Supreme Court of the State of New York seeking a declaratory judgment: (i) declaring that the amount of the Euro Note is not fixed at its face amount, but rather may vary depending on Class 6 shareholder subscriptions and redemptions; (ii) declaring the amount of the Debtor's payment obligation under the Euro Note as of January 31, 2012; and (iii) declaring that the Debtor's payment obligation under the Euro Note may be paid in cash or in kind. The case was ultimately removed to the Bankruptcy Court. [Docket No. 12-01915]. This action will be settled as part of the Investor Settlement.

---

[339] The Trustee believes that FILB assumed responsibility for the Euro Note from Arbitrage without receiving adequate consideration.

F.    **LITIGATION IN BERMUDA**

One week later, on May 30, 2012, the JOLs filed a winding up petition in

Bermuda against the Debtor (the "Bermuda Petition").  According to documents filed by the

Debtor, the Debtor ultimately filed its Chapter 11 petition in this Court in order to prevent the

Debtor from being wound up in Bermuda.  The Bermuda Petition is currently stayed pending

resolution of this Chapter 11 Case and will be settled as part of the Investor Settlement.

G.    **CREDIT SUISSE**

Prior to the Petition Date, the Debtor had a long-standing prime brokerage

relationship with Credit Suisse Securities (USA) LLC and its affiliates (collectively, "Credit

Suisse").  FAM was also a member of the CSFB Tremont Investable Hedge Fund Index.  In July

2011, Credit Suisse advised the Debtor that it was terminating the prime brokerage relationship

and terminating swap transactions entered into between the Debtor and Credit Suisse.  Following

discussions between the parties, Credit Suisse agreed to hold in abeyance the termination of the

prime brokerage relationship and the swap transactions to enable the Debtor to find a

replacement for Credit Suisse.  Initially, this consisted of periodic extensions of the termination

dates, but in late January 2012 Credit Suisse agreed to an open-ended extension of the

termination dates of the prime brokerage relationship and swap transactions, subject to

revocation on 10 days' notice at its sole discretion.[340]

In late May 2012, Credit Suisse advised the Debtor that it was revoking its

consent to the extension of the termination dates for the prime broker relationship and swap

transactions, and that the termination date would be June 7, 2012.  Credit Suisse cited the

Debtor's failure to deliver 2010 and 2011 audited financial statements and the Cayman

---

[340] Saunders Decl. ¶¶ 42, 43, July 2, 2012; Letter from Credit Suisse to FILB, Jan. 31, 2012.

liquidation proceedings of Leveraged as reasons for revoking the extension of the termination date.[341]

As of May 31, 2012, the Debtor had the following securities in its prime brokerage account with Credit Suisse: (i) the ION Preferred Shares (27,000 shares of preferred stock in ION), carried on FILB's books at approximately $69.9 million; and (ii) the Helix Preferred Shares (1,000 shares of Helix Series A-1 Cumulative Convertible Preferred Stock), carried on FILB's books at $7.9 million.  Between June 7, 2012 and June 27, 2012, Credit Suisse liquidated the ION Preferred Shares for approximately $39.5 million and paid itself $40 million from the sale proceeds and cash on hand to pay down the Debtor's margin debt and obligations under the swap transactions.[342]  As of the Petition Date, Credit Suisse was holding approximately $1.6 million in cash and the Helix Preferred Shares.[343]  As described more fully in Section VI.G.1 below, the Trustee completed negotiations of a cash collateral order whereby the Helix shares and most of the cash were turned over to the Debtor.

AF has maintained that the liquidation of the ION Preferred Shares was improper and that there was another bidder willing to offer a better price.  The Trustee investigated this claim.  The third party ultimately did not submit a bid, and there is no evidence that the bid AF claimed the third-party would have made was necessarily better than the bid accepted by Credit Suisse.  The Trustee concluded that Credit Suisse undertook a reasonable sales process and that the price obtained – which included a slight premium over the conversion price (e.g., six months

---

[341] Saunders Decl. ¶ 44, July 2, 2012.

[342] Id. ¶ 45.

[343] Id. ¶ 46; Cash Collateral Order ¶ 5 [Docket No. 149].

of dividends) – was a better price than FAM ever obtained when it liquidated FILB's positions in the same stock.

## VI.
## THE CHAPTER 11 CASE

### A.    COMMENCEMENT OF THE CHAPTER 11 CASE

On June 29, 2012 (the "Petition Date"), the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code in the Southern District of New York (the "Chapter 11 Case"). [Docket No. 1]. The case was assigned to the Bankruptcy Judge Robert E. Gerber.

Upon commencement of the Chapter 11 Case, all actions and proceedings against the Debtor and all acts to obtain property from the Debtor were stayed, and continue to be stayed, under Section 362 of the Bankruptcy Code. The Debtor was authorized to operate its business and manage its properties as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

The United States Trustee solicited for the formation of an official committee of unsecured creditors, but none was ever formed.

### B.    THE DEBTOR'S EMPLOYMENT OF PROFESSIONALS

With the Bankruptcy Court's approval, the Debtor retained the following professionals to represent the Debtor and assist it in connection with the Chapter 11 Case:

- Young Conaway Stargatt & Taylor, LLP, as bankruptcy counsel, effective as of June 29, 2012 [Docket No. 97];

- Donald S. MacKenzie, as the chief restructuring officer, effective as of July 15, 2012 [Docket No. 155];

- Conway MacKenzie Management Services, LLC, as restructuring and management services provider, effective as of July 15, 2012 [Docket No. 155];

- Trott & Duncan Limited, as special Bermuda counsel, effective as of August 13, 2012 [Docket No. 96];[344] and

- Stewart Turner and Stuart MacGregor, as consultants, effective as of June 29, 2012 [Docket No. 152].

The Bankruptcy Court also entered an order authorizing implementation of orderly procedures for interim compensation and reimbursement of expenses of the Debtor's restructuring professionals [Docket No. 48].[345]

### C.    SUMMER 2012 LITIGATION BETWEEN FILB AND LEVERAGED, ARBITRAGE AND ALPHA

On the Petition Date, the Debtor commenced an adversary proceeding against Arbitrage, Leveraged and Alpha (collectively, the "AP Defendants") seeking a preliminary and permanent injunction enjoining any action to displace the Debtor's existing management, including proceeding with the Bermuda Proceeding and proceeding with a shareholder meeting or vote to change the Debtor's directors.

On July 5, 2012, the Bankruptcy Court entered a temporary restraining order in the Adversary Proceeding, nunc pro tunc to July 3, 2012 [AP Docket No. 7], pending consideration of the Debtor's request for a preliminary injunction.  The temporary restraining order enjoined the AP Defendants and certain related parties for a period of 14 days from (i)

---

[344] The Debtor also sought to retain Appleby (Bermuda) Limited as special Bermuda counsel [Docket No. 44], but later withdrew its retention application [Docket No. 123].  After he was appointed, the Trustee continued to consult Trott & Duncan related to issues of Bermuda law.

[345] This order was later amended after the Trustee was appointed.  [Docket No. 156].

taking any action to obtain appointment of a liquidator in the Bermuda Proceeding, except as such action was expressly ordered by the Bermuda Court after certain conditions were met, and (ii) holding any shareholder meeting or shareholder vote to change the Debtor's board.

Subsequently, following the issuance of the temporary restraining order, and given the new information that emerged in the Supplemental 1007-2 Affidavit (that the purported transfer of FII's ownership of FILB to Arbitrage was never implemented) [see Bankruptcy Docket No. 18], the Debtor sought to narrow the scope of the injunctive relief it was seeking. Specifically, rather than seeking an injunction preventing shareholder actions that might result in removal and replacement of the Debtor's board of directors, the Debtor sought an order enjoining the Defendants from pursuing the appointment of a liquidator in the Bermuda Proceeding.  [See AP Docket No. 31 at 1.]

In response, Arbitrage and Leveraged filed an opposition brief [AP Docket No. 41] and a supporting affidavit [AP Docket No. 45] from Robin McMahon, Arbitrage and Leveraged's official joint liquidator.  The McMahon Affidavit emphasized the E&Y Liquidator's concerns with respect to the mismanagement of the Debtor and raised a number of related concerns and allegations.

At a hearing on July 27, 2012, the Bankruptcy Court granted the Debtor a preliminary injunction for a period of 60 days.  The Bankruptcy Court also held that the automatic stay "[applied] to efforts to cause liquidators of the estate property to be appointed in a foreign jurisdiction."[346]  With respect to the preliminary injunction, the Bankruptcy Court found that the factors were "barely" satisfied.[347]  The Bankruptcy Court further stated that it was not

---

[346] Preliminary Injunction Transcript 164:24–25; 165:1–2.

[347] Id. at 165.

sure that there was a likelihood of successful reorganization where there was such distrust of the

Debtor's management and no truly independent fiduciary was in place.[348]

On August 13, 2012, Arbitrage commenced an action in the Supreme Court of

Bermuda against the Debtor, seeking entry of an order (a) scheduling a special telephonic

meeting of the Debtor's shareholders on August 20, 2012, and (b) authorizing Arbitrage to vote

at the meeting as the Debtor's 83% shareholder.  In response, the Debtor filed a motion by order

to show cause in the Chapter 11 Case [Docket No. 42] seeking entry of an order enforcing the

automatic stay with respect to the Bermuda Action.  Arbitrage filed a response to the Debtor's

injunction motion on August 17, 2012 [Docket No. 47], and, at a hearing held on August 20,

2012, the Bankruptcy Court granted the Debtor's injunction motion.

### D.    APPOINTMENT OF CHAPTER 11 TRUSTEE

On August 21, 2012, the Debtor filed an emergency motion for an order directing

the appointment of a Chapter 11 trustee [Docket No. 52].  In the motion, the Debtor stated that

"that there is no negotiated resolution to be had [with Leveraged and Arbitrage] and additional

costly litigation with Leveraged and Arbitrage is inevitable."[349]  Accordingly, the Debtor's Board

of Directors believed that "the appointment of a chapter 11 trustee [would] be in the best interest

of the Debtor's estate and its stakeholders."[350]

On August 24, 2012, the United States Trustee filed a separate motion for an

order directing the appointment of a Chapter 11 trustee [Docket No. 64].  Concurring with the

Debtor's assessment, the United States Trustee highlighted the need for an "independent

_____

[348] Id. at 171–72.

[349] Id. ¶ 7.

[350] Id.

-113-

fiduciary" to "conduct a full and thorough investigation and restore confidence of the creditors in

the liquidation of the estate."[351]

On September 7, 2012, the Bankruptcy Court entered an order [Docket No. 95]

granting the Chapter 11 Trustee Motions pursuant to 11 U.S.C. Section 1104(a)(2) and directing

the appointment of a Chapter 11 trustee.  Thereafter, on September 25, 2012, the United States

Trustee filed an application [Docket No. 112] for an order approving the appointment of Richard

J. Davis, Esq., as Chapter 11 trustee.  The Trustee's appointment was approved by Bankruptcy

Court order dated September 28, 2012 [Docket No. 115].

### E.    SCHEDULES AND STATEMENTS OF FINANCIAL AFFAIRS

On September 24, 2012, the Debtor filed its Schedules of Assets and Liabilities

(the "Schedules") and Statement of Financial Affairs (the "SOFA") with the Bankruptcy Court

[Docket Nos. 104, 105].  The Schedules and Statement set forth the claims of known creditors

against the Debtor as of the Petition Date, according to the Debtor's books and records.  The

Schedules were prepared by Conway MacKenzie, which up until that time had been acting as

consultant to Donald MacKenzie, the Chief Restructuring Officer to the Debtor, without any

input or participation from the Trustee.

Conway MacKenzie included a broad disclaimer regarding the Schedules and

SOFA, which noted, among other things, that the SOFA and Schedules were unaudited and that

the Debtor had made reasonable efforts to ensure that the SOFA and Schedules were accurate

and complete based on information that was known and available to it at the time of preparation.

Conway MacKenzie also noted that subsequent information or discovery might result in material

changes to the SOFA and Schedules; that inadvertent errors or omissions might exist in the

---

[351] Id. ¶ 17.

SOFA and Schedules; and that the financial and other information underlying the SOFA and Schedules and the prepetition transactions in which the Debtor engaged were subject to ongoing review, investigation, and analysis by the Debtor, the results of which might necessitate adjustments that might have a material impact on the Schedules and Statement taken as a whole. Finally, Conway MacKenzie noted that because the SOFA and Schedules contained unaudited information that was subject to further review and potential adjustment, there could be no assurance that these Schedules and Statement were wholly accurate and complete.[352]

### F.    THE TRUSTEE'S EMPLOYMENT OF PROFESSIONALS

With the Bankruptcy Court's approval, the Trustee retained the following professionals to represent the Trustee and assist him in connection with his statutory duties:

- Luskin, Stern & Eisler, LLP, as bankruptcy counsel, effective as of September 25, 2012 [Docket No. 154];

- Goldin Associates, LLC, as special consultant, effective as of October 5, 2012 [Docket Nos. 153, 246];

- Abrams & Bayliss LLP, as special litigation counsel, effective as of January 15, 2013 [Docket No. 181];

- WeiserMazars LLP as Tax Service Provider, effective as of March 19, 2013 [Docket No. 231]; and

- An expert consultant, effective as of October 16, 2013 [Docket No. 311].[353]

---

[352] The Trustee has not revised the Debtor's schedules.  However, as discussed, in Section VI.K below, the Trustee has reviewed the monthly operating reports filed before he was appointed and revised certain transactions reflected in them.

[353] In order to protect the identity of the expert and the target of the investigation, the motion was filed under seal and a redacted copy was filed publicly.  [Docket Nos. 300, 302–03].

On the Trustee's motion, the Bankruptcy Court also entered a revised Interim Compensation Order authorizing procedures for interim compensation and reimbursement of expenses of the Trustee's restructuring professionals [Docket No. 156].

### G.    SIGNIFICANT ACTIONS TAKEN BY THE TRUSTEE

Since his appointment on September 28, 2012, the Trustee has assumed all management responsibilities for the Debtor.  The Trustee is continuing to oversee the operation of the Debtor while he conducts his investigation and eventually seek entry of a plan of reorganization.  The Trustee's significant actions since his appointment have included, among other things, the following:

### 1.    Cash Collateral Order

Prior to the Trustee's appointment, the Debtor and Credit Suisse, the Debtor's prime broker, agreed to a stipulated cash collateral order [Docket No. 80].  Under the original Cash Collateral Order, Credit Suisse would, among other things, release its lien in the Debtor's cash and securities held in a brokerage account at Credit Suisse in exchange for, among other things, a superpriority claim pursuant to Section 507(b) of the Bankruptcy Code.  After the Trustee's appointment, the Trustee negotiated a revised stipulation and order with Credit Suisse. The economic terms of the revised Cash Collateral Order were identical to the terms of the original Cash Collateral Order, but incorporated certain technical edits, a clarification of the Trustee's reservation of rights with respect to possible claims and recoveries against Credit Suisse, and a requirement that Credit Suisse cooperate with the Trustee's investigation of possible contract claims against Credit Suisse.  On November 9, 2012, the Bankruptcy Court entered the Revised Cash Collateral Order [Docket No. 149].

### 2.    363 Sale of the Helix Stock

Many of the financial instruments owned by the Debtor are illiquid privately

placed investments of little or no value.  Aside from a limited amount of cash, the Debtor's

primary source of liquidity was its beneficial interest in 1,000 shares of Series A-1 Cumulative

Convertible Preferred Stock of Helix Energy Solutions Group, Inc., a publicly-traded oil and gas

services company.  On October 22, 2012, the value of the preferred stock was approximately

$6.8 million if converted to Helix common stock.  In order to fund his investigations and

diversify the Debtor's holdings, the Trustee determined that it was in the best interests of the

estate to liquidate the preferred stock.  Accordingly, the Trustee filed a motion under Section

363(b)(1) of the Bankruptcy Code [Docket No. 134] seeking authorization to sell the preferred

Stock or convert the preferred stock into Helix common stock and sell it if the Trustee

determined in his business judgment that conversion and sale would obtain a better result for the

estate.  The Bankruptcy Court approved the 363 Motion by order dated November 16, 2012

[Docket No. 161].

The Trustee opened a brokerage account at Seaport Group ("Seaport") and

directed Seaport to explore selling the stock "as is."  Unable to realize a premium over the

conversion price despite his efforts to do so, on November 29, 2012, the Trustee directed Seaport

to convert the Helix preferred stock into common stock and dispose of it on the open market.

Between December 5, 2013, and December 7, 2012, all common stock was disposed of on the

open market for approximately $6.5 million, which reflected the then market price of the stock.

### 3.    Consulting Agreements with Turner and MacGregor

On August 29, 2012, the Debtor filed a motion [Docket No. 71] seeking the

approval of its entry into post-petition consulting agreements with the Debtor's two key

prepetition consultants – Stewart Turner and Stuart MacGregor (the "Consultants").  Prepetition,

the Debtor had no employees, and the Consultants served as the two persons providing day-to-day services to the Debtor.  According to the Debtor's motion, Turner provided valuation services while MacGregor managed the Debtor's financial reporting systems.  Post-petition, the Consultants continued to provide the same services they provided to the Debtor under their respective prepetition consulting agreements, as well as a number of additional services as requested by the Debtor.  Instead of assuming the Consultant's prepetition consulting agreements, the Debtor sought to enter into new post-petition consulting agreements (the "Amended Consulting Agreements").  The Amended Consulting Agreements memorialized the expansion of the scope of the Consultants' services and eliminated the Consultants' responsibility to provide services to the Debtor's affiliates at the Debtor's expense.

After the Trustee's appointment, he retained his own advisors to aid his investigation.  As a result, the Trustee did not wish to retain the Consultants on the terms set forth in the Amended Consulting Agreements.  However, the Trustee believed that the Consultants' first-hand knowledge of the Debtor's business would be beneficial to his investigation.  Accordingly, the Trustee renegotiated certain terms of the Amended Consulting Agreements and, on November 7, 2012, filed a response to the Debtor's Consultant Motion [Docket No. 142].  The Amended Consulting Agreements, as modified by the Trustee's Consultant Response, were approved by the Bankruptcy Court by order dated November 12, 2012 [Docket No. 152].[354]  Turner and MacGregor are no longer providing consulting services to the Trustee.

---

[354] Although the Trustee retained Turner and MacGregor because of their knowledge of the workings of FILB and the other funds, the Trustee did not as part of that retention release any potential claims or causes of action that he may have against them related to their pre-petition roles as consultants to the Debtor.  The Trustee later did release certain limited claims against Turner pursuant to the stipulation resolving the dispute over the improper transfer of the FIP shares.  [See Docket No. 305].

4.    **Rejection of the FAM Investment Management Agreement**

On December 28, 2000, the Debtor and FAM entered into an investment management agreement (the "IMA"). Pursuant to the IMA, FAM agreed to manage the Debtor's assets in exchange for a fee. Among other things, FAM supervised and arranged all of the Debtor's investment-related transactions, including the purchase and sale of all investments and all related loans. The Trustee determined that the IMA was no longer necessary for the Debtor's operations and provided no material value to the Debtor's estate. To the extent there were any transactions involving the Debtor's assets or investors during the Chapter 11 Case, they would be investigated and managed by the Trustee, with the advice of his advisors. Any transactions out of the ordinary course of the Debtor's business would be presented to the Bankruptcy Court for approval. Accordingly, on October 25, 2012, the Trustee filed a motion (the "Rejection Motion") [Docket No. 130] seeking authority to reject the IMA. The Rejection Motion also established streamlined procedures (the "Contract Rejection Procedures") for rejecting additional executory contracts during the pendency of the Chapter 11 Case on an expedited basis. On November 9, 2012, the Bankruptcy Court entered an order approving both the rejection of the IMA and the Contract Rejection Procedures [Docket No. 148].

5.    **Authorization to Serve Rule 2004 Subpoenas**

In conducting his statutory investigation, the Trustee sought to obtain documents from and examine persons and entities, including the Debtor's affiliates and subsidiaries, the Debtor's former employees, the Debtor's current and former officers, directors and employees of the Debtor's affiliates and subsidiaries, lenders, investors, service providers, creditors and counterparties to transactions with the Debtor (each a "Witness" and collectively, the "Witnesses"). While some Witnesses initially complied with the Trustee's requests voluntarily,

the Trustee believed that other Witnesses would refuse to cooperate or would not be able to do so without compulsory process.

Accordingly, the Trustee filed a motion (the "2004 Motion") [Docket No. 126] seeking authority to issue subpoenas to compel Witnesses to produce documents and appear for examination, and to establish deadlines for Witnesses to produce documents and appear for examination. The 2004 Motion also created procedures for Witnesses to assert claims of privilege and file responses or objections to the Trustee's subpoenas and included a uniform protective order governing the disclosure, discovery, production, and use of all of the documents and other information provided to the Trustee. The Bankruptcy Court approved the 2004 Motion by order dated November 9, 2012 [Docket No. 150] and entered a separate uniform protective order for trustee discovery [Docket No. 151] (the "Protective Order").

### 6.    Unwind of April 22 Transactions

After months of intensive negotiations between the parties and their counsel, on February 8, 2013, the Trustee and FII entered into a term sheet agreement (the "Term Sheet Agreement") unwinding the April 22 Transactions. The Term Sheet Agreement provided for, inter alia, the following:

- The payment by FII to the Debtor of $2,200,000;

- An assignment by FII to the Debtor of the UCBI Warrants or, to the extent any or all of such warrants had been exercised, an assignment of the Common Stock Junior Preferred purchased pursuant to such UCBI Warrants and any claims against UCBI for its failure to honor the UCBI Warrants;

- An assignment by FII to the Debtor of the BRG Membership Interests;

- An assignment by FII to the Debtor of the DSS Warrants or, to the extent any or all of such warrants had been exercised, an assignment of the common stock purchased pursuant to such DSS Warrants;

- An assignment by FII to the Debtor of the right to receive the Excess Registration Funds;

- The reinstatement and reissuance to FII of the shares of the Debtor redeemed by FII; and

- A release of any claims of the Debtor claims against FII as they relate to the assets returned under the Term Sheet Agreement.

As a result of the Term Sheet Agreement, the Trustee obtained nearly all of the relief that he would have sought in a lawsuit against FII without any of the associated costs, delays or risks inherent in any litigation. Further, the Trustee ensured that the release under the Term Sheet Agreement was limited solely to claims for the returned assets and did not impair the Trustee's claims against FII or any other parties unrelated to the returned assets. The Bankruptcy Court approved the Term Sheet Agreement by order dated February 20, 2012 [Docket No. 190].

On March 8, 2013, the parties closed on the transaction, executing an Omnibus Assignment and Stock Reinstatement Agreement, completing reversal of the asset transfers in the April 22 Transactions.[355]

**7.    Settlement of Silva Litigation**

On November 22, 2011, Chris Silva ("Silva") filed a complaint in Los Angeles County Superior Court (the "Silva Action") against, inter alia, FAM, BRG[356] and Fletcher

---

[355] Omnibus Agreement and Stock Reinstatement Agreement, Mar. 8, 2013.

[356] Pursuant to the Term Sheet Agreement, 100% of the membership interests of BRG were returned to the Debtor's estate by assignment agreement dated March 8, 2013.

(the "Silva Defendants") regarding an alleged breach of agreement between Silva and film

production company Seven Arts Pictures, PLC.  Silva alleged that pursuant to the agreement,

Seven Arts agreed to pay Silva 5% of any amounts received from any party introduced to Seven

Arts by Silva.  Silva further alleged that an agent of FAM represented to Silva that FAM would

invest a minimum of $20 million with Seven Arts and, accordingly, that Silva would receive a

$1 million commission.  FAM then allegedly breached this representation by failing to provide

Seven Arts with the $20 million payment.

      The case was removed to Federal Court and then subsequently remanded back to

the California Superior Court.  After partially granting the Silva Defendants' motion to dismiss,

the California Superior Court set a trial date of January 21, 2014, on Silva's remaining claims.

On February 22, 2013, the parties participated in a mediation at which Silva reduced his

settlement demand from $1 million to $100,000.  Although the Silva Defendants denied any

wrongdoing whatsoever, the parties entered into a settlement agreement (the "Silva Settlement")

resolving all claims between the parties.  Pursuant to the Silva Settlement, FAM and BRG agreed

to make payments to Silva of $85,000 and $15,000, respectively, in exchange for the dismissal of

the Silva Action.  The Silva Settlement also provided for mutual releases by all parties.  On

April 9, 2013, the Trustee filed a motion seeking approval of the Silva Settlement [Docket

No. 213].  The Silva Settlement was thereafter approved by Bankruptcy Court order dated

April 29, 2013 [Docket No. 232].

### 8.    Settlement of the FILBCI Litigation

      On July 3, 2012, FILBCI commenced a lawsuit against UCBI in the United States

District Court for the Southern District of New York captioned FILB Co-Investments LLC v.

United Community Banks, Inc., Index No. 12 CV 5183 (S.D.N.Y.) (SAS) (the "FILBCI

Action").

The FILBCI Action was based on UCBI's alleged breach and repudiation of the terms of the SPA between the Debtor and UCBI.  The Debtor assigned FILBCI certain of its rights under the SPA pursuant to the Assignment Agreements.  As discussed in Section V.B above, pursuant to the Assignment Agreements, FILBCI was entitled to among other things, (i) purchase up to 65,000 Series C Preferred Shares from UCBI and (ii) convert Series C shares into common shares.  Under the terms of the SPA, FILBCI was required to purchase the Series C Preferred Shares within a specified period of time (as extended pursuant to the SPA, the "Investment Period").  If FILBCI did not make the required investment, it was required to pay UCBI $3.25 million.  FILB had previously made an earlier $3.25 million payment.

In June 2012, FILBCI attempted to purchase 76 shares of Series C Preferred Stock and to convert them into 14,476 common shares.  UCBI refused to honor the Investment Notice or the redemption request, and FILBCI commenced an action in the District Court for the Southern District of New York asserting five counts seeking equitable, declaratory and monetary relief related to UCBI's alleged breach of the SPA.  Specifically, FILBCI sought (a) declarations (i) that UCBI was obligated to redeem Series C Preferred Shares in accordance with pre-reverse stock split price, and (ii) that the Investment Period had not expired due a Registration Failure (as that term is defined in the SPA), and (b) damages and specific performance for UCBI's failure to redeem the Series C Preferred Shares into common shares, UCBI's anticipatory repudiation of the SPA, and an unpaid fee related to the Registration Failure.

The dispute arose primarily from the fact that in June 2011, UCBI unilaterally underwent a reverse 1:5 stock split (i.e. for each five shares of UCBI common stock, the shareholder was entitled to one share of common stock).  The price of the UCBI shares increased accordingly, rising from $2.04 per share to $10.20 per share on the date that the reverse stock

split occurred.  UCBI took the position that the strike price for Series C Preferred Shares

increased by a factor of five (from $5.25 to $26.25); FILBCI took the position that it did not.

UCBI asserted various other defenses, including, among other things, that (i) FILBCI was

judicially estopped from arguing that the warrants had value by virtue of the arguments the JOLs

made in securing the Liquidation Order entered in the Cayman Islands against Leveraged, (ii)

that FILBCI lacked standing to assert the claims, (iii) that FILBCI lacked $65 million dollars to

purchase the Series C Preferred Shares, and (iv) that FILBCI was in breach of the SPA for failing

to make the required investment within the Investment Period and failing to make the associated

$3.25 million payment.  UCBI also asserted a counterclaim seeking the $3.25 million payment

plus accrued interest.

Leveraged and the Louisiana Pension Funds and UCBI entered into a Settlement

Agreement and Mutual Releases, dated as of February 27, 2013, settling the action.  The JOLs

and the Pension Funds urged the Trustee to release any claims that the Debtor might have had

related to the Series C Preferred Shares and the Assignment Agreements so that it could obtain

the settlement from UCBI and asked the Trustee to sign a release and waiver (the "Release and

Waiver") under the following terms:

(a)    UCBI released the Debtor of all claims asserted by FILBCI in the FILBCI Action
       or related to the Assignment Agreements;

(b)    UCBI released the Debtor of all claims asserted by UCBI in the FILBCI Action
       and all claims related to the Assignment Agreements;

(c)    The Release and Waiver did not affect any other claims the Debtor may have
       against UCBI, any other claims UCBI may have against the Debtor, or any
       obligations that each may have to the other;

(d)    The Release and Waiver did not affect any of the rights, causes of action
       (including without limitation avoidance and other causes of action arising under
       the U.S. Bankruptcy Code), claims, counterclaims, defenses or remedies of the
       Debtor or the Trustee arising out of or relating to any of the transactions between

and/or among UCBI, the Debtor, FILBCI, or Fletcher International Inc. in 2010 that were not within the specific rights and obligations designated in paragraphs (a),(b), and (c) of the Subscription Agreement and the Cross Receipt.

[Docket No. 220].

The Release and Waiver provided the Debtor with a full and unconditional waiver, release and discharge of all actions, claims and counterclaims that UCBI had asserted in the FILBCI Action or that relate to the Assignment Agreements and insulates the Debtor's estate from any potential future liability resulting from the FILBCI Action or the Assignment Agreements, including any liability related to a $3.25 million claim described in UCBI's counterclaims. Such relief came at virtually no cost to the Debtor because, pursuant to the Assignment Agreements, the Debtor assigned to FILBCI any rights it may have had to bring the claims asserted in FILBCI Action. The Trustee does not believe that he now has or might in the future have any claims that are being released pursuant to the Release and Waiver.

The settlement of the FILBCI Action was entered between FILBCI, the Louisiana Pension Funds, the JOLs and UCBI. While the Trustee took no position as to the advisability of the Settlement Agreement reached by them, the Trustee considered and carefully analyzed whether it would have been appropriate to seek to "claw back" the assets that were assigned to FILBCI pursuant to the Assignment Agreements and thereby stand in the shoes of FILBCI, but decided that it would not be in the best interests of the estate, its creditors or other parties-in-interest. By the time that the Trustee was appointed, the FILBCI Action was well underway and had been fast-tracked towards trial. If the Trustee took over, he would most likely have been bound by all prior pleadings and proceedings in the FILBCI Action and would have been immediately subjected to time-consuming and expensive discovery. Also, by stepping into the shoes of FILBCI, the Trustee would have subjected the Debtor to potential liability for the $3.25

million counterclaim that UCBI asserted against FILBCI.  While UCBI might have sought to assert that claim against the Debtor anyway, the Release and Waiver obtained by the Trustee specifically releases the estate from that claim.

Moreover, the Release and Waiver is limited solely to claims asserted in the FILBCI Action or otherwise related to the Assignment Agreements; it does not impair any other claim the Trustee may have against UCBI or any other party.  The Release and Waiver specifically excludes "any Claims . . . arising under or related to those certain Warrants to Purchase Shares of Common Stock of UCBI dated April 5, 2010, as amended (including any claim that the 1:5 reverse split of UCBI Common Stock did not affect the strike price of such Warrants), any rights to payment of amounts in excess of $606,667 for alleged Registration Failure under the Securities Purchase Agreement, and any rights relating to the establishment and administration of the so-called 'Carry Accounts.'"  Nor does the settlement agreement reached by the JOLs impose a ceiling or upper limit on what the Trustee might be able to recover for any claims that the Debtor's estate may have against UCBI.

### 9.    Unwind of FIP Transaction

In May and June 2011, the Richcourt Euro Strategies and Richcourt Allweather Fund submitted redemption requests for the entirety of their respective holdings of Series 6 shares in Leveraged.  Richcourt Euro Strategies and Richcourt Allweather Fund requested that their respective redemption requests be satisfied as of June 30, 2011.  FAM made the decision to satisfy these redemption requests in part by providing an in kind distribution of certain shares that the Debtor owned in FIP.[357]

---

[357] See Section IV.F.

Due to the master-feeder fund structure, the Debtor could not redeem the FIP shares directly to Richcourt Euro Strategies and Richcourt Allweather Fund.  In theory, satisfaction of Richcourt Euro Strategies and Richcourt Allweather Fund's redemption requests would have first required them to have been transferred from the Debtor to Leveraged (a feeder fund) and then from Leveraged to the redeeming Richcourt funds as an in kind satisfaction of their respective redemption requests.[358]

Each of these transactions should have been backed up by corporate resolutions at each level.  There should have been corporate resolutions approving the transfer of the FIP shares from the Debtor to Leveraged, and a second resolution authorizing the transfer of shares from Leveraged to Richcourt Euro Strategies and Richcourt Allweather Fund.  While certain of the books and records accounted for the transaction, the Trustee's investigation has confirmed that no resolutions were executed at any time before the Debtor filed for bankruptcy, that AF and others knew that the requirements to complete the transaction had not been finalized, and that the transaction therefore was never completed.  Accordingly, on the date the Debtor filed for Bankruptcy, the Debtor still owned approximately 10% of the common stock and 3,650 preferred shares of FIP (before taking into account dividends due).   Notwithstanding, because of certain erroneous entries in the Debtor's books and records, the Debtor did not include these shares on any of the schedules listing the Debtor' assets.  [See Docket No. 104].

On July 31, 2013, the Trustee learned that on June 20, 2013 – nearly one year after the Debtor filed for Chapter 11 protection –Turner (who by this time was no longer serving as a consultant to the Trustee), a FAM employee, purported to execute a corporate resolution in

---

[358] The transfer of the interest in the FIP shares from the Debtor to Leveraged would have reduced the Debtor's obligations under the Euro Note, which were tied to the value of the Series 6 shares.  However, the Trustee believes that FILB assumed the obligations under the Euro Note for inadequate consideration.

his capacity as a Director of FIP and transfer the Debtor's interest in FIP to RES and RAF.  In

reliance on that FIP resolution, on or about June 19, 2013, Intertrust Cayman ("Intertrust"), the

corporate administrator of FIP, made entries in the Register of Members for FIP (the "FIP

Register") reflecting the transfer of (i) 1,060.08 preferred shares and 195.86674 ordinary shares

to RES, and (ii) 2,589.92 preferred shares and 478.52679 ordinary shares to RAF, effective as of

June 30, 2011.[359]  None of the Bankruptcy Court, the Trustee, or the Bankruptcy Code

authorized this purported transfer, which the Trustee believes was in violation of Sections 362

and 549 of the Bankruptcy Code.

Upon learning of these transactions, the Trustee immediately sought expedited

discovery by way of order to show cause from FIP, FAM, FII, AF, Turner and MacGregor,

[Docket Nos. 251–53], and the Court ultimately issued an order [Docket No. 255] directing

Messrs. Fletcher, Turner and MacGregor to appear for depositions and directing FAM, FIP and

FII to produce documents related to the transfer of the FIP shares (the "Expedited Discovery

Order").  Pursuant to the Expedited Discovery Order, the Trustee's counsel examined

MacGregor on August 7, 2013, and Turner on August 8, 2013, and informally obtained

information about the Transfers from AF.  The Trustee also received documents related to the

transfers from FAM and FII.

The Trustee had intended to commence litigation in the Southern District of New

York and in the Cayman Islands (if necessary) to recover the FIP Shares.  However, prior to

commencing any litigation, the Trustee was able to negotiate an agreement whereby the FIP

Register was updated to reflect that the Debtor was the owner of the FIP Shares.  Deborah

---

[359] Intertrust appears to have processed the transaction notwithstanding the absence of a "transfer document" executed by FILB memorializing the transfer of the shares, in violation of FIP's Articles of Organization.

