Michael Luskin
Lucia T. Chapman
Stephan E. Hornung
LUSKIN, STERN & EISLER LLP
Eleven Times Square
New York, New York 10036
Telephone:  (212) 597-8200
Facsimile:  (212) 974-3205

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| FLETCHER INTERNATIONAL, LTD. | Case No. 12-12796 (REG) |
| Debtor, | |

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR ENTRY OF
AN ORDER PURSUANT TO SECTIONS 1125 AND 1128 OF THE BANKRUPTCY
CODE AND BANKRUPTCY RULES 2002, 3017, AND 3020
APPROVING THE DISCLOSURE STATEMENT,
FIXING CERTAIN DEADLINES, AND GRANTING RELATED RELIEF**

# TABLE OF CONTENTS

Preliminary Statement ........................................................................................................... 1

Recent Developments ........................................................................................................... 2

    A.    The Ion Litigation
        (Report Section VI.H; Supplement Section II.A) ................................... 2

    B.    The Kasowitz Litigation
        (Report Section VI.G; Supplement Section II.B) ................................... 2

    C.    Fletcher International Partners, Ltd.
        (Report Section IV.F; Supplement Section I.C) ................................... 2

    D.    Budget Travel Bankruptcy
        (Report Section VI.G; Supplement Section II.E).................................. 2

    E.    FII Avoidance Action
        (Supplement Section II.E)........................................................... 3

    F.    The Soundview Bankruptcy
        (Supplement Section I.F) ........................................................... 3

    G.    Approval by the Cayman Islands Court
        (Supplement Section II.G) .......................................................... 3

Plan Revisions and Clarifications and Other Disclosure Supplements and Amendments ............. 3

    A.    Distribution to the MBTA and the Louisiana Pension Funds
        (Article VI of the Plan) ............................................................. 3

    B.    Pre- and Post-Confirmation Amendments to the Plan
        (Sections 8.1 and 14.1 of the Plan) ............................................. 4

    C.    Plan Administrator Compensation
        (Section 7.3(a)(iii) of the Plan) .................................................. 4

    D.    Plan Advisory Board
        (Section 7.3(b) of the Plan)........................................................ 4

    E.    Investor Settlement
        (Article VIII of the Plan)........................................................... 5

    F.    Waivers, Releases, and Indemnification
        (Article 10 of the Plan) ............................................................ 5

    G.    Funding of the Plan
        (Section 11.4(b) of the Plan) ..................................................... 6

    H.    Classification of Claims and Objections to Certain Claims................... 6

I.      Confirmation Budget
        (Report Section X.D.1; Supplement Section IV.I, Ex. F.)......................................7

J.      Solicitation Documents.........................................................................................7

K.      Revised Appendix ................................................................................................7

Argument ........................................................................................................................7

I.      THE OBJECTIONS TO THE FORMAT OF THE REPORT AND DISCLOSURE
        STATEMENT ARE MERITLESS .........................................................................7

II.     THE OBJECTIONS TO THE REPORT AND DISCLOSURE STATEMENT FAIL
        TO ADDRESS THE TRUSTEE'S FINDINGS AND CONCLUSIONS...........................8

        A.      The Report Sets Forth an Accurate and Comprehensive
                Description of Relevant Facts and Conclusions and Satisfies
                the "Adequate Information" Standard ..................................................8

        B.      The Objections Fail to Call into Question the Trustee's
                Findings and Conclusions ....................................................................9

                1.      The Objections Do Not Contest Many of the Facts
                        and Conclusions in the Report ................................................11

                2.      The Objections Are Rife with Misrepresentations and Inaccuracies........15

III.    NO ADEQUATE ALTERNATIVE RECOVERY PLAN HAS BEEN PROPOSED .....19

Conclusion .....................................................................................................................21

## TABLE OF AUTHORITIES

CASES

**Page(s)**

In re Nat'l Health & Safety Corp., 2000 WL 968778 (Bankr. E.D. Pa. July 5, 2000) ...................9

In re New Haven Radio, Inc., 18 B.R. 977 (Bankr. D. Conn. 1982) ..............................................9

In re Walker, 198 B.R. 476 (Bankr. E.D. Va. 1996).......................................................................9

Richard J. Davis, the Chapter 11 Trustee in this Chapter 11 case (the "**Trustee**"),

submits this Memorandum of Law in Support of his Motion for Entry of an Order Pursuant to

Sections 1125 and 1128 of the Bankruptcy Code and Bankruptcy Rules 2002, 3017, and 3020

Approving the Disclosure Statement, Fixing Certain Deadlines, and Granting Related Relief

(the "**Motion**").

