HEARING DATE AND TIME: January 14, 2014 at 9:45 a.m. (Eastern Time)

OBJECTION DEADLINE: January 3, 2014 at 4:00 p.m. (Eastern Time)

STEWART TURNER, Pro Se

Address: 200 East 71st St., Apt. 5A

New York, NY 10021

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X

In re:

                                                Chapter 11

FLETCHER INTERNATIONAL, LTD.

                                                Case No. 12-12796 (REG)

Debtor.

-------------------------------------------------- X

**OBJECTION OF STEWART TURNER**

**TO THE TRUSTEE REPORT AND DISCLOSURE STATEMENT**

1

Stewart Turner, who is both an administrative and pre-petition creditor of Fletcher International, Ltd. (Bermuda), states as follows:

1. I have filed claims in this case in the amount of $33,502.76 plus unliquidated damages regarding legal fees under my rights to indemnification. I am a former consultant and a former Director of Fletcher International, Ltd. I have a Bachelor of Science in Engineering degree from Princeton University in 1980 and an MBA degree from The Wharton School at The University of Pennsylvania in 1984.

2. My particular expertise within the Fletcher organization is in connection with negotiating the customized PIPEs warrants which are the major investment vehicle of the Fletcher organization and, from an industry perspective, in valuing those warrants. Although I do not earn my living as a valuations expert, in addition to my graduate business education I have worked on valuation matters with our accountants and experts throughout the years and I have industry perspective and experience on valuation.

3. I have reviewed the Trustee Report and Disclosure Statement dated November 25, 2013. There are a number of inaccuracies and indeed, outright incorrect statements in the report that I feel compelled to point out for several reasons. First, some of the statements are about me and wrongly impugn my reputation. Second, since my understanding is that the purpose of a disclosure statement is to give the creditors "adequate information" within which to decide whether to vote for or against a Plan, I believe they should be made aware of statements that are wrong. Because of the errors and omissions, I do not believe the disclosure statement contains or refers to such adequate information.

4. I ask the Court's indulgence insofar as I cannot afford counsel and I have prepared all of what follows myself.

2

### Misleading Information regarding the Profitability of FILB

On page 1 of the Trustee Report, there is the following claim made by the Trustee[1]:

"What the Trustee's investigation shows is that, with FAM as its investment manager, FILB did not make a single profitable investment after August 31, 2007..."

The Trustee purportedly demonstrates this through a table on page 181.

The Trustee's accusation is false. The table on page 181 of his report is 1) erroneous, 2) incomplete, 3) contains half-truths and 4) ignores relevant information.

Excluding the AGEN trade, which the Trustee states was the last profitable investment for FILB, the cost-basis for the listed items at page 181 was $67.8MM and sale proceeds were only $44.4MM; this implied a loss of $23.4MM during this time period.

   a) The table is **erroneous** because it combines the profitable "SMHG" transaction made by FILB with what turned out to become a series of unprofitable investments made by Fletcher International, Inc. ("Fletcher Delaware") into Madison Williams.[2] While the Madison Williams investment was later abandoned by Fletcher Delaware in order to receive tax benefits for the 2012 tax year, the $8.2MM invested should not be confused as a FILB (the entity for which the Trustee was appointed) loss to be merged with "SMHG".

   Thus, FILB invested only $7.5MM into Sanders Morris Harris Group, Inc. (ticker symbol "SMHG", later renamed Edelman Financial with ticker "EF") and by my calculations received proceeds of $14.3 MM over the next 2.2 years (or a profit of $6.8MM). I do not understand why the Trustee shows proceeds of $15.3MM.

   In sum, the "SMHG" transaction made by FILB in late 2009 should list a profit of $6.8MM instead of the Trustee's loss of $0.4MM. This alone would add back $7.2MM of the Trustee's uncalculated loss of $23.4MM.

   b) The sale proceeds for the "UCBI" (the ticker symbol for United Community Banks, Inc.) transactions for FILB were listed as a negative $3.3MM.[3] The FILB portion of the UCBI transaction essentially had two components: a) a $30MM warrant in UCBI and b) a right to buy a

---

[1] Page 10 of Docket 327
[2] The initial $5MM wire was sent by FILB to Madison Williams, but by the time the transaction closed, Fletcher Delaware was the only Fletcher affiliate to invest in Madison Williams. Subsequent payments in 2011 were made by Fletcher Delaware. The FILB Trustee should know this.
[3] This amount was related to a payment made by FILB since it did not exercise the right to buy the United preferred during the first year after the securities purchase agreement between FILB and United was signed.

