HEARING DATE AND TIME: March 4, 2014 at 9:45 a.m. (EST)

OBJECTION DEADLINE: February 18, 2014 at 5:00 p.m. (EST)

STEWART TURNER, Pro Se

Address:  200 East 71st St., Apt. 5A

New York, NY 10021

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

In re:

Chapter 11

FLETCHER INTERNATIONAL, LTD.

Case No. 12-12796 (REG)

Debtor.

-------------------------------------------------------------------- X

**OBJECTION OF STEWART TURNER**

**TO CONFIRMATION OF THE TRUSTEE'S PROPOSED PLAN OF LIQUIDATION**

Stewart Turner, who is both an administrative and pre-petition creditor of Fletcher International, Ltd. (Bermuda), states as follows:

1.      I have filed claims in this case in the amount of $33,502.76 plus unliquidated damages regarding legal fees under my rights to indemnification. I am a former consultant and a former Director of Fletcher International, Ltd.  I have a Bachelor of Science in Engineering degree from Princeton University in 1980 and an MBA degree from The Wharton School at The University of Pennsylvania in 1984.

2.      My particular expertise within the Fletcher organization is in connection with negotiating the customized PIPEs warrants which are the major investment vehicle of the Fletcher organization and, from an industry perspective, in valuing those warrants. Although I do not earn my living as a valuations expert, in addition to my graduate business education I have worked on valuation matters with our accountants and experts throughout the years and I have industry perspective and experience on valuation.

3.      I have reviewed the Proposed Plan and it is premised on many errors and misunderstandings.  I believe it would be wrong for the Court to confirm it.

4.      I ask the Court's indulgence insofar as I cannot afford counsel and I have prepared all of what follows myself.

5.      Although I am not am attorney, my understanding of Section 1129(a) of the Bankruptcy Code is that a Plan should have the following characteristics:

        (i)      It must NOT discriminate unfairly in that similarly situated creditors (and should treat higher ranked creditors and equity holders at least no worse than a lesser class).

        (ii)     Confirmation of the Plan should not expect to lead to a liquidation.

2

(iii)    Creditors should get at least as much as they would in a Chapter 7 liquidation than under the Plan.

6.    As part of my proposal that the Trustee's Plan be rejected, I will address the following items to see if the Plan appropriately meets it goals, or what should be its goals.

(i)    Should it seek to maximize distributions?

(ii)    Should it be fair to all creditors who have filed claims? Should it be fair to those creditors who did not file a claim against FILB as now it appears that several cases have been amalgamated by the Trustee?

(iii)    Should it be based upon facts or opinions of the Trustee that have not been proven?

(iv)    Should the Plan Administrator believe that the assets he has held and may still hold have the ability to control have significant value?

(v)    Should the Trustee have selected a Plan Advisory Board that is capable of obtaining that maximum value or have proposed Board members previously compromised themselves from pursuing that possibility? Are all members of the proposed Plan Advisory Board intellectually honest or has there been an incomplete filing of evidence made before this Court?

(vi)    Did the Trustee, who is basically looking to sue numerous fiduciary organizations, find all that should be sued or did he leave one off of the list? If so, why would he do so when it runs contrary even to the valuations his financial expert has chosen?

7.    I will seek to answer these questions here as succinctly as I can by summarizing my prior objection (Exhibit 1 here and Exhibit I in the Trustee Plan) and Plan Insert (Exhibit 2 here and Exhibit L in the Trustee Plan) along with new incomplete information that has recently been filed with this Court.

3

**Organizational Structure and Ownership of FILB**

8.      According to Exhibit 1 (Exhibit B of the Trustee Report), Fletcher International, Inc. ("Fletcher Delaware") is the owner of the FILB shares.

9.      From my reading of the proposed Plan, the Trustee's intention is, after paying seven Class 3 claims (revised after Mr. Luskin's testimony on January 14, 2014, to one Class 2 claim for a new creditor, Credit Suisse, and only six Class 3 claims totaling about $1.5 million in the latest version of the Trustee Report[1] at the FILB level that are "Entitled to Vote", and then to deliver 80% of proceeds to the Leveraged and Arbitrage funds and its JOLs and the remaining 20% to the Alpha fund and its JOL, the only other entities (Classes 4A-4D), that are "Entitled to Vote".

10.     Conveniently, the proposed plan Advisory Board is to be comprised of Robin McMahon, one of the JOLs for Leveraged/Arbitrage, (2) Tammy Fu, a JOL for Alpha, and (3) Mr. Davis himself, the Trustee who would become the Plan Administrator in addition to being a member of the Advisory Board.

11.     Based on this, one would think that the "Louisiana Pension Funds" (defined as the Firefighters' Retirement System, the Municipal Employees' Retirement System of Louisiana and the New Orleans Fire Fighters' Pension & Relief Fund), which invested in Leveraged Series N and have not to my knowledge accepted the Trustee's Plan which would entitle them to one additional spot on the Plan Advisory Board, and the MBTA Retirement Fund, (the "Massachusetts Fund"), which invested in Alpha, would have invested in FILB itself.  However, referring to the FILB Trustee's Exhibit B, we see that:

---

[1] Docket 393

4

(i)     The Louisiana Pension Funds and the Massachusetts Fund did not invest in and do not own FILB; in fact, Mr. Luskin claims that "The truth is that, of the $95 million net invested by the Louisiana Pension Funds, no more than $33.8 million found its way to FILB..."[2]

(ii)    The Louisiana Pension Funds and the Massachusetts Fund did not invest in and do not own Fletcher Delaware, the fund that owns FILB.

(iii)   The Louisiana Pension Funds and the Massachusetts Fund did not invest in and do not own Arbitrage, the fund that owns Fletcher Delaware.

(iv)    The Louisiana Pension Funds did invest in Leveraged, which directly and indirectly (through FIAL 1 Fund, which is not shown in Mr. Davis' chart) invested in Arbitrage and were redeemed in-kind with the Right to buy $65 MM of United preferred and the associated $35MM warrant they would have received had they invested $65MM into the United preferred after objecting to the Notes from Arbitrage that were previously provided to two of the funds in regard to their earlier partial redemptions.[3]

12.    The Massachusetts Fund invested in Alpha and received a $10MM note from Arbitrage as payment for a partial redemption in 2011 and I believe a full redemption was made after that in 2011.

13.    As such, Mr. Davis skips multiple levels in the org chart to benefit the Leveraged and Alpha funds; I suppose that his hand-picked proposed Board members representing these funds do not have any objection to his Plan. On the other hand, disenfranchised creditors at multiple levels of the organizational structure have been determined to have no standing under Mr. Davis' Plan.

---

[2] Docket 393, page 505.

[3] There is a small "holdback" creditor position totaling approximately $11.3MM for the three funds as the February 2012 redemption in-kind only had to exceed 90% of the value of the redemptions.

**Who are the enfranchised creditors and investors and who were selected to be impaired?**

14.     Upon reading Mr. Davis' earlier exhibits, other than the New York City claim of less than

$7,000 , the secured claim of Credit Suisse Securities (USA) LLC and the seven professional firms in Class

3 referenced by Mr. Luskin[4] with claims totaling in excess of $1 million (I agree with the later corrected

status by the Trustee and Mr. Luskin of objecting to Mr. Messer's claim), it appears that the Trustee

objects to all claims other than those if the aforementioned Leveraged/Arbitrage funds, the Alpha fund

and the Louisiana investors should they decide to join the Plan.

15.     On a side note, one wonders why the Louisiana Pension Funds have been reluctant to

join this Plan, especially when they would be entitled to 80% of the proceeds after the Class 3 claims.  Is

it possible that they disagree with the Leveraged/Arbitrage JOLs who decided to sell the UCBI assets

held by the FILB Co-Investments vessel used to hold them back to United for only $2.5MM?

**Examples of impaired creditors**

16.     While it is not my place to represent all impaired creditors, let me just list a few, who

are representative of the numerous.

(i)     Windcrest Fund – A fund (to be clear, not in any way managed by Fletcher Asset

Management) owned by Mr. and Mrs. Eric Jager of Missouri.  Windcrest invested in The Fletcher

Income Arbitrage Fund, LP (an onshore version of the Arbitrage fund represented by proposed

Advisory Board member McMahon, but not legally connected in any way) and was redeemed in-

kind with a note for $992,780 backed by Fletcher Delaware.  The Trustee Report does not list

Windcrest as a creditor of FILB, as the note is backed by Fletcher Delaware and not FILB.  As

such, Windcrest would not have had a reason to file a claim against FILB over a year ago on

---

[4] January 14, 2014 transcript, page 20.

6

January 18, 2013. However, Fletcher Delaware as equity holder of FILB needs to receive its ownership proceeds to pay off this note. The FILB Trustee's Plan would send assets all the way up to the Leveraged and Alpha levels and then the Louisiana Pension Funds and MBTA, while bypassing Fletcher Delaware and harming Windcrest and the Jagers.

(ii)    The Richcourt and Soundview funds – Numerous Richcourt and Soundview funds invested directly in Arbitrage probably starting in 2009 or 2010 and indirectly may have invested as far back as 1998 either through Leveraged or entities that invested into Leveraged. Some of the Richcourt and Soundview funds remain investors in Arbitrage and/or Leveraged and some are waiting to receive redemptions from these funds or holdbacks from redemptions made in prior years. The proposed Plan derisively states "As set forth in Exhibit D, the Trustee disputes and intends to object to (or already has objected to) 39 claims that otherwise would be classified as Class 3 Unsecured Claims. The Holders of these claims – which the Trustee believes are inflated, invalid, untimely, or otherwise not adequately supported – will be provided ballots; however, to the extent the Trustee objects to these claims before the Voting Deadline, their votes will not be counted."[5]

(iii)    Former members of the FILB Board – After FILB filed for bankruptcy on June 29, 2012, three of the four Board members remained in place at the debtor-in-possession. Board members were entitled to a quarterly fee of $10,000 in advance. Mr. Floyd Saunders filed an administrative claim for his 2012Q4 director fee, which was not paid. Part of my claim against FILB is an administrative claim for my 2012Q3 director fee, which was not paid. I resigned from the Board of FILB on July 15, 2012, on the suggestion of FILB's then-counsel, Young & Conaway, in order to reduce the overlapping boards among entities. The Trustee wrongly moves these

---

[5] Docket No. 393, pages 274-275.

7

administrative claims to Class 5 status instead of administrative status.    I hereby seek to challenge the Trustee's classification of this portion of my claim.

17.        Former consultants of FILB – Both Stuart MacGregor and I were consultants to FILB in June 2012, prior to its filing Chapter 11.  Mr. MacGregor did not receive fees totaling approximately $12,600 for 28 days of service from June 1 – June 28, 2012 with $11,725 scheduled as a priority claim and I did not receive fees totaling approximately $17,40 with $11,725 scheduled as a priority claim for that same period.  Docket 71 was filed before this Court on August 29, 2012 for a hearing scheduled October 2, 2012, but were not reviewed at that time as the FILB Trustee had not yet been appointed.  Upon taking over, the Trustee through Mr. Luskin, reserved the right to object to part or all of our prepetition claims.  Please note that this is a direct claim again FILB and I believe that it should be paid in full before any equity claims drop all the way to the Leveraged and/or Alpha levels for payments to the Louisiana Pension Funds or the Massachusetts Fund.    I hereby seek to challenge the Trustee's classification of this portion of my claim.

**Soundview Elite**

18.        While Soundview Elite falls under the category above with a redemption receivable from Arbitrage, it also has its own specific claim.

19.        Soundview Elite is owed $4,000,000 by Fletcher Delaware for the 2012 New Year's Eve / 2013 New Year's Day transaction that was not fully consummated as discussed at length in the Soundview Case (Case No. 13-13098 (REG)) as heard by this Court.

20.        Mr. Davis objected to the April 2012 resolutions which transferred ownership of specific assets from FILB to Fletcher Delaware in exchange for some of Fletcher Delaware's ownership of FILB (the remainder of the FILB shares were delivered to Arbitrage in return for Arbitrage's ownership in Fletcher Delaware).  The FILB Trustee later caused the unwinding of those transactions.

8

21.     From what was heard in the Soundview Case, Fletcher Delaware attempted to sell its ownership of the FILB shares to Soundview Elite for $4,000,000.  It appears as if this sale was not consummated as Mr. Davis also objected to that transaction and effectively forced a partial unwind of that transaction.  Specifically, while ownership of the FILB shares once again returned to Fletcher Delaware, that entity was no longer in a position to return the $4,000,000 it received to Soundview Elite as $2,200,000 of that amount had already been sent to the FILB Trustee as part of its unwinding of the April 2012 transactions.  Due to Fletcher Delaware's inability to return the $4,000,000, that amount became a loan from Soundview Elite to Fletcher Delaware.

22.     The Soundview Trustee, Ms. Corinne Ball, rightly believes that if Soundview Elite is not the owner of the FILB shares, then it has a $4MM note from Fletcher Delaware, primarily backed by the FILB shares.  Mr. Davis, the FILB Trustee, simply disregards the ownership of the FILB shares by either Fletcher Delaware (when he insisted upon the unwinding of the April 2012 transactions) or Soundview Elite (when he insisted upon the unwinding of the sale of the FILB shares) in his plan, even though he was the direct cause of both actions.

23.     By the FILB Trustee's disregarding the organizational structure, he is causing great harm to Soundview Elite, its recently Court-appointed Trustee and its longstanding shareholders.

24.     It might be simple and fair if the Louisiana and Massachusetts funds owned all of the FILB shares, but they do not.  Fletcher Delaware owns the FILB shares, as demanded by Mr. Davis as part of the unwind of the April 2012 transactions and the unwind of the sale to Soundview Elite.  Now, he is looking to deliver the underlying assets of FILB (or their value upon being liquidated) to favored non-direct investors in FILB, as opposed to its shareholder.

9

**Understanding the FILB Assets in Order to Maximize Value for Creditors and its Shareholder**

25.    I will briefly summarize my prior comments here and point to where more detailed

information can be found.

