Hearing Date:  **March 27, 2014 at 9:45 a.m. (E.T.)**
Objection Deadline:  **March 20, 2014 at 4:00 p.m. (E.T.)**

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Veerle Roovers
Amy Edgy Ferber

*Attorneys for the Chapter 11 Trustee*
*for Soundview Elite Ltd., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                             :
In re:                                                       :     Chapter 11
                                                             :
FLETCHER INTERNATIONAL, LTD.                                 :     Case No. 12-12796 (REG)
                                                             :
                               Debtor.                       :
                                                             :
-------------------------------------------------------------x

## NOTICE OF HEARING ON MOTION OF THE
## SOUNDVIEW TRUSTEE FOR RELIEF FROM BAR DATE

**PLEASE TAKE NOTICE THAT:**

1.      A hearing to consider the Motion of the Soundview Trustee for Relief

from Bar Date (the "**Motion**"), filed by Corinne Ball, not individually but solely in her capacity

as chapter 11 trustee (the "**Soundview Trustee**") for creditors (a) Soundview Elite Ltd.,

(b) Soundview Premium, Ltd., (c) Soundview Star Ltd., (d) Elite Designated, (e) Premium

Designated and (f) Star Designated (collectively, the "**Soundview Debtors**") shall be held before

the Honorable Robert E. Gerber, United States Bankruptcy Judge, in courtroom 523, One

Bowling Green, New York, New York 10004-1408, on **Thursday, March 27, 2014 at 9:45 a.m.**

**(New York time)**.

NYI-4576382v2

2.      Objections, if any, to the relief sought in the Motion must be made in writing, with a hard copy to Chambers, conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York and the Case Management Order #1 (Docket No. 4) (the "**Case Management Order**") and be filed with the Court and must be served in accordance with the provisions of General Order M-399 on: (a) the Soundview Trustee, 222 East 41st Street, New York, NY 10017 (Attn: Corinne Ball, Esq.); (b) Jones Day, counsel to the Soundview Trustee, 222 East 41st Street, New York, NY 10017 (Attn: Veerle Roovers, Esq.); (c) Richard J. Davis, Esq. in his capacity as  chapter  11 trustee of the above captioned debtor  (the "**FILB Trustee**"); (d) Luskin, Stern & Eisler LLP, counsel to the FILB Trustee, Eleven Times Square, New York, NY 10036 (Attn: Michael Luskin, Esq.); (e) the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn: Richard C. Morrissey, Esq.); and (f) all parties requesting notice in this chapter 11 case, not later than **4:00 p.m. New York time on March 20, 2014** (the "**Objection Deadline**").

3.      If no objections are timely filed and served with respect to the Motion,  the Soundview Trustee may, on or after the Objection Deadline, submit to the Court an order substantially in the form attached to the Motion, which order shall be submitted and may be entered with no further notice or opportunity to be heard offered to any party.

4.      Copies of the Motion, General Order M-399 and the Case Management Order may be obtained from the Court's website at  http://ecf.nysb.uscourts.gov.

NYI-4576382v2

Dated:  March 13, 2014
       New York, New York

Respectfully submitted,

 /s/ Veerle Roovers               
Veerle Roovers
Amy Edgy Ferber
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

*Attorneys for the Chapter 11 Trustee for*
*Soundview Elite Ltd., et al.*

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Veerle Roovers
Amy Edgy Ferber

*Attorneys for the Chapter 11*
*Trustee for Soundview Elite Ltd,. et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                         :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| FLETCHER INTERNATIONAL, LTD. | : | Case No. 12-12796 (REG) |
| | : | |
| Debtor. | : | |
| | : | |

------------------------------------------------------------x

## MOTION OF THE SOUNDVIEW TRUSTEE FOR RELIEF FROM BAR DATE

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

FACTS RELEVANT TO THIS MOTION.................................................................. 2

    A.    Background ................................................................................................ 2

    B.    The Soundview Trustee's Investigation of the Inter-Fund Relationship
        Between the Soundview Debtors and the FILB Debtor......................... 5

RELIEF REQUESTED........................................................................................... 8

JURISDICTION AND VENUE ............................................................................. 9

BASIS FOR RELIEF REQUESTED...................................................................... 9

    A.    Equitable Considerations Support The Soundview Trustee's Requested
        Relief...................................................................................................... 9

        (a)    The Court Has Ordered The Soundview Trustee to Investigate
              Inter-Fund Issues And To Protect Stakeholder Interests ......................... 10

        (b)    Relief From The Bar Date Is Necessary To Effectuate This Order
              And Mandate.............................................................................. 11

    B.    The Soundview Trustee Can Establish "Excusable Neglect." ............... 12

        (a)    The Delay Was Not Within the Reasonable Control of the
              Soundview Trustee........................................................................ 13

        (b)    There Is No Danger of Prejudice To the Estate ...................................... 16

        (c)    The Length Of The Delay Was Minimal ................................................. 17

        (d)    The Soundview Trustee Acted In Good Faith ........................................ 17

NOTICE.............................................................................................................. 18

NO PRIOR REQUEST ........................................................................................ 18

# TABLE OF AUTHORITIES

**Page**

## Cases

Back v. LTV Corp. (In re Chateaugay Corp.), 213 B.R. 633 (S.D.N.Y. 1997)............................. 9

In re Andover Togs, Inc., 231 B.R. 521 (Bankr. S.D.N.Y. 1999) ................................. 12

In re Enron Creditors Recovery Corp., 370 B.R. 90 (Bankr. S.D.N.Y. 2007) ...................... 13, 16

In re Garden Ridge Corp., 348 B.R. 642 (Bankr. D. Del. 2006) ................................... 16

In re Keene Corp., 188 B.R. 903 (Bankr. S.D.N.Y. 1995) .......................................... 13

In re Overmyer, 30 B.R. 123 (Bankr. S.D.N.Y. 1983) .................................................. 14

In re Waterman Indus., Inc., No. 04-11065-B-11, 2007 Bankr. LEXIS 1157 (Bankr. E.D. Cal.
Mar. 30, 2007) ...................................................................................................... 14

In re XO Communs., Inc., 301 B.R. 782 (Bankr. S.D.N.Y. 2003) ................................. 13

Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.), 304 F.3d 223 (2d Cir. 2002)....... 9

Midland Cogeneration Venture Ltd. v. Enron Corp. (In re Enron Corp.), 419 F.3d 115 (2d Cir.
2005) ..................................................................................................................... 13

Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P., 507 U.S. 380 (1993) ................................. 12

Universal Oil Ltd. v. Allfirst Bank (In re Millenium Seacarriers, Inc.), 419 F.3d 83 (2d Cir.
2005) ..................................................................................................................... 9

## Statutes

11 U.S.C. § 105(a) ............................................................................................... 8, 9

## Rules

Fed. R. Bank. P. 3003 ........................................................................................ 12

Fed. R. Bank. P. 9006 ...................................................................................... 8, 12

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Corinne Ball, not individually but solely in her capacity as chapter 11 trustee

(the "**Soundview Trustee**") for creditors (i) Soundview Elite Ltd. ("**Soundview Elite**"), (ii)

Soundview Premium, Ltd., (iii) Soundview Star Ltd., (iv) Elite Designated, (v) Premium

Designated and (vi) Star Designated (collectively, the "**Soundview Debtors**"), hereby files this

motion (the "**Motion**") seeking relief from the Bar Date (as defined below) in order to file new

proofs of claim on behalf of the Soundview Debtors.  In support of this Motion, the Soundview

Trustee respectfully represents as follows:

## PRELIMINARY STATEMENT

While the Soundview Trustee fully appreciates the efforts of the FILB Trustee (as

defined below) to move this chapter 11 case to its conclusion in an expeditious manner, her

recent appointment leaves her with no choice but to file this Motion to seek to preserve the rights

of the Soundview Debtors, their estates, creditors and parties in interest.

On January 18, 2013, approximately one year prior to the Soundview Trustee's

appointment, proofs of claim were timely filed on behalf of three of the six Soundview Debtors.

Such claims, however, were filed by the Soundview Debtors' previous management—

specifically, Mr. Gerti Muho, whose erratic and questionable behavior has been well-

documented.  The Soundview Trustee believes that these proofs of claim are at a minimum

incomplete and most likely are deficient.

Based upon the Soundview Trustee's statutory investigation, which is ongoing,

the Soundview Trustee believes that it is necessary to file new proofs of claim on behalf of the

Soundview Debtors against the FILB Debtor (as defined below).  Accordingly, the Soundview

Trustee seeks relief from the Bar Date and authorization to file new proofs of claim on behalf of

the Soundview Debtors in the FILB Debtor's chapter 11 case in an unliquidated amount and

contingent upon the outcome of her investigation, within sixty (60) days of the entry of an order

granting this Motion.

## FACTS RELEVANT TO THIS MOTION

### A.    Background

1.    On June 29, 2012 (the **"Petition Date"**), the above-captioned debtor

(the **"FILB Debtor"**) commenced its chapter 11 case (the **"FILB Chapter 11 Case"**) by filing a

voluntary petition for relief under chapter 11 of title 11 of the United States Code

(the **"Bankruptcy Code"**).

2.    The general bar date established in the FILB Chapter 11 Case was

January 18, 2013 at 5:00 p.m. (Eastern Time) (the **"Bar Date"**).  See *Order Establishing*

*Deadlines and Procedures for Filing Proofs of Claim and Approving Form and Manner of*

*Notice Thereof* [Docket No. 147].  Mr. Gerti Muho, a then-director of each of the Soundview

Debtors, timely filed six proofs of claim in the FILB Chapter 11 Case on behalf of certain of the

Soundview Debtors (i.e., Soundview Elite Ltd., Soundview Premium Ltd. and Soundview Star

Ltd.):  claim numbers 44, 45, 46, 52, 57 and 62 (together, the **"Soundview Claims"**).

3.    The allegations with respect to Mr. Muho's erratic behavior and

inappropriate actions are already well known to this Court.[1]  As then-counsel to the Soundview

Debtors informed this Court on November 6, 2013, Mr. Muho's conduct  has been the subject of

litigation in multiple forums.  See November 6, 2013 Hrg. Tr., 17:13-18:5, 19:3-19:16, *In re*

---

[1]    They are also apparently well known to the Soundview Debtors' former management.  See *Direct*
*Testimony/Affidavit of Alphonse Fletcher, Jr. on Motions to Dismiss, Convert, or Appoint a Trustee*
*[Corrected]*, *In re Soundview Elite Ltd., et al.*, No. 13-13098 (REG) (Bankr. S.D.N.Y. December 11,
2013) [Soundview Docket No. 118], at ¶ 122 ("Mr. Muho is a criminal … After his removal, he began
taking actions to steal from the Debtors.").

*Soundview Elite Ltd., et al.*, No. 13-13098 (REG) (Bankr. S.D.N.Y.).[2]  Litigation is proceeding

in the United States District Court for the Southern District of New York, captioned *Soundview*

*Elite, et al. v. Muho, et al.*, No. 13-06895 (the "**Muho Litigation**"), wherein the plaintiffs

(Soundview Elite and Vanquish Fund Ltd.) allege that in early 2013, Mr. Muho attempted to

transfer $5 million from various of the Soundview Debtors' accounts at Wilmington Trust, N.A.

to a corporate entity owned and controlled by Mr. Muho himself.  This attempt was ultimately

stymied, as Wilmington Trust, N.A. refused to transfer the funds and instead brought the

interpleader action in the Superior Court of the State of Delaware, New Castle County, styled as

*Wilmington Trust, National Association v. Soundview Elite Ltd. et al*, No. N13C-06-156.[3]

       4.     Mr. Muho, however, is alleged to not have stopped there, and rather to

have also unlawfully transferred more than $2 million from two HSBC bank accounts (including

one maintained by Debtor Soundview Elite) in Monaco to a bank account controlled by a

corporate entity owned and controlled by Mr. Muho himself.  See November 6, 2013 Hrg. Tr.,

19:11-20:12, *In re Soundview Elite Ltd., et al.*, No. 13-13098 (REG) (Bankr. S.D.N.Y.).

Approximately $400,000 of that amount, which the Soundview Debtors were able to trace to an

account controlled by Mr. Muho, has been frozen.  *Id.*  To date the defendants in the Muho

Litigation remain subject to a temporary restraining order, and that litigation is proceeding.  See

*Order*, dated February 28, 2014 [Muho Litigation Docket No. 27] (denying motion to dissolve

TRO and stating that "federal courts have inherent power to strike frivolous motions.").  It is

clear, therefore, that there are serious questions to be raised with respect to Mr. Muho's good

---

[2]     A copy of the November 6, 2013 hearing transcript is attached hereto as **Exhibit A**.

[3]     As this Court is aware, the substantial majority of these funds (less a fee reserve) has been transferred into
new accounts and is now under the control of the Soundview Trustee.  See *Stipulation and Agreed Order
By And Between The Chapter 11 Trustee And Wilmington Trust, National Association Authorizing the
Release of Funds and For Related Relief, In re Soundview Elite Ltd., et al.*, No. 13-13098 (REG) (Bankr.
S.D.N.Y. Feb. 20, 2014) [Soundview Docket No. 188].

faith, as well as his competence and ability to file accurate and fulsome proofs of claim on behalf of each of the Soundview Debtors.

5.    On September 24, 2013, the Soundview Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (collectively, the "**Soundview Chapter 11 Cases**").

6.    On January 24, 2014, the chapter 11 trustee in this chapter 11 case (the "**FILB Trustee**") filed the *Trustee's Amended Plan of Liquidation* [Docket No. 394] (the "**FILB Plan**"), together with the *[Amended] Trustee's Report and Disclosure Statement* [Docket No. 393] (the "**FILB Disclosure Statement**").  According to the FILB Trustee, as set forth in the FILB Disclosure Statement, in November and December 2008, "massive subscriptions" were made into, among other funds, the FILB Debtor from (among others) the Soundview Debtors at a time when the FILB Trustee believes that the Fletcher System[4] was insolvent.  *FILB Disclosure Statement*, at 10 and 214-17.  The FILB Trustee has stated that the structure had "many of the characteristics of a Ponzi scheme."  *Id*., at 9.  Furthermore, again according to the FILB Trustee, the FILB Debtor's portfolio was highly overvalued.  *Id*., at 5-6 (in March 2008, Fletcher Asset Management, Inc. ("**FAM**") "valued [the entire FILB Debtor's portfolio] at $352.8 million, when a fair valuation would have been approximately $212 million.").

7.    On January 23, 2014, this Court directed the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") to appoint a chapter 11 trustee in the Soundview Chapter 11 Cases.  <u>See</u> *Bench Decision on Motions to Dismiss, For Relief From Stay, For Appointment of Trustee, and on Sanctions For Contempt, In re Soundview Elite Ltd., et al.,*

---

[4]    As used in the FILB Disclosure Statement, the term "**Fletcher System**" means Arbitrage, Alpha, Leveraged, Arbitrage L.P., FILB, and FII (as such terms are defined in the FILB Disclosure Statement).

