HEARING DATE AND TIME: March 19, 2014 at 9:45 a.m. (ET)

OBJECTION DEADLINE: March 12, 2014 at 4:00 p.m. (ET)

STEWART TURNER, Pro Se

Address: 200 East 71st St., Apt. 5A

New York, NY 10021

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------- X
In re:

                                     Chapter 11

        FLETCHER INTERNATIONAL, LTD.

                                     Case No. 12-12796 (REG)

                     Debtor.

                                                        X
----------------------------------------------------------------------------

**OBJECTION OF STEWART TURNER**

**TO TRUSTEE'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY**

**RULE 9019(A) APPROVING THE SETTLEMENT AGREEMENT BETWEEN**

**FLETCHER INTERNATIONAL, LTD. AND UNITED COMMUNITY BANKS, INC.**

Introduction

Stewart Turner, who is both an administrative and pre-petition creditor of Fletcher International, Ltd. (Bermuda), states as follows:

1.  I have filed claims in this case in the amount of $33,502.76 plus unliquidated damages regarding legal fees under my rights to indemnification. I am a former consultant and a former Director of Fletcher International, Ltd. I have a Bachelor of Science in Engineering degree from Princeton University in 1980 and an MBA degree from The Wharton School at The University of Pennsylvania in 1984.

2.  My particular expertise as an advisor to the Fletcher organization is in connection with negotiating the customized PIPEs warrants which are the major investment vehicle of the Fletcher organization and, from an industry perspective, in valuing those warrants. Although I do not earn my living as a valuations expert, in addition to my graduate business education I have worked on valuation matters with our accountants and experts throughout the years and I have industry perspective and experience on valuation.

3.  I ask the Court's indulgence insofar as I cannot afford counsel and I have prepared all of what follows myself.

<u>The Stock Market has Spoken to the Tune of $86 Million (and $80MM in excess gains for UCBI)</u>

4. In his Declaration, FILB Trustee Davis claims that "(t)he value of the main element of the dispute – the Warrants – has been tested in the market."[1] While I believe that he was referring to his own proposed settlement for a mere $12 MM (or $1.70 per each of the 7,058,823 underlying warrant shares), the stock market has responded with an increase in the market cap(italization) of UCBI by approximately $86MM in the four trading days following the announcement of the proposed settlement, theoretically $80MM more than it would have had in the absence of such announcement.

5. UCBI closed at $16.87 per share on Wednesday, March 5, 2014; this was the day that both the FILB Trustee filed his papers and that United Community Banks, Inc. issued a press release at 4:47PM, after the stock market had closed.

6. On Thursday, the price closed at $17.20; on Friday, it closed at $18.03; on Monday, it closed at $18.05; and, on Tuesday, March 11, 2014, it closed at $18.45. Overall, UCBI's stock price increased by $1.58 per share over the four-day period, for an increase of 9.37%.

7. By comparison, over this four-day period, the S&P 500 Index decreased by 0.33%, the NASDAQ Composite Index decreased by 1.17%, the NASDAQ Composite Index dropped by 1.56%, but the KBW Bank Index (BKX) increased by 0.66%.

8. Had United risen by 0.66% (the same as the largest move of the four indexes listed above), its price would have gone from $16.87 to $16.98. Since the stock price closed at $18.45, the excess per share gain was the difference or $1.47 over this four-day period. This $1.47 per share is almost as much as the $1.70 per share settlement value.

---

[1] Docket 440, page 13.

9.      Given that United has 54.44 million shares currently outstanding, the excess increase is equal to the excess per share gain of $1.47 multiplied by the 54.44 million shares outstanding, for a total of $79.99 million (the overall increase in market cap is $86.02 million).

10.     Thus, just the announcement (not the implementation) of this proposed settlement of $12MM yielded a market-based excess gain of $80 MM to United's existing shareholder base by removing these overhanging shares. A fair settlement should have led to little stock price movement and a reasonable settlement should have led to a much smaller increase in UCBI's market cap. **In light of this 4-day share price movement, I believe that this proposed settlement is not reasonable and the Court should not approve it.**

### What does this $80 MM excess gain represent?

11.     To be clear, there is some uncertainty as to whether this settlement will be approved by the Court. Thus, I believe there may be an additional increase in value to the existing shareholders of United should this proposed settlement be approved by the Court next week.

