HEARING DATE: March 27, 2014

SUBMISSION DEADLINE: April 10, 2014

STEWART TURNER, Pro Se

Address:  200 East 71st St., Apt. 5A

New York, NY 10021

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

In re:

                                        Chapter 11

    FLETCHER INTERNATIONAL, LTD.

                                        Case No. 12-12796 (REG)

                Debtor.

                                        X
--------------------------------------------------------------

**AFFIDAVIT REGARDING MY**

**FURTHER RESPONSE OF STEWART TURNER**

**AS DIRECTED BY JUDGE GERBER**

**TO PARAGRAPHS 96 AND 98-149 OF THE**

**TESTIMONY OF RICHARD J. DAVIS IN SUPPORT OF CONFIRMATION**

**OF THE TRUSTEE'S SECOND AMENDED PLAN OF LIQUIDATION (DOCKET NO. 474)**

I hereby swear under penalty of perjury that all statements contained in my "Further response of Stewart Turner as directed by Judge Gerber to paragraphs 96 and 98-149 of the testimony of Richard J. Davis in support of confirmation of the Trustee's Second Amended Plan of Liquidation (Docket No. 474)," attached as Exhibit A, are to the best of my knowledge and after reasonable inquiry, true and correct.

**STEWART TURNER**

Sworn to before me on this

l(ᵗʰ day of April 2014

FAZIA K KHAN
Notary Public - State of New York
NO. 01KH6224789
Qualified in Queens County
My Commission Expires 2/12/14

# Exhibit A

HEARING DATE: March 27, 2014

SUBMISSION DEADLINE: April 10, 2014

STEWART TURNER, Pro Se

Address:  200 East 71st St., Apt. 5A

New York, NY 10021

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

In re:

                                        Chapter 11

     FLETCHER INTERNATIONAL, LTD.

                                          Case No. 12-12796 (REG)

           Debtor.

---------------------------------------------------------------- X

**FURTHER RESPONSE OF STEWART TURNER**

**AS DIRECTED BY JUDGE GERBER**

**TO PARAGRAPHS 96 AND 98-149 OF THE**

**TESTIMONY OF RICHARD J. DAVIS IN SUPPORT OF CONFIRMATION**

**OF THE TRUSTEE'S SECOND AMENDED PLAN OF LIQUIDATION (DOCKET NO. 474)**

<u>Introduction</u>

As per Judge Gerber's ruling on March 27, 2014[1], I, Stewart Turner, am making the following paragraph-by-paragraph response to paragraphs 96 and 98-149 of Docket No. 474, as filed by FILB Trustee Richard Davis. All actions taken by me were at all times in fulfillment of my duties as a Director or a consultant, and the negative references made by Mr. Davis in those paragraphs should not mandate my inclusion as a Class 5 Insider with the detrimental remarks associated with that status. I am numbering the paragraphs below to correspond to the paragraph numbers in the Davis Testimony (Docket No. 474) and I respond paragraph by paragraph.

96.     I, and others, did act on both sides of what Mr. Davis calls the April 22 Transactions (in 2012) but there was no attempt to fraudulently convey assets from the Debtor. Multiple counsel, including Seth Schwartz of Skadden, Leif King (also of Skadden), Jay Lefkowitz and Andrew Horne of Kirkland & Ellis were consulted over the days preceding the April 22 transactions in order to provide advice to me and others with respect to these transactions. Appleby's, Bermuda counsel to FILB, later assisted in drafting documentation to paper these transactions properly.

**I. The April 22 Transactions**

98.     Mr. Davis has the facts correct that the Grand Court of the Cayman Islands entered an order winding up Leveraged and confirming the appointment of Robin McMahon and Roy Bailey as Joint Official Liquidators of Leveraged.

---

[1] March 27, 2014 transcript, page 77 (page 78 of the PDF).

99.     On the evening of Sunday, April 22, 2012, proposed actions were reviewed and authorized by the appropriate boards of directors to redeem shares of FILB held by its parent, Fletcher International, Inc. (referred to in Docket No. 474 as "FII"), with underlying assets, in a manner similar to the way the Louisiana Pension Funds were redeemed in February 2012. For redeeming approximately $44.1 MM of FILB shares held by the then-100% owner of FILB, consisting of $2.2MM in cash and non-cash assets that were valued at $41.9MM (for a total of $44.1 MM) were transferred to FII. (Mr. Davis itemized these assets in his paragraph 101 and I will respond to this below.)

100.     While AF is currently a Director and President of FII, he was not so at that time. His participation in the transactions was on behalf of FAM, the Investment Manager to the relevant funds.

101.     The following assets were transferred from FILB to FII as part of the April 22 redemption, with the values ascribed below.

- $2,200,000 of cash (valued at $2,200,000)

- One-half of the remaining UCBI warrant (this would be one-half of the warrant that Mr. Martin in the Soundview case (13-13098 (REG)) called the "seven-million share bucket." Here the value of the 3,529,412 share value of the warrant was calculated based on the April 21, 2012 valuations by Quantal as of Friday, April 20, 2012, the last trading prior to the Sunday night board calls on April 22 with a value of $20,756,841. Exhibit 1 is an email thread where the value for the one-half UCBI warrant was included in my April 22 response at page 8. Please note that this thread began on Friday morning, April 20, 2012 where both Mr. Fletcher and my first response focused on the need to have an attorney review the proposals. Mr. Fletcher responded by adding Seth Schwartz of Skadden to the email thread. Mr. Schwartz was included throughout the weekend and he had no objection regarding the voting proposals for the various boards.

