HEARING DATE AND TIME: May 28, 2014 at 19:45 a.m. (ET)

RESPONSE DUE: May 21, 2014 at 4:00 p.m. (ET)

STEWART TURNER, Pro Se

Address: 200 East 71st St., Apt. 5A

New York, NY 10021

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

In re:

                                                 Chapter 11

FLETCHER INTERNATIONAL, LTD.

                                                 Case No. 12-12796 (REG)

               Debtor.

---------------------------------------------------------------- X

## OBJECTION OF STEWART TURNER TO THE

## THIRD AND FINAL APPLICATION OF GOLDIN ASSOCIATES, LLC, SPECIAL CONSULTANT TO THE TRUSTEE, FOR INTERIM AND FINAL ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED FOR THE PERIOD OCTOBER 5, 2012 THROUGH APRIL 6, 2014 AND FOR REIMBURSEMENT OF EXPENSES

Introduction

Stewart Turner, who is both an administrative and pre-petition creditor of Fletcher International, Ltd. (Bermuda), states as follows:

1. I have filed claims in this case in the amount of $33,502.76 plus unliquidated damages regarding legal fees under my rights to indemnification. I am a former consultant and a former Director of Fletcher International, Ltd. ("FILB"). I have a Bachelor of Science in Engineering degree from Princeton University in 1980 and an MBA degree from The Wharton School at The University of Pennsylvania in 1984.

2. My particular expertise as an advisor to the Fletcher organization is in connection with negotiating the customized PIPEs warrants which are the major investment vehicle of the Fletcher organization and, from an industry perspective, in valuing those warrants. Although I do not earn my living as a valuations expert, in addition to my graduate business education I have worked on valuation matters with our accountants and experts throughout the years and I have industry perspective and experience on valuation.

3. I ask the Court's indulgence insofar as I cannot afford counsel and I have prepared all of what follows myself.

Background

4. Goldin Associates, LLC, has filed another fee application, bringing its total fee requests to $4,284,447.21 plus expenses since being hired as a financial consultant by FILB Trustee Richard J. Davis in October 2012.

5.      I was a consultant to the Debtor before the filing and remained as a consultant in bankruptcy under law firm Young Conaway Stargatt & Taylor LLP ("Young Conaway"), then Chief Restructuring Officer firm Conway MacKenzie, Inc., which acted as Chief Restructuring Officer, and then under FILB Trustee Richard J. Davis. I was paid for my work by the Davis-run FILB from September 2012 through April 2013 and I handled a few minor matters for FILB without submitting time sheets requesting payment after that.

6.      During that time, I met and became familiar with a number of people at Goldin, notably Gary Polkowitz, Marti Murray and Alois Chakabva.

7.      I prepared numerous emails and had many meetings with Goldin staff during my time as a consultant to the Davis-led FILB. Some issues were simple and easily understood. Others required more than one meeting for Goldin to get a complete understanding. Valuation issues were never understood by Goldin, although larger major accounting firms such as Grant Thornton, EisnerAmper, Ernst & Young had staff that understood Fletcher's valuations and generally approved or corroborated these values.

Bases of Objection

Valuation Issues

8.      As a "special consultant" and as a "financial consultant" (both terms have been used by the Trustee to describe Goldin), Goldin reviewed the offering documents, the financial records, and the valuation issues related to the Debtor and in an expanded role taken on, reviewed many other funds managed by FILB's former Investment Manager, Fletcher Asset Management ("FAM") as well.

9. Among my earliest conversations with Trustee Davis (and similarly with Young Conaway and Conway MacKenzie), I highlighted a then-recent (June 2012) sale of a FILB-owned asset (perpetual, non-callable, convertible preferred stock in Ion Geophysical Corporation ("Ion")) by Credit Suisse for just over $700,000 above conversion value. This was an amount slightly in excess of two quarterly dividend payments and far below the $32-million premium placed on it by Fletcher's outside valuation analyst, Quantal International, Inc. ("Quantal"). I had thought that this was a major item that the Trustee should seek to recover on behalf of the creditors and shareholders of FILB. (In addition to paying over $2MM in dividends to the buyer, Ion paid a $5MM fee to the buyer to convert the preferred in September 2013.)

