UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

|                                   |   |                      |
|-----------------------------------|---|----------------------|
| In re:                            | ) | Chapter 11           |
|                                   | ) |                      |
| FLETCHER INTERNATIONAL, LTD.,     | ) | Case No. 12-12796 (REG) |
|                                   | ) |                      |
|                         Debtor. | ) |                      |

———————————————————————

## SUPPLEMENTAL OPINION AND ORDER ON EQUITABLE SUBORDINATION OF STEWART TURNER AND ALPHONSE FLETCHER CLAIMS

APPEARANCES:

LUSKIN, STERN & EISLER LLP
*Counsel for Richard Davis, FILB Chapter 11 Trustee*
11 Times Square
New York, New York 10036
By:    Michael Luskin, Esq. (argued)
        Lucia T. Chapman, Esq.
        Stephan E. Hornung, Esq.

STEWART TURNER
*Former Director and Treasurer of the Debtor, Pro Se* (argued)
200 East 71st St., Apt. 5A
New York, New York 10021

HOLLAND & KNIGHT LLP
*Counsel for Fletcher Fixed Income Alpha Fund, Ltd. And Massachusetts Bay
Transportation Bay Retirement Fund*
10 St. James Avenue
Boston, Massachusetts 02116
By:    John J. Monaghan, Esq. (argued)

JONES DAY
*Counsel for Soundview Trustee, Corinne Ball*
222 East 41st Street
New York, New York 10017
By:    Veerle Roovers, Esq. (argued)
        Corinne Ball, Esq., Trustee

WILLIAM K. HARRINGTON
*United States Trustee, Region 2*
201 Varick Street, Suite 1006
New York, New York 10014
By:    Richard C. Morrissey, Esq. (argued)

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

At the confirmation hearing on March 27, I found that the Trustee, by his direct testimony, taken by declaration,[1] had made a prima facie showing that the claims of Stewart Turner and Alphonse Fletcher should be subordinated.  But I gave Mr. Turner an additional opportunity to respond, after which I would determine whether there were disputed issues of fact as to the subordination of his claims, which could be determined only after an evidentiary hearing.

After review of Mr. Turner's Response[2] and the Trustee's Reply,[3] and the underlying Davis Declaration, I determine that issues of fact exist with respect to three of the Trustee's seven bases for subordination, and that those three cannot be decided without an evidentiary hearing.  But I further determine that material issues of fact do not exist with respect to the other four bases upon which the Trustee relies, and that these by themselves are sufficient to warrant equitable subordination of Mr. Turner's claims.

Thus I conclude that Mr. Turner's claims, like those of Alphonse Fletcher,[4] should still be subordinated.  The bases for this determination follow.

---

[1]    Decl. of Richard J. Davis, Mar. 24, 2014, ECF No. 474 ("**Davis Decl.**").

[2]    *See* ECF No. 498–501 ("**Turner Response**").

[3]    *See* ECF No. 518 ("**Trustee Reply**").

[4]    Mr. Fletcher failed to timely object.

<u>Findings of Fact</u>

Familiarity with the background of this controversy is assumed.  By reason of the positions they occupied, as shown by the Trustee in his declaration[5] (and apart from the Trustee's contentions as to the control they exercised in practice), each of Alphonse Fletcher[6] and Mr. Turner[7] was, at least at the times relevant here, an insider of the Debtor Fletcher International Bermuda Ltd ("**FILB**").[8]  Their claims, along with the claims of five others, were classified as Class 5 Insider Claims, which were subordinated under the Trustee's Plan.[9]

The Trustee bases his equitable subordination of Mr. Turner's claims on five grounds.  With respect to each of them, I first discuss evidence presented by the Trustee. I then discuss Mr. Turner's response to the Trustee's showing, and the extent, if any, to which Mr. Turner's response led me to determine that there were disputed issues of material fact that could not be determined in the absence of a trial.

---

[5]    Davis Decl. ¶ 95.

[6]    CEO and sole shareholder of Fletcher Asset Management, Inc., the Debtor's asset manager and agent, and the person in control of the Debtor at all relevant times.  *Id.* ¶ 96.

[7]    Former director of the Debtor (from February 2012 through July 2012) and Fletcher Asset Management.  He was also the Debtor's Treasurer between 2010 and the June 29, 2012 filing of the Debtor's chapter 11 case (the "Petition Date").  *Id.*

[8]    In the Davis declaration, he used numerous acronyms.  For example, Fletcher International Inc. ("**Fletcher Int'l Inc**.") was referred to as "FII"; Fletcher Asset Mgt was referred to as "FAM"; Fletcher International Partners was referred to as "FIP"; United Community Bank Inc. was referred to as "UCBI"; and Assets Under Management were referred as "AUM".  To help make this discussion more understandable, I've substituted names that have more meaning to those who haven't been living with this case on a daily basis.  But though I generally dislike acronyms and don't use them unless their meaning is obvious, the parties have used "FILB" so often in this case that I will too.

[9]    Davis Decl. ¶ 95.

