HEARING DATE AND TIME: June 17, 2014 at 9:45 a.m. (ET)

STEWART TURNER, Pro Se

Address: 200 East 71st St., Apt. 5A

New York, NY 10021

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

———————————————————— X

In re:

                                           Chapter 11

FLETCHER INTERNATIONAL, LTD.

                                           Case No. 12-12796 (REG)

            Debtor.

———————————————————— X

## RESPONSE OF STEWART TURNER TO THE DECLARATION OF RICHARD J. DAVIS IN FURTHER SUPPORT OF INTERIM AND FINAL FEE APPLICATIONS AND IN RESPONSE TO THE OBJECTIONS OF STEWART TURNER AND THE "DISGORGEMENT MOTION" OF ALPHONSE FLETCHER, JR.

Introduction

1. After the Ernst & Young Joint Official Liquidators took control of FIA Leveraged Fund ("Leveraged"), the then-Directors of FILB decided to put FILB into Chapter 11 for the protection of the remaining creditors and indirect shareholders.

2. This case could have been about protecting the remaining creditors and equity holders and this case should have been about protecting the remaining creditors and equity holders.

3. This is what I thought when I became a consultant to the Debtor-in-Possession with the initial attorneys from Young Conaway, under the Chief Restructuring Officer Donald MacKenzie of Conway Mackenzie, and then under Trustee Davis from September 2012 through April 2013. That is why I was working for him.

4. I thought that the Trustee's Report would show the whole truth when it was released and not be one-sided.

5. I was wrong. After reading the fee applications, it now seems that this has been about money the whole time.

6. I ask the Court's indulgence insofar as I cannot afford counsel and I have prepared all of what follows myself. Requesting indemnification and asking for an attorney in the civil lawsuit filed against me in New York Supreme Court has brought a nasty response letter from Mr. Luskin.

Background

7. In his May 2, 2014 fifth fee application with the Court (Docket No. 522) where he showed "Total Moneys Disbursed or Assets Turned Over" of $46,535,608.30[1] and in his declaration of

---
[1] Docket No. 522, page 83.

2

June 11, 2014 where he reduced the "Total Moneys Disbursed or Assets Turned Over" to $31,929,731.30 after talking with the U.S. Trustee and receiving my letter of June 5, 2014 (attached as Exhibit A), I still believe that his fee request is too high.

8. Trustee Davis' fee is too high arithmetically, which I showed in my June 11 analysis of Section 326, his team's (including Luskin and Goldin) fees are too high from a practical perspective (the fee requests for Davis ($1,103,206.50)[2], Luskin ($3,747,703.95 excluding expenses)[3] and Goldin ($4,183,526.51 excluding expenses)[4] total a combined $9,034,436.96, which exceeds 28% of the revised $31,929,731.30 "Total Moneys Disbursed or Assets Turned Over"), and these fees are too high considering the Trustee's team's lack of knowledge of Fletcher and the hedge fund industry after this $9 million billing of these fees.

9. Accusing me of being too late is self-serving and most of the interim fee requests had been delivered prior to the initial Trustee's Report being released on November 25, 2013, where for the first time I saw his one-sidedness.

10. As you recall, Your Honor required the following paragraph to be inserted into the Disclosure Statement released to the Creditors in bold font.

> **"The facts and opinions set forth in this Disclosure Statement may in material respects be disputed in later proceedings in this chapter 11 case or elsewhere, and have not yet been found to be true by any court, if they ever will be. There can be no assurance that any litigation brought by the Trustee will be successful."[5]**

---

[2] Docket No. 522, pages 2 and 4.

[3] Docket No. 523, pages 2 and 7.

[4] Docket No. 524, page 4.

[5] Docket No. 393, page 12 of the PDF.

3

11. I had never expected the report to be so one-sided and biased; thus, I never objected to the interim filings.

12. I had also anticipated that the Trustee and his team would fight hard to achieve maximum value for the UCBI Warrant held by FILB. Had he done so and won, his original fee request of $1,103,206.50 would have fallen well within Section 326 guidelines. Instead, Mr. Luskin has threatened me with sanctions for filing an appeal or even considering an appeal in regard to the UCBI warrant.

13. Mr. Davis' comment that "Turner has waited far too long to raise these issues and should not be permitted to assert them at this late juncture"[6] is false and specious. If I understand Sections 327 and 330 of the U.S. Bankruptcy Code correctly, all fee applications are interim until final.

14. The analysis below will focus on items mentioned in the Davis Declaration: hedge funds are a homogenous group, conspiracy theory as mentioned by Mr. Fletcher (but not mentioned in regard to his conspiracy theory regarding all of the parties that he is filing suit against) and his Section 326 calculations.

