UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| FLETCHER INTERNATIONAL, LTD., | ) | Case No. 12-12796 (REG) |
| | ) | |
| Debtor. | ) | |
| | ) | |

DECISION AND ORDER ON MOTION FOR
RECONSIDERATION

APPEARANCES:

LUSKIN, STERN & EISLER LLP
*Counsel for Richard Davis, FILB Chapter 11 Trustee*
11 Times Square
New York, New York 10036
By:     Michael Luskin, Esq.
         Lucia T. Chapman, Esq.
         Stephan E. Hornung, Esq.

STEWART TURNER
*Former Director and Treasurer of the Debtor, Pro Se*
200 East 71st St., Apt. 5A
New York, New York 10021

HOLLAND & KNIGHT LLP
*Counsel for Fletcher Fixed Income Alpha Fund, Ltd. And Massachusetts Bay
Transportation Bay Retirement Fund*
10 St. James Avenue
Boston, Massachusetts 02116
By:     John J. Monaghan, Esq.

JONES DAY
*Counsel for Soundview Trustee, Corinne Ball*
222 East 41st Street
New York, New York 10017
By:     Veerle Roovers, Esq.
         Corinne Ball, Esq., Trustee

-1-

WILLIAM K. HARRINGTON
*United States Trustee, Region 2*
201 Varick Street, Suite 1006
New York, New York 10014
By:    Richard C. Morrissey, Esq.


ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

Deeming the attached Request for Reconsideration to be a motion for reargument under Fed. R. Bankr. P. 9023,[1] Fed.R.Civ.P. 59,[2] and Local Bankruptcy Rule 9023-1, the motion is denied.

Rule 9023-1 of the Local Rules of this Court provides, in relevant part:

> (a)    A motion for reargument of a court order determining a motion shall be served within 14 days after the entry of the Court's order determining the original motion, or in the case of a court order resulting in a judgment, within 14 days after the entry of the judgment, and, unless the Court orders otherwise, shall be made returnable within the same

---

[1]    Fed.R.Bankr.P. 9023, as it will provide until December 1, 2014, states:

Except as provided in this rule and Rule 3008, Rule 59 F.R.Civ.P. applies in cases under the Code.  A motion for a new trial or to alter or amend a judgment shall be filed, and a court may on its own order a new trial, no later than 14 days after entry of judgment.

[2]    Fed.R.Civ.P. 59 provides, in relevant part:

(1) *Grounds for New Trial.*  The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows:

(A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or

(B) after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court.

(2) *Further Action After a Nonjury Trial.*  After a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment.

-2-

> amount of time as required for the original motion.
> *The motion shall set forth concisely the matters or*
> *controlling decisions which counsel believes the*
> *Court has not considered.* No oral argument shall
> be heard unless the Court grants the motion and
> specifically orders that the matter re-argued orally.[3]

Here the motion fails to identify any matters or controlling decisions that the Court has not considered. Rather, the motion is in substance an effort to reassert arguments that were made, and rejected, when the Court first considered the motion; to make new arguments that could have been made at that time;[4] or to say that because the Movant now "apologize[s]" for things he did,[5] subordination of his claims should not be imposed. None provide an appropriate basis for the entry of Bankruptcy Rule 9023 or Local Rule 9023-1 relief.

To be entitled to reargument, the moving party "must demonstrate that the court overlooked controlling decisions or factual matters 'that might materially have influenced its earlier decision.'"[6] Likewise, as Judge Garrity of this Court observed in *In re Jamesway Corp.*:[7]

---

[3]    Emphasis added.

[4]    One such argument, which must be rejected in any event, is the contention that there were no fraudulent transfers incident to the April 22 Transactions "as FILB was solvent in April 2012." (Motion at 2). This new argument, like the related one previously rejected by this Court, *see* 2014 Bankr. LEXIS 2558 at *8–10, 2014 WL 2619690 at *3–4 (in which Mr. Turner contended that that there were no fraudulent transfers incident to the April 22 Transactions because reasonably equivalent value was obtained), must be rejected for the same reason. Solvency, like reasonably equivalent value, applies only to constructive fraudulent transfers. Where, as here, one has the actual intent to hinder, delay or defraud, solvency is irrelevant.

[5]    Motion at 8.

[6]    *In re Adelphia Business Solutions, Inc.*, 2002 Bankr. LEXIS 1604, *2, 2002 WL 31557665, *1 (Bankr. S.D.N.Y. 2002) (Gerber, J.) (internal quotation marks omitted), *quoting Stylesite Marketing, Inc.*, 2001 Bankr. LEXIS 2299, *3, 2001 WL 13212, *1 (Bankr. S.D.N.Y. 2001) (Bernstein, C.J.) (in turn quoting *Anglo-American Ins. Group, P.L.C. v. Calfed, Inc.*, 940 F.Supp. 554, 557 (S.D.N.Y. 1996)). *See also Reifler v. Glaser, Weil, Finks, Jacobs, Howard & Shapiro* (*In re Pali Holdings, Inc.*), 2011 Bankr. LEXIS 1503, *1–2, 2011 WL 1558422, *1 (Bankr. S.D.N.Y. 2011) (Gerber J.) (to same effect).

[7]    203 B.R. 543 (Bankr. S.D.N.Y. 1996).

> The only proper ground on which a party may move
> to reargue an unambiguous order is that the court
> overlooked 'matters or controlling decisions' which,
> had they been considered, might reasonably have
> altered the result reached by the court.[8]

Judge Garrity continued that:

> This rule is calculated to "insure the finality of
> decisions and to prevent the practice of a losing
> party examining a decision and then plugging the
> gaps of a lost motion with additional matters."[9]

And as Chief Judge Bernstein noted in *Stylesite Marketing*:

> The rule permitting reargument must be narrowly
> construed to avoid repetitive arguments on issues
> that the court has already fully considered. Further,
> the parties cannot advance new facts or arguments,
> and may not submit affidavits or new material.[10]

Here, in apparent ignorance of the requirements of Local Rule 9023-1, Mr. Turner

has failed to identify any factual matter or controlling decisions that the Court

overlooked. His motion amounts in substance to an effort to relitigate the matter based

on a new, improved, factual record—forbidden under *Stylesite Marketing*, *Jamesway*,

*Adelphia Business Solutions* and *Pali Holdings*—and to request that the Court revisit

issues which the Court has fully considered.

