HEARING DATE AND TIME: September 19, 2014 at 12:00 noon (ET)

OBJECTION DEADLINE: September 12, 2014 at 4:00 p.m. (ET)

STEWART TURNER, Pro Se

Address: 200 East 71st St., Apt. 5A

New York, NY 10021

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------- X

In re:

                                                  Chapter 11

FLETCHER INTERNATIONAL, LTD.

                                                  Case No. 12-12796 (REG)

                 Debtor.

---------------------------------------------------------------------------- X

**OBJECTION OF STEWART TURNER**

**TO PLAN ADMINISTRATOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO**

**BANKRUPTCY RULE 9019(A) APPROVING THE SETTLEMENT AGREEMENT**

**BETWEEN FLETCHER INTERNATIONAL, LTD. AND CREDIT SUISSE**

Introduction

Stewart Turner, who is both an administrative and pre-petition creditor of Fletcher International, Ltd. (Bermuda), states as follows:

1.      I have filed claims in this case totaling $33,502.76 - $10,000.00 as an administrative claim and $23,502.76 as a subordinated pre-filing claim.  I am a former consultant and a former Director of Fletcher International, Ltd.  I have a Bachelor of Science in Engineering degree from Princeton University in 1980 and an MBA degree from The Wharton School at The University of Pennsylvania in 1984.

2.      My particular expertise as an advisor to the Fletcher organization is in connection with negotiating the customized PIPEs which are the major investment vehicle of the Fletcher organization, where I have built an understanding of the terms and the need for them and, from an industry perspective, in valuing those PIPEs. Although I do not earn my living as a valuations expert, in addition to my graduate business education I have worked on valuation matters with our accountants and experts throughout the years and I have industry perspective and experience on valuation.

3.      I ask the Court's indulgence insofar as I cannot afford counsel and I have prepared all of what follows myself.

2

Background

4.       In paragraph 20 of his motion, Mr. Luskin anticipates that I, as a pro se objector, may
contend that the proposed settlement between FILB and Credit Suisse is not a good one. According to
Mr. Luskin, the Plan Administrator will "recover approximately $160,000 for the estate. This money will
be available to fund litigation commenced pursuant to the Plan and make distributions to creditors."[1] I
am indeed objecting to this proposed settlement; as Mr. Luskin pointed out, I have previously "asserted
that Credit Suisse disposed of the ION Preferred Shares for too little money."[2].

5.       I provide two basic valuation reasons as to why this settlement should not proceed.
First, I show that Duff & Phelps, whom the Trustee has not objected to, confirmed the FILB valuation of
the asset sold by Credit Suisse for only $702,000 above conversion value as having a huge time premium
($29 million when valued as of December 31, 2010). Second, the proposed settlement is below where
the Trustee has already requested and received his commission for assets received from Credit Suisse.

6.       Under TMT Trailer Ferry[3], a bankruptcy judge is supposed to make an "informed,
independent decision", one presumes with information provided by the Trustee and his attorney.
Without being provided the underlying documents of the investment by the Trustee or at least a
complete description of the important terms, I do not believe that Your Honor is at a point to be able to
do so. I do my best to summarize the assets' terms and values below.


The Asset – The Ion Preferred Shares

---

[1] Docket No. 617, paragraph 19.

[2] Docket No. 617, paragraph 21.

[3] Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. C. Gordon Anderson, Trustee,
390 U.S. 414 (1968).

7.      In 2005, FILB had purchased $30 million of non-called perpetual preferred convertible equity (Series D-1) and received the right to buy an additional $40 million of this convertible preferred with conversion prices to be determined by a numerical formula at the time of purchase. The two additional purchases (Series D-2 and D-3) totaling $40 million were completed in November 2007 and February 2008. The three preferred series originally had conversion prices of $7.869, $16.0429 and $14.7981, respectively.

8.      During the 2008 market crisis, the steep drop in share price triggered a provision in the contract that reset the conversion price on all of the preferred shares to $4.4517 (and the redemption feature was extinguished as a result), causing the preferreds to be convertible into significantly more shares of common stock due to the lower conversion prices.

9.      FILB converted most ($43 million of the combined $70 million) of the FILB preferred, primarily to invest in the UCBI positions (more on conversions below). However, $27 million of ION preferred ($22 million of Series D-1 and $5 million of Series D-2) remained.

10.     The ION preferred shares paid a *minimum* annual dividend of 5%, on a quarterly basis. That meant that each quarter, FILB would receive preferred dividends of no less than $337,500 per quarter (or $1.35 million per year) as long as the preferred shares were not sold or converted.

Valuation of the Ion Preferred Shares

11.     Due to these dividend streams, FILB valued the remaining $27 million preferred on December 31, 2010 at $80,487,722. This represented a total of conversion value of $51,432,037 based upon the $8.48 closing price of the common stock and $29,055,685 of time premium.

4

12.     Duff & Phelps, the large valuation firm[4], was hired at the urging of FILB's auditor, EisnerAmper, to confirm the values that Fletcher was using for the remaining $27 million of Ion preferred. Duff & Phelps did so by comparing the yield of the ION preferred to risky bond assets and in a draft report determined that "(b)ased on the information provided, the carrying value of the Investment as of the Valuation Date appears reasonable."

13.     In June 2012, when Credit Suisse sold the ION preferreds for a premium of only $702,000 to conversion value, Fletcher still valued the preferreds with large time premium (roughly $33 million at that time, based upon the May 2012 financials).

