ALPHONSE FLETCHER, JR., Pro Se
Address:188 Minna Street
      San Francisco, CA 94105

HEARING DATE: September 19, 2014 at 12:00 noon (ET)
OBJECTION DEADLINE: September 12, 2014 at 4:00 p.m. (ET)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

          FLETCHER INTERNATIONAL, LTD.

              Debtor.

Chapter 11

Case No. 12-12796 (REG)

**OBJECTION OF ALPHONSE FLETCHER, JR.,**
**TO PLAN ADMINISTRATOR'S MOTION FOR ENTRY OF**
**AN ORDER PURSUANT TO BANKRUPTCY RULE 9019(A) APPROVING**
**THE SETTLEMENT AGREEMENT BETWEEN**
**FLETCHER INTERNATIONAL, LTD. AND CREDIT SUISSE**

Introduction

Alphonse Fletcher, Jr., a party-in-interest proceeding *pro se*, states as follows:

**1.**      I incorporate portions of Mr. Turner's objection ("Turner Objection") referencing the summary of the terms of the Ion Geophysical Corporation ("Ion") instrument including that it was perpetual, non-callable, floating-rate, convertible preferred stock with a minimum annual dividend of 5% and that the initial investment, the issuer granted an option entitling Fletcher International, Ltd. ("International") to purchase additional stock with similar terms, and the investment agreement provided substantial unique protection for International.

**2.**      From January 1, 2007 through June 30, 2012, International realized profits of $64,928,215 according to the FILB Realized Gains Schedule" on which the Trustee relies for

much of his report.    Yet his motion to settle the dispute states: "Indeed, Fletcher Asset Management has never obtained more than conversion value when it liquidated shares of the same stock."    The Trustee does not share this information and does not attempt to address this substantial contradiction.

3.    Additionally, the value of the Ion stock was corroborated by independent reviews conducted by several parties.    Those parties include Duff & Phelps, Grant Thornton, Eisner, Professor Dwight Grant, Quantal International, FTI consulting, Mukesh Bajaj, Ph.D., Peter A Fowler, Ernst & Young, and others.    The Trustee does not share this information and does not attempt to address this substantial contradiction.

4.    Further, the financial statements filed by Ion with the U.S. Securities and Exchange Commission corroborate the substantial profit captured by International on its investment in Ion. The below excerpt is from Ion's 2010 10-K (emphasis added):

> *Preferred Stock Beneficial Conversion Charge.* As a result of the Reset Notice and the adjustment in November 2008 of the conversion prices for the Series D Preferred Stock to the Minimum Price of $4.4517 per share under the Fletcher Agreement, we recognized in the fourth quarter of 2008 a contingent beneficial conversion feature of the Series D Preferred Stock as a non-cash charge to earnings in the amount of $68.8 million. Under applicable financial accounting guidance, the adjustment of reducing the conversion price was deemed to be equivalent to value being transferred to the holder of the Series D Preferred Stock, with **such holder thereby realizing enhanced economic value compared to the holders of other ION securities that did not hold a beneficial conversion feature. This feature was calculated at its intrinsic value at the original commitment date, and the amount of the charge was limited to the amount of proceeds allocated to the convertible instruments (i.e. the Series D Preferred Stock).**

5.    Finally, D.E. Shaw purchased the Ion preferred from Credit Suisse and realized a profit of seven times the premium it paid above the conversion value of International's Ion preferred stock.    Credit Suisse chose to sell the preferred to D.E. Shaw over a better bid secured by International.    The Trustee dismisses that bidder without disclosing the allegations made by that bidder, allegations which call into question whether the transactions were arms length.

2

6.      Arms Length transactions are a requirement of settlements under Bankrtupcy Rule 9019. Bankruptcy fiduciaries are granted wide discretion.   The Trustee has represented that his settlement with Credit Suisse was done at arms length.   A review of the record including the economics of the various transactions involving Credit Suisse, the parties involved, and the allegations against disinterestedness of the Trustee, his counsel Luskin Stern, and his financial advisor Goldin Associates raises questions that prevent an objective party reaching the conclusion that the TMT Trailer requirement of arms length negotiations has been met.

7.      As discussed in the attached Disgorgement Motion appeal brief, the undisclosed connections relating to the parties discussed in the Trustee's motion raise serious concern.

- **Credit Suisse and D.E. Shaw:**  The Trustee has elected not to pursue recoveries from Credit Suisse and D.E. Shaw despite the fact that Credit Suisse seized Fletcher International, Ltd.'s second most value asset, an Ion Geophysical Corporation floating rate perpetual convertible non-callable preferred stock, days prior to its bankruptcy filing.   Credit Suisse sold the preferred stock to D.E. Shaw for a premium of less than $1 million above the value of the underlying common stock. D.E. Shaw realized a premium of $7 million. The Trustee elected not to pursue either.   Both are clients of his further partnership and former clients of his financial advisor Goldin Associates.   In fact, this is not the first time that Mr. Goldin has been accused of favoring Mr. Liftin's employers (see above regarding Granite Partners and Kidder Peabody).

- **Ion Geophysical Corporation:**   Additionally, the Trustee chose to withdraw claims worth more than $50 million in Fletcher International, Ltd.'s litigation against Ion Geophysical, in which a verdict against Ion on liability was won, one of Fletcher International, Ltd.'s three summary judgment victories over Ion Geophysical prior to the bankruptcy filing.   The trial judge directed the trial to focus on the hypothetical negotiation over "consent rights" that would have transpired between the primary decision makers of Fletcher International, Ltd. Ion did not call me to testify nor anyone else affiliated with Fletcher International, Ltd. that was involved in valuation of the consent right and related seniority covenants.   Surprisingly, neither did the Trustee.   Instead, the Trustee put forth an argument that failed to address the key questions asked by the judge.   Whether or not they would have succeeded, specific answers were available.

- **The Louisiana Officials**:  The trustee chose not to pursue the Louisiana Officials despite the significant harm they caused the debtor.   The Officials made false statements both publicly and under oath in court proceedings.  With aid from the Angelo/Dakota Parties, the Officials abused process through use of an involuntary bankruptcy petition, in bad faith, to resolve a dispute over a debt. In that proceeding the Officials employed the Angelo/Dakota Parties' co-counsel which happened to be the presiding judge's personal counsel, a situation which would not be permitted under U.S. rules. Among the Louisiana officials is the chairman of

Ion Geophysical, James Lapeyre whose close ties to Ernst & Young[1] and Louisiana state government[2] are well publicized in Louisiana. Some Louisiana pension fund board member complained openly in late 2011 about the unreasonable and unfair pressures being applied on them by other Officials and the Angelo/Dakota Parties. Nevertheless, the Trustee deemed the Louisiana Officials as the "major parties-in-interest"[3] and chose not to pursue claims for their bad acts.

8.      I respectfully request that the proposed settlement not be approved until the issues raised have been properly addressed through an evidentiary hearing or otherwise.

*[signature]*

Alphonse Fletcher, Jr.

Dated: September 12, 2014.

---

[1] "Finance industry needs clarity on complex investment tools and a corporate culture that avoids scandal, Ernst & Young CEO says in New Orleans" - http://www.nola.com/business/index.ssf/2013/02/ finance_industry_needs_clarity.html

[2] "Conflicts Galore" http://www.bestofneworleans.com/blogofneworleans/archives/2013/11/19/conflicts-galore

[3] The Verified Petition in support of chapter 15 recognition for FIA Leveraged Fund does not state the current ownership of the stakeholders even though it is required by Rule 1007(a)(4). Instead the Ernst & Young Liquidators inserted a reference to 2012 ownership information:

I certify that the equity ownership of FIA Leveraged Fund (in Liquidation) ("Leveraged") as reported in Leveraged's records is as follows: Leveraged - Estimated capital balances as at 13th April 2012 Provided by the Directors of Leveraged... Note 1 - Names redacted as it is an offence in the Cayman Islands to release investor names without an order of the Cayman Court pursuant to the Confidential Relationships Preservation Law

Similarly, none of the Ernst & Young Liquidators, their counsel, the Louisiana pension funds, their counsel, nor any of the Soundview parties appear to have filed disclosure required by Bankruptcy Rule 2019. Rule 2019 requires "a verified statement setting forth the information specified in subdivision (c) of this rule shall be filed by every group or committee that consists of or represents, and every entity that represents, multiple creditors or equity security holders that are (A) acting in concert to advance their common interests, and (B) not composed entirely of affiliates or insiders of one another."

Bankruptcy Rule 2019(b)(1); "Represent" or "represents" means to take a position before the court or to solicit votes regarding the confirmation of a plan on behalf of another. [2019(a)(2)]; "Disclosable economic interest" means any claim, interest, pledge, lien, option, participation, derivative instrument, or any other right or derivative right granting the holder an economic interest that is affected by the value, acquisition, or disposition of a claim or interest. [Rule 2019(a)(1)].

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>FLETCHER INTERNATIONAL, LTD<br>Debtors. | Chapter 11<br><br>Case No. 14-cv-06070 (RJS) |
|     ALPHONSE FLETCHER, JR. (*pro se*),<br>            Appellants.<br>v.<br><br>    RICHARD J. DAVIS, ESQ.<br>            Appellees. | *On Appeal from the United States*<br>*Bankruptcy Court for the*<br>*Southern District of New York*<br>*(Honorable Robert E. Gerber)* |

ORAL ARGUMENT REQUESTED

**APPELLANT ALPHONSE FLETCHER'S OPENING BRIEF**

This is an appeal to the United States District Court for the Southern District of New York from the Bankruptcy Court's June 17, 2014 Decision denying a motion for an order vacating retention of chapter 11 fiduciaries and requiring disgorgment of their compensation. Each court-appointed fiduciary serving Fletcher International, Ltd. (together "Fiduciaries" ) represented to the Court that it had "disclose[d] all facts" and connections. No connection could be hidden that "would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules." These Fiduciaries, however, hid and even denied representations of and connections to the estate's primary adversaries, parties associated with defendants in a civil rights lawsuit[1] vowing to "destroy" the plaintiffs and their affiliates including Fletcher International, Ltd. Fiduciaries with connections to such parties could have interests "consistent with Defendant Barnes' threat to Fletcher in June 2010 that if Fletcher went ahead and vindicated his rights by filing this lawsuit, the [Dakota] Board would do everything in its power to destroy Fletcher and his reputation in the business community." The Fiduciaries secretly negotiated with those parties for compensation beyond the $10,000,00 they charged the estate then awarded the majority of the Fletcher International, Ltd. estate to those parties.

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**                                                          v

**JURISDICTIONAL STATEMENT**                                                      ix

**STATEMENT OF THE ISSUES**                                                       ix

**STANDARD OF REVIEW**                                                             x

**STATEMENT OF THE CASE**                                                          x

**STATEMENT OF THE FACTS**                                                         1

    Summary of the Facts                                       1

   BACKGROUND                                                        7

    History                                                     7

    JPMorgan Chase, Angelo Gordon, and United Community Banks, Inc.    8

    News Corporation and Jesse Angelo                           9

    Quinn Emanuel's Counsel Gregory P. Joseph and the Louisiana Officials    10

    Cayman Insolvency Proceedings                               11

   US PROCEEDINGS                                                    13

    Debtors' Counsel Young Conaway                              13

    Chapter 11 Trustee Richard J. Davis and His Advisors Are Well Connected    16

    Trustee Davis and His Team's Settlements Favor their Connections    17

    Chapter 11 Proceedings of Affiliates Soundview Elite Ltd et al    21

   CURRENT STATUS OF PROCEEDINGS                                     23

    Fees and Post Confirmation Agreement for Trustee            23

    The Results                                                 24

**SUMMARY OF THE ARGUMENT**                                                       24

**ARGUMENT**                                                                      25

GOVERNING LAW.                                                                                 25

    The Honorable Shelley C. Chapman's recent opinion succinctly highlights the issues.
    25

    "Complete and truthful disclosure of all connections and fee arrangements must be
    made."                                                                              27

    Section 327(a) of the Bankruptcy Code.                                               28

    Disinterestedness.                                                                   28

    The Mandatory Duty of Professionals to Disclose Connections                          30

        Bankruptcy Rule 2014(a).                                                 30

        Bankruptcy Rule 2016.                                                    31

        The Professional's Duty to Disclose is Self-Policing.                    32

        Courts Strictly Construe the Duty to Disclose.                           34

        The Duty To Disclose is Continuing.                                      35

        Failure to Disclose Has Serious Consequences.                            35

    Court May Allow Reasonable Compensation To Retained Professionals From the
    Estate Upon Proper Application With Requisite Disclosure.                             36

        Section 330(a)(1) of the Bankruptcy Code.                                36

        Section 329 of the Bankruptcy Code.                                      37

        Section 330(a)(5) of the Bankruptcy Code.                                37

    The Court May Vacate Its Own Retention Orders and Order Full Disgorgement Where
    There Has Been A Fraud Perpetrated Upon The Court.                                   38

        Civil Rule 60(b) – Generally.                                            38

        Civil Rule 60(b)(6).                                                     39

        Civil Rule 60(d)(3).                                                     39

    The Court's Inherent Power To Impose Sanctions.                                      42

The Fiduciaries failed to make complete and candid disclosure.                               42

    Undisclosed and Partially Disclosed Conflicts that Preceded the June 29, 2012 Filing
    of Bankruptcy for FILB                                                               42

Undisclosed Connections and Interests Adverse to the Estate                    44

The Fiduciaries' Lack of Disinterest                                            46

The Protection of the Integrity of the Bankruptcy System Requires Vacateur of
Appointment Orders  of and Disgorgement of Fees from Mr. Davis and his advisors.
47

The Court, Pursuant to Fed. R. Civ. P. 60(b)(6) and 60(d)(3), Made Applicable by Fed.
R. Bankr. P. 9024, Should Vacate the Retention Orders of Luskin and Goldin        48

The Court Should Order the Removal of Mr. Davis as Plan Administrator and Direct
Mr. Davis to Disgorge All Compensation Paid to Richard J. Davis from the Estate.  48

**CONCLUSION**                                                                   **49**

## TABLE OF AUTHORITIES

**Cases**

Andrada Fin., LLC v. Humana Group, Inc. (In re Andrada Fin. LLC), No. AZ-10-1209- -JuMkPa, 2011
    WL 3300983 (9th Cir. BAP)

Andrulonis v. United States, 26 F.3d 1224 (2d Cir.1994)

Balco Equities Ltd. v. Cohen, Estis and Assocs., LLP (In re Balco Equities Ltd.),
    345 B.R. 87 (Bankr. S.D.N.Y. 2006)

Bank Brussels Lambert v. Coan (In re AroChem Corp.), 176 F.3d 610 (2d Cir. 1999)

Birnbaum v. Birnbaum, 73 N.Y.2d 461 (1989)

Demjanjuk v. Petrovsky, 10 F.3d 338 (6th Cir. 1993)

Diamond Lumber Inc. v. Unsecured Creditors' Comm., 88 B.R. 773 (N.D. Tex. 1988)

Freedom, N.Y., Inc. v. United States, 438 F.Supp.2d 457 (S.D.N.Y. 2006)

Futuronics Corp. v. Arutt, Nachamie and Benjamin (In re Futuronics Corp.),
    655 F.2d 463 (2d Cir. 1981)

Goldberg v. Vilt (In re Smith), 397 B.R. 810 (Bankr. E.D. Tex. 2008)

Hazel Atlas Glass Co. v. Harford-Empire Co., 322 U.S. 238 (1944)

I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.).

In re ACandS, Inc., 297 B.R. 395 (Bankr. D. Del. 2003)

In re Adams, 229 B.R. 312 (Bankr. S.D.N.Y. 1999)

 n.44 In re AMC Realty Corp., 270 B.R. 132 (Bankr. S.D.N.Y. 2001).

In re Angelika Films 57th, Inc., 227 B.R. 29 (Bankr. S.D.N.Y. 1998)

In re B.E.S. Concrete Prods., Inc., 93 B.R. 228 (Bankr. E.D. Cal. 1988)

In re BH & P, Inc., 949 F.2d 1300 (3d Cir. 1991)

*In re Big Rivers Elec. Corp..*, 355 F.3d 415, 428 (6th Cir. 2004)

In re Caldor, Inc., 193 B.R. 165 (Bankr. S.D.N.Y. 1996)

In re C&C Demo, Inc., 273 B.R. 502 (Bankr. E.D. Tex. 2001)

In re Codesco, Inc., 15 B.R. 351 (Bankr. S.D.N.Y. 1981)

In re Codesco, Inc., 18 B.R. 997 (Bankr. S.D.N.Y. 1982)

 In re Drake, 7 F. Cas. 1046 (D.N.J. 1876)

In re Egwu, No. 10-30652 (RAG), 2012 WL 5193958
    (Bankr. D. Md. Oct. 19, 2012).

In re Enron Corp., 352 B.R. 363 (Bankr. S.D.N.Y. 2006)

In re eToys, Inc., 331 B.R. 176 (Bankr. D. Del. 2005)

In re FairPoint Commc'ns, Inc., 445 B.R. 271 (Bankr. S.D.N.Y. 2011)

In re Fibermark, Inc., No. 04-10463, 2004 WL 723495 (Bankr. D. Vt. Mar. 11, 2006)

In re Futuronics Corp., 5 B.R. 489 (SDNY 1980)

In re Granite Partners, L.P., 219 B.R. 22 (Bankr. S.D.N.Y. 1998)

In re GSC Group, Inc. No. 10-14653 (AJG), 2012 WL 676409 (Bankr. S.D.N.Y. Feb. 29, 2012)
        In re Ira Haupt & Co., 361 F.2d 164 (2d Cir. 1996)
        In re Jore, 298 B.R. 703 (Bankr. D. Mo. 2003)
        In re Kewriga, No. 01-44262, 2002 WL 484942 (Bankr. D. Mass. Mar. 28, 2002)

In re Leslie Fay Cos., 175 B.R. 525 (Bankr. S.D.N.Y. 2002)

In re Levander 180 F.3d 1114 (9th Cir. 1999)

In re Lewis Road, LLC,, No. 09-37672, 2011 WL 6140747
        (Bankr. E.D. Va. Dec. 9, 2011)

In re Matco Elecs. Group, Inc., 383 B.R. 848 (Bankr. N.D.N.Y. 2008)
        In re Mercury, 280 B.R 35 (Bankr. S.D.N.Y. 2002)
        In re MF Global, Inc., 464 B.R. 594 (Bankr. S.D.N.Y. 2011)

In re Old Cargo, LLC, 423 B.R. 40 (Bankr. S.D.N.Y. 2010)

In re Park-Helena Corp., 63 F.3d 877 (9th Cir. 1995)

In re Plumeri, No. 10-10050 (MG), 2010 WL 3087685
        (Bankr. S.D.N.Y. Mar. 25, 2010)

In re Project Orange Assocs., LLC, 431 B.R. 363 (Bankr. S.D.N.Y. 2010)

In re Roberts, 46 B.R. 815 (Bankr. D. Utah 1985)
        In re Rockaway Bedding, Inc., 454 B.R. 592 (Bankr. D.N.J. 2011)
        In re Roger J. Au & Son, Inc., 71 B.R. 238 (Bankr. N.D. Ohio 1986)

In re Soulisak, 227 B.R. 77 (Bankr. E.D. Va. 1998)

In re Source Enters., Inc., No. 06-11707 (AJG), 2008 WL 850229
        (Bankr. S.D.N.Y. Mar. 27, 2008)

In re St. Joseph Cleaners, Inc., 346 B.R. 430 (Bankr. W.D. Mich. 2006)

In re Teligent, Inc., 326 B.R. 219 (S.D.N.Y. 2005)

In re United Cos. Fin. Corp., 241 B.R. 521 (Bankr. D. Del. 1999)

In re Vebeliunas, 231 B.R. 181 (Bankr. S.D.N.Y. 1999)

In the Matter of Arlan's Dep't Stores, Inc., 615 F.2d 925 (2d Cir. 1979)

King v. First Am. Investigations, Inc., 287 F.3d 91 (2d Cir. 2002)

Kravit, Gass & Weber, S.C. v. Michel (In re Crivello), 134 F.3d 831
        (7th Cir. 1998)

Kupferman v Consolidated Research and Mfg. Corp., 459 F.2d 1072
        (2d Cir. 1972)

Lamie v. United States Trustee, 540 U.S. 526 (2004)

LeBoeuf, Lamb, Greene & McCrae, L.L.P. v. Worsham, 185 F.3d 61 (2d Cir. 1999)

Lee v. Marvel Enters., 765 F.Supp.2d 440 (S.D.N.Y. 2011)

Lubit v. Chase (In re Chase), 372 B.R. 142 (Bankr. S.D.N.Y. 2007)

Mapother & Mapother, P.S.C. v. Cooper (In re Downs), 103 F.3d 472 (6th Cir. 1996)

Marrero Pichardo v. Ashcroft, 374 F.3d 46 (2d Cir. 2004)

Martina Theatre Corp. v. Schine Chain Theatres, Inc., 278 F.2d 798 (2d Cir. 1960)

Matarese v. LeFevre, 801 F.2d 98 (2d Cir. 1986)

Matter of Olsen Indus., Inc., 222 B.R. 49 (Bankr. D. Del. 1997)

Meinhard v. Salmon, 249 N.Y. 458 (1928)

Nemaizer v. Baker, 793 F.2d 58 (2d Cir. 1986)

Pearson v. First NH Mort. Corp., 200 F.3d 30 (1st Cir. 1999)

Philips Lighting Co. v. Schneider, 395 F. App'x 796 (2d Cir. Oct. 12, 2010)

Radack v. Norwegian Am. Line Agency, Inc., 318 F.2d 538 (2d Cir. 1963)

Reilly v. Natwest Markets Group, Inc., 181 F.3d 253 (2d Cir. 1999)

Rome v. Braunstein, 19 F.3d 54 (1st Cir. 1994)

Specker Motor Sales Co. v. Eisen, 393 F.3d 659 (6th Cir. 2004)

Standard Oil Co. of Cal. v. United States, 429 U.S. 17 (1976)

United States v. Seltzer, 227 F.3d 36 (2d Cir. 2000)

United States v. Smiley, 553 F.3d 1137 (8th Cir. 2009)

Vouzianas v. Ready & Pontisakos (In re Vouzianas), 259 F.3d 103 (2d Cir. 2001)

Weldon v. U.S., 225 F.3d 647, No. 99-6142, 2000 WL 1134358 (2d Cir. Aug. 9, 2000)

Workman v. Bell, 227 F.3d 331 (6th Cir. 2000)

| *Statutes - Federal* | **Rules-Federal** |
|---|---|
| 11 U.S.C. § 101(14)(A) | Fed. R. Bankr. Fed. R. Bankr. Fed. R. Bankr. |
| 11 U.S.C. § 101(14)(C). | Fed. R. Bankr. Fed. R. Bankr. |
| 11 U.S.C. § 101(41) | Fed. R. Bankr. P 2014 |
| 11 U.S.C. § 105(a) | Fed. R. Bankr. P. 2016 |
| 11 U.S.C. § 326 | Fed. R. Bankr. P. 2017 |
| 11 U.S.C. § 327 | Fed. R. Bankr. P. 7030 |
| 11 U.S.C. § 328 | Fed. R. Bankr. P. 7034 |
| 11 U.S.C. § 329 | Fed. R. Bankr. P. 9024 |
| 11 U.S.C. § 330(a)(1) | |
| 11 U.S.C. § 330(a)(3) | Fed. R. Civ. P. 30 |
| 11 U.S.C. § 330(a)(5) | Fed. R. Civ. P. 34 |
| 11 U.S.C. § 503(b)(2) | Fed. R. Civ. P. 60(b)(3) |
| 11 U.S.C. § 503(b)(4) | Fed. R. Civ. P. 60(b)(6) |
| 11 U.S.C. § 504(a) | Fed. R. Civ. P. 60(c)(1) |
| 11 U.S.C. § 507(a)(2) | Fed. R. Civ. P. 60(d) |
| 11 U.S.C. § 1103 | Fed. R. Civ. P. 60(d)(3) |
| 11 U.S.C. § 1107 | |
| 11 U.S.C. § 1108 | |
| 28 U.S.C. § 1927 | |
| 28 U.S.C. § 1746 | |

*Statutes-State*

N.Y. Est. Powers & Trusts Law § 7-2.6(a)(2)

## JURISDICTIONAL STATEMENT

This is an appeal of the Order Denying the Disgorgement Motion Filed by Alphonse Fletcher, Jr. (the "Order") [Docket 578]. The Bankruptcy Court entered the Order on June 24, 2014. The Appellant filed a Notice of Appeal of the Order on June 27, 2014. The Appellant filed their Designation of the Items to be Included in the Record on Appeal and a Statement of Issues to be Presented on Appeal on July 10, 2014. The District Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. §158(a)(1) and Federal Rules of Bankruptcy Procedure 8001, *et seq*.

