Michael Luskin
Lucia T. Chapman
Stephan E. Hornung
LUSKIN, STERN & EISLER LLP
Eleven Times Square
New York, New York 10036
Telephone:  (212) 597-8200
Facsimile:  (212) 974-3205

*Attorneys for the Plan Administrator*
*and Former Chapter 11 Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:                                                          :          Chapter 11
                                                                :
FLETCHER INTERNATIONAL, LTD.,                                   :          Case No. 12-12796 (REG)
                                                                :
                                  Debtor.                       :
                                                                :
-------------------------------------------------------------x

## DECLARATION OF RICHARD J. DAVIS IN SUPPORT OF PLAN ADMINISTRATOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019(A) APPROVING THE SETTLEMENT AGREEMENT BETWEEN FLETCHER INTERNATIONAL, LTD. AND CREDIT SUISSE

I, Richard J. Davis, pursuant to 28 U.S.C. §1746, hereby declare under penalty of

perjury that the following is true to the best of my knowledge, information and belief:

1.       I am the Plan Administrator and former Trustee in this Chapter 11 case.

My appointment as Trustee was approved by Order of the Court dated September 28, 2012, and

the Trustee's Second Amended Plan of Liquidation (the "**Plan**") [Dkt. Nos. 115, 490 Exh. A]

(pursuant to which I became Plan Administrator) was confirmed by Order of the Court dated

March 28, 2014.

2.       I submit this declaration in support of the Plan Administrator's motion

(the "**Motion**") [Dkt. No. 617] for entry of an order pursuant to Bankruptcy Rule 9019(a)

approving the settlement agreement (the "**Settlement Agreement**") between Fletcher

International, Ltd. ("**FILB**") and Credit Suisse Securities (USA) LLC ("**Securities USA**") and its

current and future subsidiaries, parents and affiliates including, without limitation, Credit Suisse

Securities (Europe) Limited ("**Securities Europe**" and, together with the foregoing entities,

"**Credit Suisse**").

        3.      All statements of fact contained herein are based upon my own personal

knowledge and my investigation of the Debtor, including my review of the relevant documents

and the record of prior proceedings in this Chapter 11 case.  If I were called to testify, I could

testify competently to the facts stated herein.

## I.      FLETCHER AND TURNER LACK STANDING TO RAISE THEIR OBJECTIONS

        4.      The only objections to the Settlement Agreement are by Alphonse

Fletcher, Jr. and Stewart Turner, two of the individuals most seriously implicated in the

wrongdoing unearthed during the course of my investigation.  (Objection of Alphonse Fletcher,

Jr. (the "**Fletcher Objection**") [Dkt. No. 631]; Objection of Stewart Turner (the "**Turner**

**Objection**" [Dkt No. 630] and, collectively, the "**Objections.**")  Whatever their claims against

FILB might be – and I have objected to them all – Fletcher's and Turner's claims have been

deeply subordinated behind approximately $120 million in allowed, unsecured claims, and they

stand no chance of recovery.  The Court so ruled with respect to claims by Fletcher (and other

insiders, with the exception of Turner) in the March 28, 2014 Findings of Fact, Conclusions of

Law and Order Confirming the Trustee's Second Amended Plan of Liquidation Pursuant to

Chapter 11 of the Bankruptcy Code ("the "**Confirmation Order**") [Dkt. No. 490] and with

respect to Turner on June 11, 2014, in the Supplemental Opinion and Order on Equitable

Subordination of Stewart Turner and Alphonse Fletcher Claims (the "**Subordination Order**")

[Dkt. No. 558]; neither Fletcher nor Turner appealed from those rulings, and they are final.

5.     The Court subordinated Fletcher's and Turner's claims due to the

intentional frauds they committed both prior to and during the pendency of the FILB Chapter 11

proceedings.  Among other things, they engineered the "April 22 transactions" in order to divert

assets away from FILB's creditors and investors; they transferred $4.1 million of FILB's money

to purchase shares in Fletcher International Partners, Ltd., solely for the undisclosed purpose of

putting this cash into the hands of a top Citco executive; and Turner engineered the transfer of

FILB's shares in Fletcher International Partners, Ltd. in violation of the automatic stay.

(See Subordination Order at 4–18; Confirmation Order ¶¶ 82–83.)

6.     More recently, since the confirmation of FILB's Plan in March, Turner

asserted claims in state court litigation against the Trustee and his professionals in violation of

the Plan releases and injunctions and dropped those claims only under threat of contempt.

(See July 24, 2014 Tr. 19:12–27:8.)  Again, only last month, Fletcher and Turner were involved

in diverting at least $75,000 of the $100,000 that the Bankruptcy Court authorized Soundview

Composite to use for its two lawyers, and instead used $15,000 for their costs bonds in

connection with their personal litigation against FILB challenging the UCBI settlement; the rest

was used to pay themselves, other insiders, and various professionals, all in violation of the

Bankruptcy Court's order.  (See Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.),

Adv. Proc. No. 14-01923 (REG), Sept. 3, 2014 Tr. 49:1–15, 53:1–23; [Dkt. No. 46 ¶¶ 9–19].)[1]

---

[1] The District Court has since vacated both costs bonds and directed that the $15,000 be returned to
Composite.  (See Turner v. Davis (In re Fletcher International, Ltd.), Index No. 14-2836 (S.D.N.Y.)
(WHP) [Dkt. Nos. 52, 57].)

7.      Both Turner and Fletcher have committed repeated, ongoing acts of intentional fraud.  Moreover, their repeated – and rejected – attempts to use this Court as well as the District Court and Court of Appeals to obtain relief to which they clearly are not entitled is no more than vexatious litigation intended to add delay and costs.  They represent nobody but themselves, and cannot speak for other investors or creditors.  Under the confirmed Plan of Liquidation, all investor and creditor interests and claims are under the sole management of the Plan Administrator and the Advisory Board.  (See Plan [Dkt. No. 490 Exh. A] § 7.3.)  Moreover, the Settlement Agreement now before the Court has the support of all major constituencies, amounting to more than 99% of total allowed claims.

## II.     THE SETTLEMENT IS FAIR AND REASONABLE AND SHOULD BE APPROVED

8.      As discussed in the Motion, in determining whether it should approve a settlement, a bankruptcy court considers whether the settlement is "reasonable," "fair and equitable" and "in the best interests of the estate," and whether it "falls below the lowest point in the range of reasonableness."  (Motion ¶¶ 17–18.)  Using that standard, the Settlement Agreement should be approved.  It will provide the estate with much needed cash to fund litigation commenced pursuant to the Plan and to make distributions to creditors in exchange for limited releases, including potential claims relating to Credit Suisse's sale of FILB's shares of ION Geophysical Corporation ("**ION**") that I investigated and determined were of little or no merit and would require litigation in which FILB almost certainly would lose.[2]

---

[2] As discussed in the Motion, had I not reached a settlement with Credit Suisse, Credit Suisse would have kept the cash remaining in the account until it was depleted, and were I to attempt to recover this money without a settlement, Credit Suisse likely would have set off against those funds to pay its legal fees.  (See Motion ¶ 19.)

A.    **The Background of the ION Transaction**

9.    FILB's preferred shares in ION were pledged to Credit Suisse as collateral for FILB's margin account.  (Motion ¶¶ 4–6.  Copies of the relevant contracts are attached as Exhibits A and B.)

10.    Credit Suisse sought to terminate its prime brokerage relationship with FILB in July 2011.  After granting FILB a series of extensions of the termination date of the prime broker relationship, Credit Suisse terminated the relationship based on, among other reasons, the Debtor's failure to deliver 2010 and 2011 audited financial statements, and liquidated the ION shares in June 2012 and used the proceeds to satisfy FILB's outstanding loan obligations.  (Trustee's Report and Disclosure Statement ("**Trustee's Report**") [Dkt. No. 393] at 110–12.)  Approximately $600,000 was left in FILB's margin account.[3]  (Amended Stipulation and Final Order by and between Chapter 11 Trustee and Credit Suisse Securities (USA) LLC (a) Authorizing the Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (b) Governing Return of Assets to the Debtor, (c) Granting Adequate Protection to Credit Suisse Pursuant to 11 U.S.C. §§ 105(a), 361, 362 and 363, and (d) Allowing Setoff by Credit Suisse ("**Cash Collateral Order**") [Dkt. No. 149] ¶ 10.)

11.    Shortly after FILB's Chapter 11 filing, the Debtor's then counsel (Young Conaway Stargatt & Taylor, LLP) began negotiating with Credit Suisse over the use of the $600,000 balance in the margin account.  Credit Suisse argued that it was entitled to retain those funds to secure FILB's indemnification obligations.  FILB wanted the funds to be returned.  Following my appointment, I concluded the negotiations and agreed to a consensual cash collateral order with Credit Suisse.  (See Motion ¶¶ 7–8; Cash Collateral Order.)

---

[3] That balance was further reduced by the payment of Credit Suisse's legal fees, and the remaining cash (the "**Remaining Holdback**") is currently approximately $200,000.

12.     Early in my term as Trustee, I investigated potential claims against Credit Suisse, including potential claims arising out of its liquidation of FILB's ION shares.  I did so, in part, at the behest of Fletcher and Turner.  (Motion ¶¶ 21–22.)

13.     Fletcher and Turner maintained that Credit Suisse liquidated the ION shares for too little money.  (Motion ¶ 21.)  They repeat these same allegations in their current objections to the Motion.  (Turner Objection ¶ 13; Fletcher Objection ¶ 5.)

