1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 12-12796-reg

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    FLETCHER INTERNATIONAL, LTD.,

9

10              Debtor.

11

12    - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              October 15, 2014

19              10:19 AM

20

21    B E F O R E:

22    HON. ROBERT E. GERBER

23    U.S. BANKRUPTCY JUDGE

24

25

1

2   Motion Filed by the Plan Administrators for Entry of an Order

3   Approving the Settlement Agreement Between Fletcher

4   International, Ltd. and Credit Suisse

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Michael Drake

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

1

2   A P E A R A N C E S :

3   LUSKIN, STERN & EISLER LLP

4         Attorneys for Richard J. Davis, as Plan Administrator

5         Eleven Times Square

6         8th Avenue & 41st Street

7         New York, NY 10036

8

9   BY:   MICHAEL LUSKIN, ESQ.

10        STEPHAN E. HORNUNG, ESQ.

11

12

13  ALSO PRESENT:

14        STEWART TURNER, Party Pro Se

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Okay.  Fletcher International.

3            Mr. Fletcher, are you on the phone yet?

4            COURTCALL OPERATOR:  Good morning, Your Honor.  This

5    is the operator.

6            THE COURT:  Yeah.  You're from CourtCall?

7            COURTCALL OPERATOR:  Yes, Your Honor.

8            THE COURT:  And Mr. Fletcher had preregistered for the

9    call, but didn't actually call in?

10           COURTCALL OPERATOR:  That's correct.

11           THE COURT:  Okay.  We're going to proceed.  The record

12   should reflect it's now 10:20.

13           COURTCALL OPERATOR:  Okay.

14           THE COURT:  Thank you.

15           All right.  I see Mr. Luskin and Mr. Davis.

16           MR. LUSKIN:  No.  You have Mr. Hornung here from my

17   office --

18           THE COURT:  I'm sorry, Mr. Hornung.  I meant you no

19   disrespect either.

20           MR. LUSKIN:  -- with me, Your Honor, Michael Luskin.

21           THE COURT:  Okay, Mr. Hornung.

22           MR. LUSKIN:  And we're here for Mr. Davis as plan

23   administration and former trustee.

24           THE COURT:  I understand.

25           All right.  Mr. Hornung and Mr. Davis (sic), we have

1  what is obviously another settlement by the trustee that's been

2  objected to by you, Mr. Davis (sic).  I read Mr. Fletcher's

3  written objection, which in part incorporates your objections,

4  Mr. Davis (sic).  And --

5          MR. LUSKIN:  Your Honor, if I might, just so the

6  record is clear, that's Mr. Turner.

7          THE COURT:  Did I say Davis?

8          MR. LUSKIN:  Yes, you did.

9          THE COURT:  Twice.

10          MR. LUSKIN:  You've been saying Davis.  I apologize,

11  but --

12          THE COURT:  No.  I know Mr. Turner very well.

13          Mr. Turner, I apologize to you.

14          MR. TURNER:  Thank you.  No problem, Your Honor.

15          THE COURT:  All right.  I read your objection, too,

16  Mr. Turner.

17          I'll hear what each of you has to stay, starting with

18  Mr. Hornung.  I want both sides to address the standing issue,

19  given the fact that I have difficulty seeing how you would be a

20  party aggrieved on any appeal, Mr. Turner, but I also have

21  trouble seeing how you have any skin in the game on this

22  settlement either, given how subordinated you are.

23          But having read the papers, the estate is getting cash

24  that it badly needs with a modest discount.  You're principal

25  concern seems to be the release that's given.  But the trustee

FLETCHER INTERNATIONAL, LTD.                                    6

1  has made a focused and thoughtful decision that pursuing any

2  litigation wouldn't be worth it, given the failure of there

3  being any better offer and reasonable differences of views as

4  to whether Credit Suisse could have done a better job.  So both

5  sides focus on that.

6          Let me hear first from you, Hornung.

7          MR. LUSKIN:  You're going to hear from me, Your Honor,

8  Mr. Luskin, Michael Luskin.

9          THE COURT:  Wait.  I am totally confused --

10          MR. LUSKIN:  That's okay.  It's --

11          THE COURT:  -- because I thought that you were telling

12  me is that you were going to --

13          MR. LUSKIN:  No.

14          THE COURT:  -- that Mr. Hornung was going to argue it.

15          MR. LUSKIN:  This one I'm going to do, Your Honor.  So

16  it's Michael Luskin for the trustee and plan administrator.

17          THE COURT:  Okay.

18          MR. LUSKIN:  Very briefly, Your Honor, by way of

19  background, this is a 9019 motion to approve a long-awaited

20  final settlement with Credit Suisse.  Credit Suisse is one of

21  Fletcher International, Ltd., FILB's, prime brokers.

22          The relationship is laid out in a series of contracts

23  that are before Your Honor.  They're fairly standard agreements

24  that provide for Credit Suisse to be able to liquidate the

25  margin account in the event of a default.  There was a default

1   pre-petition.  Credit Suisse exercised its rights under the

2   agreement, sold off stock in ION, I-O-N, Corporation, paid down

3   the forty-million dollar obligation, retained over a million

4   dollars to secure or to provide adequate assurance of

5   compensation under the indemnity provisions and cost

6   reimbursement provisions of the customer contracts.  That was

7   the subject of negotiation.

