TRACY HOPE DAVIS

United States Trustee for Region 2

U.S. Department of Justice

Office of the United States Trustee

33 Whitehall Street, 21st Floor

New York, New York 10004

Tel. (212) 510-0500

By:    Andrea B. Schwartz, Esq.
       Trial Attorney

<u>Hearing Date and Time:</u>

**February 11, 2013, at 10:00 a.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| GSC GROUP, INC., <u>et</u> <u>al.</u>, | : | Case No. 10-14653 (SCC) |
|  | : |  |
|  | : |  |
| Debtors. | : |  |
|  | : |  |

------------------------------------------------------x

## MOTION OF THE UNITED STATES TRUSTEE, FOR AN ORDER: (I) PURSUANT TO FED. R. CIV. P. 60(b)(6) AND 60(d)(3), MADE APPLICABLE BY FED. R. BANKR. P. 9024, VACATING THE COURT'S ORDERS AUTHORIZING THE DEBTORS TO RETAIN KAYE SCHOLER LLP AND CAPSTONE ADVISORY GROUP, LLC AND DIRECTING DISGORGEMENT OF ALL COMPENSATION RECEIVED FROM THE ESTATES OR, IN THE ALTERNATIVE, (II) PURSUANT TO 11 U.S.C. §§ 327, 328(c), 329, 330(a)(5), 504(a) AND 105(a), FED. R. BANKR. P. 2014, 2016 AND 2017, LBR 2014-1 AND 2016-1, ADMINISTRATIVE ORDER M-389 AND UST FEE GUIDELINES b(1)(ii) AND b(1)(iii), DISALLOWING THE PENDING COMPENSATION REQUESTS OF KAYE SCHOLER LLP AND CAPSTONE ADVISORY GROUP, LLC AND DIRECTING DISGORGEMENT OF ALL COMPENSATION PAID FROM THE ESTATES AND (III) REMOVING RJM1, LLC AS LIQUIDATING TRUSTEE AND DIRECTING DISGORGEMENT OF ALL <u>COMPENSATION PAID FROM THE LIQUIDATING TRUST</u>

TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................viii

I.    INTRODUCTION ................................................................................................2

II.   FACTS ................................................................................................................3

      A.    The Chapter 11 Filings.................................................................................3

      B.    The Debtors' Retention of Kaye Scholer.....................................................4

            I.     The Kaye Scholer Retention Application ..........................................4
            II.    The Statements of Michael B. Solow ...............................................4

      C.    The Debtors' Retention of Capstone............................................................6

            I.     The Capstone Retention Application ................................................6
            II.    The Declarations of Edwin N. Ordway, Jr.......................................8

                   a.    The First Ordway Declaration ...............................................8
                   b.    Kaye Scholer's Supplementations to the Capstone
                         Retention Application ............................................................9
                   c.    The First Supplemental Ordway Declaration .......................10
                   d.    The Second Supplemental Ordway Declaration...................11

      D.    Significant Case Events ............................................................................12

      E.    Capstone's Requests for Compensation......................................................14

            I.     The Monthly Fee Statements ...........................................................15

            II.    The Interim and Final Fee Applications ...........................................16

                   a.    The First Capstone Fee Application .....................................16
                   b.    The Second Capstone Fee Application ..................................17
                   c.    The Final Capstone Fee Application......................................18

            III.   Capstone's Multiple Requests for a Success Fee...............................18

                   a.    Capstone's First Success Fee Motion Seeking a $3.25
                         Million Bonus .......................................................................18

                         i.     The UST Success Fee Objection.................................19
                         ii.    Capstone's Replies.....................................................19

iii.        The Continuance of the First Success Fee Motion ....20

b.        Capstone's Second Success Fee Motion Seeking a $2.75
Million Bonus Through A Settlement With The Trustee ......21

c.        Capstone's Amended Success Fee Motion Seeking a $2.75
Million Bonus .......................................................................21

F.        Discovery:  Document Production..................................................................22

I.        The Capstone/Manzo Agreement ......................................................23

a.        Mr. Manzo Was An Independent Contractor And Not A
Capstone Employee .............................................................23

b.        Capstone and Mr. Manzo Engaged in Fee Sharing...............25

II.        Mr. Ordway and At Least Two Other Capstone Executive
Directors Considered Whether Capstone Needed To Disclose Mr.
Manzo's Independent Contractor Status Before the Capstone
Retention Application was Filed with the Court...............................26

III.        Undisclosed Post-Petition Amendments To Fee Sharing
Agreement Result In Greater Compensation To Mr. Manzo............26

a.        The November 2010 Amendment..........................................26

b.        The March 2011 Amendment ................................................27

c.        Fees Earned By Mr. Manzo Under the Capstone/Manzo
Agreement.............................................................................28

IV.        Mr. Manzo Did Not Work Exclusively For Capstone During The
Pendency Of These Cases.................................................................29

V.        Mr. Solow Provided Legal Advice to Mr. Manzo Concerning the
Capstone/Manzo Agreement While Concurrently Representing the
Debtor ..............................................................................................31

VI.        While Serving as Debtors' Counsel, Mr. Solow and Kaye Scholer
Assisted Capstone and Mr. Manzo in Prosecuting The Success Fee
Motion..............................................................................................33

a.        Mr. Solow Assisted Mr. Manzo and Capstone With
Drafting the Eckert/Frank Letter To Support the
Success Fee Motion ...........................................................33

b.        Mr. Solow Submitted Two Declarations To Support the
Success Fee Motion ...........................................................33

G.        Discovery:  Depositions.................................................................................33

I.      The May 30, 2012, Deposition of Robert J. Manzo............................33

II.     The June 1, 2012, Deposition of Edwin N. Ordway, Jr. ....................35

H.    Kaye Scholer, Capstone and Mr. Manzo's Pre-Petition Knowledge of
      Independent Contractor Disclosure Requirements and Bankruptcy Code's
      Prohibition Against Fee Sharing ................................................................39

      I.      In re Refco, Inc.. ..............................................................................39

              a.      Capstone Is Special Financial Advisor To The RCM
                      Trustee Pre-Confirmation ......................................................39
              b.      Mr. Manzo, Through RJM, Is Appointed As the Refco Plan
                      Administrator For The Contributing Debtors ........................40
              c.      As Plan Administrator, Mr. Manzo, with Kaye Scholer as
                      His Counsel, Prosecuted Claims Against APS For Failure
                      To Disclose Independent Contractors And For Prohibited
                      Fee Sharing ...........................................................................41

      II.     In re Old Cargo, Inc. (f/k/a In re Chrysler, LLC) ..............................45

I.    Subsequent Court Conferences ...................................................................47

      I.      The June 11, 2012, Conference.........................................................47

      II.     The June 13, 2012, Conference.........................................................49

      III.    The October 10, 2012, Conference ...................................................52

      IV.     The October 12, 2012, Telephonic Conference ................................52

J.    The Solow Letter.........................................................................................53

K.    The Supervised Settlement Discussions ......................................................53

L.    The December 3, 2012, Conference ............................................................53

M.    Case Status .................................................................................................53

III.  ARGUMENT .....................................................................................................54

A.    Governing Law ...........................................................................................54

      I.      Employment of Estate Professionals and the Disinterestedness
              Requirement.......................................................................................55

a.    Section 327(a) of the Bankruptcy Code..................................55
b.    Disinterestedness.....................................................................55

II.    The Mandatory Duty of Professionals To Disclose Connections......58

a.    Bankruptcy Rule 2014(a)......................................................58
b.    Bankruptcy Rule 2016 ...........................................................59
c.    The Professional's Duty To Disclose is Self-Policing...........60
d.    Courts Strictly Construe the Duty To Disclose.....................62
e.    The Duty to Disclose is Continuing.......................................63
f.    Failure to Disclose Has Serious Consequences ....................63

III.    A Court May Allow Reasonable Compensation To Retained
Professionals From the Estate Upon Proper Application With
Requisite Disclosures.........................................................................65

a.    Section 330(a)(1) of the Bankruptcy Code ............................65
b.    Section 329 of the Bankruptcy Code .....................................66
c.    Section 330(a)(5) of the Bankruptcy Code ............................66

IV.    The Bankruptcy Code's Prohibition on Fee Sharing .........................67

a.    Section 504 of the Bankruptcy Code .....................................67
b.    Prohibition on Fee Sharing With Undisclosed
Subcontractors.......................................................................68
c.    Undisclosed Fee Sharing May Result in Full
Disgorgement.........................................................................69
d.    Ethical Considerations and Fiduciary Duties.........................70

V.    The Court's Authority To Vacate Its Own Orders Where There
Has Been A Fraud Perpetrated Upon The Court ...............................71

a.    Civil Rule 60(b) – Generally..................................................71
b.    Civil Rule 60(b)(6)................................................................72
c.    Civil Rule 60(d)(3)................................................................72

VI.    The Court's Inherent Power To Impose Sanctions ...........................75

B.    CAPSTONE, BY MESSRS. ORDWAY AND MANZO, FILED OR
CAUSED TO BE FILED WITH THE COURT DOCUMENTS
CONTAINING FALSE STATEMENTS ......................................................76

I.    Mr. Ordway Falsely Stated That Mr. Manzo was a Capstone
Employee in his Second Supplemental Declaration ..........................76

II.     Capstone, By Mr. Ordway, Falsely Represented That Mr. Manzo
        Was a Capstone Employee in Capstone's Final Fee Application
        Seeking $6.2 Million.........................................................................77

III.    Capstone, By Messrs. Ordway and Manzo, and Mr. Frank,
        Represented in Not Fewer Than 10 Documents Filed With The
        Court That Capstone Had Not Agreed to Share Fees
        in these Cases ..................................................................................78

C.      MESSRS. ORDWAY, MANZO AND SOLOW WERE AWARE
        BEFORE, AND AT THE TIME OF, THE COMMENCMENT OF
        THESE CASES THAT MR. MANZO WAS NOT A CAPSTONE
        EMPLOYEE AND THAT CAPSTONE AND MR. MANZO, THROUGH
        RJM, HAD AGREED TO SHARE FEES ....................................................78

D.      CAPSTONE, BY MESSRS. ORDWAY AND MANZO, WITH THE AID
        OF KAYE SCHOLER, FILED MORE THAN 30 DOCUMENTS
        CONTAINING MISLEADING STATEMENTS, THEREBY
        PREVENTING THE FULL EVALUATION OF CAPSTONE'S
        RETENTION APPLICATION .....................................................................80

E.      THE FILING OF NEARLY 50 DOCUMENTS THAT CONTAINED
        FALSE AND/OR MISLEADING REPRESENTATIONS BY
        EXPERIENCED BANKRUPTCY PROFESSIONALS ESTABLISHES
        THAT MESSRS. ORDWAY, MANZO, SOLOW AND OTHER KAYE
        SCHOLER LAWYERS KNOWLINGLY FAILED TO DISCLOSE
        MATERIAL FACTS CONCERNING CAPSTONE'S FINANCIAL
        RELATIONSHIP WITH MR. MANZO.........................................................84

        I.      Messrs. Ordway, Manzo and Solow are Experienced Bankruptcy
                Professionals ....................................................................................85

        II.     For More Than 20 Years, Messrs. Ordway, Manzo and Solow Have
                Maintained Professional and Personal Connections ..........................85

        III.    Kaye Scholer Knew Or Should Have Known That It Was Filing
                With The Court Documents Containing Inaccurate And/Or
                Misleading Statements ......................................................................87

        IV.     Messrs. Manzo and Solow Knew that Mr. Manzo's Independent
                Contractor Relationship and Fee Sharing Arrangements With
                Capstone Should Have Been Disclosed Because as Plan
                Administrator in Refco, Mr. Manzo and Mr. Solow Prosecuted
                These Very Claims Against Another Financial Advisor That
                Resulted in a $4 Million Credit Back to the Estates ..........................88

v

F.      KAYE SCHOLER AND CAPSTONE FAILED TO MAKE COMPLETE
        AND CANDID DISCLOSURE CONCERNING THEIR
        CONNECTIONS IN THESE CASES ........................................................90

        I.      The Extent of Kaye Scholer's Disclosure..........................................90

                a.      Kaye Scholer's Lack of Disinterestedness............................93
                b.      Kaye Scholer's Nondisclosure ...............................................95

        II.     The Extent of Capstone's Disclosure.................................................97

G.      THE PROTECTION AND PRESERVATION OF THE INTEGRITY OF
        THE BANKRUPTCY SYSTEM REQUIRES THAT THE COURT
        DISALLOW THE PENDING FEE REQUESTS OF KAYE SCHOLER
        AND CAPSTONE, AND ORDER THE DISGORGEMENT OF ALL
        COMPENSATION THAT THEY HAVE RECEIVED FROM THE
        ESTATES ....................................................................................................98

        I.      The Court, Pursuant to Fed. R. Civ. P. 60(b)(6) and 60(d)(3), Made
                Applicable by Fed. R. Bankr. P. 9024, Should Vacate the
                Retention Orders of Kaye Scholer and Capstone and Direct that
                They Disgorge all Compensation Received......................................99

        II.     In the Alternative, the Court Should Disallow the Pending Fee
                Requests of Kaye Scholer and Capstone, and Order the
                Disgorgement of all Compensation they Have Received From the
                Estates Because they Failed to Make Complete and Candid
                Disclosures Required by Fed. R. Bankr. P. 2014(a) ........................104

        III.    The Court, Pursuant to 11 U.S.C. §§ 328(c), 329 and 330(a)(5),
                Should Disallow the Pending Fee Requests of Kaye Scholer and
                Capstone, and Order the Disgorgement of all Compensation that
                they Have Received From the Estates Because Capstone, with the
                Aid of Kaye Scholer, Violated 11 U.S.C. § 504(a)...........................107

        IV.     The Court Should, Pursuant to its Inherent Powers to Issue
                Sanctions, Disallow the Pending Fee Requests of Kaye Scholer and
                Capstone and Direct that they Disgorge all Compensation they
                Have Received from the Estates .......................................................108

H.      THE COURT SHOULD ORDER THE REMOVAL OF RJM1 AS
        LIQUIDATING TRUSTEE AND DIRECT RJM1 TO DISGORGE ALL
        COMPENSATION PAID TO RJM1 FROM THE TRUST .........................109

IV.  CONCLUSION......................................................................................111

# TABLE OF AUTHORITIES

*Cases*

Andrada Fin., LLC v. Humara Group, Inc. (In re Andrada Fin. LLC), No. AZ-10-1209-
-JuMkPa, 2011 WL 3300983 (9th Cir. BAP) ............................................................74

Andrulonis v. United States, 26 F.3d 1224 (2d Cir.1994) ....................................................72

Balco Equities Ltd. v. Cohen, Estis and Assocs., LLP (In re Balco Equities Ltd.),
345 B.R. 87 (Bankr. S.D.N.Y. 2006)........................................................................61,69

Bank Brussels Lambert v. Coan (In re AroChem Corp.), 176 F.3d 610 (2d Cir. 1999)........56, 57,
58

Birnbaum v. Birnbaum, 73 N.Y.2d 461 (1989) ....................................................................110

Demjanjuk v. Petrovsky, 10 F.3d 338 (6th Cir. 1993)............................................................74

Diamond Lumber Inc. v. Unsecured Creditors' Comm., 88 B.R. 773 (N.D. Tex. 1988)......62

Freedom, N.Y., Inc. v. United States, 438 F.Supp.2d 457 (S.D.N.Y. 2006) .........................72

Futuronics Corp. v. Arutt, Nachamie and Benjamin (In re Futuronics Corp.),
655 F.2d 463 (2d Cir. 1981).....................................................................................60, 68,
70

Goldberg v. Vilt (In re Smith), 397 B.R. 810 (Bankr. E.D. Tex. 2008) ................................67, 68,
69

Hazel Atlas Glass Co. v. Harford-Empire Co., 322 U.S. 238 (1944) ...................................73

I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)...................................................63

In re ACandS, Inc., 297 B.R. 395 (Bankr. D. Del. 2003)......................................................64, 69

In re Adams, 229 B.R. 312 (Bankr. S.D.N.Y. 1999) .............................................................90 n.44

In re AMC Realty Corp., 270 B.R. 132 (Bankr. S.D.N.Y. 2001)..........................................72, 100

In re Angelika Films 57th, Inc., 227 B.R. 29 (Bankr. S.D.N.Y. 1998) .................................56, 58

In re B.E.S. Concrete Prods., Inc., 93 B.R. 228 (Bankr. E.D. Cal. 1988) ............................58, 99

In re BH & P, Inc., 949 F.2d 1300 (3d Cir. 1991) ................................................................64

In re Caldor, Inc., 193 B.R. 165 (Bankr. S.D.N.Y. 1996) .................................................63

In re C&C Demo, Inc., 273 B.R. 502 (Bankr. E.D. Tex. 2001) ...........................................63

In re Codesco, Inc., 15 B.R. 351 (Bankr. S.D.N.Y. 1981) ...................................................67

In re Codesco, Inc., 18 B.R. 997 (Bankr. S.D.N.Y. 1982).................................................56

In re Drake, 7 F. Cas. 1046 (D.N.J. 1876) ...........................................................................68

In re Egwu, No. 10-30652 (RAG), 2012 WL 5193958
     (Bankr. D. Md. Oct. 19, 2012)......................................................................54, 55,
                                                                                                                            67, 98

In re Enron Corp., 352 B.R. 363 (Bankr. S.D.N.Y. 2006)...................................................71

In re eToys, Inc., 331 B.R. 176 (Bankr. D. Del. 2005)..................................................64, 99

In re FairPoint Commc'ns, Inc., 445 B.R. 271 (Bankr. S.D.N.Y. 2011)............................75, 108
                                                                                                                            109

In re Fibermark, Inc., No. 04-10463, 2004 WL 723495 (Bankr. D. Vt. Mar. 11, 2006).......58, 60,
                                                                                                                            61, 62

In re Futuronics Corp., 5 B.R. 489 (SDNY 1980) ..............................................................60, 68,
                                                                                                                            70, 96

In re Granite Partners, L.P., 219 B.R. 22 (Bankr. S.D.N.Y. 1998)......................................56, 57,
                                                                                                                            60, 61,
                                                                                                                            63, 94,
                                                                                                                            96, 106

In re GSC Group, Inc., No. 10-14653 (AJG), 2012 WL 676409
     (Bankr. S.D.N.Y. Feb. 29, 2012) .................................................................65

In re Ira Haupt & Co., 361 F.2d 164 (2d Cir. 1996) ...........................................................95

In re Jore, 298 B.R. 703 (Bankr. D. Mo. 2003) ..................................................................64

In re Kewriga, No. 01-44262, 2002 WL 484942 (Bankr. D. Mass. Mar. 28, 2002) ............69

In re Leslie Fay Cos., 175 B.R. 525 (Bankr. S.D.N.Y. 2002) .............................................55, 57,
                                                                                                                            58, 60,
                                                                                                                            61, 62,
                                                                                                                            64, 93,
                                                                                                                            96, 99,
                                                                                                                            106

In re Levander 180 F.3d 1114 (9th Cir. 1999)......................................................75

In re Lewis Road, LLC,, No. 09-37672, 2011 WL 6140747
    (Bankr. E.D. Va. Dec. 9, 2011)...........................................................72, 100

In re Matco Elecs. Group, Inc., 383 B.R. 848 (Bankr. N.D.N.Y. 2008) ..............61

In re Mercury, 280 B.R 35 (Bankr. S.D.N.Y. 2002) ...........................................56

In re MF Global, Inc., 464 B.R. 594 (Bankr. S.D.N.Y. 2011) ..............................57, 60,
                                                                                                     62, 94

In re Old Cargo, LLC, 423 B.R. 40 (Bankr. S.D.N.Y. 2010) ................................71, 72,
                                                                                                     73, 74,
                                                                                                     85, 101

In re Park-Helena Corp., 63 F.3d 877 (9th Cir. 1995) .........................................55

In re Plumeri, No. 10-10050 (MG), 2010 WL 3087685
    (Bankr. S.D.N.Y. Mar. 25, 2010) .......................................................75,
                                                                                                     108,
                                                                                                     109

In re Project Orange Assocs., LLC, 431 B.R. 363 (Bankr. S.D.N.Y. 2010) ........55, 57

In re Roberts, 46 B.R. 815 (Bankr. D. Utah 1985) ..............................................57

In re Rockaway Bedding, Inc., 454 B.R. 592 (Bankr. D.N.J. 2011) ....................66

In re Roger J. Au & Son, Inc., 71 B.R. 238 (Bankr. N.D. Ohio 1986) .................61

In re Soulisak, 227 B.R. 77 (Bankr. E.D. Va. 1998) ..........................................69

In re Source Enters., Inc., No. 06-11707 (AJG), 2008 WL 850229
    (Bankr. S.D.N.Y. Mar. 27, 2008) ......................................................60, 61,
                                                                                                     62, 63

In re St. Joseph Cleaners, Inc., 346 B.R. 430 (Bankr. W.D. Mich. 2006) ...........66

In re Teligent, Inc., 326 B.R. 219 (S.D.N.Y. 2005) ............................................72, 100

In re United Cos. Fin. Corp., 241 B.R. 521 (Bankr. D. Del. 1999) ......................69, 98

In re Vebeliunas, 231 B.R. 181 (Bankr. S.D.N.Y. 1999) .....................................56, 94

In the Matter of Arlan's Dep't Stores, Inc., 615 F.2d 925 (2d Cir. 1979) ...........................60, 68, 70

King v. First Am. Investigations, Inc., 287 F.3d 91 (2d Cir. 2002) ....................................73, 74, 100, 101

Kravit, Gass & Weber, S.C. v. Michel (In re Crivello), 134 F.3d 831
        (7th Cir. 1998) ...........................................................................................60, 63, 64, 70 75, 95

Kupferman v Consolidated Research and Mfg. Corp., 459 F.2d 1072
        (2d Cir. 1972) ..............................................................................................73, 74, 100, 101

Lamie v. United States Trustee, 540 U.S. 526 (2004) .........................................................65, 104

LeBoeuf, Lamb, Greene & McCrae, L.L.P. v. Worsham, 185 F.3d 61 (2d Cir. 1999) ........90 n.44

Lee v. Marvel Enters., 765 F.Supp.2d 440 (S.D.N.Y. 2011) .................................................74

Lubit v. Chase (In re Chase), 372 B.R. 142 (Bankr. S.D.N.Y. 2007) ...................................109

Mapother & Mapother, P.S.C. v. Cooper (In re Downs), 103 F.3d 472
        (6th Cir. 1996) ...........................................................................................75

Marrero Pichardo v. Ashcroft, 374 F.3d 46 (2d Cir. 2004)  .................................................72

Martina Theatre Corp. v. Schine Chain Theatres, Inc., 278 F.2d 798 (2d Cir. 1960) ..........73

Matarese v. LeFevre, 801 F.2d 98 (2d Cir. 1986) .................................................................72, 100

Matter of Olsen Indus., Inc., 222 B.R. 49 (Bankr. D. Del. 1997) ........................................64

Meinhard v. Salmon, 249 N.Y. 458 (1928)  ........................................................................110

Nemaizer v. Baker, 793 F.2d 58 (2d Cir. 1986)  ..................................................................71, 72, 100

Pearson v. First NH Mort. Corp., 200 F.3d 30 (1st Cir. 1999) .............................................64, 73 100

Philips Lighting Co. v. Schneider, 395 F. App'x 796 (2d Cir. Oct. 12, 2010) .....................72, 74, 100

Radack v. Norwegian Am. Line Agency, Inc., 318 F.2d 538 (2d Cir. 1963) ......................71, 100

Reilly v. Natwest Markets Group, Inc., 181 F.3d 253 (2d Cir. 1999)  ...................................75

Rome v. Braunstein, 19 F.3d 54 (1st Cir. 1994) ...................................................................58, 60,
61, 63,
93

Specker Motor Sales Co. v. Eisen, 393 F.3d 659 (6th Cir. 2004) ...........................................66

Standard Oil Co. of Cal. v. United States, 429 U.S. 17 (1976)  ...........................................73

United States v. Seltzer, 227 F.3d 36 (2d Cir. 2000)  ...........................................................75,
108,
109

United States v. Smiley, 553 F.3d 1137 (8th Cir. 2009) .....................................................73, 74,
101

Vouzianas v. Ready & Pontisakos (In re Vouzianas), 259 F.3d 103 (2d Cir. 2001).............55

Weldon v. U.S., 225 F.3d 647, No. 99-6142, 2000 WL 1134358 (2d Cir. Aug. 9, 2000) ....74

Workman v. Bell, 227 F.3d 331 (6th Cir. 2000)...................................................................74, 100

### Statutes - Federal

11 U.S.C. § 101(14)(A)..........................................................................................................56

11 U.S.C. § 101(14)(C)..........................................................................................................56

11 U.S.C. § 101(41)  .............................................................................................................57

11 U.S.C. § 105(a) ...............................................................................................................1

11 U.S.C. § 326.....................................................................................................................65

11 U.S.C. § 327......................................................................................................................1, 55,
57, 58,
59, 60,
61, 62,
68, 72,
104

11 U.S.C. § 328......................................................................................................................1, 65

11 U.S.C. § 329 ..................................................................................................1, 65, 66

11 U.S.C. § 330(a)(1) ........................................................................................65, 68

11 U.S.C. § 330(a)(3) ........................................................................................65

11 U.S.C. § 330(a)(5) ........................................................................................1, 66

11 U.S.C. § 503(b)(2) ........................................................................................54, 67

11 U.S.C. § 503(b)(4) ........................................................................................67

11 U.S.C. § 504(a) ............................................................................................1, 67, 68, 69, 70, 98

11 U.S.C. § 507(a)(2) ........................................................................................54

11 U.S.C. § 1103 ...............................................................................................65

11 U.S.C. § 1107 ...............................................................................................4

11 U.S.C. § 1108 ...............................................................................................4

28 U.S.C. § 1927 ...............................................................................................109

28 U.S.C. 1746 ..................................................................................................104

***Statutes-State***

N.Y. Est. Powers & Trusts Law § 7-2.6(a)(2) ...................................................105

***Rules-Federal***

Fed. R. Bankr. P. 2014 ......................................................................................1

Fed. R. Bankr. P. 2016 ......................................................................................1

Fed. R. Bankr. P. 2017 ......................................................................................1

Fed. R. Bankr. P. 7030 ......................................................................................23

Fed. R. Bankr. P. 7034 ......................................................................................23

Fed. R. Bankr. P. 9024 ......................................................................................1

Fed. R. Civ. P. 30 ........................................................................................................23

Fed. R. Civ. P. 34 ........................................................................................................23

Fed. R. Civ. P. 60(b)(3).............................................................................................71, 72, 73, 75

Fed. R. Civ. P. 60(b)(6).............................................................................................1, 4

Fed. R. Civ. P. 60(c)(1) .............................................................................................71 n.36, 73

Fed. R. Civ. P. 60(d) .................................................................................................75

Fed. R. Civ. P. 60(d)(3).............................................................................................1, 3, 72, 73, 99

LBR 2014-1 ................................................................................................................1, 59 n.31

LBR 2016-1 ................................................................................................................1

LBR 9004-1 ................................................................................................................92 n.47

***Rules-State***

22 NYCRR § 1200.0 ...................................................................................................93

***Administrative Orders***

Admin. Order M-389 ..................................................................................................1, 60 n.32, 80, 81 n.40

***Executive Materials***

UST Fee Guidelines b(1)(ii) ......................................................................................1

UST Fee Guidelines b(1)(iii) .....................................................................................1

***Treatises***

Alan N. Resnick & Henry J. Sommer (eds.), <u>Collier on Bankruptcy</u> (16th ed. 2012)  .........58, 67, 68, 70, 99

James WM. Moore <u>et al.</u>, <u>Federal Practice</u>  (3d ed. 2009) ...................................................74

TO:    THE HONORABLE SHELLEY C. CHAPMAN,
       UNITED STATES BANKRUPTCY JUDGE:

Tracy Hope Davis, the United States Trustee for Region 2 (the "United States Trustee"),

by and through her counsel (the "UST Counsel"), respectfully submits this motion (the "UST

Vacatur//Disgorgement Motion"), (i) pursuant to Rules 60(b)(6) and 60(d)(3) of the Federal

Rules of Civil Procedure (the "Civil Rules"), as made applicable herein by Rule 9024 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order vacating the

Court's orders authorizing GSC Group, Inc. and its affiliated debtors (the "Debtors") to retain

Kaye Scholer LLP ("Kaye Scholer") as their counsel, and Capstone Advisory Group, LLC

("Capstone") as their financial advisor, and directing the disgorgement of all compensation

received by them from the estates or, in the alternative, (ii) pursuant to Sections 327, 329,

330(a)(5), 504(a) and 105(a) of title 11, United States Code (the "Bankruptcy Code"), Rules

2014, 2016 and 2017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

Local Bankruptcy Rules 2014-1 and 2016-1 of the Southern District of New York (the "Local

Bankruptcy Rules"), the Amended Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Cases ("Amended Fee Guidelines" or "Admin. Order M-389")

and Guidelines b(1)(ii) and b(1)(iii) of the Guidelines for Reviewing Applications for

Compensation and Reimbursement of Expenses filed under 11 U.S.C. § 330 (the "UST Fee

Guidelines") for an order disallowing the pending fee requests of Kaye Scholer and Capstone

and directing the disgorgement of all compensation received by them from the estates and (iii)

removing RJM1, LLC ("RJM1" or "Liquidating Trustee") as Liquidating Trustee of the GSC

Liquidating Trust (the "Liquidating Trust") and directing the disgorgement of all compensation

received by RJM1 from the Liquidating Trust.  In support hereof, the United States Trustee

respectfully states as follows:

## I.    INTRODUCTION

The Debtors retained a law firm and a financial advisory firm to guide them through the bankruptcy process.  Both firms are experienced in the bankruptcy arena, each staffed with highly qualified professionals.  Each of the professionals that the law firm and financial advisory firm assigned to these cases was well aware that the integrity of the bankruptcy system depends upon full disclosure by debtors, creditors, and professionals.  As such, each knew that the Bankruptcy Code, Bankruptcy Rules, and the caselaw interpreting them, impose specific and mandatory requirements governing the depth and breadth of the disclosures that must be provided by professionals such as themselves – which disclosures must continue to be evaluated and made throughout the pendency of the bankruptcy proceeding.

