Page 60

E. N. Ordway

1    A.    We were located at the company's

2    offices in either a conference room or

3    adjacent rooms, so we were always

4    together, frankly.

5    Q.    Now, you said we.

6         Did you include yourself, Edwin

7    Ordway, in that we or was it the deal team

8    to which you had referenced in your last

9    answer?

10   A.    I was incorrectly using the

11   royal we.  I meant Capstone, not me.

12   Q.    I'm glad I'm not the only one

13   making the mistake.

14        Did you understand that they

15   communicated with each other about the GSC

16   matter regularly by e-mail?

17   A.    I don't know.

18   Q.    Do you have an understanding as

19   to whether the members of your deal team

20   kept notes during the case?

21   A.    I don't know for a fact but I

22   assume they did.

23   Q.    Were you involved in responding

24   on behalf of Capstone to document requests

Page 61

1              E. N. Ordway

2  served both by Black Diamond and by the

3  United States Trustee on this matter?

4      A.    I'm sorry, could you ask the

5  question again?

6      Q.    Sure.

7            Did you have any personal

8  involvement in responding on behalf of

9  Capstone to document requests that my

10 client, Black Diamond, and Ms. Schwartz's

11 client, the United States Trustee, served

12 on Capstone with respect to this motion?

13     A.    No.

14     Q.    Who handled that?

15     A.    Principally one of my senior

16 colleagues, Ron Zaidman, but some of the

17 other members of the deal team as well.

18     Q.    How much, approximately, did

19 Capstone receive for its prepetition

20 services from GSC?

21     A.    I don't remember.

22     Q.    Was it in the vicinity of $4

23 million?

24           MR. MANDELSBERG: Objection.

25     A.    I don't remember.

Page 62

1                        E. N. Ordway

2        Q.      Do you have a view personally as

3    to whether or not the rates Capstone

4    charges for the services of its

5    professionals are market rates?

6                MR. MANDELSBERG: Objection.

7        A.      I believe they're market rates.

8        Q.      How does Capstone attempt to

9    ensure that the rates its professionals

10   charge reflect the market?

11       A.      We regularly collect information

12   about billing rates for our competitors.

13   We compare to them.

14       Q.      How do you collect those

15   materials?

16       A.      A lot of it is publicly

17   available through retention documents like

18   this, for example, or even on some cases

19   we've been able to see detailed billings

20   from other professional firms like

21   ourselves.

22       Q.      How often do you do this?

23       A.      We adjust our bill rates

24   typically annually, January 1, but we

25   collect information about competitor

Page 63

1                    E. N. Ordway

2   billing rates throughout the year.

3        Q.     Is the decision to change the

4   rates made annually or more frequently?

5        A.     Typically annually.

6        Q.     When the rates are set annually,

7   is the attempt made to have your rates

8   reflect the market of professionals of

9   like experience and expertise?  Isn't that

10  what we mean by market?

11             MR. MANDELSBERG: Objection.

12       A.     We thoughtfully review our bill

13  rates and consider where we want to

14  position ourselves in the market.

15       Q.     How does Capstone attempt to

16  position itself in the market?

17       A.     We like to establish our bill

18  rates below some of the more larger

19  competitors of ours.

20       Q.     How much below?

21       A.     Ten to fifteen percent.

22       Q.     Do you attempt to do that

23  consistently?

24       A.     Yes.

25       Q.     Is there a process you go

Page 64

1                     E. N. Ordway

2     through in addition to gathering

3     disclosure documents in order to do that?

4         A.    I'm not sure of your question.

5         Q.    If you're trying to remain, as

6     you said, ten to fifteen percent below

7     certain competitors, how do you determine

8     what your competitors -- and I use that

9     word in quotation marks -- are charging?

10            MR. MANDELSBERG: Objection.

11        Asked and answered.

12            You can answer it again.

13        A.    We collect publicly available

14    information and can see specific bill

15    rates and titles related to many of our

16    competitors and we use that information to

17    decide what our billing rates should be.

18        Q.    So you're looking at disclosure

19    documents, you're looking at particular

20    individuals with particular levels of

21    experience and education, you're seeing

22    what they charge, you're comparing them to

23    people in your organization and then

24    fixing Capstone rates based on what you

25    see they are charging.

Page 65

E. N. Ordway

2    Do you I have that more or less
3    right?
4        A.    More or less right.  I have no
5    idea what the educational background is
6    but we do look at bill rates in the
7    context of titles and we know who many of
8    the individuals are.
9        Q.    Why does Capstone attempt to
10   position itself ten to fifteen percent
11   below these other individuals you
12   mentioned?
13       A.    We are in an interesting
14   situation.  We're neither fish nor fowl.
15   We're not a small firm, we're not a large
16   firm.  We like to be able to compete for
17   middle market, lower middle market
18   engagements which would require that we
19   have competitive bill rates.  What I mean
20   by that is lower than what someone like,
21   for example, an Alvarez and Marsal or an
22   Alex Partners and FTI would charge.
23       Q.    When you say you're neither fish
24   nor fowl, you mean Capstone isn't like
25   those firms, an Alvarez and Marsal or an

Page 66

1                       E. N. Ordway

2    Alex Partners?

3              MR. MANDELSBERG: Objection.

4         Mischaracterizes his testimony which

5         referred to size.

6              MR. WOOLNER: I want to

7         understand the difference why Capstone

8         isn't that kind of fish.

9         A.    We're not that big.

10        Q.    Do you consider Alvarez and

11   Marsal and Alex Partners peer firms?

12        A.    Yes.

13        Q.    Why?

14        A.    We have similar capabilities.

15        Q.    Is the only difference then one

16   of size?

17        A.    Size and geographic reach.

18        Q.    In order to maintain your status

19   with the clients you're attempting to woo

20   and you position as neither fish nor fowl,

21   to use your phrase, do you have to ensure

22   that billings to those clients are

23   different in any way from what you expect

24   that firms like Alex Partners or Alvarez

25   and Marsal would render?

1              E. N. Ordway

2     A.    I don't understand the question.

3     Q.    You referred earlier to rates

4  times hours.

5           Do you remember that?

6     A.    Yes.

7     Q.    The bill a client gets when it's

8  rates times hours is a function of the

9  hourly rate and the hours worked.

10          Are you with me so far?

11    A.    Yes.

12    Q.    If you're neither fish nor fowl

13 compared to Alex Partners and Alvarez and

14 Marsal with respect to rates, did you also

15 have to position yourself differently with

16 respect to the number of hours worked

17 recognizing that bills are a combination

18 of rates times hours?

19          MR. MANDELSBERG: Objection.

20    A.    The number of hours as incurred

21 or what's required by the engagement.  It

22 has nothing to do with competition.

