**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **GSC GROUP, Inc., *et al.*,**[1] | **Case No. 10-14653 (AJG)** |
| **Debtors.** | **(Jointly Administered)** |

**BLACK DIAMOND CAPITAL MANAGEMENT, L.L.C.'S FOURTH AMENDED JOINT CHAPTER 11 PLAN FOR GSC GROUP, INC. AND ITS AFFILIATED DEBTORS**

KIRKLAND & ELLIS LLP
Patrick J. Nash, Jr. (admitted *pro hac vice*)
Paul Wierbicki (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000

Counsel to Black Diamond Capital Management, L.L.C.

Dated: February 14, 2012

[1] The Filing Debtors along with the last four digits of each Filing Debtor's federal tax identification number are GSC Group, Inc. (6382), GSCP, LLC (6520), GSC Active Partners, Inc. (4896), GSCP (NJ) Inc. (3944), GSCP (NJ) Holdings, L.P. (0940), GSCP (NJ), L.P. (0785), and GSC Secondary Interest Fund, LLC (6477).

**TABLE OF CONTENTS**

Page

ARTICLE I

DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

Section 1.1 Defined Terms ....... 1
Section 1.2 Rules of Interpretation and Computation of Time ....... 15

ARTICLE II

RESOLUTION OF INTER-DEBTOR ISSUES

Section 2.1 Substantive Consolidation of Debtors for Purposes of Voting, Confirmation and Distribution ....... 15

ARTICLE III

UNCLASSIFIED CLAIMS

Section 3.1 Administrative Claims ....... 16
Section 3.2 Priority Tax Claims ....... 17
Section 3.3 Professional Fees ....... 17
Section 3.4 United States Trustee Statutory Fees ....... 17

ARTICLE IV

CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

Section 4.1 Classification ....... 17
Section 4.2 Treatment and Voting Rights of Claims and Equity Interests ....... 18
Section 4.3 Cram Down ....... 21

ARTICLE V

MEANS FOR IMPLEMENTATION OF THIS PLAN

Section 5.1 Formation of the Liquidating Trust ....... 21
Section 5.2 Reorganized Debtors ....... 23
Section 5.3 Management of the Reorganized Debtors ....... 23
Section 5.4 Capitalization of the Liquidating Trust ....... 24
Section 5.5 Initial Distribution of Trust Units ....... 24
Section 5.6 Compromise of Controversies ....... 24
Section 5.7 Corporate Action ....... 25
Section 5.8 Post-Effective Date Governance ....... 25

Section 5.9 Transfer of Post-Petition Agreements....25
Section 5.10 Rights Under Tax Indemnification Agreement....25
Section 5.11 Straddle Tax Provisions....26
Section 5.12 BDCM Loan....26
Section 5.13 Restructuring Transactions....27
Section 5.14 Distributions from the Liquidating Trust....27

ARTICLE VI

TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 6.1 Assumption of Management Contracts....27
Section 6.2 Rejection of Executory Contracts and Unexpired Leases....27
Section 6.3 Claims Based on Rejection of Executory Contracts or Unexpired Leases....28

ARTICLE VII

PROVISIONS GOVERNING DISTRIBUTIONS

Section 7.1 General Distribution Provisions....28
Section 7.2 Establishment of Disputed General Unsecured Claims Reserves....29
Section 7.3 Establishment of Disputed Priority Claims Reserve....29
Section 7.4 Liquidating Trust, Reorganized Debtors, Distribution Agent, Disputed Unsecured Claims Reserves and Disputed Priority Claims Reserve Distributions....30
Section 7.5 Delivery of Distributions and Undeliverable or Unclaimed Distributions....30
Section 7.6 Setoff and Recoupment....31
Section 7.7 Manner of Payment Under Plan....31

ARTICLE VIII

PROCEDURES FOR RESOLVING DISPUTED CLAIMS

Section 8.1 Prosecution of Objections to Claims....32
Section 8.2 Estimation of Claims....32
Section 8.3 Payments and Distributions on Disputed Claims....32

ARTICLE IX

CONDITIONS PRECEDENT TO CONFIRMATION
AND EFFECTIVE DATE

Section 9.1 Conditions Precedent to Confirmation....33
Section 9.2 Conditions Precedent to the Effective Date....33
Section 9.3 Waiver of Conditions....33
Section 9.4 Modification of Plan....34
Section 9.5 Effect of Withdrawal or Revocation....34
Section 9.6 Reservation of Rights....34

K&E 20788663

Section 9.7 Substantial Consummation of Plan ....... 34

ARTICLE X

EFFECT OF PLAN CONFIRMATION

Section 10.1 Binding Effect ....... 34
Section 10.2 Preservation of All Causes of Action ....... 34
Section 10.3 Discharge of Claims & Interests ....... 35
Section 10.4 Liquidating Trust as Successor ....... 35
Section 10.5 **Releases** ....... 36
Section 10.6 **Exculpation and Limitation of Liability** ....... 38
Section 10.7 **Injunction** ....... 38
Section 10.8 Term of Bankruptcy Injunction or Stays ....... 39
Section 10.9 Limitation on Release and Exculpation Provisions ....... 39

ARTICLE XI

RETENTION OF JURISDICTION

ARTICLE XII

MISCELLANEOUS PROVISIONS

Section 12.1 Payment of Statutory Fees ....... 42
Section 12.2 Reports ....... 42
Section 12.3 Governing Law ....... 42
Section 12.4 Severability ....... 43
Section 12.5 Inconsistency ....... 43
Section 12.6 Exemption from Transfer Taxes ....... 43
Section 12.7 Filing of Additional Documents ....... 43
Section 12.8 Service of Documents ....... 43
Section 12.9 Schedules and Exhibits ....... 44
Section 12.10 No Prejudice ....... 44
Section 12.11 Allocation of Payments ....... 44

**BLACK DIAMOND CAPITAL MANAGEMENT, L.L.C.'S FOURTH AMENDED JOINT CHAPTER 11 PLAN FOR GSC GROUP, INC. AND ITS AFFILIATED DEBTORS**

BDCM, as affiliate of the Designated Purchaser of the assets of the estates of GSC Group, Inc., GSCP, LLC, GSCP (NJ), L.P., GSC Active Partners, Inc., GSCP (NJ), Inc., GSCP (NJ) Holdings, L.P. and GSC Secondary Interest Fund, LLC, debtors in the above-captioned cases, hereby respectfully proposes the following fourth amended joint chapter 11 plan for the Debtors (this or the "Plan"). The only Entities entitled to vote on this Plan are the Holders of General Unsecured Claims in Class 3 and Holders of Preferred Equity Interests in Class 4. Prior to voting to accept or reject this Plan, such Holders are encouraged to read this Plan, the accompanying Disclosure Statement, and their respective exhibits and schedules, in their entirety. No materials other than this Plan, the Disclosure Statement, and their respective exhibits and schedules have been authorized by the BDCM for use in soliciting acceptances or rejections of this Plan.

## ARTICLE I

## DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

Section 1.1 *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form in this Plan and the Disclosure Statement:

"Administrative Claim" means any Claim against any Debtor for costs and expenses of administration under section 503(b) or 507(b) of the Bankruptcy Code, including for: (i) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (ii) compensation for services and reimbursement of expenses under section 330(a) or 331 of the Bankruptcy Code, including Professional Fees; and (iii) any indebtedness or obligations incurred or assumed by the Debtors during the Chapter 11 Cases. For the avoidance of doubt, UST Fees are not Administrative Claims, and the Debtors, Reorganized Debtors, or Liquidating Trustee, as applicable, shall pay such UST Fees pursuant to Section 3.4 herein.

"Administrative Claim Payment" means a cash payment to the Chapter 11 Trustee from Black Diamond in the amount of $1 million to pay allowed administrative claims of the Chapter 11 Trustee, Shearman & Sterling LLP, Capstone Advisory Group, LLC, Ernst & Young LLP, Togut Segal & Segal LLP, Epiq Bankruptcy Solutions, LLC and any other retained professional, as set forth in the Agreed Stipulated Order.

"Agent" means the administrative agent and collateral agent under the operative loan and security documents relating to the Prepetition Credit Agreement.

"Agreed Stipulated Order" means the *Stipulation and Order Between the Chapter 11 Trustee and Black Diamond Capital Management, L.L.C. Regarding Settlement of Designation and Disqualification Motions*, by and between the Chapter 11 Trustee, BDCM, and the Designated Purchaser, as approved by the Bankruptcy Court on December 20, 2011 [Docket No. 1049].

"Allowed" means, with respect to any Claim, such Claim or portion thereof: (i) as to which no objection or request for estimation has been Filed, no litigation has commenced, and the Chapter 11 Trustee, the Liquidating Trustee or the Reorganized Debtors, as the case may be, otherwise has assented to the validity thereof (and as to which a proof of claim has been properly and timely Filed to the extent required by this Plan, the Bankruptcy Code, the Bankruptcy Rules or any order of the Bankruptcy Court); (ii) as to which any objection or request for estimation that has been Filed has been settled, waived or withdrawn with prejudice or otherwise denied by a Final Order; or (iii) that is allowed (a) pursuant to the terms of a Final Order, (b) pursuant to the terms of an agreement by and between the Holder of such Claim and the Chapter 11 Trustee, the Liquidating Trustee, or the Reorganized Debtors, as the case may be, or (c) under the terms of this Plan. The following claims are Allowed: (i) claim of Eric Snyder as set forth on the Debtors' schedules of assets and liabilities filed September 15, 2010; and (ii) any fee or other compensation awarded by the Bankruptcy Court to the Chapter 11 Trustee on account of his participation in these cases.

"Amended and Restated Bylaws" means the amended, restated or new bylaws adopted pursuant to the Plan by each Reorganized Debtor, as applicable,, substantially in the form included in the Plan Supplement.

"Amended and Restated Certificate of Incorporation" means the amended, restated or new certificate of incorporation, partnership agreement or other organizational document adopted pursuant to the Plan by each Reorganized Debtor, substantially in the form included in the Plan Supplement.

"AP Holdings" means non-debtor GSC Active Partners Holdings, L.P.

"AP Inc." means Debtor GSC Active Partners, Inc.

"APA 1" means that certain Asset Purchase Agreement dated October 31, 2010 by and among the GSC Acquisition Partners LLC, GSCP (NJ), L.P., GSCP (NJ) Holdings, L.P., GSCP (NJ), Inc., GSC Group, Inc. and GSCP, LLC (as amended by Amendment No. 1 to Asset Purchase Agreement dated December 3, 2010 and as further supplemented and amended by the Side Letter.)

"APA 2" means that certain Asset Purchase Agreement by and among GSC Acquisition Holdings LLC, GSCP (NJ), L.P., GSCP (NJ) Holdings, L.P., GSCP (NJ), Inc., GSC Group, Inc. and GSCP, LLC dated as of May 23, 2011.

"Auction" means the auction held from October 26 to October 29, 2010 for the sale of substantially all of the Debtors assets in accordance with the court-approved Bidding Procedures.

"Avoidance Actions" means all Causes of Action of, or belonging to, the Estates arising under chapter 5 of the Bankruptcy Code.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as in effect on the Petition Date, together with any amendments made thereto subsequent to the Petition Date, to the extent that any such amendments are applicable to the Chapter 11 Cases.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York, or such other court having jurisdiction over the Chapter 11 Cases or any proceeding within, or appeal of an order entered in, the Chapter 11 Cases.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms or the local rules of the Bankruptcy Court, together with any amendments made thereto subsequent to the Petition Date, to the extent that any such amendments are applicable to the Chapter 11 Cases.

"BDCF" means Black Diamond Commercial Finance, L.L.C.

"BDCM" means Black Diamond Capital Management, L.L.C.

"BDCM Loan" means a loan by BDCM to the Reorganized Debtors on the Effective Date in the amount equal to the excess of the amount necessary to satisfy in full the Debtors' obligations for payment of, or establishment of reserves for, Up-Front Option Plan Cash and Combination Option Plan Cash to creditors electing the Up-front Cash Option and Combination Cash Option, respectively, over Remaining Plan Cash available at the time such payments are required to be made, which loan shall be on terms and conditions consistent in all material respects with Exhibit B, including (i) 6 year maturity, (ii) interest at 5% per annum, and (iii) payable in full prior to any distribution to any equity holder in the Reorganized GSC Group.

"Bidding Procedures" means the bid and auction procedures approved under the Bidding Procedures Order.

"Bidding Procedures Order" means the order entered by the Bankruptcy Court approving the Bidding Procedures, entered on September 23, 2010 [Docket No. 134].

"Black Diamond" means, collectively, BDCM, BDCF and their respective affiliates.

"Business Day" means any day, other than a Saturday, Sunday or a "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

"CALNY" means Calyon New York Branch.

"Capstone" means Capstone Advisory Group, LLC.

"Cash" means the lawful currency of the United States of America and equivalents thereof.

"Cash Options" means the Up-front Cash Option and the Combination Cash Option.

"Catch-Up Combination Cash Distribution" means a distribution of (i) Cash from the Disputed General Unsecured Claims Cash Reserve and (ii) Reserved Trust Units, to (a) the Holder of a Disputed General Unsecured Claim that has elected the Combination Cash Option and that becomes an Allowed General Unsecured Claim equal to the distributions such Holder would have received if such Allowed General Unsecured Claim had been allowed prior to such date or (b) Reorganized GSC Group on account of a Disputed General Unsecured Claim that

elected the Equity Option equal to the distributions that the Holder of such Claim would have received if such Holder had elected the Combination Cash Option and if such Allowed General Unsecured Claim had been allowed prior to such date.

"Catch-Up Equity Distribution" means a distribution of Reorganized GSC Group Convertible Class B Common Stock from the Disputed General Unsecured Claims Equity Reserve to the Holder of a Disputed General Unsecured Claim that has elected the Equity Option and that becomes an Allowed General Unsecured Claim equal to the distributions such Holder would have received if such Allowed General Unsecured Claim had been allowed prior to such date.

"Catch-Up Up-front Cash Distribution" means a distribution of Cash from the Disputed General Unsecured Claims Cash Reserve to the Holder of a Disputed General Unsecured Claim that has elected or been deemed to elect the Up-front Cash Option and that becomes an Allowed General Unsecured Claim equal to the distributions such Holder would have received if such Allowed General Unsecured Claim had been allowed prior to such date.

"Causes of Action" means all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, rights to legal remedies, rights to equitable remedies, rights to payment and claims, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances and trespasses, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or indirectly or derivatively, in law, equity or otherwise.

"Certificate of Designation" means, either the Certificate of Designation, Powers, Preferences and Rights of Series A Preferred Sock of GSC Group, Inc. or the Certificate of Designation, Powers, Preferences and Rights of Series B Preferred Sock of GSC Group, Inc., both as set forth in the Plan Supplement, as applicable.

"Chapter 11 Cases" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Filing Debtors in the Bankruptcy Court.

"Chapter 11 Trustee" means James L. Garrity, Jr., in his capacity as chapter 11 trustee of the Estates, or his duly appointed successor.

"Claim" means a claim as defined in section 101(5) of the Bankruptcy Code against any Debtor, whether or not asserted.

"Class" means a class of Claims or Equity Interests as set forth in Article IV hereof.

"Combination Cash Distribution Share" means, for any Holder of an Allowed General Unsecured Claim who elects or is deemed to elect the Combination Cash Option, its Pro Rata Share of Combination Option Plan Cash.

"Combination Cash Option" means the election or deemed election by a Holder of a General Unsecured Claim to accept (i) Combination Option Plan Cash and (ii) Trust Units in exchange for its claim pursuant to the terms set forth in Section 4.2.

"Combination Option Plan Cash" means Remaining Plan Cash, plus $1.0 million proceeds of the BDCM Loan.

"Common Equity Interests" means all outstanding ownership interests in common stock of Debtor GSC Group, Inc., which interests are comprised of Class A, Class B and Class C common stock.

"Confirmation Date" means the date upon which the Confirmation Order is entered.

"Confirmation Hearing" means the hearing to be held by the Bankruptcy Court to consider confirmation of this Plan pursuant to section 1128 of the Bankruptcy Code.

"Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

"Consent Solicitation Process" means the consent solicitation process authorized under the Bidding Procedures Order.

"Debtors" means, collectively, GSC Group, Inc., GSCP, LLC, GSC Active Partners, Inc., GSCP (NJ) Inc., GSCP (NJ) Holdings, L.P. and GSCP (NJ), L.P.

"Designated Purchaser" means GSC Acquisition Holdings LLC.