Midanek of the Solon Group, Inc. ("Solon Group"), in her capacity as sole director of RES and

RAF, and Stewart Turner, in his capacity as sole director of FIP, each executed resolutions

authorizing Intertrust to reverse the transfers to RES and RAF.[360]  Additionally, the Trustee

negotiated a stipulation with FAM, FII, FIP and AF, whereby the Trustee, FAM, FII and AF

agreed that the FIP Register would be updated to reflect that the Debtor was still the owner of the

FIP shares, but reserved their respective rights to challenge at a later date the ownership of the

shares.  The Trustee submitted the stipulation to the Court, which approved the Debtor's entry

into the Stipulation on September 30, 2013.  [Docket No. 305].  The Resolutions were submitted

to Intertrust on October 1, 2013, and the FIP Register has been updated to reflect that the Debtor

is the owner of the FIP shares.

FIP's sole asset is shares of FFC Fund Ltd. ("FFC"), which indirectly owns shares

of Citco III Limited., a Cayman Islands company formed to make an equity investment in the

Citco Group Limited – the holding company for the Citco Group.  While the true value of these

FIP shares is unknown – as they are directly tied to the value of the Citco Group – the Trustee

believes that they have value.  Indeed, the basis of these purported transfers was to satisfy certain

redemptions valued at approximately $4.8 million; however, the value is potentially greater.  An

issue in valuing the shares (and in securing that value), however, is that the shares are illiquid

and redeemable only in kind and at the sole option and discretion of FFC Management.

### 10.    UCBI Warrant Exercise

On August 16, 2013, the Trustee exercised FILB's UCBI warrants.  UCBI has

refused to honor the warrant exercise.  It contends that FILB is not entitled to exercise the

warrants because (among other reasons) the $4.25 warrant strike price should have been adjusted

---

[360] AF challenges whether Midanek is a director of these funds.  See generally, Richcourt Allweather
Fund v. Deborah Hicks Midanek, Case No. 13-04810 (RBK) (AMD) (D.N.J.) [Docket No. 1].

to account for a reverse 1:5 stock split that took place in June 2011.  According to UCBI, FILB

may not exercise the warrant until the adjusted stock price reaches $21.25.  Under New York

law, however, the Trustee believes that, absent sufficiently explicit language, the strike price

would not be affected by the reverse stock split, and that the warrants do not contain such

sufficiently clear language.  UCBI contends that the warrant language is sufficiently clear to

include a reverse stock split as the basis for an adjustment of the stock price.  UCBI also claims

that, pre-petition, FILB committed other breaches of the UCBI Securities Purchase Agreement

pursuant to which the warrants were issued and that those breaches excuse UCBI from honoring

the warrants. [361]

       If the Trustee's interpretation of the warrants is correct, it could result in

approximately $71 million in common stock to the Debtor, which the Trustee could then sell on

the open market.  The Trustee has additional claims arising out of FILB's involvement with

UCBI (all of which UCBI disputes).  In an effort to avoid litigation over all these claims, the

Trustee and UCBI have begun settlement negotiations.  Failing a consensual resolution, the

Trustee intends to commence litigation against UCBI and vigorously enforce its rights against

UCBI.  The Trustee expects that UCBI will vigorously contest his claims.  While the Trustee

believes he has good arguments, it is not possible to predict who would prevail in any litigation,

and it therefore should not be assumed that the Estate will prevail.

### 11.    MV Nepenthes Consent Agreement

       The Trustee negotiated a consent agreement (the "Consent Agreement") with

Geoffrey Fletcher related to MV Nepenthes, and its primary asset, the motion picture <u>Violet &</u>

---

[361] On April 30, 2012, the Debtor had previously attempted to exercise the UCBI Warrant in the amount
of $1 million.  UCBI took the same position, alleging that the strike price for the warrants changed in
proportion with the June 2011 1:5 reverse stock, and that the Debtor was otherwise unable to exercise the
warrants because of breaches under the SPA.

Daisy. Geoffrey Fletcher is AF's brother. Under the terms of the consent agreement, the Trustee's consent is required before any non-ordinary course and other large expenditures are made by MV Nepenthes. This agreement ensures that MV Nepenthes' assets, including a substantial tax refund, cannot be used without the Trustee's consent. The Trustee is currently negotiating a settlement with Geoffrey Fletcher related to MV Nepenthes' assets, pursuant to which nearly all remaining cash will be distributed to BRG and to Magic Violet. Assuming that the settlement is finalized, it will not involve a release of the claims relating to the propriety of the initial FILB-BRG investment in MV Nepenthes. That settlement will be the subject of a separate motion brought by the Trustee pursuant to Rule 9019 of the Bankruptcy Rules.

### 12.    Budget Travel Bankruptcy

Intellitravel Media, Inc. (d/b/a Budget Travel) is a travel media company that is indirectly owned by the Debtor through its parent, BRG, a FILB subsidiary. On December 5, 2012, three of Budget Travel's unsecured creditors filed an involuntary petition under Chapter 7 of the Bankruptcy Code. After learning of the bankruptcy and later gaining control of BRG, the Trustee determined that it would be in the best interests of Budget Travel's creditors and FILB to convert to a voluntary proceeding under Chapter 11 of the Bankruptcy Code and initiated conversion proceedings. Since then, the Budget Travel has been operating as a debtor-in-possession. The Trustee, in consultation with Budget Travel's executives and retained advisors (all of whom were approved by the Bankruptcy Court) have determined that it is in the best interests of the Budget Travel and its creditors to attempt to sell Budget Travel's assets to a willing purchaser. Elaine Alimonti, Budget Travel's president, has worked extensively to market Budget Travel. While a "stalking horse" bid auction is expected to be held shortly, recovery by FILB and BRG is expected to be relatively insubstantial.

13.      **Settlement of the BRG Lease Litigation**

In 2000, Budget Travel entered into a lease with G&S Realty 1, LLC for property located in Manhattan.  After Budget Travel allegedly failed to pay its rent and was evicted in May 2012, the landlord re-leased the premises and, in November 2012, commenced an action against Budget Travel and its former owner – Post NW, LLC (the "Post") – which had guaranteed the lease.  In January 2013, the Post commenced a third-party action against BRG and FII for indemnification pursuant to the stock purchase agreement under which BRG had purchased Budget Travel.  Since reacquiring BRG for the benefit of the Debtor, the Trustee and his counsel have negotiated a settlement with the Post, to which FII has consented.  That Settlement Agreement is the subject of a separate motion filed by the Trustee pursuant to Rule 9019 of the Bankruptcy Rules.  The Trustee understands that FII and the Post are separately discussing settlement, but that discussions have not yet produced an agreement.  In the meantime, the Post has moved for summary judgment against FII.  FII did not oppose the motion.  Discovery has been stayed pending resolution of the Trustee's 9019 motion.

14.      **Fletcher Dividend Income Fund**

The Trustee has also been negotiating with the Post, the preferred shareholder of FDIF (BRG owns 100% of the common shares), over gaining control of the fund to ensure that its assets are preserved for the benefit of the Debtor's estate.  The Trustee believes that obtaining control of FDIF is essential to ensure that its assets are not dissipated.  As part of the Settlement of the Lease Litigation, the Post – which owns preferred stock in FDIF – will provided its consent to remove the current directors of FDIF and appoint the Trustee.  This will allow the Trustee to gain control over this entity.

15. **Kasowitz Adversary Proceeding**

Between August 2011 and the Petition Date, FAM and AF caused the Debtor to

pay Kasowitz approximately $975,000 for services related almost exclusively to AF's litigation

against The Dakota in which he claims racial discrimination in connection with a potential

apartment purchase by him.[362]  On October 1, 2013, the Trustee commenced an adversary

proceeding against Kasowitz seeking to avoid the payment on the grounds that it was a

fraudulent conveyance (both constructive and intentional) under both the Bankruptcy Code and

State law and, to the extent it was not, that it was a preferential payment in violation of the

Bankruptcy Code.[363]

On November 18, 2013, Kasowitz filed an answer and asserted third-party claims

against AF and FAM, alleging that AF and FAM are obligated to indemnify Kasowitz to the

extent that FILB obtains a judgment against Kasowitz.[364]

H.     THE ION LITIGATION

Beginning on February 16, 2005, the Debtor purchased $70 million of preferred

stock in ION Geophysical Corporation, a publicly-traded technology-focused seismic solutions

company.  The ION preferred stock designations required ION to obtain the Debtor's approval

before ION's subsidiaries issued any securities.  In 2008 and 2009, ION subsidiaries issued

securities without first obtaining the Debtor's consent.  In 2009, the Debtor commenced an

action against ION, ION's subsidiaries and certain members of ION's board of directors in the

---

[362] See Alphonse Fletcher Jr. et al. v. The Dakota, Inc. et al., Index No. 101289/11 (Sup. Ct. N.Y. Cnty).

[363] Davis v. Kasowitz, Adv. Pro. No. 13-01527 (REG) [Docket No. 1].

[364] Id. [Docket No. 5].

Delaware Court of Chancery (the "ION Litigation").[365]  The case is captioned <u>Fletcher International, Ltd. v. ION Geophysical Corp.</u>, C.A. No. 5109-CS (Del. Ch.).

In two orders, dated May 28, 2010 and May 23, 2012, the Delaware Court of Chancery granted partial summary judgment to FILB, finding that ION breached the Debtor's rights as a preferred stockholder by causing ION subsidiaries to issue securities without the Debtor's prior approval.  By letter agreement dated October 19, 2011 (the "Headlands Engagement Agreement"), the Debtor's original counsel – Proskauer – had retained Peter A. Fowler ("Fowler") of Headlands Capital Inc. ("Headlands") to serve as an expert for the Debtor in the ION Litigation.  Pursuant to the Headlands Letter, Fowler employed Compass Lexecon to provide support services for his work.  Fowler and Compass Lexecon consulted at length with Proskauer, prepared Fowler's expert reports for the Debtor, reviewed ION's expert reports on damages, and consulted with the Debtor about preparing for expert discovery and the trial on damages.  Prior to the appointment of the Trustee, the Debtor and its counsel prosecuted the ION litigation through the completion of fact discovery and the submissions by the parties of their respective expert reports addressing the Debtor's damages claims.

Through the Petition Date, the Debtor was represented in the ION Litigation by Proskauer and Skadden.  By agreement with the Trustee, Proskauer and Skadden withdrew from representing the Debtor in the ION Litigation and, by Order dated January 15, 2013 [Docket No. 181], the Bankruptcy Court approved the Trustee's retention of Abrams & Bayliss LLP ("Abrams & Bayliss") to represent the Debtor.  Abrams & Bayliss agreed to represent the Debtor in the ION Litigation on a contingency basis at the Trustee's request.

---

[365] The Debtor later amended its complaint in 2010 to include events that took place after the Debtor filed its initial Complaint.

After the Trustee's appointment, the Trustee consulted at length with Abrams & Bayliss about the need and desirability to continue to use the Experts in the damages trial. The Trustee ultimately determined that it would be in the best interests of the estate to do so on the condition that the experts reduce their fees for prior work. Following negotiations with the Trustee, an agreement was reached to reduce their outstanding bills and to new terms for further work relating to the ION Litigation. On March 11, 2013, the Trustee filed a motion seeking to assume an amended engagement agreement with Headlands. [Docket No. 199]. The Trustee's assumption of the new engagement Agreement with Headlands was approved by Order of the Bankruptcy Court dated April 10, 2013 [Docket No. 221].

A bench trial in the ION litigation was held on August 14–15, 2013. Post-trial briefing was submitted on September 13, 2013, and October 4, 2013, and post-trial oral argument was held on October 31, 2013. In its post-trial arguments, ION contends that FILB is entitled to recover between zero and $1 million. While before trial the Debtor sought significantly more in damages, the Debtor's post-trial position is that, subject to a full reservation of appeal rights, the Debtor should recover $6.2 million plus pre-judgment interest. The Debtor modified its positions following trial due to adverse rulings by the trial court (which the Debtor may appeal) and other statements by the trial court that were skeptical of the Debtor's damages theory as presented by Fowler. The trial court indicated at post-trial oral argument that any potential damages award to the Debtor will be significantly less than $6 million. Because of arguments that the non-consented transaction benefited the Debtor by preserving or increasing the value of the ION shares owned by the Debtor, and that the non-consented transaction might have been consummated in ways that would not have required the Debtor's consent, the damages award to the Debtor could be zero.

-135-

I.    **THE LOUISIANA LITIGATION**

In March 2013, the Louisiana Pension Funds commenced litigation against AF

and many of his associates, affiliates, and advisors in Louisiana State District Court for the 19th

District for the Parish of East Baton Rouge.  On June 11, 2013, several defendants removed the

case to the United States District Court for the Middle District of Louisiana. See Firefighters'

Retirement System et al. v. Citco Group Limited et al., Index No. 13-00373 (M.D. La.)

[Docket No. 1].  The defendants also moved to dismiss [Docket Nos. 17, 56, 57, 59, 68, 107, 156

& 163], and the plaintiffs have moved to remand the case to state court. [see Docket No. 60] and

some of the defendants have separately moved to transfer the litigation to the Bankruptcy Court

for the Southern District of New York.  [Docket No. 117].  A decision on the remand and

transfer motions is expected by the end of 2013.

J.    **CLAIMS AND BAR DATE**

By order (the "Bar Date Order") dated November 9, 2012, the Bankruptcy Court

established January 18, 2013 (the "Bar Date") as the deadline for each person or entity to file a

proof of claim against the Debtor in the Chapter 11 Case.  The Bar Date also confirmed

procedures for providing notice of the Bar Date and filing the proofs of claim.  Notice of the Bar

Date was given by the Trustee as required by the Bar Date Order.

As mentioned above, the Debtor filed its Schedules listing certain obligations to

its creditors (the "Scheduled Claims") on September 24, 2012.  Each of the purported debts was

marked as "disputed."  Prior to and after the Bar Date, 69 proofs of claims were filed against the

Debtor (the "Filed Claims,").  A list of the Filed Claims appears in the Appendix as Exhibit D.

Based on the Trustee's preliminary review of the Filed Claims, the Trustee estimates that a large

number are duplicative, overstated, improperly assert priority or secured status, inappropriately

designated in euros, or are otherwise invalid.  Accordingly, the Trustee expects to object to many of the Filed Claims.

Under the Investor Settlement, Arbitrage and the Arbitrage JOLs will receive an Allowed Claim of $110.0 million, Leveraged and the Leveraged JOLs will receive an Allowed Claim of $5.0 million, Alpha, the Alpha JOLs and the MBTA will receive an allowed claim of $1.6 million, and the Louisiana Pension Funds (assuming they support the Plan) will receive an allowed claim of $3.0 million.

The New York City Department of Finance has filed a priority tax claim in the amount of approximately $6,900.  This claim will likely be allowed in its entirety.

Service providers and other general unsecured debtors have submitted proofs of claim in the aggregate amount of approximately $2.6 million.  The Trustee estimates that approximately $1 million of these claims will be allowed.

Insiders have filed proofs of claims in the aggregate amount of approximately $500,000 and €5 million plus unspecified unliquidated claims.  Pursuant to the Plan, all Insider Claims will be expunged or extinguished, and the Trustee therefore estimates that the recovery for Insiders will be zero.

Individual investors in Arbitrage and Leveraged and other Fletcher-Related Entities have filed proofs of claim in the aggregate amount of $10.5 million.  These individual investors do not have direct claims against the Debtor, and the Trustee therefore estimates that the recovery for individual investors will be zero.

Affiliates of the Debtor have submitted unliquidated claims that cannot be estimated.  Pursuant to the Plan, all Inter-Company Claims will be expunged or extinguished, and the Trustee therefore estimates that the recovery from Insiders will be zero.

Certain of the Richcourt Funds have filed Proofs of Claim in the aggregate amount of $21.9 million and €15.8 million, as well as certain unspecified and unliquidated claims. The Richcourt Funds do not have direct claims against the Debtor, and the Trustee therefore estimates that the recovery for the Richcourt Funds will be zero.

### K.   MONTHLY OPERATING REPORTS AND GENERAL ADMINISTRATION

In accordance with his obligations under the relevant law, the Trustee has prepared monthly operating reports detailing, among other things, the Debtor's accrued expenses, assets, and cash on hand.[366] Additionally, the Trustee, attended to general administration tasks associated with the Debtor, including its compliance with corporate laws.

### L.   TAX RETURNS AND OTHER TAX CONSEQUENCES

The Trustee determined that he required the services of a tax services provider to assist him in the exercise of his statutory responsibilities, and retained WeiserMazars to help him determine, among other things, whether the Debtor was in compliance with applicable federal and state tax laws, to quantify any tax exposure, and to prepare tax returns and other filings.

After consulting with WeiserMazars, which prepared an extensive analysis of the Debtor's potential United State tax liability, the Trustee confirmed that the Debtor was not required to file a United States Federal tax return.

WeiserMazars also prepared and filed Federal, State, and New York City tax returns on behalf of the Debtor's wholly-owned subsidiary BRG.

---

[366] The Trustee reviewed the Monthly Operating Reports prepared by the Debtor and filed before the Trustee was appointed. Based on this review, the Trustee decided to reverse post-petition interest and foreign currency translations previously accrued since the Petition Date; reverse recognized gains and losses recognized on the investments after the Petition Date, adjusting the valuations to value as reported by the Debtor on the Petition Date; and dispute and reverse Quantal and director fees incurred after the Petition Date. The amounts on the MOR are subject to continuing investigation and review by the Trustee.

## VII.
## THE TRUSTEE'S INVESTIGATIVE PROCESS

A significant portion of the Trustee's role was gathering information concerning the Debtor's complex master-feeder fund structure and investigating to determine whether there were potential claims. While some individuals and entities provided documents and information voluntarily, others would not or could not without compulsory process. During the course of his investigation, the Trustee collected approximately one million documents from approximately 50 individuals and entities and interviewed or deposed more than 20 individuals with information relevant to his investigation.

### A.   DOCUMENTS

The Trustee and his counsel sought documents from a variety of different entities (and their affiliates) and individuals that were related to, provided services to, or transacted business with the Debtor and its affiliates, including the following:

- Affiliates and related parties, including Fletcher International, Inc., Fletcher Asset Management, Inc., MV Nepenthes LLC, BRG Investments, LLC, Geoffrey Fletcher, AF, Kiely, Turner, MacGregor, and Gerti Muho (an employee of FAM until early 2013),

- Third-Party Administrators and their affiliates: SS&C, Citco Fund Services (USA), Inc., and Citco Corporate Services, Inc.

- Accounting and tax service providers: McGladrey LLP, Duhallow, and RF Services.

- Third-party auditors for the Funds: Grant Thornton and Eisner.

- Third-party valuators: Duff & Phelps LLC and Quantal.

- Third-Party business partners:  JP Morgan Securities, LLC ("JPM"), Royal Bank of Scotland ("RBS"), Credit Suisse (USA) LLC and Credit Suisse (Europe) LLC (together, "Credit Suisse), United Community Banks, Inc. ("UCBI"); Kohlberg Capital Corporation; and Gyre Capital Management, LLC.

- Counsel to the Funds:  Skadden, Arps, Slate, Meagher & Flom LLP and Walkers.

- The Richcourt Funds: Pitagora Fund Ltd., New Wave Fund SPC, Soundview Composite, Ltd., Soundview Elite, Ltd., Soundview Star Ltd., Soundview Premium, Ltd., Elite Designated, Star Designated, Premium Designated, America Alternative Investments Inc., Optima Absolute Return Fund Ltd., Richcourt Allweather Fund Inc., Richcourt Allweather B Inc., Richcourt Composite Inc., Richcourt Euro Strategies Inc.

- Miscellaneous:  Consulting Services Group, Joseph Meals, UBS, Lampost Capital, Michael Meade.

- The JOLs for Alpha, Leveraged, and Arbitrage.

- The Louisiana Pension Funds.

- The MBTA.

- Credit Suisse and Del Mar Asset Management, the entities identified by AF as willing to buy the ION shares.

In connection with obtaining documents from each of these individuals and entities (whether voluntarily or pursuant to subpoena), the Trustee and his counsel spent hundreds of hours drafting subpoenas, participating in "meet and confers," and negotiating

custodians, date restrictions and search terms.  Documents were processed and uploaded to an

online repository that provided online access to the Trustee and his advisors.  The Trustee has

sought court intervention to compel production of documents where appropriate.  In particular,

the Trustee recently moved the Court for an order compelling AF, FAM, Duff & Phelps and

Skadden to comply with the various subpoenas the Trustee has served on them, but which were

not complied with because of privilege claims and other failures of FAM and AF; this matter is

currently being briefed.

There were also issues and limitations associated with the reach of the Trustee's

subpoena power.  Citco, for example, is located offshore beyond the reach of the Trustee's

Rule 2004 subpoena power.

The Trustee continues to follow up with certain subpoena targets on any

outstanding document productions, and will continue to do so after this Report and Disclosure

Statement has been filed with the court to the extent there has not been full compliance with the

subpoenas.

**B.    EMAIL REVIEW**

The Debtor shares offices, computers, and email accounts and servers with FAM

and other related entities.  In early July 2012, the Debtor's counsel, Young Conaway Stargatt &

Taylor, LLP ("Young Conaway") went to the Debtor's offices located at 48 Wall Street and

directed FAM's IT coordinator to make a copy of certain Fletcher email accounts (the "Emails").

In addition to the Emails, the IT coordinator was asked to copy approximately 2,300 files (the

"FILB Documents") that were believed to belong to the Debtor.  The emails and the FILB

Documents were downloaded to a hard drive (the "Hard Drive") and delivered to Young

Conaway.  Young Conaway made a copy of the Hard Drive; however, it did not review the

contents of the Hard Drive.

The Trustee determined that email review needed to be of the Hard Drive rather than of emails files as they existed months later after the Trustee was appointed.  The Trustee, FAM, and AF agreed to a review protocol for the documents contained on the Hard Drive.  The Trustee was provided the FILB Documents, and agreed-upon search terms were run by the Trustee against the Emails contained on the Hard Drive to cull out potentially relevant documents.  In the event any documents appeared to be potentially protected by the non-FILB attorney-client or other privileges, the Trustee provided those documents to FAM, which had two weeks to review the documents and either (i) return the documents to the Trustee if it determined no privileges were implicated, or (ii) withhold the documents from production and provide a privilege log to the Trustee if it contended the documents were immune from discovery.  Pursuant to the terms of the agreed-upon review protocol, documents concerning FILB-related transactions were reviewed by the Trustee regardless of privilege since the Trustee controlled the FILB privilege.

Through this review protocol, the Trustee's counsel reviewed approximately 490,000 documents (consisting of emails and attachments)[367] and turned over approximately 98,000 documents to FAM for review for potential privilege.  Of the approximately 98,000 documents produced to FAM by the Trustee, FAM reviewed approximately 74,000 documents and returned to the Trustee approximately 60,000 documents either in whole or in part (FAM redacted a significant number of documents).  However, very few (several hundred) of the documents produced by FAM were produced within the two weeks originally agreed to by the parties, and while ultimately produced, none of the privilege logs was produced within the agreed-upon time period.  With respect to the final 24,000 documents made available to FAM in

---

[367] There were very few emails from 2009 and virtually no emails from prior to 2009.  The vast majority of the emails were from 2010 through July 2012.

June 2013, the Trustee has not received any documents back or a privilege log.  FAM's failure to

comply is the subject of the discovery proceedings described above.

### C.    DEPOSITIONS AND WITNESS INTERVIEWS

In addition to collecting and reviewing documents, the Trustee also spoke with

informally or deposed more than 20 individuals, including the following people:

- Credit Suisse:  its counsel from Milbank, Tweed, Hadley & McCloy LLP

- SS&C:  Renee Mooney and Anthony Maniglia

- Current and former employees, directors and other representatives of the
  Funds, including AF, Stewart A. Turner, Floyd Saunders, Stuart D.
  MacGregor, Michael Meade, James Keyes, Eric Lieberman, Denis Kiely,
  Moez Kaba, Peter Zayfert, Gerti Muho

- MBTA:  its counsel in connection with the investment

- Louisiana Pension Funds:  Stephen Stockstill, Richard Hampton, Robert
  Rust

- Skadden:  Leif King and Richard T. Prins

- Grant Thornton:  Matthew Luttinger and Steven Recor

- Eisner:  Peter Testaverde

- Quantal:  Jim Quinn and Terry Marsh

- Del Mar Asset Management regarding the liquidation of certain Helix and
  ION shares: Peter Smith and Peter Wiesnewski

### D.    THE DOJ AND SEC SUBPOENAS

In April 2013, the Department of Justice served a subpoena on the Trustee

seeking documents that had been produced to the Trustee by FAM.  The SEC followed suit,

serving a similar subpoena in July 2013. The Trustee agreed to produce documents, subject to a

clawback arrangement in the event that any inadvertently privileged documents were produced.

Before doing so, as contemplated by the Protective Order, the Trustee notified FAM's counsel of

its intention to produce documents. FAM moved the court for a protective order enjoining the

Trustee from producing documents to the SEC. [Docket No. 277].

On October 18, the Court entered an order denying FAM's motion for a protective

order, but placed two conditions on the Trustee's production of emails to the SEC. [Docket

No. 312]. First, FAM was provided with standing to claw back any inadvertently produced

privileged documents. Second, the SEC could share the documents with any other United States

Agency, but not with a private litigant without approval of the Court. On November 11, 2013,

the Trustee produced approximately 362,000 documents to the SEC.

## VIII.
## TRUSTEE'S CONCLUSIONS

### A.    MISUSE OF THE PENSION FUNDS' MONEY

The Louisiana Pension Fund investors unequivocally believed that their $95

million net cash subscription for Leveraged Series N shares in March 2008 would be invested in

accordance with the investment strategy set out in the Series N Offering Memorandum and the

other materials they were given. In fact, none of the Louisiana Pension Funds' money was

invested in accordance with the investment strategy (and over time a number of investments

were made which were inconsistent with that strategy). Instead, the bulk of the money the

Louisiana Pension Funds invested was used to fund a variety of transactions with Citco or its

affiliates and for fees paid to FAM, AF, or professionals, administrators, and consultants

beholden to AF. The remainder was used for redemptions and margin calls. While there is

nothing inherently wrong with using new investor money to pay redemptions of older investors,

there must be sufficient underlying value in the fund's investments to support the substitution. Here, there was not, a fact that was exacerbated by the highly inflated values that FAM was using for the underlying assets at FILB.

Before the Louisiana Pension Funds invested their $95 million on March 31, 2008, there was $1.6 million of cash in the Fletcher System.  Accordingly, but for the Louisiana Pension Funds' investment, there would have been no cash for the various transactions FAM engaged in between April 1, 2008 (when the Louisiana Pension Funds invested) and November 12, 2008 (by which time all of the $95 million was spent).  As discussed in Section IV.D above, FAM spent the money (as well as other cash inflows) as follows:

- Providing non-market terms financing to allow Richcourt Acquisition Inc. to acquire the Richcourt business ($27 million, June 20, 2008);

- Third-party redemptions ($26.6 million, April 2008 to November 2008);

- Margin calls ($24.4 million, April 2008 to October 2008);

- Citco credit facility final paydown ($13.5 million, March 31, 2008, and April 1, 2008);

- Fees to FAM ($7 million, April 2008 to November 2008);

- Fletcher Fund (FFLP) redemptions ($5.1 million, April 2008 to November 2008);

- Net investment in FIP ($4.1 million, July 2008);

- Professional, administrative, and consulting fees ($4.6 million, April 2008 to November 2008); and

- Other miscellaneous items ($1.2 million, April 2008 to November 2008).

Although there were additional inflows of approximately $20.5 million during this time (April 1, 2008, to November 12, 2008),[368] virtually all of these funds were exhausted by November 12, 2008, when the cash balance in the system was down to $3.6 million.[369]

The Trustee believes that the appearance of the Louisiana Pension Funds as likely investors in early 2008 came as a godsend to AF.  At the time AF was soliciting the Louisiana Pension Funds, Citco was dunning AF and FAM for Leveraged to repay the outstanding balance on its $60 million loan and for the long-overdue payment of $3.1 million outstanding on a prior Richcourt fund redemption.[370]  Also at the same time, AF was negotiating for the acquisition of the Richcourt business from Citco Trading.  While AF may have considered raising the funds for the acquisition from traditional sources who typically fund transactions like the Richcourt acquisition (e.g., acquisition of a fund of funds), outside of the Millennium Management principals, none of the others participated, and indeed the non-market term financing provided by the Leveraged was highly advantageous to him.  In March 2008, the Louisiana Pension Funds likely were the only certain source of cash.

To issue the proposed Leveraged Series N shares to the Louisiana Pension Funds, AF and FAM needed the consents of Leveraged's investors – primarily the Corsair product – because the new Series N shares were to have a preferred 12% return (when Arbitrage – the fund to which the return would be pegged – had annualized returns of approximately 8% over the

---

[368] This includes $10.9 million of third-party subscriptions into Arbitrage; $2.5 million of Helix and Ion dividends to FILB; $6.6 million of transfers from FILB trading accounts; and $0.5 million of miscellaneous inflows.

[369] Cash Model.

[370] Redemption request in the name of Citco Global Custody (NA) NV Ref: Richcourt, June 29, 2007; Credit Facility Agreement, Mar. 3, 2008, extending the maturity of the outstanding $13.5 million credit facility to April 1, 2008, from March 1, 2008.

prior ten years),[371] to be paid for if necessary out of the other investors' capital accounts, to have a 20% cushion to support the Series N investment, and to have redemption and liquidation priorities over the other investors.  It was Citco who was to deliver these consents, and even though the incentive for the Leveraged investors to grant their consent is not apparent, Citco delivered them.

In addition, the key Citco executive in charge of the Richcourt Funds, their planned sale to a FAM controlled entity, and the entire relationship with AF, FAM, and the other Fletcher-Related Entities, was Ermanno Unternaehrer, who in the spring of 2008 was negotiating with FAM for "liquidity" for himself.  Unternaehrer received a total of $6.6 million from FIP shortly after the Richcourt transaction closed in a transaction blessed by Christopher Smeets, the Citco CEO.  $4.1 million of this came from FILB, and the remaining $2.5 million came from Citco International Pension Plan, Unternaehrer's pension fund that had also invested in FIP.[372]

None of these transactions was disclosed to the Louisiana Pension Funds.  FAM did not advise the Louisiana Pension Funds that any of their money had in any way been used to pay Unternaehrer, or to pay down the Citco loan, or to redeem certain Richcourt funds, or to make any of the other payments made using the Louisiana Pension Funds' money; and it did not disclose the purchase of Richcourt until August 2009 – months after the SEC began investigating FAM – and then only through an oblique reference on the fourth page of a letter to the Series N investors.  That letter, in addition to being incomplete, was affirmatively misleading because it implied that Leveraged had made an equity investment in the Richcourt business.  The letter stated:

---

[371] FRS Presentation at 16.

[372] Emails from Ermanno Unternaehrer to AF and Denis Kiely (June 25, 2008) and (June 26, 2008).

In June 2008, FAM led a group of investors, including the Fund, affiliated funds, and founders of major alternative investment firms, in making an indirect investment in the Richcourt Group, an international fund of funds group previously controlled by the Citco Group.[373]

Neither FAM nor AF ever advised the investors that the Richcourt acquisition was structured in such a way that the Louisiana Pension Funds provided 100% of the cash and received none of the equity – ownership of Richcourt Holding went to Richcourt Acquisition, Inc., the holding company partially and indirectly owned by AF.  Also undisclosed was the non-market basis for the promissory notes provided to Leveraged: Leveraged's only recourse was to a shell company, whose value was indirectly tied to the value of Richcourt through three separate ownership levels, there was no collateral securing the loan, there was no guaranty, no covenants, and no cash interest was ever paid.  No sound-minded investor would lend money on these non-market terms.  Nor did AF or FAM advise the Louisiana Pension Funds that their money would be used to pay down the Citco loan, pay the balance on the long-outstanding Richcourt redemption requests, make substantial fee and redemption payments to FAM and FFLP, and make a substantial payment to a top Citco executive.

As discussed above, much of the MBTA money similarly was used to fund repayments to Citco, margin calls, fees, and redemptions.  Only up to $8 million of the investment went into trading accounts at FILB, which might have been invested in the kinds of transactions described in the marketing materials referred to in the MBTA Side Letter.

These transactions give rise to potential claims against AF, FAM, other FAM Insiders and certain of their affiliates, against Citco and its affiliates (including Unternaehrer and

---

[373] Letter from FAM to Leveraged Series N Investors, Aug. 13, 2009, at 4.

Smeets personally), and potentially others. Claims arising out of this transaction are Pooled

Claims under the Plan.[374]

## B.    USE OF RICHCOURT FUNDS

Prior to being acquired by AF, Richcourt Holding had maintained liquidity lines

of credit, but they expired in September 2008; no replacement lines of credit were put in place.

Without these credit lines, Richcourt Holding had to use assets that otherwise would have been

used to redeem clients, to pay down its expired lines of credit. As of November 30, 2008, the

Richcourt investment managers suspended NAV calculation and redemptions and began to

"gate" their investors, prohibiting them from receiving full value upon redemption.[375] Also, by

mid-November, the cash balances in the Fletcher System had dropped to approximately $1

million, and the Funds were therefore unable to meet their obligations.[376] Beginning in

November 2008, FAM began directing certain Richcourt Funds to invest their cash balances into

Arbitrage. Several of these investments were later transferred to Leveraged. Since November

2008, the Richcourt Funds invested approximately $61.7 million into the Funds and, of this,

$40.3 million was redeemed.[377]

## C.    INVESTMENTS OUTSIDE OF THE INVESTMENT STRATEGY

The required investment strategy for the Funds was, as discussed in Section II.E.2

above, set out in the Offering Memoranda of Leveraged, Alpha and Arbitrage, the MBTA Side

---

[374] As discussed above, the Louisiana Pension Funds are not at this time participating in the Pool.

[375] 2008 Richcourt Holding Audited Financial Statements at 17, 18; Letter from Richcourt Euro Strategies, signed by D. Kiely and S. Turner, to "Shareholder" of Richcourt Euro Strategies, Dec. 30, 2008.

[376] Cash Model.

[377] Id.

Letter, and in the other presentations and materials.  In analyzing how the particular investments were or were not consistent with the strategy, the Trustee considered the following:

- The Offering Memoranda focused on investments of a nature consistent with investing in public companies, which is the overwhelming emphasis of these documents.  While the Offering Memoranda do contain references to equity investing in private companies, they do so only in the context of investments that can be "actively" traded – e.g., publicly issued bonds of a private company.

- Presentations to the pension fund investors and other materials that referenced only public company investments;

- A due diligence questionnaire prepared by FAM for Arbitrage; and

- The MBTA Side Letter precluded private company investments absent notice and an opportunity to redeem.

### 1.    Richcourt

As noted above, in late 2007 and early 2008, Citco put its Richcourt fund of funds business up for sale and retained UBS to conduct the sale.  Following the bidding and negotiating process, FAM emerged as the successful bidder.  The bid was for an 85% stake in the Richcourt Group (consisting of Richcourt Holding and its subsidiaries) for approximately $28 million.  There were two closings:  the first, for $27 million on June 20, 2008, was for all but Richcourt's French assets; the second, for $1 million, was for Richcourt's French fund, and was delayed until October 4, 2010, pending French regulatory approval.  Citco also received a put on its remaining 15% interest in Richcourt.  While Citco attempted to exercise its put in March 2011, Richcourt Acquisition never paid for it, and the put transaction never closed.  Also as

noted above, the $27 million paid to Citco at the first closing came from the Louisiana Pension

Funds' subscription to Leveraged's Series N Shares in the form of a loan and made its way to

Richcourt Acquisition (the acquisition vehicle for the transaction) through a series of transfers

from Leveraged to Arbitrage to FII to Richcourt Acquisition and then to Citco Trading.  There

was an equally complicated series of transfers of promissory notes to account for the movement

of the $27 million.  At the end of the day, Leveraged held a $27 million non-market, illiquid note

made by IAP, interest on which was linked to the performance of the Arbitrage fund and was

subject to a monthly cap and which was never paid in cash, and AF – through an entity he

partially and indirectly owned – ended up owning 85% of Richcourt indirectly through a series

of companies he controlled.[378]

         The Richcourt acquisition was really an investment by AF, where he improperly

used Leveraged as a bank.  This was a loan to a private company, not equity, and thus was not a

permitted investment.  And even if it were an equity investment, it was not an investment that

could be actively bought and sold.  Moreover, everything about it is inconsistent with the Funds'

advertised investment strategy:  the Funds were supposed to take non-controlling positions in

companies,[379] but by buying 85% (and contracting to buy 100%) it took control of the Richcourt

business.  The Funds' investments were supposed to be hedged;[380] this one was not.  And, most

importantly, the authorized investment strategy never contemplated lending to AF-controlled

entities in the manner done here.  Plainly, investor funds could not have been loaned to AF to

---

[378] Richcourt Acquisition Inc. was 100% owned by RPLP.  MMI owned 84% of RPLP, and Fletcher
Aggressive Fund LP owned 100% of MMI.  FFLP owned 80% of FAF, and AF owned or controlled
FFLP.