### Preliminary Statement

On November 25, 2013, the Trustee filed his Report and Disclosure Statement

(the "**Report**") and Plan of Liquidation (the "**Plan**").  The Report and the Plan were the

culmination of a 14-month investigation.  The report details the result of the Trustee's

investigation and concludes that AF[1] and his associates, assisted or facilitated by various of their

outside service providers, perpetrated an elaborate fraud on its investors through the use of

wildly-inflated valuations, fraudulent transactions, and the misappropriation of client assets.  As

set forth in the Report, the Trustee has already liquidated the Debtor's liquid assets, and, other

than a potential recovery on a dispute involving a warrant issued by UCBI, the primary expected

source of recovery to FILB's creditors will likely be from litigations against these Insiders and

service providers.  These potential claims are discussed in detail in the Report.

Since the Trustee filed the Report and the Plan, there have been several important

developments in the case.  The Trustee has received informal comments from parties-in-interest

and written objections from two Insiders whose conduct is criticized in the Report, and who take

issue with portions of the Report.  Additionally, based on extensive discussions with the

Arbitrage, Leveraged and Alpha JOLS, the MBTA, and the Louisiana Pensions Funds, the

---

[1] This memorandum adopts the shorthand references incorporated in the Report and its accompanying
Glossary, as well as to defined terms in the Supplement to the Trustee's Report and Disclosure Statement.
Thus, "AF" refers to Alphonse Fletcher, Jr.

Trustee believes it is appropriate to clarify or modify certain aspects of the Plan. These are all described in the Supplement to the Trustee's Report and Disclosure Statement (the "**Supplement**"), which is being filed simultaneously with this brief. They are summarized below for the Court's convenience.

<u>**Recent Developments**</u>

A.     **The Ion Litigation**
        **(Report Section VI.H; Supplement Section II.A)**

On December 4, 2013, the Court issued a written decision and awarded the Debtor $300,000 in damages plus interest. Since then, the Trustee has settled the case for $500,000. The Trustee expects to receive payment in February 2014.

B.     **The Kasowitz Litigation**
        **(Report Section VI.G; Supplement Section II.B)**

The parties have exchanged formal document requests and a status conference is scheduled for January 16, 2014.

C.     **Fletcher International Partners, Ltd.**
        **(Report Section IV.F; Supplement Section I.C)**

The Trustee has learned that Stewart Turner has misappropriated approximately $145,000 in investor money, and intends to commence litigation to recover it should Turner refuse to return it voluntarily.

D.     **Budget Travel Bankruptcy**
        **(Report Section VI.G; Supplement Section II.D)**

On December 9, 2013, the Trustee filed proofs of claim on behalf of BRG and FDIF to preserve their rights with respect to approximately $3.6 million in loans that were made to Budget Travel. An auction to sell Budget Travel's assets has been scheduled for February 7, 2014.

-2-

E.      **FII Avoidance Action**
        **(Supplement Section II.E)**

The Trustee has commenced an avoidance action against Fletcher International, Inc., seeking to avoid and recover more than $143 million in preferential and fraudulent transfers.

F.      **The Soundview Bankruptcy**
        **(Supplement Section I.F)**

Orders have been entered in the Cayman Islands, winding up several Richcourt Funds and appointing joint official liquidators.  AF has caused these funds and others to file Chapter 11 petitions in the Southern District of New York.  The parties-in-interest in the Soundview Bankruptcy are currently litigating, among other things, the propriety of filing the Soundview Petitions, who has control over the Soundview Debtors, whether a Chapter 11 trustee should be appointed, and whether the cases should be dismissed in favor of the pending Cayman Islands proceedings.

G.      **Approval by the Cayman Islands Court**
        **(Supplement Section II.G)**

At a hearing on January 9, 2014, the Cayman Islands Court authorized the Arbitrage and Leveraged JOLs' entry into the Investor Settlement and support of the Plan.  No written order as yet been issued.

**Plan Revisions and Clarifications and Other Disclosure Statement
Supplements and Amendments**

A.      **Distribution to the MBTA and the Louisiana Pension Funds**
        **(Article VI of the Plan)**

The Plan has been modified to remove any reference to credits against the "waterfall" (i.e., how money would be distributed to investors after it was received at the Arbitrage and Leveraged levels). The JOLs, the MBTA, the Louisiana Pension Funds have

instead agreed that the ratio of total recoveries by the MBTA and the Louisiana Pension Funds

from the FILB, Arbitrage, Leveraged and Alpha insolvency proceedings and individual

(unpooled) claims will be 80% for the Louisiana Pension Funds and 20% for MBTA/Alpha.

(See Supplement Section IV.A.)

**B.      Pre- and Post-Confirmation Amendments to the Plan
(Sections 8.1 and 14.1 of the Plan)**

The Plan has been modified to clarify under what circumstances the Louisiana

Pension Funds can join the Investor Settlement and to provide authority for the Advisory Board

to revise the parties' shares of the Pooled Recoveries.  (See Supplement Section IV.B.)