3

$65MM convertible preferred equity stake in UCBI, which would deliver an additional $35MM warrant once the right was fully exercised.

Please note that this right to buy the preferred (along with the associated $35MM warrant) was distributed to redeeming investors of FIA Leveraged Fund through a holding entity called FILB Co-Investments (sometimes referenced by the Trustee as "FILBCI") at a value of $135.5MM in February 2012. I will address this right in more detail later.

The Trustee's own interpretation for the remaining warrant held by FILB is that "it could result in approximately $71 million in common stock to the Debtor."[4] Adding this amount of $71MM to the negative $3.3MM payment would show more profit than all of the losses in the table combined. In other words, this warrant, the only remaining part of the UCBI investment still held by FILB[5], (without including any value for UCBI as a sale has not occurred) would make this table, at best, incomplete.

In a footnote to the table, the Trustee does acknowledge that the FILBCI Settlement was not reflected. That footnote is also incomplete. While the amount received by FILBCI is not included in the proceeds, the value indicated in the highest mark includes value that was distributed to FILBCI. This line for UCBI is incomplete in an additional way as the highest mark would have occurred in 2013 had the Trustee not signed off on the FILBCI Settlement. (The Trustee's own $71MM number for the remaining portion of the UCBI investments was higher than FILB had valued that portion in 2011.)

c) Regarding DSS (the ticker symbol for Document Security Systems), the table contains a half-truth as FILB still holds a warrant in DSS. The date of sale (from February 2011 through June 2011) is misleading as the DSS warrant currently held does not expire until at least February 2020. More will be discussed about the DSS warrant in a subsequent section.

d) The most astonishing exclusion from the table is the omission of the Helix and Ion Geophysical investments from this analysis. While these investments were originally made prior to August 2007, excluding them ignores relevant information to performing a fair and unbiased analysis of FILB's profitability.

---

[4] From page 130 of the Trustee Report (page 139 of Docket 327). Based upon the August 16, 2013 closing price of $15.08 and the 7,058,823 (=$30,000,000 / $4.25 strike price) shares, I calculated a value of $76.4MM. It is possible that the Trustee is using a litigation discount of 7% or there may be other reason(s) to explain the discrepancy.
[5] As part of the April 2012 transactions, one-half of this warrant was distributed to Fletcher Delaware as part of FILB looking to sell its stake in Fletcher Delaware. The April 2012 transactions were undone at the insistence of the FILB Trustee, making Fletcher Delaware once again the 100% owner of FILB and FILB the sole holder of the $30MM UCBI warrant.

4

> While the Trustee scoffed at my reference to the "bells and whistles" of the FILB transactions on page 193[6] of his report, adjustments to these two large investments during the economic crisis of 2008-09 added significant profit to FILB. These special terms in the agreements between FILB and Helix and Ion caused Helix to take accumulated beneficial conversion charges of $53.4MM and Ion to take a beneficial conversion charge of $68.8MM according to the companies' respective 10-Ks filed with the Securities and Exchange Commission.
>
> The Trustee does not accept much of the numerical analysis by Fletcher or its valuation analyst Quantal. Please note that the beneficial conversion charges totaling $122.2MM (more than five times that of the losses that were not totaled in the table) were provided by these companies and their auditors in their 10-Ks, but excluded from the Trustee's analysis.

The Trustee' accusation that FILB did not make a profitable investment after August 2007 is false and the table that purports to support that statement has errors, ignores relevant information and presents incomplete information as presumed totals. FILB was profitable during the relevant time period when Fletcher controlled the entity.