**The Remaining United (UCBI) Warrant**

26.    The asset with the largest value that remains in FILB is the $30MM United (UCBI)

warrant. Mr. Davis, in his Trustee Report, states the following:

> "If the Trustee's interpretation of the warrants is correct, it could result
> in approximately $71 million in common stock to the Debtor, which the Trustee
> could then sell on the open market. The Trustee has additional claims arising
> out of FILB's involvement with UCBI (all of which UCBI disputes). In an effort to
> avoid litigation over all these claims, the Trustee and UCBI have begun
> settlement negotiations. Failing a consensual resolution, the Trustee intends to
> commence litigation against UCBI and vigorously enforce its rights against
> UCBI. The Trustee expects that UCBI will vigorously contest his claims. While
> the Trustee believes he has good arguments, it is not possible to predict who
> would prevail in any litigation, and it therefore should not be assumed that the
> Estate will prevail."[6]

27.    Like Mr. Davis, I believe that the UCBI warrant has major value.  UCBI stock closed at

$17.14 on Friday, February 14, 2014.  Following his methodology (exercising and selling shares), with the

remaining warrant exercisable for over seven million shares and the stock price more than two dollars

higher on the day Mr. Davis attempted to exercise the UCBI warrant in August 2013, his amount, listed

as $71 million, should increase to an amount in excess of $85 million.

28.    This would provide plenty of value for direct FILB creditors and the numerous entities

below FILB in the simplified org chart prepared by the Trustee (Exhibit 3 here and Exhibit B in the (FILB)

Trustee's Report).  The Soundview Trustee, Ms. Corinne Ball, and at least one of her attorneys (Ms. Heidi

Wendel) agree that this United warrant has enormous value.  I am hopeful that they will also file an

[6] Docket No. 393, pages 142-143.

10

objection to the FILB Trustee's Plan by the deadline date or at least be granted additional time for them to get fully up-to-speed. The notice of Ms. Ball's appointment as Soundview Trustee was recently announced on January 31, 2014.

29.    While both the FILB Trustee and the Soundview Trustee point out that there will be litigation related to exercising the warrant, the Securities Purchase Agreement between FILB and United states that:

> "This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, and each of the parties hereto hereby submits to the exclusive jurisdiction of any state or federal court in New York City, New York and any court hearing any appeal therefrom, over any suit, action or proceeding against it arising out of or based upon this Agreement (a "Related Proceeding"). Each of the parties hereto hereby waives any objection to any Related Proceeding in such courts whether on the grounds of venue, residence or domicile or on the ground that the Related Proceeding has been brought in an inconvenient forum."[7]

30.    While I am not an attorney, Skadden Arps had found relevant precedent supporting Fletcher's point of view in <u>Marvin M. Reiss et al, v. Financial Performance Corporation</u>, 97 N.Y. 2d 195 (N.Y. 2001). The decision by the Court of Appeals of New York on December 18, 2001 is attached (Exhibit 4).

31.    Further, I believe that the terms relating to the stock split in the Securities Purchase Agreement and the Warrant are unambiguous and unilateral in that a standard stock split results in an adjustment and that a reverse stock split would not. From the Securities Purchase Agreement:

> "Notwithstanding anything herein to the contrary, if the Company at any time subdivides (by any stock split, stock dividend, recapitalization, reorganization, reclassification or otherwise) the shares of Common Stock or Common Stock Equivalent Junior Preferred Stock into a greater number of shares, then, after the date of record for effecting each such subdivision, all measurements and references herein related to share prices for such securities

---

[7] Securities Purchase Agreement between United Community Banks, Inc. and Fletcher International, Ltd., dated as of April 1, 2010, Section 19(c).

will be proportionately decreased and all references to share numbers for such securities herein will be proportionately increased."[8]

32.    The explicit language above makes it a true shame that the instruments Quantal and Fletcher had valued in excess of $136 million were given back to United in exchange for a mere $2.5 million (just under two cents on the dollar) by the Leveraged JOLs and/or the Louisiana Pension Funds; further, the underlying stock price of United had increased since February 2012, implying increased value for the instruments that was not captured by these JOLs.

33.    Similar language exists in Section 1.6 of the United Warrant in regard to the warrant exercise price:

> "Adjustment to Warrant Price.  Notwithstanding anything herein to the contrary, if the Company at any time subdivides (by any stock split, stock dividend, recapitalization, reorganization, reclassification or otherwise) the shares of common stock, par value $1.00 per share, of the Company ("Common Stock") and/or Common Stock Equivalent Junior Preferred Stock into a greater number of shares, then, after the date of record for effecting each such subdivision, all measurements and references herein related to share prices (including the Warrant Price) for such securities will be proportionately decreased and all references to share numbers for such securities herein will be proportionately increased."[9]

34.    By definition, a reverse stock split would reduce (and not increase) the number of shares outstanding and is specifically omitted here.  Thus, there would not be any decrease in the number of underlying shares for the warrant.  Additionally, there would not be an increase in the exercise price of the warrant.

35.    Please note that a subsequent modification to the terms of the transaction between FILB and United did not call for any adjustment to the sections regarding stock splits.

---

[8] Securities Purchase Agreement between United Community Banks, Inc. and Fletcher International, Ltd., dated as of April 1, 2010, Section 19(q).

[9] Section 1.6 of the Warrant.

36.    I will have additional commentary regarding the handling of the UCBI assets returned to United in subsequent sections related to the selection of the proposed members of the plan Advisory Board.

<u>**Document Security System (DSS) Warrant**</u>

37.    The Document Security Systems warrant also has significant value (approximately $1.4MM as of December 31, 2013 according to Quantal, but less now that the underlying stock price has declined from $2.07 at that time to $1.65 as of February 14, 2014). Mr. Davis, in his Report, understands that this DSS warrant should have more value than a similar warrant with more standard terms but does seem to argue against receiving that value on page 202 of Docket No. 393.

38.    The FILB "Trustee intends to liquidate the warrants as part of the Plan."[10] One hopes that the Trustee will be diligent in achieving the full value of the warrant and not look to prove himself correct where he wrote that "(t)he warrants with the non-standard formula would have been considered suspect and subject to litigation risk from the issuing company."[11]

39.    Simply, if the FILB Trustee is looking to prove that there is less value than believed to be by many experts including Quantal, Grant Thornton, Eisner, Citco, Duff & Phelps (one of the few creditors that the Trustee has deemed "Entitled to Vote"), and even Ernst & Young and the Louisiana Pension Funds based on the Joint Statement by the Louisiana Pension Funds on September 9, 2011, Mr. Davis will be in a position to accept a lowball value for the DSS warrant as Plan Administrator.

---

[10] Docket 393, page 106.

[11] Docket 393, page 202.

## Other issues with valuations and profitability and solvency

40.     As I raised in my original Objection to the Trustee Plan (Exhibit I of the Trustee's Report and Disclosure Statement)[12] and the Plan Insert (Exhibit L of the same document)[13], there were numerous misstatements by Mr. Davis in his Report regarding valuations and profitability.

41.     Mr. Davis' claim that "FILB did not make a single profitable investment after August 31, 2007"[14], which I refuted in my current Exhibit 1 (pages 3-5) and my Exhibit 2 (page 6-7). Instead of paying a Class 2 claim to Credit Suisse Securities (USA) LLC, I believe that this is an appropriate situation where the FILB Trustee should sue a fiduciary for breaching its duties.

42.     Simply, Credit Suisse sold the Ion preferred equity to a buyer at too low of a price ($702,000 over conversion value). Within sixteen months, the buyer collected just over $2,000,000 in dividends and a $5,000,000 fee from Ion to convert the security (or ten times the premium that the buyer paid). For more details, see pages 10-11 of Exhibit 2.

43.     The FILB Trustee mistakenly believes that there were solvency issues as far back as 2008. I addressed this on page 10 of Exhibit 2 by stating that the redemption in-kind provisions of the funds invested in by the Louisiana Pension Funds and the Massachusetts Fund removed the basis for the insolvency claim by the FILB Trustee.

44.     Interestingly, the FILB Trustee, referencing many Class 3 Unsecured Claims, states "which the Trustee believes are inflated, invalid, untimely, or otherwise not adequately supported"; yet, he astonishingly does not reach that conclusion for the Class 4A Unsecured Claim, for the Arbitrage Fund. If you combine his statement that "FILB did not make a single profitable investment after August

---

[12] Incorporated as pages 468-482 of Docket No. 393.

[13] Incorporated as pages 594-608 of Docket No. 393.

[14] Now in Docket No. 393, page 11.

14

31, 2007"[15] with Mr. Luskin's claim, "The truth is that, of the $95 million net invested by the Louisiana Pension Funds, no more than $33.8 million found its way to FILB"[16] and that the Massachusetts Fund invested just $25 MM in 2007, one would be hard-pressed to see how Arbitrage (where the money from Leveraged and Alpha would have been invested) could file a claim for $60MM from FILB, let alone the $110 MM the Trustee cites.[17]

45.     After all of the negative publicity regarding Fletcher after the Trustee Report and these hearings, I would believe that the remaining United warrant and the DSS warrant would be considered distressed in any sales process at this point. Hopefully, the Plan Administrator, whoever it turns out to be, would not add any fuel to the fire in any such distressed sales process.

### The Plan Advisory Board

46.     In the FILB Trustee's Plan, he appoints himself as Plan Administrator and to the plan Advisory Board. He also appoints Robin McMahon of Ernst & Young, one of the Arbitrage and Leveraged JOLs and Tammy Fu of Zolfo Cooper, a JOL for Alpha.

47.     As previously pointed out, Arbitrage and Leveraged should not be considered creditors or shareholders of FILB, as their ownership holdings were several levels away from FILB and creditors at other levels and equity holders at other levels in the organization structure are skipped over.

### The FILB Trustee, Mr. Davis

48.     Some of this may be explained as a bias on the part of the FILB Trustee. It appears that Mr. Davis, whose legal experience is that of a litigator, did not present a neutral summary in his

---

[15] Now in Docket No. 393, page 11.

[16] Docket 376, page 22

[17] Document 393, page 357.

Trustee's Report which encompasses the first 264 pages of Docket No. 393; instead, it is an attack of

Fletcher and Fletcher's advisors instead of a two-sided or multi-sided portrayal of events that occurred.

49.    For example, the Joint Statement by the Louisiana Pension Funds on September 9, 2011

where they wrote that the "assets and their valuations have now been corroborated" was simply

ignored.

50.    This bias against Buddy Fletcher personally has continued to the detriment of FILB.  In

his decision in Fletcher International, Ltd. v. Ion Geophysical Corporation held in the Court of Chancery

of the State of Delaware, in a December 4, 2013 opinion, Chancellor Strine opined:

> "At trial, [the Fletcher Trustee's] advocates and expert witness premised
> its case on this extreme position. [The Trustee] told this court that Buddy Fletcher
> would not have consented to the BGP Transaction without receiving consideration
> greater in value than the bridge financing itself. Even more, Buddy Fletcher was
> portrayed as a person willing to bring it all down on his own head — and the
> heads of the Fletcher investors of which he was a fiduciary. [FILB] maintained this
> portrayal of Buddy Fletcher throughout its pretrial briefing and at trial even
> though: (1) Buddy Fletcher's own actions revealed that he thought the BGP deal
> was great for ION and thus Fletcher; (2) an ION bankruptcy would have ruined
> Fletcher itself; and (3) Fletcher only had consent rights over a $40 million bridge
> financing. This approach to the litigation appears to have been shaped by Buddy
> Fletcher, Benson, and Fletcher's advisors before the bankruptcy. Because the
> bankruptcy occurred after this litigation had already proceeded through discovery
> and the expert reports had been filed, Fletcher was held to the case that it had
> already put together and not permitted to make up a new one at ION's expense.
> **For reasons that were not explained, the bankruptcy trustee, who controlled the
> litigation, and new counsel did not present Buddy Fletcher as a witness at trial.**
> There was, therefore, no basis for the court to hear directly from him about the
> way that he was portrayed by Fletcher's advisors in its briefs and expert
> reports."[18] (emphasis added)

In his conclusion, Chancellor Strine wrote:

---

[18] Memorandum Opinion delivered by Chancellor Strine on December 4, 2013 in Fletcher international, Ltd. v. Ion
Geophysical Corporation, f/k/a Input/Output, Inc. and Ion International S.ar.l. in the Court of Chancery of the State
of Delaware

**"IV. Conclusion**

For all of these reasons, I impose a monetary damage award of $300,000 (.75% x 40,000,000). Because [the Trustee] has subjected ION to unnecessary prejudice and expense by violating its discovery obligations, attempting to circumvent the rulings of this court, and changing its damages theories, I exercise my discretion to award pre-judgment interest calculated at two-thirds of the statutory rate, compounded on an annual basis.  The court will not entertain any further applications for fee-shifting. ION shall submit a conforming final judgment within five days, after giving notice as to form to [the Trustee]."[19]

51.     Prior to the appointment of the FILB Trustee and prior to FILB's filing for Chapter 11 protection, FILB had already won summary judgment against Ion.  What remained to be determined was the amount of damages owed to FILB by Ion in this case in which Skadden and Proskauer had already been paid millions in legal fees.  The $300,000 damage award is nowhere close to the damages that were sought; this must be considered a loss as Peter Fowler, the expert originally retained by FAM and also used by Mr. Davis as well as Mukesh Bajaj, another expert originally retained by FAM, both thought the damages should be in the tens of millions of dollars.  The bias against Mr. Fletcher and the FILB Trustee's handling of the case appear to have hurt FILB deeply here.

52.     It may be necessary to bring in a new Plan Administrator instead of having the FILB Trustee to take on that role.  In addition to the personal bias against Mr. Fletcher, which may hurt other cases, this would lead to protecting the many creditors and shareholders where the FILB Trustee wrongly objects to their claims.  For instance, the investors in the Richcourt funds and the Soundview Funds include investors that invested in these funds prior to the June 2008 purchase of Richcourt referenced by the Trustee.  I expect that the Soundview Trustee will look to protect the funds now under her control and the funds' investors.

---

[19] Ibid, p. 67.

17

**Mr. Robin McMahon**

53.    I believe that Robin McMahon of Ernst & Young is a bad choice for the Plan Advisory Board for several reasons:

(i)    He is one of the two-Cayman based JOLs of Arbitrage and Leveraged, which as previously pointed out, are several levels removed from being direct investors or creditors.

(ii)    Ernst & Young is conflicted here as Richard Thomas who is affiliated with Mr. McMahon previously prepared the report that led the Louisiana Pension Funds to state that the "assets and their valuations have now been corroborated" and now here, Mr. McMahon, the JOL from E&Y claims the opposite.

(iii)    As one of the JOLs, Mr. McMahon approved the FILBCI-UCBI settlement where FILBCI received $2.5MM.  Specifically, Mr. McMahon willingly entered into a settlement agreement with UCBI where the larger pieces (representing the right to buy approximately 18 million shares of United) of the Fletcher investment into UCBI were sold for $2.5MM (just less than 2% of the value placed on the assets by FAM and its valuation analyst, Quantal). This is in direct contrast to the Trustee looking to raise $71MM for the smaller remaining piece (a warrant to buy only 7 million shares) of United.