No. 13-13098 (REG) (Bankr. S.D.N.Y. Jan. 23, 2014) [Soundview Docket No. 156]

(the "**Soundview Bench Decision**").  On January 31, 2014, the U.S. Trustee filed the *Notice of*

*Appointment of Chapter 11 Trustee* [Soundview Docket No. 160] in the Soundview Chapter 11

Cases.  On February 3, 2014, this Court issued its *Order Approving the Appointment of*

*Chapter 11 Trustee* [Soundview Docket No. 164] approving the U.S. Trustee's appointment of

Corinne Ball as the chapter 11 trustee of the Soundview Debtors.

8.    On February 10, 2014, the FILB Trustee objected to, among other claims,

the Soundview Claims.  <u>See</u> *Chapter 11 Trustee's Second Omnibus Claims Objection* [Docket

No. 399] (the "**Claims Objection**"). The Claims Objection, insofar as it concerns the Soundview

Claims, is scheduled to be heard by this Court on April 30, 2014.

9.    The Soundview Debtors' deadline to vote on the FILB Plan and file any

objection thereto was extended to March 21, 2014 at 12:00 p.m. (Eastern Time). The FILB

Debtor's confirmation hearing is currently scheduled for March 27, 2014 at 9:45 a.m. (Eastern

Time).  <u>See</u> *Notice of Adjournment of Confirmation Hearing* [Docket No. 430].

**B.    The Soundview Trustee's Investigation of the Inter-Fund Relationship Between the
Soundview Debtors and the FILB Debtor**

10.    Upon her appointment, the Soundview Trustee promptly commenced her

statutory investigation.  At this time, she has largely finalized the first stage of such

investigation, which was focused on securing the Soundview Debtors' books and records, and

she is currently focusing on the second stage of her investigation, including the investigation of

the Soundview Debtors' rights and priorities *vis-a-vis* the FILB Debtor and other related funds.

It is clear that these linkages are significant—and that the Soundview Claims do not accurately

reflect the amounts owing.

11.    As of year-end 2007, the Richcourt Funds[5] (including the Soundview Debtors) direct and indirect investment (i.e. via Corsair) in the Funds[6] totaled $49 million, representing 37% of FAM's total client assets under management of $132 million.  *FILB Disclosure Statement*, at 67.  After November 1, 2008, the Richcourt Funds invested an additional $61.7 million in cash into Fletcher Income Arbitrage Fund, Ltd. ("**Arbitrage**").  *Id.* This total investment into the Fletcher structure of $110.7 million dwarfs the payments coming back the other way to the Richcourt Funds ($56 million).  *Id.*

12.    The Soundview Trustee has already identified at least three examples of instances where, thereafter, the Soundview Debtors' funds were used to fund transactions in respect of which she believes that new claims should be asserted.[7]

13.    First, the Soundview Trustee is seriously concerned about the circumstances surrounding both the Louisiana Pension Funds' investments into FIA Leveraged Fund, Ltd. ("**Leveraged**") and the use of Soundview Debtors' money to fund the subsequent Corsair Redemption from Leveraged.[8]  As set forth in greater detail in the FILB Disclosure Statement, the Louisiana Pension Funds became Series N Shareholders in Leveraged, as part of which they are said to have been guaranteed a preferred return of 12%, such that the account balances of all other investors had to be maintained at 20% of an ever increasing number. *FILB Disclosure Statement*, at 63.  They are also said to have been granted an automatic redemption

---

[5]    The term "**Richcourt Funds**" is defined in the FILB Disclosure Statement to include the Soundview Debtors, as well as certain other funds listed on **Exhibit E** to Section XVI (Appendix) of the FILB Disclosure Statement.  The Soundview Trustee's investigation is focused on whether and how the Soundview Debtors were specifically involved in a number of transactions.

[6]    As used in the FILB Disclosure Statement, "**Funds**" refers to FILB, Arbitrage, Alpha, and Leveraged (as such terms are defined in the FILB Disclosure Statement).

[7]    In addition, the Soundview Claims do not include claims based on breach of fiduciary and related duties.

[8]    Capitalized terms in paragraphs 11-16 have the meanings given to them in the FILB Disclosure Statement.

trigger. *Id*. In order to issue the Series N Shares on such preferential terms, "consent" from the non-Series N Shareholders was obtained from Citco, which controlled Corsair, the structured product that was the only non-Series N shareholder that was not related to FAM or its affiliates. *Id*., at 63-64. The Soundview Trustee has not been able to establish that any Richcourt Funds that invested via the Corsair product consented to such alleged subordination.

14.     Moreover, the Corsair investment (which was made through an entity known as Global Hawk) was made in part with funds loaned from RBS. In June 2009 RBS issued a default notice and called its $91.3 million loan, leading the parties to seek to unwind the Corsair investment. *Id*., at 65. The FILB Trustee has stated that Global Hawk repaid its loan from RBS "*apparently* from the proceeds of the Treasury STRIPS and from the redemption." *Id*., at 65-66 (emphasis added). Putting aside the vagueness of this assertion by the FILB Trustee, the Soundview Trustee believes there is reason to suspect that, directly or indirectly, the Soundview Debtors' monies may have been used to fund this redemption. To the extent that further investigation and a full accounting with respect to Global Hawk and Corsair confirms this, the Soundview Trustee will likely have to assert claims relating thereto on behalf of the Soundview Debtors.

15.     Second, the Soundview Trustee is aware that funds sourced from at least one of the Soundview Debtors were used to finance the April 2010 transaction with UCBI, which involved both the purchase of a portfolio of non-performing loans and bank owned properties and the distribution of warrants and a contract to purchase UCBI preferred stock. *FILB Disclosure Statement*, at 90. Arbitrage contributed $10 million in cash to the purchase price paid to UCBI, of which, to the best of the Soundview Trustee's current knowledge, at least $2.7

million came from the Soundview Debtors.  *Id*.  The Soundview Trustee believes it is highly

likely that a claim can and should be asserted as a result of this transaction.

16.     Third, and again as set forth in greater detail in the FILB Disclosure

Statement, this Court is familiar with the "April 22 Transactions" and the subsequent unwinding

of the same by the FILB Trustee.  See *FILB Disclosure Statement*, at 122-23.  In order to achieve

that unwinding, Fletcher International, Inc. (**"FII"**) paid the FILB Debtor $2.2 million.  *Id*.  Yet,

as of March 2013, FII simply did not have $2.2 million to turn over.  Rather, on March 8, 2013,

$4 million was transferred from Soundview Elite, one of the Soundview Debtors, to FII, and, that

same day, $2.2 million of the $4 million was transferred to the FILB Debtor to accomplish the

unwinding.  A copy of the relevant bank statements of Soundview Elite and FII are attached

hereto as **Exhibit B**.  The Soundview Trustee believes it is highly likely that a claim can and

should be asserted as a result of this transaction as well.

17.     In addition to the specific points raised above, the Soundview Claims also

do not include any claims based on breach of fiduciary duty and related duties, of which there are

likely to be many (and against multiple entities within the Fletcher structure).

18.     Although substantial further investigation by the Soundview Trustee and

her advisors is needed with respect to the above, it is already evident that claims are likely to lie

that risk being cut off before they can be fully explored and advanced if the Soundview Trustee

is not able to obtain the relief requested herein.

## RELIEF REQUESTED

19.     By this Motion, the Soundview Trustee requests, pursuant to Section

105(a) of the Bankruptcy Code and Rule 9006 of the Federal Rules of Bankruptcy Procedure

(the **"Bankruptcy Rules"**), entry of an order, substantially in the form attached hereto as

**Exhibit C**, granting the Soundview Trustee relief from the Bar Date and authorizing her to file

new proofs of claim on behalf of the Soundview Debtors (the "**New Soundview Claims**"), in an

unliquidated amount and contingent upon the outcome of her statutory investigation, within sixty

(60) days of the entry of an order granting this Motion.[9]

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction to consider this matter pursuant

to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BASIS FOR RELIEF REQUESTED

**A.      Equitable Considerations Support The Soundview Trustee's Requested Relief.**

21.    Section 105 of the Bankruptcy Code provides that "[t]he court may issue

any order, process, or judgment that is necessary or appropriate to carry out" the Bankruptcy

Code's provisions.  11 U.S.C. § 105(a).

22.    Moreover, it "codif[ies] the bankruptcy court's inherent power to enforce

its own orders."  *Back v. LTV Corp. (In re Chateaugay Corp.)*, 213 B.R. 633, 640 (S.D.N.Y.

1997).  Numerous courts in this circuit have recognized the existence of such inherent authority.

See, e.g., *Universal Oil Ltd. v. Allfirst Bank (In re Millenium Seacarriers, Inc.)*, 419 F.3d 83, 97

(2d Cir. 2005) ("Bankruptcy courts retain jurisdiction to enforce and interpret their own orders.")

(citing *Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 230 (2d Cir.

2002)); see also *Chateaugay*, 213 B.R. at 637 (quoting the lower bankruptcy court opinion that

"it had jurisdiction pursuant to its 'inherent or ancillary jurisdiction to interpret and enforce [its]

own orders'" (alteration in original)).

---

[9]      For the avoidance of doubt, the Soundview Trustee also seeks authority to amend and liquidate the New
Soundview Claims after they are filed as additional facts and information are identified as part of her
investigation.

(a)    **The Court Has Ordered The Soundview Trustee to Investigate Inter-Fund Issues And To Protect Stakeholder Interests**

23.    The Soundview Trustee was appointed expressly because, although no finding was made that the Soundview Debtors' management "acted fraudulently or incompetently," the parties had "identified numerous matters of concern that raise issues in that regard, and that necessitate investigation in depth." Soundview Bench Decision, 14-15. These included:

> a) "the apparent backdating of documents";
>
> b) "the $2 million Muho transfer";
>
> c) "the payment of management fees to Fletcher Asset Management based on seemingly inflated values for assets under management";
>
> d) "continued payments of management fees to Fletcher Asset Management at the same time redemption requests were not being honored";
>
> e) "the use of funds of one or more of the Limited Debtors for a lawsuit brought by Mr. Fletcher against the Dakota Apartments that at this juncture appears to have been principally, if not entirely, advancing Mr. Fletcher's private concerns"; and
>
> f) "the Debtors' purchase of FILB shares, based on a decision by the Fletcher management team, at a time when FILB was already in bankruptcy and FILB stock was an investment fraught with great risk."[10]

*Id.*, at 15. As this litany of troubling matters demonstrates, from the outset this Court envisioned a statutory investigation focused in large part on inter-fund issues, as well as potential management misconduct.

24.    Moreover, the Court specifically determined that it "need[s] a trustee to ensure that investigation and, if warranted, litigation that must take place in the United States may be fully pursued for the benefit of stakeholders and the estates." *Id.*, at 16. As such, the

---

[10]    This matter, and the Soundview Trustee's concerns relating thereto, are described in greater detail in paragraph 16, *supra*.

Soundview Trustee was thus clearly not appointed to sit on her hands as misconduct or other causes of action come to light, nor could it have been envisioned that her investigation would be rendered toothless due to a lack of an ability to assert claims because of deficiencies in the Soundview Claims filed prior to her appointment.

(b)     **Relief From The Bar Date Is Necessary To Effectuate This Order And Mandate**

25.    Absent relief from the Bar Date and the ability to file the New Soundview Claims, however, the Soundview Trustee will be unable to effectively discharge her responsibilities, and the issues set forth above and in the Soundview Bench Decision will not be fully addressed.  The Soundview Trustee's investigation will be for naught if the ultimate result is that she is foreclosed from actually recovering amounts due and owing from the FILB Debtor to the Soundview Debtors because (a) the Bar Date occurred more than a year prior to her appointment and (b) because the Soundview Debtors' previous management may have been more concerned with obscuring their own mismanagement and unauthorized use of funds, than with accounting for and assessing accurate claims against affiliated funds and other entities.  Such a result would be neither equitable nor consistent with the decisions of this Court that appointment of the Soundview Trustee was warranted.

26.    This is particularly true where, as here, the Soundview Claims ignore potentially valuable causes of action.  For example, as indicated above, they do not assert any breach of fiduciary and related duties.  Again, this may well be an indication that the previous management would naturally hesitate to draw attention to their—and others'—potential or actual breaches of duty.

27.    The Soundview Claims also do not appear to take into account any causes of action which could be asserted under Cayman Islands law, including, without limitation,

proprietary and non-proprietary claims arising from the constructive trusts created when monies
are disbursed in breach of fiduciary duty.

28.     The Soundview Trustee, and ultimately the stakeholders in the Soundview
Chapter 11 Cases, should not be prevented from recovering on account of any of these claims
because of the bad acts of those who came before her.

29.     Exercise of this Court's discretion and of its equitable powers in order to
facilitate the Soundview Trustee's discharge of her duties (and comply with the mandate set forth
in the Soundview Bench Decision) is therefore justified.

**B.     The Soundview Trustee Can Establish "Excusable Neglect."**

30.     In addition to the foregoing equitable considerations, because pursuant to
Bankruptcy Rule 3003(c)(3) the time for filing claims in a chapter 11 case is set by the court,
Bankruptcy Rule 9006(b)(1) provides that the court in its discretion may accept a late-filed proof
of claim where a claimant establishes "excusable neglect."  The burden is on the claimant to
prove that he or she did not timely file the claim because of "excusable neglect." *In re Andover
Togs, Inc.*, 231 B.R. 521, 549 (Bankr. S.D.N.Y. 1999).

31.     The decisive case interpreting the "excusable neglect" language of
Bankruptcy Rule 9006(b)(1) is *Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P.*, 507 U.S. 380
(1993).  In *Pioneer*, the U.S. Supreme Court stated that the determination of whether neglect is
excusable "is at bottom an equitable one, taking account of all relevant circumstances
surrounding the party's omission."  507 U.S. at 395.  "These equitable considerations include (1)
the danger of prejudice to the debtor, (2) the length of delay and its potential impact on judicial
proceedings, (3) the reason for the delay, including whether it was within the reasonable control
of the movant, and (4) whether the movant acted in good faith."  *In re Enron Creditors Recovery*

*Corp.*, 370 B.R. 90, 100-01 (Bankr. S.D.N.Y. 2007) (quoting *Pioneer*, 507 U.S. at 395) (internal

quotations omitted).

32.    The relative weight to be accorded to the factors identified in Pioneer

requires recognizing that not all factors need to favor the moving party.  *In re XO Commc'ns Inc.*,

301 B.R. 782, 796 (Bankr. S.D.N.Y. 2003) (citing *In re Keene Corp.*, 188 B.R. 903, 909 (Bankr.

S.D.N.Y. 1995)).  However, "the Second Circuit observed that in the typical case, three of the

Pioneer factors – the length of the delay, the danger of prejudice, and the movant's good faith –

usually weigh in favor of the party seeking the extension." *Enron*, 370 B.R. at 101 (quoting

*Midland Cogeneration Venture L.P. v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115, 122 (2d

Cir. 2005)) (internal quotations omitted).  "Therefore, the Second Circuit has focused on the third

factor: the reason for delay, including whether it was in the reasonable control of the movant."