12.     Does this mean that the $80 million understates the value to be received by the United shareholders by Mr. Davis pushing for this settlement? I believe that it does, since the settlement is not yet final.

13.     Does this mean that the market believes that the settlement price for the Warrant alone should have exceeded $12MM + $80 MM? Probably not, as United is the sole buyer in a position to receive additional benefits beyond recouping the value of the warrant.

### What benefits does United receive in this proposed settlement that other bidders would not receive?

14.     According to the Davis Declaration in Support of the UCBI Settlement, the terms are:

4

> "The Settlement Agreement will release and be in full satisfaction of the Warrants and all claims by and between UCBI and FILB and their respective subsidiaries (including without limitation BRG), and each of its officers, directors, attorneys, heirs, executors, administrators, liquidators, trustees, estates, successors, and assigns related to or arising out of the UCBI Transactions or the Transaction Documents, including, without limitation: (i) the Warrants; (ii) **the SPA, including, without limitation, any payment allegedly due to FILB by UCBI under Section 5 of the SPA on account of a Registration Failure**, and any payment allegedly due to UCBI by FILB under Section 15(b) of the SPA, including any allegedly unpaid interest; and (iii) **any claims related to the Asset Sale (e.g., with respect to the Carry Accounts)**."[2]

15. According to the Seaport Group presentation, the Trustee believes that the payment for the registration failure is approximately $9.2MM. This release is a benefit from which only United, but none of the other bidders, could benefit. Thus, it should not come as a surprise that UCBI was the highest bidder, unless the winning outside bidder could have amazingly sued United for that $9.2MM benefit.

16. Actually, the registration failure benefit is far higher than that. Mr. Kell Benson, Vice Chairman of Fletcher Asset Management, Inc., who had been Chief Financial Officer of Zenith Electronics Corporation prior to joining Fletcher in 1996, values the payment for non-registration under the terms of the Securities Purchase Agreement in excess of $127.3 MM as of February 13, 2014, due to an increasing interest rate, then at 13% per month (and now at 14% per month); obviously, it was not contemplated by United that any registration failure on their part would continue for more than two years. In addition to the comments provided above, Mr. Benson is a credible person as the Trustee allowed him to be the sole Fletcher witness in the Ion hearing before Chancellor Strine where Mr. Fletcher was not invited to appear. With a potential value of $127.3 MM being granted to United only,

---

[2] Docket No. 440, pp. 10-11.

there is no doubt that UCBI would be the highest bidder. (The 5% commission to The Seaport Group should be reviewed and capped at an amount far below the present $500,000 cap as it should have been clear that United should outbid all others and that the bidding process was not truly open. I would not be opposed to a commission for The Seaport Group if an auction for the Warrant was held independently from a separate and fair settlement agreement related to the payment for registration failure.)

17. Further, in Paragraph 41 of his Declaration, the Trustee states:

> "In connection with the Carry Accounts issue, the Trustee believes that UCBI has used nearly $3.9 million on deposit in the carry accounts since the Petition Date in possible violation of the automatic stay, but he also believes that the ultimate outcome of litigation is uncertain because UCBI has good arguments that it was entitled to use the deposits as it did."[3]

18. When combining the $127 MM figure calculated by Mr. Benson with the $3.9MM amount related to the Carry Accounts, United was provided with a bidding advantage in excess of $130MM. Thus, although I would expect the payment for non-registration to be settled for less than the amount Mr. Benson calculated, the $12MM overall package bid seems unreasonably low. Thus, it should not be a major surprise that this proposed settlement for $12MM led to excess gains for United shareholders in the amount of $80MM in just four trading days.

Who is The Seaport Group and who could have been a natural buyer?

19. Although The Seaport Group mentions on its home page that they have over a dozen business lines, their focus is credit. The largest emphasis on their home page is the statement, "Executing over $40 Billion of average annual credit-related transactions volume in the last three years,

---

[3] Docket No. 440, p. 13.