This value for the UCBI warrant (and other values) were calculated by Samir Dutt of Quantal and included in an email on April 21, 2012. The email and one of his spreadsheets are included as Exhibit 2.

3

Exhibit 3 is an email thread where on page 1, Leif King of Skadden said that "the certificates should be titles in the name of 'Fletcher International, Inc.'" The Kirkland & Ellis lawyers did not raise an objection.

- The BRG membership valued at book value by Stu MacGregor at $13,180,846 as of April 22, 2012. The primary asset of BRG at that time was the interest in MV Nepenthes, the holding company for the Geoffrey Fletcher movie, valued at $7,717,048 at that time. It is unclear why Mr. Davis and Mr. Luskin spent money fighting for this asset when Mr. Luskin later referred to the movie, saying: "That money, by the way, is all lost, apart from this tax refund."[2] Mr. Geoffrey Fletcher is an Oscar award-winning screenwriter by the way.

- The DSS (Document Security Systems) Warrants valued at $4,689,722 by Quantal, also on April 21, 2012. Mr. Luskin referred to them in the following way in his March 27, 2014 statement before this Court[3]: "And we still hold some of the DSS warrants; we've been trying to unload them. I think if we're lucky, we'll get — I forget whether it's 40,000 or 140,000, but it certainly isn't into the millions."[4] Exhibit 4 is the transcript from March 27, 2014.

- What Mr. Davis as described as the "Excess Registration Funds." Mr. Luskin has fought before this Court to call this amount as disputed[5].

Other than the cash that was transferred, Mr. Davis has disputed the value of these assets from very near the beginning of his term as Trustee, where he said in a November 20, 2012 email (Exhibit 5)

---

[2] March 27, 2014 transcript, page 26 (page 27 of the PDF).

[3] March 27, 2014 transcript, page 29 (page 30 of the PDF).

[4] March 27, 2014 transcript, page 29 (page 30 of the PDF).

[5] Discussions during the March 19, 2014 hearing.

4

"And , no we are not relying on your or Quantals valuations"[6]. One wonders why he sought to reclaim these assets from Fletcher International, Inc. in the unwind transaction while at all times challenging their value.

If the FILB Trustee believed that these assets (other than the cash) had almost no value, Fletcher International, Inc. (the Trustee has referred to this as "FII") redeemed FILB shares worth $44.1MM for $2.2MM of cash, or just 5% of the value received. Even when you include the 12% settlement value ($6MM) for the half of the UCBI warrant that was returned to FILB, FII received a very low percentage of value for the FILB shares from Mr. Davis' current perspective. The FILB Trustee's fighting to reclaim these assets calls into question why he did not seek to reclaim the UCBI assets given to the Louisiana Pension Funds in 2012, which were returned to United in exchange for just a $2.5MM settlement solely to the Leveraged JOLs and the Louisiana Pension Funds, a settlement which he blessed.[7]

102.    As pointed out above, there was contemporaneous valuation for most assets (the exception was waiting a little longer for Mr. MacGregor to finalize the book value for BRG). Quantal valued the UCBI and DSS warrants on April 21, 2012. Exhibit 2 contains the spreadsheet with values and the cover email. As also mentioned above, the BRG position was marked at historical cost, the "Excess Registration Funds" were valued as of that date and the cash was valued at $2.2MM. These values, with a small tweak regarding the Excess Registration Funds from the number used in Exhibit 3 were all determined by the time of the April 22 board meetings.

The primary business purpose of the transactions was to deliver the assets with value as recognized by Quantal, FAM and Turner to the parent entity and its shareholders which understood the

---

[6] Exhibit 3, page 1.

[7] While a misleading claim may be raised about a $3.25MM payment that would have had to be made, given the claim that the Trustee believes FILB was owed approximately $9.2MM in as Mr. Davis described as "Excess Registration Funds" (see Exhibit 6 –Presentation by The Seaport Group, at page 4), this $3.25MM amount would not have had to be paid once the registration statement was not in effect.

value and not to the Joint Official Liquidators appointed by the Grand Court of the Cayman Islands, which considered the UCBI assets to be "commercially worthless".

103.     While I did discuss the April 22 Transactions with Mr. Davis after his appointment in late 2012, there was no bad intent as implied by Mr. Davis when these transactions occurred. As mentioned above, the intention was to divide the assets fairly but to maintain the assets later considered by Mr. Davis to be of little value held by entities that appreciated the value and would work to maximize it rather than being held in an entity subject to foreign liquidation where they would be unappreciated and therefore mishandled.

104.     While many transactions were reviewed by attorneys, the official documentation related to some transactions was sometimes not completed in a timely fashion or at all.  However, with respect to transactions he likes, Mr. Davis has taken the position that partially documented transactions are complete.  For example, Exhibit 7 is a Proof of Debt claim filed by Mr. Davis against Intellitravel (the owner of Budget Travel magazine).  Please note that the first item in "Exhibit A" which supports the Davis claim against Intellitravel is an unexecuted promissory note, dated "June __, 2011" (where the specific date was left to be filled in later).  Another example is the Luskin law firm repeatedly calling and emailing Mr. George Ladner many times in a short period just before the bar date of December 9, 2013[8], in order to get him to sign the Proof of Claim for Fletcher Dividend Income Fund, LLC (Exhibit 8); this claim was also supported by the unexecuted promissory note.  Even where the paperwork for a completed transaction is not finalized, Mr. Davis takes the position that transactions were, in fact, completed.  The same is true in the real world.