10. Similarly, there was a related perpetual, non-callable, converted preferred in Helix Energy Services Group ("Helix"). The Trustee, after having The Seaport Group look for buyers for this preferred, wound up converting the preferred and selling the common stock, even though this was also valued at a premium of around $1,000,000 to conversion value. (The Trustee needed the $6.5MM received to fund the beginning of his investigation; similarly, FAM would convert part of a position when needed for cash for among other things, making an investment in more highly-valued securities.)

11. Based upon Goldin's valuations (unless the Trustee has a special expertise in this area), the Trustee determined that FAM's and Quantal's valuations were not reliable (Exhibit 1).

12. I do not know how Trustee Davis determined that these valuations were wrong but these values were not determined solely by Quantal and FAM. They had been reviewed for audit purposes by Fletcher's auditors, Grant Thornton and EisnerAmper, their outside valuation firms, and Duff & Phelps (the largest valuation firm).

13. Ernst & Young LLP reviewed these values during the summer of 2011. As a result of the Ernst & Young LLP review, the Louisiana Pension Funds issued a Joint Statement on September 9, 2011 stating that "The assets and their valuations have now been corroborated."

14. Yet, Goldin determined that the assets' values were overstated. What expert did Goldin have who could determine that FAM, Quantal, Grant Thornton, EisnerAmper, Duff & Phelps and Ernst & Young were all wrong?

15. Their Management Committee Member, Marti P. Murray, valued the Fletcher assets. According to the Goldin website, Ms. Murray's "specific expertise *(is)* in the distressed debt and bankruptcy arenas" and not in dealing with perpetual, non-callable, convertible preferred stock, by its very nature, a long-term asset.

16. Ms. Murray was not qualified to value these assets and certainly did not have greater expertise than the large outside firms: Grant Thornton, EisnerAmper, Duff & Phelps and Ernst & Young.

17. I believe that her actions and Goldin's actions led Trustee Davis to not believe any of the valuations prepared by Quantal and FAM. The Trustee Report primarily focuses on the assets being overvalued and FAM and Duhallow Financial Services, LLC receiving excess fees due to these valuations questioned by Goldin.

18. These valuations include warrants that had special terms. Instead of appreciating and valuing the special provisions that had been accepted by at least three companies in which FILB (as managed by FAM) invested, Goldin simply felt that these were unusual terms and did not give them any value (or at least that is my reading of the Trustee Report). Specific warrants questioned in the Trustee Report are Document Security Systems (ticker DSS) and High Plains Gas (ticker HPGS); more on this below in the Accounting Issues section.

19. Goldin's questions about warrants have also impacted the valuation of the UCBI Warrants where the Trustee and the Bankruptcy Court approved a Settlement Agreement with UCBI, although I have filed an appeal on this matter. I humbly request this Court to not make any payments to Goldin until the UCBI matter is resolved.

20. While the UCBI matter is primarily related to a legal issue, I believe that Trustee Davis would have given FAM more (some) credibility had it not been for the Goldin mistakes, both related to valuation issues mentioned above and accounting issues related below.

Accounting Issues

21. While I did not think Goldin had the expertise to value assets, I had felt there was sufficient capability on their part in the accounting area based on the number of accounting people I had met at Goldin. Based upon my review of the Trustee Report, there are several glaring items that should have been caught before its release in a thorough $4MM+ review by Goldin, unless these items were inserted solely for sensational or inflammatory value.

22. One such inflammatory statement from the Trustee Report is: "In 2010, a different valuation scheme became increasingly prevalent – the immediate markup of newly-acquired investments."[1]

23. As a good financial consultant, one would have expected Goldin to point out to the Trustee that FAS 157, issued by the Financial Accounting Standards Board, requires all financial instruments to be valued at fair value at the end of each accounting period. FILB, under FAM and reviewed by its auditors, had to mark and did mark all new investments at fair value, not since 2010, but since FILB held any financial instruments going back to at least 2003 (before FAS 157), if not earlier.

24. The Trustee highlights three items: DSS, UCBI and HPG (the ticker was actually HPGS).

25. "On December 31, 2010, FILB made a $4 million investment in DSS. On the same day, FAM marked that position at $23.6 million, suggesting an immediate unrealized profit of $19.6 million."[2]

---

[1] Docket No. 393, page 193 of the PDF.

26.     As stated above, FAS 157 required that the position be marked at fair value "on the same day" as December 31 was the end of a month and the fiscal year. This was required even though as the Trustee wrote, "In all three examples, there had been no fundamental development at any of these companies that would have justified marking up the values."[3] (I address the other two examples below.)