1. *The April 22 Transactions*

   (a) *The Trustee's Showing*[10]

   On April 18, 2012, the Grand Court of the Cayman Islands entered an order winding up FIA Leveraged Fund, Ltd. ("**Leveraged**") and confirming the appointment of Robin McMahon and Roy Bailey as Joint Official Liquidators ("**JOLs**"). On the evening of April 22, 2012, just four days after the Grand Court of the Cayman Islands ordered that Leveraged be wound up, the boards of directors of FILB, Fletcher Int'l Inc. and Fletcher Income Arbitrage Fund, Ltd. ("**Arbitrage**") attempted to enter into a series of transactions ("**April 22 Transactions**") (structured as a redemption, which in general terms involves the transfer of cash or other assets to an equity owner in exchange for the cancellation of the equity owner's stock or other interest) which would have changed the ownership structure of the Debtor FILB so that FILB would be owned largely by Arbitrage. To that end, FILB transferred assets said to be worth $44.1 million to Fletcher Int'l Inc. (of which Alphonse Fletcher was a director and the President), which as part of those transaction was then intended to be largely owned by entities controlled by Alphonse Fletcher, rather than Arbitrage.

   More specifically, as a purported payment in kind for the redemption by Fletcher Int'l Inc. of its shares of FILB, FILB assets were transferred from Debtor FILB to Fletcher Int'l Inc.:

   - $2.2 million in cash, which was transferred from FILB's bank account to Fletcher Int'l Inc.'s bank account;

---

[10] In some cases, with respect to this asserted basis for subordination and the ones after it, the Trustee said more than what follows in his prima facie case. But some of this was detail unnecessary for this discussion. Also, because I thought remarks by the Trustee sometimes strayed too far into characterization, I have limited my discussion of the Trustee's showing to more objectively demonstrable matter.

- one-half of the United Community Bank Warrants (warrants to purchase shares of United Community Bank Inc.);

- the membership interests in BRG Investments, LLC which were 100% of the membership interest in BRG;

- the Document Security Systems Warrants (warrants to purchase shares of Document Security Systems common stock); and

- the Excess Registration Funds (the right to any payment in excess of $606,667 made by United Community Bank to FILB due to a "Registration Failure" under the United Community Bank Securities Purchase Agreement).[11]

There was no evidence of a valid business purpose for performing these transactions. If they were successfully implemented, their effect would have been to remove the transferred assets from an entity over which the JOLs might secure control (*i.e.*, FILB) to one where they would not (*i.e.*, Fletcher Int'l Inc.).[12]

On two separate occasions, Mr. Turner verbally admitted to the Trustee that the express purpose of the April 22 Transactions was to put FILB assets out of the reach of the JOLs and ultimately the Louisiana Pension Funds, by transferring them to an entity— Fletcher Int'l Inc.—in which Arbitrage would no longer have an interest.[13]

Mr. Turner and Floyd Saunders—both FILB Directors—each voted in favor of the transactions. Mr. Turner was also a director of Fletcher Int'l Inc. and voted in favor of the April 22 transaction with respect to Fletcher Int'l Inc.[14] Mr. Turner, along with Alphonse Fletcher, played a central role in the April 22 Transactions.[15]

---

[11]    Davis Decl. ¶ 101.

[12]    *Id.* ¶ 102.

[13]    *Id.* ¶ 103.

[14]    Fletcher Int'l Inc. Board Minutes, and Draft FILB Minutes, Apr. 22, 2012, Davis Exh. 2.

[15]    Emails Regarding Apr. 22 Transactions, Davis Exh. 3.

After a demand by the Trustee in December 2012 that Fletcher Int'l Inc. return

these assets to the Debtor (and instructions by the Trustee to his counsel to begin

preparing an adversary complaint against Fletcher Int'l Inc. seeking return of the assets

on the grounds that they were intentionally fraudulently conveyed to Fletcher Int'l Inc.),

settlement negotiations culminated in the execution of an agreement between the Trustee

and FII that unwound the April 22 Transactions ("**Term Sheet Agreement**"), pursuant to

which, on March 8, 2013, the Debtor FILB, Fletcher Int'l Inc., and Alphonse Fletcher

entered into an Omnibus Assignment and Stock Reinstatement Agreement (the

"**Assignment Agreement**") returning the assets to the Debtor.[16]  But a prima facie case

was made that the April 22 Transactions were intended by Mr. Turner and Fletcher to

transfer assets outside of the reach of FILB's investors and creditors (including Arbitrage,

Leveraged, and the Louisiana Pension Funds), and were returned to the Debtor only

under threat of imminent litigation.

These transactions and their eventual unwind cost the Debtor's Estate

considerable time and expense in legal and related fees.[17]

(b)  *Turner's Response & My Finding*

Shorn of remarks not germane to the analysis, Mr. Turner's response, in

substance, was that the challenged transfer took place but was justified; that it was a

redemption "in kind," in a manner that FILB offered to the Louisiana Pension Funds;

that it was in exchange for fair value; and that there was no bad intent.  He stated that:

> On the evening of Sunday, April 22, 2012, proposed
> actions were reviewed and authorized by the
> appropriate boards of directors to redeem shares of

---

[16]    Assignment Agreement, Davis Exh 4.

[17]    *Id.* ¶ 108; *see, e.g.*, Applications for Professional Compensation, ECF Nos. 209–211, 268–270.