### All hedge funds are not homogeneous

15. I believe that Mr. Davis' defense of Goldin shows a fundamental lack of understanding in regard to hedge funds.

16. Mr. Davis wrote:

> "As reflected in its retention application, Goldin is extraordinarily well qualified to perform the services it provided. The principal individuals involved in the representation have strong credentials in the areas of accounting and hedge fund issues which were important to the investigations I undertook as Trustee. They have performed financial advisory services in matters before this Court in many cases over many

---

[6] Docket No. 562, paragraph 15.

4

years. I have closely monitored their work, and my entire team has reviewed their conclusions, as is apparent in the Trustee's Report and Disclosure Statement."[7]

17. His concept of "hedge fund issues" may apply to management fees and performance fees, although his Trustee's Report was flat wrong when it implied that FAM received performance fees based upon the marks for Document Security Systems ($4MM) and High Plains Gas ($5MM).

18. Goldin's valuations, which I believe to have been performed by distressed debt expert Marti Murray were also wrong as she is an expert in distressed debt. Relying on Ms. Murray for her valuations of warrants and preferred equities was not prudent as all hedge funds are not the same.

19. The Credit Suisse Hedge Fund Index focuses on the "ten style based sectors"[8] listed below, where distressed debt does not even get its own full category.

- Convertible Arbitrage
- Dedicated Short Bias
- Emerging Markets
- Equity Market Neutral
- Event Driven
- Fixed Income Arbitrage
- Global Macro
- Managed Futures
- Long/Short Equity
- Multi-Strategy

20. HFRI has many different indexes including Activist Index, Credit Arbitrage Index, Distressed / Restructuring Index (Ms. Murray's core competence), and Volatility Index among a total of about 50 indexes.[9]

21. BarclayHedge also ranks 47 categories of hedge funds.[10]

---

[7] Docket No. 561, paragraph 16.

[8] Credit Suisse website.

[9] Hedgefundresearch.com website.

22. I would not consider either myself or Mr. Fletcher as having "strong credentials" in all areas of hedge funds, far from it.

23. While I accept that Goldin and the principal individuals have worked on many bankruptcy cases and have solid experience, I do not think that anyone can have "strong credentials" in all areas of hedge funds. If Ms. Murray and Goldin believe they do, they should provide proof in an evidentiary hearing. Otherwise, referring to expertise in all hedge fund areas is overstating facts.

Conspiracy Theories

24. While Mr. Davis mentions "an embodiment of Fletcher's apparent conspiracy theory which he has articulated in connection with the Dakota litigation and is now raising in the bankruptcy case."[11], I, too, find this to be complex and not yet taken as proved. On the other hand, the Trustee also asserts a conspiracy theory without having proved it.

25. Grant Thornton and EisnerAmper, large accounting firms, have approved the Fletcher/Quantal valuations over the years.

26. Having said that, both of these firms have hired outside experts in valuing the multi-year warrants and the preferred equity positions that have been staples of the FILB portfolio, and these outside experts also approved the Fletcher/Quantal valuations. (Goldin could have and should have hired an outside expert for these valuations.)

27. EisnerAmper also asked Fletcher to get another expert to review our valuations as the SEC was reviewing Fletcher at that time. Duff & Phelps, the largest such valuation firm, also approved the Fletcher/Quantal values.

---

[10] http://www.barclayhedge.com/research/hedge-funds-rankings.html

[11] Docket No. 561, paragraph 23.

6

28.     Citco, as administrator to FILB, questioned Fletcher staff including Denis Kiely, Sean Martin, and me, and Quantal regarding valuations, and accepted these valuations.

29.     Does Mr. Davis really think there is a conspiracy among all of Fletcher, Grant Thornton, EisnerAmper, their outside advisors, Duff & Phelps and Citco? Why would these firms take such risk for the relatively small amount of dollars provided to them over the years by Fletcher? At least Mr. Fletcher's theory contains the manager of a $20+ billion hedge fund who can afford to pay a lot more than Mr. Fletcher.

30.     I did not include Quantal in the above group as Mr. Davis accuses them of being an insider as well. Dr. Marsh's qualifications have been challenged by Davis, Goldin and Luskin, but he is well-respected.

31.     In fact, Markit and Quantal are co-sponsoring a seminar in New York next week titled "Navigating the liquidity landscape" (see Exhibit B).

32.     "Markit Ltd., the financial information company whose price data forms the basis for much of the global derivatives and bond markets, is seeking to raise as much as $1.14 billion in its U.S. initial public offering."[12] This article expected the company's equity value to be about $4.5 billion after the IPO. If Dr. Marsh and Quantal were as unqualified as the Trustee's Report and the civil lawsuit claim, why would Quantal be co-leading this event during Markit's IPO process?