---

[8]      *Id.* at 546 (internal quotation marks omitted).

[9]      *Id.* (quoting *Carolco Pictures Inc. v. Sirota*, 700 F.Supp. 169, 170 (S.D.N.Y. 1988) (Sweet, J.)).

[10]     2001 Bankr. LEXIS 2299 at *3, 2001 WL 13212 at *1 (citation omitted).

While this Court has also held that a court can grant 9023-1 relief where there is "the need to correct a clear error or prevent manifest injustice," or to "show that newly discovered evidence has been unearthed,"[11] Mr. Turner's motion falls far short of making any such showing either.  Motions of this character are not appropriate to obtain a "second bite at the apple."

The Court's decision stands.

SO ORDERED.

Dated:  New York, New York                    __s/Robert E. Gerber_____
        July 1, 2014                          United States Bankruptcy Judge

---

[11]    *See Fox v. Stein (In re Perry H. Koplik & Sons, Inc.)*, 2007 Bankr. LEXIS 5040, *12, 2007 WL 3076921, *4 (Bankr. S.D.N.Y. 2007) (Gerber, J.).

OPINION DATE: June 11, 2014

STEWART TURNER, Pro Se

Address:  200 East 71st St., Apt. 5A

New York, NY 10021

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

---

In re:

                                        Chapter 11

FLETCHER INTERNATIONAL, LTD.

                                        Case No. 12-12796 (REG)

                Debtor.

---

## REQUEST FOR RECONSIDERATION

## OF THE EQUITABLE SUBORDINATION

## OF STEWART TURNER'S PRE-PETITION CLAIM

Introduction

I am requesting reconsideration of Your Honor's Supplemental Opinion issued on June 11, 2014. After some questionable activity on display in the Trustee's requests for excessive commissions (Dockets No. 522 and 561) at least for the present time and Mr. Luskin's rants in Court on June 17, I am asking for Your Honor to review Your prior opinion which was decided before these recent events unfolded.

After these attempts at excessive compensation, which I brought to the Court's attention only after first sending a private letter to the Trustee's attorney on June 5, 2014, I hope that the Court will see my actions in a kinder and more appropriate light after seeing the Trustee's multiple mistakes in his Section 326 analysis. That is why I am requesting Your Honor's reconsideration. Please note that some of my prior responses were directly in response to Docket No. 474 and may have not been presented in a broader picture which would address the issues that Your Honor raised in Your Supplemental Opinion.

The Trustee raised seven issues and Your Honor made no finding on three of these issues. I am responding as to why Your Honor should reconsider on the four remaining issues.

Again, I am seeking that my claim relating to pre-filing consulting fees and expenses be moved to Class 3 General Unsecured Claims from Class 5 Insider status.

**I. The April 22 Transactions**

I contend that these actions were not a fraudulent conveyance as FILB was solvent in April 2012. The Trustee has contended that Fletcher (I do not know if he means FILB or FILB and the feeder funds Leveraged, Arbitrage and Alpha) was insolvent as far back as 2007, without having proved that (or anything else) before this Court in an evidentiary hearing.

2

Two (and not just one) well-respected auditing firms have issued signed audits stating that FILB had significant nine-figure positive equity in 2007, 2008 and 2009 after reviewing the value of FILB's underlying positions with internal and external experts in valuing such privately held instruments such as preferred equity and warrants.  (These valuation methodologies had been implemented and reviewed and approved by Grant Thornton and its outside valuation expert before I returned to Fletcher in October 2005.) I have been called a senior FAM employee by the Trustee and his counsel but I only became a Director of the relevant funds in 2012. Had I been a senior FAM employee[1] earlier, I would have seen to it that the 2010 audit was completed in a timely fashion; this audit would also have shown positive nine-figure equity based upon the assets that the Louisiana Pension Funds themselves in September 2011 issued a statement[2] saying that there was significant value to justify value well over their combined $100MM investments. Ernst & Young reviewed Fletcher in the second half of 2011 for the Louisiana Pension Funds before the funds issued that statement.

Thus, I did not (and still do not) believe that there was a possibility of fraudulent conveyance when the FILB Board[3] voted unanimously in favor of these transfers.

I discussed these transfers with the Trustee while I was a consultant to him[4] and have asked for indemnification and advancement of legal fees in response to the civil suit filed by the Pooled Claimants.

---

[1] I reported to Mr. Denis Kiely either unofficially or officially when I worked for him as a consultant and employee of Duhallow Financial Services, LLC.

[2] Joint Statement, September 9, 2011.

[3] The FILB Board was larger than the Trustee references.  In addition to Mr. Floyd Saunders and me (who are mentioned), other members of the FILB Board at that time were Mr. Teddy Stewart and Mr. James Keyes.  Mr. Stewart had previously served over 11 years on the Board of Trustees of the San Antonio Fire & Police Pension Fund. Mr. Keyes is a Bermudian solicitor and barrister with 25 years' experience and serves as an independent director on the boards of many hedge funds, including FILB, where he served for at least seven-plus years prior to my appointment until his resignation on June 29, 2012. His signature is on the balance sheets of the FILB audits at least as far back as April 2004 (for the year ended December 31, 2003).

[4] Docket No. 518, page 6.

3

There was significant value in the FILB assets and positive equity in FILB and the feeder funds in both February 2012 (when the 18-million share bucket of United assets, as described by Mr. Martin in the Soundview trial (13-13098 (REG)), was distributed via FILBCI to the Louisiana Pension Funds as payment in-kind for their redemptions) and April 2012 when the disputed transactions occurred. If the funds were solvent, which to the best of my knowledge they were (and which the Trustee alleges they were not but has not proven so in any evidentiary way), the April 2012 transactions would not be a fraudulent conveyance.

If the Trustee truly believes that the April 2012 transactions were a fraudulent conveyance (the Trustee states that the one-half of the United warrant (from the seven-million share bucket) recovered is worth $6MM based upon the current $12MM settlement value with UCBI[5], why did he not seek to recover the much larger eighteen-million share bucket? As Mr. Fletcher testified during the Soundview trial, the eighteen-million share bucket is worth about 250% of the seven-million share bucket. While the Trustee could have tried to recover the larger UCBI asset for FILB, he signed off on the FILBCI-United settlement of just $2.5MM (instead of 2.5 * $12MM = $30MM) without obtaining anything of value for FILB.