14.     Despite losing $32 million when the remaining ION preferred was sold for only $702,000 above conversion value, the *total realized profit* on the Helix and ION investments was over $160 million, with over $60 million coming from ION alone.[5]

15.     While an argument could be made that the time premium could substantially erode should interest rates go sharply higher, Fletcher Asset Management included a term that the preferreds pay the dividend at the greater of 5% or 3-month LIBOR plus 2.5%. This feature would lessen the impact of such a move in interest rates.

Trading History of the Ion Preferred Shares

16.     In paragraph 23 of his motion, Mr. Luskin points out that Fletcher Asset Management never obtained more than conversion value when it liquidated shares of the Helix and Ion and cites the Trustee Report, which refers to six conversions.

---

[4] Duff & Phelps had total revenue of $485 million and adjusted EBITDA of $84 million in 2012, the last year it was public before being bought by a consortium led by The Carlyle Group for approximately $665.5 million. Certainly, no one can claim that Duff & Phelps is a small company dependent upon Fletcher.

[5] Soon after taking over, the Trustee converted the last $1 million of the Helix preferred and sold the common shares received in order to raise funds.

17.    Fletcher typically sought to be close to fully invested (with attractive investments) at all times. Thus, it should not be a surprise that circumstances could possibly induce a conversion rather than a sale at a premium. Such circumstances include but are not limited to liquidating an instrument through conversion and maintaining the confidentiality of proprietary strategies in order (a) to lock in a lower conversion price instead of having the issuer of the preferred be able to redeem FILB at face value, (b) to fund a more promising investment available at that time (e.g. UCBI) where more value could be gained than given up via the conversions, (c) to raise smaller amounts of cash for other needs (e.g. investor redemptions via smaller conversions),  (d) to reduce risk (e.g. if the credit quality of an issuer is deteriorating), (e) tax considerations, and (f) to facilitate a new additional investment in the issuer (e.g. to acquire additional options while remaining below certain ownership percentages), among others.  Several conversions did occur for some of the reasons outlined above, yet as I previously mentioned, Fletcher achieved a realized profit of over $160 million on these Helix and ION investments.

18.    Just because Fletcher did not have the cash to hold the positions while looking to make additional investments does not mean that there was not large value in the remaining ION preferreds beyond the conversion value.  Certainly, Credit Suisse and the $20+ billion hedge fund family that bought the ION preferreds had the wherewithal and flexibility to hold such positions.

19.    The buyer of the preferreds paid a premium of $702,000 and received a $337,500 dividend within just three weeks of the purchase, plus five more quarterly payments of $337,500 in the following fifteen months for a total of over $2,000,000.  To top it off, ION paid the buyer $5,000,000 to convert the preferreds; this amount, while far less than the premium calculated by FILB and confirmed by Duff & Phelps was more than seven times the time premium FILB received.

6

FILB's Recent History with Credit Suisse and the Trustee's Basis for Settlement

20.     It is possible that despite the analysis provided above, the Trustee might not think that he can obtain a settlement with Credit Suisse for millions of dollars.

21.     One could only wish he had come to this conclusion when Credit Suisse retained the entire $595,673.38 Holdback Amount before it took $389,000 in litigation costs under the setoff, or even the remaining $206,337.03 in cash that is available at Credit Suisse before it incurred the latest post-petition legal expenses of approximately $46,000 that it has not yet set off.

22.     Trustee Davis has already used the sum of $206,337.03 as the recovery from Credit Suisse in calculating his commission under Section 326 (see Docket No. 561, "Declaration of Richard J. Davis in Further Support of Interim and Final Fee applications…").

23.     By not placing a discount on this Credit Suisse cash balance, it would seem that Trustee Davis did not consider the possibility that he would have to accept an amount from Credit Suisse that was less than the cash then-currently available. I don't understand how a settlement that is <u>less</u> than the anticipated amount on which the Trustee has already collected a commission (which one would assume is conservatively calculated) cannot be below the lowest point in the range of reasonableness.

24.     To be clear, this is not about and I am not looking to reduce Mr. Davis' 3% marginal commission (approximately $1400) on cash amounts to be made available to creditors. Rather, I am looking to find out what happened between June 11, 2014, the date of his most recent commission application, and August 26, the date of Mr. Luskin's filing. I am curious to see how circumstances might have changed during this period to see why a settlement that is 22%[6] below the value of the cash that was sitting at Credit Suisse is now favorable.

---

[6] (1 - ($160,000 / $206,337.03)) = 22.46% discount

Conclusion

25.     Based on the information above, it would seem as if this $160,000 settlement, which is even below the amount that the Trustee used to determine his Section 326 fee, cannot be above the lowest point in the range of reasonableness, let alone far exceed that amount as stated by Mr. Luskin.[7]

26.     If FILB does not feel that it can win this litigation against Credit Suisse, where it would risk only the $160,000 held by Credit Suisse to ideally obtain at least the difference between the $702,000 premium it received and the $5,000,000 that ION paid to get this issuance back, one wonders what better lawsuit for achieving the goal of bringing money into the estate exists where "[t]his money will be available to fund litigation commenced pursuant to the Plan."

Stewart Turner, Pro Se

Dated:  September 12, 2014.

---

[7] Docket No. 617, paragraph 26.