## STATEMENT OF THE ISSUES

Whether the Bankruptcy Court committed an error of law or an abuse of discretion or exceeded its discretion, under Bankruptcy Codes and Rules including Code 327 and Rule 2014, in not disqualifying and removing a chapter 11 trustee ("Trustee"), his counsel ("Trustee's Counsel") and his financial advisor ("Financial Advisor," the three together, "Fiduciaries") serving the chapter 11 estate of Fletcher International, Ltd. ("Debtor") after being put on notice that those Fiduciaries currently represent and previously represented, directly or indirectly,

1. parties holding interests adverse to the Debtors, parties holding interests potentially adverse to the Debtors, and agents and affiliates of such parties adverse to the Debtors, or affiliates of such parties;

2. parties affiliated with defendants ("Civil Rights Defendants") in civil rights litigation in which the Debtor's affiliates allege that the Civil Rights Defendants unlawfully retaliated by promising to and taking actions intended to "destroy" the plaintiffs and the plaintiff's affiliated funds, including the Debtor; and

3. parties actually or potentially adverse to the Debtor parties that the Fiduciaries failed to disclose in retention declarations and in some cases affirmatively denied.

## STANDARD OF REVIEW

This District Court, vested with the appellant jurisdiction over the ruling of the Court pursuant to 28 U.S.C. §158(a)(1), reviews the legal conclusions of the Court and may reverse the Court's extraordinary remedy. Mixed questions of facts and law are reviewed either *de novo* or under clearly erroneous standards depending on weather the question is predominately legal or factual.

## STATEMENT OF THE CASE

This is an appeal to the United States District Court for the Southern District of New York from the Bankruptcy Court's June 17, 2014 Decision found in the June 17, 2014 Hearing Transcript (the "06-17-14 Transcript" p. 39:15-25, 40:1-25, 41:1-14 [Docket 577]) denying the Fletcher International Ltd. Disgorgement Motion (the "Disgorgement Motion") and Disgorgement Motion Supplementary Information (the "Supplementary Information") filed by Alphonse Fletcher Jr. [Dockets 544 and 566] which identified a lack of disclosure of interests adverse to the estate (11 U.S. Code § 327(a) - Employment of professional persons) and connections with the debtor (Rule 2014 - Employment of Professional Persons) as it applies to Richard J. Davis, ESQ. (the "Trustee"), his counsel Luskin, Stem & Eisler, LLP ("Luskin"), and his financial advisor Goldin Associates ("Goldin"). The Supplementary Information requested an evidentiary hearing pertaining to connections to a related case involving Mr. Fletcher and lack of disinterest by Luskin and Goldin and the failure of the Trustee to take corrective action when the information of connections and lack of interest was brought to his attention. The Order Denying the Disgorgement Motion Filed by Alphonse Fletcher, Jr. (the "Order") [Docket 578] was signed on June 24, 2014.

## STATEMENT OF THE FACTS

### Summary of the Facts

Assets of offshore private investment fund Fletcher International, Ltd., which despite extraordinary circumstances realized more than $150 million of profits between January 1, 2007 and June 30, 2012 according to the its trustee's schedules, were transferred through "settlements" to parties affiliated with its adversaries who had threatened to "destroy" its founder and its affiliates.

- In 2007, as president of the board of Dakota, Inc,. a Manhattan cooperative apartment building where Alphonse Fletcher lived for two decades, Alphonse Fletcher opposed conduct that was anti-semitic, racist, and unlawful.

- In response, between 2007 and 2010 certain officers of Dakota Inc. repeatedly threaten to destroy the investment business Alphonse Fletcher founded in 1991 including the private investment fund Fletcher International, Ltd.

- By 2010, the retaliation had escalated to include adverse actions taken by law firms including Quinn Emanuel and Paul Weiss and other agents and entities, such as News Corporation, Sotheby', Credit Suisse, and JPMorgan Chase, affiliated with certain Dakota Inc. shareholders ("Angelo/Dakota Parties"). The unlawful retaliation included interference with investors in and investments of Fletcher and its affiliates and witnesses.

- In February 2011, Alphonse Fletcher and Fletcher Asset Management, Inc. sued certain of the Angelo/Dakota Parties ("*Fletcher v Dakota*") for breach of fiduciary duty, tortious interference, defamation, retaliation, discrimination, and other torts and in response the Angelo/Dakota Parties escalated their retaliation.

- On July 22, 2011, the Louisiana Officials entered into a Non-Disclosure Agreement.[2] The agreement allowed the Louisiana Officials' accounting firm, Ernst & Young, to conduct an in depth analysis of the Fletcher funds in response to derogatory statements and articles by News Corporation reporters including demonstrably fabricated quotes.[3] In the Non-Disclosure Agreement, the Louisiana Officials promised not to provide confidential information relating to Fletcher International, Ltd. and its affiliates to

> "the Dakota co-op board, Quinn Emanuel Urquhart & Sullivan,
> LLP... or to any director, officer, member, partner, associate,
> employee or any other affiliate or person related to such entities."

- Beginning on July 28, 2011, the Louisiana Officials announced that the Ernst & Young review of Fletcher and the fund in which they invested, FIA Leveraged Fund ("FIAL") was successful.

  July 28, 2011: FIAL is being "completely open and forthcoming" and FIAL "has assets exceeding the value of the [Louisiana Pension Funds] investments and earnings showing more than $40 million in profit on the [pension funds] original investment." http://lafirefightersret.com/pdf/7-28-11-JOINT-STATEMENT.pdf

  August 18, 2011: "To this point the management and staff of FAM have been open and forthcoming with the documents requested by the team. FAM representatives freely discussed any subject raised by the team. The firm that provides a valuation of

investments managed by FAM is comprised of a well respected, independent team of academics. Independent valuations have been used to value the assets in preparing prior audits of the funds in accordance with generally accepted accounting principles." http://lafirefightersret.com/pdf/memo-to-members.pdft

September 9, 2011: The review was conducted with "a principal in the investigation and dispute services unit of Ernst & Young accounting firm...The assets and their valuations have now been corroborated." [See statement which the three pension funds distributed selectively rather than posting on their websites.]

August 14, 2011: Fredieu, the chair of the Firefighters' Retirement System who initially questioned the arrangement with Fletcher, said that if the preliminary investigation into the hedge fund's assets holds true, the deal will remain "our best investment since I've been on the board." "Normally, we don't like to make a hasty decision," he said, "but in that particular case, the hasty decision paid off." http://www.nola.com/business/index.ssf/2011/08/louisiana_pension_fund_may_rue.html

September 8, 2011: Steven Stockstill, director of the Firefighters' Retirement System, said in an interview after the closed-door meeting that Fletcher "has the assets in place" to cover the original investment, according to the accounting firm, which is set to issue a final report to Stockstill in the next week. http://www.nola.com/business/index.ssf/2011/09/hedge_fund_appears_to_have_eno.html

September 8, 2011: Robert Rust, administrative director of the Municipal Employees' Retirement System, said the findings left him "comfortable that there are assets there and that the assets are in excess of our investments."... Fund officials said discretion was necessary avoid disclosing information about securities the hedge fund has invested in. http://www.nola.com/business/index.ssf/2011/09/hedge_fund_appears_to_have_eno.html

- On August 3, 2011, the Louisiana Officials asked Alphonse Fletcher why Angelo/Dakota Party Quinn Emanuel was contacting them about our fund, "Who is this law firm? Why would they have an interest in this matter?" He responded, "Quinn Emanuel, represents The Dakota and is well known in New York for its "Public Strategy" tactics (please see the below page from Quinn's web site). *The Wall Street Journal* appears to be working with them" and included the below page from Quinn Emanuel's website:

### "Public Strategy in High Profile Litigation: Media Relations

High profile legal disputes can become politicized and the subject of intense media attention. Public statements, court filings and testimony can impact both potential jurors and government officials, can shape settlement issues and obviously and dramatically affect other business objectives. In many of the "bet the farm" cases that our firm specializes in, success in the court of public opinion is as important as —or can contribute to—success in the court of law.

Our experience and that of our clients in California, New York, and abroad has been that it is very difficult to find public relations firms which can operate effectively in the context of such complex and contentious legal disputes. Washington is full of lobbyist-lawyers, but even the best of them are not effective outside of the beltway. And outside of Washington, most of those who hold themselves out as providing strategic advice lack the necessary skills to do so in the context of an investigation or

2

complex litigation; they do not understand the legal imperatives and cannot effectively package the issues involved.

Quinn Emanuel has lawyers who have special expertise and experience in coordinating litigation and communication strategies. We are prepared to offer strategic counseling not only to deal with crises but also to prevent them. We have decades of experience training CEOs and top executives in presenting issues to the public, dealing with government investigations, guiding public relations staffers and consultants, and aggressively pursuing communications and political efforts in a way that both supports and protects our clients' legal and business interests. And because we are lawyers, to the extent our work is done in the context of providing legal advice, it can be done in confidence."

- In or about January 2012, Angelo/Dakota Parties' counsel, began representing Louisiana state officials ("Louisiana Officials") responsible for three pension funds invested in preferred stock of Fletcher's affiliate FIA Leveraged Fund despite the July 22, 2011 agreement.

- After the Louisiana Officials, which had been redeemed with a distribution of the United Option securities, joined with the Angelo/Dakota Parties to seize control of FIA Leveraged Fund through a Cayman Wind Up proceeding in which they were represented by the judge's personal counsel.[4] In April 2012, one of the Louisiana Officials' new counsel that included the Chief Justice as one of his clients was granted an involuntary bankruptcy petition against Leveraged, despite disputes of material facts, in a summary proceeding before the Chief Justice.

- The Chief Justice appointed the Louisiana Officials' financial advisor, Ernst & Young, as Leveraged's "independent" fiduciary ("Ernst & Young Liquidators") to be paid by the Louisiana Officials. Those officials demanded that Ernst & Young Liquidators seek to liquidate "all funds in the FAM silo."[5]

- The court-appointed fiduciaries serving Fletcher International, Ltd. and the fiduciaries in the associated chapter 11 cases each have undisclosed connections to the Angelo/Dakota Parties and those associated with them. The Angelo/Dakota Parties appear to be interfering in those proceedings, related proceedings, media coverage, and Fletcher's business dealings. On September 6, 2012, Mr. Marc E. Kasowitz, then counsel to Fletcher International, Ltd., Alphonse Fletcher, and Fletcher Asset Management, wrote to Dakota counsel[6]:

"Finally, it is beyond ironic that you point to a recent decision involving FAM fund investors and their fund's Chapter 11 filing as a supposed justification for illegal discrimination, retaliation and defamation by the Dakota and its directors. Plaintiffs have propounded discovery seeking revelation of all communications regarding them between the Dakota defendants (and their agents) and the press, plaintiffs investors, regulators and other third parties. While you point to actions by third parties as evidence purportedly relevant to this case, at the same time you have refused to produce your communications with those same parties. Among other things, your stonewalling this discovery gives rise to the clear inference that the evidence will show that it is defendants' (and their agents') dissemination of false and defamatory information and wrongful interference in plaintiffs business, regulatory, and legal matters which have brought about the very incidents listed in your letter which you concede have damaged Mr. Fletcher and FAM."

3

- In or about January 2013, the Fiduciaries entered into negotiations and reached understandings with certain Angelo/Dakota Parties, including the Ernst & Young Liquidators, to secure an agreement for additional compensation beyond that provided through the bankruptcy case. That compensation was eventually structured as fees for the chapter 11 trustee in a new position he would assume after confirmation,"Plan Administrator."

- Since then fiduciaries and parties-in-interest cooperating between US and Cayman insolvency proceedings have removed substantial value from the estates with settlements that are not "arms-length," disregard for claims against "connected" parties, and allowing exaggerated claims made by connected parties. The Angelo/Dakota Parties have benefited and little value has survived for the estate (see below discussion of settlements with United Community Banks associated with Angelo/Dakota Party JPMorgan and Ion Geophysical associated with a Louisiana Official).

- In November 2013, the Fiduciaries released the "Trustee's Report and Disclosure Statement" for their "Plan of Liquidation." That plan provided the Ernst & Young Liquidators, Angelo/ Dakota Parties, with the majority of the estate.

  - Neither the trustee's report nor his plan of liquidation report on or seeks recoveries for the harms caused by the Angelo/Dakota Parties.

  - The trustee's report does not disclose that during the period in which the trustee characterizes it as "likely insolvent," Fletcher International, Ltd. was audited by two separate notational independent certified public accounting firms whose audits reveal more than $100 million of realized profits.

  - The trustee's report implies that the SEC found wrongdoing during an intensive investigation when in fact the SEC found no wronging and informed Fletcher's counsel, Skadden Arps, that the SEC was not taking any action.[7]

- Despite their prominence, the Fiduciaries have persisted in trivializing their failure to comply with their obligations to disclose all connections. The trustee's counsel has been dismissive and proven wrong.

  "I mean, almost a silly example but Mr. Fletcher claims that my client, Mr. Davis, the trustee, sat on the Citizens Union with Anthony Smith, a Dakota board member. He's got the wrong Anthony Smith. The Anthony Smith on the Citizens Union was the former executive director of the Horticultural Society and lives in The Ansonia, not The Dakota. Now, I'm sure there are plenty of other examples like that throughout this letter and I'm not suggesting that any of these facts are material to any germane issue." [March 26, 2014 Hearing 13:18-14-1]

  "And the same is true with Goldin Associates. He's just wrong with respect to Angelo Gordon and Balfour (ph.). They're not clients, and everything else was disclosed." [April 2, 2014, 15:5-9]

  "There are dead -- facts that are just dead wrong. As I mentioned on the phone, Mr. Fletcher persists in naming Anthony Smith as the Citizens Union Leadership executive director, and he's just got the wrong person. It's another Anthony Smith who doesn't live in the Dakota. He lives in the Ansonia. There's a disputed issue of fact. Is it material? I don't think so, but there it is on the chart." [April 2, 2014, 12:2213:2]

"He's got my firm down as really the only listing there of a client with a -- that merits disclosure is Ernst & Young, where my firm represented -- now past tense -- two E&Y liquidators, two liquidators in the Nortel case in London who are partners at an Ernst & Young entity that's an affiliate of the Ernst & Young entities in the Caymans. That was disclosed on day one. If there was an issue about that, Mr. Fletcher could have taken issue with my disclosure back then." [April 2, 2014, 14:23-15:5]

- The trustee's counsel has been threatening and has disregarded the principle that fiduciaries cannot have a "'material adverse' interest to any party to the bankruptcy 'for any … reason,' either at the time of appointment or during the course of the bankruptcy." In re Big River quoting In re Marvel Entm't Group, 140 F.3d 463, 476 (3d Cir. 1998) ("A plain reading of this section suggests one is a `disinterested person' only if he has no interest that is materially adverse to a party in interest in the bankruptcy.").

"And I guess finally, Your Honor, I know we're dealing with a pro se litigant here, but this is a very, very sophisticated pro se litigant. Responding to this is going to cost a fortune. There are ten or more high-priced lawyers on this phone call and as much as I hate to use the word, I am going to raise the word; this calls for sanctions and we are reserving our right to send a Rule 11 letter and pursue this if this turns out to be what I think it is. I've said it before, I'll say it again: enough is enough." [March 26, 2014, 15:3-15-11

"As I mentioned, FILB's not a party to the Dakota litigation. Davis is a fiduciary for FILB. The fact that he has interests that are adverse to Fletcher and FAM should be no surprise. Of course, he does. He is adverse to Fletcher and FAM. He's investigated them." [April 2, 2014, 12:2213:2]

- The trustee's counsel has sought to arrogate to himself, decisions that are not his. "The Court stated that 'there is 'no merit to the . . . argument that [a party] did not have to disclose its connections . . . because its attorneys did not feel that a conflict existed.' . . . Weil Gotshal had no right to 'make a unilateral determination regarding the relevance of a connection.'"[8] In re GSC quoting In re Leslie Fay. This can be sen in his dismissive, condescending, and bullying comments.

"And even if Mr. Davis had a relationship with other people who are adverse to Mr. Fletcher, I fail to see what the conflict is and what the need for disclosure is, even accepting that all of the facts and the insinuations in this letter were accurate." [April 2, 2014, 14:5-9]

"The chart lists potential clients and people with close working relationships. I don't think those are cognizable as a matter of law. I think there's no duty to disclose anything having to do with that." [April 2, 2014, 13:5-8]

"As to the facts, Davis doesn't represent any of the people listed page 1 of the chart. Weil may have, but the fact that Weil represented them in and of itself, I believe, is legally irrelevant." [April 2, 2014, 13:11-14]

"And as I've said, Mr. Davis does not have any such representations, but the idea that Davis' former firm represented or had a close working relationship with Quinn Emanuel seems to be pretty farfetched as a basis." [April 2, 2014, 14:4-8]

5

> "The fact that Mr. Davis was a partner at Weil Gotshal that represented a party ten years ago that was adverse to someone who is on the board or advised someone on the board of a co-op that Mr. Fletcher has a dispute with, hardly seems to rise to the level of any kind of disclosure, let alone material disclosure." [April 2, 2014, 14:2115:1]

- In June 2014 hearings and filings relating to the Fiduciaries compensation, which exceeds $10,000,000, the Fiduciaries sought to collect fees in excess of that permitted by Bankruptcy Rules, have not disclosed to parties-in-interest the identity of "special consultants" used [Docket 302], have collected substantial payments based on significantly redacted invoices in violation of local rule with only after-the-fact permission of the court [docket 537] to redact the invoices, and demonstrated other irregular conduct.

- Alphonse Fletcher's June 12, 2014 "Disgorgment Supplemental Filing" stated:

> "The Trustee, Luskin, Goldin have refused repeated requests to address the absence of certain connections from their applications, flled September 29, 2013 (Docket No. 115), November 12, 2012 (Docket No. 154), and November 12,2012 (Docket No. 153), respectively. Certainly they are aware that "the decision as to what information to disclose should not be left to counsel, whose judgment may be clouded by the beneflts of the potential employment." *In re Persaud,* 496 B.R. 667, 675 (E.D.N.Y. 2013)

> Just yesterday in his declaration, the Trustee admitted two of the connections that Mr. Luskin denied on the record on April 2, 2014 (i.e. Anthony Smith and News Corporation). If the Fiduciaries continue to arrogate the decision to disclose all connections, especially connections to the estate's adversaries, "the question will always linger whether it held back, or failed to bite the hand that feeds it quite as hard as the circumstances warranted." Granite Partners, 219 B.R. at 38."

Section 101(14)(A) ofthe Bankruptcy Code provides that a person is "disinterested" if that person "is not a creditor, an equity holder, or an insider."1 11 U.S.C. § 101(14) (A). Section101(14)(C) of the Bankruptcy Code provides that a "disinterested person" is someone who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14)(C).

To be disinterested is "to prevent even the appearance of a conflict irrespective of the integrity of the person or firm under consideration." In re Vebeliunas, 231 B.R. 181, 191 (Bankr. S.D.N.Y. 1999), dismissed on appeal, 246 B.R. 172 (S.D.N.Y. 2000) (citing In re Codesco, Inc., 18 B.R. 997, 999 (Bankr. S.D.N.Y. 1982» (additional citations omitted); see also In re Angelika Films 57th, Inc., 227 B.R. 29, 38 (Bankr. S.D.N.Y. 1998) ("The determination of adverse interest is objective and is concerned with the appearance of impropriety."). A disinterested on "should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters." Vebeliunas, 231 B.R. 191-92 (citations and quotations omitted). The most modest interest or relationship will undo a person's disinterestedness if it "would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules." In re Granite Partners, L.P., 219 B.R. 22,23 (Bankr. S.D.N.Y. 1998» (internal quotations and citations omitted).

6

## BACKGROUND

### History

These associated cases *In re Fletcher International, Ltd., In re FIA Leveraged Fund, In re Fletcher Income Arbitrage Fund, Ltd.*, and *In re Soundview Elite, Ltd. et al*, and a dozen other proceedings in five countries and nine states arise out a dispute with New York's Dakota Inc. cooperative apartment building ("Dakota"). That lawsuit was brought in an effort to stop the attacks[9] on Alphonse Fletcher, his family, Fletcher Asset Management, Inc. and its funds (together, "Fletcher"):[10]

> Founded by [Alphonse] Fletcher in 1991, FAM serves in an advisory capacity with respect to a series of funds that include outside investors. Since 1991, FAM has completed more than 50 transactions that have provided additional capital to companies through the purchase of newly issued securities. The investments have helped these companies create and preserve tens of thousands of quality jobs from upstate New York to Southern California in industries including affordable and energy-efficient housing, alternative energy, education services, and environmental services. FAM is currently focused on providing additional capital and other support to community banks aimed at helping to reinvigorate the economy and generate attractive returns.