14.     I investigated the claims and found them to be baseless.  (Motion ¶ 22; Trustee's Report at 111–12.)  Fletcher had asked a third party, Del Mar Asset Management, LP ("**Del Mar**"), about a possible transaction in which Fletcher would sell the ION shares while keeping the "upside " by having a right to repurchase the shares.  (Deposition of Peter Smith, Mar. 27, 2013 ("**Smith Dep.**") 26:4–12; email from Alphonse Fletcher, Jr. to Giacomo LaFata, Jr., Stewart Turner, cc: Peter Smith (June 14, 2012, 16:44).  Copies of the relevant portions of the deposition and the June 14 email are attached as Exhibits C and D.)  Del Mar looked into the possibility of acquiring the shares – going so far as to enter into a non-disclosure agreement with Credit Suisse – but ultimately chose not to submit an offer.  (Smith Dep. Exh. 12; Deposition of Peter Wisniewski, Apr. 11, 2013 ("**Wisniewski Dep.**") 111:9–13.  Copies of the exhibit and relevant portions of the deposition are attached as Exhibits E and F.)  Indeed, the only bid even being considered by Del Mar was for less money than the bid accepted by Credit Suisse.  (See Exh. D.)  Thus there is no evidence that there ever was a "better bid secured by [FILB]," as Fletcher claims.  (Fletcher Objection ¶ 5.)

15.     I also investigated Credit Suisse's sales process – i.e., how Credit Suisse liquidated the ION shares in the margin account.  (Motion ¶ 22; Trustee's Report at 111–12.)  I

obtained documents from Credit Suisse and engaged in other fact-finding through Credit Suisse's

counsel, Milbank.

16.     My conclusions are as follows:

(a)     Credit Suisse conducted a commercially reasonable sale process,

soliciting bids in the open market, and the price obtained – which included a slight

premium over the conversion price (i.e., six months of dividends) – was a better price

than Fletcher Asset Management, Inc. ("**FAM**") ever obtained when it liquidated FILB's

positions in the same stock.  Indeed, FAM has never obtained more than conversion

value when it liquidated shares of the same stock.  (See Trustee's Report at 111–12;

Motion ¶ 23.)

(b)     Credit Suisse also solicited bids from FILB and Fletcher.  Credit Suisse

followed up with Fletcher's suggestion that Del Mar was interested in bidding for the

ION shares.  Indeed, the first contact between Credit Suisse and Del Mar was initiated

by someone at Credit Suisse, who called Del Mar twice to ask if it was interested in

submitting a bid.  (Wisniewski Dep. 46:3–9; 46:13–16; 47:21–48:9.  A copy of the

relevant portions of the deposition is attached as Exhibit G.)  Contrary to Fletcher's

assertion, however, there is no evidence of a better bid – Fletcher's efforts to have Del

Mar buy the ION shares came to naught.  Not only did Del Mar ultimately not submit a

bid, but the only bid even being considered by Del Mar was for less money than the bid

accepted by Credit Suisse.  (See Exh. D.)  And to satisfy Fletcher, any bid by Del Mar

would also have been subject to a completely unrealistic right on the part of FILB to

repurchase the ION shares, even though there was no chance whatsoever that FILB

would have the money to do so.  (Motion ¶ 22.)

(c)    Litigation with Credit Suisse over the propriety of the sale would have been expensive and taken time, and almost certainly would have been unsuccessful. Credit Suisse was entitled under its contract to liquidate the ION shares on the open market. (<u>See</u> Exh. A § 7(a).) It was not obligated to entertain suggestions from its borrower, although it did so here. (<u>Id</u>.) It was not obligated to forbear from liquidating the shares in the hopes of obtaining a higher price sometime in the future. I have therefore concluded that there is no good faith basis to assert claims against Credit Suisse based upon the agreements that are the subject of this Settlement Agreement. But in any event, even if there were colorable claims, as with all litigation, it would take time and money, the outcome would almost certainly be a loss for FILB, and Credit Suisse would further deplete the Remaining Holdback defending any such litigation.

**B.    Fletcher's and Turner's Objections**

17.    What is obvious from Turner's strained effort to explain why Credit Suisse got more of a premium then Fletcher ever did when it liquidated its own ION positions (Turner Objection ¶ 16) is that there are different ways to value the shares in part depending on the motive for the sale. (Turner Objection ¶¶ 17–19.) The fact remains that Credit Suisse neither wanted nor was obligated to hold onto the ION shares and continue to collect quarterly dividends <u>ad</u> <u>infinitum</u>; rather, it desired to liquidate the ION shares as quickly as possible, as it was entitled to do under its contract with FILB. In any event, Credit Suisse tested the market and found no one willing to pay the kind of premiums that Turner claims, without any basis whatsoever, to have been available at the time

18.    The balance of the Objections contains irrelevant speculation or unsupported accusations about how and why I conducted settlement negotiations the way I did. (<u>See</u> Turner Objection ¶¶ 20–24; Fletcher Objection ¶¶ 5–7.) Turner appears to find fault with

the history of my dealings with Credit Suisse and the fact that I did not place a discount on the previous cash balance when calculating my commission, but it is unclear what his point is or how it is conceivably relevant to the Motion.  What is clear is that I concluded, based on my independent investigation, that Credit Suisse acted independently and the negotiations with Credit Suisse were conducted at arm's length.  Fletcher's objections are little more than a reiteration of his disjointed claims contained in his so-called "Conflicts Motion" and "Disgorgement Motion."  [Dkt. Nos. 481, 544.]  These baseless allegations should – again – be stricken.

19.    Moreover, as discussed above, there is no evidence of a better bid.  I concluded that Credit Suisse undertook a reasonable sales process and that the price obtained – which included a slight premium over the conversion price (e.g., six months of dividends) – was a better price than FAM ever obtained when it liquidated FILB's positions in the same stock.  FAM never obtained more than conversion value when it liquidated shares of the same stock.  (See Trustee's Report at 111–12, 179; Motion ¶ 23.)  I have therefore concluded that I have no good faith basis to assert claims against Credit Suisse based upon the agreements that are the subject of this Settlement Agreement.

20.    I believe that the Settlement Agreement is in the best interests of the Debtor's estate, the Debtor's creditors, and all other parties in interest.  Bringing in the amount held in FILB's account at Credit Suisse to the estate will provide funding for potential litigation against third parties.

21.    The major parties-in-interest (the Louisiana Pension Funds, the Massachusetts Bay Transportation Authority Retirement Fund, and the Joint Official Liquidators of FIA Leveraged Fund, Fletcher Income Arbitrage Fund, Ltd., and Fletcher Fixed Income Alpha

Fund, Ltd.), which together account for more than 99% of allowed claims, have all indicated their support for the Settlement Agreement.

22.     Based on all of the above, I believe that the Settlement Agreement far exceeds the lowest point in the range of reasonableness of possible litigation and settlement outcomes, is a proper exercise of my discretion and business judgment, and is in the best interests of the estate.  Accordingly, I request that the Court approve the Settlement Agreement.

I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 10th day of October 2014 in New York, New York.

/s/ Richard Davis
Richard J. Davis

# EXHIBIT A

CREDIT SUISSE

## CUSTOMER AGREEMENT
### Institutional, non-ERISA

In consideration of CREDIT SUISSE SECURITIES (USA) LLC ("CSSU") opening and maintaining for the undersigned (the "Customer") pursuant to the terms of this agreement (the "Customer Agreement" and, together with any and all annexes attached thereto, this "Agreement"), as well as any other agreement as to which Customer is a party, has any obligations or holds any rights (any such agreement, together with the Agreement, "Contracts"), one or more accounts (each, a "Customer Account") in Customer's name for the purpose of transacting business with CSSU on behalf of itself and as agent for any of the current and future subsidiaries, parents, affiliates, or divisions of CSSU, either collectively or individually, as the context requires (each, including CSSU, a "CS Entity" and collectively, the "CS Entities"), Customer agrees as follows:

### 1.  Applicable Rules and Regulations.

All transactions and positions in the Accounts shall be subject to all applicable laws, by-laws, rules, regulations and customs, including without limitation those of all U.S. and non-U.S. federal, state and local governmental authorities, self-regulatory organizations, markets, exchanges and clearing facilities ("Applicable Law").

### 2.  Payment of Indebtedness.

Immediately upon written or oral demand (unless otherwise agreed) by CSSU or any of the CS Entities that (i) maintains any deposit, custody, securities, commodity, or other accounts for Customer, including without limitation any Customer Account (each an "Account") or (ii) is a party to any Contract, Customer shall pay to the relevant CS Entity, in immediately available U.S. funds, any principal balance of, accrued but unpaid interest on, and any other obligation or liability owing in respect of, any Account or Contract, (which, for purposes of this agreement, shall be collectively referred to as "Obligations") including, without limitation:

(a)  all brokerage charges, commissions and service fees at the CS Entity's customary rates or such rates as agreed upon by Customer and the relevant CS Entity from time to time;

(b)  all contract market, exchange or clearinghouse fees or other charges and losses in any Account;

(c)  any advances made by any of the CS Entities to or for the benefit of Customer and any debit balance owing with respect to any Account, and interest and service charges on such debit balance at the rates then charged by the relevant CS Entity;

(d)  any deficiency in any Account;

(e)  any fees, fines, penalties or other charges imposed by any governmental or self-regulatory authority or any court of competent jurisdiction on any Account or transaction executed for Customer by any of the CS Entities;

(f)  any applicable taxes imposed by any taxing authority or interest, penalties and additions, on any of the foregoing ("Taxes"), together with the CS Entities' costs and expenses, including, without limitation, reasonable attorney's fees and expenses, incurred in connection with the enforcement or collection by the CS Entities of its rights or claims against Customer hereunder, under any Contract with any of the CS Entities or otherwise; and

(g)  any and all Obligations or indebtedness, however evidenced, arising at any time and from time to time, whether or not mature or contingent, related to the purchase, sale, or loan of securities or other property, or under or in connection with any and all Contracts, and transactions executed in connection therewith, with any of the CS Entities, including, without limitation, payment and delivery obligations, obligations related to the extension of credit or to pay damages (including costs of cover) and payment of reasonable legal and other expenses

incurred in connection with the enforcement of such Contracts, whether now existing or hereafter arising.