8        Before the trustee was brought in -- it was when

9   Mr. Davis was appointed -- we negotiated a cash collateral

10   order with Credit Suisse that resolved many issues, but not

11   all.  And then more recently, we've completed an investigation

12   into whether or not it would be prudent to resolve all

13   outstanding claims arising out of the customer contracts with

14   Credit Suisse.  And the conclusion is, yes, it is.  The

15   settlement standard, of course, is the familiar reasonableness

16   test:  is the settlement fair and equitable and in the best

17   interest of the estate?

18        The key factors here are the litigation risk, cost,

19   and time that Your Honor referred to, creditor support, and was

20   the negotiation conducted at arm's length and in good faith.

21   The facts, as I've said, are undisputed.  The agreements are

22   standard customer agreements.  The money that was retained was

23   retained under the cash collateral order approved by the Court

24   back in the fall of 2012.

25        When the agreement was terminated pre-petition, Credit

FLETCHER INTERNATIONAL, LTD.                                          8

1    Suisse exercised its rights under the lien it had on the

2    securities in the account.  It liquidated the shares after a

3    long series of extensions of allowing the debtor pre-petition

4    to try to work things out.  That never happened.

5           And as I said, the parties negotiated a cash

6    collateral order.  The settlement resolves all claims between

7    the parties relating to the cash customer accounts, the margin

8    account.  It does not release -- the trustee is not releasing

9    claims against Credit Suisse arising out of its status as an

10   investor, either directly or through subsidiary, special-

11   purpose subsidiaries.

12          THE COURT:  Pause please, Mr. Luskin.

13          MR. LUSKIN:  Yes.

14          THE COURT:  But it is providing a limited release with

15   respect to the disposition of the ION shares?

16          MR. LUSKIN:  Correct.  There were mutual releases.

17          THE COURT:  Go ahead.

18          MR. LUSKIN:  With respect to the ION shares and with

19   respect to the ISDA documents, I-S-D-A, the ISDA standard

20   customer documents, the margin account documents, all of the

21   disputes that were or could have been raised with respect to

22   that relationship, call it the prime broker relationship, have

23   been resolved and are being released.  The claims that may

24   exist arising out of Credit Suisse's status as an investor in

25   FILB or its subsidiaries are not being dealt with on this.

1          Now, before agreeing to the settlement, we conducted
2  an investigation as to the circumstances of the termination and
3  the liquidation of the margin account.  We interviewed Credit
4  Suisse.  It's represented by the Milbank firm.  We had several
5  meetings.  We took deposition, at least one deposition of a
6  third party that was identified to us by Messrs. Fletcher and
7  Turner as potential buyer of the shares at a better price than
8  Credit Suisse.  The undisputed record is that third party,
9  Delmar, never made an offer.  And the terms of the offer that
10  it was discussing were not as good as the terms that Credit
11  Suisse got in the open market.
12          Fletcher and Turner's papers make reference to a deal
13  that was they think greatly favorable to FILB because it gave
14  FILB the option to buy back the shares at ninety percent or
15  some percentage of the price.  We're talking about a company in
16  June of 2012 that had no money.  The idea that the options
17  are --
18          THE COURT:  If the option were exercised, how much
19  money would have been required?
20          MR. LUSKIN:  Millions of dollars.  Millions of
21  dollars.  I don't have a --
22          THE COURT:  Which FILB did not at the time have?
23          MR. LUSKIN:  No, FILB not at the time have.  At the
24  time, FILB was in the process of filing for bankruptcy because
25  it had been pushed to the wall by the Cayman and Bermuda

1    liquidators.  The litigation spilled over from pre-petition to

2    post-petition.  And I think Your Honor will recall, probably

3    not happily, with all the litigation that occurred that summer

4    of 2012 before we were appointed.

5              Completely unrealistic.  And in any event, the third-

6    party offer, this Delmar offer, didn't exist.  The deposition

7    testimony is clear as day.  It's in the record.  They never

8    made an offer.

9              The trustee's conclusions, which are laid out at

10   paragraph 16 of Mr. Davis's affidavit or declaration, are that

11   there was no better offer possible than what Credit Suisse was

12   able to obtain in the open market.  The third-party bid that

13   was promoted by Fletcher and Turner was illusory.  And this, as

14   I said, has been established through credible, unchallenged

15   deposition testimony.  Credit Suisse undertook a reasonable

16   sales process and obtained a better price than FAM, Fletcher

17   Assessment Management, ever did.  I mean, the irony here is

18   that Credit Suisse was able to get a modest premium over the

19   conversion price of the securities.  And that's something that

20   Fletcher was never able to do in the past.  I'll have a little

21   more to say about that.

22             And in any event, and frankly most important, given

23   the money involved here, litigation with Credit Suisse would

24   have been unbelievably expensive, time-consuming, complicated,

25   and risky.  This is not a case like, say, the USCBI case where

1    Mr. Turner has been litigating up down, where FILB actually had
2    control over the assets.  And the trustee then had control over
3    the asset.

4          We don't have control over the asset, and we didn't
5    have control over the asset.  And neither did the debtor when
6    it filed.  Credit Suisse had control over the asset, and Credit
7    Suisse has all of the rights under its contracts to liquidate
8    that asset.  And it did so.  And Credit Suisse is under no
9    obligation under --

10         THE COURT:  And as this litigation went on, would the
11   remaining collateral -- I think we're now in the gross 200,000
12   dollar range --

13         MR. LUSKIN:  That's correct.

14         THE COURT:  -- get eaten up as part of this indemnity
15   if at least Credit Suisse were successful?

16         MR. LUSKIN:  Your Honor, yes.  When the case was
17   filed, the reserve -- when Young Conaway was negotiating with
18   Milbank over cash collateral, it was 1.6 million dollars.  When
19   we took over, it was 210.  I don't remember what the number
20   was.