As courts have observed on multiple occasions, the bankruptcy system is self-policing.  It is not the responsibility of the United States Trustee, the Court, or other interested parties to discern gaps in the disclosures provided, or to ferret out every last piece of information that may not have been disclosed completely.  In essence, the bankruptcy system relies upon the integrity of professionals appearing in bankruptcy cases to make forthright, complete and candid disclosures to fulfill the spirit of the Bankruptcy Code, even where the professionals know that making these disclosures may result in a court's determination that they may not be retained in the case.  This determination is for the courts to decide, and not the professionals themselves.

Based upon the respective representations that Kaye Scholer and Capstone made to this Court, each firm was retained by court order.  Approximately two years after their respective retentions were approved, the United States Trustee learned for the first time that two specific material representations contained in a document that a Capstone officer signed under penalty of perjury were inaccurate.  The first representation described an individual, the sole member of a

limited liability company, as a Capstone employee when, in fact, the individual was an independent contractor. The second representation stated that Capstone did not have any fee-sharing agreements, when, in fact, Capstone had a fee sharing agreement with the independent contractor.

Thereafter, an investigation uncovered information that revealed that not only was the Kaye Scholer partner in charge of the lawyers working on these cases fully aware of the status of this independent contractor and the fee sharing agreement with Capstone, but that professionals at both Capstone and Kaye Scholer knew or should have known this same information, yet failed to disclose it to the Court.

The bankruptcy system must be protected from failures by the very professionals upon whose integrity the Court and other parties rely. Therefore, in light of the facts presented in this motion, and in accordance with Rule 60(b)(6) and (d)(3), the United States Trustee respectfully requests that the court vacate its respective retention orders for each of these firms. In addition, each firm should be directed to disgorge all compensation received from the Debtors' estates, and any pending compensation requests should be denied. Finally, the independent contractor who subsequently has become the Liquidating Trustee, should be removed immediately.

## I.    FACTS

### A.    <u>The Chapter 11 Filings</u>.

1.      On August 31, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the "Bankruptcy Code. (ECF No. 1).

2.      The Debtors provided debt-focused investment management of alternative assets. <u>See</u> Declaration of Peter R. Frank in Support of First Day Motions and Applications in Compliance with Local Rule 1007-2 dated August 31, 2010 at ¶ 9. (ECF No. 9).

3.      The United States Trustee did not appoint a creditors' committee due to an insufficient response to her solicitation from general unsecured creditors.

4.      Upon information and belief, the Debtors operated their businesses and managed their properties as debtors in possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code, until January 5, 2011, when the Court appointed a Chapter 11 trustee (the "Trustee") to administer these estates.

**B.    The Debtors' Retention of Kaye Scholer.**

*(I)    Kaye Scholer Retention Application.*

5.      On September 1, 2010, the Debtors, by their proposed counsel Kaye Scholer, filed an application (the "Kaye Scholer Retention Application") to retain Kaye Scholer in these cases. (ECF No. 20).

6.      By the application, the Debtors asserted that Kaye Scholer's employment was necessary and should be approved because of Kaye Scholer's "extensive knowledge and experience in business reorganizations both in and out of court," and Kaye Scholer's "familiarity with the business, financial and legal affairs of the Debtors."[1]  Kaye Scholer Retention App. at ¶ 10.

*(II)    The Statements of Michael B. Solow.*

7.      In support of the Kaye Scholer Retention Application, the Debtors submitted a "verified" statement of Michael B. Solow (the "Solow Statement").[2]  (ECF No. 20).  Mr. Solow

---

[1] Kaye Scholer represents that it's Bankruptcy and Restructuring Department comprises "one of the most experienced teams of insolvency practitioners in the U.S."  See http://www.kayescholer.com/practice/bankruptcy_restructuring.

[2] Although captioned as "verified," neither the Solow Statement nor the Supplemental Solow Statement (defined below) include Mr. Solow's representation that the statements contained therein were made "under penalty of perjury."  See ECF Nos. 20 and 115.

was the "head of the legal team" that represented the Debtors in these cases.[3]  See Declaration of

Michael B. Solow in Support of Capstone Advisory Group, LLC's Motion for a Performance Fee

(the "First Solow Success Declaration") at ¶ 1.  (ECF No. 1245).

8.    By the Solow Statement, Mr. Solow represented:

- To the best of my knowledge, information and belief, except as otherwise
  disclosed herein, Kaye Scholer is a "disinterested person" within the
  meaning of Section 101(14) of the Bankruptcy Code in that neither I, nor
  Kaye Scholer, its partners, counsel and associates hold or represent any
  interest materially adverse to the interests of the Debtors' estate . . . . ;

- . . . to the best of my knowledge, information and belief, except as
  otherwise disclosed herein, neither I nor Kaye Scholer, its partners,
  counsel and associates have any connection with the Debtors, their
  secured lenders, their unsecured creditors (on a consolidated basis), equity
  holders, any other parties-in-interest, or the attorneys of any of the
  foregoing; and

- Kaye Scholer has in the past represented, may presently represent, or
  might in the future represent certain creditors, other parties in interest, or
  their affiliates, in matters unrelated to and having no effect upon or
  influence upon the Debtors' chapter 11 cases. . . . .

Solow Statement at ¶¶ 11, 14 and 15.  (ECF No. 20-1).

9.    Mr. Solow declared that, "[t]o the extent that any information disclosed [in the

Solow Statement] require[d] amendment or modification upon Kaye Scholer's completion of

further analysis or as additional party-in-interest information becomes available to me, [he

would] promptly file a supplemental verified statement."  Id. at ¶ 3; see also ¶¶ 15 and 18.

10.    Mr. Solow also stated that, "although not relevant in concluding that Kaye

Scholer is 'disinterested,' in an abundance of caution, listed on Schedule 1 to the Solow

---

[3] According to Kaye Scholer's website, Mr. Solow is licensed to practice law in New York and
Illinois, and serves as the firm's Managing Partner, Co-Chair of the Executive Committee and
Co-Chair of the Bankruptcy and Restructuring Department.  See
http://www.kayescholer.com/professionals/solow_michael.  Mr. Solow signed all of the Debtors'
pleadings, until the appointment of the Trustee.  See, e.g., id.

Statement hereto are the results of Kaye Scholer's conflicts searches." Id. at ¶ 16.  A copy of

Schedule 1 is annexed as **Exhibit A** to the Declaration of Andrea B. Schwartz, dated January 4,

2013 (the "Schwartz Declaration").  Neither Mr. Manzo, RJM nor RJM1 are included on

Schedule 1. Id.

11.    On September 21, 2012, Kaye Scholer filed a supplemental statement (the

"Supplemental Solow Statement," and together with the Solow Statement, the "Solow

Statements"), that Mr. Solow signed, and pursuant to which he added one entity, namely, Versa

Capital Management, Inc., to Kaye Scholer's list of conflicts searches.  (ECF No. 115).  A copy

of Schedule 1A is annexed as **Exhibit B** to the Schwartz Declaration.

12.    On September 22, 2010, the Court entered an Order (the "Kaye Scholer Retention

Order") approving the Debtors' retention of Kaye Scholer, and retaining jurisdiction over all

matters arising therefrom.  (ECF No. 127).

**C.    The Debtors' Retention of Capstone.**

*(I)    The Capstone Retention Application*.

13.    On September 1, 2010, the Debtors, by Kaye Scholer, filed an application (the

"Capstone Retention Application") to retain Capstone as their financial advisor.[4] (ECF No. 22).

The Capstone Retention Application provides that, since February 2009, to the Petition Date,

Capstone had been providing out-of-court restructuring services to the Debtors.  Capstone

---

[4] At a scheduling conference held by the Court on June 13, 2012 (the "June 13 Conference"),
Kaye Scholer Counsel represented that the Debtors' prior restructuring counsel, Dechert LLP
("Dechert"), had prepared the initial drafts of the Capstone Retention Application, but that Kaye
Scholer was responsible for "bringing that document forward" and filing it with the Court.  See
Transcript of Court Hearing Held on June 13, 2012, at 31:10-31-21.  (ECF No. 1510).  A copy of
the transcript of the June 13 Conference is annexed as **Exhibit C** to the Schwartz Declaration.
Schwartz Decl., Ex. C.

Retention App. at ¶ 12.  Upon information and belief, Capstone received not less than $4 million for these pre-petition services.

14.    By the Capstone Retention Application, the Debtors asserted that Capstone's employment was necessary and should be approved because Capstone is "a premier advisory firm, with vast experience in the fields of restructuring and providing financial operational guidance to companies in distressed situations." Id. at ¶ 12.

15.    With respect to compensation, annexed to the Capstone Retention Application was an engagement letter (the "The Capstone Engagement Letter"), which set forth Capstone's proposed compensation schedule as follows:

> Our fees will be based on the actual hours charged at our standard hourly rates, which are in effect when the services are rendered; our rates are revised annually January 1.  We will also be reimbursed for our reasonable out-of-pocket expenses including, but not limited to, costs of reproduction, research expenses, travel, typing, legal counsel, any applicable sales or excise taxes and other direct expenses.  Our current hourly rates are as follows:
>
> | Executive Directors | $600 - $850 |
> | Staff | $160 - $595 |
> | Support Staff | $110 - $170 |

Capstone Engagement Letter at 3.  See ECF No. 22.

16.    The Capstone Engagement Letter also provided that:

> Capstone shall be eligible to request a success fee, the amount and conditions of which to be mutually agreed upon and subject to Bankruptcy Court approval.

Id.

17.    Edwin N. Ordway, Jr., a Member and Manager of Capstone, signed the Capstone Engagement Letter.[5] Id.

---

[5] At his deposition conducted on June 1, 2012 (the "Ordway Deposition"), Mr. Ordway testified that he is a Certified Public Accountant, a Member and one of Capstone's two Managers.  See

(II)     *The Declarations of Edwin N. Ordway, Jr.*

18.     The Debtors, by Kaye Scholer, filed three declarations (collectively, the "Ordway

Declarations") that Mr. Ordway signed to support the Capstone Retention Application.  Upon

information and belief, Kaye Scholer prepared, revised, reviewed and/or filed all three of the

declarations.[6]

> a.     The First Ordway Declaration.

19.     Pursuant to his first declaration dated August 31, 2010 (the "First Ordway

Declaration"), Mr. Ordway made the following representations to the best of his knowledge:

- [O]ther than in connection with these cases, neither Capstone, nor any of
  its principals, employees, contractors, agents, or affiliates have any
  connection with the Debtors, the U.S. Trustee, or their creditors, the U.S. Trustee, or any other
  party with an actual or potential interest in these chapter 11 cases or their
  respective attorneys or accountants, except as set forth therein;

- In connection with the preparation of this Declaration, Capstone
  conducted a review of the parties identified by the Debtors as being
  potential parties in interest.  Based on the results of that review, Capstone
  has determined that it does not have any connection with any such parties
  on matters related to these proceedings and does not have any adverse
  interest to the estates, except as set forth in Schedule 1.  A copy of
  Schedule 1 is annexed as **Exhibit E** to the Schwartz Declaration; and

- Capstone is involved in numerous cases, proceedings and transactions
  involving many different professionals, including Kaye Scholer LLP, the
  Debtors' bankruptcy counsel, other attorneys, accountants and financial
  consultants, some of which may represent claimants and parties-in-interest
  in the Debtors' chapter 11 cases and/or unsecured creditors.  In addition,
  Capstone has in the past, and may in the future, be working with or against
  other professionals involved in these cases in matters wholly unrelated to
  these cases.  Based on our current knowledge of the professionals
  involved, and to the best of my knowledge, none of these business
  relationships constitute interests materially adverse to the Debtors' estates

---

Ordway Dep. Tr. at 137:14-137:18; 140:19-141:4.  A copy of the transcript of the Ordway
Deposition is annexed as **Exhibit D** to the Schwartz Declaration.

[6] Each of the Ordway Declarations includes Mr. Ordway's representation that his statements
were made "under penalty of perjury."  <u>See</u> ECF Nos. 22-1, 142-1 and 148-1.

or their creditors herein in matters upon which Capstone is to be
employed, and none are in connection with these cases.

First Ordway Decl. at ¶¶ 3, 4, 5 and 6.  (ECF No. 22-1).

20.     With respect to fee sharing, Mr. Ordway represented that to the best of his

knowledge:

> (a) no commitments have been made or received by Capstone with respect to
> compensation or payment in connection with these cases other than in accordance
> with applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, and
> (b) Capstone has no agreement with any other entity to share with such entity any
> compensation received by Capstone in connection with these chapter 11 cases.

First Ordway Decl. at ¶ 17.

21.     Mr. Ordway further represented that if Capstone discovered additional

information that required disclosure, Capstone would file a supplemental disclosure with the

Court.  First Ordway Decl. at ¶ 13.

b.      Kaye Scholer's Supplementations to the Capstone
        Retention Application.

22.     One of the documents that Kaye Scholer produced in connection with the Court's

direction was a compilation of handwritten notes that included the following checklist:

☐     do we retain any contractors
☐     Capstone has to disclose
☐     include in conflict search
☐     mark-up on fees

Copies of the notes are annexed as **Exhibit F** to the Schwartz Declaration.

23.     On October 1, 2010, a Kaye Scholer associate sent an email to Mr. Micheli,

attaching a blacklined version of a supplemental declaration for Mr. Ordway.  Copies of the

email from the Kaye Scholer associate to Mr. Micheli dated October 1, 2010, and the blacklined

version of the supplemental declaration are annexed as **Exhibit G** to the Schwartz Declaration.

9

24.     Paragraph 3 of the associate's draft includes Mr. Ordway's disclosures about Capstone's connections in these cases and, in particular, the connections of Capstone's "contractors." Id. Footnote 3, which refers to Capstone's contractors, includes the following question: "[Do we need to make a disclosure about this?]" Id.

25.     The same day, Mr. Nurnberg apparently reviewed and provided his handwritten comments to the draft, placing his imprimatur and date ("DTN 10/1") at the top of the first page. Mr. Nurnberg's markup reflects that footnote 3 was struck, and did not insert any disclosures concerning Capstone's retention of contractors. A copy of Mr. Nurnberg's markup of the associate's draft supplemental declaration is annexed as **Exhibit H** to the Schwartz Declaration.

     c.     The First Supplemental Ordway Declaration.

26.     On October 4, 2010, the Debtors, by Kaye Scholer, filed a Notice of Supplemental Capstone Documents, to which Kaye Scholer annexed: (i) a second declaration of Mr. Ordway dated October 1, 2010 (the "First Supplemental Ordway Declaration"), and (ii) a revised proposed order. (ECF No. 142).

27.     By the Supplemental Ordway Declaration, Mr. Ordway made the same representations concerning Capstone's connections to parties in interest in these cases. Supp. Ordway Decl. at ¶¶ 3, 4, 5 and 13. Mr. Ordway also made the same representation that Capstone was not sharing fees in these cases. First Supp. Ordway Decl. at ¶ 18.

28.     The revised proposed order contained several modifications to the initial order proposed by the Debtors and Capstone, including that Capstone was being retained solely pursuant to Section 327(a) of the Bankruptcy Code and not pursuant to Section 328 of the Bankruptcy Code as initially requested. See ECF No. 142-2.

d.    The Second Supplemental Ordway Declaration.

29.    On October 5, 2006, Mr. Micheli sent an email to Mr. Manzo and others attaching

a blacklined copy of a third declaration of Mr. Ordway (the "Second Supplemental Declaration")

and asking specifically that Mr. Manzo review paragraph 15 ("Paragraph 15") to "make sure that

[he (Mr. Manzo) was] comfortable with the language that [Kaye Scholer] added."  Copies of the

email from Mr. Micheli to Mr. Manzo and others dated October 5, 2010, and the blacklined

Second Supplemental Ordway Declaration are annexed as **Exhibit I** to the Schwartz Declaration.

30.    Paragraph 15 provides:

> It is my understanding that Robert Manzo, a professional staffed on this engagement, is
> the sole member of RJM, LLC.  Mr. Manzo, through RJM, LLC, is an employee of, and
> works exclusively for, Capstone.  No business is conducted by RJM, LLC except as
> described herein with respect to its employment by Capstone.  None of the other
> Capstone employees staffed on this engagement has a similar employment structure.

Second Supp. Ordway Decl. at ¶ 15.

31.    On October 6, 2010, the Debtors, by Kaye Scholer, filed an executed copy of the

Second Supplemental Ordway Declaration with no changes to Paragraph 15. Second

Supplemental Declaration at ¶ 15.  (ECF No. 148).  By the Second Supplemental Ordway

Declaration, Mr. Ordway again made the same representations concerning Capstone's

connections in these cases and the absence of any fee sharing, as he did in his two prior

declarations.  Second Supplemental Declaration at ¶¶ 3, 4, 5, 10, 14 and 19.

32.    On October 7, 2010, the Court entered an order (the "Capstone Retention Order")

approving the Debtors' retention of Capstone and retaining jurisdiction over all matters arising

therefrom.  Capstone Retention Order at 6.  (ECF No. 150).[7]

---

[7] From the Petition Date until January 20, 2012, Kaye Scholer (under Mr. Solow's name") filed
all of Capstone's pleadings with the Court.  See, e.g., ECF Nos. 22, 142 and 148.  Based upon a
review of the Court's docket, Kaye Scholer's time records and testimony that Mr. Ordway gave

**D.**    **Significant Case Events**

33.    The history of these cases leading up to, and following, confirmation of the plan

(the "Plan") that Black Diamond Capital Management, L.L.C. ("BDCM" or "Black Diamond")

proposed, is well-documented in the various pleadings that the United States Trustee and others

filed in opposition to Capstone's several requests for a multi-million dollar success fee in these

cases.  See, e.g., Objection of the United States Trustee to Capstone Advisory Group, LLC's

Motion for a Success Fee (ECF No. 1230).  The Court, therefore, respectfully is referred to these

pleadings for these facts, all of which are incorporated by reference herein.

34.    On January 5, 2011, the Court issued a bench ruling finding cause for the

appointment of a Chapter 11 trustee.  See ECF No. 374.

35.    On January 7, 2011, the United States Trustee appointed James L. Garrity, Jr. (the

"Trustee"), as trustee, which the Court approved the same day.  (ECF Nos. 379 and 382).

36.    By Order dated July 11, 2011, the Court approved the Trustee's sale (the "Trustee

Sale") of substantially all of the Debtors' assets to GSC Acquisition Holdings, LLC ("GSCAH"),

a Black Diamond affiliate.  (ECF No. 668).

37.    On February 17, 2012, the Court entered an order (the "Confirmation Order")

confirming the Plan and retaining "exclusive jurisdiction over all matters arising out of, or

related to, these chapter 11 cases and the [Black Diamond] Plan pursuant to Article XI of the

[Black Diamond] Plan."[8]  Confirmation Order at ¶ 75.  (ECF No. 1212).  A copy of the Black

---

at his deposition, Kaye Scholer either prepared, reviewed or revised several of Capstone's
pleadings in addition to its retention papers, including: four of Capstone's monthly fee
statements, Capstone's First Rate Increase Notice (defined below) and Capstone's First Interim
Fee Application.  See ECF Nos. 180, 215, 333, 361, 398 and 400.  See Schwartz Decl., Ex. D at
41:23-41:25, 47:4-47:7.

[8] Article XI provides, in part:  "Notwithstanding the entry of the Confirmation Order and the
occurrence of the Effective Date or anything to the contrary in this Plan, or the Plan Supplement,

Diamond Plan is annexed as **Exhibit J** to the Schwartz Declaration.  See ECF No. 1212-1.  The

Plan became effective on March 16, 2012 (the "Effective Date").  (ECF No. 1312).

38.    According to the Plan, on the Effective Date, all of the Debtors' assets were

transferred to the Trust and Mr. Manzo, through RJM1, of which he is the sole member, became

the Liquidating Trustee of the Trust.[9]  See Schwartz Decl., Ex. L, § 5.1.

39.    According to the agreement (the "Liquidating Trust Agreement") that governs the

Trust, Mr. Manzo, through RJM1, is entitled to receive compensation based upon an hourly rate

of $895.00 (subject to annual adjustments) for the time that he spends providing services to the

Trust, plus reimbursement for out-of-pocket expenses.  See Liquidating Trust Agmt. at § 2.4(a)

and Ex. 1.  A copy of the Liquidating Trust Agreement is annexed as **Exhibit L** to the Schwartz

Declaration.  In addition, the Liquidating Trustee may seek a bonus, subject to Bankruptcy Court

approval.  Id.[10]

40.    The Liquidating Trust Agreement provides the Court with independent authority

to remove the Liquidating Trustee.  In addition, the Bankruptcy Court may remove the

Liquidating Trustee upon a motion by the United States Trustee or others for gross negligence or

willful misconduct.  The relevant provisions include:

> The Liquidating Trustee's appointment shall continue until the earlier of: . . . (ii)
> the expiration of the term of such Liquidating Trustee's employment agreement or

---

the Bankruptcy Court shall retain exclusive jurisdiction over all matters related to this Plan, the
Confirmation Order, the Liquidating Trust Agreement, and the Chapter 11 Cases to the fullest
extent permitted by law . . . ."  See Schwartz Decl., Ex J at Art. XI.

[9] At his deposition conducted on May 30, 2012 (the "Manzo Deposition"), Mr. Manzo testified
that he is the sole member of RJM1.  Manzo Dep. Tr. 173:6-173-9.  A copy of the transcript of
the Manzo Deposition is annexed as **Exhibit K** to the Schwartz Declaration.

[10] Upon information and belief, Mr. Manzo, through RJM1, already has exhausted the $1 million
budget designated for the administration of the Liquidating Trust, although the actual
disbursements are not known.

such Liquidating Trustee's resignation, death, incapacity, removal, or termination
pursuant to this Liquidating Trust Agreement or order of the Bankruptcy Court; . .
. The Liquidating Trustee may also be removed by Beneficiary or the U.S.
Trustee.

\*\*\*

The initial Liquidating Trustee . . . shall serve until the earlier of . . . (ii) the
expiration of the term of such Liquidating Trustee's employment agreement or
such Liquidating Trustee's resignation, death, incapacity, removal or order of the
Bankruptcy Court; . . . The Liquidating Trustee may also be removed by the
Bankruptcy Court for gross negligence or willful misconduct upon motion by any
Beneficiary or the U.S. Trustee.

See Schwartz Decl., Ex. L, at § 2.1 and § 10.3, respectively.

41.    The Liquidating Trust Agreement is governed by the laws of the State of New

York. Id. at § 11.9.

42.    In addition, the Liquidating Trust Agreement provides that the Court retains

exclusive jurisdiction over the Trust after the Effective Date including, without limitation any

entity's obligations under the Liquidating Trust Agreement and any action against the

Liquidating Trustee or any professional retained by the Liquidating Trustee.  Id. at § 11.10.

Upon information and belief, Mr. Manzo has retained Capstone as one of his professionals a

Liquidating Trustee.  As of the date hereof, it is unknown whether Mr. Manzo also has retained

Kaye Scholer to provide any services for the Trust.

**E.    Capstone's Requests for Compensation**

43.    For the 18-month period from the Petition Date through confirmation of the Black

Diamond Plan, Capstone has requested fees and expenses that aggregate approximately $9

million.  See Third Interim and Final Application of Capstone Advisory Group, LLC for

Compensation for Services Rendered and Reimbursement of Expenses as Financial Advisor to

the Debtors for the Period from August 31, 2010 through February 16, 2012 (the "Capstone Final

Fee Application"), at 2.  (ECF No. 1431); Amended Success Fee Motion (defined below) at 2.

(ECF No. 1412).  The only fees that Capstone has not been paid are:  (i) approximately

$365,000.00 based upon its hourly rates and (ii) its request for a $2.75 million success fee (the

"Success Fee"), which, as of the date hereof, has not been withdrawn.

> ### *(I)    The Monthly Fee Statements.*

51.    Capstone has filed or caused to be filed 18 monthly fee statements (the "Capstone

Monthly Fee Statements") to be served and filed with the Court on its behalf.  (ECF Nos. 180,

215, 361, 398, 424, 462, 469, 498, 608, 694, 745, 783, 828, 1283, 1284, 1285, 1363 and 1364).

Pursuant to these statements, Capstone has requested payment of and, upon information and

belief, received 80 percent of the fees incurred plus 100 percent of the expenses.  Id.

52.    A review of the Court's docket reveals that, in addition to providing Capstone

with the courtesy of filing its documents with the Court, Kaye Scholer, while concurrently

representing the Debtors, also aided Capstone with the preparation of many Capstone documents,

including:

- Capstone's Monthly Fee Statement for September, October, November and December 2010, wherein Kaye Scholer's name, not Capstone's, appears on the face of each document;

- Capstone's first rate increase notice (the "Capstone Rate Increase Notice"), where Kaye Scholer's name appears on the face of the document and Mr. Solow's signature; and

- Capstone's First Fee Application, wherein Kaye Scholer's time records reveal that its attorneys were billing the estates for preparing this document.

See ECF Nos. 180, 215, 333, 361, 398 and 839..  Copies of the above Capstone fee statements,

the Capstone Rate Increase Notice and excerpts from the time records annexed to Kaye Scholer's

second interim fee application are annexed as **Exhibit M** to the Schwartz Declaration.

*(II)*    ***The Interim and Final Fee Applications.***

53.    Capstone has requested interim and final fees as follows:

| Capstone Application | Fee Period | Interim Fees Allowed | Interim Expenses Allowed |
|---|---|---|---|
| First Capstone Fee Application (ECF No. 400) | 8/31/10 – 11/30/11 | $1,853,290.50 | $62,616.45 |
| Second Capstone Fee Application (ECF No. 842) | 12/1/11 – 8/31/11 | $2,906,408.00 | $55,438.26 |
| Final Capstone Fee Application (ECF No. 1431) | 8/31/10 – 2/16/12 | $1,187,571.50 | $136,293.69 |
| **Totals** | | **$5,947,270.00** | **$254,348.40** |

a.    <u>The First Capstone Fee Application</u>.

54.    On January 27, 2011, prior to the filing of Capstone's first interim fee application (the "First Capstone Fee Application"), Robert Butler, a Capstone Managing Director, sent an email to Mr. Nurnberg, at Mr. Manzo's direction, inquiring as to whether Mr. Manzo could sign the fee application "given that Bob is an independent contractor and not an employee of Capstone." A copy of the email from Mr. Butler to Mr. Nurnberg dated January 27, 2011, is annexed as **Exhibit N** to the Schwartz Declaration.

55.    An email chain among Messrs. Nurnberg, Micheli, Solow and others shows that this inquiry was passed among them and that Mr. Solow stated, "Should not be a problem as long as cap authorizes." A copy of this email chain among Messrs. Butler, Nurnberg, Micheli, Solow and others dated January 27, 2011, is annexed as **Exhibit O** to the Schwartz Declaration.

56.    On January 28, 2011, Kaye Scholer filed the First Capstone Fee Application. (ECF No. 400). Mr. Manzo, as "Executive Director," signed the application, and submitted the certification (the "Manzo M-389 Certification") required by Admin. Order M-389. <u>Id.</u> at 26.

57.     By the Manzo M-389 Certification, Mr. Manzo represented:

- Neither I nor any professional of my firm has entered into any agreement, written or oral, express or implied, with the Office of the United States Trustee (the U.S. Trustee) with the Debtors, any creditor or any other party in interest, or any attorney of such person, for the purpose of fixing the amount of any of the fees or other compensation to be allowed out of or paid from the assets of the Debtors; and

- In accordance with section 504 of the Bankruptcy Code, no agreement or understanding exists between me, my firm or any professional thereof or any person for the division of such compensation as my firm may receive for services rendered in connection with this case, nor will any division of fees prohibited by section 504 of the Bankruptcy Code be made by me or any professional of my firm.[11]

Manzo M-389 Cert. at 27-28.

58.     On March 11, 2011, the United States Trustee filed an objection (the "UST Fee Objection") to the fees that Capstone sought in its first interim application.  (ECF No. 439).