23    Q.    When you reviewed bills, not

24 just on the GSC matter but on other

25 matters where you were the individual

Page 68

1                    E. N. Ordway
2    reviewing bills, were you reviewing the
3    number of hours worked on particular
4    matters for reasonableness?
5        A.    Yes.
6        Q.    Were you reviewing them for
7    whether they made sense compared to what a
8    peer firm would be incurring?
9        A.    Not in that context.
10       Q.    Why not?
11       A.    I'm looking at our invoices to
12   make sure that I think they're fair for
13   the services provided.
14       Q.    If you believed that a firm you
15   considered your peer would be rendering a
16   lower bill for the same services, would
17   you still have rendered a bill in the rate
18   times the hours?
19           MR. MANDELSBERG: Objection.
20       Mischaracterizes his testimony.
21       Hypothetical.  Conjectural.
22           You can answer if you understand
23       it.
24       A.    What another firm might charge
25   sometimes comes into consideration, but I

Page 69

                    E. N. Ordway

1
2   look at it strictly from do I believe that
3   the level of effort justifies the related
4   invoice.
5       Q.   Is that what you describe as
6   billing judgment?
7           MR. MANDELSBERG: Objection.
8       Q.   It's what we call it at our
9   firm.
10      A.   I've never used that term
11  before.
12          MR. MANDELSBERG: And you also
13      established no basis that Mr. Ordway
14      knows what you do at your firm.
15          MR. WOOLNER: What I do isn't
16      relevant, Steve, what he does is.
17          MR. MANDELSBERG: I know but your
18      question assumed that he knows what
19      you do at your firm.
20      Q.   What have Capstone's revenues on
21  the GSC engagement post petition been to
22  date, approximately?
23          MR. MANDELSBERG: Objection to
24      the use of the word "revenues."
25          Are you referring to fees

Page 70

```
1                    E. N. Ordway
2       received after the GSC engagement?
3             MR. WOOLNER: Yes, but only post
4       petition.
5       A.    I'm not sure.
6       Q.    Approximately six million?
7       A.    I'm not sure.
8       Q.    The order and the engagement
9  letter that we looked at reserved the
10 right for Capstone to seek a success fee;
11 correct?
12      A.    Yes.
13      Q.    The engagement letter spoke of
14 the amount and conditions being mutually
15 agreed for a success fee.
16            Do you remember that?
17      A.    Yes.
18      Q.    Were the amount and conditions
19 ever mutually agreed?
20            MR. MANDELSBERG: Objection.
21      Asked and answered.
22            You can answer again.
23      A.    I understand they were agreed
24 to.
25      Q.    When?
```

Page 71

1                           E. N. Ordway

2         A.      I'm not sure.

3         Q.      By whom?

4         A.      I'm not sure.

5         Q.      How?

6         A.      I'm not sure.

7         Q.      Who told you they were mutually

8    agreed?

9         A.      Bob Manzo.

10        Q.      When did he tell you that?

11        A.      I don't remember.

12        Q.      This year?

13                MR. MANDELSBERG: Objection.

14                You mean for the first time, at

15        any time?

16        A.      I'm not sure.

17        Q.      Did he tell you last year?

18        A.      I don't recall.

19        Q.      In 2010?

20        A.      Not 2010.

21        Q.      So it was either 2011 or this

22   year that he told you the conditions that

23   had been satisfied, that there had been

24   mutual agreement on the conditions?

25        A.      Yes.

Page 72

E. N. Ordway

1

2    Q.    Did you ask him, press him in

3    any way for details?

4    A.    No.

5    Q.    Did you ask him how quickly can

6    we make an application for our success

7    fee?

8    A.    I asked him when would it be

9    appropriate to file the application and I

10   went with his advice.

11   Q.    What did he tell you?

12   A.    I don't remember.

13   Q.    Now, the application, in fact,

14   was filed in late January, 2012, this

15   year.

16        Does that help you in any way to

17   remember what Bob Manzo's advice to you

18   was about when it would be appropriate to

19   seek a success fee?

20   A.    I don't remember.

21   Q.    So far as you, Mr. Ordway, are

22   you aware, when did Capstone

23   representatives first disclose to anyone

24   outside the firm their actual intention to

25   seek a success fee?  And in that question,

Page 73

1                 E. N. Ordway
2   I distinguish and want you to distinguish
3   between the right that was reserved to
4   seek a success fee and the actual
5   intention to seek such a fee.
6        A.    I understand the question.  I
7   don't know the answer.
8        Q.    Are you aware of anyone from
9   Capstone ever telling anyone prior to the
10  filing of the motion at the end of
11  January, 2012 that Capstone intended to
12  seek a success fee?
13       A.    I'm aware of that Manzo spoke to
14  others about it prior to that date.
15       Q.    With whom did he speak and when?
16       A.    I don't know.
17       Q.    Do you have any understanding as
18  to what Mr. Manzo told those individuals?
19       A.    No.
20            MR. WOOLNER: We've been going
21       for about an hour and a quarter.
22            Is this a good time for a break?
23            MR. MANDELSBERG: Sure.
24            MR. WOOLNER: Let's go off the
25       record.

Page 74

1                    E. N. Ordway

2              (Whereupon a break was taken)

3        Q.    Mr. Ordway, in response to a

4    question I asked you about with whom the

5    amount and conditions of the success fee

6    were to be mutually agreed, you responded

7    that it would be with the estate.

8              Do you remember that?

9        A.    Yes.

10       Q.    Can you tell me what you meant

11   when you referred to the estate in that

12   answer?

13       A.    The debtor.

14       Q.    Did that mean with Mr. Eckert

15   and Mr. Frank or with someone else?

16       A.    With Frank and Eckert and, to

17   the extent that the court so required, the

18   trustee that was appointed.

19       Q.    Let me ask you to take a look at

20   a letter that is encompassed within what

21   was previously marked as Exhibit BD 5.

22       A.    (Reviewing).

23       Q.    And the item within BD 5 to

24   which I will direct your attention is

25   marked as Exhibit A.  It bears production

1                    E. N. Ordway

2    number CAP 5.  It's a letter dated

3    November 3, 2010.

4              Have you ever seen that letter

5    before?

6         A.    Yes.

7         Q.    When?

8         A.    I saw it a few days ago but I'm

9    pretty sure I saw it over a year ago.

10        Q.    And that would mean sometime in

11   2011 or do you mean sometime around the

12   date it bears?

13        A.    I'm not sure.

14        Q.    Do you remember seeing a copy of

15   this letter before it was signed by either

16   Mr. Eckert or Mr. Frank?

17        A.    I did not see it before it was

18   signed.

19        Q.    Was a draft of this letter ever

20   run past you by anyone on the GSC deal

21   team?

22        A.    No.

23        Q.    When you first saw it, did you

24   understand what the letter had been

25   prepared for, in other words to what use

Page 76

                        E. N. Ordway

1

2    it was intended to be put?

3            MR. MANDELSBERG: Objection.

4        A.      No, I wasn't sure exactly what

5    the use of this was going to be other than

6    as it related to probably our application

7    to get a success fee.

8        Q.      Let's step back.

9                Did you understand that an

10   auction of substantially all but not quite

11   all of the assets of GSC took place in

12   late October, 2010?

13       A.      Yes.

14       Q.      Did you understand that

15   contemporaneously?

16       A.      Yes.

17       Q.      Did you ask Mr. Manzo or other

18   members of the deal team following the

19   auction in words or substance when will we

20   be applying for a success fee?

21       A.      I don't recall when I might have

22   specifically asked that question but let

23   me say this, I'm sure I did.

24       Q.      Was it ever contemplated that

25   you would not apply for a success fee

Page 77

1                    E. N. Ordway

2  following completion of that auction?

3                    MR. MANDELSBERG: Objection.

4                    You mean contemplated by him,

5          contemplated by someone else?

6                    MR. WOOLNER: Steve's right, let

7          me break it down.

8          Q.    Did you ever contemplate,

9  following the auction, that there would

10  not be a success fee sought?

11         A.    No.

12         Q.    So far as you are aware, did any

13  on the deal team you've described -- Mr.

14  Manzo, Mr. Zaidman, Mr. Butler -- ever

15  contemplate not seeking a success fee

16  following the completion of the auction?

17         A.    Not that I'm aware of.

18         Q.    Did you understand when you saw

19  this November 3, 2010 letter we're looking

20  at that it was intended to be offered in

21  some way in connection with seeking the

22  success fee?