"Director and Officer Causes of Action" means all Causes of Action of, or belonging to, the Estates, against any current or former directors or officers of the Filing Debtors arising prior to or during the Chapter 11 Cases related to the sale of the Debtors' assets or for breach of fiduciary duties.

"Disallowed" means, with respect to any Claim, such Claim or portion thereof that has been disallowed or expunged by a Final Order.

"Disclosure Statement" means the written disclosure statement that relates to this Plan, as the same may be amended, supplemented, revised or modified from time to time, as approved by the Bankruptcy Court, including without limitation all exhibits, appendices and schedules annexed thereto.

"Disputed" means any Claim or portion thereof: (i) as to which the Chapter 11 Trustee, the Liquidating Trustee, BDCM or the Reorganized Debtors has filed an objection or request for estimation, which objection has not been withdrawn or determined by a Final Order; (ii) that is subject to any right of setoff or recoupment; or (iii) that otherwise is disputed by the Chapter 11 Trustee, the Liquidating Trustee, BDCM or the Reorganized Debtors.

"Disputed General Unsecured Claims Cash Reserve" means the reserve related to the Cash Options established pursuant to Section 7.2 of this Plan.

"Disputed General Unsecured Claims Cash Reserve Amount" means the portion of the Remaining Plan Cash in an amount necessary to cover the aggregate Estimated Claim Amounts

of those General Unsecured Claims that have elected one of the Cash Options and that are Disputed as of the Effective Date.

"Disputed General Unsecured Claims Equity Reserve" means the reserve related to the Equity Option established pursuant to Section 5.2 of this Plan.

"Disputed General Unsecured Claims Equity Reserve Amount" means the portion of the Reorganized GSC Group Stock in an amount necessary to cover the aggregate Estimated Claim Amounts of those General Unsecured Claims that have elected the Equity Option and that are Disputed as of the Effective Date.

"Disputed General Unsecured Claims Reserves" means the Disputed General Unsecured Claims Cash Reserve and the Disputed General Unsecured Claims Equity Reserve.

"Disputed Priority Claims Reserve" means the reserve established pursuant to Section 7.3 of this Plan.

"Disputed Priority Claims Reserve Amount" means the portion of the Up-front Option Plan Cash and the Combination Option Plan Cash, in an amount necessary to cover the aggregate Estimated Claim Amounts of those Priority Tax Claims and Other Priority Claims that are Disputed as of the Effective Date.

"Distribution Agent" means the Entity or Entities chosen by the Debtors or the Reorganized Debtors, as applicable, and BDCM, to make or facilitate distributions pursuant to this Plan other than any distributions that are to be made by the Liquidating Trustee under this Plan.

"Effective Date" means the Business Day on which all conditions specified in Article IX have been satisfied or waived in accordance with Section 9.3.

"Entity" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

"Equity Distribution Share" means, for any Holder of an Allowed General Unsecured Claim who elects the Equity Option, an amount of Reorganized GSC Convertible Class B Common Stock to be determined by multiplying the total number of shares of Reorganized GSC Convertible Class B Common Stock to be issued and outstanding immediately following the issuance of all shares of Reorganized GSC Convertible Class B Common Stock by a fraction, the numerator of which is the amount of such Holder's Allowed General Unsecured Claim and the denominator of which shall be the aggregate amount of all Allowed General Unsecured Claims for which the Holders elected the Equity Option, including the claim of such Holder.

"Equity Interests" means all outstanding ownership interests, whether or not certificated, including any interest evidenced by common or preferred stock, warrant, membership interest, option or other right to purchase or otherwise receive any ownership interest in any of the Debtors, or any right to payment or compensation based upon any such interest, whether or not such interest is owned by the Holder of such right to payment or compensation.

"Equity Option" means the affirmative election by a Holder of a General Unsecured Claim to accept its Equity Distribution Share, in exchange for its claim, pursuant to the terms of Section 4.2 hereof.

"Escrow Agent" means the law firm or other escrow agent selected by the Chapter 11 Trustee and Black Diamond.

"Escrow Funds" means the cash payment in the amount of $4 million made pursuant to the Agreed Stipulated Order by Black Diamond to the Escrow Agent which is to be used exclusively for payment of the Straddle Tax as set forth in the Agreed Stipulated Order and Section 5.11 herein. The amount of the Escrow Funds may be reduced, from time to time, by the portion of any cash distributions made by the Debtors, the Liquidating Trust or the Liquidating Trustee that would be attributable to the claims held by general unsecured creditors who elect the Equity Option, and to the extent such amounts are deposited with the Escrow Agent, they shall be held in accordance with the terms of the Agreed Stipulated Order and/or any separate escrow agreement entered in accordance with the Agreed Stipulated Order terms as may be approved by the Chapter 11 Trustee or the Liquidating Trustee, as applicable.

"Estate Assets" means those assets (including any tangible or intangible property rights, privileges or immunities of any kind whatsoever) remaining in the Estates following the consummation of APA 1 and APA 2, including those set forth as "Excluded Assets" on Schedule 2.2 to APA 2 (and all proceeds received from such assets), and any contractual or other rights under the Letter of Credit and the Sale Transaction Documents. Notwithstanding the foregoing, the Estate Assets shall not include the rights and obligations of the Sellers under the Tax Indemnification Agreement.

"Estates" means the estates of the Debtors created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

"Estimated Claim Amount" means the lesser of (i) the filed amount of a Disputed Claim as asserted by the Holder of such Claim; (ii) the estimated maximum amount of a Disputed Claim that could become Allowed as agreed to by the Holder of such Claim, BDCM and the Chapter 11 Trustee prior to the Effective Date or the Liquidating Trustee following the Effective Date; or (iii) the maximum estimated amount of a Disputed Claim that could become Allowed as determined by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code.

"File", "Filed" or "Filing" means file, filed or filing with the Bankruptcy Court (or agent thereof) in connection with the Chapter 11 Cases.

"Filing Debtors" means the Debtors and SIF.

"Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

"Final Order" means an order or judgment entered by the Bankruptcy Court: (i) that has not been reversed, stayed, modified, amended or revoked, and as to which (a) any right to appeal or seek certiorari, review, reargument, stay or rehearing has been waived or (b) the time to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending; or (ii) as to which an

appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been Filed and (a) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought and (b) the time to appeal further or seek certiorari, further review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, further review, reargument, stay or rehearing is pending; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code, Rule 59 or 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be Filed with respect to such order or judgment.

"General Bar Date Order" means the Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof entered by the Bankruptcy Court on March 18 , 2011 [Docket No. 442 ].

"General Unsecured Claim" means all Claims that are not Administrative Claims, Priority Tax Claims, Other Priority Claims, Secured Claims, Intercompany Claims or based upon Equity Interests.

"GSC Group" means Debtor GSC Group, Inc.

"GSCP LLC" means Debtor GSCP, LLC.

"GSC U.K." means GSC Group Limited.

"Guarantor Sellers" means the Sellers other than NJLP.

"Holder" means the beneficial holder of any Claim or Equity Interest.

"Holdings LP" means Debtor GSCP (NJ) Holdings, LP.

"Impaired" means with respect to each Claim or Equity Interest, such Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"Indemnified Liabilities" means tax liabilities in an amount not greater than the amount of liabilities that can be satisfied by Reorganized Debtors by the proceeds of the Tax Indemnification Agreement or the Letter of Credit.

"Initial Administrative Claims Bar Date Order" means the Order Establishing a Deadline and Procedures for Filing Certain Administrative Claims and Approving the Form and Manner of Notice Thereof entered by the Bankruptcy Court on September 14, 2011 [Docket No. 776].

"Initial APA" means that certain Asset Purchase Agreement, dated October 31, 2010, among the Sellers and the GSC Acquisition Partners LLC.

"Initial Sale Order" means the initial proposed sale order authorizing consummation of the transactions under the Initial APA.

"Intercompany Claims" means all Claims held by any Debtor against any other Debtor including but not limited to the Intercompany Subrogation Claims and the NJLP Intercompany Claims.

"Intercompany Subrogation Claims" means the subrogation Claims of the Guarantor Sellers against NJLP resulting from their sale of assets under APA 1 and APA 2 to the Designated Purchaser in satisfaction of their obligations as guarantors of NJLP's obligations under the Prepetition Credit Agreement.

"Letter of Credit" means the certain letter of credit dated July 26, 2011, issued by JPMorgan Chase Bank, N.A. in favor if James L. Garrity, Jr. as trustee on behalf of GSCP (NJ), L.P., GSCP (NJ) Holdings, L.P., GSCP (NJ), Inc., GSC Group, Inc., and GSCP, LLC, and any replacement letter of credit issued in lieu thereof.

"Lien" means a mortgage, a pledge, a judgment lien, an attachment, a security interest, or other encumbrance on any Estate Assets, whether voluntary of involuntary, which is valid, perfected, and enforceable under applicable non-bankruptcy laws as of the Confirmation Date.

"Life Insurance Policies" means AXA Equitable Policy Nos. 156 232 880, 156 232 882, 156 232 883, 156 232 885, and 156 232 890 issued for the benefit of certain Debtors.

"Liquidating Trust" means the trust created by the Liquidating Trust Agreement.

"Liquidating Trust Agreement" means the instrument governing the Liquidating Trust, in substantially the form Filed as part of the Plan Supplement, as the same may be amended, supplemented or modified from time to time.

"Liquidating Trust Cash" means all Cash remaining in the Estates after all distributions and payments required to be made on or before the Effective Date in accordance with this Plan have been made.

"Liquidating Trustee" means RJM1, LLC or its successor as trustee, designated by the Liquidating Trust Agreement, retained as of the Effective Date as the employee or fiduciary responsible for implementing the applicable provisions of this Plan and administrating the Liquidating Trust in accordance with this Plan, the Tax Indemnification Agreement, and the Liquidating Trust Agreement and any successor appointed as provided in the Liquidating Trust Agreement.

"Local Bankruptcy Rules" means the Local Bankruptcy Rules for the Southern District of New York.

"Management Contracts" means the collateral management agreements listed on Exhibit A hereto.

"NJ Inc." means Debtor GSCP (NJ), Inc.

"NJLP" means Debtor GSCP (NJ) L.P.

"NJLP Intercompany Claims" means the Claims of NJLP against the Guarantor Sellers on account of intercompany loans extended by NJLP to the Guarantor Sellers.

"Non-Controlling Lender Group" means the Non-Controlling Lender Group as defined in the Sale Order.

"Other Priority Claim" means a Claim under section 507(a) of the Bankruptcy Code that is not an Administrative Claim or a Priority Tax Claim.

"Person" means a person as defined in section 101(41) of the Bankruptcy Code.

"Petition Date" means August 31, 2010.

"Plan" means this joint chapter 11 plan with respect to the Debtors, either in its present form or as may be amended, supplemented or modified from time to time and consistent with the Agreed Stipulated Order, including the Plan Supplement and all annexes, appendices, attachments, exhibits and/or schedules hereto or to the Plan Supplement, all of which are incorporated herein by reference.

"Plan Administrative Claims Bar Date" means the date that is 90 days after the Effective Date.

"Plan Cash" means Cash in the aggregate amount of $4.6 million or less as determined by the Chapter 11 Trustee in his discretion, to be distributed to (a) any Holders of Allowed Priority Tax Claims in accordance with Section 3.2; (b) any Holders of Allowed Secured Claims in accordance with Section 4.2(a); (c) any Holders of Allowed Other Priority Claims in accordance with Section 4.2(b); (d) any Holders of Allowed General Unsecured Claims who elect or are deemed to elect the Up-front Cash Option or the Combination Cash Option in accordance with Section 4.2(c); (e) the Disputed Priority Claims Reserve in accordance with Section 7.3; and (f) the Disputed General Unsecured Claims Cash Reserve in accordance with Section 7.4.

"Plan Documents" means the agreements, documents and instruments to be entered into as of the Effective Date as contemplated by, and in furtherance of, this Plan.

"Plan Supplement" means the compilation of documents and exhibits Filed not later than ten days prior to the Voting Deadline, as such documents and exhibits may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules and the terms hereof.

"Preferred Equity Interests" means the Preferred Units issued by Debtor GSCP (NJ) L.P. pursuant to the Fourth Amended and Restated Agreement of Limited Partnership of GSCP (NJ) L.P. dated as of October 1, 2006.

"Prepetition Credit Agreement" means that certain Fourth Amended and Restated Credit Agreement, dated as of February 28, 2007, among GSCP (NJ), L.P., as borrower, GSCP (NJ) Holdings, L.P., GSC Group, Inc., GSCP, Inc., GSC Group Limited and GSCP, LLC, as guarantors, the lenders party thereto from time to time, and the Agent, as amended.

"Prepetition Lenders" means the financial institutions who are or were parties to the Prepetition Credit Agreement and their successors and assigns.

"Prepetition Loan Documents" means the Prepetition Credit Agreement together with any security agreements, guarantees or any ancillary documents related thereto.

"Priority Tax Claim" means a Claim under Bankruptcy Code section 507(a)(8).

"Professional Fees" means the compensation and reimbursement of expenses allowed to (i) Professionals pursuant to sections 330, 331 or 1103(a) of the Bankruptcy Code or (ii) any Person or Entity making a claim for compensation or reimbursement of expenses under section 503(b) of the Bankruptcy Code.

"Professionals" means (a) all professionals employed in the Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) all professionals or other entities seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

"Pro-Rata Share" means, with respect to any distribution on account of any Allowed Claim or Allowed Interest in any Class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Claims, other than Disallowed Claims, in such Class.

"Purchase Agreements" means APA 1, APA 2 and all related ancillary documents.

"Released Parties" means collectively the Chapter 11 Trustee, the Debtors, the Reorganized Debtors, the Estates, Black Diamond, the Liquidating Trust, the Liquidating Trustee and their respective Professionals.

"Remaining Equity Interests" means, with respect to Debtor GSC Group, Inc. the Equity Interests minus the Preferred Equity Interests.

"Remaining Plan Cash" means the Plan Cash remaining following distributions of Plan Cash to (a) any Holders of Allowed Priority Tax Claims in accordance with Section 3.2; (b) any Holders of Allowed Secured Claims in accordance with Section 4.2(a); (c) any Holders of Allowed Other Priority Claims in accordance with Section 4.2(b); and (d) the Disputed Priority Claims Reserve in accordance with Section 7.3.

"Reorganized Debtors" means the Debtors, as reorganized pursuant to this Plan, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

"Reorganized GSC Group Common Stock" means Reorganized GSC Group Class A Common Stock, Reorganized GSC Group Convertible Class B Common Stock, and Reorganized GSC Group Class C Common Stock.

"Reorganized GSC Group Class A Common Stock" means a new class of stock to be authorized prior to the Effective Date, which will comprise between 51% and 67%, at BDCM's discretion and as set forth in the Plan Supplement, of the Reorganized GSC Group Common

Stock and share the same powers, preferences and rights as the Class A, Class B, and Class C common stock of Debtor GSC Group, Inc.

"Reorganized GSC Group Convertible Class B Common Stock" means a new class of common stock to be authorized prior to the Effective Date, which will comprise between 33% and 49%, at BDCM's discretion and as set forth in the Plan Supplement, of the Reorganized GSC Group Common Stock and share the same powers, preferences and rights as the Reorganized GSC Group Class A Common Stock, except that on all matters submitted to a vote of the shareholders of the Reorganized GSC Group, every Holder of Reorganized GSC Group Convertible Class B Common Stock shall be entitled to cast a fractional vote per share so that the total votes for which Reorganized GSC Group Convertible Class B Common Stockholders are eligible to vote shall equal 24.9% of all votes that may be cast at such time by all classes of Reorganized GSC Group Common Stock eligible to vote. The terms of Reorganized GSC Group Convertible Class B Common Stock are set forth in more detail on Exhibit C hereto.

"Reorganized GSC Group Class C Common Stock" means a new class of common stock to be authorized prior to the Effective Date, which will, upon conversion of the Reorganized GSC Group Convertible Class B Common Stock, share the same powers, preferences and rights as the Reorganized GSC Group Class A Common Stock.

"Reorganized GSC Group Preferred Stock" shall mean Reorganized GSC Group Series A Preferred Stock and Reorganized GSC Group Series B Preferred Stock.

"Reorganized GSC Group Series A Preferred Stock" shall have the terms and conditions set forth in the Certificate of Designation and on Exhibit C hereto.

"Reorganized GSC Group Series B Preferred Stock" shall have the terms and conditions set forth in the Certificate of Designation and on Exhibit C hereto.

"Reorganized GSC Group Stock" means Reorganized GSC Group Preferred Stock and Reorganized GSC Group Common Stock.