[379] Non-Verbatim Transcript at 1, 2.

[380] Arbitrage Offering Memorandum at 26; MBTA Presentation at 4; FRS Presentation at 6.

enable him to buy a $27 million yacht; functionally, that is no different from what transpired here.  Neither AF nor FAM disclosed this investment to the Louisiana Pension Funds or to the MBTA at the time it was made.[381]  This investment gives rise to potential claims against AF, FAM, and other Insiders, Citco and Citco insiders, and possibly others.  Claims arising out of this transaction are Pooled Claims under the Plan.

## 2.    Fletcher International Partners, Ltd.

FILB's investment in FIP is described in Section IV.F above.  The investment was not in public securities or in securities that could be converted into public securities and it could not be hedged: it was an indirect illiquid investment in private Citco shares.  The investment was not supported by contemporaneous, independent valuations; the value used seems to have been overstated.  In addition, the investment was designed to meet liquidity needs of one of Citco's top executives (Unternaehrer), and was negotiated at a time when he was the key person in the Fletcher-Citco relationship.  It also was plainly inconsistent with the requirements of the MBTA Side Letter and the Offering Memoranda since it was incapable of being actively bought and sold.

As with the Richcourt acquisition, neither the FIP investment nor the Citco/Unternaehrer conflict of interest was disclosed to investors before the fact, and no meaningful disclosure was ever provided.  Nor was any notice provided that the investment was "illiquid," that it was redeemable at the sole discretion of Unternaehrer.  No advance notice was given to the MBTA under the MBTA Side Letter, and no notice was otherwise given to any of the investors.  The transaction was first partly disclosed when it appeared in FILB's 2008 audited

---

[381] As discussed above, FAM did make cryptic reference to its purchase of the Richcourt business in an August 2009 investor letter.  However, even that letter was misleading, giving the impression that the Funds had purchased an equity interest in the Richcourt business.

financial statements provided to investors in May 2009, which disclosed an unidentified $4.1

million investment in a Cayman Islands fund, and even then there was no mention of the

payment to Unternaehrer or that this transaction involved a top executive of the administrator for

the funds in which they directly invested.  Neither Grant Thornton nor Eisner included this

plainly material information in their audit reports.  This investment gives rise to potential claims

against AF, FAM, and other Insiders; Citco, Smeets, and Unternaehrer; and Grant Thornton, and

Eisner.  Claims arising out of this transaction are Pooled Claims under the Plan.[382]

### 3.    BRG

BRG was formed on December 15, 2009, as a wholly-owned subsidiary of

FILB.[383]  Three of the FILB investments made through BRG were outside the scope of the

investment objective of the Funds:  MV Nepenthes, Budget Travel, and Lowercase.  The

Trustee's conclusions and recommendations about them follow.

#### a)    Intellitravel (Budget Travel)

BRG purchased Intellitravel from Newsweek in December 2009.  This purchase

of a privately held operating business was outside the Funds' stated investment strategy.  The

investment was illiquid, not convertible into publicly-traded securities, and could not be hedged.

FILB (and FAM) had no experience managing an operating company like Intellitravel.  The

acquisition put client capital at risk to fund operating losses and to cover large legacy lease

obligations on the company's office space.  No notice of the transaction was ever given to the

MBTA under the MBTA Side Letter or to investors generally.  Plainly, this investment was

---

[382] Grant Thornton and Eisner dispute the Trustee's claim that they failed to provide adequate disclosure of the FIP transaction, Citco and Unternaehrer's conflict of interest, the lack of advance notice to the MBTA, or the lack of notice to other investors.

[383] As discussed in Sections II.B.2 and VI.G.6 above, FILB's interest in BRG was purportedly transferred to FII as part of the April 22, 2012 Transactions, but that transfer has since been undone.

incapable of being actively bought and sold in the manner described in the Offering Memoranda.

Quarterly reports sent to the MBTA purportedly listing investments did not reference Budget

Travel.   Budget Travel is currently in Chapter 11 proceedings and is of uncertain value.  This

investment gives rise to potential claims against AF, FAM, other Insiders, and potentially others.

Claims arising out of this transaction are Pooled Claims under the Plan.

### b)    MV Nepenthes

Another investment outside the Funds' investment strategy was FILB's

investment of $ $7.7 million (between September 2010 and December 2012) into MV Nepenthes

in order to fund the production of <u>Violet & Daisy</u>, a motion picture written and directed by AF's

brother Geoffrey Fletcher.  This was another illiquid private investment with no chance of being

publicly traded or hedged.  It was not even an investment in an operating company, but instead

was an investment in an entity created to do one thing – make AF's brother's movie.  No

disclosure of the investment or of the inherent conflict (investing in the fund manager's brother's

film) was made under the MBTA Side Letter (or in the MBTA Quarterly Reports), or otherwise.

Plainly, this was not an investment that could be actively sold.  There is no evidence that FAM

conducted a valuation of the investment in any way before making it.  This investment is

virtually worthless, and gives rise to potential claims against AF, FAM, and other Insiders,

Geoffrey Fletcher, and potentially others.  Claims arising as a result of this transaction are

Pooled Claims under the Plan.

### c)    Lowercase

Lowercase is a venture capital fund in which BRG invested $70,000.  While the

Trustee considers this investment to have been outside the Funds' stated investment strategy, it

appears the investment could return value to the estate.

4.   **UCBI**

The UCBI transaction is described in Section IV.K above.  Various Fletcher-Related Entities, including FII, purchased a portfolio of non-performing real estate loans and bank-owned real estate from UCBI for approximately $103 million.  FILB provided $10.5 million in cash (and Arbitrage provided $10 million) towards the purchase price and also provided $21.9 million in cash and securities to fund the Carry Accounts that were used to partially collateralize an $82.5 million purchase loan made by UCBI to finance the transaction.  FILB received $30 million of Initial Warrants and the right to purchase $65 million in Convertible Preferred Stock and up to $35 million in Additional Warrants.  This was a complex transaction.

Investing in real estate was outside the Fletcher Funds' stated investment strategies.  Kiely expressly told the Louisiana Pension Funds, that no investments would be made in real estate.[384]  The real estate loans and bank-owned properties were not publicly traded or convertible into publicly-traded securities, nor could they be hedged or quickly liquidated.  They clearly were not investments that could be actively bought or sold.  (Arbitrage, for instance, was supposed to provide its investors with weekly liquidity, and could not do so with these assets.)  And while the real estate assets were owned by FII, FILB provided over $30 million to fund their acquisition.  In any event, FII was owned by Arbitrage and subject to the investment restriction in Arbitrage's Offering Memorandum.  No advance notice was given to any of the investors (under the MBTA Side Letter or otherwise) for this transaction prior to it being closed.  It was, however, referenced in communications to the MBTA and to the Louisiana Pension Funds' outside investment advisor, and, it will be argued, no complaints were then made.

---

[384] Non-Verbatim Transcript at 2.

This transaction gives rise to potential claims against AF, FAM, other Insiders, and potentially others.  Claims arising out of this transaction are Pooled Claims under the Plan.

**5.    Madison Williams**

As discussed in Section IV.H above, in November 2009, FILB made a $5 million investment in Madison Williams, a broker-dealer owned by SMHG.  FILB received common shares representing approximately 30% of the company and warrants and an option to purchase additional shares.  Subsequently, FILB transferred its entire investment to FII.  The Trustee is not aware of any justification for this transfer.  In February 2011, FII invested an additional $1.2 million in Madison Williams and acquired additional shares.  Shortly thereafter, Madison Williams experienced a liquidity crisis, and FII redeemed another $2 million of its holding in FILB and loaned $2 million to Madison Williams.  By the end of the year, Madison Williams ran out of cash and filed a voluntary Chapter 7 petition.  FILB's and FII's investments were wiped out completely.

This investment violated the Funds' advertised investment strategy because the Madison Williams shares were not publicly traded and could not be hedged.  There is no evidence that any disclosure was made to any of the investors before the investment was made.[385]  Plainly, this also was an investment in shares that were incapable of being actively bought and sold.  And again, there is no question that the transaction violated the MBTA Side Letter, and that it is inconsistent with other materials available to the Louisiana Pension Funds.  A one sentence reference to this investment was, however, included in a quarterly report sent to the MBTA, nearly six months after the investment was made.  Again, it may be argued that no complaint followed this disclosure, inadequate though it was.

---

[385] It does not appear that the investment was disclosed to the MBTA until May 2010.  See email from S. Turner to Jacqueline Gentile (May 24, 2010); Fourth Quarter 2009 Investment Overview at 3.

This transaction gives rise to potential claims against AF, FAM, other Insiders, and potentially others.  Claims arising out of this transaction are Pooled Claims under the Plan.

### 6.    Vanquish and Aesop

In late 2009, FAM formed two funds, Vanquish and Aesop, and FILB invested a net of approximately $10.4 million in them.[386]  Other investors in the funds included BRG, FDIF, and Richcourt Holding; there were no third-party investors.  Vanquish and Aesop were supposed to invest in a portfolio of small-cap securities.  However, at least in the case of Vanquish it appears that no such investments were ever made.[387]  Aesop and Vanquish used funds to redeem a major investor out of Richcourt Euro Strategies ($10.8 million); to subscribe to Leveraged Series 1 shares, at a total cost of $11.7 million[388] for, as discussed below, the apparent purpose of "round tripping" money to Leveraged to prop up the 20% cushion required for the Series N investors; and to pay fees to FAM ($2 million).[389]

As implemented by FAM, FILB's investment in Vanquish and Aesop did not comply with the Funds' stated investment strategy, because neither Vanquish nor Aesop was a hedged structured investment in a mid-sized public (or private) company.[390]  Instead, Vanquish and Aesop had the very different purposes described above.

---

[386] See Section IV.O above.

[387] It appears that Aesop did some securities trading through its investment manager, Ariel Investments LLC.

[388] $8 million was a cash subscription ($4 million in April 2010 and $4 million in September 2010) by Vanquish and the remainder represents Aesop's contribution of Arbitrage shares with a stated value of $3.7 million as of July 31, 2010, into Leveraged.

[389] Leveraged used $2 million of the $8 million contributed by Vanquish to partially redeem FAM from the Leveraged shares which FAM had obtained as a result of the $12.3 million deferred performance fee related to the Corsair unwind.

[390] MBTA Side Letter; Due Diligence Questionnaire dated July 7, 2009 for Arbitrage; Non-Verbatim Transcript at 1–2.

This transaction gives rise to potential claims against AF, FAM, and other Insiders, and potentially others. Claims arising out of this transaction are Pooled Claims under the Plan.

### 7.    Lyxor

In March 2011, FILB entered into a total return swap with Société Generale. The reference security was the Lyxor Hedge Funds Tracker PC, which was designed to replicate an investment in a portfolio of hedge funds selected by SG. FILB acquired a notional amount of $41.3 million[391] and was required to post collateral of $1.66 million[392] and to pay monthly interest based on LIBOR. The swap was supposed to have been held by a subsidiary of Leveraged, but because the subsidiary was not a qualified swap counterparty for SG, FAM did the transaction through FILB. FAM then transferred the transaction (or its economics) through a series of intercompany transactions to Leveraged.[393] Richcourt Capital Management was supposed to manage the investment under an investment management agreement and charge a 2%[394] fee for doing so. The fee was to be based on the notional amount of the investment, i.e., 2% on $41.3 million (yielding a fee of approximately $0.8 million) rather than on the amount FILB invested. At the time, the Richcourt business was failing. FILB ended up paying out a total of approximately $4.4 million[395] in connection with this transaction and received a total of $0.8 million in return, for a net loss of $3.6 million.[396]

---

[391] "Total Return Swap linked to LYXHFAUJY Equity" Term Sheet, Mar. 31, 2011, prepared by SG.

[392] Cash Model.

[393] Fund-Linked Swap Transaction Agreement between FILB and FIAL 1, June 24, 2011; Cash Model.

[394] FIAL I Marketing Materials.

[395] Cash Model.

[396] Id.

The investment did not fit the Funds' stated investment strategy and appears to have been no more than a mechanism to funnel money to Richcourt at the expense of FILB's investors. These facts give rise to potential claims against AF, FAM, Richcourt Capital Management and its affiliates, and possibly others (which the Trustee is still investigating). Claims arising out of these transactions are Pooled Claims under the Plan.

### D.    MANDATORY REDEMPTION OF SERIES N

The Series N Shares require that they be redeemed in two situations. First, if the 20% cushion requirement were breached, the Series N investors had to be redeemed. The Series N Offering Memorandum provides:

> Notwithstanding the foregoing, a redemption of the Series N Shares will automatically occur on any Valuation Date on which the aggregate value of the Investment Accounts of Non-Series N Shareholders Series 1, Series 3, Series 4, Series 5 and Series 6 Shareholders (the "Non-Series N Shareholders") falls below 20% of the aggregate value of the Investment Accounts of the Series N shareholders (the "Mandatory Redemption").[397]

Second, if any of the Series 4, 5, or 6 investors were to be redeemed, then the Series N investors had to be redeemed one day before the non-series N investors. The Series Offering Memorandum Provides:

> Notwithstanding anything to the contrary herein contained, Series N shares must be redeemed no later than the business day prior to the shares of Series 4, 5 and 6 of the Fund being redeemed.[398]

As early as 2008, the Series N investment should have been redeemed because of an apparent breach of the 20% requirement.[399] FAM seemingly recognized this fact and took

---

[397] Series N Offering Memorandum at 27.

[398] Id. at 10.

[399] Indeed, properly valuing the portfolio, it appears that the Louisiana Pension Funds were entitled to redeem from day one of their investment. See FILB Holdings Report for the Month Ending Mar. 31, 2008; Leveraged Monthly Closing Package, Mar. 31, 2008.

steps to avoid the consequences, but was either unsuccessful or engaged in inappropriate conduct

to seek to avoid the mandatory redemption requirement, and that went unreported.  Had the

Series N investors been aware of what was going on, they would almost certainly have insisted

on exercising their redemption rights.[400]  It is highly unlikely that Leveraged could have met the

Series N investor's redemption demands, without causing a collapse of the system.

### 1.    Valuations

Discussed below are the ways that FAM's valuations of the Funds' assets were

overstated.  One result of this overvaluation was that the inflated marks artificially prevented the

20% cushion from being breached.

### 2.    IAP/EIC Note

The issues surrounding the valuation of the IAP/EIC Note are discussed in

Sections VIII.E.3.(i), VIII.J.1.(a), and VIII.J.2.(a).  In short, the value of the IAP/EIC Note is

linked to the value of the Richcourt business, and while the face amount of the IAP/EIC Note is

$27 million, its fair value is nowhere near that amount.  The valuations that FAM obtained from

Quantal are deeply flawed, and the auditors at Grant Thornton adopted Quantal's flawed analysis

without doing any independent work of their own.  Eisner, which took over for Grant Thornton,

proposed to value the Note at $10 million, but because FAM would not agree to use this amount

in Leveraged's 2009 audit report, Eisner never issued its report, and audited statements were

---

[400] In July 2011 the Louisiana Pension Funds waived the 20% requirement at the urging of Eisner and
FAM.  See email from Eli Shamoon to Joe Meals dated July 26, 2011.  Eisner apparently encouraged the
Louisiana Pension Funds to execute the waiver after warning the pension funds that it would not issue an
audit without the waiver and warning them that they would lose previous profits that had been accrued.
Apart from the fact that the waiver was procured without disclosure of the relevant facts – only the
dispute over the valuation of the IAP/EIC Note was disclosed – there is no doubt that the reaction of the
Louisiana Pension Funds would have been quite different if they had been told in 2008, 2009 and 2010 of
this failure.

ultimately never issued.[401]   At the $10 million value, the 20% cushion requirement would not have been met, and the Series N investors would have been entitled to immediate redemption. The improper valuation of the IAP/EIC Note and the failure to disclose the consequences of a proper valuation give rise to potential claims against AF, FAM, Quantal, Terry Marsh, Grant Thornton, and, for the reasons discussed below, Eisner.  Claims arising out of the valuation of the IAP/EIC Note are Pooled Claims under the Plan only if the Louisiana Pension Funds join the Investor Settlement.

### 3.    Vanquish and Aesop

Between April and September 2010, Vanquish and Aesop subscribed for $11.7 million of Leveraged Series 1 Shares.  The subscription was made with two $4 million cash payments and $3.7 million in shares of Arbitrage.  The Leveraged Series 1 Shares were subordinate to the Series N Shares, so their value could be counted when determining compliance with the 20% cushion requirement.[402]   There is no valid reason why FILB would invest through Vanquish, in its own feeder fund, Leveraged.  It seems clear that the only rationale for the Vanquish and Aesop Series 1 subscription was to "pump up" the subordinate (non-Series N) assets and allow compliance with the 20% cushion requirement, and that FAM was effectively using investor dollars to avoid mandatory redemptions by those same investors. Without the Vanquish and Aesop investment, based upon FAM's own valuations, Leveraged

---

[401] It appears that in June 2012 (after Leveraged, Alpha and Arbitrage had been put into liquidation, and just days before the Debtor filed for bankruptcy), FAM eventually decided that it was going to accept the Eisner calculation, which would have required SS&C to go back and redo the NAV calculations for each month between April 2010 (the first month for which SS&C calculated the NAV) and May 31, 2011 (the last month for which SS&C calculated the NAV).  However, ultimately the 2009 Leveraged Audit was never issued, and SS&C never redid the NAV calculations.  See Maniglia Dep. 105:21–106:16, July 17, 2013.

[402] Leveraged Series N Offering Memorandum at 10.

would have violated the 20% cushion by at least September 2010, since the non-Series N shares

would have amounted to at most 18% of Louisiana Pension Fund investors.[403]

        FAM's use of the Vanquish funds to meet the 20% cushion was improper, as was

its failure to advise the Series N investors that Leveraged had breached the 20% requirement and

that they were entitled to redeem their Series N Shares.  This transaction gives rise to potential

claims against AF, FAM, their affiliates, and other Insiders.  Claims arising out of these events

are Pooled Claims under the Plan only if the Louisiana Pension Funds join the Investor

Settlement.

### 4.    Corsair Redemption

        In June 2009, RBS issued a default notice and called its $91.3 million loan to

Global Hawk.  The called loan resulted in an unwind of the Corsair investment and a compulsory

redemption of Corsair's investment in Leveraged Series 4, 5 and 6 shares.  Under the Series N

Offering Memorandum, the Series N shares should have been redeemed one business day prior

to the redemption of Series 4, 5 or 6 shares.[404]  They were not, nor could they have been without

liquidating the entire fund structure.

        AF and FAM contend that allowing these redemptions to occur did not violate the

Series N Offering Memorandum because the beneficial owners of the Corsair/Global Hawk

investment – four of the Richcourt Funds – reinvested into Leveraged.  According to FAM, the

only difference was that these Richcourt funds were now directly invested into Leveraged

instead of invested indirectly through Global Hawk and Corsair.  However, the Series N Offering

---

[403] Another reason for the new Series 1 subscription was to provide cash to Leveraged to redeem FAM's
in kind investment:  one week after Vanquish made its $4 million subscription payment on September 1,
2010, FAM redeemed $2 million of the Leveraged Series 5 and 6 Shares that it had received as an
incentive fee in the Corsair Redemption described above.

[404] Series N Offering Memorandum at 10.

Memorandum is unequivocal: no Series 4, 5, or 6 redemptions are allowed unless the Series N

investors are redeemed first. Moreover, the investors before and after the Corsair Redemption

were not the same, and the consideration paid out was very different from the consideration paid

in. Thus, while the redemption payment out was in cash, the new investment paid in was made

in kind; and a substantial portion of the Corsair investment was now owned by FAM via its

deferred incentive fee, not by the four Richcourt Funds.

The Corsair Redemption also provided another opportunity for AF to secure an

inappropriate fee at the expense of the investors. AF argued that the early redemption entitled

FAM to the immediate payment of what he claims was a previously deferred incentive fee of

$12.3 million. However, according to the Leveraged Offering Memorandum, in the event the

board of directors forced a compulsory redemption, FAM was not necessarily entitled to this full

deferred incentive fee. If the return on the Corsair notes was less than the return of Arbitrage,

FAM was required to refund the difference.[405] While the board of directors unequivocally

served notice of a compulsory redemption on Corsair, the parties, as part of their settlement,

apparently agreed to recharacterize the redemption as a voluntary one.[406] Indeed, as

memorialized in a June 25, 2010, letter from Citco Cayman to FAM, Citco initially challenged

FAM regarding the voluntary nature of the redemption as well as on the calculation of the

performance fee, but later acquiesced on the action of the Leveraged board of directors.[407] FAM

---

[405] Leveraged Offering Memorandum, Oct. 9, 1998, as supplemented Dec. 21, 2004, at 6.

[406] Section 5(a) of Settlement Agreement (noting that "Each of the Parties agrees that the redemption by
FIAL of the FIAL Shares shall be treated as an optional early redemption by Corsair for purposes of the
Confidential Memorandum Relating to Participating Shares of FIAL dated October 9, 1998, as
Supplemented December 21, 2004."); Notice of Compulsory Redemption issued by the Leveraged Board
of Directors (stating that the Leveraged Board of Directors compulsorily redeemed Corsair's Series 4, 5,
and 6 shares in Leveraged).

[407] Letter from Citco Cayman to Board of Directors of Leveraged and FAM (June 25, 2010).

initially took this fee in kind as an investment in Arbitrage, which it invested in kind into

Leveraged.  The Trustee believes that a reason for initially investing the FAM fee in Leveraged

was to avoid breaching the 20% cushion and triggering a mandatory redemption.  As monies

were invested by Vanquish in Leveraged, FAM and FFLP redeemed in cash approximately two

thirds of its investment in Leveraged and received more than $8 million in cash.  The Trustee

believes that each of these redemptions by FAM also triggered the mandatory redemption of the

Series N Shares.

 The $12.3 million fee also appears to have been artificially high.  FAM calculated

the deferred fee as if the Cashless Notes (described in Section II.E.8) were really investable

capital when they were not, and as though any returns on Series N were for the benefit of

Corsair.  The profits attributed to Corsair thus were calculated not only on Corsair's capital but

also on $77.6 million of the Louisiana Pension Funds' investment and the two $80 million

Cashless Notes.  This approach resulted in purported profits earned by Arbitrage being

reallocated from the non-Corsair investors (i.e., the Series N shareholders) to the Corsair

investors.  In any event, Corsair's capital balance as of March 31, 2010, was approximately

$33.1 million – less than Corsair's initial investment of $34.7 million into Leveraged between

October 2004 and January 2005.  It appears that Corsair lost money on its Leveraged investment,

meaning that no performance fee ought to have been paid to FAM at all.

 The Corsair Redemption gives rise to potential claims against AF, FAM, Citco

and possibly others.  Claims arising out of this transaction are Pooled Claims under the Plan only

if the Louisiana Pension Funds join the Investor Settlement.

### E.    VALUATION ISSUES

Valuation is an essential element of business for firms investing in hard-to-value

assets.  As a result, decisions about valuation ought to be grounded in what AIMA refers to as

"prudence and fairness."

> Prudence is not only a fundamental accounting concept, but a
> natural attribute of responsible Investment Managers.  If there is an
> element of contingency to the value of an investment because of its
> illiquidity or the subjectivity of pricing assumptions, many
> managers are understandably reluctant to mark up a position until
> there is clear evidence of substantive and sustainable change in
> circumstances."[408]

The Trustee believes that FAM's actual valuation procedures did not meet

standards that would be viewed as generally acceptable in the investment community.  The

practices were ill-defined, inconsistently applied, dominated at FAM by AF (who stood to

benefit at FILB's and the other funds' expense), and produced valuations that were inflated and,

in a number of instances, unrealistic on their face.  In the end, AF controlled the FAM valuation

process, and he, with the assistance of others from FAM and Quantal, bear responsibility for the

inflated valuations.  As discussed elsewhere, the Funds' administrators and auditors also failed to

follow standard procedures, including, as to the administrators, those represented to investors in

the Offering Memoranda.[409]

FAM's valuation methodology was flawed at the time investments were initiated

and immediately marked up to multiples of their cost, and often continuously thereafter.  The

valuation methodologies as applied by FAM violated acceptable boundaries and, in the end,

---

[408] AIMA, Guide to Sound Practices for Hedge Fund Valuation 19, 20 (2d ed. Mar. 2007).

[409] See, e.g., Series N Offering Memorandum at 9, 21, 23–24; Leveraged April 2010 Administrator
Supplement at 1; Alpha Offering Memorandum at 12, 41, 44–45.  The administrators, auditors, and
Quantal were in a position to stop AF from using inappropriate valuations, but they failed to do so.

produced fraudulent valuations wholly detached from reality.  Fraudulent valuations enabled

FAM and others to take out excessive fees and created a false picture of the Funds' true financial

condition.  The fraud was ultimately exposed for what it was when the investors asked for their

money back and there were no assets available to support the account values that had been

represented to them.

### 1. Valuation Best Practices

#### a) Fair Value Standards

Hedge fund valuations of underlying investments are required to be performed on

the basis of fair value.  FAS157 defines fair value as "the price that would be received to sell [an]

asset or paid to transfer a liability in an orderly transaction between market participants at the

measurement date."[410]  A decision by a portfolio manager to sell one position in order to buy

another one is by definition orderly, as the portfolio manager is under no compulsion to act and

is merely making every-day decisions with respect to portfolio optimization.[411]  The Funds'

Offering Memoranda stated that the hard-to-value assets would be fair valued.[412]

#### b) Best Practices for Valuations Policies and Procedures

Best practices with respect to the valuation of non-exchange traded securities is a

topic that has received considerable attention in the investment management community in

recent years.  By 2007, at least three major industry organizations had published treatises on

hedge fund valuation:  the International Organization of Securities Commissions

---

[410] Financial Accounting Standards Board, Statement of Financial Accounting, Standards No. 157:  Fair Value Measurements, Financial Accounting Series, No. 284-A, Sept. 2006, at 2.

[411] Tabinda Hussain, Hedge Fund Portfolio Turnover and Record Low of 29%:  Goldman, Value Walk (Nov. 21, 2012).

[412] Arbitrage Offering Memorandum at 29; Alpha Offering Memorandum at 34; Series N Offering Memorandum at 24.

(the "IOSCO"),[413] AIMA,[414] and the Managed Funds Association ("MFA").[415]   Among the

principles that these three organizations have agreed are the hallmarks of a sound valuation are:

- The hedge fund should establish a comprehensive set of documented valuation policies and procedures;

- The policies and procedures should identify the methodologies that will be used for each type of financial instrument;

- The financial instruments held by the fund should be consistently valued according to the policies and procedures;

- The policies and procedures should ensure that an appropriate level of independent review is undertaken of each individual valuation and in particular of any valuation influenced by the fund manager; and

- The arrangements in place for the valuation of the hedge fund investment portfolio should be transparent to investors.

FAM's valuation procedures were not consistent with these standards for the

following reasons:

---

[413] The IOSCO is the acknowledged international body that brings together the world's securities regulators and is recognized as the global standard setter for the securities sector.  IOSCO develops, implements, and promotes adherence to internationally recognized standards for securities regulation. The SEC is an active member of the IOSCO board.

The IOSCO's membership regulates more than 95% of the world's securities markets.  Its members include over 120 securities regulators and 80 other securities markets participants (i.e., stock exchanges, regional and international financial organizations, etc.).

[414] Citco has served as a co-chair of the AIMA Asset Pricing Committee since at least 2007.

[415] Technical Committee of the International Organization of Securities Commissions, Principles for the Valuation of Hedge Fund Portfolios: Final Report (Nov. 2007); AIMA, Guide to Sound Practices for Hedge Fund Valuation (2d ed.2007); MFA Sound Practices for Hedge Fund Managers (4th ed. 2007).

First, FAM had no written valuation policies that would identify the methodologies employed for valuing various types of investments. In response to a 2010 request for FAM's written valuation policies by an investment consultant to one of FAM's clients, Turner responded "N/A."[416] Written valuation policies are a basic requirement for any sound valuation process; there were none here.

Second, investments were not valued using consistent methodologies. For example, within two months of the initial UCBI investment, FAM changed the valuation methodology applied after an adverse development caused a $61.4 million write-down of the Initial Warrant. As of April 30, 2010, the Initial Warrant was valued at $76.3 million, and the contract to purchase UCBI Preferred Stock did not appear as a position on FILB's books even though the contract had been finalized. The UCBI Preferred position did not appear on the books of FILB until two months later, in June of 2010, after UCBI had successfully challenged the cashless exercise feature of the Initial Warrants, forcing an amendment of the cashless exercise warrant formula governing those warrants and a reduction in its mark to $14.9 million.[417] Then on June 30, 2010, the UCBI Preferred position, which previously was given no value in the FILB portfolio, suddenly appeared as a position on FILB's books with a stated value of $44.3 million. The inference is clear – FAM changed its valuation of the Preferred Stock contract in order to offset the loss attributable to reduced value of the Initial Warrant.

Third, the valuation process was not independent, nor is there any evidence it was reviewed periodically. The Offering Memoranda explicitly state that the board and the administrators would play an important role in the valuation of the underlying portfolio

---

[416] Email from Stewart Turner to Denis Kiely, Dilshoda Yergasheva, AF and Moez Kaba (July 29, 2010, 22:48).

[417] FILB Holdings Report for the Month Ending June 30, 2010.

positions, an assignment of responsibilities consistent with AIMA's best practices.[418]  However,

there is no evidence that FAM provided accurate information to allow the Funds' boards to play

any role.  Despite explicit language in the Offering Memoranda describing the administrators'

role with respect to valuations and AF's assertions that the administrator had the final say,[419]

Citco Cayman did not value the underlying positions,[420] and SS&C, when it took over as fund

administrator, explicitly disavowed its responsibility for the valuation of the underlying portfolio

positions.[421]  While it does appear that they failed to perform the role assigned to them in the

Offering Memoranda, there is evidence that Citco Cayman did on occasion at least review the

valuations.  However, the Trustee is not aware of any evidence that Citco did anything but accept

the fraudulent valuations.  In December 2011, after the Louisiana Pensions Funds had submitted

their redemption requests, SS&C did challenge FAM's UCBI valuation after UCBI underwent

the 1:5 reverse stock split.  While it appears that SS&C eventually accepted FAM's valuation,

ultimately, SS&C never issued a NAV calculation based upon the inflated UCBI valuation.[422]

According to AIMA, "[t]he procedures enshrined in the Fund's Valuation Policy

Document should be designed to ensure that the parties controlling the Fund's valuation process

are segregated from the parties involved in the Fund's investment process."[423]  FAM had no

---

[418] AIMA, Guide to Sound Practices for Hedge Fund Valuation, 6 (2d ed. 2007).

[419] WSJ Transcript at 119:04.

[420] In its agreement with Alpha, Citco Cayman disavowed its obligation to price the portfolio of investments.  See Alpha Administration Services Agreement, Schedule 1, Part 1 (a).  However, this limitation was not disclosed in the Alpha Offering Memorandum, and it does not appear that this was ever disclosed to the investors.

[421] SS&C Agreement at 5.

[422] Maniglia Dep. 72:8–96, July 17, 2013; Mooney Dep. 49–60, May 3. 2013.

[423] AIMA, Guide to Sound Practices for Hedge Fund Valuation, 10 (2d ed. 2007).

written policies, and in fact, there was also no real independence in pricing the portfolio.  There

was no process to ensure that the individuals managing and trading the portfolio were segregated

from individuals involved with the valuation process, which would have been consistent with

best practices in the industry.[424]

Fourth, there was no transparency with respect to FAM's valuation policies.  The

process described in the Offering Memoranda with respect to how valuations would be

conducted was not a fair representation of the actual practice.

### c)    Use of Pricing Letters and Broker Quotations

Hedge fund best practices require hedge funds to obtain pricing letters/broker

quotations for hard-to-value assets.[425]  The letters are to be independently sent to the

administrator without intervention by the investment manager.[426]  The prices obtained from the

brokers are often averaged to arrive at final value.  There is no evidence that FAM ever

attempted to obtain pricing letters; to the contrary, the evidence is that FAM never talked to the

street.

### 2.    The Trustee's Market Research

The Trustee conducted a survey to determine market practices on a variety of

topics relating to the proper valuation of hard-to-value assets generally and PIPEs and warrant

investments specifically.  The survey was conducted by identifying recognized and widely

accepted industry trade organizations who publish on these topics, reviewing relevant books and

other published material, and speaking with a wide variety of market participants at both broker-

---

[424] Id.

[425] Id. at 45.

[426] Id.

dealers and investment funds as well as an academic specializing in option theory.  In total, over the course of the investigation the Trustee spoke with 15 individuals.  The survey includes input from a total of five broker-dealers active in convertible instruments, warrants and illiquid assets.  The results follow:

1.    Valuing convertible preferred PIPEs.  A convertible preferred PIPE that is worth more on a conversion basis than its face amount should be valued at conversion value plus potentially at most one to four years of dividends.  As a convertible preferred becomes increasingly in-the-money, models become less relevant.   Based on the survey, the Trustee has concluded that FAM would have been able to obtain pricing letters for the Helix and ION positions had it requested them and that at times when the conversion value equaled or exceeded redemption value, FAM would have received pricing letters reflecting a value of no greater than conversion value plus at most one to four years' worth of dividends.

2.    Valuing private warrants.  Private out-of-the-money warrants would be valued at a discount of 30% to 70% to a value generated by a Black-Scholes model.  The leading industry research on the topic, a study by Pluris Valuation Advisors, reports that actual discounts to Black-Scholes based valuations for private warrants were in the range of 57% to 67%.[427]  One investor indicated that his fund's base case is to assign a zero valuation to private warrants if there is uncertainty about the issuing company's future prospects.  Furthermore, the option theory specialist interviewed stated that the volatility input to any valuation model should be a volatility measurement over a period of time that matches the maturity of the warrant.  With respect to cashless exercise formulas, survey participants had never seen the non-standard cashless exercise formula included in many of FILB's warrant positions.  The concept of having

---

[427] Shannon Pratt, Business Valuations, Discounts and Premiums, 117–18. (2d ed. 2009).

the strike price in the denominator of the formula was so foreign to those asked that no one was

prepared to say that the non-standard formula would add any incremental value to what would be

derived using a standard formula.  Two of the participants opined that they would want to

confirm such a formula with the issuing company out of fear that the formula was a

typographical error.

        3.        <u>Immediate markups</u>.  Immediate markups of portfolio positions is an

unacceptable practice in the absence of fundamental change in the company, its public security

prices, or trading activity.  One survey participant noted that if a manager acquired a position for

$1 million, it would be hard to believe that the manager could genuinely believe that he could

turn around and sell it for $25 million.  In fact, this survey participant noted that it often would

be hard to get the $1 million purchase price back that quickly.  Market participants expressed

serious concerns about any manager who would engage in such a practice.