**C.      Plan Administrator Compensation
(Section 7.3(a)(iii) of the Plan)**

The parameters of the compensation for the Plan Administrator have been agreed

to and set forth in the Plan.  The Plan administrator will charge the same discounted rates that the

Trustee received in the FILB bankruptcy, subject to a monthly cap, and two incentive milestones.

The Plan Administrator will also be reimbursed for all out of pocket expenses.  (See Supplement

Section IV.C.)

**D.      Plan Advisory Board
(Section 7.3(b) of the Plan)**

The Plan has been amended to identify the members of the Advisory Board, who

are:

- The Trustee, as Plan Administrator, and on behalf of the Debtor;

- Rob McMahon, of Ernst & Young, on behalf of Arbitrage and Leveraged
  JOLs; and

- Tammy Fu, of Zolfo Cooper, on behalf of the MBTA and Alpha JOLs.

(See Supplement Section IV.D.)

E.    **Investor Settlement**
      **(Article VIII of the Plan)**

The description of the Investor Settlement has been expanded to discuss the claims being settled among the settling parties.  Among others, the Investors Settlement will resolve the following claims:

- Litigation commenced by the Arbitrage and Leveraged JOLs against FILB over the so called Euro Note (See Section V. E.);

- The winding up petition filed against FILB in Bermuda (See Section V.F.);

- All proofs of claim filed by the Parties to the Investor Settlement against the Debtor, including, Claim No. 12 (Alpha); Claim No. 30 (Arbitrage); Claim Nos. 35, 37 (Leveraged); and

- Clawback claims by FILB against the Parties to the Investor Settlement for redemptions made to redeeming investors during the statutory look-back period – including, without limitation any claims that FILB may have against Arbitrage or Leveraged for the UCBI assets that were transferred in February 2012.

(See Supplement Section IV.E.)

F.    **Waivers, Releases, and Indemnification**
      **(Article 10 of the Plan)**

Section 10.6 of the Plan has been amended to clarify that the waivers, releases and injunctions in Article 10 of the Plan do not operate to waive, release or enjoin any claims of the Trustee, the Estate, the parties to the Investor Settlement (current or future), or the Louisiana Pension Funds other claims than against the Debtor.

A new Section 10.7 is being added to the Plan to clarify that the Plan is not intended to affect the rights of any parties to any settlement agreements that the Trustee entered into prior to confirmation of the Plan and that have already been approved by the Court. (See Supplement Section IV.F.)

### G.   Funding of the Plan
### (Section 11.4(b) of the Plan)

In order to allow the Advisory Board to fund litigation of Pooled Claims, Section 11.4(b) of the Plan has been amended to allow the Advisory Board to (i) enter into financing agreements with parties and non-parties to the Investor Settlement, on such terms as the Advisory Board approves, including, without limitation, providing premiums to the funding party, granting superpriority status to the funding party, reallocating claims among the Holders of Allowed Class 4 Claims, or providing other consideration, or (ii) hold back a portion of the distributions otherwise due to Holders of Allowed Class 4 Claims; provided, however, that in the event Class 4 Allowed Claims are reallocated, the aggregate amount of Class 4 Allowed Claims cannot be increased above the aggregate amount set forth in Article VI of the Plan. (See Supplement Section IV.G.)

### H.   Classification of Claims and Objections to Certain Claims

Exhibit D to the Disclosure Statement has been amended and replaced in its entirety. Revised Exhibit D now reflects how each claim has been classified for voting purposes. Additionally, the Supplement discusses how the Trustee intends to treat holders of certain Class 3, 5 and 6 Claims, and Equity Interests. (See Supplement Section IV.H and Exhibit 4.)

**I.    Confirmation Budget**
**(Report Section X.D.1; Supplement Section IV.I, Ex. F.)**

The Trustee has formulated a budget through expected confirmation.  The budget is attached to the Supplement as Exhibit 3 and will be added to the Disclosure Statement as Exhibit F.

**J.    Solicitation Documents**

The Disclosure Statement is being amended to add an Exhibit G, which includes certain solicitation documents, including a Notice of the Confirmation Hearing, form ballots, and notices to holders of claims who are not entitled to vote.  (See Supplement Section IV.J.)

**K.    Revised Appendix**

The Appendix to the Disclosure Statement has been amended to reflect the addition of new exhibits.  (See Supplement Section IV.K.)