**The Question of Backdating**

The Trustee Report accuses me of backdating. In particular, I am accused of backdating in regard to the FIP investment and redemption transactions. From page 47 of the Trustee Report[7]:

"The FIP Redemption: FAM attempted to backdate the transfer of FILB's interest in FIP to Richcourt Euro Strategies and Richcourt Allweather Fund in partial satisfaction of two redemption requests. Turner, as sole director of FIP, signed resolutions dated June 20, 2013, to effect a transfer as of June 30, 2011, nearly two years after the event."

The Trustee's accusation is false. I signed the resolutions on June 20, 2013 and forwarded them to the registered office of FIP on that date; thus, no backdating occurred.

- The resolutions were executed in order to bring FIP's register of members up-to-date and in line with the financials of FILB, the Debtor, as of June 30, 2011.

- This is how Mr. Stuart MacGregor had been keeping the books of both FILB and FIP during this time period.

- It is also consistent with the books and records kept by FILB's outside administrator, SS&C. Mr. Anthony Maniglia of SS&C provided a copy of the June 30, 2011 trial balance to Mr. MacGregor

---

[6] Page 202 of Docket 327
[7] Page 56 of Docket 327

5

- in a February 2012 email showing that the FIP[8] asset was no longer owned by FILB as of June 30, 2011.

- I believed in good faith that this FIP/FIPLTD asset had been distributed as partial payment of redemptions-in-kind to Richcourt Allweather Fund Inc. and Richcourt EuroStrategies Inc. as set forth in a sworn affidavit to the JOLs of FIA Leveraged Fund on June 6, 2012, more than three weeks prior to the Chapter 11 filing by FILB, the Debtor.

Not only had the transfers occurred as of June 30, 2011, I specifically told the Trustee and Goldin of these transfers in a December 21, 2012 email during my consulting period with the Trustee: "According to FILB's books as of June 30, 2011 / July 1, 2011, FILB's holdings in FIPLTD were delivered to FIA Leveraged Series 6 redeeming shareholders Richcourt Allweather Fund and Richcourt EuroStrategies."

**Valuing assets and getting the most value for the creditors**

**The Trustee Report, at Best, Does Not Properly Value Assets and, at Worst, shows a Complete Ignorance of Valuation Methodology**

As the Trustee wrote in his report, FILB's investment strategy was primarily PIPEs. PIPEs is an acronym for "Private Investments in Public Equities". In other words, FILB made its own private investments into publicly traded (exchange-listed or over-the-counter) companies. While the underlying companies were public, the actual investments that FILB made were not publicly traded or similar to other publicly traded securities and were not marketed as such.

Fletcher has used Quantal as its outside valuation analyst for many years to value these PIPEs. While the Trustee attacks Quantal's independence after working with Fletcher for many years, it is hard to understand how he can attack the credentials of such a firm, led by a current Stanford finance professor and a former Berkeley finance professor.

Further, the valuations used by Fletcher/Quantal were reviewed by Citco, its former administrator, and two outside auditors (Grant Thornton and Eisner LLP). Grant Thornton has used its own outside experts including Dwight Grant, who at least as early as August 2005, prior to when I rejoined Fletcher, generally confirmed Quantal's analysis. Grant Thornton, as part of its audits, generally had Fletcher take a low single-digit percentage haircut on the Quantal numbers for Helix and Ion.

Further, Eisner, after consultation with its outside expert Sterling, also accepted the Quantal numbers in FILB's 2009 audit.

---

[8] For clarity, this investment was listed as FIPLTD on the books of FILB as there were similar sounding investments held by FILB. I am using the Trustee's convention of calling Fletcher International Partners, Ltd. ("FIPLTD") as "FIP". However, FILB owned an investment in Fletcher International Partners, LP ("FIPLP"). These investments should not be confused.

6

Prior to Eisner releasing the FILB 2009 audit on July 14, 2010, Fletcher enlisted Duff & Phelps, a nationally recognized third party valuation firm to do an additional analysis of the Helix and Ion positions. The Duff & Phelps report issued July 1, 2010 confirmed Quantal's analytics. Duff & Phelps is a firm with in excess of 1200 professionals.

The size of D&P with its well-known national reputation speaks volumes relative to Goldin Associates, a firm that may not have an option/warrant specialist (or at least the four people I had met at Goldin Associates have no apparent options experience).