(iv)    This inconsistency cannot be overlooked; if the FILB Trustee / proposed Plan Administrator settles with United for an amount near $71MM ($85MM based upon the higher UCBI stock price), this will be a huge embarrassment for Mr. McMahon.  It will also confirm that the UCBI investment given to Leveraged and the Louisiana Pension Funds was of substantial value and that Leveraged and the Louisiana Pension Funds should not be given any additional consideration from the sale of the United warrant currently held by FILB as they were properly

18

redeemed[20]. Mr. McMahon can only be in a position to downplay this asset; an asset that in my discussions with the Soundview Trustee, Soundview (a nearer creditor to FILB) considers to be of significant value.

(v)      I believe that the Soundview Trustee, with an incentive to get the most value for the remaining United warrant, would be a better Plan Advisory Board member than Mr. McMahon, who would have an incentive to settle the United warrant for very little value.

(vi)      In his Chapter 15 filing before this Court, Exhibit 1 of Exhibit K, part of Mr. McMahon's affidavit, purportedly includes "Stewart Turner's sworn statement of affairs dated June 6, 2012, a true and correct copy of which is attached hereto as Exhibit 1." He omits the crucial seventh page out of seven pages (referenced in footnote 16 below) of my sworn affidavit. This seventh page is also the page where it shows that two Richcourt funds (Richcourt EuroStrategies and Richcourt Allweather Fund) had been paid in-kind with shares of Fletcher International Partners, Ltd. (referred to as "FIP" in the FILB Trustee's Report) as partial redemption payments and without that redemption in-kind standing, some other amounts in my affidavit have now become obsolete.

(vii)      Please note that the Trustee and Mr. Luskin have accused me of backdating in June 2013 the delivery of the partial redemption payments of the FIP shares that I affirmed on June 6, 2012, several weeks prior to the Chapter 11 filing by FILB. It is glaring that this is the one page that is missing from my affidavit as filed by Mr. McMahon. It makes one wonder what other shenanigans might occur with Mr. McMahon joining Mr. Davis on the plan Advisory Board.

(viii)      Further, I wonder what Mr. Davis was thinking when he thought to include Mr. McMahon on his proposed plan Advisory Board after settling an asset similar to the single FILB

---

[20] Other than that the Louisiana Pension Funds would be entitled to receive consideration for the $11.3 million holdback amount as referenced on page 7 of my June 6, 2012 sworn affidavit to the Leveraged JOLs (my Exhibit 4).

asset that represents the vast majority of the asset value of FILB for just two cents on the dollar. With one of three proposed members of this plan Advisory Board willing to settle assets for two cents on the dollar and a second member selecting the first, can this proposed Advisory Board of currently only three members achieve the proper value for the creditors and shareholders up through the organizational structure even only to the next level of Fletcher Delaware to pay off the Note held by Soundview Elite?

### Ms. Tammy Fu

54.     I do not believe I have had any direct contact with her.  Assuming that the remaining United warrant is sold for significant value, this would justify the value of what had been delivered to Leveraged and the Louisiana Pension Funds in February 2012.  This would leave MBTA/Alpha as the largest remaining shareholder/creditor as the Louisiana Pensions Funds would only be entitles to their $11.3 million holdback claim.

### Summary

55.     I have tried to make the following points in my above arguments:

(i)     Mr. McMahon settled with United too cheaply; he sold an asset roughly 2.5 times the size of the United asset that the FILB Trustee thinks is worth $71MM for $2.5MM.  In other words, if Mr. McMahon becomes part of the plan Advisory Board, he would think that returning the $71MM+ asset to United for $1MM is acceptable.  This seems wrong as then FILB will not have any significant assets.

(ii)     Mr. Davis' selecting Mr. McMahon for the plan Advisory Board does not show a good faith effort to maximize value for all creditors and shareholders and his position as Plan Administrator and his position on the plan Advisory Board should also be questioned.

(iii)     The FILB bankruptcy trustee decided to not present Mr. Fletcher as a witness after taking over the FILB v. Ion Geophysical case in the Delaware Court, which led to just a six-

20

figure award for FILB instead of an eight-figure award and a rebuke for the FILB bankruptcy trustee by Chancellor Strine.

      (iv)     Mr. Davis is looking to favor certain shareholders: 80% of proceeds for the Louisiana Pension Funds via Leveraged (ignoring any creditors at the Leveraged level and the remaining shareholders at Leveraged as the Louisiana Pension Funds received sufficient payment if as Mr. Davis reported the remaining United asset that FILB currently holds is worth $71MM) and just 20% for MBTA/Alpha.

      (v)     MBTA/Alpha should actually get a much higher portion than 20% as Leveraged received assets of significant value although the E&Y liquidators representing Leveraged gave them back to United for a pittance. Based upon Mr. Davis valuing the United warrant at $71MM the MBTA/Alpha claim should be significantly larger than the Louisiana Pension Funds' holdback of $11.3 MM. Please note that this figure was produced by Mr. Stuart MacGregor and is on the page of my affidavit that was **omitted** when Mr. McMahon purportedly included "a true and correct copy" of my sworn statement of affairs dated June 6, 2012.

      (vi)     That page omitted by Mr. McMahon (sworn by me **prior** to the FILB Chapter 11 filing) also validates my statement that FIP shares were delivered to two Richcourt funds and was not part of any backdating scheme as alleged by Mr. Davis and Mr. Luskin.

      (vii)     Just a few weeks on the job, Ms. Ball, the Soundview Trustee, quickly sees what Mr. Davis does not: his ignoring the Fletcher organizational structure provides advantages to the Louisiana Pension Funds at the expense of innocent investors, including, among others, the Soundview funds. Soundview Elite, in particular, is owed $4MM directly from Fletcher Delaware as Mr. Davis negated the purchase of FILB shares by Soundview Elite from Fletcher Delaware. Mr. Davis then proposes to skip paying Fletcher Delaware, which could then pay Soundview Elite what it is owed.

## Conclusion

56.     Other than paying a few professional firms (including Credit Suisse, who should instead be sued for breaching a fiduciary duty to FILB by not demanding an appropriate price for the sale of the Ion preferred), the FILB Trustee and proposed Plan Administrator is looking to make payments to just two investors who invested several levels below where Soundview Elite is owed money and should be paid first.

57.     This is further compounded by Mr. McMahon's poor choice in selling Leveraged's United assets for two cents on the dollar.

58.     At the least, Mr. McMahon should not be a part of this Advisory Board and that Mr. Davis also should not be a part of the Advisory Board for (a) selecting Mr. McMahon to be on this Board and (b) letting his bias against Mr. Fletcher come in the way of maximizing value for FILB, as demonstrated before Chancellor Strine.

59.     While I have not discussed the following with Ms. Ball, I believe that the Soundview Trustee would be a better candidate for the plan Advisory Board as she represents at least one more senior creditor of FILB than Mr. McMahon.

60.     Given that the FILB Trustee's Report is opinion and not fact as the Court insisted[21], I believe that a senior member of FAM, perhaps as thought by Chancellor Strine, Mr. Fletcher himself,

_____

[21] In fact, the Court **required** the following to be placed in bold font near the beginning of the FILB Trustee's Report:

• **The information set forth in this Disclosure Statement is a combination of facts learned by the Trustee in his investigation and opinions formed by the Trustee after consideration of those facts. At this point, it should be regarded solely as the Trustee's opinions. The Soundview Debtors dispute those statements of fact and opinions in numerous respects, for the reasons set forth in a document their counsel has prepared that is attached as Exhibit K. Turner also disputes those statements of fact and opinions in numerous respects, for the reasons set forth in a document he prepared that is attached as Exhibit L. Some matters that appear to be facts in this Disclosure Statement may later be found to be matters of opinion.**

should be placed on this Board, possibly in a non-voting position.   He is in the best position to understand and seek maximum value for the FILB assets.  If done quickly, perhaps some value can be salvaged from the failed Ion lawsuit.  Regardless, his input in any likely litigation with United would be of critical importance in maximizing asset value as opposed to Mr. McMahon, who is in a position to seek lesser value.

61.    Perhaps Ms. Fu should remain as the third member, as I believe that she would represent the largest remaining investor/creditor if FILB has significant proceeds from the sale of the United warrant.

_____

Stewart Turner, Pro Se

Dated: February 18, 2014.

---

• The Court has authorized the inclusion of Exhibits K and L as part of this Disclosure Statement, but has not reviewed Exhibits K and L for their accuracy and has formed no view on the accuracy of any statements Exhibits K and L contain.
• The facts and opinions set forth in this Disclosure Statement may in material respects be disputed in later proceedings in this chapter 11 case or elsewhere, and have not yet been found to be true by any court, if they ever will be. There can be no assurance that any litigation brought by the Trustee will be successful.

# Exhibit 1

HEARING DATE AND TIME: January 14, 2014 at 9:45 a.m. (Eastern Time)

OBJECTION DEADLINE: January 3, 2014 at 4:00 p.m. (Eastern Time)

STEWART TURNER, Pro Se

Address: 200 East 71st St., Apt. 5A

New York, NY 10021

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

X

In re:

Chapter 11

FLETCHER INTERNATIONAL, LTD.,

Case No. 12-12796 (REG)

Debtor.

X

OBJECTION OF STEWART TURNER

TO THE TRUSTEE REPORT AND DISCLOSURE STATEMENT

1

FILED
U.S. BANKRUPTCY COURT
2014 JAN -6 A 11: 15

Stewart Turner, who is both an administrative and pre-petition creditor of Fletcher International, Ltd. (Bermuda), states as follows:

1.      I have filed claims in this case in the amount of $33,502.76 plus unliquidated damages regarding legal fees under my rights to indemnification. I am a former consultant and a former Director of Fletcher International, Ltd.  I have a Bachelor of Science in Engineering degree from Princeton University in 1980 and an MBA degree from The Wharton School at The University of Pennsylvania in 1984.

2.      My particular expertise within the Fletcher organization is in connection with negotiating the customized PIPEs warrants which are the major investment vehicle of the Fletcher organization and, from an industry perspective, in valuing those warrants. Although I do not earn my living as a valuations expert, in addition to my graduate business education I have worked on valuation matters with our accountants and experts throughout the years and I have industry perspective and experience on valuation.

3.      I have reviewed the Trustee Report and Disclosure Statement dated November 25, 2013. There are a number of inaccuracies and indeed, outright incorrect statements in the report that I feel compelled to point out for several reasons.  First, some of the statements are about me and wrongly impugn my reputation.  Second, since my understanding is that the purpose of a disclosure statement is to give the creditors "adequate information" within which to decide whether to vote for or against a Plan, I believe they should be made aware of statements that are wrong.  Because of the errors and omissions, I do not believe the disclosure statement contains or refers to such adequate information.

4.      I ask the Court's indulgence insofar as I cannot afford counsel and I have prepared all of what follows myself.

2

<u>**Misleading Information regarding the Profitability of FILB**</u>

On page 1 of the Trustee Report, there is the following claim made by the Trustee[1]:

"What the Trustee's investigation shows is that, with FAM as its investment manager, FILB did not make a single profitable investment after August 31, 2007..."

The Trustee purportedly demonstrates this through a table on page 181.

The Trustee's accusation is false. The table on page 181 of his report is 1) erroneous, 2) incomplete, 3) contains half-truths and 4) ignores relevant information.

Excluding the AGEN trade, which the Trustee states was the last profitable investment for FILB, the cost-basis for the listed items at page 181 was $67.8MM and sale proceeds were only $44.4MM; this implied a loss of $23.4MM during this time period.

    a)  The table is erroneous because it combines the profitable "SMHG" transaction made by FILB with what turned out to become a series of unprofitable investments made by Fletcher International, Inc. ("Fletcher Delaware") into Madison Williams.[2] While the Madison Williams investment was later abandoned by Fletcher Delaware in order to receive tax benefits for the 2012 tax year, the $8.2MM invested should not be confused as a FILB (the entity for which the Trustee was appointed) loss to be merged with "SMHG".

        Thus, FILB invested only $7.5MM into Sanders Morris Harris Group, Inc. (ticker symbol "SMHG", later renamed Edelman Financial with ticker "EF") and by my calculations received proceeds of $14.3 MM over the next 2.2 years (or a profit of $6.8MM). I do not understand why the Trustee shows proceeds of $15.3MM.

        In sum, the "SMHG" transaction made by FILB in late 2009 should list a profit of $6.8MM instead of the Trustee's loss of $0.4MM. This alone would add back $7.2MM of the Trustee's uncalculated loss of $23.4MM.

    b)  The sale proceeds for the "UCBI" (the ticker symbol for United Community Banks, Inc.) transactions for FILB were listed as a negative $3.3MM.[3] The FILB portion of the UCBI transaction essentially had two components: a) a $30MM warrant in UCBI and b) a right to buy a

---

[1] Page 10 of Docket 327
[2] The initial $5MM wire was sent by FILB to Madison Williams, but by the time the transaction closed, Fletcher Delaware was the only Fletcher affiliate to invest in Madison Williams. Subsequent payments in 2011 were made by Fletcher Delaware. The FILB Trustee should know this.
[3] This amount was related to a payment made by FILB since it did not exercise the right to buy the United preferred during the first year after the securities purchase agreement between FILB and United was signed.

$65MM convertible preferred equity stake in UCBI, which would deliver an additional $35MM warrant once the right was fully exercised.

Please note that this right to buy the preferred (along with the associated $35MM warrant) was distributed to redeeming investors of FIA Leveraged Fund through a holding entity called FILB Co-Investments (sometimes referenced by the Trustee as "FILBCI") at a value of $135.5MM in February 2012. I will address this right in more detail later.

The Trustee's own interpretation for the remaining warrant held by FILB is that "it could result in approximately $71 million in common stock to the Debtor."[4] Adding this amount of $71MM to the negative $3.3MM payment would show more profit than all of the losses in the table combined. In other words, this warrant, the only remaining part of the UCBI investment still held by FILB[5], (without including any value for UCBI as a sale has not occurred) would make this table, at best, incomplete.

In a footnote to the table, the Trustee does acknowledge that the FILBCI Settlement was not reflected. That footnote is also incomplete. While the amount received by FILBCI is not included in the proceeds, the value indicated in the highest mark includes value that was distributed to FILBCI. This line for UCBI is incomplete in an additional way as the highest mark would have occurred in 2013 had the Trustee not signed off on the FILBCI Settlement. (The Trustee's own $71MM number for the remaining portion of the UCBI investments was higher than FILB had valued that portion in 2011.)

c) Regarding DSS (the ticker symbol for Document Security Systems), the table contains a half-truth as FILB still holds a warrant in DSS. The date of sale (from February 2011 through June 2011) is misleading as the DSS warrant currently held does not expire until at least February 2020. More will be discussed about the DSS warrant in a subsequent section.

d) The most astonishing exclusion from the table is the omission of the Helix and Ion Geophysical investments from this analysis. While these investments were originally made prior to August 2007, excluding them ignores relevant information to performing a fair and unbiased analysis of FILB's profitability.