*Id.* (internal quotations omitted).

33.    Applying the *Pioneer* test to the instant facts, the Soundview Trustee's

failure to file proofs of claim prior to the Bar Date was clearly the result of excusable neglect,

justifying an extension of time under Bankruptcy Rule 9006(b) and providing sufficient grounds

to grant the relief herein.

**(a)    The Delay Was Not Within the Reasonable Control of the Soundview
Trustee**

34.    Most importantly, the Soundview Trustee clearly satisfies the key third

*Pioneer* factor because it was not possible for the Soundview Trustee to have filed timely proofs

of claim in the FILB Chapter 11 Case, simply because the Soundview Trustee was only

appointed in the Soundview Chapter 11 Cases on February 3, 2014.  Therefore, and while the

Soundview Trustee firmly believes that filing the New Soundview Claims is necessary to

preserve the rights of the Soundview Debtors, their estates, creditors and parties in interest, the

filing of proofs of claim in the FILB Chapter 11 Case by the January 18, 2013 Bar Date was

outside of the Soundview Trustee's reasonable control.

      35.    The factual scenario previously before this Court in *In re Overmyer*,

30 B.R. 123 (Bankr. S.D.N.Y. 1983) is particularly instructive here.  In *Overmyer*, the chapter 11

trustee of Hadar Leasing International Company, Inc. ("**Hadar**") sought to reopen the time to file

a dischargeability complaint in the chapter 7 proceeding of Mr. Overmyer (the "**Overmyer**

**Proceeding**"), the person who formerly controlled Hadar.  *Id*. at 123.  The chapter 11 trustee was

not appointed until nearly four months after the bar date.  *Id*. at 124.  Analyzing the *Pioneer*

factors, the *Overmyer* court held that the chapter 11 trustee was able to file a dischargeability

complaint due to excusable neglect, even though the chapter 11 trustee had the same rights as the

postpetition debtor-in-possession who deliberately chose not to file a dischargeability complaint,

stating:

> It would be inequitable and unjust to bar Hadar's trustee from
> having his day in court and litigating the merits of his claim against
> Daniel H. Overmyer for the benefit of the creditors of Hadar
> merely because the dischargeability bar date expired before the
> trustee was appointed.  It is precisely this type of action that should
> be undertaken by a trustee in a Chapter 11 case after a bankruptcy
> court has determined that cause existed for the transfer of control
> from the erstwhile debtor in possession to a Chapter 11 trustee
> pursuant to [section] 1104.  Indeed, the objectionable control of
> Hadar, which justified the appointment of a Chapter 11 trustee,
> should not now serve as the basis for preventing the application of
> the doctrine of excusable neglect.  **The neglect that prompted the**
> **appointment of the trustee may not be used as a weapon to**
> **counter the trustee's performance of his required duties. . . .**
> **The trustee acted promptly after his appointment and in good**
> **faith for the benefit of the creditors of Hadar, who should not**
> **be penalized for Hadar's failure to seek this relief before the**
> **transfer of control to the trustee**.

*Id*. at 126 (emphasis added).  See also *In re Waterman Indus., Inc.*, No. 04-11065-B-11, 2007

Bankr. LEXIS 1157, at *19 (Bankr. E.D. Cal. Mar. 30, 2007) (holding that a chapter 7 trustee

who was not appointed until the case was converted from a chapter 11 to a chapter 7, which occurred after the claims bar date in an affiliate's bankruptcy proceeding had passed, was allowed to submit a proof of claim in the affiliate's bankruptcy because "[t]he Trustee could not have received notice of the bar date as a matter of law, and could not have filed a timely proof of claim on behalf of [the debtor] because he had not been appointed yet").

36.     Similarly, it would be inequitable and unjust to bar the Soundview Trustee from asserting comprehensive and accurate proofs of claim for the benefit of the Soundview Debtors' creditors merely because the Bar Date expired before the Soundview Trustee was appointed.  As the Court in *Overmyer* stated, the neglect of the Soundview Debtors' previous management that prompted the appointment of the Soundview Trustee, and its apparent failure to file comprehensive proofs of claim, should not be allowed to undermine or negate the Soundview Trustee's performance of her required duties.  As detailed above, there is substantial reason to suspect that the Soundview Debtors' management (including, specifically, Mr. Muho, who filed the Soundview Claims) may have been engaged in fraud and deliberate mismanagement—and the very failures that led to the determination that cause existed for the appointment of the Soundview Trustee should not now be held against her and preclude her from performing her statutory duties.

37.     Moreover, as in *Overmyer*, the Soundview Trustee has acted in good faith and as expeditiously as possible since her appointment to conduct her statutory investigation and to identify the Soundview Debtors' assets, including the claims in the FILB Chapter 11 Case, for the benefit of the Soundview Debtors' creditors, who should not be penalized for the debtor-in-possession's failure to file complete, and likely failure to assert comprehensive and accurate, proofs of claim.

**(b)      There Is No Danger of Prejudice To the Estate**

38.      Allowing the Soundview Trustee to file proofs of claim in the FILB

Chapter 11 Case will not prejudice the FILB Debtor.

39.      Courts have rejected a narrow view of prejudice.  In *Enron*, the Court

considered a number of factors in assessing prejudice, including "whether the debtor had

advance knowledge of the claim," "whether allowance of a particular late claim would jeopardize

the success of the reorganization, by, for example, forcing the return of . . . amounts already paid

out under the confirmed Plan, or affecting the distribution to creditors and equity holders." 419

F.3d at 130 (internal quotations and citations omitted); see also *In re Garden Ridge Corp.*, 348

B.R. 642, 646 (Bankr. D. Del. 2006) (rejecting the committee's "narrow view of prejudice").

40.      Applying this rationale, the Court should likewise find no prejudice to the

FILB Debtor and his estate by the relief requested.  Given the existing Soundview Claims filed

against the FILB Debtor, the existence of the Soundview Debtors' claims against the FILB

Debtor should not come as a surprise.  Moreover, the FILB Disclosure Statement indicates that

"massive subscriptions" occurred into the FILB Debtor from (among others) the Soundview

Debtors at a time when the FILB Trustee believes that the Fletcher System, which includes the

FILB Debtor, was insolvent.  See *FILB Disclosure Statement*, at 5-6, 10, 217.  The FILB Debtor

is not attempting to reorganize, so there are no such prospects to jeopardize.

41.      Finally, the FILB Plan has not yet been confirmed and distributions have

yet to be made to the FILB Debtor's creditors.  The FILB Trustee has informed the Soundview

Trustee that it is critical that the FILB Plan be confirmed in March, in large part so that the

parties to the Investor Settlement (as defined in the FILB Plan) may proceed with litigation

against third parties before the six-year statutes of limitation expire.  Assuming that that is the

case, and that tolling agreements cannot be obtained, nothing herein precludes the

commencement of such litigation.  Allowing the Soundview Trustee to file new proofs of claim

will not prevent the FILB Plan from being confirmed, although it may require that the FILB

Trustee reserve amounts sufficient to make distributions on account of the New Soundview

Claims (as well as any administrative claims that may be asserted by the Soundview Trustee).

But, again, that is only fair and equitable if the inter-estate claims are to be resolved properly and

without undue haste that benefits one estate and prejudices the other.

### (c)        The Length Of The Delay Was Minimal

42.        The Soundview Trustee has worked as efficiently as possible since the

Court's approval of her appointment on February 3, 2014.  Accordingly, while almost 14 months

have passed since the Bar Date, this is not the result of the Soundview Trustee's passivity or

gamesmanship.  The New Soundview Claims will be presented to the Court and the FILB

Trustee expeditiously after the Soundview Trustee's appointment, while the Soundview Trustee's

investigation is still ongoing.  The Soundview Trustee therefore submits that the length of delay

is minimal.

### (d)        The Soundview Trustee Acted In Good Faith

43.        Finally, the Soundview Trustee has acted in good faith since her

appointment to investigate the facts and work towards identifying accurate proofs of claim

against the FILB Debtor on behalf of the Soundview Debtors.  This is not an instance where the

movant sat on her rights for tactical reasons.

44.        For the reasons set forth above, the Soundview Trustee submits that she

satisfies all four of the *Pioneer* factors and that, most importantly, she satisfies the most critical

of the *Pioneer* factors as recognized by the Second Circuit:  the reason for the delay was not

within her reasonable control.  Accordingly, the Soundview Trustee respectfully requests that the

Court exercise its discretion and authorize the Soundview Trustee to file the New Soundview

Claims on behalf of the Soundview Debtors after the Bar Date in order to preserve the rights of

the Soundview Debtors, their estates and creditors in the FILB Chapter 11 Case.

## NOTICE

45.    Notice of this Motion will be provided to (a) the U.S. Trustee, (b) the

FILB Trustee and his counsel and (c) all parties requesting notice in the FILB Chapter 11 Case.

The Soundview Trustee submits that no other or further notice need be provided.

## NO PRIOR REQUEST

46.    No prior request for the relief sought in this Motion has been made to this

or to any other Court.

WHEREFORE, the Soundview Trustee respectfully requests that this Court (i) enter an order substantially in the form attached hereto as **Exhibit C**, granting the relief requested herein and (ii) grant such other and further relief as the Court may deem proper.

Dated: March 13, 2014
      New York, New York

Respectfully submitted,

  /s/  Veerle Roovers
Veerle Roovers
Amy Edgy Ferber
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

*Attorneys for the Chapter 11*
*Trustee for Soundview Elite Ltd. et al.*

**EXHIBIT A**

NYI-4574696v9

**In Re:**

*SOUNDVIEW ELITE LTD., et al.*

*Case No. 13-13098-reg*

---

*November 6, 2013*

---

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*



Min-U-Script® with Word Index

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 13-13098-reg

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    SOUNDVIEW ELITE LTD., et al.

9

10              Debtors.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              November 6, 2013

19              10:04 AM

20

21

22

23   B E F O R E:

24   HON. ROBERT E. GERBER

25   U.S. BANKRUPTCY JUDGE

2

1

2  Doc # 43 Motion of Debtors Pursuant to Section 365 of the

3  Bankruptcy Code, Bankruptcy Rule 6006 and Local Bankruptcy Rule

4  6006-1(a) for an Order Authorizing the Assumption of

5  Administration Agreements, as Modified, Between the Debtors and

6  Pinnacle Fund Administration LLC

7

8  Doc# 29 Authorizing the Retention and Employment of Porzio,

9  Bromberg & Newman, P.C. as Counsel to the Debtors Nunc Pro Tunc

10 to the Petition Date

11

12 Doc# 31 Motion Authorizing the Retention and Employment of

13 CohnReznick LLP as Financial Advisor to the Debtors Nunc Pro

14 Tunc to the Petition Date

15

16 Doc# 41 Motion Authorizing the Retention and Employment of

17 Patterson Belknap Webb & Tyler LLP as Special Counsel to the

18 Debtors, Nunc Pro Tunc to the Petition Date

19

20 Transcribed by:  Sharona Shapiro

21 eScribers, LLC

22 700 West 192nd Street, Suite #607

23 New York, NY 10040

24 (973)406-2250

25 operations@escribers.net

1

2  A P P E A R A N C E S :

3  PORZIO BROMBERG & NEWMAN P.C.

4          Attorneys for Debtors

5          100 Southgate Parkway

6          Morristown, NJ 07962

7

8  BY:   WARREN J. MARTIN, JR., ESQ.

9          RACHEL A. SEGALL, ESQ.

10

11  PATTERSON BELKNAP WEBB & TYLER LLP

12          Proposed counsel to Debtors

13          133 Avenue of the America

14          New York, NY  10036

15

16  BY:   PETER C. HARVEY, ESQ.

17

18

19  UNITED STATES DEPARTMENT OF JUSTICE

20          Office of the United States Trustee

21          33 Whitehall Street

22          21st Floor

23          New York, NY 10004

24

25  BY:   GREG M. ZIPES, ESQ.

1

2  KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

3         Attorneys for Pasig Ltd.

4         1633 Broadway

5         New York, NY 10019

6

7  BY:   ANDREW K. GLENN, ESQ.

8

9

10  MORRISON & FOERSTER LLP

11         Joint Official Liquidators

12         1290 Avenue of the Americas

13         New York, NY 10104

14

15  BY:   WILLIAM M. HILDBOLD, ESQ.

16

17

18  MORRISON & FOERSTER LLP

19         Attorneys Cayman Joint Official Liquidators

20         425 Market Street

21         San Francisco, CA 94105

22

23  BY:   LARRY ENGEL, ESQ.

24

25

1

2   OSTAD PLLC

3         Attorneys for Optima Absolute Return Fund Ltd.; Richcourt

4          Allweather Fund Inc.; and America Alternative

5          Investments Ltd.

6         185 Great Neck Road

7         Suite 330

8         Great Neck, NY 11021

9

10  BY:   KAREN OSTAD, ESQ.

11

12

13  ALSO PRESENT TELEPHONICALLY:

14        Brian Smith, Pinnacle Fund Administration

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Okay, Soundview.  Folks want to come up on

3    that one, please?  I know some of you, but I don't know

4    everybody.  I want to get appearances, and then I have some

5    preliminary comments.

6            First, Mr. Martin, I know you, of course, and I

7    know --

8            MR. MARTIN:  Thank you, Your Honor.  I do have my

9    colleague, Rachel Segall; attorneys for the debtor, Porzio,

10   Bromberg & Newman.  It's S-E-G-A-L-L; the reporter has --

11           MR. GLENN:  Good morning, Your Honor.  Andrew Glenn,

12   Kasowitz, Benson, Torres & Friedman, on behalf of Pasig Ltd.

13           THE COURT:  Okay.

14           MR. ENGEL:  Good morning, Your Honor.  Larry Engel

15   from Morrison & Foerster for the Cayman joint liquidators.

16           THE COURT:  Okay.

17           MR. HILDBOLD:  Good morning, Your Honor.  Billy

18   Hildbold on behalf of the joint official liquidators.

19           THE COURT:  Okay.

20           MS. OSTAD:  Good morning, Your Honor. Karen Ostad of

21   Ostad PLLC, on behalf of Optima as well as America Investment

22   and Richcourt Allweather Funds.

23           THE COURT:  Okay.  Mr. Zipes, are you appearing on

24   this one?

25           MR. ZIPES:  Yes, Your Honor.

1          THE COURT:  Okay.  All right.  Folks, I've got a

2    tentative, California style, after reading all the papers, many

3    of which rehash issues that are appropriate for December 17th

4    but aren't relevant, in my thinking, today.  There is one

5    unanswered question which could affect my tentatives, but

6    somehow, with lawyers of this quality, I think that if it were

7    a factor, I would have seen it in the papers.