New York based Seaport Group has emerged as a leader in global credit markets with one of the largest sales and trading platforms of any boutique investment bank."

20. Given the complexities of the UCBI warrant, one wonders why the Trustee decided to go with Seaport and not another firm whose primary business is stock warrants.

21. Further, despite the selling document provided by it, was The Seaport Group able to counter the negative press associated with the primary remaining FILB position after the Trustee's Report where the press picked it up as "like a Ponzi scheme"[4]?[5]

22. Who would want to voluntarily step into such a mess? The Trustee is correct that legal fees would be prohibitive to many proposed investors; I believe that the fees for Mr. Davis, his legal firm (Luskin) and his special consultant (Goldin Associates) currently exceed $6 million. Anyone willing to enter the fray would need to pay huge legal fees to catch up and believe that they could substantially multiply such an investment of both these estimated legal fees plus the payment to FILB, leading to low distressed bids under the circumstances. Ideally, the Trustee would have continued the legal fight with United on behalf of FILB by himself as the upfront fees have already been accrued. Perhaps the new representatives of both Soundview and Richcourt will step up to protect their investors' positions.

23. UCBI is familiar with what it is buying (if the Court approves the buyback) and is receiving the other benefits that were not available to other bidders. It has already been shown by the market to generate a huge return for its shareholders even though the likelihood of this settlement being approved by the Court is less than 100% (for sake of argument, let's say 80%).

---

[4] FINAlternatives, "Fletcher Hedge Funds Like A Ponzi Scheme, Trustee Alleges", December 2, 2013

[5] The Trustee's actual quote was "In many ways, the fraud here has many of the characteristics of a Ponzi scheme, where, absent new investor money coming in, the overall structure would collapse due to an inability to meet existing redemption and other obligations." – Docket 327, p.18. I had previously objected that the redemption-in-kind provision meant that cash was not needed for the Louisiana redemptions.

24. In theory, I believe that UCBI should be willing to pay an additional $44 million to seal the deal. My calculations are as follows: (a) the $80MM in excess gain was based upon my 80% estimate of the deal closing; to get to 100%, the gain would be $100MM; (b) combining this $100MM with the $12MM already offered puts $112MM to be split between FILB and United's shareholders; (c) splitting it 50/50, would mean that FILB would receive a total of $56 MM ($12MM + $44MM) and since the full value of the gain was not baked into the share price, shareholders would have to give back only a theoretical $24MM from the $80MM temporary gain to lock in the settlement at the higher value. I consider $56MM in benefits for each party to be fair given that New York law and precedent are both on FILB's side (the Trustee in his written statements seems to agree although Mr. Luskin may refer to this as a "litigation position"[6]) and thus a $12MM proposed settlement (21% of $56 MM) does not seem reasonable. When combining all the terms ($89MM of intrinsic value in the warrant, $127MM for the registration failure and $3.9MM related to the Carry Accounts), $12 MM represents less than 6% of this total and is clearly not reasonable.

Response to certain specific points made in Mr. Davis' Declaration

25. Although he dedicates paragraph 27 to informing readers that Fletcher International, Inc. knew about the bidding process and that "FII chose not to respond to the notice,"[7] the Trustee omitted that he knew that Fletcher International, Inc., led by Mr. Fletcher, did not have the cash to make a significant bid for this UCBI warrant.

26. In paragraph 44, he refers to the "major parties-in-interest", including the Louisiana Pension Funds and the Massachusetts Bay Transportation Authority Retirement Fund, indicating their

---

[6] Luskin's terminology from Docket No. 376, p. 20.

[7] Docket No. 440, p. 9.

"strong support for the Settlement Agreement." First, the Plan has not been approved yet and (a) Soundview, (b) Richcourt and (c) Massachusetts have additional time to file objections to limiting proceeds for just these few entities.