---

[8] Exhibit 9 contains an email between Stephan Hornung of the Luskin firm and George Ladner.  There are many separate contacts initiated by Mr. Hornung in other emails over the period December 5 - December 9, 2013.

6

105.   While Mr. Davis referring to his Exhibit Binder states[9] that "Copies of certain email related to the April 22 Transactions are included in the Exhibit Binder as Exhibit 3," he does not include all related emails.  In particular, he excludes the ones where I asked for a legal review of the proposed transactions and a review of the then-proposed United Warrant exercise by attorneys.  My Exhibits 1 and 3 described above are therefore referenced here.

106.   As Mr. Davis states, the April 22 Transactions were undone on March 8, 2013, after I left the boards of both FILB and FII.

107.   I strongly disagree with Mr. Davis' comment that the "April 22 Transactions were an intentional fraud."[10]  Asking for legal advice with respect to these transactions shows my intentions.  I took Mr. Schwartz' participation without objection to mean that there was no objection.  He had told me many times that he was FAM's attorney and not mine, both prior to and at my SEC interviews in Washington, DC.  In fact, when I asked him about Denis Kiely's resignation (as I learned many months later was around the time that Mr. Kiely received a Wells Notice), Mr. Schwartz immediately sent an email to Mr. Fletcher (see Exhibit 10 where it was made apparent to me that Mr. Schwartz would provide confidential information to Mr. Fletcher (and/or previously Mr. Kiely) only.  While I expected he would object if there was an issue, his non-objection was taken to mean no objection.

108.   Mr. Davis' paragraph 108 refers to events after I was no longer a Director of FII.

## II. FAM Causes the Debtor to Invest in Fletcher International Partners, Ltd. ("FIP")

### A.  The July 2008 and later transactions

---

[9] Docket No. 474, page 42.

[10] Docket No. 474, page 43.

109.    While I do not know if Mr. Ermanno Unternaehrer was the founder of Richcourt, I know that he was a senior official at Richcourt prior to the purchase of an 85% interest in Richcourt by Fletcher's Richcourt Acquisition Inc. I also knew that Mr. Unternaehrer was interested in liquidity at that time, although I still do not know why he needed it.

110.    Yes, Mr. Unternaehrer subscribed into FIP in July 2008 by delivering 1639.15 shares of FFC Fund Ltd. to FIP.

111.    I have reviewed Mr. Davis' Exhibit 7, which does in part contain an email between Mr. Unternaehrer and Christopher Smeets (CEO of Citco). However, much of the email summarizes a conversation between Mr. Kiely and Mr. Unternaehrer for Mr. Fletcher. I do not recall seeing this email at that time. (I only have copies of emails I received and saved in July 2008 and attached as my Exhibit 11.) I was also given a copy of the valuation report of Citco by UBS (Turner Exhibit 12). Based upon this then- $4.0-$4.4 billion valuation, the 0.45% ownership interest in Citco would have been worth at least $18MM (=0.45*$4Bn), but the valuation proposed by Mr. Unternaehrer in that email was only $10.5MM, a 42% discount to the bottom of the UBS valuation range. Based on the UBS valuation report, I had every reason to believe that this was a good deal and frankly no reason to believe that it was a bad deal, or as the Trustee would put it, a "fraudulent conveyance."

Further, ignoring the small piece (approximately 10%) of common owned by FILB at the end of July 2008, the FILB preferred would only have been at risk in July 2008 if the value of the FFC Fund shares fell to Fletcher's then-investment in the preferred of $3.65 MM, or a plunge of approximately 80% from the UBS value. On the reward side, FILB was to receive a return of 1% per month based upon the original investment into the preferred shares or have the ability to exercise an upside call based on the value of the FFC Fund shares asset by converting the preferred to common.

Given what appeared to be limited risk, the solid return and the potential reward upon conversion, using business judgment, I deemed this to be a prudent investment. While Corporation

8

Code Section 7231 would technically not apply to an offshore company, I adhered to its principles, based upon the information provided to me by Mr. Kiely, my then co-Director of FIP.

112.    Mr. Davis in Davis Exhibit 8 does point out on pages 5-6, which refers to the illiquidity of the underlying FFC Fund shares. However, he does not mention that at the bottom of his page 6 that the "Term" was listed as: "Each of the Funds will have a term ending on August 31, 2008, with up to two one-year extensions in the sole and absolute discretion of FFC Management." In July 2008, I took that to mean that the underlying FFC Fund shares would be distributed by August 31, 2010 (just 26 months later). That illiquidity, when compared to our standard PIPE investments, which were virtually all long-term investments, did not seem all that restrictive and, as previously stated, the upside was attractive.

113.    Statement of fact – no objection

114.    Statement of fact – no objection

115.    Statements of fact – no objection

116.    Again, I refer to Turner Exhibit 12, which is a copy of the independently valued UBS Report valuing Citco in the $4.0-$4.4 Billion range. This would imply a value of the FFC shares held by FIP of at least $18MM based upon the 0.45% interest in Citco held by FIP multiplied by the minimum $4.0B valuation. I also mention again that based on the FFC Offering Memorandum, it was anticipated that FIP would receive the underlying Citco III Limited shares by August 31, 2010. I reiterate that I had not seen the Unternaehrer / Smeets email at that time.

117.    The statement from SFT Bank for the FFC shares held by FIP (Davis Exhibit 12) showed a mark of approximately $2.7MM as of December 31, 2008. While I did not know that at the time, I recently learned from Davis Exhibit 7 that this was based upon a mark from a transaction between Sandoz and Citco prior to July 2008.