27.     Goldin should have made the Trustee aware of FAS 157. Not only did FILB mark the position to fair value "on the same day" as required, so did DSS itself as required by its auditors under similar GAAP (Generally Accepted Accounting Principles) rules for issuers, although DSS' calculation of fair value differed from FAM's.

28.     Goldin did not correct the Trustee when he wrote "On April 1, 2010, FILB executed a multi-faceted transaction with United Community Banks. As part of that transaction, FILB received warrants to purchase the publicly-traded stock of UCBI. The warrants were assigned a zero cost basis but were marked at a value of $76.3 million by April month-end, suggesting that there had been an unrealized gain of $76.3 million on the position within the same month the investment was made."[4] Goldin should have reminded the Trustee to include the cash and securities given in several transactions to UCBI totaling $42.5 million and the immediate write-down of $20.6 million by FILB's parent, Fletcher International, Inc., on one of the other facets.

29.     Regarding HPGS, the Trustee wrote "On February 25, 2011, FILB made an investment in a warrant issued by HPG that had been acquired for $1 million. By February 28, 2011 – the next business day – FAM had marked the position at $25.7 million. This effectively meant that for $1 million

---

[2] Docket No. 393, page 194 of the PDF.

[3] Docket No, 393, page 195.

[4] Docket No. 393, page 194.

7

spent by FILB, FAM received credit for $24.7 million in earnings, which on the margin would result in an approximate $5 million fee."[5]

30.     Had Goldin reviewed the offering documents thoroughly to find the high water mark provisions (meaning that no new performance fees can be collected until investors start earning new profits instead of simply recovering losses since the most recent payment of a performance fee) and the financial statements, the Trustee would have realized that **no** performance fee was paid and **not** "an approximate $5 million fee."

Summary

31.     Goldin and Ms. Murray did not have the expertise to value the Fletcher positions. Their claims that FAM overvalued the positions *and* received excessive fees were simply false. These errors caused Trustee Davis to not trust FAM, leading him to undervalue the UCBI position and entering a cheap Settlement Agreement that will hurt all creditors and shareholders, if the appeal is not successful.

32.     Goldin's not reviewing the Trustee Report and correcting the Trustee's errors has also led to continuing bias and an ill-conceived lawsuit against Alphonse Fletcher, Jr., FAM, Quantal and Turner.

33.     Based on the above, I request that Goldin receive no fees for the period November 20, 2012 (the date of the email in Exhibit A showing Trustee Davis' unfortunate reliance on Goldin) through April 6, 2014 and disgorgement of all fees in excess of that amount that have already been paid.

---

[5] Docket No. 393, pages 194-195.

34. Although I do not know if it is possible under the law, I would request that any fees earned or accrued by Trustee Davis or the Luskin firm after that date paid by FILB be reimbursed to FILB by Goldin.

*[Signature]*
Stewart Turner, Pro Se

Dated: May 21, 2014.

# Exhibit 1

| | |
|---|---|
| **Subject:** | Re: Helix Preferred |
| **From:** | Davis, Richard (Richard.Davis@rjdavislaw.com) |
| **To:** | stewart_turner@ymail.com; |
| **Cc:** | AFletcher@fletcher.com; mmurray@goldinassociates.com; luskin@lsellp.com; GMuho@fletcher.com; dkiely@kielyllp.com; |
| **Date:** | Tuesday, November 20, 2012 7:44 AM |

We will discuss the Helix situation. I would remind you that your track record of selling these kinds of instruments above the conversion price is not good. And, no we are not relying on your or Quantals valuations

Richard J Davis

On Nov 20, 2012, at 7:37 AM, "Stewart Turner" <stewart_turner@ymail.com> wrote:

> Marti -
> Buddy may have additional questions, but here are several of mine:
> - How many rounds of bidding will there be?
> - When will the first round of bidding end?
> - What information will be provided to the bidders by the broker? Will any of that information come from Goldin? Please forward copies of that information to me.
> - Will any spreadsheets prepared by me be forwarded to the bidders?
> - Will any Quantal reports be forwarded to the bidders?
> - Is there a minimum price set? If so, is it in terms of dollars or in terms of years/dollars of dividends above the conversion price?
> - Who is the broker? How much time did Goldin spend explaining the instrument(s) to the broker?
> - Who are the other potential bidders? What types of firms do these represent? Can Buddy or I meet with them to explain the value of the Helix, and additionally, the IO preferreds?
>
> Richard, may we discuss these questions at our meeting this morning?
> Thanks,
> Stewart
>
> **From:** AF {AFletcher} <AFletcher@fletcher.com>
> **To:** Marti P. Murray <mmurray@goldinassociates.com>
> **Cc:** Stewart Turner <stewart_turner@ymail.com>; "Richard.Davis@rjdavislaw.com" <Richard.Davis@rjdavislaw.com>; "luskin@lsellp.com" <luskin@lsellp.com>; GEM {GMuho} <GMuho@fletcher.com>; DJK {DKiely} <dkiely@kielyllp.com>
> **Sent:** Monday, November 19, 2012 2:50 PM
> **Subject:** Re: Helix Preferred
>
> I confirm receipt of these messages. My views haven't changed since our meeting. My analysis is diverges somewhat from Stewart's but generally I agree that a distressed sale is

not helpful to maximizing the estate. I would welcome information on the bidding format.

On Nov 19, 2012, at 11:07 AM, "Marti P. Murray" <mmurray@goldinassociates.com> wrote:

Stewart -

Thank you for your input. We have instructed the broker we are working with to contact the parties you have listed below as part of the universe of potential buyers they will be contacting.

Can you please advise whether Buddy is in a position to confirm receipt of my e-mail?

Marti

---

**From:** Stewart Turner [mailto:stewart_turner@ymail.com]
**Sent:** Monday, November 19, 2012 10:28 AM
**To:** Marti P. Murray; 'AFletcher@fletcher.com'
**Cc:** 'Richard.Davis@rjdavislaw.com'; 'luskin@lsellp.com'
**Subject:** Re: Helix Preferred

Marti -

I am happy to help here. Please describe the marketing effort that you are starting today.

Previously, I thought that Credit Suisse kept the position itself or sold it to a high-commission paying client at that price (within four months, the buyer had already received 96% of the premium paid back in dividends). Perhaps there was no misconduct on the part of Credit Suisse and perhaps the buyer wanted to make the greatest profit possible, but maybe there was simply a limited explanation of the asset that the IO buyer purchased.

Thus, I recommend that Buddy or I explain the asset along with you and/or colleagues of yours to get the best bid possible. I believe that this should include face-to-face meetings as this is a unique investment. I also believe that in order to be able to get a face-to-face meeting, the IO preferred with its annual dividend of at least $1,350,000 must be part of the discussion as the Helix dividend is only 3% of that of IO.

As previously mentioned, I believe that mutual funds or ETFs may provide the strongest bids although Buddy might have other recommendations. Sample fund/ETF buyers would include:

- Dimensional Fund Advisors
- Vanguard Group
- FMR LLC (Fidelity)
- Blackrock
- State Street

I implore you to give this your best effort along with including Buddy or me as part of the selling team as I anticipate an 8-figure adjustment in the sale price of the IO preferred to come out of this (whether from a new buyer or an adjustment by the old buyer).

Kind regards,
Stewart


**From:** Marti P. Murray <mmurray@goldinassociates.com>
**To:** "'AFletcher@fletcher.com'" <AFletcher@fletcher.com>; "'stewart_turner@ymail.com'" <stewart_turner@ymail.com>
**Cc:** "'Richard.Davis@rjdavislaw.com'" <Richard.Davis@rjdavislaw.com>; "'luskin@lsellp.com'" <luskin@lsellp.com>
**Sent:** Monday, November 19, 2012 7:33 AM
**Subject:** Helix Preferred

Buddy and Stewart -

The Trustee has received court approval to monetize the Helix Preferred position. Please advise if there are any parties you believe should be contacted in connection with the marketing effort which is set to commence today.

Thanks very much -

Marti Murray
Marti P. Murray
Managing Director and Member of Management Committee
Goldin Associates, LLC
The Empire State Building - 44th floor
350 Fifth Avenue
New York, NY 10118

---

This communication, and any attachment(s), is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential and/or protected by privilege. This communication is for information purposes and should not be regarded as an offer, a contract, or any form of official statement of Fletcher Asset Management Inc., or any of its affiliated entities. If you are not the intended recipient, any use, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please delete the original email, any copies, attachments thereto, or printouts and notify the sender immediately.