> FILB held by its parent, Fletcher International, Inc. .
> . . with underlying assets, in a manner similar to the
> way the Louisiana Pension Funds were redeemed in
> February 2012.  For redeeming approximately $44.1
> MM of FILB shares held by the then-100% owner
> of FILB, consisting of $2.2MM in cash and non-
> cash assets that were valued at $41.9MM (for a total
> of $44.1 MM) were transferred to FII.[18]

He then effectively admitted that the purpose of the transaction was to deliver the

assets to the "parent entity" (presumably Fletcher Int'l Inc.) and its shareholders, rather

than to FILB's creditors or their representatives:

> The primary business purpose of the transactions
> was to deliver the assets with value as recognized
> by Quantal, FAM and Turner to the parent entity
> and its shareholders which understood the value and
> not to the Joint Official Liquidators appointed by
> the Grand Court of the Cayman Islands, which
> considered the UCBI assets to be "commercially
> worthless".[19]

He later described the intention (apart from "divid[ing] the assets fairly") to be to transfer

the assets to people "that appreciated the value and would work to maximize it rather

than being held in an entity subject to foreign liquidation where they would be

unappreciated and therefore mishandled."[20]

He also relies on the participation without objection of Mr. Schwartz, Fletcher

Asset Management's attorney, to mean that there was no objection.[21]

But Mr. Turner did not in any way dispute the basic facts that justify, if they do

not also compel, equitable subordination.  Indeed he repeated them.  The "primary

business purpose" of the transactions was to deliver the assets to an entity other than the

---

[18]    Turner Response ¶ 99.

[19]    *Id.* ¶ 102.

[20]    *Id.* ¶ 103.

[21]    *Id.* ¶ 107.

-7-

representatives of the Debtor's creditors—the Joint Official Liquidators.  The effect and purpose of the transfer—as squarely admitted—was to frustrate the Cayman Court's order.  Keeping assets away from creditors or their representative is exactly what an intentional fraudulent conveyance is all about.  And where, as here, one has the actual intent to hinder, delay or defraud one's creditors, "reasonably equivalent value," which applies only to constructive fraudulent transfers, is irrelevant.

Apart from his claim that Fletcher Int'l Inc. could better appreciate the value of FILB's assets (which is irrelevant, where the purpose of the transaction was to spirit the assets out of FILB's hands), Mr. Turner's only other defense to this conduct is that counsel assertedly blessed the transfers.  Mr. Turner argues that the lack of any objection by Seth Schwartz of Skadden was tantamount to approval by counsel.  But without factual dispute, Schwartz was merely copied on an email chain two days prior to the Sunday consummation of the transfers, and Schwartz's "non-objection was taken to mean no objection."[22]  But this is not the case as a matter of law; silence does not constitute legal advice, particularly where Mr. Turner presents no evidence that the actual facts were ever presented to any lawyer or that any lawyer was asked to render an opinion.[23]

The admitted purpose of the April 22 Transactions was to move FILB assets out of the company and keep them away from the representatives of FILB's creditors.  Based

---

[22]    *Id.*

[23]    I agree with the Trustee's point that the law on attorney-client privilege and on the advice of counsel defense to criminal charges is instructive.  In order to establish that a communication with counsel is privileged, the person or entity asserting privilege must show, among other things, that the purpose of the communication was to obtain legal advice from a lawyer.  *Markowski v. SEC*, 34 F.3d 99, 105 (2d Cir. 1994).  Similarly, in order to avail himself of the advice of counsel defense, an accused must show, among other things, that he made a complete disclosure to counsel of all relevant facts and reasonably relied on and followed that advice.  *See, e.g.*, *United States v. Beech-Nut Nutrition*, 871 F.2d 1181, 1194–95 (2d Cir. 1989).

on admitted and undisputed facts alone, Mr. Turner's explanations are unsatisfactory, and his claims may be, and should be, subordinated on this ground alone.

2. *Investments in Fletcher International Partners*

    (a) *The Trustee's Showing*

        (1)   *Cash to Ermanno Unternaehrer of $4.1 million in Exchange for Illiquid Indirect Interests in Citco*

In July 2008, Alphonse Fletcher, Denis Kiely (a FILB director from 2008 through 2011), and Mr. Turner provided Ermanno Unternaehrer (who, among other things, was a top Citco executive and longtime acquaintance and business associate of Alphonse Fletcher) with what turned out to be $4.1 million in FILB funds, in exchange for illiquid assets, through an investment in a then-dormant Cayman Islands entity called Fletcher International Partners.

Unternaehrer agreed to contribute illiquid shares of FFC Fund (which indirectly owned shares of Citco III Limited, a Cayman Islands company formed to make an equity investment in the Citco Group Limited) to Fletcher International Partners.[24]

Among other things, the offering memorandum disclosed that the FFC shares are "redeemable only at the option of FFC Management, as determined in its sole and absolute discretion"; investors "should not expect that they will ever receive cash redemption payments"; and that "[t]he Issuers do not anticipate paying cash distributions or dividends to their respective investors."  Unternaehrer—the  person obtaining the benefit of the FILB investment—was the Director of FFC Management and was directly responsible for determining whether a redemption was allowed.[25]

---

[24]    *See* Davis Decl. ¶ 110; Subscription Agreement, July 2, 2008, Davis Exh. 5.

[25]    *See* Davis Decl. ¶ 112; Offering Mem., July 11, 2005, Davis Exh. 8.

Through a coordinated scheme of transactions, Unternaehrer was able to extract
$6.6 million in cash from Fletcher International Partners, $4.1 million of which came
from FILB.  Through a series of additional transactions in October (a share purchase by
FILB) and November 2009 (an ordinary dividend from Fletcher International Partners),
Unternaehrer received an additional $900,000, of which $250,000 came from FILB and
$650,000 from Fletcher International Partners.[26]

The investment in Fletcher International Partners, designed to provide liquidity to
a Citco executive, was not disclosed to investor Massachusetts Bay Transit Authority
Retirement Fund (the "**MBTARF**") as was required under the MBTARF's side letter
agreement (the "**MBTARF Side Letter**"); was outside of the Funds' investment strategy,
and resulted in a $4.1 million illiquid investment that could not be redeemed for cash
other than at the will of Ermanno Unternaehrer—the very person that stood to benefit
from this transaction.  Alphonse Fletcher, Denis Kiely, and Mr. Turner were involved in
this transaction.