Summary of Mr. Davis' revised Section 326 calculations

33.     In my June 11, 2014 filing, I referenced his including $15,000,000 of "Pending Litigations" as part of his "Total Moneys Disbursed or Assets Turned Over." Whether it was my June 5, 2014 letter to Mr. Luskin or the U.S. Trustee's involvement that led to Mr. Davis removing this from his

---

[12] Bloomberg.com on June 4, 2014.

revised calculation, these early-stage litigations with no money received should never have been included in any calculation. In particular, the Massachusetts complaint of which I am aware and which he vaguely references[13] lists Alpha and the Massachusetts Bay Transportation Authority Retirement Fund as Plaintiffs and not FILB; how could this have been included in Mr. Davis' initial calculations?

34. Despite my June 5 letter (a letter questioning his calculations and asking for a response which I did not receive, at least privately), he continues to include the entire $4,250,000 from the Skadden settlement even though the Trustee wrote "On April 22, 2014, the Trustee received FILB's share of the settlement with Skadden resulting in an additional $804,000 in cash for the estate."[14]

35. Additionally, the "FILB Investment in FIP Ltd.", which the BVI Funds may fight to reclaim and the "Intellitravel Outstanding Loans Receivable" are nowhere close to being finalized for cash even though Section 326 clearly references "moneys disbursed or turned over". In re LAN Associates XI, L.P. 237 B.R. 49 (1998) clearly states the need for "moneys disbursed or turned over" and not "assets turned over" as the Trustee's calculation page states.

## Conclusion

36. Based on the above, it is my opinion that Mr. Davis' revised and reduced fee request of $981,141.94 for his work at Trustee still exceeds the Section 326 maximum amount permitted.

37. After my pointing out these irregularities (including moneys not yet received for lawsuits barely started, including 100% of the Skadden settlement and not just the portion going to the FILB estate, and including an estimated amount to be received from a bankruptcy filing before it is received

---

[13] Docket No. 561, paragraph 15.

[14] Docket No. 522, page 9.

or been determined) in the Trustee's multiple filings and believing that Goldin is an expert for valuing the Fletcher financial instruments, should the Trustee be allowed to receive this maximum?

38.     Without Goldin sticking to its areas of expertise and objecting to the valuations approved by many others with expertise, should Goldin be allowed to collect the entire $4,183,526.51 in fees it requested?

*Stewart Turner*
Stewart Turner, Pro Se

Dated: June 13, 2014.

# Exhibit A

June 5, 2014

**BY EMAIL**

Mr. Michael Luskin, Esq.
Luskin, Stern & Eisler, LLP
Eleven Times Square
New York, NY 10036

Re: In re Fletcher International, Ltd., Case No. 12-12796 (REG)

Dear Mr. Luskin:

Under Section 326 (a) of the U.S. Bankruptcy Code, a Trustee's compensation is limited to roughly 3% of "moneys disbursed or turned over in the case." In his fee application, at page 83 of Docket No. 322, the Trustee includes in his commission calculation $15 million in estimated recoveries in pending litigations, and the entire $4,250,000 Skadden settlement. However, under the pooling agreement, the Trustee is only entitled to 26.8% or $1,139,000 of the Skadden settlement. And, there is no $15 million "disbursed or turned over" in the pending litigations, which in many cases are at very early stages.

If I am missing something, please let me know at your earliest convenience. I am in the process of preparing an amendment to my objection to the Trustee's fee application based on section 326.

Very truly yours,

*[signature]*

Stewart Turner

Cc:     Richard J. Davis, Esq.

# Exhibit B

View this email on your mobile device | View this email as a web page

# markit

## Seminar
## Navigating the liquidity landscape

**Join Markit and Quantal for a seminar exploring the current state of liquidity as well as strategies for finding and managing it.**

Hear from leading academic, industry, and regulatory experts as we examine the impact of regulation and market structure changes as well as the influence of liquidity on portfolio and risk management.

The discussions will cover:

- The definition and role of liquidity in the financial markets
- Liquidity spirals and black holes
- Portfolio management, liquidity levels and liquidity risk
- Managing liquidity

View the complete agenda and speakers. Space is limited, so register today:

**Register today**

For more information, please contact cydney.siegel@markit.com.

**DATE**
Thursday, June 19th 2014

**TIME**
2:30pm - 6:00pm: Seminar
6:00pm - 7:30pm:
Networking Reception

**VENUE**
Convene Grand Central
101 Park Ave (at 41st street)
New York, NY 10178

Copyright © 2014 Markit Group Limited. ALL DATA PROVIDED AS IS, WITH NO WARRANTIES. All rights reserved.
Privacy Policy    Terms of Use    Disclaimer    Contact Us

Unsubscribe from this communication
Unsubscribe from ALL Markit communications
Subscribe to this or other Markit communications

Markit Group Limited is registered and incorporated in England & Wales (company number 04185146).
Registered office: 4th floor Ropemaker Place, 25 Ropemaker Street, London, EC2Y 9LY