An evidentiary hearing into these transactions would also be helpful as the Trustee's counsel provided more relevant documentation regarding United to the District Court than to this Bankruptcy Court.

---

[5] Docket No. 518, footnote on page 7.

4

## II. FAM Causes the Debtor to Invest in Fletcher International Partners, Ltd. ("FIP")

### A. The July 2008 and later transactions

The FILB investment in FIP was a sound transaction when undertaken and I believe that it still is today, although stressed first by the 2008 financial crisis, later by some difficulties between Citco and Fletcher, and finally by the Trustee's interactions with Citco.

To me, the primary reason for the FIP investment was that it looked good as it met many criteria that Fletcher seeks in transactions (probably more criteria were met here than in other investments):

- There was downside protection in that the valuation of Citco, as provided by UBS, was higher than the valuation given to the FFC shares delivered.

- UBS provided an independent valuation. While there has been discussion that the UBS valuation was not independent, UBS' current $70 billion market cap greatly exceeds that of Citco, let alone Quantal or Goldin, and UBS is not beholden to any of the parties involved.

- FILB's 2008 investment was primarily in preferred shares, providing additional downside protection. This FILB preferred investment would retain value while the ordinary shares would suffer first losses.

- Citco International Pension Plan (CIPP) was also a buyer of the ordinary shares in July 2008. Would Citco actually be in on the Trustee's conspiracy theory with Mr. Unternaehrer risking Citco's many businesses just to provide him with about $2.5MM of cash?

- As the preferred shares were convertible into common, FILB could participate in the upside if the value of Citco/FFC increased.

- If nothing happened, the convertible had a preferred dividend of 1% per month, providing income to FILB.

- At the time of investment, FFC was supposed to distribute its underlying investment within 26 months, although it could have been extended by two one-year periods after that.

(While this investment was not a PIPE, it had many similar qualities that Fletcher sought to have in its PIPE investments.)

While Mr. Unternaehrer may have benefitted from the transaction (I apologize as I missed the line in the email about his needing the cash to purchase property in France), that was not the primary reason for the transaction. The primary reasons were that it made sense for Fletcher, as outlined above. As of 2007, Fletcher had calculated that we had made PIPE investments in companies that had total employees of over 50,000 people. While Mr. Fletcher was and is proud of this, it never made him do a PIPE transaction where he thought Fletcher would not make a substantial profit. I believe the same is true regarding FILB investing in FIP.

This transaction *was available* to Fletcher because of the connection between Fletcher and Mr. Unternaehrer just as the Ion investment became available to Fletcher after a proponent (either an officer or director) of the Helix (formerly Cal Dive) transaction became involved with Ion (formerly Input/Output). This method of using connections was typical of how Fletcher found investment opportunities; I believe that this is true of most businesses.

The Trustee's issue of the Massachusetts Bay Transportation Authority Retirement Fund's side letter is a "red herring" here. In an evidentiary hearing, I would show that Alpha invested as agreed upon. The side letter references a presentation; I have attached this as Exhibit A. On page 10 of this PowerPoint, it said that Alpha would invest (a) in products to match the return of the Lehman Brothers (later Barclays) Bond Index and (b) Fletcher Income Arbitrage Fund, Ltd. ("Arbitrage" or "FIALTD" as stated in the PowerPoint).

6

Mr. Denis Kiely, who appears to still be in the process of coming to some sort of agreement with FILB[6] although it was announced by Mr. Luskin in Court in late March, may have told the Massachusetts fund something different as I saw and heard frustration when I met Mr. Michael Mulhern of that fund during a 2011 meeting with Mr. Kiely as he complained that Mr. Kiely had not been forthcoming with him.   Internally, as a non-senior employee then, I was only aware that the expectation was a combination investment of the "Lehman Aggregate" as it was then known and Arbitrage. I do not think that any investment restrictions could have been placed on the master fund FILB by that letter, as Alpha's indirect investment into FILB would have been small when compared to that of other investors.

I would like to contrast this use of the term "red herring" with Mr. Luskin's use in Court on June 17, which he used in reference to the Trustee receiving credit under Section 326 for proceeds from a civil suit filed by only Alpha and the Massachusetts fund and not FILB.  Even if this were to become a pooled claim as Mr. Luskin claims, (a) wouldn't FILB need to be listed as a plaintiff in that case and (b) would the Trustee receive credit for the entire amount as Mr. Luskin had pushed a second time in regard to the Skadden settlement, even after Your Honor had already ruled against him?

I believe an evidentiary hearing is needed to get a full understanding of all of these matters.

**B.  Turner's Actions regarding the June 2011 redemptions by two Richcourt Funds with FIP shares**

The Trustee states that no resolutions were executed in 2011 regarding the distribution of the FIP shares as redemptions in-kind to the two Richcourt Funds.  Although draft resolutions were prepared

---

[6] I still have not seen the terms of what he has agreed upon, other than his dismissing his claims against FILB.

(and the Trustee has claimed that these would have been incorrect anyhow), resolutions were not needed in regarding to paying redemptions, either in cash or in-kind.

In fact, many redemptions (mostly for cash) have been paid by the Fletcher funds without resolutions. At least two redemptions in addition to the FIP redemptions were done in-kind from a feeder fund where FILB assets were delivered to the investors.

I apologize to the Court for having had the Register of Members for FIP updated in 2013 without at least notifying Your Honor. That action was not done to be disrespectful of the Court. The register needed to be updated for the transactions that had already occurred in 2011, which did not need resolutions done at the FILB level as pointed out above. RF Services' Stuart MacGregor maintains the share register for FIP and he had already removed FILB as the owner of the relevant shares as of June 30, 2011. (This is consistent with administrator SS&C showing that FILB no longer held FIP shares after June 30, 2011.)

The Trustee should not have an issue with using Mr. MacGregor's books and records. In fact, the Trustee is looking to use Mr. MacGregor's information in regard to the Intellitravel case being heard by Judge Gropper (12-14815 (ALG)). Mr. MacGregor informed me that just this month, June 2014, Mr. Stephan Hornung of the Luskin firm contacted him to provide information regarding an unsigned promissory note, which Mr. MacGregor has on the books for BRG Investments to show that BRG's investment is not equity. While executed resolutions were not always used for a cash redemption or redemption in-kind, I believe an executed promissory note is needed to show evidence of a loan. Mr. MacGregor's records and SS&C records both show that the transfers had taken place well before the petition date.