Officers of the Dakota ("Dakota Officers") and parties aiding them including Dakota treasurer John Angelo (together with the Dakota Officers, "Angelo/Dakota Parties") followed through on threats[11] made by former Dakota presidents John Rydzewski and Bruce Barnes. As payback[12] for Alphonse Fletcher's opposition to their practices which he claimed were discriminatory, Rydzewski and Barnes threatened to destroy Alphonse Fletcher, his family, and his funds.[13] On July 3, 2012, the New York Supreme Court Appellate Division denied the Dakota's motion to dismiss stating: "knowingly and maliciously spreading false statements and rumors to third parties, including the media, concerning Fletcher's financial condition," states a claim for illegal retaliation, breach of fiduciary duty, and defamation.[14]    Paul Weiss drafted the complaint and managed the litigation for Fletcher during the first six months but its managing partner ordered the firm's attorneys not appear in court or sign the filings its drafted because John Angelo's firm Angelo Gordon is an "important client" of Paul Weiss. One week prior to motion-to-dismiss arguments, Paul Weiss withdraw and was retained by News Corporation.

**JPMorgan Chase, Angelo Gordon, and United Community Banks, Inc.**

In April 2010, shortly after Alphonse Fletcher submitted his application to the Dakota board, JPMorgan suddenly began a series of hostile actions that continue to this day without explanation or justification. Days earlier, Dakota Officers had incorrectly asserted to Alphonse Fletcher and to the Dakota Baord that his lender JPMorgan Chase could call his real-estate-backed, long-term "business loans."[15] The Dakota Officers may have confused Alphonse Fletcher's non-callable loans from JPMorgan with other financing, callable securities loans, provided by JPMorgan to one of his central funds, to Fletcher International, Ltd.[16] JPMorgan called the Fletcher International, Ltd.'s securities financing, delayed Fletcher Asset Management's liquidation of product it structured with JPMorgan's affiliate Corsair (Jersey) Limited,[17] caused other banks[18] to terminate their financing of Fletcher according to people involved, conducted unauthorized credit checks and other inquires on Alphonse Fletcher and his affiliates while refusing to explain to Fletcher what prompted the inquires, restricting substantial amounts of cash in Fletcher-related accounts without valid justification, and interfering in Fletcher investments including its investment in Georgia-based United Community Banks, Inc. ("United").

On April 1, 2010, United had announced a strategic investment from Fletcher International, Ltd. and received an enthusiastic response from industry analysts.[19] "Community banks are the engines that power local economies, which, in turn, provide jobs, homes, and security to people around the country," said Denis J. Kiely, Director of Fletcher Asset Management, Inc. "With these concurrent investments, we hope to free capital on United's balance sheet to allow it to continue and expand its investments in its communities and fulfillment of its mission."[20] A few months later, Credit Suisse, a partner, lender, and agent of Angelo Gordon, helped launch a fund hoping to free capital on banks' balance sheets managed by Christofferson Robb, a hedge fund run by former Dakota presidents John Rydzewski and Richard Robb which John Angelo claimed to bail out during the economic crisis. The new "CRC Capital Release Fund" would "effectively buy a small amount of exposure to the riskiest" assets of banks.[21]

On April 22, 2011, Reuters reported on United's srategy, "With the stabilization of credit issues, the company is now focusing its attention to acquire failed banks through FDIC-assisted transactions. 'We are absolutely interested in FDIC transactions within our footprints that has real customers and real franchise that would add to our franchise,' the CEO said."[22] A few months later, on

8

June 9, 2010, Angelo, Gordon & Co., with former JPMorgan executives,[23] announced its intention to make a strategic investment in Georgia banks followed by "FDIC-assisted transactions."[24]   At the same time, in early June, 2010, Wachtell Lipton, counsel to JPMorgan Chase and Angelo, Gordon & Co., insisted that Fletcher International, Ltd. acquiesce to United's unilateral amendments to its investment agreement well after United, its counsel, Kilpatrick Townsend, Fletcher Asset Management, Inc., and its counsel Skadden Arps, had executed, funded, and announced the transaction.

From time to time, often with assistance from Wachtell,[25] United would further modify and violate those agreements.  United replaced the Fletcher International, Ltd. transaction with a similar but larger non-performing asset purchase and equity investment from JPMorgan Chase affiliate Corsair Capital LLC and its co-investors.  JPMorgan Chase affiliate JPMorgan Securities advised United on the investment[26] and a former JPMorgan Chase executive joined United's board.[27]  On March 16, 2011, United's CEO declared: "Corsair is an ideal partner for United, with its experience and track record as a thoughtful and positive strategic investor focused entirely on the financial services sector" and "This capital plan is the result of many months of internal analysis and discussion..."[28]   Corsair executives reportedly met with United's management weeks after Wachtell began assisting United.[29]  While United had previously trumpeted its Fletcher deal, a "Top Deal of 2010,"[30] United began using the Dakota's false allegations as excuses for breaching its contracts with Fletcher,[31] disparaging Fletcher in its public filings,[32] and making further unilateral amendments to its Fletcher agreements.  News Corporation's The *Wall Street Journal,* which has published more than 50 stories relating to Alphonse Fletcher, his family, and his funds, summarized United's efforts to undermine its convertible securities deal with Fletcher[33] claiming United:

> "reset the conversion price after the bank brought in more investors and
> implemented a reverse stock split last year, making the rights far less valuable than
> Fletcher asserted."

## News Corporation and Jesse Angelo

News Corporation, in May, 2010, began running a series of articles with scoops on the historically press-shy Dakota.  In March 2011, Fletcher's business associates including investors began telling of News Corporation reporters disparaging Fletcher to investors and regulators, challenging in some cases, "what are you going to do about Fletcher?"  In July 2011, News Corporation began a series

of stories about Fletcher, Alphonse Fletcher, and the Fletcher family that eventually exceeding 50 each

with false and derogatory statements. Shortly before Kasowitz Benson informed Fletcher that it would

suddenly withdraw as counsel in *Fletcher v Dakota*, as Paul Weiss had done before it, Alphonse Fletcher

learned that Kasowitz was defending News Corporation in race discrimination-retaliation cases in which

Angelo/Dakota Party Jesse Angelo, son of John Angelo, was a central figure. John Angelo's Angelo,

Gordon & Co. had successfully defeated a discrimination-retaliation case in 2009 in which the plaintiff

alleged that Angelo Gordon "set out to destroy my ability to find subsequent employment."[34] Dakota

Bruce Barnes is reported to have used similar tactics.[35] Court filings revealed that Black journalists

claimed their termination from News Corporation's *New York Post* was in retaliation for their

complaints about a February 2009 cartoon. The cartoon depicted a monkey shot dead by two New York

City policemen who then ask "Who are they going to get to write the next stimulus bill?" The

preceding page featured a picture of President Barack Obama signing the stimulus bill. Court filings in

that litigation contained many references to Jesse Angelo who then served as managing editor of the

*Post*.

> According to the affidavit of *Post* employee Shari Logan filed in the litigation,
> Jesse Angelo informed another editor of the arrest of Harvard's Alphonse Fletcher
> University Professor Henry Louis Gates for "breaking into his own home."
> According to the affidavit, the editor said "apparently, he is an angry, Black man"
> and in response to the arrest responded "nice!"[36]

> In an April 25, 2012 deposition, defended by Kasowitz, Jesse Angelo addressed
> his management of a race-related controversy including his "reprimand" of
> employee Steve Dunlevy as "punishment" fir referring to a black journalist to his
> face in front of other colleagues as a "token nigger." Jesse Angelo was asked "was
> any other action ever taken against Mr. Dunley?" To which, which Jesse Angelo
> responded: "For what?" The questioning attorney replied: "For this incident,"
> Jesse Angelo responded, "Not that I am aware of."

> During that deposition, in response to questions about the "Stimulus" monkey
> cartoon, Jesse Angelo testified: "I approved the cartoon for publication... I was
> aware of the historical fact that Blacks had been portrayed as chimpanzees in the
> past in American history."

### Quinn Emanuel's Counsel Gregory P. Joseph and the Louisiana Officials

The Dakota Officers retained Quinn Emanuel ("Quinn") to help with its escalating conflict with

Alphonse Fletcher in mid 2010, months prior to the 2011 filing of *Fletcher v Dakota* and two years prior

to the 2012 wind ups of Fletcher's Cayman Islands funds. Quinn's engagement was led by a partner that appears to have had no discrimination litigation experience. At the time of her retention by the Dakota, the Quinn Emanuel partner was working with Geoffrey Varga of Kinetic in a multi-billion dollar Cayman Islands fund windup and U.S. chapter 15 proceeding. Mr. Varga was later proposed as a fiduciary for *In re Fletcher International, Ltd.* and then for its affiliates *In re Soundview Elite, Ltd. et al.* Quinn's outside counsel, Gregory P. Joseph ("Quinn's Outside Counsel"), began representing Louisiana officials and three of their funds that had invested in Fletcher's FIA Leveraged Fund ("Louisiana Officials") in a "multi-jurisdictional" litigation.[37]

In the Cayman Islands, the Chief Justice's personal counsel, Ross McDonough of Campbells, retained for the Louisiana Officials in January 2012, was able to have FIA Leveraged Fund wound up, the U.K. Commonwealth equivalent of an involuntary bankruptcy proceeding. The Chief Justice presided despite the conflict of interest.[38] The wind up petition was granted despite the clear dispute regarding the debt. Ernst & Young liquidators ("Ernst & Young Liquidators") were appointed as "independent" fiduciaries for the fund's liquidation despite having worked for the Louisiana Officials for the past nine months.[39]

On August 2011, the Louisiana Officials asked me why Angelo/Dakota Party Quinn Emanuel was contacting them about our fund, "Who is this law firm? Why would they have an interest in this matter?" In or about December 2011, in an effort to pressure a modification to the agreements governing their redemption, the Louisiana Officials threatened to "just throw it into bankruptcy," an improper use of bankruptcy process due to the existence of "a *bona fide* dispute as to liability or amount" and the filing would be intended to benefit only the Louisiana Officials not creditors as a group.[40]

In or about December 2011 or January 2012, the Louisiana Officials breach the July 22, 2011 confidentiality agreement in which they promised not share information with the Angelo/Dakota Parties and the Angelo/Dakota Parties, including Quinn Emanuel outside counsel Gregory P. Joseph and Cayman law firm, Campbells, began representing the Louisiana Officials.[41]

**Cayman Insolvency Proceedings**

11

In February 2012, the three investors controlled by Louisiana officials were redeemed in accordance with governing documents drafted and interpreted by Skadden Arps counsel to Fletcher Asset Management, Inc. The Funds' Adversaries deployed the tactical maneuver of a bad faith winding up petition in the Grand Court of the Cayman Islands, the equivalent to an involuntary bankruptcy petition, even though "It would be an abuse of process to ask for a winding up petition when a debt was bona fide under dispute."[42]

The Funds' Adversaries, advised by the Angelo/Dakota Parties, filed sworn affidavits which contradicted documentary evidence[43] and their multiple prior public statements[44] and which, against self interest, publicly denigrated the key asset on which the value of their investment ultimately depended, the United Community Banks, Inc. option ("United Option").

In April 2012, the Funds' Adversaries petition was granted and their request to appoint Ernst & Young as Joint Official Liquidators was also granted despite the fact that Ernst & Young had worked for the Louisiana Officials for the past nine months.

The Chief Justice in paragraph 100 of his April 18, 2012 opinion sided with the counsel for the Funds' Adversaries', Ross McDonough of Campbells, and against hundreds of Cayman Islands funds and their counsel that created special purpose vehicles to facilitate distributions of their funds' assets as redemptions in kind over the past several years:[45]

> 100. In support of the first ground of the Petition, Mr. McDonough advanced further arguments of a technical nature... that the distributions in specie were, in any event, non-complaint with the [Confidential Offering Memorandum] because they were required to be made from 'assets of the Fund...'

In paragraph 108 of his opinion, the Chief Justice appeared to rule that an option contract, regardless of the expert valuation entered in evidence, has no value prior to its exercise:

> 108. First, the distribution in specie of the FILBCI shares could have been of no real consequence... can lay no existing claim to a substantial proprietary interest in UCBI... is only the right to exercise the [United Community Banks, Inc.] Stock Option...

The Chief Justice presided over this hearing despite the fact that his personal counsel, Ross McDonough of Campbells, argued for the Louisiana Officials which would disqualify a judge[46] under U.S. legal system. Mr. McDonough has represented the Chief Justice for years in, among other things, a mystery involving anonymous letters to the editor of a Cayman Newspaper [47]that were critical of the

12

Chief Justice and what *The Independent* terms "attempts to pervert the course of justice over a Watergate-style break-in at a newspaper office on the islands, according to documents seen by *The Independent on Sunday*."[48]

The significance ofThe significance of this dual representation cannot be determined with certainty because, other than Scotland Yard's determination that the currently secret complaint filed by the leader of a U.K. Metropolitan Police task force alleging unlawful conduct by officials in the Cayman judiciary and government has merit, little is else is known of the allegations against the Chief Justice and other government figures.  The Foreign & Commonwealth Office[49] of the U.K. government refuses to release the complaint arguing:

> "disclosure could lead to a loss of confidence within the international community which could impact negatively on the Cayman Islands' reputation and, more directly, on its financial services industry"[50]

## US PROCEEDINGS

### Debtors' Counsel Young Conaway

On May 18, 2012, Fletcher filed an action against the Ernst & Young Liquidators in the U.S. District Court in the Southern District of New York seeking a declaratory judgment to resolve any disputes fairly.  The Angelo/Dakota Parties's counsel, Gregory P. Joseph, communicated briefly with Young Conaway.  The Ernst & Young Liquidators, however, disregarded the US proceedings and pursued an involuntary bankruptcy petition against Fletcher International, Ltd. in Bermuda and to have liquidators appointed.

On June 29, Fletcher International, Ltd., solvent but under attack in offshore jurisdictions, sought protection under chapter 11 with Young Conaway Stargatt & Taylor, LLP ("Young Conaway")y as Debtor's Counsel.  On the advice of Young Conaway, Fletcher filed a chapter 11 petition in the Southern District of New York Bankruptcy Court seeking to resolve all disputes resolved in the U.S. with due process and to stop the bad-faith, offshore legal proceedings.  Fletcher International, Ltd. won a temporary restraining order and a trial for a "Manville Injunction" against actions by its direct and indirect shareholders including the Ernst & Young Liquidators.  Satterless Stephens, long known for

representing financial institutions like JPMorgan Chase51, appeared on behalf of the Louisiana pension funds and ridiculed the debtor's claim of a conspiracy by shareholders to undermine its reorganization. Those comments were disingenuous in light of information later obtained.52

On July 3, 2012, the Court granted Fletcher a temporary restraining order prohibiting the Ernst & Young Liquidators from seeking to appoint liquidators or to change Fletcher's board. and scheduled a hearing for a preliminary injunction.

Within days, on July 17, 2012, Young Conaway withdrew the crucial "Manville" Injunction request prohibiting further actions to appoint liquidators, seize control, or undermine the reorganization without the informed consent of the principals of Fletcher International, Ltd. Young Conaway later claimed it was necessary due to technical legal reasons though it was unable to explain those reasons and referred to Bermuda counsel, Appleby's.   Later it was revealed that Appeby's also represented certain Angelo/Dakota Parties.  While Young Conaway withdrew the "Manville" injunction discovery demands, it seized a Fletcher Asset Management network disk intended for an e-discovery vendor. Counsel for the Ernst & Young Liquidators at the July 23, 2012 hearing (13:6-12) commented:

> "Two days after the conference before Your Honor, and after our clients had
> diligently endeavored on an extremely  expedited basis to satisfy the plaintiff's
> extensive discovery demands, plaintiff sent a letter to this Court, without
> explanation, withdrawing in its entirety their demand for an injunction against
> shareholder action and all of their discovery requests."

Young Conaway threatened the directors of Fletcher International, Ltd. with "personal liability" and ordered them to disregard communications form their single shareholder, Fletcher International, Inc., despite Judge Gerber's explicit directive that "ordinary corporate governance" was in effect. Young Conaway then filed a motion for the appointment of a Trustee without obtaining informed consent of the principals of Fletcher International, Ltd.

On July 17, the Young Conaway attorneys representing Fletcher spoke with counsel representing the Ernst & Young Liquidators.  Also on July 17, according to billing records in a Delaware bankrtupcy case, In re Sands, (11-13393, docket 448-1) other Young Conaway attorneys that had been working with the Louisiana Officials in a Delaware fund bankrtupcy In re Sands, spoke with those officials by

telephone and included Kinetic Partners whom they had chosen to replace the Sands funds's original manager. Finally, also on July 17, an order was issued (docket 372) in that Delaware matter approving professional fees including more than $370,000 for Young Conaway. On July 25, Young Conaway submitted a request (docket 390) for additional compensation which would bring its total to almost $1 million in that matter. Finally, on July 11, 2012, Young Conaway attorneys argued for Angelo Gordon in the Delaware bankruptcy proceeding In re Tribune.53 Jones Day represented Angelo Gordon and filed a brief in that matter on July 20, 2012.54 Despite that representation, Jones Day and one of its partners were appointed fiduciaries in the chapter 11 of affiliates of Fletcher International, Ltd. as discussed below.

At a July 27, 2012 hearing, comments and actions by Young Conaway partner David Hurst evidenced his change of course. Mr. Hurst had just withdrawn the injunction request and discovery demands without informed consent of his client and instead provided discovery to the Ernst & Young Liquidators from documents owned by Fletcher International, Ltd. and documents owned by its affiliates without an appropriate privilege review, induced the debtors' parent, Fletcher International, Inc., into a "standstill agreement" without court approval, suggested that the Court appoint a liquidator or trustee, and falsely characterized Alphonse Fletcher as hostile without consent and contrary to the belief of of Mr. Hurst's client.

> I think a Chapter 11 trustee could probably -- the big difference is that a Chapter 11 trustee's not getting through the front door. He's not going to have access to the people who know what they're doing. He's not going to have sort of the goodwill of sort of the enterprise. When I'm saying "the enterprise", I have to tell you -- and I don't even want to say the name, because -- but you know, Mr. Fletcher is -- he could tell us you don't have access to the servers. He could tell you that. But let me just say that, there have been a lot of fingers pointed at him, but he's not stopping it.
>
> THE COURT: Wouldn't that be the day before you, assuming you're doing your job, hauled his butt in before me for violation of the automatic stay under 362(a)(3), if not a zillion other things? And also call up the U.S. Trustee and the U.S. Attorney's Office?
>
> MR. HURST: For doing -- what will we -- why would we—
>
> THE COURT: For depriving you of the use of the servers which are essential to the debtor's operations.

MR. HURST: Your Honor, they're not the property of the debtor. So I imagine we would certainly, if we couldn't -- if we did not have access and we couldn't do our job, we'd have to address it one way or another. But just conceptually, as far as property rights go, we don't just have the unfettered right to take other people's property. And I guess I don't know how it would be resolved.

[In re Fletcher International, Ltd., July 27, 2012 Hearing, 44:2-45:3 ]

## Chapter 11 Trustee Richard J. Davis and His Advisors Are Well Connected

Eventually, Mr. Hurst motioned the court for a trustee, the order was granted, and Mr. Richard J. Davis was appointed. Mr. Davis had recently retired from Weil Goshal Manages LLP where he advised Sotheby's in a settlement of government charges and News Corporation in defense of defamation claims. Mr. Davis sits on boards with Deborah Hicks Midanek and John Liftin, former general counsel of Kidder Peabody and current general counsel of DE Shaw.[55] Ms. Midanek used fabricated documents to seize control of affiliates of the Fletcher International, Ltd. through a court ruing in the British Virgin Islands. That ruling was overturned on appeal last week. Similarly flawed rulings in Cayman (an involuntary insolvency proceeding in which the "debt" was disputed) would likely be overturned on appeal. In Cayman, however, chicanery resulted in the appeal to the Privy Council being "struck" immediately after the US Bankruptcy court issued its automatic stay halting related Cayman proceedings. After the stay, counsel for the Ernst & Young Liquidators' claimed to the Cayman court that the $200,000 "security for costs"posted and accepted by the Cayman Court weeks earlier for the then-scheduled Privy Council appeal was received two days too late. The funds remain in the Cayman court. With respect to Mr. Liftin, D.E. Shaw purchased Fletcher International, Ltd.'s shares of Ion Geophysical preferred stock after Credit Suisse seized them days prior to the chapter 11 filing. Credit Suisse paid Fletcher International, Ltd. less than one million above the value of the underlying common shares. D.E. Shaw was later paid millions above the common stock value by Ion Geophysical. Credit Suisse refused Fletcher International, Ltd.'s demands to allow it to sell to a higher bidder it had identified. Mr. Davis has also sat on boards with a named defendant in *Fletcher v Dakota,* Anthony Smith and with Gregory P. Joseph, counsel to Angelo/Dakota Parties.[56] None of Ms. Midanek, Ernst & Young, Mr. Joseph, or Mr. Smith appear in Mr. Davis's application.  In fact, at least three occasions,

Mr. Davis's counsel represented to the Bankruptcy Court that Mr. Davis had not in fact sat on a board with Mr. Smith then later admitted the false statement and asserted that connection was not relevant.

Mr. Davis retained Luskin Stern Eisler, LLP ("Luskin Stern") which happened to represent Ernst & Young liquidators and was working with Ernst & Young and Young Conaway in the bankruptcies of Nortel Networks and Kodak. Luskin Stern did not disclose it connections to counsel that represented affiliates of Fletcher International Ltd. For example, a Luskin Stern partner served as fee examiner in Kodak. On November 15, 2012, Nixon Peabody suddenly resigned as counsel to Fletcher International, Inc. and on November 30, 2012 Nixon Peabody filed its application for "special compensation." On April 9, 2013 a Luskin Stern partner, Michael Luskin, was appointed trustee in an unrelated case, Ampal-American Israel Corp. On April 29, 2013, Brown Rudnick purported to make a "noisy withdrawal" from its representation of an affiliate of Fletcher International, Ltd. but did not state the cause as is required. Three days later on May 1, 2013, Mr. Luskin, as trustee, endorsed the Ampal-American Israel Corp liquidation plan advocated for by Brown Rudnick.