### 3.  Security Interest and Lien.

(a)  Customer hereby grants to the CS Entities a continuing first priority security interest in, a lien on and a right of set-off against all Collateral (as defined herein), and all such Collateral shall be subject to a general lien and a continuing first security interest and fixed charge in favor of the CS Entities, in each case securing the discharge of all Obligations, Contracts with the CS Entities and other liabilities of Customer to the CS Entities, whether now existing or hereafter arising; provided that, Collateral pledged to a CS Entity under any particular Contract shall secure first Customer's Obligations with respect to such Contract, and second, all other Obligations. Each CS Entity acknowledges the foregoing security interest and agrees to make payment under any Contract as instructed by any CS Entity exercising its rights as a secured party. Any Contract with any of the CS Entities is hereby amended to reflect and incorporate Customer's pledge of Collateral hereunder and the foregoing acknowledgement and agreement.

(b)  All Collateral delivered to any of the CS Entities shall be free and clear of all prior liens, claims and encumbrances (other than liens solely in favor of any of the CS Entities), and Customer will not cause or allow any of the Collateral, whether now owned or hereafter acquired, to be or become subject to any liens, security interests, mortgages or encumbrances of any nature (other than liens created solely in the favor of any of the CS Entities). Collateral consisting of securities shall be delivered in good deliverable form (or the CS Entities shall have the unrestricted power to place such securities in good deliverable form) in accordance with the requirements of the primary market or markets for such securities.

(c)  Customer and the CS Entities acknowledge and agree that all Collateral held in or credited from time to time to any Account that is a securities account will be treated as "financial assets" under the Uniform Commercial Code as in effect in the State of New York (the "NYUCC"). Each CS Entity hereby represents and warrants that it is a "securities intermediary" within the meaning of the NYUCC and is acting in such capacity with respect to each and every securities account maintained by it for Customer.  Notwithstanding anything in this Agreement or any Contract to the contrary, each CS Entity hereby agrees to comply with entitlement orders or other instructions originating from any CS Entity that is a secured party under any Contract with respect to any Account, and any financial asset credited to any such Account or other account or any security entitlement in respect thereof, in each case without the consent of Customer, and Customer hereby consents to such agreement.  In addition, Customer hereby consents to any agreement pursuant to which a CS Entity agrees to comply with entitlement orders or other instructions originating from any other CS Entity that is a secured

party under any Contract or with respect to any Obligation with respect to Collateral held in or credited to any Account maintained by such CS Entity for Customer, or otherwise held by such CS Entity, including entering into control or similar agreements. Each of the CS Entities represents and warrants that it has not agreed, and that it will not agree, to comply with entitlement orders or other instructions concerning the Collateral that originate from any person other than (i) Customer or (ii) a CS Entity. If such CS Entity receives notice from any other CS Entity that such CS Entity is exercising exclusive control or to the effect that Customer's rights with respect to the relevant Account have been terminated, then the CS Entity receiving such notice shall no longer comply with entitlement orders or other instructions originating from Customer. Customer shall execute such documents and take such other action as the CS Entities shall reasonably request in order to perfect the CS Entities' rights with respect to any such Collateral and, in the case of an investment property, grant the CS Entities control (within the meaning of the NYUCC) thereof. Customer hereby irrevocably appoints the CS Entities as Customer's true and lawful agent and attorney-in-fact, with full power to act in the name of Customer and on Customer's behalf to sign, seal, execute and deliver all documents, and do all such acts as may be required, to perfect (and, in the case of investment property, grant the CS Entities control thereof) the security interests created hereunder in, or realize upon all rights in, the Collateral.

(d) The security interest, lien, and right of set-off granted herein shall (i) remain in full force and effect until the payment and performance in full by Customer of all of its Obligations and termination of this Agreement by the parties, (ii) be binding upon Customer, its successors and permitted assigns, and (iii) inure to the benefit of, and be enforceable by, the CS Entities and their respective successors, transferees and assigns.

(e) For purposes of this Agreement, the term "Collateral" shall mean (i) each deposit, custody, security, commodity or other account maintained by Customer with any of the CS Entities, including, but not limited to any and all Accounts; (ii) any cash, securities, financial assets, security entitlements, commodities, commodities contracts, general intangibles and other property which may from time to time be deposited, credited, held or carried in any such Account, or that is delivered to or in the possession of any of the CS Entities or any of the CS Entities' agents for any purpose, including safekeeping; (iii) all of Customer's rights, title or interest in, to or under any Contract with any of the CS Entities, including obligations owed by any CS Entity; (iv) all of Customer's security interests (or similar interests) in any property of any CS Entity securing any CS Entity's obligations to Customer under any Contract; (v) any property of Customer in which any of the CS Entities is granted a security interest under any Contract or otherwise (howsoever held); (vi) all income and profits on any of the foregoing, all dividends, interest and other payments and distributions with respect to any of the foregoing, all other rights and privileges appurtenant to any of the foregoing, including any voting rights and any redemption rights, and any substitutions for any of the foregoing; and (vii) all proceeds of any of the foregoing, in each case whether now existing or owned by Customer or hereafter arising or acquired.

4. **Rehypothecation, Maintenance of Collateral.**

(a) Any amount of Collateral may, from time to time and without notice to Customer, be carried in any CS Entity's general account to be held and re-registered in any CS Entity's own name or in another name other than Customer's and may be pledged,

re-pledged, hypothecated or re-hypothecated, sold, lent, or otherwise transferred or used (in the case of cash Collateral, used or invested for its own risk and reward), separately or together with other amounts of Collateral, with all attendant rights of ownership (including the right to vote the securities), for the sum due to any of the CS Entities thereon or for a greater sum and for a period of time equal to, longer or shorter than the Obligations or Contracts with respect to which such Collateral was pledged, and without the CS Entities retaining in their possession and control for delivery a like amount or similar Collateral. For the avoidance of doubt, Customer hereby grants CSSU its consent to rehypothecate its securities for purposes of Rule 15c2-1(a)(1) of the Securities Exchange Act of 1934. For the purposes of the return of any Collateral to Customer, the CS Entities' return obligations shall be satisfied by delivering securities of the same issuer, class and quantity as the Collateral initially transferred.

(b) Customer and the CS Entities each acknowledge and agree that each CS Entity which holds Collateral does so both for itself and also as an agent and bailee for all other CS Entities which may be secured parties under any Contract or with respect to any Obligation. Customer agrees and acknowledges that the CS Entities, at any time and from time to time at any of the CS Entity's discretion and without prior notice to Customer, may use, apply or transfer any and all Collateral interchangeably between CS Entities in any accounts in which Customer has an interest. With respect to Collateral pledged principally to secure Obligations under any Contract with any CS Entity, the CS Entity shall have the right, but in no event the obligation, to apply all or any portion of such Collateral to Customer's Obligations to any of the CS Entities under any other Contract, to transfer all or any portion of such Collateral to secure Customer's Obligations to any of the CS Entities under any other Contract or to release any such Collateral. Nothing in this Agreement providing for a security interest in Collateral pledged in connection with a particular Contract with any CS Entity or Obligation shall affect any calculation of margin or right of any CS Entity to require additional margin or other Collateral to secure any other Contract with or Obligation to any CS Entity.

5. **Margin Accounts.**

(a) Upon written or oral demand by CSSU from time to time in its sole discretion, Customer shall transfer immediately to CSSU such funds, securities, commodities or other property ("Margin") as is required by Applicable Law and such greater amounts as the CS Entities may require from time to time and in their sole discretion in connection with any Contract with any CS Entities and Obligations or potential Obligations of Customer to any of the CS Entities.

(b) Any outstanding debit balance(s) in Customer Account(s) shall accrue interest, in accordance with CSSU's Credit Policy or amendments thereto. Any such interest unpaid at the end of a charge period (such period being determined by CSSU from time to time in its sole discretion) will be added automatically to the opening balance in such Customer Account(s) for the next charge period.

6. **Events of Default.**
The following events shall each constitute an "**Event of Default**":

(a) Customer fails to make any payment or delivery as and when due or otherwise fails to fulfill or discharge any Obligations as required in Paragraph 2 hereof;

2

(b)   Customer fails to provide margin to CSSU as and when required in Paragraph 5 hereof or to perform any other Obligations as and when required;

(c)   any representation or warranty made by Customer under this Agreement or any Contract with any of the CS Entities shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, or CSSU believes that the representations and warranties contained in Paragraph 10(a)(x) hereof are likely to be untrue or Customer has failed to provide notice as required under Paragraph 10(b) hereof;

(d)   Customer fails to give adequate assurances of due performance, as set forth in this Agreement, which shall constitute a material and additional breach, repudiation, misrepresentation or default (howsoever characterized) under the terms of all Contracts with any of the CS Entities, or Customer states that it will not perform any of the Obligations;

(e)   any material breach, repudiation, misrepresentation or the occurrence of a default, termination event or similar condition (howsoever characterized which, for the avoidance of doubt, includes the occurrence of an Additional Termination Event under any ISDA Master Agreement) by Customer or any of its affiliates under any Contract now or hereafter entered into; or

(f)   Customer (i) applies for, consents to or is the subject of an application or petition for the appointment of or the taking of possession by a receiver, custodian, trustee, liquidator or similar person of itself or of all or a substantial part of its property, (ii) files or is the subject of the filing or entry of a petition or order for relief under the United States Bankruptcy Code, Title 11 of the United States Code, or any similar law of any jurisdiction regarding reorganization, liquidation, dissolution, insolvency, or relief of debtors or of an application for a protective decree under the Securities Investor Protection Act of 1970, (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors, (iv) has a secured party take possession of any property or account of Customer or has a distress, execution, attachment, sequestration or similar legal process commenced with respect to any property or account of Customer, or (v) admits in writing its inability, or becomes unable, to pay its debts generally as such debts become due.