21         THE COURT:  So we're talking about fighting over a
22   constantly depleting asset?

23         MR. LUSKIN:  There is no question whatsoever that the
24   200,000, the 100-whatever it is that's currently there, will be
25   gone.  There is no question that to litigate against Credit

FLETCHER INTERNATIONAL, LTD.                                    12

1    Suisse on a set of documents that doesn't seem to have any

2    cracks or crevices in it would cause hundreds of thousands of

3    dollars that we don't have.  And the outcome on the merits, we

4    have no chance of winning this case.

5            They had the right to liquidate.  Then they're a

6    secured creditor in possession of collateral.  There's no way

7    they could grant -- well, this all had occurred pre-petition.

8    If it had occurred post-petition, we couldn't have granted

9    adequate protection to secure the bank.  They would have been

10   allowed to liquidate.  Then the law has been clear in New York

11   for generations that secured lenders don't have to take market

12   risk.

13           They can go out and liquidate.  They're not obligated

14   to get the absolute highest and best price after a lengthy

15   marketing period.  They're entitled, especially in a case like

16   this, where we're talking about a security that's traded, to

17   list the security, to go to the usual brokers, which they did,

18   and sell it, which is what they did.  There's no claim, which

19   really renders the entire issue of the valuation of the shares

20   moot.  It's been tested in the market.  We got what we got for

21   it.  That is, Credit Suisse got what it got for it, something

22   worth forty million dollars or around forty million dollars.  I

23   paid off the loan and in doing so, as I said, was able to get a

24   premium.

25           Now, there are a million different ways to value these

1    things.  There are a million different motivations for selling

2    and taking a particular price.  And the papers that Mr. Turner

3    has once again filed, he's got his own theories about value and

4    he points to a bunch of other third-party valuations, none of

5    which is admissible for reasons we've already been through at

6    length in the UCBI case.  None of that's relevant here, none of

7    it.

8            Credit Suisse sold this on the open argument and got a

9    fair price.  There is absolutely not a shred of evidence to

10   indicate that they did anything improper or other than ordinary

11   and customary.  That's what we found.  And that's where we are.

12           I would also point out that once again, the creditor

13   body, ninety-nine-point-something percent, supports this.

14   You've seen the objections, including -- I suppose you saw what

15   Mr. Turner filed yesterday in his sur-reply.  A document, I

16   believe, is unknown, in the Rules, without permission from the

17   Court.  But putting that aside, you wanted to hear about

18   standing.  And frankly, you're correct.  They have no skin in

19   the game.  Whatever claims they have in Mr. Turner's papers --

20           THE COURT:  Well, we're talking about standing at two

21   levels.

22           MR. LUSKIN:  Yes, we are.

23           THE COURT:  Appellate standing requires you to be a

24   party aggrieved and to be to be affected by the order.  And

25   given the subordination, that would at least seemingly destroy

1   appellate standings, but that's an appellate court issue.  The

2   fundamental standing issue here is that having a claim, albeit

3   a subordinated one, Mr. Turner is technically a creditor.

4            And this will be something I'm going to want to hear

5   from you, Mr. Turner.

6            But turning down this cash in hand in favor of an

7   alternate deal, assuming one existed, in essence, you want to

8   gamble with all the other senior creditors' money.  And you can

9   regard that as a standing issue, or you can regard that as an

10  issue that affects the exercise of my discretion on approving

11  something that's in the discretion of the Court.

12           But I wonder, and this will be your turn to address

13  Mr. Turner, whether that helps me understand why every other

14  creditor in the case, all of whom are senior to you, likes this

15  deal and you don't like it, because you want to shoot the moon

16  with their money.

17           MR. LUSKIN:  Well, Your Honor, on both levels, the

18  appellate level, there isn't really much to talk about.  He's

19  not a party, agreed, because the chance of recovering anything

20  are zero for him.  He's been deeply subordinated.  That's law

21  of the case.  It's been adjudicated.  It can't be readjudicated

22  here or anywhere else.  That's done.  And that goes for both of

23  them, Fletcher and Turner.

24           On the larger standing issue, the Constitutional

25  issue, or as Your Honor just phrased it, the exercise of

1  discretion, I think that the facts that have been established

2  in this case warrant -- call out for the Court to say,

3  Mr. Turner, Mr. Fletcher, you have no basis to appeal to the

4  equitable discretion of this Court.  There is no reason I

5  should be exercising my discretion in your favor.  And that's

6  because of, in equitable terms, their unclean hands.  They are

7  adjudicated fraudsters.  They committed intentional fraud.

8  They did it pre-petition.  They did it post-petition.  They

9  continue to act in ways that put them in the crosshairs of

10  contempt motions, which they back down from only after made or

11  threatened.

12        The latest round, the theft of 100,000 dollars or

13  75,000 dollars from Soundview is really the icing on the cake.

14  And there we have -- you have an August 8th order that was

15  clear as day.  You have a September 3rd order that's clear as

16  day.  You have a September 23rd order that's clear as day.