59.     Subsequently, the United States Trustee and Capstone reached a resolution, pursuant to which Capstone reduced its fee request by approximately $150,000.00.  (ECF No. 1116).  By Order dated January 30, 2012, the Court granted the First Capstone Interim Fee Application, as modified.  (ECF No. 1140).

b.     The Second Capstone Fee Application.

60.     On October 21, 2011, Kaye Scholer filed Capstone's second interim fee application (the "Second Capstone Fee Application"), pursuant to which Capstone sought fees in the amount of approximately $2.9 million and expenses of approximately $55,000.00. Capstone's Second Interim Fee App. at 28.  (ECF No. 842).  Mr. Ordway signed the application and submitted the M-389 Certification (the "Ordway M-389 Certification I"), pursuant to which

---

[11] Because Mr. Manzo submitted the Manzo M-389 Certification in support of the First Capstone Fee Application, his references in the certification to "my firm" appear to mean Capstone and not RJM or RJM1.

he made the same representations set forth above at ¶ 58.  Ordway M-389 Cert. I at 30-31.  The

United States Trustee reserved her rights.  See ECF No. 934.

61.    By Order dated January 30, 2012, the Court approved the Capstone Second Fee

Application.  (ECF No. 1141).

c.    <u>The Final Capstone Fee Application.</u>

62.    On May 15, 2012, Capstone, by Hahn & Hessen, LLP ("Hahn & Hessen"), filed

its third interim and final fee application (the "Capstone Final Fee Application") seeking

approximately $.2 million.  (ECF No. 1431).  Mr. Ordway again signed the application and

submitted the M-389 Certification (the "Ordway M-389 Certification II and, together with the

Ordway M-389 Certification I, the "Ordway M-389 Certifications") wherein he makes the same

representations set forth above at ¶ 58.

63.    Capstone, by Mr. Ordway, represented in the Capstone Final Fee Application:

". . . because of Mr. Manzo's experience, he was the only ***senior-level Capstone employee***

actively working on this engagement."  Capstone Final Fee App. at ¶ 25.  (emphasis added).

*(III)    **Capstone's Multiple Requests for a Success Fee.***

a.    Capstone's First Success Fee Motion Seeking a $3.25
       <u>Million Bonus.</u>

64.    On January 30, 2012, Capstone filed its first motion (the "Success Fee Motion")

seeking allowance and payment of a $3.25 million success fee.  (ECF No. 1146).

65.    Capstone argued that it "fought tooth and nail" to draft and negotiate the crucial,

"destiny-changing" act of incentivizing a group of the Debtors' pre-petition lenders to consent in

writing to joint bidding at the auction.  Id. at 3.

66.    Capstone annexed two documents to the Success Fee Motion, including: (i) a

letter (the "Eckert/Frank Letter") signed by the Debtors' former CEO Fred Eckert and Mr. Frank,

wherein they essentially congratulate Mr. Manzo for his work and (ii) a chart (the "Fee Chart") that Capstone asserted provided success fee awards in comparable cases. See Success Fee Motion at Ex. B.

67.     In addition, Mr. Manzo testified at his deposition and stated, under penalty of perjury, in a declaration that he submitted in support of Capstone's and his success fee requests, that he drafted the Eckert/Frank Letter. See Schwartz Decl., Ex. K, 30:14-30:23; 81:23-83:10; 115:24-118:15; Declaration of Robert J. Manzo (In Lieu of Evidentiary Hearing Direct Testimony) in Support of Capstone Advisory Group, LLC's Amended Motion for a Performance Fee at ¶ 71. (ECF No. 1486). According to an email from Mr. Solow to Mr. Manzo dated November 3, 2010, it appears that Mr. Solow actually drafted the Eckert/Frank Letter. Mr. Solow writes, "Did you read the letter. Need changes?" Copies of emails dated November 3, 2010, between Mr. Solow to Mr. Manzo, and a draft of the Eckert/Frank Letter are annexed as **Exhibit P** to the Schwartz Declaration. In a follow up email from Mr. Manzo to Mr. Solow in the same email chain, Mr. Manzo states, "Great. I will get it typed today and ask fred/peter to execute it. Bob." Id.

> i.     *The UST Success Fee Objection.*

68.     On February 23, 2012, the United States Trustee filed an objection (the "UST Success Fee Objection") to the Success Fee Motion.[12] (ECF No. 1230).

> ii.     *Capstone's Replies.*

69.     On February 27, 2012, Capstone filed separate replies (collectively, the "Capstone Reply") to each of the above objections. (ECF Nos. 1241, 1242 and 1243).

---

[12] The Trustee and Black Diamond also filed objections to the Success Fee Motion. See ECF Nos. 1229 and 1231.

70.    Messrs. Manzo and Solow also submitted declarations to support of the Success Fee Motion.  See ECF Nos. 1244, 1245, 1486 and 1487, respectively).

71.    Among other things, annexed to Mr. Manzo's declaration was the Eckert Frank Letter.  See ECF No. 1244, Ex. 1.

72.    In the First Solow Success Fee Declaration, Mr. Solow represented that he was the "head of the legal team" that represented the Debtors, that he personally negotiated the Capstone Engagement Letter, and that Capstone was retained as financial advisor and investment banker.  First Solow Success Fee Decl. at ¶¶ 1 and 2.  Mr. Solow also stated that a "transaction-based performance fee was contemplated for Capstone as consideration for its investment banking role."  Id. at ¶ 3.  Mr. Solow also represented that Capstone "almost singlehandedly" caused the auction in these cases and that Capstone "deserves almost exclusive credit" for the sales auction. Id. at ¶¶ 10-11.

73.    According to an email from Mr. Solow to Mr. Manzo dated February 25, 2012 (Saturday), Mr. Solow sent a copy of his declaration to Mr. Manzo before Kaye Scholer filed it and requested that Mr. Manzo review the declaration and let Mr. Solow know whether he (Mr. Manzo) approved of it.  Copies of the email from Mr. Solow to Mr. Manzo dated February 25, 2012, and the proposed declaration are annexed as **Exhibit Q** to the Schwartz Declaration.

        *iii.    The Continuance of the First Success Fee Motion.*

74.    On February 29, 2012, the Court conducted a hearing to consider the Success Fee Motion, and at the conclusion took the matter under advisement.  A copy of the transcript of the Success Fee Hearing is annexed as **Exhibit R** to the Schwartz Declaration.  (ECF No. 1281).

75.    On March 1, 2012, the Court entered an order continuing the Success Fee Motion for further proceedings and directing the parties to contact the assigned judge to schedule further

proceedings.  (ECF No. 1263).  Capstone never undertook to schedule further proceedings on the Success Fee Motion.

      b.      Capstone's Second Success Fee Motion Seeking a $2.75 Million Bonus Through A Settlement With The Trustee.

76.      On March 16, 2012, Capstone filed a second motion (the "9019 Motion") seeking approval of a settlement agreement (the "Settlement Agreement") between Capstone and the Trustee, pursuant to which they settled the Trustee's objection to the Success Fee Motion by, among other things, reducing the amount requested from $3.25 million to $2.75 million.  (ECF No. 1310).

77.      The United States Trustee, Black Diamond and a group of unsecured creditors (the "Unsecured Creditor Group") objected. [13]  (ECF Nos. 1376, 1382, 1383 and 1386).

78.      At a hearing conducted on April 25, 2012, the Court denied the 9019 Motion and fixed June 13, 2012, for the evidentiary hearing on the Success Fee Motion.  See Order Denying Motion Pursuant to Fed. R. Bankr. P. 9019 to Approve Settlement Agreement Between Chapter 11 Trustee James L. Garrity, Jr. and Capstone Advisory Group, LLC Regarding Performance Fee.  (ECF No. 1427).

      c.      Capstone's Amended Success Fee Motion Seeking a $2.75 Million Bonus.

79.      On May 3, 2012, Capstone filed an amended motion (the "Amended Success Fee Motion") pursuant to which it amended the Success Fee Motion to request a $2.75 million Success Fee.  Amended Success Fee Mot. at ¶ 2.  (ECF No. 1412).

---

[13] The Unsecured Creditor Group includes Thomas Libassi, Philip Raygorodetsky, Seth Katzenstein and Nicholas Petrusic.  Upon information and belief, all of these individuals were employees of the Debtors and now, with the exception of Mr. Libassi, are employed by a Black Diamond entity.  Upon further information and belief, their claims aggregate $2.3 million.

80.    On June 8, 2012, Mr. Manzo submitted a declaration (the "Manzo Direct Testimony Declaration") to support the Amended Success Fee Motion, in which he referred to himself as "the Debtors' Honest Broker," and represented, under penalty of perjury:

- At all times relevant, he was an Executive Director for Capstone Advisory Group, LLC;

- He had over 28 years of financial restructuring experience;

- He negotiated the Capstone Engagement Letter on behalf of Capstone;

- He drafted the Eckert/Frank Letter;

- He was the sole member of RJM; and

- RJM never worked for Capstone because RJM has no employees.[14]

Second Manzo Success Fee Decl. at ¶¶ 2, 13-20, 25, 71-72, 119 and 122.  (ECF No. 1486).

81.    Capstone also filed a second declaration signed by Mr. Solow (the "Second Solow Success Fee Declaration") wherein Mr. Solow, among other things, stated that the services provided by Mr. Manzo "and his team" were business related, whereas the services provided by Kaye Scholer dealt with legal matters.  (ECF No. 1487).

82.    As of the date hereof, the Amended Success Fee Motion has not been withdrawn and remains extant.

**F.    Discovery:  Document Production.**

83.    After the Success Fee Hearing, but prior to the 9019 Hearing, the UST Counsel and counsel for Black Diamond served document requests upon Capstone and RJM1 pursuant to Civil Rule 34, as made applicable herein by Bankruptcy Rule 7034.  Thereafter, the UST

---

[14] In Capstone's brief filed in support of its Amended Success Fee, Capstone acknowledged RJM was "primarily a conduit for Capstone's payments to Mr. Manzo."  See Capstone's Pre-Evidentiary Hearing Brief In Support Of Its Amended Motion For A Performance Fee at 14 n.7. (ECF No. 1488).

Counsel and Black Diamond's Counsel also served deposition notices upon Capstone, RJM1 and

Mr. Manzo pursuant to Civil Rule 30, as made applicable herein by Bankruptcy Rule 7030.

### (I)    *The Capstone/Manzo Agreement.*

84.    On or about May 29, 2012, Capstone and RJM1 produced documents revealing

the existence of an agreement (the "Capstone/Manzo Agreement"), among Capstone, RJM and

Mr. Manzo, pursuant to which the parties agreed, among other things that:

- Capstone would engage Mr. Manzo, through RJM, as a "contractor" and by no means an "employee;"

- Mr. Manzo, through RJM, would work exclusively for Capstone; and

- Capstone and Mr. Manzo, through RJM, would share fees that Capstone received as the result of engagements on which Mr. Manzo personally provided financial advisory services and/or managed other Capstone professionals.

A copy of the Capstone/Manzo Agreement dated February 4, 2006, together with amendments, is

annexed as **Exhibit S** to the Schwartz Declaration.[15]

a.    Mr. Manzo Was An Independent Contractor
And Not A Capstone Employee.

85.    According to the Capstone/Manzo Agreement, Capstone first engaged Mr.

Manzo, through RJM, as an independent contractor in February 2006.  Schwartz Decl., Ex. S, at

1.

86.    On February 1, 2006, Capstone issued a press release titled, "Robert Manzo Joins

Capstone Advisory Group, LLC."  The press release expressly states that "Robert Manzo has

---

[15] Documents produced in discovery, and annexed to the Schwartz Declaration as **Exhibit T**, show that drafts of the Capstone/Manzo Agreement were being generated and exchanged between the parties as early as May 2005.

joined the firm."[16]  A copy of Capstone Press Release dated February 1, 2006, is annexed as

**Exhibit U**, to the Schwartz Declaration.

87.    Upon information and belief, Mr. Manzo also was included as an "Executive

Director" on Capstone's website, which inclusion was what Mr. Ordway referred to as the

"Manzo Exception" to the Capstone policy that independent contractors were not included on the

firm's website.  Copies of the emails between Ms. DePiro and Mr. Ordway dated September 27,

2007, concerning the Capstone website and the "Manzo Exception" are annexed as **Exhibit V** to

the Schwartz Declaration.

88.    The iteration of the Capstone/Manzo Agreement that was operative as of the

Petition Date was dated February 19, 2009, and was signed by Mr. Ordway, on behalf of

Capstone, and Mr. Manzo on behalf of himself and RJM.  See Schwartz Declaration, Ex. S.

89.    In pertinent part, the Capstone/Manzo Agreement provides:

1.    Relationship of the parties:

The parties intent [sic] that an independent contractor-employee relationship will
be created by this arrangement.  ***Contractor is not to be considered an employee
of Capstone for any purpose***, and the Contractor is not entitled to any of the
benefits that Capstone provides for Capstone's employees.  Contractor shall
perform services under the direct supervision of Capstone's managers, Ed
Ordway and Chris Kearns (the "Managers").

Schwartz Decl., Ex. S, at ¶ 1.  (emphasis added).

90.    A review of the Capstone/Manzo Agreement and amendments thereto reveals that

at all times during which Mr. Manzo provided services to the Debtors in these cases, he was

---

[16] Mr. Manzo, himself, also stated under penalty of perjury in documents filed with this Court
that he had "joined Capstone."  See, e.g., Declaration of Robert Manzo in Support of the
Debtor's Motion for an Order Authorizing the Implementation and Continuation of the
Employee Incentive Compensation Plan ("Manzo Incentive Plan Declaration") at ¶ 4.  (ECF No.
21-3).

affiliated with Capstone as an independent contractor, and not as an employee.  See Schwartz
Decl., Ex. S.

91.    All of the documents that Capstone caused to be filed with this Court, including
Mr. Manzo's declarations, refer to him as an "Executive Director" of Capstone.  See, e.g., ECF
No. 400 and 1486.  Capstone billed Mr. Manzo's services at rates ranging from $850.00 per hour
to $950.00 per hour, which, according to the Capstone Engagement Letter, were Capstone's
highest rates and would be billed only by Executive Directors of the firm.

b.    Capstone and Mr. Manzo Engaged in Fee Sharing.

92.    The Capstone/Manzo Agreement includes a multi-component compensation
structure pursuant to which Capstone and Mr. Manzo for himself and, through RJM, agree,
among other things, to share certain fees.  As of the Petition Date, the operative version of the
Capstone/Manzo Agreement provided that Mr. Manzo, through RJM, would receive:

- a fixed monthly payment in the amount of $125,000.00;

- 80 percent of the fees that Mr. Manzo generated from his work on these cases, calculated by multiplying the hours Mr. Manzo billed times his hourly rate;

- the greater of two incentive payments, including: (a) an incentive payment calculated based upon the growth in Capstone's total billable staff hours in financial restructuring matters or (b) an incentive payment called the "Net Revenue Incentive Payment" that essentially represented 15.5 percent of the revenues generated on engagements for which Mr. Manzo supervised the work, but could be calculated one of two ways; and

- 50 percent of any special or success bonus payment that Capstone and/or Mr. Manzo, through RJM, received as provided for in the Capstone/Manzo Agreement dated as of December 26, 2006, including bonuses in Refco as well as all other assignments in which Mr. Manzo is or was actively involved in managing as well as engagement that Mr. Manzo was instrumental in obtaining for Capstone.

Schwartz Decl., Ex. S, Capstone/Manzo Agreement dated February 19, 2009, at ii-iii.

*(II)    Mr. Ordway and At Least Two Other Capstone Executive Directors
Considered Whether Capstone Needed To Disclose Mr. Manzo's
Independent Contractor Status Before The Capstone Retention
Application was Filed with the Court.*

93.    In an email from Jay Borow, an Executive Director of Capstone, to Ms. DePiro

and David Galfus, also Executive Directors of Capstone, with a copy to Mr. Ordway, dated July

7, 2010, Mr. Borow inquired of his colleagues:

> On revco. Did we use contractors? Yes. at least manzo. Did we make any
> special disclosure arrangements? What issue did j alix run into using contractors
> on that assignment?

94.    Ms. DePiro responded in pertinent part:

> We referred to Manzo as an Executive Director. We did not reflect him as a contractor.
> All others were employees.

> Alix included employees of a firm called KordaMentha as contractors on their fee
> application. KordaMentha is an Australia based firm, which Alix has an "agreement"
> with. The group was hired to oversee the Asian entities without disclosure of the
> relationship of the 3 firms.

Copies of the emails among Messrs. Borow, Galfus and Ordway, and Ms. DePiro dated July 7,

2010, are annexed as **Exhibit W** to the Schwartz Declaration.

*(III)    Undisclosed Post-Petition Amendments To the Capstone/Manzo
Agreement Result In Greater Compensation to Mr. Manzo.*

a.    The November 2010 Amendment.

95.    On or about November 22, 2010, Capstone, by Mr. Ordway, and RJM, by Mr.

Manzo, amended the Capstone/Manzo Agreement (the "November 2010 Amendment"). See

Schwartz Decl., Ex. S.

96.    By the November 2010 Amendment, Capstone, Mr. Manzo and RJM, through Mr.

Manzo, agreed to the following changes:

- The Capstone/Manzo Agreement shall extend through March 31, 2011;

26

- Effective January 1, 2011, Mr. Manzo would only be entitled to one of the two incentive payments previously provided for in the agreement, that is, Mr. Manzo would only receive the incentive payment that provided for 15 percent of the "Net Revenue Payment" and not the payment based upon the growth in Capstone's billable hours in financial restructuring;

- The 50/50 split on success fees was changed so that Mr. Manzo would receive 60 percent of the success fees in these cases and in GM and Capstone would receive 40 percent;[17] and

- The following "non-compete" provision:  "Capstone acknowledges that [Mr. Manzo] has or will likely enter into discussions with other consulting firms with the intention of securing employment or a contractor relationship therewith commencing after March 31, 2011. Notwithstanding the foregoing, [Mr. Manzo] agrees that, during the term of this Agreement, that [he] shall not solicit engagements for [Mr. Manzo or RJM] or a prospective employer or contractor, to provide services similar to that which Capstone currently offers to its clients nor shall [Mr. Manzo] participate in any other business activities which may directly or indirectly compete with Capstone's current business activities.

Schwartz Decl., Ex. S.

97.     The November 2010 Amendment is signed by Messrs. Ordway and Kearns for

Capstone and Mr. Manzo for himself and RJM.  See id.

b.     The March 2011 Amendment.

98.     On or about March 22, 2011, two months after the appointment of the Trustee,

Capstone and Mr. Manzo, through RJM, again amended the Capstone/Manzo Agreement (the

"March 2011 Amendment").  See Schwartz Decl., Ex. S.

99.     By the March 2011 Amendment, Capstone, Mr. Manzo and RJM, through Mr.

Manzo, agreed to the following changes:

---

[17] In a handwritten addition to the November 2010 Amendment, dated November 25, 2011, the following provision was included:  "All other success fees related to matters included in the Net Revenue Incentive Payment Calculation shall be shared 50 percent [Mr. Manzo] and 50 percent Capstone."  This clarification was initialed by both Messrs. Ordway and Manzo.  See Schwartz Decl., Ex. S.

- The agreement is extended to December 31, 2011;

- Mr. Manzo shall be paid 100 percent of his hourly compensation on the GSC matter, instead of 80 percent, effective April 1, 2011;

- Mr. Manzo no longer shall receive the $125,000.00 monthly payment;

- The incentive payment, i.e., the Net Revenue Incentive Payment, shall now include, in addition to fees generated in Refco, GSC and Chrysler, "a new assignment from Cerberus."

- After April 1, 2011, [Mr. Manzo] shall bill his time directly to the Chrysler entity and the Refco entity for his services rendered to each. In addition, [Mr. Manzo] shall also have a separate engagement for the Cerberus matter, effective on or prior to the date hereof;

- The parties agree that any success fee received by either [Mr. Manzo] or Capstone applicable to either GSC or Chrysler shall be shared 60 percent to [Mr. Manzo] and 40 percent to Capstone. This sharing agreement shall survive the expiry of this amendment;

- The potential Cerberus engagement currently provides for an analysis of one of its investments, Blue Linx. Depending on the findings from this engagement, Blue Linx may engage [Mr. Manzo] as a CRO or for other consulting services directly. If that were to occur, Capstone would cease to be involved; and

- The same "non-compete" provision as included in the November 2010 Amendment is included with the following additional language: "…[Mr. Manzo] shall not be limited in any manner from participating in any other business activities which may directly or indirectly compete with Capstone's current business activities.

Schwartz Decl., Ex. S. (emphasis added).

100.    The March 2011 Amendment was signed by Messrs. Ordway and Kearns for

Capstone and Mr. Manzo for himself and RJM. See id.

   c. Fees Earned by Mr. Manzo Under the Capstone/Manzo
     Agreement.

101.    Under the Capstone/Manzo Agreement, from September 1, 2010, through March

31, 2011, Mr. Manzo earned $125,000.00 per month plus 80 percent of all fees that he billed to

the <u>GSC</u> estates plus 15.5 percent of the fees that any Capstone employee billed to these estates.

<u>See</u> Schwartz Decl., Ex. S.  During this period, Mr. Manzo charged the estates $1,431,343.00,

resulting in payment of $1,145,074.00 to Mr. Manzo.  In addition, Capstone employees billed the

<u>GSC</u> estates $3,442,747.00, resulting in payment of $533,625.00 to Mr. Manzo.  Thus, the fees

paid to Mr. Manzo during this time period aggregate $2,553,699.00 or 52 percent of the total fees

($4,874,090.00) that Capstone billed to the estates.

102.    As of April 1, 2011, Mr. Manzo earned 100 percent of all fees that he billed to

these cases plus 15.5 percent of all of fees billed to these cases by Capstone employees.  <u>See</u>

Schwartz Decl., Ex. S.  During this time period, Mr. Manzo billed $1,223,185.00 to the <u>GSC</u>

estates, resulting in payment of $1,223,185.00 to Mr. Manzo.  In addition, Capstone employees

billed $1,309,434.00 to these Debtors, resulting in payment to Mr. Manzo of $202,962.00.  Thus,

since April 1, 2011, the fees paid to Mr. Manzo aggregate $1,426,147.00 or approximately 56

percent of the total fees ($2,532,619) that Capstone billed to these Debtors.

103.    In addition, if the Court were to approve the Success Fee requested by Capstone,

Mr. Manzo stands to earn an additional $1.65 million, resulting in total compensation under the

fee sharing agreement exceeding $5 million, or more than one-half of the total fees earned by

Capstone on this engagement.  <u>See</u> Schwartz Decl., Ex. S.

### (IV)    *Mr. Manzo Did Not Work Exclusively For Capstone.*

104.    In Paragraph 15 of the Second Supplemental Ordway Declaration, Mr. Ordway

stated that Mr. Manzo, through RJM, "is an employee of, and works exclusively for, Capstone.

No business is conducted by RJM, LLC except as described herein with respect to its

employment by Capstone."  Second Supp. Ordway Decl. at ¶ 15.  In discovery it was learned that

Mr. Manzo owns at least one other limited liability company, namely, RJM1, which Kaye

Scholer provided legal services to form.  A copy of an email from Marjorie Stern to a representative at CSI dated January 19, 2010, attaching a copy of the Certificate of Formation of RJM I, LLC, signed by Kaye Scholer attorney Andrew A. Kress, for filing with in Delaware is annexed as **Exhibit X** to the Schwartz Declaration.

105.    As set forth above at ¶ 98-100, the March 2011 Amendment authorized Mr. Manzo to perform services on a "new engagement" for Cerberus.  Although it is not clear from the March 2011 Amendment whether Capstone would be engaged or Mr. Manzo, through one of his wholly controlled limited liability companies, a letter from Adam Harris, an attorney with Schulte Roth & Zabel, LLP ("Schulte Roth"), addressed to Mr. Manzo and dated September 23, 2011, provides that Schulte Roth, on behalf of its clients Cerberus Serious Four Holdings, INK Acquisition LLC and INK Acquisition II LLC, retained Mr. Manzo, through RJM1, to provide expert services in the adversary proceeding styled <u>Innkeepers USA Trust v. Cerberus Series Four Holdings</u>, Adv. Pro. No. 11-2557, commenced in this district.  A copy of the letter from Mr. Harris to Mr. Manzo dated September 23, 2011, is annexed as **Exhibit Y** to the Schwartz Declaration.  In addition, a copy of an invoice issued by RJM1 to Schulte Roth, shows that Mr. Manzo sought approximately $76,000.00 for services provided during the period from September 17, 2011, through October 5, 2011.  A copy of this invoice is annexed as **Exhibit Z,** to the Schwartz Declaration.

*(V)*    ***Mr. Solow Provided Legal Advice to Mr. Manzo Concerning the Capstone/Manzo Agreement While Concurrently Representing the Debtors.***

106.    As shown below, since as early as December 2006, through at least March 2011, Mr. Manzo requested, and Mr. Solow provided, legal advice to Mr. Manzo concerning the Capstone/Manzo Agreement.

107.    At the June 13 Hearing, Mr. Solow represented to the Court that prior to June 13, 2012, he had never before seen the Capstone/Manzo Agreement.  <u>See</u> Schwartz Decl., Ex. C, 38:18-38:23.

108.    At the June 13 Hearing, the Court directed that Kaye Scholer produce all documents relating to the Capstone/Manzo Agreement.  <u>Id.</u> at   Among the documents produced were the following emails by, between and among Mr. Solow, Mr. Manzo and others:

- **Date: 12/25/06**:  From Mr. Manzo to Mr. Solow wherein Mr. Manzo forwards to Mr. Solow Capstone's proposed first amendment to the Capstone/Manzo Agreement and requests that Mr. Solow review it;

- **Date: 1/4/07**:  From Mr. Manzo to Peter Nurge (a Member of Capstone) and Mr. Solow wherein Mr. Manzo requests that Mr. Nurge forward a copy of the Capstone/Manzo Agreement to Mr. Solow and further requests that Mr. Solow review the indemnity section;

- **Date: 1/4/07**:  From Mr. Nurge to Mr. Solow and Mr. Manzo dated January 4, 2007, attaching a copy of the proposed amended consulting agreement and stating:  "Here it is Mike.  Call me if you have any questions, but other than identification of the parties . . . it should be identical to the working you approved earlier."

- **Date: 11/19/08**:  From Mr. Manzo to Mr. Solow wherein Mr. Manzo states: "Mike.  Hi.  As usual I need another favor!!!  Help.  I just faxed a copy of the letter agreement from capstone to you.  Would you mind looking at [sic].  I have one big issue that I need to speak with you about Thanks. Bob."

- **Date: 11/20/08:**  From Geraldine Fleming (secretary to Mr. Solow) to Mr. Manzo dated November 20, 2008, stating that the attached agreement was being sent to Mr. Manzo at Mr. Solow's request.

- **Date: 11/21/08**:  From Geraldine Fleming to Mr. Manzo dated November 21, 2008, attaching blacklined and clean copies of Capstone's latest proposed amendments to the Capstone/Manzo Agreement.[18]

- **Date: 11/18/10**:  From Mr. Manzo to Mr. Solow forwarding an email from Mr. Ordway with Capstone's proposal to amend the Capstone/Manzo Agreement and stating: "See below.  Ed's offer.  Thanks. Bob;"[19]

- **Date: 11/18/10**:  From Mr. Solow to himself at what appears to be a personal email address forwarding the above email and an attachment titled, "Bob Manzo Amended Agreement 11-18-10.docx."

- **Date: 11/19/10**:  From Mr. Manzo to Mr. Ordway with a copy to Chris Kearns (a Member of Capstone) and a "blind copy" to Mr. Solow dated November 19, 2010, wherein Mr. Manzo responds to Mr. Ordway's email dated November 18, 2010, stating that he found Capstone's proposal "very disappointing;"

- **Date: 11/19/10**:  From Mr. Solow to Mr. Manzo concerning Capstone's proposal and stating:  "That was a waste of time reading.  It is great that you can work for others if they let you!;"

- **Date: 11/24/10**:  From Mr. Manzo to Mr. Solow attaching a document titled "Manzo Amendment 11-22.docx" and asking Mr. Solow to "see below" an email from Mr. Ordway to Mr. Manzo dated November 23, 2010 that states "Bob—I think this should work;" and

- **Date: 3/22/11**:  From Mr. Manzo to Mr. Solow attaching a document titled, Manzo Amendment 3-21.docx, forwarding emails from Messrs. Ordway and Kearns concerning the amendment, and stating to Mr. Solow: "Swammy.  See below.  What do you think?  Thanks. Bob."[20]

Copies of these emails are annexed as **Exhibit AA** to the Schwartz Declaration.

---

[18] The blacklined version shows changes that Mr. Solow provided specifically with respect to the independent contractor provision in the agreement.  See Schwartz Decl., Ex. AA.

[19] The Capstone proposal was not attached to the email.

[20] In addition to these emails, Kaye Scholer produced no fewer than 10 separate hard copies of the Capstone/Manzo Agreement.  Because these are copies, they are not annexed to the Schwartz Declaration.  See Schwartz Decl. at ¶ 45.