23         A.    I expected that it would be.

24         Q.    Did you ask Mr. Manzo why it

25  didn't include an amount?

Page 78

E. N. Ordway

1

2        A.      No.

3        Q.      Why not?

4                MR. MANDELSBERG: Objection.

5        A.      I don't know.  I'm not sure.

6        Q.      You remember that the engagement

7    letter speaks of the amount and conditions

8    to be mutually agreed?

9                MR. MANDELSBERG: Objection.

10       A.      Yes.

11       Q.      But there's no amount here; is

12   there?

13               MR. MANDELSBERG: Objection.

14       A.      No, there isn't.

15       Q.      Did you suggest to Mr. Manzo

16   that there should be some other agreement

17   reached that included an amount?

18       A.      No, I left it to him as to what

19   the best process was to proceed with

20   getting approval for a success fee.

21       Q.      Did you check in with him at any

22   regular interval about where the

23   contemplated success fee stood?

24       A.      From time to time we would

25   speak.

Page 79

1                        E. N. Ordway

2        Q.     What did he tell you when you

3   asked him?

4        A.     I don't have specific

5   recollection.

6        Q.     Did he tell you on any of those

7   occasions why he wasn't seeking a success

8   fee at that time?

9        A.     I don't specifically remember.

10       Q.     Did you press him as to how

11   quickly a success fee could be sought?

12       A.     I wouldn't use the words "press

13   him." I would ask him and he would tell

14   me when he thought it was appropriate and

15   I would defer to his judgment.

16       Q.     What did you understand his

17   thinking process was as he communicated it

18   to you as to when it would be appropriate

19   to seek a success fee?

20       A.     I don't remember.

21       Q.     Did you have an understanding of

22   any kind on that subject following

23   completion of the auction?

24       A.     You'll have to repeat your

25   question.

Page 80

                    E. N. Ordway

1

2        Q.      If this was being left in Mr.

3    Manzo's hands, which I think you just

4    said, right, when to apply for it, the

5    success fee?

6        A.      Yes.

7        Q.      What was your understanding of

8    the process he was going to go through in

9    deciding when it was appropriate?

10       A.      I don't have an appreciation as

11   to what the process was that he was going

12   through.

13       Q.      Did you care when it was?

14           MR. MANDELSBERG: Objection.

15       A.      I certainly was interested in

16   getting it sooner than later but I

17   appreciated that a trustee was appointed,

18   for example, in December and that there

19   were complications associated with that so

20   I wasn't sure when the right timing was

21   and I deferred to him as to when that

22   would be.

23       Q.      And when you said December, did

24   you mean December, 2010?

25       A.      Yes.

Page 81

1                           E. N. Ordway

2        Q.     Within that same document that I

3    believe you have in front of you, Mr.

4    Ordway, you will find a document titled

5    Exhibit B called summary of investment

6    banking/financial adviser performance

7    success fees approved in bankruptcy court.

8    It bears production number CAP 7.

9               Do you see that?

10       A.     Yes.

11       Q.     Have you ever seen that chart

12   before?

13       A.     Yes.

14       Q.     When?

15       A.     I saw it this week and, although

16   I can't tell you when, I'm quite sure I've

17   seen this in the past.

18       Q.     Do you recall under what

19   circumstances you saw it in the past?

20       A.     No.

21       Q.     Was it in connection in some way

22   with the seeking of a performance fee

23   here?

24       A.     No.

25       Q.     That reminds me, I did something

Page 82

                    E. N. Ordway

1

2    with Mr. Manzo that I should do with you.

3            At his deposition we used the

4    terms "success fee" and "performance fee"

5    as essentially synonymous.

6            Is it fair to do the same with

7    you or do you distinguish in your own mind

8    in some way between the terms "success

9    fee" and "performance fee?"

10       A.    I would like to use them as one

11   and the same.

12       Q.    Good.  I just wanted to have

13   that clear.

14            Coming back then, when you first

15   saw this document, Exhibit B, within

16   Exhibit BD 5, was it in conjunction with

17   the preparation of papers to be offered in

18   support of the success fee motion here?

19       A.    No.

20       Q.    In what circumstances did you

21   first see this document?

22       A.    I don't recall precisely, but

23   let me explain the context.

24            I have a research department and

25   we keep track of information of this

Page 83

E. N. Ordway

1    nature, we keep track of rights offerings,

2    we keep track of preferred stock issues

3    and what the terms and conditions are of

4    those so that when we're in a position

5    where we might be advising lenders or

6    advising companies as to what's

7    appropriate, we have the information.  So

8    I suspect that I might have seen something

9    like this maybe in 2009 in some other

10   matters.  It's information I have

11   internally at my firm.

12   Q.    What do you understand it is?

13   A.    It's a summary of some instances

14   where investment bankers or financial

15   advisers as the case may be, received

16   success fees.

17   Q.    Do you personally have any

18   information about the circumstances under

19   which each of those advisers or investment

20   bankers received those success fees?

21   A.    I know -- I had to pause to read

22   the list.  I know some of them.

23   Q.    Are there any of those listed as

24   one through forty-six that you personally

Page 84

```
 1                    E. N. Ordway
 2    believed to be comparable to the GSC
 3    success fee you are seeking?  And by you,
 4    I mean Capstone.
 5              MR. MANDELSBERG: Objection.
 6       A.    I don't know in particular.
 7              Just in my experience in doing
 8    this twenty-two, twenty-three years fees
 9    of this nature range from one to three,
10    one's kind of low, three's kind of high,
11    so two is pretty standard as what this
12    chart suggests is an average.
13       Q.    So when you refer to fees in
14    your last answer, you were referring to M
15    and A fees?
16              MR. MANDELSBERG: Objection.
17       A.    To success fees.
18       Q.    You're calling them success fees
19    and the chart calls them M and A fees;
20    right?
21              MR. MANDELSBERG: Objection.
22       A.    The chart -- maybe we're looking
23    at two different charts.
24              MR. MANDELSBERG: Objection.
25              The chart that the witness is
```

Page 85

1                    E. N. Ordway

2        looking at is entitled Exhibit B,

3        Summary of Investment

4        Banking/Financial Adviser Performance

5        Success Fees Approved in Bankruptcy.

6                    THE WITNESS: The columns say M

7        and A fee range.

8        Q.        Is M and A fee in your lexicon

9    also synonymous with success fee?

10       A.        Not necessarily.

11       Q.        What's the difference?

12       A.        Sometimes investment bankers get

13   success fees related to reorganizing

14   companies.

15       Q.        Any other differences that you

16   can think of?

17       A.        No.

18       Q.        Do you intend in any way to

19   sponsor this chart or something like it in

20   connection with Capstone's request for a

21   success fee?

22                   MR. MANDELSBERG: Objection.

23       Improper.  Calls for a legal

24       conclusion.

25                   You can answer if you know.

Page 86

                        E. N. Ordway

1

2          MR. WOOLNER: I just want to be

3      very clear.  If Mr. Ordway is not

4      going to be offered in support of this

5      chart or anything like it, I won't

6      need to ask him questions about it.

7          MR. MANDELSBERG: You can ask him

8      any questions you want but Mr. Ordway

9      is not needed in order to produce this

10     chart.  You're making an assumption

11     that he is.

12         MR. WOOLNER: I'm simply --

13         MR. MANDELSBERG: You're also

14     making an assumption that it's going

15     to be introduced.  You can ask him

16     about it but it's a grandiose

17     assumption on your part.

18     A.     I don't know if it's our plan to

19  use this or not.

20     Q.     If it is used, are you able to

21  sponsor it or not?