"Reorganized GSC Group" means GSC Group, Inc., as reorganized pursuant to this Plan.

"Reserved Trust Units" means those Trust Units in an amount necessary to cover (i) the aggregate Estimated Claim Amounts of (i) those General Unsecured Claims that have elected the Combination Cash Option and that are Disputed, and (ii) those General Unsecured Claims that have elected the Equity Option and that are Disputed.

"Residual Estate Assets" means: (i) all of the Estate Assets other than the Management Contracts, the list of agreements (as set forth in Exhibit A of the Plan Supplement) that will vest with the Reorganized Debtors pursuant to the Plan, and the Residual Plan Cash: and (ii) the rights of the Chapter 11 Trustee to distributions from the Escrow Funds or the Straddle Tax Letter of Credit.

"Residual Plan Cash" means the Pro-Rata Share of the Remaining Plan Cash allocable to Holders of Allowed General Unsecured Claims that have elected the Equity Option.

"Sale Order" means the Order entered by Chief Judge Gonzalez on July 11, 2011 (I) Authorizing Sale of Assets and Assignment of Executory Contracts Pursuant to Certain Asset Purchase Agreements and Related Documents; (II) Authorizing the Payment of *De Minimis* Prepetition Franchise Taxes; and (III) Granting Related Relief [Docket No. 668].

"SEC" means the Securities and Exchange Commission.

"Secured Claim" means a Claim against any Debtor that is secured by a Lien on, or security interest in, property of such Debtor, which value shall be determined as provided in sections 506(a) or 553 of the Bankruptcy Code.

"Sellers" means GSCP (NJ), L.P., GSCP (NJ) Holdings, L.P., GSCP (NJ), Inc., GSC Group, Inc. and GSCP, LLC.

"Services Agreement" means that certain services agreement dated July 26, 2011 between GSCP (NJ) L.P. and GSC Acquisition Holdings, LLC.

"Side Letter" means that certain letter agreement dated May 23, 2011 between GSC Acquisition Holdings LLC and the Sellers.

"SIF" means GSC Secondary Interest Fund, LLC.

"Straddle Tax" means any amount of federal, state or local tax liability (including interest and penalties), including any liability arising from payments to the Debtors under the Agreed Stipulated Order, for which one or more Debtors or the Liquidating Trust is liable, that would not have been payable by such Debtors or Liquidating Trust if the Trustee's Plan had been consummated in 2011.

"Straddle Tax Filing Party" means, prior to the Effective Date, the Chapter 11 Trustee (on behalf of the Debtors) or, on or after the Effective Date, the Reorganized Debtors entitled to file a tax return reflecting any Straddle Tax.

"Straddle Tax Indemnified Party" means each of the Debtors, the Chapter 11 Trustee, the Liquidating Trustee, the Liquidating Trust and their respective successors and permitted assignees indemnified by Black Diamond and the Designated Purchaser for any claim or liability whatsoever for any Straddle Tax as set forth in Section 5.11 herein.

"Straddle Tax Letter of Credit" means, at Black Diamond's option, in lieu of the Escrow Funds, a letter of credit in the amount of $4 million to be used exclusively for payment of the Straddle Tax as set forth in the Agreed Stipulated Order and Section 5.11 herein. The amount of the Straddle Tax Letter of Credit shall be reduced, from time to time, by the portion of any cash distributions made by the Debtors or the Reorganized Debtors, as applicable, or the Liquidating Trust or Liquidating Trustee, as applicable, that would be attributable to the claims held by Holders of General Unsecured Claims who elect the Equity Option.

"State Court Proceeding" means that certain action in the New York Supreme Court, County of New York styled Credit Agricole Corporate and Investment Bank New York Branch,

*et al*. v. Black Diamond Commercial Finance, L.L.C., *et al*., captioned at Index No. 651989/2010 (Sup. Ct. N.Y. Co.).

"Swap" means the $97 million notional principal interest rate hedge contract with CALNY entered into in accordance with the terms of the Prepetition Credit Agreement.

"Tax Code" means the Internal Revenue Code of 1986, as amended an in effect of the date hereof.

"Tax Indemnification Agreement" means that certain agreement dated July 26, 2011 by and among the Sellers, the Chapter 11 Trustee and the GSC Acquisition Holdings LLC, as amended by this Plan (i) to increase the aggregate permitted amount of the Designated Prepetition Unsecured Creditors Distribution (as defined in the Tax Indemnification Agreement) from $4.6 million to up to $6.6 million and (ii) such that the reference to $7 million in section 4.6(e) of the Tax Indemnification Agreement shall be deemed to be amended to $8 million and that such amount shall be available for the winddown of the estate and that it shall not be included in the calculation of "Residual Cash" as defined in the Tax Indemnification Agreement.

"Transition Services Agreement" means that certain agreement dated July 26, 2011 among GSCP (NJ) L.P., GSCP (NJ) Holdings, L.P., GSCP (NJ), Inc., GSC Group, Inc., and GSCP, LLC and GSC Acquisition Holdings LLC.

"Trust Units" means interests in the Liquidating Trust distributed to (i) Holders of General Unsecured Claims who have elected the Combination Cash Option pursuant to Section 4.2 of this Plan, and (ii) Reorganized GSC Group on account of those interests in the Liquidating Trust that would have been allocable to Holders of General Unsecured Claims who have elected the Equity Option had they instead elected the Combination Cash Option.

"Trustee's Plan" means the *Chapter 11 Trustee's Modified Joint Chapter 11 Plan for GSC Group, Inc. and its Affiliated Debtors Other Than GSC Secondary Interest Fund, LLC* [Docket No. 981].

"Up-front Cash Distribution Share" means, for any Holder of an Allowed General Unsecured Claim who elects or is deemed to elect the Up-front Cash Option, its Pro Rata Share of Up-front Option Plan Cash.

"Up-front Cash Option" means the election or deemed election by a Holder of a General Unsecured Claim to accept Up-front Option Plan Cash in exchange for its claim pursuant to the terms set forth in Section 4.2.

"Up-front Option Plan Cash" means Remaining Plan Cash, plus $2.0 million of proceeds of the BDCM Loan.

"U.S. Trustee" means the United States Trustee for Region 2.

"Unimpaired" means, with respect to any Claim or Equity Interest, such Claim or Equity Interest that is not Impaired.

"UST Fees" means all fees payable pursuant to section 1930 of title 28 of the United States Code or accrued interest thereon arising under section 3717 of title 31 of the United States Code.

"Voting Deadline" means the date established by an order of the Bankruptcy Court as the deadline for the return of ballots accepting or rejecting this Plan.

Section 1.2 *Rules of Interpretation and Computation of Time*

(a) For purposes of this Plan: (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (ii) any reference in this Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document substantially shall be in such form or substantially on such terms and conditions; (iii) any reference in this Plan to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented; (iv) unless otherwise specified, all references in this Plan to sections, articles and exhibits are references to sections, articles and exhibits of or to this Plan; (v) the words "herein" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (vi) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (vii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (viii) any term used in capitalized form in this Plan that is not defined in this Plan but is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

(b) In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II

## RESOLUTION OF INTER-DEBTOR ISSUES

Section 2.1 *Substantive Consolidation of Debtors for Purposes of Voting, Confirmation and Distribution*

(a) This Plan contemplates the substantive consolidation of the Debtors solely for purposes of voting, confirmation, and making distributions to the Holders of Allowed Claims against the Debtors under this Plan. On the Effective Date, and solely for purposes of voting, confirmation, and making distributions to the Holders of Allowed Claims against the Debtors under this Plan, the following shall take place in the following order: (i) the Intercompany Subrogation Claims shall be setoff against the NJLP Intercompany Claims such that the NJLP Intercompany Claims are reduced by an amount equal to the fair market value of the assets sold by the Guarantor Sellers pursuant to APA 1 and APA 2 and immediately following such setoffs, all Intercompany Claims shall be deemed eliminated, canceled, released and of no further effect; (ii) all guarantees of any Debtor of the payment, performance or collection of another Debtor

with respect to Claims against such Debtor shall be eliminated and cancelled and Claims on account thereof shall be released and of no further effect; and (iii) any single obligation of multiple Debtors shall be treated as a single obligation in the Debtors' Estates.

(b) Notwithstanding the substantive consolidation of the Debtors for the purposes set forth in Section 2.1(a), each Debtor shall calculate and pay UST Fees in respect of all disbursements, including disbursements in and outside of the ordinary course of business, until the entry of a Final Decree in the Chapter 11 Cases, dismissal of the Chapter 11 Cases, or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

(c) The substantive consolidation of the Debtors for the limited purposes set forth in Section 2.1(a)shall not affect (i) the legal or organizational structure of the Debtors or (ii) the assertion of or defenses to any Causes of Action.

(d) The substantive consolidation of the Debtors for the limited purposes set forth in Section 2.1(a)shall not give rise to the creation of Causes of Action to the extent such Causes of Action do not exist prior to the substantive consolidation.

## ARTICLE III

## UNCLASSIFIED CLAIMS

Section 3.1 *Administrative Claims*

Except for: (a) professionals requesting compensation or reimbursement for Professional Fees; (b) UST Fees; and (c) Holders of Administrative Claims who were required to file proofs of such Administrative Claims incurred on or before August 31, 2011 in accordance with the Initial Administrative Claims Bar Date Order, requests for payment of Administrative Claims must be made and billed no later than 90 days after the Effective Date. **Holders of Administrative Claims who are required to file a request for payment of such Claims and who do not file such requests by the Plan Administrative Claims Bar Date shall be forever barred from asserting such Claims against the Debtors, the Reorganized Debtors, the Liquidating Trust or their property, and the Holder thereof shall be enjoined from commencing or continuing any action to collect, offset or otherwise recover such Administrative Claim.**

Each Holder of an Allowed Administrative Claim shall receive from the Reorganized Debtors, in full satisfaction and discharge thereof, Cash equal to the unpaid amount of such Allowed Administrative Claim (except to the extent that such Holder agrees to less favorable treatment thereof) either on, or as soon as practicable after, the latest of (a) the Effective Date; (b) the date on which such Administrative Claim becomes Allowed; (c) the date on which such Administrative Claim becomes due and payable; and (d) such other date as mutually may be agreed to by such Holder, the Liquidating Trustee, or the Reorganized Debtors, as the case may be. Notwithstanding the foregoing, any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto.

Section 3.2 *Priority Tax Claims*

Each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction and discharge thereof, Plan Cash equal to the unpaid amount of such Allowed Priority Tax Claim (except to the extent that such Holder agrees to less favorable treatment thereof) either on, or as soon as practicable after, the latest of (a) the Effective Date; (b) the date on which such Priority Tax Claim becomes Allowed; (c) the date on which such Priority Tax Claim becomes due and payable; and (d) such other date as mutually may be agreed to by such Holder and the Chapter 11 Trustee, the Liquidating Trustee or the Reorganized Debtors, as the case may be; *provided*, *however*, that the Chapter 11 Trustee, the Liquidating Trustee or the Reorganized Debtors, as the case may be, shall be authorized, at their option, and in lieu of payment in full of an Allowed Priority Tax Claim, to make deferred Cash payments on account thereof in the manner and to the extent permitted under section 1129(a)(9)(C) of the Bankruptcy Code.

Section 3.3 *Professional Fees*

The Chapter 11 Trustee and each Professional requesting compensation pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code for services rendered in connection with the Chapter 11 Cases prior to the Effective Date shall File an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Cases on or before the 60th day following the Effective Date. Without limiting the foregoing, the Liquidating Trustee or the Reorganized Debtors may pay the charges incurred by the Debtors or the Chapter 11 Trustee on and after the Effective Date for any Professional's fees, disbursements, expenses or related support services, without application to, or approval by, the Bankruptcy Court.

Black Diamond has waived its rights to receive any substantial contribution award that would be payable from or otherwise affect or impact the distributions to be made by the Liquidating Trust.

Section 3.4 *United States Trustee Statutory Fees*

To the extent required by applicable law, the Debtors, the Liquidating Trustee, the Chapter 11 Trustee and the Reorganized Debtors, as applicable, shall pay all UST Fees on all disbursements, including, to the extent required by applicable law, Plan payments and disbursements in and outside the ordinary course of the Debtors' business, until the entry of a Final Decree, dismissal of the Chapter 11 Cases, or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

## ARTICLE IV

## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

Section 4.1 *Classification*

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including for purposes of voting, confirmation and distribution pursuant to this Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that

11-14653-scc Doc 1212-1 Filed 02/07/13 Entered 02/07/13 23:30:20 Exhibit 1 Pg 22 of 66

such Claim or Equity Interest qualifies within the description of such Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest has not been paid or otherwise settled prior to the Effective Date.

Claims (except for Administrative Claims and Priority Tax Claims, which are not required to be classified pursuant to section 1123(a)(1) of the Bankruptcy Code) are classified as follows:

(a) Class 1—Secured Claims

(b) Class 2—Other Priority Claims

(c) Class 3—General Unsecured Claims

(d) Class 4 – Preferred Equity Interests

(e) Class 5—Remaining Equity Interests

Section 4.2 *Treatment and Voting Rights of Claims and Equity Interests*

(a) Class 1—Secured Claims

(i) *Treatment*: Each Holder of an Allowed Secured Claim shall receive either (A) payment in full in Plan Cash on the latest of (I) the Effective Date; (II) the date on which such Secured Claim becomes Allowed; (III) the date on which such Secured Claim otherwise is due and payable; or (IV) such other date as mutually may be agreed to by and between such Holder and the Chapter 11 Trustee, the Liquidating Trustee, or the Reorganized Debtors, as the case may be; or (B) its collateral.

(ii) *Voting*: Class 1 is Unimpaired. Holders of Secured Claims are presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

(b) Class 2—Other Priority Claims

(i) *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive Plan Cash in an amount sufficient to pay the Claim in full or otherwise leave unaltered the legal, equitable and contractual rights to which such Claim entitles such Holder on, or as soon as practicable after, the latest of (A) the Effective Date (but not later than 30 days after the Effective Date); (B) the date on which such Other Priority Claim becomes Allowed; (C) the date on which such Other Priority Claim otherwise is due and payable; and (D) such other date as mutually may be agreed to by and among such Holder and the Chapter 11 Trustee, the Liquidating Trustee, or the Reorganized Debtors, as the case may be.

(ii) *Voting*: Class 2 is Unimpaired. Holders of Other Priority Claims are presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

(c) Class 3—General Unsecured Claims

(i) *Treatment*: Each Holder of an Allowed General Unsecured Claim shall be permitted to elect the Up-front Cash Option, the Combination Cash Option, or the Equity Option.

Subject to Section 7.4, if such Holder elects the Up-front Cash Option, such Holder shall receive its Up-front Cash Distribution Share on, or as soon as practicable after, the latest of (I) the Effective Date (but not later than 30 days after the Effective Date); (II) the date on which such General Unsecured Claim becomes Allowed; (III) the date on which such General Unsecured Claim otherwise is due and payable; and (IV) such other date as mutually may be agreed to by and among such Holder and the Chapter 11 Trustee, the Liquidating Trustee, or the Reorganized Debtors, as the case may be.

Subject to Section 7.4, if such Holder elects the Combination Cash Option, such Holder shall receive (A) its Combination Cash Distribution Share and (B) its Pro Rata Share of Trust Units, in each case, on, or as soon as practicable after, the latest of (I) the Effective Date (but not later than 30 days after the Effective Date); (II) the date on which such General Unsecured Claim becomes Allowed; (III) the date on which such General Unsecured Claim otherwise is due and payable; and (IV) such other date as mutually may be agreed to by and among such Holder and the Chapter 11 Trustee, the Liquidating Trustee, or the Reorganized Debtors, as the case may be.

Subject to Section 7.4, if such Holder elects the Equity Option, such Holder shall receive:

(A) one share of Reorganized GSC Group Series B Preferred Stock with a liquidation preference equal to the lesser of (i) the face amount of such Holder's Allowed General Unsecured Claim and (ii) a pro rata portion of 80% of the net asset value of Reorganized GSC Group as of the Effective Date; and

(B) such Holder's Equity Distribution Share of Reorganized GSC Convertible Class B Common Stock. The Reorganized GSC Group B Common Stock will comprise between 33% and 49%, at BDCM's discretion and as set forth in the Plan Supplement, of the common stock of Reorganized GSC Group (and 24.9% of the voting power) and will be convertible upon majority vote of the holders of such Reorganized GSC Group Convertible Class B Common Stock on a one-for-one basis to shares of Reorganized

GSC Group Class C Common Stock, which will, upon exercise of such conversion, comprise 49% of the common stock of Reorganized GSC Group (and hold 49% of the voting rights).