        4.        <u>Pricing letters</u>.  Most funds obtain third-party broker pricing letters for

hard-to-value securities.  These pricing letters are generally reliable, and should be sent directly

to the fund's administrator.

        5.        <u>Use of models vs. market transactions</u>.  Market activity trumps model-

based valuations.  If a manager is transacting in an asset, that is the best indicator of fair value.

Models may be appropriately used when there are no transactions.

        6.        <u>Documented valuation policy and consistent methodology</u>.  A hedge fund

must have a written valuation policy describing its valuation methodology, and that methodology

must be consistently applied.

        7.        <u>Independence in valuation process</u>.  A high level of independence should

be brought to bear in the application of any valuation policy.  To the extent that the investment

advisor is valuing a portfolio, the process should be independent of the portfolio manager. While the portfolio manager and others involved with portfolio management may have a role in determining values, they cannot control the ultimate decision. One of the standard arrangements to assure a level of independence in the valuation process is to have a fund's valuation committee comprised of professionals removed from trading and investment decisions. The portfolio manager cannot control the fund's valuation committee.

8.      Fair value standard.  Investment positions must be recorded at their fair value, meaning that positions should be valued at a price that would be received in an orderly transaction between market participants.

9.      Fundamental analysis.  Fundamental analysis on a given company is essential in determining the value of the company's securities. Fundamental analysis includes an evaluation of the company's financials, creditworthiness and viability. This is particularly true with PIPEs and warrants issued with PIPEs because they are typically issued by companies that are in some kind of financial distress or otherwise need the financing for growth.

## 3.      **Fraudulent Valuations**

The Trustee believes that FILB's portfolio positions were substantially overvalued by AF, FAM and Quantal, and that this boosted fees and deceived investors. FAM was assisted in particular by Quantal, a firm that lacked adequate expertise to value FAM's investments and that, over time, lost any of the independence it ever had. The auditors, who stood as the next line of defense after the fund boards and administrators, failed to exercise proper oversight. Among the flaws were the following:

### a)    Valuations of Investments That Did Not Reflect Partial Monetizations

From January 2007 through the Petition Date, FILB's investments in Helix and ION dominated the portfolio, representing on average upwards of 75% of FILB's reported gross portfolio value. The investments in both Helix and ION were in the form of convertible preferred stock that was at times either redeemable to the company or convertible into publicly-traded common stock. FAM's positions in Helix and ION convertible preferred stock were held at Credit Suisse, which acted as FILB's prime broker, and which provided a margin loan against the positions. Credit Suisse's standard methodology for ascribing value to these positions was to mark them at conversion value.

FILB transacted in Helix and ION a total of eight times. Six of these monetizations occurred under FAM's direction between January 2009 and May 2010. One occurred as a result of a June 2012 margin call by Credit Suisse in which Credit Suisse sold off the remaining ION position after FAM did not market it independently. The final monetization occurred after the bankruptcy, when the Trustee sold the remaining Helix preferred in December 2012. These transactions took every possible form – redemption to the company, conversion into publicly-traded common stock and the subsequent sale of that stock, and the sale of the position as a convertible preferred. Regardless of form, none of the transactions resulted in significant value in excess of conversion value or redemption value.

The Helix and ION positions consisted of convertible preferred stock with future dividends. While some market participants might believe that it would be possible to sell convertible preferred stock at its conversion value plus the value of some period of future dividends, FAM never achieved a price greater than conversion. In practice, market participants would not seek to value these convertible preferred shares with more than one to four years of

future dividends.  Yet the FAM-Quantal model (with limited exceptions relating to stock ownership) was based on the concept of a perpetual dividend and assumed decades worth of dividends as part of the value of the Helix and ION positions.[428]

Despite repeated monetizations under FAM's direction, the Helix and ION positions were both marked at much higher "mark-to-model" valuations that represented not just small increments over conversion value but numbers vastly in excess of conversion value.  For example, on January 27, 2009, FILB monetized a portion of the Helix position by redeeming $30 million of it to the company.[429]  This transaction implied that the appropriate valuation for the Helix position as of year-end 2008 would have been no more than $74.6 million, yet FILB carried the position as of December 31, 2008, at $100 million.  Likewise, had FAM valued its ION position based on the manner in which the Helix position had been monetized, it would have been carried at $67.9 million as of December 31, 2008, when in fact it was marked at $112.7 million.  Changing these two marks alone would have reduced 2008 year-end gross assets by $70.5 million, or approximately 23%, and would have resulted in a breach of the 20% cushion threshold at Leveraged, required by the Series N Offering Memoranda.

AF has claimed that FILB's partial monetizations in Helix and ION had no impact on the value of FILB's residual positions because the conversions were "forced" and did not reflect the value that might theoretically be realizable through a fully marketed sales process designed to sell the instrument as a convertible preferred as opposed to simply redeeming it or

---

[428] Quantal Valuation Report of Helix as of Dec. 31, 2008 (Feb. 2, 2009).

[429] Closing Documents for the Redemption of 30,000 Shares of Series A-2 Cumulative Convertible Preferred Stock of Helix by FILB on January 27, 2009.

converting it.  FAM claimed that it wanted to use the sale proceeds "in order to take advantage of a more economically compelling investment opportunity" – namely UCBI.[430]

AF's claim is not credible for a variety of reasons.  Fund managers sell investments and purchase other investments as part of their normal everyday portfolio management process – the desire to swap one investment for another does not create a forced sale, and the manager is under no compulsion to act.  Furthermore, FAM's flagship fund – Arbitrage – provided investors with weekly redemption rights, and therefore the positions should have been marked in a manner where the value on the books was achievable in the context of the weekly redemption cycle.  FAM's valuation methodology also should have taken into account that the positions were financed with short term borrowed funds that could be called under a variety of circumstances outside FAM's control.  As a result of the redemption privileges and the fact that significant leverage was employed, FILB's positions ought to have been marked at or close to where they could have been liquidated in a matter of weeks at most.  In the case of Helix and ION, that value would have been the higher of conversion or redemption value (or as a hybrid debt instrument if that resulted in a higher value, which it would not).

AF's claim that the liquidations were forced and the value received should not be considered is also not credible for other reasons.  For example, AF claimed he had to sell a portion of the ION position quickly in April 2010 in order to fund the UCBI investment.  However, the UCBI investment was negotiated over a number of months, a period that would have provided ample opportunity to conduct any form of orderly sales process deemed appropriate.  Furthermore, while it is possible that perhaps one monetization could be explained away, in this case there were six monetizations before the 2009 FILB audit was finalized – all

---

[430] Letter from FILB to Eisner, 8 (July 14, 2010).

done at conversion value with no premium – creating a pattern that simply should not, in good faith, have been ignored.

Given the frequency of FILB's conversions and redemptions of these positions – six times over 17 months – it was clearly FAM's expectation that FILB's capital needs would be met by converting portions of the Helix and ION positions, and this expectation was met in practice. Because these positions were convertible into publicly-traded common stock of the companies at any time, both positions could have been considered liquid and could have been, and actually were, used to create liquidity for the Fletcher System. In reality, between January 2009 and May 2010, FAM monetized these positions on average every four months. The valuations needed to reflect reality, but did not.

Quantal was aware of FILB's conversions of the Helix and ION holdings but failed to consider them properly in its valuations. In preparing what were essentially model-based valuations divorced from reality, Quantal chose not to take any actual transactions by FAM in the Helix and ION convertible preferred stock positions into account. In June 2010, Quantal prepared a memo[431] that Marsh claimed supported Quantal's theoretical valuations of the Helix and ION positions, taking into account the FILB realizations.[432] Marsh's characterization of that memo is misleading; the memo does not support his testimony. Marsh testified that he did not take monetizations of the ION position into account in valuing the remaining ION position. When asked why not, he responded that he did not consider the terms of the monetization of the ION Convertible Preferred position relevant to his valuation because

---

[431] Supplemental Explanatory ION and HLX Valuation Note for Submission to Eisner and Sterling (June 7, 2010).

[432] Marsh Dep. 72:17–21, 174:4–7, May 7, 2013.

"they were hedging out the stock price risk is my understanding."[433]  This answer is

disingenuous and is not credible because the existence of any hedge would not affect how one

would mark a long position, as the hedge itself would be separately marked, and was in fact so

marked.[434]  Quantal likewise did not take into account that Credit Suisse (the prime broker and

margin lender) was marking Helix and ION at conversion value.[435]

The artificially high valuation of the Helix and ION positions resulted in

redemptions at inflated values.  The Trustee believes that those valuations contributed to the

calculation of excessive fees paid to FAM and its affiliates.

### b)       Valuing Non-Exercised Contract Rights

In a number of circumstances, FAM ascribed value to mere contract rights to

purchase preferred or common stock (other than through the exercise of warrants).  Examples of

this are Debtor's investments in UCBI, ANTS, Raser, and Syntroleum.

### c)       Initial Markups

By 2010, Helix's and ION's dominance of the FILB portfolio had declined, as a

large share of these positions had been liquidated over time – at a loss against their marks.  In

2010, a different valuation scheme became increasingly prevalent – the immediate markup of

newly-acquired investments.

In this scheme, FAM would initiate a PIPE or warrant investment in which FILB

was the only investor, and then immediately mark up the position by multiples of the purchase

price.  In at least two instances, FILB initiated investments with a zero cost basis – Syntroleum

---

[433] Id. 168:6–17.

[434] FILB Holdings Report for the Month Ending April 30, 2010.

[435] Credit Suisse Bank Statement of Account for Dec. 2008.

and UCBI – that were immediately ascribed values of $2.2 million and $76.3 million,

respectively. Between 2007 and the bankruptcy filing in June 2012, FILB initiated ten new

PIPEs or warrant investments. The ten investments were marked as of the month-end

immediately following the investment at a cost-weighted average multiple of 2.7 times what

FILB had just paid for them.[436] In other words, if FILB invested $10 million, on average the

month-end initial mark for the investment would have been $27 million, thus presenting a likely

fictitious (and unrealized) profit of $17 million. FAM would base its fees on this fictitious mark,

and it would report AUM and returns on investment based on that mark.

While a savvy investment manager might see opportunities in the market based on

different perceptions of value – as AF himself claimed to do in the various Offering

Memoranda[437] – that is not what happened here. Here the higher values were plainly

unattainable. In fact, no FILB investment (other than a single 2007 investment – AGEN) was

ever sold at or near its mark. Some examples:

- On December 31, 2010, FILB made a $4 million investment in DSS. On

  the same day, FAM marked that position at $23.6 million, suggesting an

  immediate unrealized profit of $19.6 million.

- On April 1, 2010, FILB executed a multi-faceted transaction with United

  Community Banks. As part of that transaction, FILB received warrants to

  purchase the publicly-traded stock of UCBI. The warrants were assigned

  a zero cost basis but were marked at a value of $76.3 million by April

---

[436] See FILB Realized Gains Report and Holdings Reports from January 2007 through the Petition Date. This does not include initial mark-up of UCBI and Syntroleum because they were ascribed a zero cost basis.

[437] See, e.g., Series N Offering Memorandum at 1.

month-end, suggesting there had been an unrealized gain of $76.3 million

on the position within the same month the investment was made.

- On February 25, 2011, FILB made an investment in a warrant issued by

    HPG that had been acquired for $1 million.  By February 28, 2011 – the

    next business day – FAM had marked the position at $25.7 million.  This

    effectively meant that for $1 million spent by FILB, FAM received credit

    for $24.7 million in earnings, which on the margin would result in an

    approximate $5 million fee.

In all three examples, there had been no fundamental development at any of these companies that

would have justified marking up the values.  Similar markups were taken for seven other

investments.

      In most cases, FAM continued to mark up the value of these positions over time.

On a combined basis, these ten positions at their highest marks were purportedly worth an

aggregate of $454 million, whereas actual realization on these investments was $60 million, or

13% of the highest aggregate marks taken.  All of these transactions are set out in the chart on

the following page.

| Company (in $ millions) | Investment Date | Cost Basis | Initial Mark | Date | Initial Markup | Highest Mark | Date | Sale Proceeds[438] | Date of Sale |
|---|---|---|---|---|---|---|---|---|---|
| AGEN | 8/31/2007 | $5.0 | $10.5 | 8/31/2007 | 2.1x | $11.0 | 10/31/2007 | $15.5 | 10/2007-04/2011 |
| SYNM - Initial[439] | 11/18/2007 | 0.0 | 2.2 | 11/30/2007 | NA | 13.2 | 6/30/2008 | 0.0 | 10/14/2009 |
| SYNM - 10/2009 | 10/14/2009 | 4.0 | 10.3 | 10/30/2009 | 2.6x | 10.8 | 12/31/2009 | 9.7 | 11/2009-06/2010 |
| SYNM -12/2009 | 12/24/2009 | 6.1 | 8.6 | 12/31/2009 | 1.4x | 8.6 | 12/31/2009 | 0.0 | 11/2009-06/2010 |
| SYNM - 04/2010 | 4/15/2010 | 3.9 | 2.9 | 4/30/2010 | 0.7x | 3.1 | 3/31/2011 | 0.0 | 11/2009-06/2010 |
| KCAP | 4/22/2008 | 0.3 | 0.3 | 4/30/2008 | 1.0x | 0.4 | 5/31/2008 | 0.1 | 04/2008-10/2008 |
| Raser-Initial[440] | 11/28/2008 | 20.0 | 34.4 | 11/30/2008 | 1.7x | 43.9 | 3/31/2009 | 14.4 | 06/2009-04/2010 |
| Raser - Follow up | 1/29/2010 | 5.0 | 25.4 | 1/31/2010 | 5.1x | 26.3 | 2/28/2010 | 0.0 | 03/2011-06/2011 |
| Raser - Follow up warrant | 1/29/2010 | 0.0 | 4.9 | 3/31/2011 | NA | 4.9 | 3/31/2011 | 0.0 | NA |
| SMHG[441] | 12/16/2009 | 15.7 | 21.7 | 12/31/2009 | 1.4x | 40.3 | 4/30/2011 | 15.3 | 04/2010-02/2012 |
| ANTS - Initial | 3/15/2010 | 4.4 | 17.3 | 3/31/2010 | 3.9x | 38.0 | 8/31/2010 | 4.2 | 6/2010-1/2012 |
| ANTS - BRG | 12/31/2010 | 3.0 | 24.8 | 12/31/2010 | 8.3x | 24.8 | 12/31/2010 | 0.7 | NA |
| UCBI[442] | 4/1/2010 | 0.0 | 76.3 | 4/30/2010 | NA | 173.8 | 9/30/2011 | (3.3) | NA |
| DSS | 12/31/2010 | 4.0 | 23.6 | 12/31/2010 | 5.9x | 23.6 | 12/31/2010 | 3.1 | 02/2011-06/2011 |
| Seven Arts | 1/4/2011 | 0.4 | 0.3 | 1/31/2011 | 0.8x | 0.3 | 2/28/2011 | 0.2 | 5/6/2011 |
| HPGS | 2/25/2011 | 1.0 | 25.7 | 2/28/2011 | 25.7x | 30.7 | 5/31/2011 | 0.0 | NA |
| *Cost-weighted Average* | | | | | *2.7x* | | | | |
| *Median* | | | | | *2.3x* | | | | |
| *High* | | | | | *25.7x* | | | | |
| *Low* | | | | | *0.7x* | | | | |

[438] All sale proceeds include amounts transferred to carry accounts as of the value of the day of the transfer.

[439] SYNM warrants issued after settlement of the litigation in October 2009 did not include a cashless exercise provision. Sales proceeds for SYNM includes the sale of common stock from all investments in SYNM.

[440] The initial investment was $10 million but FAM marked it as though a $20 million investment had been made. Sale proceeds for Raser include sale of common stock from all phases of investments in Raser.

[441] The highest mark includes Madison Williams (highest mark assumed to be $14.4 million as per June 30, 2011 FILB schedule of investments). The initial markup for Edelman Financial and Madison Williams includes mark of $5 million for Madison Williams. The initial markup of position is based only on the $12.5 million initial investment.

[442] Does not reflect the FILBCI Settlement.

-181-

The artificially high valuations arising from initial markups resulted in redemptions at inflated values, and the Trustee believes that those valuations contributed to the calculation of excessive fees paid to FAM and its affiliates.

### d)        Non-Standard Cashless Warrant Exercise Provisions

There were seven warrant positions in FILB's portfolio that contained unusual provisions for their cashless exercise:  Raser, UCBI, Edelman Financial, DSS, ANTS, HPG and Syntroleum.

It is not uncommon for warrant contracts to provide for the cashless exercise of warrants.  In essence, the warrant holder is able to realize the economics of its warrant position without actually having to put up any cash.  Upon exercise, the issuing company can simply deliver a number of their underlying shares the value of which, in the aggregate, is equal to the intrinsic value[443] of the warrant contract.  All that the "cashless" exercise feature of the warrants does is save the holder from having to come up with the strike price in advance; the cashless exercise feature does not create any incremental value.

The market-standard formula for calculating what is due to the holder of a cashless exercise warrant is as follows:

---

[443] The value of a warrant is composed of its intrinsic value and its time value.  A warrant is only exercised when the current stock price exceeds the warrant strike price – i.e., the warrant is "in-the-money."  Assuming the warrants are "in-the-money," the intrinsic value of a warrant is the net value received by the investor after warrant exercise costs.  The time value of a warrant represents value expected to be realized from exercising the warrant in the future as a result of exposure to continuing stock price movements before the warrant's contractual maturity.

$$X = N(S-K)/S$$

where:

X = the number of shares of stock to be issued pursuant to the cashless exercise

provision

N = the number of shares of stock for which this warrant is being exercised

without a cashless exercise provision

S = price per share of the stock

K = the exercise price for the stock

This same formula is also set out in accounting literature.[444]  In effect, the formula

calculates the number of shares of common stock that must be given to the warrant holder in

order to compensate the investor for how much the warrant is "in-the-money."

The following example demonstrates the application of the cashless exercise

provision in a scenario where a holder has a warrant to purchase 100 shares of common stock at

an exercise price of $5 per share.  The cost to exercise the warrant is $500, which is the product

of the $5 strike price and the 100 shares receivable pursuant to the warrant contract.  If the stock

is trading at $20 per share, the warrant would have an intrinsic value of $15 per share, which is

the difference between the $20 stock price and the $5 strike price.  In a regular cash exercise, the

warrant holder would pay $500 to exercise the warrant and receive 100 shares of stock worth

$2,000.  This investor would net $1,500 – the intrinsic value of the warrant.  With cashless

exercise, the warrant holder would not pay any cash; instead he would receive 75 shares of stock

trading at $20 per share, and the stock would be worth $1,500.  Thus, the cash and cashless

---

[444] FASB, <u>Definition of a Derivative: Contracts That Provide for Net Share Settlement</u>, Derivatives
Implementation Group, Statement 133 Implementation Issue No. A 17,  Mar. 21, 2001.

exercise scenarios provide the holder with the same economics but through a different mechanism.

The formula for cashless exercise in the FILB contracts did not conform to market standard terms.  Instead, the FILB contracts contained a formula to determine the number of shares to be issued following a cashless exercise as follows:

$X = N(S-K)/K$

where:

$X$ = the number of shares of stock to be issued pursuant to the cashless exercise provision

$N$ = the number of shares of stock for which this warrant is being exercised without a cashless exercise provision

$S$ = price per share of the stock

$K$ = the exercise price for the stock

Thus, the FILB contracts used a formula in which the denominator was the strike price of the warrant ($K$) rather than the current stock price ($S$).  The use of the strike price in the denominator would result in a windfall profit because in any scenario where an investor would want to exercise the warrant, the strike price would be lower than the current price.

Applying the FILB contract to the example above, the warrant holder with the cashless exercise feature found in FILB's contracts would receive 300 shares of common stock instead of 75 shares.

Using the same example, for various stock prices, the graph below compares value received with the erroneous cashless formula to value received with the correct formula:



Comparison of Cashless Exercise Formulas

As shown in the graph, the non-standard formula results in dramatically higher values at high stock prices. Even if the warrant is currently "out-of-the-money," the expectation of large future payoffs in high stock price scenarios would result in a large theoretical value being ascribed to such warrants. FAM used these theoretical valuations to mark up the FILB warrant positions to multiples of their cost. Some of these warrants represent positions on which FILB took immediate markups.

All of the seven major new warrant investments made by FAM since 2007 were initially executed with the non-standard cashless exercise formula. However, as described more fully in Section IV.K.2 above, UCBI discovered the non-standard formula shortly after the April 2010 initial closing and insisted that it be changed to the standard formula. The warrant contract was amended by the parties in June 2010. Following this amendment, FAM reduced the FILB valuation of the initial warrant reduced by 80%. Similarly, when the Syntroleum contract,

originally executed in November 2007, was amended in October 2009 (following the litigation

between FILB and Syntroleum as described in Section IV.I) all cashless exercise provisions were

eliminated, so warrants issued after that date could not be marked above the investment amount.

In light of these amendments, FAM was aware that FILB's ability to capture the

full value of the non-standard cashless exercise was far from certain but took no discount.

Likewise, Quantal should have questioned the validity of the non-standard contractual cashless

exercise terms in all the FILB warrant contracts, but did not.  There is also no evidence that

Quantal confirmed the terms of the contracts with the issuing companies.  Furthermore, neither

FAM nor Quantal appears to have conducted any market checks to determine if these non-

standard terms ought to be carried at full theoretical value or if discounts were appropriate to

account for the litigation risk associated with these terms, or for the uncertain reaction in the

market to seeing a formula so materially different from the standard formula.  Finally, neither

FAM nor Quantal appears to have evaluated the issuing company's own valuation of these

warrants.

As an example, six months after the UCBI contract was amended, FILB executed

a warrant contract with DSS with the non-standard cashless exercise formula.  Quantal does not

appear to have questioned this non-standard provision in the DSS contract.  As part of its

financial reporting, DSS ascribed a value of $3.9 million[445] to the warrant.  This valuation was

well below FILB's initial mark of $19.5 million.[446]

Similarly, on February 25, 2011, FILB invested $1 million to purchase a warrant

from HPG. The position was immediately marked at $25.7 million.  This valuation again gave

---

[445] DSS Form 10-K for the Year Ending Dec. 31, 2010, at F17.

[446] FILB Holdings Report for the Month Ending Dec. 31, 2010.

credit for the non-standard cashless exercise formula, despite the Syntroleum and UCBI experiences.[447]

Based on market conversations, the Trustee believes that market participants would not have attributed anything close to the value that FAM and Quantal attributed to FAM's off-market formula. The warrants with the non-standard formula would have been considered suspect and subject to litigation risk from the issuing company.

### e)    Lack of Fundamental Analysis

The PIPEs and warrants in the FILB portfolio were often issued by companies such as Raser and ANTS that were in dire need of capital to continue as going concerns. In valuing these positions, no weight was given to the level of financial distress of these companies and to the probability of default. Neither FAM nor Quantal performed any fundamental analysis of the companies as part of their valuations. None of the 155 Quantal valuation reports of PIPEs reviewed by the Trustee contained any fundamental analysis of the underlying issuing company.

FAM's valuation of Raser is a good example. In its September 30, 2008, Form 10-Q filed on November 13, 2008, the same day that FILB entered into the agreement with Raser to make its $20 million investment, Raser disclosed that it would require incremental financing over and above what FILB had just invested in order to continue as a going concern.[448] As discussed in Section IV.G, FAM nevertheless, on November 30, 2008, marked the Raser position at $34.4 million based on a valuation that did not consider the going concern issues at Raser.

---

[447] Only the AGEN positions were exercised on a cashless basis using a non-standard formula. The strike price on the AGEN warrants was always determined by reference to an average stock price over a look-back period. Thus, the strike price would be relatively close to the market price, minimizing the difference in results between the two formulas.

[448] Raser Form 10-Q, Nov. 13, 2008, at 10.

By year-end 2008 (19 days after the second tranche of the $20 million was funded), Raser had depleted most of the $20 million FILB cash infusion, and was left with only $1.5 million in cash on its books. Despite the decline in Raser's stock price, FILB marked up its entire $20 million Raser investment from $34.4 million as of month-end November 2008 to $39.8 million as of December 2008, for an additional gain of 16%.[449]  As part of Raser's 2008 audit, released on March 16, 2009, Raser's auditors expressed substantial doubts about Raser's ability to continue as a going concern, despite the recent $20 million infusion from FILB.[450]  On March 31, 2009, two weeks later, FAM nevertheless marked the entire Raser investment at its highest value to date, at $43.9 million. In January 2010, FILB made a $5 million follow-on investment in Raser. On the same day, FAM marked the new separate position at $25.4 million, booking an immediate unrealized gain (all fictional) of 408%.[451]  Raser filed for bankruptcy in April 2011.

FILB's investment in ANTS also should also have been discounted for the uncertain financial prospects of the company. In the first half of 2010, ANTS' financial position was tenuous, and it is likely that the company would have filed for bankruptcy without FILB's investment during this period.[452]  Nonetheless, 16 days after its March 15, 2010, investment of $1.5 million, FAM marked that investment at $17.3 million on the same day that ANTS' auditors raised issues about its ability to continue as a going concern.[453]  FILB's subsequent ANTS

---

[449] FILB Holdings Report for the Month Ending Dec. 31, 2008.

[450] Raser Form 10-K for the Year Ended Dec. 31, 2009, at F-2.

[451] FILB Holdings Report for the Month Ending Jan. 31, 2010.

[452] ANTS 2010 Form 10-Q, May 24, 2010, at 24.

[453] ANTS Form 10-K for Year Ended Dec. 31, 2010, at F-1.

investments represented an unsuccessful attempt to shore up a legacy investment, and also do not appear to have been valued with any consideration for the financial distress at the company.

The HPG warrant is another example of a valuation that ignored the fundamental financial condition of the issuer. Two days after FILB made a $1 million investment in the HPG warrant on February 25, 2011, FAM marked the position at $25.7 million. However, in July 2010, in November 2010, and again in April 2011, HPG disclosed that, for the years ended December 31, 2010 and December 31, 2011, its auditors had expressed significant concern about its ability to continue as a going concern. [454]

### f) Insufficient Discounts and Flawed Model Inputs

### (i) Warrants

FILB's warrants and rights were complex, customized investments valued using custom-built theoretical models. In producing the valuations reflected on FILB's books, neither FAM nor Quantal applied adequate discounts to account for the illiquidity and complexity of the investments.[455]

Warrants typically trade in investor-to-investor transactions at significant discounts to their theoretical model values. Research by Pluris,[456] suggests the time value discount for out-of-the-money warrants should be approximately 57–67%. Quantal was not aware of this study and did not rely on it.[457] Indeed, with the exception of ANTS, Quantal did

---

[454] See Northern Exploration, Ltd. (now known as HPG) Form 10-K for Year Ended Dec, 31, 2010 at 20; HPG Form 10-Q, Nov. 22, 2010, at F-8; HPG Form 10-K for Year ended Dec. 31, 2011, at 23, F-1.

[455] The only "discount" that Quantal applied was a reduction of the stock volatility input to its theoretical models by 25%. Quantal's approach does not discount for lack of liquidity and marketability. The Trustee believes that Quantal should have applied a true liquidity discount to its model outputs.

[456] Shannon Pratt, Business Valuations, Discounts and Premiums, 117–18 (2d ed. 2009).

[457] Marsh Dep. 189:7–11, May 7. 2013.

not apply any liquidity discount to the FILB warrants.  For the ANTS investment, Quantal used

only a 15% discount on the basis of studies related to restricted stock, a security that is very

different from the investments in the FILB portfolio.[458]

FILB's warrants had several characteristics that supported the application of large

valuation discounts:  they were complex, long-dated, out-of-the-money at issuance, and

represented a significant volume of the issuer's common stock if exercised.  They also were

generally issued by companies that were small and sometimes in questionable financial

condition.[459]  However, none of these factors appears to have been taken into consideration in a

meaningful way by either Quantal or FAM in determining valuation discounts.

For the period prior to September 2011, for the most part, FAM took Quantal's

valuations and then applied discounts to them that were well below those prescribed based on

empirical evidence on valuation discounts for warrants.  For the period after September 2011 –

when AF was plainly under pressure from the Louisiana Pension Funds – FAM largely accepted

Quantal's valuations without any additional discounts.  This was the same period in which

warrants became an increasingly large portion of the FILB portfolio.  Further, there is no

evidence that FAM took into consideration its own need to meet weekly investor redemptions in

discounting these illiquid positions.

Other incorrect assumptions in Quantal's models included stock volatility that did

not reflect the maturity of the warrants being valued; stock ownership limits that were arbitrarily

---

[458] Quantal arrived at the 15% discount on the basis of studies related to restricted stock, a security that is very different from the investments in the FILB portfolio.  Quantal Valuation Report of ANTS as of Mar. 31, 2010, 7 (July 11, 2010) (citing Mukesh Bajaj, Denis J. David, Stephen P. Ferris, and Atulya Sarin, Firm Value and Marketability Discounts, 27 JOURNAL OF CORPORATION LAW, 89–115 (2001)).

[459] For example, in July 2010, more than six months before the company issued warrants to FILB, the auditors of HPG expressed substantial doubt about its continued viability as a going concern.

increased based on representations by FAM; incorrect coupon rate assumptions for preferred

stock instruments including Helix, ION and Raser; and several incorrect assumptions related to

the valuation of Richcourt Holding and Madison Williams.  These errors, had they been

corrected, would have had a material impact on the valuations produced.

**(ii)    PIPEs**

The use of theoretical model-based valuations is inappropriate when pricing

information is available from market transactions or from other market sources.  While models

can be used in the absence of reliable market data, the model must be applied with prudence and

care.  Quantal and FAM used inappropriate model inputs that produced erroneous results.  While

the Trustee does not intend to provide an exhaustive review of all deficiencies in the Quantal and

FAM model inputs and illiquidity discounts, a few selected examples follow.

<u>Modification of Contractual Terms</u>

FAM and Quantal assumed that contractual terms in investment contracts could

be modified without actually receiving the consent from the issuing companies.  For example,

FILB's stock ownership in an issuing company was typically limited to approximately 20%.  In

the case of Helix, FAM and Quantal[460] assumed this limit could be raised to 44%.  The effect of

this was to increase the valuation of the position that would have otherwise resulted if the

contractual 20% limit had been applied.

<u>Erroneous Dividend Rates and Discount Rates applied to Convertible Preferred Positions</u>

Quantal used incorrect dividend rates and discount rates in arriving at values for

FILB's convertible preferred PIPEs positions.  For example, Quantal used a 30-year Treasury

rate, which is a fixed rate, as the basis for the dividend stream calculation on Raser when the

---

[460] Quantal Valuation Report of HPG as of Dec. 31, 2008 (Feb. 2, 2009).

contract called for the coupon rate to be based on 3-month LIBOR.  If the proper base rate for the

dividend had been assumed, the resulting valuation would have been lower because 3-month

LIBOR was consistently lower than the 30-year Treasury.  Furthermore, Quantal discounted

projected dividends at inappropriate discount rates.  For example, Quantal discounted the

dividend stream from the UCBI preferred stock FILB had contracted to buy using a risk free rate

of interest despite the obvious stressed conditions at the bank that was one of the reasons for the

transaction with FILB.

Failure to reflect assumptions following changes to contractual terms

Quantal does not appear to have updated its valuation assumptions following the

change in contractual of certain FILB investments.  For example, when the Helix convertible

preferred stock conversion price was reset on February 27, 2009,[461] both FILB's redemption

privilege as well its ability to receive dividends in common stock were eliminated.  Quantal had

ascribed significant value to both these options.  In its valuation of FILB's Helix positions as of

December 31, 2009, Quantal appears to have assumed that the company could continue to make

dividend payments in common stock and that the convertible preferred stock retained the

redemption provision.  Other Quantal valuation memos were similarly out-of-date.[462]

g)    **Lack of Corroborative Evidence For Valuations From Market Participants**

Neither FAM nor Quantal contacted any market participants as a cross-check to

the valuation modeling methodologies, model inputs and discounts.  The FAM investment

processes began with confidential negotiations of complex PIPEs and warrant terms with issuing

---

[461] Helix Form 10-Q, May 11, 2009 at 9.

[462] At varying times FAM or Quantal also assumed litigation wins.  This materially increased the value of various holdings.

companies.  Turner noted that the FILB investments had several proprietary features that made

them unique.[463]  AF never wanted to describe what Turner called the "bells and whistles" of the

FILB deals to outsiders.  When asked how FILB expected to get value by selling its positions

without disclosing those features, Turner said that that was why they converted the positions.

They apparently were never marketed to third parties.  While AF has pointed to these special

features as a source of value in fact it is difficult to see how they could be.

### h)    UCBI Investment

FAM's valuations of the UCBI investment were flawed in several respects,

among them ascribing full theoretical value to non-standard cashless exercise provisions, failing

to account for litigation risk, applying inadequate discounts for lack of marketability, and failing

to account for the impact of the penalty payable to UCBI for failing to purchase UCBI Preferred

Stock before May 2011 and May 2012.

The UCBI investment initially closed on April 1, 2010.[464]  At that time, FILB

received the Initial Warrants and the contract to buy Preferred Stock.  As of April 30, 2010, only

the Initial Warrants were ascribed value on FILB's books.  As discussed above, no value was

ascribed to the contract to purchase the Preferred Stock or the Additional Warrants that would be

issued if and when the Preferred Stock investment was made.  The Initial Warrants were entered

into the books of FILB with a zero cost basis and an initial value of $76.3 million, creating the

illusion of an immediate unrealized gain of $76.3 million.

---

[463] Turner Interview.

[464] UCBI Form 10-Q, Aug. 4, 2010, at 19.  As of the closing on April 1, 2010, UCBI had marked the
Initial Warrants at $17.6 million.  In April 2010, the price of the UCBI common stock rose 22%;
however, during that time period FAM marked FILB's position up 330%.

Although FILB relied on a valuation of the UCBI warrants provided by Quantal, the Quantal valuation was wholly unreliable. Most importantly, Quantal did not account for the non-standard cashless exercise formula. Given the fact that the UCBI position as valued represented approximately 35% of the value of FILB's gross portfolio as of April 30, 2010, Quantal should have assessed the likelihood that the theoretical valuation embedded in non-standard terms could be realized in an arms-length transaction. The impact of this unquestioning acceptance of the non-standard formula is demonstrated by the reduction in the value of these warrants to $14.9 million once the formula was corrected.

By June 17, 2011, UCBI's stock price had declined from $4.77 (its price as of the April 1, 2010 closing) to $2.04 per share.[465] On this date, UCBI effected a 1:5 reverse stock split, meaning that for every five shares of UCBI common stock owned, shareholders would now own one share. All else being equal, such a reverse stock split would have the effect of making the stock price rise automatically by a factor of five. In fact, at the time of the reverse stock split, the UCBI stock went from $2.04 to $10.20 per share. Regardless, FAM took the position that the original $4.25 strike price of the UCBI warrants would remain unchanged, rather than going up by a multiple of five to $21.25. By extension, FAM contended that the UCBI warrants, which previously had no intrinsic value, were now "in-the-money" by $5.95 per share because the warrants had a strike price of $4.25 and the stock had risen to $10.20.[466] While there is New York law supporting this position, in valuing the UCBI position on FILB's books, FAM ascribed no weight to any litigation risk associated with its position on the strike price and marked up the UCBI position on the assumption that the strike price continued to be $4.25 (rather than $21.25).

---

[465] Bloomberg Historical Stock Price Ticker for June 17, 2011; UCBI Form 10-Q, May 5, 2010, at 19.

[466] Bloomberg Historical Stock Price Ticker for June 17, 2011.