<u>Argument</u>

**I.**
**THE OBJECTIONS TO THE FORMAT OF THE REPORT AND DISCLOSURE STATEMENT ARE MERITLESS**

Only two Insiders whose conduct is severely criticized in the Report – AF (in the guise of the Soundview Debtors) and Turner – have filed objections to the Report.[2]

As a preliminary matter, counsel for the Soundview Debtors objects on the grounds that the Trustee inappropriately combined his Report and Disclosure Statement in a single document and that the combined Report "fails to adequately and consistently distinguish

---

[2] Objection of Debtors-in-Possession Soundview Elite Ltd., et al., to Trustee's Report and Disclosure Statement [Docket No. 370] ("**Soundview Objection**"); Objection of Stewart Turner to the Trustee Report and Disclosure Statement [Docket No. 371] ("**Turner Objection**").  Citations to "**AF Aff.**" in this memorandum refer to the Direct Testimony/Affidavit of Alphonse Fletcher, Jr. on Motions to Dismiss, Convert, or Appoint a Trustee, attached as Exhibit A to the Soundview Objection.  Citations to "**Report Section**" refer to sections of the Report.  Citations to "**Supplement Section**" refer to sections of the Supplement.

between mere allegations and facts." Soundview Objection ¶¶ 1, 11-15. There is no merit to this

criticism. Under Section 1106 of the Bankruptcy Code, the Trustee was required to file a report

detailing any fraud or dishonesty and any claims available to the Debtor's estate, and a simple

review of the Table of Contents of the Report makes clear what portions of that document are

facts and what are the Trustee's conclusions. Report Sections II, III, IV and V set forth relevant

facts concerning the Fletcher Funds and the events leading to FILB's bankruptcy.[3] Report

Section VI describes the Chapter 11 Case. The Trustee's conclusions – which are far from

"mere allegations" – are set forth in great detail in Report Section VIII (concisely and clearly

labeled "Trustee's Conclusions") and are the result of an intensive and extensive investigation by

the Trustee over the course of more than a year, as described in Report Section VII. Finally, the

Trustee disclosed certain litigation risk factors to be considered (Report Section IX) before

setting forth the Plan and related procedural details and other disclosures (Report Sections X, XI

and XII).

## II.
### THE OBJECTIONS TO THE REPORT AND DISCLOSURE STATEMENT FAIL TO ADDRESS THE TRUSTEE'S FINDINGS AND CONCLUSIONS

**A.    The Report Sets Forth an Accurate and Comprehensive Description of Relevant Facts and Conclusions and Satisfies the "Adequate Information" Standard**

The Soundview Debtors object to the Report on the grounds that it fails to meet

the "adequate information" standard required by law. Soundview Objection ¶¶ 2, 4-9. To the

contrary, the Report far exceeds that minimal requirement. As discussed above, the 249 page

Report clearly differentiates between "facts" and "conclusions," details the extensive

investigation conducted by the Trustee, and contains 577 footnotes to documents and testimony

supporting the Trustee's findings and conclusions. As discussed below, any suggestion that the

---

[3] To the extent that those sections contain any arguments, they are clearly such on their face.

Trustee's conclusions are inaccurate is unsupported by the evidence.  In any event, all that is now

an issue is the adequacy of the Trustee's disclosure about the Plan and his reasons for proposing

it, all of which are detailed.  Voting creditors also will have access to the Soundview and Turner

Objections, and to the extent that disputes over the Trustee's conclusions with respect to fraud

and other wrongdoing are found to be material to confirmation of the Plan, they will be resolved

at the confirmation hearing.  To the extent they are not material to confirmation of the Plan, they

will be resolved in subsequent litigation.[4]

AF's contention that the Report could "create confusion for voting creditors as to

the difference between facts actually proven, sworn and established . . . and the Trustee's

opinion" (Soundview Objection ¶ 14) is absurd.  The voting creditors who are the focus of AF's

current concern are highly sophisticated parties (including law firms and investment banks) who

were intimately involved in the Funds' affairs and will have no problem distinguishing between

the clearly-labeled fact and conclusions sections of the Report and Disclosure Statement.

## B.    The Objections Fail to Call into Question the Trustee's Findings and Conclusions

AF and Turner – two Insiders whose conduct the Trustee has severely criticized –

are the only parties to have filed objections to the Report and Disclosure Statement.

Significantly, those objections fail even to address many of the most significant facts and

conclusions in the Report.  And to the extent that the objections do attempt to refute specific

portions of the Report, they fail to call into question in any meaningful way the Trustee's

---

[4] Counsel for the Soundview Debtors asserts that a disclosure statement is inadequate "when it contains misleading and/or slanted statements and omits or misrepresents material information" (citing, *inter alia*, In re Nat'l Health & Safety Corp., 2000 WL 968778, at *1 (Bankr. E.D. Pa. July 5, 2000)).  However, courts have considered all of the facts and circumstances, including the cumulative effect of any misstatements and omissions, in determining whether to approve a disclosure statement.  See, e.g., In re Walker, 198 B.R. 476, 479 (Bankr. E.D. Va. 1996) ("[a]dequate information for purposes of 11 U.S.C. § 1125 is to be determined by the facts and circumstances of each case."); In re New Haven Radio, Inc., 18 B.R. 977, 979 (Bankr. D. Conn. 1982) ("there is no precise formula for the information to be provided").

findings and conclusions because they contain incomplete and often inaccurate and misleading assertions.  Nevertheless, the Trustee has no objection to noting in his Supplement that AF and Turner have filed objections and dispute certain allegations, and that those objections are readily available for interested parties to review.