The Trustee states that "Ascribing value to non-exercised contract rights to buy securities without actually investing in them"[9] is a red flag. I would agree. The sentence is a red flag in that neither the Trustee nor his professionals, particularly Goldin, have even a basic understanding of valuation with respect to these instruments. These rights are virtually identical to options and warrants, all of which are required to be recorded at fair value on an investment company's books (in accordance with the investment company guidance). Warrants, options and contract rights have value at any given point in time prior to or at their maturity (comprised of intrinsic value plus time value), even if, in the end, they expire worthless. This shows a lack of understanding by the Trustee in regard to the assets he currently controls.

Ironically, the Trustee attacks Fletcher's valuations of Helix and Ion, post-adjustment, because Fletcher does not reduce its valuation and notes an inconsequential paragraph that had not been removed from a Quantal report. While I applaud the Trustee for his attention to detail in regard to reading the Quantal report, I am surprised that the Trustee Report and the table did not make any reference to the much more significant $122.2MM adjustments made by Helix and Ion, as pointed out above.

Further, the Trustee is wrong in his premise that Quantal had ascribed any value to a potential conversion price change. That is why the formula did not change after the change in conversion prices. This is yet another example of his not understanding the FILB assets.

Even if the Trustee's claim that Fletcher and the outside advisors it hired and the external advisors the accounting firms hired were biased in favor of Fletcher and their valuations, on September 9, 2011, the Louisiana funds issued a Joint Statement saying among other things that "The assets and their valuations have now been corroborated and the governing boards of the systems have been briefed."[10].

While discounts may have been used in the valuations received by Ernst & Young with the largest being for litigation related to the reverse stock split of United (UCBI), we now see that the Trustee may have used a 7% discount for the potential litigation in his conversion valuation of the UCBI warrant.

---

[9] Trustee Report page 10 (page 19 of Docket 327
[10] Please note that while technically Ernst & Young LLP did work for the Louisiana funds in 2011 and the JOLs, affiliated with Ernst & Young Ltd., are separate, Richard I. Thomas, Principal, Fraud Investigation & Dispute Services for Ernst & Young LLP who was lead investigator for Louisiana was referred to as a "representative of the JOLs" in 2012.

If professionals from within and/or external to Grant Thornton, Citco, Eisner, Duff & Phelps and even the opposing Ernst & Young all were able to corroborate the valuations prepared by Quantal, one wonders how the Trustee and Goldin arrived at different but as yet unstated lower valuations, possibly as low as conversion value. If the Trustee is to become the Plan Administrator, it would have helped to have a financial consultant who could see the value in these complex instruments and a firm superior to Goldin. (There will be additional points listed in this regard later.)

## DSS

The Trustee is wrong when he objects to the "immediate markup" of investments. Document Security Systems (ticker symbol DSS) was a company that Fletcher made a PIPE investment into on December 31, 2010. The Trustee claims that Fletcher would immediately mark up the value of its position, as though it was doing something wrong. Accounting rules require the immediate valuation of assets and liabilities when acquired. While there is more than a hint of impropriety in the Trustee Report when such actions were undertaken by Fletcher ("a different valuation scheme became increasingly prevalent – the immediate markup of newly-acquired investments")[11], there is no comment about the fact that DSS, in its 10-K report for the period ended December 31, 2010 (the same day as the investment) listed a liability related to the warrant of $3.9MM. Was this an immediate overvaluation of liabilities scheme by DSS?

So now that the timing of the marking of the positions is the same for both Fletcher and its asset and DSS and its liability, the only question is regarding the different valuations, which the Trustee highlighted. Fletcher used the Quantal valuations, based on an open-form model (Monte Carlo simulation) which handled the Fletcher cashless settlement provision.

While the Trustee highlighted that UCBI forced a change in the agreement related to the cashless settlement feature of the warrants and implied that another company, Syntroleum, did as well; that is not correct. Syntroleum and Fletcher signed a revised agreement since certain conditions which had not been met by Syntroleum caused the original investment to not occur. The Trustee provides a detailed discussion of the "cashless settlement" formula on pages 182-186 of his Report[12]. Shockingly, on pages 171-172 of his Report, the Trustee writes, "With respect to cashless exercise formulas, survey participants had never seen the non-standard cashless exercise formula included in many of FILB's warrant provisions. The concept of having the strike price in the denominator was so foreign to those asked that no one was prepared to say that the non-standard formula would add any incremental value to what would be derived using a standard formula."