---

[4] From page 130 of the Trustee Report (page 139 of Docket 327). Based upon the August 16, 2013 closing price of $15.08 and the 7,058,823 (=$30,000,000 / $4.25 strike price) shares, I calculated a value of $76.4MM. It is possible that the Trustee is using a litigation discount of 7% or there may be other reason(s) to explain the discrepancy.
[5] As part of the April 2012 transactions, one-half of this warrant was distributed to Fletcher Delaware as part of FILB looking to sell its stake in Fletcher Delaware. The April 2012 transactions were undone at the insistence of the FILB Trustee, making Fletcher Delaware once again the 100% owner of FILB and FILB the sole holder of the $30MM UCBI warrant.

4

While the Trustee scoffed at my reference to the "bells and whistles" of the FILB transactions on page 193[6] of his report, adjustments to these two large investments during the economic crisis of 2008-09 added significant profit to FILB. These special terms in the agreements between FILB and Helix and Ion caused Helix to take accumulated beneficial conversion charges of $53.4MM and Ion to take a beneficial conversion charge of $68.8MM according to the companies' respective 10-Ks filed with the Securities and Exchange Commission.

The Trustee does not accept much of the numerical analysis by Fletcher or its valuation analyst Quantal. Please note that the beneficial conversion charges totaling $122.2MM (more than five times that of the losses that were not totaled in the table) were provided by these companies and their auditors in their 10-Ks, but excluded from the Trustee's analysis.

The Trustee' accusation that FILB did not make a profitable investment after August 2007 is false and the table that purports to support that statement has errors, ignores relevant information and presents incomplete information as presumed totals. FILB was profitable during the relevant time period when Fletcher controlled the entity.


**The Question of Backdating**

The Trustee Report accuses me of backdating. In particular, I am accused of backdating in regard to the FIP investment and redemption transactions. From page 47 of the Trustee Report[7]:

"**The FIP Redemption**: FAM attempted to backdate the transfer of FILB's interest in FIP to Richcourt Euro Strategies and Richcourt Allweather Fund in partial satisfaction of two redemption requests. Turner, as sole director of FIP, signed resolutions dated June 20, 2013, to effect a transfer as of June 30, 2011, nearly two years after the event."

The Trustee's accusation is false. I signed the resolutions on June 20, 2013 and forwarded them to the registered office of FIP on that date; thus, no backdating occurred.

- The resolutions were executed in order to bring FIP's register of members up-to-date and in line with the financials of FILB, the Debtor, as of June 30, 2011.

- This is how Mr. Stuart MacGregor had been keeping the books of both FILB and FIP during this time period.

- It is also consistent with the books and records kept by FILB's outside administrator, SS&C. Mr. Anthony Maniglia of SS&C provided a copy of the June 30, 2011 trial balance to Mr. MacGregor

---

[6] Page 202 of Docket 327
[7] Page 56 of Docket 327

5

in a February 2012 email showing that the FIP[8] asset was no longer owned by FILB as of June 30, 2011.

- I believed in good faith that this FIP/FIPLTD asset had been distributed as partial payment of redemptions-in-kind to Richcourt Allweather Fund Inc. and Richcourt EuroStrategies Inc. as set forth in a sworn affidavit to the JOLs of FIA Leveraged Fund on June 6, 2012, more than three weeks prior to the Chapter 11 filing by FILB, the Debtor.

Not only had the transfers occurred as of June 30, 2011, I specifically told the Trustee and Goldin of these transfers in a December 21, 2012 email during my consulting period with the Trustee: "According to FILB's books as of June 30, 2011 / July 1, 2011, FILB's holdings in FIPLTD were delivered to FIA Leveraged Series 6 redeeming shareholders Richcourt Allweather Fund and Richcourt EuroStrategies."

**Valuing assets and getting the most value for the creditors**

**The Trustee Report, at Best, Does Not Properly Value Assets and, at Worst, shows a Complete Ignorance of Valuation Methodology**

As the Trustee wrote in his report, FILB's investment strategy was primarily PIPEs. PIPEs is an acronym for "Private Investments in Public Equities". In other words, FILB made its own private investments into publicly traded (exchange-listed or over-the-counter) companies. While the underlying companies were public, the actual investments that FILB made were not publicly traded or similar to other publicly traded securities and were not marketed as such.

Fletcher has used Quantal as its outside valuation analyst for many years to value these PIPEs. While the Trustee attacks Quantal's independence after working with Fletcher for many years, it is hard to understand how he can attack the credentials of such a firm, led by a current Stanford finance professor and a former Berkeley finance professor.

Further, the valuations used by Fletcher/Quantal were reviewed by Citco, its former administrator, and two outside auditors (Grant Thornton and Eisner LLP). Grant Thornton has used its own outside experts including Dwight Grant, who at least as early as August 2005, prior to when I rejoined Fletcher, generally confirmed Quantal's analysis. Grant Thornton, as part of its audits, generally had Fletcher take a low single-digit percentage haircut on the Quantal numbers for Helix and Iori.

Further, Eisner, after consultation with its outside expert Sterling, also accepted the Quantal numbers in FILB's 2009 audit.

---

[8] For clarity, this investment was listed as FIPLTD on the books of FILB as there were similar sounding investments held by FILB. I am using the Trustee's convention of calling Fletcher International Partners, Ltd. ("FIPLTD") as "FIP". However, FILB owned an investment in Fletcher International Partners, LP ("FIPLP"). These investments should not be confused.

6

Prior to Eisner releasing the FILB 2009 audit on July 14, 2010, Fletcher enlisted Duff & Phelps, a nationally recognized third party valuation firm to do an additional analysis of the Helix and Ion positions. The Duff & Phelps report issued July 1, 2010 confirmed Quantal's analytics. Duff & Phelps is a firm with in excess of 1200 professionals.

The size of D&P with its well-known national reputation speaks volumes relative to Goldin Associates, a firm that may not have an option/warrant specialist (or at least the four people I had met at Goldin Associates have no apparent options experience).

The Trustee states that "Ascribing value to non-exercised contract rights to buy securities without actually investing in them"[9] is a red flag. I would agree. The sentence is a red flag in that neither the Trustee nor his professionals, particularly Goldin, have even a basic understanding of valuation with respect to these instruments. These rights are virtually identical to options and warrants, all of which are required to be recorded at fair value on an investment company's books (in accordance with the investment company guidance). Warrants, options and contract rights have value at any given point in time prior to or at their maturity (comprised of intrinsic value plus time value), even if, in the end, they expire worthless. This shows a lack of understanding by the Trustee in regard to the assets he currently controls.

Ironically, the Trustee attacks Fletcher's valuations of Helix and Ion, post-adjustment, because Fletcher does not reduce its valuation and notes an inconsequential paragraph that had not been removed from a Quantal report. While I applaud the Trustee for his attention to detail in regard to reading the Quantal report, I am surprised that the Trustee Report and the table did not make any reference to the much more significant $122.2MM adjustments made by Helix and Ion, as pointed out above.

Further, the Trustee is wrong in his premise that Quantal had ascribed any value to a potential conversion price change. That is why the formula did not change after the change in conversion prices. This is yet another example of his not understanding the FILB assets.

Even if the Trustee's claim that Fletcher and the outside advisors it hired and the external advisors the accounting firms hired were biased in favor of Fletcher and their valuations, on September 9, 2011, the Louisiana funds issued a Joint Statement saying among other things that "The assets and their valuations have now been corroborated and the governing boards of the systems have been briefed."[10].

While discounts may have been used in the valuations received by Ernst & Young with the largest being for litigation related to the reverse stock split of United (UCBI), we now see that the Trustee may have used a 7% discount for the potential litigation in his conversion valuation of the UCBI warrant.

---

[9] Trustee Report page 10 (page 19 of Docket 327

[10] Please note that while technically Ernst & Young LLP did work for the Louisiana funds in 2011 and the JOLs, affiliated with Ernst & Young Ltd., are separate, Richard I. Thomas, Principal, Fraud Investigation & Dispute Services for Ernst & Young LLP who was lead investigator for Louisiana was referred to as a "representative of the JOLs" in 2012.

If professionals from within and/or external to Grant Thornton, Citco, Eisner, Duff & Phelps and even the opposing Ernst & Young all were able to corroborate the valuations prepared by Quantal, one wonders how the Trustee and Goldin arrived at different but as yet unstated lower valuations, possibly as low as conversion value. If the Trustee is to become the Plan Administrator, it would have helped to have a financial consultant who could see the value in these complex instruments and a firm superior to Goldin. (There will be additional points listed in this regard later.)

### DSS

The Trustee is wrong when he objects to the "immediate markup" of investments. Document Security Systems (ticker symbol DSS) was a company that Fletcher made a PIPE investment into on December 31, 2010. The Trustee claims that Fletcher would immediately mark up the value of its position, as though it was doing something wrong. Accounting rules require the immediate valuation of assets and liabilities when acquired. While there is more than a hint of impropriety in the Trustee Report when such actions were undertaken by Fletcher ("a different valuation scheme became increasingly prevalent – the immediate markup of newly-acquired investments")[11], there is no comment about the fact that DSS, in its 10-K report for the period ended December 31, 2010 (the same day as the investment) listed a liability related to the warrant of $3.9MM. Was this an immediate overvaluation of liabilities scheme by DSS?

So now that the timing of the marking of the positions is the same for both Fletcher and its asset and DSS and its liability, the only question is regarding the different valuations, which the Trustee highlighted. Fletcher used the Quantal valuations, based on an open-form model (Monte Carlo simulation) which handled the Fletcher cashless settlement provision.

While the Trustee highlighted that UCBI forced a change in the agreement related to the cashless settlement feature of the warrants and implied that another company, Syntroleum, did as well; that is not correct. Syntroleum and Fletcher signed a revised agreement since certain conditions which had not been met by Syntroleum caused the original investment to not occur. The Trustee provides a detailed discussion of the "cashless settlement" formula on pages 182-186 of his Report[12]. Shockingly, on pages 171-172 of his Report, the Trustee writes, "With respect to cashless exercise formulas, survey participants had never seen the non-standard cashless exercise formula included in many of FILB's warrant provisions. The concept of having the strike price in the denominator was so foreign to those asked that no one was prepared to say that the non-standard formula would add any incremental value to what would be derived using a standard formula."

The cashless settlement feature used by Fletcher used a smaller number in the denominator when the option was in-the-money than the standard formula in determining the number of shares to be received under a cashless exercise of the warrants. Thus, any survey participant with options and arithmetic

---

[11] Page 178 of the Trustee Report / page 187 of Docket 327
[12] Pages 191-195 of Docket 327

expertise should have been able to figure that the non-standard formula would lead to a greater number of shares being issued and, thus, a substantial increase in value.

The Trustee claims in a footnote in his Report[13] that AGEN was the only company to honor the cashless settlement provision used by Fletcher. This is wrong as Raser had also done so in April 2010.

Furthermore, Edelman Financial (the renamed Sanders Morris Harris Group) bought back the existing warrant for $8,000,000; this was a price far in excess of what should have been paid for a warrant that did not have the Fletcher cashless settlement feature.

Thus, three companies (AGEN, Raser and Edelman) honored this provision while one company (United) quickly demanded a revised document. Syntroleum's revised agreement was re-executed primarily for a reason having to do with something other than the issue the Trustee raised.

Thus, the Trustee is wrong in his understanding of the DSS position, the accounting behind its valuation, and the value inherent in it. Should the Trustee become the Plan Administrator under his proposed Plan, he may look to sell the DSS warrant without considering the value of the cashless settlement feature. His inability to see the value in this position could cause a disservice to the creditors and shareholders of the Debtor as he would not be seeking maximum value for this asset.

## Misunderstanding UCBI

The Trustee makes mocking claims about how Fletcher's value of the warrant changed. In particular, he finds on page 195 of the Trustee Report (page 204 of Docket 327) that "FAM and Quantal then valued the UCBI Preferred Stock and Warrants at $143.1 million (perhaps, coincidentally, matching the amount needed to satisfy the redemption request)."[14]

While that is one unsophisticated way of looking at this, option professionals would have a better understanding, based upon science. There is and was a "delta", a mathematically-based calculus and derivative term, which relates to both the option and the right to buy the preferred (which effectively contained an imbedded short put – technical jargon that does not need to be developed fully here). In layman's terms, this "delta" would allow the investment manager to very closely estimate the value of the position by simply multiplying the change in the price of the underlying stock of the UCBI shares (for small price changes) by this delta to estimate the new value. Using this delta, FAM was able to estimate its value on February 13, 2012 and ask Quantal to do an additional valuation that Monday night to get a more precise valuation through its Monte Carlo simulation method.

---

[13] In a footnote on page 187 of his Report (page 196 of docket 327)
[14] Technically, Quantal valued the Right to but the UCBI Prefered and the associated Warrant B at $135.5MM on February 13, 2012.

9

To be clear, I did not mean to call FAM's multiplication and addition "science". The work that Quantal did was science, including providing the "delta" of the positions. The multiplication referenced just provided a fairly accurate estimate of the value Quantal would provide based upon the updated price of the underlying stock at the time of the valuation. Other factors impacting any valuation would be a change in volatility (there was no significant change on the February 13, 2012 valuation date when compared to the volatility used with the Friday, February 10, 2012 valuation) and reduction in time of the warrants although the decay in value related to fewer days remaining until expiration is insignificant with a warrant that has more than seven years remaining until expiration.

Thus, what appears to be magic or coincidence to the Trustee was actually a scientific calculation (Quantal did provide valuations to the FILB Directors that night of February 13, 2012) regarding when to deliver the United position as a redemption-in-kind to the Louisiana investors.

Please note that the delta impact (although Quantal did fresh weekly and monthly valuations) could explain much of the value fluctuations through other time periods. The accounting rules for investment firms require updating the values of the positions in each accounting period, both up and down for Fletcher. Issuing companies have different accounting rules. That is another issue in regard to the Trustee's table on page 181.

While the Trustee now understands that the UCBI warrant he holds is worth $71 MM (now a higher value), it is unclear what he was thinking when he signed off on the UCBI-FILBCI settlement. The position held by FILBCI is worth roughly 2.5 times the value of the warrant he holds. Yet, in one instance he claims his asset is worth $71MM but he agreed to the sale of the 2.5 times larger position for only $2.5 MM. If someone is to seek to maximize the estate, should it be the Trustee who signed off on a sale at less than 2% of the asset's value?