8          My tentative, folks, is to grant the Porzio

9    application, and to deny, without prejudice, or at the option

10   of the movant to continue the motions vis-a-vis CohnReznick and

11   Patterson Belknap, and to do likewise with respect to the

12   Pinnacle application.

13         On these, a matter that could inform the exercise of

14   my discretion, if it were true, would be if there is some

15   demonstrable urgency in deciding the matters that I think that

16   should be denied without prejudice.  In particular, I would

17   need to know what is the need for any of the CohnReznick or

18   Patterson Belknap entities to be retained between now and

19   December 17th, especially if, as I understand, the interpleader

20   action is frozen for the time being.  I have similar questions

21   with respect to Pinnacle.  I understand that Pinnacle, at some

22   point, either would or might be providing useful services.  But

23   I need to know whether, and to what extent, there is an urgency

24   in Pinnacle serving before December 17th or the decision that

25   would follow any proceedings that take place on the 17th.

1        It seemed to me that the assumption of that contract

2   has more than minimal economic consequences, but I can't tell

3   whether the Pinnacle services are worth the cost or not.

4   That's not to say, of course, that they're not, but I'm not

5   sure if there's an urgency.

6        Also, if Pinnacle is holding any information with

7   respect to the debtor, I saw no briefing or argument as to the

8   extent to which we could skin the cat by 542(e).  And Pinnacle,

9   under such circumstances, might have whatever rights it has to

10  get paid its pre-petition debt, but they would be separate from

11  its duty to comply with any information that might hold with

12  respect to the debtor and that's necessary for the

13  administration of the estate.

14       Of course, if people want Pinnacle's services, going

15  forward, which is something I hardly rule out, nobody would

16  expect Pinnacle to do that for free.  But it seems to me that

17  would be better clarified after we know what's going to happen

18  on the 17th.

19       So anybody want to be heard in opposition to my

20  tentatives?  Mr. Martin?

21       Oh, let me say what I think is obvious, and I think I

22  said it at the last hearing.  I'm expressing no views now, just

23  as I didn't then, vis-a-vis who should win on the 17th.  But I

24  don't think it's appropriate to make the estate prosecute the

25  defense of the filing, or the matters related to it, without a

1  lawyer, or with one hand tied behind its back.  And at least

2  until the 17th, implicit in my ruling is that Mr. Martin

3  continues -- Mr. Martin and his firm.

4          Go ahead, Mr. Martin.

5          MR. MARTIN:  Thank you, Your Honor.  Let me address

6  Pinnacle first, and then Patterson Belknap and CohnReznick.

7  Just as a housekeeping matter, Mr. Brian Smith of Pinnacle,

8  who's based in Raleigh, North Carolina, wanted to be here but

9  was not able to get here.  And I understand they were trying to

10  make arrangements for him to dial in.

11          THE COURT:  I have a dial-in log that shows you as

12  appearing by phone, which is obviously no longer the case.

13          MR. SMITH:  Warren, this is Brian Smith.  I actually

14  am on the line.

15          THE COURT:  Oh, okay.

16          MR. MARTIN:  Okay.

17          THE COURT:  All right.  Very well, Mr. Smith.

18          MR. MARTIN:  Your Honor, with respect to Pinnacle --

19  and it's good that we're doing this one first so we can let Mr.

20  Smith go when we're done, because he's been very busy.

21          Let me say that 542(e) is -- or 542, rather, is not

22  required here.  Pinnacle has been nothing but professional.

23  They -- after the petition, we began discussions with them, we

24  asked them for help, we filed the motion.  Mr. Smith has shared

25  with us 5,500 pages of documents which represent the HSBC file,

1  who was the fund administrator before Mr. Smith.

2          With respect to the necessity and essential nature of

3  the application, I would say the following, Your Honor.  I

4  don't think any of the other parties here would dispute, in the

5  hedge fund industry, the critical nature of a third party fund

6  administrator.  It is, in effect, the back office for the

7  financial and accounting records of the fund.  And because of

8  the Wilmington Trust interpleader, which Your Honor is well

9  aware of, the back office was frozen.

10         We have been in regular daily communications with Mr.

11  Morrissey, Ms. Riffkin.  The CohnReznick firm -- and we'll get

12  to CohnReznick separately -- has been doing yeomen's work in

13  putting together schedules and statements.  And a 341, although

14  I don't think I saw the notice, it was tentatively scheduled

15  for November 15th.  We had committed to the U.S. Trustee to get

16  our schedules done by November 15th.  They can't get done

17  without Pinnacle.

18         With respect to Mr. Smith's professionalism, I would

19  add the following.  Mr. Smith cleared his calendar; he had some

20  forty or fifty items, cleared them for this case, and has been

21  working eight hour days, and he's on the line.  But I know the

22  effort that he's been putting in.

23         So if you look at the objection, that was filed, to

24  assumption of this contract, and you think about the business

25  judgment test, the objection doesn't dispute pricing of

 1 Pinnacle.  It doesn't dispute that it's not in the debtors'
 2 business judgment, other than the concept that the obligations
 3 that this debtor has, as a debtor-in-possession, ought to be
 4 put on hold until we decide who's captaining the ship.
 5        But I sense, and Your Honor hinted to it a bit in your
 6 opening comments, that a lot of what we're seeing here is
 7 litigation, or litigation-driven.  And I sense a concern, on
 8 the part of my adversaries, that if they let this debtor do
 9 what it's supposed to do, under the Bankruptcy Code, it'll be
10 used against them on December 17th.
11        We don't want credit.  December 17th, we will make our
12 case or we won't, and Your Honor will rule on the appropriate
13 disposition of this case.  We don't need credit for doing what
14 we're supposed to do, but to delay a project that anybody
15 needs -- and Mr. Smith can tell us, if necessary; I believe if
16 this case did go back to the Caymans, for example, Mr. Smith
17 would be retained on the same terms and out of the same funds,
18 and he would proceed forward.  So why not do it now?
19        THE COURT:  I take your points, Mr. Martin, but I have
20 residual questions.  One is that -- perhaps I read the papers
21 too hastily; I did sense an uncertainty vis-a-vis the economic
22 terms.  But more importantly, I was led to believe, either in
23 earlier proceedings in this case, or in the most recent round
24 of papers, that the debtor is not -- or actually debtors are
25 not actively running funds at this point.  And therefore, it

1    was unclear to me as to the extent to which some of the

2    services that you articulated would be as necessary as if you

3    had an actively running fund.  Can you help me on those things?

4           MR. MARTIN:  My understanding, Your Honor, and

5    unfortunately I'm just an attorney, not a witness, but my

6    understanding is that in order -- to the extent your question

7    goes exclusively to timing --

8           THE COURT:  Which it does, because I've got nothing

9    against Pinnacle, and so far as the record reflects, everything

10   you said about Mr. Smith and his diligence and his not holding

11   up anybody is entirely true.

12          MR. MARTIN:  To the extent that your question goes to

13   timing, unfortunately, because of the situation in which these

14   debtors found themselves with the Wilmington situation, which

15   is now resolved, there was an extensive period of time where

16   what should have gotten done didn't get done.  And now we're

17   debtors under the Bankruptcy Code, and I have requirements of

18   the U.S. Trustee's Office that I cannot complete without

19   Pinnacle.  So I either need to get a pass on those, or we need

20   to bring Pinnacle in.

21          THE COURT:  But I still have more authority than the

22   U.S. Trustee's Office, don't I?

23          MR. MARTIN:  I'm sorry, Your Honor?

24          THE COURT:  I still have more authority than the U.S.

25   Trustee's Office.  I can give you a pass on schedules and

1   statements, if I think it's otherwise in the interest of the

2   estate.  Not a pass, but a --

3            MR. MARTIN:  Deferral?

4            THE COURT:  -- deferral.  I mean --

5            MR. MARTIN:  It --

6            THE COURT:  -- certainly I would hear from the U.S.

7   Trustee's --

8            MR. MARTIN:  You know, you --

9            THE COURT:  -- from Mr. Zipes or whomever --

10           MR. MARTIN:  You --

11           THE COURT:  -- as to whether there are immediate

12   needs.  I would also want to hear from the parties as to

13   whether they think they need extra information.  They sure have

14   been able to file a lot of paper without the benefit of what

15   would appear in the schedules and statements.

16           MR. MARTIN:  Your Honor spoke about hamstringing in

17   terms of the selection of counsel.  I would posit that not

18   giving us financial advisors -- not retaining financial

19   advisors at this time, not allowing assumption of the Pinnacle

20   contract, accomplishes that same hamstringing, because now you

21   have counsel without easy access to financial information.  We

22   want to be transparent.  I talked about that at the status

23   conference on October 16th.

24           We chose the U.S. of A. bankruptcy court for openness,

25   for avoidance actions, for transparency to tell our story, and

1  we will tell our story on December 17th.  There are parts of

2  our story that will be difficult to tell, and will remain

3  untold, if we can't have access to Pinnacle, who again, I would

4  toss the question or ask Your Honor to toss the question to the

5  other parties: Do these funds not need a Pinnacle?  Whether --

6  if we -- if the debtor was removed today from management, and

7  we put in Caymans liquidators, would the Caymans liquidators

8  not need Pinnacle, and would they find these terms

9  unreasonable?  We want to mind the store, and if we lose on

10  December 17th, we want to present the best debtor and

11  transition the best debtor that we can on that day.

12        I don't think I have anything else to say on Pinnacle.

13  And with Your Honor's permission, then, I would turn to

14  Patterson Belknap.

15        THE COURT:  Sure.

16        MR. MARTIN:  Your Honor, there's two matters that

17  Patterson Belknap are handling besides the Wilmington Trust

18  matter.  The Wilmington Trust matter, you're absolutely

19  correct, is concluded.  And we attached two complaints as

20  exhibits to Mr. Harvey's certification.  Mr. Harvey is present

21  in court.

22        One is the complaint against Gerti Muho, who is a

23  former director/officer of the debtor, who is alleged -- it's a

24  pretty strong allegation -- to have removed two million

25  dollars, unauthorized, from the debtors' bank account.  Last

1  week, in that action, Mr. Harvey obtained a preliminary

2  injunction and froze over 400,000 dollars at Citibank for the

3  benefit of this estate.  He is in the process of finding more

4  money, HSBC and elsewhere, and we hope and expect that he'll

5  find the entire two million dollars.  To not give Mr. Harvey

6  the benefit of 372(e) retention, under these circumstances,

7  with him actively pursuing litigation for our behalf, I think

8  is not appropriate.

9       The other action is an action against Deborah Midanek,

10 also a former director of the debtors, for breach of a

11 confidentiality agreement and for damages.  That action is

12 proceeding at pace, in the United States District Court for the

13 District of New Jersey.  And the Muho action is Southern

14 District of New York.

15      And the prosecution of that action is related to all

16 the other -- without getting into them, it is related to the

17 matters Your Honor will be considering on December 17th.  And I

18 will rely on Mr. Harvey's help and guidance in keeping me up to

19 speed and doing what he needs to do in that action.  So again,

20 under those circumstances, with those two offensive litigation

21 actions that he's pursuing on behalf of these debtors, we would

22 ask that he have the comfort, at least, of knowing he can be

23 retained, recognizing that fees are for another day.

24      THE COURT:  You understand why I'm not crazy about

25 having somebody working for the benefit of the estate and not

1  having some comfort that his firm would get paid for it.

2          MR. MARTIN:  Yes, Your Honor, I appreciate that.

3          THE COURT:  Let me confirm my understanding on what

4  you just said.  From what I heard, on the first of the two

5  non-Wilmington Trust matters that you were talking about, your

6  opponents, the guys at the other table, would have a shared

7  interest in success in that litigation, if the guy did, as

8  alleged, rip off the estate for two million bucks.

9          MR. MARTIN:  Absolutely.

10          THE COURT:  But on the second one, it sounded to me

11  like you were trying to use Patterson Belknap to act contrary

12  to your opponents, and it would be less likely that they would

13  endorse that aspect.  Of course I'm going to hear their

14  perspective, but I want to hear yours.

15          MR. MARTIN:  I think that's accurate.  The action,

16  just to put it in perspective, the first of those two actions

17  was filed post-petition.  And as I mentioned, the injunction

18  against the Citibank funds was obtained by Mr. Harvey last

19  week.  The second action we spoke about, which involves one of

20  the opponents, was filed by Mr. Harvey in either the spring or

21  summer.  So it predated these petitions, and frankly, pre-dated

22  my knowledge of these debtors.  So it hasn't been trumped up,

23  post-petition, to help in the litigation.  It's a matter that

24  existed and was proceeding apace, and we would like to continue

25  Mr. Harvey's work on that matter.  I believe there are motions

1  to dismiss, scheduled for November 18th, that Mr. Harvey has to

2  argue in Camden.  And there's work to be done.

3        THE COURT:  I understood from what you said, rightly

4  or wrongly, that he got a pre-judgment attachment.  If you

5  know -- and I'll let you ask Mr. Harvey if you don't -- are

6  there other potential gains to the estate that might be

7  advanced if I were to allow him to continue to act before the

8  17th of December?

9        MR. MARTIN:  Do you want to -- may Mr. Harvey address

10  the Court?

11        THE COURT:  Yes, and he can do it directly.

12        Welcome, Mr. Harvey?

13        MR. HARVEY:  Thank you, Judge.  Thank you for your

14  time.  The action against Muho actually arose from the

15  Wilmington Trust action.  Mr. Muho went to Wilmington Trust

16  after he left the debtors, and he tried to withdraw -- transfer

17  five million dollars.  He had created a new entity after he

18  left the debtors, called Leveraged Hawk, Inc.  He went to

19  Wilmington Trust, and he tried to persuade them to transfer

20  five million dollars to Leveraged Hawk.  The bank refused, and

21  brought an interpleader action, claiming that they were unclear

22  as to who had the rights to access the funds.  We intervened

23  and showed the Court, we thought, that Mr. Muho --

24        THE COURT:  The interpleader court?

25        MR. HARVEY:  The interpleader court in Wilmington,

1    Delaware, Superior Court, that Mr. Muho had no such authority.
2    In fact, prior to the hearing, Mr. Muho participated in a
3    telephone conference with the judge, and when he was asked who
4    was representing the corporate entity, Leveraged Hawk, he said
5    I will.  The judge said, well, you're not admitted --
6             THE COURT:  Forgive me for interrupting you --
7             MR. HARVEY:  Yes.
8             THE COURT:  -- Mr. Harvey, I still have a very full
9    courtroom.
10            MR. HARVEY:  Sure.
11            THE COURT:  I'm not so concerned about the merits of
12   the underlying controversy with this guy, especially since he's
13   not here in the courtroom, as far as I know, and I may have to
14   adjudicate it, in the first instance, although I'm not sure if
15   I'd have Constitutional power to issue a final order if it
16   proceeded here.
17            But what I need to know is a narrow question, the same
18   one that I asked Mr. Martin.  Is there stuff that you've got to
19   do immediately to protect the interests of the estate?  Because
20   if you were successful in putting a freeze at Wilmington Trust,
21   then it doesn't -- it sounds like that fire's been put out.  I
22   want to know if there are existing fires that need to be put
23   out, or things that you might do, between now and the 17th,
24   that would cause me to want you to continue --
25            MR. HARVEY:  Yes.