27.    Second, if Mr. Davis' contention that the $12 million is fair value for the smaller package of securities (in the Soundview case, Mr. Warren Martin had referred to this as the 7-million share basket), the larger by a factor of 2.5 (18-million share) basket should be worth on the order of $30 million (= 2.5 * $12 million). One wonders whether the Massachusetts fund thinks it should receive the vast majority of the $12 MM after Soundview Elite recoups its $4MM loan at the Fletcher International, Inc. level[8], a $7.5MM payment to Massachusetts would be 20% relative to Louisiana's $30MM value (80%), even though Mr. Robin McMahon, one of the JOLs for Leveraged and Arbitrage, sold that 18-million share basket back to UCBI for only $2.5MM. If the purpose of the Plan Advisory Board is to recoup maximum value for the FILB creditors and its shareholder, why is Mr. McMahon a proposed member of this Board as (a) he has not maximized value and (b) he represents funds at least two levels away from FILB?

28.    I would also like to specifically respond to Mr. Davis' paragraph 45, where he declares the following:

> "The only likely objection to the Settlement Agreement will be from the Debtor's former consultant, Stewart Turner, who in prior court filings has asserted that the Warrants are worth at least $90 million. [See, e.g., Docket No. 371.] As the Trustee has previously noted, Mr. Turner's valuation is a fantasy: Mr. Turner persists in ignoring both standard valuation techniques for valuing the Warrants and the considerable litigation risks in seeking to recover their value. [See Docket No. 376.] Mr. Turner cannot present any credible evidence that the Trustee's marketing process was flawed

---

[8] This analysis does not include the claims of the Soundview and Richcourt funds at the Arbitrage and Leveraged levels, should either Ms. Midanek of Solon Group on behalf of Richcourt or Ms. Ball, Trustee of the Soundview Funds, file objections or objections by other parties.

or that it did not yield the highest and best arms-length offer, and represents fair market value for the Warrants and other claims."[9]

Mr. Davis is wrong on several points here:

a. My $90 million number was simply updating his $71 million number for an increase in the underlying value of the shares between his exercise date of the UCBI warrant (not accepted by United) and the date of my response and the relevant court hearing. It does not attempt to use a Black-Scholes or a Quantal valuation, but just the intrinsic value. With the stock price this far in-the-money and with the low volatility of UCBI, there is not much difference between Black-Scholes/Quantal and intrinsic value at this time.

b. I believe that there is credible evidence that the marketing process was flawed in that the benefits provided to UCBI were not (or at least, *could not* have been) offered to bidders other than UCBI itself. I think these advantages to UCBI run contrary to Mr. Davis' claim (in the absence of detailed information to the contrary) that this bidding process did "yield the highest and best arms-length offer." A standalone bidding process should have occurred for the warrant and a separate settlement for the payment for non-registration and the transfer of fees from the Carry Accounts would have provided the best arms-length offers.

c. Please recall that Mr. Davis fought for and negotiated a settlement to unwind the April 2012 transactions where this payment for a registration failure, among other assets, was returned from Fletcher International, Inc. to FILB. To claw this back and then simply

---

[9] Docket No. 440, p. 14.

give it away to United for no consideration or virtually no consideration after it had amassed substantial value is a terrible waste of an asset.

d. The excess market value increase in UCBI stock over the four trading days ended on Tuesday, March 11, 2014, of $80 million shows that my valuation was certainly not a fantasy.

e. If any valuation was a (negative) fantasy, it would be that of Mr. Davis' proposed colleague on his proposed Plan Advisory Board, Mr. McMahon. He sold UCBI assets that combined were roughly 2.5 times (18-million share bucket) as large as Mr. Davis' warrant (7-million share bucket) for just $2.5 MM (only about one-twelfth of the price on a per-share basis). I repeat my objection to including Mr. McMahon on the Plan Advisory Board in the interest of achieving maximum value for FILB's worthy creditors and its sole shareholder, Fletcher International, Inc. Mr. McMahon also does not represent an immediate creditor or shareholder of FILB and should not be on the Board for these reasons alone.

**Conclusion and request for additional information for all parties and the Court**

29. First, I believe that this settlement for $12 million vastly understates the value of the remaining UCBI warrant still held at this time by the FILB Trustee based upon its likelihood of being found more valuable via litigation against United.

30. The contractual provision requiring the application of New York law to the dispute between FILB and United along with the New York precedent of the Reiss v. Financial Performance

Corporation case[10] should lead an impartial observer to believe that the likelihood of winning is greater than losing. In other words, the chances of winning should be considered at least 50%.