This was a surprise issue (supporting my comment that I had not previously received the Unternaehrer/Smeets email from Mr. Kiely) that we needed to go over with our then-auditor Grant

9

Thornton in 2009 as part of the audit of FILB.  Please find attached an email that I sent to Matt Luttinger,

the Grant Thornton partner in charge of the FILB audit at that time (Turner Exhibit 13 with attachments).

Based upon share buybacks of Citco III Limited, the entity underlying the FFC Fund Ltd. investment made

during a period in 2008 (after the referenced Sandoz transaction), the value of the FFC Fund Ltd. shares

held by FILB was $13.715MM, but FAM and FILB continued to value these shares at the lower

$10.479MM.

Please note that in a later section of this complaint, Mr. Davis refers to a restatement of the

2008 audits for Leveraged and Arbitrage after the SEC questioned Grant Thornton.  However, despite

the SEC's similar review of the 2007 and 2008 audits for Leveraged and Arbitrage, the SEC did not

require a restatement of the 2008 FILB audit, the entity where the FIP shares were held.

118.    The Alpha fund was designed as a "portable alpha" product.  While this is an industry

term, it simply means combining an investment in the Arbitrage fund along with a swap on what was

originally the Lehman Brothers Aggregate Bond Index, but which later became the Barclays Aggregate.

PIPEs were Fletcher's primary but not only investment strategy and I doubt that Mr. Fletcher would have

agreed to let one investor decide what could or could not be the strategies used by the master fund, as

allowed under all of the Offering Memoranda supplied by the FILB Trustee (Davis Exhibits 15, 16 and 17).

119.    Mr. Davis and I discussed that Citco had offered $1MM for the FIP shares held by FILB

back in November or December 2013 when we discussed that the actual value was much higher.  Thus,

"if" should not be used in his statement that "It remains unclear if and to what extent the Debtor will be

able to recover based upon this investment,"[11] unless he is referring to the BVI Funds ability to reacquire

the FIP shares under the September 2013 Order Approving Stipulation Governing Certain Shares of

FIPLTD (see Turner Exhibit 14, pages 14 and 17 of the PDF, where both Richcourt Euro Strategies Inc. and

---

[11] Docket No, 474, p. 47.

Richcourt Allweather Fund Inc. can "later assert that it is, should become, or should be deemed the lawful owner of any, some or all of the Shares, or of any other rights..."). Based upon the UCBI settlement value the FILB Trustee has advocated for, it might make sense for Ms. Midanek to reacquire the FIP preferred and ordinary shares for Richcourt EuroStrategies and Richcourt Allweather Fund instead of a settlement under the Trustee's Plan.

**B.    Turner's Actions regarding the June 2011 redemptions by two Richcourt Funds with FIP shares**

120.    Statement of fact – no objection

121.    Sloppy recordkeeping by BRG, FILB and FIP around June 2011 led to the resolutions not being finalized as discussed in paragraph 104 above. However, as also discussed in paragraph 104, the promissory note that was also not signed in June 2011 was used by Mr. Davis as part of FILB's Proof of Claim in the Intellitravel Bankruptcy (please see Turner Exhibit 7 as signed by Mr. Davis and Turner Exhibit 8 signed by Mr. Ladner after multiple follow-ups from the Luskin firm).

122.    While the resolutions may not have been signed, SS&C, FILB's then-administrator showed the FIP asset coming off the books and records of FILB as of June 30, 2011. Exhibit 15 is an email from Anthony Maniglia of SS&C to Stuart MacGregor containing Exhibit 16, SS&C's version of the FILB trial balance for June 2011. Please note that this email with this information was sent on February 3, 2012, more than four months prior to the Petition Date and over a year before the FIP resolution was sent to Intertrust. (Lines 11090 and 11091 at the bottom of the first page show that the FIPLTD asset was removed from FILB's assets as of the end of June 2011. Please disregard a small amount in regard to line 11093 on the second page as that is an investment in an unrelated company – Fletcher International Partners, LP).

123.    Intertrust, the Corporate Office in the Cayman Islands for Fletcher International Partners, Ltd. needed to be paid for both services that they provide as well as collect fees such that FIP

would remain in good standing with the Registrar of Companies in the Cayman Islands. When SFT Bank was asked to prepare a wire, SFT insisted upon updated copies of the Register of Members and the Register of Directors and a copy of the shareholder register (prepared by Stuart MacGregor) before they would release the wire (Exhibit 17 at page 4 and again at page 5). I followed up with Desiree Ebanks of Intertrust, who said that she would need a resolution in order to update the Register of Members (so that it would match the records kept by Mr. MacGregor). Please see Exhibit 18, which contains an email thread where Ms. Ebanks' June 19, 2013 request for an FIP resolution can be seen on page 3.

Please also see Exhibit 19, which is an email that I sent to Richard Davis and Goldin's Gary Polkowitz and Marti Murray on December 21, 2012, informing them on page 3 that the (original) preferred shares of FIP belonged to Richcourt EuroStrategies and Richcourt Allweather Fund, Inc. As I never heard back from Mr. Davis, Mr. Polkowitz or Ms. Murray regarding any issues in regard to the transfer of the FIP shares, it had not occurred to me to think that simply updating the shareholder register of FIP would cause such a reaction on their part.

124.    As mentioned above, I considered this simply as finishing the paperwork on prior transactions on the part of FIP since Mr. Davis and Goldin had been informed six months prior to these actions and had never challenged any comments in my December 21, 2012 email including that SS&C had incorporated these changes in the FILB financial statements (as had Mr. MacGregor).