(2)    *Distribution of Fletcher International Partners Shares to Richcourt
Funds in Violation of Automatic Stay*

In May and June 2011, the Richcourt Euro Strategies and Richcourt Allweather
Fund submitted redemption requests for the entirety of their respective holdings of Series
6 shares in Leveraged.  Richcourt Euro Strategies and Richcourt Allweather Fund
requested that their respective redemption requests be satisfied as of June 30, 2011.
Fletcher Asset Management made the decision to satisfy these redemption requests in

---

[26]    *See* Davis Decl. ¶ 115; Wire Transfer Authorization and Share Transfer Documents, Davis Exh.
11.

-10-

part by providing an in-kind distribution of certain shares that the Debtor owned in

Fletcher International Partners.

Due to the master-feeder fund structure, the Debtor FILB could not redeem the

Fletcher International Partners shares directly to Richcourt Euro Strategies and Richcourt

Allweather Fund.  Satisfaction of Richcourt Euro Strategies' and Richcourt Allweather

Fund's redemption requests would have first required them to have been transferred from

the Debtor up through the feeder fund structure to Leveraged, and then from Leveraged

to the redeeming Richcourt funds as an in-kind satisfaction of their respective redemption

requests.  Each of these transactions should have been backed up by corporate resolutions

or other appropriate documentation at each fund level documenting the transfer of the

Fletcher International Partners shares.

But no resolutions were executed at any time before the Debtor filed for

bankruptcy, and the transaction therefore was never completed.  Alphonse Fletcher also

confirmed that the purported redemption was never completed prior to the Petition Date

in an affidavit that he delivered to the Trustee in connection with the unwind of these

transactions.  Accordingly, on the date the Debtor filed for Bankruptcy, the Debtor still

owned approximately 10% of the common stock and 3,650 preferred shares of Fletcher

International Partners (before taking into account dividends due).

But on June 20, 2013—nearly one year after the Debtor filed for Chapter 11

protection and two years after the purported redemption request—Mr. Turner (who by

this time was a former director of both the Debtor and Fletcher Asset Management)

executed a corporate resolution in his capacity as the sole Director of Fletcher

International Partners, and purported to transfer the Debtor's interest in Fletcher International Partners to Richcourt Euro Strategies and Richcourt Allweather Fund.

In reliance on this Fletcher International Partners resolution, on or about June 19, 2013, Intertrust Cayman ("**Intertrust**"), the corporate administrator of Fletcher International Partners, made entries in the Register of Members for Fletcher International Partners (the "**Register**") effectuating the transfers noted in the resolution. This transaction was not authorized by the Trustee or the Bankruptcy Court, nor otherwise authorized under the Bankruptcy Code.

Though upon learning of these transactions, the Trustee immediately sought expedited discovery to inquire as to them and intended to commence litigation to recover the Fletcher International Partners shares, the Trustee was able to negotiate an agreement, before the commencement of litigation, whereby the Register was updated to reflect that the Debtor was the owner of the Fletcher International Partners shares. Deborah Midanek, of the Solon Group, Inc. (in her capacity as sole director of Richcourt Euro Strategies and Richcourt Allweather Fund), Fletcher, and Mr. Turner (in his capacity as sole director of Fletcher International Partner) each executed resolutions authorizing Intertrust to reverse the transfers to Richcourt Euro Strategies and Richcourt Allweather Fund.

As a result of these improper redemptions, the Trustee was forced to expend at least $100,000 to obtain the return of these assets to the Debtor's estate.

> (3)   *Mr. Turner Appointing Himself as President of Fletcher International Partners, and Paying Himself $140,000*

Mr. Turner, acting as sole director of Fletcher International Partners, and without notice to any of the shareholders, executed an employment contract, dated July 1, 2013,

on behalf of both Fletcher International Partners and himself, pursuant to which he agreed to serve as president of Fletcher International Partners (a position that had not previously existed).[27]

At a board meeting attended only by himself, Turner agreed to pay himself the following amounts:

(i) a signing bonus of $25,000;

(ii) a $16,000 per month salary (equal to $192,000 per year);

(iii) a 5% commission in the event Fletcher International Partners' only asset (FFC shares) was sold for more than it had been valued in April 2013 (approximately $4 million);

(iv) a $50,000 bonus in the event that more than 90% of the outstanding Fletcher International Partners shares were repurchased or paid out during his tenure as president or within three months after his term as president ended; and

(v) severance of four months' salary ($72,000) if the shareholders removed him from office or if he resigned from office.[28]

In April 2013, Fletcher International Partners received approximately $150,000 on account of certain shares of FFC being redeemed.  But according to Mr. Turner, all that remains is approximately $3,800 in cash.  Mr. Turner caused the other approximately $145,000 to be spent as follows:

(i) $30,000 to himself for director's fees for all of 2012 and the first two quarters of 2013;

---

[27]    Stewart Turner Employment Agreement with FIP, July 1, 2003, Davis Exh. 22.

[28]    *See* Davis Decl. ¶ 129; FIP Board Minutes, July 1, 2013, Davis Exh. 23.

(ii) $25,000 to himself as a signing bonus for becoming president of Fletcher International Partners;

(iii) approximately $80,000 ($16,000 per month, less certain unidentified fees) to himself in salary as president for the months of July through November 13, 2013;

(iv) $5,000 to himself as reimbursement for legal fees; and

(v) $6,000 in fees to Intertrust Cayman, Fletcher International Partners' corporate administrator.