I believe that an evidentiary hearing is needed to see why an unexecuted BRG-Intellitravel Note on the books and records maintained by Mr. MacGregor can be accepted by the Trustee as proof but

8

then see why Mr. MacGregor's books and records for FIP are challenged due to the non-execution of resolutions that were not needed.

### C. Turner appoints himself President of FIP

I believe that my actions in regard to my payment from FIP were all done in good faith. My contract was originally executed for the purpose of looking into the possibility of selling the FFC shares as the directors of some of the shareholders would be looking to raise cash. The directors of Richcourt EuroStrategies, Richcourt Allweather Fund, and America Alternative Investments were in flux as Deborah Midanek, Gerti Muho and the team of Alphonse Fletcher, Jr. and George Ladner were each claiming control of these entities.

My services changed somewhat once the Trustee claimed that certain FIP shares belonged to FILB and not Richcourt EuroStrategies and Richcourt Allweather Fund. Within six weeks of becoming President of FIP, I was deposed at Mr. Luskin's office where I testified that I was working for FIP in a paid capacity. He may not have shared this information with the Trustee until November, but it is clearly in the transcript and should have been raised with me sooner.

I have done and continue to do work for FIP. I have looked into valuing the FFC shares, selling the FFC shares, and contacting potential buyers for these shares. I have met with representative of the various shareholders. Ms. Midanek, who is now recognized to be the director (through Solon Group) of the three Richcourt funds mentioned above (including America Alternative Investments, the undisputed shareholder of the Preferred B shares) , contacted me just this week to discuss issues related to FIP.

Prior to my learning about Section 326, my contract as President provides for a potential bonus only upon achieving results (shares being sold). Given how the Trustee filed a false Section 326 analysis

9

regarding his commission from FILB but based upon payments that are going to entities other than FILB and for moneys not yet brought into FILB, I believe my contract shows good intentions.

### Conclusion

I believe that my actions were appropriate and forthright and I humbly ask for reconsideration that my claim should be moved from Class 5 with its negative insider status to Class 3 General Unsecured Claims.

Stewart Turner, Pro Se

Dated: June 25, 2014.

10

# Exhibit A

Presentation to



FLETCHER ASSET MANAGEMENT, INC.

*Structured Market Neutral Investments in Mid-Sized Public Companies*

March 2007

1. Overview
2. Philosophy
3. Strategy
4. Process
5. Companies
6. Performance

*Appendix*
- ❑ Recent Investment Transactions
- ❑ Investment Process Detail
- ❑ Fletcher Income Arbitrage Fund, Ltd. Performance
- ❑ Investment Staff

20070315ppt.doc

- Fletcher Asset Management, Inc. (FAM) was founded in 1991 by Alphonse Fletcher, Jr. and invested its own capital until it voluntarily registered with the SEC in 1995 and began accepting outside capital.

- FAM seeks superior risk-adjusted returns by funding promising companies that have good management and responsible business practices.

- Strengthened by FAM's investment of approximately $1 billion since its founding in 1991, dozens of publicly traded companies have created and preserved tens of thousands of quality jobs and developed products and services that improve our standard of living.

- The constructive nature of this investment approach has contributed to the wealth of pension funds, philanthropists, foundations, endowments and other investors.



- **Philosophy**: uncommon combination of four disciplines.
    - Investment Management, Corporate Finance, Quantitative Methods, Social Responsibility
- **Strategy**: hedged structured investments in quality mid-sized companies.
    - Direct Investments, Structured Transactions, Market Hedges
- **Process**: only a few promising, responsible companies selected among thousands.
    - Research, Analyze, Negotiate, Manage
- **Companies**: dozens of responsible companies have welcomed the firm's capital.
    - Share prices reach new highs
    - Tens of thousands of quality jobs
    - Products and services that improve quality of life
- **Results**: the firm's funds have generated superior risk-adjusted returns.
    - The firm's first fund has generated a **15.6%** annualized return since its **1995 inception**.
    - Its largest fund has generated a **8.2%** annualized return with a Sharpe Ratio of **3.5**.
    - **JP Morgan** has structured and **guaranteed** two principal-protected FAM funds.



The Fletcher Asset Management investment philosophy combines four disciplines to capitalize on the specific advantages and disadvantages of various market participants including corporations, foreign investors, tax-exempt institutional investors, financial intermediaries.

The objective of this is to structure transactions that are positive for both the investor and the companies.

- **Investment Management**
  - Disciplined techniques to manage market risk
- **Quantitative Methods**
  - Proprietary models built on financial theory
- **Corporate Finance**
  - Constructive transactions that benefit all parties
- **Social Responsibility**
  - Risk analysis of the social and environmental "sustainability" of companies



Social Responsibility



5

FAM's investment strategy utilizes the following three types of transactions.

- ❏ **Direct Investments** in promising, responsible small-cap and mid-cap public companies
- ❏ **Structured Transactions** involving dividend or interest income
- ❏ **Market Hedges** seeking to capitalize on correlations and volatility

These investments benefit from techniques common with strategies such as

| | |
|---|---|
| *Event-Driven* | *Fixed Income* |
| *Convertible Arbitrage* | *Dividend Capture* |
| *Statistical Arbitrage* | *International* |
| *Long-Short* | *Options* |





- ☐ **Research Opportunities** primarily among small-cap and mid-cap companies

- ☐ **Analyze Companies** that meet the specific qualifications required by FAM

- ☐ **Structure Investment Terms** negotiating with company or counterparties

- ☐ **Manage** positions and portfolio



20070315ppt.doc

7





**Companies Appreciate the Share Price Appreciation that Has Followed FAM's Investment**

Bloomberg LP headline regarding one of Fletcher's direct investments:

☐ "Baan Rises for 3rd Day as Investors Favor Fletcher Investment"

8

20070315ppt.doc



20070315ppt.doc

Fletcher Fixed Income Alpha Fund, Ltd.

Performance data is net of fees.