Mr. Davis's selection for his financial advisor, Goldin Associates ("Goldn") had particularly close ties to Quinn Emanuel counsel to Angelo Gordon and Dakota Inc. Goldin had been defended by Quinn Emanuel in a fraud lawsuit. Goldin's founder has been criticized for providing favorable treatment to Kidder Peabody while serving as chapter 11 trustee for Granite Partners. Mr. Liftin, then general counsel for Kider Peabody, dismissed allegations of favorable treatment.[57] Mr. Liftin unsuccessfully led Kidder Peabody's defense of litigation brought against it by Alphonse Fletcher year ago.

### Trustee Davis and His Team's Settlements Favor their Connections

In early 2013, after the Fletcher Trustee convinced his estate's parent company, Fletcher International, Inc., to return an earlier distribution. That distribution, a dividend paid by Fletcher International, Ltd. while it was solvent to its sole shareholder Fletcher International, Inc., the sole shareholder, included a portion of the United Option. The agreement between Fletcher International, Inc. and the Fletcher Trustee was for the purpose of pursuing the United litigation jointly.[58] On Friday, February 8, 2013, the Fletcher Trustee and Fletcher International, Ltd.'s sole shareholder, Fletcher International, Inc., entered into a term sheet for the transfer of the approximately 3.5 million shares of

the United Option then held by Fletcher International, Inc. back to Fletcher International, Ltd. The parties sought to work together with the Ernst & Young Liquidators to pursue jointly the maximum recovery on the United Option and the Fletcher Trustee explicitly agreed to provide the Debtor's parent with "notice" and "opportunity to comment [on] any (a) proposed disposition of all or part of the Assigned Assets and (b) any contemplated non-ordinary course transactions."[59]


On Monday, February 11, 2013, Fletcher Trustee counsel spoke with Angelo/Dakota Party Gregory P. Joseph counsel and with United counsel re "UCBI" and filed the Motion to Approve Term Sheet Agreement Between the Trustee and Fletcher International, Inc. A few days later, the Appeals Court of the Cayman Islands which dismissed the appeal of the Grand Court wind up order six months earlier in August 2012 issued its written opinion, the lack of which had substantially delayed the appeal to the U.K. Privy Council.

On February 20, 2013 Bankruptcy court approved the Term Sheet and within 36 hours, United filed a Form 8-K[60] with the U.S. Securities and Exchange Commission and publicly announced a settlement with the Ernst & Young Liquidators including a release and waiver from the Fletcher International, Ltd. trustee in return for a $2.5 million cash payment to the Ernst & Young Liquidators.

Mr. Davis and his team, had previously disregarded of claims against banks like JPMorgan Chase and Credit Suisse.[61] Now, Mr. Davis supported the settlement between United Community Banks, Inc. and the Ernst & Young Liquidators by granting United a broad release and waiver. Mr. Davis believed that United was at that time in violation of the chapter 11 automatic stay before and after that settlement, release, and waiver, he later admitted. United refused to return property that the Fletcher Trustee claimed was owned by his Estate yet he took no action. Instead, he granted an overly broad release to United.[62]

> FILB and the Trustee... release... "UCBI Releases" from all actions... which FILB Co-Investments, LLC ("FILBCI") has asserted against UCBI in... the "FILBCI Action"... or that were the subject of the Subscription Agreement ... and the Cross Receipt...and will refrain from ... any legal proceeding... in respect thereof.

Though he negotiated for an agreement for Fletcher International, Inc.'s return of 3.5 million share United Option it had received, the Fletcher Trustee elected not to "claw back" the 18 million share United Option that had been distributed ultimately to the Ernst & Young Liquidators. Ernst & Young

Liquidators were at the time clients of the Trustee's counsel and of his former partnership, Weil Gotshal.

In his moving papers, the Trustee exercised great discretion afforded to court-appointed fiduciaries:

> [The Fletcher Trustee] considered and carefully analyzed whether it would be
> appropriate to seek to "claw back" the assets that were assigned to FILBCI
> pursuant to the Assignment Agreements and thereby stand in the shoes of FILBCI,
> but decided that it would not be in the best interests of the estate, its creditors or
> other parties-in-interest."

The Fletcher Trustee suggested in his motion that the consideration received by his Estate was

relief from potential claims that United might make. A cursory reading of the release and waiver,

however, immediately reveals that each of United's purported claims remained available in its efforts to

frustrate the Fletcher Trustee's efforts to realize value on the significant United warrant it held[63]:

> For the avoidance of doubt, nothing in this Mutual Release and Waiver is
> intended ... to bar UCBI from asserting, in response to any claims, counterclaims,
> or remedies asserted by any FILB Releasees, any defenses asserted by UCBI in the
> FILBCI Action.

On February 27, 2013, in violation of its February 8, 2013 term sheet with Fletcher

International, Inc., the Fletcher Trustee did not include the United settlement agreement in its motion to

the Bankruptcy Court and refused to share it with Fletcher International, Inc. but nevertheless executed

the release and waiver requested by United and the Ernst & Young Liquidators in which:

> "The FILB Chapter 11 Trustee hereby agrees that it shall take all steps necessary to
> secure the FILB Bankruptcy Court's approval of this Mutual Release and Waiver..."

The Ernst & Young Liquidators did not provide notice nor grant an opportunity to their

stakeholders to comment on the terms of the settlement with United. Reportedly, United paid $2.5

million to resolve the dispute over the Ernst & Young Liquidators' portion of the United Option, which

represented approximately 18 million common shares. The Ernst & Young Liquidators refused an offer

from Soundview Elite, Ltd. and its affiliates to acquire the United rights for more than twice the

settlement amount. The Ernst & Young Liquidators refused to even consider even higher offers from

the Soundview funds and refused a request from the Soundview funds that the Ernst & Young

Liquidators seek Cayman Court approval of the settlement. The Ernst & Young Liqduiators declared:[64]

"As it is not necessary, we will not be pursuing court sanction in Cayman of the mediation settlement."

Later, through Mr. Davis's former partnership, Weil Gotshal, it was revealed that settlement agreement was among United, the Ernst & Young Liquidators, and the Louisiana Officials, but not the other similarly situated stakeholders in the funds controlled by the Ernst & Young Liquidators.

The "Release and Waiver" granted to United by the Fletcher Trustee to facilitate the settlement was considerably broader than the Trustee and his counsel represented to the court in his motion seeking approval.[65] When the Fletcher Funds and Soundview Funds warned the Fletcher Trustee that he was conveying substantial value from his estate, his counsel Michael Luskin of Luskin Stern, which represented Ernst & Young Liquidators in other proceedings,[66] claimed simply "I have my reasons."[67] At around the same time, a partner at Mr. Davis's former law partnership, Weil Gotshal, reported that Mr. Davis and Mr. Luskin were negotiating to be hired by the Ernst & Young Liquidators to pursue litigation outside the bankruptcy proceeding.

On March 4, 2014, the Fletcher Trustee filed a motion proposing a settlement of his estate's portion of the United Option, which represented approximately 7 million common shares, in return for cash and stock from United valued at $12 million[68] and again made false representations to the court. The Fletcher Trustee had recently reported the estate's United Option's value at "approximately $71 million."[69]

On Friday, March 8, 2013, the Fletcher Trustee and Fletcher International, Inc. executed the Omnibus Agreement called for in the Term Sheet they previously executed and which was approved by the Bankruptcy Court. The next business day, on Monday, March 11, 2013, the Fletcher Trustee counsel filed the Motion to Approve the Release and Waiver between the Debtor and United Community Banks, Inc.

Three days later, on March, 14, 2013, United proposed to affiliates of Fletcher International, Inc. to accept collateral in full satisfaction of their loans from United relating to their 2010 purchase of United's non-performing assets. On March 31, 2013, United seized the assets claiming a technical default. The borrowers were all fully current in their financial obligations under those loans. The

paperwork that United alleged was not in order was, by contract, supposed to be managed by United as administrative agent for the loan portfolio.

On April 10, 2013, the Bankruptcy Court approved the United release. Weil Gotshal, then counsel to Richcourt Holding Inc. was advising Richcourt Holding Inc. and its affiliates regarding its affiliates the Soundview and Richcourt funds. Weil Gotshal refused to object to significant failures in the proposed release and waiver such as the lack of any meaningful consideration and unreasonable restrictions on the trustee's ability to pursue United for its wrongdoing. Mr. Davis's former partner disregarded the list of specific "holes" presented to it and argued on April 9, 2013:

> Buddy, I think the important point is that the Trustee and the counsel believes it does and we have no basis to point out a gaping hole in the document. We have pointed out your concerns and they believe there is nothing to worry about and they are not waiving any rights or causes of action unnecessarily. Michael (and Richard) despite what you think of them are both excellent lawyers.

On June 26, 2013, United announced the bulk sale of non-performing assets, including those United seized from affiliates of Fletcher International, Ltd., to Great Oak Pool I LLC during its second quarter at a $50 million discount:

> "The classified assets sold during the quarter included $131 million of performing classified loans, non-performing loans and foreclosed properties sold in a bulk sale for an aggregate purchase price of approximately $81 million (the " *Transaction* ")."

## Chapter 11 Proceedings of Affiliates Soundview Elite Ltd et al

On September 23, 2013, Fletcher fund affiliate Soundview Elite, Ltd. and five of its affiliates ("Soundview Debtors") filed for protection under chapter 11 in the Southern District of New York Bankruptcy Court as a result of the continuing unlawful retaliation. Later that day, Chief Justice Smellie granted wind up petitions filed by Citco[70] even though he was not the judge scheduled to hear the cases and the wind up proceeding was stayed by the chapter 11 filing. The Cayman Court of Appeals registrar then struck the the pending Privy Council appeal citing Campbells claim that the $200,000 "security for costs" held in Cayman since August had been received two business days too late.[71]

In the Soundview chapter 11 proceedings, former Fletcher counsel Paul Weiss in *Fletcher v Dakota* represented Citco.[72] Soundview investors Pasig Ltd. was represented by Kasowitz Benson which had replaced Paul Weiss as counsel to Alphonse Fletcher and Fletcher Asset Management, Inc. until it too withdrew. Paul Weiss and Kasowitz Benson represented a Pasig when Pasig was adverse to their former client, Pasig was associated with the Angelo/Dakota Parties, the matters were related, and the law firms made arguments that contradict positions they took in their earlier representation.

On November 25, 2013, the Fletcher Trustee released his "Trustee's Report and Disclosure Statement." The Court required the Fletcher trustee to add a disclaimer to the start of the document clarifying that it contained unsubstantiated opinion and allowed objectors to include a supplement which contradicting much of the Report.[73] The report was released toward the end of the Soundview discovery period but Luskin Stern refused to provide any documents and warned Soundview's debtor's counsel not to try to call Mr. Davis for discovery or suffer the wrath of a "Watergate Prosecutor." The Soundview debtors' counsel stated on page 2 of its December 11, 2013 "Debtors' Memorandum of Law:"

> In a call by Debtors' counsel to Trustee's counsel on November 27, 2013, Trustee's counsel advised that he could not provide Debtors' counsel with the materials supporting the 579 footnotes which accompany the report, for two reasons: (i) because they are not separately organized in that order, and (ii) because "most of the stuff came from Fletcher anyway."

After a five day trial in December and January, Judge Gerber found "no fraud or incompetence" in the Soundview management. He also found that the liquidators repeatedly violated the "automatic stay" in U.S. Bankruptcy law. Nevertheless, he removed management with the appointment of a chapter 11 trustee and gave the liquidators shared control over the Soundview debtors. The Soundview directors have filed an appeal.

The Soundview trustee selected by the U.S. Trustee and approved by the Bankruptcy Court appears to have the same undisclosed connections as the previously fiduciaries have had in these associated cases. She appears to be pursuing a plan with the Fletcher Trustee.

## CURRENT STATUS OF PROCEEDINGS

### Fees and Post Confirmation Agreement for Trustee

Objections to fee applications for Trustee Richard J. Davis, trustee's counsel Luskin Stern, and trustee's financial advisor Goldin Associates were denied with one exception. The trustee sought payment beyond the statutorily proscribed limits in Section 326(a). Party-in-interest Stewart Turner identified the over-billing. The over-billing involved payments negotiated in 2013 between the trustee and the Ernst & Young Liquidators as part of their plan for the trustee to pursue litigation on their behalf if a certain plan of liquidation and the post confirmation agreement for the Trustee was approved by the Bankruptcy Court. The plan was confirmed. An Excerpt of Mr. Turner's filing follows.

> On May 2, 2014, Trustee Richard J. Davis filed his fifth fee application with the Court (Docket No. 522), bringing his total fee requests to $1,103,206.50 (without additional expenses) since being hired as the FILB Trustee in September 2012. On page 83 of this fee application, there is a pro forma Section 326 calculation showing a "Total Statutory Fee Calculation" of $1,419,318.25 based upon "Total Moneys Disbursed or AssetscTurned Over", thus making his $1,103,206.50 (77.7% of this amount) look like it is not the maximum amount he could charge. At first glance, the calculations appear straightforward. Yet, not all of these "moneys" have been distributed. Thus, releasing fees to the Trustee at this time is at best premature. The numbers in the calculation are also overstated, as they mix two items, the FILB claims and the pooled claims. Mr. Luskin provided this summary to Judge Pauley:
>
> > "[T]he plan is a liquidation plan, and it basically creates two buckets of assets. One bucket are the assets that were owned solely by the debtor, by FILB, which consisted mostly of securities, including the securities that are the subject of this appeal, the UCBI warrants, some other assets, some other investments. Those are being liquidated and divided up in accordance with -- let's call it one waterfall of distributions. That's the liquidation bucket. There's a second bucket that we refer to as the pooled claims. What we've done is that the FILB trustee, together with the JOLs in the Caymans and one of the investors, the Massachusetts Bay Transit Authority-- it's a public pension fund -- have collectively pooled their claims and causes of actions against insiders, including Mr. Turner, and also third- party service providers, accounting firms, law firms, so on. And the recoveries on the pooled claims will be divided according to a different waterfall, different percentages. n The FILB estate, the bankruptcy estate, is a participant in the pooled claim bucket, so that if a dollar is recovered on pooled claims,

FILB gets 26, 27 cents, and then that goes into the liquidation claim, and that gets distributed as to liquidation claims are distributed. So that's a process that has all been undertaken and completed in the bankruptcy court. The plan is confirmed. We're post confirmation. We're out of bankruptcy. We're operating under the plan. And that's moving ahead, we're collecting realizing on assets, and we're on the FILB assets. And we're also prosecuting the pooled claims."

On page 83 of his fee application, Mr. Davis includes the entire $4,250,000 amount of the Skadden Settlement even though on page 9 he wrote, "On April 22, 2014, the Trustee received

FILB's share of the settlement with Skadden resulting in an additional $804,000 in cash for the estate." Also on page 83, the Trustee includes $15,000,000 of "Pending Litigations" as part of his "Total Moneys Disbursed or Assets Turned Over." None of this estimated $15,000,000 has been disbursed or turned over yet or even explained. In fact, these litigations are in their early stages and no moneys are close to being collected. Additionally, at least one of these litigations is a pooled claim (e.g. the Insider Lawsuit). Further, given litigation risk and collection risk, how can the Trustee justify using the entire $15,000,000 in his calculation?

Stewart Turner's Supplemental Objection to Davis Fee Application 6/11/2014

## The Results

The Fletcher Trustee's "Plan of Liquidation," awards the majority of the estate to the Ernst & Young Liquidators, representatives of the Louisiana officials, former indirect investors whose redemption was disregarded by the Cayman court proceedings in which they were represented by the judge's personal counsel. The Trustee has settled for less than $20 million claims estimated well in excess of $200 million relating to a) Ion Geophysical Corporation whose chairman is a Louisiana official and b) United Community Banks Inc. which is associated with Angelo Gordon partner JPMorgan. In these settlements, the companies were represented by counsel representing John Angelo or Angelo Gordon. The Plan proposes to create a litigation trust to file frivolous suits against insiders including plaintiff's suing parties associated with Angelo Gordon and service providers who are primary witnesses. Neither the Plan nor the Trustee's Report makes any allegations against the adversaries of Fletcher International, Ltd. whose bad acts caused such great harm including the Angelo/Dakota Parties.

### SUMMARY OF THE ARGUMENT

24

Each of the court-appointed fiduciaries serving Fletcher International, Ltd. (together "Fiduciaries" ) represented to the Court that it had "disclose[d] all facts" and connections that "would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules." The disclosed and undisclosed connections described to the Bankruptcy Court and described below, however, including connections to parties related to the defendants in Fletcher v Dakota,74 a race discrimination-retaliation case Alphonse Fletcher filed in 2011, reveal "divided loyalties and affected judgments."75 Fiduciaries with connections to such parties could have interests "consistent with Defendant Barnes' threat to Fletcher in June 2010 that if Fletcher went ahead and vindicated his rights by filing this lawsuit, the [Dakota] Board would do everything in its power to destroy Fletcher and his reputation in the business community."76

Fraud by the court-appointed Fiduciaries, officers of the court, has seriously damaged the integrity and impartiality of these and related legal proceedings.   Fiduciaries have betrayed their client, the Court, and the public.   First they failed to disclose and have even denied connections they held to parties with interests adverse to the estate.   Then they served as fiduciaries to a bankruptcy estate while secretly holding interests adverse to the estate and collecting more than $10,000,000 in fees. Finally the Fiduciaries used the great powers granted by the bankruptcy system to transfer estate assets to the parties with which they maintained undisclosed connections.

## ARGUMENT

### GOVERNING LAW.

### The Honorable Shelley C. Chapman's recent opinion succinctly highlights the issues.

Judge Chapman's opinion In re GSC Group reviews the conduct in Leslie Fay of Weil Gotshal, where Richard J. Davis served as senior partner and general counsel, and the conduct of Harrison Goldin as trustee to Granite Partners.  The opinion underscores the

> In the last twenty years, there have been two seminal cases in this District
> involving serious allegations of misconduct in connection with the retention and

compensation of professionals in a large chapter 11 case, Leslie Fay and Granite
Partners[77]...

Judge Brozman found that Weil (i) represented interests that were materially
adverse to the debtors at the time of its retention and (ii) violated Rule 2014 by
not making complete disclosure of its connections, thereby causing actual injury
to Leslie Fay. Regarding its relationship with members of the audit committee,
Weil did not deny its lack of disinterestedness, but instead asserted that, by the
time it was retained as counsel for the debtors, it was clear that no claims existed
against such audit committee members. While the Court did not doubt Weil's
belief that no claims existed, it found that, pursuant to Rule 2014, Weil was
required to have disclosed its connections to the members. The Court stated that
"there is 'no merit to the . . . argument that [a party] did not have to disclose its
connections . . . because its attorneys did not feel that a conflict existed.' . . . Weil
Gotshal had no right to 'make a unilateral determination regarding the relevance
of a connection.'"[78] Similarly, with respect to BDO, the court also found that
Weil was not disinterested. In commenting on Weil's undisclosed ties to three
different targets of the audit committee investigation, Judge Brozman observed
that "[i]t was for the Court, and not Weil Gotshal, to determine whether in fact a
conflict existed and, if so, what the remedy should be." Id... As the court stated,
"[t]he shame in all of this is that the heavy financial and emotional toll in this
matter could have been avoided completely..."[79]

Four years after Leslie Fay, Judge Bernstein put his imprimatur on the issue of
disclosure in his Granite Partners decision.[80]  In Granite Partners, the debtors had
invested in funds raised by outside investors which held collateralized mortgage
obligations created and sold by broker- dealers, including Merrill, Lynch, Pierce,
Fenner & Smith, Inc. ("Merrill"). Granite Partners' chapter 11 filings in April
1994 followed the collapse of their business due to margin calls by broker-
dealers that could not be met after the value of the debtors' investments dropped
and interest rates rose. Upon the motion of the creditors' committee, the court
appointed a chapter 11 trustee (the "Trustee") to investigate and report on the
events leading to the debtors' collapse and identify possible claims against (i) the
broker-dealers, (ii) the debtors' insiders, and (iii) the debtors' professionals,
including the debtors' auditor, Price Waterhouse & Co. ("PWC")...

In his opinion, Judge Bernstein undertook a lengthy review and analysis of (i)
section 327(a) of the Bankruptcy Code, which requires that retained
professionals be "disinterested" and (ii) Bankruptcy 2014(a), which imposes
disclosure requirements on trustees and the professionals they seek to retain. Id.
at 32-36. Judge Bernstein concluded that "[p]roper disclosure allows the court to
decide, in an informed manner, whether the retention should be approved." Id. at
35.

Judge Bernstein found that Willkie represented adverse interests at the time it
undertook representation of the Trustee due to its concurrent relationship with
Merrill. Id. at 36. Due to its increased representation of Merrill (and the amount
of fees generated by its work for Merrill), no matter how thoroughly or fairly
Willkie conducted the investigation on behalf of the Trustee, "the question will

always linger whether it held back, or failed to bite the hand that feeds it quite as hard as the circumstances warranted." Id. at 38. Judge Bernstein observed that the Trustee's counsel must be above suspicion, as "[b]ankruptcy is concerned as much with appearances as with reality." Id... The court [observed] that:

> The trustee broke the cardinal principle of Rule 2014(a). He arrogated to himself a disclosure decision that the Court must make. Rule 2014(a) required, even in the absence of an investigation, that the trustee disclose Willkie Farr's connections with the debtors' accountants. Here, the need for disclosure went further. The trustee knew that Price Waterhouse was a target of his own investigation. He should have understood the improper perception created by Willkie Farr investigating any accountant in light of its association with the AICPA and its policy of not suing accountants. He nevertheless decided, on his own, that the connection was not a conflict, and the refusal to sue was not an obstacle, and he concluded that he did not have to disclose it. He made a decision that was never his to make in the first place, and reached the wrong conclusion when he did.

Id. at 45.[81]
Taken together, Leslie Fay and Granite Partners stand for the straightforward proposition that it is incumbent upon the professional to make full disclosure, after which it is the role of the court, and not the professional, to make the ultimate determination vis-à-vis the information disclosed and compliance with the Bankruptcy Code and Rules.