**7.   Rights and Remedies.**

(a)   Upon the occurrence of any Event of Default, any of the CS Entities may, in their sole discretion and without notice to Customer, terminate, liquidate and accelerate any and all Contracts and exercise any right under any security relating to any Contract and any right to net or set off payments which may arise under any Contract or other agreement with any CS Entities or under Applicable Law, cancel any outstanding orders for the purchase or sale or borrowing or lending of any securities or other property, or sell any or all of the Collateral (either individually or jointly with others), or buy in any securities, commodities or other property of which any Account may be short. To the extent permitted by Applicable Law, such sale, purchase or cancellation may be made on the exchange or other market where such business is then usually transacted, or at public auction or at private sale, without advertising the same and without any notice of the time or place of sale to Customer or to the personal representatives of Customer, and without prior tender, demand or call of any kind upon Customer or upon the personal representatives of Customer, all of which are expressly waived. The CS Entities shall have the right to convert sale proceeds into U.S. dollars to the extent such proceeds are denominated in another currency. To the extent permitted by Applicable Law, the

CS Entities may purchase or sell the property to or from itself or third parties in whole or in any part thereof free from any right of redemption, and Customer shall remain liable for any deficiency. A prior tender, demand or call of any kind from the CS Entities, or prior notice from the CS Entities, of the time and place of such sale or purchase shall not be considered a waiver of the CS Entities' right to sell or buy any Collateral at any time as provided herein.  In addition to the rights provided herein upon the occurrence of any Event of Default, each CS Entity may exercise all the rights of a secured party under any applicable law and under the NYUCC (whether or not in effect in the jurisdiction in which such rights are exercised) with respect to any Collateral.

(b)   Customer shall remain liable for any deficiencies in its Accounts or in respect of any Contract with any CS Entities or Obligation, including any loss or expense incurred in connection with the exercise of remedies under this Agreement following the termination of this Agreement or the exercise of any other remedies by the CS Entities.

**8.   Adequate Assurances.**

If at any time any of the CS Entities has reasonable grounds for insecurity with respect to Customer's performance of any Contract or its Obligations, any of the CS Entities may demand, and Customer shall give, adequate assurances of due performance by Customer within 24 hours, or within any reasonable shorter period of time the CS Entities demand. The adequate assurance of performance may include, but shall not be limited to, the delivery by Customer to the CS Entities of additional Margin. Any failure by Customer to give such adequate assurance of due performance shall constitute an independent, material default under this Agreement.

**9.   Netting and Set Off Rights.**

Without limiting the rights and remedies of the CS Entities hereunder, the CS Entities shall have the right and Customer agrees that the CS Entities shall have the right, at any time and from time to time, to set off and otherwise apply any and all obligations of any of the CS Entities to Customer (whether mature or unmature, fixed or contingent, liquidated or unliquidated) against any and all Obligations of Customer to any of the CS Entities then due (whether at maturity, upon acceleration or termination or otherwise) and to foreclose on any Collateral for the purpose of satisfying any and all Obligations. Customer agrees that the fulfillment of the obligations of any of the CS Entities to Customer under any Contract is subject to there being no breach, repudiation, misrepresentation or default (however characterized) by Customer which has occurred and is continuing under any Contract with any CS Entity.

**10.   Representations and Warranties.**

(a)   Customer represents and warrants as of the date hereof, which representation and warranties shall be deemed repeated on each date on which a transaction is effected for Customer's Account(s) or a Contract with any CS Entity is executed, that:

(i)   Customer is duly organized and validly existing under the laws of the jurisdiction of its organization;

(ii)   Customer has full power and authority to execute and deliver this Agreement (including any annex hereto) and each Contract and to perform and observe the provisions hereof and thereof and to enter into each transaction contemplated by this Agreement (including any annex hereto), and this Agreement does and the Contracts do or will constitute valid and binding agreements of Customer, enforceable in accordance with their

3

#160540v1

terms, subject to applicable bankruptcy and similar laws affecting creditors' rights and general principles of equity;

(iii) the execution, delivery and performance by Customer of this Agreement (including any annex hereto), the consummation of the Contracts, the fulfillment of the Obligations and any transaction hereunder do not and will not result in a breach or violation of any Applicable Law or order or award binding on Customer or its property, or Customer's organizational documents, or any contract or other instrument binding on or affecting Customer or any of its property;

(iv) the person signing this Agreement (including any annex hereto) on behalf of Customer is duly authorized to do so on its behalf (and on behalf of any such disclosed principal, all information contained on the signature page hereof is true and correct);

(v) no consent of any person and no authorization or other action by, and no notice to, or filing with, any governmental authority or any other person is required that has not already been obtained (i) for the due execution, delivery and performance by Customer of this Agreement or for the consummation of the Contracts and the fulfillment of the Obligations; (ii) for the pledge by Customer of the Collateral or the perfection or maintenance of the first priority security interest created hereby; or (iii) for the exercise by any of the CS Entities of the rights or remedies provided for in this Agreement, including rights and remedies in respect of the Collateral;

(vi) no person, other than Customer or any CS Entity, has an interest in the Customer Account or any Accounts or any Collateral or other assets or property held therein or credited thereto;

(vii) Customer is the lawful owner of all Collateral, free and clear of all liens, claims, encumbrances and transfer restrictions, other than as are created under this Agreement and other liens solely in favor of one or more CS Entities, and Customer will not cause or allow any of the Collateral, whether now owned or thereafter acquired, to be or become subject to any liens, security interests, mortgages or encumbrances of any nature other than those solely in favor of the CS Entities;

(viii) Customer's financial statements or similar documents previously or hereafter provided to the CS Entities do or will fairly present the financial condition of Customer as of the date of such financial statements and the results of its operations for the period for which such financial statements are applicable, have been prepared in accordance with U.S. generally accepted accounting principles and, if audited, have been certified without reservation by a firm of independent public accountants, and since the date of its most recent audited or unaudited financial statements furnished to CSSU prior to the date hereof, there has been no material adverse change in the business, financial conditions, operations or prospects of Customer, and, if at any time since the date of its most recent audited financial statements delivered prior to the date hereof, there occurs a material adverse change in Customer's business, financial condition or results of operations, Customer agrees that it will inform CSSU of such material adverse change promptly in writing;

(ix) no litigation, arbitration or administrative proceeding or claim is in progress, pending or, to Customer's knowledge, threatened which could by itself or together with any other proceedings or claims affect the legality, validity or enforceability of this Agreement or affect Customer's ability to perform the Obligations under this Agreement;

(x) at all times during the existence of an Account, such Account shall not contain (i) plan assets subject to the provisions of Title I, Subtitle B, Part 4 of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA") or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), (ii) assets of a governmental plan or other plan subject to restrictions similar or analogous to those contained in the foregoing provisions of ERISA or the Code or (iii) assets subject to restrictions that would otherwise be violated by the transactions and investments conducted by Customer in such Account; and

(xi) unless Customer otherwise informs CSSU in writing, Customer is not an affiliate (as defined in Rule 144(a)(1) of the Securities Act of 1933) of the issuer of any security held in the Account(s) or the securities that are the subject of any transaction.

(b) Customer shall provide 45 days prior written notice to CSSU if any of the representations and warranties contained in Paragraph 10(a)(x) hereof becomes incorrect at any time. Customer agrees that it shall cease executing contracts of any kind in the Account(s) in the event Customer's assets include assets described in Paragraph 10(a)(x) hereof.

**11. Long and Short Sales.**

Customer agrees to comply with all of the Applicable Law relating to short sales, including but not limited to the requirement that no short sale may be effected through CSSU or an executing broker unless Customer has first determined, either with CSSU or a third party, that the securities are available for delivery. Pursuant to Applicable Law, Customer hereby undertakes and agrees to designate all sell orders as "long", "short", or "short exempt", or as otherwise required by Applicable Law, and that the designation by Customer of an order as a "long" sell order shall be a certification by Customer that the security ordered to be sold is owned by Customer and that unless the security to be delivered pursuant to the sale is carried in the account for which the sale is to be effected, it will deliver such security in good deliverable form to CSSU on or before the settlement date for such sale. If there is carried in the account for which the sale is to be effected a security which can be delivered in satisfaction of the sale, the CS Entities are authorized and directed to deliver such security from such account.

**12. Completion of Customer Transaction.**

If Customer is required, and fails, on a settlement date to make delivery of any securities, instruments, commodities or other property in connection with contracts executed or cleared by any CS Entity on Customer's behalf, the CS Entity is authorized, but not obligated, to borrow or purchase any necessary securities, instruments, commodities or other property and to complete such delivery on Customer's behalf with such securities, instruments, commodities or other property, and Customer shall indemnify the CS Entity for any and all losses suffered or expenses or liabilities incurred by or on behalf of the CS Entity in connection with such failure by Customer, whether or not the CS Entity borrows or purchases such securities, instruments, commodities or other property and completes such delivery on Customer's behalf.

**13. Indemnification.**

Customer hereby releases and shall indemnify and hold harmless the CS Entities, their officers, directors, employees, agents and affiliated persons for any loss, claim, damage or expense (including reasonable attorneys' fees and expenses, reasonable accountants' fees and expenses, special, direct and consequential damages, fines and penalties) when and as incurred by, or asserted against, any of the CS Entities and such persons arising out of or in connection with this Agreement or any

4

Contract or pursuant to authorized instructions received by the CS Entities from Customer or its agent, and to fully reimburse the CS Entities and such persons for any reasonable legal or other fees and expenses, including the cost of any investigation and preparation, when and as incurred by them in connection with any claim, action, proceeding or activities of the CS Entities and such persons in connection with this Agreement or any Contract.