17        Judge Pauley has now ruled -- well, let's see.  At the

18  first hearing, he threatened Mr. Fletcher with contempt,

19  telling him that -- revoking his right to participate by phone,

20  telling him the game is up, and telling him that he had to

21  appear in person and to bring his toothbrush with him because

22  he wasn't going home.  Everyone in the courtroom knew exactly

23  what that meant.  And to his credit, Mr. Fletcher actually

24  backed down and dropped his claim to the bond and the appeal.

25        Mr. Turner didn't.

1        Then at the last hearing, after warning Mr. Turner

2   that he was on thin ice, and if he fell through, he would fall

3   to the bottom, Judge Pauley directed that the bond be returned

4   and found on the record after -- it took Judge Pauley four

5   questions, four cross-examination questions of Mr. Turner, to

6   get him to admit -- I'm ninety-nine percent sure I think he

7   said to get him to admit that the money that he used for the

8   bond was stolen money.  It belonged to Soundview.  And on that

9   basis, Judge Pauley ruled.  But, you know what, both Fletcher

10  and Turner also took 5,000 dollars and put it in their own

11  pocket from Soundview.  Now, that's the subject of a pending

12  contempt motion.

13       But, Your Honor, the law's been settled since the

14  middle of the last century in the Supreme Court United Mine

15  Worker case that if you don't like an injunction, if you don't

16  like a court order, you don't get to ignore it.  You have to

17  comply with it, an appeal or get a stay.  And they haven't done

18  it.  He hasn't returned -- Mr. Turner hasn't returned the 5,000

19  dollars.  Mr. Fletcher hasn't returned the 5,000 dollars.

20  They've taken no steps whatsoever to comply with the orders by

21  making the disclosures they're supposed to make.

22       It seems to me that both of them are about to walk

23  into a truck, if you'll apologize my analogizing the Court to a

24  truck here, or a moving train.  They're going to be faced with

25  orders that are designed to coerce them to compel (sic) with

1  Your Honor's orders.  They're going to face daily fines until

2  they return them money.  And if they don't pay those fines or

3  return the money, they're going to go to jail.  That's what

4  they face.  This is not someone who comes to court with clean

5  hands.  And on that basis, there is no reason for Your Honor to

6  exercise any kind of discretion in Mr. Turner or Mr. Fletcher's

7  favor.

8           Now, that's on standing.  And of course, that's a

9  whole alternative ground for granting our motion.  This is a

10 pretty plain vanilla 9019 motion.  We think that it's certainly

11 safer and probably easier for the Court, if I can respectfully

12 suggest, to grant the motion on traditional ground that were

13 within a --

14          THE COURT:  Conditional grounds being TMT Trailer

15 Ferry --

16          MR. LUSKIN:  Yes, exactly.

17          THE COURT:  -- and the Second Circuit decisions and

18 the like?

19          MR. LUSKIN:  Yes, yes.  Iridium and all of them.  I

20 mean, it's -- I don't even know that we briefed it.  Since it's

21 such a familiar standard, I think we had a few cites in there.

22 But the bottom line on that is that once again, all that's

23 going on here is Mr. Turner doesn't like the result.  He thinks

24 that the trustee has sold out cheap.  That's what he thinks.

25 And again, I don't want to belabor the point, but the trustee

1   is accorded great, great discretion to exercise his business

2   judgment and decide which claims to bring and which assets to

3   sell and how to sell them.  And in this case, remember, we

4   didn't sell an asset.  What we're investigating is what Credit

5   Suisse did.  And Credit Suisse did exactly what any other bank,

6   any other secured lender, any other mortgagee of piece of real

7   property does when it forecloses on a piece of collateral.

8           THE COURT:  Pause.  The business judgment that's

9   before me is the trustee's decision to take the cash that the

10  estate is entitled to before it gets depleted and to release a

11  claim that Mr. Turner thinks is worth a lot and which the

12  trustee thinks it's worth little or nothing?

13          MR. LUSKIN:  Absolutely correct.

14          THE COURT:  Okay.

15          MR. LUSKIN:  Thank you, Your Honor.

16          THE COURT:  Thank you.

17          Mr. Turner, your perspective, please.

18          MR. TURNER:  Thank you, Your Honor.  For the record,

19  Stewart Turner appearing pro se.

20          I will speak in much less time than Mr. Luskin.  I

21  prepared remarks for just a few minutes, but I do want to

22  respond to several things, realizing that the subject of

23  today's hearing is Credit Suisse and not Soundview.

24          Once upon a time, I was a director of Soundview, with

25  Soundview Entities, but I resigned from those roles in June of

1   2012.  Mr. Fletcher and Mr. Ladner, the directors, upon my

2   request, paid the bond, and without a specific request, paid

3   the 5,000 dollars.  But I don't want to focus on this here.

4          The big issue here, Your Honor, is that in June of

5   2012, before I, as a director of Fletcher International, Ltd.

6   which I became in 2012, considered what Mr. Luskin said, when I

7   was considering it, I did not consider bankruptcy at the time

8   of Credit Suisse selling this asset from under Fletcher

9   International, Ltd.'s control.

10          This asset was a great asset.

11          Did I miss something?

12          THE COURT:  By "this asset" being one of the great

13   assets, are you talking about the ION shares or the right to

14   litigate against Credit Suisse?

15          MR. TURNER:  Both.  Both.  The ION shares, Your Honor,

16   in addition to converting into a little over six million shares

17   of common stock, paid a dividend of at least 337,500 dollars

18   per quarter in perpetuity.  Yes, there was a loan against it.