**(VI)** ***While Serving As Debtors' Counsel, Mr. Solow and Kaye Scholer
Assisted Capstone and Mr. Manzo in Prosecuting the Success
Fee Motion.***

      a.      Mr. Solow Assisted Mr. Manzo and Capstone With
Drafting The Eckert/Frank Letter To Support the Success
<u>Fee Motion</u>.

109.      Capstone submitted the Eckert/Frank Letter to support Capstone's claim that the

Debtors supported its request for the Success Fee.  Although Mr. Manzo testified at his

deposition and represented in the Manzo Direct Testimony Declaration under penalty of perjury

that he drafted the Eckert/Frank Letter, documents produced by Kaye Scholer appear to show

that Mr. Solow drafted the letter.  <u>See</u> Schwartz Decl., Ex. P.  In fact, on November 3, 2010, Mr.

Solow sent a draft of the letter to Mr. Manzo and in an attached email asked Mr. Manzo if the

letter was satisfactory.  <u>Id.</u>

      b.      Mr. Solow Submitted Two Declarations to Support the
<u>Success Fee Motion</u>.

110.      On February 25, 2012, Mr. Solow submitted the First Solow Success Fee

Declaration.  Documents produced during discovery show that Mr. Solow consulted with Mr.

Manzo to determine whether Mr. Manzo was satisfied with the declaration before Mr. Solow

submitted it to the Court.  <u>See</u> Schwartz Decl., Ex. Q.

**G.**      <u>**Discovery: Depositions**</u>.

**(I)**      ***The May 30, 2012, Deposition of Robert J. Manzo.***

111.      At his deposition, Mr. Manzo testified in sum and substance that he was not an

employee, partner or principal of Capstone and he would always tell people that he was not

employed by Capstone.  <u>See</u> Schwartz Decl., Ex. K, at 77:5-77:9; 195:2-195:24.

112.      In response to questions concerning why Mr. Manzo did not sign various

documents on Capstone's behalf, Mr. Manzo testified:

> I'm not a principal partner of Capstone and that's why I believe principals and
> partners of Capstone are the ones executing legal documents on behalf of the firm,
> engagement letters, fee applications, et cetera.
>
> ***
>
> Again, the word "approve" is a legal word. I don't have legal authority for
> Capstone to approve or not approve.
>
> ***
>
> I didn't sign it because in my mind, this is Capstone's firm. I'm not an owner of
> Capstone. I don't know if there's a legal distinction or impediment or not for
> other people to sign documents but I know when I had my own firm, one of the
> owners signed the documents. I'm not an owner. I didn't sign these types of
> documents.

Id. at 11:19-12:14; 34:10-36:10; 199:4-199:22.

113.    In response to questions concerning the meaning of his title as "Executive

Director" of Capstone, Mr. Manzo testified:

> That is the title, if you will, that Capstone chose to give me on accounts that I
> worked on.
>
> ***
>
> Q.    It didn't mean, for example, that you were a director of the company?
>
> A:    No, I have no ownership stake, no equity interest, I'm not on any boards, I
> have no responsibilities of any kind on an organizational basis in
> Capstone.

Id. 221:15-221:25.

114.    With respect to his connections to Mr. Solow, Mr. Manzo testified that he has

known Mr. Solow since the early '90s and the two are "good friends." Id. 160:18-19; 262:12-

262:14. Mr. Manzo testified that he and Mr. Solow have gone on a number of golfing trips

together.[21]

---

[21] In an email from Mr. Ordway to Mr. Manzo dated October 13, 2009, Mr. Ordway seeks to
speak with Mr. Manzo regarding certain T&E expenses, including Mr. Manzo's request for

115.    Mr. Manzo testified that he could not recall whether he received any legal

representation in connection therewith.  Id. at 195:23-196:14.

116.    As stated, Mr. Manzo testified that he drafted the Eckert/Frank Letter.

Id. 115:15-116:21.

117.    Mr. Manzo testified that he was not involved in the discussions concerning the

First Solow Success Fee Declaration and he did not recall reviewing the declaration.  Id.  162:6-

162:14.

118.    With respect to conflicts checks performed in these cases, Mr. Manzo testified:

Q:    But there was no formal process that [Capstone] put upon RJM in order to,
      for example, fill out any paperwork or anything along those lines?

A:    Correct, there's no formal policy or I had to sign off that there were no
      conflicts or anything like that.

Id.  206:11-206:17.

*(II)*    *The June 1, 2012, Deposition of Edwin N. Ordway, Jr.*

119.    At his deposition, Mr. Ordway testified that he is an experienced bankruptcy

practitioner, having worked as a turnaround consultant for over 20 years. Ordway Dep. Tr. 6:2-

---

reimbursement of a $23,000.00 expense related to his chartering of a private jet.  Mr. Manzo
explains his request as follows:

> It was mike's [Solow] 50th birthday so I took him and invited mintz [Benjamin
> Mintz, a Kaye Scholer attorney] down to south carolina for two days.  This was a
> bit of pay back for mike's advice (he didn't charge us) on how to handle the
> chrysler transaction fee so that it qualified under the code section which does not
> give creditors a right to attack the fee and as importantly does not require us to
> file a fee application.  Jones day was not able to structure it as we wanted so I
> asked mike to advise peter and I on how to do it.  Bob.

Copies of the emails among Messrs. Ordway and Manzo, and Patti Foose dated October 13, 2009
are annexed as **Exhibit BB** to the Schwartz Declaration.  Upon information and belief, Ms.
Foose formerly was an executive assistant with Capstone.

6:10; 84:7-84:12.  Mr. Ordway considers himself an expert in executive compensation in troubled situations.  Id. 138:21-139:8.

120.    Mr. Ordway testified that he and Mr. Manzo have known each other for over 30 years.  Mr. Ordway first met Mr. Manzo when the two worked at Arthur Andersen in the late 1970s and early 1980s. Id. at 14:24-15:2.  Beginning in 1991, Mr. Ordway worked with Mr. Manzo at Mr. Manzo's firm, known as Policano & Manzo LLP ("PM"), and then at FTI Consulting, LLC ("FTI"), until Mr. Ordway left in 2004, to form Capstone.  Id. at 6:2-6:6;16:11-17:9.

121.    With respect to Mr. Manzo's employment relationship with Capstone, Mr. Ordway testified that (i) Capstone's engagement of Mr. Manzo was always pursuant to the Capstone/Manzo Agreement, (ii) Capstone did not include Mr. Manzo on its payroll or pay payroll taxes for him and (iii) the structure of Mr. Manzo's relationship with Capstone was effected at Mr. Manzo's request.  Id. 93:22-25; 171:24-172:3; 123:4-123:6.

122.    When questioned about the accuracy of Paragraph 15, Mr. Ordway acknowledged that Mr. Manzo was "technically not an employee."  Id. 172:4-8.

123.    In response to questions concerning why Mr. Ordway and not Mr. Manzo signed various documents on Capstone's behalf, Mr. Ordway testified, "It's our practice at my firm that engagement letters are executed by members."  Id. 22:17-22:21.  Mr. Ordway testified that Mr. Manzo did not sign the Capstone Engagement Letter because "he's not a member."  Id. 22:25-23:3.  When asked why Mr. Ordway signed the Capstone Retention Application and the related declarations he testified, ". . . it's our policy at our firm that all types of documents of that nature be executed by a member of the firm."  Id. 37:10-37:12.

124.    With respect to the management of engagements, Mr. Ordway testified:

Typically every engagement has a member directing it and that member is the person responsible for making sure our documents are in good order.  In addition, the other manager of the firm, Chris Kearns, and I will frequently review the documents.

Id.  144:25-145:7.

125.    Mr. Ordway testified that he was the Capstone member responsible for the GSC cases.  Id.  168:19-168:22.

126.    In addition, Mr. Ordway testified that even if Mr. Manzo had informed him that he (Mr. Manzo) thought the Capstone Retention Application was acceptable, he (Mr. Ordway) "always do[es] a thorough review."  Id.  156:5-156:14.

127.    With respect to his declarations, Mr. Ordway testified that he personally reviewed them carefully, verified their accuracy by discussing them with the deal team,[22] and reviewing any underlying documents if any were referenced therein.  Id. 38:25-47:19.  He further testified that with respect to his second supplemental declaration, Paragraph 15 was added because "Kaye Scholer recommended that we disclose this."  Id. 47:3-47:5.  With respect to the accuracy of Paragraph 15, Mr. Ordway testified:

Q:           How did you satisfy yourself that [the language contained in paragraph 15] was accurate?

Counsel:     Objection.
A:           I asked Robert Manzo if it was accurate.

Q:           What did he say?

A:           He said it was accurate.

Id.  47:13-47:19.

---

[22] Mr. Ordway testified that the "deal team" consisted of Messrs. Manzo, Zaidman, Butler, Randall and Miller.  Ordway Dep. Tr. 156:25-157:10.

128.    At his deposition, Mr. Ordway testified, "we are sharing [fees received in these cases] with RJM, LLC and we have a subsequent documentation to that effect." Id. 159:4-6.

129.    When asked why he represented in his declarations that Capstone was not sharing fees, Mr. Ordway testified:

> . . . I thought that – and maybe wrongly so but I thought that it was okay that I had contractors working for me and working on engagements. ***I had been doing it for twenty years.***

Id. 161:24-162:4. (emphasis added).

130.    Mr. Ordway testified that in bankruptcy cases, Capstone assigns titles that it uses for its employees, such as "Executive Director," and to independent contractors billing the estates through agreements with Capstone. Id. 170:12-171:5. When asked how Capstone discloses its use of independent contractors in bankruptcy cases, Mr. Ordway advised, "[t]ypically, we do not." Id. 171:6-171:9.

131.    Mr. Ordway also acknowledged that Capstone does not include Mr. Manzo on its payroll and does not pay payroll taxes for Mr. Manzo. Id. 171:24-172:3.

132.    Mr. Ordway testified that the conflict check procedure that Capstone utilizes for independent contractors does not involve any written forms or written verification by the independent contractor that he does not have any connections to the cases. Id. 199:18-200:2. Mr. Ordway stated that he would provide the contractor the list of interested parties and verbally ask them if they had any connections. Id. 197:18-199:17. He testified that he could not remember whether he asked Mr. Manzo about his connections or whether he delegated that task to someone else. Id.

133.    Mr. Ordway testified that he has known Mr. Solow since the 1990s and considers

Mr. Solow a "professional collegial friend."  Id. 209:7-209:22.  Mr. Ordway testified that he and

Mr. Solow have referred business to each other.  Id. 209:23-210:16.

**H.      Kaye Scholer, Capstone and Mr. Manzo's Pre-Petition Knowledge of
          Independent Contractor Disclosure Requirements and the Bankruptcy
          Code's Prohibition Against Fee Sharing.**

    *(I)      In re Refco, Inc.*

        a.      Capstone Is Special Financial Advisor To The RCM
             Trustee Pre-Confirmation.

134.    On October 17, 2005, Refco Inc. ("Refco") and certain subsidiaries and affiliates

(collectively, the "Refco Contributing Debtors") and Refco Capital Markets Ltd. ("RCM") filed

petitions for relief under Chapter 11 of the Bankruptcy Code in this Court.  See Case No. 05-

60006 (RDD).

135.    On April 12, 2006, the Court approved the United States Trustee's appointment of

Marc Kirschner as the Chapter 11 trustee (the "RCM Trustee") of the estate of RCM.  (Refco

ECF No. 1656).  Pursuant to an Order dated July 17, 2006, Mr. Kirschner retained Capstone as

his Special Financial Advisor.  (Refco ECF No. 2408).  In its retention application and

throughout the Refco cases, Capstone and Mr. Manzo identified Mr. Manzo as an "Executive

Director" of Capstone.  See Application of Chapter 11 Trustee of Refco Capital Markets, Ltd.

For Authority Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code for Entry of an

Order Authorizing Retention and Appointment Nunc Pro Tunc of Capstone Advisory Group,

LLC as Special Financial Advisor with Respect to Intercompany and Intercreditor Interests at ¶

16.  (Refco ECF No. 2192).  The Capstone retention application and engagement letter also

provided that Mr. Manzo would be one of the three Capstone professionals with primary

responsibility for that engagement.  Id.; see also June 2, 2006 Engagement Letter at 2.  (Refco

ECF No. 2192-1).

136.    A review of the Court's Refco docket does not reveal any pleadings wherein

Capstone disclosed the existence of the Capstone/Manzo Agreement that was drafted and

circulated in or about May 2005, and finalized in February 2006.  See Schwartz Decl. at ¶ 49.

        b.      Mr. Manzo, Through RJM, Is Appointed As Plan
               Administrator For The Refco Contributing Debtors.

137.    On December 15, 2006, the Court confirmed the Modified Joint Chapter 11 Plan

of Refco Inc. and Certain of its Direct and Indirect Subsidiaries (the "Refco Plan").[23]  (Refco

ECF No. 3971).

138.    Pursuant to Refco Plan and the Refco Confirmation Order, RJM was appointed as

the Plan Administrator for the Contributing Debtors and Mr. Kirschner was appointed as the Plan

Administrator for RCM (collectively, the "Plan Administrators").  See Refco Plan at Art. V, §

5.5.

139.    As Plan Administrator, Mr. Manzo retained Mr. Solow and Kaye Scholer, as his

counsel, and Capstone as his financial advisor.  See Second Amended Verified Statement of

Kaye Scholer LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019(a) dated May 18,

2007.  (Refco ECF No. 5243).

140.    Among other things, Messrs. Manzo and Kirschner were charged with the review

of final fee requests by professionals retained by the Refco estates.  See APS 9019 Motion

(defined below) at ¶ 17.  Where the Plan Administrators believed that the fees were

---

[23] In the case of the Contributing Debtors, the Refco Plan's implementation was supervised by a
"Plan Committee."  See Refco Plan at Art. V, § 5.11.

unreasonable, they engaged in settlement discussions with the professionals, and claimed that by

following this strategy, they obtained substantial cost savings to Refco's estates.  Id. at ¶ 19.

c.    As Plan Administrator, Mr. Manzo and Kaye Scholer
Prosecuted Claims Against APS For Failure To Disclose
Independent Contractors And For Prohibited Fee Sharing.

141.    During these cases, the Refco debtors had retained AP Services, LLC ("APS") as

their "crisis manager."  (Refco ECF Nos. 779 and 2410).  APS sought final fees and expenses in

the amount of $25 million, plus a $5 million success fee.  (Refco ECF Nos. 4468 and 4469).

142.    Among the issues that the Plan Administrators raised concerning APS's final fee

request, was the fact APS had not adequately disclosed its use of six independent contractors that

it sourced through another crisis management firm known as KordaMentha Pty Ltd.

("KordaMentha"), or the fee sharing arrangement between APS and KordaMentha contained in a

document referred to as the "Heads of Agreement."  Id. at ¶ 25.

143.    In a draft objection to APS's fee request prepared by Kaye Scholer for Mr.

Manzo, the Plan Administrator argues that APS "should be severely sanctioned for the

misconduct described [in the objection], including the fact that "[APS] willfully disregarded

fundamental disclosure and 'fee sharing' rules governing professionals paid out of a bankruptcy

estate."  See Draft Objection to Requests By AP Services, LLC for (A) Final Award of Hourly

Fees and Expenses and (B) Success Fee at 2, a copy of which is annexed as **Exhibit CC** to the

Schwartz Declaration.[24]

144.    According to the APS 9019 Motion, APS did not disclose its use of the

KordaMentha independent contractors or its billing arrangement for these individuals in its initial

retention papers.  Id. at ¶ 26.  APS did, however, disclose in subsequent disclosures filed with the

Court that the six individuals were "independent contractors sourced from KordaMentha."  Id.

---

[24] The draft objection will be submitted to the Court and not filed on the Court's docket.

41

145.    In addition, APS's engagement letter authorized APS to hire independent
contractors to work on the Refco engagement, provided that the individuals file disclosure
affidavits with the Court.  Id.  All but one of the six individuals filed a disclosure affidavit with
the Court.  Id.

146.    The Plan Administrators learned that APS had paid the KordaMentha contractors
based upon the usual and customary hourly rates charged by KordaMentha for the professionals'
services, but had charged the Refco estates at higher rates.  Id. at ¶ 27.  The incremental margin
amounted to approximately $550,000 of the approximately $2.1 million of fees incurred by APS
for the Refco engagement.  Id.

147.    Thereafter, upon information and belief, the Plan Administrators informally
objected to APS's fees on the grounds, among others, that APS had not properly disclosed its use
of independent contractors, its relationship with KordaMentha or the fee sharing agreement and,
as stated, had drafted an objection.

148.    In an email from Mr. Manzo to Richard Deitz dated May 9, 2007, concerning the
remedy that Mr. Manzo, as Plan Administrator would seek during a meeting with APS's counsel,
Mr. Manzo states:[25]

> I agree that the disgourgement [sic] should be very big.  I will go through my approach
> when we speak tomorrow.  They have in my opinion very serious reputational. And legal
> risks.

A copy of an email exchange between Mr. Manzo to Mr. Deitz and others, dated May 8 and 9,
2007, concerning the disgorgement that Mr. Manzo would seek from APS is annexed as **Exhibit
DD** to the Schwartz Declaration.

---

[25] Upon information and belief, Mr. Deitz is the founder of VR Global Partners, LLP, one of the
creditors that the United States Trustee had appointed to the creditors' committee in Refco.  See
Refco ECF No. 115.

149.    In a subsequent email to Mr. Deitz, Mr. Manzo stated:

Thanks. when you're involved in these matters as a professional you should always do the right thing for the estate. Sadly they didn't. By the way all the specifics in the motion are without taking discovery. I can only imagine how harmful that will be for them. Regards, Bob

Id.

150.    On June 8, 2007, Kaye Scholer, on behalf of Mr. Manzo, and Bingham McCutchen LLP, on behalf of Mr. Kirschner, filed a motion (the "APS 9019 Motion"), pursuant to Bankruptcy Rule 9019, seeking approval of a settlement (the "APS Settlement") among APS, the Plan Administrators and the Plan Committee (collectively, the "Estate Parties").[26] (Refco ECF No. 5352).

151.    According to the APS 9019 Motion, APS had vigorously asserted that it had made the appropriate disclosures of the independent contractors and that any claimed deficiency was inadvertent and based upon a good-faith determination regarding the appropriate level of disclosure. APS 9019 Motion at ¶ 28. The Estate Parties did not contest APS's claims. Id. However, to settle the matter and avoid further litigation and the attendant costs and risks, APS agreed to, among other things: (i) waive its request for a $5 million success fee, (ii) waive any right it may have had to assert a claim under Section 503(b) of the Bankruptcy Code for "substantial contribution," and credit the estates the sum of $3.25 million against its accrued and unpaid post-confirmation fees and expenses. Id. at ¶ 33.

152.    On June 26, 2007, the United States Trustee filed a response (the "UST APS Response") to the APS 9019 Motion arguing that APS had failed to disclose critical information required by Bankruptcy Rule 2014 since the beginning of the cases regarding its alliance with

---

[26] Mr. Solow executed the APS 9019 Motion for Kaye Scholer on Mr. Manzo's behalf. See APS 9019 Motion at 15.

KordaMentha and failed to abide by the Court's order authorizing APS's retention.  UST APS
Response at 1 and 2.  (Refco ECF No. 5473).

153.    Among other things, the United States Trustee noted that the disclosures filed by
five of the six KordaMentha independent contractors did not comply with the terms of the
Court's retention order because they did not set forth the economic terms of their engagements
with KordaMentha or APS.  Id. at ¶ 10.  The United States Trustee also cited strong precedent in
this district supporting the importance of full disclosure in matters concerning retentions and
noted that APS was a sophisticated and experienced professional, active in many of the large
bankruptcy cases and should have been fully aware of the seriousness with which the Bankruptcy
Code, the court and the United States Trustee apply to matters regarding retention disclosures.
Id. at 6-13.

154.    The United States Trustee argued that what amounted to a 15 percent reduction
($3.25 million) agreed upon by the Estate Parties and APS was insufficient given the gravity of
the disclosure deficiencies, noting that the waiver of the $5 million success fee was illusory
given the facts and circumstances in the cases.  Id. at 12.  The United States Trustee deferred to
the Court with respect to the amount of reduction that should, in fact, be imposed.  Id.

155.    Thereafter, APS agreed to a further reduction in the amount of $800,000.00 to
resolve the concerns raised by the United States Trustee.  See Notice of Resolution of Response
of the United States Trustee, Plan Administrators, RJM, LLC, and Mark Kirschner for Approval
of Settlement with AP Services, LLC ("UST Notice of Resolution") at 2 and 3.  (Refco ECF No.
5696).  In addition, pursuant to the UST Notice of Resolution, the United States Trustee stated
that APS had represented that it had begun to develop procedures governing disclosure of
independent contractors with the goal of obviating the issues that arose in the Refco cases.  Id.

44

156.    By Order dated August 15, 2007, the Court approved the APS 9019 Motion as modified by the UST Notice of Resolution.  (Refco ECF No. 5728).

157.    In an email from Mr. Manzo to Mr. Nurnberg dated August 27, 2007, wherein Mr. Manzo responds to Mr. Nurnberg's having advised him that the wire transfer reflecting the credit achieved in the settlement had been confirmed, Mr. Manzo stated:  "Big guy.  Great. Good triumphs over evil once again!!!!!!!!  Thanks for all the help.  Regards, Bob."  A copy of the email from Mr. Manzo to Mr. Nurnberg dated August 27, 2007, is annexed as **Exhibit EE**, to the Schwartz Declaration.

158.    Upon information and belief, Mr. Manzo and Mr. Solow were prosecuting the nondisclosure and disgorgement claims against APS at or very close to the same time that Capstone's request for final fees was pending with the Refco court.  See Refco ECF No. 4455. A review of the Refco docket does not reveal that any disclosures concerning the Capstone/Manzo Agreement were made in those cases.

159.    By Order dated April 11, 2007, the Court awarded Capstone in excess of $1 million.  See Refco ECF No. 4983.

*(II)      In re Old Cargo LLC (f/k/a Chrysler LLC).*

160.    On April 30, 2009, Chrysler LLC and 24 of its domestic direct and indirect subsidiaries (collectively, the "Chrysler Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  (Old Cargo ECF No. 1).

161.    By Order dated May 20, 2009, the Court authorized the Debtors to retain Capstone as the Chrysler Debtors' financial Advisor. (Old Cargo ECF No. 1301).  A review of the Chrysler docket does not reveal that any disclosures concerning the Capstone/Manzo Agreement were made in those cases.

162.     On June 29, 2010, just two months before the <u>GSC</u> cases were commenced,

Capstone filed a fee application (the "Capstone Chrysler Final Fee Application") seeking final

fees of approximately $30,000,000.00.  (<u>Chrysler</u> ECF No. 7720).  Capstone's compensation

request was comprised of $13 million for its hourly services in the cases, plus a $17 transaction

fee (the "Chrysler Transaction Fee").  As set forth above at ¶ 114, n.23, Mr. Manzo explained his

request to be reimbursed $23,000.00 by Capstone for chartering a jet to fly Mr. Solow and others

to South Carolina:

> "a bit of pay back for mike's [solow] advice (he didn't charge us) on how to
> handle the chrysler transaction fee so that it qualified under the code section
> which does not give creditors a right to attack the fee and as importantly does not
> require us to file a fee application.  Jones day was not able to structure it as we
> wanted so I asked mike to advise peter and I on how to do it.  Bob.

Schwartz Decl., Ex. BB.

163.     By Order dated August 12, 2010, the Court granted Capstone's final fee

request.  (<u>Chrysler</u> ECF No. 7375).

164.     On April 23, 2010, the bankruptcy court entered an order (the "Chrysler

Confirmation Order") confirming the Debtors Second Amended Joint Plan of Liquidation of

Debtors and Debtors in Possession, as Modified (the "Chrysler Plan") in the bankruptcy cases of

Chrysler, LLC, and following confirmation, Old Cargo.  (<u>Old Cargo</u> ECF No. 6875).

165.     Paragraph 17 of the Chrysler Confirmation Order appoints Mr. Manzo, through

RJM1, to serve as Liquidating Trustee of the Old Cargo Liquidation Trust on the terms set forth

in the Chrysler Confirmation Order, the Chrysler Plan and the Chrysler Liquidation Trust

Agreement dated April 30, 2010, by and between the Chrysler debtors and RJM1.  Chrysler

Confirmation Order at ¶ 17.

166.    Mr. Manzo, in his role as Liquidating Trustee through RJM1, retained Mr. Solow and Kaye Scholer as his counsel and Capstone as his financial advisor.  See, e.g., Notice of Presentment of Agreed Order Pursuant to Sections IV.B.3.b and X.A.224 of the Second Amended Joint Plan of Liquidation and the Liquidation Trust Agreement (A) Modifying the Winddown Budget and Authorizing Further Use of Cash Collateral by RJM1, LLC as Liquidation Trustee on Behalf of Old Cargo Liquidation Trust and (B) Granting Related Relief.  (Old Cargo ECF No. 7959).

167.    As of the Petition Date and during these cases, Mr. Manzo, through RJM1, was serving as the Liquidation Trustee for the Old Cargo estates.  In addition, as of the Petition Date and during these cases, Kaye Scholer and, upon information and belief, Capstone, were providing services to Mr. Manzo, through RJM1, as Liquidation Trustee in the Old Cargo cases.

**I.    Subsequent Court Conferences and Meetings.**

**(I)    *The June 11, 2012, Conference.***

168.    On June 8, 2012, Black Diamond's counsel sent a letter to the Court advising that discovery had revealed the existence of a prohibited fee sharing agreement among Capstone, RJM and Manzo.  See ECF No. 1481.

169.    On June 11, 2012, the Court convened a conference at (the "June 11 Conference"), at which time the parties responded to questions from the Court concerning the Capstone-Manzo Agreement.  A copy of the transcript of the June 11 Conference is annexed as **Exhibit FF** to the Schwartz Declaration.

170.    At the conference, the UST Counsel and Black Diamond's counsel suggested that, in light of the newly disclosed fee sharing agreement, the Court first consider the legal issues

concerning the agreement, before considering the Success Fee Motion on June 13, 2012.  See
Schwartz Decl., Ex. FF, 5:10–6:23.

171.    In addition, the Court inquired of the Trustee's knowledge of the Capstone/Manzo
Agreement.  Id.  The Trustee stated that he was unaware of it.  Id.  22:5-22:14.  Noting that the
agreement had been amended during the Trustee's tenure, the Court asked the Trustee whether
he would have wanted to know about the amendment, to which he responded, "Certainly."  Id.
23:9-23:19.

172.    The Court observed that according to the March 2011 amendment, the fixed
monthly payments to RJM would cease and contrary to the Ordway Declaration, which stated
that RJM would work exclusively for Capstone, there was a separate engagement for another
entity.[27]  Id.  23:20-23:24.

173.    The Court asked Mr. Micheli about his and Kaye Scholer's knowledge of the
Capstone/Manzo Agreement.  Id.  26:16-28:8.  In response, Mr. Micheli stated that he was not
personally aware of the specifics of the fee sharing agreement.  Id.  26:24-27:1.  Mr. Micheli also
stated that he did not think that others in his firm were aware of the fee sharing agreement,
"specifically."  Id. 27:2-27:4.  Mr. Micheli then engaged in the following colloquy with the
Court:

> Mr. Micheli:    . . . I can tell you that at the time the retention application was
> filed we had discussions with the Office of the United States
> Trustee on behalf of the retained  -- proposed retained
> professionals at the time, the issue came up regarding RJM, LLC
> and its relationship to Capstone.  The Ordway declaration was
> amended to specifically address that.  I was involved with respect
> to those issues, and I know that the amended papers were sent
> around prior to filing, both clean and redlines to the Office of the United
> States Trustee so we did have discussions about it.

---

[27] The Amendment provides that the separate engagement would be for Cerberus.

| | |
|---|---|
| The Court: | That may be, but the Office of the U.S. Trustee would have no way of knowing that what was being given to her was accurate or not. |
| Mr. Micheli: | Understood, and I don't disagree with that, Your Honor, I just – I want to just make certain that we – |
| The Court: | But I think it's significant – it will be significant to know – and this gets back to Mr. Garrity's comment in his capacity as the reviewer of the fee applications – it will be significant to know to what extent Kaye Scholer was aware of these agreements and participated in the preparation, submission of the Ordway declaration or otherwise didn't bring the fee arrangement to everyone's attention. |
| Mr. Micheli: | Understood, Your Honor, and I can't speak to that other than what I've told the Court today, but I will be prepared to answer that question. |

Id., 27:5 – 28:6.

174.    The Court noted that one issue raised by the revelation of the Capstone/Manzo Agreement was whether or not RJM1 was an appropriate person to serve in the role of the liquidating trustee and that this issue may have to be revisited.  Id. 31:4-31:17.

175.    The Court then scheduled another status conference for June 13, 2012, at 2:00 p.m. Id. 41:3-41:7.

*(II)    The June 13, 2012, Conference.*

176.    On June 13, 2012, the Court convened a further status conference (the "June 13 Conference") in these cases.  See Schwartz Decl., Ex. C.  In addition to the attorneys that were present at the June 11 Hearing, present at the June 13 Hearing were Messrs. Manzo, Ordway and Solow.  See Schwartz Decl., Ex. C, 18:12-18:13; 29:12; 57:11-57:13.