22         MR. MANDELSBERG: Objection.

23     Vague.

24     A.     What does sponsor mean?

25     Q.     Establishing what the chart is

Page 87

```
 1               E. N. Ordway
 2  and why it is relevant to Capstone's
 3  success fee motion.
 4          MR. MANDELSBERG: Objection.
 5      Calls for a legal conclusion.  The
 6      record already establishes.
 7      A.     That wouldn't be me.
 8      Q.     Do you have any information as
 9  you sit here as to whether the financial
10  advisers listed in lines one through
11  forty-six were retained under Section 327
12  of the bankruptcy code?
13      A.     I don't know the answer to that.
14      Q.     Do you have any information as
15  to whether any of those financial advisers
16  were retained in these matters under
17  Section 328 of the bankruptcy code?
18          MR. MANDELSBERG: Objection.
19      A.     Just so I'm clear, you're asking
20  me sitting here right now?
21      Q.     Exactly.
22      A.     No.
23      Q.     Do you understand that there can
24  be a difference between retention under
25  Section 327 and retention under
```

Page 88

1                    E. N. Ordway

2    undertaking Section 328 when it comes to

3    obtaining fees in bankruptcy cases?

4            MR. MANDELSBERG: Objection.  No

5        foundation.  Calls for a legal

6        conclusion.

7        A.    I understand there's a

8    difference.

9        Q.    And you don't know whether in

10   these cases the retention was under one

11   section or the other?

12           MR. MANDELSBERG: Objection.

13       Asked and answered.

14       A.    I don't know.

15       Q.    In your experience, is it

16   typical when there is an M and A fee to

17   have a formula specified in advance for

18   determining the M and A fee?

19           MR. MANDELSBERG: Objection.  No

20       foundation.

21       A.    It's quite common.

22       Q.    Is it, in fact, typical?

23           MR. MANDELSBERG: Objection.  To

24       the extent you're asking Mr. Ordway to

25       testify as an expert, we haven't

Page 89

E. N. Ordway

2     offered him as such and it's improper.

3          You can answer if you know.

4     A.     It's typical.

5     Q.     If you'll turn to the next

6     chart, it's marked CAP 8.

7          Have you seen this chart before?

8     A.     Yes.

9     Q.     When?

10    A.     A few days ago.

11    Q.     Did you see it before that?

12    A.     No.

13    Q.     Am I correct in assuming

14    therefore that you do not intend to

15    sponsor this chart in connection with the

16    hearing on Capstone's success fee motion?

17         MR. MANDELSBERG: Objection to

18         the form.  Objection for lack of

19         foundation.

20         You can answer if you know.

21    A.     No, I won't be.

22    Q.     You're not in a position to

23    sponsor this chart; are you?

24         MR. MANDELSBERG: Objection to

25         the form.

Page 90

                        E. N. Ordway

1

2      A.      No.

3      Q.      Please turn to the next page,

4   CAP 9, which is headed Exhibit D.

5              Have you seen this page before?

6      A.      No.

7      Q.      I said we were done with the

8   document but I do have one other question.

9              On Exhibit B, CAP 7 within BD 5,

10  do you know whether any of the

11  professionals listed received hourly

12  compensation in addition to M and A

13  compensation?

14     A.      I don't know.

15     Q.      In your experience, Mr. Ordway,

16  is it typical where there is a success or

17  transaction fee to negotiate whether there

18  will be an hourly fee as well?

19             MR. MANDELSBERG: Objection.

20     A.      It's typically not the case.

21     Q.      Just so we're clear, explain

22  what you mean.

23     A.      Typically investment bankers

24  don't bill by the hour.

25     Q.      Is that also true with financial

Page 91

```
 1                    E. N. Ordway
 2   advisers?
 3              MR. MANDELSBERG: Objection.
 4      A.     I'm not sure of the question.
 5      Q.     Do you use the terms "financial
 6   adviser" and "investment banker"
 7   interchangeably?
 8      A.     No.
 9              MR. MANDELSBERG: Objection.
10      Q.     Is the same true -- you said
11   investment bankers typically don't bill by
12   the hour.
13              Is the same true for financial
14   advisers?
15              MR. MANDELSBERG: Objection.
16      A.     Financial advisers bill fixed
17   monthly arrangements as well as hourly.
18      Q.     And is that instead of or
19   potentially in addition to
20   transaction-based fees?
21              MR. MANDELSBERG: Objection.
22      Asked and answered.
23              You can answer again.
24      A.     It could be in addition to.
25      Q.     What is your personal billing
```

Page 92

                              E. N. Ordway
1
2    rate, Mr. Ordway?
3         A.      Seven hundred ninety-five.
4         Q.      What was Mr. Manzo's billing
5    rate at the time --
6                 MR. WOOLNER: Let me step back.
7         Q.      Is Mr. Manzo still affiliated
8    with Capstone?
9         A.      We still have an affiliation,
10   yes.
11        Q.      What is the affiliation?
12        A.      We have an amendment to his
13   existing agreement that's still operative
14   where we continue to provide him
15   compensation related to some cases that
16   have existed since 2011, 2010.
17        Q.      What agreement are you referring
18   to in that answer?  You said amendment to
19   an existing agreement.  What agreement did
20   you refer to?
21        A.      His contractor agreement.
22        Q.      What is that?
23        A.      What is a contractor agreement?
24        Q.      What is his contractor
25   agreement?

Page 93

                           E. N. Ordway

1

2      A.     Are you asking me what the terms

3   are of his agreement?

4      Q.     I want you to tell us about that

5   agreement, what is it first, and then I'll

6   ask you some follow-up questions.

7      A.     It is a document that explains

8   his contractor relationship with Capstone

9   that outlines the types of services that

10   he'll be providing Capstone and how he'll

11   be compensated.

12      Q.     Now, you told us earlier that

13   you snapped up Mr. Manzo as soon as his

14   time with FTI ended.

15            Did I understand that correctly?

16      A.     Yes.

17      Q.     Is the relationship that was

18   established by his contractor agreement

19   one that has applied from that time?

20      A.     It's been modified since that

21   time, yes.

22      Q.     But his association with

23   Capstone has at all times been subject to

24   a contractor agreement?

25      A.     Yes.

Page 94

1              E. N. Ordway

2      Q.    Why was that?

3            MR. MANDELSBERG: Objection.

4      A.    Bob preferred not to be an

5  employee or a partner and preferred to be

6  a contractor.

7      Q.    So you, for example, as a

8  principal, you don't have a contractor

9  agreement with Capstone?

10     A.    No.

11     Q.    Does Mr. Zaidman?

12     A.    No.

13     Q.    Mr. Butler?

14     A.    No.

15     Q.    Is there anybody else at

16  Capstone who has such a contractor

17  agreement with Capstone?

18           MR. WOOLNER: I said that badly.

19     Let me rephrase it.

20     Q.    Is that anyone else who has such

21  a contractor agreement with Capstone?

22     A.    We have perhaps today one

23  contractor.  We've had as many as thirteen

24  or fourteen.

25     Q.    With those people, why were

Page 95

1                    E. N. Ordway

2    there contractor agreements?  And I don't

3    want you to name names.  I'm simply trying

4    to get an understanding.

5        A.    We didn't insist that people

6    become employees or perhaps they had a

7    particular skill that was required for a

8    short period of time.  It really depends

9    on the facts and circumstances of each

10   individual.

11       Q.    Was there a standard form of

12   contractor agreement that was used at

13   different times with these individuals or

14   were they specifically tailored to each

15   one?

16             MR. MANDELSBERG: Objection.

17       A.    We would generally start with a

18   standard form and tailor it to the

19   individual circumstance.