If a Holder of a General Unsecured Claim, whether Disputed or Allowed, does not elect either the Up-front Cash Option, the Combination Cash Option or the Equity Option on or before the Voting Deadline, such Holder will be deemed to have elected the Up-front Cash Option. Holders of Allowed General Unsecured Claims arising on account of executory contracts or unexpired leases that are rejected pursuant to Section 6.2 herein will have the opportunity to elect the Up-front Cash Option, the Combination Cash Option, or the Equity Option in accordance with Section 6.3 of this Plan.

With respect to any Holder of a General Unsecured Claim who elects the Equity Option, Reorganized GSC Group shall be entitled to (A) the Combination Cash Distribution Share and (B) the Pro Rata Share of Trust Units that such Holder would have received had such Holder elected the Combination Cash Option.

(ii)     *Voting*: Class 3 is Impaired. Holders of General Unsecured Claims are entitled to vote to accept or reject this Plan.

(d)     Class 4 — Preferred Equity Interests

(i)     *Treatment*: On the Effective Date, all Preferred Equity Interests shall be cancelled and extinguished and Holders of Preferred Equity Interests shall be issued Reorganized GSC Group Class A Common Stock, according to the Pro Rata Share of Preferred Equity Interests they held, equal to between 51% and 67%, at BDCM's discretion and as set forth in the Plan Supplement, of total Reorganized GSC Group Common Stock (with 75.1% of voting rights subject to conversion of the Reorganized GSC Group Convertible Class B Common Stock to Reorganized GSC Group Class C Common Stock, at which time the voting rights of such existing Common Equity Interests would be diluted to 51%) as a result of the issuance of the Reorganized GSC Group Class C Common Stock.

(ii)     *Voting*: Class 4 is Impaired. Holders of Preferred Equity Interests are entitled to vote to accept or reject this Plan.

(e)     Class 5 — Remaining Equity Interests

(i)     *Treatment*: Holders of Remaining Equity Interests shall not receive or retain any property or interest in property on account of such Remaining Equity Interests. On the Effective Date, all Remaining Equity Interests shall be cancelled, extinguished and discharged.

(ii)     *Voting*: Class 5 is Impaired. Holders of Remaining Equity Interests are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

Section 4.3     *Cram Down*

With respect to Class 5 (Remaining Equity Interests), BDCM shall request that the Bankruptcy Court confirm this Plan pursuant to section 1129(b) of the Bankruptcy Code as Class 5 is deemed to reject this Plan.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THIS PLAN

Section 5.1     *Formation of the Liquidating Trust*

Notwithstanding the general release of the Chapter 11 Trustee from his duties and obligations in the Chapter 11 Cases, because the Liquidating Trustee shall be RJM1, LLC, an entity affiliated with Capstone Advisory Group, LLC, the Chapter 11 Trustee, and not the Liquidating Trustee, shall have the right to review the fees and expenses incurred by Capstone Advisory Group, LLC before the Effective Date, and the Chapter 11 Trustee and his counsel shall be compensated from the administrative reserve established pursuant to the Liquidating Trust Agreement for any work performed in connection with such review.

On the Effective Date, the Liquidating Trust shall be formed pursuant to the Liquidating Trust Agreement. Confirmation of the Plan shall constitute the appointment of the Liquidating Trustee by the Bankruptcy Court as the representative of the Estates, subject to the Liquidating Trust Agreement, for all purposes. The Liquidating Trustee shall sign the Liquidating Trust Agreement and accept the Residual Estate Assets, including the Liquidating Trust Cash, the Disputed Priority Claims Reserve Amount and the Disputed General Unsecured Claims Cash Reserve Amount, to be transferred to the Liquidating Trust pursuant to Section 5.4 of the Plan on behalf of the beneficiaries thereof, and the Liquidating Trust will then be deemed created and effective without any further action of the Chapter 11 Trustee, the Debtors or the employees, officers, directors, members, partners or shareholders of the Debtors. On the Effective Date, the Chapter 11 Trustee's rights and obligations with respect to the Escrow Funds or the Straddle Tax Letter of Credit, as applicable, shall be transferred to the Liquidating Trust. The Liquidating Trust shall be established for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidating Trust. The beneficiaries of the Liquidating Trust shall be bound by the Liquidating Trust Agreement.

The Liquidating Trust is intended to be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of U.S. Treasury Regulation section 301.7701-4(d), and the Plan, the Liquidating Trust and the Disclosure Statement are intended to comply with the advance-ruling guidelines contained in Rev. Proc. 94-45, 1994-2 C.B. 684, although no advance ruling will be sought for the Liquidating Trust. The Liquidating Trust will be treated as a grantor trust for U.S. federal income tax purposes, all of the assets of which are deemed owned by the Holders of General Unsecured Claims pursuant to Tax Code sections 671 through 677 (or successor provisions). The Liquidating Trustee will file all returns for the Liquidating Trust as a grantor trust pursuant to U.S. Treasury Regulation section 1.671-4(a) (or successor provisions).

The transfers by the GSC Group or its subsidiaries of assets to the Liquidating Trust will be treated for all federal income tax purposes as a transfer of such assets directly to Reorganized GSC Group and the Holders of General Unsecured Claims who have elected the Combination Cash Option at the time of the creation of the Liquidating Trust, followed by the immediate transfer by Reorganized GSC Group and the Holders of General Unsecured Claims of such assets to the Liquidating Trust in exchange for beneficial interests in the Liquidating Trust. Reorganized GSC Group and Holders of General Unsecured Claims who have elected the Combination Cash Option will be treated as the grantors and direct owners of a specified undivided interest in the assets held by the Liquidating Trust for all U.S. federal income tax purposes (such assets will have a tax basis equal to their fair market value on the date transferred to the Liquidating Trust). The Liquidating Trustee shall determine the valuations of the transferred property, such valuations will be used for all U.S. federal income tax purposes, and Reorganized GSC Group and all Holders of General Unsecured Claims who have elected the Combination Cash Option shall be bound by such valuations.

The Liquidating Trustee shall provide to Reorganized GSC Group and the Holders of General Unsecured Claims who have elected the Combination Cash Option an annual statement that will list items of income, deduction and credit applicable to the Liquidating Trust in the taxable year. The statement also will clearly specify the portion of the total items that is attributed to (a) Reorganized GSC Group and (b) each Holder of a General Unsecured Claim who has elected the Combination Cash Option. The character of items of income, deduction and credit to any General Unsecured Creditor who has elected the Combination Cash Option, and the ability of such General Unsecured Creditor who has elected the Combination Cash Option to benefit from any deduction or losses will depend on the particular situation of such General Unsecured Creditor. In addition, the character of items of income, deduction and credit to Reorganized GSC Group and the ability of Reorganized GSC Group to benefit from any deduction or losses will depend on the particular situation of Reorganized GSC Group. Reorganized GSC Group and each General Unsecured Creditor who has elected the Combination Cash Option shall pay any tax imposed by any governmental unit on its portion of the income of the Liquidating Trust. The Liquidating Trustee, however, will comply with all withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements.

The Liquidating Trust shall terminate five years from the Effective Date. If warranted by the facts and circumstances and subject to the approval of the Bankruptcy Court upon a finding that an early termination of the Liquidating Trust is appropriate or that an extension of the term of the Liquidating Trust is necessary to the liquidating purpose of the Liquidating Trust, the term of the Liquidating Trust may be terminated early or may be extended for a finite term based on the particular facts and circumstances. For any extension, Bankruptcy Court approval must be obtained within six months of the beginning of the extended term.

Until all of the beneficial interests in the Liquidating Trust can be distributed to the Holders in accordance with the terms of the Plan, the Disputed General Unsecured Claims Cash Reserve will be treated as owning a portion of the assets in the Liquidating Trust. Distributions from the Disputed General Unsecured Claims Cash Reserve will be made to Holders of Disputed Claims in accordance with the Cash Option elected by such Holder when such Claims are subsequently Allowed and will be retained or paid to other beneficiaries when Disputed Claims

are subsequently Disallowed. Distributions from the Disputed General Unsecured Claims Cash Reserve will be made to Reorganized GSC Group when Disputed General Unsecured Claims held by Holders that have elected the Equity Option are subsequently Allowed. The Liquidating Trust shall file all income tax returns with respect to any income attributable to the Disputed General Unsecured Claims Cash Reserve and shall pay the federal, state and local income taxes attributable to the Disputed General Unsecured Claims Cash Reserve, based on the items of income, deduction, credit or loss allocable thereto.

Section 5.2 *Reorganized Debtors*

On the Effective Date, (i) 100% of the Equity Interests in GSC Group, Inc. and the Preferred Equity Interests shall be cancelled, and (ii) Reorganized GSC Group shall distribute, or cause to be distributed, the Reorganized GSC Group Class A Common Stock, the Reorganized GSC Group Convertible Class B Common Stock, and the Reorganized GSC Group Preferred Stock.

On the Effective Date, 100% of the Equity Interests in the Debtors other than GSC Group, Inc. and other than the Preferred Equity Interests shall remain outstanding and shall remain as presently classified.

On the Effective Date, the certificate of incorporation of the Reorganized GSC Group shall be amended in its entirety in substantially the form contained in the Plan Supplement to, among other things, permit the Reorganized Debtors to increase the number of authorized shares, and to establish the rights, preferences, privileges and other terms of each of the Reorganized GSC Group Class A Common Stock, the Reorganized GSC Group Convertible Class B Common Stock, the Reorganized GSC Group Class C Common Stock and Reorganized GSC Group Preferred Stock.

On the Effective Date, the Management Contracts, the list of agreements (as set forth in Exhibit A of the Plan Supplement) that will vest with the Reorganized Debtors pursuant to the Plan, and the Residual Plan Cash shall remain the assets of Reorganized GSC Group and the Residual Estate Assets shall be transferred to the Liquidating Trust pursuant to Section 5.4.

On the Effective Date, the Reorganized Debtors shall establish the Disputed General Unsecured Claims Equity Reserve.

Section 5.3 *Management of the Reorganized Debtors*

On the Effective Date, the Reorganized Debtors' management will revert to the management of the Debtors in place prior to the appointment of the Chapter 11 Trustee in January 2011, as supplemented by Reorganized GSC Group in consultation with BDCM. Such management will conduct all operations and administer the Plan, other than those duties delegated under the terms hereof to the Liquidating Trustee. On the Effective Date, the Chapter 11 Trustee shall be relieved of his duties and obligations to the estate under the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules, including, but not limited to, any obligation to file a final report pursuant to Local Bankruptcy Rule 3022-1, or otherwise; *provided*, *however*, that the Chapter 11 Trustee's rights under the Plan, in general, and specifically, the right of the Chapter 11 Trustee and the Chapter 11 Trustee's professionals to

seek and prosecute claims for compensation in accordance with Section 3.3 hereof, as well as the Chapter 11 Trustee's right to object to the allowance of Professional Fees, shall be fully preserved; *provided*, *further*, *however*, notwithstanding anything to the contrary herein, that the Chapter 11 Trustee shall not be relieved of his duties to make a final report and file a final account pursuant to section 704(a)(9) of the Bankruptcy Code as made applicable by section 1106(a)(1) of the Bankruptcy Code. Notwithstanding the general release of the Chapter 11 Trustee from his duties and obligations in these Chapter 11 Cases provided for in this section, if any Professional retained in these Chapter 11 Cases (or any person affiliated with any Professional in these Chapter 11 Cases) is appointed as Liquidating Trustee, the Chapter 11 Trustee shall retain the right to review and approve any fees of such Professional incurred on or prior to the Effective Date.

Section 5.4 *Capitalization of the Liquidating Trust*

On the Effective Date, the Residual Estate Assets, including the Liquidating Trust Cash, the Disputed Priority Claims Reserve Amount and the Disputed General Unsecured Claims Cash Reserve Amount shall be transferred to the Liquidating Trust. All transfers and contributions made pursuant to this Section 5.4 shall be made free and clear of all Claims, Liens, and Equity Interests, and all setoff and recoupment rights, except as otherwise specifically provided in this Plan or in the Confirmation Order. The Liquidating Trustee and the Liquidating Trust are hereby appointed as successor trustees to the Chapter 11 Trustee for purposes of the Letter of Credit.

Consistent with the terms of the Purchase Agreements, on the Effective Date, all remaining liabilities and obligations of the Debtors, including post-closing obligations of the Sellers under the Purchase Agreements, other than those rights and obligations under the Management Contracts, shall be transferred to the Liquidating Trust; provided, however, that the Indemnified Liabilities shall remain with Reorganized Debtors and be payable from the proceeds of the Letter of Credit and Tax Indemnification Agreement. Without limiting the foregoing, the Liquidating Trustee shall be responsible for the transfer to the Designated Purchaser of any Causes of Action acquired under the Purchase Agreements or any other assets to be transferred on a post-closing basis.

Section 5.5 *Initial Distribution of Trust Units*

On the Effective Date, or as soon as practicable thereafter, Reorganized GSC Group and Holders of Allowed General Unsecured Claims who have elected the Combination Cash Option will receive their Pro-Rata Share of an initial distribution of Trust Units from the Liquidating Trustee. The Reserved Trust Units will be issued but held in reserve on account of estimated Disputed General Unsecured Claims held by Holders who have elected the Combination Cash Option and, for the benefit of Reorganized GSC Group estimated Disputed General Unsecured Claims held by Holders who have elected the Equity Option.

Section 5.6 *Compromise of Controversies*

In consideration for the distributions and other benefits provided under this Plan, the provisions of this Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under this Plan, and the entry of the Confirmation Order shall constitute

10-14653-scc Doc 1210-1 Filed 02/14/12 Entered 02/14/12 23:40:20 Exhibit A Pg 29 of 66

the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

Section 5.7 *Corporate Action*

Upon the Effective Date, by virtue of the solicitation of votes in favor of this Plan and entry of the Confirmation Order, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including, but not limited to, (i) the adoption of the organizational documents for the Reorganized Debtors; (ii) the issuance of the Reorganized Debtors Stock; and (iii) all other actions contemplated by the Plan. All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action or notice by the Debtors, the Chapter 11 Trustee, the Liquidating Trustee, Holders of Equity Interests in the Debtors or directors and officers of the Debtors or the Reorganized Debtors. Upon the Effective Date, the appropriate officers and directors of Reorganized Debtors shall be authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by this Plan (or necessary or desirable to effect the transactions contemplated by this Plan) in the name of an on behalf of the Reorganized Debtors. The authorizations and approvals contemplated in this Section 5.6 shall be effective notwithstanding any requirements under any applicable non-bankruptcy law.

Section 5.8 *Post-Effective Date Governance*

The Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan. Without limiting the generality of the foregoing, as of the Effective Date, each of the Reorganized Debtors shall be governed by their respective Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws.

After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other constituent documents as permitted by the laws of its respective states, provinces, or countries of formation and its respective charters and bylaws**.**

Section 5.9 *Transfer of Post-Petition Agreements*

As of the Effective Date, the Liquidating Trust shall be deemed successor in interest to the Debtors and Chapter 11 Trustee and any rights and obligations under any agreements the Debtors entered into post-petition remaining in effect as of the Effective Date, including, without limitation, the Purchase Agreements, the Services Agreement and the Transition Services Agreement shall be transferred to the Liquidating Trust.

Section 5.10 *Rights Under Tax Indemnification Agreement*

Except for the amendments to the Tax Indemnification Agreement set forth in the definition of "Tax Indemnification Agreement" in Section 1.1 herein, nothing in the Plan or the Confirmation Order shall alter or amend the rights of the parties under the Tax Indemnification Agreement.

Section 5.11 *Straddle Tax Provisions*

The Escrow Funds may not be used and no draw may be made under the Straddle Tax Letter of Credit other than to pay any amount of Straddle Tax. The Escrow Agent shall be entitled to hold the Escrow Funds or the Straddle Tax Letter of Credit shall remain outstanding until the earlier of the closing of the Chapter 11 Cases or such other date as provided for in the Agreed Stipulated Order. When that date has occurred, the Escrow Funds shall be returned to Black Diamond or the Straddle Tax Letter of Credit will be cancelled. In addition, at any time prior to the expiration of such period, the Chapter 11 Trustee (prior to the Effective Date) or the Liquidating Trustee (on or after the Effective Date) shall, upon being advised by a reputable accounting firm retained by such party that no Straddle Tax is payable by the Debtors, return the Escrow Funds to Black Diamond or terminate its right to draw under the Straddle Tax Letter of Credit. The Straddle Tax Filing Party shall be entitled to use the Escrow Funds or draw under the Straddle Tax Letter of Credit to pay any Straddle Tax for which the Designated Purchaser and Black Diamond are providing an indemnification pursuant to the Agreed Stipulated Order. In the event of any direct conflict between the terms of the Agreed Stipulated Order and this Section 5.11, the terms of the Agreed Stipulated Order shall govern and control.