This valuation resulted in a $91.5 million gain on the UCBI position in the month of June 2011.[467]  Using FAM's valuation and applying a litigation risk of 50% would have resulted in a mark of $61.1 million.

Quantal later adopted the same position in its January 2012 valuation of the assets being used to attempt to satisfy the Louisiana Pension Funds' redemption requests.  FAM and Quantal then valued the UCBI Preferred Stock and Warrants at $143.1 million (perhaps coincidentally, matching the amount needed to satisfy the redemption request).[468]  Adjusting for a discount for liquidity, even on a purely theoretical mark-to-model basis, using the original $4.25 strike price without taking any litigation risk into consideration, the Trustee's analysis indicates that the value should have been no higher than $7o million.[469]  Quantal also proceeded on the assumption that there would be no change in the strike price based on its understanding of the legal precedent, without considering any litigation risk at all.[470]  The Cayman Islands Court rejected FAM's valuation of the UCBI Warrants (finding among other things that the shares of FILBCI and the corresponding contract to purchase the UCBI preferred stock were "commercially worthless when compared to the debt it purports to redeem") and rejected the notion that they could support an "in kind" redemption of the Louisiana Pension Funds' redemptions.[471]

---

[467] FILB Holdings Report for the Month Ending June 30, 2011.

[468] FILB Holdings Report for the Month Ending Feb. 29, 2012.

[469] This valuation reflects the application of a 50% valuation discount to the FILB mark of the entire UCBI position as of February 2012.

[470] Quantal Valuation Report of UCBI as of June 30, 2011 (July 24, 2011)

[471] Cayman Winding Up Order at 119.

FAM and Quantal also failed to apply appropriate discounts for the lack of marketability of the UCBI warrant and preferred contract.  These UCBI investments were unique, complex instruments that were customized by FAM after extensive negotiations.  The UCBI investment would be of potential interest to only a handful of sophisticated, institutional investors.  There was no guarantee that any prospective investor would have any interest, and even if it did that it would use either the same model or any of the same assumptions underlying the model.  The reality that, in order to obtain any value from the warrants attached to the preferred shares, an investor would have to invest $65 million in new money in a small troubled regional bank was not even considered.  FAM and Quantal should have substantially discounted any model-based valuation, but they did not.  In fact, as discussed above, Quantal's Terry Marsh testified that he did not take into consideration available research on appropriate warrant discounts.[472]

FAM and Quantal also failed to account adequately for the $6.5 million penalty fee (equal to 10% of the face amount of preferred) payable to UCBI for not purchasing any preferred stock by May 26, 2012 (later extended to at least July 3, 2012).[473]  In the event the holder of the preferred contract chose not to purchase the preferred, it would be required to make a payment to UCBI equal to $6.5 million, of which $3.25 million remained unpaid.  FAM and Quantal only considered scenarios in which the Preferred was acquired.  This was unrealistic.

---

[472]Marsh Dep. 188:11-189:11, May 7, 2013.  Marsh was not familiar with the Pluris study (Espen Robak, CFA, Discounts for Illiquid Shares and Warrants: The LiquiStat™ Database of Transactions on the Restricted Securities Trading Network (Pluris Valuation Advisors eds., Jan. 22, 2007) that was cited by Pratt as the leading industry research report on actual discounts for trades in illiquid warrants between actual market participants. Marsh Dep. 188:11–189:11; see Shannon Pratt, Business Valuations, Discounts and Premiums, 117 (2d ed. 2009).  The report concluded that actual discounts to Black-Scholes based valuations of private out-of-the-money warrants were in the range of 57% to 67%. Id.

[473] UCBI Securities Purchase Agreement; Prospectus for the Issuance of the 65,000 shares of Series C Convertible Preferred Stock, Feb. 10, 2012; Quantal Valuation Report of UCBI as June 29, 2011 (Jan. 29, 2012).

### i)     IAP/EIC Note Valuation

The value of the $27 million IAP/EIC Note was crucial to the viability of the Funds.  The IAP/EIC Note was an asset of Leveraged.  If the Note's fair value fell below a certain level (approximately $18 million as of December 31, 2008) then, all else being equal, the compulsory redemption provisions of the Leveraged Series N Shares held by the Louisiana Pension Funds would have been triggered, causing a collapse of the whole structure.

FAM asked Quantal to conduct several valuations of Richcourt to support FAM's valuations of the IAP/EIC Note in connection with its 2008 and 2009 year-end audits.  Quantal's valuation analyses were accordingly given to both Grant Thornton and Eisner.  Quantal's analyses concluded that the Note's value was unimpaired at the end of both 2008 and 2009.  However, Quantal's valuations were flawed.

While the value of the IAP/EIC Note was tied to the value of Richcourt Holding, a proper valuation of the Note would have taken into account not only the value of Richcourt Holding, but also the specific terms and characteristics of the Note.  Even if the value of Richcourt had exceeded the $27 million face amount of the Note, the Note was not necessarily worth $27 million.  For example, the Note was unsecured and had no covenants and for a period of time no set interest coupon.  The borrower was not Richcourt Holding but rather a holding corporation with no apparent assets other than the equity of another entity that had an indirect 85% interest in Richcourt Holding.  The Note never actually paid any cash interest.[474]  Given these numerous deficiencies, it is doubtful that any other investor would have had any interest in it, and anyone valuing the Note should have taken a considerable discount for its illiquidity.

---

[474] Cash Model.

These facts alone, without regard to the underlying valuation of Richcourt, materially diminished the value of the Note.

Apart from its failure to consider the intrinsic defects in the Note, Quantal's analysis of the value of the Richcourt Group at year-end 2008 was deeply flawed in the following ways:

1.     Quantal recognized that it was important to start with a correct measure of Richcourt Holding's AUM as of year-end 2008 that would be generating future fee income, and then to apply an appropriate multiple to that number.  However, Quantal did not value Richcourt Holding using this principle.  It used an incorrect AUM figure of $1.1 billion.[475]

2.     The analysis did not take into account pending redemptions that had not been paid out by year-end 2008, and as a result the AUM number would have been materially overstated. [476]

3.     Quantal seemingly was not even aware of crossholdings (i.e., where one Richcourt fund invested in another and not additional fees were generated as a result) that were significant ($58 million as of December 31, 2008, and where no additional fees are generated as a result and essentially "double counted" these assets.[477]

4.     The analysis did not consider that Richcourt Holding had put certain illiquid assets into designated funds, or "sidepockets," and that once the assets were liquidated

---

[475] Apart from using erroneous AUM numbers, Quantal justified the multiple it applied to that AUM by using absurd comparables, such as Fortress and Blackstone which are publicly traded entities with AUM in excess of $20 billion.  While it applied a 20% discount to the multiples applicable to those entities, such a reduction does not begin to deal with the absurdity of comparing a failing fund of funds business to those financial giants.

[476] See 2008 Richcourt Holding Audited Financial Statements.

[477] Quinn Dep. 65:24, May 8, 2013.

the proceeds would be returned to investors. Any AUM placed in these sidepockets would not qualify as AUM because any fee income they might generate would only last for a limited amount of time. To the extent any value was ascribed to AUM in sidepockets it ought to have been valued separately or not at all; this was not done.

5.      Not only would correcting the AUM figure affect future fee generation, but the fact that NAVs and redemptions had been suspended, gates had been imposed,[478] and assets had been sidepocketed would have most certainly led to concerns among existing and prospective clients about the future viability of Richcourt Holding given its small size and the deterioration in its AUM since the FAM acquisition, and put Richcourt Holding's entire business at risk in the short term.

6.      The analysis did not evaluate AUM trends or performance records of the Richcourt Funds. The trends, performance records and fee structures varied by fund and had varying impacts on projected revenues.

7.      The analysis made no reference to the client base with respect to any particular client concentrations and the outlook for those clients to remain with the funds. There was also no discussion about any pipeline of potential new clients. All of this was critical since there were no contractual protections against a loss of AUM. In addition, there were, in fact, client concentration issues. For example, 90% of the AUM of RFA-Richcourt Paris was attributable to a single investor.[479]

8.      The Quantal valuation did not evaluate performance track records on an absolute or on a relative basis to peers basis across the different Richcourt Holding products. If

---

[478] See 2008 Richcourt Holding Audited Financial Statements. This information was available as of the time Quantal performed its valuation.

[479] Turner Interview.

the underlying Richcourt products did not have a competitive performance track record they would have been at risk of losing AUM. Furthermore, not all AUM was of equal value because the different funds had varying fee structures. For example, the Soundview and Pitagora funds only earned management fees while Richcourt Holding branded funds and the RFA-Richcourt Paris funds earned management and incentive fees.[480] Because the value of Richcourt Holding was ultimately derived from fees generated by the underlying fund products, an analysis of the likely future business prospects for each of those products that acknowledges their varied fee structures was a key consideration.

9.      The analysis did not consider that Richcourt Holding would be at risk of operating with minimal cash flow, a fact that Quantal should have known because it was highlighted in the Grant Thornton due diligence report prepared for FAM in connection with the acquisition.[481]

10.     The analysis did not consider the human capital of the Richcourt Business and specifically the fact that there was concern that the largest producer in the RFA-Richcourt Paris office might leave and take all his clients with him if FAM were to acquire Richcourt Holding.[482]

As part of its 2008 valuation report, Quantal also performed a discounted cash flow analysis on Richcourt Holding based on financial projections in Richcourt's five-year business plan. As was the case with the AUM based multiple analysis, the discounted cash flow analysis performed for 2008 was also fatally flawed. Underlying the discounted cash flow

---

[480] Richcourt Holding Audited Financial Statements at 14–16.

[481] Grant Thornton Due Diligence Report at 52.

[482] Turner Interview. Moreover, Richcourt had only twelve employees when it was acquired by FAM. Grant Thornton Due Diligence Report at 14.

analysis were financial projections that made the wholly unrealistic assumption that Richcourt

Holding would be able to acquire one fund of funds entity per year commencing in 2011, with no

discussion of how Richcourt Holding would accomplish or finance this result.  Furthermore, the

cash flow projections were discounted at a risk free rate plus 9% without adequate support of

why this was the appropriate discount rate for a fund of funds company facing financial distress.

By failing to acknowledge the extremely challenging business conditions that existed at year-end

2008, Quantal implicitly and improperly based its 2008 year-end valuation on a false premise –

that the Richcourt Holding business model was stable and sustainable, and therefore could

support the premises underling the five-year projections.  This assumption, in turn, improperly

supported FAM's valuation of the IAP/EIC Note as of year-end 2008.

Quantal's year-end 2009 valuation was similarly flawed.[483]  Apart again from its

failure to consider inherent defects in the IAP/EIC Note, the 2009 valuation analysis was based

on the assumption that the Richcourt Funds had AUM of $622 million as of year-end 2009,

notwithstanding that by year-end 2009, ███████████████ that actual AUM was $104

million without RFA-Richcourt Paris and $388 million with RFA-Richcourt Paris.[484]  RFA-

Richcourt Paris was not part of the initial closing of the Richcourt acquisition, as it required

regulatory approval, and did not close until October, 2010. ████████████████████

█████████████████████████████████████████████████,[485]

███████████████████████████████ The loss of these redeeming clients would

mean that by the end of January 2010, RFA-Richcourt Paris would not be able to maintain that

---

[483] Quantal Valuation Report of the Richcourt Group as of December 31, 2009 (Apr. 1, 2010).

[484] ██████████████████████████████████████████

[485] ████████████████████████████████████████████████

fund or its track record, and would have no viable funds to market.[486]  While the date of

Quantal's 2009 Richcourt Holding valuation was April 19, 2010, by the time the acquisition of

RFA-Richcourt Paris actually closed in October 2010, its AUM turned out to be zero or close to

zero.[487]

Apart from using erroneous AUM numbers for 2009, Quantal applied a multiple

to the overstated AUM based on the multiple that would be applied to large publicly traded funds

like Blackstone, Fortress and MAN group with AUM in excess of $20 billion.  While Quantal

discounted those multiples by approximately 20% that was plainly insufficient given the vast

difference between these $20 billion plus companies and a declining fund like Richcourt.

Quantal also purported to value Richcourt Holding as of year-end 2009 based on a

multiple of earnings.  While Quantal labeled the section "EBITDA-based Multiple," EBITDA

was not in fact used in the valuation.  Instead, Quantal estimated that Richcourt Holding's

estimated earnings were $1.3 million, while Richcourt Holding's 2009 draft financials indicated

that net operating income was $18,669.  Quantal then applied a 27 times earnings multiple to

Richcourt Holding's adjusted earnings of $1.3 million to arrive at an estimated value for

Richcourt of $35.9 million.

Quantal described performing a 2009 discounted cash flow analysis that was

predicated on financial projections assuming Richcourt Holding would grow its EBITDA at a

6% rate into perpetuity, an aggressive assumption for which Quantal provided no support.

Furthermore, there is no disclosure of what actual EBITDA number was assumed, which is of

particular concern because according to Richcourt Holding 2009 draft financials, EBITDA was a

---

[486] RFA-Richcourt Paris was attempting to obtain a capital commitment from FAM to keep the fund
operational.

[487] ████████████████████████████████████

mere $59,608.  In addition, the discount rate applied to the projections was the risk free rate plus

6% without adequate support of why this was the appropriate discount rate for a fund of funds

company with a highly impaired business model.

FAM submitted to the SEC a report by Charles Rivers Associates attempting to

defend the Quantal valuation in light of Eisner's very different conclusion as to the value of the

IAP/EIC Note.[488]  The CRA report does not endorse any particular valuation of Richcourt

Holding.  In attempting to reconcile the Eisner and Quantal 2009 valuations, the CRA report

argues that the difference can largely be explained by Eisner's reliance on redemption requests

that were made after the Quantal valuation was completed.[489]  This conclusion is, however,

wrong.  The redemption requests were known to Richcourt Holding prior to the Quantal report,

and would dramatically reduce AUM once they were honored.  Therefore, not only would it have

been possible for Quantal to have considered pending redemptions, it was essential that Quantal

do so.

CRA also attempts to explain away Quantal's use of entities like Blackstone and

Fortress as comparables as mere differences in judgment.[490]  In fact, use of these comparables

was totally unjustified.  The comparables Quantal used would be the equivalent of using Wal-

Mart's valuation multiple to value a hardware store located across the street from a Wal-Mart.

### j)    Madison Williams

As discussed in Section IV.H, in November 2009, a consortium of investors

(including FILB) purchased Madison Williams out of SMHG at an approximate value of $16.0

---

[488] Charles River Associates Report dated January 8, 2012 (the "CRA Report") (opining on whether the valuation process employed by FAM were consistent with GAAP and customary valuation processes).

[489] CRA Report at 7-8.

[490] Id. at 4.

million.[491]  In January 2011, when Madison Williams had been a standalone business for just

over a year, Quantal (at FAM's request) prepared a valuation of Madison Williams.  In that

report, Quantal pegged the value of 100% of Madison Williams at $46.5 million as of December

2010,[492] which translated into a carrying value for FILB of $14.4 million, a valuation that the

Trustee believes contributed to the calculation of excessive fees by FAM.  By April 28, 2011,

Madison Williams was experiencing significant liquidity issues.  In July, 2011, the CEO

resigned, and the company ended up filing for bankruptcy in December 2011.  Quantal made no

mention of Madison Williams' liquidity position in its valuation.  The Trustee believes that

Madison Williams was grossly overvalued.

        Quantal's valuation analysis fell short in at least the following ways:

        1.     The valuation report did not include any fundamental analysis of the

Madison Williams business, including an assessment of the business model, profitability or

viability.  A critical evaluation of the future prospects of the business is necessary in any

valuation, but is especially imperative in the case of new ventures with little or no operating

history.

        2.     One of the most commonly used valuation method for a company such as

Madison Williams, a broker-dealer in the financial services industry, would be a multiple of

tangible book value.[493]  In December 2010, the effective date of Quantal's valuation of Madison

---

[491] 2009 Madison Williams Audited Financial Statements.

[492] Quantal Valuation Report of Madison Williams as of Dec. 31, 2010 (Jan. 27, 201).

[493] Aswath Damodaran, Valuing Financial Services Firms, 22 (New York University School of Business) (April 2009)

Williams, similar companies were trading at 1.3 times book value.[494]  Quantal, however, elected not to use a tangible book value approach, instead applying three different methodologies, discussed below.  As a result, Quantal arrived at a valuation that was <u>16.0 times</u> book value.  While the consortium might have paid a premium for Madison Williams (3.0 times book value) a year earlier, it is absolutely clear that under no circumstances was the appropriate multiple 16.0.  Applying a 1.3 times multiple would have resulted in a value of $3.7 million for 100% of Madison Williams, in contrast to Quantal's $46.5 million value.

3.      Rather than using a tangible book value approach, Quantal employed a discounted cash flow analysis; an enterprise value to sales analysis; and an enterprise value to employees analysis.  Even then, Quantal did not apply the methodologies appropriately.  The overriding flaw in their application was that each methodology utilized multiples derived from a set of comparable companies that were all significantly larger than Madison Williams and had different business models, different levels of profitability, and different outlooks than Madison Williams.[495]  The comparable companies used included Lazard, Raymond James, Stifel Financial, and Piper Jaffray among others.  A simple review of sell side research would have made it clear that the comparable companies used were not in fact comparable.

### k)      Fletcher International Partners, Ltd.

As discussed in Section IV.F, in July 2008 FILB made an investment into FIP.  The value of FIP derived from the value of FFC shares – its only non-cash asset – contributed to

---

[494] Capital IQ; represents median tangible book value multiple for comparables selected by Quantal.  Tangible book value was computed as the ratio of the stock price to the tangible book value of equity per share of common stock.  Tangible book value is calculated as the book value of equity less intangible assets such as goodwill.

[495] Quantal made a number of additional errors in its application of these three different methodologies, including the use of unreasonably optimistic growth projections, the absence of any review or analysis of Madison Williams's competitive position, and the apparent failure to review the company's financial statements.

FIP by Unternaehrer.  These FFC shares were not publicly traded, and they were never independently valued.  There were, however, a number of occasions over the course of this investment when a valuation should have been performed.

FIP's value was effectively based on Unternaehrer's own $10.5 million valuation of his FFC shares that he contributed to FIP on July 2, 2008, a valuation apparently acquiesced in by Christopher Smeets, the head of Citco.  He arrived at the $10.5 million valuation by using a multiple of 12.4 times EBITDA "based on the Richcourt sale."   However, there does not appear to have been any contemporaneous analysis to support that valuation or to support the conclusion that the Richcourt transaction even took place at a 12.4 times EBITDA multiple.

In fact SFT Bank (the Citco affiliate acting as custodian for FIP) carried the FFC shares at $2.7 million during the same time frame – not $10.5 million.  Unternaehrer's $10.5 million valuation represented an immediate markup of almost four times the $2.7 million valuation ascribed to the shares by SFT Bank.  There was also no consideration of the need to adjust this valuation due to the illiquidity of the FFC shares.  Both FAM and Unternaehrer were aware of this based on their email communications in June 2008.  Therefore, FILB's cash investment into FIP was based on Unternaehrer's valuation of FFC shares, approved by FAM and Citco.

### l)     BRG

BRG was incorporated in December 2009 and was the entity that held FILB's investments in Intellitravel, MV Nepenthes, FDIF, and Lowercase.  BRG also extended a loan to Vanquish in February 2010.  Similarly, BRG carried its investments in Intellitravel, MV Nepenthes, FDIF, Lowercase, and the loan to Vanquish at cost.  As is the case with other investments made by FILB, there is no evidence that FAM prepared any fundamental analysis to determine the fair value of FILB's investment in BRG.

4.        **Impact of Misvaluations**

By immediately marking up newly created positions and maintaining fraudulent valuations over time, FAM and its affiliates were able to rack up massively inflated fees.  Based on preliminary estimates assembled by the Trustee, FAM, Duhallow, and RF Services received a total of $50.7 million between January 2007 and the Petition Date from the Funds and FII.  FAM should have received approximately $13.3 million in management fees and operating expenses and $0 in incentive fees.  In addition, Duhallow and RF Services should have received approximately $5.6 million, reflecting an aggregate overcharge of $31.7 million.  An analysis of overcharges incurred as a result of misvaluations is as follows:

| Estimated Adjustments to Fees Paid | | | | | | |
|---|---|---|---|---|---|---|
| (Period from January 1, 2007 through June 30, 2012) | | | | | | |
| ( $ millions) | | | | | | |
| FEES PAID[1] | | | | | | |
| | FILB | FII | Arbitrage[3] | Leveraged | Alpha | Total |
| Paid to FAM[2] | $0.0 | $0.0 | $34.3 | $2.8 | $4.7 | $41.7 |
| Paid to Duhallow | $1.0 | $0.6 | $5.2 | $0.5 | $0.1 | $7.5 |
| Paid to RFS | $0.2 | $0.3 | $0.9 | $0.0 | $0.0 | $1.5 |
| **Total Fees Paid** | **$1.3** | **$0.9** | **$40.4** | **$3.3** | **$4.8** | **$50.7** |
| | | | | | | |
| ADJUSTMENTS/OVERCHARGE[4] | | | | | | |
| FAM - Incentive Fees | $0.0 | $0.0 | ($17.0) | $0.0 | ($2.3) | ($19.3) |
| FAM - Management Fees | $0.0 | $0.0 | ($5.2) | $0.0 | ($0.8) | ($6.0) |
| FAM - Operating Expenses | $0.0 | $0.0 | ($1.7) | ($1.2) | ($0.3) | ($3.1) |
| **Subtotal - FAM** | **$0.0** | **$0.0** | **($23.9)** | **($1.2)** | **($3.4)** | **($28.4)** |
| Duhallow and RFS Fees | ($0.5) | ($0.5) | ($2.1) | ($0.3) | ($0.1) | ($3.4) |
| **Total Overcharge[5]** | **($0.5)** | **($0.5)** | **($25.9)** | **($1.4)** | **($3.4)** | **($31.7)** |
| **Overcharge as % of Fees Paid** | **36.9%** | **53.1%** | **64.2%** | **43.4%** | **71.1%** | **62.6%** |
| | | | | | | |
| ADJUSTED FEES | | | | | | |
| **FAM - Fees Net of Overcharge** | **$0.0** | **$0.0** | **$10.4** | **$1.6** | **$1.3** | **$13.3** |
| **Duhallow and RFS - Fees Net of Overcharge** | **$0.8** | **$0.4** | **$4.1** | **$0.2** | **$0.1** | **$5.6** |
| **Total - Fees Net of Overcharge** | **$0.8** | **$0.4** | **$14.5** | **$1.9** | **$1.4** | **$19.0** |
| **% of Fees Paid** | **63.1%** | **46.9%** | **35.8%** | **56.6%** | **28.9%** | **37.4%** |

*All calculations are estimates and are subject to revision.*

*(1) Based on fees paid from January 1, 2007 through June 30, 2012. Data based on the Cash Model.*
*(2) Includes all fees paid to FAM, including management, incentive, deferred, and expense reimbursements.*
*(3) For purposes of this analysis, fees to FAM paid by Arbitrage include the $12.3 million deferred incentive fee related to the Corsair unwind.*
*(4) Adjustments estimated on a recalculation of AUM and changes in PnL every 6 months during this period.*
*(5) Analysis includes only estimated misvaluations of certain investments: Helix, ION, UCBI, and Document Security Systems.*
   *Gross up misvaluations by a factor of 1.5 to account for other investments not valued.*
*General Notes: Analysis assumes payment of administrative fees at FII based on a rollup of FILB assets into FII.*
   *Numbers may not foot exactly as a result of rounding.*

The fraudulent valuations also allowed AF and FAM to inflate the AUM they reported to investors and prospective investors, to cover up for losses in existing investments that had to be sold to raise cash, and to evade the mandatory redemption requirement of the Louisiana Pension Funds' investment in the Series N Preferred Shares of Leveraged, which, if triggered, would have collapsed the entire Fletcher structure.

Finally, the inflated valuations and resulting fictitious AUM permitted the payment of inappropriately large redemptions to Fletcher entities, related parties and third party investors.

The improper valuations give rise to potential claims against AF, FAM, and other insiders; Quantal and Terry Marsh; Citco, and Citco insiders; SS&C; and Eisner and Grant Thornton.  Claims arising out of the improper valuations are part of the Pooled Claims under the Plan.

F.    SOLVENCY

Given the lack of cash in Arbitrage, Alpha, Leveraged, Arbitrage LP, FILB and FII (the "Fletcher System"), the misvaluations of assets, and the mandatory redemption provisions relating to Leveraged Series N, the Trustee considered the solvency of the Fletcher System as of certain dates.  This analysis is intended to be used for a variety of purposes, including assessing the potential for recoveries to investors as of two selected measurement dates and assessing potential avoidance claims.

The solvency analysis was performed on an aggregated basis in order to capture all of the available assets and the major investors.  The Fletcher System was structured as a master-feeder fund.  FILB, the master fund, did not have any direct third-party, non-insider investors.  Arbitrage, one of the feeder funds, was the entity through which a majority of the clients invested,[496] and Arbitrage then was supposed to transfer these invested amounts down to FILB through its partial ownership of FII, which after December 31, 2008, was the 100% owner of FILB.  Given the state of the financial records and the Trustee's belief that not all investor

---

[496]This included investors who invested via Leveraged and Alpha.

capital was transferred down to FILB, the Trustee determined that a solvency analysis on an aggregated basis was the appropriate approach.

To test solvency, the Trustee analyzed the Fletcher System based on three accepted solvency tests: i) a balance sheet test that evaluated the fair value of net assets available as compared to net capital claims (the "Balance Sheet Test"); ii) whether the Fletcher System had incurred debts that would be beyond its ability to pay as they would become due (the "Cash Flow Test"); and iii) whether there was unreasonably small capital with which to conduct business (the "Capital Adequacy Test"). The measurement dates selected were December 31, 2008 (the end of the year in which the Louisiana Pension Funds invested), and March 31, 2010 (the date of the Corsair Redemption) (the "Measurement Dates"). While the solvency analysis conducted to date was based on less than complete information and does not constitute a full-blown solvency analysis, the Trustee believes that a more detailed analysis would further support the conclusion that the Fletcher System was insolvent on the Measurement Dates.

### 1. Balance Sheet Test

Application of the Balance Sheet Test was accomplished by comparing the fair value of net assets available[497] to the net capital claims of investors. Because most investors had invested through Arbitrage, for purposes of applying the Balance Sheet Test to the Fletcher System, the fair value of net assets available was defined as the fair value of net assets available to Arbitrage ("Fair Value of Net Assets Available"). Certain adjustments were then made to reflect the fact that there was one asset – the IAP/EIC Note – that would be available to satisfy

---

[497] Net assets available is equal to gross assets less margin debt outstanding.

net capital claims of certain investors and not others, because it was an asset of Leveraged, not Arbitrage.

      First, the Trustee calculated the Fair Value of Net Assets Available by adjusting the stated value of certain FILB investments to a reasonable approximation of fair value. Fair value is defined as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date"[498]. The FILB investments that were subject to fair value adjustments were Helix, ION, Raser, Syntroleum and ANTS. These investments represented approximately 80% and 92% of FILB's investment portfolio as of December 31, 2008, and March 31, 2010, respectively. All remaining positions in FILB's portfolio were left unchanged at their carrying values.

      Once the FILB investment portfolio was revalued as of the Measurement Dates, the change in valuation of the investment portfolio was allocated to the owners of FILB. As of December 31, 2008, Arbitrage indirectly owned 88% of FILB. Therefore, 88% of the change in the valuation of the FILB investment portfolio was allocated to Arbitrage. As of December 31, 2009 – a date reasonably close to March 31, 2010 – Arbitrage indirectly owned 97% of FILB.[499] Therefore, 97% of the change in the valuation of the FILB investment portfolio was allocated to Arbitrage. The resulting Fair Value of Net Assets Available was then compared with net capital claims.

      For purposes of the Balance Sheet Test, net capital claims are defined as cash invested by an investor less any cash returned to that investor as of the Measurement Date. As applied to the Fletcher System, the net capital claims of investors are equal to the aggregate of

---

[498] FASB, Statement of Financial Accounting, Standards No. 157: Fair Value Measurements, Financial Accounting Series, No. 284-A, Sept. 2006.

[499] No audited financial statements were prepared as of March 31, 2010.

the net capital claims attributable to the seven major investors in the Fletcher System ("Net Capital Claims").  Only seven major investors in the Fletcher System were included in this analysis, because the data available to the Trustee did not allow for the calculation of the Net Capital Claims of all investors.  (Even if such information had been available, it would not have changed the result.)  Based on the Trustee's analysis of the Fletcher System, the Fair Value of Net Assets Available was materially less than the Net Capital Claims as of the Measurement Dates, and the Trustee therefore believes that the Fletcher System was insolvent on a Balance Sheet Test basis as of the Measurement Dates.

As of December 31, 2008, based on the application of the methodologies described and analysis performed, the Trustee believes that the Fletcher System would be insolvent because the Net Capital Claims exceeded the Fair Value of Net Assets Available by approximately $71.1 million. The implied recovery to Arbitrage investors would be no greater than 63.9% of their Net Capital Claims.  The calculations are summarized in the following chart[500]:

---

[500] Louisiana Pension Funds (Series N) and Corsair invested through Leveraged.  NOFF, the Richcourt Funds, a private university, other investors, and Richcourt Partners LP invested directly through Arbitrage. The MBTA invested through Alpha and Arbitrage (as of year-end 2008, the direct MBTA investment was fully redeemed from Arbitrage).

| Fair Value of Net Assets Available vs. Net Capital Claims as of December 31, 2008 | |
| --- | --- |
| | $ in millions |
| Louisiana Pension Funds[501] | $108.7 |
| Corsair | 34.7 |
| MBTA | 23.7 |
| Richcourt Funds | 18.4 |
| A Private University | 5.0 |
| Richcourt Partners LP | 3.4 |
| Other Investor | 3.0 |
| **Net Capital Claims** | **$196.8** |
| | |
| **Fair Value of Net Assets Available** | **$125.8** |
| **Recovery of Fletcher System Investors** | **63.9%** |
| **Deficiency of Fair Value of Net Assets Available vs. Net Capital Claims** | **($71.1)** |

In discussing recoveries on the Measurement Dates, actual recoveries would likely be less because all of the investments at FILB were not revalued and not all investor claims were included in Net Capital Claims.

For purposes of calculating the recovery to the Leveraged investors, the Trustee included the allocation of value available to Arbitrage investors up to Leveraged plus the value of the IAP/EIC Note carried on the books of Leveraged at a value of $28 million as of December 31, 2008 (even though its value was, as discussed above, materially less). In considering the actual implied recovery to the investors in Leveraged as of December 31, 2008, the contractual preference of the Louisiana Pension Funds (i.e., Leveraged Series N) was also considered. Corsair invested in Leveraged Series 4, 5 and 6. Because the Series 4, 5 and 6 shares were contractually subordinated to the Series N shares, all value they would otherwise

---

[501] $100 million was attributable to Louisiana Pension Funds' investment in Leveraged. The remaining $8.7 million was attributable to one of the Louisiana Pension Funds' legacy investment in Arbitrage.

receive would have been for the benefit of Series N investors until Series N investors received a full recovery.  As of December 31, 2008, the Louisiana Pension Funds would have received recoveries of $100 million from Leveraged (100% of the Louisiana Pension Funds' net capital claims).  The recovery to Corsair, which was invested in Leveraged Series 4, 5, and 6, would be no greater than $14.1 million, or 40.5% of Corsair's Net Capital Claims.  These recoveries are prior to any adjustments to the value of the IAP/EIC Note, which was recorded on Leveraged's books and records as of year-end 2008 at $28 million and was overvalued.

As of March 31, 2010, based on the application of the methodologies described and analysis performed, the Trustee believes that the Fletcher System was also insolvent under the Balance Sheet Test because Net Capital Claims exceeded the Fair Value of Net Assets Available by approximately $76.9 million.[502]  The implied recovery to Arbitrage investors as of March 31, 2010, would be no greater than 61.7% of their Net Capital Claims.  The calculations are summarized in the following chart:[503]

---

[502] Pursuant to the analysis performed, Arbitrage and Leveraged separately would be insolvent on the Measurement Dates.

[503] The Louisiana Pension Funds (Series N) and Corsair invested through Leveraged.  The Richcourt Funds, a private university, and Richcourt Partners LP invested directly into Arbitrage.  The MBTA invested through Alpha and Arbitrage (as of March 31, 2010, the MBTA was fully redeemed from Arbitrage).

| Fair Value of Net Assets Available vs. Net Capital Claims as of March 31, 2010 | |
|---|---|
| | $ in millions |
| Louisiana Pension Funds[504] | $100.0 |
| MBTA | 23.7 |
| Richcourt Funds | 33.8 |
| Corsair | 34.7 |
| A Private University | 5.0 |
| Richcourt Partners LP | 3.4 |
| **Net Capital Claims** | **$200.6** |
| | |
| **Fair Value of Net Assets Available** | **$123.7** |
| **Recovery of Fletcher System Investors** | **61.7%** |
| **Deficiency of Fair Value of Net Assets Available vs. Net Capital Claims** | **($76.9)** |

Consistent with the analysis as of December 31, 2008, the recovery of the Leveraged investors included the allocation from Arbitrage and the value of the IAP/EIC Note without adjusting for its gross overvaluation (it was carried on the books of Leveraged at a value of $28.6 million as of March 31, 2010). Taking into consideration the liquidation preference to the Leveraged Series N investors as in the December 31, 2008, analysis, the Louisiana Pension Funds would receive $100.0 million from Leveraged (100% of Louisiana Pension Funds' net capital claims at Leveraged). The Leveraged Series 4, 5 and 6 investors (Corsair) would receive no more than $11.7 million (33.7%). These recoveries are prior to any adjustments to the value of the IAP/EIC Note, which was recorded at $28.6 million on Leveraged's books and records and was overvalued.

---

[504] Represents Net Capital Claims attributable to the Louisiana Pension Funds' investment in Leveraged. As of March 31, 2010, the Louisiana Pension Funds were fully redeemed from their legacy investment in Arbitrage.

## 2.    Cash Flow Test and Capital Adequacy Test

The Cash Flow Test and the Capital Adequacy Test were performed to determine if there would be reasonable expectations that the Fletcher System could pay its debts as they would become due and to determine if there was sufficient capital to conduct future business as of the Measurement Dates.  The tests in this case were based on the cash flows generated from the Fletcher System.[505]  Both the Cash Flow Test and the Capital Adequacy Test were performed by aggregating the cash flows from the Fletcher System for the period from June 8, 2007 through the Petition Date.  Pursuant to this analysis, the Trustee believes that the Fletcher System and each of the funds in the Fletcher System (with the exception of Arbitrage LP, for which a detailed analysis was not performed) was insolvent as of the Measurement Dates.

As a background to the actual Cash Flow Test and Capital Adequacy Test, a review was performed of the cash flows of the funds in the Fletcher System since mid-2007, the time of the MBTA investment in Alpha.  This review determined that there was a repeated pattern of clearly inadequate cash resources, followed by a cash infusion from an investor or a FAM-affiliated entity, followed by a dissipation of that cash (largely to meet redemption demands, margin calls, loan repayments and fees), followed again by a period of inadequate cash.  While FAM theoretically could have sold some of FILB's investments to generate cash, this would not have been practical, since selling FILB's investments would have generated major mark-to-market losses that likely would have caused a collapse of the entire Fletcher System.

Beginning in 2007, there were four waves of external liquidity that allowed the Fletcher System to continue operating.  The first was the $25 million cash investment by the

---

[505] The cash flows used were only from bank accounts and did not include the brokerage accounts at FILB.  Due to the frequency of margin calls during 2008 and 2009 and the closing down of the Citco liquidity line, it was unlikely that the Fletcher System had any external credit availability.