The objections filed by AF and Turner overlap to a great extent, and for that reason the Trustee will address them jointly.  Initially, AF and Turner face a significant hurdle in attempting to refute the Trustee's conclusions.  The findings set forth in the Report resulted from a lengthy and thorough investigation by the Trustee that is laid out in detail in that document.  See Report Section VII.  The Trustee approached his investigation with no preconceptions and conducted extensive legal and forensic analysis of all of the evidence obtained.  In contrast, the objecting parties (AF and Turner) are both Insiders whom the Trustee has concluded participated in and spearheaded the fraud perpetrated on FILB, its feeder funds, and their investors.  Their objections must be considered in light of the fact that they stand accused of massive wrongdoing.

The parties will have an opportunity to dispute the merits of the Trustee's conclusions and any underlying claims against AF, Turner, other Insiders and affiliates either as part of the confirmation process or in separate lawsuits.  This memorandum therefore addresses only a limited number of the assertions contained in – or, strikingly, absent from – the objections that on their face are inaccurate, misleading, and ultimately unpersuasive.

1.      **The Objections Do not Contest Many of the Facts and Conclusions in the Report**

   a)      **Uncontested Facts and Conclusions Relating to Valuations**

Among other facts and conclusions in the Report, AF and Turner do not seriously dispute the following:

- No audit was completed for Leveraged for 2009 due to valuation differences between FAM and its auditor, Eisner.  Furthermore, no audit of any Fund in the Fletcher structure was completed for 2010 due to material valuation differences between FAM and Eisner.

- The appropriate standard for valuing FILB's complex investments was "fair value" (although, as discussed extensively in the Report, AF and Turner appear not to apply that standard).  See Report Section VIII.E.1.

- Neither FAM nor Quantal performed any fundamental analysis of the companies as part of their valuations.  See Report Sections VIII.E.2, VIII.E.3.e, VIII.E.3.j, VIII.E.3.l.  Turner's response – without any support – is merely that "[a]ccounting rules do not allow such subjective interpretations."  Turner Objection at 10.  However, AF refers to a "careful and rigorous investment strategy" (AF Aff. ¶ 11), and FAM's marketing materials state that FAM performed "Fundamental Research-Meticulous analysis of management, financials, and business plan."  FRS Presentation at 8.  They said that they did it, but they did not.

- FAM took enormous initial markups on many of FILB's investments.  See Report Sections IV.G, IV.I, IVJ, IV.L, VIII.E.2, VIII.E.3.c, VIII.E.3.h, VIII.E.3.k.  Ten new PIPEs and warrants investments initiated

by FILB between 2007 and the Petition Date had a combined highest mark

of $454 million, but FILB realized only $60 million on those investments,

a mere 13% of the highest mark.  In attempting to refute the Trustee's

conclusions that such markups were improper, Turner cites to the DSS

transaction in which FILB paid $4 million for stock and two warrants.  On

the same day, FAM marked the stock at $4.1 million, the first warrant at

$13.1 million, and the second warrant at $6.4 million, for a total of

$23.6 million, or a same day markup of $19.6 million.  (FILB ultimately

realized only $3.1 million for the entire investment.)  Turner appears to

suggest that the fact that DSS also listed a $3.9 million liability related to

one of the warrants somehow justifies FAM's exorbitant markup.  Turner

fails to say that the warrant for which DSS recorded a $3.9 million liability

is the same one that FAM marked at $13.1 million, and that for the second

warrant, DSS recorded a $0.4 million liability while FAM valued the

warrant at 16 times that amount, or $6.4 million.[5]

- The non-standard warrant formula was so highly unusual as to cause at

  least one issuer to insist on an amendment incorporating the standard

  formula and undermines the purely theoretical valuation of those warrants

  because of very real market concerns.  See Report Sections VIII.E.2,

  VIII.E.3.d.

---

[5] Turner criticizes the table in the Report and Disclosure Statement analyzing information relating to the ten post-2007 investments (see Report Section VIII.E.3.c) as containing a "half-truth" (Turner Objection at 4).  That criticism is without merit.  Turner misunderstands the meaning of the column in that table titled "Date of Sale."  That column lists the dates on which securities were sold, and the fact that FILB still holds a warrant in DSS has no bearing on the information in that column.

- FAM did not use its own sales of the investments in Helix and ION in valuing those positions, relying instead on purely theoretical model-based valuations which provided dramatically greater values on FILB's books (and thereby boosted AUM and fees). None of those transactions resulted in significant value in excess of conversion or redemption value, and the Trustee has concluded that they were orderly transactions. See Report Sections II.E.6, VIII.E.3.a. Turner's argument that the conversions (at numbers well below FAM's marks) were done to "preserve the proprietary aspects of these investments" (Turner Objection at 12) is utter nonsense. If that were the case, FAM would never benefit from those so-called undisclosed proprietary provisions (which, by the way, are disclosed in public SEC filings).