The cashless settlement feature used by Fletcher used a smaller number in the denominator when the option was in-the-money than the standard formula in determining the number of shares to be received under a cashless exercise of the warrants. Thus, any survey participant with options and arithmetic

---

[11] Page 178 of the Trustee Report / page 187 of Docket 327
[12] Pages 191-195 of Docket 327

8

expertise should have been able to figure that the non-standard formula would lead to a greater number of shares being issued and, thus, a substantial increase in value.

The Trustee claims in a footnote in his Report[13] that AGEN was the only company to honor the cashless settlement provision used by Fletcher. This is wrong as Raser had also done so in April 2010.

Furthermore, Edelman Financial (the renamed Sanders Morris Harris Group) bought back the existing warrant for $8,000,000; this was a price far in excess of what should have been paid for a warrant that did not have the Fletcher cashless settlement feature.

Thus, three companies (AGEN, Raser and Edelman) honored this provision while one company (United) quickly demanded a revised document. Syntroleum's revised agreement was re-executed primarily for a reason having to do with something other than the issue the Trustee raised.

Thus, the Trustee is wrong in his understanding of the DSS position, the accounting behind its valuation, and the value inherent in it. Should the Trustee become the Plan Administrator under his proposed Plan, he may look to sell the DSS warrant without considering the value of the cashless settlement feature. His inability to see the value in this position could cause a disservice to the creditors and shareholders of the Debtor as he would not be seeking maximum value for this asset.

### Misunderstanding UCBI

The Trustee makes mocking claims about how Fletcher's value of the warrant changed. In particular, he finds on page 195 of the Trustee Report (page 204 of Docket 327) that "FAM and Quantal then valued the UCBI Preferred Stock and Warrants at $143.1 million (perhaps, coincidentally, matching the amount needed to satisfy the redemption request)."[14]

While that is one unsophisticated way of looking at this, option professionals would have a better understanding, based upon science. There is and was a "delta", a mathematically-based calculus and derivative term, which relates to both the option and the right to buy the preferred (which effectively contained an imbedded short put – technical jargon that does not need to be developed fully here). In layman's terms, this "delta" would allow the investment manager to very closely estimate the value of the position by simply multiplying the change in the price of the underlying stock of the UCBI shares (for small price changes) by this delta to estimate the new value. Using this delta, FAM was able to estimate its value on February 13, 2012 and ask Quantal to do an additional valuation that Monday night to get a more precise valuation through its Monte Carlo simulation method.

---

[13] In a footnote on page 187 of his Report (page 196 of docket 327)
[14] Technically, Quantal valued the Right to but the UCBI Prefered and the associated Warrant B at $135.5MM on February 13, 2012.

9

To be clear, I did not mean to call FAM's multiplication and addition "science". The work that Quantal did was science, including providing the "delta" of the positions. The multiplication referenced just provided a fairly accurate estimate of the value Quantal would provide based upon the updated price of the underlying stock at the time of the valuation. Other factors impacting any valuation would be a change in volatility (there was no significant change on the February 13, 2012 valuation date when compared to the volatility used with the Friday, February 10, 2012 valuation) and reduction in time of the warrants although the decay in value related to fewer days remaining until expiration is insignificant with a warrant that has more than seven years remaining until expiration.

Thus, what appears to be magic or coincidence to the Trustee was actually a scientific calculation (Quantal did provide valuations to the FILB Directors that night of February 13, 2012) regarding when to deliver the United position as a redemption-in-kind to the Louisiana investors.

Please note that the delta impact (although Quantal did fresh weekly and monthly valuations) could explain much of the value fluctuations through other time periods. The accounting rules for investment firms require updating the values of the positions in each accounting period, both up and down for Fletcher. Issuing companies have different accounting rules. That is another issue in regard to the Trustee's table on page 181.