Fundamental analysis

The Trustee goes on at great length discussing the lack of fundamental analysis performed by Fletcher. Accounting rules do not allow such subjective interpretations (nor do the Black-Scholes model and Monte Carlo simulations allow for that). These models indirectly allow for fundamental analysis as the stock price, an input to both models, is impacted by market forces; a higher stock price implied improving fundamentals and a lower price implies reduced prospects for the company.

The Trustee's market participants

In his Report, the Trustee cites unnamed market participants who would not value more than one-to-four years worth of dividends on the Helix and Ion non-callable perpetual convertible preferreds. As I believe the market valuation prospect for a bond or a straight (non-convertible) preferred instrument simply takes the present value of ALL of the future interest payments or dividends and payment of principal and appropriately discounts these values at the appropriate discount rate. This rate may be

10

the risk-free rate for short-term Treasury bills or a higher rate depending upon the riskiness of the underlying issuer.  Bond traders investing in the 30-year government bond takes into account all sixty semi-annual coupons.

In addition to not naming the market participants he contacted, it is unknown as to whether the Trustee fully describes the instruments specifically as perpetual non-callable convertible preferred securities.  Is it possible that these unnamed market participants were considering a publicly traded convertible that had a call feature?  If so, any comparisons would not be valid.  Fletcher never found a perpetual non-callable convertible preferred equity in the marketplace despite looking many times over the years.  The Trustee would then have asked the market participants to incorrectly compare apples and oranges.

Over the years, Dwight Grant (outside analyst to Grant Thornton), Grant Thornton itself, Eisner, Sterling and Duff & Phelps have not objected (at least more than a few percent, statistically "noise") to the values determined by Quantal.  Additionally, while Quantal's model and inputs may determine the valuation of HLX and IO in a non-customary fashion[15], the analysis by Duff & Phelps among others by attempting to determine the appropriate discounting rate confirms Quantal's valuations.  Perhaps they understood that these instruments were perpetual and non-callable.

<u>Credit Suisse and the Ignored $6.3MM Profit</u>

The Trustee also cited how Credit Suisse, FILB's prime broker, marked the position at conversion value.  This was done as one input for its lending and margin formulas and likely not as part of any valuation process.

The Trustee chose to mention this about Credit Suisse but chose not to include any information about the profitability of the trade of the Ion preferred equity achieved by the buyer from Credit Suisse's sale.

Starting with my initial meeting with the Trustee, I mentioned that Credit Suisse sold the Ion preferred to a hedge fund investor at a very low price (approximately $702k over the conversion value in mid-June 2012) and that this should be reviewed.  The buyer essentially recouped that premium (technically $675k) by September 30, 2012 (in three-and-a-half months, although the Trustee referred to it as six months of dividends in the following quote):

"The Trustee concluded that Credit Suisse undertook a reasonable sales process and that the price obtained – which included a slight premium over the conversion price (<u>e.g.</u> six months of dividends) – was a better price than FAM ever obtained when it liquidated FILB's positions in the same stock."[16]

Not only did the buyer receive six quarterly dividends totaling $2,025,000, Ion paid the holder $5,000,000 to convert the preferred.  In other words, the buyer received $7,025,000 or ten times the premium paid in less than sixteen months.  I mentioned this to the Trustee six days before the Report

---

[15] This is a reference to the comments made by the Trustee on pages 191-192 of his Report (pages 200-201 of Docket 327).
[16] Pages 109-110 of the Trustee Report (pages 118-119 of Docket 327)

11

was released but this profit of $6.3MM or 900% of the premium of $702k that was invested by the buyer is not listed in the Report. This shows that the Trustee and Credit Suisse were both wrong in thinking that this asset was not worth more than conversion value.

While FAM initiated conversions of the Helix and Ion preferreds to raise cash, this was done in order to preserve the proprietary aspects of these investments. This was no longer necessary by the time the Trustee became involved and saw no issue with the $6.3MM or 900% profit based on the premium paid. I believe a review of the sale by Credit Suisse should be investigated. The Trustee's lack of action and not even mentioning this in his Report should disqualify him from being Plan Administrator who should seek to maximize assets for the creditors and shareholder of FILB.

While Quantal, AF, the accounting firms performing the audits, their experts, Duff & Phelps, and I believe that the value of the Ion preferred far exceeded the value received by the buyer, it is hard to blame someone for realizing a 900% profit in under sixteen months. If the Trustee and his experts cannot see the value of these assets, it would be wrong for the Trustee to become the Plan Administrator seeking to maximize value for the creditors.

## The Trustee Report Does Not Properly Describe the Master-Feeder Structure

### The Master-Feeder Structure

The Fletcher funds used a master-feeder structure, where the feeder funds (the funds where investors invested) turned around and placed most of their assets into a master fund (a fund which would make the actual PIPE investments) and the feeder funds would receive a pro rata share of the returns. This is a general hedge fund strategy, and not unique to Fletcher.

The Trustee of the Debtor (FILB) has expanded his investigation beyond FILB to the entire master-feeder structure. The Trustee fought to unwind the April 2012 transactions, which makes Fletcher Delaware once again the 100% owner of the Debtor. The Trustee is now overreaching his fiduciary limits by proceeding on a path of substantive consolidation by ignoring Fletcher Delaware, its creditors and its shareholders to decide who he feels should received any remaining proceeds.

In his FILB-centric view of the world, he did not fully grasp the concept of the master-feeder structure. As I said above, the majority of the feeder fund's assets would typically be placed into the master fund (Fletcher is more complicated than the typical master-feeder in that there are more levels at Fletcher than most other hedge funds). However, most of the cash from the subscriptions into the feeder funds eventually made it into FILB. Thus, when a particular feeder fund would need cash to pay a fund-specific invoice or a shareholder redemption or management or performance fees, the fund would typically redeem through a series of steps possibly as far as FILB to receive the cash it needed to pay the required amount.

12

The Trustee, in his FILB-centric view, claims that "much of the cash and securities FII used to fund this transaction (a purchase of United bank-owned properties and non-performing real estate loans) came from FILB"[17]. That is one way of looking at the transaction. The more correct way to view this is that the 100% owner of the subsidiary needed cash at the parent level in order to do a transaction to enable FILB to receive the warrants and rights that it had and FILB's cash, which FII had a 100% claim on, facilitated this.

## Expanding the scope of his role

The Trustee has assumed for himself an expanded role beyond being the Trustee of FILB. He has effectively declared himself to be the Trustee for the entire master/feeder structure.

Of particular significance, the Trustee wrote, "As noted elsewhere, as part of the Plan Confirmation, the Trustee will seek to subordinate FII's claims and equity interest, and FII will receive no distributions under the Plan."[18] After unwinding the April 2012 transactions between FILB and FII (the acronym the Trustee used for Fletcher Delaware), FII is once again the shareholder of FILB. In addition to any general creditors FII might have, there is a note between FII and Windcrest Fund. At the time of the FILB bankruptcy, Windcrest was 100% owned by Mr. Eric Jager of Kansas City, Missouri and his wife. This $992,780 note was structured as a redemption in-kind for Windcrest, who redeemed from Fletcher Income Arbitrage Fund, L.P., the onshore version of Arbitrage and unfairly punishes Windcrest.

The Trustee's move also distorts the amount of FII's equity that should flow to each of the feeder funds; in theory, each feeder fund that invested in FII should receive a pro rata distribution. The Trustee uses what appears to be arbitrarily determined distribution percentages rather than a pro rata methodology.

This will hurt investors in the domestic Fletcher funds, which do not appear to be offered anything. As investors in the feeder funds, they may not have even thought to file in the bankruptcy of FILB. It will hurt Soundview and Richcourt investors that invested in Arbitrage or Leverage who will not receive anything directly or have it left up to the JOLs who may look to reward the Louisiana funds over the Soundview and Richcourt investors. These include the Soundview investors that are currently appearing before you in In Re: Soundview Elite Ltd., et al, Case No. 13-13098 (REG). Once the Soundview and Richcourt investors are able to access cash to fund the appeal of the FIA Leveraged Fund liquidation to the Privy Council, they may be able to get their proper share of Leveraged proceeds after the UK Court may deem the Louisiana investors redeemed via the United right. The results of the appeal will likely impact the relative proceeds that should go to the Louisiana investors vs. MBTARF.

In other words, the Trustee is proposing a distribution prior to the results of the appeal to the Privy Council and possibly preempting the funding of the appeal.

---

[17] Page 13 of the Trustee Report (page 22 of Docket 327)
[18] Page 16 of the Trustee Report (page 25 of Docket 327)

13

The Trustee has not even commented on the disparity of the requests by each of the Louisiana funds. From Exhibit D of the related exhibits, the two Louisiana funds that invested $45MM and $40MM are seeking $66MM and $60MM, but NOFF, which invested only $15 MM is seeking an outsized $234MM!

The Trustee was wrong in developing a distribution plan for some of the feeder fund investors and not others and not even comment in regard to NOFF's outlandish request. The numbers do not line up regarding these investors!

### The FILBCI Settlement

Other numbers that do not line up are the pieces of the United transaction. On one hand, the Trustee believes that the United asset held by FILB was worth in excess of $71MM; it is worth even more now that UCBI stock is higher now than when he filed his exercise notice in August 2013.

The Louisiana investors received an asset that upon exercise of the Right for $65MM, would provide roughly two-and-a-half times as many shares. Thus, using the December 27, 2013 closing stock price of $17.78 and subtracting the $65MM that would need to be paid to purchase the right and exercising the warrants on a cashless basis (without any disputing of the revised agreement's cashless settlement formula), the value of the asset once held by FILBCI would be worth $223 MM without any time value.

How can the Trustee say that the United asset he holds is worth $71MM (I now believe that figure on a net basis would be worth $95MM) and, now that we see him happy to be an activist, not object to the $2.5MM settlement for assets that would now be worth almost 100 times that amount??

The Trustee is wrong when he further compounds this dichotomy by allowing the Leveraged/Arbitrage JOLs and the Funds they represent to receive 53.6% of the proceeds. Except for a small (less than 10%) holdback position, the Louisiana investors were already paid in-kind redemptions totaling $136MM (worth more if you use the Trustee's $71MM value for the smaller part of the UCBI position). If the fund's investors only received value of $2.5MM, the Ernst & Young JOL's responsible for the sale of the assets for only $2.5MM should be held accountable and not other Fletcher investors. Giving the Leveraged and Arbitrage JOLs another shot at assets after their original mistake is wrong and comes at the expense of MBTARF and other investors. This also comes at the expense of creditors of FII and the creditors and shareholders of the domestic Fletcher funds and the Soundview and Richcourt investors.

On a personal basis, Stuart MacGregor and I both worked for FILB and we did not receive payment for our services for most of June 2012. In our original contracts signed with the debtor-in-possession and its then-Chief Restructuring Officer, there was a term for a payout of the statutory maximum under Bankruptcy Code Section 507(a)(4) of $11,725 on account of unpaid prepetition consulting fees called for a payment upon the approval of the consulting agreements. When the Trustee and Mr. Luskin stepped in, this term was removed. Now that we are being called "insiders" who should not receive any proceeds, I now believe that the Trustee showed a bias against Fletcher from the start.

14

However, the Trustee's plan is not fair because some investors in the feeder funds are treated more than fairly while others are treated unfairly. The Trustee should not be allowed to continue his biases against some people and groups and his favoritism for others. Thus, the Plan should be rejected.

## Conclusion

WHEREFORE, I respectfully request that the Court not approve the Disclosure Statement, or certainly not approve it in its current form, until the inaccuracies are corrected.

Dated: January 3, 2014

_Stewart Turner_

**STEWART TURNER**

15

# Exhibit 2

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

In re:

                                                          Chapter 11

          FLETCHER INTERNATIONAL, LTD.

                                                    Case No. 12-12796 (REG)

                        Debtor.

------------------------------------------------------------ X

## Stewart Turner's Supplement to FILB Trustee Report and Disclosure Statement

## and Trustee's Proposed Plan

### Introduction

A Plan Administrator should seek to maximize the value of the Estate. In order to do that well, it is important to have the following:

- a full understanding of the background of the situation at FILB and why certain decisions had been made over the years prior to the Trustee's appointment
- a clear understanding of the assets of the Estate and to know where the value is (and was)
- the clarity to guide in the determination of the beneficiaries of the Estate
- the ability to work to maximize the remaining assets of the Estate
- to pick a Plan advisory Board to fairly support a plan of maximizing the values of the Estate and payment to the appropriate beneficiaries

### Timeline

In order to help with a full understanding of the events, I have included a timeline of relevant dates and activities. This will seek to address the events brought up by Mr. Davis in the first substantive paragraph

1

of the Trustee Report and the follow-up comments by Mr. Luskin in Docket 376. While they may have presented certain facts correctly, their analysis and opinion is often wrong or driven by 20/20 hindsight.

Fiscal year 2003

    January – Original Helix (then-named Cal Dive International) investment was made

    Original Helix valuation by Quantal

    Audit – Performed by Grant Thornton; FILB Equity: $288MM

Fiscal year 2004

    Audit – Performed by Grant Thornton; FILB Equity: $335MM

Fiscal year 2005

    February – Original Ion Geophysical (then-named Input/Output) investment was made

    August – Dwight Grant, outside consultant to Grant Thornton, prepares Helix and Ion valuations; Grant's values confirms Quantal's values (all within 2%)

    October – Turner joins FAM as a Director

    Audit – Performed by Grant Thornton; FILB Equity: $273MM

Fiscal year 2006

    Audit – Performed by Grant Thornton; FILB Equity: $151MM

Fiscal year 2007

    June – MBTARF invests $25MM into Fletcher Fixed Income Alpha Fund, Ltd.