1          THE COURT:  -- to act between now and the 17th of

2    December.

3          MR. HARVEY:  Let me focus my attention on that

4    question, Judge.

5          THE COURT:  Please.

6          MR. HARVEY:  The answer's yes.  U.S. District Court

7    Judge Analisa Torres has entered, not only a TRO, but now a

8    preliminary injunction --

9          THE COURT:  Analisa Torres is here in the Southern

10   District.

11         MR. HARVEY:  That's correct.  She has entered not only

12   a TRO but a preliminary injunction against Mr. Muho.  We have

13   frozen his assets, in excess of 400,000 dollars at Citibank.

14   She has also granted us an order for expedited discovery.  We

15   know that Mr. Muho has more money.  We do not believe, in the

16   span of sixty days, he burned through over two million dollars.

17         We know some things.  We know, for example, he went to

18   Atlantic City, and went to the Borgata casino and spent money

19   there.  We know he also bought a luxury vehicle.  But we also

20   believe that money has been transferred out of Citibank to

21   other accounts.

22         We have a process pending with Citibank to discover

23   what transfers were made out of his accounts to other accounts.

24   We also have served him with discovery, as authorized by Judge

25   Torres.  And we intend to take his deposition later this month.

1   We believe that these discovery tools will help us identify

2   other funds that will come back to the debtor, at some point,

3   that Mr. Muho has taken from HSBC.

4          Essentially, when he failed to get money in

5   Wilmington, he went to HSBC in Monaco, and using what we

6   believe to be fraudulent documents, obtained the two million

7   dollars.  And so we have frozen what we have found in Citibank,

8   because the money was routed through Citibank here in New York.

9   We've frozen what is left.  We are trying to find the other

10  assets.  And Judge Torres has given us expedited discovery to

11  find exactly that, where are the other assets, where are the

12  other monies.

13         And so the problem that we have is that unless we

14  press him, and unless we act expeditiously, he's going to burn

15  through the money.  And the clock is essentially running on us.

16  And so that's why we're trying to act as quickly as we can.

17  We've been trying to serve him.  He's been alluding service of

18  our deposition notice.  And we're trying to get him in on a

19  deposition, and we are using process to obtain other

20  information.

21         THE COURT:  If he's a party, why -- how can he evade

22  service?

23         MR. HARVEY:  Well --

24         THE COURT:  Once you get jurisdiction over a person at

25  the outset of the litigation, you don't need to keep serving

1   him with subpoenas.

2          MR. HARVEY:  That's correct, but Judge Torres has

3   asked us to give him specific notice of the discovery tools and

4   specific notice of the deposition date.  And in order to

5   schedule the deposition, we have to make sure he knows about

6   it, so we don't set up, prepare to take the deposition, he

7   doesn't show up and then claim to Judge Torres later he didn't

8   know about it.

9          So essentially, the clock is running.  We are acting

10  as quickly as we can.  And we are trying to find this money

11  before he continues to spend it.  And we have a very limited

12  window, because he has shown a desire to spend as much of it as

13  he can, on himself, mostly, and perhaps to even start a new

14  business.  And so for that reason we are seeking it.

15         And with respect to the New Jersey action involving

16  Ms. Midanek, she has a contract with the debtors that prohibits

17  her from engaging in conduct that's detrimental to the funds.

18  What we are trying to explore is what monies she took out of

19  the debtors, what payment she has made to herself, what payment

20  she has made to Solon Group.

21         There are cross motions pending.  She has a motion to

22  dismiss.  We have a motion for expedited discovery so that we

23  can get in and take her deposition and obtain documents from

24  her relating to the monies that she has taken out of the debtor

25  and has expended on other matters.

1        And so everything we're trying to do, Judge,

2   everything we're trying to do, is to bring money back into the

3   debtors, not for any other purpose.  So our Muho action is to

4   find funds to bring them back, and our Midanek action is also

5   to find out from her how she spent the funds of the debtor, and

6   try to recover those funds by order of the Court.  And we just

7   have a very limited window.

8        THE COURT:  Okay, thank you.

9        MR. HARVEY:  Thank you.

10       THE COURT:  Mr. Martin, anything further before I give

11   your opponents a chance to be heard?

12       MR. MARTIN:  Yes, Your Honor, just -- I don't want my

13   lack of speaking on it to be deemed acquiescence.  The third

14   item I wanted to speak on was CohnReznick.  And frankly, for

15   all the reasons that I expressed with respect to Pinnacle, it's

16   critical that we have financial advisors who are assured,

17   again, subject to the fee application process -- are assured

18   that, should they do their job and do it well, and Your Honor

19   ultimately finds that it was appropriate, the steps that have

20   been taken, that they have some assurance that they will be

21   paid at that time.  And Mr. Bernie Katz of CohnReznick is in

22   court, if the Court has any questions.

23       THE COURT:  Okay.  Mr. Glenn, do you want to be heard

24   first?

25       MR. GLENN:  Thank you, Your Honor.  I'm not going to

1    address the issues of the Porzio retention.  We're going to

2    rest on our papers.  I think the liquidators have some items to

3    add with respect to that.

4          Concerning Pinnacle, we were able to speak with Mr.

5    Smith, and I would indicate that he was helpful; he was

6    cooperative with us.  And our first inclination, when we heard

7    about the Pinnacle retention, was, you know, can't we use 542;

8    why is this necessary?  And what we learned was that it's

9    probably unhelpful, if not useless, to us, because the problem

10   with this debtor is that it essentially does not have many, if

11   not all, of the accounting records that a fund would typically

12   have, since around the 2009 or 2010 time frame.  So what

13   Pinnacle proposes to do, as we understand it, is to roll the

14   company forward, from 2009 to 2013, as if this bankruptcy had

15   never occurred.

16         Now, the problem with that is that it's obviously

17   expensive, it's not going to happen between now and the

18   hearing, and in our view, it sort of begs the question about

19   the fundamental leadership and direction of this company.  Yes,

20   some accounting work will need to be done, at some point in

21   time.  But someone's going to --

22         THE COURT:  Pause, please, Mr. Glenn.

23         MR. GLENN:  Yes.

24         THE COURT:  By whom?

25         MR. GLENN:  Well, that's the question.  That's the

1   question; under whose direction?  To cite one example --

2         THE COURT:  Well, under whose direction is not the

3   same question as by whom.  On one side, you have the guy or

4   woman who's giving the orders, and on the other hand, you have

5   the company that's taking the orders.

6         MR. GLENN:  Correct.  Correct.

7         THE COURT:  And I well understand your problems and

8   the JOLs problems with who's giving the orders, but I'm trying

9   to get my arms on who's going to take the orders, and whether

10  orders should be taken between now and the 17th.

11        MR. GLENN:  Well, two responses to that, Your Honor.

12  Most, or a significant portion, of the accounting that needs to

13  be done is questions regarding inter-fund and intra-fund

14  transfers within the Fletcher family of funds, both that are

15  debtors before Your Honor in this case, the cases under Mr.

16  Davis' auspices, the BVI companies that Ms. Midanek is running.

17  And it could very well be the case that the cost of doing this

18  process outweighs the benefit of it.  We could explore subcon

19  (ph.).  We could disregard all these intercompany claims.  The

20  creditors and redeeming investors, such as my client, could get

21  together and come up with a global resolution in this case

22  without undertaking that process.

23        And it's important to understand that the amount that

24  they want to charge for this is based on a variety of

25  assumptions that very well may not prove to be true, that there

1    are accounting records that would allow them to reconstruct and

2    roll forward the company's books and records, calculating the

3    net asset value of each fund, on a quarterly basis, from the

4    time Pinnacle was supposed to start working until today.  So

5    there's no guarantee that 240,000 dollars is going to be the

6    extent of the work that needs to occur.

7          I don't want to prejudice their litigation position by

8    my objection to this, and their position with the U.S. Trustee,

9    so consistent with Your Honor's indication, we would support an

10   extension to file schedules, and we would not use the fact that

11   they didn't file their schedules, within a certain amount of

12   time, against them on the 17th.

13         But what I think the critical issue here is, Your

14   Honor, the fact that the company doesn't have these books and

15   records since 2009 and 2010, is what it is.  That was the case

16   as of the petition date.  And whether they could rectify that

17   between now and December 17th, begs the question of why these

18   books and records didn't exist for years before these debtors

19   filed Chapter 11 petitions.  So --

20         THE COURT:  Pause, please, Mr. Glenn.  You talked

21   about issues vis-a-vis intercompany obligations and

22   intercompany transfers, or potential intercompany transfers.  I

23   had another case on my watch for a couple of years, Adelphia.

24   Your firm was actively involved; I'm not sure if you personally

25   were --

1          MR. GLENN:  I was.

2          THE COURT:  -- as involved as some of the others.  One

3   thing we learned in Adelphia was that doing the schedules and

4   statements required not just getting one's arms around the

5   obligations to the outside world, but getting one's arms on the

6   intercompany obligations.  Do you have a view, one way or the

7   other, as to whether any accurate schedules and statements

8   could be done, until there was more either forensic analysis,

9   or otherwise, vis-a-vis the intercompany obligations?

10          MR. GLENN:  Do I have a view as to whether an --

11          THE COURT:  Or am I going to have a situation, as I

12   did in Adelphia, where it was almost two years before schedules

13   and statements filed because of the inability to get

14   intercompany obligations fixed with satisfactory certainty.

15          MR. GLENN:  I don't think this debtor is anywhere near

16   as complicated as Adelphia, based on very preliminary

17   indications and my informal conversation with Mr. Smith, who

18   was helpful about this.  But there's no definitive end in sight

19   for this process, and I don't have any confidence that it can

20   be done before December 17th.  To my mind, this company is

21   divided into buckets.  It's a fund-to-funds investment vehicle.

22   So the third-party investments, if they exist, as has been

23   described to us, are in reputable, major, international hedge

24   funds.  We certainly can get accounting statements from those

25   funds, because they're provided to all their investors,

1   including the debtors and other people.  The cash is sitting in

2   Wilmington Trust; we hope it stays in Wilmington Trust, despite

3   some of the issues that have been described to us.  So the only

4   real issue here is what do we do with these inter-fund claims.

5   And I think that, as a matter of confidence in the process and

6   in the integrity of the process, that can't be done without

7   second guessing, without the possibility of significant regret

8   about the cost and the direction, in our view, without a true

9   independent fiduciary to run it.  Otherwise, if an independent

10  fiduciary is appointed by this Court, if the case moves to the

11  Cayman Islands, under the auspices of the liquidators, they're

12  going to have to revisit what has been done.

13         So in my estimation, if they're doing this for us, so

14  that we can get a snapshot of what this company is about, in

15  the next quarter or so, we don't want the money spent.  Okay.

16  We're going to freeze the record, as of the petition date.

17  We're not going to use the fact that they didn't do this post-

18  petition as some nefarious issue that independently warrants a

19  trustee or dismissal of the case in favor of the Caymans.

20         But given the cloud over these cases, and in my view,

21  the almost certainty, if the Court does appoint a third party

22  or the JOLs are running this case, that it's going to be second

23  guessed, there's going to be a do-over, why waste that money?

24  Let's do this right.

25         The Court scheduled this hearing for December 17th,

SOUNDVIEW ELITE LTD., et al.                    28

1   based on a variety of issues: the government shutdown, as I
2   understand it.  And the case is being drawn out.  We shouldn't
3   use this stub period to sort of fill in that space, like gas
4   occupying a room, just because we have it.  Let's sort out
5   who's going to run this case and agree with that person, be it
6   Mr. Fletcher, be it a trustee, be it the JOLs, about the right
7   way to do this once and to do it once correctly.

8           With respect to Patterson Belknap, I'm going to divide
9   this into two pieces.  One is the Wilmington Trust and Midanek
10  actions, and the other is the Muho actions.

11          With respect to Midanek and Wilmington Trust,
12  Wilmington Trust, those funds are now frozen.  That case, as we
13  understand it, is on a suspense calendar.  Nothing is going to
14  happen in that case for the foreseeable future.  Whether Ms.
15  Midanek should remain in place begs the question, almost, about
16  the outcome of the trustee motion.  That case, as we understand
17  it, in New Jersey, is yet another struggle about who's supposed
18  to be running the funds, what authority Ms. Midanek had versus
19  Mr. Fletcher.  That's going to be sorted out between now and
20  we're on December 17th.  Again, if an independent fiduciary is
21  running this debtor, that person should have the right to
22  review the Midanek action and decide whether to move forward.
23  But it seems to us that it begs the question of who's going to
24  be running this fund and whether there really is a true dispute
25  over Ms. Midanek's stewardship of the funds she's running and

 1   the Soundview funds before the Court.

 2           THE COURT:  I'm confused then, Mr. Glenn; I'm not sure

 3   which way that cuts.  I thought there were allegations that Ms.

 4   Midanek was ripping off the estate, just like Muho was.  If I

 5   misunderstood that, you or the others can help me.  But if it

 6   is a matter of stuff that you or your allies might have the

 7   same gripes against her that the existing management has, that

 8   Mr. Harvey's quarterbacking, I'm not sure whether I should fire

 9   Mr. -- not fire -- Mr. Harvey, I mean no disrespect.  I wonder

10   if I should put Mr. Harvey's Patterson Belknap firm on hold

11   while things clarify, or whether it advances the joint interest

12   to allow him to continue between now and the 17th.

13           MR. GLENN:  I fundamentally disagree with the

14   assertion that Ms. Midanek has ripped off these debtors.  If

15   that were the case, we'd see a motion for an order of

16   attachment like we saw in the Muho action, and I'll get to that

17   in a moment because I have very different concerns about that,

18   and based on what I've heard, I'm ready to revisit our position

19   with respect to that.  But there's no proof that we've seen

20   that Ms. Midanek took any money out of this company that she

21   wasn't entitled to.

22           The allegations that I've seen or that she might have

23   overcharged fees or that people disagreed with business

24   decisions she made but she's from a reputable firm in the

25   United States, she worked on many, many Chapter 11 cases, she's

1   a member of our community and I haven't seen proof of anything

2   either way but I'm very skeptical that Ms. Midanek should be

3   classified anywhere near where we see Mr. Muho and what he's

4   done.

5          Ms. Midanek was appointed by Mr. Fletcher as was Mr.

6   Muho as we understand it but the court in the British Virgin

7   Islands has reaffirmed her right to run the British Virgin

8   Island funds, not before Your Honor.  She filed a liquidation

9   petition in the Cayman Islands, which, as we understand it,

10  divested her of authority -- any authority with respect to the

11  debtors before Your Honor.  So if she were engaging in any

12  nefarious conduct, the last place she'd run is to a court that

13  would supplant her authority and investigate her.