31.    On the other hand, the Trustee's settlement value of $12MM vs. the intrinsic (the in-the-money amount **before** the recent stock price increase) value of the warrants of $89 million (warrants on 7,058,823 shares multiplied by the in-the-money amount of $16.87 (March 5, 2014 price) less the exercise price of $4.25), implies only a 13.5% chance of winning (less if other benefits are included in the denominator. This contradicts what the Trustee wrote in his Disclosure Statement that:

> "If the Trustee's interpretation of the warrants is correct, it could result in approximately $71 million in common stock to the Debtor, which the Trustee could then sell on the open market. **The Trustee has additional claims arising out of FILB's involvement with UCBI (all of which UCBI disputes).** In an effort to avoid litigation over all these claims, the Trustee and UCBI have begun settlement negotiations. Failing a consensual resolution, the Trustee intends to commence litigation against UCBI and **vigorously enforce its rights against UCBI.** The Trustee expects that UCBI will vigorously contest his claims. While the Trustee believes he has good arguments, it is not possible to predict who would prevail in any litigation, and it therefore should not be assumed that the Estate will prevail."[11] (emphasis added)

32.    Further, this proposed settlement with United, as opposed to selling the Warrant to a buyer other than the company itself, also includes both the settlement of the payment for registration failure valued in excess of $127.3 MM by Mr. Benson and settlement of any Carry Account fees paid by subsidiaries of Fletcher International, Inc. (listed by the Trustee at $3.9MM). How could any buyer other than United have had a fair chance of winning a single auction?

---

[10] Marvin M. Reiss et al, v. Financial Performance Corporation, 97 N.Y. 2d 195 (N.Y. 2001), also mentioned in The Seaport Group presentation.

[11] Docket No. 327, p. 139 of the PDF

12

33. In return for providing certainty to the marketplace that only UCBI could have provided (another bidder would have prolonged the fight over these warrants and, thus, the uncertainty) and the advantages provided solely to UCBI, the Trustee should have at the very least demanded appreciation rights through the trading day following the date of Court approval on the about-to-be-returned 7,058,823 warrant shares to collect at least the increased market value on these shares, if not all shares. Market veterans Seaport Group and Goldin should have pointed out this to-be-expected scenario to the Trustee. With the stock at $18.64 at 2:46 PM[12] on Wednesday, March 12, the stock price has appreciated by $1.77 per share since the March 5 post-close announcement or more than 10%[13]. This $1.77 per share figure, if captured, could have slightly more than doubled the $1.70 per warrant share paid by UCBI. In other words, a settlement valued in excess of $24 million should have been obtained.

34. When the above items are included, the Trustee may be giving the Warrant back to United for virtually nothing. That is why it would have been helpful to see what the terms of the bids actually were.

35. Conceivably, United may look to settle the two items available only to the bank itself at an amount when combined with the highest remaining bidder of solely the Warrant could easily far surpass $12 million. (At this time, my strong recommendation would be to negotiate with United for the additional $44 million, a realistic amount as I demonstrated above, or barring such settlement, to litigate vigorously with United until a more appropriate settlement is achieved. At the very minimum, a fallback position of the post-announcement profit on the 7,058,823 warrant shares should be added to the $12 million.)

---

[12] A closing price for Wednesday is not used as this objection needs to be filed with the Courthouse at the same time as the stock market close.

[13] This 10% figure is not used throughout the rest of the objection due to the need to finish the objection by the 4:00 deadline.

36. If somehow, the Trustee is able to show that United's bid is almost entirely for the warrant, (a) the other non-warrant-related terms should be removed from the settlement agreement and (b) Mr. Robin McMahon should be removed from the proposed Plan Advisory Board. Mr. McMahon, in his role related to FILB Co-Investments returned a package of United-backed assets for just $2.5 MM, or roughly one-twelfth the per share value of the Trustee's proposed settlement, an insanely cheap settlement when measured against the FILB Trustee's embarrassingly cheap settlement of 7,058,823 warrants for $12 million proposed herein.

*Stewart Turner*

Stewart Turner, Pro Se

Dated: March 12, 2014.