125.    I met with Mr. Luskin for a deposition in regard to FIP on August 9, 2013, with an attorney for me. I had FIP reimburse me for the $5000 that I paid to Cadwalader and to which Mr. Davis objected to in his December 26, 2013 letter to me. Unlike his December 16, 2013 letter (Davis Exhibit 26) and my response on December 24, 2013 (Davis Exhibit 27), this letter (Turner Exhibit 20) was not included in his book of exhibits.

Exhibit 21 is a copy of the Turner August 9, 2013 deposition at the Luskin office.

126.    At this time, Mr. Fletcher, Ms. Midanek and Mr. Gerti Muho were each claiming to be directors of these Richcourt funds and also claiming that the others were not directors. Given that Ms. Midanek of Solon Group, Inc. executed a resolution in her capacity as Director of each of the relevant Richcourt funds to reverse the transfers while retaining the right to have these transactions re-executed (Exhibit 14 at pages 14 and 17) and that FAM and AF agreed to the stipulation[12], I agreed to execute a resolution authorizing Intertrust to reverse the posted transfers. I sent that resolution to Intertrust on September 30, 2013.

127.    Had Mr. Davis or Mr. Luskin simply called me to ask what this was about (instead of making demands and threatening a subpoena), we could have had a simple, nearly cost-free discussion where I would have reminded Mr. Davis about the email I sent referring to the transfer of the FIP shares. Instead, he states that he "was forced to expend at least $100,000 to obtain the return of these assets to the Debtor's Estate." In his December 26, 2013 letter (Davis Exhibit 20), Mr. Davis also stated that he would seek the return of the $5000 that FIP reimbursed me for legal fees that I paid to have representation in this matter, less than 5% of the fees he claimed to spend on this matter.

## C.  Turner appoints himself President of FIP

128.    FIP is a Cayman Islands company that is not in bankruptcy. Thus, the Board (and not the shareholders) runs the company, just like it would under US law. The Board is allowed to have just one director (Turner Exhibit 22 contains Fletcher International Partners, Ltd.'s Memorandum & Articles of Association). Paragraph 79 allows for the Board to have one director.   Paragraph 80 states, "The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution." For the

---

[12] By that time, Mr. Muho had illegally wired funds out of a Soundview bank account for which he was not a signatory and, thus, I did not think of him as a possible director of these funds.

13

avoidance of doubt, paragraph 2(a) states, "words importing the singular number shall include the plural number and vice versa."

Any member of the Board may take on any role (with the exception of auditor) for pay at the company as allowed under Paragraph 86 and reaffirmed by Paragraphs 103 and 104. As the company is not in bankruptcy, the board does not need approval from the shareholders or anyone else to conduct its business unless the shareholders vote to remove the Board. Thus, Mr. Davis' comment in his December 16, 2013 letter (that my "purported employment agreement with FIP is null and void and of no force and effect...") has no standing at FIP.

Regardless, within six weeks of my appointment as President, I informed Mr. Luskin during my August 9, 2013 deposition that I indeed worked for Fletcher International Partners, among other entities. When Mr. Luskin asked if I was working for those entities, I responded that I believed so. For clarification purposes, Mr. Luskin asked, "Those are the entities that are paying you for your services?" I responded with "There have been some payment difficulties."[13]

Mr. Luskin left it there but I will explain the payment difficulties issue with FIP. SFT Bank, FIP's bank, sent at least two of my wire instructions to its correspondent bank (Citco) for review before processing payment. After a review by Citco, the wire instructions I sent on July 29, 2013 were paid on September 11, 2013 and the September 4, 2013 wire instructions were paid on September 13, 2013. Thus, both FILB and Citco were aware of the situation even though there is no requirement for notification. The emails contained in Exhibit 23 address some of these payment issues. In the end, Citco agreed to make the payments.

129.    Mr. Davis and previously Mr. Luskin filed objections to my contract with the following terms:

---

[13] Exhibit 21 at page 5.

14

a. The "signing bonus" as described by Mr. Davis was a combination signing bonus and payment for prior work (Davis Exhibit 22, page 1). From a public relations standpoint, I should have stated it more clearly and separately listed the amounts.

b. A monthly salary of $16,000, less than $200,000 per year, is well within the market for this role. In fact, all numbers cited in this section seem downright trivial compared to the amounts that the Debtor has paid the FILB Trustee and his legal firm and special consultant; I believe that these fees now stand in excess of $7MM for eighteen months of work.

c. The 5% commission on the sale of FFC shares for an amount greater than the posted value of these shares does not seem excessive either, especially in light of Mr. Davis' proposed fee of 5% of the amount received from the first dollar with a $500,000 cap to The Seaport Group in connection with the UCBI settlement. Its $500,000 fee for finding that United itself would bid more than any other potential buyer of the warrant seems ridiculously high for about a month's work.

d. A $50,000 payment for winding down this non-bankrupt company if the shareholders agree also does not seem high. Please note the proposed fees and potential bonuses for the Plan Administrator to be paid out of the Debtor's estate.

e. Severance of four months' salary (just $64,000 and not the previously reported $72,000) seems low in regard to the risks I assumed that Mr. Fletcher might have fired me from other positions had I not found in his favor and given that he may have worked to also vote me out as Director of FIP.