Other than the payment to Intertrust, all of these payments were wrongfully made and constituted a misappropriation of FILB assets. The Trustee informed Mr. Turner that the Debtor considered the contract to be of no force and effect, and demanded that Mr. Turner return the salary and signing bonus and refrain from further dissipating Fletcher International Partners' assets. To date, Mr. Turner has refused, claiming that he was justified in paying himself these amounts.

(b) *Mr. Turner's Response & My Finding*

(1) *Cash to Unternaehrer*

With respect to the first of the Trustee's three asserted bases for subordination in connection with Fletcher International Partners, Mr. Turner's principal response is that it was a prudent investment. If that were the only issue, that would be an issue of fact that would necessitate an evidentiary hearing; it could not be addressed on the Trustee's showing alone. But Mr. Turner's response misses the point.

He does not deny that the purpose of initial investment in Fletcher International Partners was to provide Citco's Ermanno Unternaehrer with cash—in fact, for the

purchase of a personal property in France.[29]  Mr. Turner admits that "I also knew that Mr. Unternaehrer was interested in liquidity at that time, although I still do not know why he needed it,"[30] but even that is contradicted by exhibits he himself offered, which show that he was sent the email disclosing Unternaehrer's purchase of the property in France (and "Ermanno's sketch of the transaction") within hours after Denis Kiely's receipt of it.

Nor does Mr. Turner deny knowledge of, or participation in, the underlying transaction, claiming instead that "I had every reason to believe that this was a good deal and frankly no reason to believe that it was a bad deal, or as the Trustee would put it, a 'fraudulent conveyance.'"[31]  Mr. Turner does not claim any business purpose other than to confer a benefit on Unternaehrer.  And Mr. Turner does not dispute that the Fletcher International Partners transaction was not disclosed to FILB investors, including, most significantly, the MBTARF, as required by the MBTARF Side Letter.

These facts, even after Mr. Turner's response, show knowing participation on Mr. Turner's part in a transaction with no business purpose other than to benefit a favored individual, at the expense of other FILB creditors.  Here too undisputed facts warrant equitable subordination of Mr. Turner's claims.

> (2)   *Distribution of Fletcher International Partners Shares to Richcourt Funds in Violation of Automatic Stay*

With respect to the Trustee's second asserted basis for equitable subordination resulting from transactions involving Fletcher International Partners (based on Turner

---

[29]   Turner Response ¶ 109.  *See* Emails from Denis Kiely to Mr. Turner regarding FIP, July 1, 2008, Turner Exh. 11 (Unternaehrer saying to Denis Kiely and Alphonse Fletcher, in email of 7/1/2008, "With the bank account being open, we just need subscriptions and redemptions forms to get this executed tomorrow—which is the latest date for me to have the Euros available on Friday to close on the purchase of my property in France.").

[30]   Turner Response ¶ 109.

[31]   *Id.* ¶ 111.

causing FILB's interest in Fletcher International Partners to be transferred to two

Richcourt Funds, by backdating transactions two years after purported redemption

requests by those entities, and a year after FILB's chapter 11 filing), Mr. Turner starts by

saying that "the official documentation related to some transactions was sometimes not

completed in a timely fashion or at all"[32] and that "sloppy recordkeeping"[33] led to the

resolutions under which the FILB property left the estate.  Mr. Turner says he

"considered this simply as finishing the paperwork" on prior transactions of Fletcher

International Partners.[34]  He further contends that if the Trustee or his counsel had

"simply called me to ask what this was about," he would have reminded the Trustee

about an earlier email he had sent referring to the transfer.

　　　　This explanation too is wholly unsatisfactory. Mr. Turner does not dispute the

underlying facts.  Mr. Turner's explanation, in substance, is that this was no big deal.

But postpetition transfers without court approval—when, as here, they are out of the

ordinary course—are a very big deal.  They are flatly prohibited by the Bankruptcy Code.

And backdating transactions is likewise a very big deal, especially when the backdating is

with respect to a purported event taking place two years earlier.

　　　　With the earlier transfer not having been accomplished prepetition, for whatever

reason (and with the FILB estate being entitled to avail itself of that situation), Mr.

Turner could not take things into his own hands to effect an unauthorized postpetition

transfer of estate property.  His contention that the Trustee spent too much money trying

to reverse the transaction is irrelevant, assuming (without deciding) that such is true.  The

---

[32]    *Id.* ¶ 104.

[33]    *Id.* ¶ 121.

[34]    *Id.* ¶ 124.

issue here is not whether the Trustee can recover from Mr. Turner the expenses of

undoing the unauthorized postpetition transfer.  The issue is instead whether Mr. Turner's

efforts to recover on his claims deserve to be treated *pari passu* with creditors who did

not act wrongfully as he did.  Mr. Turner's conduct in this respect too was grossly

inequitable to FILB's other creditors, and provides an additional basis for equitable

subordination.

### (3)    Mr. Turner Appointing Himself as President of Fletcher International Partners, and Paying Himself $140,000

With respect to the Trustee's third asserted basis for equitable subordination

resulting from transactions involving Fletcher International Partners (based on Turner's

appointing himself as President of Fletcher International Partners, signing an employment

contract hiring himself, and paying himself $140,000 from that company), Mr. Turner

essentially makes three points.  He argues that under Cayman law, Fletcher International

Partners (which is not a debtor) was run by its Board (of which he was the sole member)

and not its shareholders, could appropriately authorize a single individual to act on its

behalf,[35] and that he was so authorized; that the amounts he caused to be paid to himself

were reasonable;[36] and that if the Trustee didn't like it, he "should have called a general

meeting to attempt to remove me as Director (he would need other votes to do so) and

then look to cancel my contract."[37]

---

[35]    *Id.* ¶ 128.