- Fletcher Fixed Income Alpha Fund, Ltd. (FFIA) combines the FIALTD equity market neutral strategy with Lehman Brothers U.S. Aggregate Index ("Lehman Aggregate") exposure to produce highly consistent returns in excess of the Lehman Aggregate

- Annualized Alpha of 3.87% since inception in 1997 *(pro forma)*

- FFIA holds shares of FIALTD and Lehman Aggregate swap instruments

- Fund Objectives
  - Alpha of 200-400 bps per year net of all fees
  - Volatility similar to Lehman Aggregate
  - Consistent monthly alpha that is uncorrelated to Lehman Aggregate

- Fees are refunded in any year to the extent that the net return of FFIA does not exceed the benchmark



10



| % | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Year | Vol |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2007 | 0.20 | | | | | | | | | | | | **0.20** | N/A |
| 2006 | 0.22 | 0.25 | 0.32 | 0.10 | 0.09 | 0.05 | 0.08 | 0.20 | 0.15 | 0.12 | 0.19 | 0.22 | **2.01** | 0.28 |
| 2005 | 0.05 | 0.21 | 0.14 | 0.05 | 0.01 | 0.20 | 0.20 | 0.33 | 0.09 | 0.15 | 0.09 | 0.11 | **1.64** | 0.31 |
| 2004 | 0.46 | 0.52 | 0.19 | 0.22 | 0.60 | 0.17 | 0.17 | 0.17 | 0.13 | 0.07 | 0.17 | 0.10 | **3.01** | 0.61 |
| 2003 | 0.92 | 0.01 | 0.22 | 0.02 | 0.92 | 0.04 | 0.04 | 0.70 | 0.04 | 0.05 | 0.70 | 0.09 | **3.81** | 1.31 |
| 2002 | -0.01 | -0.02 | 0.65 | 0.39 | -0.01 | -0.01 | 0.53 | -0.01 | -0.01 | 0.01 | 0.00 | 0.24 | **1.76** | 0.85 |
| 2001 | -0.19 | 0.28 | 0.22 | -0.24 | 0.64 | 0.70 | 0.70 | 0.52 | 0.45 | 0.62 | 0.59 | 0.57 | **4.96** | 1.13 |
| 2000 | -0.03 | 0.21 | 0.37 | 0.05 | -0.02 | 0.42 | -0.10 | 0.73 | 0.04 | 0.39 | 0.29 | 0.45 | **2.83** | 0.87 |
| 1999 | 0.52 | 0.53 | 0.71 | 0.42 | 0.45 | 0.57 | 0.18 | 0.42 | 0.59 | 0.34 | 0.11 | 1.17 | **6.17** | 0.94 |
| 1998 | 0.60 | 0.63 | 0.62 | 0.62 | 0.61 | 0.65 | 0.53 | -0.42 | 0.65 | -0.40 | 0.50 | 0.81 | **5.53** | 1.42 |
| 1997 | | | | | | 1.19 | 0.70 | 0.73 | 0.67 | 0.62 | 0.72 | 0.87 | **5.63** | 0.67 |

11

20070315ppt.doc





| | |
|---|---|
| **Annualized Return** | 10.34% |
| Lehman Aggregate | 6.25% |
| **Standard Deviation** | 3.81% |
| Lehman Aggregate | 3.57% |

## Alpha Analysis

| | |
|---|---|
| **Annualized Alpha** | 3.87% |
| **Best Month Alpha** | 1.19% |
| **Worst Month Alpha** | -0.42% |
| **Positive Months** | 89% |
| **Max Drawdown** | -0.42% |

These statistics were calculated with actual returns of Fletcher Income Arbitrage Fund, Ltd. and the Lehman U.S. Aggregate Bond index and rates quoted for swaps as of November 2006. While these *pro forma* returns are a reasonable estimation of the actual return that would have been earned, it is important to note that they are *pro forma*.



20070315ppt.doc

❑ Domicile                          Cayman Islands Exempted Company
❑ Fees                              Fletcher Income Arbitrage Fund, Ltd. fees apply
❑ Hurdle Rate                      Fees refunded in any year to the extent FFIA's
                                    net return does not exceed the benchmark
❑ Minimum Investment               5,000,000 USD
❑ Liquidity                        1-year lockup, quarterly thereafter
❑ Auditor                          Grant Thornton LLP
❑ Administrator                    Citco Fund Services (Cayman Islands) Limited
❑ Valuation Agent                  Quantal International, Inc.
❑ Prime Brokers                    Credit Suisse Securities (USA) LLC
                                    Bear, Stearns & Co. Inc.
                                    Lehman Brothers, Inc.
❑ Legal Counsel                    Skadden, Arps, Slate, Meagher & Flom, LLP
                                    Walkers SPV Limited



20070315ppt.doc

20070315ppt.doc



**TRC Companies Inc.**

Ticker: TRR

Recent Market Cap:
$0.2 billion

TRC Companies, Inc., a leading environmental services company providing technical, financial risk management, and construction services to industry and government, turned to FAM for additional equity capital to finance strategic and accretive acquisitions while maintaining a conservative debt position.  Recognizing the market opportunities for the Company, we structured an investment of $15 million in TRC in 2001 and, in December 2006 at the request of the company, increased our investment.

*"The direct placement process with Fletcher allowed us to complete the transaction on terms that are favorable for our existing shareholders with minimum diversion of management's time."* said Mr. Dick Ellison, Chairman, President and CEO of TRC in 2001.  "We are happy to be partnering with the well-respected Fletcher organization."



**Input/Output, Inc.**

Ticker: IO

Recent Market Cap:
$1.1 billion

Input/Output, Inc., a leading provider of seismic imaging technology for the oil and gas industry, sought a patient and supportive investor to provide the financial flexibility the company desired to confidently execute its ambitious business plan.  A director of Input/Output, who had completed a transaction with Fletcher while at another company, arranged an initial meeting between Input/Output and Fletcher.

In February 2005 Input/Output and Fletcher reached agreement for an investment of up to $70 million in preferred stock that is convertible into shares of Input/Output's common stock at a significant premium to the market price.

*"Over the past few months, we have come to know and appreciate the long-term strategic view of the Fletcher team and we believe they will be a valuable stakeholder as we execute our strategy,"* said Bob Peebler, President and Chief Executive Officer of Input/Output.



16



**The Princeton Review**

Ticker: REVU

Recent Market Cap:
$0.1 billion

Based in New York City and a leading provider of test preparation, educational support and college admissions services, **The Princeton Review, Inc.** used proceeds from Fletcher's initial $10 million investment to expand their K-12 business, pursue strategic acquisitions and for general corporate purposes.

In addition to the purchase of $10 million of convertible preferred stock, Fletcher received the right to purchase an additional $20 million of similar preferred stock from The Princeton Review.