In re GSC Group, Inc. [10-bk-14653]

## "Complete and truthful disclosure of all connections and fee arrangements must be made."

The Bankruptcy Code extends an administrative fee priority, payable in full in advance of other claimants, to professionals retained by the estate. See 11 U.S.C. §§ 507(a)(2) and 503(b)(2). Although this significant advantage may be "the oil that greases the gears of the bankruptcy system," because of the great potential for abuse, "the court has a great oversight responsibility to ensure that professional fees are reasonable and are paid in exchange for services that benefit the estate." In re Egwu, No. 10-30652 (RAG), 2012 WL 5193958, at *3 (Bankr. D. Md. Oct. 19, 2012) (citing In re Park-Helena Corp., 63 F.3d 877, 880 (9th Cir. 1995) (additional citations omitted)).

The Bankruptcy Code's "myriad of provisions must be observed, and complete and truthful disclosure of all connections and fee arrangements must be made, both as a foundation for the

allowance of administrative fees and to permit the court to discharge its oversight function." Egwu,

2012 WL 5193958, at *3; see also In re Leslie Fay Cos., 175 B.R. 525, 537 (Bankr. S.D.N.Y. 2002)

(all connections that are not so remote as to be *de minimis* must be disclosed).

## Section 327(a) of the Bankruptcy Code.

The Bankruptcy Code permits the debtor in possession to retain one or more

professionals. 11 U.S.C. § 327. Section 327(a) of the Bankruptcy Code provides in pertinent part:

> (a) Except as otherwise provided in this section, the trustee, with the court's
> approval, may employ one or more attorneys, accountants, appraisers, auctioneers,
> or other professional persons, that do not hold or represent an interest adverse to
> the estate, and that are disinterested persons, to represent or assist the trustee in
> carrying out the trustee's duties under this title.[82]

11 U.S.C. § 327(a).

## Disinterestedness.

To be retained by the estate, professionals must be both disinterested and not hold or

represent any adverse interest to the estate. In re Project Orange Assocs., LLC, 431 B.R. 363, 369

(Bankr. S.D.N.Y. 2010) (citing Vouzianas v. Ready & Pontisakos (In re Vouzianas), 259 F.3d 103,

107 (2d Cir. 2001) (citing Bank Brussels Lambert v. Coan (In re AroChem Corp.), 176 F.3d 610,

621 (2d Cir. 1999)). Courts lack the power to authorize the "employment of a professional who

has a conflict of interest." In re Mercury, 280 B.R 35, 55 (Bankr. S.D.N.Y. 2002).

Section 101(14)(A) of the Bankruptcy Code provides that a person is "disinterested" if that

person "is not a creditor, an equity holder, or an insider."[83] 11 U.S.C. § 101(14)(A). Section 101(14)

(C) of the Bankruptcy Code provides that a "disinterested person" is someone who "does not have an

interest materially adverse to the interest of the estate or of any class of creditors or equity security

holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor,

or for any other reason." 11 U.S.C. § 101(14)(C).

To be disinterested is "to prevent even the appearance of a conflict irrespective of the integrity of the person or firm under consideration." In re Vebeliunas, 231 B.R. 181, 191 (Bankr. S.D.N.Y. 1999), dismissed on appeal, 246 B.R. 172 (S.D.N.Y. 2000) (citing In re Codesco, Inc., 18 B.R. 997, 999 (Bankr. S.D.N.Y. 1982)) (additional citations omitted); see also In re Angelika Films 57th, Inc., 227 B.R. 29, 38 (Bankr. S.D.N.Y. 1998) ("The determination of adverse interest is objective and is concerned with the appearance of impropriety."). A disinterested person "should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters." Vebeliunas, 231 B.R. 191-92 (citations and quotations omitted). The most modest interest or relationship will undo a person's disinterestedness if it "would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules." In re Granite Partners, L.P., 219 B.R. 22, 23 (Bankr. S.D.N.Y. 1998)) (internal quotations and citations omitted).

Courts in this district have found that the definition of "disinterested person" "overlaps with the adverse interest requirement of section 327(a), creating a single test for courts to employ when examining conflicts of interest." See, e.g., In re MF Global, Inc., 464 B.R. 594, 600 (Bankr. S.D.N.Y. 2011) (quoting Project Orange, 431 B.R. at 370 (citing 11 U.S.C. § 101(14) (C))); see also Granite Partners, 219 B.R. at 23 (observing that "the two prongs of Section 327(a) are duplicative and form a single test to judge conflicts of interest") (internal citations omitted). Thus, under both Sections 327 and 101(14) of the Bankruptcy Code, a professional must not "hold or represent an interest adverse to the estate." See AroChem, 176 F.3d at 622-23.

Although not defined by the Bankruptcy Code, the Second Circuit has held that "to hold or represent an adverse interest" means:

> to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.

AroChem, 176 F.3d at 623 (quoting In re Roberts, 46 B.R. 815, 827 (Bankr. D. Utah 1985), aff'd in part and rev'd on other grounds, 75 B.R. 402 (D. Utah 1987)). However,

> [r]ather than worry about the potential/actual dichotomy, it is more productive to ask whether a professional has either a meaningful incentive to act contrary to the best interest of the estate ... - an incentive sufficient to place those parties at more than acceptable risk – or the reasonable perception of one ... In other words, **if it is plausible** that the representation of another interest may cause the trustee's attorneys to act differently than they would without the representation, then they have a conflict and an interest adverse to the estate. *(Emphasis added.)*

*Id.* (citations and internal quotation marks omitted); see also MF Global, 464 B.R. at 600 ("a more recent trend elides the distinction [between actual and potential conflicts] and focuses on the concerns of divided loyalties and affected judgments.") (quoting Granite Partners, 219 B.R. at 33)); Leslie Fay, 175 B.R. at 532 ("The requirements of Section 327 of the Bankruptcy Code cannot be taken lightly, for they 'serve the important policy of ensuring that all professionals appointed pursuant to [the section] tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities.'") (quoting Rome v. Braunstein, 19 F.3d 54, 58 (1st Cir. 1994)).

Courts determine whether an adverse interest exists on a case-by-case basis, examining the specific facts in a case. AroChem, 176 F.3d3 at 623; see also Angelika Films, 227 B.R. at 39 (same).

### The Mandatory Duty of Professionals to Disclose Connections

The purpose of the retention application is to provide the court (and the United States Trustee) with information necessary to determine whether the professional's employment is: (i) in the best interest of the estate and (ii) necessary. See Leslie Fay, 175 B.R. at 533; see also Fed. R. Bankr. P. 2014(a). Failure to disclose any fact that may influence the court's decision on retention may result in a later determination that disclosure was inadequate and sanctions should be imposed upon the professional. See In re B.E.S. Concrete Prods., Inc., 93 B.R. 228 (Bankr. E.D. Cal. 1988); accord Leslie Fay, 175 B.R. at 525.

### Bankruptcy Rule 2014(a).

Bankruptcy Rule 2014 was enacted to implement the appointment of professionals, including under Section 327 of the Bankruptcy Code. 9 Alan N. Resnick & Henry J. Sommer (eds.), Collier on Bankruptcy [hereinafter, "Collier"] ¶ 2014.03 (16th ed. 2012). The rule is very broad and provides a mechanism for ensuring the disinterestedness of retained professionals. In re Fibermark, Inc., No. 04-10463, 2004 WL 723495, at *8 (Bankr. D. Vt. Mar. 11, 2006).

In pertinent part, Bankruptcy Rule 2014 provides:

a.      *Application for an Order of Employment.* An order approving the employment of attorneys . . . or other professionals pursuant to § 327 . . . of the Code shall be made only on application of the trustee or committee. . . . The application shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.[84]

Fed. R. Bankr. P. 2014(a).

Bankruptcy Rule 2014(b) further elucidates the requirements of Section 327(a) of the Bankruptcy, see supra at 63, by making clear that only a person or entity that is a partner, member or associate of a partnership or corporation hired as attorneys or accountants can perform services or be employed for the debtors without the necessity for a separate application. Fed. R. Bankr. P. 2014(b).

### Bankruptcy Rule 2016.

The duty to disclose connections also is embodied in Bankruptcy Rule 2016, which provides in pertinent part:

. . . a statement as to what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case, the source of the compensation so paid or promised, whether any compensation previously received has been shared and whether an agreement or understanding exists between the applicant and any other entity for the sharing of compensation received or to be received for services rendered in or in connection with

31

the case, and the particulars of any sharing of compensation or agreement or understanding therefor . . . .

Fed. R. Bankr. P. 2016(a).[85] See also UST Fee Guidelines b(1)(ii) and (iii) (requiring disclosure of

fee arrangements).

> "The Bankruptcy Code and Rules mandate that a professional, such as an Examiner, be a neutral, disinterested party in the case. The moment that the Examiner approached three of Big Rivers' largest unsecured creditors and broached the subject of his compensation, suggesting that they pay him a percentage-based fee based on the "success" or "new value" he brought them to the estate, he was no longer a disinterested party. Whether or not such an agreement was reached or whether an agreement was subject to the approval of the bankruptcy court is irrelevant. What is relevant is that the Examiner sought to have his compensation tied to the enhanced value brought to the estate and, in particular, tied to what [Bank of New York], Chase and Mapco received on their claims from the estate."

*In re Big Rivers Elec. Corp.*., 355 F.3d 415, 428 (6th Cir. 2004)

## The Professional's Duty to Disclose is Self-Policing.

The professional's duty to disclose is self-policing. Granite Partners, 219 B.R. at 35 (citing

Kravit, Gass & Weber, S.C. v. Michel (In re Crivello), 134 F.3d 831, 839 (7th Cir. 1998)). The court

relies primarily on forthright disclosure to determine qualification under Section 327 of the

Bankruptcy Code. *Id.* (citing Rome, 19 F.3d at 59); see also MF Global, 464 B.R. at 602 (a lack of

candor in "disclosing [] potential problem[s] for independent court review before a [professional's]

appointment . . . in itself, presents an appearance of impropriety.") (quotation omitted).

Courts in this circuit consistently hold that it is the duty of the professional, and not the court,

to make sure that "all connections" have been disclosed. In Fibermark, the court opined:

> It is not the duty of the court, the U.S. Trustee or any other party to search beyond the 2014(a) disclosure for the existence of connections that a professional seeking to be employed should have disclosed. Full disclosure of all connections to a party in interest is the affirmative duty placed on the professional seeking employment. The duty to disclose all possible connections is so vital to the bankruptcy process that failure to do so is an independent basis for the disallowance of fees.

In re Fibermark, Inc., No. 04-10463, 2006 WL 723495, at *9 (Bankr. D. Vt. Mar. 11, 2006) (citing

Futuronics Corp. v. Arutt, Nachamie and Benjamin (In re Futuronics Corp.), 655 F.2d 463, 469 (2d

Cir. 1981); In the Matter of Arlan's Dep't Stores, Inc., 615 F.2d 925, 933 (2d Cir. 1979)) (additional citations omitted); see also Leslie Fay, 175 B.R. at 533 (same); In re Source Enters., Inc., No. 06-11707 (AJG), 2008 WL 850229, at *8 (Bankr. S.D.N.Y. Mar. 27, 2008) (same); In re Matco Elecs. Group, Inc., 383 B.R. 848, 853-54 (Bankr. N.D.N.Y. 2008) ("Fed. R. Bankr. P. 2014 is not intended to condone a game of cat and mouse, where the professional seeking appointment provides only enough disclosure to whet the appetite of the UST, the court or other parties in interest, and then the burden shifts to those entities to make inquiry in an effort to expand the disclosure."); Granite Partners, 219 B.R. at 35 (the court "should not have to rummage through files or conduct independent fact finding investigations" to determine if the professional is disqualified.) (quotations omitted).

"Absent the spontaneous, timely and complete disclosure required by Section 327(a) and Fed. R. Bankr. P. 2014(a), the court appointed counsel proceed *at their own risk.*" Fibermark, 2006 WL 723495, at *9 (emphasis in original) (quoting Rome, 19 F.3d at 59-60)); see also In re Roger J. Au & Son, Inc., 71 B.R. 238, 242 (Bankr. N.D. Ohio 1986) (failure to disclose fact material to potential conflict may provide *totally independent* ground for denial of fees quite apart from the actual representation of competing interests).

Further, the Fibermark court emphasized that "[i]n light of the court's responsibility to approve the employment of professionals, the disclosure requirements of Rule 2014(a) are broader than those governing inquiries into disinterestedness under § 327." Fibermark, 2006 WL 723495, at *5 (citing Leslie Fay, 175 B.R. at 536) (retention under Section 327 is only limited by interests that are "materially adverse," whereas under Bankruptcy Rule 2014, "all connections" that are not so remote as to be *de minimis* must be disclosed); see also Source Enters., 2008 WL 850229, at *8 (the "term 'connections' is broad and is strictly construed for purposes of Bankruptcy Ruled 2014) (citing Balco Equities Ltd. v. Cohen, Estis and Assocs., LLP (In re Balco Equities Ltd.), 345 B.R. 87, 112 (Bankr. S.D.N.Y. 2006) ("Failure to disclose direct or indirect relations to, connections with, or interest in the

33

debtor violate ... [s]ection 327(a) and Bankruptcy Rule 2014")). Thus, "[p]rofessionals who seek appointment owe the duty of complete disclosure of all "connections" that bear upon their eligibility for such appointment." Fibermark 2006 WL 723495, at *9.

In addition, disclosure will not be adequate if it is not sufficiently specific. "Boilerplate" disclosure may cover an inadvertent failure to disclose an insignificant connection, but is not an adequate substitute for discloser of known and significant connections. See Leslie Fay, 175 B.R. at 537. To find otherwise, would eviscerate the disclosure requirements of Bankruptcy Rule 2014(a). Id.

### Courts Strictly Construe the Duty to Disclose.

"Courts have an obligation to construe Rule 2014 very strictly because it is the courts' responsibility to determine whether a professional shall be disqualified due to their connection to a party in interest." Fibermark, 2006 WL 723495, at *8 (citing Diamond Lumber Inc. v. Unsecured Creditors' Comm., 88 B.R. 773, 777 (N.D. Tex. 1988)); see also MF Global, 464 B.R. 600-01 (in construing disinterestedness, bankruptcy courts hold trustee and their retained professionals to a rigorous standard). "It is for the courts to decide what facts may be relevant and that decision should not be left to the professional, 'whose judgment may be clouded by the benefits of the potential employment.'" Id. (quoting In re Lee, 94 B.R. 172, 177 (Bankr. C.D. Cal. 1988)); see also Source Enters., 2008 WL 850229, at *8 (persons to be employed "'must disclose all facts that bear on [their] disinterestedness and cannot usurp the court's function by choosing, ipse dixit, which connections impact disinterestedness and which do not. The existence of an arguable conflict must be disclosed if only to be explained away . . . .'") (emphasis in original) (citing In re C&C Demo. Inc., 273 B.R. 502, 507 (Bankr. E.D. Tex. 2001) (quoting Granite Partners, 219 B.R. at 35)).

Furthermore, whether an applicant's retention application or supplemental disclosures satisfy the United States Trustee does not affect the professional's obligation to make full and candid disclosure of all connections to the court. See Source Enters., 2008 WL 850229, at *13.

### The Duty To Disclose is Continuing.

Although Bankruptcy Rule 2014(a) does not expressly require supplemental or continuing disclosure, see In re Caldor, Inc., 193 B.R. 165, 176 (Bankr. S.D.N.Y. 1996), Section 327(a) of the Bankruptcy Code implies a duty of continuing disclosure, and requires professionals to reveal connections that arise after their retention.   Granite Partners, 219 B.R. at 35 (additional citations omitted). "Continuing disclosure is necessary to preserve the integrity of the bankruptcy system by ensuring that the trustee's professionals remain conflict free." Id.

In addition, an attorney is under a duty to promptly notify the court if any potential for conflict arises. See Crivello, 134 F.3d at 831; see also Rome, 19 F.3d at 59-60 ("[A]s soon as counsel acquires even a constructive knowledge reasonably suggesting an actual or potential conflict, a bankruptcy court ruling should be obtained . . .") (internal citations omitted).

### Failure to Disclose Has Serious Consequences.

Failure to comply with the disclosure rules is a sanctionable violation, even if proper disclosure would have shown that the professional had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule. See I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.), 432 F.3d 347, 355 (5th Cir. 2005) (holding that "[w]e have observed that these standards are 'strict' and that attorneys engaged in the conduct of a bankruptcy case 'should be free of the slightest personal interest . . . [a]ccordingly, we are 'sensitive to preventing conflicts of interest' and require a 'painstaking analysis of the facts and precise application of precedent'") (internal citations omitted); see also Matter of Olsen Indus., Inc., 222 B.R. 49, 60 (Bankr. D. Del. 1997) (because nondisclosure was intentional and serious, it was not necessary for the court to determine the firm's disinterestedness to order disgorgement of fees); In re eToys, Inc., 331 B.R. 176, 190 (Bankr. D. Del. 2005) ("So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees.") (quoting Leslie Fay, 175 B.R. at 533).

Nondisclosure of relevant information under Bankruptcy Rule 2014 is sanctionable even if the failure to disclose was negligent or inadvertent. See, e.g., In re BH & P, Inc., 949 F.2d 1300, 1318 (3d

Cir. 1991) ("[n]egligence does not excuse the failure to disclose possible conflict of interests"); see also In re Jore, 298 B.R. 703, 729 (Bankr. D. Mo. 2003) (same) (citations omitted).

Where the failure to disclose is willful, disallowance of fees is almost assured. In fact, willful nondisclosure of relationships in connection with the retention of professionals may rise to the level of a fraud upon the court. See Pearson v. First NH Mort. Corp., 200 F.3d 30, 35-41 (1st Cir. 1999); see also Crivello, 134 F.3d at 836-37 (stating that "a bankruptcy court should punish a willful failure to disclose the connections required by Fed. R. Bankr. P. 2014 as severely as an attempt to put forth a fraud on the court."); accord In re ACandS, Inc., 297 B.R. 395, 405 (Bankr. D. Del. 2003) (disallowing nunc pro tunc retention and ordering disgorgement of all fees of professional which willfully concealed relationships and potential and actual conflicts).

## Court May Allow Reasonable Compensation To Retained Professionals From the Estate Upon Proper Application With Requisite Disclosure.

### Section 330(a)(1) of the Bankruptcy Code.

Bankruptcy Code Section 330(a)(1) provides that:

After notice to the parties in interest and the United States trustee and a hearing, and subject to section 326, 328, and 329, the court may award to a trustee, ... an examiner, ... or a professional person employed under section 327 or 1103 –

(A)reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, ... or attorney and by any paraprofessional person employed by any such person; and

(B)reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1)(A) and (B). Only a professional whose retention is approved by order of the court may be compensated from the estate. Lamie v. United States Trustee, 540 U.S. 526, 526 (2004).

To determine reasonableness, Section 330(a)(3) sets forth various factors that the court must consider, including among others, "whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title." 11. U.S.C. § 330(a)(3)(f). The fee applicant bears the burden of proof on its claim for compensation.

36

In re GSC Group, Inc., No. 10-14653 (AJG), 2012 WL 676409, at *2 (Bankr. S.D.N.Y. Feb. 29, 2012) (citations omitted).  In addition, "[T]he court may, on its own motion or on the motion of the United States Trustee for the Region or the District, or any other party in interest, award compensation that is less than the amount of compensation that is requested." GSC Group, 2012 WL 676409, at *1. (additional citation omitted); see also 11 U.S.C. § 330(a)(2) (court may award less than amount of fees requested).

### Section 329 of the Bankruptcy Code.

Section 329 of the Bankruptcy Code gives the Court the power to review the compensation paid to a debtor's attorney if such payment or an agreement to be paid was made after one year before the date of the filing of the petition, and to determine if the fee paid was, or is, reasonable or excessive. Section 329(b) provides:

> (b) If such compensation [of bankruptcy counsel] exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—
>     (1) the estate if the property transferred—
>
>         (A) would have been property of the estate; or
>
>         (B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or
>
>     (2) the entity that made such payment.

11 U.S.C. § 329. Bankruptcy Rule 2017 provides the mechanism for a determination of whether payments to an attorney are excessive. Fed. R. Bankr. P. 2017.

### Section 330(a)(5) of the Bankruptcy Code.

Section 330(a)(5) of the Bankruptcy Code specifically permits a court to order disgorgement of interim payments received under Section 331 to the extent that they exceed the ultimate award, if any, under Section 330. 11 U.S.C. § 330(a)(5). Thus, interim fee awards are always "subject to re-examination and adjustment" and no professional may claim to be unaware of the inherent risk of disgorgement. In re Rockaway Bedding, Inc., 454 B.R. 592, 596 (Bankr. D.N.J. 2011) (citing In re

37

St. Joseph Cleaners, Inc., 346 B.R. 430 (Bankr. W.D. Mich. 2006) (quoting Specker Motor Sales Co.

v. Eisen, 393 F.3d 659, 663 (6th Cir. 2004)).


### The Court May Vacate Its Own Retention Orders and Order Full Disgorgement Where There Has Been A Fraud Perpetrated Upon The Court.

#### Civil Rule 60(b) – Generally.

Bankruptcy Rule 9024 provides that Civil Rule 60 is applicable in bankruptcy cases.[86] Fed.

R. Bankr. P. 9024. Civil Rule 60(b) affords a party relief from a judgment if there existed:

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence . . . ; (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged ... or (6) any other reason that justifies relief. . . .[87]

Fed. R. Civ. P. 60(b).

"Properly applied, Rule 60(b) strikes a balance between serving the ends of justice and

preserving the finality of judgments. It should be broadly construed to do 'substantial justice,' yet final

judgments should not 'be lightly reopened. The Rule may not be used as a substitute for a timely

appeal. Since 60(b) allows extraordinary judicial relief, it is invoked only upon a showing of

"exceptional circumstances," in the discretion of the trial court. Nemaizer v. Baker, 793 F.2d 58, 61 (2d

Cir. 1986) (internal citations omitted);see also In re Enron Corp., 352 B.R. 363, 369 (Bankr. S.D.N.Y.

2006) (these grounds "should be liberally construed when substantial justice will . . . be served")

(quoting Radack v. Norwegian Am. Line Agency, Inc., 318 F.2d 538, 542 (2d Cir. 1963)).

Additional requirements are that (i) the supporting evidence be "highly convincing;" (ii) there

be good cause for the movant's failure to act sooner; and (iii) application of the rule should not impose

undue hardship on other parties. In re Old Cargo, LLC, 423 B.R. 40, 45 (Bankr. S.D.N.Y. 2010) (citing

Freedom, N.Y., Inc. v. United States, 438 F.Supp.2d 457, 462-63 (S.D.N.Y. 2006) (citations omitted)).