### 14. Limitation of Liability.

(a) None of the CS Entities, nor any of their respective officers, directors, employees, agents or counsel, shall be liable, except for their own gross negligence or willful misconduct, and no such party shall be liable for any error of judgment made by it in good faith for any action taken or omitted to be taken by any of them hereunder or in connection herewith.

(b) The CS Entities shall not be held liable for any acts, omissions or defaults of any subcustodian (other than another CS Entity) or other third party (including any executing broker or other agents, if applicable), subject to U.S. bank regulatory limitations applicable to U.S. bank offices of any of the CS Entities. All transactions effected with a third party (including an executing broker) for Customer shall be for the account of Customer and the CS Entities shall have no responsibility to Customer or such third party with respect thereto. Customer agrees that it is responsible, and liable to the relevant CS Entity, for all costs, losses and fees arising out of the settlement of Customer's orders with an executing broker selected by Customer (including, without limitation, the insolvency of any such party or the failure of any such party to fulfill its settlement obligations to such CS Entity.

(c) In no event shall the CS Entities be held liable (i) for indirect, consequential, punitive, or multiple damages or (ii) for any loss of any kind caused, directly or indirectly, by government restrictions, exchange or market rulings, suspension of trading, war (whether declared or undeclared), terrorist acts, insurrection, riots, fires, flooding, strikes, failure of utility services, accidents, adverse weather or other events of nature, or other conditions beyond the CS Entities' control. In the event that any communications network, data processing system, or computer system used by any of the CS Entities or Customer is rendered wholly or partially inoperable, the CS Entities will not be liable to Customer for any loss, liability, claim, damage or expense resulting, either directly or indirectly, therefrom.

### 15. Reliance on Authorized Instructions.

Customer agrees that the CS Entities may rely upon any authorized instructions or any notice, request, waiver, consent, receipt or other document which the CS Entities reasonably believe to be genuine and transmitted by authorized persons of Customer. The CS Entities shall be entitled to rely upon the identity and authority of the authorized persons designated pursuant to this Agreement until it receives an authorized instruction from Customer to the contrary.

### 16. Taxes.

Each payment by Customer and all deliveries of Collateral under this Agreement shall (except as required by law) be made, and the value of any Collateral shall be calculated, without withholding or deducting any Taxes. If any Taxes are required to be withheld or deducted, Customer shall pay such additional amounts as necessary to ensure that the actual net amount received by the CS Entities is equal to the amount that the CS Entities would have received had not such withholding or deduction been required. Customer will provide the CS Entities

with any forms or documentation reasonably requested by the CS Entities in order to reduce or eliminate withholding tax on payments made to Customer with respect to this Agreement. The CS Entities are hereby authorized to withhold Taxes from any payment made hereunder and remit such Taxes to the relevant taxing authorities to the extent required by law. Customer will also be responsible for making any claims in relation to Taxes, whether for exemption from withholding taxes or otherwise, for filing all tax returns and for providing any relevant taxing authorities with all required information in respect of any payments by the CS Entities to Customer or any monies which the CS Entities hold on Customer's behalf.

### 17. Agents.

The CS Entities may execute any of their duties and exercise their rights hereunder by or through agents (which may include affiliates) or employees. In selecting and appointing agents, the CS Entities shall use reasonable care to ensure that they appoint only reportedly competent persons or entities.

### 18. Financial Information.

Customer will promptly furnish to the relevant CS Entity upon request relevant financial statements or similar documents and any other information as may be reasonably requested.

### 19. CS Entities are not Providing Advice; Not Fiduciaries.

Customer represents and warrants that it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms and conditions set forth in this Agreement and any transaction or Contract it may undertake with the CS Entities. It is also capable of undertaking the obligations set forth in this Agreement. With respect to this Agreement or any transaction it may undertake with the CS Entities, Customer acknowledges that none of the CS Entities or their respective agents or affiliates is acting as a fiduciary for or an adviser to Customer; Customer understands that the CS Entities are not acting as investment advisers or soliciting orders, that the CS Entities are not performing any analysis, or making any judgment on any matters pertaining to the suitability of any order, or offer any opinion, judgment or other type of information pertaining to the nature, value, potential or suitability of any particular investment.

### 20. Successors and Assigns.

The CS Entities may assign their rights hereunder or any interest herein to any affiliate and otherwise on thirty days prior written notice to an unaffiliated entity. Customer may not assign its rights hereunder or any interest herein or under any other Contract with any of the CS Entities without the prior written consent of the respective CS Entity or Entities. Any attempted assignment by Customer in violation of this Agreement shall be null, void and without effect.

### 21. Modification and Termination.

Customer agrees that CSSU may modify the terms of this Agreement at any time upon thirty days prior written notice. If the modifications are unacceptable, Customer agrees to notify CSSU in writing within ten days of the transmittal of such written notice to Customer. CSSU may then terminate the Customer Account(s), after which Customer agrees to remain liable to the CS Entities for all existing liabilities or Obligations without giving effect to any such modifications. Customer further agrees that all transactions and Contracts entered into after such notification shall be subject to the modifications. Under no

5

circumstances may a modification be made by Customer without CSSU's written consent. Either CSSU or Customer may terminate this Agreement upon delivery of written notice to the other party, provided that Sections 3, 4, 9, 12, 13, 14 and 25 shall survive any such termination.

## 22. Single Agreement.

CSSU and Customer acknowledge that they have entered into this Agreement and will enter into transactions under this Agreement in consideration of and in reliance upon the understanding that all such transactions constitute a single business and contractual relationship and have been made in consideration of each other. Customer agrees that any Event of Default hereunder shall constitute a default in all of Customer's Obligations to the CS Entities under all Contracts with such CS Entities.

## 23. Severability.

If any provision of this Agreement is or becomes inconsistent with any applicable present or future law, rule or regulation, that provision will be deemed modified or, if necessary, rescinded in order to comply with the relevant law, rule or regulation. All other provisions of this Agreement will continue and remain in full force and effect. To the extent that this Agreement is not enforceable as to any Contract, this Agreement shall remain in full force and effect and be enforceable in accordance with its terms as to all other Contracts.

## 24. Governing Law.

(a)    This Agreement (including any annexes to this Agreement), its enforcement, and any dispute between the CS Entities and Customer hereunder, whether arising out of or relating to a Customer Account or otherwise (including, without limitation, the establishment and maintenance of the Accounts and all interests, duties and obligations related thereto), shall be governed by and construed in accordance with the laws of the State of New York including but not limited to the NYUCC and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(b)    The parties hereto further agree that, in respect of any Account, the law applicable to all the issues specified in Article 2(1) of the "Hague Convention on the Law Applicable to Certain Rights in Respect of Securities Held with an Intermediary (Hague Securities Convention)" is the law in force in the State of New York and agree that none of them has or will enter into any agreement to the contrary.

## 25. Litigation in Court; Sovereign Immunity; Service.

(a)    Unless the parties otherwise agree in writing when any dispute arises, any litigation must be instituted in the United States District Court for the Southern District of New York or the Supreme Court of the State of New York for the County of New York. Each party hereby irrevocably waives, to the fullest extent permitted by Applicable Law, any objection, including, any objection to the laying of venue or based on the grounds of forum non conveniens, which it may now or hereafter have to the bringing of any such action or proceeding in such courts. Each party hereby agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Each party waives, to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement.

(c)    Each party hereto, to the fullest extent permitted by Applicable Law, irrevocably waives with respect to itself and its revenues and assets (irrespective of their use or intended use) all immunity on the grounds of sovereignty or similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance, or recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any actions or proceedings in such courts, and irrevocably agrees that it will not claim such immunity in any such actions or proceedings.

(d)    Customer hereby consents to process being served by any CS Entity on Customer in any suit, action or proceeding of the nature specified in this paragraph by the mailing of a copy thereof by registered or certified mail, postage pre-paid, to Customer at the address set forth after Customer's signature below; such service shall be deemed completed and effective as from 30 days after such mailing. Nothing contained herein shall affect the right to serve process in any other manner permitted by law.

## 26. Notices and Communications.

All notices and other communications provided hereunder shall be in writing and either posted onto the Internet in a form agreed to by the parties or mailed, electronically mailed, faxed, or delivered to the address of the intended recipient specified on the signature page or to such other address as such intended recipient may provide. All communications sent to Customer, whether through the Internet, or by mail, fax, messenger or otherwise, shall be deemed given to Customer as of the date sent, whether actually received or not, and Customer agrees to waive all claims resulting from failure to receive such communication. Any notice and other communication to CSSU provided under this Agreement shall be addressed to the manager of the CSSU department or office handling the Account(s). Any reports of CSSU's execution of Customer's orders and statements of Account(s) issued by CSSU shall be deemed to have been accepted by and shall be binding upon Customer if not objected to by Customer in writing within ten days after delivery thereof by CSSU to Customer by mail or otherwise.

## 27. Miscellaneous.

(a)    Each party to this Agreement acknowledges and agrees to the tape recording of conversations between the parties to this Agreement whether by one or other or both of the parties and each party hereby consents to such recordings being used as evidence in any proceedings.

(b)    Customer does not wish to have certain information pertaining to its beneficial ownership disclosed to a "registrant" (as such term is defined in Rule 14b-1 of the Securities Exchange Act of 1934) pursuant to SEC Rule 14b-1. Customer objects to disclosure for the purposes of Rule 14b-1(b)(1)(ii).

(c)    No demand, call or notice that any of the CS Entities may have made in the past in any one or more instance shall be considered a waiver of such CS Entity's or CS Entities' right to act in the future without demand, call or notice. No failure or delay in exercising any right, or any partial exercise of a right will operate as a waiver of the full exercise of that right. The rights provided in this Agreement are cumulative and not exclusive of any rights provided by Applicable Law.