19   Mr. Luskin is correct there.  And the margin contract was a

20   standard margin contract.

21          The reason that the Fletcher trustee should be

22   fighting this settlement further with Credit Suisse is that,

23   while Credit Suisse had the right to sell the asset, it does

24   not have a right to sell it at a terrible value.  There was no

25   risk in the position.

1    In addition to the convertible shares that were
2    convertible into six million at the time and plus paying the
3    337,000 quarterly dividend forever, there was a hedge against
4    it.  There was a short-swap against it, also of the same exact
5    number of shares, which I believe was 6,065,098 shares, which
6    meant that if the stock went up a buck, the value of -- the
7    conversion value of the preferred would go up by six million
8    dollars.  But there would be a loss on the swap of six million
9    dollars, thus no net change.  And if the price of ION common
10   stock went down by a dollar, while there would be a six million
11   dollar loss on the conversion value of the shares, there would
12   be an equivalent profit on the other side.

13        Thus, there was no imminent risk.  There was no
14   mortgage foreclosure situation.  That had to be done
15   immediately once they decided to sell this; they should have
16   looked out for the value of FILB.  The trustee should be
17   looking out for the value of FILB.

18        The premium which is a present value of the 337,000
19   dollars forever, this preferred stock was a perpetuity.  And it
20   was not callable.  This would have come in 337,000 dollars a
21   quarter, 1,375,000 dollars a year forever as long as ION
22   existed.  And in the case of if it were acquired by another
23   company, that other company would have to undertake that
24   obligation.

25        Now, I understand from last time in United, that you

1  thought my analysis was good, but you couldn't take me as a

2  Rule 702 witness.  Duff & Phelps, the largest valuation firm

3  out there -- I think they call themselves the premier valuation

4  firm, and I agree that they are the gold standard -- valued

5  this previously as -- the preferred as having a premium to the

6  conversion amount of twenty-nine million dollars.  It's my

7  understanding that Duff & Phelps is not on Mr. Luskin's bad guy

8  list.

9        THE COURT:  Pause please, Mr. Turner.  Mr. Luskin and

10  Mr. Davis have contended that never in FILB's history did it

11  ever get anything more than the conversion price.  Is that a

12  disputed fact?

13        MR. TURNER:  That is factually correct, but let me

14  explain the situation that has occurred, Your Honor.  FILB, as

15  Mr. Davis and Mr. Luskin have always claimed, was cash

16  constrained.  I disagree with their comments that it was

17  insolvent, but it certainly did not have a lot of cash.  And

18  Your Honor, if you have two dollars in your pocket and you want

19  to get an ice cream and a soda, you can't get both, at least I

20  don't think you can.  And sometimes you might have to give

21  up -- you might have to sell the soda or part of a can of soda

22  to get cash to get the ice cream.  And that was done,

23  specifically in the case of United.

24        The original ION Preferred was for a total of seventy

25  million dollars.  Fletcher converted forty-three million

1   dollars of that to raise cash in order to buy the United asset.

2   It was a decision that was made, what would be the best value.

3   And in the month that it was done, Fletcher made money.  It was

4   a choice of giving up some of the ION to get the United, which

5   was perceived to be better value, certainly at least at that

6   time.

7           So there is also in the trustee's report a comment

8   that the trustee made in regards to Quantal's Terry Marsh

9   where, "This answer is disingenuous and is not credible because

10  the existence of any hedge would not affect how one would mark

11  a long position as the hedge itself would be separately marked

12  and was so marked."  I'm pointing this out, that just because

13  FILB didn't have the cash to keep both the ice cream and the

14  soda to buy the UCBI and keep the entire ION position doesn't

15  mean the value is there.  Fletcher made a decision to sacrifice

16  some value here to get that value plus more value in the United

17  position.  In a perfect world, Fletcher would have kept both.

18  But Fletcher didn't have the cash to do both.

19          The Credit Suisse is a company with a forty-two

20  billion dollar market cap.  The hedge fund family that they

21  sold the asset to, the shell funds, have assets of over twenty

22  billion dollars is my understanding.  They were not as cash-

23  constrained as Fletcher.  The real question is, what is the

24  value of the asset?  What is getting 337,000 dollars a quarter

25  for the rest of perpetuity worth?  Now, of course, we won't be

1 | here on perpetuity.  But is it better than --
2 |          THE COURT:  Well, pause.
3 |          MR. TURNER:  -- 702,000 dollars?
4 |          THE COURT:  Please, please, Mr. Turner.  Forgive me.
5 |          If you want to debate with the trustee the real value
6 | of the asset, and the asset is defined as the value of the ION
7 | shares that were liquidated by Credit Suisse, you are either
8 | close to or over the line that Mr. Luskin talked about and, in
9 | substance, testifying as an expert and with the failure to
10 | comply with the rules that the federal courts require for the
11 | testimony of experts.
12 |          If you redefine the question as is it within the realm
13 | of business judgment to take the money that's left at Credit
14 | Suisse before it's depleted and to give up the right to sue
15 | Credit Suisse for perceived or alleged deficiencies and not
16 | getting more for the collateral, then the issue isn't a
17 | valuation decision as such.  It's is that a reasonable business
18 | judgment or not.
19 |          I want to ask you whether you quarrel with the way
20 | that I just sliced and diced the issues.  And if you don't
21 | quarrel with it, could you comment on what I think is the more
22 | fundamental issue, which is the second one I articulated, and
23 | tell me why you think the trustee is being unreasonable in that
24 | regard?
25 |          MR. TURNER:  Okay.  I don't quarrel with the way Your

1   Honor has phrased the question.  Sorry if I went off on the

2   incorrect tangent.