177.    At the conference, the Court inquired as to the knowledge that various parties, in particular, Kaye Scholer, had concerning the Capstone/Manzo Agreement (and amendments

thereto), as well as the preparation of the Capstone Retention Application and the Ordway Declarations.[28]

178.    Andrew Tenzer, an attorney with Shearman & Sterling, and counsel to the Trustee and RJM1, represented to the Court that the Trustee had waived any privilege held by the Debtors in connection with these matters.  Id. 29:21-30:17.

179.    Concerning the preparation of the Capstone Retention Application and supplemental documentation, Mr. Micheli represented that, at the time Kaye Scholer was retained, Kaye Scholer replaced other counsel, namely, "Deckert [sic]."  Id. 31:10-31:13.  Mr. Micheli stated that in connection with Kaye Scholer taking over the representation of the Debtors, Kaye Scholer received a set of "first day" papers that included a draft of the Capstone Retention Application and the Ordway Declaration.  Id. 31:14-31:18.  From that point on, Mr. Micheli stated that, Kaye Scholer was involved in bringing the Capstone Retention Application forward to represent the facts as the case progressed.  Id. 31:19-31:21.

180.    The Court inquired as to whether or not Kaye Scholer or any of its attorneys were aware of the Capstone/Manzo Agreement at the time the Second Supplemental Ordway Declaration was submitted.  Id. 37:16-37:22.  When asked by the Court if he was aware of the existence of the Capstone/Manzo Agreement, Mr. Solow represented as follows:

> Mr. Solow:    No.  Actually the first time I saw it was this afternoon sitting waiting for court, Your Honor.  I knew that Mr. Manzo had an arrangement, I knew that that existed because of his testimony in the Chrysler case, that he had an arrangement with Capstone.  The exact nature and how it was structured I did not know.

Id.  38:10-38:23.

---

[28] During the June 13 Hearing, Mr. Mandelsberg, an attorney with Hahn & Hessen, confirmed that Hahn & Hessen was representing both Capstone and Mr. Ordway individually in these proceedings.  Id. 22:20-23:3.

181.    In response to the Court's question whether it was Mr. Solow's understanding that

Mr. Manzo is an executive director of Capstone, Mr. Solow responded that "I have no reason to

know whether he is or he is not." Id.  39:22-40:1.

182.    The Court's colloquy with Mr. Solow continued at a later point concerning the fee

sharing agreement as follows:

| | |
|---|---|
| The Court: | Go ahead, Mr. Solow.  You told me that you just found out about the consulting agreements. |
| Mr. Solow: | Correct. |
| The Court: | And you told me that you found out about the existence of the RJM entity at or about the time that the Capstone retention was put in place.  Can you to the best of your recollection – |
| Mr. Solow: | No—no, I didn't say – |
| The Court: | No? |
| Mr. Solow: | -- that.  I knew of the existence of LLCs that Mr. Manzo had formed at the time he decided to go back into the work force. . . . Before Mr. Manzo started working for Capstone and after he had completed working for a firm called FTI he took a period of time off.  During that time he formed an LLC.  Why do I know that? He asked our firm to form it.  We had a paralegal form the LLC over six years ago for a variety of activities that he wanted potentially to do, period.  So I knew that he had an LLC, I did not know exactly what it would be used for or the – you know, what would generate from that.  So I knew of an existence of an LLC, but I did not know the consulting agreement or arrangements, their nature until I read what was produced and Mr. Micheli showed it to me in preparation this afternoon for this hearing. |
| The Court: | All right.  Well – |
| Mr. Solow: | And I do know that my firm, under my direction, prepared or revised drafts that we first received from Deckert and Mr. Micheli stated, that they were then sent to various members of Capstone for review, and ultimately signature, and we received them back |

> without to our knowledge either recollection from talking to the
> people who were directly involved.

Id. 45:4-47:1.

183.    In response to the Court's inquiry as to what events precipitated RJM being first

mentioned in the Second Supplemental Ordway Declaration, Mr. Solow stated:

> Mr. Solow:        -- we had – we had questions that were raised as part of our first
>                   day motions by the U.S. Trustee's Office that were direct
>                   discussions between Ms. Schwartz, Mr. Micheli, Mr. Nurnberg
>                   with respect to the papers on a variety of issues.  One of the issues
>                   was Capstone's retention papers, and the genesis – although I was
>                   not directly involved in those conversations – the genesis of those
>                   amendments related to resolving questions that were raised by the
>                   office and then our discussion with Capstone and getting answers
>                   and – I mean, I hate to use the word, but I guess I have to –
>
> The Court:        Relied?
>
> Mr. Solow:        --we're – we are scriveners.  No, I mean we – we –
>
> The Court:        Well, let me state it differently, You relied on information that was
>                   provided to you by Capstone?
>
> Mr. Solow:        That's correct, Your Honor. . . .

Id. 47:10-48:3.

### (III)    The October 10, 2012, Conference.

184.    On October 10, 2012, the Court convened a conference (the "October 10

Conference") to ascertain a status on any settlement discussions among the parties.  At this

conference, the Court considered the putative defendants' suggestion that the matter be referred

to mediation or some other form of alternative dispute resolution.

### (IV)    The October 12, 2012, Telephonic Conference.

185.    On October 12, 2012, the Court held a telephonic conference at which time the

Court directed that the parties participate in settlement discussions (the "Supervised Settlement

Discussions") to be supervised by the Honorable James M. Peck.  The Court requested, and the

United States Trustee, Black Diamond and the Unsecured Creditors agreed, that the parties

continue to forebear from filing motions with the Court concerning these matters through

November 20, 2012.

186.    By Order dated November 5, 2012, the Court directed the parties to participate in

the Supervised Settlement Discussions.  (ECF No. 1584).

**J.    The Solow Letter.**

187.    On October 12, 2012, Mr. Solow sent a letter (the "Solow Letter") to the Court

wherein he acknowledged that the representations that he made to the Court at the June 13

Conference concerning his knowledge of the Capstone/Manzo Agreement were not accurate.

Solow Letter at 1.  (ECF No. 1573).

**K.    The Supervised Settlement Discussions.**

188.    From November 1, 2012, the parties participated in the Supervised Settlement

Discussions.  A settlement was not reached through these discussions.

**L.    The December 3, 2012, Conference.**

189.    On December 3, 2012, the Court convened a conference with all of the parties.  In

sum, the Court placed a freeze on all pending matters in these cases subject

to the outcome of a trial on the issues set forth in this Motion.  The Court fixed the trial to

commence on February 11, 2013.

**M.    Case Status.**

190.    The chart below reflects the final fees and expenses incurred by the Debtors'

professionals through February 29, 2012:

| GSC Group, Inc., et al. Case No. 10-14653 (SCC) Aggregate Fees of Estate Professionals Through February 29, 2012 | | | |
|---|---|---|---|
| Professional | Fees Incurred | Expenses Incurred | Total Fees and Expenses Incurred |
| Shearman & Sterling, LLP | $8,316,999.75 | $381,629.56 | **$8,698,629.31** |
| Kaye Scholer, LLP | $5,780,495.75 | $348,920.27 | **$6,129,416.02** |
| Capstone Advisory Group, LLC | $5,947,270.00 | $126,354.82 | **$6,073,624.82** |
| Togut, Segal & Segal, LLP | $604,518.25 | $3,928.59 | **$608,446.84** |
| Ernst & Young, LLP | $1,033,640.70 | $26,512.00 | **$1,060,152.70** |
| Epiq Solutions, LLC (Solicitation and Tabulation Agent) | $38,361.70 | $0.00 | **$38,361.70** |
| **Totals** | **$21,721,286.15** | **$887,345.24** | **$22,608,631.39** |

191.    In addition, upon information and belief, the Liquidating Trustee has not made

any distributions to unsecured creditors in these cases.  Further, upon information and belief, the

Liquidating Trustee has expended the $1 million budget designated for his administration of the

GSC Trust.  As of the date hereof, there is no information concerning what portion of the $1

million Mr. Manzo has paid to RJM1.

## ARGUMENT

A.    **Governing Law.**

The Bankruptcy Code extends an administrative fee priority, payable in full in advance of

other claimants, to professionals retained by the estate.  See 11 U.S.C. §§ 507(a)(2) and

503(b)(2).  Although this significant advantage may be "the oil that greases the gears of the

bankruptcy system," because of the great potential for abuse, "the court has a great oversight

responsibility to ensure that professional fees are reasonable and are paid in exchange for

services that benefit the estate."  In re Egwu, No. 10-30652 (RAG), 2012 WL 5193958, at *3

(Bankr. D. Md. Oct. 19, 2012) (citing In re Park-Helena Corp., 63 F.3d 877, 880 (9th Cir. 1995) (additional citations omitted)).

The Bankruptcy Code's "myriad of provisions must be observed, and complete and truthful disclosure of all connections and fee arrangements must be made, both as a foundation for the allowance of administrative fees and to permit the court to discharge its oversight function." Egwu, 2012 WL 5193958, at *3; see also In re Leslie Fay Cos., 175 B.R. 525, 537 (Bankr. S.D.N.Y. 2002) (all connections that are not so remote as to be de minimis must be disclosed).

### (I) *Employment of Estate Professionals and the Disinterestedness Requirement*.

a.    Section 327(a) of the Bankruptcy Code.

The Bankruptcy Code permits the debtor in possession to retain one or more professionals. 11 U.S.C. § 327. Section 327(a) of the Bankruptcy Code provides in pertinent part:

> (a)    Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.[29]

11 U.S.C. § 327(a).

b.    Disinterestedness.

To be retained by the estate, professionals must be both disinterested and not hold or represent any adverse interest to the estate. In re Project Orange Assocs., LLC, 431 B.R. 363, 369 (Bankr. S.D.N.Y. 2010) (citing Vouzianas v. Ready & Pontisakos (In re Vouzianas), 259

---

[29] Section 1107(a) of the Bankruptcy Code gives the debtor in possession the rights and powers of a chapter 11 trustee and also imposes on the debtor in possession most of the obligations of a trustee. 11 U.S.C. § 1107(a).

F.3d 103, 107 (2d Cir. 2001) (citing <u>Bank Brussels Lambert v. Coan</u> (<u>In re AroChem Corp.</u>), 176

F.3d 610, 621 (2d Cir. 1999)).  Courts lack the power to authorize the "employment of a

professional who has a conflict of interest."  <u>In re Mercury</u>, 280 B.R 35, 55 (Bankr. S.D.N.Y.

2002).

 Section 101(14)(A) of the Bankruptcy Code provides that a person is "disinterested" if

that person "is not a creditor, an equity holder, or an insider."[30]  11 U.S.C. § 101(14)(A).  Section

101(14)(C) of the Bankruptcy Code provides that a "disinterested person" is someone who "does

not have an interest materially adverse to the interest of the estate or of any class of creditors or

equity security holders, by reason of any direct or indirect relationship to, connection with, or

interest in, the debtor, or for any other reason."  11 U.S.C. § 101(14)(C).

 To be disinterested is "to prevent even the appearance of a conflict irrespective of the

integrity of the person or firm under consideration."  <u>In re Vebeliunas</u>, 231 B.R. 181, 191 (Bankr.

S.D.N.Y. 1999), <u>dismissed on appeal</u>, 246 B.R. 172 (S.D.N.Y. 2000) (citing <u>In re Codesco, Inc.</u>,

18 B.R. 997, 999 (Bankr. S.D.N.Y. 1982)) (additional citations omitted); <u>see also</u> <u>In re Angelika

Films 57th, Inc.</u>, 227 B.R. 29, 38 (Bankr. S.D.N.Y. 1998) ("The determination of adverse interest

is objective and is concerned with the appearance of impropriety.").  A disinterested person

"should be divested of any scintilla of personal interest which might be reflected in his decision

concerning estate matters."  <u>Vebeliunas</u>, 231 B.R. 191-92 (citations and quotations omitted).

The most modest interest or relationship will undo a person's disinterestedness if it "would even

faintly color the independence and impartial attitude required by the Code and Bankruptcy

Rules."  <u>In re Granite Partners, L.P.</u>, 219 B.R. 22, 23 (Bankr. S.D.N.Y. 1998)) (internal

quotations and citations omitted).

---

[30] The Bankruptcy Code defines "person" to include individuals, partnerships and corporations.
<u>See</u> 11 U.S.C. § 101(41).

Courts in this district have found that the definition of "disinterested person" "overlaps with the adverse interest requirement of section 327(a), creating a single test for courts to employ when examining conflicts of interest."  See, e.g., In re MF Global, Inc., 464 B.R. 594, 600 (Bankr. S.D.N.Y. 2011) (quoting Project Orange, 431 B.R. at 370 (citing 11 U.S.C. § 101(14)(C))); see also Granite Partners, 219 B.R. at 23 (observing that "the two prongs of Section 327(a) are duplicative and form a single test to judge conflicts of interest") (internal citations omitted).  Thus, under both Sections 327 and 101(14) of the Bankruptcy Code, a professional must not "hold or represent an interest adverse to the estate."  See AroChem, 176 F.3d at 622-23.

Although not defined by the Bankruptcy Code, the Second Circuit has held that "to hold or represent an adverse interest" means:

> to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.

AroChem, 176 F.3d at 623 (quoting In re Roberts, 46 B.R. 815, 827 (Bankr. D. Utah 1985), aff'd in part and rev'd on other grounds, 75 B.R. 402 (D. Utah 1987)).  However,

> [r]ather than worry about the potential/actual dichotomy, it is more productive to ask whether a professional has either a meaningful incentive to act contrary to the best interest of the estate … - an incentive sufficient to place those parties at more than acceptable risk – or the reasonable perception of one … In other words, if it is plausible that the representation of another interest may cause the trustee's attorneys to act differently than they would without the representation, then they have a conflict and an interest adverse to the estate.

Id. (citations and internal quotation marks omitted); see also MF Global, 464 B.R. at 600 ("a more recent trend elides the distinction [between actual and potential conflicts] and focuses on the concerns of divided loyalties and affected judgments.") (quoting Granite Partners, 219 B.R. at 33)); Leslie Fay, 175 B.R. at 532 ("The requirements of Section 327 of the Bankruptcy Code

cannot be taken lightly, for they 'serve the important policy of ensuring that all professionals appointed pursuant to [the section] tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities.'") (quoting <u>Rome v. Braunstein</u>, 19 F.3d 54, 58 (1st Cir. 1994)).

Courts determine whether an adverse interest exists on a case-by-case basis, examining the specific facts in a case.  <u>AroChem</u>, 176 F.3d3 at 623; <u>see also</u> <u>Angelika Films</u>, 227 B.R. at 39 (same).

### (II)    *The Mandatory Duty of Professionals to Disclose Connections.*

The purpose of the retention application is to provide the court (and the United States Trustee) with information necessary to determine whether the professional's employment is: (i) in the best interest of the estate and (ii) necessary.  <u>See</u> <u>Leslie Fay</u>, 175 B.R. at 533; <u>see also</u> Fed. R. Bankr. P. 2014(a).  Failure to disclose any fact that may influence the court's decision on retention may result in a later determination that disclosure was inadequate and sanctions should be imposed upon the professional.  <u>See</u> <u>In re B.E.S. Concrete Prods., Inc.</u>, 93 B.R. 228 (Bankr. E.D. Cal. 1988); <u>accord</u> <u>Leslie Fay</u>, 175 B.R. at 525.

a.    <u>Bankruptcy Rule 2014(a)</u>.

Bankruptcy Rule 2014 was enacted to implement the appointment of professionals, including under Section 327 of the Bankruptcy Code.  9 Alan N. Resnick & Henry J. Sommer (eds.), <u>Collier on Bankruptcy</u> [hereinafter, "<u>Collier</u>"] ¶ 2014.03 (16th ed. 2012).  The rule is very broad and provides a mechanism for ensuring the disinterestedness of retained professionals.  <u>In re Fibermark, Inc.</u>, No. 04-10463, 2004 WL 723495, at *8 (Bankr. D. Vt. Mar. 11, 2006).

In pertinent part, Bankruptcy Rule 2014 provides:

a.    *Application for an Order of Employment*.  An order approving the employment of attorneys . . . or other professionals pursuant to § 327 . . . of the

Code shall be made only on application of the trustee or committee. . . . The application shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.  The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.[31]

Fed. R. Bankr. P. 2014(a).

Bankruptcy Rule 2014(b) further elucidates the requirements of Section 327(a) of the

Bankruptcy, see supra at 63, by making clear that only a person or entity that is a partner,

member or associate of a partnership or corporation hired as attorneys or accountants can

perform services or be employed for the debtors without the necessity for a separate application.

Fed. R. Bankr. P. 2014(b).

      b.        <u>Bankruptcy Rule 2016</u>.

The duty to disclose connections also is embodied in Bankruptcy Rule 2016, which

provides in pertinent part:

. . . a statement as to what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case, the source of the compensation so paid or promised, whether any compensation previously received has been shared and whether an agreement or understanding exists between the applicant and any other entity for the sharing of compensation received or to be received for services rendered in or

---

[31] The local rules of this Court require additional disclosures, including ". . . the specific facts showing the reasonableness of the terms and conditions of the employment, including the terms of any retainer, hourly fee, or contingent fee arrangement."  LBR 2014-1.

in connection with the case, and the particulars of any sharing of compensation or agreement or understanding therefor . . . .

Fed. R. Bankr. P. 2016(a).[32]  See also UST Fee Guidelines b(1)(ii) and (iii) (requiring disclosure of fee arrangements).

### c.    The Professional's Duty to Disclose is Self-Policing.

The professional's duty to disclose is self-policing.  Granite Partners, 219 B.R. at 35 (citing Kravit, Gass & Weber, S.C. v. Michel (In re Crivello), 134 F.3d 831, 839 (7th Cir. 1998)). The court relies primarily on forthright disclosure to determine qualification under Section 327 of the Bankruptcy Code.  Id.  (citing Rome, 19 F.3d at 59); see also MF Global, 464 B.R. at 602 (a lack of candor in "disclosing [] potential problem[s] for independent court review before a [professional's] appointment . . . in itself, presents an appearance of impropriety.") (quotation omitted).

Courts in this circuit consistently hold that it is the duty of the professional, and not the court, to make sure that "all connections" have been disclosed.  In Fibermark, the court opined:

> It is not the duty of the court, the U.S. Trustee or any other party to search beyond the 2014(a) disclosure for the existence of connections that a professional seeking to be employed should have disclosed.  Full disclosure of all connections to a party in interest is the affirmative duty placed on the professional seeking employment.  The duty to disclose all possible connections is so vital to the bankruptcy process that failure to do so is an independent basis for the disallowance of fees.

In re Fibermark, Inc., No. 04-10463, 2006 WL 723495, at *9 (Bankr. D. Vt. Mar. 11, 2006) (citing Futuronics Corp. v. Arutt, Nachamie and Benjamin (In re Futuronics Corp.), 655 F.2d 463, 469 (2d Cir. 1981); In the Matter of Arlan's Dep't Stores, Inc., 615 F.2d 925, 933 (2d Cir. 1979)) (additional citations omitted); see also Leslie Fay, 175 B.R. at 533 (same); In re Source

---

[32] The administrative orders of this Court also require a certification from the professional designated by the applicant with the responsibilities for complying with the Amended Guidelines.  Admin. Order M-389 at 1.

Enters., Inc., No. 06-11707 (AJG), 2008 WL 850229, at *8 (Bankr. S.D.N.Y. Mar. 27, 2008)

(same); In re Matco Elecs. Group, Inc., 383 B.R. 848, 853-54 (Bankr. N.D.N.Y. 2008) ("Fed. R.

Bankr. P. 2014 is not intended to condone a game of cat and mouse, where the professional

seeking appointment provides only enough disclosure to whet the appetite of the UST, the court

or other parties in interest, and then the burden shifts to those entities to make inquiry in an effort

to expand the disclosure."); Granite Partners, 219 B.R. at 35 (the court "should not have to

'rummage through files or conduct independent factfinding investigations" to determine if the

professional is disqualified.) (quotations omitted).

    "Absent the spontaneous, timely and complete disclosure required by Section 327(a) and

Fed. R. Bankr. P. 2014(a), the court appointed counsel proceed *at their own risk."* Fibermark,

2006 WL 723495, at *9 (emphasis in original) (quoting Rome, 19 F.3d at 59-60)); see also In re

Roger J. Au & Son, Inc., 71 B.R. 238, 242 (Bankr. N.D. Ohio 1986) (failure to disclose fact

material to potential conflict may provide *totally independent* ground for denial of fees quite

apart from the actual representation of competing interests).

    Further, the Fibermark court emphasized that "[i]n light of the court's responsibility to

approve the employment of professionals, the disclosure requirements of Rule 2014(a) are

broader than those governing inquiries into disinterestedness under § 327." Fibermark, 2006 WL

723495, at *5 (citing Leslie Fay, 175 B.R. at 536) (retention under Section 327 is only limited by

interests that are "materially adverse," whereas under Bankruptcy Rule 2014, "all connections"

that are not so remote as to be de minimis must be disclosed); see also Source Enters., 2008 WL

850229, at *8 (the "term 'connections' is broad and is strictly construed for purposes of

Bankruptcy Ruled 2014) (citing Balco Equities Ltd. v. Cohen, Estis and Assocs., LLP (In re

Balco Equities Ltd.), 345 B.R. 87, 112 (Bankr. S.D.N.Y. 2006) ("Failure to disclose direct or

indirect relations to, connections with, or interest in the debtor violate ... [s]ection 327(a) and

Bankruptcy Rule 2014")).  Thus, "[p]rofessionals who seek appointment owe the duty of

complete disclosure of all "connections" that bear upon their eligibility for such appointment."

Fibermark 2006 WL 723495, at *9.

    In addition, disclosure will not be adequate if it is not sufficiently specific.  "Boilerplate"

disclosure may cover an inadvertent failure to disclose an insignificant connection, but is not an

adequate substitute for discloser of known and significant connections.  See Leslie Fay, 175 B.R.

at 537.  To find otherwise, would eviscerate the disclosure requirements of Bankruptcy Rule

2014(a).  Id.

    d.    Courts Strictly Construe the Duty to Disclose.

    "Courts have an obligation to construe Rule 2014 very strictly because it is the courts'

responsibility to determine whether a professional shall be disqualified due to their connection to

a party in interest."  Fibermark, 2006 WL 723495, at *8 (citing Diamond Lumber Inc. v.

Unsecured Creditors' Comm., 88 B.R. 773, 777 (N.D. Tex. 1988)); see also MF Global, 464

B.R. 600-01 (in construing disinterestedness, bankruptcy courts hold trustee and their retained

professionals to a rigorous standard).  "It is for the courts to decide what facts may be relevant

and that decision should not be left to the professional, 'whose judgment may be clouded by the

benefits of the potential employment.'"  Id. (quoting In re Lee, 94 B.R. 172, 177 (Bankr. C.D.

Cal. 1988)); see also Source Enters., 2008 WL 850229, at *8 (persons to be employed "'must

disclose all facts that bear on [their] disinterestedness and cannot usurp the court's function by

choosing, *ipse dixit,* which connections impact disinterestedness and which do not.  The

existence of an arguable conflict must be disclosed if only to be explained away . . . .'")

(emphasis in original) (citing In re C&C Demo, Inc., 273 B.R. 502, 507 (Bankr. E.D. Tex. 2001) (quoting Granite Partners, 219 B.R. at 35)).

Furthermore, whether an applicant's retention application or supplemental disclosures satisfy the United States Trustee does not affect the professional's obligation to make full and candid disclosure of all connections to the court.  See Source Enters., 2008 WL 850229, at *13.

e.    The Duty To Disclose is Continuing.

Although Bankruptcy Rule 2014(a) does not expressly require supplemental or continuing disclosure, see In re Caldor, Inc., 193 B.R. 165, 176 (Bankr. S.D.N.Y. 1996), Section 327(a) of the Bankruptcy Code implies a duty of continuing disclosure, and requires professionals to reveal connections that arise after their retention.  Granite Partners, 219 B.R. at 35 (additional citations omitted).  "Continuing disclosure is necessary to preserve the integrity of the bankruptcy system by ensuring that the trustee's professionals remain conflict free."  Id.

In addition, an attorney is under a duty to promptly notify the court if any potential for conflict arises.  See Crivello, 134 F.3d at 831; see also Rome, 19 F.3d at 59-60 ("[A]s soon as counsel acquires even a constructive knowledge reasonably suggesting an actual or potential conflict, a bankruptcy court ruling should be obtained . . .") (internal citations omitted).

f.    Failure to Disclose Has Serious Consequences.

Failure to comply with the disclosure rules is a sanctionable violation, even if proper disclosure would have shown that the professional had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule.  See I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.), 432 F.3d 347, 355 (5th Cir. 2005) (holding that "[w]e have observed that these standards are 'strict' and that attorneys engaged in the conduct of a bankruptcy case 'should be free of the slightest personal interest . . . [a]ccordingly, we are 'sensitive to preventing conflicts

of interest' and require a 'painstaking analysis of the facts and precise application of precedent")
(internal citations omitted); see also Matter of Olsen Indus., Inc., 222 B.R. 49, 60 (Bankr. D. Del.
1997) (because nondisclosure was intentional and serious, it was not necessary for the court to
determine the firm's disinterestedness to order disgorgement of fees); In re eToys, Inc., 331 B.R.
176, 190 (Bankr. D. Del. 2005) ("So important is the duty of disclosure that the failure to
disclose relevant connections is an independent basis for the disallowance of fees.") (quoting
Leslie Fay, 175 B.R. at 533).

Nondisclosure of relevant information under Bankruptcy Rule 2014 is sanctionable even
if the failure to disclose was negligent or inadvertent.  See, e.g., In re BH & P, Inc., 949 F.2d
1300, 1318 (3d Cir. 1991) ("[n]egligence does not excuse the failure to disclose possible conflict
of interests"); see also In re Jore, 298 B.R. 703, 729 (Bankr. D. Mo. 2003) (same) (citations
omitted).

Where the failure to disclose is willful, disallowance of fees is almost assured.  In fact,
willful nondisclosure of relationships in connection with the retention of professionals may rise
to the level of a fraud upon the court.  See Pearson v. First NH Mort. Corp., 200 F.3d 30, 35-41
(1st Cir. 1999); see also Crivello, 134 F.3d at 836-37 (stating that "a bankruptcy court should
punish a willful failure to disclose the connections required by Fed. R. Bankr. P. 2014 as
severely as an attempt to put forth a fraud on the court."); accord In re ACandS, Inc., 297 B.R.
395, 405 (Bankr. D. Del. 2003) (disallowing nunc pro tunc retention and ordering disgorgement
of all fees of professional which willfully concealed relationships and potential and actual
conflicts).

**(III)    *A Court May Allow Reasonable Compensation To Retained Professionals From the Estate Upon Proper Application With Requisite Disclosure.***

    a.    <u>Section 330(a)(1) of the Bankruptcy Code</u>.

Bankruptcy Code Section 330(a)(1) provides that:

After notice to the parties in interest and the United States trustee and a hearing, and subject to section 326, 328, and 329, the court may award to a trustee, … an examiner, … or a professional person employed under section 327 or 1103 –

(A)    reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, … or attorney and by any paraprofessional person employed by any such person; and

(B)    reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1)(A) and (B).  Only a professional whose retention is approved by order of the court may be compensated from the estate.  <u>Lamie v. United States Trustee</u>, 540 U.S. 526, 526 (2004).

    To determine reasonableness, Section 330(a)(3) sets forth various factors that the court must consider, including among others, "whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title."  11. U.S.C. § 330(a)(3)(f).  The fee applicant bears the burden of proof on its claim for compensation.  <u>In re GSC Group, Inc.</u>, No. 10-14653 (AJG), 2012 WL 676409, at *2 (Bankr. S.D.N.Y. Feb. 29, 2012) (citations omitted).  In addition, "[T]he court may, on its own motion or on the motion of the United States Trustee for the Region or the District, or any other party in interest, award compensation that is less than the amount of compensation that is requested."  <u>GSC Group</u>, 2012 WL 676409, at *1.  (additional citation omitted); <u>see also</u> 11 U.S.C. § 330(a)(2) (court may award less than amount of fees requested).

      b.     <u>Section 329 of the Bankruptcy Code</u>.

Section 329 of the Bankruptcy Code gives the Court the power to review the compensation paid to a debtor's attorney if such payment or an agreement to be paid was made after one year before the date of the filing of the petition, and to determine if the fee paid was, or is, reasonable or excessive.  Section 329(b) provides:

> (b) If such compensation [of bankruptcy counsel] exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—
>
>     (1)    the estate if the property transferred—
>
>         (A) would have been property of the estate; or
>         (B) was to be paid by or on behalf of the debtor
>         under a plan under chapter 11, 12, or 13 of this title;
>         or
>
>     (2)    the entity that made such payment.