20       Q.    Was Mr. Manzo your first

21   contractor?

22       A.    I don't remember.

23       Q.    Did Mr. Manzo give you any

24   information as to why he preferred a

25   contractor agreement rather than to be an

Page 96

1                    E. N. Ordway

2    employee?

3         A.    I don't remember.

4         Q.    Who negotiated his initial

5    contractor agreement?

6         A.    I did.

7         Q.    In substance what were the terms

8    under which he came to work as a

9    contractor for Capstone?

10        A.    We engaged him to manage

11   engagements and his compensation was based

12   on principally three pieces.  We paid him

13   for his billable hours, we paid him a

14   percentage of the revenues that he was

15   associated with, and thirdly we gave him a

16   small monthly fixed payment.

17        Q.    In your listing of the three

18   components of his compensation, you

19   mentioned one, the second, as being a

20   percent of the revenue he was associated

21   with.

22              What did you intend to

23   communicate by that phrase "associate

24   with?"

25        A.    Either engagements that he was

Page 97

```
 1                    E. N. Ordway
 2   actively managing or engagements that he
 3   was instrumental in obtaining for the
 4   firm.
 5       Q.    The third component you
 6   mentioned was a small monthly fixed
 7   amount.
 8            Do you recall what that amount
 9   was?
10       A.    No, I don't.
11       Q.    Was that monthly fixed amount
12   offset in any way against either his
13   billable hours or the percent of revenues
14   amounts that were the first two components
15   of his compensation?
16       A.    No.
17       Q.    So the monthly fixed fee was in
18   addition to the billable hours which was
19   in addition to the percent of revenues?
20       A.    Yes.
21       Q.    Now, you mentioned in an earlier
22   answer that he's still subject to an
23   existing agreement under an amendment.
24            Was that contractor agreement
25   amended at any point?
```

Page 98

1              E. N. Ordway

2          MR. MANDELSBERG: Objection.

3      A.    Several occasions.

4      Q.    Why?

5      A.    To modify it for changes in

6  circumstances.

7      Q.    As best you can recall, what

8  were the changes made by the first

9  amendment to his contractor agreement?

10     A.    I don't recall.

11     Q.    How about the second amendment?

12     A.    There might have been four or

13 five amendments so I don't know with

14 specificity what was included in each one

15 of those.

16     Q.    Tell us what you do remember

17 about the sequence leading up to today.

18     A.    The basic framework that I just

19 described was pretty much his arrangement

20 up through last year.  Last year we

21 eliminated the fixed component.  Again,

22 I'm not sure with precision what the date

23 of that was.  And given the engagements

24 that he's still involved with, we're not

25 paying him for his hours.  He's not

Page 99

1                    E. N. Ordway
2    billing through Capstone at the moment.
3    We're involved with some cases where he's
4    the named trustee and he's billing the
5    trust directly for his time so the only
6    component of his compensation that remains
7    might be a revenue sharing.
8         Q.    What is the nature of the
9    revenue sharing that exists with respect
10   to the cases where Mr. Manzo is a named
11   trustee?
12        A.    He gets a percentage of the
13   revenues, the realized revenues.
14        Q.    Is it the same in every case or
15   does it differ case by case?
16        A.    It's the same in every case with
17   respect to hourly arrangements.  For
18   certain matters where we've had an
19   opportunity to get a success fee, we've
20   had different sharing arrangements.
21        Q.    What is the arrangement in those
22   cases where there are hourly arrangements?
23        A.    He gets a percentage of the
24   revenue and I don't recall if it's
25   fourteen or fifteen percent, it's

Page 100

                              E. N. Ordway

1
2    something like that.
3        Q.    In that range?
4        A.    Yes.
5        Q.    What is the arrangement in
6    matters where there's a success fee?
7        A.    Forty -- sixty or fifty percent.
8        Q.    Did you say forty, fifty, or
9    sixty?
10            MR. WOOLNER: Let's try it again.
11       Q.    What is the arrangement in those
12   cases where there is a success fee?
13       A.    It's either fifty percent or
14   sixty percent.
15       Q.    When you say it's either fifty
16   or sixty percent, is that fifty or sixty
17   percent to Mr. Manzo or fifty or sixty
18   percent to Capstone?
19       A.    Fifty or sixty percent to Manzo.
20       Q.    Is there such an arrangement
21   with respect to GSC?
22       A.    Yes.
23       Q.    What is the arrangement with
24   respect to GSC?
25       A.    He would receive sixty percent.

Page 101

```
 1                    E. N. Ordway
 2      Q.     Does he share on an hourly basis
 3  at approximately fourteen to fifteen
 4  percent or is that strictly -- with
 5  respect to the trustee work?
 6              MR. MANDELSBERG: Objection.
 7  Compound.  Confusing.
 8              MR. WOOLNER: Let me clarify.
 9      Q.     GSC is now in a trustee phase;
10  correct?
11      A.     Correct.
12      Q.     And an entity of which Mr. Manzo
13  is the sole member acts as liquidating
14  trustee?
15      A.     Correct.
16      Q.     Is the arrangement you've
17  described under which in certain cases
18  where Mr. Manzo acts as named trustee
19  there's a revenue sharing arrangement, is
20  that arrangement applicable here?
21      A.     No.
22      Q.     Why not?
23              MR. MANDELSBERG: Objection.
24      A.     I don't recall why we decided
25  not to but we decided not to.  He's going
```

Page 102

1                      E. N. Ordway

2    to bill his hours and we're going to bill

3    our hours.   It's not a big project.

4         Q.    Did he ask for revenue sharing

5    on the GSC matter while he was acting as

6    liquidating trustee?

7         A.    No.

8         Q.    Do you have an understanding as

9    to why not?

10        A.    No.

11        Q.    Where you have contractors

12   acting for Capstone, whether it's Mr.

13   Manzo or one of the others that you made

14   reference to generically, how do you

15   disclose that fact to the clients for whom

16   Capstone does work?

17             MR. MANDELSBERG: Objection.

18        A.    Our engagement letters sometimes

19   refer to employees or contractors.

20        Q.    Is that standard that it would

21   refer to a contractor where there is a

22   contractor?

23        A.    Not standard.   Not necessarily.

24        Q.    Is there any standard disclosure

25   where a contractor is doing work on

Page 103

1                    E. N. Ordway
2    Capstone's behalf for a client?
3        A.    Is there a standard disclosure?
4        Q.    Is it standard for Capstone to
5    disclose to its clients when a contractor
6    is doing work on Capstone's behalf for
7    that client?
8        A.    Yes.
9        Q.    How?
10       A.    Sometimes in writing, sometimes
11   verbally.
12       Q.    Was such a disclosure made here
13   with respect to Mr. Manzo to GSC?
14           MR. MANDELSBERG: Objection.
15       Asked and answered.
16       A.    I don't remember.
17       Q.    You don't remember if a
18   disclosure was made at all?
19           MR. MANDELSBERG: Objection.
20       A.    I don't remember.
21       Q.    You don't have a recollection
22   now of making such a disclosure?
23       A.    I'd like to say yeah, I did, but
24   I don't recall specifically if I did or
25   not.

Page 104

1                        E. N. Ordway

2        Q.    You mentioned as the first

3    component of Mr. Manzo's compensation as a

4    contractor his billable hours.

5               Did I understand that correctly?

6        A.    Yes.

7        Q.    Did Mr. Manzo receive some

8    fraction of his rates times his billable

9    hours?

10       A.    That's correct.

11       Q.    What was that fraction?

12       A.    Either eighty or eighty-five

13   percent.