Section 5.12 *BDCM Loan*

Confirmation shall be deemed approval of the BDCM Loan (including any and all transactions contemplated thereby, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and authorization for the Debtors or Reorganized Debtors, as applicable, to enter into and execute any agreement evidencing the BDCM Loan and such other documents as may be required or appropriate to effectuate the treatment afforded to such lenders thereto. The Reorganized Debtors may use the BDCM Loan for any purpose permitted thereunder. Upon the date the BDCM Loan closes, the Debtors and the Reorganized Debtors are authorized to execute and deliver any agreement evidencing the BDCM Loan and perform their obligations thereunder, and such agreement shall constitute the legal, valid and binding obligations of the Reorganized Debtors which are parties thereto, enforceable in accordance with their respective terms, and no obligation, payment, transfer or grant of security under such agreement (or any other documents as may be required or appropriate to effectuate the treatment afforded to the BDCM Loan lenders) shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff or counterclaim.

The Debtors and the Reorganized Debtors, as applicable, and any other Entities granting any Liens and security interests to secure the obligations under the BDCM Loan are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary or desirable to establish and further evidence perfection of such liens and security interests under the provisions of any applicable federal, state, provincial or other law (whether domestic or foreign) (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

Section 5.13 *Restructuring Transactions*

On or after the Confirmation Date, the Debtors or the Reorganized Debtors, as applicable, may take any and all actions as described in, approved by, contemplated by, necessary or appropriate to effectuate the Plan and preserve the intended benefits thereunder without need of any further court, corporate or other approval, including, without limitation: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, liquidation, dissolution or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (c) the effecting of any transaction or transfer of interests with respect to any of the Debtors; (d) the filing of appropriate certificates of incorporation, merger or consolidation with the appropriate governmental authorities pursuant to applicable law; (e) making any filings or recordings that may be required by applicable law in connection with any of the transactions approved by, contemplated by or necessary or appropriate to effectuate the Plan and preserve the intended benefits thereunder; and (f) all other actions that the Debtors or the Reorganized Debtor determine are necessary or appropriate.

Section 5.14 *Distributions from the Liquidating Trust*

To the extent that, on or as soon as practicable after the Effective Date, Cash distributable to Holders of Allowed General Unsecured Claims who elected the Up-front Cash Option is less than one hundred percent (100%) of such Holders' aggregate Up-front Cash Distribution Shares, in the aggregate, because the Chapter 11 Trustee, in his discretion, withheld from such distribution funds to be used for administration of the Liquidating Trust, any Cash later available for distribution on account of the Trust Units shall be paid first to Holders of Allowed General Unsecured Claims who elected the Up-front Cash Option up to a maximum aggregate amount of one hundred percent (100%) of such Holders' aggregate Up-front Cash Distribution Shares and, in the event that after such payment, there is remaining Cash, Holders of Allowed General Unsecured Claims who elected the Combination Cash Option and Reorganized GSC Group (on account of Allowed General Unsecured Claims whose Holders elected the Equity Option instead of the Combination Cash Option) shall receive their Pro Rata Share of such remaining Cash.

## ARTICLE VI

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 6.1 *Assumption of Management Contracts*

All Management Contracts shall be deemed to be assumed on the Effective Date.

Section 6.2 *Rejection of Executory Contracts and Unexpired Leases*

All executory contracts and unexpired leases that have not been assumed, assumed and assigned, or rejected prior to the Confirmation Date, or for which a motion is not pending for assumption, assumption and assignment, or rejection as of the Confirmation Date, will be deemed rejected as of the Confirmation Date; *provided*, *however*, that any executory contract or

unexpired lease that the Debtors have moved to assume or assume and assign prior to the Confirmation Date, or that BDCM has specifically identified herein or in the Plan Supplement as a contract to be assumed and assigned, shall not be deemed rejected. To the extent that any contract (including any contracts effectuating the novation of any collateral management agreement or any other contract) has not been rejected or assumed by the Debtors and the Chapter 11 Trustee because such contract is no longer executory, the Debtors, the Reorganized Debtors, the Liquidating Trust and the Liquidating Trustee shall have no liability with respect to such contract on and after the Effective Date.

Section 6.3 *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases as of the Confirmation Date, if any, must be Filed within 14 days after the Confirmation Date. Any Claim arising from the rejection of an executory contract or unexpired lease for which proof of such Claim is not Filed within such time period shall forever be barred from assertion against the Debtors, the Estates and their property, the Liquidating Trust or the Reorganized Debtors unless otherwise ordered by the Bankruptcy Court. Any Allowed Claim arising from the rejection of executory contracts or unexpired leases for which proof of such Claim timely has been Filed shall be, and shall be treated as, an Allowed General Unsecured Claim under the terms hereof, subject to any limitation under section 502(b) of the Bankruptcy Code or otherwise. Any Holder of General Unsecured Claims arising on account of executory contracts or unexpired leases that are rejected pursuant to Section 6.2 herein shall have until seven days after the Confirmation Date to elect to receive a distribution under the Up-front Cash Option, the Combination Cash Option, or the Equity Option on account of such Claims (to the extent such Claims are Allowed), provided that if no such election is made (or if more than one option is selected), such Holder will be deemed to have elected the Up-front Cash Option on account of such Claims.

## ARTICLE VII

## PROVISIONS GOVERNING DISTRIBUTIONS

Section 7.1 *General Distribution Provisions*

Except as otherwise provided in this Plan, any distribution to be made hereunder shall be made on, or as soon as practicable after, the Effective Date (but not later than 30 days after the Effective Date). Any payment or act required to be made or done hereunder on a day that is not a Business Day shall be made on the next succeeding Business Day.

Notwithstanding anything to the contrary, distributions to Holders of Allowed Claims and Equity Interests shall be made to Holders of record as of the Confirmation Date. The Debtors or Reorganized Debtors, as applicable, shall have the authority to (i) enter into agreements with one or more Distribution Agents to facilitate distributions hereunder (and any Distribution Agent engaged by the Debtors or Reorganized Debtors shall be entitled, as directed by the Reorganized Debtors, to make those distributions that pursuant to the Plan the Reorganized Debtors would otherwise have made) and (ii) make (or cause any Distribution Agent to make) distributions of any shares of Reorganized GSC Group Stock through the facilities of The Depository Trust

10-14653-scc Doc 1210-1 Filed 02/14/12 Entered 02/14/12 23:40:50 Exhibit 1 Pg 33 of 66

Company (or its successors or assigns). The Reorganized Debtors shall make (or cause a Distribution Agent to make) distributions (other than any distribution of Trust Units) to any Holder of a Claim or Equity Interest who is entitled to distribution under the Plan and whose Claim or Equity Interest is Allowed on or before the Effective Date. The Reorganized Debtors shall also make (or cause a Distribution Agent to make) distributions to any Holder of a General Unsecured Claim who elected the Equity Option and whose Claims become Allowed after the Effective Date and any Holder of a Preferred Equity Interest whose Equity Interest becomes Allowed after the Effective Date. The Liquidating Trustee shall make Cash distributions in accordance with the Plan to any Holder of a General Unsecured Claim who elected a Cash Option and whose Claim becomes Allowed after the Effective Date. The Liquidating Trustee shall also (i) make distributions to Holders of Secured Claims, Priority Tax Claims, or Other Priority Claims whose Claims become Allowed after the Effective Date and (ii) distribute Trust Units to (a) Reorganized GSC Group and (b) any Holder of General Unsecured Claims who elected the Combination Cash Option whenever such Holder's General Unsecured Claims become Allowed. Distributions made on account of Claims or Equity Interests that became Allowed on or before the Effective Date shall take into account an estimated amount (as agreed by the Chapter 11 Trustee and BDCM) of Disputed Claims that may later become Allowed Claims. Except as otherwise provided in the Plan, Holders of Claims or Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. On the Effective Date, all certificates or other instruments evidencing the Preferred Equity Interests shall be deemed surrendered to the Reorganized Debtors

Section 7.2 *Establishment of Disputed General Unsecured Claims Reserves*

On, or as soon as practicable after, the Effective Date (but not later than 30 days after the Effective Date), the Reorganized Debtors, in consultation with the Liquidating Trustee and BDCM, shall establish (a) the Disputed General Unsecured Claims Cash Reserve and Reserved Trust Units required to be set aside on account of Disputed General Unsecured Claims held by Holders who elected the Cash Options and Reorganized GSC Group's right to the Cash and Trust Units that would otherwise have been allocable to any Holder of General Unsecured Claims who elected the Equity Option had such Holder instead elected the Combination Cash Option, and the Liquidating Trustee shall maintain the Disputed General Unsecured Claims Cash Reserve and the Reserved Trust Units; and (b) the number of shares of Reorganized GSC Group Stock required to be set aside on account of Disputed General Unsecured Claims held by Holders who elected the Equity Option and such Disputed General Unsecured Claims Equity Reserve shall be maintained by the Reorganized Debtors.

Section 7.3 *Establishment of Disputed Priority Claims Reserve*

On the Effective Date or as soon thereafter as is practicable, the Reorganized Debtors shall establish, in consultation with the Liquidating Trustee and BDCM, the Disputed Priority Claims Reserve for any Up-front Option Plan Cash or Combination Option Plan Cash, as applicable, required to be set aside on account of Disputed Priority Tax Claims and Disputed Other Priority Claims in the amount of the Disputed Priority Claims Reserve Amount. The Disputed Priority Claims Reserve shall be maintained by the Liquidating Trustee.

Section 7.4 *Liquidating Trust, Reorganized Debtors, Distribution Agent, Disputed Unsecured Claims Reserves and Disputed Priority Claims Reserve Distributions*

(a) Periodically, the Liquidating Trustee or the Reorganized Debtors, as the case may be, may make ratable distributions of the Liquidating Trust's available Cash and Reserved Trust Units, or the Reorganized Debtors' Reorganized GSC Group Stock, to the respective Disputed General Unsecured Claims Reserves for the benefit of Holders of Disputed Claims. If a Disputed General Unsecured Claim (including claims pursuant to Section 6.2 herein) becomes Allowed, the Liquidating Trustee or the Distribution Agent, as the case may be, shall make, as applicable, either a (i) Catch-Up Up-front Cash Distribution, (ii) a Catch-Up Combination Cash Distribution or (iii) a Catch-Up Equity Distribution. If a Disputed Priority Tax Claim becomes Allowed, the Liquidating Trustee shall make distributions from the Disputed Priority Claims Reserve to the Holder thereof in accordance with Section 3.2. If a Disputed Other Priority Claim becomes Allowed, the Liquidating Trustee shall make distributions from the Disputed Priority Claims Reserve to the Holder thereof in accordance with Section 4.2(b). Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Equity Interest until all such disputes in connection with such Disputed Claim or Equity Interest have been resolved by settlement or Final Order.

(b) If a Disputed General Unsecured Claim, or portion thereof, is Disallowed, (i) the Liquidating Trustee shall distribute to or for the benefit of Reorganized GSC Group and the Holders of all then Allowed General Unsecured Claims that have elected one of the Cash Options their Pro-Rata Share of the Up-Front Option Plan Cash or Combination Option Plan Cash and Reserved Trust Units, as the case may be, allocable to such Disallowed General Unsecured Claim or (ii) the Reorganized Debtors or the Distribution Agent, as applicable, shall distribute to or for the benefit of all the Holders of all then Allowed General Unsecured Claims that have elected the Equity Option their Equity Distribution Share of the Reorganized GSC Group Stock allocable to such Disallowed General Unsecured Claim, in each case, on such date as the Liquidating Trustee shall deem to be reasonable. If a Disputed Priority Tax Claim or Disputed Other Priority Tax, or portion thereof, is Disallowed, the Liquidating Trustee shall transfer the Plan Cash allocable to such Disallowed Priority Tax Claim or Other Priority Claim to the Disputed General Unsecured Claim Cash Reserve for the benefit of the Holders of Allowed General Unsecured Claims who have elected one of the Cash Options, to be distributed to such Holders in their Pro-Rata Share, on such date as the Liquidating Trustee shall deem to be reasonable.

Section 7.5 *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

(a) *General*. Any distribution to be made hereunder to a Holder of an Allowed Claim shall be made to the address of such Holder as set forth in the books and records of the Debtors or their agents, or in a letter of transmittal, unless the Debtors have been notified in writing of a change of address, including by the Filing of a proof of claim by such Holder that contains an address for such Holder that is different from the address reflected on such books and records or letter of transmittal.

(b) *Undeliverable Distributions*. In the event that any distribution or notice provided in connection with the Chapter 11 Cases to any Holder of an Allowed Claim is returned to the Liquidating Trustee or the Reorganized Debtors (or the Distribution Agent, as applicable) as undeliverable or otherwise is unclaimed, the Liquidating Trustee and the Reorganized Debtors (or the Distribution Agent, as applicable) shall make no further distribution to such Holder unless and until the Liquidating Trustee and the Reorganized Debtors (or the Distribution Agent, as applicable) are notified in writing of such Holder's then current address. On, or as soon as practicable after, the date on which a previously undeliverable or unclaimed distribution becomes deliverable and claimed, the Liquidating Trustee or the Reorganized Debtors (or the Distribution Agent, as applicable) shall make such distribution without interest thereon. Any Holder of an Allowed Claim that fails to assert a Claim hereunder for an undeliverable or unclaimed distribution within 180 days after the Effective Date shall be deemed to have forfeited its Claim for such undeliverable or unclaimed distribution and shall forever be barred and enjoined from asserting such Claim against any of the Debtors, the Estates, or the Reorganized Debtors or their property. Any Cash amounts in respect of undeliverable or unclaimed distributions for which a Claim is not made within such 180-day period shall be forfeited to the Liquidating Trustee. Nothing contained herein shall require, or be construed to require, the Debtors, the Reorganized Debtors, the Distribution Agent or the Liquidating Trustee to attempt to locate any Holder of an Allowed Claim.

Section 7.6 *Setoff and Recoupment*

In the event the Debtors have a claim of any nature whatsoever against a Holder of a Claim, the Debtors, the Reorganized Debtors, or the Liquidating Trustee may, but are not required to, setoff against such Holder's Claim (and any distributions or other rights to receive property arising out of such Claim under this Plan), the Debtors' claim against such Holder, subject to the provisions of section 553 of the Bankruptcy Code and other applicable law. Neither the failure to setoff nor the allowance of any Claim under this Plan shall constitute a waiver or release by the Debtors, the Reorganized Debtors, or the Liquidating Trustee of any Claims that the Debtors, the Reorganized Debtors or the Liquidating Trustee have against the Holder of such Claim, all of which are preserved. Nothing contained or omitted from this Plan shall limit, adversely affect, or otherwise impair any rights of setoff or recoupment the Debtors, the Reorganized Debtors or the Liquidating Trustee may possess, as against third parties.

Section 7.7 *Manner of Payment Under Plan*

The Liquidating Trustee, the Reorganized Debtors, and the Distribution Agent shall be authorized to make any Cash payment required to be made hereunder by check or wire transfer, each in their discretion.

## ARTICLE VIII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

Section 8.1 *Prosecution of Objections to Claims*

After the Effective Date, (i) the Reorganized Debtors shall have the authority to file, withdraw or litigate to judgment objections to Claims and Equity Interests, and shall be permitted to settle or compromise any such Disputed Claim or Equity Interest without need of approval of the Bankruptcy Court, (ii) the Liquidating Trustee shall have the authority to file, withdraw or litigate to judgment objections to Claims (other than the claims of 888 Seventh Avenue LLC or David Robbins) and (iii) BDCM (subject to the limitations set forth in the Agreed Stipulated Order) shall have the authority to object to Administrative Claims and General Unsecured Claims that elected the Combination Cash Option or the Equity Option. Each of the Liquidating Trustee and the Reorganized Debtors shall be permitted to settle or compromise any Disputed Claim or Equity Interest to which it objected without need of approval of the Bankruptcy Court; *provided*, *however*, that if more than one such party has objected, both parties shall be required to approve any such settlement or compromise.