MBTA on June 8, 2007.  Immediately prior to this investment, there was $2.6 million cash in the

Fletcher System.  The MBTA funds – along with $11.9 million of other investors' money – were

exhausted by December 20, 2007, when the balance in the system was down to $1.7 million.  Of

the $25 million invested by MBTA and the additional $11.9 million that came in from other

sources, no more than $8 million was used for investments.

   The second wave of liquidity came once the MBTA funds were fully expended.

On January 4, 2008, FFLP invested $7.5 million into the Fletcher System.  The funds infused by

FFLP were used to pay down the Citco loan further by $6.5 million, to meet margin calls, and to

pay for third-party redemptions and fees.  By February 13, 2008, the cash balance had declined

to $2.4 million.  Between February and March, 2008, FFLP invested another $3.6 million,

bringing FFLP's aggregate investment in the first quarter of 2008 to $11.1 million.  In addition,

NOFF (one of the Louisiana Pension Funds) invested the first $5 million of what would

eventually be a $100 million investment by the Louisiana Pension Funds.  Once again, by March

12, 2008, the system was virtually out of cash, as the aggregate cash balance had fallen to

$400,000 and the Fletcher System faced the looming April 1, 2008, maturity date on the

remaining $13.5 million due on the Citco credit facility (the maturity date had recently been

extended from March 1 to April 1).

   On March 31, 2008, the Louisiana Pension Funds invested an additional $95

million of cash in Leveraged, bringing the total 2008 cash subscription of the three Louisiana

Pension Funds to $100 million, and providing the Fletcher System with a third wave of liquidity.

As discussed above, the first use of the Louisiana Pension Funds' $95 million in cash came when

Citco swept out $13.5 million to make the final pay down on its loan to Leveraged.  The

remainder of the Louisiana Pension Funds' money – again with a limited amount of other

investor funds – was used in this period for the Richcourt Holding acquisition loan, to pay

investor redemptions, to meet margin calls, and to pay fees to FAM and its affiliates.  In

addition, a portion of the Louisiana Pension Funds' money was paid out to FFLP to return $5.1

million of the $11.1 million it had injected in the first quarter of 2008.  The remainder of the

$11.1 million was returned between February and August 2009.  By November 2008, all of the

Louisiana Pension Funds' cash had been fully expended.

        After the Louisiana Pension Funds' cash was used, FAM took cash out of certain

of the Richcourt Funds beginning in November 2008, and infused that cash into the Fletcher

System.  In some cases, this money came from Richcourt Funds at a time when NAVs and

redemption rights had been suspended and where gates had been imposed.  Between November

2008 and March 2010, a total of $61.7 million of cash was taken out of the Richcourt Funds over

three distinct periods:  November 2008 to January 2009, April 2009 to June 2009, and March

2010, and then invested into Arbitrage.  Of the $61.7 million, $10 million was used for the

second tranche of the Raser investment in December 2008, and $10 million was used for the

UCBI transaction in April 2010.  The remaining $41.7 million of the $61.7 million was used for

third-party redemptions, margin calls, fees, and redemptions by FFLP.[506]

        As of December 31, 2008, based on the application of the methodologies

described and analysis performed under the Cash flow Test, the Trustee believes that the Fletcher

System was insolvent.  Similarly, as of December 31, 2008, based on the application of the

methodologies described and analysis performed under the Capital Adequacy Test without the

need to evaluate additional downside scenarios, the Trustee believes that the Fletcher System

was insolvent.  As of December 31, 2008, the Fletcher System had only approximately $4.3

---

[506] $40.3 million of this $61.7 million was later redeemed for cash by the Richcourt Funds.

million of cash. During the first quarter of 2009, there were approximately $25.2 million in investor redemption payments required, $5.3 million in margin call payments, $3.6 million of fees and redemptions paid to FAM and FFLP, and $1.6 million of professional, administrative and consulting fee payments. Based on an analysis of cash flows and upcoming obligations in the Fletcher System, as of December 31, 2008, the Fletcher System either was unable to pay debts as they become due or had unreasonably small capital unless new investors' capital was available, or both.

As of March 31, 2010, based on the application of the methodologies described and analysis performed, the Trustee believes that the Fletcher System was insolvent under the Cash Flow Test. Similarly, as of March 31, 2010, based on the application of the methodologies described and analysis performed, the Trustee believes that the Fletcher System was insolvent, under the Capital Adequacy Test without the need to evaluate additional downside scenarios. At that time, the Fletcher System had approximately $17.8 million of cash, including $13.8 million in cash that had been transferred from the Richcourt Funds between March 23, 2010 and March 29, 2010, as an investment in Arbitrage. In addition to other obligations as of March 31, 2010, there was a pending redemption obligation of $33.1 million[507] to Corsair.[508] In turn, the Corsair Redemption created a redemption obligation to the Series N investors. Leveraged could not meet its redemption obligations without a collapse of the Fletcher System.

Also, by mid-April 2010, in the absence of external sources of cash, FILB was left with no option but to start liquidating existing investments at substantial discounts to recorded values on FILB's books in order to keep the operation going. Thus, for example, in

---

[507] This includes the $12.3 million deferred incentive fee.

[508] The redemption was not paid until August 2010.

April 2010, FILB converted a substantial portion of its ION position for proceeds of $36 million, representing a 43% loss relative to the mark as of March 31, 2010.

### 3.    Conclusions

Based on the Balance Sheet Test, Cash Flow Test, and Capital Adequacy Test, applying the methodologies as described above, the Trustee believes that the Fletcher System was insolvent as of the Measurement Dates.  Accordingly, potential avoidance claims (constructive fraudulent conveyance and "clawback" claims) may arise in favor of the JOLs of Leveraged and Arbitrage against investors who redeemed at or around year-end 2008, at any time since early 2010, and likely at other times as well – as early as June 2007.  These potential claims will not be pooled under the Plan.  The insolvency of the Fletcher System as of the Measurement Dates also may give rise to potential claims by FILB against FII and possibly other Fletcher–Related Entities that redeemed from it.

### G.    INSIDERS

AF and FAM Insiders (FAM executives and affiliates) perpetrated a fraud against the Funds and their major pension fund investors.  Those who were supposed to be watching out for the Funds' (and their investors') interests chose instead to use their position to advance their own interests.  The FAM Insiders consistently caused the Funds to enter into transactions that were rife with self-dealing, without any regard to whether the transactions were in the best interests of the Funds.  As discussed in detail above, among other things, the Trustee's investigation has revealed that the FAM Insiders used the pension funds' money to pay themselves inflated fees, purchase for themselves the Richcourt Fund of Fund Business, and make investments in assets that were well outside of the stated investment strategy of the Funds' Offering Memoranda, including a nearly $8 million investments in AF's brother Geoffrey's movie.

This misconduct gives rise to potential claims against FAM, FII, RFS, DFS, AF, Geoffrey Fletcher, Turner, Kiely, MacGregor, Moez Kaba, and potentially others. Claims against the FAM Insiders arising out of this misconduct are Pooled Claims under the Plan.

### H.    QUANTAL

Quantal's work was defective – it produced inflated and fraudulent valuations that FAM used for many purposes. Notably, as described in Section VIII.E.4, these valuations were used as a basis for charging significant and excessive management and incentive fees. Furthermore, the valuations would have been a major factor for investors to consider in making decisions about whether to subscribe to the Fletcher Funds or redeem their investments.

Quantal was well aware that its work was being used to support FAM's representation of value to third parties, including the auditors and investors. Quantal is referenced several times in Fletcher's promotional material as FAM's valuation agent. Moreover, in March 2011, Quantal acknowledged that third parties and investors in the Funds had relied on Quantal's work when, in an affidavit submitted in connection with AF's litigation with the Board of the Dakota, Terry Marsh of Quantal stated, "Quantal prepares objective, independent valuation reports regularly for clients with whom we have an ongoing business relationship and those reports are often submitted to third parties such as auditors and their independent valuation experts, fund administrators, prime brokers, and prospective investors."[509] Because FAM was Quantal's only meaningful valuation client, it is reasonable to infer that this reference was to the Funds. And finally, in his deposition, James Quinn of Quantal responded to the Trustee's attorney: "So my understanding of the purpose of the PIPEs valuations was to

---

[509] See Marsh Aff. ¶ 25, Mar. 2, 2011, Alphonse Fletcher Jr. et al. v. The Dakota, Inc. et al., Index No. 101289/11 (Sup. Ct. N.Y. Cnty).

provide a value for the fund that held the PIPEs, I'm assuming for investments and withdrawals."[510]

In addition, the Trustee has concluded that over time Quantal was no longer the independent valuation agent that FAM had touted. Quantal's relationship with FAM became rife with conflict. Any claim that Quantal was an "independent" valuation firm (as recommended by the AIMA Guide to Sound Practices for Hedge Fund Valuation) is belied by the efforts of its principal, Terry Marsh, to pursue a wide-ranging business relationship with FAM and Richcourt. These obvious conflicts existed at least as early as the first half of 2010, when Marsh was asked to serve as Chief Financial Officer of FAM, and explored the possibility to the extent that he provided references to Fletcher.[511] In addition, Marsh came up with the idea of taking on "the responsibility of managing and building the Richcourt business,"[512] and served as a manager for Richcourt Fund Services and on the advisory board for Richcourt's Paris operation, which Marsh ultimately helped to unwind.[513]

One of Marsh's objectives was also to manage a fund. Quantal Asset Management ("QAM"), a Quantal subsidiary, had maintained a relationship (that ended with the financial crisis in 2008) with Deutsche Bank and Fortress.[514] FAM and FILB offered the opportunity to replace that business through a seed capital arrangement in which FILB or a

---

[510] Quinn Dep. 88:3–6, May 8, 2013.

[511] Marsh Dep. 286:10–287:14, May 7, 2013. Marsh and a retired partner from Deloitte had spent two days at Fletcher examining what might be needed to be done to address AF's concern that "there was some amount of internal things not getting done." Marsh Dep. 289:211.

[512] Marsh Dep. 290:12–22.

[513] Marsh Dep. 238:11–15, 242:11–16. There were discussions that Quantal would create a strategy that would be "put inside Richcourt." Marsh SEC Dep. 85:89, May 25, 2011.

[514] Marsh Dep. 37:12–39:17.

Richcourt entity would make an investment equal to $20 million in a QAM-managed fund.
Marsh pursued this opportunity as far as entering into a "handshake agreement" and negotiating
a sub-advisory agreement that Marsh signed on December 23, 2010 (but was not signed by FAM
or FILB).[515]  That relationship would have involved a Fletcher entity (e.g., Richcourt) obtaining
an equity stake in QAM.[516]

      Marsh also wanted to sell risk management and accounting software to FAM and
Richcourt through a joint venture with QED Financial Systems, a partner of Quantal's.  Someone
from QED pitched the idea during a meeting at FAM's offices.[517]  At the same time, FAM was
seeking to replace Citco as the administrator for the funds, and engaged SS&C, threatening this
potential business venture involving QED, since Quantal apparently envisioned SS&C as a
competitor.[518]  And at one point, Quantal was asked to consider becoming involved with
Duhallow in the area of fund administration through QAM.[519]  These potential business
arrangements between Quantal and FAM were sufficiently advanced that they caused Marsh to

---

[515] Marsh Dep. 279:18–280:19, 290:12–25, 308:2–24; Investment Sub-Advisory Agreement dated
December 2010 (signed by T. Marsh as Manager of QAM, Dec. 23, 2010); email from T. Marsh to K.
Hoover (Sept. 3, 2010, 21:38:12).  Pursuant to that agreement, Quantal would have been entitled to a 2%
management fee and a 10% incentive fee paid annually.

[516] Marsh Dep. 304:12–305:10, 24–306:22.

[517] Quinn Dep. 119:12–20.

[518] In an e-mail on March 7, 2010, Marsh wrote "We'll also have to worry some if SS&&C (sic) comes
out as the new outside administrator (perhaps we can wean them off the SS&&C (sic) system toward
QED, but we don't want to engender ill-will by pushing to do this quickly?). Maybe the QED guys can
help us install an anti SS&&C (sic) 'mole'?" Email from T. Marsh to Mark Gresack and David Rossien,
Mar. 26, 2010.

[519] Marsh Dep. 294:20–23; 301:3–9.

consider the likelihood that Quantal would not be able to continue to do valuations and to discuss the possible conflicts with the Chairman of Quantal.[520]

While there are numerous examples of Quantal's defective valuations and apparent conflicts, one of the most egregious involved Richcourt Holding.  In a July 25, 2009 email discussing the 2008 valuation, Quinn stated to his colleagues Marsh and Yoshi Ozaki:

> [a]s you know this report completely ignores the revenue projections for 2009.  Obviously we could do a better job if we had those numbers and made use of them.

He continued:

> I suspect that Fletcher is just hoping to get something from us that allows them to go to Grant Thornton and talk them out of doing an impairment evaluation.  If they are not successful in convincing Grant Thornton, then we may need to take the next step, which would be to do the DCF analysis, using reasonable numbers from 2009 as the starting point.[521]

These are hardly the words of a truly independent and objective valuation agent.

As discussed above, Quantal was asked to perform a valuation of Richcourt Holding to determine whether or not its value was impaired by financial market events between the June 20, 2008, purchase date and December 31, 2008.  Quantal created at least seven drafts of the valuation report before issuing its final report.  The drafts were dated between July 27, 2009, and September 18, 2009.  The final report was issued on October 16, 2009.[522]

---

[520] Marsh Dep. 303:11–304:6.

[521] Email from J. Quinn to Yoshi Ozaki and T. Marsh (July 25, 2009, 12:08).

[522] Quantal Draft Valuation of Richcourt Group as of Dec. 31, 2008 (July 27, 2009); Quantal Draft Valuation of Richcourt Group as of Dec. 31, 2008 (July 30, 2009); Quantal Draft Valuation of Richcourt Group as of Dec. 31, 2008 (Aug. 14, 2009); Quantal Draft Valuation of Richcourt Group as of Dec. 31, 2008 (Aug. 20, 2009); Quantal Draft Valuation of Richcourt Group as of Dec. 31, 2008 (Aug. 21, 2009); Quantal Draft Valuation of Richcourt Group as of Dec. 31, 2008 (Aug. 28, 2009); Quantal Draft Valuation of Richcourt Group as of Dec. 31, 2008 (Sept. 18, 2009); Quantal Valuation of Richcourt Group on Dec. 31, 2008 (Oct. 16, 2009).

Over the course of the drafts and the final report, Quantal's description of Richcourt Holding's AUM evolved.  The changes in the description related to a) recent trends in Richcourt Holding's AUM, and b) whether Quantal had considered pending redemptions when evaluating AUM levels as of year-end 2008.

### 1.    Richcourt Holding AUM Trends

Of the seven drafts reviewed by the Trustee, each had identical language with respect to 2008/2009 AUM trends.  Each draft stated that Richcourt Holding's AUM was $1.1 billion as of year-end 2008 and $972 million as of end of the first quarter of 2009, thus reflecting a trend of declining AUM.  Declining AUM would suggest that Richcourt Holding's value was likely deteriorating.

Quantal's final valuation report, issued on October 16, 2009, did not contain the language reflecting declining AUM.  Instead, the final report stated that AUM was $1.106 billion as of year-end 2008 and was unchanged at $1.106 billion as of the end of the first quarter of 2009.  We have seen no evidence indicating why the lower, $972 million figure used in the seven drafts was not used in the final report, and it appears that both the omission of the lower $972 million figure and the inclusion of the higher $1.106 billion figure were deliberate.

There is also no mention in any of the draft reports or in the final report that Richcourt Holding had suspended NAVs and redemptions and gated investors.  This information would have been available to Quantal because it was disclosed in the audited 2008 financial statements for Richcourt Holding, which had been issued on April 30, 2009.

### 2.    Richcourt Holding's Year-End 2008 AUM

The first draft is dated July 27, 2009, and states that Richcourt Holding's AUM was $1.1 billion as of December 31, 2008.  The second draft report dated July 30, 2009, contains the following language:

> During the tumultuous markets of 2008, Richcourt's AUM has
> declined from $1.5B in June 2008 to approximately $1.1B as of
> December 31, 2008.  [Our understanding is that this $1.1B
> includes all inflow and redemption notices received prior to
> December 31, 2008.][523]

The inclusion of the bracketed language indicates that Quantal was aware that pending inflows and redemption notices received prior to December 31, 2008, were relevant factors to consider in evaluating Richcourt Holding's AUM for valuation purposes.  Yet in subsequent drafts, the bracketed language was eliminated, and the AUM number used by Quantal did not take into account pending subscriptions or redemptions.  Richcourt Holding's audited financial statements for 2008 were released in April 2009, and disclosed that NAVs and redemptions had been suspended and that gates had been imposed on clients.[524]  As a result, Quantal clearly knew or should have known at the time it issued its report that there were significant pending redemptions as of year-end 2008.  Quantal's failure to adjust the AUM for pending redemptions rendered its report misleading.

Additional examples of Quantal's lack of independence and seeming desire to satisfy AF and FAM are evident in other email communications.  In connection with Quantal's 2008 Richcourt Holding valuation, Marsh stated, "[o]ur intent is not to bring in 2009 quantitatively, this would be inappropriate; rather we will just adjust the 'tone' so that, if the question of 2009 comes up, it leaves us in a good position to address it without back-filling."[525]  In another instance, James Quinn, looking ahead to the 2009 valuation, wrote to Marsh:

> [i]t's going to be challenging to support the old valuation given the
> path they are on so far.  I think we need a good argument as to

---

[523] Quantal Valuation for Richcourt Group as of Dec. 31, 2008, 2 (July 30, 2009) (brackets in original).

[524] 2008 Richcourt Holding Audited Financial Statements.

[525] Email from T. Marsh to D. Kiely (Aug. 28, 2009, 18:25.19).

whether they expect thing (sic) to turnaround and the AUM to start increasing again. Let's talk about where to go next with this.[526]

On April 19, 2010, Quantal issued a valuation report on Richcourt for year-end 2009 stating that the value continued to equal or exceed the $33 million implied value at acquisition, and that no impairment was warranted, a view that was inconsistent with Quantal's internal communications.

Potential claims against Quantal and Terry Marsh arising from Quantal's valuation work and undisclosed conflicts of interest are Pooled Claims under the Plan.

## I.    AUDITORS

There were substantial, material inaccuracies in the Funds' financial statements. FAM failed to follow proper generally accepted accounting principles in connection with valuations and descriptions of many of FILB's assets, and FAM failed to disclose or adequately describe numerous significant, material events and transactions that should have been described in full, along with their likely consequences. The Funds' financial statements were issued and delivered to investors; the statements included as attachments the audited statements of the Funds in which they were invested. Thus, for example, when the Alpha audit was transmitted to its investors, the FILB and Arbitrage audits were attached.[527]

It was the responsibility of the Funds' independent auditors, Grant Thornton and Eisner, to express their opinions on whether the financial statements fairly reflected, "in all material respects, the financial position, results of operation, and cash flow for the funds in conformity with generally accepted accounting principles." [528] The Trustee believes that both

---

[526] Email from J. Quinn to T. Marsh, (Mar. 17, 2010, 23:25:08).

[527] MBTA Interview, Oct. 29, 2013.

[528] AU Section 110-Responsibilities and Functions of an Independent Auditor.

Grant Thornton and Eisner improperly opined that the financial statements were not misleading and were free from material errors or omissions.[529]

To arrive at their opinions and discharge their duties, Grant Thornton and Eisner were required to plan and perform their audits in accordance with generally accepted auditing standards (GAAS). These standards prescribe the minimum threshold conduct for an auditor. The Trustee reviewed, among other evidence, the accountants' work papers and deposition testimony, and concluded that the audits performed failed to comply with GAAS. Grant Thornton and Eisner failed to qualify their audit opinions appropriately to acknowledge that the financial statements were materially misstated and should not have been relied on by those receiving them.[530] In this regard, it is important to remember that the audience for these audits was not only the Funds, but also the investors to whom the various audits were addressed.

Grant Thornton or Eisner (or both) violated the following GAAS:[531]

- General Standard No. 1, which requires the auditor to "have adequate technical training and proficiency to perform the audit."[532]

- General Standard No. 2, which requires the auditor to "maintain independence in mental attitude in all matters relating to the audit."

- General Standard No. 3, which requires the auditor to "exercise due professional care in the performance of the audit and the preparation of the

---

[529] AU Section 508-Reports on Audited Financial Statements.

[530] Eisner did include one qualification in its 2009 audit of Arbitrage: it said that, "except for the exclusion of certain financial highlights," the statements conformed with GAAP. 2009 Arbitrage Financial Statements at 3–Independent Auditor Report. The omitted highlights were the share class financial highlights required by GAAP and are not material to the Trustee's conclusions.

[531] AU Section 150-Generally Accepted Auditing Standards.

[532] AU Section 210-Training and Proficiency of the Independent Auditor.

report."[533]  Due professional care requires the auditor to exercise professional skepticism.  Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence.

- Standard of Field Work No. 3, which requires the auditor to "obtain appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements."

- Standard of Reporting No. 1, which requires the auditor to state whether the "financial statements are presented in conformity with generally accepted accounting principles (GAAP)."

- Standards of Reporting No. 3, which requires that "when the auditor determines that the informative disclosures are inadequate, the auditor must state so in the auditor's report."

The ways in which Grant Thornton and Eisner violated each of these GAAS are discussed in the following sections.

### 1.    **Grant Thornton**

#### a)    **Cashless Notes**

As discussed in Section II.E.8 above, FAM used the Cashless Notes, with notional amounts of $80 million each (one in 2007 and one in 2008), issued by Leveraged, as in kind subscriptions to Arbitrage.  Arbitrage recorded the Notes due from Leveraged as assets, and Leveraged recorded the investments in Arbitrage as an asset and recorded the Notes as liabilities.  After issuing the first such Note in 2007, in 2008, FAM substituted FILB for Leveraged as the

---

[533] AU Section 230-Due Professional Care in the Performance of Work.

obligor on the Cashless Notes.[534]  The result of FAM's accounting was to include the Cashless

Notes in reported AUM ($83.9 million in 2007 and $178.8 million in 2008),[535] which increased

AUM and fees calculated on the basis of AUM – including management and financial services

fees paid to FAM, Duhallow, and RFS.[536]

       Grant Thornton failed to opine that FAM's accounting for the Cashless Notes as

assets on the 2007 and 2008 financial statements of Arbitrage was not in conformity with

GAAP.[537]  Grant Thornton correctly identified ████████████████████████████

████████████████████[538] but did not gather adequate audit evidence or adopt an attitude of

professional skepticism until prompted to do so by the SEC in late 2009.  Grant Thornton fell

short of GAAS and its own planning standards.

       In both his SEC testimony and his Rule 2004 deposition, the Grant Thornton

partner in charge of the audit (Matt Luttinger) acknowledged that if the Notes were truly

cashless, they should not have been counted as assets.[539]  Luttinger admitted to the SEC that,

despite identifying the notes as a "significant risk area," Grant Thornton did not "analyze the

---

[534] FILB Resolution and Promissory Note with Arbitrage, June 2, 2007.  As discussed in the 2008 Audited Arbitrage Financial Statements, the notes were "repaid" on December 31, 2008, but no cash changed hands.  FILB's 2008 Audited Financial Statements state that that the Cashless Notes "were paid in full." Note G – Related Party Transactions.  However, FILB's books and records do not show that these Cashless Notes were paid in cash by FILB.

[535] Includes interest up through each balance sheet date.  2007 and 2008 Arbitrage Audited Financial Statements.

[536] 2008 Restated Arbitrage Audited Financial Statements.

[537] EITF 85-1 Classifying Notes Received for Capital Stock, EITF 02-1 Balance Sheet Classification of Assets Received in Exchange for Equity Instruments, and SEC Comment Letter on EITF 02-1 dated June 10, 2002.

[538] Grant Thornton Risk and Response Work papers for year-end 2007, Oct. 29, 2007.

[539] Luttinger SEC Dep. 79:2–6, Apr. 9, 2010; Luttinger Dep. 59–60:1-18, June 4, 2013.

notes as deeply as [one] could have."[540]  Luttinger maintained, however, that he did not know and was not sure that anyone at Grant Thornton knew that the Cashless Notes were not accompanied by a transfer of cash.[541]  It is simply not credible that responsible auditors would not probe deeply into related party transactions of this size – 37% of Arbitrage's reported net assets in 2007[542] and 49% during 2008[543] – and see that no cash was transferred and, at the very least, describe them in detail.  The evidence shows that Grant Thornton was or should have been aware of the cashless nature of the Cashless Notes, and this should have been highlighted.[544]

### b)    IAP/EIC Note

Grant Thornton failed to notice that 100% of Leveraged's assets were to be invested into Arbitrage, making it a violation of its mandate for Leveraged to hold any asset other than shares in Arbitrage.  Even if holding the IAP/EIC Note had been permitted, unlike its successor auditor, Grant Thornton failed to recognize that the value of the IAP/EIC Note was dramatically overstated on Leveraged's financial statements.  Indeed, there is no evidence that, during the audit of Leveraged, Grant Thornton even understood the nature of the IAP/EIC Note or its link to the value of Richcourt Holding.[545]

---

[540] Luttinger SEC Dep. 179:1–80:7, Apr. 9, 2010.

[541] Luttinger SEC Dep. 79:18–80:1, Apr. 9, 2010.

[542] 2007 Arbitrage Audited Financial Statements.

[543] 2008 Arbitrage Audited Financial Statements.  As discussed earlier, the Notes were extinguished on December 31, 2008, without a transfer of cash.  The Trustee has added the amount immediately extinguished to the year end balances for illustrative purposes.

[544] Grant Thornton's work papers contained the board resolutions of Arbitrage that state that Arbitrage will "accept the FIAL Note as a subscription-in kind for such interest in the Company [Arbitrage]." Arbitrage Board Resolutions, May 20, 2007.

[545] In a planning meeting with Sean Martin and Delina Arroyo in October 2008, FAM told Grant Thornton that the acquisition of Richcourt had no impact on the audit of Leveraged.  Risk Assessment

Grant Thornton failed to consider the impact of the suspensions and gating at the

Richcourt Funds, even though its work papers included a set of the Richcourt Holding 2008

financial statements which disclosed them beginning in December 2008.[546]  The impact was

substantial:  the suspended and gated funds represented 88% of the Richcourt Funds' AUM

(excluding Paris).  Thus, at the time of the preparation of Leveraged's 2008 financial statements,

the Richcourt Funds were suffering from redemptions, gates had been imposed, and they had no

ready access to capital, facts that, on their face, would have greatly diminished the value of

Richcourt and the IAP/EIC Note.  Grant Thornton failed to opine on these impacts in its audit

opinions for 2008.

Grant Thornton also failed to take into account the unusual terms of the IAP/EIC

Note itself.  The IAP/EIC Note was unsecured and had no covenants and no set interest coupon.

Furthermore, at year-end 2008, the credit markets were under significant stress due to the

worldwide financial crisis, and it is simply not possible to imagine that the fair value of the

IAP/EIC Note could have been anywhere close to its face value.  There is also no evidence that

Grant Thornton took a critical look at Quantal's valuation of Richcourt as of year-end 2008.  Had

it done so, it would have discovered its numerous material flaws.  Eisner did.

Notwithstanding these deficiencies, Grant Thornton issued an unqualified opinion

on Leveraged's 2008 financial statements.  In 2011, when Grant Thornton issued its opinions on

Leveraged's and Arbitrage's restated 2008 financial statements, it failed to opine appropriately

that disclosures in the restated 2007 and 2008 financial statements were not adequate with

respect to the potential impact of further reduction in value of the IAP/EIC Note due to the near

Work paper for 2008 Leveraged Audit at 5.  The Trustee has not found any evidence in Grant Thornton's
audit work papers that it questioned this during the audit of Leveraged.

[546] 2008 Richcourt Holding Audited Financial Statement at 17–18.

100% redemptions from the Richcourt Funds by this time.[547]  An appropriate valuation of the

IAP/EIC Note would have resulted in a breach of the 20% cushion and triggered a mandatory

redemption of the Louisiana Pension Funds' investment, which would have led to the collapse of

all of the Funds.

c)      **Related Party Transactions**

The financial statements included inadequate disclosure of several significant

related party transactions.  Grant Thornton failed to opine appropriately that the material related

party transactions concerning Citco, Richcourt, Unternaehrer and FIP were either inadequately

disclosed or not disclosed at all.  A particularly egregious example is the failure of the Leveraged

2008 financial statements to disclose the ownership structure which reveals that AF owned

Richcourt Holding.  In fact, "Richcourt" was not mentioned in the Leveraged 2008 audited

financial statements.  In contrast, the 2008 audited financial statements of the Fletcher

Aggressive Fund, LP, an entity whose financial statements would not be disseminated to outside

investors, but only to insiders, contained far more extensive disclosures that AF was the ultimate

economic beneficiary of the Richcourt transaction.[548]

FILB's 2008 audited financial statements also included inadequate disclosures of

the transactions between FIP and Unternaehrer, who in 2008 received substantial cash and

dividends from FIP, paid for by FILB.  These transactions constituted material related party

transactions that should have been scrutinized carefully and with a higher degree of professional

skepticism, rather than accepted without question, and disclosed to investors.

---

[547] █████████████████████████████████████████████████

[548] 2008 Aggressive LP and Affiliate Audited Financial Statement, Note C "Investment in Affiliates."

### d)      FILB PIPEs and Warrant Investments

Grant Thornton fell short in several ways in connection with valuations of FILB's PIPE and warrant investments.

This section lists some of those failures.  The Grant Thornton partner (Lee Ericksson)[549] who performed the valuation work appears to have had inadequate training and proficiency to perform valuations of FILB's PIPE and warrant investments, violating the GAAS requirement of adequate training and proficiency to conduct the audit.[550]  He had not performed PIPE and warrant investment valuations prior to working on FILB's audits.  He had no market experience with PIPE and warrant investments, and he did not did engage in any discussions with market participants about FILB's PIPE and warrant investments.  This violated GAAS No. 1.  At the very least, Grant Thornton should have retained a qualified outside valuation expert to audit FAM's investment values.

Second, Grant Thornton failed to analyze subsequent events and material transactions adequately.  Doing so would have resulted in significant downward adjustments to the values of major investments.  For example, in connection with the valuation of Helix and ION (representing almost 70% of the FILB portfolio as of December 31, 2008), Grant Thornton



[551]                                                                        .[552]  It did not.  In the FILB 2008 year-end financial statements, Helix and ION were carried at values of $100.3 million and

---

[549] Ericksson was a partner in Grant Thornton's forensic and investigative group.  Ericksson SEC Dep. 19:21-22, Mar. 8, 2010.

[550] Ericksson SEC Dep. 27:6–28:19, Mar. 8, 2010.

[551] In January 2009, Helix redeemed 30,000 shares of Series A-2 Helix preferred stock in exchange for 5.9 million shares of common stock (worth $32.6 million).

[552] Memorandum from Ericksson to FILB Audit File, 5 (Apr. 29, 2009).

$112.7 million, respectively. Applying the same methodology that was used in the Helix monetization (redemption) to the Helix and ION positions as of the 2008 year end, the Trustee's analysis indicates that the appropriate valuations would have been $74.6 million for Helix (versus $100.3 million) and $67.9 million for ION (versus $112.7 million). Auditing standards require the financial statements to be adjusted for those events that "provide additional evidence with respect to conditions that existed at the balance sheet date."[553] Grant Thornton's failure to take the January 2009 transaction into account violated GAAS Standard of Field Work No. 3 and allowed FAM to issue materially misleading financials.

Third, even if a mark-to-model approach were acceptable with respect to certain positions, Grant Thornton failed to insist that an appropriate discount for lack of liquidity be applied to the theoretical mark-to-model valuations of all of FILB's PIPE and warrant investments. Such a discount is required because conversion of the positions into common stock would involve extremely large blocks of stock relative to their relative daily trading volume. FILB's PIPEs and warrant investments were also complex investments that would likely be of interest to only a limited group of sophisticated institutional investors.

Fourth, Grant Thornton failed to recognize that the non-market formula in the cashless exercise warrants was not industry standard and resulted in valuations far in excess of what a willing buyer would pay. Grant Thornton failed to account for the inevitable uncertainty and possible litigation that would reduce the value of the warrants.

Fifth, it appears that Grant Thornton failed to scrutinize the qualifications of the valuation firm in the way the auditing standards envision, and relied on Quantal's work despite the fact that its work fell short of numerous generally accepted valuation standards. For

---

[553] AU Section 560-Subsequent Events.

example, Quantal's reports did not express the purpose of the valuations. The purpose will determine the standard of value and the method appropriate for the valuation. The Quantal reports do not state which valuation standard it applied – e.g., fair value, fair market value, investment value, etc. [554] By relying on Quantal, Grant Thornton did not exercise due professional care and scaled back its level of professional skepticism, resulting in opinions that did not reflect the material misstatements in the valuations of the investments.

Taken as a whole, these factors would have resulted in severe downward revisions to the valuations of FILB's PIPE and warrant investments.

Additionally, Grant Thornton failed to opine that the financial statements of FILB contained misleading valuation accounting policies. FILB's Securities Transactions and Related Income footnote to the 2008 FILB audited financial statements states that the "pricing models . . . consider current market conditions, contractual terms, and other available information underlying these financial instruments." As discussed in the paragraphs above, the Quantal pricing models did not consider the Helix transaction that was fully described in Helix's public filings. Furthermore, there is no evidence that Grant Thornton investigated whether FAM attempted to obtain pricing letters from third parties prior to reverting to mark-to-model valuations. Finally, there is no evidence that Grant Thornton requested or received FAM's written valuation policies as prescribed by AIMA – there were none, and this should have been noted. [555]

---

[554] Uniform Standards of Professional Appraisal Practice (1987) ("USPAP").

[555] In addition, Grant Thornton does not appear to have undertaken due consideration of companies with signs of financial distress, including Raser, whose auditor issued an audit opinion casting doubt on Raser's ability to continue as a going concern. Grant Thornton should have evaluated whether FAM's valuation of the Raser investment was reasonable after considering the going concern issue. Ericksson noted that Raser ███████████████████████████████████████████████. Memorandum from

e)        **Going Concern**

Grant Thornton failed to evaluate properly whether there was a substantial doubt

about the ability of the Funds to continue as going concerns for a reasonable period of time when

it reissued its opinions for the 2007 and 2008 Arbitrage and Leveraged financial statements in

January 2011.  In this connection, Grant Thornton failed to opine on how the Corsair

Redemption could have collapsed the structure.[556]  The Series N Offering Memorandum required

that the Series N shareholders were to be redeemed at least one business day before the Corsair

investors.  The Corsair Redemption contravened that requirement.  Although the Corsair

Redemption occurred after year-end 2008, Grant Thornton was responsible for examining events

subsequent to the year end and up to the date that the restated financial statements were issued on

January 20, 2011, a fact confirmed by the Grant Thornton partner in charge of the audit.[557]  And,

if Grant Thornton valued FILB's investment portfolio properly, it would have triggered the 20%

mandatory redemption and caused Grant Thornton to evaluate going concern issues during the

original 2008 audits of the financial statements of each of the Funds.

Additionally, in connection with Grant Thornton re-issuing its audit opinions for

2007 and 2008 audits of Leveraged and Arbitrage in January 2011, Grant Thornton failed to

opine on the impact of a proper valuation of the Helix and ION positions and of the substantial

reduction in the value of the IAP/EIC Note.  Again, although this occurred after year-end 2008,

Grant Thornton was responsible for examining subsequent events up to the date it issued its

---

Ericksson to FILB Audit File, Apr. 29, 2009, at 14 (discussing valuation of PIPEs as of December 31, 2008).