- The valuations of Richcourt were inaccurate and misleading and relied on incorrect data in order to disguise Richcourt's actual decline and the fact that, by September 2010, Richcourt's AUM not subject to pending redemptions had dropped to zero or close to zero. See Report Sections IV.E, VIII.H.

- No independent valuation of the investment in FIP was conducted. Instead, FAM merely accepted the value ascribed to the investment by Unternaehrer despite evidence that the actual value was far less. See Report Section IV.F.[6]

---

[6] AF's and Turner's claim that Ernst & Young LLP blessed FAM's valuations (see Turner Objection at 7 & n.10, AF Aff. ¶ 130) is false. In its report, E&Y specifically states that it did not perform valuations of the underlying portfolio positions. [Docket No. 347-1 at 4, 10, 17] For purposes of its analysis, E&Y used the lower of Quantal's and FAM's valuations. [Docket No. 347-1 at 18] See Report Section V.B.

**b)**  **Other Uncontested Facts and Conclusions**

AF and Turner also do not dispute the following:

- The fee structure of FAM's overall business was such that incentive fees were charged to clients in a highly unusual manner, effective management fees were above market, and employees were being paid by funds when they should have been paid by FAM.  <u>See</u> Report Sections II.E.5, II.E.10.

- Promising an investor a 12% return when FAM's historical track record was 8.13% was unrealistic.  <u>See</u> Report Sections III.B.2, VIII.A.

- AF bought Richcourt for himself using the money from the Louisiana Pension Funds, through the non-market IAP/EIC Note.  They also did not dispute that the IAP/EIC Note was worth substantially less than its face amount.  <u>See</u> Report Sections IV.E, VIII.C.1.

- FAM used $160 million of Cashless Notes to boost AUM artificially by that amount, which benefitted FAM, other service providers, and other related parties who charged fees based on inflated AUM.  <u>See</u> Report Sections II.G, V.I.

- The Corsair Redemption (which ultimately resulted in FAM owning much of the Corsair investment and securing another inappropriate fee at the expense of investors) breached the 20% cushion required for the Leveraged Series N shareholders and should have triggered a redemption

---

The joint statement to which Turner and AF refer stated merely that E&Y had determined that "FAM's valuation [of the investment portfolio] showed that the asset values exceed[ed] the [Louisiana Pension Funds'] investment and expected return."  The review was a facial analysis of the books and records only, and did not include any independent analyses of the propriety or valuation of particular investments.  <u>See</u> Report Section V.B.

of Series N, an event that would have collapsed the entire structure.

<u>See</u> Report Sections III.B.3, VIII.D.4.

- FAM round-tripped client funds through Vanquish and Aesop to invest in Leveraged and maintain the appearance of the 20% cushion.  <u>See</u> Report Sections IV.O, VIII.C.6, VIII.D.3.

- FILB, at FAM's and AF's direction, put almost $8 million of investor funds in AF's brother's movie without disclosing the payment and without any prior notice as required by the MBTA Side Letter.  <u>See</u> Report Section VIII.C.3.

- AF and FAM caused FILB to invest a net of $4.1 million in FIP as a means of providing $6.5 million in cash to a senior Citco executive, Ermanno Unternaehrer, without any meaningful disclosure and without any prior notice.  <u>See</u> Report Sections IV.F, VIII.A, VIII.C.2, VIII.I, VIII.J.

- The Fletcher System (Arbitrage, Alpha, Leveraged, Arbitrage LP, FILB and FII) was insolvent as of the Measurement Dates (December 31, 2008, the end of the year in which the Louisiana Pension Funds invested, and March 31, 2010, the date of the Corsair Redemption).  <u>See</u> Report Section VIII.F.

**2.**     **<u>The Objections Are Rife with Misrepresentations and Inaccuracies</u>**

The objections misrepresent and mischaracterize a number of statements in the Report and are full of fallacious arguments.  Here, however, we address only a few of those arguments.  One particularly egregious misstatement concerns the remaining UCBI warrant

owned by FILB.  The assertion that the Trustee values that investment at $71 million

demonstrates a complete lack of understanding and is patently untrue.  See Turner Objection

at 4; Soundview Objection  ¶ 16.s (at 14).  Nothing better demonstrates how FAM and the Funds

operated than this distortion.  AF and Turner have seized upon a litigation position and

transformed it into a truth, when in reality the Report contains the following language:

> If the Trustee's interpretation of the warrants is correct, it could result in
> approximately $71 million in common stock to the Debtor, which the Trustee
> could then sell on the open market. . . . In an effort to avoid litigation over all
> these claims, the Trustee and UCBI have begun settlement negotiations.  Failing a
> consensual resolution, the Trustee intends to commence litigation against UCBI
> and vigorously enforce its rights against UCBI.  *The Trustee expects that UCBI*
> *will vigorously contest his claims.  While the Trustee believes he has good*
> *arguments, it is not possible to predict who would prevail in any litigation, and it*
> *therefore should not be assumed that the Estate will prevail.*

See Report Section VI.G.10.  In other words, AF and FAM would have the Trustee do what they

did:  value the warrants as if there were no dispute with UCBI, or as if success at trial were

guaranteed.[7]  Also, in criticizing the JOL settlement relating to the preferred shares delivered in

an attempt to redeem the Louisiana Pension Funds, AF and Turner fail to address the fact that

their valuation was grossly overstated, failed to account for litigation risk, and ignored the fact

that the JOLs would have had to invest $65 million to purchase UCBI convertible preferred

shares in order to be entitled to the disputed warrants.  See Report Section VIII.E.3.h.[8]

Similarly, Turner's criticism of the Report "because it combines the profitable

'SMHG' transaction made by FILB with what turned out to become a series of unprofitable

---

[7] As noted in the Report, FAM marked up the entire UCBI investment by 299% in the one month
following the reverse stock split and failed to account for *any* litigation risk. See Report Section IV.K.

[8] Additionally, AF's suggestion that Quantal, Ernst & Young, and Skadden addressed the value of the
UCBI investment and supported a valuation of at least $136 million (AF Aff. ¶137) is false.  Neither
Ernst & Young nor Skadden valued or revalued the investments.  Skadden merely provided legal advice
relating to the arguments in the dispute over the effect of the reverse stock split.

investments made by Fletcher International, Inc. . . . into Madison Williams" is disingenuous. Turner Objection at 3. Turner himself is the source: he told the Trustee that these transactions were linked and that FILB could not have purchased SMHG warrants without purchasing Madison Williams. Turner Interview, June 6, 2013.

Turner misrepresents the Trustee's methodology for valuing the Helix and ION positions by claiming that the Trustee did not consider beneficial conversion charges that companies recorded on their books that arose as a result of the conversion price. Turner Objection at 5. Turner is wrong: the Trustee did. See Report Section VIII.E.3.

Turner refers to the sale of FILB's ION convertible preferred investment by Credit Suisse for slightly more than conversion value, noted in the Report (see Report Section V.G), but adds details of a transaction in which the buyer paid an apparent $5 million premium over conversion value. Turner Objection at 11. In fact, the premium was the present value of 3.7 years of dividends, a figure which is in line with the Trustee's view on how to value these securities. Quantal's figure, on the other hand, implied 18 years of dividends. Indeed, AF and Turner never obtained more than the conversion price in the earlier sales of portions of the ION position. See Report Sections VIII.E.2 and VIII.E.3.a.

Turner also mischaracterizes his conduct in connection with FIP. Although he argues that he did not backdate resolutions concerning FIP (Turner Objection at 5), his description of his actions proves otherwise. On June 20, 2013 – nearly one year after FILB's bankruptcy – Turner violated the automatic stay by executing resolutions transferring FILB's interest in FIP and purporting to make the transfer effective as of two years earlier. This required the Trustee to seek the Court's intervention on an expedited basis in order to undo the transfer.[9]

---

[9] While Turner appears to object to the characterization of his conduct as backdating, he signed resolutions dated June 20, 2013, to reflect a transfer as of June 30, 2011. Turner Objection at 5. Whether

<u>See</u> Report Sections II.E.11, IV.F.  Then, having already violated the automatic stay in the
Chapter 11 Case, Turner misappropriated FIP funds by secretly agreeing with himself that he
should be appointed president of FIP and paying himself a $25,000 signing bonus and a monthly
salary of $16,000, and guaranteeing himself other significant benefits, including a $72,000
severance package. <u>See</u> Supplement Section II.D.

AF's and Turner's attempt to refute the Trustee's conclusions that many if not all
of FILB's assets were grossly overvalued by suggesting that various third parties, including
Citco, SS&C, Grant Thornton, Eisner Amper, Quantal, Sterling, and Duff & Phelps reviewed
them.  Turner Objection at 6-7; AF Aff. ¶ 60 (Trustee "is required to conclude, and does appear
to conclude," that various third parties "were all either incredibly ignorant, stupid, or perhaps 'in
on it'").  In fact, the Trustee *does* conclude that each of these parties failed to perform as
required, in a variety of ways and for a variety of reasons, all laid out in the Trustee's Report.
AF and Turner cannot dispute this.