While the Trustee now understands that the UCBI warrant he holds is worth $71 MM (now a higher value), it is unclear what he was thinking when he signed off on the UCBI-FILBCI settlement. The position held by FILBCI is worth roughly 2.5 times the value of the warrant he holds. Yet, in one instance he claims his asset is worth $71MM but he agreed to the sale of the 2.5 times larger position for only $2.5 MM. If someone is to seek to maximize the estate, should it be the Trustee who signed off on a sale at less than 2% of the asset's value?

### Fundamental analysis

The Trustee goes on at great length discussing the lack of fundamental analysis performed by Fletcher. Accounting rules do not allow such subjective interpretations (nor do the Black-Scholes model and Monte Carlo simulations allow for that). These models indirectly allow for fundamental analysis as the stock price, an input to both models, is impacted by market forces; a higher stock price implied improving fundamentals and a lower price implies reduced prospects for the company.

### The Trustee's market participants

In his Report, the Trustee cites unnamed market participants who would not value more than one-to-four years worth of dividends on the Helix and Ion non-callable perpetual convertible preferreds. As I believe the market valuation prospect for a bond or a straight (non-convertible) preferred instrument simply takes the present value of ALL of the future interest payments or dividends and payment of principal and appropriately discounts these values at the appropriate discount rate. This rate may be

10

the risk-free rate for short-term Treasury bills or a higher rate depending upon the riskiness of the underlying issuer. Bond traders investing in the 30-year government bond takes into account all sixty semi-annual coupons.

In addition to not naming the market participants he contacted, it is unknown as to whether the Trustee fully describes the instruments specifically as perpetual non-callable convertible preferred securities. Is it possible that these unnamed market participants were considering a publicly traded convertible that had a call feature? If so, any comparisons would not be valid. Fletcher never found a perpetual non-callable convertible preferred equity in the marketplace despite looking many times over the years. The Trustee would then have asked the market participants to incorrectly compare apples and oranges.

Over the years, Dwight Grant (outside analyst to Grant Thornton), Grant Thornton itself, Eisner, Sterling and Duff & Phelps have not objected (at least more than a few percent, statistically "noise") to the values determined by Quantal. Additionally, while Quantal's model and inputs may determine the valuation of HLX and IO in a non-customary fashion[15], the analysis by Duff & Phelps among others by attempting to determine the appropriate discounting rate confirms Quantal's valuations. Perhaps they understood that these instruments were perpetual and non-callable.

**Credit Suisse and the Ignored $6.3MM Profit**

The Trustee also cited how Credit Suisse, FILB's prime broker, marked the position at conversion value. This was done as one input for its lending and margin formulas and likely not as part of any valuation process.

The Trustee chose to mention this about Credit Suisse but chose not to include any information about the profitability of the trade of the Ion preferred equity achieved by the buyer from Credit Suisse's sale.

Starting with my initial meeting with the Trustee, I mentioned that Credit Suisse sold the Ion preferred to a hedge fund investor at a very low price (approximately $702k over the conversion value in mid-June 2012) and that this should be reviewed. The buyer essentially recouped that premium (technically $675k) by September 30, 2012 (in three-and-a-half months, although the Trustee referred to it as six months of dividends in the following quote):

"The Trustee concluded that Credit Suisse undertook a reasonable sales process and that the price obtained – which included a slight premium over the conversion price (e.g. six months of dividends) – was a better price than FAM ever obtained when it liquidated FILB's positions in the same stock."[16]

Not only did the buyer receive six quarterly dividends totaling $2,025,000, Ion paid the holder $5,000,000 to convert the preferred. In other words, the buyer received $7,025,000 or ten times the premium paid in less than sixteen months. I mentioned this to the Trustee six days before the Report

---

[15] This is a reference to the comments made by the Trustee on pages 191-192 of his Report (pages 200-201 of Docket 327).
[16] Pages 109-110 of the Trustee Report (pages 118-119 of Docket 327)

11

was released but this profit of $6.3MM or 900% of the premium of $702k that was invested by the buyer is not listed in the Report. **This shows that the Trustee and Credit Suisse were both wrong in thinking that this asset was not worth more than conversion value.**

While FAM initiated conversions of the Helix and Ion preferreds to raise cash, this was done in order to preserve the proprietary aspects of these investments. This was no longer necessary by the time the Trustee became involved and saw no issue with the $6.3MM or 900% profit based on the premium paid. I believe a review of the sale by Credit Suisse should be investigated. The Trustee's lack of action and not even mentioning this in his Report should disqualify him from being Plan Administrator who should seek to maximize assets for the creditors and shareholder of FILB.