    August – "AGEN" investment made; preferred has "cashless settlement" feature

    Audit – Performed by Grant Thornton; FILB Equity: $167MM

    Grant Thornton restates Arbitrage and Leveraged audits but does not restate FILB

Fiscal year 2008

    April – Louisiana funds invest in FIA Leveraged Fund

    April – first "AGEN" conversion made, using "cashless settlement" feature; went smoothly

    November – First Raser transaction closes; warrant has "cashless settlement" feature

    Audit – Performed by Grant Thornton; FILB Equity: $242MM

Grant Thornton restates Arbitrage and Leveraged audits but does not restate FILB

Fiscal year 2009

April – two more "AGEN" conversions made using "cashless settlement" feature; went smoothly

April – Citco brings team to discuss valuations at Fletcher office; follows up with Quantal

December – FILB closes $7.5MM investment with Sanders Morris Harris Group (SMHG); investment contains a warrant using the Fletcher "cashless settlement" feature

December – FII closes $5MM investment with Madison Williams

Audit – Performed by Eisner with outside consultant Sterling; FILB Equity: $214MM

(Duff & Phelps confirmed the Quantal valuations of the Helix and Ion positions as part of the audit process)

Fiscal year 2010

April 1 – Raser warrant is exercised under Fletcher "cashless settlement" feature; went smoothly

April 1 – Agreements are signed with United Community Banks, Inc. ("UCBI") containing Fletcher cashless settlement feature and right to buy preferred valued by Quantal similarly to Helix and Ion but reduced by value of the imbedded call held by United

June 11 – Agreement is revised with UCBI; the cashless settlement feature is revised but no adjustments are made in regard to reverse stock splits

Fiscal year 2011

March 3 and 14– Two (FRS and MERS) Louisiana pension funds file a partial redemption notice

March 24 – MBTARF (Massachusetts) pension fund files a partial redemption notice

June 15 – The two Louisiana funds receive a note from FIALTD as partial redemption in-kind

June – All three Louisiana funds file full redemption notices

July 25 – 2-day meeting between Fletcher and all three Louisiana funds, along with their consultants, Joe Meals of Consulting Services Group and Richard Thomas of Ernst & Young begins.  Thomas and his team continue work beyond the 2-day meeting.

3

July 28 - Joint press release is issued by the Louisiana funds saying that "the E&Y accountant will remain until he has enough information to provide a thorough, independent report to the systems."[1]

August – MBTARF receives note as redemption in-kind (for March 24, 2012 partial redemption)

September 9 – A second joint press release by the Louisiana funds states that the "assets and their valuations have now been corroborated".[2]

September 15 – Louisiana funds begin monthly rollover on receiving redemption payments from full redemptions

Fiscal year 2012

January 20 - After not responding to another monthly rollover proposal, Louisiana funds file suit against FIA Leveraged in Cayman

January 24 – Stewart Turner and Teddy Stewart become directors of FIA Leveraged Fund

February – Stewart Turner, Teddy Stewart, George Ladner, and Floyd Saunders join various boards of Arbitrage, Fletcher Delaware and FILB

February – Louisiana investors redeemed with UCBI right and associated warrant

February – Edelman Financial (formerly SMHG) buys back warrant from FILB for $8MM (far in excess of Black-Scholes valuation); total proceeds from SMHG transaction now exceed $14MM

April 18 – FIA Leveraged Fund loses case in Grand Cayman hearing before Chief Justice Smellie

April 22 – FII redeems some FILB shares for underlying FILB investments and delivers remaining FILB shares to Arbitrage; transactions later cancelled or reversed by Trustee Davis and FII.

April 26 – Winding-Up Order issued by Cayman Chief Justice Smellie including appointment of Robin Lee McMahon and Robert Bailey as Joint Official Liquidators (JOLs) of FIA Leveraged Fund

April 27 – Receive email at 11:56AM from the JOL team that Richard Thomas[3] was looking to take books and records from Fletcher office that afternoon (possibly five minutes later)

June 29 – On advice of counsel, FILB files Chapter 11

---

[1] Joint Statement issued by the three Louisiana funds on July 28, 2011

[2] Joint Statement issued by the three Louisiana funds on September 9, 2011

[3] The same Richard Thomas that led the E&Y team's review of Fletcher during Summer 2011

Fiscal Year 2013

> February – JOLs (presumably including McMahon) enter into a Settlement Agreement with UCBI to return the UCBI right (and associated warrant) back to UCBI for $2.5MM; less than 2% of value attributed to the right and associated warrant by Quantal and Fletcher

> Trustee Davis gives assent to above agreement. Trustee states: "Nor does the settlement agreement reached by the JOLs impose a ceiling or upper limit on what the Trustee might be able to recover for any claims that the Debtor's estate may have against UCBI."[4]

> November 25 – Trustee Davis issues report and disclosure statement citing that the UCBI warrant held by FILB is worth $71MM

Fiscal Year 2014

> January 13 – Trustee Davis issues supplementary Disclosure Statement announcing members of Plan Advisory Board, including himself, JOL McMahon of Ernst & Young, on behalf of Leveraged and Arbitrage and Tammy Fu of Zolfo Cooper on behalf of the MBTA and Alpha[5].

## The beginning of the Trustee Report

In the first substantive paragraph of his report (on page 1), the Trustee raises the following four issues in four sentences:

- the value of the "Helix stock"

- the lack of profitability of Fletcher, as he sees it

- a list of people and entities that "enabled" Fletcher instead of protecting investors

- the solvency of Fletcher

I will respond to each of these issues below.

## The "Helix stock"

The Trustee claims that "FILB was a fund which on the date of its bankruptcy held only one asset of undisputed value – Helix stock – worth less than $8 million." Actually, FILB held a perpetual convertible preferred stock in Helix. He wound up converting this into Helix common stock to raise

---

[4] Trustee Report page 126; Docket 327, page 135

[5] Docket 375, Page 83

5

$6.5MM in cash, the vast majority of which funded his services along with the Luskin law firm and the "special consultant" Goldin firm.

While due to its small size, the remaining piece of the Helix preferred would have been a difficult sale for a significant amount above conversion value, it was an instrument that if sold above conversion value could have been used to obtain additional value from FILB's former prime broker, who sold the much larger Ion Geophysical non-callable perpetual convertible preferred stock for very little value in excess of conversion value.

**FAM's Investment Expertise**

In this first paragraph, the Trustee claims that "FILB did not make a single profitable investment after August 31, 2007" and has a table at page 181 of his Report that would make a reader think the same. To briefly summarize these comments, the Trustee's table which purportedly shows a loss of $23.4 MM (not actually calculated within the table), is erroneous, incomplete, contains what appears to be a half-truth and ignores relevant information.

- The table has an error as it combines the "SMHG" transaction with the Madison Williams transaction. While I did state that the December 2009 FILB transaction with SMHG was linked to the December 2009 Madison Williams transaction by FII, transactions made in the following years elected independently by FII were not required. Thus, FILB's profitability from SMHG was $6.8MM and it was still profitable even if you wish to deduct the $5MM investment made by FII in December 2009.

- The table on page 181 includes "sale proceeds" only. So while the Trustee is happy to claim in one part of the Report that if his "interpretation of the warrants is correct, it could result in approximately $71 million in common stock to the Debtor, which the Trustee could then sell on the open market" not even a fraction of this value is hinted at in the table since no "sales proceeds" have yet been received.

- In a similar argument, Document Security Systems (DSS) is shown to have a cost basis of $4.0 million and as Mr. Luskin says "FILB ultimately realized only $3.1 million for the entire investment."[6] FILB retains a warrant that will not expire until February 2020 at the earliest, which Quantal has valued at $1.4MM as of December 31, 2013, thus making the overall DSS investment profitable. Notwithstanding Mr. Luskin's ability to predict the future, "ultimately" has not occurred as of 2014. This feeling of little value will hopefully not permeate any Plan Administrator's outlook in selling this warrant to maximize value for the Estate.

---

[6] Page 16 of Docket 376

- While Luskin argues that "Turner is wrong: the Trustee did. See Report Section VII.E.3." at page 21 of Docket 376, regarding that the Trustee ignored the profitability to FILB resulting from a total of $122.2 million of beneficial conversion charges recorded on the books of Helix and Ion, I was not able to find any discussion in that Section. Even if he had, not acknowledging this $122.2 million in the table vs. just listing losses that total only $23.4 million does not accurately portray Fletcher's profitability.

For a more detailed response, please see page 3-5 of the Turner Objection[7].

**Fletcher's many external advisors and the Trustee's financial advisor**

In the third sentence of his first substantive paragraph, the Trustee claims that Fletcher was "aided or facilitated by those we normally think of as creating a line of protection against such fraud – administrators, valuation experts, and auditors."

Fletcher was aided by these entities, but in a good way.

Over the relevant period, Fletcher had Quantal, led by Terry Marsh (more on him below), prepare independent valuations.

It had two administrators prepare financial statements. Citco, the largest hedge fund administrator based on disclosures by SEC-registered hedge fund managers[8], and who was Fletcher's administrator for most of the relevant period, would often question and request detailed documentation about certain transactions and followed up with Quantal in regard to valuations. At least once to my personal knowledge (April 2009), representatives of Citco came to Fletcher's office to get a better understanding of certain transactions. Fletcher's replacement administrator is also not an unknown entity; SS&C is currently the third-largest hedge fund administrator.

It also had two auditors over this period: Grant Thornton (the sixth-largest accounting firm by revenue[9]) and Eisner (the 18th largest). I will have more comments regarding the auditors and the audit process after discussing the Trustee's resource.

Skadden, Arps provided legal advice to many Fletcher entities, most notably to FILB regarding the UCBI reverse stock split. The Trustee accepts the basic conclusion of Skadden's analysis. Quoting from the Trustee Report:

---

[7] Docket 371

[8] Hedge Fund Alert as of May 8, 2013

[9] Based on AccountingToday's Top 100 Accounting Firms

"Under New York law, however, the Trustee believes that, absent sufficiently explicit language, the strike price would not be affected by the reverse stock split, and that the warrants do not contain such sufficiently clear language." [10]

**The Trustee's financial advisor (compared to Quantal)**

According to Luskin[11], the Trustee "has hired really the best in the business, the Goldin firm. And in particular, one of the experts that has had a leading role in this case has extensive experience with hedge fund businesses and actually ran one herself. I think that it should go without question that the trustee has availed himself of the expertise necessary to do the analysis and investigation that's required."

I do question that. While Goldin has charged like the best, submitting invoices for claims of $2,256,259 from October 5, 2012 through June 30, 2013, and I now believe its fees through the present exceed $3 million, what expertise did the Trustee receive?

While I worked as a paid consultant for the Trustee providing information, explanations and analysis for over seven months (receiving less than $100,000), I had interactions with four of the people mentioned on Goldin's website: three people whose focus is on accounting and Marti Murray, who I believe is the unnamed woman mentioned by Mr. Luskin.

According to Goldin's website, Ms. Murray's primary focus throughout her career was distressed debt. Similarly, her former firm, Murray Capital Management, Inc., specialized in distressed debt.

While based on his comment copied above, Mr. Luskin's view, and presumably that of the Trustee, is that all hedge funds are similar, this is far from the case. Specifically, Ms. Murray's expertise in the area of options, warrants and rights would likely be small and her view of fixed income may be primarily limited to distressed debt, limiting her ability to consider a perpetual stream of dividends related to three large positions, Helix, Ion and United (UCBI). The Debtor's assets, i.e. its long-term positions in these companies, were not "distressed." While the term "distressed debt" may not have a specific definition, by its very nature, distressed debt should not count on years (or possibly, in perpetuity), a future stream of dividend payments if it is truly distressed. Perhaps that is why the Trustee turned to unnamed "market participants" for valuation purposes. It is likely that the terms of the Fletcher non-callable perpetual convertible preferred securities were not properly described to such market participants as the group explaining may itself not have been familiar with the details of the products.

On the other hand, who is Terry Marsh? In addition to his role at Quantal, he is Professor Emeritus at Berkeley's Haas School of Business and an Associate Editor of The Journal of Fixed Income. More precisely, he is one of 25 Associate Editors; three others include Nobel laureates Eugene Fama, Robert

---

[10] Page 130 of the Trustee Report, which is Page 139 of Docket 327

[11] 1-14-14 Hearing Transcript – FILB, page 12

8

Merton, and Myron Scholes of the eponymous Black-Scholes options pricing formula. He has also done much work in the area of shifting volatility models, which can significantly affect option valuations.

My goal here is not to bash Goldin and Ms. Murray; but to explain that Goldin was the wrong firm for the job. I consider bringing Goldin as the equivalent of hiring perhaps the best radiologist to perform a heart transplant. While a radiologist obviously has a better understanding of surgery than a non-doctor, it is doubtful that the radiologist has recently performed surgery and likely not in the cardiac area. Thus, while Goldin may be a good firm, its hedge fund "expert" has limited experience in understanding the primary assets of FILB.

Accepting one person's view in an area that is not her specific area of expertise over a group of experts with more specific knowledge of the instruments seems preposterous on the part of the Trustee and any potential Plan Administrator.

**The auditing process**

In addition to Quantal's / Dr. Marsh's valuations, the year-end audits provided an additional review. Grant Thornton hired at least one outside valuation expert (Dwight Grant) in addition to its own internal team. Eisner also hired an outside valuation team, Sterling, to review the positions for the 2009 FILB audit. Additionally, as part of this process, Eisner asked Fletcher to provide an additional expert and Duff & Phelps, a company with over 1200 investment professionals, was hired.

The Trustee Report referred to the restated financials at FIA Leveraged Fund and Fletcher Income Arbitrage Fund, Ltd. for 2007 and 2008. What he does not mention is that there was no requirement for the restatement of the FILB financials for these years. FILB is where the Helix and Ion positions were held during 2003-12. FILB's equity in 2007 and 2008 was $167 million and $242 million, respectively.

The United right (and its associated warrant) was held at FILB starting in 2010 and the remaining United warrant is held at FILB. Please note that Quantal's valuation model for the UCBI right was similar to prior valuations of Helix and Ion, which were reviewed by Grant Thornton and Eisner and their consultants, but reduced by the value of United's call provision.

**Ernst & Young**

During the review process of Fletcher by the Louisiana funds on July 25 and 26, 2011, two of the Executive Directors came along with members of the third fund. The consultant to the three funds, Joe Meals of Consulting Group Services, LLC, now CSG Holdings LLC, was also in attendance. "The team was led by", Richard Thomas, "a principal of the investigative and dispute services of Ernst & Young (E&Y) accounting firm."[12] The statement added "The E&Y accountant will remain until he has enough information to provide a thorough, independent report to the systems."

---

[12] Joint Statement, July 28, 2011, by the three Louisiana funds

A second Joint Statement was released on September 9, 2011, stating that "(t)he assets and their valuations have now been corroborated and the governing boards of the systems have been briefed." Mr. Thomas was mentioned in this statement as well, also on an unnamed basis.

All had seemed well between Fletcher and the Louisiana funds with the exception of paying the redemption requests. An agreement had been put in place on September 15, 2011 and rolled over several times on a monthly basis through January 15, 2012.

**Solvency vs. being cash-constrained**

While the Fletcher funds were cash-constrained, they were never at risk of insolvency in 2008 or for years after that. As mentioned above, FILB's equity in 2007 was $167 million and $242 million in 2008.