14         So there are no guarantees of anything in life but we

15  are very, very cynical of an allegation that she's stolen or

16  siphoned away any money from the estate and there are none that

17  have risen to the level that Mr. Muho has engaged in.

18         THE COURT:  Is a corollary of what you just said that

19  you see no urgency in proceeding against Ms. Midanek?

20         MR. GLENN:  That's correct.  And she's party to the

21  proceedings before Your Honor.  So Your Honor can -- and she's

22  being deposed, I believe, after court today.  So if anyone

23  comes to us and identifies any improper transfer, we'll be

24  right back here before Your Honor to support that petition

25  because we're not going to bite our nose to spite our face and

1   that's a good segue into Mr. Muho.

2           As we understood it, when the Patterson Belknap

3   application had been filed, before that time, we understood

4   that there was litigation between Fletcher and Muho.  That was

5   out in the open in Delaware.  We were not aware of this two

6   million dollar transfer from Monaco to Mr. Muho until the

7   Patterson Belknap application was filed.  We saw that there was

8   an order of attachment and we saw that there were funds

9   attached and we understood that the work was essentially done

10  and that that would be frozen and we could wait until December

11  17th.

12          If there's a deposition to be done between now and

13  December 17th, if their serviced to be issued to Mr. Muho, if

14  there's other activities that need to be done to freeze those

15  assets, we would withdraw our objection to allow those things

16  to happen between now and December 17th.

17          If they can identify more assets, great.  It should be

18  on an agreed upon basis so that we keep the ship righted.  And,

19  again, we're not going to stop them from doing that and we

20  would withdraw our objection to allow whatever minimum amount

21  of work needs to be done between now and the 17th so that the

22  estate's rights are not prejudiced in that interim period.

23          Concluding with the CohnReznick firm, there's

24  absolutely nothing in that application and there's nothing in

25  the reply to our objection indicating any urgency in moving

 1   forward with that firm between now and December 17th and

 2   there's nothing that counsel has articulated today.  If there

 3   is anything, we'd like an opportunity to be heard with respect

 4   to that but we think that that firm's retention can wait

 5   without prejudice to anyone between now and December 17th.  And

 6   I'm sure if we make a contrary point on December 17th, Your

 7   Honor will remind us of the position we took today.  We're not

 8   going to do that.

 9            THE COURT:  Okay.

10            MR. GLENN:  Thank you.

11            THE COURT:  Now, let me hear from JOLs.  Mr. Engel?

12            MR. ENGEL:  Yes, Your Honor.

13            I generally agree with Mr. Glenn and as to the Muho

14   situation, I agree as well that can go forward.

15            Speaking to the Midanek situation, if you look at that

16   closely as we do, you will see that this is another Mr.

17   Fletcher controlled governance fight.  This time it involves

18   BVI and indirectly the Caymans as well.  There's absolutely no

19   reason for this Court to allow the debtors to start another

20   governance by -- it is totally counterproductive and ill-

21   advised for lots of reasons and certainly doesn't need to

22   happen between now and December 17th.  There's no reason for

23   that at all.

24            The JOLs have their own investigations.  We look at a

25   variety of things and we think that the Deborah Midanek

 1  situation is the lowest point of investigation of our concerns.
 2  And, basically, she's a whistleblower and this is a retribution
 3  is the way it appears to us.

 4      As to the CohnReznick situation, I totally agree with
 5  Mr. Glenn.  There is no basis for that and whatever work they
 6  did would have to be redone.  After the 17th, it would be not a
 7  productive expenditure.  Having been through depositions in the
 8  last week with three of the directors, I see no basis for
 9  CohnReznick to be needed for the 17th at all.  I'm sure they
10  have some ideas but they're not apparent to me and I was
11  looking for them as we went through that discovery process.

12      So we strongly oppose the Belknap Midanek situation,
13  we oppose CohnReznick.  And as to Porzio, let me clarify our
14  objection.

15      It was not to keep them from their work on the 17th.
16  We heard Your Honor.  We understand the debtors' rebel
17  government in exile needs to be represented by counsel.  Fine.
18  They can do that on the 17th.  But what's happening, in fact,
19  is far beyond that and it -- it is objectionable beyond that.

20      And so, for example, I'd invited Warren to update his
21  conflict disclosures because there's new information that the
22  Court should have that we think bears on all this which is the
23  fact that Porzio is representing at least two of the three
24  directors, officers, managers, the Fletcher team, personally.
25  And the third one is a money situation -- I can explain to you,

1    if you wish.  They may or may not be representing Mr. Saunders

2    but they are representing Mr. Ladner and they are representing

3    Mr. Fletcher individually and we think that that's

4    objectionable and creates all sorts of conflicts.

5           From our perspective, we're investigating Mr.

6    Fletcher, we're investigating Mr. Ladner and they're not just

7    potential defendants, they're also claiming to be creditors,

8    they're seeking indemnification, they're defense is to

9    indemnification.  How can debtors' counsel represent

10   individually those insiders under these circumstances?  I've

11   never seen that allowed as a matter of disinterestedness.  So

12   we have that concern with respect to Porzio.  So it's really

13   the scope of what it is that Porzio is doing that is the issue

14   here today not their defense on the 17th.

15          We're not trying to resist what Your Honor told us you

16   wanted to have happen.  We're accommodating that perspective;

17   we just don't want to get it out of control.  And what's really

18   blown this whole thing up, frankly, is the fact that they are

19   intermeddling in the -- someone for the debtor and in due

20   course we'll find out who, is intermingling and meddling in the

21   Cayman Islands in a very serious way.

22          The thing that distinguishes this case from all the

23   other cases that you're talking about is that we're here in

24   part because CIMA wants us here; the Cayman Islands Monetary

25   Authority.  The sovereign regulator of these Cayman companies

1  wanted the JOLs to be appointed.  They missed that whole point

2  in their opening affidavits the first day -- you still don't

3  understand from them in their papers why their role is seen as

4  so critical here but we have sovereign issues here with a

5  regulator who's never been stayed because of 362(b)(4) and

6  other reasons and yet they're telling -- they're instructing

7  people in Cayman not to answer our questions, not to cooperate

8  with involun --

9          THE COURT:  They, to whom you made reference, leads

10  that program?

11         MR. ENGEL:  The debtors, and they include the Porzio

12  firm, I believe, have told Stuarts, for example, not --

13         THE COURT:  Who is Stuarts?

14         MR. ENGEL:  That's a law firm in the Cayman Islands,

15  Your Honor.

16         THE COURT:  Acting for whom?

17         MR. ENGEL:  Acting for the debtor; Soundview in the

18  Caymans.  They were party to the action in the Caymans.  And

19  under Cayman law, they're accountable to the JOLs.  They're

20  supposed to cooperate with the JOLs, they're supposed to turn

21  over records.  And what's going to happen, I suppose, is that

22  CIMA is going to have to -- to go to their Cayman people.  If

23  we're not -- if we're supposedly stayed for asking for

24  information, which is what we're doing, and trying to do it

25  informally rather than trying to use discovery, we'll, I guess,

SOUNDVIEW ELITE LTD., et al.                    36

1   have to have CIMA do it.  I mean they're certainly not stayed.

2          From the Cayman perspective, this meddling in the

3   Caymans is a serious, serious sovereign issue.  And the worst

4   part of it, economically, and I'm sure this alarms the real

5   parties-in-interest here, the major investors, is HSBC came and

6   told CIMA that someone, a "a director" was trying to move

7   assets out of the Cayman Islands.  Now, they deny there even

8   are assets in the Cayman Islands but we believe there are, we

9   believe that's the registered place where HSBC came into hold

10  the securities.  We can't have people moving assets out of the

11  Cayman Islands between now and the 17th.  This was supposed to

12  be a status quo maintenance situation.  And we can't get HSBC

13  to talk to us because they're told by Porzio they're violating

14  the stay.  Everybody's afraid of the stay.  But it doesn't

15  apply to CIMA and it doesn't apply to CIMA's agents and we

16  don't think it should apply to the JOLs either.

17         So what I'm suggesting to Your Honor, is not that

18  Porzio doesn't represent them on the 17th, I'm not trying to

19  change history and I'm not trying to move back -- the last

20  thing I want to do is move back the date, what I am suggesting

21  is that the legitimate scope of what they're doing should be

22  narrowed to what they're supposed to be doing in the interim

23  period which is getting ready for the 17th.

24         We have never tried to restrict them for what they

25  tried to do on the 17th here.  We're just trying to keep the

 1  scope of it to that.  And Mr. Martin is correct, maybe I should
 2  have filed a request for a protective order and that seems a
 3  lot of cumbersome more expensive, et cetera, than just trying
 4  to address this question directly to Your Honor but
 5  fundamentally, there's going to be unnecessary conflict if the
 6  scope of that representation continues to expand into the
 7  Caymans.
 8          And what triggered all this is that there's an
 9  upcoming motion to hire Stuarts.  Well, as soon as that happens
10  over objections, I expect, we then get into some really
11  interesting questions because, for instance, if they try and
12  use Stuarts as an expert up here, then the question becomes
13  experts don't have privileges anymore, now, we're cross-
14  examining our own debtor on our own privilege to waive the
15  privilege.  I mean it's counterproductive, right?  I mean,
16  the -- things are getting out of control.  Your Honor should
17  understand that.  The scope of what Porzio was doing should be
18  limited in a reasonable way and that's my major concern for
19  Your Honor today.  Do you have any questions?
20          THE COURT:  Not that I didn't already ask you.
21          MR. ENGEL:  I'm sorry.
22          THE COURT:  Not that I did not already ask you.
23          MR. ENGEL:  Thank you.
24          My colleague has a brief comment on Pinnacle and then
25  we're --

1          THE COURT:  Mr. Hildbold?

2          MR. HILDBOLD:  Good morning, Your Honor.  Billy

3   Hildbold on behalf on the JOLs.

4          We also had a productive conversation with Mr. Smith

5   and we did not file an objection because it was our

6   understanding that the books are in such disarray that they

7   needed someone to be working on them and it was our

8   understanding that it was going to take a while to get this

9   done.  We were not led to believe that this would be done by

10  the 15th but that this was an ongoing project.

11         We do have concerns, the same concerns that Pasig

12  raised about revisiting the costs and understanding that at the

13  end of the day it's largely Pasig's dime so we are concerned

14  about this and --

15         THE COURT:  I'm losing you in pronouns.  You're

16  concerned about what?  I thought you said half-a-second ago

17  that you weren't objecting to the Pinnacle retention.

18         MR. HILDBOLD:  Right.  We did not object because --

19  because of the disarray of the books but we do have concerns

20  about the cost.

21         THE COURT:  So your problem is not that Pinnacle

22  serves, it's the price at which Pinnacle would serve.

23         MR. HILDBOLD:  Right.  Mostly because we weren't made

24  aware of the negotiations that took place, how this price was

25  arrived at.  As Mr. Glenn said, from what we understand, it was

1  largely based on assumptions to get this work completed by the

2  15th.

3           THE COURT:  The 15th of what?  I lost you.

4           MR. HILDBOLD:  I believe November 15th to the

5  schedule.  Correct?

6           THE COURT:  Oh, the debtors' existing deadline for

7  filing schedules.  Is that right?

8           MR. HILDBOLD:  Right.

9           THE COURT:  Well, what about the point that I asked

10 Mr. Glenn?  If you have intercompany obligations, do you think

11 the best accounting firm in the world could do schedules and

12 statements before the 15th or any date before the 17th or any

13 date before the summer of 2014?

14          MR. HILDBOLD:  We don't know that it's that

15 complicated, as you described earlier in Adelphia, but we do

16 have concerns that this could not be completed by the 15th.

17          THE COURT:  All right.  I'm losing my bearings in this

18 to a certain extent.  I'm trying to get my arms around the

19 extent, if any, to which I still have objections to the

20 retention of Pinnacle as a conceptual matter and apart from

21 that, as a level two issue, whether there is agreement that

22 Pinnacle's fine, nobody's said anything bad about Pinnacle

23 itself, whether people simply want to have the opportunity to

24 have input as to its cost.

25          MR. HILDBOLD:  Let me make sure I under --

 1          THE COURT:  And I want just not -- I want not just

 2   your position but your understanding of the other guy's

 3   position.

 4          MR. HILDBOLD:  I think my understanding from Mr. Glenn

 5   is that this is not -- they're not capable of completing this

 6   before --

 7          THE COURT:  "They" being Pinnacle?

 8          MR. HILDBOLD:  Yes, sir.  That they are not capable of

 9   completing this before the 17th and, therefore, their retention

10   should not go forward before then because it's not required.

11          THE COURT:  Um-hum.  And your view is to what extent

12   similar and to what extent different?

13          MR. HILDBOLD:  I believe that our position is similar,

14   although as the JOLs, we recognize that at some point this work

15   will likely need to be done.

16          THE COURT:  And that Pinnacle would be good as any an

17   entity to do it?

18          MR. HILDBOLD:  As far as we know at this time.

19          THE COURT:  Um-hum.  All right.  Anything else?

20          MR. HILDBOLD:  No, sir.

21          THE COURT:  All right.  Ms. Ostad and then I want to

22   hear from Mr. Zipes.

23          MS. OSTAD:  Good morning, Your Honor.

24          I omitted to mention when I introduced myself this

25   morning that I also represent the Solon Group, Inc. and Deborah

1    Midanek, its principal.

2         And to correct something that Mr. Martin said earlier,

3    it is actually the Solon Group and not Ms. Midanek in her

4    personal capacity that was appointed at the request of Mr.

5    Fletcher to be a director of a number of the Richcourt funds

6    including these debtors and who essentially resigned from these

7    debtors' boards in order to bring creditor petition on behalf

8    of the BVI entities that Solon is the director of in the Cayman

9    Islands.  And unfortunately, it was because Ms. Midanek had the

10   audacity to see that she had fiduciary duties to investors and

11   brought those petitions that she was sued in her individual and

12   personal capacity in late July in the District of New Jersey on

13   allegations of --

14        THE COURT:  Which vicinage?  Down in Camden did I hear

15   somebody say?

16        MS. OSTAD:  I believe so, Your Honor.  I'm not counsel

17   in that case.  It is pending in federal court in the District

18   of New Jersey --

19        THE COURT:  Um-hum.

20        MS. OSTAD:  -- on claims of disparagement, breach of a

21   confidentiality provision of her contract as a director and for

22   damages relating to those.

23        Your Honor may have noticed that I involuntarily

24   jumped out of my chair earlier and that is because it is for

25   the very first time during Mr. Harvey's addressing the Court

1    that I've heard that there's even a mention or a question of

2    Ms. Midanek taking monies from these debtors in an unauthorized

3    manner.

4          I should note to the Court that there are nine

5    accounts aside from the six accounts that are frozen to these

6    debtors at Wilmington Trust, there are nine other accounts

7    which include the accounts that my client is -- well, BVI

8    entities that are my clients and Solon is a director of that

9    are also frozen at Wilmington Trust that are not the subject of

10   these proceedings.