130.    The fees were paid by FIP to me but, again, FIP is not a company in bankruptcy. Given that the FILB Trustee knew or should have known that I was being paid by FIP as early as August 9, 2013, the FILB Trustee should have called a general meeting to attempt to remove me as Director (he would need other votes to do so) and then look to cancel my contract. Yet, almost eight months have passed

15

since then and more than three months since Mr. Davis' December letters without any appropriate corporate action undertaken under the terms of the Memorandum and Articles of Association by this minority investor.

131.    While I have so far voluntarily refrained from paying myself any fees that have accrued since the payment of my November 2013 salary, I may look to start paying the accrued amounts with notification to all FIP investors. The FILB positions in FIP (as preferred shareholder and approximately 10% holder of the ordinary shares) leave FILB as a minority shareholder in a solvent company. Thus, Mr. Davis has no particular status here but is simply trying to pierce the corporate veil; FILB does not outright own or control FIP. The FILB Trustee is free to call a general meeting to have the shareholders vote me out as Director, assuming he can obtain a two-thirds majority. He, and Mr. Luskin who cited details from the Memorandum & Articles of Association (Turner Exhibit 21 at page 53) during my deposition, should already know that. Yet, as pointed out above, they have not sought to do that as they are allowed to do so under the terms of the Memorandum & Articles of Association.

Given that Mr. Davis and Mr. Luskin have already successfully argued that a settlement at 12% of intrinsic value is above the lowest level of the range of reasonableness regarding the UCBI warrant, it seems contrary to logic to fight this much smaller case given a higher percentage offer and where litigation and discovery costs might be just as high for a much lower dollar reward when all is done.

Specifically, in the paragraph immediately following the paragraph that Your Honor required at the front of the Trustee's Report and Disclosure Statement:

> **"The facts and opinions set forth in this Disclosure Statement may in material respects be disputed in later proceedings in this chapter 11 case or elsewhere, and have not yet been found to be true by any court, if they ever will be. There can be no assurance that any litigation brought by the Trustee will be successful."[14]**

---

[14] Docket No. 393, page 12.

Mr. Davis wrote:

"The paucity of assets with any value has had two major impacts on the FILB bankruptcy since the Trustee was appointed. First, while the Trustee has done an extensive investigation to determine whether any claims exist, it has been necessary to factor in cost considerations in deciding whether to take particular investigative steps.2 A prime example of this necessary balancing involves discovery relating to Citco and its affiliates, Citco Trading Inc. and Citco Fund Services (Cayman Islands) Ltd., the latter serving as the administrator of the feeder funds – Alpha, Leveraged, and Arbitrage – until March 31, 2010, while also having many other conflicting relationships with AF, FAM and the Funds. The U.S.-based Citco entities from which the Trustee sought discovery responded to subpoenas by denying that they had any responsive documents; all responsive documents purportedly reside with non-U.S. Citco entities.   Once Citco refused to provide those documents (or any witnesses) voluntarily, the Trustee made the decision not to incur the substantial expense involved in engaging in foreign discovery. In the end, while the Funds have all the complexities of much larger funds, the estate simply did not have the resources to take all conceivable investigative steps."[15]

## III. The Insiders Cause the Debtor to Invest in AF's Brother's Movie

132.    This paragraph does not apply to me (Mr. Turner) and should not be responded to according to Your Honor's directions.

133.    This paragraph generally does not apply to me but I would like to point out that a part of Davis Exhibit 29 is a resolution where I am a signer authorizing a dividend to be paid from FAM, which is 100% owned by Mr. Fletcher, to Mr. Fletcher.  That seems reasonable and does not relate to the Debtor in any way.

134.    Again, this paragraph does not apply to me.

135.    Again, this paragraph does not apply to me.

---

[15] Docket No. 393, pp. 12-13.

17

136.    Again, this paragraph does not apply to me.

## IV. Fletcher Asset Management Collects Inflated Fees

137.    This paragraph generally states facts (although I have not reviewed the calculations). Such payments were reviewed by Grant Thornton and Eisner over the years that audits were finalized but I do not see how this should involve subordinating my claim.

138.    This contains statements of fact, probably going back to the 1990s and is included in the Arbitrage OM. These performance fees are not calculated on all series and were sometimes waived. Further, the amounts paid in performance fees were nowhere near what Mr. Davis makes them out to be. In any case, I do not see how weekly performance fees should involve subordinating my claim.

139.    There are many inflammatory and simply downright incorrect statements in each of the next few paragraphs. Thus, I will respond with separate bullet points for intra-paragraph comments.

- FAM prided itself in that FILB (or possibly other Fletcher entities) was the sole investor in a PIPE. Typically, when there is syndicate bidding on a PIPE, the stock price of the underlying company drops substantially in the minutes following the press release related to the investment as each of the investors tries to put on a hedge. As the sole investor, Fletcher would not have to worry about other investors putting on a hedge faster than it could. Further, based upon advice from Skadden, Fletcher would wait at least thirty days before putting on a stock-specific hedge to a position. Thus, being the sole investor is a good thing and not a bad thing.

- Accounting rules require that investments be valued at the end of a marking period. Thus, Fletcher was required to value the new positions.

- The Trustee's comments about UCBI ignore the fact that FILB's parent, Fletcher International, Inc. made a huge investment into United. FII bought a $103MM real

18

estate portfolio by investing approximately $20.6MM of cash and having United issue an $82.4MM non-recourse note. Fletcher then wrote down the $20.6MM at the end of April 2010. Additionally, Fletcher had to put up cash and other assets with United for what was called a "carry account". Thus, Fletcher contributed another $16MM of assets. While FILB's cost basis may have been zero, the combined FILB-FII put up more than $36MM in assets (far from zero). While there have been comments that Fletcher became involved in real estate, this was just a way to bring value to UCBI in return for a limited (but significant) investment of value, which was less than the value that Fletcher and Quantal placed on the United right and warrants.