[36]    *Id.* ¶ 129 (sums he paid himself were "well within the market for this role"; "[do] not seem excessive"; "[do] not seem excessive either"; "[do] not seem high"; and "seem[] low in regard to the risks I assumed that Mr. [Alphonse] Fletcher might have fired me from other positions had I not found in his favor and given that he may have worked to also vote me out as Director of [Fletcher International Partners]").

[37]    *Id.*  ¶ 130.

In some respects, Mr. Turner was right, but in the more important respects, he was wrong, and his contentions once again miss the point.  As a matter of corporate governance, I assume without deciding that Mr. Turner was authorized to act on behalf of Fletcher International Partners, and did not require shareholder approval to do so.  But that did not absolve him of the fiduciary duties he owed to Fletcher International Partners—including the duties of loyalty, good faith, to avoid a conflict of duty and self-interest,[38] and not to enrich himself at Fletcher International Partners' expense.

Fletcher International Partners had no need for Mr. Turner's services;  it was not and is not an active entity, and holds a single, highly illiquid asset that requires no management.  He offered no evidence that he performed any services on behalf of FIP (other than executing the backdated documents, and violating the automatic stay).  In fact, as the Trustee properly observes, Mr. Turner not only refuses to acknowledge the impropriety of his actions as a fiduciary, but threatens, in the face of clear direction otherwise by the Trustee, to take more.[39]

It might be true, as Mr. Turner argues, that the FILB Trustee might be impotent, in the short run, to overturn the acts Mr. Turner took in his self interest, and that such might require a shareholder vote to remove directors, a derivative suit, or some other litigation.  But these realities do not detract from the fact that damage to FILB's creditors from Mr. Turner's actions still resulted and was foreseeable, and that Mr. Turner acted inequitably toward them.  Equitable subordination is appropriate on this ground as well.

---

[38]    *See Corporacion Nacional Del Cobre de Chile v. Interglobal Inc. and Avendano Sabugao* [2002] CILR 298, Cayman Islands Grand Court.

[39]    Trustee Reply 9–10 (citing Turner Response ¶ 131 ("I may look to start paying the accrued amounts with notification to all FIP investors.")).

3. *Investments in Alphonse Fletcher's Brother's Movie*

    (a) *The Trustee's Showing*

Between September 2010 and December 2012, Fletcher Asset Management, Alphonse Fletcher, Denis Kiely and others caused FILB to invest $7.7 million into MV Nepenthes LLC through FILB's wholly-owned subsidiary BRG Investments, LLC in order to fund the production of *Violet & Daisy*, a motion picture written and directed by Alphonse Fletcher's brother Geoffrey Fletcher.[40]  BRG's investment in the movie was authorized by FILB's board of directors, including Denis Kiely and Moez Kaba.  But Alphonse Fletcher was instrumental in causing this investment to be made.[41]

Prior to making this investment, FILB's directors and Fletcher Asset Management consulted with their counsel, Skadden, who advised Alphonse Fletcher and Fletcher Asset Management of the risks associated with this type of investment, and of the need to review the MBTARF Side Letter, which placed limitations on the kinds of investments that FILB could acquire.[42]  Fletcher Asset Management went forward with the investment in spite of Skadden's advice.[43]

This illiquid private investment was wholly inconsistent with the investment strategy set out in the Feeder Funds' Offering Memoranda and the MBTARF Side Letter —because, among other reasons, it had no chance of being publicly traded or hedged, and it was not an investment in an operating company but instead was an investment in an entity created to do one thing, to make Alphonse Fletcher's brother's movie.  No disclosure of the investment or of the inherent conflict (investing in the fund manager's

---

[40]    Davis Decl. ¶ 132; FILB Board Minutes, Sept. 22, 2010, Davis Exh. 28.

[41]    Davis Decl. ¶ 133.

[42]    *Id.* ¶ 134, MBTARF Side Letter, June 7, 2007, Davis Exh. 14.

[43]    Davis Decl. ¶ 134.

brother's film) was made under the MBTARF Side Letter (or in the MBTARF Quarterly Reports), or otherwise.  This was not an investment that could be actively sold.  And there is no evidence that Fletcher Asset Management conducted a valuation of the investment in any way before making it.

The picture had an unsuccessful United States theatrical release in June 2013, and the investment is virtually worthless.[44]

*(b)  Mr. Turner's Response & My Finding*

Mr. Turner responded to the various paragraphs of the Trustee's declaration by stating, in substance, that each paragraph did not apply to him.

With respect to these elements of the Trustee's showing, Mr. Turner was right. While the Trustee made a strong showing of misconduct by those involved in the funding of Alphonse Fletcher's brother's movie, the Trustee failed to make a showing, at least by his declaration, that Mr. Turner was one them.  Mr. Turner became a FILB director only in 2012, near the end of the time in question, and the Trustee's declaration included no facts establishing Mr. Turner's involvement.

In his Reply, the Trustee says that "[g]iven his top position in the Fletcher organization . . . , it is *hard to believe* that Turner was not involved . . . ."[45]  Whether or not that is true, I cannot draw such a conclusion based on the Trustee's declaration, and even if the Trustee had given me more, it would still raise an issue of fact.