*"We are pleased to be included in Fletcher International's portfolio of responsible companies", said John Katzman, Chief Executive Officer of The Princeton Review, "especially given the inspirational commitment of the team at Fletcher Asset Management to education."*



Mechanical Technology Incorporated and

Plug Power Inc.

Ticker: MKTY, PLUG

Combined Recent Market Cap:
$0.4 billion

A leader in clean energy generation and pioneer in the fuel cell industry, **Mechanical Technology Incorporated** (MTI) was seeking capital which would enable them to bring their direct methanol micro fuel cell (DMFC) products to market. MTI was focused on partnering with a supportive and recognized institutional investor. With this in mind, MTI's financial advisors reached out to Fletcher in late 2003.

In January 2004, Fletcher invested $10 million into MTI in a transaction that could total more than $36 million. The day after the announcement of Fletcher's investment, MTI's share price hit a 52-week high. The investment included rights, which were exercised, to purchase shares of MTI spin-off **Plug Power Inc.**

*"The Company believes the proceeds of this placement will support MTI Micro's efforts through its first product introduction by the end of 2004 and should also provide for the development of additional products," said Dale W. Church, Chairman and CEO of MTI, of our initial investment.*



17



**Euronet Worldwide**

Ticker: EEFT

Recent Market Cap:
$1.0 billion

A provider of secure electronic financial transactions solutions, **Euronet Worldwide, Inc.** (EEFT) was seeking finance to help it complete a strategic acquisition that would strengthen its offerings of outsourcing and consulting services, integrated electronic funds transfer (EFT) software, network gateways and electronic prepaid processing services (top-up services) to financial institutions, mobile operators and retailers.

In November 2003, Fletcher purchased $20 million of common shares at a premium of approximately 13 over the market price in an investment that could total over $36 million.



**Helix Energy Solutions**

Ticker: HLX

Recent Market Cap:

$3.1 billion

A leading provider of subsea construction and maintenance services to the oil and gas industry, **Helix Energy Solutions Group, Inc.** (formerly **Cal Dive International, Inc.**) wanted to support its rapid growth with a solid balance sheet. Although discussions did not begin in earnest until December 2002, by year-end Fletcher reached an agreement with Helix for an investment of up to $55 million of preferred stock that is convertible into shares of Helix's common stock at a significant premium to the market price.

*"This preferred stock issuance [to Fletcher] gives us the financial flexibility to execute our business plan with confidence as we integrate our expansion program," remarked Owen Kratz, Chairman and Chief Executive Officer of Helix.*



20070315ppt.doc



Champion Enterprises

Ticker: CHB

Recent Market Cap:
$0.6 billion

**Champion Enterprises, Inc.**, the leading housing manufacturer in the U.S., was seeking to improve its capital structure and balance sheet while working through their industry's cycle. The company's investment bankers, Credit Suisse First Boston, turned to FAM and in June 2001, we completed a $20 million equity investment. Nine months later, Champion had an opportunity to undertake an acquisition and a major business expansion which required the proposed issuance of $150 million of unsecured notes and a separate $150 million financing facility. To support this strategic move, Champion requested and received an additional equity investment of $25 million from Fletcher.

*Champion's Chairman & Chief Executive Officer, Walter R. Young remarked: "We are excited that these capital structure transactions enhance our liquidity and allow us to enter a new platform for growth that complements our existing operations. We are particularly pleased that Fletcher, one of our largest investors, so quickly and strongly supported our entry into this business."* After Fletcher's investment was announced, Standard & Poor's affirmed their ratings on Champion despite the substantial planned increase in Champion's indebtedness, citing the favorable business opportunity and Fletcher's equity investment.



Alloy Inc. and

dELiA*s

Tickers: ALOY, DLIA

Recent Combined
Market Cap: $0.5 billion

**Alloy, Inc.**, a multi-channel media company and direct marketer providing community, content and commerce to Generation Y, was seeking capital to pursue acquisitions critical to its strategic plan. In January 2002, after meeting with the Company, FAM structured an innovative proposal which provided Alloy with $30 million of equity capital while, at the same time, created a multi-million dollar strategic marketing alliance between Alloy and one of FAM's existing portfolio companies, a manufacturer of products used primarily by Generation Y. The investment includes rights to purchase shares in Alloy spin-off **dELiA*s, Inc.**

*"Our transaction with Fletcher provides Alloy with the capital and currency to further grow the business through accretive acquisitions while placing our shares in the hands of a supportive, strategic shareholder."* said Mr. Matt Diamond, Chairman and CEO of Alloy.



19

20070315ppt.doc

Seek Compelling "Special Situations"

❑ Highly experienced and qualified management

❑ Board-endorsed business plan

❑ Productive funding purpose (acquisition, expansion, etc.)

❑ Market capitalization generally between $100 million and $10 billion

❑ Relevant financial instruments offered by investment banks

❑ Investment ideas generated from multiple sources including:

| | |
|---|---|
| Internal Research | Investment Banks |
| Current Portfolio Companies | Attorneys |
| Previous Portfolio Companies | Accountants |
| Investors | Securities Professionals |
| Corporate Directors | Investment Managers |



21

□ Conduct fundamental corporate analysis unbiased by market "mood"

□ Review prospective investment (financial, tax, regulatory, other issues)

□ Determine that financial risk protection is available

□ Conduct rigorous external review with accountants, attorneys, tax experts, industry-specific consultants and other advisors

□ Examine social and environmental sustainability to minimize risk

20070315ppt.doc

❑ Identify mutually attractive investment ideas

❑ Develop instruments that capture income, option value, or both

❑ Consider risk implications of initial and total investment size

❑ Identify optimal investment structure (e.g., common v. preferred)

❑ Establish time frame of investment (e.g., expiration, maturity dates)



20070315ppt.doc

**Manage** portfolio

- ☐ Monitor portfolio risk in real time

- ☐ Seek to minimize market, sector, and other risks

- ☐ Maximize risk-adjusted return by exiting positions at statistically optimal times

**Support** management

- ☐ Further develop positive relationship with company management

- ☐ Revise investment terms and structures as circumstances change

- ☐ Pursue possible opportunities to increase existing investments

20070315ppt.doc



20070315ppt.doc

Fletcher Income Arbitrage Fund, Ltd.

Performance data is net of fees.