A decision concerning a Civil Rule 60(b) motion is within the discretion of the court. <u>Old Cargo,</u> 423

B.R. at 40 (citing <u>Nemaizer,</u> 793 F.2d at 61-62).

### Civil Rule 60(b)(6).

Civil Rule 60(b)(6), which permits a court to grant relief from a final order for "any other reason

that justifies relief," "confers broad discretion on the trial court to grant relief when appropriate to

accomplish justice [and] it constitutes a grand reservoir of equitable power to do justice in a particular

case. It is properly invoked where there are extraordinary circumstances, or where the judgment may

work an extreme and undue hardship[.]" <u>Marrero Pichardo v. Ashcroft,</u> 374 F.3d 46, 55 (2d Cir. 2004)

(internal quotations and citations omitted); <u>see also  Andrulonis v. United States,</u> 26 F.3d 1224, 1235

(2d Cir.1994) (Rule 60(b)(6) properly "invoked to override the finality of judgments in the interests of

justice."); <u>Matarese v. LeFevre,</u> 801 F.2d 98, 106 (2d Cir. 1986) (Rule 60(b)(6) "confers broad

discretion on the trial court to grant relief when appropriate to accomplish justice."); <u>In re Teligent,</u>

<u>Inc.,</u> 326 B.R. 219, 227 (S.D.N.Y. 2005); <u>In re AMC Realty Corp.,</u> 270 B.R. 132, 143-44 (Bankr.

S.D.N.Y. 2001). Thus, subject to the caveat that relief under this subsection may not be based upon a

reason included in subclauses (1)-(5), <u>see Nemaizer,</u> 793 F.2d at 63, Civil Rule 60(b)(6) serves as an

effective catch-all. <u>See In re Lewis Road, LLC.,</u> No. 09-37672, 2011 WL 6140747 (Bankr. E.D. Va.

Dec. 9, 2011) (court invoked Civil Rule 60(b)(3) and (b)(6) to vacate an order due to inadequate

disclosure required by Section 327 of the Bankruptcy Code and Bankruptcy Rule 2014).

### Civil Rule 60(d)(3).

Rule 60(d)(3) also authorizes a court to "set aside a judgment" where there has been a "fraud on

the court." Fed. R. Civ. P. 60(d)(3); <u>Philips Lighting Co. v. Schneider,</u> 395 F. App'x 796, 798 (2d Cir. Oct.

12, 2010); <u>Old Cargo,</u> 423 B.R. at 49. The rule applies where there is a "scheme to defraud" the court.

<u>See Hazel Atlas Glass Co. v. Harford-Empire Co.,</u> 322 U.S. 238, 245-46 (1944), <u>overruled on other</u>

<u>grounds</u> by <u>Standard Oil Co. of Cal. v. United States,</u> 429 U.S. 17 (1976) (scheme to defraud both

Patent Office and court constitutes fraud on the court); <u>see  also Pearson,</u> 200 F.3d at 38 (fraud upon the

court occurs where a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter.")

A court may invoke Civil Rule 60(d)(3), even on its own initiative, "to maintain the integrity of the courts and safeguard the public." United States v. Smiley, 553 F.3d 1137, 1142 (8th Cir. 2009); see also Martina Theatre Corp. v. Schine Chain Theatres, Inc., 278 F.2d 798, 801 (2d Cir. 1960). There must be clear and convincing evidence to support a Rule 60(d)(3) motion, King v. First Am. Investigations, Inc., 287 F.3d 91, 95 (2d Cir. 2002); Old Cargo, 423 B.R. at 51. Nevertheless, such a premium is placed on the court's mission to preserve its integrity that, although Federal Rule of Civil Procedure 60(c)(1) sets forth a one-year time limitation on a motion under Rule 60(b)(3), a Rule 60(d)(3) motion is not time-barred. Id.

"'[F]raud upon the court' as distinguished from fraud on an adverse party is limited to fraud which seriously affects the integrity of the normal process of adjudication." King, 287 F.3d at 95. (internal quotation omitted). Thus, Civil Rule 60(d)(3) embraces "only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases." Id. (internal quotation omitted). The Hazel-Atlas case has been described as a case in which a judgment was set aside on motion primarily on the basis "that an attorney was implicated in perpetrating the fraud." Kupferman v Consolidated Research and Mfg. Corp., 459 F.2d 1072, 1078 (2d Cir. 1972) (citing 7 James WM. Moore et al., Federal Practice ¶ 60.33 at 513 (3d ed. 2009)). As an officer of the court a lawyer must deal with the court with honesty and integrity. Id. If a lawyer betrays this duty of loyalty to the court, the lawyer is deemed to have "perpetrate[d] a fraud upon the court." Id.

Although the fraud or misconduct need not be the "primary basis for the ruling," the conduct must have "impressed, affected or influenced the court." Old Cargo, 423 B.R. at 52. However, fraud on the court may be present if a party inserts a false or forged document into the record. Id. (citing Weldon v. U.S., 225 F.3d 647, No. 99-6142, 2000 WL 1134358, at *2 (2d Cir. Aug. 9, 2000)). (additional citations omitted). Courts may also invoke the rule when an officer of the court has "fabricat[ed] . . .

40

evidence." Smiley, 553 F.3d at 1145. This species of fraud has been defined as conduct "on the part of an officer of the court" that "is directed to the judicial machinery itself", "is willfully blind to the truth", "is a positive averment or a concealment when one is under a duty to disclose," and "that deceives the court." Workman v. Bell, 227 F.3d 331, 336 (6th Cir. 2000); see also Philips Lighting, 395 F. App'x at 798 (Rule 60(d) applies to conduct by officers of the court). Thus, participation by counsel is a key to a finding of fraud on the court. See Demjanjuk v. Petrovsky, 10 F.3d 338, 348 (6th Cir. 1993) (where government attorneys withheld exculpatory evidence); see also Kupferman, 459 F.2d at 1078 (attorney's "loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court").

Fraud under Rule 60(d) concerns the integrity of the judicial process, see Lee v. Marvel Enters., 765 F.Supp.2d 440, 450 (S.D.N.Y. 2011), and fraud on the court interferes with the court's ability to decide cases. Id.; see also King, 287 F.3d at 95 (fraud on the court is fraud by officers of the court that prevents the court from "adjudging cases"); Andrada Fin., LLC v.  Humara Group, Inc. (In re Andrada Fin. LLC), No. AZ-10-1209-JuMkPa, 2011 WL 3300983, at *4 n.9 (9th Cir. BAP) (Rule 60(d) "addresses a species of fraud . . . perpetrated by officers of the court so that the judicial machinery" cannot function properly). The movant under Rule 60(d) must show fraud on the court by clear and convincing evidence. See King, 287 F.3d at 95.

Although nondisclosure is not *per se* "fraud upon the court," see In re Levander 180 F.3d 1114, 1119 (9th Cir. 1999), it is fraud on the court where the failure to disclose deprived parties of the opportunity to mount a challenge to the relief sought at the original hearing. Id. at 1120. Civil Rule 60(d), therefore, certainly applies where the nondisclosure of a conflict under Section 327(a) prevented parties and the United States Trustee from challenging the retention of a professional in court. See Crivello, 134 F.3d at 839.

 **The Court's Inherent Power To Impose Sanctions.**

Bankruptcy courts have inherent authority to sanction parties for improper conduct. In re Feinberg, 215, 226 (Bankr. S.D.N.Y. 2010) (citing Mapother & Mapother, P.S.C. v. Cooper (In re Downs), 103 F.3d 472, 477 (6th Cir. 1996); see also In re FairPoint Commc'ns, Inc., 445 B.R. 271, 276 (Bankr. S.D.N.Y. 2011) (sanctions may be imposed through the inherent power of the court); In re Plumeri, No. 10-10050 (MG), 2010 WL 3087685, at *2 (Bankr. S.D.N.Y. Mar. 25, 2010) ("Bankruptcy Courts, like Article III courts, enjoy inherent power to sanction parties for improper conduct.") (quotation omitted). A court possesses wide discretion when imposing these sanctions. Reilly v. Natwest Markets Group, Inc., 181 F.3d 253, 267 (2d Cir. 1999).

The applicable standard in imposing sanctions on an attorney pursuant to a court's inherent power depends upon the nature of the conduct in question. FairPoint, 445 B.R. at 276. The Second Circuit, in U.S. v. Seltzer held that a finding of bad faith is necessary only when sanctions are imposed for a lawyer exceeding "conduct of the sort that is normally part of the attorney's legitimate efforts at zealous advocacy for the client." U.S. v. Seltzer, 227 F.3d 36, 40 (2d Cir. 2000). In cases where sanctions are imposed for conduct that impacts the orderly running of the court system and is not undertaken for the client's benefit, bad faith need not be shown. FairPoint, 445 B.R. at 276.


**The Fiduciaries failed to make complete and candid disclosure.**

**Undisclosed and Partially Disclosed Conflicts that Preceded the June 29, 2012 Filing of Bankruptcy for FILB**

> [C] with the statutory requirement of "disinterest," the [Fiduciaries] may not have a "material adverse" interest to any party to the bankruptcy "for any ... reason," either at the time of appointment or during the course of the bankruptcy. See In re Marvel Entm't Group, 140 F.3d 463, 476 (3d Cir. 1998) ("A plain reading of this section suggests one is a `disinterested person' only if he has no interest that is materially adverse to a party in interest in the bankruptcy."); *Roger J. Au Son, Inc. v. Aetna Ins. Co. (In re Roger J. Au Son, Inc.)*, 64 B.R. 600, 605 n. 8 (N.D.Ohio 1986) (This section "appears broad enough to include anyone who in the slightest degree might have some interest or relationship that would color the independent

and impartial attitude required by the Code.") (quotation and citation omitted); *In re Watson*, 94 B.R. 111,116 (Bankr.S.D.Ohio 1988) ("A disinterested person should be divested of any scintilla of personal interest which might be reflected in [that person's] decisions concerning estate matters.").

In re Big River

Young Conaway was actively working with Angelo Gordon in the Tribune bankruptcy[88] when it was retained as debtor's counsel for Fletcher International, Ltd. but did not disclose it. Young Conaway also did not disclose that it was actively working with the Louisiana Officials (Trustee's Plan of Liquidation Class 4D), and Fletcher's Cayman law firm Walkers in the Delaware bankruptcy proceeding of another fund ground in which the Louisiana Officials invested.

Richard J. Davis retired as a senior partner of Weil, Gotshal & Manges LLP ("Weil") fewer than nine months prior to his appointment as Fletcher Trustee yet did not disclose any Weil clients among his connections, though several have interests adverse to the estates. Mr. Davis personally represented News Corporation and Sotheby's, each of which is closely affiliated with John Angelo. Silver Point Capital, a primary lender and partner to Citco, is a Weil client and Angelo partner. Mr. Davis served in leadership roles at Citizens Union with Angelo/Dakota Party Anthony Smith, a named defendant in Fletcher v Dakota. Mr. Davis's counsel Michael Luskin repeatedly denied this but Mr. Davis later admitted the connection and his connection to News Corporation. In retention applications filed while Mr. Davis was a senior partner, Weil listed additional clients with interests adverse to the estates, including Blackrock, Credit Suisse, D.E. Shaw, Ernst & Young, HSBC Bank, J. P. Morgan Chase, Milbank Tweed Hadley & McCloy (counsel to Credit Suisse), Morgan Stanley & Co. (Dakota shareholder is a senior officer), The Seaport Group ("arms length" broker for the Fletcher International, Ltd. trustee), and Wilmington Trust Company.

Luskin disclosed its current active representation of Ernst & Young Liquidators but attested to having no interests adverse to the estate even though the estate was already in active litigation with the Ernst & Young Liquidators that were appointed to liquidate FIA Leveraged Fund and Fletcher Income Arbitrage Fund, Ltd  Had it not been for the [appointment/actions] of the Ernst & Young Liquidators, FILB, a then-solvent entity would not have even filed Chapter 11. Luskin (counsel to Trustee Davis and to the Ernst & Young Liquidators) failed to disclose its business relationship with Young Conaway, Fletcher Debtor's counsel, and others with involvement in these proceedings.

43

Goldin attested to having no interests adverse to the estate. Yet Goldin disclosed its current work for Fletcher estate adversaries, including JPMorgan Chase (whose affiliates interfered with Fletcher International, Ltd. including its investment agreement with United Community Banks, Inc.), Young Conaway (Fletcher International, Ltd.'s debtor's counsel), Kasowitz Benson, Zolfo Cooper liquidators (for Alpha), Holland & Knight (counsel to a significant Fletcher fund investor), and HSBC (lender to the Dakota and Angelo Gordon). Goldin also disclosed that it had worked for Fletcher estate adversaries Ernst & Young and Credit Suisse[89] (which seized tens of millions of dollars of Fletcher International, Ltd. assets).

Goldin failed to disclose its direct relationship with Dakota counsel Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn") (which defended Goldin in a fraud suit settled after losing its motion to dismiss)[90], Dakota President Jay Goldsmith of Balfour, and Dakota Treasurer John Angelo of Angelo Gordon.

## Undisclosed Connections and Interests Adverse to the Estate

> [C]onsistent with the Federal Rules of Bankruptcy Procedure, examiners have several disclosure obligations. They must disclose all "payments . . . made or promised" to them, meaning they must disclose in all fee applications any understandings they believe they have reached with anyone regarding their compensation. *See Henderson v. Kisseberth (In re Kisseberth)*, 273 F.3d 714, 720 (6th Cir. 2001) ("An attorney in a bankruptcy case has an affirmative duty to disclose fully and completely all fee arrangements and payments."); *Mapother Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 480 (6th Cir. 1996) ("[T]he fulfillment of the [disclosure] duties imposed under [the Code] are crucial to the administration and disposition of proceedings before bankruptcy courts."); *Neben Starrett v. Chartwell Fin. Corp. (In re Park-Helena Corp.)*, 63 F.3d 877, 880 (9th Cir. 1995) ("The disclosure rules impose upon attorneys *434 an independent responsibility.");
>
> In Big River

These undisclosed connections and interests adverse to the estate cast doubt on the major decisions of the Trustee, specifically, related to the proposed settlement of the primary disputes underlying this case and the associated cases. Those settlements would provide relatively little or no consideration to the estate or create liabilities. Yet, as described above, those settlements benefit those connected to the trustee and his advisors.

· **United Community Bank, Inc:** the Trustee's settlement abandoned multiple claims. He admitted that the potential value of one of those claims, an option to purchase 7 million share, exceeded $70 million yet he agreed to accept only $12 million. In his motion, he misstated the controlling law, failed to disclose his relationship with the placement agent, failed to disclose his relationship with parties that induced and aided United's breaches and torts, did not disclose potential claims for those breaches and torts, and mislead the court regarding the "maximum" value that could be achieved if victorious in the litigation.. This act was consistent with the Trustee's previous acts such as his grant, for no consideration, a Release and Waiver to United, while the Trustee considered United in violation of the Automatic Stay. This Release and Waiver facilitated the Ernst & Young Liquidators $2.5 million settlement of the United option that entitled them to purchase 18 million shares.

· **The Ernst & Young Liquidators:** the Trustee settled the litigation which precipitated the Fletcher International, Ltd. bankruptcy, a lawsuit that Fletcher International, Ltd brought to stop the damage being caused by the Ernst & Young Liquidator. The Trustee awarded the Ernst & Young Liquidator most of the Fletcher International, Ltd. estate. Luskin Stern, which served as counsel to Ernst & Young Liquidators when it was appointed Trustee's counsel, chose to disregard the valid redemption the Ernst & Young Liquidators received, chose to elevate their claim from that of former equity holder of a shareholder of a shareholder of the FILB to creditor of FILB, and did not address this violation of the "strict priority rule" in its memorandum of law..[91]

· **Angelo/Dakota Parties:** the Trustee's report and invoices show no investigation of the conduct of the Angelo/Dakota Parties yet Sotheby's, where John Angelo is a director, has lent money to a Dakota president when he was late in paying his monthly maintenance fees, a Sotheby's officer and a Sotheby's advisory board member are two recent purchasers of Dakota apartments. News Corporation, where Jesse Angelo is a senior executive, has published more than 50 stories that damaged Fletcher International, Ltd. often with statements that the reporters knew were false or knew violated the reporters' contractual agreement to confirm correctness prior to publishing in return for certain cooperation. As mentioned previously, both have been clients of Mr. Davis.

· **Credit Suisse and D.E. Shaw:** The Trustee has elected not to pursue recoveries from Credit Suisse and D.E. Shaw despite the fact that Credit Suisse seized Fletcher International, Ltd.'s second most value asset, an Ion Geophysical Corporation floating rate perpetual convertible non-callable preferred stock, days prior to its bankruptcy filing. Credit Suisse sold the preferred stock to D.E. Shaw for a premium of less than $1 million above the value of the underlying common stock. D.E. Shaw realized a premium of $7 million. The Trustee elected not to pursue either. Both are clients of his further partnership and former clients of his financial advisor Goldin Associates. In fact, this is not the first time that Mr. Goldin has been accused of favoring Mr. Liftin's employers (see above regarding Granite Partners and Kidder Peabody).

· **Ion Geophysical Corporation:** Additionally, the Trustee chose to withdraw claims worth more than $50 million in Fletcher International, Ltd.'s litigation against Ion Geophysical, in which a verdict against Ion on liability was won, one of Fletcher International, Ltd.'s three summary judgment victories over Ion Geophysical prior to the bankruptcy filing. The trial judge directed the trial to focus on the hypothetical negotiation over "consent rights" that would have transpired between the primary decision makers of Fletcher International, Ltd.

45

Ion did not call me to testify nor anyone else affiliated with Fletcher International, Ltd. that was involved in valuation of the consent right and related seniority covenants. Surprisingly, neither did the Trustee. Instead, the Trustee put forth an argument that failed to address the key questions asked by the judge. Whether or not they would have succeeded, specific answers were available.

·**The Louisiana Officials**: The trustee chose not to pursue the Louisiana Officials despite the significant harm they caused the debtor. The Officials made false statements both publicly and under oath in court proceedings. With aid from the Angelo/Dakota Parties, the Officials abused process through use of an involuntary bankruptcy petition, in bad faith, to resolve a dispute over a debt. In that proceeding the Officials employed the Angelo/Dakota Parties' co-counsel which happened to be the presiding judge's personal counsel, a situation which would not be permitted under U.S. rules. Among the Louisiana officials is the chairman of Ion Geophysical, James Lapeyre whose close ties to Ernst & Young[92] and Louisiana state government[93] are well publicized in Louisiana. Some Louisiana pension fund board member complained openly in late 2011 about the unreasonable and unfair pressures being applied on them by other Officials and the Angelo/Dakota Parties. Nevertheless, the Trustee deemed the Louisiana Officials as the "major parties-in-interest" [94] and chose not to pursue claims for their bad acts.

## The Fiduciaries' Lack of Disinterest

The Fiduciaries connections to Fletcher v Dakota are not *de minimis*.

Richard J. Davis as a then-recently retired partner for Weil failed to disclose any Weil clients though several have interests adverse to the estates including Blackrock, Credit Suisse, D.E. Shaw, Ernst & Young, HSBC Bank, J. P. Morgan Chase, Milbank Tweed Hadley & McCloy (counsel to Credit Suisse), Morgan Stanley & Co. (Dakota shareholder is a senior officer), The Seaport Group (purported "arms length" broker for the Fletcher International, Ltd. trustee), and Wilmington Trust Company. He has failed to disclose his relationship as former counsel to News Corporation and Sotheby's, each of which is closely affiliated with John Angelo and failed to disclose his relationship with Anthony Smith, a named defendant in Fletcher v Dakota. Mr. Davis has failed to disclose his connections to D.E. Shaw's general counsel John Liftin and Ms. Deborah Hicks Midanek who used fabricated documents to seize control of an affiliate of Fletcher International, Ltd.

Luskin disclosed its current active representation of Ernst & Young Liquidators but attested to having no interests adverse to the estate even though the estate was already in active litigation with the Ernst & Young Liquidators that were appointed to liquidate FIA Leveraged Fund and Fletcher Arbitrage

Fund, Ltd. (affiliates of FILB).  Luskin failed to disclose its business relationship with Young Conaway, Fletcher Debtor's counsel prior to appointment of the Trustee.

Goldin had multiple conflicts but dismissed them as having no interests adverse to the estate. Though the Cooper liquidators, Holland & Knight, HSBC, Ernst & Young and Credit Suisse all had specific and direct interest in the outcome of the proceedings.  Goldin failed to disclose its direct relationships with Dakota counsel Quinn in Fletcher v Dakota, Dakota President Jay Goldsmith, and Dakota Treasurer John Angelo.

Courts in this district have held that the disinterestedness requirement mandates that a person "should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters." Vebeliunas, 231 B.R. 191-92 (citations and quotations omitted); see also Granite Partners, 219 B.R. at 24 (the most modest interest or relationship will undo a person's disinterestedness if it "would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules.") (internal quotations and citations omitted); MF Global, 464 B.R. at 600 (the trend in determining disinterestedness "focuses on the concerns of divided loyalties and affected judgments") (citations omitted).


## The Protection of the Integrity of the Bankruptcy System Requires Vacateur of Appointment Orders  of and Disgorgement of Fees from Mr. Davis and his advisors.

> [C]onsistent with the statutory requirement for receiving "reasonable compensation" and with the common-law standards of fiduciary duty, examiners owe the creditors and shareholders a duty of loyalty. In imposing this duty on examiners and trustees, bankruptcy law "seeks to avoid such delicate inquiries . . . into the conduct of its own appointees by exacting from them forbearance of all opportunities to advance self-interest." Mosser v. Darrow, 341 U.S. 267, 271, 71 S.Ct. 680, 95 L.Ed. 927 (1951). See G. Bogert, Law of Trusts and Trustees § 543 (rev.2d ed. 2003) (trustees "must display throughout the administration of the [case] complete loyalty to the interests of [the creditors and shareholders] and must exclude all selfish interest"); Collier ¶ 1108.09[1] ("[A] chapter 11 trustee, like the trustee of a conventional personal trust, owes single-minded devotion to the interests of those on whose behalf the trustee acts.").
>
> In Big River

Disclosure "goes to the heart of the integrity of the bankruptcy system, of counsel and of the courts." B.E.S. Concrete, 93 B.R. at 236. The duty to disclose mandated by Bankruptcy Rule 2014, therefore, is considered sacrosanct because the complete and candid disclosure by a professional seeking employment is indispensable to the court's discharge of its duty to assure the professional's eligibility for employment under Section 327, and to make an informed decision on whether the engagement is in the best interest of the estate. See Leslie Fay, 175 B.R. at 533; see also eToys, 331 B.R. at 189 (the duty to disclose is considered sacrosanct because the complete and candid disclosure of a professional seeking retention under Section 327 is indispensable to court's discharge of its duty to ensure eligibility); see generally 9 Collier ¶ 2014.03.