(d)    The CS Entities shall have the right to convert currencies in connection with the effecting of transactions and the exercise of any of their rights and remedies hereunder in such

6

manner as any of them may determine, in its sole discretion, to be commercially reasonable.

(e) Customer acknowledges receipt of the CSSU Statement of Credit Policy, the terms of which are incorporated herein by reference.

(f) The parties hereto acknowledge that this Agreement is a "securities contract" within the meaning of the United States Bankruptcy Code (Title 11 U.S.C., Section 741(7)) ("Bankruptcy Code").

(g) This Agreement is hereby incorporated into each Contract with any of the CS Entities that is a "swap agreement" under the Bankruptcy Code and any transfer hereunder shall be a transfer "under" and "in connection with" each such Contract.

(h) This Agreement and any annex hereto may be executed by the parties hereto in any number of counterparts, each of which when so executed and delivered will be an original, but all of which counterparts will together constitute one and the same instrument.

(i) This Agreement supersedes all prior agreements as to matters within its scope. To the extent this Agreement contains any provision which is inconsistent with provisions in any other Contract or agreement between Customer and any of the CS Entities, or of which Customer is a beneficiary, the provisions of this Agreement shall control except if such other Contract or agreement explicitly states that it is intended to supersede this Agreement in which case such other Contract or agreement shall prevail.

(j) For purposes of any annex hereto, "Business Day" means any day other than a Saturday, Sunday or other day on which the New York Stock Exchange is closed. All references to time herein are to time in New York City.

[The remainder of this page is blank.]

7

Before signing, Customer acknowledges having read this Agreement and the Credit Suisse Securities (USA) LLC Statement of Credit Policy in their entirety and hereby consents and agrees to all the terms and conditions of these documents.

**BY SIGNING THIS AGREEMENT CUSTOMER AGREES THAT ANY SECURITIES HELD ON MARGIN MAY BE LOANED TO CREDIT SUISSE SECURITIES (USA) LLC OR LOANED OUT TO OTHERS.**

CUSTOMER ACKNOWLEDGES THAT IT HAS RECEIVED A COPY OF THIS AGREEMENT.

**Customer:**

Fletcher International, Ltd.     BY ITS DULY AUTHORIZED INVESTMENT ADVISOR, FLETCHER ASSET MANAGEMENT, INC.
_Name of Institution/Individual_

_Jurisdiction of organization_

_Type of organization_

_Place of Business / Chief Executive Office_

_Organizational Identification Number_     Peter Zayfert                    Davis J. Kiely
_Name of Authorized Officer_     Executive Vice President         DIRECTOR
_Title of Authorized Officer_

_Signature of Authorized Officer/Individual_

_Date_     7/10/06                         7/7/06

**Customer's Address for Notices and Other Communications:**

c/o Fletcher Asset Management, Inc.
_Name_
48 Wall Street, 5th Floor
_Street Address_
New York, NY 10005
_City, State, Zip Code_
Peter Zayfert (PMZ), Patrick Huvane (PBH), Jack LaFata (JL)
_Attention_
PMZ: 212-284-4760, PBH: 212-284-4778, JL: 212-284-4760
_Telephone_
212-284-4801
_Fax_
pmz@fletcher.com, pbh@fletcher.com, jl@fletcher.com
_Email_

**Accepted and agreed to:**

CREDIT SUISSE SECURITIES (USA) LLC , on behalf of itself and as agent for the CS Entities

By: _____
       Vittorio Sclafoja
       Vice President

8

#160540v1

**STATEMENT OF CREDIT POLICY\***

This is to advise you of the terms and conditions under which interest will be charged with respect to accounts you maintain with **CREDIT SUISSE SECURITIES (USA) LLC ("CSSU")** from time to time.

Regulation T of the Board of Governors of the Federal Reserve System prohibits a broker-dealer from extending credit to a customer who maintains only a Special Cash Account. Should you establish a Margin Account, a broker-dealer is permitted to extend credit to you for the purpose of enabling you to purchase, sell, carry or otherwise trade in securities which the Federal Reserve Board has designated as "margin" securities.

1. **Method of Determining the Debit Balance.**

If you have established a Margin Account with CSSU, you may purchase securities on margin and may sell securities you do not own (you may also sell short against the "Box"), contingent upon your prompt deposit of sufficient cash and/or eligible securities to enable you and CSSU to comply with the margin requirements of the Federal Reserve Board, the New York Stock Exchange, Inc. and other securities regulatory or self-regulatory body having jurisdiction. The difference between the aggregate transaction price and the amount you are required to deposit represents your debit balance. Credit is extended to you by CSSU to the extent that it must pay the party from whom you have purchased securities, the difference between the aggregate purchase price and the amount you have deposited or, alternatively, the amount CSSU must pay in those instances when CSSU is required to borrow securities to effect delivery to the purchaser in a transaction where you have sold such securities short (or short against the "Box").

2. **Conditions Under Which an Interest Charge Will be Imposed.**

Interest will be charged on the debit balance in your Margin Account commencing on the settlement date of the transaction creating such debit until the balance is paid in full in available funds. Additional purchases on margin, withdrawals of cash from your account (if permissible under Regulation T) or an increase in the market value of a security sold (or sold short against the "Box") may create or add to your debit balance as may interest charged on your account and any other charge which may be assessed to your account.

3. **Annual Rate of Interest.**

An annual interest rate will be imposed on the debit balance in your account at a level no more than 2% above the prevailing broker's call money rate as determined by CSSU. This rate is subject to change without notice. In the event of any default, CSSU may charge interest as a rate fixed by it not greater than three times the prevailing broker's call money rate which shall not exceed the highest rate permitted by the laws of the State of New York.

4. **Method of Computing Interest.**

Interest is calculated by CSSU on a daily basis employing a 360 day year. Starting with the balance as of the close of the previous interest period, for each day of the new period, CSSU calculates your new debit or credit balance from the previous day's closing balance taking into consideration both debits and credits which occurred that day. To compute interest, the resulting daily balance, if a debit, is multiplied by 1/360th times the daily interest rate. The charge shown on the monthly statements furnished to you from the first to the last calendar day of the previous month and will be posted on the first business day of the current month. CSSU reserves the right to waive interest charges under one dollar. For interest computation purposes, CSSU does not combine the balance in any Special Memorandum Account with the balance in any other account carried by it.

For monthly statement display purposes only, an average daily debit balance and an average interest rate is calculated by taking the day's balance if a debit and the interest rate that day which become components in the sums which equal the totals of all the resulting daily debit balances and interest rates for the period. These sums are divided by the number of calendar days to arrive at the average daily debit balance and interest rate for that interest period. For each interest period shown on your monthly statement, this monthly average balance and

9

this monthly average interest rate and the number of calendar days for which a debit balance existed within an interest period are identified on your statement.

**5.    Credit for Balances in Cash Accounts.**

For interest computations, CSSU combines balances in all your account types at CSSU, other than those arising as a result of short sales in a Margin Account and sales of securities not on deposit in your Special Cash Account. This means any debit balance or available credit balance in such accounts will increase or decrease the average daily debit balance on which interest is computed as if there was just one combined account.

**6.    Other Charges.**

In the case of the prepayment of the proceeds of a sale, interest (calculated as set forth above) is charged to the settlement date and is deducted from the prepayment disbursement. Cash Accounts may be subject, at CSSU's discretion, to interest on any debit balances resulting from failure to make payment in full when due for securities purchased, from failure to timely deliver securities sold, from proceeds of sales paid prior to settlement date or from other charges which may be made to such account.

**7.    Lien Retained by CSSU.**

In connection with its extension of credit to you, CSSU, as pledgee, retains a lien in accordance with paragraph 3 of CSSU'S Customer Agreement.

Any questions regarding CSSU's credit policy may be directed to your registered representative who will be pleased to provide further information.

*CREDIT SUISSE SECURITIES (USA) LLC, A REGISTERED BROKER-DEALER, IS REQUIRED TO DISCLOSE ITS CLIENT POLICY TO EACH CUSTOMER AT THE TIME THE CUSTOMER OPENS A MARGIN ACCOUNT IN ACCORDANCE WITH THE PROVISIONS OF RULE 10b-16 UNDER THE SECURITIES EXCHANGE ACT OF 1934

#160540v1

**Margin Disclosure Statement**

Credit Suisse Securities (USA) LLC ("CS") is furnishing this document to you to provide some basic facts about purchasing securities on margin, and to alert you to the risks involved with trading securities in a margin account. Before trading stocks in a margin account, you should carefully review the CS Customer Agreement, which includes a section applicable to margin accounts. Consult your registered representative at CS regarding any questions or concerns you may have with your margin accounts.

When you purchase securities, you may pay for the securities in full or you may borrow part of the purchase price from CS. If you choose to borrow funds from CS, you will open a margin account with CS. The securities purchased are CS's collateral for the loan to you. If the securities in your account decline in value, so does the value of the collateral supporting your loan, and, as a result, CS can take action, such as issue a margin call and/or sell securities or other assets in any of your accounts held with CS and its affiliates, in order to maintain the required equity in the account.

It is important that you fully understand the risks involved in trading securities on margin. These risks include, without limitation, the following:

\* **You can lose more funds than you deposit in the margin account.** A decline in the value of securities that are purchased on margin may require you to provide additional funds to CS to avoid the forced sale of those securities or other securities or assets in your account(s).

\* **CS can force the sale of securities or other assets in your account(s).** If the equity in your account(s) falls below the maintenance margin requirements or CS's higher "house" requirements, CS can sell the securities or other assets in any of your accounts held at CS and its affiliates to cover the margin deficiency. You also will be responsible for any short fall in the account after such a sale.