3       When the trustee became involved with Fletcher

4   International, Ltd., shortly thereafter, the account had

5   roughly 600,000 dollars of cash in it under the cash collateral

6   order Mr. Luskin referred to before.  And it had the right to

7   sue Credit Suisse for value that Duff & Phelps thinks is worth

8   twenty-nine million dollars.  600,000 in cash, 29 million

9   dollars in loss.

10       Here we are roughly two years later.  And how much is

11   the trustee seeking for the value of the lawsuit?  The answer

12   is zero.  How much of the 600,000 dollars is coming back?  Just

13   160-.  Under DeRosa v. Chase Manhattan Mortgage, and that was

14   relating to a foreclosure where there was risk in the market I

15   believe, the ruling was that the court has to accept the

16   findings unless the finding of the settlement value of so

17   little shocks the court's conscience.

18       Here, instead of getting back 600,000-plus some

19   portion of 29 million dollars, we were told that 160,000

20   dollars is a wonderful, wonderful settlement where I may not be

21   able to articulate the value of the preferred stream of

22   dividends, but Your Honor could make your own educated guess as

23   to what 337,000 a quarter for forever is.  And see, if -- the

24   702,000-dollar price was something that the trustee should not

25   be suing over.  And --

FLETCHER INTERNATIONAL, LTD.                                      25

1          THE COURT:  Forgive me, Mr. Turner.  How could the

2   estate assuming the continuing receipt of 337,000 bucks a

3   quarter if Credit Suisse had the ability under its agreements

4   to liquidate its collateral?

5          MR. TURNER:  It has the right to liquidate collateral,

6   but not to do so at an unfair price.

7          THE COURT:  All right.  Go on, please.

8          MR. TURNER:  And with that in mind, Your Honor, I

9   would hope you find against the settlement amount because

10  getting 160,000 dollars of FILB's own 600,000 dollars back is

11  bad enough.  But getting zero value from Credit Suisse from an

12  asset that was sold out of FILB -- from under FILB's control

13  just seems wrong.

14         To address the standing issue, I am still the holder

15  of an administrative claim of 10,000 dollars plus the

16  subordinated claim.  I'm also being sued in civil court, most

17  of which is related to the fact that Fletcher inflated values

18  and collected fees on that and that I aided and abetted.  I

19  believe that the valuations were correct, certainly much more

20  correct than the conversion valuations that Mr. Luskin and Mr.

21  Davis would have you believe.

22         Just because Fletcher was cash constrained and had to

23  do some things it didn't want to do with the purpose of getting

24  a greater sum of value doesn't mean that the asset wasn't worth

25  what Fletcher, what Duff & Phelps, what other bad guys

1    according to Mr. Luskin thinks, but not Duff & Phelps.  And the

2    trustee not seeking to get better than what is offered here,

3    the 160,000 of its own 600,000 in cash and zero value for the

4    29 million dollars of that perpetual stream of dividends seems

5    too low, Your Honor, especially in light of the fact that a

6    year and a half after this was sold, ION itself paid a five

7    million dollar premium to the holder of the asset to have him

8    convert the shares after paying two millions dollars in

9    dividends.

10           If, Your Honor, Mr. Davis, and Mr. Luskin don't think

11   twenty-nine million dollars is possible, five million dollars

12   could have been easily possible and expected.  And there was no

13   rush for Credit Suisse to sell it for just two quarters' worth

14   of dividends when there was a lifetime of dividends following.

15   Thank you.

16           THE COURT:  Thank you.

17           Mr. Luskin, I'll take --

18           MR. LUSKIN:  Very briefly.

19           THE COURT:  Reply.  Please keep it brief.

20           MR. LUSKIN:  Yeah.  Very briefly.

21           Just on this valuation and the risks, I think Your

22   Honor adverted to it.  Dividends in perpetuity, forever and

23   ever?  That turns on the underlying strength of the company.

24   You have a dividend stream that may or may not exist.  People

25   have to opine about whether that's going to happen.  And

1    there's nothing in the record on that.

2              The dividend stream has to be discounted to present

3    value using some interest rate.  Your Honor is well familiar

4    with that.

5              The Duff & Phelps report, which is not in evidence and

6    cannot be introduced in evidence, was based on a twenty-five-

7    year stream of dividends and use the discount rate of thirty-

8    year Treasuries.  And we don't think that's an appropriate way

9    to analyze things.  And I'm just pointing out -- not to debate

10   who's right, who's wrong, but I'm pointing out that if you want

11   to raise these issues, you do it in a way so I can cross-

12   examine Duff & Phelps up there on the stand and point out how

13   bad their work is.

14             Not an issue today, but just one example of why we

15   follow procedures, and Mr. Turner hasn't.  He makes the point

16   that we shouldn't -- the Court shouldn't make anything of the

17   fact that on -- let's see, on six occasions, when FILB

18   monetized either the ION stock or the Helix stock, similar kind

19   of security, it never received more than conversion value.

20   Credit Suisse was the only sale that we're aware of where they

21   actually received a premium.  And they have excuses.  You heard

22   one today.  Oh, FILB decided, Fletcher and Turner decided that

23   it was more advantageous to invest in UCBI than to keep ION in

24   the portfolio.