11 U.S.C. § 329.  Bankruptcy Rule 2017 provides the mechanism for a determination of whether payments to an attorney are excessive.  Fed. R. Bankr. P. 2017.

      c.     <u>Section 330(a)(5) of the Bankruptcy Code</u>.

Section 330(a)(5) of the Bankruptcy Code specifically permits a court to order disgorgement of interim payments received under Section 331 to the extent that they exceed the ultimate award, if any, under Section 330.  11 U.S.C. § 330(a)(5).  Thus, interim fee awards are always "subject to re-examination and adjustment" and no professional may claim to be unaware of the inherent risk of disgorgement.  <u>In re Rockaway Bedding, Inc.</u>, 454 B.R. 592, 596 (Bankr. D.N.J. 2011) (citing <u>In re St. Joseph Cleaners, Inc.</u>, 346 B.R. 430 (Bankr. W.D. Mich. 2006) (quoting <u>Specker Motor Sales Co. v. Eisen</u>, 393 F.3d 659, 663 (6th Cir. 2004)).

**(IV)    *The Bankruptcy Code's Prohibition on Fee Sharing.***

a.    Section 504 of the Bankruptcy Code.

Section 504 of the Bankruptcy Code prohibits any person receiving compensation under

Subsections 503(b)(2) or (b)(4) of the Bankruptcy Code from sharing this compensation with

another person.[33]   11 U.S.C. § 504(a); see, e.g., In re Codesco, Inc., 15 B.R. 351, 353 (Bankr.

S.D.N.Y. 1981) (retained appraiser's sharing of fees with consultant violated Section 504).

In pertinent part, Section 504(a) provides:

Except as provided in subsection (b) of this section, a person receiving
compensation or reimbursement under section 503(b)(2) or 503(b)(4) may not
share or agree to share –

(1)    any such compensation or reimbursement with another
person or

(2)    any compensation or reimbursement received by another
person under such sections.[34]

11 U.S.C. § 504(a).

Courts have held that there is simply "no doubt that section 504(a) is intended to be

mandatory and preemptory."  Goldberg v. Vilt (In re Smith), 397 B.R. 810, 819 (Bankr. E.D.

Tex. 2008) (quoting 4 Collier ¶ 504.02[1]).  A violation of Section 504(a) of the Bankruptcy

Code is dependent solely upon a finding that the prohibited conduct occurred.  Smith, 397 B.R.

at 819 (citation omitted).  Indeed, one court commented: "Could there be a provision of the Code

less susceptible to misunderstanding?  Not likely."  Egwu, 2012 WL 5193958, at *4.

A violation of Section 504 is established upon a showing of three elements:  (a) a party

was awarded compensation under Section 503(b)(2) or (b)(4); (b) that party "shared or agreed to

---

[33] Section 503(b)(2) of the Bankruptcy Code allows as an administrative expense, compensation
and reimbursement awarded under Section 330(a).  11 U.S.C. § 503(b)(2).

[34] Subsections (b) and (c) are inapplicable exceptions in these cases.

share in the awarded compensation;" and (c) none of the exceptions of Section 504(b) of the

Bankruptcy Code apply.  Smith, 397 B.R. at 817.  The persons included in this prohibition are

trustees, ombudsmen, examiners, attorneys, accountants and other professional persons

compensated pursuant to Section 330(a) and 503(b) of the Bankruptcy Code.  4 Collier ¶ 504.01.

The Bankruptcy Code's prohibition against fee sharing is supported by strong policy

reasons, including: (i) the potential that a claimant may inflate his fee to make up for the portion

lost to sharing, (ii) the potential that the approved professional may be subject to outside

influences of which the court has neither knowledge nor control, and (iii) the potential for the de

facto transfer of judicial power over expenditures and allowances.  In re Futuronics Corp., 5 B.R.

489, 499 n.3 (SDNY 1980), aff'd, 655 F.2d 463 (2d Cir. 1981).

Section 504 of the Bankruptcy Code illustrates a congressional intent to preserve the

integrity of the bankruptcy process so that professionals engaged in bankruptcy cases attend to

their duty as officers of the bankruptcy court, rather than treat their interest in bankruptcy cases

as "matters of traffic."  See Arlan's, 615 F.2d at 943-44 (quoting In re Drake, 7 F. Cas. 1046

(D.N.J. 1876)).

> b.    Prohibition Against Fee Sharing with Undisclosed
>        Subcontractors.

Section 504 of the Bankruptcy Code also ensures that professionals whose retention

should be reviewed and determined by the bankruptcy court under Section 327 cannot avoid that

review by subcontracting with a retained professional.  4 Collier ¶ 504.02.  Indeed, there is an

overlap in the application of Sections 327 and 330, on the one hand, and Section 504 on the

other, in requiring court approval of the compensation paid to retained professionals.  Id.  A

professional cannot be compensated under Section 330 of the Bankruptcy Code for amounts that

the professional has paid to a subcontractor rendering professional services unless the retention

of the subcontractor also has been approved by the court.  See ACandS, 297 B.R. at 405 (entity

functioning as professional cannot subcontract even with subsidiary); see also In re United Cos.

Fin. Corp., 241 B.R. 521 (Bankr. D. Del. 1999) (restructuring subsidiary of retained accounting

firm should have been retained separately; cannot avoid Section 327 of the Bankruptcy Code

through subcontracting arrangement); In re Kewriga, No. 01-44262, 2002 WL 484942, at *2

(Bankr. D. Mass. Mar. 28, 2002) (use of contract attorneys by approved professional is non-

compensable without appropriate disclosures to the court).  Likewise, the professional whose

compensation is approved under Section 330 cannot recoup the cost of a subcontractor providing

professional services without violating Section 504.

      c.      Undisclosed Fee Sharing May Result in Full Disgorgement.

      Failure to disclose a fee sharing arrangement that violates Section 504(a) of the

Bankruptcy Code is grounds to deny professional fees requested and the disgorgement of fees

already paid.  In re Soulisak, 227 B.R. 77, 82-83 (Bankr. E.D. Va. 1998).  In that case, the court

opined that courts are "given wide latitude in fashioning an appropriate sanction for unethical

behavior, including the disgorgement of fees."  Id.  Similarly, in Smith, supra, the bankruptcy

court found that the appropriate sanction for an undisclosed referral fee between attorneys could

warrant "total disgorgement."  Smith, 397 B.R. at 820 n.31.

      In addition, as noted, violations of the disclosure requirements of Bankruptcy Rule 2014

may warrant denial of professional compensation, and, in certain circumstances, disgorgement of

the professional's retainer.  In Balco Equities, the bankruptcy court held that a chapter 11

debtor's counsel's failure to disclose all connections to parties in interest, where full disclosure

would have rendered counsel ineligible for retention, "alone is sufficient to deny all fees" sought

by debtor's counsel.  Balco Equities 345 B.R. at 112-13.  Further, if the failure to disclose is

intentional or deliberate, such conduct may be treated as a fraud upon the court, and may warrant

a harsher sanction.  See Crivello, 134 F.3d at 839.

> d.     Ethical Considerations and Fiduciary Duties.

The Section 504(a) expands the general prohibition against fee splitting, imposed upon

attorneys by various ethics rules, to virtually all professional persons who seek compensation in

bankruptcy cases.  4 Collier ¶ 504.02.  In this manner, the Bankruptcy Code extends the

protections of the duty of loyalty to the client and the rules precluding conflicts of interest to

nonlawyers as well as lawyers.  Id.

Generally, a finding of improper sharing of compensation results in a denial or

disgorgement of compensation.  Notably, many decisions emanating from the Second Circuit

considering Section 504 and its statutory and common law predecessors discuss the role of the

attorneys in the context of their professional ethics rather than merely addressing the scope of the

statute or other rule, thereby highlighting the importance of these considerations in the

bankruptcy context.  4 Collier ¶ 504.02; see, e.g., Arlan's, 615 F.2d at 943 (Second Circuit

affirming district court's order of full disgorgement from attorneys who failed to disclose their

connections); Futuronics, 655 F.2d at 465 (Second Circuit found that bankruptcy court abused its

discretion in not ordering disallowance of fee requests and disgorgement of all fees received

where attorneys had shared fees, noting that in a bankruptcy case, it is necessary for a court to

depend upon the integrity of the debtor's counsel, who is held to a higher standard of conduct, in

handling and administration of the debtor's assets.).

*(V)*     ***The Court May Vacate Its Own Retention Orders and Order Full Disgorgement Where There Has Been A Fraud Perpetrated Upon The Court.***

    a.     <u>Civil Rule 60(b) – Generally</u>.

Bankruptcy Rule 9024 provides that Civil Rule 60 is applicable in bankruptcy cases.[35]

Fed. R. Bankr. P. 9024. Civil Rule 60(b) affords a party relief from a judgment if there existed:

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence . . . ; (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged ... or (6) any other reason that justifies relief. . . .[36]

Fed. R. Civ. P. 60(b).

"Properly applied, Rule 60(b) strikes a balance between serving the ends of justice and preserving the finality of judgments. It should be broadly construed to do 'substantial justice,' yet final judgments should not 'be lightly reopened. The Rule may not be used as a substitute for a timely appeal. Since 60(b) allows extraordinary judicial relief, it is invoked only upon a showing of "exceptional circumstances," in the discretion of the trial court. <u>Nemaizer v. Baker</u>, 793 F.2d 58, 61 (2d Cir. 1986) (internal citations omitted);<u>see also</u> <u>In re Enron Corp.</u>, 352 B.R. 363, 369 (Bankr. S.D.N.Y. 2006) (these grounds "should be liberally construed when substantial justice will . . . be served") (quoting <u>Radack v. Norwegian Am. Line Agency, Inc.</u>, 318 F.2d 538, 542 (2d Cir. 1963)).

Additional requirements are that (i) the supporting evidence be "highly convincing;" (ii) there be good cause for the movant's failure to act sooner; and (iii) application of the rule should not impose undue hardship on other parties. <u>In re Old Cargo, LLC</u>, 423 B.R. 40, 45 (Bankr.

---

[35] Rule 9024 sets forth certain exceptions that are not applicable here.

[36] Civil Rule 60(c)(1) requires that motions under Civil Rule 60(b) be made within a reasonable period of time and, for subsections (1), (2) and (3), no more than a year after the entry of the judgment or order or the date of the proceeding. Fed. R. Civ. P. 60(c)(1).

S.D.N.Y. 2010) (citing <u>Freedom, N.Y., Inc. v. United States</u>, 438 F.Supp.2d 457, 462-63

(S.D.N.Y. 2006) (citations omitted)).  A decision concerning a Civil Rule 60(b) motion is within

the discretion of the court.  <u>Old Cargo</u>, 423 B.R. at 40 (citing <u>Nemaizer</u>, 793 F.2d at 61-62).

      b.      <u>Civil Rule 60(b)(6)</u>.

Civil Rule 60(b)(6), which permits a court to grant relief from a final order for "any other

reason that justifies relief," "confers broad discretion on the trial court to grant relief when

appropriate to accomplish justice [and] it constitutes a grand reservoir of equitable power to do

justice in a particular case.  It is properly invoked where there are extraordinary circumstances,

or where the judgment may work an extreme and undue hardship[.]"  <u>Marrero Pichardo v.

Ashcroft</u>, 374 F.3d 46, 55 (2d Cir. 2004) (internal quotations and citations omitted); <u>see also

Andrulonis v. United States</u>, 26 F.3d 1224, 1235 (2d Cir.1994) (Rule 60(b)(6) properly "invoked

to override the finality of judgments in the interests of justice."); <u>Matarese v. LeFevre</u>, 801 F.2d

98, 106 (2d Cir. 1986) (Rule 60(b)(6) "confers broad discretion on the trial court to grant relief

when appropriate to accomplish justice."); <u>In re Teligent, Inc.</u>, 326 B.R. 219, 227 (S.D.N.Y.

2005); <u>In re AMC Realty Corp.</u>, 270 B.R. 132, 143-44 (Bankr. S.D.N.Y. 2001).  Thus, subject to

the caveat that relief under this subsection may not be based upon a reason included in

subclauses (1)-(5), <u>see</u> <u>Nemaizer</u>, 793 F.2d at 63, Civil Rule 60(b)(6) serves as an effective

catch-all.  <u>See</u> <u>In re Lewis Road, LLC</u>, No. 09-37672, 2011 WL 6140747 (Bankr. E.D. Va. Dec.

9, 2011) (court invoked Civil Rule 60(b)(3) and (b)(6) to vacate an order due to inadequate

disclosure required by Section 327 of the Bankruptcy Code and Bankruptcy Rule 2014).

      c.      <u>Civil Rule 60(d)(3)</u>.

Rule 60(d)(3) also authorizes a court to "set aside a judgment" where there has been a

"fraud on the court."  Fed. R. Civ. P. 60(d)(3); <u>Philips Lighting Co. v. Schneider</u>, 395 F. App'x

796, 798 (2d Cir. Oct. 12, 2010); Old Cargo, 423 B.R. at 49.  The rule applies where there is a

"scheme to defraud" the court.  See Hazel Atlas Glass Co. v. Harford-Empire Co., 322 U.S. 238,

245-46 (1944), overruled on other grounds by Standard Oil Co. of Cal. v. United States, 429 U.S.

17 (1976) (scheme to defraud both Patent Office and court constitutes fraud on the court);  see

also Pearson, 200 F.3d at 38 (fraud upon the court occurs where a party has sentiently set in

motion some unconscionable scheme calculated to interfere with the judicial system's ability

impartially to adjudicate a matter.")

A court may invoke Civil Rule 60(d)(3), even on its own initiative, "to maintain the

integrity of the courts and safeguard the public."  United States v. Smiley, 553 F.3d 1137, 1142

(8th Cir. 2009); see also Martina Theatre Corp. v. Schine Chain Theatres, Inc., 278 F.2d 798, 801

(2d Cir. 1960).  There must be clear and convincing evidence to support a Rule 60(d)(3) motion,

King v. First Am. Investigations, Inc., 287 F.3d 91, 95 (2d Cir. 2002); Old Cargo, 423 B.R. at 51.

Nevertheless, such a premium is placed on the court's mission to preserve its integrity that,

although Federal Rule of Civil Procedure 60(c)(1) sets forth a one-year time limitation on a

motion under Rule 60(b)(3), a Rule 60(d)(3) motion is not time-barred.  Id.

"'[F]raud upon the court' as distinguished from fraud on an adverse party is limited to

fraud which seriously affects the integrity of the normal process of adjudication."  King, 287

F.3d at 95.  (internal quotation omitted).  Thus, Civil Rule 60(d)(3) embraces "only that species

of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of

the court so that the judicial machinery cannot perform in the usual manner its impartial task of

adjudging cases."  Id. (internal quotation omitted).  The Hazel-Atlas case has been described as a

case in which a judgment was set aside on motion primarily on the basis "that an attorney was

implicated in perpetrating the fraud."  Kupferman v Consolidated Research and Mfg. Corp., 459

F.2d 1072,1078 (2d Cir. 1972) (citing 7 James WM. Moore et al., Federal Practice ¶ 60.33 at 513

(3d ed. 2009)).  As an officer of the court a lawyer must deal with the court with honesty and

integrity.  Id.  If a lawyer betrays this duty of loyalty to the court, the lawyer is deemed to have

"perpetrate[d] a fraud upon the court."  Id.

Although the fraud or misconduct need not be the "primary basis for the ruling," the

conduct must have "impressed, affected or influenced the court."  Old Cargo, 423 B.R. at 52.

However, fraud on the court may be present if a party inserts a false or forged document into the

record.  Id. (citing Weldon v. U.S., 225 F.3d 647, No. 99-6142, 2000 WL 1134358, at *2 (2d Cir.

Aug. 9, 2000)).  (additional citations omitted).  Courts may also invoke the rule when an officer

of the court has "fabricat[ed] . . . evidence."  Smiley, 553 F.3d at 1145.  This species of fraud has

been defined as conduct "on the part of an officer of the court" that "is directed to the judicial

machinery itself", "is willfully blind to the truth", "is a positive averment or a concealment when

one is under a duty to disclose," and "that deceives the court."  Workman v. Bell, 227 F.3d 331,

336 (6th Cir. 2000); see also Philips Lighting, 395 F. App'x at 798 (Rule 60(d) applies to conduct

by officers of the court).  Thus, participation by counsel is a key to a finding of fraud on the

court.  See Demjanjuk v. Petrovsky, 10 F.3d 338, 348 (6th Cir. 1993) (where government

attorneys withheld exculpatory evidence); see also Kupferman, 459 F.2d at 1078 (attorney's

"loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court").

Fraud under Rule 60(d) concerns the integrity of the judicial process, see Lee v. Marvel

Enters., 765 F.Supp.2d 440, 450 (S.D.N.Y. 2011), and fraud on the court interferes with the

court's ability to decide cases.  Id.; see also King, 287 F.3d at 95 (fraud on the court is fraud by

officers of the court that prevents the court from "adjudging cases"); Andrada Fin., LLC v.

Humara Group, Inc. (In re Andrada Fin. LLC), No. AZ-10-1209-JuMkPa, 2011 WL 3300983, at

*4 n.9 (9th Cir. BAP) (Rule 60(d) "addresses a species of fraud . . . perpetrated by officers of the

court so that the judicial machinery" cannot function properly).  The movant under Rule 60(d)

must show fraud on the court by clear and convincing evidence.  See King, 287 F.3d at 95.

Although nondisclosure is not per se "fraud upon the court," see In re Levander 180 F.3d

1114, 1119 (9th Cir. 1999), it is fraud on the court where the failure to deprived parties of the

opportunity to mount a challenge to the relief sought at the original hearing.  Id. at 1120.  Civil

Rule 60(d), therefore, certainly applies where the nondisclosure of a conflict under Section

327(a) prevented parties and the United States Trustee from challenging the retention of a

professional in court.  See Crivello, 134 F.3d at 839.

### (VI)    The Court's Inherent Power To Impose Sanctions.

Bankruptcy courts have inherent authority to sanction parties for improper conduct.  In re

Feinberg, 215, 226 (Bankr. S.D.N.Y. 2010) (citing Mapother & Mapother, P.S.C. v. Cooper (In

re Downs), 103 F.3d 472, 477 (6th Cir. 1996)); see also In re FairPoint Commc'ns, Inc., 445 B.R.

271, 276 (Bankr. S.D.N.Y. 2011) (sanctions may be imposed through the inherent power of the

court); In re Plumeri, No. 10-10050 (MG), 2010 WL 3087685, at *2 (Bankr. S.D.N.Y. Mar. 25,

2010) ("Bankruptcy Courts, like Article III courts, enjoy inherent power to sanction parties for

improper conduct.") (quotation omitted).  A court possesses wide discretion when imposing

these sanctions.  Reilly v. Natwest Markets Group, Inc., 181 F.3d 253, 267 (2d Cir. 1999).

The applicable standard in imposing sanctions on an attorney pursuant to a court's

inherent power depends upon the nature of the conduct in question.  FairPoint, 445 B.R. at 276.

The Second Circuit, in U.S. v. Seltzer held that a finding of bad faith is necessary only when

sanctions are imposed for a lawyer exceeding "conduct of the sort that is normally part of the

attorney's legitimate efforts at zealous advocacy for the client."  U.S. v. Seltzer, 227 F.3d 36, 40

(2d Cir. 2000).  In cases where sanctions are imposed for conduct that impacts the orderly

running of the court system and is not undertaken for the client's benefit, bad faith need not be

shown.  FairPoint, 445 B.R. at 276.

**B.      CAPSTONE, BY MESSRS. ORDWAY AND MANZO, FILED OR CAUSED
         TO BE FILED WITH THE COURT DOCUMENTS CONTAINING FALSE
         STATEMENTS.**

Capstone, by Messrs. Ordway and Manzo, knowingly filed or caused to be filed

many documents with the Court that contained one or both of two false statements.

Principally, Capstone made two false representations: (i) that Mr. Manzo, through RJM,

of which he is the sole member, was a Capstone employee and (ii) that Capstone had no

agreement to share fees in these cases.

*(I)      Mr. Ordway Falsely Stated That Mr. Manzo Was A Capstone Employee
          In His Second Supplemental Declaration.*

On October 6, 2010, Kaye Scholer, under Mr. Solow's name, filed with this Court the

Second Supplemental Ordway Declaration.  See ECF No. 148.  Paragraph 15, Mr. Ordway stated

that Mr. Manzo, through RJM, was a Capstone employee.  Id. at ¶ 15.  Mr. Ordway also stated

that Mr. Manzo, through RJM, worked exclusively for Capstone.  Id.

On or about May 29, 2012, as a result of the interposition of discovery demands, the

United States Trustee (and other interested parties) learned for the first time that Mr. Manzo was

not, in fact, an employee of Capstone, but rather that he was an independent contractor, through

RJM, a limited liability company of which Mr. Manzo is the sole member and for which there

are no employees.  See Schwartz Decl. at ¶ 43 and Ex. S.

Page one of the Capstone Manzo Agreement expressly provides that Mr. Manzo, through

RJM, "is not to be considered an employee of Capstone for any purpose."  Id. at 1.  A review of

the amendments to the agreement shows that this provision never was modified.  Further, the

Capstone/Manzo Agreement was amended twice post-petition, including in November 2010 (a month after Mr. Ordway submitted the declaration) and again in March 2011.  Mr. Ordway could have, but never did, correct his misstatement.  Thus, it is plain that Mr. Ordway's statement, made under penalty of perjury, that Mr. Manzo was an "employee" in the Second Supplemental Ordway Declaration was incorrect.

### (II)    *Capstone, By Mr. Ordway, Falsely Represented That Mr. Manzo Was A Capstone Employee in Capstone's Final Fee Application Seeking $6.2 Million.*

On May 15, 2012, Capstone filed the Capstone Final Fee Application seeking compensation of $6.2 million.  In support of that application, Capstone argued:

> Unlike other firms who would have likely had multiple senior-level partners working on this type of matter; because of Mr. Manzo's experience, he was the only **senior-level Capstone employee** actively working on this engagement.

Capstone Final Fee App. at ¶ 44.  (emphasis added).

Based upon the foregoing, this representation is not true.  Further, although Mr. Ordway did not sign the Capstone Final Fee Application under penalty of perjury, the application is accompanied by Mr. Ordway's M-389 Certification wherein he certified, among other things, that he read the Capstone Final Fee Application and that to the best of his knowledge the information contained in the fee application complied with the Court's orders and the UST Fee Guidelines.  Ordway M-389 Cert. at 3.

77

>    **(III)**    ***Capstone, By Messrs. Ordway And Manzo, And Mr. Frank Falsely***
>    ***Represented in Not Fewer Than 10 Documents Filed With The Court***
>    ***That Capstone Had Not Agreed To Share Fees in these Cases.***

From its inception, the Capstone/Manzo Agreement provided for fee sharing between

Capstone and Mr. Manzo, through RJM.[37]  As stated, Mr. Manzo earned a percentage of the fees

that he generated on these cases, ranging from 80 to 100 percent, a percentage of the fees that

other Capstone employees generated on these cases (15.5%) and shared any success fee, ranging

from 50 to 60 percent.  Further, although the Capstone/Manzo Agreement was amended twice

during these cases, it always provided for fee sharing and, each time, more of the fees generated

on these cases went to Mr. Manzo.  See Schwartz Decl., Ex. S.

Despite the explicit agreement between Capstone and Mr. Manzo to share fees, Capstone,

by Messrs. Ordway and Manzo, stated in not less than 10 documents that Capstone had no

agreement to share fees.  The facts, thus, demonstrate that Capstone's statements that it had no

agreement to share fees were not isolated instances of oversight, but rather, that Capstone, by

Messrs. Ordway and Manzo, deliberately and falsely stated numerous times, in order to obtain

this Court's approval of its retention and $6 million in hourly fee requests (and $3 million in

success fees), that Capstone was not sharing the fees it was receiving in these cases.

**C.    MESSRS. ORDWAY, MANZO AND SOLOW WERE AWARE BEFORE,
AND AT THE TIME OF, THE COMMENCMENT OF THESE CASES
THAT MR. MANZO WAS NOT A CAPSTONE EMPLOYEE AND THAT
CAPSTONE AND MR. MANZO, THORUGH RJM, HAD AGREED TO
SHARE FEES.**

The Capstone/Manzo Agreement was first signed and finalized as of February 4, 2006.

Documents produced in discovery show that drafts of the proposed agreement were circulated

---

[37] In one of the briefs that Capstone filed in support of its multiple success fee requests, Capstone
represented that "RJM was primarily a conduit for Capstone's payments to Manzo."  See
ECF No. 1488, at 14.

among Mr. Ordway and other Capstone professionals, and Mr. Manzo as early as May 2005.

Mr. Ordway and Mr. Manzo personally negotiated and signed the agreement, as well as the

amendments thereto.  None of the amendments modified the agreement's central premise that

Mr. Manzo would not be an employee of Capstone "for any purpose," but rather would always

be an independent contractor, through RJM.  Similarly, none of the amendments removed the

fee-sharing component, although the sharing provisions were modified over time.

Mr. Solow also knew about the Capstone/Manzo Agreement before and during the

pendency of these cases.  Notwithstanding, at the June 13 Conference, in response to the Court's

question concerning Mr. Solow's awareness of the Capstone/Manzo Agreement, Mr. Solow

replied as follows:

> Mr. Solow:    No.  Actually the first time I saw it was this afternoon sitting
> waiting for court, Your Honor.  I knew that Mr. Manzo had an
> arrangement, I knew that that existed because of his testimony in
> the Chrysler case, that he had an arrangement with Capstone.  The
> exact nature and how it was structured I did not know.

See Schwartz Decl., Ex. C, 38:18-38:23.

Although Mr. Solow, an officer of this Court, denied that he had prior knowledge of the

Capstone/Manzo Agreement, Mr. Solow acknowledged that he knew of Mr. Manzo's LLCs:

> Mr. Solow:    . . . I knew of the existence of LLCs that Mr. Manzo had formed at
> the time he decided to go back into the work force. . . . Why do I
> know that?  He asked our firm to form it.  We had a paralegal form
> the LLC over six years ago for a variety of activities that he
> wanted potentially to do, period.  So I knew that he had an LLC, I
> did not know exactly what it would be used for or the – you know,
> what would generate from that.  So I knew of an existence of an
> LLC, but I did not know the consulting agreement or
> arrangements, their nature until I read what was produced and Mr.
> Micheli showed it to me in preparation this afternoon for this
> hearing.

Id. at 46:5-46:18.  It was at this hearing that the United States Trustee learned for the first time that Kaye Scholer had provided legal services for Mr. Manzo, individually.[38]

The not fewer than 11 emails identified herein belie the representations that Mr. Solow made to the Court at the June 13 Conference.  These emails show that Mr. Solow from at least December 2006, through March 2011, was counseling Mr. Manzo personally with respect to the Capstone/Manzo Agreement.[39]  In addition, Kaye Scholer produced no fewer than 11 copies of the Capstone/Manzo Agreement that Kaye Scholer had in its filed.

Notwithstanding that Messrs. Ordway, Manzo and Solow each knew that Mr. Manzo was not a Capstone employee and that Capstone and Mr. Manzo, through RJM, had a fee sharing agreement, all of these highly experienced bankruptcy practitioners filed or caused to be filed with this Court the documents referred to above containing the false statements.  Specifically, the Second Supplemental Ordway Declaration, the Manzo M-389 Certification and no fewer than 10 documents affirmatively represented that there was no fee sharing.

### D.    CAPSTONE, BY MESSRS. ORDWAY AND MANZO, WITH THE AID OF KAYE SCHOLER, FILED MORE THAN 30 DOCUMENTS CONTAINING MISLEADING STATEMENTS, THEREBY PREVENTING THE FULL EVALUATION OF CAPSTONE'S RETENTION APPLICATION AND REQUESTS FOR COMPENSATION.

From the Petition Date until May 29, 2012, when the Capstone/Manzo Agreement was revealed, Capstone and Mr. Manzo referred to Mr. Manzo as an "Executive Director" of Capstone.  In light of Mr. Ordway's representation that Mr. Manzo was a Capstone "employee," no party, including the Court and the United States Trustee, had any reason to inquire into Mr.

---

[38] Kaye Scholer did not disclose in the Kaye Scholer Retention Application that Mr. Solow or Kaye Scholer had performed legal services for Mr. Manzo, RJM or RJM1.

[39] Despite the existence of all of these emails, at his deposition, Mr. Manzo testified that he could not recall whether he had received legal representation with respect to the Capstone/Manzo Agreement.  See Schwartz Decl., Ex. K, at 195:23-196:14.

Manzo's status at Capstone.  Notwithstanding that Mr. Solow knew for many years that Mr.

Manzo was not, in fact, an employee of Capstone.  Kaye Scholer attorneys, under Mr. Solow's

supervision, prepared and file numerous pleadings on Capstone's behalf that provided that Mr.

Manzo was an Executive Director of Capstone.

That Mr. Manzo was not a Capstone employee could not be gleaned from the Capstone

Retention Application, which only included the hourly rates for three types of professionals:

"Executive Directors," "Staff," and "Support Staff."  By billing Mr. Manzo's as an "Executive

Director" and charging his services at the firm's highest rates, Capstone and Mr. Manzo

knowingly created the false impression that Mr. Manzo was a Capstone director.  If Capstone

had disclosed the true nature of Mr. Manzo's relationship with Capstone, then the United States

Trustee (and others) potentially would have objected to Capstone's retention on the grounds that,

at a minimum, there should have been additional disclosures.  By concealing this information,

Capstone successfully eluded this inquiry.