14       Q.    Did it change over time?

15       A.    It might have changed from

16   eighty to eighty-five or seventy-five to

17   eighty.

18       Q.    How many different matters did

19   Mr. Manzo work on for Capstone?

20       A.    Since 2006?

21       Q.    Since he joined you, yes.

22       A.    Twenty.

23       Q.    Does Capstone require that its

24   employees or contractors maintain any kind

25   of professional engagement calendar or

Page 105

E. N. Ordway

1  schedule?

2

3       A.     I'm not sure of the question.

4       Q.     At law firms typically there is

5  a calendar maintained of upcoming dates in

6  matters on which the firm is engaged.

7              Does Capstone have any kind of

8  requirement that its employees or

9  contractors maintain any sort of

10 centralized schedule of upcoming dates in

11 connection with the engagements on which

12 it provides services?

13      A.     I wouldn't say it's a

14 requirement but it's practically how we

15 conduct engagements and manage

16 engagements.

17      Q.     Is there typically a centralized

18 calendar of some form that memorializes

19 dates that are relevant to the provision

20 of services on a particular engagement?

21      A.     It's engagement by engagement.

22      Q.     Was there such a calendar in the

23 GSC matter?

24      A.     I don't know.

25      Q.     If there isn't a centralized

Page 106

E. N. Ordway

1  firm-maintained calendar for a matter, do

2  you expect that your professionals will

3  personally maintain calendars so they're

4  able to keep track of important dates?

5      A.    Yes.

6      Q.    Is there any requirement that

7  they do so?

8      A.    I think it's kind of implicit

9  that they would.

10     Q.    Is there any expectation that

11 those calendars will be maintained and

12 preserved?

13          MR. MANDELSBERG: Objection.

14     A.    No, there's not a requirement.

15     Q.    So far as you're aware, were the

16 calendars of the deal team members working

17 on GSC maintained and preserved?

18     A.    I don't know.

19     Q.    Did any members of the deal team

20 maintain calendars or schedules for their

21 work in connection with GSC?

22     A.    I don't know.

23     Q.    Do you have an explanation as to

24 why calendars or schedules would not have

Page 107

1                        E. N. Ordway

2      been produced in response to requests for

3      them?

4           A.      I don't know.

5           Q.      The second component you

6      mentioned with respect to Mr. Manzo's

7      arrangement with Capstone and his

8      compensation dealt with a percentage of

9      revenues with which he was associated

10     either in managing or bringing in.

11               Do you remember that?

12          A.      Yes.

13          Q.      Was there any kind of specific

14     percentage that was attributed to the

15     revenues that were associated with him in

16     either of those fashions?

17          A.      Approximately fifteen percent.

18          Q.      Was it the same whether he was

19     managing or bringing in the work?

20          A.      The work that he managed was

21     almost always he was instrumental in

22     obtaining for the firm.

23          Q.      So in his case there really

24     wasn't a meaningful difference between

25     those two kinds of associations that could

Page 108

E. N. Ordway

1    lead to revenue sharing?

3        A.    That's correct.

4            (BEGIN CONFIDENTIAL --

5        ATTORNEYS' EYES ONLY PORTION)

Page 121

1                    E. N. Ordway

2         A F T E R N O O N    S E S S I O N

3                    June 1, 2012

4                     1:31 p.m.

5    E D W I N   N.   O R D W A Y, having

6          been previously duly sworn by a Notary

7          Public of the State of New York,

8          upon being examined,

9          testified as follows:

10   EXAMINATION CONTINUED BY

11   MR. WOOLNER:

12        Q.    Mr. Ordway, when we were talking

13   about the contractor agreement that

14   Capstone entered into with Mr. Manzo

15   immediately following his departure from

16   FTI, I think I asked you whether you had

17   any understanding as to why Mr. Manzo

18   wanted to enter into that agreement.

19          Did I ask you that question?

20   Because if not, I'd like to ask it again.

21          MR. MANDELSBERG: You did ask the

22      question.  He did answer it.

23        A.    I don't remember why he wanted

24   to have an agreement of that nature.

25        Q.    Did you have any theories

Page 122

E. N. Ordway

1       yourself as to why Mr. Manzo might be

2       trying to do it that way in having a

3       relationship with Capstone?

5             MR. MANDELSBERG: Objection.

6             Theory as differentiated from

7       reason?

8             MR. WOOLNER: I asked before, I

9       think, whether he was told by Mr.

10      Manzo. Now I'm asking if he, Mr.

11      Ordway, had a -- formed any kind of

12      view as to why Mr. Manzo might want to

13      do it on that basis.

14           MR. MANDELSBERG: Are you asking

15      him to guess? Because you've already

16      asked whether he knows and he said no.

17      You've already asked him whether he

18      knew of reasons and he said no. So

19      now you're asking him whether he has

20      any theory or any --

21           MR. WOOLNER: Not quite.

22       Q.   Did you at the time form any

23      view as to why you thought he might be

24      doing it?

25       A.   No, not that I remember.

Page 123

1                    E. N. Ordway
2        Q.    Did you believe there were
3    tax-related reasons for him to do that?
4        A.    Possibly.  I really didn't probe
5    him.  That was his preference and I
6    accepted it, it was workable.
7        Q.    Was Mr. Manzo a positive
8    addition to Capstone?
9        A.    Yes.
10        Q.    As far as you are aware, was he
11    well regarded by the other Capstone
12    professionals?  I knew you regard him
13    positively but did the other Capstone
14    professionals regard him positively?
15        A.    Most of them did.
16        Q.    If there was a contrary view,
17    what in substance was it?
18              MR. MANDELSBERG: Objection.
19        A.    The senior people at Capstone
20    were all employees at FTI and many of them
21    were employees of Policano and Manzo and
22    some people didn't like the way that he
23    managed them when they had to report to
24    him.
25        Q.    In what way?

1                    E. N. Ordway

2        A.        Just didn't like the way they

3    were treated.

4        Q.        What way was that?

5        A.        It's a personal issue.  I had no

6    issues with it whatsoever but some of my

7    guys thought they weren't treated as well

8    as they should have been by Manzo when he

9    was in charge of them.

10        Q.        Did you have an understanding of

11    what that kind of treatment was?

12        A.        Not really.

13        Q.        Did people come to you and

14    complain?

15        A.        Well, they would occasionally

16    complain like gee, this isn't fair the way

17    he's treating me or assigning me.  I

18    didn't think so, I thought everything was

19    reasonable.

20        Q.        Was there a pattern of any kind?

21        A.        No.

22        Q.        Other than the complaints you

23    received about the way people felt they

24    were treated, did any of your colleagues

25    at Capstone complain to you about Mr.

Page 125

1                        E. N. Ordway

2    Manzo's handling of engagements where he

3    was the lead?

4              MS. SCHWARTZ: I didn't hear

5         that.

6         Q.    Other than the complaints that

7    you heard from time to time from people

8    who were working for Mr. Manzo and didn't

9    like the way they were treated, did you

10   ever hear complaints from any of your

11   colleagues about the way he was handling

12   engagements for Capstone?

13        A.    I had some people inquire about

14   the GSC engagement.

15        Q.    Tell me why.

16        A.    We were negotiating with --

17   before bankruptcy with lenders and some of

18   the lenders were unhappy with the

19   circumstance, not so much with Manzo but

20   just the circumstance.

21        Q.    What do you mean?

22        A.    The lenders were not going to

23   get a hundred cents on the dollar, it

24   looked like, in the arrangements that we

25   were pursuing.

Page 126

1                    E. N. Ordway

2        Q.     Did they think that was somehow

3    Capstone's fault?

4        A.     No.  I mean, perhaps the lenders

5    did or some of them might have.  It was

6    communicated to me that Manzo was being a

7    tough negotiator but that's what we were

8    hired to do so it's not an issue.