Section 8.2 *Estimation of Claims*

Before or after the Effective Date, the Reorganized Debtors, the Chapter 11 Trustee (prior to the Effective Date) or the Liquidating Trustee (on or after the Effective Date), as the case may be, shall be permitted, at any time, to request that the Bankruptcy Court estimate, pursuant to section 502(c) of the Bankruptcy Code, any contingent or unliquidated Claim that the Reorganized Debtors or the Liquidating Trustee, as the case may be, is entitled to object to under Section 8.1 herein, regardless of whether the Chapter 11 Trustee, the Liquidating Trustee or the Reorganized Debtors, as the case may be, previously had objected to such Claim or whether the Bankruptcy Court had ruled on such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during any litigation concerning any objection to such Claim, including during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If such estimated amount constitutes a maximum limitation on the amount of such Claim, the Chapter 11 Trustee (before the Effective Date) and the Liquidating Trustee (on or after the Effective Date), as the case may be, may elect to pursue any supplemental proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

Section 8.3 *Payments and Distributions on Disputed Claims*

Notwithstanding any other provision to the contrary herein, no payments or distributions shall be made hereunder with respect to all or any portion of any Disputed Claim unless and until all objections to such Disputed Claim have been settled, withdrawn, or determined by Final

Order, and such Disputed Claim has become an Allowed Claim. In no event shall a Disputed Claim be Allowed in an amount in excess of its filed amount.

## ARTICLE IX

## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE

Section 9.1 *Conditions Precedent to Confirmation*

The Confirmation Order shall not be entered unless and until such Confirmation Order is in form and substance reasonably satisfactory to BDCM and the Chapter 11 Trustee. It shall be a condition to confirmation of this Plan that all provisions, terms and conditions in this Plan shall have been approved in the Confirmation Order or waived pursuant to the provisions of Section 9.3 below.

Section 9.2 *Conditions Precedent to the Effective Date*

The Effective Date shall not occur unless and until each of the following conditions has occurred or has been waived in accordance with the terms herein:

(a) the Confirmation Order shall have become a Final Order;

(b) all other documents and agreements necessary to implement the terms of this Plan, including the Liquidating Trust Agreement, have been executed and delivered;

(c) there exists sufficient Cash to pay Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Claims, and Allowed Other Priority Claims, other than Claims assumed by the Liquidating Trust or the Reorganized Debtors, and to fund the Disputed Priority Claims Reserve;

(d) all UST Fees payable prior to the Effective Date shall have been paid;

(e) all other actions necessary to implement the terms of this Plan shall have been taken; and

(f) the BDCM Loan shall have closed in accordance with its terms.

Section 9.3 *Waiver of Conditions*

Any condition set forth in this Article IX may be waived, in whole or in part, at any time by BDCM.

Section 9.4 *Modification of Plan*

BDCM shall be permitted to amend, supplement or modify this Plan at any time, subject to the restrictions and requirements under section 1127 of the Bankruptcy Code and the Agreed Stipulated Order.

Section 9.5 *Effect of Withdrawal or Revocation*

BDCM reserves the right to revoke or withdraw this Plan at any time prior to the Confirmation Date. If this Plan is so revoked or withdrawn, or if the Effective Date fails to occur, then this Plan shall be deemed null and void in its entirety, and of no force or effect. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim against or Equity Interest in any Debtor or any other Entity, or to prejudice in any manner, in any further proceedings involving any Debtor, the rights of any Debtor or any other Entity.

Section 9.6 *Reservation of Rights*

This Plan shall have no force or effect unless and until the Confirmation Order is entered after the Effective Date occurs. Prior to the Effective Date, none of the Filing of this Plan, any statement or provision contained in this Plan, or action taken by the Debtors or BDCM with respect to this Plan shall be, or shall be deemed to be, an admission or waiver of any rights of any Debtor or any other party with respect to any Claims or Equity Interests or any other matter.

Section 9.7 *Substantial Consummation of Plan*

Substantial consummation of this Plan under Bankruptcy Code section 1101(2) shall be deemed to occur on the Effective Date.

## ARTICLE X

## EFFECT OF PLAN CONFIRMATION

Section 10.1 *Binding Effect*

This Plan shall be binding upon and inure to the benefit of the Debtors, the Chapter 11 Trustee, BDCM, all current and former Holders of Claims and Equity Interests, and their respective successors and assigns.

Section 10.2 *Preservation of All Causes of Action*

(a) Except as otherwise provided in this Plan (including, but not limited to, subparagraph (b) of this Section 10.2), in a final and non-appealable order of the Bankruptcy Court, or in any contract, instrument, release or agreement entered into in connection with this Plan, in accordance with the provisions of the Bankruptcy Code (including but not limited to section 1123(b) of the Bankruptcy Code), on and after the Effective Date, the Liquidating Trustee shall be vested with, retain, and may exclusively enforce and prosecute any Causes of Action that the Debtors or the Estates may have against any Person or Entity that has not been released pursuant to Section 10.5 herein, including, but not limited to, the Avoidance Actions

and the Director and Officer Causes of Action. The Liquidating Trustee may pursue such retained Causes of Action in accordance with the best interests of the creditors of the Debtors, the Estates, the Liquidating Trust or the Reorganized Debtors. Without further order of the Bankruptcy Court, the Liquidating Trustee shall be substituted as the party in interest in all adversary proceedings pending on the Effective Date. Notwithstanding anything to the contrary herein, no distribution shall be made to the Holder of any Claim, including by way of setoff or recoupment by such claimant, if the Debtors, the Chapter 11 Trustee (prior to the Effective Date) or the Liquidating Trustee (on and after the Effective Date), as applicable, have taken action to recover, or given notice to the applicable party of intent to take such action, on a Cause of Action against the Holder of such Claim (or the direct or indirect transferor of such Holder), until such Cause of Action is resolved.

(b) From and after July 26, 2012, pursuant to the terms of APA 2, all Causes of Action of, or belonging to, the Estates with respect to which the Chapter 11 Trustee, the Liquidating Trustee or the Reorganized Debtors has not commenced an adversary proceeding, lawsuit or similar legal proceeding, settled or released such Cause of Action, or formally asserted a right of set-off, shall be transferred to the Designated Purchaser. Without further order of the Bankruptcy Court, the Designated Purchaser, or its designee, shall have the exclusive right to enforce and prosecute any such Cause of Action.

Section 10.3 *Discharge of Claims & Interests*

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in this Plan or in the Confirmation Order, confirmation of this Plan discharges and releases, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date), the Debtors and the Estates from all Claims and Causes of Action, whether known or unknown, and from liabilities of, liens on, obligations of, rights against, and Equity Interests in the Debtors or any of their assets or properties; and, further, a Holder of any Claim or Equity Interest discharged herein may not on account of such Claim or Equity Interest seek to receive any payment or other treatment from, or seek recourse against the Debtors, the Liquidating Trustee, the Liquidating Trust or the Reorganized Debtors or their respective property, except as otherwise expressly provided in this Plan.

Section 10.4 *Liquidating Trust as Successor*

The Liquidating Trust shall be the successor to the Debtors, the Chapter 11 Trustee and the Estates for the purposes of sections 1123, 1129 and 1145 of the Bankruptcy Code and with respect to all pending Causes of Action and other litigation- related matters of, or belonging to, the Estates preserved and vested with the Liquidating Trust pursuant and subject to Section 10.2 herein, including but not limited to the Avoidance Actions and the Director and Officer Causes of Action. The Liquidating Trust shall succeed to the attorney-client privilege of the Debtors, the Chapter 11 Trustee and the Estates with respect to such Causes of Action and other litigation-related matters of, or belonging to, the Estates, and the Liquidating Trustee may waive the attorney-client privilege with respect to any such Cause of Action or other litigation-related matter of, or belonging to, the Estates, or portion thereof, in the Liquidating Trustee's discretion. After the Effective Date, the Liquidating Trustee shall have the exclusive authority and standing to file, prosecute, withdraw, settle or compromise, without the approval of the Bankruptcy Court,

those Causes of Action of, or belonging to, the Estates preserved and vested with the Liquidating Trust pursuant and subject to Section 10.2 herein.

Section 10.5 ***Releases***

(a) ***Releases By the Debtors*. For good and valuable consideration, the adequacy of which is hereby confirmed, upon the Effective Date, the Debtors and Reorganized Debtors (collectively, the "*Debtor Releasing Parties*") shall be deemed forever to release, waive and discharge any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, contract, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to the Debtors, the chapter 11 cases, the Disclosure Statement, this Plan or the solicitation of votes on this Plan that such Debtor Releasing Parties would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other entity would have been legally entitled to assert for or on behalf of the Debtors, their Estates or the Reorganized Debtors against any of the Released Parties, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or before the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, this Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors, the Chapter 11 Trustee or the Estates against any of the Released Parties; provided, however, that the foregoing provisions of this release shall not operate to waive or release (i) any Causes of Action expressly set forth in and preserved by this Plan; (ii) any Causes of Action arising from gross negligence, fraud or willful misconduct as determined by final order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (iii) the rights of such Debtor Releasing Parties to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this plan or assumed pursuant to this Plan or assumed pursuant to final order of the Bankruptcy Court, including without limitation the Purchase Agreements. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any person and the Confirmation Order will permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this release. Nothing in this Plan shall limit the liability of the Professionals of the Debtors, the Chapter 11 Trustee or the Reorganized Debtors to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility, N.Y. Comp. Codes R. & Regs. tit. 22 section 1299 Rule 1.8(h)(1)(2011), and any other statutes, rules or regulations dealing with professional conduct to which such professionals are subject. As to the United States, its agencies, departments or agents, nothing in this Plan shall discharge, extinguish, release or otherwise preclude any valid right of setoff or recoupment. Nothing herein shall**

**enjoin the United States from initiating or continuing any criminal, police or regulatory action against the Debtors or the Reorganized Debtors.**

(b) ***Releases By Holders of Claims*****. Upon the Effective Date, each Holder of a Claim or Equity Interest (collectively, the "*Non-Debtor Releasing Parties*" and together with the Debtor Releasing Parties, the "*Releasing Parties*"), in consideration for the obligations of the Debtors, the Reorganized Debtors and the other Released Parties under this Plan and the Cash and other contracts, instruments, releases, agreements or documents to be delivered in connection with this Plan, shall be deemed forever to release, waive and discharge any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, contract, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to the Effective Date arising from or related in any way in whole or in part to the Debtors, the chapter 11 cases, the Disclosure Statement, this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Parties would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties (other than the rights to enforce the obligations of the Debtors, the Reorganized Debtors, the Chapter 11 Trustee, the Liquidating Trust or the Liquidating Trustee under this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered in connection with this Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place before the Effective Date in any way relating to the Debtors, the Chapter 11 Trustee, the Chapter 11 Cases, this Plan or the Disclosure Statement against any of the Released Parties; provided, however, that the foregoing provisions of this release shall not operate to waive or release (i) any Causes of Action expressly set forth in and preserved by this Plan or the Plan Supplement; (ii) any Causes of Action arising from gross negligence, fraud or willful misconduct as determined by final order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (iii) the rights of such Non-Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to final order of the Bankruptcy Court. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any person and the Confirmation Order will permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this release.**

**Notwithstanding anything to the contrary contained herein, for the avoidance of doubt, any and all claims or objections that may be asserted against any Professionals in connection with their requests for Professional Fees incurred through the Effective Date are expressly reserved hereunder.**

Section 10.6 ***Exculpation and Limitation of Liability***

**None of the Released Parties shall have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or Equity Interest, or any other party in interest in the Chapter 11 Cases, or any of their respective agents, employees, representatives, financial advisors, attorneys or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission arising on or after the Petition Date in connection with, relating to or arising out of, the Chapter 11 Cases, formulation, negotiation or implementation of this Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the solicitation of acceptances of this Plan, the pursuit of confirmation of this Plan, the confirmation of this Plan, the administration of this Plan or the property to be distributed under this Plan, except for their gross negligence, willful misconduct, fraud or criminal conduct as determined by a final order entered by a court of competent jurisdiction. Without limiting the generality of the foregoing, the Released Parties shall, in all respects, be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under this Plan.**

**Notwithstanding anything to the contrary contained herein, for the avoidance of doubt, any and all claims or objections that may be asserted against any Professionals in connection with their requests for Professional Fees incurred through the Effective Date are expressly reserved hereunder, provided that any such objections made by Black Diamond are subject to paragraph 12 of the Agreed Stipulated Order.**

Section 10.7 ***Injunction***

(a) ***General*. All Entities who have held, hold or may hold Claims or Equity Interests and all other parties in interest in the Chapter 11 Cases, along with their respective current and former employees, agents, officers, directors, principals and affiliates, permanently are enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors; (ii) enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Debtors; (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors; or (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or against the property or interests in property of the Debtors, on account of such Claims or Equity Interests; *provided, however,* that nothing contained herein shall preclude such Entities from exercising their rights pursuant to and consistent with the terms hereof and the contracts, instruments, releases, indentures and other agreements and documents delivered under or in connection with this Plan. As to the United States, its agencies, departments or agents, nothing in this Plan or the Confirmation Order shall discharge, extinguish, release or otherwise preclude any valid right of setoff or recoupment. Nothing herein shall enjoin the United States its agencies, departments or agents, from initiating or continuing any criminal, police or regulatory action against the Debtors.**

(b) ***Injunction Against Interference With Plan*. Upon entry of the Confirmation Order, all Holders of Claims and Equity Interests and their respective current and former employees, agents, officers, directors, principals and affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan. Each Holder of an Allowed Claim, by accepting distributions pursuant to this Plan, shall be deemed to have consented to the injunction provisions set forth in this Section 10.7.**

**Notwithstanding anything to the contrary contained herein, for the avoidance of doubt, any and all claims or objections that may be asserted against any Professionals in connection with their requests for Professional Fees incurred through the Effective Date are expressly reserved hereunder.**

Section 10.8 *Term of Bankruptcy Injunction or Stays*

All injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence as of the Confirmation Date, shall remain in full force and effect until the Effective Date.

Section 10.9 *Limitation on Release and Exculpation Provisions*

(a) Notwithstanding any other provision in this Plan or any order or opinion issued by the Court related thereto, including but not limited to Sections 10.5, 10.6 and 10.7 herein, nothing contained herein, in the Confirmation Order, or in any other order or opinion of this Court related to the Plan or the Confirmation Order shall alter, conflict with, or in any manner derogate from the provisions of the Sale Order. Without in any way limiting the generality of the foregoing, the rights, remedies, causes of action and claims of the Agent, the Prepetition Lenders and their Affiliates inter se in the State Court Proceeding or otherwise are preserved and shall not be released, enjoined or limited in any respect by the Plan or the Confirmation Order. Furthermore, notwithstanding any other provision in this Plan, the Confirmation Order, or any other order or opinion of this Court related to the Plan or the Confirmation Order, including but not limited to Sections 10.5, 10.6 and 10.7 hereof, nothing in the Plan, the Confirmation Order or any other order or opinion issued by the Court related to the Plan or the Confirmation Order shall constitute a finding by this Court of any kind regarding (i) any Prepetition Lender or its Representatives with respect to its or its Representatives' respective rights, remedies, causes of action and claims vis-à-vis any other Prepetition Lender or its Representatives under the Prepetition Credit Agreement or the Prepetition Loan Documents or any other party to the State Court Proceeding or (ii) any action or transaction that is the subject of the State Court Proceeding. Nothing in the Plan, including this paragraph, shall limit the efficacy of Paragraph K of the Sale Order in these chapter 11 proceedings, the State Court Proceeding, or any other proceeding.

(b) Nothing in the Plan or Confirmation Order, including, but not limited to, Article XI of the Plan, shall discharge, release, or preclude: (i) any liability to a Governmental Unit that is not a Claim; (ii) any Claim of a Governmental Unit arising on or after the Confirmation Date; (iii) any liability to a Governmental Unit on the part of any Person or Entity other than the Debtors or Reorganized Debtors; (iv) any valid right of setoff or recoupment by a Governmental Unit; (v) any liability of the Debtors or Reorganized Debtors under environmental law to any

governmental unit as the owner or operator of property that such entity owns or operates after the Confirmation Date; or (vi) any criminal liability. Nothing in the Plan or Confirmation Order shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence. The discharge and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, after the Confirmation Date, pursuing any police or regulatory action. Nothing contained in the Plan or Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtors and the Liquidating Trust, nor shall the Plan or Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of this Plan.