[556] It is notable that the 2007 and 2008 restated audited Arbitrage financial statements contained a description of the Corsair Redemption and a disclaimer that the $12.3 million deferred fee to FAM was unaudited, but made no mention of the Series N mandatory redemption.

[557] Luttinger Dep. 146:19–147:12, June 4, 2013.

opinions on the restated financial statements.  Appropriate valuations would have resulted in a breach of the 20% cushion required for the Leveraged Series N shareholders, an event that would have collapsed the entire structure.  Moreover, there is no evidence that Grant Thornton reviewed the valuations of Helix and ION in the restated financial statements.  By the time those re-issued statements were issued, there had been six monetizations of these positions, and each one was at or below conversion value.  At the very least, these transactions should have been disclosed and discussed in the financial statements.[558]  Doing so would have required a "going concern" qualification to Grant Thornton's opinion.

> 2.    **Eisner**

Eisner's audits were also defective in a variety of ways.  For example:

> a)    **IAP/EIC Note**

Eisner determined that the value of the IAP/EIC Note was dramatically overstated on Leveraged's financial statements.  Eisner concluded that the IAP/EIC Note should have been valued at $10.0 million rather than the $28.6 million being carried on Leveraged's books.[559]

However, Eisner failed to consider or require disclosures about the impact of this valuation on the audits it performed on Arbitrage, FILB, and Alpha.  Eisner did not focus on the fact that its valuation of the IAP/EIC Note would have triggered a mandatory Series N redemption at Leveraged that would have collapsed the structure.[560]  Moreover, like Grant Thornton, Eisner also failed to notice that 100% of Leveraged assets were supposed to be

---

[558] AU Section 560-Subsequent Events.

[559] The $10 million valuation was used in the draft 2009 Leveraged financial statements.  2009 Draft Leveraged Financial Statements, at 4.

[560] There is also no evidence that Eisner considered the non-market terms of the IAP/EIC Note in its valuation.

invested in Arbitrage, making it a violation of its mandate for Leveraged to hold any asset other than shares in Arbitrage.

### b)    Corsair Redemption

Eisner issued unqualified opinions on the 2009 financial statements for Arbitrage, FILB and Alpha that did not opine appropriately that the Series N shareholders were to be redeemed at least one business day before the Corsair investors.  As discussed in more detail in Section VIII.D.4 above, the Corsair Redemption contravened that requirement and triggered a mandatory redemption of the Series N shareholders.

### c)    FIP

FILB's 2009 financial statements included inadequate disclosures of the transactions between FIP and Unternaehrer, who in 2008 and 2009 received substantial distributions from FIP, funded by FILB.  Eisner was fully aware of the FIP transactions,[561] and using investors' money to provide liquidity to a very senior executive of the administrator of Alpha, Arbitrage and Leveraged raised obvious issues.  These transactions were material related party transactions that should have been disclosed to investors.  Contemporaneously, Eisner also failed to opine on whether FIP was valued appropriately.  Eisner issued an unqualified opinion, thereby accepting FAM's inadequate disclosures.

### d)    FILB's PIPE and Warrant Investments

In assessing the valuations of Helix and ION (which made up more than 80% of the gross value of the FILB portfolio as of December 31, 2009), Eisner stated that ████████

████████████████████████████████████████████████████████████████████████

---

[561] The Eisner FIP working papers included a copy of a memorandum from Stewart Turner and Sean Martin to Matt Luttinger and Steven Recor, dated Apr. 28, 2009 (explaining the transactions).

████████████████████████████████████████████████████████████[562]

thereby seeking to avoid the auditing standards' "preference for the use of observable market

prices to make a determination of value."[563]  But by the time Eisner issued its FILB audit for

2009, FILB had completed six monetization transactions in Helix and ION (four in 2009 and two

in early 2010).  None of these positions achieved a value higher than conversion value or

redemption value, values that were far below FAM's marks.  Eisner disregarded the 2009

transactions.[564]  With respect to the two 2010 transactions, Eisner concurred with FAM that ████

████████████████████████████████████████████████████████████.[565]

Eisner did not do any independent work to verify management's representations.  Had it done so,

Eisner would have discovered that FAM liquidated Helix and ION whenever it needed cash

(about every four months) and always did so by converting or redeeming; it could never sell the

preferred convertible shares at any premium.  It should have been clear that FILB's Helix and

ION shares were being used as a source of working capital, and had to be valued as such rather

than as long term investments that could be held indefinitely.[566]

        Nor did Eisner consider where Credit Suisse was marking the Helix and ION

positions.  Peter Testaverde testified that Eisner did not give weight to Credit Suisse's mark

because "the brokers aren't there to value your securities.  They're picking prices.  They could

have stale prices.  They could have wrong prices.  In fact, they do extensive disclaiming on the

---

[562] Memorandum dated June 29, 2010 from Peter W. Testaverde to Fletcher International Audit Files re Valuation of Certain Investments ("Eisner Valuation Memorandum"), at 1.

[563] AU Section 328-Auditing Fair Value Measurements and Disclosures.

[564] ██████████████████████████████████████████████████

[565] Eisner Valuation Memorandum at 4.

[566] As discussed above, even when Credit Suisse and the Trustee conducted a marketing effort, the values ascribed to these positions by FAM could not be obtained.

prices so we don't generally take that as audit evidence."[567]  Testaverde is wrong.  Eisner's own

audit program included procedures that would involve obtaining estimates of fair value from

broker-dealers or other third parties when quoted market prices were not available.[568]  While

auditors may not wholly rely on prime brokers' pricing, Eisner gave no weight whatsoever to

Credit Suisse's marks.  Furthermore, there is no evidence that Eisner inquired whether FAM

attempted to obtain pricing letters from third parties prior to relying on mark-to-model

valuations.

           Eisner did retain an outside consultant to assist in its review and created a

memorandum purporting ███████████████████████████████████████.[569]

Eisner ████████████████████ provided by Sterling Valuation Group, Inc.

("Sterling") to value the ION position as of December 31, 2009, but this valuation was defective.

Sterling valued the ION position ████████████████████████████████████████

████████████████████████████████████████████████████████████████

██ in the financial statements.  In its report, Sterling stated that it "███████████████████

██████████████████████████████████."[570]  What Sterling

did not consider was the multiple monetizations of these securities that occurred prior to the date

of its report.  For example, the report states that the ████████████████████████████

███████████████████████████████████████ by the time the draft

report was published on June 17, 2010, the ION position had already been sold down to $27

---

[567] Testaverde Dep. 93:6–11, June 24, 2013.

[568] FILB 2009 Audit Program – Fair Value Measurements and Disclosures – Investment Funds.

[569] Eisner Valuation Memorandum.

[570] Draft report regarding ION Geophysical Corporation by Sterling, June 17, 2010.

million.  In April 2010, FILB had sold $43 million of the position to fund the UCBI investment.

Information about these monetizations was publicly available at this time because ION disclosed

it in its Form 10-Q filed on May 6, 2010.  In its draft report, Sterling stated that it relied on,

among other things, █████████████████████████████████████████

████████████████████████████████████████████████████ FILB

had monetized 61% of its ION position which would have been considered in valuing ION as of

December 31, 2009.  Thus, Eisner should not have relied on Sterling's work because the Sterling

report, on its face, ignored highly relevant market input.

Eisner requested a copy of the written valuation policy from FAM.[571]  There was

no such document included in the auditors' work papers; as far as the Trustee is aware, none

existed.

Moreover, it does not appear that Eisner scrutinized the qualifications of the

valuation firm beyond determining that the Quantal personnel had Ph.Ds.  Also, Testaverde was

aware that Quantal was at the very least engaged in discussions with FAM about other

relationships that conflicted with its independence as a valuation agent.  Testaverde stated that he

was aware that Quantal was going to participate as a partner in RF Services.[572]

Eisner also appeared to rely on a memorandum from FAM making reference to

the names of several prominent Wall Street executives purportedly summarizing conversations

with them as "market participants" that would "participate in an orderly sale process for the

---

[571] The 2009 Audit Request List from Eisner (Steven Lacob) to FAM (S. MacGregor, F. Wilson and O. Okubanjo) dated March 24, 2010, included the following request:  "Updated valuation policy and procedures memorandum.  Eisner (We) will review the valuation policies and procedures in conjunction with the December 31, 2009 schedule of investments and will make test selections for which we will need the General Partners' valuation memo and related supporting documentation."

[572] Testaverde SEC Dep. 50:21–23, June 24, 2013.

types of privately negotiated investments made by [FILB]."[573]  There is no evidence to suggest

that Eisner attempted independently to validate or to corroborate the assertions in the memo with

the named Wall Street executives or other third parties.  The memorandum suggests that in

holding these conversations, FAM personnel did not specifically reference Helix, ION or any

specific security for that matter.  This was not a pricing letter, which would have had meaning.

This memorandum from FAM on its face was not evidence an auditor should have accepted

without additional inquires.

Eisner also failed to recognize the unusual non-market formula in virtually all of

the cashless exercise warrants held by FILB.  The formula would result in a vastly greater

number of shares upon exercise than the issuer intended – and likely cause disputes and

litigations.  Eisner does not appear to have conducted market checks on whether a buyer would

value this non-market formula, requested any confirmation from the companies issuing the

warrants to confirm these non-standard terms, or checked these valuations against marks carried

by the companies issuing the warrants.[574]

### e)    Lack of Independence

In July 2011, Eisner was a participant, along with FAM, in a meeting that induced

the Louisiana Pension Funds to agree to a waiver of the 20% cushion requirement based on its

valuation of the IAP/EIC Note at $10 million.  The Trustee has been advised that the meeting,

the Louisiana Pension Funds were told that their failure to consent would put at risk their

previously accrued 1% a month return and prevent the Leveraged audit from being issued.  No

---

[573] Memorandum from Kiely, Turner and FAM to Murray C. Grenville, Richard J. Buttimer and Sterling Group (June 16, 2010) (summarizing discussions with convertible market participants).

[574] For example, as of year end 2010, DSS marked its warrant at $3.9 million, while FAM marked it at $19.5 million. See DSS Form 10-K for Year Ended Dec. 31, 2010; FILB Holdings Report for the Month Ending Dec. 31, 2010.

disclosure, however, was made to the Louisiana Pension Funds of the years of other violations of the 20% cushion requirement, and the various subterfuges used to cover up these violations.

Independent auditors should not only be independent in fact; they should avoid situations that may lead outsiders to doubt their independence.[575]  By participating in this meeting, Eisner became an advocate, not an auditor, and compromised its independence.  The lead partner on the engagement had known AF for many years,[576] and Eisner's willingness to participate in such a meeting calls into question whether it was ever independent.[577]

### f)    Going Concern

Eisner failed to evaluate properly whether there was a substantial doubt about the ability of the Funds to continue as going concerns for a reasonable period of time when it issued its opinion for the FILB, Arbitrage and Alpha 2009 financial statements.  Eisner failed to opine appropriately on the Corsair Redemption.  As discussed in Section VIII.D above, the Series N Offering Memorandum required that the Series N shareholders were to be redeemed at least one business day before the Corsair investors.  The Corsair Redemption contravened that requirement, avoiding the mandatory redemption of the Series N shareholders that likely would have led to the collapse of the Funds.  Additionally, Eisner failed to opine on the impact that the substantial reduction in the value of Richcourt Holding and the value of the IAP/EIC Note would have on the structure.

---

[575] AU Section 220-Independence.

[576] Testaverde had been AF's accountant when "[AF] first started in business in the late '80s."  Testaverde Dep. 9:13–16, June 24, 2013.

[577] On November 27, 2003, the Trustee was advised that Eisner will contest its role as described herein and will contest any claim that it acted improperly; it claims that its role in the meeting was far more limited.

J.    **CITCO**

The actions of Citco raise a variety of issues.  The first relates to Citco's failure appropriately to fulfill its obligations under the Offering Memoranda to perform the role assigned to it as administrator of Arbitrage, Leveraged, and Alpha in connection with calculation of NAVs and the valuation of the underlying assets.  The facts surrounding this potential claim are described in Sections II.E.9.(c) and VIII.E above.  Among other consequences of this failure was the payment by the various funds of over $30 million in excess fees to FAM and others, including Citco and overpaying of redemptions.

The second set of issues involving Citco derives from the multiple conflicting roles it played in connection with AF and the Fletcher Funds, many of which were undisclosed to investors.  In addition to being Administrator of the Funds (other than FILB), it was asset manager of the Richcourt Funds, many of whom were invested in the Funds; it was a marketer for FAM of investment opportunities; a lender of $60 million to Leveraged; the seller of the Richcourt Fund of Fund business to AF; and a knowing participant in the FIP transaction with Unternaehrer.

While the Offering Memoranda did disclose Citco's marketing role, they never disclosed the various other relationships which created significant conflicts:

1.    As a lender to the Funds, throughout 2007 and early 2008, Citco pressed FAM for repayment of its outstanding loans to Leveraged, granting extensions in return for partial pay downs, and ultimately insisting on final repayment of the last $13.5 million due of the loan on the day the Louisiana Pension Funds' investment in the Leverage Series N Shares closed.

2.      As asset manager of Richcourt fund investors in the Funds, Citco for a year was pressing for a $3.1 million redemption from Leveraged, which again was paid out of the Louisiana Pension Fund's investment.

3.      As a seller of assets, it achieved its longstanding goal of divesting its Richcourt fund of fund business by selling it to AF, again with the assistance of the inappropriate use of investor money to fund the transaction.

4.      As an insider with close relationships with FAM and AF, it abused its position by having FILB improperly become an indirect owner of Citco in order to provide liquidity to Unternaehrer to enable him to meet his own obligations.  It then proceeded to manipulate the value of what Unternaehrer was contributing to FIP by assigning it a value of $10.5 million at the time when Citco's own bank was valuing it at $2.7 million.

Citco knew that a Series N investor was investing $100 million into Leveraged on a preferred basis.  In connection with that investment, Citco provided questionable consents on behalf of earlier Richcourt fund investors which not only subordinated their position, but made it very likely that their capital accounts would be reduced over time.  Having thus facilitated the ability of AF to secure a $100 million investment, Citco received nearly half of this investor money for its own and Unternaehrer's benefit.  In the end, Citco participated in, and benefited from, the misuse of investor money, while acting as administrator of funds in which those investors invested.

Citco's conduct and its relationship with AF and FAM give rise to potential claims against AF, FAM, and other insiders; and Citco, Smeets, and Unternaehrer.  Claims arising out of these events are Pooled Claims under the Plan.

### K.    SS&C

SS&C, as administrator was, pursuant to the Offering Memoranda, supposed to take an active role in valuing the underlying securities owned by FILB as the master fund, which ultimately served as the basis for the NAV calculation of the feeder funds.  However, unbeknownst to the Funds' investors, SS&C disavowed this obligation in its agreement with FAM and the Funds, signing an agreement that disclaimed any responsibility to value the underlying securities.  The Agreement was fundamentally at odds with the Offering Memoranda.

SS&C had the opportunity to inform the Funds' investors when the Administrator Supplements were distributed, but SS&C chose not to do so, instead allowing a misleading supplement to be distributed that did not disclose that SS&C was going to perform a role different than that set forth in the Offering Memoranda.  A similarly misleading document was submitted to the Cayman regulatory authorities.  As an administrator, SS&C had to know that its involvement lent significant credibility to the Funds, and that potential and current investors were relying on SS&C to perform the functions set out in the Offering Memoranda.

During SS&C's watch, FAM continued to use fraudulently inflated valuations.  SS&C continued to issue monthly NAV calculations, giving the appearance that it had independently valued the Funds' assets.  However, in reality, SS&C did little more than rubber stamp the valuations that FAM and its valuation agent Quantal provided.  SS&C's lack of action is even more egregious given the fact that it ignored numerous red flags that should have tipped it off that there were significant issues with the Funds.  Among other things, SS&C continued to issue NAV calculations well into 2011, despite the fact it knew the funds books and records were not up to date and therefore could not be relied upon, that the SEC was investigating FAM, that FAM was routinely months late providing monthly reporting packages, that the investment portfolio consisted primarily of illiquid investments, that Arbitrage and Leveraged's financials

were being restated for 2007 and 2008, and that audited financials for 2009 and 2010 were either

years late or never provided.  Its failure allowed FAM and others, including SS&C, to receive

inflated fees.  SS&C also failed to notice triggering events that would have resulted in unwinding

the entire structure, allowed redemptions to be paid out to investors based upon grossly-inflated

valuations.  These facts give rise to potential claims against AF, FAM, and other insiders, and

SS&C.  Claims arising from these facts are Pooled Claims under the Plan.

## IX.
## CERTAIN LITIGATION RISK FACTORS TO BE CONSIDERED

As discussed in detail in the sections above, the Trustee's investigation has

uncovered potential claims against insiders and other Fletcher-Related Entities, service

providers, and other third-parties.  The Trustee believes that pooling claims will allow the

Debtor's creditors and other parties-in-interest to achieve the greatest possible recovery.  Among

other things, pooling claims will allow the parties to combine resources, share information, and

ensure that the proper plaintiff is named and that the lawsuit is commenced in the proper

jurisdiction.  It will also avoid unnecessary competition, facilitates settlement, and is the most

cost-efficient way to proceed.  However, there are numerous risks associated with these claims.

While the Trustee believes that the identified claims have merit, there are

significant risks associated with each of the potential claims and the Trustee cannot guarantee

success on the merits or any recovery.  As an initial matter, some of the claims may be based

upon foreign law, which may not be as favorable as domestic law, or pursued in foreign

jurisdictions, which have different procedural laws (for example, less robust discovery), which

may limit the  ability to prove these claims.

Wherever the claims are brought, the Trustee expects that various of the

defendants will raise multiple defenses.  Many of the potential defendants may assert defenses

directed at the plaintiffs' ability to commence the action, such as lack of standing, lack of personal jurisdiction, and statutes of limitations or repose.

Defendants other than FAM insiders are likely to assert that actions taken by the plaintiffs either before or after the causes of action arose absolve the defendant of any liability. These defenses include, among other things, contractual provisions such as waivers, disclaimers, limitations of liability, and indemnities. Another issue which will be raised by service providers is the so called *in pari delicto* doctrine which precludes suits by one wrongdoer against another and has been held to apply to trustees in some circumstances. See, e.g., Kirschner v. KPMG, 15 N.Y.3d 446 (2010). While the Trustee believes that the wrongful acts described herein are not covered by this doctrine, potential defendants will argue to the contrary.

Even if the plaintiffs are able to overcome these defenses, the Trustee expects that some or all of the prospective defendants will vigorously defend the claims on the merits. They all have denied wrongdoing.

There also have been certain practical limitations to the Trustee's investigation. For example, the Trustee has had limited resources and there has been required to prioritize his investigative goals. The Trustee has also been unable to obtain discovery from certain potential defendants – Citco, for example – who reside outside of the United States and therefore are not subject to compulsory process.

Given the complexity of the claims that that the Trustee believes it will likely take substantial time and resources to prosecute these claims. For this reason, the Trustee believes that hiring contingency counsel for many or all of the potential claims may be necessary and appropriate.

Finally, even if the Trustee is able to establish its claims, potential defendants (in particular, the Fletcher-Related Entities and other insiders) may have insufficient assets to satisfy the claims.

# X.
# THE PLAN

## A.    SUMMARY OF THE PLAN

### 1.  Liquidation of FILB Assets

The Trustee has already liquidated the Debtor's marketable securities and has settled certain claims and litigations for cash payments.  The Debtor's remaining assets will be liquidated by the Plan Administrator under the supervision of the Advisory Board.  These assets consist principally of a few avoidance actions (preference and fraudulent conveyance claims, including avoidance claims against law firms and other service providers) and recoveries on claims or litigations related to securities held by the Debtor (the ION Litigation and the UCBI Warrants described above).  The sole other assets which appear to have significant value are the Debtor's interest in FIP and an indirect investment in Lowercase Ventures Fund I, L.P.  The Advisory Board will consist of the Plan Administrator, who will also be the FILB representative, one representative from Alpha and one representative for both Leveraged and Arbitrage.[578]  The Trustee will disclose the identity of the members Advisory Board prior to Confirmation of the Plan.  The Plan Administrator will oversee the liquidation on a day-to-day basis.  Major decisions will require the affirmative votes of at least two members.[579]  Voting will be per capita.

---

[578] The Louisiana Pension Funds may sign onto the Investor Settlement any time before Confirmation, and if they do, they will provide a fourth representative.

[579] If the Advisory Board is increased to four members, decisions will require at least three affirmative votes.

The Board will adopt by-laws regarding meetings, notices, designees to serve as members and replacements, and retention of professionals and employees, and similar matters.

### 2.  **Pooling of Claims**

The Chapter 11 Trustee has reached an Investor Settlement Agreement with the Feeder Funds and their representatives (Arbitrage and the Arbitrage JOLs, Leveraged and the Leveraged JOLs, Alpha and the Alpha JOLs), and the sole investor in Alpha, the MBTA, pursuant to which the parties will pool certain claims, prosecute them under their joint supervision, and distribute any net proceeds in accordance with a specified formula.  The Trustee will seek Bankruptcy Court approval of the Investor Settlement Agreement as part of the Plan confirmation process.  The Louisiana Pension Funds are not currently parties to the Investor Settlement Agreement, but may join at any time prior to confirmation of the Plan.  Even if their claims are not pooled, it is likely that any settlement will require coordination with the Louisiana Pension Funds.

The potential claims to be pooled include those against AF, FAM, FII, and the other Fletcher Insiders and their current or former directors; against certain Richcourt-Related Entities; against fund servicers and administrators (Citco, SS&C, and Duhallow); against fund valuation consultants (Quantal); against fund auditors (Grant Thornton and Eisner); and against Fund lawyers.

The Pooled Claims are generally for fraud, breach of fiduciary duty, negligence, and similar torts; breach of contract; and aiding and abetting these torts and breaches.  They do not include claims for improper redemptions; those claims will be retained by each individual Feeder Fund for its own benefit.  The Pooled Claims will be administered by a Plan Administrator and the Advisory Board.  The participants' respective shares of the Pooled Claim Recoveries are as follows:

- FILB – 26.8%
- Arbitrage and the Arbitrage JOLS – 26.8%
- Leveraged and the Leveraged JOLS – 26.8%
- Alpha and the Alpha JOLS – 19.86%

B.    **CLASSIFICATION OF CLAIMS AND INTERESTS AND GENERAL PROVISIONS**

1.    **General Rules of Classification**

Generally, a Claim or Interest is classified in a particular Class for voting and distribution purposes only to the extent the Claim or Interest qualifies within the description of that Class, and is classified in another Class or Classes to the extent the Claim or Interest qualifies within the description of such other Class or Classes.  Unless otherwise provided, to the extent a Claim or Interest qualifies for inclusion in a more specifically defined Class and a more generally defined Class, it shall be included in the more specifically defined Class.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied before the Effective Date.

2.    **Administrative Claims and Priority Tax Claims**

Administrative Claims and Priority Tax Claims have not been classified and are excluded from the Classes set forth in the Plan in accordance with section 1123(a)(1) of the Bankruptcy Code.

### 3. Satisfaction of Claims and Interests

The treatment to be provided for respective Allowed Claims or Interests pursuant to the Plan shall be in full satisfaction, settlement, release, and discharge of such respective Claims or Interests.

### 4. Bar Date for Administrative Claims

Proofs of Administrative Claims and requests for payment of Administrative Claims which have arisen on or after the Petition Date must be filed and served on the Trustee, pursuant to the procedures set forth in the Administrative Bar Date Order.  Objections to proofs of Claim or applications for payment of Administrative Claims must be filed and served on the Trustee (and the Plan Administrator after the Effective Date) and the applying party by the later of:  (a) one (1) day prior to the Initial Distribution Date, and (b) 60 days after the Filing of the applicable proof of Claim or request for payment of Administrative Claim, unless otherwise ordered or extended by the Bankruptcy Court. Notwithstanding anything to the contrary herein, no proof of Claim or application for payment of an Administrative Claim need be filed for the allowance of any:  (a) Administrative Claims constituting a Fee Claim (except as provided in Section 3.5 below); or (b) fees of the United States Trustee arising under 28 U.S.C. § 1930.  All Claims described in clause (b) of the immediately preceding sentence shall be paid by the Debtor when due.  Fee Claims shall be paid in accordance with Section 3.5 of the Plan, described below.

### 5. Bar Date for Fee Claims

Any Person or entity (including a Professional) that fails to file a proof of Claim, application or compensation estimate on account of a Fee Claim as and to the extent required by the Bankruptcy Court shall be forever barred from asserting such Claim against the Debtor, the Estate, or their property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset or recover such Claim.

### C.   CLASSIFICATION OF CLAIMS AND INTERESTS

All Claims and Interests, except Administrative Claims and Priority Tax Claims,

are placed in the following Classes.  In accordance with section 1123(a)(1) of the Bankruptcy

Code, Administrative Claims and Priority Tax Claims have not been classified and thus are

excluded from the following Classes.  A Claim or Interest is classified in a particular Class only

to the extent that the Claim or Interest qualifies within the description of that Class and is

classified in other Classes to the extent that any remainder of the claim or Interest qualifies

within the description of such other Classes.

| Class | Name | Description |
|---|---|---|
| 1 | Other Priority Claims | Claims entitled to priority in payment under Section 507(a)(4),(5),(6),(7),(9) or (10) of the Bankruptcy Code. |
| 2 | Secured Claims | Claims secured by a valid, perfected and enforceable lien. |
| 3 | General Unsecured Claims | All general unsecured claims other than claims in Classes 4A, 4B, 4C, 4D, 5, and 6, which are separately described below. |
| 4A | Claims of Arbitrage and the Arbitrage JOLs | Claims held by Arbitrage and the Arbitrage JOLs. |
| 4B | Claims of Leveraged and the Leveraged JOLs | Claims held by Leveraged and the Leveraged JOLs. |
| 4C | Claims of Alpha and the Alpha JOLs | Claims held by Alpha and the Alpha JOLs |
| 4D | Claims of the Louisiana Pension Funds | Claims held by the LA Pension Funds. |
| 5 | Insider Claims | Claims held by Insiders of the Debtor. |
| 6 | Intercompany Claims | Claims held by Affiliates of the Debtor other than Claims in Classes 4A, 4B, 4C and 4D. |

### D.    TREATMENT OF UNCLASSIFIED CLAIMS AND UNIMPAIRED CLASSES OF CLAIMS AND INTERESTS

#### 1.    Treatment of Allowed Administrative Claims

These include costs and expenses of administration of the Chapter 11 Case, including the Chapter 11 Trustee's fees and expenses and compensation for professional services rendered and reimbursement of expenses incurred after June 29, 2012.  They will be paid in full or as otherwise allowed by the Bankruptcy Court.  The Trustee estimates that Administrative Claims as of October 31, 2013, were approximately $2.8 million.[580]  The Trustee will file a supplement detailing the amount of the Administrative claims and proposed budget at a later date.

#### 2.    Treatment of Allowed Priority Tax Claims

These are tax claims entitled to priority under Sections 502(i) and 507(a)(8) of the Bankruptcy Code.  The New York City Department of Finance has filed a proof of claim in the amount of $6,885.00.  This claim will be paid in full or as otherwise allowed by the Bankruptcy Court.

#### 3.    Treatment of Other Priority Claims (Class 1)

Class 1 is unimpaired under the Plan.  These are claims entitled to priority under Section 507 of the Bankruptcy Code.  None are expected, but to the extent there are any, they will be paid in full or as otherwise allowed by the Bankruptcy Court.  Holders of Allowed Class 1 Claims shall be deemed to have accepted the Plan.

---

[580] This figure excludes a possible request by Goldin Associates to recover certain additional discounts it has taken under its revised engagement letter.

### 4.      Treatment of Allowed Secured Claims (Class 2)

Class 2 is unimpaired under the Plan.  These are claims secured by a valid,

perfected and enforceable lien.  None are expected, but to the extent there are any, they will be

paid in full or as otherwise allowed by the Bankruptcy Court.  Holders of Allowed Class 2

Claims shall be deemed to have accepted the Plan.

### E.      TREATMENT OF IMPAIRED CLASSES OF ALLOWED CLAIMS AND INTERESTS

Except as otherwise ordered by the Bankruptcy Court, Holders of impaired

Claims and Interests shall be entitled to vote to accept or reject the Plan.  The Trustee reserves

the right to seek a determination that one or more of the following Classes are unimpaired.  If the

Court determines that such Class is unimpaired, such Class shall be deemed to have accepted the

Plan regardless of how the Class voted.

### 1.      Class 3: General Unsecured Claims

Class 3 is impaired under the Plan.  These are all non-insider general unsecured

claims except those in Class 4 (Arbitrage, Leveraged, Alpha, and the Louisiana Pension Funds),

which are separately classified and described above.  The Trustee estimates the Class 3 Allowed

Claims will total approximately $1.0 million.  Each holder of an Allowed General Unsecured

Claim will have the option of receiving (i) a pro rata share of the Liquidation Recoveries[581] or

(ii) cash in full payment for its Allowed Claim of $10,000 or less.

### 2.      Class 4A: Arbitrage and the Arbitrage JOLs

Class 4A is impaired under the Plan.  The Claims held by Arbitrage and the

Arbitrage JOLs will be compromised, settled and allowed in the amount of $110 million, in

accordance with the Investor Settlement.  The Trustee will seek approval of the Investor

---

[581] For purposes of distribution, all Class 3 and Class 4 creditors will share Pro Rata in the Liquidation
Recoveries based upon each creditor's individual Allowed Claim.

Settlement as part of the Confirmation.  Arbitrage and the Arbitrage JOLs will receive their pro rata share of the Liquidation Recoveries and 26.8% of the Pooled Claims Recoveries.

### 3.    Class 4B: Leveraged and the Leveraged JOLs

Class 4B is impaired under the Plan.  The Claims held by Leveraged and the Leveraged JOLs will be compromised, settled and allowed in the amount of $5 million, in accordance with the Investor Settlement.  The Trustee will seek approval of the Investor Settlement as part of the Confirmation.  Leveraged and the Leveraged JOLs will receive their pro rata share of the Liquidation Recoveries and 26.8% of the Pooled Claims Recoveries.

### 4.    Class 4C: Alpha and the Alpha JOLs

Class 4C is impaired under the Plan.  The Claims held by Alpha, and the Alpha JOLs will be compromised, settled and allowed in the amount of $1.6 million, in accordance with the Investor Settlement.  The Trustee will seek approval of the Investor Settlement as part of the Confirmation.  Alpha, and the Alpha JOLs, will receive their pro rata share of the Liquidation Recoveries and 19.6% of the Pooled Claims Recoveries.

### 5.    Class 4D: Louisiana Pension Funds

Class 4D is impaired under the Plan.  Claims of the Louisiana Pension Funds will be allowed in the amount of $3 million, provided that the Louisiana Pension Funds vote to accept the Plan.  If the Louisiana Pension Funds vote to accept the Plan, they will receive a pro rata share of the Liquidation Recoveries.  If the Louisiana Pension Funds do not vote to accept the Plan, their claim shall be listed as disputed and shall be determined by the Bankruptcy Court.  Plan distributions made to the Louisiana Pension Funds are to be credited against recoveries through the Arbitrage and Leveraged recovery waterfalls in the Arbitrage and Leveraged Liquidation Proceedings in the Cayman Islands.  The Louisiana Pension Funds have also agreed that any recoveries that they received on what would have been Pooled Claim Recoveries will

also be similarly credited.  Unless and until they join the Investor Settlement, the Louisiana

Pension Funds will have no interest in the Pooled Claim Recoveries.

### 6. <u>Class 5: Insider Claims</u>

Class 5 is impaired under the Plan.  These are all claims held by Insiders of the

Debtor.  The Insiders have filed proofs of claim totaling in excess of $500,000 and €5.0 million,

plus unspecified, unliquidated claims that cannot be estimated.  For the reasons set forth in this

Report and Disclosure Statement, the Trustee believes that that all insider claims should be

expunged.  Unless otherwise agreed by the Trustee or ordered by the Bankruptcy Court, all

insider claims will be cancelled and extinguished.  The Trustee will seek appropriate rulings

from the Bankruptcy Court on this as part of Confirmation.  Class 5 claimants are deemed to

have rejected the Plan.

### 7. <u>Class 6: Intercompany Claims</u>

Class 6 is impaired under the Plan.  These are all claims held by Affiliates of the

Debtor.  Affiliates of the Debtor have filed proofs of claim for unliquidated claims that cannot be

estimated.  Unless otherwise agreed by the Trustee or ordered by the Court, all Intercompany

Claims other than claims in Classes 4A, 4B, 4C and 4D will be cancelled and extinguished.  The

Trustee will seek appropriate rulings from the Bankruptcy Court on this as part of Confirmation.

Class 6 claimants are deemed to have rejected the Plan.

### 8. <u>Equity Interests</u>

Except to the extent that Alpha, Leveraged, or Arbitrage are deemed to hold

Equity Interests, all Equity Interests in the Debtor will be cancelled and extinguished.  The

holders of Equity Interests in the Debtor will not be entitled to receive or retain any property or

interest on account of such Equity Interests under the Plan.  The Trustee will seek appropriate

rulings from the Bankruptcy Court on this as part of Confirmation.

### F.    NO SUBSTANTIVE CONSOLIDATION

The Trustee does not believe that substantive consolidation of the Debtor with

Alpha, Leveraged, and Arbitrage is appropriate.  The Debtor is a Bermuda corporation and the

Feeder Funds are organized in the Cayman Islands, and there is no authority to substantively

consolidate estates over international borders.  Moreover, even if theoretically possible, the

Trustee does not believe that an application to substantively consolidate the entities would be

appropriate.

### G.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

On the Effective Date, all executory contracts and unexpired leases of the Debtor

shall be rejected pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code,

except:  (i) any executory contract or unexpired lease that is the subject of a separate motion to

assume filed pursuant to section 365 of the Bankruptcy Code before the entry of the

Confirmation Order, which motion is not thereafter withdrawn or denied; (ii) all executory

contracts or unexpired leases assumed by order of the Bankruptcy Court entered before the

Confirmation Date and not subsequently rejected pursuant to an order of the Bankruptcy Court;

or (iii) any agreement, obligation, security interest, transaction or similar undertaking that the

Trustee or Plan Administrator, as the case may be, believes is not an executory contract or lease

that is later determined by the Bankruptcy Court to be an executory contract or unexpired lease

under section 365 of the Bankruptcy Code, which agreements shall be subject to assumption or

rejection within 30 days of any such determination.  Any order entered after the Confirmation

Date by the Bankruptcy Court, after notice and hearing, authorizing the rejection of an executory

contract or unexpired lease even if such rejection takes place after the Effective Date as provided

above, shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of

the Bankruptcy Code, as if such relief were granted and such order were entered prior to the Confirmation Date.

Any Claim arising from the rejection of any executory contract or unexpired lease under the Plan shall be forever barred and shall not be enforceable against the Debtor or the Estate unless a proof of Claim is filed and served on the Plan Administrator and the Trustee within 30 days after the date of notice of the entry of the order of the Bankruptcy Court rejecting the executor contract or unexpired lease (which may include, if applicable, the Confirmation Order) or such other date established by the Bankruptcy Court

### H.    EFFECTIVE DATE

#### 1.    <u>Conditions to Confirmation</u>

An order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered.

#### 2.    <u>Conditions to the Effective Date</u>

The following conditions shall be met prior to the occurrence of the Effective Date:  An order confirming the Plan, as such Plan may have been modified by the Proponent, shall have been entered (the "Confirmation Order").

#### 3.    <u>Waiver of Conditions</u>

The Trustee, in his sole discretion, shall have the right to waive any conditions to Confirmation or the Effective Date.  The Trustee and the Plan Administrator shall enjoy the benefit of the mootness doctrine with respect to any conditions waived by the Trustee.