Finally, Turner's claim that "most of the cash from the subscriptions into the
feeder funds eventually made it into FILB," and that as a result, "when a particular feeder fund
would need cash to pay a fund-specific invoice or a shareholder redemption or management or
performance fees, the fund would typically redeem through a series of steps possibly as far as
FILB to receive the cash it needed" (Turner Objection at 12) is patently false.  The truth is that,
of the $95 million net invested by the Louisiana Pension Funds, no more than $33.8 million
found its way to FILB, and all of that money went to paying off margin calls, satisfying
redemptions (mostly redemptions by the Fletcher Fund LP), fees, an investment in FIP (as a way
of providing liquidity to a senior Citco executive), and other miscellaneous items.  *None* of that

---

the books of FILB and FIP reflected a June 30, 2011, transfer is irrelevant to the question of whether the
required resolutions required to effectuate the transfer were backdated.

money was invested in accordance with FAM's stated investment strategy.  See Report

Section VIII.A.[10]

### III.
### NO ADEQUATE ALTERNATIVE RECOVERY PLAN HAS BEEN PROPOSED

Counsel for the Soundview Debtors proposes that the Court should adopt an

"alternative recovery option [that] has been presented."  Soundview Objection ¶¶ 3, 18.  The

Trustee is not aware of any alternative proposed plans and is not required to offer any

alternatives.  See 11 U.S.C. § 1125 ("adequate information need not include such information

about any other possible or proposed plan").  There has been no exclusivity since the Trustee

was appointed over a year ago:  AF and Turner have had the right to propose a plan of their own,

and they have not done so.

The Soundview Objection appears to suggest that a reasonable alternative to the

Plan proposed by the Trustee would be to accept AF's valuations, which would "provide an

alternate and unsurprising path of recovery for the creditors to recoup their monies through

realizing on the funds' investments . . . [which] would . . . likely provide for greater recoveries

than the Trustee's proposal to recoup monies through litigation."  Soundview Objection ¶ 18.

The Trustee has made every effort to maximize the value of all of FILB's assets, and obviously

will continue to do so.  Liquidations to date have proven the Trustee's valuations to be accurate

and AF's and Turner's to be fanciful.[11]  The Trustee will continue to market FILB's remaining

---

[10] AF implies that he and other Insiders received a clean bill of health from the SEC.  Soundview
Objection ¶¶ 16.u n.9, 16.z, 16.ee.  The Trustee is not aware of any such "clean bill of health"
and believes that the SEC and the DOJ investigations of FAM and AF are ongoing.

[11] See the Trustee's discussion of his liquidation of FILB's Helix securities in the open market for no
premium (Report Section VI.G.2); the likely recoveries (minimal or zero) on the Budget Travel and
movie investments (Report Sections VI.G.12, VI.G.11) carried by Fletcher at cost on BRG's books; and
the likely recovery on the ION litigation, where AF predicted $124.1 million (the mark as of

holdings and to distribute any proceeds in accordance with the proposed Plan.  It is unclear how accepting AF's valuations would result in any greater recovery; saying so certainly doesn't make it happen, and so far, despite the Trustee's best efforts, it has not.  And, indeed, no one has identified any FILB asset of value other than possibly UCBI, whose value, as discussed above, is subject to material litigation risk.  More importantly, the idea of permitting AF and the Insiders who perpetrated the fraud described in the Trustee's Report to have any role in managing the Estate should be rejected out of hand.

---

March 31, 2009), but the award was only $300,000 plus pre-judgment interest.  <u>See</u> Supplement Section II.A.

## Conclusion

The Trustee has conducted an extensive investigation, submitted a detailed

Report, negotiated a complex liquidation Plan that will enable a cross-border effort to realize

value for creditors and investors, and has disclosed all he has done in the Disclosure Statement

and Supplement.  The only objectors are the two Insiders who masterminded the fraud that

brought down the funds.  The merits of their objections, such as they are, can be considered at

confirmation to the extent they raise material confirmation objections (and they do not), but at

this juncture, the Trustee submits that the full and fair disclosure required by the Bankruptcy

Code has been made, and for the reasons set out above and in the Trustee's opening papers,

respectfully requests that the Court enter an order pursuant to Sections 1125 and 1128 of the

Bankruptcy Code and Bankruptcy Rules 2002(b), 3017(a), and 3020(c), (a) approving the

Disclosure Statement and Solicitation Package; (b) scheduling a Confirmation Hearing; (c)

fixing the deadline to vote to approve or reject the Plan; (d) fixing the deadline to file objections

to the Plan; (e) fixing the deadline for the Trustee to file responses (if any) to any objections to

the Plan; and (f) granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
      January 13, 2014

LUSKIN, STERN & EISLER LLP


By:  /s/ Michael Luskin
     Michael Luskin
     Lucia T. Chapman
     Stephan E. Hornung

Eleven Times Square
New York, New York 10036
Telephone:  (212) 597-8200
Facsimile:   (212) 974-3200

*Attorneys for the Chapter 11 Trustee*