While Quantal, AF, the accounting firms performing the audits, their experts, Duff & Phelps, and I believe that the value of the Ion preferred far exceeded the value received by the buyer, it is hard to blame someone for realizing a 900% profit in under sixteen months. If the Trustee and his experts cannot see the value of these assets, it would be wrong for the Trustee to become the Plan Administrator seeking to maximize value for the creditors.

### The Trustee Report Does Not Properly Describe the Master-Feeder Structure

### The Master-Feeder Structure

The Fletcher funds used a master-feeder structure, where the feeder funds (the funds where investors invested) turned around and placed most of their assets into a master fund (a fund which would make the actual PIPE investments) and the feeder funds would receive a pro rata share of the returns. This is a general hedge fund strategy, and not unique to Fletcher.

The Trustee of the Debtor (FILB) has expanded his investigation beyond FILB to the entire master-feeder structure. The Trustee fought to unwind the April 2012 transactions, which makes Fletcher Delaware once again the 100% owner of the Debtor. The Trustee is now overreaching his fiduciary limits by proceeding on a path of substantive consolidation by ignoring Fletcher Delaware, its creditors and its shareholders to decide who he feels should received any remaining proceeds.

In his FILB-centric view of the world, he did not fully grasp the concept of the master-feeder structure. As I said above, the majority of the feeder fund's assets would typically be placed into the master fund (Fletcher is more complicated than the typical master-feeder in that there are more levels at Fletcher than most other hedge funds). However, most of the cash from the subscriptions into the feeder funds eventually made it into FILB. Thus, when a particular feeder fund would need cash to pay a fund-specific invoice or a shareholder redemption or management or performance fees, the fund would typically redeem through a series of steps possibly as far as FILB to receive the cash it needed to pay the required amount.

12

The Trustee, in his FILB-centric view, claims that "much of the cash and securities FII used to fund this transaction (a purchase of United bank-owned properties and non-performing real estate loans) came from FILB"[17]. That is one way of looking at the transaction. The more correct way to view this is that the 100% owner of the subsidiary needed cash at the parent level in order to do a transaction to enable FILB to receive the warrants and rights that it had and FILB's cash, which FII had a 100% claim on, facilitated this.

### Expanding the scope of his role

The Trustee has assumed for himself an expanded role beyond being the Trustee of FILB. He has effectively declared himself to be the Trustee for the entire master/feeder structure.

Of particular significance, the Trustee wrote, "As noted elsewhere, as part of the Plan Confirmation, the Trustee will seek to subordinate FII's claims and equity interest, and FII will receive no distributions under the Plan."[18] After unwinding the April 2012 transactions between FILB and FII (the acronym the Trustee used for Fletcher Delaware), FII is once again the shareholder of FILB. In addition to any general creditors FII might have, there is a note between FII and Windcrest Fund. At the time of the FILB bankruptcy, Windcrest was 100% owned by Mr. Eric Jager of Kansas City, Missouri and his wife. This $992,780 note was structured as a redemption in-kind for Windcrest, who redeemed from Fletcher Income Arbitrage Fund, L.P., the onshore version of Arbitrage and unfairly punishes Windcrest.

The Trustee's move also distorts the amount of FII's equity that should flow to each of the feeder funds; in theory, each feeder fund that invested in FII should receive a pro rata distribution. The Trustee uses what appears to be arbitrarily determined distribution percentages rather than a pro rata methodology.