The Trustee in his Report, states that Arbitrage owned between 88% and 97% of Fletcher Delaware, which in turn, owned all of FILB during most of the post-2008 period. Please note that the Offering Memoranda for FIA Leveraged Series N (owned by the Louisiana funds), Alpha (owned by MBTARF), and Arbitrage all allow for redemptions in-kind. Thus, the many pages and tables prepared by the Trustee in his Report[13] are not relevant, and it is clear that FILB could have delivered in-kind assets up through the master-feeder structure to Arbitrage and Alpha and Leveraged (as it did in February 2012).

While the Trustee was wrong in regard to Fletcher's solvency, he was correct that Fletcher was cash-constrained. These cash issues did cause Fletcher to occasionally convert the preferreds for cash, most notably in 2010 to raise funds available around the time of the United transactions. Fletcher Delaware sent in excess of $26MM in cash to United because on a relative basis, the value in United was higher than Helix and Ion. Seen as similar to a spread trade, which option traders are familiar with, the conversions to raise cash for the United investments seemed natural and made sense.

**Other Issues**

**Credit Suisse (another line of protection) and the Ion non-callable perpetual convertible preferred**

As described in greater detail in Exhibit I - the Turner Objection, the buyer of the Ion non-callable perpetual convertible preferred, in less than sixteen months, received just over $2MM in dividends plus a $5MM conversion premium from Ion itself, despite only paying a $702k premium to conversion value in June 2012. (In a response to Mr. Luskin in his objection[14] where he used the term "present value of 3.7 years" by simply dividing the $5,000,000 amount by the annual dividend of $1,350,000, someone at Goldin should have advised him that present value requires a discount factor. The CFO of Ion[15], said that

---

[13] Pages 209-220 of the Trustee Report, pages 218-229 of Docket 327

[14] Docket 376, page 21

[15] during Ion's third quarter conference call on November 7, 2013

this payment was equal to roughly five years on a present value basis.)  While the $5 million amount is less than the Quantal premium valuation, it is easy to understand why a buyer would take a nine-fold gain in regard to the premium above conversion value paid, or in dollar terms, $6.3 million.

One has to ask why Luskin chose to focus on the 3.7 years being within the one-to-four year period referenced by unnamed market participants referring to a non-described convertible in the Trustee Report.  These participants may have assumed that there was a call feature.  As previously mentioned on page 11 of Exhibit I - the Turner Objection, Fletcher was never able to find a publicly-traded non-callable perpetual convertible preferred.  Regardless, Quantal valued the premium in excess of $30 million in a manner consistent with valuations that had been accepted by Dwight Grant, Grant Thornton, Eisner, Sterling, Duff & Phelps, and Ernst & Young.

The Trustee chose to not include this action by Ion in his Report.  Further, the Trustee also decided not to include Credit Suisse, as prime broker / swaps dealer for FILB, among the fiduciaries who should have -been looking to protect FILB and its investors.  One has to wonder why the Trustee, who proposes himself to be the future Plan Administrator, would not look to seek any of this $6.3 MM profit for the Estate when Credit Suisse's actions clearly did not maximize value for the FILB creditors and shareholders.

**Responding to some points in Luskin's Document 376**

Mr. Luskin's responses to some of my comments in the Turner Objection are distortions.

1) Regarding the valuation of the warrants with the special cashless settlement formula, Mr. Luskin wrote, "The non-standard warrant formula was so highly unusual as to cause at least one issuer to insist on an amendment incorporating the standard formula and undermines the purely theoretical valuation of those warrants because of very real market concerns."[16]

   Referring to the timeline, we can see that by that time AGEN had accepted three cashless settlements (one in April 2008 and two in April 2009); ironically, Raser had accepted one on April 1, 2010, the day of the original United transaction (I believe Mr. Luskin is referencing United in his quote); the SMHG transaction had been closed at that point and in February 2012, its successor, repurchased the SMHG warrant at a value in line with the Fletcher terms.

   Mr. Luskin scoffed at my argument that the conversions were done to preserve the proprietary aspects of these investments", calling them "utter nonsense"[17].  He goes on to say that these provisions "are disclosed in public SEC filings".  While that is correct, Mr. Luskin does not realize

---

[16] Docket 376, page 12

[17] Docket 376, page 17

that most people that are not parties to the transaction do not read the long documents that are filed with the SEC. Quite frankly, it would appear that the United executives and attorneys themselves did not fully read the documents prior to signing them, which led to the amendment referenced by Mr. Luskin more than two months later.

2) As mentioned above, while neither of the original December 2009 SMHG and Madison Williams transactions would have occurred without the other, Mr. Luskin falsely implies that "what turned out to be a series of unprofitable investments made by Fletcher International, Inc.... into Madison Williams"[18] is what I said. The later transactions were made independently by FII at later dates and had nothing to do with the SMHG transaction.

3) That is not the only time that Mr. Luskin attempts to put words in my mouth. I made a general claim that "most of the cash from the subscriptions into the feeder funds eventually made it into FILB"[19]. I believe this to have been the case over the years. Mr. Luskin used a sample of one in his response stating, "The truth is that, of the $95 million net invested by the Louisiana Pension Funds, no more than $33.8 million found its way to FILB."[20]

4) That Luskin statement deserves further thought. After checking with RF Services, I believe that none of that cash went directly from Leveraged to FILB. What is more striking is that if only $33.8 million of the Louisiana funds' cash went to FILB, why is one of the FIA Leveraged JOLs (Robert McMahon) given one of the three seats on the Plan Advisory Board of FILB (and the Louisiana funds may get a fourth seat if they become parties to the Investor Settlement)?[21] Why does the Fletcher Disclosure Statement Supplement show a $110 million claim[22] by Arbitrage against FILB if only 36% of Louisiana's investment flowed to FILB?

5) Mr. Luskin in his latest filing claims that "(s)ince the Trustee filed the Report and the Plan, there have been several important developments in the case"[23]. One of his eleven items states that "Stewart Turner has misappropriated approximately $145,000 in investor money"[24] from Fletcher International Partners, Ltd. even though I told Mr. Luskin at my August 9, 2013 deposition (more than four months prior to the Trustee Report being issued) that I was

---

[18] Docket 376, pages 20-21

[19] Exhibit I - Turner Objection, page 12

[20] Docket 376, page 22

[21] Docket 375, page 83

[22] Docket 375, page 105

[23] Docket 376, page 5

[24] Docket 376, page 6

employed by Fletcher International Partners, Ltd. ("FIPLTD"). I have done work for this entity for which I was paid. Mr. Luskin is paid for his work. I do not see what the issue is. FIPLTD is a Cayman Islands-based Company that is not in bankruptcy and FILB is only a minority shareholder via its holdings in the preferred and about 10% of the ordinary shares of FIPLTD.

6) Mr. Luskin makes a reference to the Corsair Redemption "breach(ing) the 20% cushion required for the Leveraged Series N shareholders[25]. This followed similar comments by Mr. Davis in his Report, "However, the Series N Offering Memorandum is unequivocal: no Series 4, 5, or 6 redemptions are allowed unless the Series N investors are redeemed first."[26]

The intention of the provision that the Series N investors getting redeemed prior to the Series 4, 5, and 6 investors was only meant in the case of the 20% cushion being breached. Joe Meals, the consultant to the Louisiana funds, requested and was sent emails on March 24, 2010, July 23, 2010 and November 15, 2010 where I let him know that net redemptions had been made at FIA Leveraged as of November 2009, June 2010 and August 2010. This was never an issue with him or, to my knowledge, the Executive Directors of the Louisiana funds. It was not raised in the July 2011 meeting. Further, Mr. Davis and Goldin were given copies of these emails by me on December 11, 2012, while I was a consultant to the Debtor, but none of this was mentioned in the Trustee Report.

Regarding the Corsair Redemption as of April 1, 2010, after all subscriptions and redemptions were effected as of that date, the Series 1, 4, 5, and 6 equity increased by more than $15.8MM, improving the cushion for the Series N investors.

## The Trustee's Plan Advisory Board

On January 13, 2014, the Trustee filed his Fletcher Disclosure Statement Supplemental (Docket 375).

One big change is his announcement of others on the Plan Advisory Board in addition to himself. The two additions are:

- "Robert McMahon of Ernst & Young, on behalf of Leveraged and Arbitrage"[27]

- "Tammy Fu, of Zolfo Cooper, on behalf of the MBTA and Alpha"[28]

---

[25] Docket 376, pages 18-19

[26] Pages 162-163 of the Trustee Report (pages 171-172 of Docket 327)

[27] Docket 375, page 83

[28] Docket 375, page 83

13

**The Trustee**

While I understand why the Trustee would want to appoint himself to the Plan Advisory Board and as Plan Administrator, is he able to seek maximum value for the Estate?

In his Report, he has already said that the values are much less than what Quantal and Fletcher believe. Specifically, it is hard to think that at this point he could argue effectively for maximum value for the DSS warrant with its special cashless settlement feature.

Also, given that he signed off on the FILBCI-UCBI settlement at $2.5MM, will he push for an amount anywhere near the $71MM cited in his Report?

**Who is Robert McMahon?**

In addition to the description provided by the Trustee, he works with Richard Thomas, the investigator hired by the Louisiana funds in July 2011. I know this because of an April 27, 2012 email sent at 11:56AM by a colleague of Mr. McMahon stating that Mr. Thomas "will be attending your offices on Wall Street this afternoon in order to secure the books and records of" Leveraged.

After having had a cordial working relationship the prior summer, this announcement of Mr. Thomas stopping by in as little as five minutes seemed wrong, especially since he should have known that the Company's registered office was in Grand Cayman and that the official books and records were kept by Leveraged's then-administrator, SS&C, and not at Fletcher's offices.

Not only that, Mr. Thomas, who had corroborated the assets and their valuations, was now representing the JOLs who had been appointed by Chief Justice Smellie[29], where the Judge valued the UCBI right and the associated warrant as "commercially worthless", contrary to Mr. Thomas' prior valuation.

On page 124 of the Trustee Report[30], the Trustee writes:

> "Leveraged and the Louisiana Pension Funds and UCBI entered into a Settlement Agreement and Mutual Releases, dated as of February 27, 2013, settling the action. The JOLs and the Pension Funds urged the Trustee to release any claims that the Debtor might have had related to the Series C Preferred Shares and the Assignment Agreements so that it could obtain the settlement from UCBI and asked the Trustee to sign a release and waiver.."

Trustee Davis gave a release and waiver, but later states: "Nor does the settlement agreement reached by the JOLs impose a ceiling or upper limit on what the Trustee might be able to recover for any claims that the Debtor's estate may have against UCBI."[31]

---

[29] Winding-Up Order, signed on April 26, 2012, by Chief Justice Smellie

[30] Page 133 of Docket 327

[31] Trustee Report page 126; Docket 327, page 135

14

**What kind of relationship would there be between Davis and McMahon?**

For some reason, the Trustee has chosen Mr. McMahon (JOL to Leveraged and Arbitrage) to be on the Plan Advisory Board. This is surprising for many reasons.

- Mr. McMahon represents two entities that do not have a direct investment into FILB. Please recall from Exhibit B of the Trustee Report that Fletcher Delaware is the shareholder of FILB and that Leveraged invests into Arbitrage, which in turn, invests into Fletcher Delaware. Thus, McMahon does not represent a creditor or direct shareholder of FILB.

- Mr. McMahon is from the Cayman Islands and was appointed by Judge Smellie to be one of the JOLs for Leveraged.

- Mr. McMahon willingly entered into a settlement agreement with UCBI where the larger pieces of the Fletcher investment into UCBI were sold for $2.5MM. This is in direct contrast to the Trustee looking to raise $71MM for the smaller remaining piece of United.

- Could Mr. McMahon possibly push for a settlement with UCBI for anywhere near $71MM without making his prior settlement look bad?

- Might politics between Mr. McMahon and Mr. Davis limit how high of a settlement figure could be negotiated in contrast to Mr. Davis' earlier statement that "Nor does the settlement agreement reached by the JOLs impose a ceiling or upper limit on what the Trustee might be able to recover for any claims that the Debtor's estate may have against UCBI."[32]

- **If McMahon pushed for a low settlement figure for UCBI, might the Series 3 creditors not be paid in full?**

- Was this a strategically wise choice by the Trustee / proposed Plan Administrator?

**Who is Tammy Fu?**

While I do not believe that I have had any direct contact with Ms. Fu, does FILB need to have two of its three members on the Plan Advisory Board be from the Cayman Islands?

Additionally, MBTA and Alpha did not invest directly into FILB, or even Fletcher Delaware.

**Conclusion**

I recommend that creditors and parties in interest vote against this plan which will result in costly and unnecessary litigation being favored over a business approach of maximizing the values of investment assets in hand.

---

[32] Trustee Report page 126; Docket 327, page 135

15

# Exhibit 3

**Exhibit B**

**Fletcher System Simplified Organizational Chart as of January 1, 2009**



# Exhibit 4

Westlaw.

764 N.E.2d 958

97 N.Y.2d 195, 764 N.E.2d 958, 738 N.Y.S.2d 658, 2001 N.Y. Slip Op. 10090

**(Cite as: 97 N.Y.2d 195, 764 N.E.2d 958, 738 N.Y.S.2d 658)**

Page 1

Court of Appeals of New York.
Marvin M. REISS et al., Appellants,
v.
FINANCIAL PERFORMANCE CORPORATION,
Respondent.

Dec. 18, 2001.

Holders of warrants to purchase shares of corporation's stock brought action seeking declaratory judgment that they were entitled to purchase number of shares specified in warrants notwithstanding corporation's subsequent reverse stock split, and seeking to reform warrants to extend their expiration date. The Supreme Court, New York County, Charles Edward Ramos, J., dismissed action. Appeal was taken, and the Supreme Court, Appellate Division, affirmed as modified, 279 A.D.2d 13, 715 N.Y.S.2d 29. Appeal was taken, and the Court of Appeals, Smith, J., held that warrants were enforceable according to their terms even though they did not provide for contingency of a stock split.

Appellate Division affirmed as modified, and matter remitted.

West Headnotes

**[1] Corporations and Business Organizations 101**
**⟶1319(2)**

101 Corporations and Business Organizations
    101V Capital and Stock
        101V(B) Subscription to Stock
            101k1316 Right to Subscribe or to Issuance of Stock
                101k1319 Options and Warrants
                    101k1319(2) k. Nature of option or warrant. Most Cited Cases
        (Formerly 101k72)

Duly executed stock warrants are contracts entitling the holder to purchase a specified number of shares of stock for a specific price during a designated time period.