11         It is because of those frozen accounts that we've been

12   very, very judicious in my involvement in these cases, my

13   filing of pleadings in these cases and so forth because we're

14   dealing with funds that also Solon is the director of that are

15   themselves in need of an orderly wind down.

16         So it's my belief, Your Honor, and I've asked the

17   debtors' counsel on several occasions in the past few weeks

18   that we agreed to stay those New Jersey proceedings because

19   there's no prejudice in waiting until after the December 17th

20   hearing because I believe that another fiduciary, if there is

21   one appointed, will make different decisions about whether

22   those suits should -- that suit should proceed.

23         Ms. Midanek's separate counsel has moved to dismiss

24   that proceeding or in the alternative to stay it or have the

25   Court abstain pending the outcome of these proceedings.

1         After those --

2         THE COURT:  But those -- normally when I'm staying

3    another court, I do it in more gentlemanly way.  I pick up the

4    phone to the district judge or whoever it is and say, hey,

5    listen, I don't like to stay you but I would appreciate it if

6    you would put things on hold for a while and I assume that from

7    your perspective that would skin the cat.

8         MS. OSTAD:  I believe it would,  Your Honor, but it's

9    only be after we've had, through other counsel, to brief

10   matters before that court now and the debtors have also made

11   emergency requests for expedited discovery there, none of

12   which, I was told, seek to have discovery about monies being

13   taken but simply to explore jurisdictional and related issues.

14   And again, in the interest of economy of these debtors' assets

15   and others, we'd ask for those matters to be stayed.  And it

16   really -- the denial of that request has fueled our concerns

17   that this is a personal vendetta to make matters as expensive

18   as possible for Ms. Midanek.  Unfortunately, these are

19   indemnifiable actions but --

20        THE COURT:  Indemnifiable actions are, nevertheless,

21   pre-petition debts and there is not easy way to make any

22   payment on indemnifiable obligations.

23        MS. OSTAD:  Yes, Your Honor.  It would be acceptable

24   to us to freeze those proceedings or stay them pending the

25   outcome of the December 17th hearings, Your Honor.

 1          THE COURT:  Let me rephrase the question, Ms. Ostad.

 2          Can I, in fairness to both sides, if I tell Mr. Harvey

 3   that he's got -- he doesn't yet have authority to act in the

 4   Midanek action, can I do that in a way that doesn't prejudice

 5   the company in the event that you're view of the world isn't

 6   the only view of the world?

 7          MS. OSTAD:  I believe that, perhaps, we can agree that

 8   the matters that are before the New Jersey court in connection

 9   with Ms. Midanek's motion to dismiss or stay has been fully

10   briefed by both sides.  That's my belief and that the matter is

11   subjudice without further oral argument unless it's requested

12   by the district court --

13          THE COURT:  To what extent have issues already been

14   fully briefed in that action?

15          MS. OSTAD:  With respect to the motion to dismiss,

16   they have been fully briefed.

17          THE COURT:  And that's a motion that you filed or your

18   co-counsel filed?

19          MS. OSTAD:  My co-counsel filed, yes.  And there is a

20   separate motion for expedited discovery that I believe is

21   returnable on the 18th of November there that has, I believe,

22   been opposed by my co-counsel and we has just informally

23   requested --

24          THE COURT:  Opposed?

25          MS. OSTAD:  Opposed.  And we have been formally

1    requested that parties agree to simply hold that discovery in

2    abeyance pending the outcome of the December 17th hearing.

3            I believe we can agree that if it is held in abeyance,

4    that there is no prejudice to either side in seeking it again.

5            THE COURT:  Who is the named plaintiff in the Midanek

6    action?

7            MS. OSTAD:  Deborah Midanek.

8            THE COURT:  She's plaintiff?

9            MS. OSTAD:  I believe it's Deborah Hicks Midanek that

10   is the named plaintiff.

11           THE COURT:  Oh, I thought she was the defendant.

12           MS. OSTAD:  Oh, I'm sorry; Your Honor, I misspoke.

13           The named plaintiffs are fifteen funds which -- six of

14   which are the debtors and nine of which are other Richcourt

15   funds, all of whom have Fletcher Asset Management or related

16   management companies as their managers and all of whom have Mr.

17   Fletcher as a director.

18           THE COURT:  What name for that lawsuit would be

19   meaningful to the New Jersey District Judge?

20           UNIDENTIFIED SPEAKER:  The plaintiff is attached to

21   Mr. Harvey.

22           MS. OSTAD:  I believe it's In re Richmond -- Richcourt

23   Funds, Limited, et al., but I'm not positive.

24           THE COURT:  Richcourt -- all right.  It's in the

25   Harvey affidavit?

SOUNDVIEW ELITE LTD., et al.                    46

1          UNIDENTIFIED SPEAKER:  Yes.  Attached to the Harvey

2     affidavit and --

3          THE COURT:  All right.  That's good enough.  If I

4     decide to go that route, I got what I need.  All right.

5          Anything else, Ms. Ostad?

6          MS. OSTAD:  I would be happy, Your Honor, to provide

7     the court clerk with the case number as well.

8          THE COURT:  Um-hum.  Anything else?

9          MS. OSTAD:  Other than that, Your Honor, we support,

10    and have not filed separate papers, but support the objections

11    that have been filed to the various retention applications.

12         THE COURT:  All right.

13         MS. OSTAD:  Thank you.

14         THE COURT:  Mr. Zipes?

15         MR. ZIPES:  Greg Zipes with the U.S. Trustee's Office

16    on what is sort of a side issue in connection with all this

17    litigation.

18         My office did agree to a deadline.  It's part of a

19    back-and-forth that typically takes place with debtors and

20    until the debtors are displaced in some fashion we deal with

21    the hand we're dealt.  Obviously, it's not a court order it's

22    just a promise that we won't do something before that date

23    based on a failure by the debtor.

24         If the debtor is having specific issues with filing

25    schedules -- and we always work to get those filed as quickly

SOUNDVIEW ELITE LTD., et al.                    47

1    as possible and everybody is usually on board with that, more

2    transparency is better than less transparency.  But if there is

3    some issue or if there's a money issue or something like that,

4    we'll typically approach the debtor and ask, is there some

5    portion of the schedules that can be filed, or is there

6    something that can be filed to at least give some disclosure in

7    the meantime.

8           And we did -- if we knew that this was a specific

9    issue in this case, we might have recommended, and we do

10   recommend that perhaps some middle ground could be met with the

11   schedules so that something's on file if the work has been

12   done, subject to review and subject to revisiting if there's a

13   change in control of this debtor at some point in the near

14   future.  And obviously, having that information out in some

15   form may be helpful at the next hearing.

16          And I've heard the parties, that they're not going to

17   use this filing of schedules as evidence or lack of evidence of

18   bad faith, and so it would just be another piece that this

19   Court can use in deciding whether -- what to do when the

20   hearing occurs on the 17th.

21          THE COURT:  Um-hum.

22          MR. ZIPES:  So we would obviously defer to the Court

23   if the Court wants to extend times for the schedules.  And we

24   wouldn't require a separate application in that regard.

25          THE COURT:  Um-hum.  Do you have a position vis-a-vis

1    what Mr. Engel said about Porzio not being disinterested?

2            MR. ZIPES:  Your Honor, I didn't review that retention

3    application.  All I can say is that if there was some lack of

4    disclosure, my office would be very concerned about that.  And

5    I --

6            THE COURT:  I think the problem is exactly the

7    opposite of lack of disclosure.  His contention is that what

8    was duly disclosed is a disabling cup.

9            MR. ZIPES:  And, Your Honor, we are faced with that as

10   well.  And oftentimes we'll ask for disclosure without fully

11   understanding that we don't have the background of the

12   creditors.  If it turns out that there was a disabling -- this

13   is a disabling conflict, then obviously we'll review the

14   situation and bring it to the Court's attention, if other

15   parties don't do so in the meantime.

16           But for example, if funds come from a third party to

17   fund the debtor, we'll ask for a disclosure of that fact and

18   then someone might subsequently come forward and say, well,

19   that -- that actually is creating a conflict in the case, we

20   didn't necessarily recognize it as such when the disclosure was

21   made.  So --

22           THE COURT:  All right.  Folks, I've heard plenty.

23           But I want to hear, Mr. Martin, your views and your

24   position on the allegation of disinterestedness deficiencies.

25           MR. MARTIN:  Thank you, Your Honor.  And with all due

1  respect, I think Your Honor -- and I'll repeat it.  Mr. Engel

2  can correct me if I get it wrong.  But I think Your Honor

3  misunderstands Mr. Engel's new allegation.  And it is a new

4  allegation.  It is not a disclosure.  It is not a disqualifying

5  conflict that has been disclosed.  It is something that has not

6  been disclosed.  And let's talk about it precisely and clearly.

7          The debtor presented two officers and a corporate

8  secretary for depositions over the last week.  A third of those

9  depositions of Mr. Fletcher was concluded yesterday.  At each

10  deposition at some time during the deposition the party

11  examining the witness asked the witness, who's your lawyer, and

12  the witness responded Porzio, Mr. Martin.  And the questions

13  then proceeded to, well, are they representing you in your

14  individual capacity, or in some other way.  And in each case I

15  put a representation on the record that pursuant to typical

16  indemnity agreements between companies and directors, the

17  company -- for purpose of today's deposition, the company is

18  providing a defense.  That's it.

19          Five minutes before we came up to see Your Honor today

20  Mr. Engel said, would you put on the record -- would you

21  announce -- and frankly, we just didn't get to it -- that

22  you're representing the individuals.  And I intended to

23  disclose exactly what I just disclosed, which is at those

24  depositions, the company, the corporate officers and

25  directors -- and that was the capacity in which the company was

1  representing them -- did not have separate individual counsel.

2          I, frankly, don't know of a single question and/or

3  answer that somehow created some personal liability for some

4  individual.  If I've been ambushed in some way and there's some

5  law that I'm about to be made aware of that a company should

6  not, it's inappropriate.  The company speaks through their

7  officers and directors.  For me to state on the record that I

8  was -- the company was, in fact, representing them in their

9  capacity as officers and directors for purposes of the

10  deposition, then I'll stand corrected, if that's in some way

11  wrong.  But that's the extent of it.

12          I am not representing individuals parallel to the case

13  in some other matters.  The company provided a defense at their

14  deposition, period.  I'm repeating myself.

15          Is that all Your -- that's the only thing I wanted to

16  say about Porzio.

17          THE COURT:  That's the only thing I need you to say.

18  I won't put a sock in your mouth if you want to say anything

19  else, but we've taken a lot of time on this --

20          MR. MARTIN:  With re --

21          THE COURT:  -- so I think at this point we don't need

22  to say a whole lot more.

23          MR. MARTIN:  All right.  Let me say a couple of

24  things.  I want to describe, because I want to try to get some

25  clarity in the record, in three sentences that hopefully no one

1   would object to, the role and position of Ms. Midanek versus

2   the debtors, because there's been a lot of banter about it.

3       Ms. Midanek is a turnaround professional who Mr.

4   Fletcher brought in in mid-2013 to help these debtors.  He

5   appointed her as a director.  As you've heard, there's sort of

6   two groups of debtors.  Sorry, two groups of Richcourt funds.

7   These debtors fall under the umbrella of the Richcourt funds.

8   There are the British Virgin Islands Richcourt funds and there

9   are the Cayman Richcourt funds.

10      Ms. Midanek succeeded in essentially a takeover of the

11  British Virgin Islands funds and a forcing out of Mr. Fletcher.

12  That was done while she was subject to fiduciary duties to the

13  debtors, a duty of care and loyalty under a signed agreement

14  and a confidentiality agreement.

15      Third sentence, final.  She then used that position as

16  now controlling the British Virgin Islands funds because of the

17  interentity claims; to use those claims to bring the winding of

18  petitions against the debtor in the Caymans to explain to the

19  Cayman's monetary authority all the things that were wrong with

20  Mr. Fletcher, and what, essentially, is what got the other

21  parties up in arms and is why we are here today.

22      So this lawsuit against Ms. Midanek, again, let's get

23  the timing straight, started before winding up petitions in the

24  Caymans, before these bankruptcies.  And Mr. Harvey is our

25  attorney representing us in those.

1          With respect to Pinnacle and Mr. Katz -- and I think
2     there's sort of a -- in my view -- and parties can differ, but
3     in my view ought to be considered together.  We've heard a lot
4     of attorneys saying whether schedules can or can't be completed
5     in time, whether there's enough information, not enough
6     information.  None of the people you've heard from, including
7     me, are really qualified to tell you about that.

8          Suffice it to say we will have schedules on the U.S.
9     Trustee's time frame based on our internal records, with or
10    without Pinnacle.  Would we like to continue to have Pinnacle's
11    help and Mr. Smith, who's been working eight hours a day, as I
12    said, and cleared his calendar, in verifying and getting the
13    best information possible?  Yes.

14         And finally, what are bankruptcy cases about if not
15    assets, and liabilities, and claims?  I need Mr. Katz.  Mr.
16    Katz is a forensic accountant, among other things, and Mr. Katz
17    will be -- we haven't gotten the pretrial order yet, but he
18    will be on my witness list for December 17th.

19         THE COURT:  Katz is a Pinnacle employee?

20         MR. MARTIN:  No, Katz is CohenReznick.

21         THE COURT:  Oh.

22         MR. MARTIN:  Katz is the financial advisor.  So he is
23    the debtors' financial advisor, the debtors' accountant; and to
24    me, it's two sides of the same coin.  So can we do schedules
25    without Pinnacle?  Yes, if we have CohenReznick.  And I suspect

SOUNDVIEW ELITE LTD., et al.                    53

1  Mr. Katz is a professional and will continue to work whether or
2  not you carry his retention, but I don't understand the need
3  for carrying when we are always protected by the fee
4  application process.  Thank you.
5          THE COURT:  Not quite, Mr. Martin.
6          MR. MARTIN:  Okay.
7          THE COURT:  I was dealing with it in conceptual terms.
8  I didn't focus on the terms of the CohenReznick retention.  Is
9  he getting paid on an hourly rate, or is there some kind of --
10         MR. MARTIN:  It's hourly, Your Honor.
11         THE COURT:  An hourly alone, no success fee or any of
12 that stuff?
13         MR. MARTIN:  No success fee.
14         THE COURT:  So all we're talking about is letting him
15 get paid for whatever hours that he works between now and the
16 17th?
17         MR. MARTIN:  That's correct.
18         THE COURT:  Okay.  Thank you.
19         MR. ENGEL:  Your Honor, just one minute?
20         THE COURT:  Yes, Mr. Engel.
21         MR. ENGEL:  Very quickly.
22         THE COURT:  I'll hear you too, Ms. Ostad.  Sit down,
23 please, ma'am.
24         MR. ENGEL:  Very quickly.  Mr. Fletcher was deposed in
25 every capacity, not just as an officer or director of these

1  debtors.  He was also asked questions as a director/manager, et

2  cetera, of other nondebtor affiliates who engaged in wrongful

3  transactions with these debtors.  He was asked questions in his

4  individual capacity as to a variety of other things that we're

5  investigating.  Again, none of this is just a matter of

6  representing a corporate officer as to what he did as a

7  corporate officer.  It was much more wide ranging than that.