- Davis Exhibit 31 has some mistakes in that it separates Syntroleum into many separate tranches to show several losses and combined the investment into Sanders Morris Harris Group (SMHG) with multiple tranches of Madison Williams purchases. Even if you include the first and only required Madison Williams purchase with SMHG, the SMHG transaction was still profitable.

- While at times I played a material role in the valuation process, I did less of this during 2010 and 2011.

- Dilshoda Yergasheva, a Harvard College graduate who was already pre-admitted into Harvard Business School before joining Fletcher in the fall of 2009 and quickly became heavily involved in the valuation process during this time. Turner Exhibit 24 is a copy of her resume from November 2010, where the first bullet point states that her activities included "pricing of complex non-publicly traded multi-million dollar financial instruments that Fletcher receives as part of its private equity investments." I do not mean to put any of this on a twentysomething, even one as

19

knowledgeable as Ms. Yergasheva but her knowledge of MATLAB (not listed on her resume) was instrumental in her independently reviewing the work of Quantal. She was yet another check in the system at Fletcher.

- In addition to Mr. Fletcher, Ms. Yergasheva, and I looking at valuations for FAM at various times over the years, we had many outside advisors including:

  o Quantal – Quantal's President and CEO Terry Marsh is well respected. In addition to being Professor Emeritus at Berkeley's Haas School of Business, he is one of twenty-five Associate Editors of The Journal of Fixed Income. Three other Associate Editors have won Nobel prizes in Economics.

  o Quantal's work was reviewed for many years by Grant Thornton. Grant Thornton hired Dwight Grant as an outside consultant to review the Quantal values. Two of his reports are attached as Exhibits 25 and 26, where in 2005 he called Quantal's values reliable.

  o EisnerAmper replaced Grant Thornton as auditor for 2009 and also used an outside advisor, Sterling.

  o EisnerAmper also requested additional reviews. Duff & Phelps reviewed both Helix and Ion for the year ended 2010 and wrote "Based on our analysis, Duff and Phelps has concluded that the carrying value of the investment appears reasonable in accordance with the requirements of ASC 820." For each of these investments. Draft copies of the reports are included as Exhibits 27 and 28. I am not sure if the final reports were signed; this may have something to do with their recently withdrawn claim.

  o Ernst & Young, while working for the Louisiana Pension Funds, accepted Fletcher's valuations, at least according to Exhibit 29, a September 9, 2011

20

press release issued by the Louisiana Pension Funds, which said: "The assets and their valuations have now been corroborated and the governing boards of the systems have been briefed."[16]

- o The SEC, which required restated financials for Leveraged and Arbitrage in 2007 and 2008 did not require a restatement for FILB, where most, if not all, of the underlying positions were held.

- Based upon all of these external and reliable sources, Fletcher did not present "fictitious (and unrealized) profit." Profits may not have been realized and the value of Fletcher's derivative instruments typically rose and fell with the value of the underlying stock price as realized by all of the above reputable, and generally very well-known, sources.

140.   Again, bullet points will be necessary to respond to the many inaccurate statements in paragraph 140:

- The Trustee is wrong when he said that "no FILB investment (other than a single 2007 investment – AGEN) was ever sold at or near its mark." First, there were three exercises of the AGEN preferreds that provided common stock valued at more than the long-term value of the AGEN warrants. Second, one exercise of a Raser warrant provided stock with value equal to the value of the warrant. Third, the SMHG warrant was sold back to the company (then-named Edelman Financial) for $7.5MM, far in excess of any standard valuation methodology like the Black-Scholes model that either the Trustee or his financial consultant Goldin Associates could calculate.

---

[16] Exhibit 29, Joint Statement, September 9, 2011.

21

- DSS: There is a typo in the Davis Declaration in that $4MM was spent by FILB and not $1MM.  While the Trustee states that the value of the warrant received was marked up as of the closing date, December 31, 2010, he does not state that accounting rules require that all positions be valued at the end of the marking period, both for buyers and issuers of the warrant.  Thus, the 2010 10-K issued by DSS itself (Exhibit 30 is the relevant page) shows that it valued the warrants at $3.9MM on December 31, 2010. This was in addition to stock valued at $4.0MM. The only difference was in the magnitude of the valuations.  While I cannot speak for DSS and how it valued the warrant it issued, Quantal valued the DSS warrant via a Monte Carlo simulation.  This methodology was similar to the SMHG / Edelman Financial warrant that was reviewed by EisneAmper for the 2009 FILB audit (Exhibit 31).  As mentioned above, the warrant was sold back to Edelman Financial for $7.5MM, an amount approximating the value of the warrant at the time of the February 2012 sale, which was far in excess of the Black-Scholes valuation.

- High Water Marks: The Davis Declaration does not address the issue of high water marks.  This is how both Arbitrage and Alpha (with a small tweak proposed by the MBTA Retirement Fund itself) worked as do most hedge funds.  This methodology handles fluctuations in the value of a fund such that a shareholder does not pay an incentive fee multiple times on the same profits it receives after intervening losses. For example, let's say that an investor puts $100 into a fund.  If there were $10 of profit in the first period, a $2 incentive (or performance) fee would be paid leaving the investor with $108.  Let's say that in the next period, the investor's account drops to $103; in addition to not receiving an incentive fee for this period, the investment manager would have to get the account back to $108 before he can

22

start drawing another incentive fee. More technical language can be found in the Arbitrage (Davis Exhibit 17 at page 23 in the "Investment Management Agreement" section) and Alpha (Davis Exhibit 15 at page 26) Offering Memoranda. Leveraged does not charge incentive fees at the Leveraged level.