I cannot and do not find equitable subordination to be appropriate based on Mr. Turner's alleged involvement in the funding of Alphonse Fletcher brother's movie.

---

[44]     *Id.* ¶ 136.

[45]     Trustee Reply 11 (emphasis added).

4. *Fletcher Asset Management's Collection of Inflated Fees*

    (a) *The Trustee's Showing*

The fee structure of Fletcher Asset Management, which managed FILB, among other funds, varied over time by client and feeder fund, but generally included charging a management fee (based upon the purported value of each investor's capital account); an incentive fee (based upon the purported performance of the Funds); and additional indirect fees derived from compensation directly paid to certain members of the Fletcher Asset Management team as "consultants" or paid to companies affiliated with Fletcher Asset Management.

For the period from January 2007 through June 2012, Fletcher Asset Management, Denis Kiely's Duhallow and Duhallow's successor RF Services received $50.7 million in payments in management fees, incentive fees, expense reimbursements, and fees for administrative and record keeping services paid by the Funds.

Beginning in 2010, Fletcher Asset Management accelerated a practice it had commenced earlier of revaluing, and marking up, newly-acquired investments, with the result of generating additional incentive fees. Fletcher Asset Management would initiate a PIPE or warrant investment in which FILB was the only investor, and then immediately mark up the position by multiples of the purchase price. In at least two instances, FILB initiated investments with a zero cost basis—Syntroleum Corporation and United Community Banks Inc.—that were immediately ascribed values of $2.2 million and $76.3 million, respectively. Between 2007 and the bankruptcy filing in June 2012, FILB initiated ten new PIPEs or warrant investments. The ten investments were marked as of the month-end immediately following the investment at a cost-weighted average multiple of 2.7 times what FILB had just paid for them. In other words, if FILB invested $10

million, on average the month-end initial mark for the investment would have been $27

million, thus presenting a "profit" (though unrealized) of $17 million.  Fletcher Asset

Management would base its fees on this mark, and it would report Assets Under

Management and returns on investment based on that mark.  Alphonse Fletcher and Mr.

Turner played material roles in the valuation process.[46]

It is highly unlikely that in the limited time between acquisition and markup, the

higher value was attainable, and the markups were not the result of any material changes

in the companies' financial condition.  No FILB investment (other than a single 2007

investment—AGEN) was ever sold at or near its mark.  As examples:

- On December 31, 2010, FILB made a $4 million investment in
Document Security Systems.  *On the same day,* Fletcher Asset Management
marked that position at $23.6 million (also its highest mark), suggesting an
immediate unrealized profit of $19.6 million, which on the margin would result in
an approximately $4 million incentive fee on this one transaction alone.  This
position—marked at $23.6 million on the day of its acquisition—was liquidated
between February and June 2011 (between two and six months later) for a total of
only approximately $3.1 million.

- On February 24, 2011, FILB made an investment in a warrant
issued by High Plains Gas that had been acquired for $1 million.  By February 28,
2011 (two business days later), Fletcher Asset Management had marked the
position at $25.7 million, which on the margin would result in an approximately
$5 million incentive fee on this one transaction alone.  The Debtor still owns this

---

[46]    Davis Decl. ¶ 139.

position.  However, as of the Petition Date, the Debtor was holding it on its books and records at a value of $365,000.  Whatever the Debtor ultimately realizes on this investment, it will not approach the $25.7 million valuation it was given immediately upon making the investment or the high of $30.7 million just months later.

In each of those examples, there had been no fundamental development at either company that would have justified marking up the values.  Similar markups were taken for seven other investments.[47]

In most cases, Fletcher Asset Management continued to mark up the value of these positions over time.  On a combined basis, these ten positions at their highest marks were purportedly worth an aggregate of $454 million, whereas actual realization on these investments was $60 million, or 13% of the highest aggregate marks taken.  In addition to incentive fees, these valuations allowed Fletcher Asset Management and its related service providers to charge management fees based upon these valuations.

(b)  *Mr. Turner's Response & My Finding*

Mr. Turner responds to the Trustee's charges of revaluing assets to recoup higher fees for assets under management by stating that the higher fees were "sometimes waived" and were "nowhere near what [the Trustee] makes them out to be";[48] by stating that in some instances, "no incentive fees were earned";[49] by noting the participation of arguably capable valuation advisors and personnel, Quantal, Dilshoda Yergasheva and

---

[47]    Trustee Summary Chart of FILB Investments, Davis Exh. 31.

[48]    Turner Response ¶ 138; *see also id.* ¶ 140 ("no incentive fee was paid as of December 31, 2010 and the Trustee's claim of an approximately $4 million incentive fee is false"; "No incentive fee was paid for the period ending February 28, 2011 and the Trustee's claim of an approximately $5 million incentive fee is false").

[49]    *See id.* ¶ 141.

(though it is unclear whether they did valuations themselves or just reviewed or accepted others') Grant Thornton and EisnerAmper;[50] and by justifying the valuations in a number of cases.[51]  But aside from admitting his own participation in the valuation process,[52] Mr. Turner does not dispute the Trustee's point that he and others at Fletcher Asset Management marked up values by huge multiples within days of acquisition, without disclosure or explanation.  And while he asserts that Quantal, Dilshoda Yergasheva and others were involved in Fletcher Asset Management's asset valuations generally, he does not suggest that any of them ever addressed the propriety of the immediate markups.