- Fletcher Income Arbitrage Fund, Ltd. (FIALTD) is an equity market neutral fund designed to produce superior risk-adjusted returns that are uncorrelated with equity or fixed income markets

- Annualized rate of return of 8.2% since inception in 1997 versus the Treasury Bill benchmark return of 3.6% and Sharpe and Sortino Ratios of 3.5 and 23.4 respectively

- FIALTD invests substantially all of its capital in dividend-paying preferred stock of the Master Fund and the remainder in the Master Fund's common stock

- Fund Objectives
  - Focused on capital preservation
  - Highly consistent returns
  - Low correlation to equity or fixed income markets



20070315ppt.doc

Unlike **Stocks**, **Bonds**, and **Hedge Funds**, **FIALTD** has continued to provide positive returns since its inception in June 1997, even in its lowest months



Performance as of January 31, 2007

Stocks are represented by the Standard & Poor's 500 Index ("S&P 500"), Bonds are represented by the Lehman Brothers U.S. Aggregate Index ("Lehman Aggregate"), and Hedge Funds are represented by both the HFRI Fund of Funds Composite and the HFRI Equity Market Neutral Index.





**FIALTD** has continued to provide positive returns since its inception in June 1997:

❑ In periods when stocks or bonds declined

❑ In periods when similar market-neutral funds or more diversified fund-of-funds declined









*Performance as of January 31, 2007*

28

20070315ppt.doc

| % | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Year | Vol |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2007 | 0.65 | | | | | | | | | | | | 0.65 | N/A |
| 2006 | 0.60 | 0.65 | 0.72 | 0.52 | 0.53 | 0.49 | 0.53 | 0.66 | 0.60 | 0.57 | 0.64 | 0.68 | 7.43 | 0.25 |
| 2005 | 0.27 | 0.45 | 0.39 | 0.31 | 0.29 | 0.48 | 0.50 | 0.64 | 0.42 | 0.49 | 0.45 | 0.49 | 5.30 | 0.36 |
| 2004 | 0.58 | 0.64 | 0.31 | 0.34 | 0.72 | 0.29 | 0.31 | 0.32 | 0.29 | 0.25 | 0.36 | 0.31 | 4.82 | 0.55 |
| 2003 | 1.06 | 0.15 | 0.36 | 0.15 | 1.05 | 0.17 | 0.16 | 0.82 | 0.16 | 0.17 | 0.82 | 0.21 | 5.40 | 1.31 |
| 2002 | 0.17 | 0.16 | 0.83 | 0.57 | 0.17 | 0.17 | 0.71 | 0.17 | 0.17 | 0.18 | 0.17 | 0.38 | 3.92 | 0.85 |
| 2001 | 0.37 | 0.76 | 0.67 | 0.20 | 1.03 | 1.06 | 1.04 | 0.85 | 0.77 | 0.86 | 0.80 | 0.77 | 9.57 | 0.90 |
| 2000 | 0.47 | 0.71 | 0.88 | 0.57 | 0.52 | 0.98 | 0.46 | 1.29 | 0.60 | 0.95 | 0.85 | 1.02 | 9.71 | 0.90 |
| 1999 | 0.96 | 0.96 | 1.14 | 0.85 | 0.87 | 1.00 | 0.63 | 0.87 | 1.05 | 0.81 | 0.58 | 1.72 | 12.05 | 1.00 |
| 1998 | 1.09 | 1.11 | 1.10 | 1.11 | 1.10 | 1.14 | 1.01 | 0.07 | 1.14 | 0.06 | 0.95 | 1.29 | 11.74 | 1.43 |
| 1997 | | | | | | 1.68 | 1.19 | 1.21 | 1.15 | 1.11 | 1.20 | 1.38 | 9.26 | 0.69 |

20070315ppt.doc





| | |
|---|---|
| **Annualized Return** | 8.24% |
| **Standard Deviation** | 1.27% |
| **Sharpe Ratio (3.57 rate)** | 3.5% |
| **Sortino Ratio (3.57 rate)** | 23.4% |
| **Adjusted Sharpe Ratio (5.00 rate)** | 2.4% |
| **Adjusted Sortino Ratio (5.00 rate)** | 8.4% |
| **Best Month** | 1.72% |
| **Worst Month** | 0.06% |
| **Positive Months** | 100% |
| **Max Drawdown** | -0- |
| **Correlation (S&P 500)** | 0.18 |
| **Correlation (Lehman Aggregate)** | 0.12 |

The Sharpe Ratio and the Sortino Ratio are calculated using actual risk-free rates during this time period. The Adjusted Sharpe Ratio and the Adjusted Sortino Ratio are calculated by a simplified formula that uses an approximation of risk-free rates. The differences between the two ratios are greater for funds whose returns have low standard deviations.



30

20070315ppt.doc



September 2004 through January 2007

| | |
|---|---|
| **Annualized Return** | 6.05% |
| **Standard Deviation** | 0.48% |
| | |
| **Sharpe Ratio (3.69% rate)** | 4.7 |
| **Sortino Ratio (3.69% rate)** | 54.9 |
| **Adjusted Sharpe Ratio (5.00 rate)** | 2.1 |
| **Adjusted Sortino Ratio (5.00 rate)** | 5.1 |
| **Best Month** | 0.72% |
| **Worst Month** | 0.25% |
| **Positive Months** | 100% |
| **Max Drawdown** | -0- |
| **Correlation (S&P 500)** | 0.08 |
| **Correlation (Lehman Aggregate)** | -0.09 |



20070315ppt.doc

- ❏ Domicile — Cayman Islands Exempted Company
- ❏ Management Fee — 1.50%
- ❏ Shareholder Servicing Fee — 0.50%
- ❏ Incentive Fee — 20%
- ❏ Minimum Investment — 5,000,000 USD
- ❏ Liquidity — Weekly
- ❏ Auditor — Grant Thornton LLP
- ❏ Administrator — Citco Fund Services (Cayman Islands) Limited
- ❏ Valuation Agent — Quantal International, Inc.
- ❏ Prime Brokers — Credit Suisse Securities (USA) LLC
  Bear, Stearns & Co. Inc.
  Lehman Brothers, Inc.
- ❏ Legal Counsel — Skadden, Arps, Slate, Meagher & Flom, LLP
  Walkers SPV Limited