### The Court, Pursuant to Fed. R. Civ. P. 60(b)(6) and 60(d)(3), Made Applicable by Fed. R. Bankr. P. 9024, Should Vacate the Retention Orders of Luskin and Goldin

Subsections (b)(6) and (d)(3) of Civil Rule 60, as made applicable herein by Bankruptcy Rule 9024, authorize the Court to vacate the retention orders of Luskin and Goldin. Fed. R. Civ. P. 60(b)(6) and (d)(3). Rule 60 confers broad discretion upon the Court to grant the requested relief because, as in these cases, to do so will serve substantial justice and maintain the integrity of the Court. See Matarese, 801 F.2d at 106; see also Nemaizer, 793 F.2d at 61 (same); Enron, 352 B.R. at 369 (these grounds "should be liberally construed when substantial justice will . . . be served") (quoting Radack, 318 F.2d at 542); Teligent, 326 B.R. at 227; AMC Realty, 270 B.R. at 143-44.

### The Court Should Order the Removal of Mr. Davis as Plan Administrator and Direct Mr. Davis to Disgorge All Compensation Paid to Richard J. Davis from the Estate.

Under New York law, a court has the power "[o]n the application of any person interested in the trust estate, to suspend or remove a trustee who has violated or threatens to violate his trust . . . or who for any reason is a person unsuitable to execute the trust." N.Y. Est. Powers & Trusts Law § 7-2.6(a)(2). As Liquidating Trustee, Mr. Davis owes "a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect. Birnbaum v. Birnbaum, 73 N.Y.2d 461, 466 (1989). As Justice Cardozo articulated in Meinhard v. Salmon, "A trustee is held to something stricter than the morals of

48

the market place.    Not honesty alone but the punctilio of an honor the most sensitive, is then the standard of behavior." Meinhard v. Salmon, 249 N.Y. 458, 463-64 (1928).

The facts detailed above demonstrate that Richard J. Davis did not meet this high standard. From the beginning of this case, Mr. Davis failed to disclose material connections to Fletcher V Dakota which quantifiably damaged the FILB estate. Accordingly, the Appellant requests that the Court remove Mr. Davis as the Plan Administrator and as a member of the Plan Advisory Board and, for the reasons above, order that Mr. Davis disgorge all compensation that it has received from the estate. For similar reasons, Robin McMahon (Ernst & Young Liquidator) should be removed from the Plan Advisory Board and should not be granted indemnification of any kind.

## CONCLUSION

An excerpt from In re Big River could not be more applicable to In re Fletcher International, Ltd. The Fiduciaries

> violated their duty to remain "disinterested." An agreement with a single creditor that links the examiner's compensation to the creditor's recovery qualifies as such an interest because it creates the risk that the examiner will favor one creditor at the expense of other creditors, to say nothing of all equity holders. Given the zero-sum realities of most bankruptcies, every dollar recovered by a favored creditor becomes a dollar lost to a disfavored creditor. Opportunities abound, moreover, for bankruptcy examiners paid in this manner to benefit selected creditor patrons. They might decline to investigate and report any "cause[s] of action available to the estate" against the favored creditor (say, for a fraudulent conveyance). See 11 U.S.C. § 1106(a) (4). They might file, or threaten to file, a report that harms a disfavored creditor unless it accepts a settlement that increases the recovery of a favored creditor. They might stall or obstruct confirmation of a plan that represents the best interests of the estate if it contains no recovery for the favored creditor (and no commission for the [Fiduciary]).

As courts have observed on multiple occasions, and recently *In re GSC Group Inc.*, the bankruptcy system is self-policing. It is not the responsibility of the United States Trustee, the Court, or other interested parties to discern gaps in the disclosures provided, or to ferret out every last piece of information that may not have been disclosed completely. In essence, the bankruptcy system relies upon the integrity of professionals appearing in bankruptcy cases to make forthright, complete and candid

49

disclosures to fulfill the spirit of the Bankruptcy Code, even where the professionals know that making

these disclosures may result in a court's determination that they may not be retained in the case. This

determination is for the courts to decide, and not the professionals themselves, especially in this case

with allegations of malicious and unlawful threats and retaliation from influential parties. For the

reasons stated in this brief, I respectfully request that the court issue an order directing the disgorgement

of all compensation received by the Fiduciaries from the FILB estate and from the Liquidation Plan,

removing Richard J. Davis as Plan Administrator of FILB, and vacating the Fiduciaries' appointments.

The Court should also stay any further proceedings.

Dated:          September 5, 2014
Corrected:      September 9, 2014

Respectfully submitted by

/s/Alphonse Fletcher, Jr
188 Minna Street
San Francisco, CA 94105
Phone: (415)702-0070
AFletcher@Fletcher.com

**Endnotes**

[1] On February 1, 2011, Fletcher Asset Management, Inc. and Alphonse Fletcher, Jr. filed a lawsuit against the Dakota entitled: *ALPHONSE FLETCHER, JR., AND FLETCHER ASSET MANAGEMENT, INC. V. THE DAKOTA INC BRU.CE BARNES, PAMELA LOVINGER, PETER NITZE, JOHN R YDZEiVSKI, AND ANTHONY R. SMITH AND GAEL SMITH ARNOLD AS CO EXEC-UTORS OF THE ESTATE OF RUTH PROSKA UER SMITH*(II-IOI289).(" *Fletcher v Dakota* ")Among its claims were defamation and retaliation in violation of New York City Administrative Law 8-107 *et* seq."24 relating to the Dakota's efforts "to harm and destroy the personal and business reputation of plaintiffs; and, on information and belief, to intimidate Fletcher and FAM into dropping this lawsuit... Fletcher Asset Management, Inc. and I seek "not less than $50 million" and "an order enjoining the Dakota and Barnes from continuing to engage in discriminatory conduct with respect to Fletcher" or "interfering with or impeding in any way..."

In 2012, the Appellate Division, First Department affirmed Justice Rakower s substantial denial of the Dakota defendants' motion-to-dismiss. With Associate Justice Rolando T. Acosta's opinion, the court sought to "clear up an element of possible confusion" and confirms the lack of "a safe harbor from judicial inquiry for directors who are alleged to have engaged in conduct not protected by the business judgment rule." Fletcher v. Dakota, Inc., 99 A.D.3d 43, 52 n.2 (1st Dep't 2012)

From 2007 through 2010, my defense of current and prospective Dakota shareholders against their discriminatory conduct led former presidents John Rydzewski and Bruce Barnes to threaten to use the Dakota's "influence" to cause harm to our investment business and ultimately to my family.

Specifically, they spread lies throughout the media that FAM is not profitable, that it is highly leveraged, and that its capital is being depleted. These more recent acts of defamation were consistent with Defendant Barnes' threat to Fletcher in June 2010 that if Fletcher went ahead and vindicated his rights by fling this lawsuit, the Board would do everything in its power to destroy Fletcher and his reputation in the business community.

*Fletcher* v *Dakota,* Amended Complaint, Paragraph 7

[D]efendant Barnes specifically threatened that if Fletcher ultimately brought a lawsuit against the Dakota, "what the Dakota will say will cause [Fletcher] far more harm than any harm caused to the Dakota." Given defendants' recent conduct, and Barnes' recent machinations, defendants have at least tried to carry out this threat.... Defendant Barnes made similar statements regarding plaintiff at other points between May and September 2010. For example, on September 5, 2010, Barnes told another Dakota shareholder that the Dakota would, among other things, make public statements attacking Fletcher, his financial health, and his business if Fletcher brought a lawsuit.

*Fletcher* v *Dakota,* Amended Complaint, Paragraph 113

[2] Excerpt of July 22, 2011 agreement between the Louisiana Officials on behalf of three pension funds and Fletcher Asset Management, Inc. on behalf of its affiliates.

3. Except as otherwise provided in this letter agreement, the Confidential Information will not, without the prior written consent of FAM, be disclosed in whole or in part by the Pension Plans or any representative or affiliate of the Pension Plans, to any person, **including without limitation, the Dakota co-op board, Quinn Emanuel Urquhart & Sullivan, LLP,** or any other representative of record for the Dakota co-op board in the litigation titled Alphonse Fletcher Jr. and Fletcher Asset Management Inc. v. The Dakota Inc. et, al., filed in the Supreme Court of the State of New York, **or to any director, officer, member, partner, associate, employee or any other affiliate or person related to such entities** (each a "Dakota Party" and, collectively, the **"Dakota Parties"** ). The Confidential Information provided during the on-site review will not be copied, photographed, or otherwise duplicated or removed from FAM's New York City offices, in whole or in part, except to the extent that such Confidential Information is referenced in the report by Mr. Stockstill to the Board of Directors of each Pension Fund.

[3] Letter of September 19, 2011 from Mr. Marc E. Kasowitz to *Wall Street Journal* editors:

> I write concerning the *Wall Street Journal's* reporting about Fletcher Asset Management ("FAM") and Denis Kiely in the August 30, 2011 article entitled "Video Reveals Fletcher's
>
> Funds Claims." The article purports to describe statements made by Mr. Kiely during a March 12, 2008 meeting with representatives of the Firefighters Retirement System of Louisiana
>
> ("FRS") concerning a potential investment by FRS in FAM's FIA Leveraged Fund. The article mischaracterizes certain of Mr. Kiely s statements and creates the false impression that FAM and Mr. Kiely were guaranteeing FRS's proposed investment.
>
> Indeed, the reporters purport to quote an exchange between Mr. Kiely and an unidentified FRS representative that never occurred. According to the article, Mr. Kiely "was asked if there was a guarantee, and he answered 'yes,' adding 12%." This exchange never happened. While your reporters may suggest that this is an amalgamation of phrases uttered during a lengthy meeting, the fact is that the exchange as reported never took place. If you believe we are mistaken, we invite you to provide us with the videotape time-stamp at the point in the meeting during which this reported exchange took place...

[4] The Louisiana Officials' wind up petition was argued by Campbells, co-counsel to Quinn Emanuel, and personal counsel to the Cayman Islands Chief Justice who presided over the wind up petition, granted the petitions despite the disputed debt, and granted the request to appoint Ernst & Young as liquidators despite Ernst & Young having worked for the the Louisiana officials for previous nine months.

[5] Minutes of the Firefighters' Retirement System June 14, 2012 Board Meeting show on page 14: "MOTION: Mr. Birdwell moved to authorize the strategy of seeking liquidation of all funds in the FAM silo within the liquidation budget previously approved by the board at its meeting held on May 23, 2012. Mayor Durbin seconded. The motion passed." (www.lafirefightersret.com).

[6] Letter of September 6, 2012 from Mr. Marc E. Kasowitz to Mr. John Van Der Tuin, Esq. of Balber, Pickard, Maldonado & Van Der Tuin, PC with copies to Ms. Christine H. Chung of Quinn Emanuel and Mr. Milton Williams of Vladeck Waldman.

[7] Investigations during that period and more recent investigations appear to be prompted by Dakota Party retaliation.

[8] Id. at 536 (citing In re Rusty Jones, Inc., 134 Bankr. 321, 345 (Bankr. N.D. Ill. 1991) and In re Arlan's Dep't Stores, Inc., 615 F.2d 925, 932 (2d Cir. 1979)).

[9] Verified Amended Complaint, Paragraph 169:
> FAM has suffered injury in that defendants' false statements have damaged its reputation as a successful investment firm, and this reputational injury has had a further damaging effect on relationship with current and prospective investors, and on resulting profits.

[10] Verified Amended Complaint, Paragraph 14:

[11] Verified Amended Complaint, Paragraph 14:
> Specifically, they spread lies throughout the media that FAM is not profitable, that it is highly leveraged, and that its capital is being depleted. These more recent acts of defamation were consistent with Defendant Barnes' threat to Fletcher in June 2010 that if Fletcher went ahead and vindicated his rights by filing this lawsuit, the Board would do everything in its power to destroy Fletcher and his reputation in the business community.

[12] Verified Amended Complaint, ¶ 2:
> ...this is a case about "pay back" — defendants' unlawful scheme to retaliate against Fletcher for having the temerity to stick up for the rights of others, including minority, Jewish, and female shareholders and applicants at the Dakota and then to further defame Fletcher and FAM when he had the courage to bring their discriminatory conduct to light.

[13] Verified Amended Complaint, Exhibit A, Preliminary Report of FTI Consulting, April 6, 2011, Page 13:
> Between the years 2007 through 2010, the Fletcher Funds have disposed of 908 securities. These transactions have resulted in $1.2 billion in sales proceeds resulting in a net gain of $207 million for the funds.

[14] *Fletcher v Dakota, Supreme Court, Appellate Division, First Department, July 3, 2012, Acosta, J.*
> *Fletcher v. The Dakota, Inc.*, 99 A.D.3d 43, 54-56 (1st Dep't 2012)

[15] Verified Amended Complaint, Exhibit A, Preliminary Report of FTI Consulting, April 6, 2011, Page 13 (emphasis added).
> We received and reviewed the following documents:... J.P.Morgan Chase loan documentation for *Mr. Fletcher's loans that are secured by real estate and finance his business*

[16] Verified Amended Complaint, Paragraph 69.
> Finally, they said that Fletcher's "business loans" had left him "over-extended and at risk." They incorrectly asserted that the FAM loans had call provisions and thus were not long-term capital.

[17] At the time I refused to believe that these developments were anything other than strange coincidence but later I read about what seemed to be similar conduct by the bank.
- May 4, 2010 email that surfaced in the Tribune Company bankruptcy that described strong-arm tactics being used by JPMorgan Chase to force an investment group into agreeing with the deal that Angelo Gordon favored:  "JPM is twisting his arm and has lot's of leverage on the fundraising front."
- American Lawyer Daily reported on July 7, 2008:  "It hasn't been a summer to remember for Linklaters. First one of the firm's biggest clients, J.P. Morgan, dropped Linklaters from its preferred counsel list because of a suit it filed against Barclays."
- May 28, 2010 discrimination settlement:  U.S. Department of Housing and Urban Development, Annual Report on Fair Housing Fiscal Year 2010:
> On December 10, 2009, an African-American couple filed a complaint with the Louisiana Public Protection Division, a HUD-certified FHAP agency, alleging that J.P. Morgan Chase Home Finance denied their loan application based on their race... The couple believes that the senior processor kept trying to find reasons to not approve the loan. The couple believes that they were treated in this manner and denied the loan because they were trying to purchase a property in predominately white area... On May 28, 2010, the parties entered into a conciliation agreement. Under the terms of the agreement, J.P. Morgan Chase will pay the couple $27,000.
> http://portal.hud.gov/hudportal/documents/huddoc?id=ANNUALREPORT2010.PDF

[18] Other banks including Angelo, Gordon & Co. allies HSBC and Credit Suisse, and Citco Bank backed by Angelo, Gordon & Co. partner Silverpoint Capital, closed or refused to open accounts for Fletcher International, Ltd and its affiliates.  Some of the banks, without explanation or any involvement in any court proceeding, continue to refuse valid wire instructions from Fletcher-related entities to transfer their own cash.

[19] *Upstart Business Journal*, May 20, 2010, "Non-Toxic Solution," J. Scott Trubey (upstart.bizjournals.com)
"Few in the United States outside of banking circles or the North Georgia Mountains likely know of United Community Banks Inc. But the bank, based in tiny Blairsville, Georgia, might have found an innovative solution to soured real estate loans that other community banks will try to replicate... Banks face four primary challenges: capital adequacy, classified asset concentrations, recurring earnings, and liquidity. "This structure responds to all four challenges," said Olasov, the McKenna Long & Aldridge managing director. "This particular structure, this is very patient money. These are long-dated warrants."

Atlanta Journal Constitution, "Sells a piece of itself along with bad loans," April 1, 2010, Paul Donsky (www.ajc.com)
Experts said what makes the deal unusual – and potentially groundbreaking – is that Fletcher will invest in the bank by buying shares, in essence becoming a part owner. Analysts said the arrangement should provide the bank with capital to help it work though its remaining pool of troubled loans as well as be in a position to buy failed banks. Having Fletcher invest in the bank "is the wrinkle that makes [the deal] unique. It's frankly what we think needs to happen in the industry." said Chris Marinac, an analyst at FIG Partners in Atlanta. "Other banks will replicate this over time."

[20] United Community Banks, Inc., Press Release, April 1, 2010 (www.ucbi.com)

[21] *Financial Times,* "Fund to help banks meet Basel rules," October 27, 2010, Sam Jones (www.ft.com)
John Angelo had claimed on August 7, 2007 that he was bailing out Christofferson Robb due to the "liquidity crisis." Christofferson Robb's new fund was backed by Angelo, Gordon & Co. partner Credit Suisse, its co-investor in Philadelphia Media and Tribune Company.

[22] *Reuters*, "United Community see lower provision, shares," April 22, 2010 (www.reuters.com)

[23] *Dow Jones Private Equity & Venture Capital*, "Tailwind, Angelo Gordon Lead Investment In Hamilton State Bank,"June 9, 2010, Shasha Dai [requires subscription]

[24] *Bloomberg*, June 9, 2010, "Moelis, Angelo Gordon Seek to Buy Banks in Georgia, Texas" Daykin Campbell and Jonathan Keehner (www.bloomberg.com)

[25] See e.g. February 2011 emails from Skadden relaying Wachtell's threats of regulatory intervention if Fletcher objected.

[26] United Community Banks, Press Release, March 31, 2011

[27] United Community Banks, Inc., 2012 Proxy Statement

[28] Reuters, "United Community Banks, Inc. Announces $380 Million Capital Raise and Plans to Sell $435 Million of Classified Assets," March 16, 2011 (www.Reuters.com)

[29] *Wall Street Journal*, "Corsair Still Wandering Around The Bank 'Wasteland,'" March 17, 2011, By Shasha Dai

[30] *Atlanta Business Chronicle*, August 19, 2011, "Top Business Deals of 2011," (www.bizjournals.com/atlanta) $168 million Firm: Kilpatrick Townsend & Stockton LLP Date (of transaction): April 2010 Description (of transaction): Represented United Community Banks Inc. (Nasdaq: UCBI), the third-largest bank holding company headquartered in Georgia, in its agreement to sale of up to $65 million of United's convertible preferred stock and $103 million of nonperforming assets at United's book value to Fletcher International. The transaction, the first of its type in the United States, included seller financing of 80 percent of the asset purchase, and the grant of a warrant to purchase $65 million of United's common stock to Fletcher.

[31] See for example, emails from Skadden Arps of February 2011.

[32] United Community Banks, Inc., Second Quarter 10-K Report to the U.S. Securities and Exchange Commission (www.sec.gov):
> While recent news articles and other sources have questioned the financial health of Fletcher and its affiliates, the loans to the LCCs have performed according to their contractual terms since inception and there have been no delinquencies to date. As a result, even though these loans represent our largest loan relationship, we consider these loans performing and have not established specific reserves related to them. Should our assessment of this loan relationship change, we would then take appropriate action.

[33] *Wall Street Journal*, "Funds Face Snags in Fletcher Case," Josh Barbanel and Steve Eder, April 29, 2012

[34] John Angelo's Angelo, Gordon & Co. retained a leading law firm and its well respected private investigator who win summary judgment based on what may have been typos in a witness's letter in Nieves v Angelo, Gordon & Co. 05-CV-7782 (NRB)(DFE). The Plaintiff's affidavit (ECF No. 22) claimed that Angelo, Gordon & Co.'s retaliation hindered her ability to find a new job:

> The defendant then set out to destroy my ability to find subsequent employment... and alleged that I was never employed as an Administrative Assistant... This was done in retaliation for my complaints of age discrimination.  I have been unable to secure satisfactory employment since being fired by Angelo Gordon.

[35] "Beth Cathers charges in her suit that "Barnes vowed to Cathers and others, in or about January 2002, to utilize his immense wealth to destroy Cathers's and C & D's business, and, in particular, to impugn and ruin the reputation, credibility and career of Cathers in the Arts and Crafts community...by his immediate commencement of groundless, vexatious litigation against her and C & D, and by unjustified, demeaning and offensive attacks upon her honesty, integrity and expertise....That was threatened, she alleges, "unless Cathers immediately capitulated to his extortionate demands that she transfer ownership to him of certain rare and important examples of Arts and Crafts, free of any charge, and, in addition thereto, that the plaintiffs release him from both his obligations to pay for any portion of the substantial balance due to C & D." (Maine Antiques Digest)
http://www.maineantiquedigest.com/articles_archive/articles/apr04/suit0404.htm

[36] Affidavit of Shari Logan in *Guzman v News Corporation* (1:09-cv-09832-LG):

The vast majority of the reporters, managing editors and other news staff at the Post are white and male. Specifically, there is currently only one editor at the Post who is not white. Moreover, in or around February 2009, the New York Post published a racist, offensive and degrading cartoon depicting two White police officers holding a smoking gun after shooting a chimpanzee that was meant to represent President Obama,The cartoon contained the caption, "They' ll have to find someone else to write the next stimulus bill..." I also told Jesse Angelo, a Managing Editor at the Post, that the cartoon was very offensive to African-Americans. In response, he agreed that the cartoon could be deemed racially offensive... After Sandra Guzman complained about the cartoon to members of management at the Post, they began retaliating against her. For example, after she put together a huge photo shoot, her expense reports were closely scrutinized... Throughout my employment, I have also witnessed other discriminatory and/or harassing acts against minorities and women... For example, a reporter complained to Mr. Angelo that a headline about Lindsay Lohan, stating "Living La Vidn Lesbian" was offensive to women, However, Mr. Angelo just ignored her complaints... On another occasion, after Harvard Professor Henry Louis Gates was arrested last summer for breaking into his own home, the Managing Editors claimed that they did not know who Mr. Gates was... Despite not knowing who Mr. Gates was, Lauren Rambsy, another Managing Editor, said, "apparently, he is an angry, Black man," In fact, when Mr. Angelo informed her that Mr. Gates had been arrested, she responded by saying, "nice!"

[37] The Louisiana Officials had signed a confidentiality agreement on July 22, 2011 in which they agreed not to share Fletcher information with the Dakota, Quinn Emanuel, or any of their representatives. **quote?**

[38] Mr. McDonough represents the Chief Justice with respect to various high profile controversies including a Scotland Yard inquiry into Cayman corruption the results of which cannot be accessed because the U.K Foreign & Commonwealth Office has determined that

> "disclosure could lead to a loss of confidence within the international community which could impact negatively on the Cayman Islands' reputation and, more directly, on its financial services industry."