\* **CS can sell your securities or other assets without contacting you.** Some investors mistakenly believe that a firm must contact them for a margin call to be valid, and that the firm cannot liquidate securities or other assets in their accounts to meet the call unless the firm has contacted them first. This is not the case. Most firms, including CS will attempt to notify their customers of margin calls, but they are not required to do so. However, even if a firm has contacted a customer and provided a specific date by which the customer can meet a margin call, the firm can still take necessary steps to protect its financial interests, including immediately selling the securities without notice to the customer.

\* **You are not entitled to choose which securities or other assets in your account(s) are liquidated or sold to meet a margin call.** Because the securities are collateral for the margin loan, CS has the right to decide which security to sell in order to protect its interests.

\* **CS can increase its "house" maintenance margin requirements at any time and is not required to provide you advance written notice.** These changes in firm policy often take effect immediately and may result in the issuance of a maintenance margin call. Your failure to satisfy the call may cause the member to liquidate or sell securities in your account(s).

\* **You are not entitled to an extension of time on a margin call.** While an extension of time to meet margin requirements may be available to customers under certain conditions, a customer does not have a right to the extension.

11

#160540v1

# EXHIBIT B



# PRIME BROKER ANNEX
## TO
## CUSTOMER AGREEMENT

In consideration of Credit Suisse Securities (USA) LLC ("CSSU") opening and maintaining for the undersigned Customer a prime brokerage account pursuant to the Customer Agreement and this Prime Broker Annex To Customer Agreement (the **"PB Annex"**) for the purpose of transacting business with any of the CS Entities, Customer agrees as follows:

## 1. Integration of Agreements.

(a) All terms of this PB Annex are incorporated by reference into the Customer Agreement, and they shall constitute a single, integrated agreement. In the event of any inconsistency between any term of this PB Annex and the Customer Agreement, this PB Annex shall control.

(b) All capitalized terms used but not defined herein shall have the meaning set forth in the Customer Agreement. For the avoidance of doubt, this PB Annex is a "Contract" as defined in the Customer Agreement, all obligations of Customer to CSSU arising hereunder or in connection with this PB Annex are "Obligations" as defined in the Customer Agreement and the prime brokerage and custody accounts are each a "Customer Account" as defined in the Customer Agreement.

## 2. Transactions Subject to the SEC Letter.

In connection with any transactions for which CSSU acts as Customer's prime broker pursuant to the Securities and Exchange Commission No-Action letter, dated January 25, 1994, relating to prime brokerage, as amended, supplemented or modified from time to time (the **"SEC Letter"**), the terms and conditions of this Paragraph 2 shall apply:

(a) Customer may maintain brokerage accounts with a number of brokers other than CSSU ("**Executing Brokers**") and may, from time to time place orders to be executed by one or more of these Executing Brokers designating CSSU as its "prime broker".

(b) Customer acknowledges that it is familiar with and agrees to comply with the terms of the SEC Letter and to inform CSSU promptly if it fails to do so. In connection therewith, Customer authorizes CSSU to execute an agreement with all Executing Brokers (a **"Prime Brokerage Agreement"**), to provide any relevant information relating to Customer to the Executing Brokers, and to perform any necessary or useful act as prime broker in accordance with this Paragraph 2 and Applicable Law.

(c) Customer or its authorized representative will advise CSSU prior to 5:30 p.m. (New York time) on trade date of the details of all transactions (the **"Trade Data"**) effected by Executing Brokers on Customer's behalf as required by the SEC Letter. CSSU is authorized to acknowledge, affirm, settle and clear all such transactions. CSSU is further authorized to undertake to resolve any unmatched trade report received by it from an Executing Broker; however, Customer shall remain responsible for the ultimate resolution and CSSU shall have no responsibility with respect to Trade Data not correctly transmitted to it on a timely basis by any person or entity. As

between Customer and CSSU, the Executing Broker will be acting as an agent of Customer for the purpose of carrying out Customer's instructions with respect to the purchase, sale and settlement of securities. Customer understands that no order may be legally accepted by CSSU as Prime Broker from an Executing Broker with whom CSSU has not entered into a Prime Brokerage Agreement. Customer will use its best efforts to assure that its Executing Brokers comply with any Prime Brokerage Agreement to which such Executing Broker is a party. Customer agrees that CSSU shall be under no obligation to effect or settle any trade on behalf of Customer.

(d) On the Business Day following each transaction, CSSU shall send Customer a notification of each trade placed with any Executing Broker based upon information provided by Customer. Each such notification shall provide the information required by the SEC Letter. If Customer has instructed Executing Brokers to send trade confirmations to Customer in care of CSSU, Customer understands that such confirmations are available to Customer without charge upon request. CSSU shall also provide Customer with periodic statements concerning transactions effected for it and in respect of the Collateral held by CSSU.

(e) Customer understands and agrees that it must maintain in its prime brokerage account with CSSU a minimum net equity in cash and securities with a ready market no less than is required by the SEC Letter (the "Minimum Net Equity") or any greater amount as to which CSSU may from time to time inform Customer; and that settlement of transactions will be made by CSSU only if sufficient funds or securities, as applicable, are maintained in an account with CSSU or if Customer makes other arrangements for settlement which are satisfactory to CSSU; provided, however, that in no event will CSSU accept any transaction if Customer maintains, or the settlement of such transaction would cause it to maintain, a net equity less than the Minimum Net Equity. If the Customer Account falls below the Minimum Net Equity, and it does not bring its prime brokerage account into compliance in accordance with Applicable Law and CSSU's requirements, Customer authorizes CSSU to notify all Executing Brokers of this event. In such event, Customer further understands and agrees that CSSU is required by the SEC Letter, without notice to Customer, to disaffirm or DK any transaction effected for it by an Executing Broker. Should CSSU be required to disaffirm or DK any transaction of Customer's, all of Customer's transactions of that day and the immediately preceding Business Day will be disaffirmed or DK'd. In that case, CSSU shall send a cancellation notification to Customer to offset the prior notification sent pursuant to the previous sub-paragraph and Customer understands that it must settle outstanding trades directly with the Executing Brokers and hereby authorizes CSSU to provide the Executing Brokers with

any relevant information necessary in order for the Executing Brokers to settle such trades.

(f) If the Customer Account is managed on a discretionary basis by a third party (the "**Advisor**"), Customer hereby authorizes CSSU to commingle its prime brokerage transactions with those of other accounts managed by the Advisor ("**sub-accounts**") for settlement in bulk in accordance with the Advisor's instructions. Customer understands that no part of any transaction may be allocated to sub-accounts having net equity below the minimum levels established by the SEC Letter and that, should such a net equity maintenance problem occur in any such sub-account, CSSU may be required to disaffirm the entire transaction. Customer agrees that, in that event, prior to the disaffirmance deadline established by the SEC Letter, the Advisor may resubmit the bulk trade so as to exclude those securities which were originally allocated to the sub-account failing to meet the minimum net equity or, if permissible, re-allocate the entire prime brokerage transaction to those sub-accounts meeting the net equity requirements established by the SEC Letter.

**3. Transactions not subject to the SEC Letter.**

In the event (i) Customer's orders are not executed by CSSU and Customer gives up CSSU's name for clearance and/or settlement with respect to transactions which are not subject to the SEC Letter, or (ii) Customer requires CSSU to make a free delivery of cash or securities in connection with the settlement of such orders ("**Clearing Transactions**"), the terms and conditions of this Paragraph 3 shall apply:

(a) Customer will notify CSSU of the details of all Clearing Transactions necessary to clear and settle each Clearing Transaction (including all such information as may be specified by CSSU from time to time with respect to transactions of that type) within the time periods specified and in formats specified by CSSU from time to time. Customer will bear all risks related to each Clearing Transaction, including the risk of non-

performance by the third party, broker or dealer. Customer will provide to CSSU and be responsible for the settlement payment (including the necessary securities) to enable CSSU to process, clear and settle the delivery of securities and cash relating to each Clearing Transaction, and any cash or securities necessary to meet a demand for margin made by the third party, broker or dealer relating to a Clearing Transaction. If CSSU engages in Clearing Transactions for Customer in which CSSU becomes obligated to settle a trade Customer has placed through another broker or dealer, Customer shall be obligated to CSSU for the settlement payment (including the necessary securities) to enable CSSU to process, clear and settle such transaction. CSSU is only acting as agent in connection with any Clearing Transaction and nothing contained herein shall be construed as imposing liability on any CS Entity as a principal. Customer shall not under any circumstances represent to any third party that any CS Entity acts as guarantor in any Clearing Transaction.

(b) Customer will only execute bona fide orders, and if required for settlement of a transaction, Customer will request a free delivery of cash or securities only when Customer has reasonable grounds to believe that the counterparty and the third party, broker or dealer who executed Customer's order has the financial capability to complete the contemplated transaction;

(c) CSSU reserves the right at any time to place a limit (of either dollars or number of securities) on the size of transactions that CSSU will accept for clearance or to reject transactions. If, after Customer has received notice of such limitation, Customer executes an order in excess of the limit established by CSSU, CSSU shall have the right, exercisable in its sole discretion, to decline to accept any transaction for clearance and settlement.

(d) CSSU will attempt to clear such transactions within a reasonable period of time and utilize the same procedures it utilizes when clearing transactions on behalf of other customers. CSSU shall have the right but not the obligation to take action at any time in its sole discretion to correct errors in such transactions.

Before signing, Customer acknowledges having read this PB Annex and the Customer Agreement to which this PB Annex is to be annexed, each in its entirety, and hereby consents and agrees to all the terms and conditions hereof and thereof.