25             Well, Credit Suisse's documents give it the right to

FLETCHER INTERNATIONAL, LTD.                                        28

1   make its determination that it's more advantageous to it to

2   take the money, get what it can in the open market, pay down

3   the loan, and reinvest the proceeds as it does in its other

4   activities.  It's not obligated to go out there and hold on to

5   this because it's not in a hurry or because it has twenty

6   billion dollars of other money.  It had a contract.  It was

7   entitled to liquidate.  It liquidated.  And again, Mr. Turner

8   just overlooks the fact that this was not an asset that FILB

9   had control over.  Credit Suisse had control over it because

10  FILB was in default.

11          THE COURT:  Anything else?

12          MR. LUSKIN:  That's it.

13          THE COURT:  All right.

14          MR. LUSKIN:  Thank you.

15          MR. TURNER:  Your Honor, just two quick comments in

16  regard to what Mr. Luskin said.

17          THE COURT:  Real quick, Mr. Turner.

18          MR. TURNER:  Real quick.

19          Your Honor, maybe I didn't do it correctly.  I

20  included the Duff & Phelps report in my response.

21          THE COURT:  But I think Mr. Luskin's point is we have

22  a hearsay ruling in federal courts.

23          MR. TURNER:  They're not here.  If I could request an

24  evidentiary hearing so that Duff & Phelps could be questioned

25  because Mr. Luskin also described the report incorrectly.  The

1    rate was not discounted at the thirty-year Treasury rate.  It

2    was discounted -- I don't have it in front of me now -- I think

3    at a BB or a BBB rating.  And Duff & Phelps found that it was

4    in line with the BB or BBB rating.  And that seemed reasonable

5    to them.  Thank you.

6             THE COURT:  All right.  Everybody sit in place for a

7    second.

8             In this contested matter in the Chapter 11 case of

9    reorganized debtor Fletcher International, Ltd. of Bermuda, the

10   trustee is asking me to approve a settlement or proposed

11   settlement with Credit Suisse Securities, USA, which people

12   have colloquially referred to as Credit Suisse.  But more

13   technically it's a Credit Suisse affiliate.

14            The substance of the deal stripped to its simplest

15   terms is straightforward.  The trustee proposes to get most of

16   the cash that's being left with the Credit Suisse as collateral

17   on earlier margin arrangements before it all is dissipated and

18   to give up the prospects of a lawsuit against Credit Suisse to

19   get more than that.

20            In the exercise of my discretion, I'm approving the

21   settlement.  And the following are my findings of fact,

22   conclusions of law, and bases for the exercise of my discretion

23   in connection with that determination.

24            As facts, I find that under a pre-petition agreement,

25   Credit Suisse originally held securities of a company called

12-12796-reg   Doc 649   Filed 10/16/14   Entered 10/17/14 11:54:09   Main Document
Pg 30 of 37
FLETCHER INTERNATIONAL, LTD.                              30

1  ION, which it held its collateral to satisfy margin

2  obligations.  Those securities could be and ultimately were

3  converted to cash to meet the obligations.

4        More specifically, the ION shares were pledged to

5  Credit Suisse's collateral for FILB's margin account.  Credit

6  Suisse sought to terminate the brokerage account upon defaults

7  by FILB.  Credit Suisse argued that it was entitled to retain

8  the cash, which after cash collateral arrangements had been

9  resolved, was once 600,000 bucks, but which has now been

10 reduced to 205,000.  And the contention made by the only

11 objectors, which are Mr. Fletcher and Mr. Turner, that when

12 Credit Suisse liquidated the collateral, it did it for too

13 little money, contending that there was another bidder willing

14 to offer a better price.

15       The evidence before me established by affidavit is

16 that the trustee considered those contentions, but found them

17 to be baseless.  What that meant was that the trustee, while he

18 technically had the right to bring a lawsuit, concluded that

19 the chances of bringing that lawsuit for more than the

20 settlement were insufficiently great and that while this went

21 on, it would dissipate the amount that the trustee could still

22 get.  So that not only would that amount go up in smoke, but

23 there wouldn't be the pot of gold at the end.

24       Now, what I'm doing is I'm taking a very complex

25 transaction, and I'm turning them into plain English.  Okay.

FLETCHER INTERNATIONAL, LTD.                                    31

1    And that's the reality of this situation.  The evidence shows

2    that the ultimate purchaser, Delmar, ultimately chose not to

3    submit an offer and that, indeed, the only bid even being

4    considered by Delmar was for less money than the bid that

5    Credit Suisse ultimately got.

6           Again, looking at this in plain English, we know from

7    prior proceedings in this case that Mr. Turner and Fletcher are

8    subordinated in their claims by reason of my earlier rulings.

9    That means that they will recover on their claims only after

10   the other creditors, who are more senior, will get paid first.

11   So the dynamics of this situation is that Mr. Turner and Mr.

12   Fletcher and, of course, that's principally Mr. Turner because

13   he's the only one who's orally argued today, want to gamble

14   with the other creditor's money.  They want to try to shoot the

15   moon by a lawsuit against Credit Suisse for amounts that will

16   not be paid to them unless that lawsuit is very successful.

17   And in the meantime, they want to give up money that would go

18   to the more senior creditors in the hope that litigation could

19   ultimately be successful.