Moreover, Capstone, by Mr. Ordway and Mr. Manzo, repeatedly represented that Mr.

Manzo was the Capstone professional responsible for directing the Capstone activities in these

cases.  See, e.g., Capstone First Fee Application at ¶ 35 ("Robert Manzo is an Executive director

of the firm and is responsible for directing the activities of the Capstone team . . ."); Manzo M-

389 Certification at 26-27 ("I am an Executive Director of Capstone" and twice referring to

Capstone as "my firm");[40] Declaration of Robert J. Manzo in Support of Debtors' Proposed Sale

---

[40] Admin. Order M-389 requires that a certification be submitted with any fee application by the
person at the applicant with the responsibility for compliance with the Amended Guidelines.
Amended Order M-389.  At their respective depositions, both Messrs. Ordway and Manzo
testified that Mr. Manzo did not have the authority to bind Capstone legally or approve
documents with legal significance.  See Schwartz Decl., Ex. D, 22:15-23:3; K, 35:16-35:25,
199:12-199:22.  In fact, Mr. Ordway testified that he was the person responsible for Capstone's
engagement in GSC.  Schwartz Decl., Ex. D, 168:19-168:22.

Procedures at ¶ 5 (ECF No. 48) ("I have been with Capstone since 2006.  Prior to joining

Capstone . . ."); Manzo Success Fee Declaration at ¶ 1 ("I am an Executive Director of

Capstone").

In addition, in the following nearly 30 documents, Capstone, by Messrs. Ordway and

Manzo, with the aid of Kaye Scholer, made affirmative representations that misled the Court, the

United States Trustee and others to believe that Mr. Manzo was a Capstone employee and that no

further inquiry was required:

- **(18) Capstone Monthly Fee Statements – Listing Mr. Manzo as and "Executive Director"**
(Kaye Scholer filed with the Court 13 of these statements under Mr. Solow's name) (ECF Nos. 180, 215, 361, 398, 424, 462, 469, 498, 608, 694, 745, 783, 828, 1283, 1284, 1285, 1363 and 1364)

- **Declaration of Robert J. Manzo in Support of Debtors' Incentive Plan – Identifying Himself as an "Executive Director with Capstone Advisory Group, LLC"**
(Kaye Scholer's name appears on the first page of the document and Kaye Scholer filed the document under Mr. Solow's name) (ECF No. 21)

- **Declaration of Robert J. Manzo in Support of Debtors' Proposed Sale Procedures – Identifying Himself as an "Executive Director with Capstone Advisory Group, LLC"**
(Kaye Scholer's name appears on the first page of the document and Kaye Scholer filed the document under Mr. Solow's name) (ECF No. 48).

- **Declaration of Robert J. Manzo in Support of Debtors' Revised Incentive Compensation Plan – Identifying Himself as an "Executive Director with Capstone Advisory Group, LLC"**
(Kaye Scholer's name appears on the first page of the document and Kaye Scholer filed the document under Mr. Solow's name) (ECF No. 190-2).

- **Supplemental Declaration of Robert J. Manzo in Support of Debtors' Sale – Identifying Himself as an "Executive Director with Capstone Advisory Group, LLC"**
(Kaye Scholer's name appears on the first page of the document and Kaye Scholer filed the document under Mr. Solow's name) (ECF No. 271).

- **Second Supplemental Declaration of Robert J. Manzo in Support of Debtors' Sale – Identifying Himself as an "Executive Director with Capstone Advisory Group, LLC"**
(Kaye Scholer's name appears on the first page of the document and Kaye Scholer filed the document under Mr. Solow's name) (ECF No. 302).

- **Declaration of Robert J. Manzo in Support of Trustee's Sale – Identifying Himself as an "Executive Director with Capstone Advisory Group, LLC"**
(ECF No. 548-3).

- **Capstone's Second Interim Fee Application – Referencing Mr. Manzo as "Capstone's Robert Manzo" and Listing Him as an "Executive Director"**
(Kaye Scholer filed the application under Mr. Solow's name) (ECF No. 842)

- **Notice of Revised Hourly Rates of Capstone Advisory Group – Listing Mr. Manzo as an "Executive Director"**
(Kaye Scholer filed the notice under Mr. Solow's name) (ECF No. 1057)

- **Capstone's Success Fee Motion – Stating That Mr. Manzo "Headed The Capstone Team" and Referring To Him As Capstone's "Team Leader"** (ECF No. 1146)

- **Solow Success Fee Declaration – Referring to Mr. Manzo and "His Engagement Team's Efforts"** (ECF No. 1245)

- **Solow Success Fee Declaration – Referring to "Mr. Manzo and His Team"**
(ECF No. 1487)

In addition, not only did Capstone issue a press release stating that Mr. Manzo had "joined" Capstone as an "Executive Director," but Mr. Manzo also filed documents with this Court wherein he referred to himself as having "joined" Capstone. See, e.g., Manzo Incentive Plan Decl. at ¶ 4. Moreover, Mr. Manzo, upon information and belief, was included as an Executive Director on Capstone's website. At the time that the Capstone/Manzo Agreement was executed, Capstone issued a press release representing to the public that Mr. Manzo had "joined the firm as an Executive Director."

Furthermore, Mr. Ordway's representation in Paragraph 15 of his second supplemental declaration, wherein he states that RJM works exclusively for Capstone also is not correct. RJM

is a limited liability company with no employees and Mr. Manzo is the sole member. Thus, for all intents and purposes, Mr. Manzo is RJM. The same holds true for RJM1, another limited liability company of which Mr. Manzo is the sole member.

Through discovery it was learned that Mr. Manzo, through RJM1, actually was serving as the Liquidating Trustee in <u>Chrysler</u>. Thus, Mr. Manzo was not working exclusively for Capstone. In addition, documents produced in discovery show that Mr. Manzo was working for Cerberus in the <u>Innkeepers</u> case. Neither Capstone nor Mr. Manzo made any disclosure about this engagement.

Mr. Ordway's statement that RJM was working exclusively for Capstone does not comport with the complete and candid disclosure that is required under the Bankruptcy Code and the Bankruptcy Rules.

**E. THE FILING OF NEARLY 50 DOCUMENTS THAT CONTAINED FALSE AND/OR MISLEADING REPRESENTATIONS BY EXPERIENCED BANKRUPTCY PROFESSIONALS ESTABLISHES THAT MESSRS. ORDWAY, MANZO, SOLOW AND OTHER KAYE SCHOLER LAWYERS KNOWINGLY FAILED TO DISCLOSE MATERIAL FACTS CONCERNING CAPSTONE'S FINANCIAL RELATIONSHIP WITH MR. MANZO.**

As set forth above, there are nearly 50 documents that Capstone, by Messrs. Ordway and Manzo, with the assistance of Mr. Solow and his Kaye Scholer legal team, filed with this Court that contain false and/or misleading statements concerning Capstone's employment relationship with Mr. Manzo, and the fee sharing between Capstone and Mr. Manzo, through RJM. The facts and circumstances underlying Capstone's retention and its requests for more than $9 million demonstrates a pattern of conduct that betrays a disregard for the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the UST Fee Guidelines, other applicable law and the special role that Kaye Scholer's lawyers hold as officers of this Court.

### (I)    *Messrs. Ordway, Manzo and Solow Are Experienced Bankruptcy Professionals.*

None of the three main players involved in this scheme, namely, Messrs. Ordway, Manzo and Solow, are inexperienced.  To the contrary, Mr. Ordway, has more than 20 years' experience in the bankruptcy restructuring area and is a self-proclaimed expert in executive compensation in troubled situations.  Mr. Manzo is a Certified Public Accountant and a Certified Insolvency and Restructuring Advisor, and has over 25 years of restructuring experience in many of the country's largest bankruptcy cases including In re Old Cargo, Inc. (f/k/a In re Chrysler, LLC), In re Refco, Inc. and In re Adelphia Inc.  Id. at ¶ 2.

Finally, Mr. Solow is a member of Kaye Scholer was "head of Kaye Scholer's legal team" that represented the Debtors in these cases.  Mr. Solow serves as the firm's Managing Partner, Co-Chair of the Executive Committee and Co-Chair of Bankruptcy and Restructuring Department.  See supra at ¶ 7 n.4.

### (II)    *For More Than 20 Years, Messrs. Ordway, Manzo and Solow Have Maintained Professional and Personal Connections.*

Messrs. Ordway, Manzo and Solow have known each other for more than 20 years.  Mr. Ordway met Mr. Manzo when they worked together at Arthur Andersen in 1979.  In 1991, Mr. Ordway joined Mr. Manzo's firm, Policano & Manzo, LLC ("PM"), and continued to work with him when PM was bought by FTI in 2000.  In 2004, Mr. Ordway left to form Capstone.  Mr. Ordway testified that he considers Mr. Solow a "friend," and that he and Mr. Solow refer business to one and other.

Mr. Manzo testified that he has both a professional and a social relationship with Mr. Solow, and that he considered Mr. Solow a "good friend."  See Schwartz Decl., Ex. K, 160:10-160:11; 260:25-261:4.  With respect to Mr. Manzo's professional relationship with Mr. Solow

and Kaye Scholer, it was learned through discovery, that Mr. Solow and Kaye Scholer currently and have in the past represented Mr. Manzo, through RJM and RJM1, in several engagements unrelated to Capstone, including representing Mr. Manzo as Plan Administrator of in Refco, and as Liquidating Trustee in Chrysler.

In addition, Mr. Solow and Kaye Scholer, performed legal services for Mr. Manzo personally, including the formation of RJM and RJM1.  See Schwartz Decl., Ex. C, 45:7-46:18; and Ex. X.  In addition, Mr. Solow provided legal counsel to Mr. Manzo in connection with the Capstone/Manzo Agreement, including the two amendments that were made post-petition, when Mr. Solow contemporaneously was serving as the Debtors' counsel.

Further, at the same time as he was representing the Debtors, Mr. Solow participated in drafting the Eckert/Solow Letter that Mr. Manzo annexed to his declaration in support of Capstone's request for a $3.25 million success fee.  At the time, Mr. Solow knew that Mr. Manzo had a significant personal interest in the Success Fee Motion because he stood to earn 60%, or $1.95 million, of any fee awarded.[41]

Mr. Solow also prepared and signed two declarations to support Capstone's and Mr. Manzo's quest for a success fee..[42]  The documents and testimony show that all of these highly experienced, closely connected bankruptcy practitioners either prepared, reviewed, advised or commented on and filed nearly 50 documents with this Court that either expressly misrepresented the nature of Capstone and Mr. Manzo's employment and financial relationship,

---

[41] Mr. Manzo repeatedly represented at his deposition and in court documents that he, not Mr. Solow, drafted the Eckert/Frank Letter.  See Manzo Declaration in Lieu of Testimony at ¶ 71. (ECF No. 1486); see also Schwartz Decl., Ex. K, 30:14-30:15, 82:20-83:10, 115:13-117-7.

[42] Mr. Manzo testified at his deposition that he was not involved in discussions concerning Mr. Solow's declaration and that he could not recall whether he saw the draft.  See Schwartz Decl., Ex. K, 162:6-162-14.

or misled the Court, the United States Trustee and other parties in interest to believe that there

was nothing improper about Capstone's retention in these cases or requests for compensation.

The court should not condone this conduct.

> **(III)** ***Kaye Scholer Knew Or Should Have Known That It Was Filing With
> The Court Documents Containing Inaccurate And/Or Misleading
> Statements.***

Documents produced by Kaye Scholer also demonstrate that after Kaye Scholer filed the

Capstone Retention Application, the Kaye Scholer lawyers knew that if Capstone was engaging

independent contractors on this engagement that this information had to be disclosed.  A

document produced by Kaye Scholer that contains a compilation of handwritten attorney notes,

contains a checklist of issues, including in pertinent part:

> ☐    do we retain any contractors;
> ☐    Capstone has to disclose;
> ☐    include in conflict search; and
> ☐    mark-up on fees.

<u>See</u> Schwartz Decl., Ex. F.

Other documents that Kaye Scholer produced, for example, include an email attaching a

blacklined draft of a supplemental declaration for Mr. Ordway with a footnote relating Mr.

Ordway's disclosures in the text concerning connections of Capstone's "contractors," that read:

"[Do we need to make a disclosure about this?]"  <u>Id.</u>

Notably, the day prior to Kaye Scholer's filing of Capstone's First Interim Fee

Application, Capstone's Robert Butler, sent an email to Mr. Nurnberg, at Mr. Manzo's direction,

inquiring as to whether Mr. Manzo could sign the fee application "given that Bob is an

independent contractor and not an employee of Capstone."  See Schwartz Decl., Ex. N.  An

email chain among Mr. Solow, Mr. Nurnberg and others shows that this inquiry was circulated

among them and that ultimately, Mr. Solow stated, "Should not be a problem as long as cap

authorizes."  <u>See</u> Schwartz Decl., Ex. N and O.  Thus, each of the participants in this email chain was reminded that Mr. Manzo was not a Capstone employee, but rather was an independent contractor.

In light of Mr. Solow's long-time familiarity with the Capstone/Manzo Agreement, the above facts support that Kaye Scholer knew or, at a minimum, should have known, that the various documents that it was filing with the Court, many of which the firm prepared, contained incorrect or misleading statements.  Because the Kaye Scholer lawyers, held to an even higher standard, knew or should have known this, they breached their duties as officers of the Court.

> ***(IV)   Messrs. Manzo and Solow Knew that Mr. Manzo's Independent Contractor Relationship and Fee Sharing Arrangements With Capstone Should Have Been Disclosed Because as Plan Administrator in <u>Refco</u>, Mr. Manzo and Mr. Solow Prosecuted These Very Claims Against Another Financial Advisor That Resulted in a $4 Million Credit Back to the Estates.***

Mr. Manzo and Mr. Solow were aware that should Mr. Manzo's status as an independent contractor be disclosed, the United States Trustee and other parties would have certain concerns.  Specifically, in <u>Refco</u>, where Mr. Manzo served as Plan Administrator, with Mr. Solow as his counsel, Mr. Manzo determined that APS, the Debtors' "crisis manager" and administrative creditor, had not adequately disclosed in its final fee request (i) that it had been using six independent contractors that APS had sourced KordaMentha, or (ii) the fee sharing arrangement between APS and KordaMentha.

The circumstances in the cases before this Court are far more egregious than in <u>Refco</u> because, among other things, APS actually disclosed in its monthly fee statements that it was using independent contractors, and all but one of the independent contractors filed a disclosure affidavit with the Court.  In addition, that Capstone knew about this disclosure issue is reflected

in emails among various Capstone Executive Directors.  Just before these cases were

commenced, Capstone Executive Director Jay Borow wrote:

> On revco.  Did we use contractors?  Yes. at least manzo.  Did we make any
> special disclosure arrangements?  What issue did j alix run into using contractors
> on that assignment?

See Schwartz Decl., Ex. W.

Capstone Executive Director DePiro responded in pertinent part:

> We referred to Manzo as an Executive Director.  We did not reflect him as a contractor.
> All others were employees.

> Alix included employees of a firm called KordaMentha as contractors on their fee
> application.  KordaMentha is an Australia based firm, which Alix has an "agreement"
> with.  The group was hired to oversee the Asian entities without disclosure of the
> relationship of the 3 firms.

Id.

In contrast to the position taken by Mr. Manzo in Refco, regarding disclosure of

independent contractor agreements, Mr. Ordway testified at his deposition that Capstone

typically does not disclose which Executive Directors are independent contractors.  See Schwartz

Decl., Ex. D, 171:6-171:9.  In fact, even in Refco, Capstone did not disclose the Capstone/Manzo

Agreement and, upon information and belief, did not disclose it in Chrysler until Mr. Manzo's

role as an expert for the debtors was placed at issue and he disclosed that he personally would

receive $10 million of the success fee that Capstone sought in those cases.[43]  See Transcript of

Chrysler hearing at 152:2-152:6.  (Chrysler ECF No. 1486-10).

---

[43] It appears that in Chrysler Mr. Solow and Kaye Scholer provided Mr. Manzo and Capstone
with legal advice regarding how they could structure the $17 million transaction fee that
Capstone received without giving creditors a right to object and to avoid having to file a fee
application.  See Schwartz Decl., Ex. BB.  Mr. Manzo stated that Jones Day was not able to
accomplish this, so Mr. Solow advised Mr. Manzo and Mr. Nurge on how to structure the fee.
Id.

Thus, there can be no doubt that all of the professionals involved in these cases, namely, Messrs. Ordway, Solow and Manzo, were fully knowledgeable about the requirements of disclosure of independent contractors and the grave consequences that could result for failing to do so. Their cavalier attitude toward disclosure and compliance with the rules of this Court should not, in any way, be permitted to continue and the remedies requested herein respectfully should be granted.

**F.    KAYE SCHOLER AND CAPSTONE FAILED TO MAKE COMPLETE AND CANDID DISCLOSURE CONCERNING THEIR CONNECTIONS IN THESE CASES.**

*(I)    The Extent of Kaye Scholer's Disclosure.*

On September 1, 2010, Kaye Scholer filed the Kaye Scholer Retention Application, including the Solow Statement. See ECF No. 20. In support thereof, Mr. Solow, a member of the firm, submitted the Solow Statements.[44] See ECF Nos. 20 and 115. The disclosure statements that Mr. Solow made therein are set forth supra at ¶¶ 7-11.

Despite the central role that Mr. Manzo played in these cases (and leading up to the filings) as the Debtors' lead financial advisor, Kaye Scholer did not disclose that the firm contemporaneously was representing Mr. Manzo, through RJM, as Plan Administrator in Refco.

---

[44] Although the Solow Statement is captioned as "verified," neither the Solow Statement nor the Supplemental Solow Statement, both unsworn declarations, contain Mr. Solow's representation that the statements contained therein are made "under penalty of perjury," as required by Section 1746 of Title 28. See ECF Nos. 20 and 115. It is, therefore, questionable whether the Kaye Scholer Retention Application should ever have been approved in the first instance because it failed to comply with Bankruptcy Rule 2014(a), which requires that all retention applications be accompanied by a "verified" statement setting forth the applicant's connections to the case. Fed. R. Bankr. P. 2014(a). See In re Adams, 229 B.R. 312, 316 (Bankr. S.D.N.Y. 1999) (courts uniformly require that unsworn declarations include language regarding the penalty of perjury to be effective) (citing 28 U.S.C. § 1746); see also LeBoeuf, Lamb, Greene & McCrae, L.L.P. v. Worsham, 185 F.3d 61, 65-66 (2d Cir. 1999) (finding letter containing representation that statements therein were made "under penalty of perjury" met the requirements of Section 1746 of Title 28).

Kaye Scholer also did not disclose that the firm contemporaneously was representing Mr.

Manzo, through RJM1, as Liquidating Trustee in <u>Chrysler</u>.[45]

In addition, Kaye Scholer did not disclose that Mr. Solow had provided legal services to

Mr. Manzo personally, including (i) forming RJM and RJM1, and (ii) providing Mr. Manzo with

legal advice, including written comments, regarding various amendments to the Capstone/Manzo

Agreement, from at least December 2006.  In fact, Mr. Solow provided legal advice to Mr.

Manzo concerning two amendments that were made post-petition, including November 2010,

just one month after the cases were commenced, and in March 2011, two months after the

Trustee had been appointed.  At no time, however, did Kaye Scholer file supplemental pleadings

with this Court disclosing that Mr. Solow was providing legal advice to Mr. Manzo, personally,

post-petition.

Not only did Kaye Scholer fail to disclose this information, but Mr. Solow incorrectly

represented to the Court that, prior to June 13, 2012, he had never before seen the

Capstone/Manzo Agreement.[46]  <u>See</u> Schwartz Decl., Ex. C, 38:16-38:19, 46:14-46:18.

Significantly, when the Court inquired of the Trustee as to whether he would have been

interested in knowing about the Capstone/Manzo Agreement and the March 2011 amendment,

the Trustee replied, "Certainly. Your Honor."  <u>See</u> Schwartz Decl., Ex. FF, 23:9-23:19.

In contrast to Mr. Solow's statement to the Court that the Kaye Scholer lawyers merely

were "scriveners" with respect to Capstone's retention application, documents filed on the

---

[45] Mr. Manzo is the sole member of both these limited liability companies.  <u>See</u> Schwartz Decl., Ex. K, 172:25-176:9.

[46] In a teleconference with the Court held on June 14, 2012, a Kaye Scholer attorney informed the Court that the statements that Mr. Solow made at the June 13 Hearing concerning his knowledge of the Capstone/Manzo Agreement were inaccurate.  It was not until October 12, 2012, that Mr. Solow offered an explanation for his misrepresentation by way of the Solow Letter.  <u>See</u> ECF No. 1573.

Court's docket by Kaye Scholer reveal that Kaye Scholer's role was more substantial. Thus, at the same time as Kaye Scholer was representing the Debtors, Kaye Scholer actually was providing legal services for the benefit of Capstone. Kaye Scholer prepared, revised, reviewed and/or commented on many of Capstone's pleadings, including not only the Capstone Retention Application and the Ordway Declarations (defined below), but also four of Capstone's monthly fee statements, Capstone's First Rate Increase Notice (defined below) and Capstone's First Interim Fee Application. See ECF Nos. 22, 142, 148, 180, 215, 333, 361, 398 and 400. Kaye Scholer's name, not Capstone's, appears on the face of Capstone's fee statements for the months of September, October, November and December 2010, in contravention of this Court's Local Rule 9004-1.[47] In addition, Kaye Scholer's name appears on the face of Capstone's first rate increase notice (the "Capstone Rate Increase Notice") and bears Mr. Solow's signature. Furthermore, a review of Kaye Scholer's time records reveals that Kaye Scholer billed the estates for preparing Capstone's First Interim Fee Application.

Moreover, documents produced by Kaye Scholer appear to show that Mr. Solow himself had drafted the Eckert/Frank Letter that Capstone filed with this Court on January 30, 2012, in support of its request for a $3.25 million success fee. Under the terms of the Capstone/Manzo Agreement, Mr. Manzo, stood to earn nearly $2 million if the Success Fee Motion was approved. Thereafter, prior to the Plan becoming effective, Mr. Solow provided further aid to Capstone and Mr. Manzo by submitting a declaration in support of their request for a success fee. On June 8, 2012, Mr. Solow submitted another declaration to support Capstone's amended request for a success fee. See ECF No. 1486.

---

[47] Local Bankruptcy Rule 9004-1 requires that the name of the attorney for the filing party, here Capstone, not the Debtors' attorney's name, appear on the face of the pleading. LBR 9004-1(a)(4)(A).

Mr. Solow and the Kaye Scholer lawyers knew or should have known that these

disclosures were required, particularly in view of their roles as officers of this Court.

As stated in the Preamble to the New York Rules of Professional Conduct (the "Rules of

Professional Conduct"), "[a]s an officer of the court, each lawyer has a duty to uphold the legal

process; [and] to demonstrate respect for the legal system . . . "  22 NYCRR § 1200.0 (2012)

(Preamble: A Lawyer's Responsibilities).  Further,

> The relative autonomy of the legal profession carries with it special
> responsibilities of self-government.  Every lawyer is responsible for
> observance of the Rules of Professional Conduct . . . Neglect of these
> responsibilities compromises the independence of the profession and the public
> interest which it serves . . .

Id.

It is plain that Mr. Solow and Kaye Scholer should have known that these disclosures

were required.

a.    Kaye Scholer's lack of disinterestedness.

In light of Kaye Scholer's role as Debtors' counsel, and its attendant fiduciary duties, (i)

the fact that Kaye Scholer, while representing the Debtors, simultaneously was providing legal

assistance to Capstone, coupled with (ii) the close relationship between Mr. Solow and Mr.

Manzo, and to a lesser degree, Mr. Ordway, substantially, if not completely, impaired Kaye

Scholer's ability to provide the Debtors with untainted legal advice.  See Leslie Fay, 175 B.R. at

531 ("[t]he requirements of Section 327 cannot be taken lightly, for they 'serve the important

policy of ensuring that all professionals appointed pursuant to [the section] tender undivided

loyalty and provide untainted advice and assistance in furtherance of their fiduciary

responsibilities.") (quoting Rome, 19 F.3d at 58).

Courts in this district have held that the disinterestedness requirement mandates that a person "should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters."  <u>Vebeliunas</u>, 231 B.R. 191-92 (citations and quotations omitted); <u>see also</u> <u>Granite Partners</u>, 219 B.R. at 24 (the most modest interest or relationship will undo a person's disinterestedness if it "would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules.") (internal quotations and citations omitted); <u>MF Global</u>, 464 B.R. at 600 (the trend in determining disinterestedness "focuses on the concerns of divided loyalties and affected judgments") (citations omitted).

Given the facts presented above, Kaye Scholer was not disinterested at the time the Court approved its retention.  Although not disclosed in these cases, Mr. Solow and Kaye Scholer were representing Mr. Manzo, through his two, wholly controlled limited liability companies, in two mega cases, namely <u>Refco</u> and <u>Chrysler</u>.  Given Mr. Solow's direct involvement in both <u>Refco</u> and <u>Chrysler</u>, it is fair to conclude that the "independence and impartial attitude" that the Code and the Bankruptcy Rules required Kaye Scholer to provide to the Debtors, was compromised by Kaye Scholer's financial interest in <u>Refco</u> and <u>Chrysler</u>.  Furthermore, it is possible that Kaye Scholer, in its engagement letters with Mr. Manzo (through RJM or RJM1) in these matters, agreed not to take adverse action against Mr. Manzo, RJM or RJM1 without first obtaining a waiver.  If Kaye Scholer had disclosed its retention by Mr. Manzo in these cases, these questions may have been considered.

That Kaye Scholer was not disinterested at the time of its retention is further supported by the fact that Mr. Solow was providing legal advice to Mr. Manzo personally in these cases and, in particular, with respect to an undisclosed, impermissible fee sharing agreement.  As the facts in these case demonstrate, Mr. Solow and his legal team participated to conceal the true

nature of the employment and financial relationship between Mr. Manzo and Capstone.  More

troubling was Mr. Solow's statement to the Court that he had never before June 13, 2012, seen

the Capstone/Manzo Agreement.  Mr. Solow's participation in the drafting of the Eckert/Frank

Letter, only adds to the questions surrounding Kaye Scholer's relationship with Mr. Manzo.

As Judge Friendly noted in <u>In re Ira Haupt & Co.</u>, 361 F.2d 164, 168 (2d Cir. 1996),

"[t]he conduct of bankruptcy proceedings not only should be right but must seem right."  Kaye

Scholer failed to adhere to this standard.  Simply stated, Kaye Scholer did not make the full and

complete disclosure required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules,

Admin. Order M-389 or the United States Fee Guidelines.  By failing to disclose its connections

with Mr. Manzo, RJM and RJM1, Kaye Scholer deprived the Court, the United States Trustee

and other interested parties of the ability to consider whether Kaye Scholer had disabling

conflicts.

As courts in this district have made clear, a determination of the facts that may be

relevant to deciding whether a professional is qualified to be retained in a bankruptcy case, is for

the courts to decide, and should not be left to the professional.  <u>See</u> <u>Source Enters.</u>, 2008 WL

850229, at *8 (persons to be employed "'must disclose all facts that bear on [their]

disinterestedness and cannot usurp the court's function by choosing, *ipse dixit,* which

connections impact disinterestedness and which do not.  The existence of an arguable conflict

must be disclosed if only to be explained away . . . .'") (emphasis in original) (citations omitted).

> b.    <u>Kaye Scholer's Nondisclosure</u>.

In light of the significant role that Mr. Manzo was to serve in these cases as the Debtors'

lead financial advisor, Kaye Scholer's connections to him were not <u>de</u> <u>minimis</u>.  Indeed, as the

above facts support, Kaye Scholer failed to disclose the connections among Messrs. Solow,

Manzo and Ordway, and their respective firms.  As discussed below, if the failure to disclose is

intentional or deliberate, then such conduct may warrant a harsher sanction.  See Crivello, 134

F.3d at 839 (noting that "a bankruptcy court should punish a willful failure to disclose the

connections required by Fed. R. Bankr. P. 2014 as severely as an attempt to put forth a fraud

upon the court").

Furthermore, Kaye Scholer's boilerplate language that "has in the past represented, may

presently represent, or might in the future represent certain creditors, other parties in interest, or

their affiliates, in matters unrelated to and having no effect upon or influence upon the Debtors'

chapter 11 cases. . . ., is not adequate.  Leslie Fay, 175 B.R. at 537 ("to rule any other way would

be to eviscerate the disclosure requirement of Rule 2014(a)").