9        Q.     Anything else that comes to

10   mind?

11       A.     No.

12       Q.     Are you aware of any clients

13   ever complaining about Mr. Manzo's billing

14   practices?

15       A.     No.

16       Q.     Have there been any disputes

17   within Capstone regarding billings on

18   cases managed by Mr. Manzo?

19       A.     I've had some of my partners ask

20   me about his hours on some cases.

21       Q.     What have they asked about?

22       A.     Why were they so high in certain

23   given months.

24       Q.     What was your answer?

25       A.     It's the nature of the work.

1                    E. N. Ordway

2        Q.      When you got those questions,

3    did you investigate?

4        A.      Sure.

5        Q.      What did you do?

6        A.      Speak to Bob, speak with people

7    who were on the deal team.

8        Q.      Were any of those questions

9    about this matter, the GSC case?

10       A.      I don't think so.

11       Q.      Were you familiar from your

12   review of the bills with Mr. Manzo's hours

13   on this case?

14       A.      Yes.

15       Q.      Did you have any view about

16   their reasonableness?

17       A.      Yes.

18               MR. MANDELSBERG: Objection.

19       Q.      Did you discuss with him why

20   some of his monthly billings were so high?

21               MR. MANDELSBERG: Objection.

22       A.      I understood why and we

23   discussed why.  It was a very difficult

24   case and required a lot of time.

25       Q.      Has Capstone had to write off

Page 128

1                    E. N. Ordway

2    time on matters managed by Mr. Manzo as a

3    result of billing disputes?

4         A.    We've never had a write-off as

5    it relates to a dispute with a debtor.  We

6    have had write-offs as a consequence of a

7    fee objection from let's say a U.S.

8    trustee.

9         Q.    Is Mr. Manzo still subject to

10   the contractor agreement that you

11   described earlier?

12        A.    We have some --

13              MR. MANDELSBERG: Objection.

14        A.    We have a couple of tails to a

15   couple of engagements that he would still

16   be governed by the existing amendment.

17        Q.    Let me see if I understand what

18   you just said.

19              Have the agreements terminated

20   subject to the continuing effectiveness of

21   certain terms within them; is that what

22   you were trying to communicate in your

23   last answer?

24        A.    I'm not sure what you just said.

25        Q.    Let's see if we can break it out

Page 129

1                    E. N. Ordway
2    a little.
3                    Is Mr. Manzo still affiliated as
4    a contractor to Capstone?
5         A.    He's not working for Capstone
6    anymore.  However, there are some trailing
7    payments that we still owe him.
8         Q.    When did that relationship under
9    the contractor agreement end aside from
10   trailing payments?
11        A.    I'm not exactly sure but I would
12   say that it probably ended when we
13   completed the GSC engagement and he became
14   liquidating trustee.  We were done at that
15   point.
16                MR. WOOLNER: Mr. Ordway, subject
17        to any follow-up after questions by
18        other counsel, I want to thank you for
19        your time and turn over the chair to
20        Ms. Schwartz.
21                MS. SCHWARTZ: I'm going to take
22        five minutes before I start.
23                (Whereupon a break was taken)
24                (CONTINUED ON NEXT PAGE)
25

Page 130

1              E. N. Ordway

2    EXAMINATION BY

3    MS. SCHWARTZ:

4        Q.    Good afternoon, Mr. Ordway.   My

5    name is Andrea Schwartz.   I introduced

6    myself to you earlier today at this

7    deposition.   I am a trial attorney with

8    the U.S. Department of Justice Office of

9    the United States Trustee.   I'm here today

10   representing Tracy Hope Davis, the United

11   States Trustee for Region Two.

12             Earlier Mr. Woolner had asked

13   you your experience in having depositions

14   taken; is that right?

15       A.    Yes.

16       Q.    And you testified that you're

17   familiar with the ground rules and

18   procedures for depositions; is that right?

19       A.    Yes.

20       Q.    The one thing I'm going to -- I

21   said to you earlier and I'll state it for

22   the record that our efforts here today are

23   to get the information that we need with

24   respect to our respective clients'

25   positions and the applications for fees by

Page 131

                          E. N. Ordway
1
2    Capstone but we're making every effort to
3    not duplicate our questions to you.
4              I will ask you questions in
5    areas that Mr. Woolner had asked questions
6    before.  I will do my very best not to ask
7    you the same question but I'm not perfect
8    and it may happen but I want you to know
9    that I'm endeavoring not to ask you an
10   exactly same question.  But I listened
11   carefully to your testimony earlier and
12   I'm going to do my best.
13             All right?
14        A.   Understood.
15        Q.   One thing I would ask is that if
16   you don't understand a question that I ask
17   you, will you agree to tell me so that I
18   can rephrase that question?
19        A.   Yes, I will.
20        Q.   So if you don't tell me that you
21   don't understand the question, we will
22   assume that you understood the question
23   and your answer reflected your best
24   answer.
25             All right?

Page 132

1                    E. N. Ordway

2        A.      Fair enough.

3        Q.      What did you do to prepare for

4   today's deposition?

5        A.      I had a meeting with Steve

6   Mandelsberg on Monday afternoon.

7        Q.      One thing I also want to make

8   clear.  Please know that none of the

9   questions I'm asking you are intended for

10  you to respond to me about communications

11  you had with your lawyer.  That's not the

12  intent of my questions.  Your lawyer's

13  sharp, he's going to see if I made a

14  mistake in my question or one of the

15  questions might delve into that but I want

16  you to know that's not my intent.

17       A.      I understand.

18            MR. MANDELSBERG: We understand

19       that.  We're going to reserve the

20       right to object to any question that's

21       improper as to form or otherwise

22       improper.

23            MS. SCHWARTZ: As you have the

24       right to do.

25       Q.      Were you provided with a copy of

Page 133

1                    E. N. Ordway

2    the transcript from Mr. Manzo's

3    deposition?

4        A.    No.

5        Q.    So you have not seen that; is

6    that correct?

7        A.    No.

8        Q.    Did you speak with Mr. Manzo

9    after his deposition yesterday?

10       A.    Wednesday.

11       Q.    Wednesday, I misspoke.

12       A.    Briefly.

13       Q.    What did you speak about?

14       A.    I asked him how it went and he

15   thought it went very well.  He mentioned

16   that he spoke with you afterwards.  That

17   was about it.  I was actually in the

18   middle of a meeting and wasn't able to

19   give him more time but I think I got the

20   gist of it.

21       Q.    Earlier in the beginning of your

22   deposition today when you were talking

23   about your experience, you said that you

24   have testified as an expert; is that

25   right?

Page 134

                        E. N. Ordway

1

2      A.    Yes.

3      Q.    Could you tell us what -- can

4  you tell us about that.

5      A.    Yes.

6           I've been engaged maybe fifteen,

7  twenty times either in bankruptcies or

8  specifically litigation matters where I

9  was preparing to be an expert, provide

10  expert testimony.  Sometimes I only got to

11  the deposition point and it was settled or

12  sometimes I didn't even get to the point

13  where I was being deposed.

14           The principle areas that I was

15  preparing to provide expert testimony on

16  are things like plan feasibility, although

17  last year I was involved in a matter -- I

18  think it's confidential so I can't tell

19  you the name of the case -- that was

20  involved with a MAC clause argument on a

21  purchase arrangement where the buyer opted

22  to walk away from a purchase arrangement.