## ARTICLE XI

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date or anything to the contrary in this Plan or the Plan Supplement, the Bankruptcy Court shall retain exclusive jurisdiction over all matters related to this Plan, the Confirmation Order, the Liquidating Trust Agreement, the Tax Indemnification Agreement and the Chapter 11 Cases to the fullest extent permitted by law, including without limitation such jurisdiction as is necessary to ensure that the purposes and intent of this Plan are carried out, including for the following specific purposes:

(a) To hear and determine any applications or motions pending on the Effective Date for the rejection, assumption or assumption and assignment of any executory contract and to hear and determine the allowance or disallowance of Claims resulting therefrom;

(b) To hear and determine any motion, adversary proceeding, application, contested matter or other litigated matter arising in or related to the Chapter 11 Cases pending on or commenced after the Confirmation Date;

(c) To ensure that distributions to Holders of Allowed Claims are accomplished as provided herein;

(d) To hear and determine objections to Claims, including ruling on any and all motions to estimate Claims;

(e) To allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

(f) To enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(g) To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with

the consummation, implementation or enforcement of this Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(h)     To hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary carry our the purposes and effects thereof;

(i)     To hear and determine any and all applications for allowances and payment of Professional Fees and the reasonableness of Professional Fees authorized to be paid or reimbursed under the Bankruptcy Code for this Plan for periods ending on or before the Effective Date;

(j)     To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of this Plan, the Liquidating Trust Agreement, the Confirmation Order, the Tax Indemnification Agreement, the Letter of Credit, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(k)     To take any action and issue such orders as may be necessary to construe, enforce, implement, execute and consummate this Plan or maintain the integrity of this Plan following consummation of this Plan;

(l)     To hear and determine other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     To hear and determine all matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code filed, or to be filed, with respect to tax returns for any and all applicable periods);

(n)     To issue such orders in aid of execution of this Plan as may be authorized by section 1142 of the Bankruptcy Code;

(o)     To adjudicate all claims or controversies to a security or ownership interest in the Estate Assets or in any proceeds thereof;

(p)     To resolve any cases, controversies, suits or disputes with respect to the releases, injunctions and other provisions contained in Article X hereof and to enter such orders as may be necessary or appropriate to implement such release, injunctions or other provisions;

(q)     To consider and act on the compromise and settlement of any Claim against or Cause of Action by or against a Debtor, the Chapter 11 Trustee, the Liquidating Trustee or the Reorganized Debtors arising under or in connection with this Plan;

(r)     To hear and determine any Director and Officer Causes of Action or Avoidance Actions brought by the Liquidating Trustee or the Reorganized Debtors;

(s) To hear and determine any request by the Liquidating Trustee or the Reorganized Debtors for discovery pursuant to Bankruptcy Rule 2004 or otherwise;

(t) To determine such other matters or proceedings as may be provided for under the Bankruptcy Code, the Bankruptcy Rules, other applicable law, this Plan or in any order or orders of the Bankruptcy Court, including but not limited to the Confirmation Order or any order which may arise in connection with this Plan or the Confirmation Order;

(u) To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code;

(v) To recover all Estate Assets and property of the Debtors' Estates wherever located; and

(w) To enter a Final Decree closing the Chapter 11 Cases.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

Section 12.1 *Payment of Statutory Fees*

All fees due and payable under section 1930 of title 28 and section 3717 of title 31 of the United States Code, as of the Confirmation Date and as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date. Until the entry of a Final Decree closing the Chapter 11 Cases, dismissal of the Chapter 11 Cases, or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, the Reorganized Debtors shall pay all fees due and payable under section 1930 of title 28 and section 3717 of title 31 of the United States Code.

Section 12.2 *Reports*

Until the entry of a Final Decree closing the Chapter 11 Cases, dismissal of the Chapter 11 Cases, or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, the Reorganized Debtors shall comply with any requisite reporting requirements established pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, or the U.S. Trustee's chapter 11 operating guidelines.

Consistent with Section 5.3 herein, upon the Effective Date, the Chapter 11 Trustee shall be relieved of his duties and obligations to the estate under the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules; provided, however, that the Chapter 11 Trustee shall not be relieved of his obligation to file a final report or a report of his investigations under section 1106 of the Bankruptcy Code.

Section 12.3 *Governing Law*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law, rule or regulation is applicable, or to the extent that an exhibit or supplement to this Plan

provides otherwise, this Plan shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to the principles of conflict of laws thereof that would require application of the law of another jurisdiction.

Section 12.4 *Severability*

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of BDCM, shall have the power to alter and interpret such term or provision to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

Section 12.5 *Inconsistency*

In the event of any inconsistency among this Plan, the Disclosure Statement, the Plan Documents, any exhibit or schedule to this Plan, or any other instrument or document created or executed pursuant to this Plan, the provisions of this Plan shall govern.

Section 12.6 *Exemption from Transfer Taxes*

Pursuant to section 1146(a) of the Bankruptcy Code (a) the issuance of the Reorganized Debtors Stock, (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest, (c) the making or assignment of or surrender of any lease or sublease, or (d) the making of or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, and any merger agreements, agreements of restructuring, disposition, liquidation or dissolution, any deeds, bills of sale, transfers of tangible property, or assignments executed in connection with any disposition of assets contemplated by this Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.

Section 12.7 *Filing of Additional Documents*

BDCM shall File such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

Section 12.8 *Service of Documents*

(a) All notices, requests and demands to or upon BDCM to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered (or, in the case of notice by facsimile transmission, when received and telephonically confirmed) addressed as follows:

Black Diamond Capital Management, L.L.C.

One Sound Shore Drive, Suite 200
Greenwich, CT 06830
Telephone: 203-552-0888
Facsimile: 203-621-3316
Attn: Samuel Goldfarb, General Counsel

(b) All notices, requests and demands to or upon the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered (or, in the case of notice by facsimile transmission, when received and telephonically confirmed) addressed as set forth in the Confirmation Order.

(c) All notices, requests and demands to or upon the Liquidating Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered (or, in the case of notice by facsimile transmission, when received and telephonically confirmed) addressed as set forth in the Liquidating Trust Agreement.

Section 12.9 *Schedules and Exhibits*

All exhibits and schedules to this Plan, including, but not limited to the Plan Supplement, are incorporated into and are a part of this Plan as if fully set forth herein.

Section 12.10 *No Prejudice*

If the Confirmation Order is vacated or the Effective Date has not occurred within one year after the Confirmation Date, then (a) the Confirmation Order shall be vacated, (b) this Plan shall be null and void in all respects, (c) no distributions under this Plan shall be made, (d) the Debtors and all Holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date and (e) nothing contained in this Plan or the Disclosure Statement shall: (i) be deemed to constitute a waiver or release of any Claims against, or Equity Interests in, the Debtors; (ii) prejudice in any manner the rights of BDCM or the Debtors; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtors or BDCM in any respect.

Section 12.11 *Allocation of Payments*

To the extent that any Allowed Claim entitled to distribution hereunder comprises indebtedness and accrued but unpaid interest thereon, such distribution shall, for all income tax purposes, be allocated to the principal amount of such Claim first, and then, to the extent that the consideration exceeds such principal amount, to the portion of such Claim representing accrued but unpaid interest.

Dated: February 14, 2012

Respectfully submitted,

**BLACK DIAMOND CAPITAL MANAGEMENT, L.L.C.**

By: */s/ Stephen H. Deckoff*
Name: Stephen H. Deckoff
Title: Managing Principal

**Exhibit A**

**Management Contracts**

1. Collateral Management Agreement, dated November 28, 2006, between Cetus ABS CDO 2006-3, Ltd. and GSCP (NJ), L.P.

2. Collateral Management Agreement, dated December 15, 2006, among GSC European CDO I-R S.A., GSCP (NJ), L.P. and BNP Paribas Trust Corporation UK Limited and Deed of Amendment to the Collateral Management Agreement, dated February 1, 2007.

3. Collateral Management Agreement, dated June 29, 2005, among GSC European CDO II S.A., GSCP (NJ), L.P. and BNP Paribas Trust Corporation UK Limited.

4. Collateral Management Agreement, dated January 18, 2007, between GSC ABS Funding CDO 2006-3g, Ltd., and GSCP (NJ), L.P.

5. Collateral Management Agreement, dated May 11, 2007, between Squared CDO 2007-1, Ltd. and GSCP (NJ), L.P.

# Exhibit B

## BDCM Loan Term Sheet

SUMMARY OF CERTAIN TERMS
SENIOR CREDIT FACILITY

Unless otherwise defined herein, capitalized terms used herein are used as defined in the Black Diamond Capital Management Fourth Amended Joint Chapter 11 Plan for GSC Group, Inc. and its Affiliated Debtors to which this Summary is appended ("Plan")

| | |
|---|---|
| Borrower: | GSC Group, Inc. (the "Borrower" and together with its affiliated debtors in the Bankruptcy Case, the "Debtors"). |
| Total Facility: | Term loan facility (the "Credit Facility") in an aggregate principal amount of up to $2,000,000 million. |
| Use of Proceeds: | The proceeds of loans under the Credit Facility shall be utilized to satisfy the obligations of Debtors under the Plan to make distributions to holders of allowed Priority Tax Claims, allowed Secured Claims, allowed Other Priority Claims and allowed General Unsecured Claims (collectively, the "Allowed Claims") and the Disputed General Unsecured Claims Cash Reserve, in each case in accordance with the terms of the Plan. |
| Maturity: | The final maturity of the Credit Facility shall be 6 years from the Closing Date (the "Revolving Loan Maturity Date"). Upon the Revolving Loan Maturity Date, at the election of Borrower, the balance of the Credit Facility, including principal, accrued interest and interest that has been paid-in-kind, may be converted into Reorganized GSC Group Series A Preferred Stock, as described in Exhibit C below. |
| Availability: | The Credit Facility may be drawn to fund Allowed Claims as they come due pursuant to the terms of the Plan following the payment of Allowed Claims from Plan Cash (as defined in the Plan). |
| Lender: | BDCM and/or an Affiliate (collectively, the "Lenders"). |
| Guarantees: | Each present and future direct and indirect subsidiary of the Borrower (each, a "Guarantor" and, collectively, the "Guarantors") that is not a "controlled foreign corporation" ("CFC") for income tax purposes or owned by a CFC shall be required to provide an unconditional guaranty of all amounts owing under the Credit Facility (the "Guaranties"). Such guarantees shall be in form and substance satisfactory to the Lenders. All guarantees shall be guarantees of payment and not of collection.<br><br>The Guaranties shall contain terms and conditions satisfactory to the Lenders and customary for loans of this type. |

Security: All amounts owing under the Credit Facility (and all obligations under the Guaranties) will be secured by (i) a first priority perfected security interest in all stock, equity interests and promissory notes owned by the Borrower and the Guarantors and (ii) a first priority perfected security interest in all other tangible and intangible assets (including receivables, contract rights, securities, patents, trademarks, other intellectual property, inventory, equipment, real estate and leasehold interests) owned by the Borrower and each Guarantor; provided that a pledge of the voting stock of a CFC shall be limited to 65% of such stock.

All documentation (collectively referred to herein as the "Security Agreements") evidencing the security required pursuant to the immediately preceding paragraph shall be in form and substance satisfactory to the Lenders, and shall effectively create first priority security interests in the property purported to be covered thereby, with such exceptions as are acceptable to the Lenders in their reasonable discretion.

Voluntary Prepayments: Voluntary prepayments may be made at any time on three business days' notice, without premium.

Interest Rate: The Credit Facility shall bear interest at 5% per annum.

Interest on the Credit Facility shall be payable monthly in arrears on the last business day of each month. Interest will also be payable at the time of repayment in full of the Loan and at Maturity. All interest and fees shall be based on a 360-day year and the actual days elapsed.

At the election of the Borrower, interest may be paid-in-kind for the term of the loan.

Default Interest: Upon a default, all principal, interest and other amounts owing shall bear interest at a rate per annum equal to 2% above the applicable non-default rate. Such interest shall be payable on demand.

Assignments and Participations: The Borrower may not assign its rights or obligations under the Credit Facility. Any Lender may assign, and may sell participations in, its rights and obligations under the Credit Facility, subject to (x) the consent of BDCM, (y) in the case of participations, to customary restrictions on the voting rights of the participants, and (z) in the case of assignments, to such limitations as may be established by BDCM. The Credit Facility shall provide for a mechanism that allows for each assignee to become a direct

signatory to the Credit Facility and will relieve the assigning Lender of its obligations with respect to the assigned portion of its commitment.

Documentation; Governing Law: The Lenders' commitments are subject to the negotiation, execution and delivery of definitive financing agreements (and related security documentation, guarantees, etc.) consistent with the terms of this Term Sheet, in each case prepared by counsel to the Lenders (including, without limitation, as to the terms, conditions, representations, covenants and events of default contained therein). All documentation (except security documentation that the Lenders determine should be governed by local law) shall be governed by the internal laws of the State of New York.

Commitment Termination: The commitments hereunder shall terminate on [ ] unless definitive documentation with respect to the Credit Facility has been executed and delivered and the Plan has been confirmed as of such date.

Conditions Precedent: Those conditions precedent that are usual and customary for these types of facilities, and such additional conditions precedent as are appropriate under the circumstances. Without limiting the foregoing, the following conditions shall apply:

(i) The Plan shall have been approved by all necessary parties and confirmed by the court in the Bankruptcy Case.

(ii) After giving effect to the consummation of the Plan, the Borrower and its subsidiaries shall not have any outstanding preferred equity, indebtedness or contingent liabilities, except for (i) indebtedness incurred pursuant to the Credit Facility, (ii) Reorganized Debtor Preferred Stock and (iii) other indebtedness which may be approved by the Lenders (in their sole discretion) ("Existing Indebtedness"). If any Existing Indebtedness is permitted to be outstanding after giving effect to the Plan, all terms and conditions thereof shall be required to be reasonably satisfactory to the Lenders in their sole discretion.

(iii) All necessary governmental (domestic and foreign), Bankruptcy Court and third party orders, approvals and consents in connection with the Plan and otherwise referred to herein shall have been obtained and remain in effect, and all applicable waiting periods shall have expired without any action being taken by any competent authority which, in the judgment of the Lenders, restrains, prevents, or imposes materially adverse conditions upon, the consummation of the Plan or otherwise referred to herein. Additionally, there shall not exist any

judgment, order, injunction or other restraint prohibiting or imposing materially adverse conditions upon the Plan or the Senior Financing.

(iv) All agreements relating to, and the corporate and capital structure of, the Borrower and its subsidiaries, and all organizational documents of the Borrower and its subsidiaries, in each case as the same will exist after giving effect to the consummation of the Plan, shall be satisfactory to the Lenders.

(v) After giving effect to the Plan and the indebtedness incurred in connection with the Credit Facility, there shall be no conflict with, or default under, any agreement of the Borrower and its subsidiaries, subject to such exceptions as may be agreed upon.

(vi) The Guaranties and Security Agreements required hereunder shall have been executed and delivered in form, scope and substance reasonably satisfactory to the Lenders, and the Lenders shall have a first priority perfected security interest in all assets of the Borrower and its subsidiaries.

(vii) The documents (and related orders of the Bankruptcy Court) relating to the Debtors shall contain terms and provisions acceptable to Lenders in their sole discretion.

(viii) The Plan shall have been confirmed by a final order entered by the Bankruptcy Court (the "Sale Order"), in form and substance acceptable to the Lenders in their sole discretion, and which has not been stayed by the Bankruptcy Court or by any other court having jurisdiction to issue any such stay.

(ix) All representations and warranties shall be true and correct on and as of the date of the borrowing (although any representations and warranties which expressly relate to a given date or period shall be required to be true and correct as of the respective date or for the respective period, as the case may be), before and after giving effect to such borrowing and to the application of the proceeds therefrom, as though made on and as of such date.

(x) No event of default under the Credit Facility or event which with the giving of notice or lapse of time or both would be an event of default under the Senior Credit Facility, shall have occurred and be continuing, or would result from such borrowing.

<u>Representations and Warranties</u>: Those representations and warranties, which are usual and customary for these types of facilities, and such additional representations and warranties as are appropriate under the circumstances.

<u>Covenants</u>: Those covenants usual and customary for these types of facilities, and such additional covenants as are appropriate under the circumstances (with customary exceptions to be agreed upon). Although the covenants have not yet been specifically determined, we anticipate that the other covenants shall in any event include, but not be limited to:

(i) Prohibitions against dividends or other distributions with respect to any equity of the Borrower.

(ii) Limitations on other indebtedness (including contingent liabilities and seller notes).

(iii) Limitations on mergers, acquisitions, joint ventures, partnerships and acquisitions and dispositions of assets.

(iv) Limitations on voluntary prepayments of other indebtedness and amendments thereto, and amendments to organizational documents and other material agreements.