### I.    WAIVER, RELEASES, AND INDEMNIFICATION

#### 1.    <u>Waiver of Claims</u>

As of the Confirmation Date, but subject to the occurrence of the Effective Date, and except as otherwise expressly provided in the Confirmation Order or the Plan, all Persons

who have held, hold or may hold Claims against or Interests in the Debtor shall be deemed, by virtue of their receipt of distributions and other treatment contemplated under the Plan, to have forever covenanted with the Debtor and the Trustee and with each of their present agents, employees, representatives, financial advisors, accountants and attorneys, to waive and not to (a) sue, or otherwise seek any recovery from the Debtor, the Estate, the Trustee, the Settling Parties, the Additional Settling Parties, or any of their present agents, employees, representatives, financial advisors, accountants or attorneys, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, based upon any act or occurrence or failure to act taken before the Effective Date arising out of the business or affairs of the Debtor, or (b) assert any Claim, obligation, right or cause of action and liability which any such Holder of a Claim against or Interest in the Debtor may be entitled to assert against any such Person, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part upon any act or omission, transaction or occurrence taking place on or before the Effective Date in any way relating to the Debtor, this Case, or the Plan, to the full extent permitted by applicable law.

## 2.    **Injunction**

Except as otherwise provided in the Plan or the Confirmation Order, and subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in any of the Debtor are, with respect to any such Claims or Interests, permanently enjoined from and after the Confirmation Date from:  (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the Estate or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee  or successor; (b) enforcing, levying,

attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, of any judgment, award, decree or order against the Debtor, or the Estate or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, or the Estate or any of their property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (d) asserting any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due the Debtor, or the Estate or any of their property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; and (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

3.      **Releases**

As of the Confirmation Date, but subject to the occurrence of the Effective Date, and except as otherwise expressly provided in the Confirmation Order or the Plan, all Persons who, directly or indirectly, hold or who have held any Claim against or Interest in the Debtor shall release the Debtor, the Estate, the Trustee, the Settling Parties, the Additional Settling Parties, and their present employees, agents, representatives, financial advisors, attorneys and accountants from (a) any and all claims or liabilities arising from actions taken in their capacity as such; and (b) any and all Claims, obligations, rights, causes of action and liabilities which any Holder of a Claim against or Interest in the Debtor may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part upon

any act or omission, transaction or occurrence taking place on or before the Effective Date in any way relating to the Debtor, this Case, or the Plan, to the full extent permitted by applicable law.

### 4.    **Indemnification**

Notwithstanding anything to the contrary in the Plan or the Disclosure Statement, the obligations of the Debtor and its Estate to indemnify the Trustee or the professional persons retained by the Trustee, pursuant to the Debtor's certificate of incorporation, by-laws, or other organizational documents, applicable statutes, and preconfirmation agreements respecting all present and future actions, suits, and proceedings against any of such indemnified Persons, based upon any act or omission related to service with, for, or on behalf of such Debtor at any time, as such obligations were in effect at the time of any such act or omission, in all cases net of applicable insurance proceeds, shall not be discharged or impaired by confirmation or consummation of the Plan but shall survive unaffected by the confirmation and consummation of the Plan.

### 5.    **Exculpation**

The Trustee, the Plan Administrator, the Advisory Board and the professional persons retained by them shall have no liability to any Holder of a Claim against or Interest in the Debtor for any act or omission in connection with or arising out of their administration of the Plan or the property to be distributed under the Plan except for willful misconduct or gross negligence and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

6.      **Existing or Future Claims**Notwithstanding anything in the Plan or the Disclosure Statement to the contrary, the waiver of claims, releases and injunctions provided for in the Plan shall not operate to waive, release or enjoin any of the claims of the Trustee, the Estate and the Parties to the Investor Settlement with respect to any Pooled Claims.

J.      **RETENTION OF JURISDICTION**

Following Confirmation and until such time as all payments and distributions required to be made and all other obligations required to be performed under the Plan have been made and performed by the Plan Administrator, the Bankruptcy Court shall retain jurisdiction as is legally permissible, including, without limitation, for the following purposes:

1.      **Claims and Interests**

To determine the allowability, classification, or priority of Claims against and Interests in the Debtor.

2.      **Injunction, etc.**

To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Person, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Case on or before the Effective Date with respect to any Person.

3.      **Fees**

To determine any and all applications for allowance of compensation and expense reimbursement of Professionals for periods on or before the Effective Date.

4.      **Dispute Resolution**

To resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of the Plan and the making of distributions thereunder.

5.      **Leases and Executory Contracts**

To determine any and all motions for the rejection, assumption, or assignment of executory contracts or unexpired leases, including post Effective Date assignments, or to determine any motion to reject an executory contract or unexpired lease where (a) the parties cannot resolve the cure amount therefor, or (b) the Trustee had mistakenly determined that any such agreement was not an executory contract or unexpired lease, and to determine the allowance of any Claims resulting from the rejection of executory contracts and unexpired leases.

6.      **Actions**

To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted prior to the closing of the Case, including any remands.

7.      **General Matters**

To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

8.      **Plan Modification**

To modify the Plan under section 1127 of the Bankruptcy Code, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purposes.

9.      **Aid Consummation**

To issue such orders in aid of consummation of the Plan and the Confirmation

Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Person,

to the full extent authorized by the Bankruptcy Code.

10.      **Avoidance Actions**

To enable the prosecution of any and all proceedings which have been or may be

brought prior to the Effective Date to set aside liens or encumbrances and to recover any

transfers, assets, properties or damages to which the Estate may be entitled under applicable

provisions of the Bankruptcy Code or any other federal, state or local laws except as may be

waived pursuant to the Plan;

11.      **Implementation of Confirmation Order**

To enter and implement such orders as may be appropriate in the event the

Confirmation Order is for any reason stayed, revoked, modified or vacated;

12.      **Resolve Disputes**

To resolve any disputes concerning whether a Person had sufficient notice of the

Case, the applicable Bar Date, the Disclosure Statement Hearing, the Confirmation Hearing, for

any purpose.

13.      **Determine Tax Liability**

To determine any tax liability pursuant to section 505 of the Bankruptcy Code.

14.      **Final Order**

To enter a Final Order closing the Case.

### K.   MISCELLANEOUS PROVISIONS

#### 1.   Defects, Omissions, Amendments and Modifications

##### a)   Pre-Confirmation Modification

The Plan may be altered, amended or modified before the Confirmation Date as provided in section 1127 of the Bankruptcy Code.

##### b)   Post-Confirmation Immaterial Modification

The Plan Administrator or the Trustee, as the case may be, may, with the approval of the Bankruptcy Court and without notice to all Holders of Claims and Interests, insofar as it does not materially and adversely affect the interest of Holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite the execution of the Plan.

##### c)   Post-Confirmation Material Modification

The Plan may be altered or amended after the Confirmation Date by the Trustee or the Plan Administrator in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects Holders of Claims or Interests, provided that such alteration or modification is after a hearing as provided in section 1127 of the Bankruptcy Code.

#### 2.   Withdrawal or Revocation of the Plan

The Trustee reserves the right to revoke or withdraw the Plan prior to the Effective Date in whole or in part.  If the Trustee revokes or withdraws the Plan, then the result shall be the same as if the Confirmation Order were not entered and the Effective Date did not occur to the extent withdrawn or revoked.

3.    **Successors and Assigns**

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors or assigns of such Person.

4.    **Final Orders**

The Trustee or the Plan Administrator, as the case may be, may waive any requirement in the Plan for a Final Order.

5.    **Governing Law**

Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of New York.

6.    **Notices**

Subject to Section 11.5, all notices, requests or demands for payments provided for in the Plan shall be in writing and shall be deemed to have been given when personally delivered by hand or deposited in any general or branch post office of the United States Postal Service or received by courier service or telecopier.  Notices, requests and demands for payments shall be addressed and sent, postage prepaid or delivered, to:

Richard J. Davis, Esq.
415 Madison Avenue, 11th Floor
New York, New York  10017
(646) 553-1365

With copies to:

Luskin, Stern & Eisler LLP
Eleven Times Square
New York, New York  10036
Attention:  Michael Luskin, Esq.
(212) 597-8200

or to any other address designated by the Plan Administrator by notice to each affected Holder of an Allowed Claim or Interest at the last known address according to the Debtor's books and records or at any other address designated by a Holder of an Allowed Claim on its proof of Claim, provided that any notice of change of address shall be effective only upon receipt thereof by the Trustee or the Plan Administrator.

### 7.    Severability

Except as to terms which would frustrate the overall purpose of the Plan, and should any provision in the Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any or all other provisions of the Plan.

### 8.    No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed as an admission by the Debtor or the Trustee with respect to any matter set forth herein, including, without limitation, liability on any Claim, the impairment of any Claim or the propriety of a Claim's classification.

## XI.
## CONFIRMATION OF THE PLAN

### A.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold the Confirmation Hearing to determine whether or not to approve the Plan and hear any objections thereto.  As set forth in the Disclosure Statement Order, the Confirmation Hearing has been scheduled for [__], 2014, commencing at [__] [a.m./p.m.], before the Honorable Robert E. Gerber at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 523, New York, New York 10004, or such other

location as the Bankruptcy Court directs.  The confirmation hearing may be adjourned from time-to-time by the Trustee or the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

**B.    OBJECTIONS**

Section 1128 of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by the objector against the Debtor's estate or property, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon (i) counsel to the Trustee; (ii) the Debtor; (iii) the Office of the United States Trustee for the Southern District of New York; (iv) all creditors that have filed a proof of claim, and (v) all parties that have requested notice pursuant to Bankruptcy Rule 2002, so as to be received by no later than the objection Deadline of [__], 201__ at 5:00 p.m. (EST).

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**C.    REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

**1.    Requirements of Section 1129(a) of the Bankruptcy Code**

**a)    General Requirements**

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

i)    The Plan complies with the applicable provisions of the Bankruptcy Code.

ii)    The Trustee has complied with the applicable provisions of the Bankruptcy Code.

iii)    The Plan has been proposed in good faith and not by any means forbidden by law.

iv)    Any payment made or to be made by the Trustee, by the Debtor or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

v)    The Trustee has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a Plan with the Debtor, or a successor to the Debtor under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Trustee has disclosed the identity of any insider that will be employed or retained by the Debtor, and the nature of any compensation for such insider.

vi)    Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor, as applicable, has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

vii)    With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtor were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

viii)    Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan.

ix)    Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative

-271-

expenses and priority claims other than priority tax claims will be paid in full on the Effective Date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding five (5) years after the date of assessment of such claims, of a value, as of the Effective Date, equal to the allowed amount of such claims.

x)     At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

xi)     Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.  See discussion of "Feasibility" below.

xii)     All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the applicable Plan, have been paid or the applicable Plan provides for the payment of all such fees on the Effective Date of the applicable Plan.

xiii)     The Plan provides for the continuation after the Effective Date of payment of all retiree benefits (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtor has obligated itself to provide such benefits.

xiv)     All transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

### b)     Best Interests Test

The Bankruptcy Code requires that each holder of an impaired Claim or Equity Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. Ordinarily, this requires a "liquidation analysis."  However, because this is a liquidating plan, no liquidation analysis has been performed, and no liquidation analysis is necessary.

### c)    Feasibility

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Bankruptcy Court finds that the plan is feasible.  A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor.  Because the Plan provides for the liquidation of the Debtor, the Bankruptcy Court will find that the Plan is feasible if it determines that the Debtor will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet its post-Effective Date obligations to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Case.  The Trustee believes that the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Court.

### 2.    Requirements of Section 1129(b) of the Bankruptcy Code

Section 1129(b) of the Bankruptcy Code sets forth the so-called "cramdown" provisions for confirmation of a plan even if it is not accepted by all Impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one Impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class, and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any Impaired class that has not accepted the plan.

### a)    Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  The test sets forth different standards for what is fair and equitable, depending on the type of claims or interests in such class.  In order to demonstrate that a plan is fair and equitable, the plan proponent must demonstrate:

- **Secured Creditors.** With respect to a class of secured claims, the plan provides: (i) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property, or (ii) for the sale, subject to section 363 of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this paragraph, or (iii) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim.

- **Unsecured Creditors.** With respect to a class of unsecured claims: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan.

- **Holders of Equity Interests.** With respect to a class of equity interests: (i) the plan provides that each holder of an equity interest receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (ii) the holder of any interest that is junior to the interests of the class of equity interests will not receive or retain under the plan on account of such junior interest any property.

The Trustee believes the Plan will satisfy the "fair and equitable" requirement.

### b)    No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The Trustee believes that under the Plan all impaired classes of Claims and Equity Interests are treated in a manner that is fair and consistent with the treatment of other classes of Claims and Equity Interests having the same priority. Accordingly, the Trustee believes the Plan does not discriminate unfairly as to any impaired class of Claims or Equity Interests.

<strong>c)      Application to the Plan.</strong>

The Trustee believes the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement notwithstanding that Classes 5 and 6 and Equity Interests will receive no distribution and are deemed to reject the Plan, because as to these classes, there is no class of equal priority receiving more favorable treatment and no class that is junior to such a dissenting class will receive or retain any property on account of the claims or equity interests in such class.

<strong>3.      Alternative to Confirmation of the Plan</strong>

If the Plan is not confirmed, the Trustee could attempt to formulate a different chapter 11 plan. Any such plan would include an orderly liquidation of its assets under chapter 11. With respect to an alternative plan, the Trustee has explored various alternatives in connection with the formulation and development of the Plan. The Trustee believes that the Plan, as described herein, enables creditors and equity holders to realize the most value under the circumstances.

<strong>4.      Nonconsensual Confirmation</strong>

If any impaired class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Trustee reserves the right to amend the Plan in accordance with section 14.1 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both. With respect to impaired classes of claims that are deemed to reject the Plan, the Trustee will request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

## XII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtor and to certain Holders of Allowed Claims.  This summary does not address the U.S. federal income tax consequences to Holders of Claims who are deemed to have rejected the Plan in accordance with the provisions of § 1126(g) of the Bankruptcy Code, or Holders whose Claims are entitled to payment in full in Cash.  This summary is based on the IRC, existing and proposed Treasury Regulations, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis.  Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties at this time.  The Trustee has not requested an opinion of counsel or any rulings from the IRS, and there can be no assurance that the IRS or a court would agree with the conclusions herein with respect to any of the tax aspects of the Plan.  This summary does not address state, local or foreign income or other tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as non-U.S. persons, broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, individual retirement and other tax-deferred accounts, any Non-debtor U.S. Subsidiary, persons holding securities as part of a hedging, straddle, conversion or constructive sale transaction or other integrated investment, traders in securities that elect to use a mark-to-market method of

accounting for their security holding, certain expatriates or former long term residents of the

United States, or persons whose functional currency is not the U.S. dollar).

**THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.**

*IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, Holders of Claims and Interests are hereby notified that: (a) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by Holders of Claims and Interests for the purpose of avoiding penalties that may be imposed on them under the IRC;(b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) Holders of Claims and Interests should seek advice based on their particular circumstances from an independent tax advisor.*

A.    FEDERAL INCOME TAX CONSEQUENCE TO THE DEBTOR

The Debtor has not historically filed Federal tax returns in the United States.  The

Trustee's tax advisors have reviewed the Debtor's books and records, and the Trustee has

concluded that the Debtor is not engaged in a trade or business in the United States and therefore

does not believe that the Plan will have any tax implications to the Debtor.  The Internal Revenue

Code and applicable Treasury Regulations provide an exception for trading in securities, which

includes not, only the purchase and sale of securities but "any other activity closely related

thereto."  On the basis of the exception for trading in securities, the Debtor has taken, and the

Trustee intends to continue to take the position that the Debtor is not engaged in business in the

United States within the meaning of Internal Revenue Code Section 882.  The Trustee similarly

believes that the Debtor's other passive investment activities and activities conducted through

current and former agents will not subject it to tax in the United States.  Nevertheless, no

assurance can be made that the IRS will not contend that the Debtor is engaged in a United States

trade or business and subject to net income tax on income effectively connected with such

United States trade or business.

### B.    FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS

The federal income tax consequences of the Plan to a Holder of a Claim will

depend on several factors, including, without limitation (i) whether the Holder's Claim (or a

portion thereof) constitutes a Claim for principal or interest, (ii) the origin of the Holder's Claim,

(iii) the type of consideration received by the Ho1der in exchange for the Claim, (iv) whether the

Holder is a resident of the United States for tax purposes, (v) whether the Holder reports income

on the accrual or cash basis method, (vi) whether the Holder has taken a bad debt deduction or

worthless security deduction with respect to its claim, (vii) the tax classification of the Holder,

and (viii) whether the Holder receives distributions under the Plan in more than one taxable year.

The foregoing is intended to be a summary only and is not a substitute for careful

tax planning with a tax professional.  The Federal, State, Local, and Foreign tax consequences of

the plan are complex, and in many areas, uncertain.  Accordingly, each holder is strongly urged

to consult with its own tax advisor.

### XIII.
### CONCLUSION

The Trustee believes that confirmation and implementation of the Plan is in the best interests of all creditors, and urge holders of impaired Claims in Classes 3 and 4 to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than 5:00 p.m. (Eastern Time) on [●], 2014.

Dated: New York, New York
      November 25, 2013

Respectfully submitted,

/s/ Richard J. Davis
Richard J. Davis, Chapter 11 Trustee for Fletcher International, Ltd.

415 Madison Avenue, 11th Floor
New York, New York 10017

# XIV.
# GLOSSARY

"AAI" means America Alternative Investments Inc.

"Abrams & Bayliss" means Abrams & Bayliss LLP.

"Advisory Board" means the advisory board described in section 7.3(b) of the Plan that will supervise liquidation of the Debtor's assets.

"Aesop" means The Aesop Fund, Ltd.

"AF" means Alphonse Fletcher, Jr.

"Aggressive LP" means The Fletcher Aggressive Fund, L.P.

"Aggressive Ltd." means The Fletcher Aggressive Fund, Ltd.

"IMA" means the investment management agreement dated December 28, 2010, between FILB and FAM.

"Alpha Liquidators" means the Joint Official Liquidators for Alpha, Jenna Wise and Tammy Fu of Zolfo Cooper (Cayman) Limited.

"Alpha Offering Memorandum" means the Confidential Memorandum relating to shares of Fletcher Fixed Income Alpha Fund, Ltd., dated June 7, 2007.

"Alpha" means Fletcher Fixed Income Alpha Fund, Ltd.

"Amended Consultant Agreements" means the amended consulting agreements between the Trustee and Turner and MacGregor and approved by the Court on November 12, 2012 [Docket No. 152].

"ANTS" means ANTS Software Inc.

"AP Defendants" means Arbitrage, Leveraged and Alpha.

"April 22 Transactions" means the following series of transactions FILB entered into on April 22, 2012:

- $2,200,000 was transferred from FILB's bank account to FII's bank account;

- FILB transferred to FII one-half of the UCBI Warrants (the warrants held to purchase shares of Common Stock Junior Preferred of UCBI with a strike price of $4.25);

- FILB transferred to FII the BRG Membership Interests (100% of the membership interest in BRG);

- FILB transferred to FII the DSS Warrants (warrants to purchase in shares of Common Stock of DSS with a strike price of $5.38); and

- FILB assigned to FII the Excess Registration Funds (the right to any payment in excess of $606,667.00 made by UCBI to FILB due to a "Registration Failure" under the Stock Purchase Agreement, dated April 1, 2010).

"Arbitrage JOLs" means the Joint Official Liquidators for Arbitrage, Robin McMahon and Kay Bailey of Ernst & Young LLP.

"Arbitrage LP" means Fletcher Income Arbitrage L.P.

"Arbitrage Offering Memorandum" means the Confidential Offering Memorandum for Arbitrage dated August 16, 2007.

"Arbitrage" means Fletcher Income Arbitrage Fund, Ltd.

"Assignment Agreements" means that Subscription Agreement dated February 13, 2012, executed by FILBCI and FILB and a Cross-Receipt dated February 22, 2012, pursuant to which the Debtor transferred certain of its interests in the UCBI Securities Purchase Agreement to FILBCI.

"AUM" means assets under management.

"Balance Sheet Trust" means a test for solvency based on the comparison of the fair value of net assets available to net capital claims.

"Bar Date" means the last day to file a proof of claim, January 18, 2013.

"Bar Date Order" means the Order of the Bankruptcy Court dated November 9, 2012 establishing the date by which all Persons asserting a Claim against the Debtor, other than Administrative Claims, must have filed a proof of Claim or be forever barred from asserting a Claim against the Debtor, the Estate or its property, and from voting on the Plan or sharing in any distribution under it.

"Bermuda Petition" means the winding up petition filed against the Debtor in Bermuda.

"BRG" means BRG Investments, LLC.

"Budget Travel" means Budget Travel a/k/a Intellitravel Media Inc.

"Capital Adequacy Test" means a test for solvency based on whether there is unreasonably small capital with which to conduct business.

"Carry Accounts" means the five accounts established as part of the transaction with UCBI that held cash and securities intended to cover three years of interest on the loan from UCBI as well as the carrying costs associated with certain properties.

"<u>Cash Flow Test</u>" means a test for solvency based on whether the Fletcher System had incurred debts that would be beyond its ability to pay as they come due.

"<u>Cash Model</u>" means the cash model created by Conway MacKenzie.

"<u>Cashless Notes</u>" means the two cashless promissory notes described in Section II.E.8 of this Report and Disclosure Statement.

"<u>Cayman Islands Court</u>" means the Grand Court of the Cayman Islands.

"<u>Cayman Winding Up Order</u>" means the ruling of the Grand Court of the Cayman Islands, dated April 18, 2012.

"<u>Chapter 11 Case</u>" means the Debtor's Chapter 11 case pending in the Bankruptcy Court for the Southern District of New York.

"<u>CIMA</u>" means the Cayman Islands Monetary Authority.

"<u>Citco</u>" means The Citco Group Limited and all of its direct and indirect subsidiaries and affiliates, including without limitation Citco Cayman and Citco Bank.

"<u>Citco Bank</u>" means Citco Bank Corporation N.V.

"<u>Citco Cayman</u>" means Citco Fund Services (Cayman Islands) Ltd.

"<u>Citco Trading</u>" means Citco Trading, Inc.

"<u>Citco III</u>" means Citco III Limited.

"<u>Compass</u>" means Compass Lexecon.

"<u>Confirmation</u>" means the entry of the Confirmation Order.

"<u>Confirmation Order</u>" means an Order confirming the Plan.

"<u>Consent Agreement</u>" means the consent agreement entered into between the Trustee, Geoffrey Fletcher, MV Nepenthes and Magic Violet.

"<u>Conway MacKenzie</u>" means Conway MacKenzie Management Services, LLC.

"<u>Consultants</u>" means MacGregor and Turner.

"<u>Contract Rejection Procedures</u>" means the procedures set forth in the Order dated November 2, 2012, pursuant to which the Trustee could reject pre-petition executory contracts [Docket No. 148].

"<u>Corsair Redemption</u>" means that certain redemption as of March 31, 2010 by Corsair (Jersey) Limited.

3

"Corsair" means Corsair (Jersey) Limited.

"CRA" means Charles River Associates.

"Credit Suisse" means Credit Suisse Securities (USA) LLC and Credit Suisse (Europe) LLC.

"Debtor" means Fletcher International, Ltd.

"DOJ" means the United States Department of Justice.

"DSS" means Document Security Systems, Inc.

"Duff & Phelps" means Duff & Phelps LLC.

"Duhallow" means Duhallow Financial Services, LLC.

"E&Y" means Ernst & Young LLP.

"EIC" means Equity Income Corporation.

"Eisner" means Eisner Amper LLP.

"Emails" means the emails collected by Young Conaway and turned over to the Trustee for review pursuant to agreement between the Trustee's counsel and AF and FAM and their counsel.

"Euro Note" means that certain promissory note dated as of January 1, 2011, in the principal sum of €20,448,765.14 made by FILB in favor of Leveraged.

"Expedited Discovery Order" means the order entered by the Court directing Messrs. Fletcher, Turner and MacGregor to appear for depositions and directing FAM, FIP and FII to produce documents related to the transfer of the FIP shares [Docket No. 255].

"FAM" means Fletcher Asset Management, Inc.

"FDIF" means the Fletcher Dividend Income Fund.

"Feeder Funds" means Alpha, Leveraged, and Arbitrage.

"FFC" means FFC Fund L.P. and FFC Fund Ltd.

"FFLP" means The Fletcher Fund L.P.

"FII" means Fletcher International, Inc.

"FILB Documents" means the approximately 2,300 documents collected by Young Conaway and produced to the Trustee, by agreement with AF and FAM.

"FILB" means Fletcher International, Ltd.

"FILBCI Action" means the lawsuit commenced by FILBCI against UCBI in the United States District Court for the Southern District of New York.

"FILBCI" means FILB Co-Investments LLC.

"FIP Register" means the Official Register of Members for Fletcher International Partners Ltd.

"FIP" means Fletcher International Partners, Ltd.

"Fletcher System" means Arbitrage, Alpha, Leveraged, Arbitrage L.P., FILB, and FII.

"Fletcher-Related Entity" means all direct and indirect subsidiaries and affiliates directly or indirectly owned by AF or controlled by FAM and its affiliates, including, without limitation, all entities set forth in Exhibit C to the Appendix.

"Fowler" means Peter Fowler

"FRS Presentation" means the PowerPoint presentation to the Firefighters' Retirement System of Louisiana dated March 12, 2008, presented by Fletcher Asset Management.

"FRS" means Firefighters Retirement System.

"Funds" means FILB, Arbitrage, Alpha, and Leveraged.

"Global Hawk" means Global Hawk Ltd.

"Goldin Associates" means Goldin Associates, LLC.

"Grant Thornton" means Grant Thornton LLP.

"Hard Drive" means the hard drive of emails collected in July 2012 by the Debtor's former counsel, Young Conaway.

"Headlands Letter" means the engagement letter between the Debtor and Headlands Capital.

"Headlands" means Headlands Capital Inc.

"Helix Preferred Shares" means Helix Series A-1 Cumulative Convertible Preferred Stock.

"HLX" or "Helix" means Helix Energy Solutions Group, Inc.

"HPG" means High Plains Gas, Inc.

"IAP" means Income Arbitrage Partners, L.P.

"IAP/EIC Note" means the promissory note dated June 20, 2008 in the principal sum of $27 million made by EIC in favor of Leveraged, which was later exchanged for a promissory note dated November 1, 2009, in the principal sum of $28,606,213.95 made by IAP in favor of Leveraged.

"IMA" means the investment management agreement between FILB and FAM.

"Initial Syntroleum Investment" means the initial investment made by FILB in Syntroleum pursuant to which FILB was required to purchase $3 million of common stock at a $.60 premium to the stock price on the date of the stock purchase.

"Insider" means an insider as such term is defined in section 101(31) of the Bankruptcy Code.

"Intellitravel" means Intellitravel Media, Inc.

"Intertrust" means Intertrust Cayman Islands.

"Investment Period" means the period of time during which FILBCI was required to purchase Series C Shares of UCBI.

"Investor Settlement" means the settlement agreement described in section 8.1 of the Plan pursuant to which the Trustee, Arbitrage, the Arbitrage JOLs, Leveraged, the Leveraged JOLs, Alpha, the Alpha JOLs, and the MBTA have agreed to pool their respective rights, title and interest in and to the Pooled Claims, and to cooperate with the Trustee, the Plan Administrator, and the Advisory Board with respect to the prosecution, settlement or other resolution of the Pooled Claims.

"ION" means ION Geophysical Corporation f/k/a Input/Output, Inc.

"ION Litigation" means the litigation FILB commenced against ION in the Delaware Chancery Court.

"IOSCO" means the International Organization of Securities Commissions.

"JOLs" means the Arbitrage JOLs and the Leveraged JOLs

"JPM" means JP Morgan Securities, LLC and JP Morgan Chase Bank.

"Kasowitz" means Kasowitz Benson Torres & Friedman LLP.

"Kiely" means Denis Kiely.

"Lampost" means Lampost Capital, L.C.

"Later Syntroleum Investment" means the second of two investments that FILB made in Syntroleum pursuant to which FILB was required to invest $9 million in exchange for shares of common stock.

"Leveraged JOLs" means the JOLs for Leveraged, Robin McMahon and Kay Bailey of Ernst & Young LLP.

"Leveraged Offering Memorandum" means the Confidential Offering Memorandum for Leveraged dated October 9, 1998, as amended February 21, 2007.

6

"Leveraged" means FIA Leveraged Fund, Ltd.

"Liquidation Recoveries" means the amounts recovered from time to time by the Trustee or Plan Administrator, as the case may be, on account of the liquidation of the Debtor's assets (including recoveries in any Proceedings), net of the costs and expenses of such recoveries; provided, however, that Liquidation Recoveries shall include, with respect to Pooled Claims, only FILB's share of the Pooled Claim Recoveries as set forth in the Investor Settlement.

"Louisiana Pension Funds" means FRS, NOFF and FRS.

"Lowercase" means Lowercase Ventures Fund I L.P.

"MacGregor" means Stuart MacGregor.

"Madison Williams" means Madison Williams LLC.

"Magic Violet" means Magic Violet LLC.

"Mandatory Redemption" means that a redemption of the Series N Shares will automatically occur on any Valuation Date on which the aggregate value of the Investment Accounts of Non-Series N Shareholders falls below 20% of the aggregate value of the Investment Accounts of the Series N shareholders.

"MBTA Presentation" means the March 2007 PowerPoint presentation to the MBTA entitled "Structured Market Neutral Investments in Mid-Sized Public Companies," presented by FAM.

"MBTA Side letter" means that certain letter agreement dated June 7, 2007, by and among the MBTA, FAM, and Alpha.

"MBTA" means Massachusetts Bay Transportation Authority Retirement Fund.

"Measurement Dates" means December 31, 2008, and March 31, 2010, the dates on which the Trustee measured Solvency.

"MERS" means Municipal Employees Retirement System of Louisiana.

"MFA" means the Managed Funds Association.

"Millennium" means Millennium Management, LLC.

"MMI" means Multi Managers Inc.

"MV Nepenthes" means MV Nepenthes LLC.

"NAV" means net asset value.

"New Wave" means New Wave Asset Management Ltd.

"NOFF" means New Orleans Firefighters' Pension and Relief Fund.

"<u>Offering Memoranda</u>" means the offering memoranda of Arbitrage, Leveraged and Alpha.

"<u>Petition Date</u>" means June 29, 2012, the date FILB filed for Bankruptcy.

"<u>PIPEs</u>" means Private Investments in Public Entities.

"<u>Pitagora</u>" means Pitagora Fund Ltd.

"<u>Plan Administrator</u>" means the Person designated or appointed as such under the Plan, and may be the Trustee.

"<u>Plan</u>" means the Trustee's proposed plan of liquidation.

"<u>Pooled Claim Recoveries</u>" means all amounts received on account of Pooled Claims, net of the costs and expenses (including professional fees and expenses) of securing such recoveries.

"<u>Pooled Claims</u>" means the Claims listed in Exhibit A to the Plan.

"<u>Post</u>" means Post NW, LLC.

"<u>Proskauer</u>" means Proskauer Rose LLP.

"<u>Protective Order</u>" means the Uniform Protective Order for Trustee Discovery [Docket No. 151].

"<u>QAM</u>" means Quantal Asset Management LLC.

"<u>Quantal</u>" means Quantal International, Inc.

"<u>Raser</u>" means Raser Technologies, Inc.

"<u>RBS</u>" means The Royal Bank of Scotland PLC and its subsidiaries and affiliates.

"<u>Registration Failure Payment</u>" shall have the meaning set forth in Section IV.K.2. of the Trustee's Report & Disclosure Statement.

"<u>Release and Waiver</u>" means the release and waiver execute by the Trustee and UCBI that was approved by the Court on April 10, 2013 [Docket No. 220].

"<u>Rejection Motion</u>" means the motion filed on October 25, 2012, by the Trustee seeking authority to reject the IMA and establish streamlined procedures for rejecting additional executory contracts during the pendency of the Chapter 11 Case on an expedited basis.

"<u>RF Services</u>" means Richcourt Fund Services, LLC.

"<u>RFA-Richcourt Paris</u>" means Richcourt Fund Advisors Paris.

"<u>Richcourt Holding</u>" means Richcourt Holding Inc.

"<u>Richcourt Allweather Fund</u>" means Richcourt Allweather Fund, Inc.

"Richcourt Euro Strategies" means Richcourt Euro Strategies, Inc.

"Richcourt Funds" means the "Investment Funds" managed by Richcourt Holding and its subsidiaries and affiliates listed on Exhibit E of the Appendix.

"Richcourt Holding" means Richcourt Holding Inc.

"Schedules" means the Debtor's Schedules of Assets and Liabilities filed on September 24, 2012 [Docket No. 104].

"Seaport" means Seaport Group, LLC.

"Series C Preferred Stock" means shares of Series C Preferred Stock of Helix.

"Series N Offering Memorandum" means Supplement to the Confidential Memorandum Relating to Series N Shares of Leveraged dated March 2008.

"Seven Arts" means Seven Arts Pictures, PLC.

"SG" mean Société Générale.

"Silva Action" means the action filed by Chris Silva in Los Angeles Superior Court against FAM, BRG, and AF.

"Silva Defendants" means FAM, BRG, and AF.

"Silva" means Chris Silva.

"Skadden" means Skadden, Arps, Slate, Meagher & Flom LLP.

"Smeets" means Christopher Smeets.

"SMHG" means Edelman Financial Group f/k/a Sanders Morris Harris Group.

"SOFA" means the Debtor's Statement of Financial Affairs filed on September 24, 2012 [Docket No. 105].

"Solon Group" means Solon Group, Inc.

"SPA" means the Securities Purchase Agreement dated April 1, 2010, as amended June 11, 2010 between the Debtor and UCBI.

"SS&C" means SS&C Technologies, Inc.

"SS&C Agreement" means the Agreement to provide Administration Services dated as of March 24, 2010, between SS&C and FILB, FII, Arbitrage, Leveraged, Alpha, FAM.

"Sterling" means Sterling Valuation Group, Inc.

"Syntroleum" means Syntroleum Corporation.

"Term Sheet Agreement" means the agreement entered into between the Trustee and FII that unwound the April 22 Transactions.

"Trott & Duncan" means Trott & Duncan Limited.

"Trustee" means the Chapter 11 Trustee, Richard J. Davis.

"Turner" means Stewart Turner.

"2004 Motion" means the motion filed by the Trustee seeking permission to serve subpoenas pursuant to Bankruptcy Rule 2004 [Docket No. 126].

"UCBI" means United Community Banks, Inc.

"UCBI Securities Purchase Agreement" means a Securities Purchase Agreement dated April 1, 2010, as amended June 11, 2010 between the Debtor and UCBI.

"Unternaehrer" means Ermanno Unternaehrer.

"Vanquish" means The Vanquish Fund.

"Walkers" means Walkers SPV Limited.

"WeiserMazars" means WeiserMazars LLP.

"Witness" means any person upon which the Trustee served a subpoena pursuant to Bankruptcy Rule 2004.

"WSJ Transcript" means the transcript of the April 15, 2011 interview of AF by Wall Street Journal reporters Josh Barbanel and Jamie Heller.

"Young Conaway" means Young Conaway Stargatt & Taylor, LLP, the Debtor's counsel.

"Zolfo Cooper" means Zolfo Cooper (Cayman) Limited.

**XV.**
**APPENDIX**

Exhibit A:        Plan

Exhibit B:        Simplified Fletcher System Organizational Chart

Exhibit C:        List of Fletcher-Related Entities

Exhibit D:        List of Filed Claims

Exhibit E:        Richcourt Holding Organizational Chart