This will hurt investors in the domestic Fletcher funds, which do not appear to be offered anything. As investors in the feeder funds, they may not have even thought to file in the bankruptcy of FILB. It will hurt Soundview and Richcourt investors that invested in Arbitrage or Leverage who will not receive anything directly or have it left up to the JOLs who may look to reward the Louisiana funds over the Soundview and Richcourt investors. These include the Soundview investors that are currently appearing before you in In Re: Soundview Elite Ltd., et al, Case No. 13-13098 (REG). Once the Soundview and Richcourt investors are able to access cash to fund the appeal of the FIA Leveraged Fund liquidation to the Privy Council, they may be able to get their proper share of Leveraged proceeds after the UK Court may deem the Louisiana investors redeemed via the United right. The results of the appeal will likely impact the relative proceeds that should go to the Louisiana investors vs. MBTARF.

In other words, the Trustee is proposing a distribution prior to the results of the appeal to the Privy Council and possibly preempting the funding of the appeal.

---

[17] Page 13 of the Trustee Report (page 22 of Docket 327)
[18] Page 16 of the Trustee Report (page 25 of Docket 327)

13

The Trustee has not even commented on the disparity of the requests by each of the Louisiana funds. From Exhibit D of the related exhibits, the two Louisiana funds that invested $45MM and $40MM are seeking $66MM and $60MM, but NOFF, which invested only $15 MM is seeking an outsized $234MM!

The Trustee was wrong in developing a distribution plan for some of the feeder fund investors and not others and not even comment in regard to NOFF's outlandish request. The numbers do not line up regarding these investors!

### The FILBCI Settlement

Other numbers that do not line up are the pieces of the United transaction. On one hand, the Trustee believes that the United asset held by FILB was worth in excess of $71MM; it is worth even more now that UCBI stock is higher now than when he filed his exercise notice in August 2013.

The Louisiana investors received an asset that upon exercise of the Right for $65MM, would provide roughly two-and-a-half times as many shares. Thus, using the December 27, 2013 closing stock price of $17.78 and subtracting the $65MM that would need to be paid to purchase the right and exercising the warrants on a cashless basis (without any disputing of the revised agreement's cashless settlement formula), the value of the asset once held by FILBCI would be worth $223 MM without any time value.

How can the Trustee say that the United asset he holds is worth $71MM (I now believe that figure on a net basis would be worth $95MM) and, now that we see him happy to be an activist, not object to the $2.5MM settlement for assets that would now be worth almost 100 times that amount??

The Trustee is wrong when he further compounds this dichotomy by allowing the Leveraged/Arbitrage JOLs and the Funds they represent to receive 53.6% of the proceeds. Except for a small (less than 10%) holdback position, the Louisiana investors were already paid in-kind redemptions totaling $136MM (worth more if you use the Trustee's $71MM value for the smaller part of the UCBI position). If the fund's investors only received value of $2.5MM, the Ernst & Young JOL's responsible for the sale of the assets for only $2.5MM should be held accountable and not other Fletcher investors. Giving the Leveraged and Arbitrage JOLs another shot at assets after their original mistake is wrong and comes at the expense of MBTARF and other investors. This also comes at the expense of creditors of FII and the creditors and shareholders of the domestic Fletcher funds and the Soundview and Richcourt investors.

On a personal basis, Stuart MacGregor and I both worked for FILB and we did not receive payment for our services for most of June 2012. In our original contracts signed with the debtor-in-possession and its then-Chief Restructuring Officer, there was a term for a payout of the statutory maximum under Bankruptcy Code Section 507(a)(4) of $11,725 on account of unpaid prepetition consulting fees called for a payment upon the approval of the consulting agreements. When the Trustee and Mr. Luskin stepped in, this term was removed. Now that we are being called "Insiders" who should not receive any proceeds, I now believe that the Trustee showed a bias against Fletcher from the start.

14

However, the Trustee's plan is not fair because some investors in the feeder funds are treated more than fairly while others are treated unfairly. The Trustee should not be allowed to continue his biases against some people and groups and his favoritism for others. Thus, the Plan should be rejected.

### Conclusion

WHEREFORE, I respectfully request that the Court not approve the Disclosure Statement, or certainly not approve it in its current form, until the inaccuracies are corrected.

Dated: January 3, 2014

*/s/ Stewart Turner*

**STEWART TURNER**