**[2] Corporations and Business Organizations 101**
**⟶1319(4)**

101 Corporations and Business Organizations
    101V Capital and Stock
        101V(B) Subscription to Stock
            101k1316 Right to Subscribe or to Issuance of Stock
                101k1319 Options and Warrants
                    101k1319(4) k. Operation and effect; exercise. Most Cited Cases
        (Formerly 101k72)

Duly executed warrants to purchase shares of stock which had been issued by corporation were enforceable according to their terms, even though corporation had subsequently authorized a reverse stock split, and warrants did not provide for contingency of such a split; agreements had all necessary material provisions and were drafted by sophisticated and counseled parties, and failure to address contingency of a reverse stock split did not create an ambiguity or provide basis for court to imply a contractual term.

**[3] Contracts 95 ⟶143(1)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k143 Application to Contracts in General
                95k143(1) k. In general. Most Cited Cases

When parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.

**[4] Contracts 95 ⟶168**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k168 k. Terms implied as part of contract. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

764 N.E.2d 958                                                                                    Page 2
97 N.Y.2d 195, 764 N.E.2d 958, 738 N.Y.S.2d 658, 2001 N.Y. Slip Op. 10090
(Cite as: 97 N.Y.2d 195, 764 N.E.2d 958, 738 N.Y.S.2d 658)

A court will not imply a contractual term where the circumstances surrounding the formation of the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue, and the agreement can be enforced according to its terms.

**[5] Contracts 95 ☞143(2)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k143 Application to Contracts in General
                95k143(2) k. Existence of ambiguity.
Most Cited Cases

**Evidence 157 ☞448**

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting Writings
        157XI(D) Construction or Application of Language of Written Instrument
            157k448 k. Grounds for admission of extrinsic evidence. Most Cited Cases

An omission or mistake in a contract does not constitute an ambiguity; rather, the question of whether an ambiguity exists must be ascertained from the face of an agreement without regard to extrinsic evidence.

**[6] Evidence 157 ☞448**

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting Writings
        157XI(D) Construction or Application of Language of Written Instrument
            157k448 k. Grounds for admission of extrinsic evidence. Most Cited Cases

Extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face.

**[7] Contracts 95 ☞143(3)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k143 Application to Contracts in General
                95k143(3) k. Rewriting, remaking, or revising contract. Most Cited Cases

**Contracts 95 ☞168**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k168 k. Terms implied as part of contract. Most Cited Cases

Even where a contingency has been omitted, courts will not necessarily imply a contractual term, since courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.

***659 *196 **959 Joseph M. Weitzman, New York City, and Howard L. Mann for appellants.

Kaufman Friedman Plotnicki & Grun, L.L.P., New York City (Howard Grun of counsel), for respondent.

**\*197 OPINION OF THE COURT**
SMITH, J.
    The issue here is whether warrants to purchase shares of stock of defendant corporation must be adjusted in light of a reverse stock split authorized by defendant corporation after plaintiffs received warrants. We answer that question in the negative.

    Shortly after September 30, 1993, in partial repayment of a loan, defendant authorized the issuance of warrants enabling plaintiff Rebot Corporation to purchase up to 1,198,904 shares of defendant's common stock for 10 cents per share until September 30, 1998. Defendant also issued warrants to plaintiff Marvin Reiss, in recognition of his services to defendant as a director of the corporation, entitling him to purchase 500,000 shares of common stock at 10 cents per share until August 31, 1998. Although a warrant issued earlier, on September 1, 1993, to Robert S. Trump was accompanied by a warrant agreement providing for a reverse stock split, no other agreement accompanied the authorization of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

764 N.E.2d 958
97 N.Y.2d 195, 764 N.E.2d 958, 738 N.Y.S.2d 658, 2001 N.Y. Slip Op. 10090
(Cite as: 97 N.Y.2d 195, 764 N.E.2d 958, 738 N.Y.S.2d 658)

plaintiffs' warrants. Thus, the warrants given to Rebot and Reiss, unlike the warrants given to Trump, did not incorporate the warrant ***660 **960 agreement provisions requiring adjustment in the event of a reverse stock split.

In 1996, defendant's shareholders approved a one-for-five reverse split of its common stock, and, as a consequence, each *198 stockholder owned one-fifth of the original number of shares with the value of each share increased fivefold. In 1998, Rebot and Reiss sought to exercise a portion of their warrants, claiming that in accordance with the terms of the agreement, they were entitled to buy all of the stock specified in the warrants at 10 cents per share, without adjustment to reflect the reverse stock split. Defendant rejected the request. Plaintiffs thereafter initiated this action, seeking a declaratory judgment permitting the exercise of their warrants to purchase the full number of shares stated in the warrants at 10 cents a share. Plaintiffs also sought extension of the expiration dates of the warrants.

Supreme Court denied injunctive relief and dismissed the action. A divided Appellate Division modified by declaring judgment in defendant's favor. Relying on *Cofman v. Acton Corp.*, 958 F.2d 494 [1st Cir.1992], the Appellate Division held that an essential term of the contract was missing and, according to its determination of the intent of the parties, supplied a term providing for adjustment of the number of shares stated in the warrants. The Appellate Division also found that plaintiffs' claim for reformation of the expiration date to dates in late 2000 was without merit. We now modify to reinstate the first cause of action for declaratory relief.

[1][2][3] Duly executed stock warrants are contracts entitling the holder to purchase a specified number of shares of stock for a specific price during a designated time period. Here, the warrants are enforceable according to their terms. They have all the material provisions necessary to make them enforceable contracts, including number of shares, price, and expiration date, and were drafted by sophisticated and counseled business persons. As this Court stated in *W.W.W. Assocs. v. Giancontieri*, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms" ( 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 [1990]; *see also, Breed v. In-*surance Co., 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 [1978] ).

*Haines v. City of New York*, 41 N.Y.2d 769, 396 N.Y.S.2d 155, 364 N.E.2d 820 [1977] is instructive. *Haines* involved an agreement between the City, the Town of Hunter and the Village of Tannersville under which the City assumed "all costs of construction and subsequent operation, maintenance and repair" of a sewage system and agreed to extend the sewer lines to accommodate the growth of the respective communities (*id.*, at 770, 396 N.Y.S.2d 155, 364 N.E.2d 820). From time to time, the City fulfilled its obligations under the contract. Fifty years after the contract agreement, the system reached *199 full capacity and the City refused to grant the plaintiff permits for connections to its sewer lines on the ground that it had no obligation to further expand the plant or build a new one to accommodate additional development.

[4] The agreement was silent as to the City's obligations in the event that the municipalities' usage exceeded the capacity of the plant which the City agreed to build. The municipalities, which had intervened in the plaintiff's action against the City, requested that the Court imply a term to the agreement to address this uncovered contingency by requiring the City to expand the sewage plant or construct new facilities to accommodate the new property development. The Court, however, declined to imply such a term where the ***661 **961 contingency was clearly foreseeable by the municipalities, holding that "the contract does not obligate the [C]ity to provide sewage disposal services for properties in areas of the municipalities not presently served or even to new properties in areas which are presently served where to do so could reasonably be expected to significantly increase the demand on present plant facilities" (*id.*, at 773, 396 N.Y.S.2d 155, 364 N.E.2d 820). At the very least, *Haines* stands for the proposition that this Court will not imply a term where the circumstances surrounding the formation of the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue and the agreement can be enforced according to its terms (*see also, Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 72, 412 N.Y.S.2d 827, 385 N.E.2d 566 [1978] ).

[5][6][7] That the warrants do not address the contingency of a reverse stock split does not, of itself, create an ambiguity. "An omission or mistake in a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

764 N.E.2d 958

Page 4

97 N.Y.2d 195, 764 N.E.2d 958, 738 N.Y.S.2d 658, 2001 N.Y. Slip Op. 10090
(Cite as: 97 N.Y.2d 195, 764 N.E.2d 958, 738 N.Y.S.2d 658)

contract does not constitute an ambiguity [and] * * * the question of whether an ambiguity exists must be ascertained from the face of an agreement without regard to extrinsic evidence" *(Schmidt v. Magnetic Head Corp., 97 A.D.2d 151, 157, 468 N.Y.S.2d 649 [1983] ).* "[E]xtrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face" *(W.W.W. Assocs., supra, at 163, 565 N.Y.S.2d 440, 566 N.E.2d 639,* quoting *Intercontinental Planning v. Daystrom, Inc., 24 N.Y.2d 372, 379, 300 N.Y.S.2d 817, 248 N.E.2d 576 [1969] ).* Even where a contingency has been omitted, we will not necessarily imply a term since " 'courts may not by construction add or excise terms, nor distort the meaning of those used and thereby "make a new contract for the parties under the guise of interpreting the writing" ' " *(Schmidt, supra, 97 A.D.2d at 157, 468 N.Y.S.2d 649,* quoting *Morlee Sales Corp. v. Manufacturers Trust Co., 9 N.Y.2d 16, 19, 210 N.Y.S.2d 516, 172 N.E.2d 280 [1961] ).*

*200 Although defendant claims that to enforce the terms of the warrants creates a windfall for plaintiffs, the record evidences that the parties may have intentionally omitted incorporation of a warrant agreement containing a provision for adjustment for a reverse stock split. For example, one month earlier defendant issued warrant agreements to other investors that did contain specific reference to a reverse split adjustment provision. The Trump warrant agreement is one such agreement, providing that "if at any time or from time to time, the number of outstanding shares of Common Stock of the Corporation is decreased by a reverse split, consolidation or reclassification of shares of Common Stock, or otherwise, then, after the effective date * * * each Warrant shall be decreased in proportion to the decrease in outstanding shares and the then applicable Warrant Price shall be appropriately increased."

Further, *Cofman v. Acton Corp. (supra),* the decision relied upon by the Appellate Division majority, is inapposite here. In *Cofman,* as part of a settlement agreement, a corporation allowed 12 partnerships (Partnerships) to make a one-time demand on the corporation for payment of a sum equal to the price of a share of common stock minus $7 multiplied by 7,500. This provision was a "sweetener," added to the settlement of $120,000, in case the price of a share of stock increased. Later, the corporation

executed a reverse stock split, decreasing the number of shares and increasing the price of a share of common stock by a multiple of five. Partnerships sued the corporation for enforcement of the agreement, seeking ***662 **962 to use the price of the stock after the reverse split to calculate the settlement. Partnerships argued that the plain language required that the warrants be valued as of the time of their exercise and the defendant corporation assumed the risk of a reverse stock split by not negotiating a different provision. The corporation also relied on the plain language of the warrants, contending that it was entitled to the value of the stock existing when the agreement was signed. The Massachusetts District Court found for the corporation.

Applying Massachusetts law, the First Circuit affirmed the District Court, concluding that Partnerships would not have agreed to a forward stock split because it could have eviscerated the value of the stock. The First Circuit held that the parties had not given any thought to dilution and that an essential term of the contract was missing. Just as Partnerships should not suffer by dilution of the value of the stock, so Acton should not suffer by reverse dilution.

*201 The Appellate Division, applying the *Cofman* analysis, reasoned that, in the event of a forward stock split, supplying a term providing for the proportionate adjustment of the number of shares that could be purchased, and the exercise price, would be necessary to save the warrant holders from having the value of their warrants "eviscerated" *(279 A.D.2d 13, at 18, 715 N.Y.S.2d 29).* The Appellate Division then followed *Cofman* in taking a second step, reasoning that "just as plaintiffs should not suffer from the possibility of dilution of their warrants resulting from a stock split, so too Financial should not suffer from the consolidation of its shares resulting from a declaration of a reverse stock split" *(id., at 19, 715 N.Y.S.2d 29).* The second step, however, does not necessarily follow from the first, particularly on these facts, where there is evidence that the parties contemplated including an adjustment provision but did not do so.

It may be that Reiss would be entitled to a remedy if Financial performed a forward stock split, on the theory that he "did not intend to acquire nothing" *(Cofman, supra, 958 F.2d, at 497).* We should not assume that one party intended to be placed at the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

764 N.E.2d 958                                                                                                          Page 5
97 N.Y.2d 195, 764 N.E.2d 958, 738 N.Y.S.2d 658, 2001 N.Y. Slip Op. 10090
(Cite as: 97 N.Y.2d 195, 764 N.E.2d 958, 738 N.Y.S.2d 658)

mercy of the other (*Wood v. Duff-Gordon,* 222 N.Y. 88, 91, 118 N.E. 214 [1917] ). It does not follow, however, that Financial should be given a comparable remedy to save it from the consequences of its own agreements and its own decision to perform a reverse stock split.

There remains a remedial problem, which we cannot ignore, although it is not well framed for our review. Plaintiffs' complaint contained two causes of action. The first sought a declaration that they were entitled to exercise the warrants in accordance with their terms, while the second sought to reform the expiration date of the warrants to a date in late 2000-allegedly five years after the warrants were delivered to plaintiffs. Plaintiffs also sought, by order to show cause, an order staying cancellation of the warrants on their stated expiration dates. Supreme Court refused to sign this order and ultimately dismissed both causes of action of the complaint, and the Appellate Division affirmed the dismissal.

Before this Court, plaintiffs have not advocated reinstating the reformation cause of action, which, if granted now, would leave them with nothing more than expired warrants. Rather, they have argued that their attempt to exercise the warrants, together with their motion for an order to show cause, preserved their right to exercise all of the warrants upon the successful conclusion of the litigation. At oral argument plaintiffs suggested, further, that this Court might direct ***663 *202 **963 Supreme Court to grant them summary judgment, and that the measure of their damages in that event would be the difference between the price of defendant's stock and the exercise price at the time of their attempted tender, multiplied by the number of shares they were entitled to buy.

We cannot direct Supreme Court to grant plaintiffs summary judgment, as they did not seek it (*see, Merritt Hill Vineyards v. Windy Hgts. Vineyard,* 61 N.Y.2d 106, 110-111, 472 N.Y.S.2d 592, 460 N.E.2d 1077 [1984] ) and may not be entitled to it. If Supreme Court determines that plaintiffs are entitled to the declaration they seek on the reinstated cause of action, the Court should also resolve the remaining remedial issues, including the effect of plaintiffs' tender.

Accordingly, the order of the Appellate Division

should be modified, with costs to plaintiffs, by remitting the case to Supreme Court for further proceedings in accordance with this opinion and, as so modified, affirmed. The certified question should be answered in the negative.

Chief Judge KAYE and Judges LEVINE, CIPARICK, WESLEY, ROSENBLATT and GRAFFEO concur.
        Order modified, etc.

N.Y.,2001.
Reiss v. Financial Performance Corp.
97 N.Y.2d 195, 764 N.E.2d 958, 738 N.Y.S.2d 658, 2001 N.Y. Slip Op. 10090

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.