8          And frankly, Mr. Fletcher, and the same is true for

9  Mr. Ladner, they have lots of lawyers.  It doesn't have to be

10  Porzio.  And all we're suggesting is that we not create more

11  conflict, because I don't know how --

12          THE COURT:  You're suggesting that at this point in

13  the case I make the debtors' law firm -- the debtor hire a

14  different law firm?

15          MR. ENGEL:  Yeah, that's right.

16          THE COURT:  Uh-huh, all right.  Ms. Ostad.

17          MS. OSTAD:  Your Honor, I would just like to reserve

18  all of my clients' rights with respect to the comments made by

19  Mr. Martin about the takeover of the BVI funds, et cetera, et

20  cetera, and just reserve our rights.  Thank you.

21          THE COURT:  You've got a reservation of rights.

22          All right, everybody sit in place.

23      (Pause)

24          THE COURT:  All right, ladies and gentlemen, my

25  rulings in some respects will be similar, and in other respects

 1   will be different than the tentatives I articulated at the

 2   outset of the hearing.  And because I laid out so much of my

 3   thinking in my questions to all of you, I'm not going to flesh

 4   out the bases for the exercise of my discretion to the same

 5   extent that I might otherwise have done so.

 6         The Porzio retention will be approved, as I said in my

 7   tentatives under 327(a), but I am also ordering that within a

 8   week of this date, or as any reasonable extension beyond that

 9   might be requested, that the Porzio firm, Mr. Martin, you or

10   your designee, file a supplemental affidavit or declaration

11   laying out what you told us on the record today, vis-a-vis

12   exactly who you're acting for and explaining more if you wish.

13   And if anybody had any residual concerns vis-a-vis Porzio's

14   continuing to act, that matter can be revisited as part of the

15   proceedings on the 17th of December.

16         Of course, anything that happens on the December 17th

17   or as a consequence of that hearing could also bear on the

18   counsel situation thereafter, but I am not going to be

19   prejudging that in any way at this point in time.

20         So for the avoidance of doubt the Porzio firm will

21   have full freedom to act as it sees fit, not just with respect

22   to preparation of this -- for the 17th, but also vis-a-vis the

23   things that any 327(a) counsel has to do for the wellbeing of

24   the estate under its watch.

25         I am modifying my tentative vis-a-vis CohenReznick,

1  because with Mr. Martin's explanation it appears to me that

2  CohenReznick may be required to be a testifying witness at the

3  hearing, and the same principles that inform the exercise of my

4  discretion, vis-a-vis allowing Porzio to act for the debtors

5  under their existing management, cause me to believe that it

6  should have the witness support that it requires as well.

7         The continued services of CohenReznick after December

8  17th will be fair game for discussion on that date or

9  thereafter.

10        For the avoidance of doubt I am approving only an

11 hourly rate and I'm not dealing with the more difficult issues

12 that might be associated with any kind of success fee, if one

13 had been requested.

14        Vis-a-vis Patterson Belknap, I am authorizing

15 Patterson Belknap's service under 327(e) with respect to the

16 Muho litigation and anything that might be required to protect

17 the interests of the estates -- estates, plural, correct -- in

18 any battles with Muho.  But the request is denied without

19 prejudice otherwise, including for the avoidance of doubt, the

20 continuation of the Midanek litigation, except that I am

21 authorizing communications to the New Jersey court to advise

22 the New Jersey court of my ruling to avoid prejudice to the

23 interests of the estate on the one hand, or -- and also to

24 avoid any unfair advantage in the other direction on the other.

25        I see no need for services now vis-a-vis Wilmington

1   Trust.  All of these matters that are denied without prejudice

2   are fair game for bringing back to me after we know where we're

3   headed on the 17th of December.

4           Finally, the Pinnacle retention -- or more precisely

5   the motion to assume and assign -- excuse me, not to assume and

6   assign -- to assume Pinnacle arrangements is denied without

7   prejudice, again, until after we get a better handle on things

8   after the 17th, subject to two additional protective provisions

9   that I will impose.

10          First, the time for the debtors to file their

11  schedules and statements will be extended until thirty days

12  after December 17th, subject to further order of the Court and

13  without prejudice to the rights of any party in interest or the

14  U.S. Trustee program, to weigh in on whether further extensions

15  should be granted.

16          Secondly, the parties are encouraged to talk to Mr.

17  Smith or his designee, or anybody else at Pinnacle, to see if,

18  as is very possible, there would be consensus as to the need

19  for useful Pinnacle services.  And I'm going to give you the

20  ability to see if there are areas in which people see an

21  immediate need for Pinnacle to serve, and I certainly have a

22  very open mind vis-a-vis that.

23          My discretion in the Pinnacle respect is informed by

24  the view that I do not see an immediate need for the services

25  that Pinnacle would provide between now and the 17th.  If and

 1  to the extent people did see a need, which, frankly, has not

 2  been shown to me after all the discussion we had today, but

 3  which I would approach with an open mind if it were to occur,

 4  that could affect the exercise of my discretion going forward,

 5  also for the avoidance of doubt.

 6          Nothing has been said to me nor do I find any basis

 7  for questioning the integrity, capability, or anything else

 8  vis-a-vis Pinnacle.  And my exercise of my discretion here is

 9  informed by the corporate governance disputes that permeate

10  this case, and this is nothing personal vis-a-vis Pinnacle.

11          All right.  Not by way of reargument, do we have any

12  open issues, Mr. Glenn?

13          MR. GLENN:  Your Honor, it's not for today, but I

14  don't want my silence to be deemed acceptance.  The Patterson

15  application which we had categorically opposed before the

16  recent update, indicated that the debtors were to pay fifty

17  percent of their fee, and the nondebtors would pay fifty

18  percent even though we represent only six of twelve -- fifteen

19  funds.  And there may be a justification for that, and we'll

20  talk to Mr. Martin to see if that's appropriate, but if it's

21  not, I just wanted to make sure that I wasn't waiving the right

22  to contest any appropriate portion of that.

23          THE COURT:  All right.  You're just looking for a

24  reservation of rights at this point?

25          MR. GLENN:  Right.  Correct.

1          THE COURT:  Okay, Mr. Martin?

2          MR. MARTIN:  I can go further and agree --

3          THE COURT:  Come to a mic if you would, please.

4          MR. MARTIN:  I'm sorry.

5      I think we can go farther and stipulate to what Mr.

6   Glenn proposed.  There are fifteen entities, if I'm not

7   mistaken, who are plaintiff in the Muho action, and Mr. Harvey

8   had a retainer which, frankly, was unallocated.

9          There are six debtors, and we have proposed that Mr.

10  Harvey's services be booked fifty/fifty.  And what Mr. Glenn is

11  suggesting, that it be a numerical ratio in terms of fees and

12  expenses, we agree.

13         THE COURT:  Okay.  Ms. Ostad, did you need to be

14  heard?

15         MS. OSTAD:  Your Honor, I have only today asked Mr.

16  Martin for his thoughts on this, and I think I've spoken to Mr.

17  Engel as well.  But one housekeeping issue as to the December

18  17th hearing that we've come across is that we'd like to submit

19  an affidavit of Cayman Island counsel on Cayman Island law

20  without necessarily the need to fly counsel in, but perhaps to

21  have an affidavit and to have counsel available on the phone at

22  the hearing.  And I wanted to see if Your Honor has any

23  thoughts about that.

24         THE COURT:  I always take direct testimony by

25  affidavit, but in any instance in which somebody wants to

1   cross-examine, I never take away the right to cross-examine.

2   So if you can convince your opponents not to cross your person,

3   then I won't insist on a personal appearance, but that's for

4   you to resolve.  I do not take cross-examination except live.

5           MS. OSTAD:  Thank you, Your Honor.

6           THE COURT:  Also, if this person is testifying as an

7   expert, then your opponents have the rights to compliance with

8   the expert rules.  So talk to your opponents about it.

9           I am very much of a mind to streamline hearings and to

10  avoid unnecessary costs, but not at the price of due process.

11          MS. OSTAD:  Thank you.

12          THE COURT:  Okay.  I see a whole bunch of more people

13  rising.  Are you rising to get out of here or to raise new

14  issues?

15          MR. HILDBOLD:  No, I just --

16          THE COURT:  Mr. Hildbold.

17          MR. HILDBOLD:  Yeah, just a housekeeping issue I

18  wanted to let the Court know that we did meet and confer with

19  the Porzio firm yesterday to discuss amending the agreed to

20  schedule.  There's been a few delays in getting documents and

21  depositions taken, so if it's okay with Your Honor, we would

22  submit an amended schedule to replace what is currently there.

23          THE COURT:  That makes me shrug my shoulders if it's

24  consensual, but I need to also ask you, do you envision just

25  rearranging things before the 17th or asking for an adjournment

 1  beyond the 17th?

 2          MR. HILDBOLD:  No, no, just rearranging things before

 3  the 17th.

 4          THE COURT:  Okay.  As long as you allow me enough time

 5  to read stuff before the trial date.

 6          MR. HILDBOLD:  Of course.

 7          THE COURT:  Okay, anything else?

 8          MR. HILDBOLD:  No.

 9          THE COURT:  All right.  Those who are here then on

10  Soundview are excused.  We're going to take only a five-minute

11  recess and then I'm going to hear WineCare.

12          (Whereupon these proceedings were concluded at 11:39 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                    **I N D E X**

3

4                                    RULINGS

5                                                        Page      Line

6   Porzio retention approved                          55         6

7

8   CohenReznick's retention approved                  55         25

9

10  Patterson Belknap's retention approved             56         14

11  with respect to Muho litigation

12

13  Services of Wilmington Trust denied                56         25

14

15  Pinnacle retention denied without                  57         4

16  prejudice

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T I O N

3

4    I, Sharona Shapiro, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9    _____

10   SHARONA SHAPIRO

11   AAERT Certified Electronic Transcriber CET**D 492

12

13   eScribers

14   700 West 192nd Street, Suite #607

15   New York, NY 10040

16

17   Date:  November 7, 2013

18

19

20

21

22

23

24

25

Digitally signed by eScribers, LLC
DN: cn=eScribers, LLC gn=eScribers, LLC c=United States
l=US o=eScribers ou=eScribers e=operations@escribers.net
Reason: I attest to the accuracy and integrity of this document
Location:
Date: 2013-11-07 13:26-05:00

## **EXHIBIT B**

4/2/13

## Activity Detail

**000 SOUNDVIEW ELITE LTD.**

Account Level Detail - Separate Principal and Income
From January 01, 2013 through December 31, 2013

Report Cover Page

| Date | Type/Account | Quantity | Description | Amount |
|------|--------------|----------|-------------|--------|
| 03/08/2013 | Transfers/Withdrawals | | CASH DISBURSEMENT TRANSFER FROM PRINCIPAL OF ACCOUNT ____-000 TO ACCOUNT ____000 BUY FLETCHER INTL. LTD SHS FROM FLETCHER INTL, INC | (4,000,000.00) |

**CLOSING CASH BALANCE:**
**TOTAL PRINCIPAL**

## Activity Detail

**000 SOUNDVIEW STAR**

Account Level Detail - Separate Principal and Income
From January 01, 2013 through December 31, 2013

Report Cover Page

| Date | Type/Account | Quantity | Description | Amount |
|------|--------------|----------|-------------|--------|
| | PRINCIPAL | | | |
| | OPENING CASH BALANCE: | | | |



4/2/13

/2013

/2013

/2013

/2013

/2013

/2013

/2013

/2013

/2013

**CLOSING CASH BALANCE:**
**TOTAL PRINCIPAL**

## Activity Detail

Report Cover Page

**000 RICHCOURT ALLWEATHER FUND, INC.**

Account Level Detail - Separate Principal and Income

From January 01, 2013 through December 31, 2013

| Date | Type/Account | Quantity | Description | Amount |
|------|-------------|----------|-------------|--------|
| | PRINCIPAL | | | |
| | OPENING CASH BALANCE: | | | |

**CLOSING CASH BALANCE:**
**TOTAL PRINCIPAL**

## Activity Detail

Report Cover Page

**000 FLETCHER INTERNATIONAL INC.**

Account Level Detail - Separate Principal and Income

From January 01, 2013 through December 31, 2013

| Date | Type/Account | Quantity | Description | Amount |
|------|-------------|----------|-------------|--------|
| | PRINCIPAL | | | |
| | OPENING CASH BALANCE: | | | .00 |
| 03/08/2013 | Transfers/Additions | | CASH RECEIPT TRANSFER ACCOUNT ___-000 TO PRINCIPAL OF ACCOUNT ___000 BUY FLETCHER INTL., LTD SHS FROM FLETCHER INTL., INC | 4,000,000.00 |
| 03/08/2013 | Other Disbursements | | CASH DISBURSEMENT MISC DISBURSEMENT - WIRE PAID TO Fletcher Intl., Ltd Debtor-in-posses Unwind transactions Fletcher Intl., Ltd Debtor-in-possesion CITIBANK, N.A. | (2,200,000.00) |

2013

2013

2013

2013

**<u>EXHIBIT C</u>**

Hearing Date:  March 27, 2014 at 9:45 a.m. (E.T.)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| FLETCHER INTERNATIONAL, LTD., | : | Case No. 12-12796 (REG) |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |

---------------------------------------------------------------x

## ORDER GRANTING MOTION OF THE
## SOUNDVIEW TRUSTEE FOR RELIEF FROM THE BAR DATE

This matter coming before the Court on the *Motion of the Soundview Trustee for*

*Relief from the Bar Date* (the "**Motion**");[1] the Court having reviewed the Motion, and having

considered the Motion and the statements of counsel with respect to the Motion at a hearing

before this Court (the "**Hearing**"); and the Court having found that (i) the Court has jurisdiction

over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this proceeding is a core proceeding

pursuant to 28 U.S.C. § 157(b), (iii) proper and adequate notice has been given and no other or

further notice is necessary and (iv) the Soundview Trustee has established that excusable neglect

exists; and the Court having determined that the legal and factual bases set forth in the Motion

and at the Hearing establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED as set forth herein.

2.    Pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule

9006(b)(1), the Soundview Trustee is authorized to file new proofs of claim on behalf of each of

the Soundview Debtors (the "**New Soundview Claims**") within sixty (60) days of the entry of

this Order.

---

[1]    Capitalized terms used but not defined herein have the meanings given to them in the Motion.

NYI-4574696v9

3.      The Soundview Trustee may amend the New Soundview Claims as

necessary and appropriate without further relief from this Court.

4.      This Court shall retain jurisdiction to hear and determine all matters

arising from the interpretation, implementation and/or enforcement of this Order.


Dated: _____, 2014
          New York, New York              _____
                                          UNITED STATES BANKRUPTCY JUDGE