- Also, not all classes of Arbitrage charge an incentive fee.

- DSS again: The Trustee claims that "FAM received credit for $19.6 million in unrealized gains, which on the margin would result in an approximately $4 million incentive fee on this one transaction alone." This statement is false and misleading. As mentioned above, not all classes of Arbitrage paid an incentive fee. Further, Arbitrage did not set a new high water mark in 2010 after May 14, 2010. Thus, no incentive fee was paid as of December 31, 2010 and the Trustee's claim of an approximately $4 million incentive fee is false. Exhibit 32 contains reformatted versions (originals can be provided to the Court) of the SS&C-prepared Arbitrage financial statements for the periods ending May 31, 2010 (where a mid-month new high water mark was set) and December 31, 2010. As can be seen from this, no additional incentive fees were earned in 2010 after May, specifically on December 31, 2010.

- High Plains Gas: The purchase of the warrant from High Plains Gas was a limited risk investment. While I do not recall being involved in the valuation of this transaction, I believe that this was a good transaction since instead of purchasing shares in a lightly traded company, FILB bought a warrant with large upside for a relatively small cash outlay, about 0.6% of FILB's assets at the time. A small increase in the price of the underlying stock after the purchase of the warrant led to a higher valuation before the stock price dropped sharply. Thus, the relatively small size of

23

this transaction proved to be a wise decision. At this time, Net Asset Values (NAVs) in Arbitrage did not exceed the May 14, 2010 high water mark. The Trustee claimed that "By February 28, 2011, FAM had marked the position at $25.7 million. This effectively meant that for $1 million spent by FILB, FAM received credit for $24.7 million in unrealized gains, which on the margin would result in an approximately $5 million incentive fee on this one transaction alone." No incentive fee was paid for the period ending February 28, 2011 and the Trustee's claim of an approximately $5 million incentive fee is false. These claims are inflammatory. Exhibit 33 confirms this where it shows no YTD incentive fee was accrued at February 28, 2011.

- Stuart MacGregor, who is cited in the Trustee's paragraph 140, recently reviewed the incentive fees for Arbitrage in 2010 and 2011. Excluding the deferred multi-year performance fee for Corsair, Arbitrage showed incentive fees of less than $2 million in 2010 and less than $800,000 in 2011. These amounts are far less than a reader of the Davis deposition would think FAM charged.

141.    The Trustee and his advisors have an unusual way of looking at numbers. While I have not confirmed his calculations, adding values from different years often means that investments may lose value over time. As pointed out above, since the highest marks occurred at different times for different investments meaning losses occurred, the Trustee's claim about DSS leading to an incentive fee of $4 million on December 31, 2010 and HPGS leading to an incentive fee of $5 million on February 28, 2011 were wrong and misleading as no incentive fees were earned at either time.

V.    Fletcher Asset Management Uses $160 Million in "Cashless" Promissory Notes to Inflate Valuations and Boost AUM and Fees

24

142.    As the Trustee's paragraph 142 references only Mr. Fletcher and Mr. Kiely (and not me), I will keep my remarks brief in this section. However, please note that the restated Net Asset Values as requested by the SEC five years ago and as re-audited by Grant Thornton four years ago did not change significantly.

143.    This paragraph does not apply to me.

144.    This paragraph does not apply to me.

145.    While the intent of this paragraph does not apply to me, I need to once again address some of the Trustee's use of numbers in a misleading way. In his paragraph 145, he comments about the effects of the Cashless Notes stating: "Ultimately, the Corsair investors more than tripled their stake in Arbitrage without making any additional investment going from owning 20% of Arbitrage to close to 70%."[17]

This happened as a result of subscriptions and redemptions in various funds occurring over time, including the investment into FIA Leveraged, Series N. In early 2009, after the unwinding of the Cashless Notes as of December 31, 2008, the Corsair investors had a two-thirds stake in Arbitrage, which is a fraction that as the Trustee said is "close to 70%."

146.    This paragraph does not apply to me.

147.    This paragraph does not apply to me.

## VI. The ION Trial

148.    This paragraph does not apply to me.

---

[17] Docket No. 474, page 57.

149.    Regarding my complaint that FILB did not call Mr. Fletcher at the Ion trial, the FILB Trustee wrote: "Second, I was concerned that his appearance would not be well received by the trial judge in what was a non-jury trial. This second concern proved to be well founded."[18]

I strongly disagree with the Trustee's statement.   Chancellor Strine wrote: "For reasons that were not explained, the bankruptcy trustee, who controlled the litigation, and new counsel did not present Buddy Fletcher as a witness at trial."[19]  See Exhibit 34 at page 36 (page 37 of the PDF).

<u>Conclusion</u>

I believe that my actions were appropriate and forthright and that my claim should be moved from Class 5 with its negative insider status to Class 3 and a portion of my claim should be considered an administrative claim.

Stewart Turner, Pro Se

Dated:  April 10, 2014.

---

[18] Docket No. 474, page 59.

[19] Memorandum Opinion delivered by Chancellor Strine on December 4, 2013 in Fletcher International, Ltd. v. Ion Geophysical Corporation, f/k/a Input/Output, Inc. and Ion International S.ar.l. in the Court of Chancery of the State of Delaware