Ultimately, however, I see too many potentially disputed issues of fact here to impose equitable subordination on this record alone.  It might be, for instance, that a number of the valuations were benign, but that others (particularly those involving the substantially instantaneous markups) were not.  And Mr. Turner's participation with respect to each of the wrongful valuations would then have to be ascertained.  Ultimately, I'd have to examine the detailed circumstances with respect to each of the valuations, and I lack the information to do so on this record.

Before I can impose equitable subordination on Mr. Turner based on fraudulent valuations and inflated fees, I would need to conduct an evidentiary hearing.

5.  *"Cashless" Promissory Notes*

   *(a) The Trustee's Showing*

As Citco sought to retire the lines of credit it had issued to the Funds and the Funds' sources of capital began to tighten and eventually to disappear entirely, Fletcher

---

[50]    *Id.* ¶ 139.

[51]    *See, e.g., id.* ¶ 140.

[52]    *Id.* ¶ 139 ("While at times I played a material role in the valuation process, I did less of this during 2010 and 2011.").

Asset Management looked to alternative means of increasing Assets Under Management, including the issuance of promissory notes by the Funds. Having failed to identify a third-party lender to provide leverage, Fletcher Asset Management created a fictitious one through the use of promissory notes issued among affiliates, unaccompanied by the payment of cash (the "**Cashless Notes**"). On April 28, 2007, and again on April 26, 2008, Fletcher Asset Management used two Cashless Notes of $80 million each, issued by Leveraged, as in-kind subscriptions to Arbitrage. Both Alphonse Fletcher and Denis Kiely were involved with the cashless notes. Denis Kiely signed them and they were made at the direction of or with the consent of Alphonse Fletcher.[53]

Arbitrage recorded the Cashless Notes due from Leveraged as assets, and allocated them to the capital accounts of the Corsair investors in Leveraged Series 1, 4, 5, and 6. Leveraged recorded the investment in Arbitrage as an asset and recorded the Cashless Notes payable as liabilities. Thereafter, in June 2007, Fletcher Asset Management substituted FILB for Leveraged as the obligor on the Cashless Notes, and in June 2008, the principal value of the Cashless Notes was increased. As a result, Leveraged was obligated to FILB, and FILB was obligated to Arbitrage.

At their peak, the Cashless Note transactions artificially boosted Assets Under Management by over $160 million, enabling Fletcher Asset Management, Citco Cayman and Duhallow to collect higher fees than they otherwise would have and mislead investors as to the success (or lack thereof) of the Funds.

The Cashless Notes also benefited the Corsair investors to the detriment of other investors in Arbitrage. By issuing the new shares in connection with the Cashless Notes,

---

[53]     Davis Decl. ¶ 142.

Fletcher Asset Management increased the percentage of Arbitrage that the Corsair investors owned, and correspondingly decreased the percentage of Arbitrage that the other investors (who had invested with cash) owned.  Ultimately, the Corsair investors more than tripled their stake in Arbitrage without making any additional investment, going from owning 20% of Arbitrage to close to 70%.  The change in percentage ownership also meant that the Corsair investors received additional profit allocations, and the other investors lost their corresponding profit allocations.

An accounting standard, EITF 85-1, provides guidance on how to classify notes received for capital stock.  EITF prescribes that no value should be ascribed to the value of a note received in lieu of cash except under very limited circumstances, the most important of which are the existence of substantial evidence of the ability and intent to pay the note off in a reasonably short period of time or evidence of its being secured by a letter of credit or similar liquid collateral.  There was no such evidence in this case.

In March 2010, following a review of its work after being subpoenaed as part of an SEC investigation, Grant Thornton notified Fletcher Asset Management that it was withdrawing its audit opinions for Arbitrage and Leveraged with respect to 2007 and 2008, and requested that Fletcher Asset Management notify "persons who are known to be relying, or who are likely to [rely]" on the prior audit opinions that they should no longer be relied on.  Grant Thornton had concluded that the Cashless Notes could not be accounted for as assets on the 2007 and 2008 financial statements of Arbitrage.  After discussions with Grant Thornton, Fletcher Asset Management issued restated financial statements for Leveraged and Arbitrage upon which Grant Thornton opined.  The Debtor's books and records show that the Debtor paid hundreds of thousands of dollars

related to the SEC investigation that focused on, among other things, these Cashless Notes.

*(b) Mr. Turner's Response & My Finding*

Here too Mr. Turner responded to the various paragraphs of the Trustee's declaration by stating, in substance, that each paragraph did not apply to him.  I must agree.  While here, with respect to the Cashless Notes, the Trustee established improper conduct by others (Alphonse Fletcher and Denis Kiely), there was no showing of Mr. Turner's involvement with respect to them.

The Trustee responds in his Reply that "[it] defies credulity that Turner, a key Fletcher executive, would not know the details of two transactions of that magnitude that had a significant impact on the Funds' assets; that he would not know that the transactions were indeed cashless . . . or that he would not think that these facts needed to be described in detail in the Funds' financial statements."[54]  But here too the Trustee is asking me to draw factual inferences, effectively after making credibility determinations, which I cannot do without an evidentiary hearing.

<u>Conclusion</u>

For the reasons stated above, my earlier determination equitably subordinating Mr. Turner's claims stands.  While issues of fact exist with respect to three of the seven bases for equitable subordination upon which the Trustee relies, equitable subordination is appropriate even if based solely on the undisputed facts underlying the remaining four.

SO ORDERED.

Dated:  New York, New York                   _***s/Robert E. Gerber***___
   June 11, 2014                          United States Bankruptcy Judge

---

[54]   Trustee Reply 11.