20070315ppt.doc

☐ **Kell B. Benson, Vice Chairman,** has served as a senior executive of FAM since 1996 after 22 years at Zenith Electronics Corporation. In 1992, while he was CFO of Zenith, Mr. Benson selected FAM as a source of equity capital and negotiated what would be FAM's first direct investment. Mr. Benson focuses on company analysis and transaction structuring. (Denison University, MBA: Wharton)

☐ **Alphonse Fletcher, Jr., Chairman and Chief Executive Officer,** founded FAM in 1991. (Harvard with cross-enrollment at MIT, MEM: Yale)

☐ **Denis J. Kiely, Director and Counsel,** joined FAM in 1996 and assists in the management of the firm and the portfolio. Admitted to the New York Bar. (SUNY Albany, JD: Fordham)

☐ **Giacomo La Fata, Jr., Vice President - Trading,** joined FAM in 1993 and works in trade execution. (RIT)

☐ **Michael T. McCarville, Corporate Secretary,** joined FAM in 2006 and is responsible for legal and administrative affairs. Admitted to the New York Bar. (SUNY Binghamton, JD: St. John's)

☐ **Sinead O' Dwyer, Assistant Corporate Secretary,** joined FAM in 2007 and assists in legal affairs and investor relations. Admitted to the New York Bar. (University College Cork, European Law Degree)

☐ **Jay Shows, Chief Compliance Officer and Vice President,** joined FAM in 2006 and is responsible for compliance initiatives as well as financial management and reporting. (Baylor University, MBA: New York University)

☐ **Stewart A. Turner, Director,** first worked with FAM in 1998 and previously worked with Mr. Fletcher at Bear Stearns beginning in 1987. Mr. Turner assists in management of the firm and the portfolio. (Princeton, MBA: Wharton)

☐ **Karl E. White, Chief Investment Officer,** joined FAM in 2006 after serving as CEO and CIO of the $1.8 billion MBTA Retirement Fund, one of the first pension funds to invest in FAM funds. Mr. White focuses on investments and structuring funds including "portable alpha" strategies for the firm's investors. (Florida A&M, MBA: Chicago).

☐ **Peter M. Zayfert, Executive Vice President, Head Trader,** joined FAM in 1992; previously worked with Mr. Fletcher at Kidder Peabody beginning in 1989. Mr. Zayfert manages trade execution, risk, and operations. (Brooklyn College)

The Investment Team is supported by operations, legal, and administrative staff.

34

2007035ppt.doc



This document does not constitute an offer to sell any security. An offering can only be made pursuant to an Offering Memorandum. Returns are net of all fees.

This document contains pro forma "portable alpha" returns and other statistics for FAM's portable alpha fixed income strategy. These statistics were calculated using actual returns of Fletcher Income Arbitrage Fund, Ltd., the Lehman U.S. Aggregate Bond Index and rates quoted for swaps as of January 2007. While these pro forma returns are a reasonable estimation of the actual return that would have been earned, it is important to note that they are pro forma.

The investment funds managed by Fletcher Asset Management, Inc. ("FAM"), invest substantially all of their assets in master investment vehicles, "Master Funds," structured by FAM exclusively on behalf of the Funds. The only investors in these Master Funds are the Fletcher Funds. "Feeder Funds." This is commonly referred to as a "Master-Feeder" structure. The Master-Feeder structure may have some of the following advantages: a central pool of capital to facilitate allocation of investment opportunities; a stronger position in negotiating with agents and counterparties to potential transactions; minimization of transaction costs; favorable tax and regulatory treatment; optimal allocation of risk to best satisfy each Feeder Fund's investment objectives; and exposure to certain strategies that might be difficult to employ separately. Each Master Fund generally makes different kinds of investments than the other Master Funds. By investing in the common equity, preferred equity, or debt instruments of one or more of the Master Funds, each Feeder Fund may gain access to investment strategies and risk levels that may be best pursued in a particular Master Fund. For example, with one Master Fund that is structured as a U.S. entity, a more aggressive Feeder Fund (or another Master Fund) might hold the U.S. Master Fund's common equity while a less aggressive Feeder Fund might more appropriately hold a preferred equity or a debt interest of the U.S. Master Fund as a result of risk and tax considerations. Since multiple Feeder Funds may invest in a variety of securities of a number of Master Funds, varying the mix of investment among the various securities of the Master Funds by a particular Feeder Fund may have a substantial effect on that Feeder Fund's return from the Master Funds. The cross-investment feature also makes the Funds dependent on each other to a varying degree, with the net result that withdrawals from or additions to one of the Feeder Funds that are significantly different from withdrawals or additions at the other Funds may substantially increase or decrease the risk experienced by investors in the other Funds. The ability of FAM to vary the features of the securities issued by the Master Funds, including the type of securities issued, the amount invested by each Fund and the terms of the cross-investment itself (including seniority, yield, maturity, early termination and other provisions), gives rise to potential conflicts of interest. FAM seeks to utilize these features to produce the appropriate exposure to the types of investment strategies and relative levels of risk described for each Fund on arms-length terms, rather than to produce targeted returns without regard to indicated relative or absolute levels of risk or market rates of return. However, the terms of these securities have not been negotiated with third parties.

With respect to your consideration of investments in any Fund described you should know that :
(i) The Fund is speculative and involves a high degree of risk relative to many other investments. (ii) The Fund may be leveraged. (iii) The Fund's performance can be volatile. (iv) An investor could lose all or a substantial amount of his or her investment. (v) The Fund's investment manager has total trading authority over the Fund. (vi) There is no secondary market for the investor's interest in the Fund and none is expected to develop. (vii) There will be significant restrictions on transferring interests in the Fund and effecting withdrawals from the Fund and, accordingly, interests in the Fund will be relatively illiquid. (viii) The Fund's high fees and expenses ( relative to, for example, mutual funds registered under the Investment Company Act of 1940, as amended ) may offset the Fund's trading profits.

35

2007031Sppt.doc



Fletcher Asset Management, Inc.
48 Wall St.
Fifth Floor
New York, NY 10005

| Alphonse Fletcher, Jr. (Buddy) | alphonse.fletcher@fletcher.com |
|---|---|
| Denis J. Kiely | denis.kiely@fletcher.com |
| Karl E. White | karl.white@fletcher.com |

| Telephone: | 212 284 4800 |
|---|---|
| Fax: | 212 284 4801 |
| Email: | IR@fletcher.com |
| Website: | www.fletcher.com |



36