[39] In late 2011, the Louisiana officials announced publicly several times that their examination with Ernst & Young of the Fletcher operations was successful. Their September 9, 2011 statement declared "The assets and their valuations have now been corroborated."

...The expert is a principal in the investigation and dispute services unit of Ernst & Young accounting firm, located in New York... The review was designed to understand the structure of the Fletcher managed funds, corroborate the existence of the funds' investments, understand FAM's valuations of the funds investments, understand the nature of certain liabilities, and calculate the value of the retirement systems investment, all as of June 30, 2011. To obtain background information, E& Y had conversations with FAM's directors and personnel, FAM's auditors and administrators, and FAM's third-party valuation consultant. E&Y corroborated the existence of the investments and reconciled the key terms used in FAM's calculation of the investments' value as compared to the underlying investment agreements... The assets and their valuations have now been corroborated and the governing boards of the systems have been briefed...

Steven S. Stockstill, FRS Executive Director, Richard Hampton, NOFF Executive Director, Bob Rust, MERS Executive Director

[40] 11 USC § 303 - Involuntary cases

[41] Firefighters' Retirement System Board Meeting, January 12, 2012, "MOTION: Mayor Foster moved to ratify the hiring of Caymen Islands counsel, The Campbells law firm. Mayor Durbin seconded. The motion passed."

[42] *Mann v Goldstein* [1968] 1 WLR 1091

[43] For example, the March 20, 2012 "Second Affidavit of Steven Stockstill" submitted "*In the Matter of FIA Leveraged Fund*" FSD Cause No 0013 of 2012 falsely declared the FILB Co-Investment shares to be a "liability" not an "asset" and falsely declares that the United Option cannot be exercised unless Fletcher International, Ltd. has $65 million of cash on each option exercise closing date.

> I think that it is fair to describe the "asset" that has purportedly been distributed to the Petitioners as completely the opposite; namely, a liability. Fletcher International Ltd ("Fletcher International") has an obligation to UCBI to purchase the stock described above.

> Paragraph 7(d) of the Securities Purchase Agreement ("SPA") a copy of which is exhibited to Exhibit ST 1 contains a representation required to be made by Fletcher International that on each Closing Date (31 May 2011 or by 31 May 2012) it will have sufficient immediately available funds in cash to enable it to pay the Investment Amount (US$65 million) on such Closing Date... It appears clear from the letter from Walkers dated 16 March 2012 that Fletcher International could not have certified that it was in a position to fund the obligation under the SPA...

[44] On September 9, 2011, the Louisiana Officials released a joint public statement:
> The review was conducted with "a principal in the investigation and dispute services unit of Ernst & Young accounting firm...The assets and their valuations have now been corroborated."

[45] Later that year, on November 30, 2012, Chief Justice Smellie said in a speech, FIA Leverage is another sentimental favourite of mine..." ADDRESS TO THE RECOVERY AND INSOLVENCY SPECIALISTS ASSOCIATION (CAYMAN) LIMITED (RISA) [THE LOCAL CHAPTER OF INSOL INTERNATIONAL], THE WESTIN HOTEL, GRAND CAYMAN, 30TH, NOVEMBER 2012

[46] 28 U.S. Code § 455(a), In re Cargill, 66 F.3d 1256 (1st Cir. 1995) (https://bulk.resource.org/courts.gov/fjc/recusal.pdf)
> The disqualification requirement of section 455(a) is triggered, despite the lack of any actual bias on the judge's part, if a reasonable person, knowing all the circumstances, would question the judge's impartiality. See Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 861-62, 108 S.Ct. 2194, 2203-04, 100 L.Ed.2d 855 (1988). Most observers would agree that a judge should not hear a case argued by an attorney who, at the same time, is representing the judge in a personal matter. See 13A Charles Wright, Arthur Miller & Edward Cooper, Federal Practice and Procedure Sec. 3549, at 614 (1984) (citing cases).

[47] In Paragraph 18 of his April 18, 2012 opinion that granted the winding up petition, the Chief Justice writes:
> [T]he Investment Manager appears to be the subject of an investigation by both the U.S. Securities Exchange Commission and the U.S. Federal Bureau of Investigation. This last assertion of the Petition relies on newspaper reports of the investigations mentioned and the Company...

[48] *The Independent*, "Corruption and the FCI: Blue skies, white sand, dark clouds," May 26, 2013, Paul Peachey (www.indpendent.co.uk)

[49] The U.K. Foreign & Commonwealth Office, often abbreviated as "FCO," promotes British interests overseas, supporting our citizens and businesses around the globe. The head of the FCO is the Secretary of State for Foreign and Commonwealth Affairs, commonly abbreviated to "Foreign Secretary." (www.gov.uk)

[50] Ibid.

[51] From the website of Satterlee Stephens Burke and Burke LLP (www.ssbb.com)
> "In November of 1900, the marriage of Louisa Pierpont Morgan, daughter of J.P. Morgan, to Mr. Herbert Satterlee, in New York City was the social event of the season."

[52] Minutes of the Firefighters' Retirement System June 14, 2012 Board Meeting (www.lafirefightersret.com) show on page 14: "MOTION: Mr. Birdwell moved to authorize the strategy of seeking liquidation of all funds in the FAM silo within the liquidation budget previously approved by the board at its meeting held on May 23, 2012. Mayor Durbin seconded. The motion passed. The discussion of this matter was concluded with no further action being needed or taken." On this authorization, the Ernst & Young Liquidators brought actions against multiple Fletcher funds including a wind up petition against Fletcher International, Ltd. in Bermuda.

Documents obtained in various proceedings reveal that the Ernst and Young Liquidators convinced the MBTA Retirement Fund to argue that the Louisiana redemption in kind of the Louisiana Officials' funds was invalid. (see e.g. Mourant Ozannes June 26 2012 Letter to Maples) In fact, the MBTA Retirement Fund was the indirect owner of approximately 70% of the remaining assets after the valid redemption of the Louisiana Officials. Nevertheless, the MBTA Retirement Fund argued in support of the Ernst & Young Liquidators effectively calling for the reallocation to the Louisiana Officials of all but 20% of its 70% stake. The MBTA Retirement Fund also ceded control to the Ernst & Young Liquidators employed by the Louisiana Officials.

Further, based on "Windup Up Reports" for FIA Leveraged Fund (in liquidation) released by the Ernst & Young Liquidators and comments from Credit Suisse's counsel and executives, the Ernst & Young Liquidators appear to have been involved in Credit Suisse's June 2012 fire sale of Fletcher International, Ltd.'s Ion Geophysical preferred stock for more than $30 million below the sale that Management was structuring.

[53] IN RE TRIBUNE CO., 476 B.R. 843 (2012), In re TRIBUNE COMPANY, et al.,1 Debtors. No. 08-13141 (KJC). United States Bankruptcy Court, D. Delaware. July 13, 2012.

[54] CERTIFICATION OF COUNSEL REGARDING (I) PROPOSED CONFIRMATION ORDER AND (II) AMENDED PLAN AND RELATED DOCUMENTS, In re TRIBUNE COMPANY, et al.,1 Debtors. No. 08-13141 (KJC). United States Bankruptcy Court, D. Delaware. July 13, 2012.

[55] Committee for Economic Development, http://www.ced.org/pdf/2010_2011_Annual_Report.pdf

[56] Committee for Modern Courts, http://www.juryproject.org/Publications/pdf/annual_report/2002.pdf

[57] **The $700 Million Mystery**
It was one of the biggest disasters in the history of Wall Street. ...Did some of Wall Street's biggest brokerages--notably Kidder, Peabody & Co.--help Askin mislead investors? **Did Kidder and other firms,** such as Bear, Stearns & Co. and Donaldson, Lufkin & Jenrette Securities Corp., **improperly force his demise?...**They moved hard and fast--and shut him down. Such accusations, made by creditor lawyers in court filings in the Chapter 11 bankruptcy of the Askin funds, are vigorously denied by Kidder, now a unit of PaineWebber Inc., as well as by Bear Stearns, DLJ, and Askin's lawyer, Andrew J. Levander. **"The notion of a conspiracy or collusive arrangement with Askin is ludicrous," sniffs Kidder General Counsel John Lifton... Goldin has been criticized by Weisfelner and his clients for not pressing hard enough on the brokerages' dealings with Askin, and he seems intent on demonstrating his independence** http://www.businessweek.com/stories/1995-12-17/the-700-million-mystery

[58] The "Omnibus Agreement" between Richard J. Davis, Fletcher International, Ltd. chapter 11 trustee, and Fletcher International, Inc. provided that "Assignee shall provide notice to Assignor, and provide Assignor with an opportunity to comment on the terms of, of any (a) proposed disposition of all or part of the Assigned Assets."

[59] This provision was in the March 8, 2013 executed final agreement. The below provision which was included in the February 8, 2013 executed term sheet:
    any (a) proposed disposition of the assets transferred to [the trustee] pursuant to the Unwind Transactions (the "Returned Assets") and (b) any contemplated non-ordinary course transactions."

[60] While the February 22, 2013 press release issued by United refers to settlement of its "litigation with FILB Co-Investments LLC," United's 8-K filed on the same day states that United and "the parties to the lawsuit" agreed to a settlement. The settlement includes FILB Co-Investments LLC, then controlled by the Ernst & Young Liquidators, and includes only three of the several parties in interest for which the Ernst & Young Liquidators serve as fiduciaries. Those three parties, pension funds controlled by the Louisiana Officials, retained Ernst & Young in July 2011, nine months prior to the appointment of Ernst & Young as Joint Official Liquidators. (www.sec.gov)

[61] Trustee's Report and Disclosure Statement, pages 112, 119.

[62] TRUSTEE'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019(A) APPROVING THE RELEASE AND WAIVER BETWEEN THE DEBTOR AND UNITED COMMUNITY BANKS, INC. (ECF No. 197)

[63] To the address the likely problem of The Fletcher Trustee having granted a release for no consideration, the parties included a provision intended to exempt the agreement from law requiring consideration for valid contracts:

> This Mutual Release and Waiver shall be governed by and interpreted in accordance with the substantive laws of the State of New York, including without limitation General Obligations Law )) 5-1103, 15-303, without giving effect to its conflict of laws principles.

[64] *In re Soundview Elite, Ltd., et al*, Case No. 13-13098 (REG),SUPPLEMENTAL DIRECT TESTIMONY AFFIDAVIT OF ALPHONSE FLETCHER, JR. ON MOTION'S TO DISMISS CONVERT OR APPOINT A TRUSTEE, December 11, 2013

Email from Robert McMahon to Cherry Bridges, April 3, 2013, "re - Richcourt Holding Inc."

[65] Trustee's Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019(A) Approving the Release and Waiver Between the Trustee and United Community Banks, Inc. (ECF No. 67.)

[66] DECLARATION OF MICHAEL LUSKIN IN SUPPORT OF TRUSTEE'S APPLICATION FOR ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LUSKIN, STERN & EISLER LLP AS HIS COUNSEL NUNC PRO TUNC TO SEPTEMBER 25, 2012 (ECF No. 120)

[67] See e.g. April 2013 emails with Weil Gotshal, counsel to Fletcher funds affiliates Soundview funds.

[68] TRUSTEE'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019(A) APPROVING THE SETTLEMENT AGREEMENT BETWEEN FLETCHER INTERNATIONAL, LTD. AND UNITED COMMUNITY BANKS, INC. (ECF No. 439)

[69] Trustee's Report and Disclosure Statement, ECF 327, page 130.

[70] Citco is the founder of the funds, the 15% indirect owner of the funds' investment advisor, and was the funds' administrator.[42] Citco was represented by Paul Weiss in the Soundview proceedings.

[71] The timing of the Registrar's action, a few days after the Soundview chapter 11 filing preempted the Cayman winding up proceedings, and the irregularity of not favoring a trial on the merits struck some as vindictive.

[72] Paul Weiss cleared conflicts, drafted the original complaint in *Fletcher v Dakota*, and managed the case for more than six months. Paul Weiss did not appear in court and selected another law firm to appear in its place. Paul Weiss explained that its managing partner would not allow the firm to appear in this case because John Angelo's Angelo, Gordon & Co. is an "important" client of Paul Weiss.

[73] In brief, the report repeats allegations which the Angelo/Dakota Parties have been making since 2010. It falsely claims that Fletcher International, Ltd. was insolvent since 2008, made not a single profitable investment during the past few years, carrying investments at grossly inflated valuations, and made investments that were authorized by its governing documents. Judge Gerber permitted the Soundview Soundview Debtors' to insert a supplement which provided evidence of the falsity of the Trustee's claims. In brief, the Soundview supplement referred to evidence of several independent parties the confirmed that Fletcher International, Ltd. in fact profitably sold investments and realized profits of approximately $150 million over the past few years pursuing the investment strategies described in its governing documents.

[74] On February 1, 2011, Fletcher Asset Management, Inc. and Alphonse Fletcher, Jr. filed a lawsuit against the Dakota entitled: *ALPHONSE FLETCHER, JR., AND FLETCHER ASSETMANAGEMENT, INC. V. THE DAKOTA INC BRU.CE BARNES, PAMELA LOVINGER, PETER NITZE, JOHN R YDZEiVSKI, AND ANTHONY R. SMITH AND GAEL SMITH ARNOLD AS CO EXEC-UTORS OF THE ESTATE OF RUTH PROSKA UER SMITH*(II-IOI289).(" *FletchervDakota* ")Among its claims were defamation and retaliation in violation of New York City Administrative Law 8-107 *et* seq."24 relating to the Dakota's efforts "to harm and destroy the personal and business reputation of plaintiffs; and, on information and belief, to intimidate Fletcher and FAM into dropping this lawsuit... Fletcher Asset Management, Inc. and I seek "not less than $50 million" and "an order enjoining the Dakota and Barnes from continuing to engage in discriminatory conduct with respect to Fletcher" or "interfering with or impeding in any way..."

In 2012, the Appellate Division, First Department affirmed Justice Rakower s substantial denial of the Dakota defendants' motion-to-dismiss. With Associate Justice Rolando T. Acosta's opinion, the court sought to "clear up an element of possible confusion" and confirms the lack of "a safe harbor from judicial inquiry for directors who are alleged to have engaged in conduct not protected by the business judgment rule." Fletcher v. Dakota, Inc., 99 A.D.3d 43, 52 n.2 (1st Dep't 2012)

From 2007 through 2010, my defense of current and prospective Dakota shareholders against their discriminatory conduct led former presidents John Rydzewski and Bruce Barnes to threaten to use the Dakota's "influence" to cause harm to our investment business and ultimately to my family.

Specifically, they spread lies throughout the media that FAM is not profitable, that it is highly leveraged, and that its capital is being depleted. These more recent acts of defamation were consistent with Defendant Barnes' threat to Fletcher in June 2010 that if Fletcher went ahead and vindicated his rights by fling this lawsuit, the Board would do everything in its power to destroy Fletcher and his reputation in the business community.

*Fletcher v Dakota,* Amended Complaint, Paragraph 7

[D]efendant Barnes specifically threatened that if Fletcher ultimately brought a lawsuit against the Dakota, "what the Dakota will say will cause [Fletcher] far more harm than any harm caused to the Dakota." Given defendants' recent conduct, and Barnes' recent machinations, defendants have at least tried to carry out this threat.... Defendant Barnes made similar statements regarding plaintiff at other points between May and September 2010. For example, on September 5, 2010, Barnes told another Dakota shareholder that the Dakota would, among other things, make public statements attacking Fletcher, his financial health, and his business if Fletcher brought a lawsuit.

*Fletcher v Dakota,* Amended Complaint, Paragraph 113

[75] MF Global, 464 B.R. at 600 (citations omitted)

[76] *Fletcher v Dakota,* Amended Complaint, Paragraph 7

[77] Leslie Fay, 175 B.R. 525; Granite Partners., 219 B.R. 22.

[78] Id. at 536 (citing In re Rusty Jones, Inc., 134 Bankr. 321, 345 (Bankr. N.D. Ill. 1991) and In re Arlan's Dep't Stores, Inc., 615 F.2d 925, 932 (2d Cir. 1979)).

[79] Id. at 537. Ultimately, Judge Brozman found that, because Leslie Fay was at a critical juncture in its reorganization efforts, "it might not be able to withstand" the delay caused by having to retain new counsel. Therefore, she allowed Weil to remain as counsel to the debtors, but ordered it to pay the $800,000 cost of the examiner's report, as well the expenses the creditors incurred in challenging Weil's impartiality. Id. at 539.

[80] Granite Partners, 219 B.R. 22.

[81] Judge Bernstein also considered the examiner's conclusion that Willkie discharged its investigative duties in a thoroughly professional manner and, in fact, had provided exceptional services which were valuable to the estate. Ultimately, the court held that Willkie was not entitled to any of its fees for investigative services because of the taint caused by its relationships with Merrill, PWC and other broker-dealers – potential targets of the investigation. The court further disallowed 15% of Willkie's fees charged for non-investigative work and ordered it to pay the cost of the examiner's investigation. The court also ordered the Trustee to pay $50,000 to the estate as a sanction for his failure to disclose Willkie's connections. Id. at 41-44.

[82] Section 1107(a) of the Bankruptcy Code gives the debtor in possession the rights and powers of a chapter 11 trustee and also imposes on the debtor in possession most of the obligations of a trustee. 11 U.S.C. § 1107(a).

[83] The Bankruptcy Code defines "person" to include individuals, partnerships and corporations. See 11 U.S.C. § 101(41).

[84] The local rules of this Court require additional disclosures, including ". . . the specific facts showing the reasonableness of the terms and conditions of the employment, including the terms of any retainer, hourly fee, or contingent fee arrangement." LBR 2014-1.

[85] The administrative orders of this Court also require a certification from the professional designated by the applicant with the responsibilities for complying with the Amended Guidelines. Admin. Order M-389 at 1

[86] Rule 9024 sets forth certain exceptions that are not applicable here

[87] Civil Rule 60(c)(1) requires that motions under Civil Rule 60(b) be made within a reasonable period of time and, for subsections (1), (2) and (3), no more than a year after the entry of the judgment or order or the date of the proceeding. Fed. R. Civ. P. 60(c)(1).

[88] IN RE TRIBUNE CO., 476 B.R. 843 (2012), In re TRIBUNE COMPANY, et al.,1 Debtors. No. 08-13141 (KJC). United States Bankruptcy Court, D. Delaware. July 13, 2012.

[89] Declaration of Marti P. Murray in support of the trustee's application for an order pursuant to bankruptcy code section 327(a) and bankruptcy rule 2014 authorizing the employment and retention of Goldin Associates, LLC as special consultant to the trustee *nunc pro tunc* to October 5, 2012 (ECF no. 124)

[90] Heller v. Goldin Restructuring Fund, LP, 590 F. Supp. 2d 603 (S.D.N.Y. 2008) District Court, S.D. New York - "Complaint for federal securities fraud and breach of fiduciary duty"
"Finally, defendants made the experience and integrity of the Fund's "Key Person," Harrison J. Goldin, the former New York City C the lynchpin of their investment solicitation to plaintiff, emphasizing his major role in New York City s financial restructuring in the mid-1970s. Defendants failed to disclose, however, that an investigation report by the Securities and Exchange Commission reportedly said that Goldin, as New York City Comptroller in 1974-5, had knowingly "misled public investors" about the risks of the City's municipal securities and engaged in "deceptive practices" to mask the City's poor financial condition in advance of its near-default in 1975 information that was clearly material to plaintiff's evaluation of Goldin's new investment vehicle, the Fund."

[91] The Ernst & Young Liquidators refused to consider the Soundview funds' offer to pay more than twice that amount to purchase the position. They also refused Soundview's request that they seek Cayman Court approval. In his April 3, 2013 email to Cayman counsel for Soundview and Richcourt funds, Robert McMahon, one of the Ernst & Young Liquidators, declared:

> As it is not necessary, we will not be pursuing court sanction in Cayman of the mediation settlement. Additionally, the settlement you refer to has been agreed to by all members of the liquidation committee of FIA Leveraged Fund (in Official Liquidation) who represent the majority of creditors of the fund. With regard to the settlement amount and settlement agreement, we have authorized the Trustee, Richard Davis to share this with the New York attorneys for Richcourt Holding, Weil, Gotshal.

*In re Soundview Elite, Ltd, et al,* Case No. 13-13098 (REG),SUPPLEMENTAL DIRECT TESTIMONY AFFIDAVIT OF ALPHONSE FLETCHER, JR. ON MOTION'S TO DISMISS CONVERT OR APPOINT A TRUSTEE, December 11, 2013

Email from Robert McMahon to Cherry Bridges, April 3, 2013, "re - Richcourt Holding Inc."

[92] "Finance industry needs clarity on complex investment tools and a corporate culture that avoids scandal, Ernst & Young CEO says in New Orleans" - http://www.nola.com/business/index.ssf/2013/02/ finance_industry_needs_clarity.html

[93] "Conflicts Galore" http://www.bestofneworleans.com/blogofneworleans/archives/2013/11/19/conflicts-galore

[94] The Verified Petition in support of chapter 15 recognition for FIA Leveraged Fund does not state the current ownership of the stakeholders even though it is required by Rule 1007(a)(4). Instead the Ernst & Young Liquidators inserted a reference to 2012 ownership information:

> I certify that the equity ownership of FIA Leveraged Fund (in Liquidation) ("Leveraged") as reported in Leveraged's records is as follows: Leveraged - Estimated capital balances as at 13th April 2012 Provided by the Directors of Leveraged... Note 1 - Names redacted as it is an offence in the Cayman Islands to release investor names without an order of the Cayman Court pursuant to the Confidential Relationships Preservation Law

Similarly, none of the Ernst & Young Liquidators, their counsel, the Louisiana pension funds, their counsel, nor any of the Soundview parties appear to have filed disclosure required by Bankruptcy Rule 2019. Rule 2019 requires "a verified statement setting forth the information specified in subdivision (c) of this rule shall be filed by every group or committee that consists of or represents, and every entity that represents, multiple creditors or equity security holders that are (A) acting in concert to advance their common interests, and (B) not composed entirely of affiliates or insiders of one another."

> Bankruptcy Rule 2019(b)(1); "Represent" or "represents" means to take a position before the court or to solicit votes regarding the confirmation of a plan on behalf of another. [2019(a)(2)]; "Disclosable economic interest" means any claim, interest, pledge, lien, option, participation, derivative instrument, or any other right or derivative right granting the holder an economic interest that is affected by the value, acquisition, or disposition of a claim or interest. [Rule 2019(a)(1)].