**Customer:**

*BY ITS DULY AUTHORIZED INVESTMENT ADVISOR, FLETCHER ASSET MANAGEMENT, INC.*

Fletcher International, Ltd.
*Name of Institution/Individual*

*Peter Zayfert*                    *Denis J. Kiely*
*Name of Authorized Officer*

*Executive Vice President*         *Director*
*Title of Authorized Officer*

*[signature]*                      *[signature]*
*Signature of Authorized Officer/Individual*

*7/10/06*                          *7/7/06*
*Date*


Accepted and agreed to:

CREDIT SUISSE SECURITIES (USA) LLC

By: _____
    **Vittorio Scialoja**
    **Vice President**

# EXHIBIT C

```
1                          SMITH
2    end of the conversation he said there might be
3    something else you can help me with.
4              So I said okay.  Let me -- tell me
5    what it is.  He said well, I have a security
6    that we're long at CSFB.  They're our prime
7    broker.
8              They want us to get the position
9    out -- out of the -- out of that account, and
10   I'd like to trade it with somebody where there's
11   a possibility I could still have the upside but
12   not carry the position.
13             So I said I don't particularly
14   understand what you want to do, but if we can
15   structure something where we take over the
16   security with a return that's good enough for
17   us, and maybe give you some calls or some way of
18   maintaining your position in the upside, we can
19   take a look at it.
20             He said okay.  And I said I don't
21   trade these particular types of securities.
22   I'll -- you can call my partner, Pete
23   Wisniewski.
24             He said to me perhaps I'll have
25   somebody call him.  Can you give me his details.
```

# EXHIBIT D

| | |
|---|---|
| **From:** | AF {AFletcher} <AFletcher@fletcher.com> |
| **Sent:** | Thursday, June 14, 2012 4:44 PM |
| **To:** | GL {JLaFata} <JLaFata@fletcher.com>; SAT {STurner} <sturner@fletcher.com> |
| **Cc:** | Pete Smith <psmith@delmarasset.com> |
| **Subject:** | The Trade at 90% |

Jack and Stewart, Peter and I discussed a variation on the trade.

With IO trading at $6.20,

DM buys convert at 90% of conversion value or ~$37.6 million
DM executes swap with CS and receive 90% financing
DM grants Fletcher affiliate option to purchase preferred at 90% of the conversion value as of option exercise

This communication, and any attachment(s), is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential and/or protected by privilege. This communication is for information purposes and should not be regarded as an offer, a contract, or any form of official statement of Fletcher Asset Management Inc., or any of its affiliated entities. If you are not the intended recipient, any use, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please delete the original email, any copies, attachments thereto, or printouts and notify the sender immediately.

CONFIDENTIAL

# EXHIBIT E

From:       Kessler, Marcia <marcia.kessler@credit-suisse.com>
Sent:       Tuesday, June 26, 2012 11:45 AM
To:         Peter Wisniewski <pwisniewski@delmarasset.com>
Subject:    RE: Confidentiality Agreement

Dear Peter,

With reference to the Confidentiality Agreement below, we are getting back to you to let you know that a transaction has been completed, terminated or abandoned with respect to the securities of Helix Energy Solutions Group, Inc.

Regards,
Marcia

Marcia Lucas Kessler
Director and Counsel
Credit Suisse Securities (USA) LLC
Eleven Madison Avenue | 10010 New York | United States
Phone +1 212 538 1293 | Fax +1 917 326 7938
marcia.kessler@credit-suisse.com | www.credit-suisse.com

From: Kessler, Marcia
Sent: Thursday, June 21, 2012 3:37 PM
To: 'Peter Wisniewski'
Subject: RE: Confidentiality Agreement

Dear Peter,

With reference to the Confidentiality Agreement below, we are getting back to you to let you know that a transaction has been completed, terminated or abandoned with respect to the securities of ION Geophysical Corporation.  We will get back to you soon regarding the securities of Helix Energy Solutions Group, Inc.

Regards,
Marcia

From: Peter Wisniewski [mailto:pwisniewski@delmarasset.com]
Sent: Tuesday, June 12, 2012 11:51 AM
To: Kessler, Marcia
Subject: RE: Confidentiality Agreement

I agree

From: Kessler, Marcia [mailto:marcia.kessler@credit-suisse.com]
Sent: Tuesday, June 12, 2012 11:40 AM
To: Peter Wisniewski
Subject: Confidentiality Agreement

Dear Peter,

This email is to confirm that on June 12, 2012 Credit Suisse Securities (USA) LLC ("CSSU") discussed providing you with certain material non-public information ("Information") relating to a potential transaction (the "Potential Transaction") involving a publicly traded company or companies (collectively, the "Issuers", the name(s) of which will be disclosed to you following your agreement with the terms and conditions of this correspondence.  In consideration of CSSU providing you with the Information, you and your firm agree (i) to use the Information solely to evaluate the Potential Transaction, to keep the Information confidential and to not disclose any such Information to any person other than (a) to your affiliates, officers, directors, employees, agents or representatives (your "Representatives"), in each case who need to know such information solely to evaluate the Potential Transaction and who agree to be bound by this agreement, or (b) as required by applicable law, regulation or legal process; and (ii) not to purchase, sell or hedge any securities of the Issuers ("Trade") or provide the Information to any person that is reasonably likely to Trade while in possession of the Information or to disclose the Information to any such person. You and your Representatives are bound by this agreement until any Potential Transaction is publicly announced, completed, or terminated or abandoned. You also acknowledge that the foregoing sentence in no way limits your obligations or liabilities under applicable securities laws and that you are not relying on us for any legal advice, interpretations or conclusions concerning your obligations and liabilities under such securities laws. This Agreement shall be governed by the laws of the State of New York.

Please acknowledge that you have the authority to bind your firm and your agreement with the terms and conditions of this correspondence by responding "I agree" to this email.

Regards,

Marcia Lucas Kessler
Director and Counsel
Credit Suisse Securities (USA) LLC
Eleven Madison Avenue | 10010 New York | United States
Phone +1 212 538 1293 | Fax +1 917 326 7938
marcia.kessler@credit-suisse.com | www.credit-suisse.com

------------------------------------------------------------------------------
Please access the attached hyperlink for an important electronic communications disclaimer:
http://www.credit-suisse.com/legal/en/disclaimer_email_ib.html

This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient

------------------------------------------------------------------------------
Please access the attached hyperlink for an important electronic communications disclaimer:
http://www.credit-suisse.com/legal/en/disclaimer_email_ib.html



CONFIDENTIAL

DELMAR0000129

# EXHIBIT F

```
                         WISNIEWSKI
 1
 2    transaction Ion Geophysical has either been
 3    completed or abandoned.
 4         Q.   Do you recall receiving this?
 5         A.   I do.
 6         Q.   And what did you do when you received
 7    this?
 8         A.   Nothing.
 9         Q.   By the time you received this, had you
10    already contacted CSFB and told them that you
11    would not be participating in the Ion
12    transaction?
13         A.   Yes.
14         Q.   Do you recall how long before this
15    e-mail you made that phone call?
16         A.   I do recall it being a substantial
17    amount of time.  A week, if not more earlier that
18    I had called them.
19         Q.   After you called CSFB and told them that
20    you were not be participating in the Ion
21    transaction --
22         A.   You don't have to exactly participate.
23    You just get the bid.
24         Q.   Thank you.  Well, let me ask you:  Did
25    Del Mar ever put together an offer for -- a bid
```

# EXHIBIT G

```
 1                        WISNIEWSKI
 2   to the effect of okay.
 3        Q.   At some point did you have conversations
 4   with Credit Suisse First Boston, which I will
 5   refer to as CSFB, concerning the potential Ion
 6   trade?
 7        A.   Yes.
 8        Q.   How did that come about?
 9        A.   I got a call from Credit Suisse.
10        Q.   Do you remember who called you?
11        A.   I don't.
12        Q.   What did that person say?
13        A.   They said that they had a potential
14   transaction in a private convertible; would I
15   like to sign an NDA and receive information and
16   so on.
17        Q.   What did you say?
18        A.   I initially said no.
19        Q.   And why did you say no?
20        A.   Because I didn't realize that they were
21   referring to the same transaction that I was
22   already looking at.
23        Q.   When you received this phone call from
24   CSFB, am I correct that you were already looking
25   at the potential Ion transaction?
```

```
 1                    WISNIEWSKI
 2        A.   I was looking at a generic transaction.
 3        Q.   Thank you.
 4             Did the person from CSFB ask you why you
 5   were not interested?
 6        A.   No.
 7        Q.   And at the time you received the phone
 8   call from CSFB, had you already received the
 9   information from ███████████ that ███████████ would
10   not fund the potential transaction?
11        A.   I don't remember.
12        Q.   At some point did you become aware that
13   the potential transaction from CSFB was the same
14   as --
15        A.   Yes.
16        Q.   -- as the transaction you were looking
17   at at the time?
18        A.   Yes.
19             MS. LEPORE:  Let her ask the question.
20        Q.   How did that come about?
21        A.   There was a subsequent call from Credit
22   Suisse.
23        Q.   And how long after that first call did
24   the second call come?
25        A.   Within days.
```

```
 1                        WISNIEWSKI
 2        Q.  And who called you?
 3        A.  I don't recall.
 4        Q.  And what was the substance of that
 5   conversation?
 6        A.  Are you sure you don't want to take a
 7   look at this convertible bond?  We think that you
 8   guys are involved outside of us, and we are
 9   running the transaction.
10        Q.  What did you understand to mean "outside
11   of us"?
12        A.  Not through CSFB.
13        Q.  And what did they mean by running a
14   transaction?
15        A.  My understanding was that they were
16   putting together buyers for this particular
17   transaction.
18        Q.  And what else did they tell you?
19        A.  Nothing.
20        Q.  What did you say?
21        A.  I said sure.  I will take a look at it.
22        Q.  At that point did you realize that this
23   was the same deal that you had been examining
24   that Mr. Smith referred to you?
25        A.  Yes.
```