20          We've already had a shrinkage from 600,000 down to

21   205,000 dollars.  Credit Suisse has the right to

22   indemnification and to look to that remaining sum for its

23   expenses.  And that's against the possibility that this lawsuit

24   could be successful when there is no evidence of a better bid.

25   It doesn't -- I don't need to rule on the outcome of that

1  litigation.  I only need to determine whether or not the

2  trustee's conclusion was in reasonable exercise of business

3  judgment.  But given that state of play, it comes as no

4  surprise to me that the trustee would make that determination.

5         Now, as conclusions of law and matters relevant to the

6  exercise of my discretion, the standards for approval of a

7  settlement in the Second Circuit and indeed in the whole United

8  States are governed by cases like the Supreme Court's decision

9  in TMT Trailer Ferry, 390 U.S. 414; Iridium, that's a decision

10 by the Second Circuit, 478 F.3d at 462, and a bunch of other

11 cases, the applicability of which is not contested in this

12 proceeding.

13        When you look at a settlement, like I am here, you

14 look at the likelihood of success of the litigation compared to

15 the present and future benefits of the settlement, the prospect

16 of protracted litigation, the nature and extent of the releases

17 to be obtained, and whether the settlement was the result of

18 arm's-length bargaining.

19        Well, that it was arm's-length bargaining can't

20 seriously be disputed.  You have the trustee on the one side.

21 You have Credit Suisse on the other represented by the Milbank

22 firm.  This was obviously not a sweetheart deal.

23        When you look at the likelihood of success, you have

24 to look at the likelihood of success in its absolute terms, and

25 you also have to look at the settlement dynamics.  The

1   likelihood of success in absolute terms is that this is an

2   outstanding settlement unless the trustee gave away the store

3   by not pursuing a lawsuit against Credit Suisse.

4          Well, for reasons I've just said, I hardly can

5   conclude that the trustee was giving away the store.  I guess

6   every lawsuit has the potential of being won.  But under the

7   facts here, this would have been a real longshot.

8          Contrasted to that, the trustee took the bird in the

9   hand -- or I guess I should say the remaining bird in the hand

10  because the value of the amount to be recovered has been

11  decreasing -- and made what I consider to be reasonable

12  judgment, that he would take -- the majority of what was left

13  before it went down to zero.  And the litigation against Credit

14  Suisse, if it were to be pursued, would be both time-consuming

15  and expensive.  And what I mean, time-consuming, I mean it in

16  two senses:  one, that it would be a drain on the estate, this

17  estate, and second, because Credit Suisse could use the

18  remaining amount to be recovered to finance its own war chest.

19  Time would be on the side of dissipation of that asset and not

20  in favor of the trustee.

21         So for all of those reasons, I find that this was a

22  reasonable exercise of business judgment and that the

23  settlement should be approved.

24         Now, vis-a-vis standing -- I say this by clarification

25  or for the avoidance of doubt because I think this is a

1  standard TMT/Iridium type of analysis.

2          I think it is likely, if not certain, that Mr. Turner

3  and Mr. Fletcher would not be parties aggrieved on this because

4  of the fact that they were previously subordinated.  But that's

5  really an issue for the district court if and when they want to

6  take an appeal.

7          For the present purposes, I don't need to make

8  findings as to whether their misconduct in other areas should

9  be transposed over to this one because, as I said, I believe

10  this is a real plain vanilla TMT analysis.  I do say, however,

11  that there is an issue of de facto standing that informs the

12  exercise of my discretion, which is that whenever a party wants

13  to gamble with somebody else's money, you take contentions of

14  that character with a grain of salt.

15          For this purpose, that's more than sufficient.

16          Mr. Luskin, you're going to settle an order in

17  accordance with this, stating that for the reasons set forth on

18  the record, the settlement's approved.

19          MR. LUSKIN:  I will do it, Your Honor.

20          THE COURT:  I have considered and rejected whether I

21  should stay this ruling.  Any further requests for a stay must

22  be made to the district court if and when there's an appeal.

23          Is there anything that I failed to address, Mr.

24  Luskin?

25          MR. LUSKIN:  No, Your Honor.  I guess there's this

1  belated request for an evidentiary hearing which implicit in

2  your decision --

3          THE COURT:  The request for evidentiary hearing is

4  denied because I can and do make these findings based on

5  undisputed facts.

6          MR. LUSKIN:  Then we will submit an order to chambers

7  and circulate it to those who filed objections by e-mail.

8          THE COURT:  All right.

9          MR. LUSKIN:  Thank you, Your Honor.

10         THE COURT:  Mr. Turner, is there anything of -- not by

11 way of reargument of course.  Is there anything I failed to

12 address in the way of matters that are now before me?

13         MR. TURNER:  No.  No.  Thank you, Your Honor.

14         THE COURT:  All right.  Then we're adjourned.  Thank

15 you, gentlemen.

16         MR. LUSKIN:  Thank you, Your Honor.

17     (Whereupon these proceedings were concluded at 11:15 AM)

18

19

20

21

22

23

24

25

1

2                                    **I N D E X**

3

4                                    RULINGS

5                                                          Page      Line

6    Settlement approved                                   29        20

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

37

1

2                     C E R T I F I C A T I O N

3

4    I, Michael Drake, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10

11    _____

12    MICHAEL DRAKE

13    AAERT Certified Electronic Transcriber CET-513

14

15    eScribers

16    700 West 192nd Street, Suite #607

17    New York, NY 10040

18

19    Date:  October 16, 2014

20

21

22

23

24

25