In addition, although Refco and Chrysler were very large cases that garnered national

attention, it was Kaye's Scholer's duty, not the Court's or the United States Trustee's, to make

sure that it disclosed all connections.  See Granite Partners, 219 B.R. at 35 (the professional's

duty to disclose is self-policing); see also Matco, 383 B.R. at 853-54 ("Fed. R. Bankr. P. 2014 is

not intended to condone a game of cat and mouse, where the professional seeking appointment

provides only enough disclosure to whet the appetite of the UST, the court or other parties in

interest, and then the burden shifts to those entities to make inquiry in an effort to expand the

disclosure.").  Indeed, the court relies primarily on forthright disclosure to determine

qualification under Section 327 of the Bankruptcy Code.  Leslie Fay, 175 B.R. at 533 (citing

Rome, 19 F.3d at 59).  As the bankruptcy court in Fibermark stated, "the duty to disclose all

possible connections is so vital to the bankruptcy process that failure to do so is an independent

basis for the disallowance of fees."  Fibermark, 2006 WL 723495, at *9.

Kaye Scholer's conduct in these cases has challenged and impugned the integrity of the bankruptcy process and a largely autonomous legal system, which, as stated, is self-policing. But for Capstone's request for a $3.25 million success fee these cases, Kaye Scholer's nondisclosures and attendant potential and/or actual conflicts would never have been revealed. For all of these reasons, if the Court does not vacate the Kaye Scholer Retention Order, then the Court should sanction Kaye Scholer as set forth below.

### *(II)    The Extent of Capstone's Disclosure.*

The extent of Capstone's disclosure is factually similar to Kaye Scholer's, largely due to the involvement of the same parties.  In sum, on September 1, 2010, Kaye Scholer filed with this Court the Capstone Retention Application, including the Ordway Declaration.  See ECF No. 22. The disclosures made in the Capstone Retention Application and the Ordway Declarations are set forth specifically above, as are the false statements contained in those declarations.

In these cases, Capstone did not simply take it upon itself to determine whether to disclose a connection, rather it affirmatively made incorrect and misleading statements in its retention application and other papers filed with this Court.  Thus, neither the Court, the United States Trustee nor any other party ever had the ability to adequately consider the Capstone Retention Application or any of Capstone's fee requests.  As set forth below, Capstone's conduct should be sanctioned.

By failing to disclose its agreement to share fees with Mr. Manzo, through RJM, Capstone violated not only Bankruptcy Rule 2014, but also Bankruptcy Code Section 504, Local Bankruptcy Rule 2014-1 and UST Fee Guidelines b(1)(ii) and (iii).  Section 504 of the Bankruptcy Code prohibits any person receiving compensation under Subsections 503(b)(2) or (b)(4) of the Bankruptcy Code from sharing this compensation with another person. 11 U.S.C. §

504(a); see also Egwu, 2012 WL 5193958, at *4 (commenting on the clarity of Section 504, "Could there be a provision of the Code less susceptible to misunderstanding?  Not likely."); Smith, 397 B.R. at 819 (there is "no doubt that section 504(a) is intended to be mandatory and peremptory") (internal quotation omitted).  Thus, the undisclosed fee sharing arrangement between Capstone and Mr. Manzo, through RJM, which has been in existence since February 4, 2006, violates Section 504 of the Bankruptcy Code.  In addition, neither subsections (b) or (c) of Section 504 of the Bankruptcy Code are applicable in these cases.

Like the Second Circuit in Futuronics, and Arlan's, this court should uphold the strong policy underlying the Bankruptcy Code's prohibition against fee sharing.  See Futuronics, 5 B.R. at 499 n.3; see also Arlan's, 615 F.2d at 943-44 (finding in pre-Code case that attorney, as officer of the court, breached his fiduciary duty when he failed to disclose fee sharing agreement in his application for appointment);United Cos. Fin. Corp., 241 B.R. at 528 (restructuring subsidiary of retained accounting firm should have been retained separately; cannot avoid Section 327 of the Bankruptcy Code through subcontracting arrangement).

As discussed below, the Court should disallow Capstone's Final Fee Application and Amended Success Fee Motion, and direct Capstone to disgorge all compensation paid by the Debtors' estates because (i) it concealed its fee sharing arrangement with Mr. Manzo and (ii) the arrangement violates Section 504(a) of the Bankruptcy Code.

**G.      THE PROTECTION AND PRESERVATION OF THE INTEGRITY OF THE BANKRUPTCY SYSTEM REQUIRES THAT THE COURT DISALLOW THE PENDING FEE REQUESTS OF KAYE SCHOLER AND CAPSTONE, AND ORDER THE DISGORGEMENT OF ALL COMPENSATION THAT THEY HAVE RECEIVED FROM THE ESTATES.**

Disclosure "goes to the heart of the integrity of the bankruptcy system, of counsel and of the courts."  B.E.S. Concrete, 93 B.R. at 236.  The duty to disclose mandated by Bankruptcy

Rule 2014, therefore, is considered sacrosanct because the complete and candid disclosure by a professional seeking employment is indispensable to the court's discharge of its duty to assure the professional's eligibility for employment under Section 327, and to make an informed decision on whether the engagement is in the best interest of the estate.  See Leslie Fay, 175 B.R. at 533; see also eToys, 331 B.R. at 189 (the duty to disclose is considered sacrosanct because the complete and candid disclosure of a professional seeking retention under Section 327 is indispensable to court's discharge of its duty to ensure eligibility); see generally 9 Collier ¶ 2014.03.

The facts in these cases do not present isolated instances of oversight.  Rather, they reveal a cavalier disregard for the myriad of laws and rules governing this Court.  To protect and to preserve the integrity of the bankruptcy system, and the legal and financial professions, the Court should deny any remunerative reward to Capstone and Kaye Scholer in these cases.

    ***(I)***    ***The Court, Pursuant to Fed. R. Civ. P. 60(b)(6) and 60(d)(3), Made Applicable by Fed. R. Bankr. P. 9024, Should Vacate the Retention Orders of Kaye Scholer and Capstone and Direct that They Disgorge all Compensation Received.***

Subsections (b)(6) and (d)(3) of Civil Rule 60, as made applicable herein by Bankruptcy Rule 9024, authorize the Court to vacate the retention orders of Kaye Scholer and Capstone. Fed. R. Civ. P. 60(b)(6) and (d)(3).  Rule 60 confers broad discretion upon the Court to grant the requested relief because, as in these cases, to do so will serve substantial justice and maintain the integrity of the Court.  See Matarese, 801 F.2d at 106; see also Nemaizer, 793 F.2d at 61 (same); Enron, 352 B.R. at 369 (these grounds "should be liberally construed when substantial justice will . . . be served") (quoting Radack, 318 F.2d at 542); Teligent, 326 B.R. at 227; AMC Realty, 270 B.R. at 143-44.

Courts may invoke Rule 60(b)(6) where there has been a failure to disclose connections in violation of Bankruptcy Rule 2014.  See, e.g., In re Lewis Road LLC, No. 09-39672, 2011 WL 6140747 (Bankr. E.D. Va. Dec. 9, 2011).  In fact, some courts have held that the nondisclosure rises to the level of a "fraud on the court," and therefore may permit the invocation of Rule 60(d)(3) to vacate the court's prior order.  See Crivello, 134 F.3d at 839 ("a bankruptcy court should punish a willful failure to disclose the connections required by Fed. R. Bankr. P. 2014 as severely as an attempt to put forth a fraud on the court.").

The Supreme Court has held that a "fraud on the court" occurs where it can be demonstrated that there has been a "scheme to defraud" the court.  See King, 287 F.3d at 95 ("'Fraud upon the court' is limited to fraud which seriously affects the integrity of the normal process of adjudication.") (internal quotation omitted); see also Philips Lighting, 395 F'Appx. at 798; Pearson, 200 F.3d at 37 (fraud upon the court occurs when a party "has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter.").

In addition, courts have found it appropriate to invoke Rule 60(d) when an attorney, as an officer of the court, has been involved in the fraud.  As the Second Circuit in Kupferman explained, an attorney, as an officer of the court, must be honest and act with integrity.  Id.  If an officer of the court fails to meet this cardinal requirement, the attorney has defrauded the court. Id.; Workman, 227 F.3d at 336 (defining fraud upon the court as conduct "on the part of an officer of the court" that "is directed to the judicial machinery itself," "is willfully blind to the truth," "is a positive averment or a concealment when one is under a duty to disclose," and "that deceives the court."); Philips Lighting, 395 F'Appx. at 798 (Rule 60(d) applies to conduct by officers of the court); Kupferman, 459 F.2d at 1078 (attorney's "loyalty to the court, as an officer

thereof, demands integrity and honest dealing with the court"); Old Cargo, 423 B.R. at 52 (the

success of a motion under Civil Rule 60(d)(3) depends on whether the bad conduct by the officer

of the court "actually deceived the court.") (citing Smiley, 553 F.3d at 1145).

The Court should invoke Rule 60(b)(6) and 60(d)(3) to vacate the retention orders of

Kaye Scholer and Capstone because Messrs. Solow, Ordway and Manzo, perpetrated a fraud on

this Court by willfully concealing and affirmatively misrepresenting the true nature of

Capstone's employment and financial relationship with Mr. Manzo.

The known facts that support this remedy include:

- Mr. Solow and the other Kaye Scholer lawyers involved in these cases, are officers of the court;

- Messrs. Solow, and other Kaye Scholer lawyers on Mr. Solow's team are experienced bankruptcy lawyers;

- Mr. Solow was the self-proclaimed "head" of the Kaye Scholer legal team in these cases and he was responsible ultimately for Kaye Scholer's conduct in these cases;

- Mr. Solow and Mr. Nurnberg directed the day-to-day running of these cases;

- Under the direction of Mr. Solow and with the assistance of the Kaye Scholer lawyers, Kaye Scholer filed with this Court no fewer than 10 documents containing affirmative misrepresentations and nearly 40 additional documents containing seriously misleading statements;[48]

- Kaye Scholer prepared, reviewed and or revised many of the documents containing false and/or misleading statements that Kaye Scholer filed with the Court;

- Mr. Solow affirmatively misrepresented to the Court his knowledge of and involvement with the Capstone/Manzo Agreement;

---

[48] Rule 60(d)(3) applies where "a party inserts a false or forged document into the record." Old Cargo, 423 B.R. at 53 (citing Weldon, 225 F.3d 647). Courts may also invoke the rule when an officer of the court has "fabricat[ed] . . . evidence." Smiley, 553 F.3d at 1145.

- Kaye Scholer knowingly failed to make complete and candid disclosures in its retention application concerning the professional and personal relationships among Mr. Solow, Mr. Ordway, Mr. Manzo, Capstone, RJM and RJM1;

- Neither of the Solow Statements that Mr. Solow submitted to this Court in support of the Kaye Scholer Retention Application complied with Bankruptcy Rule 2014 or Section 1746 of Title 28 because they were not made "under penalty of perjury;"

- Kaye Scholer failed to disclose, among other things, that RJM and RJM1 (limited liability companies of which Mr. Manzo was the sole member) were current or former clients of the firm;

- Mr. Solow, while representing the Debtors, was providing legal advice to Mr. Manzo concerning the Capstone/Manzo Agreement;

- Mr. Solow, while representing the Debtors, was aiding Capstone in prosecuting its application for a success fee;

- Mr. Ordway is an experienced financial advisor with over 20 years' experience in bankruptcy and restructuring matters;

- Mr. Ordway and Mr. Manzo knowingly signed documents containing false statements, some under penalty of perjury;

- Mr. Ordway knowingly signed nearly 40 documents that contained materially misleading statements and caused them to be filed with this Court;
- Capstone failed to disclose the terms of the Capstone/Manzo Agreement in the Capstone Retention Application;

- Capstone affirmatively misrepresented more than five times that it had no agreement to share fees received in these cases;

- Messrs. Ordway, Solow and Manzo knew that Mr. Manzo's employment and financial agreement with Capstone was a required disclosure because Messrs. Solow and Manzo prosecuted the very claims for nondisclosure against APS in Refco;

- Mr. Ordway admitted under oath that Capstone does not generally disclose its use of independent contractors, and did not disclose the Capstone/Manzo Agreement in connection with its retention in Refco;

- Mr. Manzo is an experienced financial advisor with extensive involvement in major bankruptcy matters, including Refco and Chrysler;

- Mr. Manzo knowingly signed the Capstone First Interim Fee Application and submitted the M-389 Certification, (i) notwithstanding that he knew Capstone and he were sharing fees and (ii) notwithstanding that he and Mr. Ordway and admitted that Mr. Manzo did not have authority to bind the company;

- Mr. Manzo was the lead financial advisor in these cases and reviewed and did not take steps to prevent any of the pleadings filed on Capstone's behalf from being filed with the Court;

- By his failure to take action otherwise, and by referring to himself as an Executive Director of Capstone and referring to Capstone as "my firm," Mr. Manzo affirmatively perpetuated the false representations made by Capstone that he was an employee and not an "independent contractor" with the firm;

- Mr. Manzo falsely testified under oath at his deposition and in court documents that he drafted the Eckert/Frank Letter when Mr. Solow actually drafted the letter; and

- Mr. Manzo was sent a copy of the Second Supplemental Ordway Declaration and asked to specifically to review it before it was filed.

Based on these facts, it is reasonable to conclude that Messrs. Solow, Manzo and Ordway, as well as other Kaye Scholer lawyers, sought to conceal the true nature of Capstone's employment and financial relationship. As a result of their efforts, the Court was without the ability to consider whether Capstone qualified for employment under Section 327(a) of the Bankruptcy Code. Thus, the Court relied upon Capstone's affirmative misrepresentations and approved its retention order.

As stated, Kaye Scholer's retention application failed to comply with Bankruptcy Rule 2014 and Section 1746 of Title 28. The Kaye Scholer legal team, which Kaye Scholer professes is "one of the most experienced team of insolvency practitioners in the U.S.," knew or should have known that its retention papers failed to comply with the law in material respects. By failing to observe all of the laws and rules cited herein, the Court was without the information to consider whether Kaye Scholer qualified for retention under Section 327 of the Bankruptcy

Code.  Thus, the Court entered the Kaye Scholer Retention Order without knowing all of the relevant facts.

As a result of entering the Kaye Scholer Retention Order and the Capstone Retention Order, the Monthly Compensation Order and the orders granting the first two interim fee applications of these professionals, the Debtors already have paid Kaye Scholer and Capstone approximately $10 million.  Based on the above, the Court should invoke Rule 60(d)(3) and vacate the two retention orders.  If the Court takes this action, then Kaye Scholer and Capstone must disgorge all of the compensation that they had received.  See Lamie, 540 U.S. at 538-39 (only a retained professional may receive compensation from a debtor's estate).

Given the egregious conduct of these professionals, including the Kaye Scholer lawyers, as officers of this Court, the United States Trustee requests that the Court grant this relief to uphold the integrity of this Court and the bankruptcy system.

> **(II)** *In the Alternative, the Court Should Disallow the Pending Fee Requests of Kaye Scholer and Capstone, and Order the Disgorgement of all Compensation that they Have Received From the Estates Because they Failed to Make Complete and Candid Disclosures Required by Fed. R. Bankr. P. 2014(a).*

If the Court declines to vacate the retention orders of Kaye Scholer and Capstone then, in the alternative, the Court should disallow their pending fee requests and order the full disgorgement of all compensation that they have received from the estates because they failed to make complete and candid disclosures required by Fed. R. Bankr. P. 2014(a).

With respect to Capstone, not only did Capstone fail to disclose that (i) Mr. Manzo was an independent contractor and (ii) the financial terms of the Capstone/Manzo Agreement, but Capstone, by Mr. Ordway declared under penalty of perjury that Mr. Manzo was an employee and that Capstone had no agreement to share fees received in these cases.  These representations

were contained in documents prepared by Kaye Scholer and, with respect to the Second

Supplemental Ordway Declaration, were provided to Mr. Manzo prior to its filing with the

Court.  In light of the fact that the Capstone/Manzo Agreement had been in existence since

February 2006, and each of Messrs. Ordway, Solow and Manzo were involved with the various

amendments that occurred until as recently as March 2011, there can be no doubt that this

nondisclosure was not due to a lack of knowledge.

With respect to Kaye Scholer, there can be no dispute that Kaye Scholer did not make

complete and candid disclosure of its connections.  Kaye Scholer did not disclose that RJM and

RJM1, Mr. Manzo's companies, were former and current clients as of the Petition Date and

during these cases.  Kaye Scholer also did not disclose that Mr. Solow had provided legal

services to Mr. Manzo in connection with the formation of the limited liability companies, and

the Capstone/Manzo Agreement.  Kaye Scholer had a duty to disclose these connections and that

it was the Court's province, and not Kaye Scholer's, to determine whether these connections

presented a potential or actual conflict for Kaye Scholer.

As counsel for the Debtors, Kaye Scholer had a duty of loyalty to them which included,

among other things, a duty (i) to maximize value for its creditors and (ii) to review all claims,

including claims of the Debtors' professionals (including their fee applications) during these

cases.  Here, in light of the fact that Mr. Manzo (through his wholly controlled limited liability

companies) was Kaye Scholer's client in very lucrative matters, Refco and Chrysler, Kaye

Scholer was not disinterested at the time its retention was approved by the Court.  It is fair to

conclude that Kaye Scholer's engagement by Mr. Manzo in these two other matters will at least

"faintly color the independence and impartial attitude required by the Bankruptcy Court and

Bankruptcy Rules."  See Granite Partners, 219 B.R. at 23.  (internal quotations omitted).  It was

also plausible that Kaye Scholer's interest in its employment in <u>Refco</u> and <u>Chrysler</u> might cause the Kaye Scholer lawyers to act differently that if they did not have that engagement.  <u>See</u> <u>Leslie Fay</u>, 175 B.R. at 533.  It is reasonable to conclude that Kaye Scholer would be hard pressed to take issue with Capstone's bills in these cases, including the December 2010 bill where Mr. Manzo personally charged the estates for 426 hours, given that Mr. Manzo, through RJM and RJM1, a Kaye Scholer client.

Moreover, Mr. Solow knew the terms of the Capstone/Manzo Agreement.  Thus, not only was there a possibility that Mr. Solow might act in a manner adverse to the estates, he actually did, and in so doing, breached his fiduciary duty to the Debtors.  As stated, based upon documents produced by Kaye Scholer, it appears that Mr. Solow, not Mr. Manzo, drafted the Eckert/Frank Letter, which letter was used to support Capstone's application for a success fee. In addition, Mr. Solow submitted two declarations in support of Capstone's and Mr. Manzo's quest for a success fee.  At all times, Mr. Solow knew that his "good friend" and "client," Mr. Manzo, stood to earn in excess of $2 million if the success fee were approved.  Based upon these facts, and the others stated above, Kaye Scholer was not disinterested as of the Petition Date and throughout these cases.

The conduct of these highly experienced bankruptcy professionals who knew or should have known that the disclosure of "all connections" was required under Bankruptcy Rule 2014, was inexcusable.  Accordingly, the United States Trustee requests that the Court disallow the pending fee requests of Kaye Scholer and Capstone and order that they fully disgorge all compensation that they have received to date from the Debtors.  <u>See</u> <u>Crivello</u>, 134 F.3d at 836-37 (stating that "a bankruptcy court should punish a willful failure to disclose the connections required by Fed. R. Bankr. P. 2014 as severely as an attempt to put forth a fraud on the court.");

accord <u>ACandS</u>, 297 B.R. at 405 (disallowing <u>nunc pro tunc</u> retention and ordering disgorgement

of all fees of professional that willfully concealed relationships and potential and actual

conflicts).

> **(III)    *The Court, Pursuant to 11 U.S.C. §§ 329 and 330(a)(5), Should***
> ***Disallow the Pending Fee Requests of Kaye Scholer and Capstone, and***
> ***Order the Disgorgement of all Compensation that they Have Received***
> ***From the Estates Because Capstone, with the Aid of Kaye Scholer,***
> ***Violated 11 U.S.C. § 504(a).***

The Capstone/Manzo Agreement came into existence in February 2006, and was signed

by, among others, Mr. Ordway and Mr. Manzo, individually, and on behalf of RJM.  Documents

produced by Kaye Scholer show that, as early as December 2006, Mr. Solow began providing

legal advice to Mr. Manzo in connection with various amendments to the Capstone/Manzo

Agreement.  At all times the Capstone/Manzo Agreement provided that Capstone and Manzo

would share fees received by Capstone in the cases where Mr. Manzo was involved, purportedly

"on behalf of Capstone."

The fee sharing among Capstone, Mr. Manzo and RJM is prohibited by Section 504(a) of

the Bankruptcy Code and does not fall within any of the exceptions.  Mr. Ordway acknowledged

at his deposition when asked why he falsely stated that Capstone had no agreement to share fees,

that he "had been doing it for twenty years."  <u>See</u> Schwartz Decl., Ex. D, 161:24-162:4.

Because Capstone's nondisclosure was willful, and because Kaye Scholer willfully

participated in concealing this information from the Court, the United States Trustee requests

that the Court, pursuant to Sections 329 and 330(a)(5), disallow the pending fee applications of

Kaye Scholer and Capstone and order the full disgorgement of compensation already paid to

them from the Debtors' estates.

> **(IV)    The Court, Pursuant to its Inherent Powers to Issue Sanctions, Should Disallow the Pending Fee Requests of Kaye Scholer and Capstone, Order the Disgorgement of all Compensation they Have Received From the Estates and Shift the Costs of this Litigation to Kaye Scholer and Capstone.**

Bankruptcy courts have inherent authority to sanction parties for improper conduct. Feinberg, 215 at 226 (citation omitted); see also FairPoint, 445 B.R. at 276 ("sanctions can be imposed through the inherent power of the court"); Plumeri, 2010 WL 3087685, at *2 ("Bankruptcy Courts, like Article III courts, enjoy inherent power to sanction parties for improper conduct.") (quotation omitted).  "The applicable standard in imposing sanctions on an attorney pursuant to a court's inherent power depends upon the nature of the conduct in question." FairPoint, 445 B.R. at 276.  The Second Circuit, in U.S. v. Seltzer, 227 F.3d 36 (2d Cir. 2000), held that a finding of bad faith is necessary only when sanctions are imposed for a lawyer exceeding "conduct of the sort that is normally part of the attorney's legitimate efforts at zealous advocacy for the client." Id. at 40. "[I]n cases where sanctions are imposed for conduct that impacts the orderly running of the court system and is not undertaken for the client's benefit, bad faith need not be shown." FairPoint, 445 B.R. at 276.

As the Seltzer court explained:  "Under circumstances such as these, sanctions may be justified absent a finding of bad faith given the court's inherent power 'to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases.'" Seltzer, 227 F.3d at 41.  Further, even though bad faith is not required, "[s]ubsequent cases appear to apply a negligence or recklessness standard" in these circumstances. Chase, 372 B.R. at 155 (citation omitted); see also Plumeri, 2010 WL 3087685, at *2 ("sanctions against attorneys pursuant to the court's inherent power are warranted for negligent or reckless failure to perform attorneys' responsibilities as officers of the court") (citations omitted).

For the reasons set forth above, the Court also should invoke its inherent powers to deny the pending fee applications of Kaye Scholer and Capstone and order the full disgorgement of compensation that they already received from the estates.

In addition, pursuant to 28 U.S.C. § 1927, the Court should shift to Kaye Scholer and Capstone the costs to the estates associated with this litigation, and to require these firms to compensate the Trustee and his counsel and the United States Trustee and her counsel for attorneys' fees incurred in connection with this matter.[49]  See 28 U.S.C. § 1927.

**H.    THE COURT SHOULD ORDER THE REMOVAL OF RJM1 AS LIQUIDATING TRUSTEE AND DIRECT RJM1 TO DISGORGE ALL COMPENSATION PAID TO RJM1 FROM THE TRUST.**

On the Effective Date (March 6, 2012), all of the Debtors' assets were transferred to the Trust and Mr. Manzo, through RJM1, became the Liquidating Trustee.  Pursuant to the Confirmation Order, the Court retained "exclusive jurisdiction over all matters arising out of, or related to, these chapter 11 cases and the [Black Diamond] Plan pursuant to Article XI of the [Black Diamond] Plan."  Confirmation Order at ¶ 75.  Article XI of the Plan expressly provides that the Court shall retain exclusive jurisdiction over the Liquidating Trust Agreement.  See Schwartz Decl., Ex. J.

Although the Plan includes the Trust and the Liquidating Trustee within the "Released Parties" for which certain releases and an injunction apply to certain claims, the Plan expressly

---

[49] The United States Trustee's staff estimates that the primary attorney working on this matter has spent approximately 500 hours reviewing the record, drafting objections to the various motions for success fees, reviewed 10s of thousands of documents, attended and conducted two depositions and attended numerous court hearings and conferences and participated in the supervised settlement discussions.  In addition, other trial attorneys have dedicated their time and resources to drafting the UST Vacatur/Disgorgement Motion.  If the Court determines that Kaye Scholer's fees should be offset by the costs and resources devoted to these matters, then the United States Trustee will provide the Court with staff resumes so that it can arrive at a reasonable hourly rate to calculate the offset.

carves out from these provisions "any and all claims that may be asserted against any

Professionals in connection with their requests for Professional Fees incurred through the

Effective Date." <u>Id.</u>  Further, claims for willful misconduct, gross negligence and fraud are also

excepted from these provisions.  <u>Id.</u>

 The Liquidating Trust Agreement also provides that the Court retains exclusive

jurisdiction over the Trust after the Effective Date including, without limitation any entity's

obligations under the Liquidating Trust Agreement and any action against the Liquidating

Trustee or any professional retained by the Liquidating Trustee.  Schwartz Decl., Ex. L, § 11.10.

The Liquidating Trust Agreement provides the Court with the independent authority to remove

the Liquidating Trustee.  <u>Id.</u> § 2.1 and § 10.3.  In addition, the Court may remove the Liquidating

Trustee on motion by the United States Trustee for gross negligence or willful misconduct. [50]  <u>Id.</u>

 The Liquidating Trust is governed by New York law, and provides that "[t]he rights and

remedies provided [therein] are cumulative and are not exclusive of any rights under law or

equity." <u>Id.</u>, § 11.9

 Under New York law, a court has the power "[o]n the application of any person

interested in the trust estate, to suspend or remove a trustee who has violated or threatens to

violate his trust . . . or who for any reason is a person unsuitable to execute the trust." N.Y. Est.

Powers & Trusts Law § 7-2.6(a)(2).  As Liquidating Trustee, Mr. Manzo owes "a duty of

undiluted and undiluted loyalty to those whose interests the fiduciary is to protect.  <u>Birnbaum v.</u>

<u>Birnbaum</u>, 73 N.Y.2d 461, 466 (1989).  As Justice Cardozo articulated in <u>Meinhard v. Salmon</u>,

"A trustee is held to something stricter than the morals of the market place.  Not honesty alone,

---

[50] Under New York law, "gross negligence" is conduct that involves a "reckless disregard for the
rights of others or 'smacks' of intentional wrongdoing."  <u>Colnaghi, U.S.A., Ltd. v. Jewelers</u>
<u>Prots. Servs., Ltd.</u>, 81 N.Y.2d 821, 823 (1993).

but the punctilio of an honor the most sensitive, is then the standard of behavior." <u>Meinhard v. Salmon</u>, 249 N.Y. 458, 463-64 (1928).

The facts detailed above demonstrate that Mr. Manzo did not meet this high standard. From the beginning of these cases, Mr. Manzo never disclosed that he was an independent contractor at Capstone or that he and Capstone had an agreement to share fees. He also signed the Capstone First Interim Fee Application and submitting the M-389 Certification when he, admittedly, had no authority to sign these types of documents on Capstone's behalf. Mr. Manzo also intentionally failed to disclose his relationship with Mr. Solow, including the fact that Mr. Manzo, through his two limited liability companies, was a former and is possibly current client of Kaye Scholer's.

For all of these reasons, Mr. Manzo is not an appropriate person to hold the role as trustee of the Liquidating Trust. As stated, a trustee must not only be honest, but is charged with the most sensitive position of honor. Mr. Manzo has demonstrated that he is not suitable for the position with which he has been charged. Accordingly, the United States Trustee requests that the Court remove RJM1 as the Liquidating Trustee and, for the reasons above, order that RJM1 disgorge all compensation that it has received from the Liquidating Trust.

## IV.    CONCLUSION

WHEREFORE, the United States Trustee respectfully submits that the Court enter an Order (i) vacating the Kaye Scholer Retention Order and the Capstone Retention Order or, in the alternative, (ii) disallowing the pending fee requests of Kaye Scholer and Capstone, (iii) directing that Kaye Scholer and Capstone disgorge all fees that they have received from the

estates, (iv) removing RJM1 as Liquidating Trustee, (vi) directing that RJM1 disgorge all fees it

has received from the Trust, (vii) shifting the costs of this litigation to Kaye Scholer and

Capstone and (vii) granting such other relief as is just.

Dated: New York, New York
       January 4, 2013

                                        Respectfully submitted,

                                        TRACY HOPE DAVIS
                                        UNITED STATES TRUSTEE

                                        By  */s/ Andrea B. Schwartz*
                                             Andrea B. Schwartz
                                             Trial Attorney
                                             271 Cadman Plaza East, Suite 4529
                                             Brooklyn, NY 11201
                                             Tel. No. (718) 422-4960
                                             Fax No. (718) 422-4990