23           My first time testifying was in

24  1993 in bankruptcy court in New Orleans on

25  a contested bankruptcy matter.  The last

Page 135

1                    E. N. Ordway

2    time I was deposed was in 2011 in a matter

3    called Almatis which was filed here in New

4    York.

5         Q.    Did you provide expert testimony

6    in Almatis?

7         A.    Yes.  Sorry, deposition and then

8    we settled.

9         Q.    What was the area you were

10   opining on?

11        A.    We had a -- we were representing

12   a creditor constituency that was objecting

13   to a plan of reorganization and my firm

14   was engaged to critically challenge and

15   independently determine a valuation

16   separately from what the company's

17   advisers had developed.

18        Q.    You mentioned that you testified

19   -- in what cases have you actually

20   testified in court?

21        A.    I'm probably not going to

22   remember them all but there was a case in

23   Miami that I testified on in December,

24   2010 called Cabi Downtown, which was a

25   failed condominium development, about two

Page 136

                          E. N. Ordway

 1

 2   hundred fifty million of bank debt

 3   associated with that.   I represented

 4   lenders.

 5        Q.      And your testimony was on?

 6        A.      Plan feasibility.

 7                I advised a debtor that filed in

 8   New Jersey named Rockaway Bedding in the

 9   Newark court and I testified on several

10   occasions regarding plan feasibility and

11   arrangements for liquidating stores, for

12   compensation arrangements for management,

13   things of that nature.

14                I testified in Chicago court

15   regarding a company called American

16   Classic Voyages regarding compensation

17   arrangements for senior executives.

18                The matter that I testified in

19   New Orleans was for a company named

20   Interurban Communications, two competing

21   plans.

22                I testified in court in Newark

23   for Judge Stern.   He appointed me to be a

24   court-appointed examiner on a -- on Jazz

25   Photo was the name of that bankruptcy.

Page 137

1                        E. N. Ordway

2              I'm not remembering other

3       in-court testimony but there were other

4       depositions.

5         Q.    I know you testified earlier

6       that you got a degree from Rutgers I think

7       it was economics; is that right?

8         A.    Accounting and economics, double

9       major.

10        Q.    After obtaining that degree from

11      Rutgers, did you obtain any subsequent

12      educational degrees?

13        A.    No.

14        Q.    Did you obtain any subsequent

15      licenses?

16        A.    I'm a CPA.

17        Q.    Is your CPA license current?

18        A.    Yes.

19        Q.    I know you said also that you

20      testified that you worked at Arthur

21      Andersen?

22        A.    Yes.

23        Q.    Did you have a particular focus

24      on the type of work you did?

25        A.    I was in the audit group.

Page 138

1                      E. N. Ordway

2        Q.      Would you characterize yourself

3    as having any particular expertise in a

4    particular area?

5        A.      Workout consulting, you know,

6    restructuring.

7        Q.      When did you first start doing

8    that?

9        A.      When I was at Arthur Andersen, I

10   did some bankruptcy consulting but that

11   was not full time.  I did audits and I did

12   some bankruptcy work.  I started to do

13   this full time in July of 1991.

14       Q.      You said that you testified on

15   some compensation -- as an expert on

16   compensation arrangements; is that

17   correct?

18       A.      Yes.

19       Q.      Could you tell us about your

20   background and expertise in that area.

21       A.      Since I began to do

22   restructuring work, I've worked on over

23   two hundred engagements and it's very

24   typical -- maybe about a hundred of them

25   wound up in bankruptcy.  We do a lot of

Page 139

```
 1              E. N. Ordway
 2   out-of-court work.  But it's typical in
 3   almost all of these instances that we
 4   review compensation arrangements for
 5   employees and what's appropriate given the
 6   circumstances.  So I would consider myself
 7   an expert in executive compensation in
 8   troubled situations.
 9       Q.    I'd like to ask you some
10   questions about Capstone.
11            You testified earlier that you
12   were one of the persons that formed that
13   company; is that correct?
14       A.    Yes.
15       Q.    Is Capstone one corporate entity
16   or multiple?
17            MR. MANDELSBERG: Objection.
18       A.    Here's the structure.  Capstone
19   Advisory Group, LLC is a limited liability
20   company formed in Delaware.  It has ten
21   members.  It owns two other entities that
22   are both LLCs.  One of them is called
23   Capstone Valuation Services, LLC and
24   another one I don't remember precisely the
25   name but it's for my Bogota, Colombia
```

Page 140

```
 1                    E. N. Ordway

 2    office.

 3        Q.    Is Capstone AG, LLC the parent

 4    company of those two entities?

 5        A.    Did I say AG?  I meant advisory

 6    group.

 7        Q.    You did say advisory group.  I

 8    just said AG.  I wrote it so I could get

 9    it down faster.

10            MR. MANDELSBERG:  You're

11        abbreviating.

12        A.    Yes is the answer.

13        Q.    And you said that Capstone

14    Advisory Group -- and now for purposes of

15    going on I'll just refer to it as Capstone

16    -- you said that Capstone has ten members;

17    is that right?

18        A.    Yes.

19        Q.    And you're a member; is that

20    right?

21        A.    Yes.

22        Q.    And you are the managing member;

23    is that right?

24        A.    There's two managing members.

25        Q.    Who is the other managing
```

Page 141

1              E. N. Ordway

2   member?

3      A.    Chris Kearns, I think you know

4   him, K E A R N S.

5      Q.    I think he came here the other

6   day and said hello.

7            Now, I'd like to understand the

8   Capstone corporate structure.

9            You have ten members that are

10  owners of the company; is that right?

11     A.    Yes.

12           MR. MANDELSBERG: Objection.

13           You mean the Capstone, LLC

14      structure?

15           MS. SCHWARTZ: Yes, I said before

16      when I used Capstone I was going to

17      refer to Capstone Advisory Group, LLC.

18     A.    I understand.

19     Q.    And they're all owners; right?

20     A.    Yes.

21     Q.    They own different percentages

22  of units or does everybody own the same?

23     A.    Different.

24     Q.    Do you own the most?

25     A.    Yes.

Page 142

1                     E. N. Ordway

2        Q.      How many employees does Capstone

3    have today?

4        A.      I think it's one hundred five.

5        Q.      Do you consider the members to

6    also be employees?

7        A.      Yes, when I make that count, I'm

8    talking about the size of the firm.  So

9    it's ninety-five and ten members.

10       Q.      Is Capstone or any of its

11   entities an investment bank?

12              MR. MANDELSBERG: Objection.

13       A.      No.  We from time to time

14   provide investment banking services but we

15   don't refer to ourselves as an investment

16   bank.

17       Q.      Could you expand on what you

18   just said.

19       A.      Sometimes on engagements we get

20   involved in where we were initially

21   engaged as financial advisers evolve to

22   where investment banking services are

23   required.  Depending on the engagement we

24   may either suggest that we can provide

25   that service or we may suggest that

Page 143

1                    E. N. Ordway

2   separately an investment banker be hired

3   either in place of us or to work alongside

4   with us.

5        Q.    I may pause in asking you

6   questions as I go down my list if they've

7   already been asked so I don't repeat them.

8        A.    I understand.

9        Q.    You said one hundred five

10  employees?

11       A.    And then I corrected it and said

12  ninety-five and ten members, yes.

13       Q.    So they're all employees, you

14  consider them all employees of the

15  company; right?

16       A.    And they are employees.

17       Q.    A little earlier in your

18  deposition testimony you said that

19  presently Capstone has one contractor; is

20  that right?

21       A.    Yes.

22            MR. MANDELSBERG: Objection.

23       Q.    Who is that?

24       A.    His last name is Butler.  Not

25  the same Butler who's in our fee