(v) Limitations on transactions with affiliates and formation of subsidiaries.

(vi) Limitations on (x) investments (including joint ventures) and (y) use of cash and Cash Equivalents at any time the Credit Facility is outstanding.

(vii) Limitations on liens.

(viii) Limitations on capital expenditures.

(ix) Financial reporting, notice of environmental, ERISA- related matters and material litigation and visitation and inspection rights.

(x) Compliance with laws, including environmental and ERISA.

(xi) Payment of taxes and other liabilities.

(xii) Limitation on changes in nature of business.

(xiii) Use of proceeds.

(xiv) Prohibitions on direct or indirect change of control.

<u>Events of Default</u>: Those events of default usual and customary for these types of facilities, and such additional events of default as are appropriate under the circumstances, including, without limitation, a change of control (to be defined to the reasonable satisfaction of the Lenders) of the Borrower or any of its subsidiaries.

<u>Indemnification</u>: The documentation for the Credit Facility will contain customary indemnities for the Lenders (other than as a result of the Lender's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable decision).

**Exhibit C**

Summary Principal Terms of Series A Preferred Stock, Series B Preferred Stock, Convertible Class B Common Stock and Class C Common Stock

**Series A Preferred Stock**

Name of Security

- Series A Cumulative Preferred Stock (the "Series A Preferred Stock").

Ranking

- The Series A Preferred Stock shall rank senior in all liquidation and dividends to all of the Company's Series B Preferred Stock and common stock.

Dividends

- Holders of Series A Preferred Stock shall be entitled to receive, when declared by the Company's board of directors (the "Board") or a duly authorized committee thereof and out of legally available funds, cumulative quarterly dividends at an annual rate of 10% on the Liquidation Preference thereof.
- Dividends will accrue on a daily basis from the date such shares are issued, shall compound quarterly calculated on the basis of a 360-day year of twelve 30-day months, and shall be payable in arrears on the 25th day of January, April, July and October of each year.
- Dividends are payable in cash or, at the election of the Board, by increasing the Liquidation Preference in an amount equal to the unpaid dividend, or unpaid portion thereof. If any dividend is not paid in full and in cash on the applicable dividend payment date, the Board shall be deemed to have elected to make payment of such dividend, or unpaid portion thereof, by causing an amount equal to the unpaid dividend, or portion thereof, to be added to the Liquidation Preference.
- No dividends, share repurchases or other distributions may be declared, made or paid on any common stock or other junior security of the Company nor may any common stock or other junior security of the Company be redeemed, purchased or otherwise acquired for any consideration by the Company until redemption of the Series A Preferred Stock (other than for cashless option exercises and other typical carveouts).

Liquidation Preference

- Upon a liquidation, dissolution or winding up of the Company, subject to the payment or provision for payment of the debts and other liabilities of the Company, each share of Series A Preferred

Stock shall be entitled to receive, out of the remaining assets of the Company available for distribution to its stockholders, an amount equal to the Liquidation Preference thereof, before any distribution shall be made to the holders of Series B Preferred Stock, common stock or any other junior security of the Company.

- The "Liquidation Preference" shall be an amount equal to the amount of the Credit Facility, including all principal and interest, including PIK'd interest, thereupon, as of the Revolving Loan Maturity Date.

All shares of Series A Preferred Stock will receive their respective Liquidation Preferences on a pari passu basis. If the liquidation payments on all shares of Series A Preferred Stock cannot be paid in full, then the available funds shall be distributed ratably among the holders of the Series A Preferred Stock.

Redemption

- The Company will have the option to redeem all or any of the Series A Preferred Stock for cash at any time upon at least 30 but not more than 60 days' notice.
- If less than all shares of Series A Preferred Stock are to be redeemed, such redemption will be ratable among the holders of Series A Preferred Stock.

Payment Default

- In the event the Company fails to comply with any of its payment obligations under the terms of the Series A Preferred Stock (subject to a reasonable cure period to be determined), holders of Series A Preferred Stock as a class will have the right to elect one director to the Board, and such director shall be entitled to serve for so long as such default remains uncured or unwaived. For purposes hereof, the payment of dividends through an increase in Liquidation Preference, as provided above, shall not be considered a failure by the Company to comply with its payment obligations under the terms of the Series A Preferred Stock.

Voting; Amendments; Waivers

- Holders of Series A Preferred Stock, in their capacity as such, shall have no voting rights except as required by law, or as noted below.
- Non-economic amendments/waivers to the Series A Preferred Stock will require majority approval.

Economic amendments/waivers to the Series A Preferred Stock will require 100% approval.

**Series B Preferred Stock**

Name of Security

- Series B Cumulative Preferred Stock (the "Series B Preferred Stock").

Ranking

- The Series B Preferred Stock shall rank senior in all liquidation and dividends to all of the Company's common stock, but junior to the Company's Series A Preferred Stock.

Dividends

- Holders of Series B Preferred Stock shall be entitled to receive, when declared by the Board or a duly authorized committee thereof and out of legally available funds, cumulative quarterly dividends at an annual rate of 5% on the Liquidation Preference thereof.
- Dividends will accrue on a daily basis from the date such shares are issued, shall compound quarterly calculated on the basis of a 360-day year of twelve 30-day months, and shall be payable in arrears on the 25th day of January, April, July and October of each year.
- Dividends are payable in cash or, at the election of the Board, by increasing the Liquidation Preference in an amount equal to the unpaid dividend, or unpaid portion thereof. If any dividend is not paid in full and in cash on the applicable dividend payment date, the Board shall be deemed to have elected to make payment of such dividend, or unpaid portion thereof, by causing an amount equal to the unpaid dividend, or portion thereof, to be added to the Liquidation Preference.
- No dividends, share repurchases or other distributions may be declared, made or paid on any common stock or other junior security of the Company nor may any common stock or other junior security of the Company be redeemed, purchased or otherwise acquired for any consideration by the Company until redemption of the Series B Preferred Stock (other than for cashless option exercises and other typical carveouts).

Liquidation Preference

- Upon a liquidation, dissolution or winding up of the Company, subject to the payment or provision for payment of the debts and other liabilities of the Company, each share of Series B Preferred Stock shall be entitled to receive, out of the remaining assets of the Company available for distribution to its stockholders, an amount equal to the Liquidation Preference thereof, before any distribution shall be made to the holders of common stock or any

| | |
|---|---|
| | other junior security of the Company. |
| | • The "Liquidation Preference" shall be an amount equal to the lesser of (i) the face amount of the applicable stockholder's Allowed General Unsecured Claim and (ii) a pro rata portion of 80% of the Company's net asset value as of the Effective Date of the Black Diamond Capital Management Joint Chapter 11 Plan of Reorganization for the Company ("Effective Date"), which net asset value will be determined by third-party valuation within 120 days after the Effective Date. |
| | • All shares of Series B Preferred Stock will receive their respective Liquidation Preferences on a pari passu basis. If the liquidation payments on all shares of Series B Preferred Stock cannot be paid in full, then the available funds shall be distributed ratably among the holders of the Series B Preferred Stock. |
| Redemption | • The Company will have the option to redeem all or any of the Series B Preferred Stock for cash at any time upon at least 30 but not more than 60 days' notice. |
| | • If less than all shares of Series B Preferred Stock are to be redeemed, such redemption will be ratable among the holders of Series B Preferred Stock. |
| Payment Default | • In the event the Company fails to comply with any of its payment obligations under the terms of the Series B Preferred Stock (subject to a reasonable cure period to be determined), holders of Series B Preferred Stock as a class will have the right to elect one director to the Board, and such director shall be entitled to serve for so long as such default remains uncured or unwaived. For purposes hereof, the payment of dividends through an increase in Liquidation Preference, as provided above, shall not be considered a failure by the Company to comply with its payment obligations under the terms of the Series B Preferred Stock. |
| Voting; Amendments; Waivers | • Holders of Series B Preferred Stock, in their capacity as such, shall have no voting rights except as required by law, or as noted below. |
| | • Non-economic amendments/waivers to the Series B Preferred Stock will require majority approval. |
| | • Economic amendments/waivers to the Series B Preferred Stock will require 100% approval. |

**<u>Convertible Class B Common Stock</u>**

Name of Security

- Convertible Class B Common Stock

Voting

- Subject to the limitations described under "Transfer Restrictions" and "Voting Restrictions" below, each share of Convertible Class B Common Stock will be entitled to a fractional vote per share such that the total votes represented by the shares of Convertible Class B Common Stock issued to Unsecured Creditors shall equal 24.9% of all votes that may be cast by holders of Common Stock eligible to vote.
- By comparison, subject to the limitations described under "Transfer Restrictions" and "Voting Restrictions" below, but otherwise consistent with the existing terms of such securities, each share of Class A Common Stock will be entitled to 3 votes per share. Collectively, the Class A Common Stock, the Convertible Class B Common Stock and the Class C Common Stock comprise the Company's "Common Stock."
- Except as required by law, all shares of Common Stock shall vote together as a single class and their votes shall be counted and totaled together on all matters submitted to a vote of the stockholders of the Company.

Economic Rights

- All shares of Common Stock, regardless of class or series, will have pari passu economic rights.
- Notwithstanding the foregoing, dividends or distributions payable in Common Stock will be payable to holders of Convertible Class B Common Stock in respect thereof in additional shares of Convertible Class B Common Stock.

Conversion

- At the election of the Board in its sole discretion at any time after having obtained the affirmative vote or written consent of holders of at least 51% of the Class A Common Stock, each share of Convertible Class B Common Stock will be converted into one share of Class A Common Stock.
- At the election of a majority of the outstanding shares of the Convertible Class B Common Stock, each share of Convertible Class B Common Stock will be converted into one share of Class C Common Stock (the "Class B Conversion").

Transfer Restrictions

- Transfer Restrictions Generally. The transfer restrictions generally will restrict any direct or indirect transfer of Common Stock if the effect could, in the judgment of the Board, reasonably be expected to result in either:

  1. an "ownership change" of the Company within the meaning of Section 382 of the Internal Revenue Code (an "NOL Event"); or

  2. an "assignment" of any investment advisory contract to which the Company or any of its subsidiaries is a party within the meaning of the Investment Advisers Act of 1940, the Investment Company Act of 1940, the related rules promulgated under either such statute and/or interpretations of such statutes or rules by the staff of the Securities and Exchange Commission (an "Assignment Event"); provided that following the occurrence of a Class B Conversion, transfers or prospective transfers will no longer be restricted solely due to the potential to result in an Assignment Event.

  Complicated rules of constructive ownership, aggregation, segregation, combination and other stock ownership rules arising under the Internal Revenue Code, and similarly complicated rules regarding the determination of direct or indirect power to vote stock arising under federal securities laws, will determine whether any proposed or purported transfer could result in an NOL Event or an Assignment Event. Accordingly, the term "transfer" will be defined broadly to include all direct or indirect transfers of economic and/or voting rights in respect of Common Stock, including transfers that result from the transfer of interests in other entities that own Common Stock.

  The transfer restrictions will include the right of the Board to require a proposed transferee, as a condition to registration of a transfer of Common Stock, to provide to the Board all information reasonably requested regarding such person's direct and indirect ownership of Common Stock. The transfer restrictions may result in the delay or refusal of certain requested transfers of Common Stock, and could result in prohibiting ownership (thus requiring dispositions) of stock of the Company as a result of a change in the relationship between two or more persons or entities, or of a transfer of an interest in an entity other than the Company.

- Consequences of Prohibited Transfers. Upon adoption of the transfer restrictions, any direct or indirect transfer attempted in violation of the restrictions would be void as of the date of the

purported transfer as to the purported transferee (or, in the case of an indirect transfer, the ownership of the direct owner of Common Stock would terminate simultaneously with the transfer), and the purported transferee (or in the case of any indirect transfer, the direct owner) would not be recognized as the owner of the shares owned in violation of the restrictions for any purpose, including for purposes of voting and receiving dividends or other distributions in respect of such stock. Shares of Common Stock acquired in violation of the transfer restrictions are referred to herein as “Excess Stock.”

In addition to the purported transfer being void as of the date of the purported transfer, the Board may, but shall not be obligated to, require the purported transferee to transfer the Excess Stock to the Company’s agent along with any dividends or other distributions paid with respect to such Excess Stock. The Company’s agent would thereafter be required to sell such Excess Stock in an arms’ length transaction (or series of transactions) that would not constitute a violation under the transfer restrictions. The net proceeds of the sale, together with any other distributions with respect to such Excess Stock received by the Company’s agent, after deduction of all costs incurred by the agent, will be distributed first to the purported transferee in an amount, if any, equal to the cost (or in the case of gift, inheritance or similar transfer, the fair market value of the Excess Stock on the date of the violative transfer) incurred by the purported transferee to acquire such Excess Stock, and the balance of the proceeds, if any, will be distributed to a charitable beneficiary. If the Excess Stock is sold by the purported transferee, such person will be treated as having sold the Excess Stock on behalf of the Company’s agent, and will be required to remit all proceeds to the agent (except to the extent the Company grants written permission to the purported transferee to retain an amount not to exceed the amount such person otherwise would have been entitled to retain had the Company’s agent sold such shares).

In addition, the Board may, but shall not be obligated to, redeem any Excess Stock for the fair market value thereof, as such value may be determined by the Board in good faith.

Any stockholder who knowingly violates the transfer restrictions will be liable for any and all damages suffered by the Company as a result of such violation, including damages resulting from an NOL Event or (if such transfer occurred prior to the occurrence of a Class B Conversion) an Assignment Event.

- Modification and Waiver of Transfer Restrictions. The Board will

have the discretion to approve a transfer of stock that would otherwise violate the transfer restrictions. As a condition to granting an exemption from the transfer restrictions, the Board may require an opinion of counsel (the cost of which will be borne by the transferor and/or the transferee) that the transfer will not result in an NOL Event or (if such transfer is to occur prior to the occurrence of a Class B Conversion) an Assignment Event. The Board may establish, modify, amend or rescind by-laws, regulations and procedures for purposes of determining whether any transfer of stock of the Company could reasonably be expected to result in either an NOL Event or an Assignment Event.

Voting Restrictions

- As an additional protection against an Assignment Event, in the event that any holder of equity securities of the Company acquires, directly or indirectly, beneficial voting power in excess of 24.9% of the voting power of all outstanding equity securities of the Company without the express consent of the Board, then, notwithstanding the rights, preferences and privileges otherwise represented by such equity securities, such holder shall be entitled to cast not more than 24.9% of the votes cast on any matter submitted to a vote of the stockholders of the Company. The foregoing restrictions will not apply to any holder that establishes to the Board's satisfaction, prior to the Effective Time, that such holder controls 25% or more of the voting power of all outstanding equity securities of the Company as of and immediately after the Effective Time; provided that such voting restrictions shall terminate upon the occurrence of a Class B Conversion.

- The Board will have the discretion to waive the voting restrictions with respect to a holder of equity securities. As a condition to granting an exemption from the voting restrictions, the Board may require an opinion of counsel (the cost of which will be borne by the transferor and/or the transferee) that the grant of such waiver will not result in an Assignment Event.

**Class C Common Stock**

Name of Security

- Class C Common Stock

Voting

- Subject to the limitations described under "Transfer Restrictions" and "Voting Restrictions" below, each share of Class C Common Stock will be entitled to a number of votes per share such that the total votes represented by the shares of Class C Common Stock issued upon conversion of the shares of the Convertible Class B Common Stock shall equal 49% of all votes that may be cast by holders of Common Stock eligible to vote.
- By comparison, subject to the limitations described under "Transfer Restrictions" and "Voting Restrictions" below, but otherwise consistent with the existing terms of such securities, each share of Class A Common Stock will be entitled to 3 votes per share.
- Except as required by law, all shares of Common Stock shall vote together as a single class and their votes shall be counted and totaled together on all matters submitted to a vote of the stockholders of the Company.

Economic Rights

- All shares of Common Stock, regardless of class or series, will have pari passu economic rights.
- Notwithstanding the foregoing, dividends or distributions payable in Common Stock will be payable to holders of Class C Common Stock in respect thereof in additional shares of Class C Common Stock.

Conversion

- At the election of the Board in its sole discretion at any time after having obtained the affirmative vote or written consent of holders of at least 51% of the Class A Common Stock, each share of Convertible Class C Common Stock will be converted into one share of Class A Common Stock.

Transfer Restrictions

- <u>See "Transfer Restrictions" under summary of terms for the Convertible Class B Common Stock above.</u>

Voting Restrictions

- <u>See "Transfer Restrictions" under summary of terms for the Convertible Class B Common Stock above.</u>